IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

FILED CLERK
U.S. DISTRICT COURT

04 NOV 23  AM II: 23

TEXAS-EASTERN

BY *Taya M. Ewie*

| | |
|---|---|
| **BILLY JOE WARDLOW,** § | |
| § | |
| Petitioner, § | |
| § | |
| § | NO. 4:04 CV 408 |
| -v- § | *Judge Richard Schell* |
| § | |
| § | |
| § | |
| **DOUGLAS DRETKE, Director, Texas** § | |
| **Department of Criminal Justice,** § | **CAPITAL CASE** |
| **Institutional Division,** § | |
| § | |
| Respondent. § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

**MANDY WELCH**
TBA No. 21125380
412 Main Street, Suite 1100
Houston, Texas 77007
(713) 516-5229
(713) 893-2500 fax

**RICHARD BURR**
TBA No. 24001005
412 Main Street, Suite 1100
Houston, Texas 77002
(713) 628-3391
(713) 893-2500 fax

**COUNSEL FOR BILLY JOE WARDLOW**

## Table of Contents

I.      INTRODUCTION ........................................................................... 1

II.     JURISDICTION ............................................................................ 2

III.    PROCEDURAL HISTORY ........................................................... 2

IV.     STATEMENT OF FACTS

        A.      Evidence in the guilt phase of the trial ................................................. 4

        B.      Evidence in the penalty phase of the trial ............................................. 7

        C.      Information about Billy Joe Wardlow's background and the
                circumstances surrounding the offense that was available but not
                investigated and thus not presented at trial. ....................................... 13

V.      CLAIMS FOR RELIEF

        A.      The State obtained Mr. Wardlow's confession in violation of his rights
                under the Fifth, Sixth, and Fourteenth Amendments. .......................... 21

                1.      Relevant Facts ..................................................................... 21

                2.      Rulings by Trial Court ........................................................ 28

                3.      Ruling on Direct Appeal ..................................................... 28

                4.      Legal Basis for the Claim ................................................... 29

                5.      This Error Is Not Harmless ................................................ 36

                6.      The State Court's Rulings Deserve No Deference ................... 37

        B.      Mr. Wardlow was deprived of effective assistance of counsel on direct
                appeal. ............................................................................................. 38

                1.      Relevant Facts ..................................................................... 38

                2.      Legal Basis for Claim ......................................................... 39

3.    The State Court's Rulings Deserve No Deference ................................... 40

C.    The State's pretrial plea offer to Tonya Fulfer deprived Mr. Wardlow of
      due process and a fair trial in violation of the Sixth, Eighth, and Fourteenth
      Amendments of the U.S. Constitution. ............................................... 40

      1.    Relevant Facts ........................................................ 40

      2.    Legal Basis for Claim ................................................ 45

      3.    This Error Is Not Harmless ........................................... 48

      4.    The State Court's Rulings Deserve No Deference ....................... 48

D.    The State violated Mr. Wardlow's Fifth, Eighth, and Fourteenth
      Amendment rights when the district attorney failed to disclose to the
      defense that Ms. Fulfer's version of the offense and her anticipated
      testimony corroborated Mr. Wardlow's second confession letter and his
      trial testimony. .................................................................. 49

      1.    Relevant Facts ........................................................ 49

      2.    Legal Basis for Claim ................................................ 50

      3.    The State Court's Rulings Deserve No Deference ....................... 52

E.    Mr. Wardlow was deprived of the effective assistance of counsel as a
      result of acts and omissions of his trial counsel. ................................ 53

      1.    Introduction .......................................................... 53

      2.    Trial Counsel Did Not Conduct a Reasonable Investigation of
            Mitigating Evidence and Unreasonably Failed to Present Available
            Mitigating Evidence at the Penalty Phase of the Trial. ................ 54

            a.    Facts Relevant to the Claim ...................................... 54

            b.    Legal Basis for the Claim ......................................... 60

      3.    Trial counsel failed to provide the consulting mental health expert
            with the information concerning Mr. Wardlow's background and
            social history necessary for a competent and reliable evaluation and
            failed to request an appropriate psychological evaluation relevant

to Mr. Wardlow's background and social history and his mental condition at the time of the offense for use at the penalty phase of the trial. ............................................................................................ 63

    a.    Relevant Facts ............................................................................ 63

    b.    Legal Basis for the Claim ........................................................... 67

4.    Trial counsel failed to object to improper and irrelevant testimony from Royce Smithey. ............................................................... 68

    a.    Relevant Facts ............................................................................ 68

    b.    Legal Basis for the Claim ........................................................... 72

5.    Trial counsel failed to object to the non-expert testimony of the medical examiner that the gun which killed Mr. Cole was fired from at least three feet away, and failed to obtain the assistance of firearms and crime scene reconstruction experts to help explain how the physical evidence was consistent with Mr. Wardlow's testimony concerning the manner in which Mr. Cole was killed. ............ 76

    a.    Relevant Facts ............................................................................ 76

    b.    Legal Basis for the Claim ........................................................... 78

6.    The State Court's Rulings Deserve No Deference .................................. 79

F.    Mr. Wardlow was denied due process in the sentencing phase of his trial because (a) the testimony of Royce Smithey created false impressions about the prison classification process, the frequency of violent acts by prison inmates, and the frequency of violent acts by inmates convicted of capital murder and sentenced to life imprisonment, and (b) the prosecutor should have known that Smithey's testimony was misleading and would create false impressions with the jury that were material to the outcome of the sentencing process. ....................................................................... 79

1.    Relevant Facts ........................................................................................ 79

2.    Legal Basis for the Claim ..................................................................... 85

3.    This Error Is Not Harmless ................................................................... 87

        4.     The State Court's Rulings Deserve No Deference ................................... 87

    G.     Trial counsel provided ineffective assistance in failing to confront the testimony of Royce Smithey with cross-examination and expert rebuttal testimony that would have exposed the misleading, false impressions created by his testimony. .................................................................................. 88

        1.     Relevant Facts ....................................................................... 88

        2.     Legal Basis for the Claim ...................................................... 89

        3.     The State Court's Rulings Deserve No Deference ................... 89

VI.    PRAYER FOR RELIEF ................................................................................. 90

VERIFICATION .................................................................................................... 90

CERTIFICATE OF SERVICE ............................................................................... 91

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **BILLY JOE WARDLOW,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| -v- | § | **NO.** _____ |
| | § | |
| | § | |
| | § | |
| **DOUGLAS DRETKE, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | **CAPITAL CASE** |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

## PETITION FOR WRIT OF HABEAS CORPUS
## BY A PERSON IN STATE CUSTODY

### I. INTRODUCTION

This is Billy Joe Wardlow's's first federal petition for a writ of habeas corpus challenging the constitutionality of his conviction and death sentence. Mr. Wardlow was convicted and sentenced to death for the murder of Carl Cole during an attempted robbery at Mr. Cole's home in Morris County, Texas, in 1993. After Mr. Wardlow's illegally obtained confession was introduced into evidence, Mr. Wardlow acknowledged from the witness stand that he killed Mr. Cole but said that he did so unintentionally, in the course of a struggle over the gun he used to attempt to rob Mr. Cole. The case then turned on whether the killing was intentional or unintentional. Crucial evidence supporting the state's theory that the killing was intentional was admitted without objection by the defense, even though that evidence was inadmissible. Crucial evidence supporting the defense theory that the shooting was unintentional

became unavailable to the defense because the prosecutor made a plea agreement with a witness – Mr. Wardlow's codefendant – contingent upon her not testifying for Mr. Wardlow. In the penalty phase, Mr. Wardlow's lawyers failed to object to inadmissible information concerning assaults in the Texas Department of Criminal Justice that the prosecutors then used to support an otherwise unsupported theory that Mr. Wardlow would be dangerous in the future. Mr. Wardlow's lawyers also failed to investigate Mr. Wardlow's life history and provide that information to a defense mental health expert. As a result, the defense could only present limited, uninformed character evidence in the penalty phase and did not have available the wealth of life history information that would have helped the jury understand Mr. Wardlow, why the crime was committed, and why Mr. Wardlow's life should be spared. These constitutional errors deprived Mr. Wardlow of a fair and reliable determination of his guilt and his sentence.

## II. JURISDICTION

This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 2241(d). Mr. Wardlow was indicted for the offense of capital murder in the 276th District Court of Morris County, Texas. Venue was changed for trial to the 76th District Court of Titus County, Texas. Both counties are in the Eastern District of Texas. Petitioner is in the custody of the Texas Department of Criminal Justice pursuant to this judgment and death sentence. Under 28 U.S.C. § 2244(d)(1), a petition filed on or before November 24, 2004 is timely.

## III. PROCEDURAL HISTORY

Billy Joe Wardlow was indicted for capital murder in Morris County, Texas, in connection with the June 14, 1993, shooting death of Carl Cole. On June 24, 1993, the court appointed Vernard Solomon of Marshall, Texas, to represent Mr. Wardlow. A year later, June

2

24, 1994, the court granted Mr. Solomon's motion to withdraw and appointed Bird Old, III.

Shortly thereafter, Lance Hinson was appointed as co-counsel. Both Mr. Old and Mr. Hinson

practiced in Mt. Pleasant, Texas, at the time they represented Mr. Wardlow.

A change of venue was granted to Titus County, and Mr. Wardlow was tried by a jury in

the District Court for the 76th Judicial District, Titus County, Texas. Jury selection commenced

on October 6, 1994, and was completed on January 10, 1995. The guilt phase of the trial began

on January 31, 1995, and the jury returned with a verdict of guilty of capital murder on February

8, 1995.

On February 11, 1995, after hearing evidence during the penalty phase of the trial, the

jury returned an affirmative answer to the special issue concerning future dangerousness and a

negative answer to the special issue concerning mitigating evidence. Accordingly, under Texas

law, Mr. Wardlow was sentenced to death.

The conviction and death sentence were affirmed by the Court of Criminal Appeals on

April 2, 1997, in an unpublished decision. *Wardlow v. State*, No. 72,102. Mr. Wardlow was

represented on direct appeal by Douglas Parks of Dallas, Texas.

Mr. Wardlow's state habeas corpus application was timely filed under applicable state

law on July 20, 1998. Prior to the filing of this application, Mr. Wardlow informed the Court of

Criminal Appeals that he "wish[ed] to waive and forego all further appeals." Exhibit 1 (letter of

June 29, 1998, to Court of Criminal Appeals from Mr. Wardlow). The Court of Criminal

Appeals treated this as a request and granted Mr. Wardlow permission to waive all further

appeals on July 14, 1998. Exhibit 2 (order of Court of Criminal Appeals). Thereafter, Mr.

Wardlow changed his mind and decided to pursue his state habeas remedy. To be sure his

intentions were clear, at the same time Mr. Wardlow filed his state habeas corpus application, he also filed a "Statement of Applicant" articulating his decision as of that date, July 20, 1998, to pursue state habeas remedies and authorizing his attorney to file his application for habeas corpus "in order to preserve my right to seek relief under Article 11.071 of the Texas Code of Criminal Procedure." Exhibit 3. Thereafter, on March 9, 2004, following paper proceedings in the trial court, the court entered proposed findings of fact and conclusions of law denying relief to Mr. Wardlow.

The Court of Criminal Appeals reviewed the trial court's proposed findings and conclusions pursuant to its obligation to review all applications for writ of habeas corpus under Art. 11.071, § 11, Tex. Code Crim. Procedure. However, it neither adopted nor rejected the trial court's order. Instead, on September 15, 2004, the Court held that its previous order of July 14, 1998, granting Mr. Wardlow permission to waive further appeals, barred him from filing a state habeas application, and pursuant to that order dismissed his state habeas application. Exhibit 4. Mr. Wardlow filed a motion for rehearing on September 24, 2004, pointing out that Mr. Wardlow had changed his mind in a timely manner about waiving state habeas remedies and so informed the trial court and the Court of Criminal Appeals on the day that he filed his state habeas application. Exhibit 5. The Attorney General did not oppose this motion. *Id.* On October 20, 2004, the Court denied the motion without opinion.

## IV. STATEMENT OF FACTS

### A.    <u>Evidence in the guilt phase of the trial</u>

At the guilt phase, the State introduced evidence that Mr. Wardlow went to Carl Cole's residence to rob him. In the course of the robbery, Mr. Cole was shot. The State contended that

4

Mr. Wardlow planned to kill Mr. Cole and that the shooting was intentional.  Mr. Wardlow's defense was that he planned to rob Mr. Cole but did not intend to kill him.  Mr. Wardlow maintained that he pulled his gun when Mr. Cole refused to let him into the house, that Mr. Cole was shot during a struggle over the gun, and that he never intended to kill him.

The State introduced a letter dated February 28, 1994 from Mr. Wardlow to Ricky Blackburn, sheriff of Morris County, which was written while Mr. Wardlow was in the Morris County jail awaiting trial.  In this letter, Mr. Wardlow admitted that he was the person who shot Carl Cole.  The letter, admitted into evidence at trial as State's Exhibit 73, R. 35:521,[1] and read to the jury, R. 35:524-528, was written shortly after a meeting between Mr. Wardlow and the sheriff.  *See* R. 10:65; 9:22-23.  According to this letter, Mr. Wardlow and his girlfriend, Tonya Fulfer went to Mr. Cole's residence around 11:30 pm on the night of June 13, 1993 and disconnected the phone lines.  Mr. Wardlow knocked on the door of Mr. Cole's home, but there was no answer.  Mr. Wardlow returned to the residence between 5:00 and 6:00 am, again knocked on the door and again there was no answer.  He waited until Mr. Cole's lights came on and returned to the home without Tonya Fulfer, who waited at a neighbor's house.  This time, Mr. Cole answered the door and Mr. Wardlow asked to use the phone.  Mr. Cole handed Mr. Wardlow a cordless phone.  Mr. Wardlow told Mr. Cole that the phone was dead and asked to use another one.  At this point, Mr. Cole attempted to shut the door.  Mr. Wardlow blocked the door and drew a gun from inside his the waist of his pants.  Mr. Cole then grabbed Mr. Wardlow's arm.  In this letter, he then stated:

---

[1]Citations to the trial Statement of Facts are as follows: R. [volume # of Record on Appeal]:[page #].

Being younger and stronger, I pushed him off and shot him right between the eyes. Just because he pissed me off. He was shot like an executioner would have done it. He fell to the ground lifeless and didn't even wiggle a hair.

State's Exhibit 73.

Mr. Wardlow wrote a second letter to Sheriff Blackburn, dated September 11, 1994, in which he recanted portions of the February 28 letter about how the shooting occurred. *See* Motion to Suppress Confessions (with attachments), filed October 13, 1994. T. 2:94-110.[2] In this letter, Mr. Wardlow explained that his first letter was written to protect his girlfriend, Tonya Fulfer, and that it was inaccurate in several respects. T. 2:97. According to the second letter, Mr. Wardlow planned to rob Mr. Cole so that he and Ms. Fulfer could move to another state and "start all over." T. 2:98. Mr. Wardlow acknowledged in the second letter that Tonya accompanied him to Mr. Cole's house and was there when Mr. Cole was shot. T. 2:99-100. This account is consistent with the testimony of two other state witnesses – one who saw Ms. Fulfer and Mr. Wardlow together the night before the shooting, and one who saw a young man and woman at Mr. Cole's house at the time of the shooting. In the second letter, Mr. Wardlow said the gun fired during a struggle with Mr. Cole and that he did not intend to kill him: "The shot was simply in hopes he would let go and back up seeing I wasn't playing." T. 2:100. Mr. Wardlow testified at trial consistent with the account in this second letter to Sheriff Blackburn. R. 37:644-656,663-664, 696-699, 719.

The state's forensic pathologist testified that during the autopsy he found no evidence of gunpowder or residue at the entrance wound, and thus he concluded that the gun was fired from a

---

[2]Citations to the trial record, referred to in the state courts as the "transcript" at the time of Mr. Wardlow's trial and direct appeal, are as follows: T. [volume # of Transcript]:[page # within volume]. The September 11 letter from Mr. Wardlow is at T. 2:97-101.

minimum distance of about 3 feet. The state prosecutor argued that this evidence contradicted Mr. Wardlow's testimony that Mr. Cole was shot during a struggle.

**B.**     **Evidence in the penalty phase of the trial**

At the penalty phase of the trial, the prosecution introduced evidence of other offenses as well as testimony concerning Mr. Wardlow's threatening conduct in jail while awaiting trial. A Morris County deputy sheriff testified that in January, 1993, he arrested Mr. Wardlow for fleeing from an officer following a high speed chase near Cason. An employee from Charles Sessum's Motor Company testified that Mr. Wardlow and Tonya Fulfer took a 1989 Chevrolet pickup for a test drive and never returned it. Mr. Wardlow and Ms. Fulfer were later arrested in the pickup.

A dispatcher/jailer from Morris County jail testified that while searching a cell occupied by Mr. Wardlow and several other inmates, he found a two foot metal bar behind a box that contained Mr. Wardlow's belongings. One of the inmates from that cell testified that he overheard Mr. Wardlow say that he was going to use the metal bar to hit one of the officers in the head in an attempt to escape.

The prosecutor also introduced five letters from Mr. Wardlow to the Morris County jailer or the Sheriff (State's exhibits 82, 83, 84, 85, 86) in support of the State's contention that Mr. Wardlow would constitute a future danger to society. State's Exhibit 83 included a request to be moved to a single cell because of concern that he might harm another inmate as a result of the stress he was under. In State's Exhibit 82, Mr. Wardlow requested a radio and threatened to damage and dismantle things if he did not get a response to the letter. In State's Exhibit 84, Mr. Wardlow asked to speak to the judge so that he could get a different attorney assigned to his case. The letter contained profanity and expressed anger and frustration with his situation. In State's

Exhibit 86, Mr. Wardlow told the sheriff that recent events together with the stress had "pushed him] beyond [his] limitation of control" and that the sheriff should not be surprised if he had to "run in and help one of these jailers." He also complained about his treatment: "Just because I'm an inmate doesn't make me any less human, but these bastards think I'm some sort of freak or monster, and maybe it's time I strike back." In State's Exhibit 85, Mr. Wardlow accused the sheriff of being involved in the drug business.

A Morris County deputy who transported Mr. Wardlow to and from the Titus County jail during the trial testified that Mr. Wardlow complained that it was unconstitutional for the County to use trustees as guards and threatened, "If they don't stop using them I am going to double my time on one of them."

A narcotics investigator testified that he had encountered Billy Wardlow while working undercover in Cason, Texas. The investigator was at a Texaco station parking lot where he was meeting someone whom he expected to bring him drugs. The investigator was dressed as he thought a "drug buyer would dress." He and his companion approached Mr. Wardlow, who was in a pickup, and asked about purchasing marijuana. Mr. Wardlow told him that he didn't fool with drugs. The investigator noticed a gun on the seat next to Mr. Wardlow and asked him what he was doing with it and Mr. Wardlow replied, "I'll shoot you with it." The investigator acknowledged that he was trying to behave as he thought a drug addict would behave when he approached Mr. Wardlow and that Mr. Wardlow did not raise the gun or do anything else threatening. The investigator was 38 years old at the time and Mr. Wardlow was 17 years old.

The State's last witness was Royce Smithey, an investigator with the Special Prosecution Unit out of Huntsville, Texas, which prosecutes felony offenses that occur within the prison

8

system.  Mr. Smithey testified that he has a Bachelor of Science degree from Sam Houston

University in Law Enforcement and Police Science and graduated from the Law Enforcement

Management Institute of the State of Texas.  However, he did not report any education or training

in the field of corrections and was not employed by the Texas Department of Criminal Justice.

Mr. Smithey testified that he had discussed violent prison crimes with others who were also

involved in investigating such crimes; that he was "familiar with the type of weapons that are

used to commit crimes in prison"; that in the course of his investigations he has gathered

information from inmates who commit violent crimes as well as inmates who are victims of

crimes; and that as a part of his work he comes into contact with different units in the Texas

Department of Criminal Justice.

     Mr. Smithey then testified about the policies and practices of the Texas prison system in

placing incoming inmates in various institutions.  According to Mr. Smithey, the majority of

units in the Texas system are multi-security level units and house "everything from trustee status

inmates to administrative segregated inmates."  Mr. Smithey testified that an inmate initially goes

through a diagnostic and testing process to determine IQ, educational level, and physical and

mental ability and disability. R. 40:219.  He also testified that an inmate's classification is not

necessarily based on the type of crime he committed.  According to Mr. Smithey, a person

convicted of capital murder and sentenced to life can be placed "in with the general population ...

and would come in contact with any prisoner that commits a felony in the State of Texas"

including someone convicted of felony DWI.

     Much of Mr. Smithey's testimony was presented through leading questions by the district

attorney.  Through the leading questions and his testimony, Mr. Smithey indicated that a person

convicted of capital murder is treated as "any other felony inmate," and the fact they were

convicted of murder "would make no difference." R. 40:222. On the other hand, persons

sentenced to death are isolated from other prisoners.

Mr. Smithey also testified, again in response to leading questions, that violent crimes

happen "fairly often in the prison system." According to Mr. Smithey, inmates commit such

crimes using socks with hard objects placed in them; wood, metal, glass or plastic sharpened on

concrete and made into knives; and homemade bombs made from articles inmates are allowed to

have, such as nitroglycerin. R. 40:223-24. The inmates also use bed sheets and towels to strangle

other inmates and steel-toed boots to stomp and kick people.

Although Mr. Smithey acknowledged that the murder rate inside the prison system was

low during the "past year," he suggested that it was usually quite high. He testified that "in one

year we had twenty-five homicides, the year before that we had twenty-four homicides so in

some cases you will have aggravated assaults where inmates are multiply stabbed but they don't

die." R. 40:224. In contrast, Mr. Smithey testified that on death row the inmates' movement is

severely restricted and it is easier to control and maintain the prisoners than in the general

population. Also death row inmates, as opposed to other inmates, don't have access to teachers,

social workers, and other employees.

Characterizing Mr. Smithey's testimony, the district attorney stated in a leading question:

"So basically what you are saying [is] if a TDC inmate wants to be involved in violent behavior

they can certainly do so?" R. 40:227. Mr. Smithey answered: "Very much so."  When asked

whether inmates convicted of violent crimes are placed in administrative segregation units, Mr.

Smithey testified that even inmates who are known to be extremely violent based on their

behavior in county jails and during transportation "would be housed as any other inmates even

through Diagnostics." *Id.* at 228.

Through the district attorney's questions and Mr. Smithey's answers, the prosecution

implied that Mr. Wardlow should be sentenced to death because the conditions in general

population units, as a result of lawsuits, are such that they do not constitute sufficient punishment

for people convicted of murder:

Q.    How about the – we hear a lot about some of these court rulings,
      what are the living conditions like in TDC so far as the place is
      eaten up with insects, that sort of thing?

A.    The newer units are probably some of the best units that there are
      anywhere in the world. These units are climate controlled, some of
      the newer larger units are what is commonly referred to as an
      "automated unit," things are more electronic, they are very very
      clean, there's not a unit within the system, whether it be the oldest
      unit that there is there or not, one that is – that was built the day
      before yesterday that is not as clean as it can be, the floor shined,
      there are some of the older units are not air conditioned but almost
      all of – well, all of the new units, are climate control, it's not a
      place that I would want to be because I don't particularly care to be
      locked up but the living conditions — they have to have their food
      at certain temperatures and they have to receive so much recreation
      per day, they have to have access to all and any legal materials they
      need to work on their appellate work and cases and it's certainly
      not a country club but it's not the system that it was prior to the
      early 1980s.

R. 40:228-229.

On cross-examination, Mr. Smithey testified that he was not familiar with anything being

done during the diagnostics evaluation concerning an inmate's propensity for violence,

acknowledging that he is not an expert in this area. *Id.* at 232.

The defense only called three witnesses: the youth minister with the Cason Baptist

11

Church who knew Billy Joe from the sixth grade through the ninth grade, a high school librarian who had contact with Billy Joe from his freshman year in high school until the spring of his junior year, and the assistant principal who was in charge of attendance and discipline while Billy Joe was in high school.  The direct examination of these witnesses consisted of approximately 11 pages.

The youth minister testified that Billy participated in Church fundraisers, and was a hard worker, well mannered, very bright and respectful to her.  She knew that Billy Joe was involved in the youth group called the Royal Ambassadors, but since she was not connected with that group, she could not provide any information about the groups activities or Billy Joe's involvement in it.  The librarian testified that Billy often came in the library before school and during lunch.  He enjoyed working with the computer programs and reading books about mechanics, cars, and technology.  He also volunteered to help move the library books and equipment during a school remodeling project.  The assistant principal for Daingerfield High School testified that there were no disciplinary procedures lodged against Billy Joe while he was in high school and that he was in attendance 95% of the time.  On cross-examination, the prosecutor made the point that these witnesses had no contact with Mr. Wardlow during the year and a half to two years before Mr. Cole was killed.

In his closing statement, the prosecutor understandably argued that the defense had not presented evidence of any mitigating circumstances to outweigh an affirmative answer to the first special issue concerning "future dangerousness."

C.   **Information about Billy Joe Wardlow's background and the circumstances surrounding the offense that was available but not investigated and thus not presented at trial.**

Billy Joe Wardlow is the third child born to Jimmy and Lynda Wardlow. He grew up in Cason, Texas, a very small, rural community and attended school in the nearby town of Daingerfield. Both Jimmy and Lynda Wardlow grew up in this same area. The family's income has been very limited. Jimmy Wardlow works odd jobs as a carpenter and electrician. People in the community describe Jimmy as being "a very hard worker." *See* Exhibit 6 (affidavit of Lynda Wardlow), at 1.

Lynda Wardlow is a very tall, large-framed woman with an imposing and striking appearance. She is the caretaker of the Cason Cemetery. For years, she and Jimmy have also provided substantial volunteer services for the Cason Volunteer Fire Department. Exhibit 6, at 1. According to many people in the Cason area, Lynda and Jimmy "are the Cason volunteer fire department." Clearly Lynda is the dominant figure in the family. Consequently, an understanding of Lynda Wardlow is essential to an understanding of her family, and in particular, her son Billy Joe Wardlow.

Lynda Wardlow's childhood left scars on her psyche that have plagued both her life and the lives of her children. Lynda's father was "a bad alcoholic" who was "not around very much" when she was growing up. Exhibit 6, at 5. When he was around, he was usually drunk and would beat up Lynda's mother. *Id.* She also lived in abject poverty during much of her childhood – her family had to move frequently because they couldn't pay rent, they "usually didn't have electricity," and sometimes they didn't have enough food. *Id.*

It appears that Lynda's unbearably harsh childhood led to her suffering a dissociative

disorder – as her only way of coping with life.  The disorder manifests itself as dramatically different personalities and explosive and uncontrolled rages of which she frequently has no memory.  *See* Exhibit 6, at 6.  In addition to the traumas of her childhood, Lynda lost her second baby, James, to Sudden Infant Death Syndrome when he was about six months old.  Billy Joe was conceived about 2 ½ years after James' death, and after Lynda was told by her doctor that she should not have any more children.  Exhibit 6, at 1.

After James died, Lynda suffered a major mental breakdown.  Lynda remembers going to the cemetery and wailing over her baby's grave.  Exhibit 6, at 6.  She simply could not accept the loss of her child.  In addition to her grief she felt tremendous guilt.  Lynda's doctor prescribed strong medication, probably tranquilizers, and over time she learned she had become addicted to them.  When she stopped the medication she suffered from a severe depression and wanted to die.  Exhibit 6, at 1.

Lynda prayed for another child to replace the baby that she had lost.  Exhibit 6, at 1.  About 2 ½ years after James' death, Lynda became pregnant with Billy Joe.  She believed he was sent by God in answer to her prayers.  *Id.*  Lynda suffered serious complications during her pregnancy and had a very difficult delivery.  Billy Joe was ultimately pulled with forceps and his face and head were bruised and damaged.  The doctor expressed concern that because of the difficult birth, Billy Joe may have been without oxygen long enough to cause brain damage.  Billy Joe was kept in the hospital nearly two weeks after Lynda was released.  Exhibit 6, at 2.

As Billy Joe was growing up Lynda taught him that he was a special child – a gift from God.  Exhibit 6, at 2; Exhibit 7 (affidavit of Billy Joe Wardlow), at 1.  She also told him that he was still born and that God brought him back to life.  Exhibit 7, at 1.  Billy Joe believed her and

14

grew up thinking that he was special and that he was here for a special purpose.  *Id.*  As he grew

older, he had trouble reconciling his expectations to be special with his human limitations.

Lynda Wardlow was extremely over-protective of both her children and limited their

activities as they were growing up.  Exhibit 6, at 2.  At the same time she was excessively harsh –

and frequently seemed to lose control of herself in inflicting punishment.  Exhibit 8 (affidavit of

John Wardlow), at 1.  While Lynda unquestionably loved her children, as a result of her own

experiences and hardships she was "almost like ... two different people."  Exhibit 8, at 1.  As

Billy's older brother John explained, "As long as I can remember, my mother has had a temper

and a tendency to be violent when she is mad or upset.  She can also be sweet and loving."  *Id.*

The positive and generous side of Lynda Wardlow is best illustrated by her service to the

Cason community.   For years, she has devoted a substantial part of her life to Cason's volunteer

fire department and ambulance service, in addition to caring for the Cason cemetery.  Exhibit 6,

at 1.  She and Jimmy both received training as fire fighters and are "on call" at all times.  They

have a short wave radio which they monitor regularly and whenever there is an emergency in the

area, they are available if they are needed to help.  Lynda's dedication to the volunteer fire

department was something she passed on to Billy Joe.  *Id.*  During his teenage years, the one of

the few things he was deeply interested and involved in was the volunteer service to the Cason

fire department.  Exhibit 7, at 2.  Through this work, Lynda passed on to Billy Joe a commitment

to and enjoyment of service to the community.  Billy's teachers all recall that when he was in

high school, he talked a lot about his work with the Cason Fire Department, and that it was very

important to him.  One teacher commented that he was "like a kid with a new toy when it came

to the fire department."

15

A retired couple in Daingerfield, who knew the Wardlows through their common work with volunteer emergency services, remember Billy Joe working side by side with his mother fighting fires. They saw Billy grow up and they remember him as someone who was always willing to help. He appeared to them to be a polite, obedient child.

Lynda Wardlow is also a very religious and devoted Christian and the whole Wardlow family regularly attended church as Billy Joe was growing up. Exhibit 6, at 5. Billy Joe was an active member of Royal Ambassadors, a Baptist youth group, and he always attended Vacation Bible School. Billy Joe's grandmother kept the church nursery, and Billy Joe often helped her out. The minister of the Baptist church often took Billy on camping trips and other outings with his own children. He describes Billy Joe as "a model young boy" during that time. At about 16 years of age, Billy Joe stopped attending church, and the minister didn't see him much after that.

On the darker side, Lynda Wardlow was often overbearing, harsh and fierce and, undoubtedly, to a young child, very frightening. Exhibit 7, at 2 ("growing u[p], I was afraid of mother, mostly because of her tantrums"). There was a side of her that she experienced as a another presence and that she has had to struggle mightily to control. As she has explained,

> I think it's fair to say that I have a violent temper. When I really lose my temper, it brings on a strange power surge. My eyes dilate and I have superhuman strength.... It is scary to me. It's like there is a part of me that I can't control.
>
> . . . .
>
> Most people who know me, have witnessed my temper or at least heard about it. It certainly is not a secret. It's like something takes hold of me. Sometimes I call it the beast within and other times I refer to it as the Force. I actually hear a voice telling me to do things and I talk back to it. My doctor has called these experiences seizures.

Exhibit 6, at 6.

16

This was the side of Lynda that often made her sons' lives so difficult. Numerous times, Lynda's sons saw her lose control and fly into a rage. One of the more memorable – but not atypical – incidents involved John. Lynda got angry at John for talking with a neighbor she didn't like. When John got home, Lynda attacked him and dug her fingernails into his throat. Blood was pouring down his neck. Lynda hit John a time or two. When Jimmy went out to break them apart, Lynda grabbed a 10 foot steel pipe with one hand while still holding John with the other. The pipe was so heavy that it required superhuman strength to pick it up. Lynda hit Jimmy with the pipe in the back of the head and knocked him unconscious. When Lynda regained control of herself, she saw John sitting on the porch with scratch marks all over him. Lynda did not remember what had happened, but she was very apologetic. *See* Exhibit 7, at 2. Billy and John saw Lynda throw many other "tantrums" like this and afterwards she often seemed like she didn't know what was going on. According to John, she has been like this "as long as I can remember." Exhibit 8, at 1.

Lynda has also recounted bizarre experiences and expressed unusual beliefs over much of her life, which she shared numerous times with her son Billy. As she explained in her affidavit:

> I have seen what I believe to be a UFO a number of times, and once I was abducted by aliens. The abduction happened on March 15, 1968 on my way back to Cason from Pittsburg, Texas. The experience lasted about 2 hours. For a while I didn't know how to explain it, but after researching UFO's and aliens I realized that I had been abducted. After the abduction, I found out I was pregnant with Johnny, and I was afraid that he might have been fathered by an alien. When Johnny was born, I kept asking the doctor, 'What is it,' and he said, 'It's a boy.' I meant is it human? When Johnny was newly born, he was much more alert and active than most babies and I've always believed that it was because he is part alien.
>
> In my research of aliens, I've read that children conceived in that way will be taken away by the aliens when they are 12 years old, and I worried that I might lose Johnny that way. My mother, who lived next door to us before she died, told

> me about a UFO flying over her and Johnny one afternoon when they were
> outside.  Mother told me it looked like a flying house and that it was zeroing in on
> Johnny.  She was as white as a ghost when she was telling me.  I believed that
> was the aliens trying to get him.
> . . . .
>
> When Billy Joe and I we were looking for property from that pickup he and
> Ronald Barrett took, a large blue light came over us.  I called for Billy Joe.  The
> light hit him in the temple.  I thought that this was a sign that the aliens were mad
> at him for taking the pickup.  Billy Joe also thinks that at one time he was
> abducted by aliens.

Exhibit 6, at 7.  And, "After Billy's birth, I was told that I had bacteria in my tears and sweat that

resembled the bacteria found on moon rocks."  Exhibit 6, at 2.

Lynda and Jimmy Wardlow have always had a "huge" gun collection which included

rifles and pistols.  While Billy was growing up there was always a gun behind every door and in

every room of their house.  That's how Lynda was raised.  It was not at all unusual for her to

carry a loaded gun.  *See* Exhibit 6, at 6.  Once when John was baby sitting, Lynda was looking

for him and was angry with him.  When she found him, she got out of her pickup with a loaded

shotgun and ordered him to go home.  Exhibit 8, at 2.  When Billy was around 10 or 11 years old,

he took some money from his mother's purse.  When she discovered it, she pointed a gun at him

to impress upon him that he should not do that again.  Exhibit 7, at 2.

As Billy Joe grew into his mid-teenage years, life became more difficult for him.  His

parents wouldn't allow him participate in sports.  Exhibit 6, at 2.  He was not a part of any

"crowd" at school.  He felt very different from the other kids and was not very close to anyone.

Exhibit 7, at 2.  There was also a growing tension between him and his mother during this time.

Billy began to experience serious emotional distress.  *Id.* At 3.  Once when Billy was around 17

years old, he barred his bedroom door shut and wouldn't let Lynda in.  When she realized the

door was barred, she broke it down. Billy was in his bed with a Magnum rifle under his chin

with the safety off. Lynda tried to get him to give her the gun. When he wouldn't, she got her

.45 Llama and told him to take it and kill her with it because that was what he would be doing if

he shot himself. Billy's hand started to shake and he started crying and gave her the rifle. *See*

Exhibit 6, at 2-3.

In October, 1991 Billy Joe met Tonya Fulfer, who was a special education student at

Daingerfield High School. They soon learned that they both considered themselves to be "black

sheep" in their family, and they found it easy to open up to each other. Billy Joe considered

himself a good student. He was smart and did well in school. But he didn't consider Tonya as

inferior at all. He appreciated her intuitive abilities which he thought were better than his. He

was impressed with the fact that she could speak "sign" language. Tonya was the first person

Billy ever opened up to and is the only person with whom he has ever experienced love. They

became inseparable. Often at night, they would go to the lake and sit up for hours talking about

their problems and heartaches. Tonya had been severely abused at home and was able to talk to

Billy about these problems. Also she was understanding of Billy's problems at home. *See*

Exhibit 7, at 3.

In early 1993, Billy and Tonya were becoming more dependent upon each other and were

very unhappy at home. In February, at the beginning of the second semester of their Senior year,

they decided to leave Cason. They dropped out of school and went to Ft. Worth, where Billy's

brother John lived, and they moved into his apartment. From March through May, Billy had

several jobs. He worked at a landscaping job for a hospital, he worked for a courier service, and

he had a job selling perfumes and colognes. In late March, 1993, Billy's truck broke down and

19

he was unable to get it fixed.  For a while, he borrowed a vehicle from a friend of John until he

lost his job.  He managed to get another job with a construction company, but he got a terrible

sunburn the first day and lost the job after just a few days.  *See* Exhibit7, at 3.

In early June, Billy Joe started looking for another job.  He was also needing a vehicle.

On or about June 3, 1993, he and Tonya filled out a credit application at Charles Sessum Motor

company and test drove a 1989 Black Chevrolet.  Later that night, he and Tonya talked about

what they were going to do and they decided to move to Montana and start a new life.  The next

day, they went back to the same dealership and asked to test drive a pickup and they didn't return

it.  By evening, the car dealer called Billy Joe's brother about the stolen pick-up.  The next day,

Billy Joe and Tonya removed the licence plate from the pickup and left Ft. Worth on their way to

Montana where they planned to start all over.  On June 6, 1993, a highway patrolman stopped

them in Franklin County, Texas, because the vehicle was missing a headlight and did not have

any license plates.  The trooper obtained a report over his radio that the pick-up was stolen and

Billy Joe and Tonya were arrested.  They admitted stealing the pick-up after test driving it.

Tonya told the officer that they were on their way to Montana, and the officer found garbage bags

full of their clothes in the bed of the pick-up.  Tonya called their parents from the jail and Lynda

came to get them and took them back to Cason.  The owner of the pickup dropped the charges

after retrieving his pick-up and being paid by Lynda Wardlow for minor damages.  *See* Exhibit 6,

at 3; Exhibit 7, at 3-4.

In Cason, Billy and Tonya continued to talk about leaving home and going to Montana.

After a few days, they decided to steal some money and a pickup, naively thinking they could

escape their pain by leaving home and finding a new life in the wide open spaces of Montana.

*See* Exhibit 7, at 2.

The course they chose reflected desperation, immaturity, and flawed judgment. It was

destined to fail as surely as their botched attempt to steal a pick-up from Charles Sessum's Motor

Company after filling out a complete credit application with their correct names, addresses,

relatives, and phone numbers. What followed was not a planned, calculated, and deliberately

executed murder. It was an ill-conceived, awkward, and bumbling robbery where things went

tragically wrong.

## V.  CLAIMS FOR RELIEF

**A.**     **The State obtained Mr. Wardlow's confession in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments.**

**1.     Relevant Facts**

On or about June 22, 1993, Ricky Blackburn, Sheriff of Morris County, Texas, traveled to

Madison, South Dakota to take Billy Wardlow into custody for the murder of Charles Cole and

return him to Morris County, Texas. Upon taking him into custody, Sheriff Blackburn read Mr.

Wardlow the *Miranda* warnings, and Mr. Wardlow requested an attorney. R. 9:11 (Hearing on

Defendant's Motion to Suppress Confessions, October 18, 1994). They arrived in Morris

County, Texas, on June 23, 1993. On June 24, 1993, Sheriff Blackburn took Mr. Wardlow

before Judge Porter, Morris County District Judge. On the same date, Judge Porter entered an

order appointing Vernard Solomon of Marshall, Texas, to represent Mr. Wardlow. R. 35:530-

533.

Within a few days after the appointment, Mr. Solomon wrote a letter to Sheriff Blackburn

advising him not to talk to or communicate with Mr. Wardlow about his case unless he was

21

present. R 35:534-35.

From June 1993, when he was arrested, through February 1994, Mr. Wardlow had difficulty sleeping. He would go for "days on end" without being able to sleep and then would sleep for two or three days. R 10:58. During this time, Mr. Wardlow attempted unsuccessfully to communicate with his attorney. Mr. Wardlow could not communicate with him by phone because his office would not accept collect calls and letters were not answered. Exhibit 7, at 4. The Morris County Jail log reflects that Mr. Wardlow wrote letters to Mr. Solomon on July 19, 1993, and August 10, 1993 and never received a response. In September, 1993, at his request, Mr. Wardlow's mother made several telephone calls to Mr. Solomon with unsatisfactory results. Exhibit 6, at 4.

During the fall of 1993, Mr. Wardlow requested several ministerial visits with Tony Carr, a prison minister. In late October, 1993, he asked to be moved to the general population cell (Cell 160) so that he could help his "brothers in Christ to strengthen as [he had]," and the request was granted. At some point during Mr. Wardlow's pretrial detention, Sheriff Blackburn personally transported Mr. Wardlow to the Daingerfield Pentecostal Church in order that he could be baptized. R 9:48; 35:547-548. The jail logs do not reflect the trip, and when Sheriff Blackburn testified at trial, he was not able to recall whether the baptism took place before or after a meeting with Mr. Wardlow in January or February, 1994. R. 35:548.

After his unsuccessful efforts to communicate with Mr. Solomon, Mr. Wardlow attempted to obtain different counsel. In December, 1993, he wrote several notes to Sheriff Blackburn, expressing his dissatisfaction with Mr. Solomon. R 10:55. In a letter to Sheriff Blackburn received on December 12, 1993, Mr. Wardlow specifically asked the sheriff to help

him obtain another attorney.  The letter stated:

> Ricky,
>
> I need for you to set up a hearing to assign me another attorney.  My present one
> isn't satisfactory, therefore I request a new one A.S.A.P.
>
> Thank you,
> Billy Wardlow

This letter was not provided to Mr. Solomon until March 1, 1994.  (Letter from District Attorney
Richard Townsend to Vernard Solomon, March 1, 1994).

On December 20, 1993, Mr. Wardlow wrote a letter to Judge Billy Moye asking to be
assigned a new attorney as soon as possible.  On December 20, 1998, Mr. Wardlow also filed a
grievance against Mr. Solomon with the Texas Bar Association.  The mailing of the grievance
letter to the Bar Association is recorded in the Morris County jail logs.  Mr. Solomon visited Mr.
Wardlow in jail on December 27, 1998.  The meeting was very unsatisfactory.   Exhibit 7, at 4.

In late January and February 1994, a jailer telephoned Mr. Wardlow's mother on at least
two occasions and expressed concern about Mr. Wardlow's mental condition.  Each time, Mrs.
Wardlow called Mr. Solomon to let him know that Billy Joe was not doing well and to urge Mr.
Solomon to go see him.  Mrs. Wardlow only reached Mr. Solomon once, at which time he
angrily told her that Mr. Wardlow had filed a complaint on him and that he was unhappy about it.
Mr. Solomon's actual language was more graphic and hostile.  Exhibit 6, at 4.  The second time
Mrs. Wardlow called she was told that Mr. Solomon was not in the office.  Mr. Solomon did not
make any effort to see Mr. Wardlow until May 1994 when they appeared in court for a pretrial
hearing.[3]

---

[3]The jail records reflect that Vernard Solomon's first visit with Mr. Wardlow in the jail
was on December 27, 1993, and that the second jail visit occurred on June 20, 1994.  R. 35:565,

On January 25, 1994, the jailer, Patsy Martin, received a letter from Mr. Wardlow asking to speak to her about "a matter of utmost importance." In the same letter, Mr. Wardlow stated: "I would also like to have a private consultation with Sheriff Blackburn, concerning my case, and will do what is necessary to receive this hearing." The letter was given to Sheriff Blackburn. Shortly thereafter, Sheriff Blackburn contacted both the district attorney and District Judge Porter concerning Mr. Wardlow's letter.  R 35:538-40.

Sheriff Blackburn contacted Judge Porter by telephone to seek his advice concerning a request by Mr. Wardlow to talk to him.  R. 36:581.  Judge Porter told Mr. Blackburn that if he wanted to talk to Mr. Wardlow, he should first contact Mr. Solomon and ask to meet with Mr. Wardlow in Mr. Solomon's presence.  *Id.*  According to Sheriff Blackburn, the district attorney advised the sheriff that it would "probably be okay" to meet with Mr. Wardlow so long as they did not discuss the case.  R 35:538-540, 581-84.  Neither Sheriff Blackburn, the district attorney, nor Judge Porter notified Mr. Solomon of Mr. Wardlow's request to see the sheriff about his case or of any subsequent meetings between Sheriff Blackburn and Mr. Wardlow.

Sheriff Blackburn testified that he met with Mr. Wardlow after receiving an additional letter from him.  R 35:536:18-21; R. 35:537:8-11.  The next letter Mr. Wardlow wrote to Sheriff Blackburn was received on February 24, 1994.  State's Pre-trial Exhibit 2.  When Mr. Wardlow wrote Sheriff Blackburn the February 24, 1994 letter, he was requesting someone who would could help him cope with the psychological problems he was having and provide him counseling. R 10:65.  In the February 24, 1994 letter, Mr. Wardlow stated:

> I know you probably don't understand why I'm acting up.  I can't really explain it
> either, but if at all possible I need to get someone to talk to about this problem.  It

567.

is imperative that it is soon because I am beginning to lose what control I have. State's Pre-Trial Exhibit 2. Sheriff Blackburn met with Mr. Wardlow between February 24, 1994, and February 28, 1994.

Sheriff Blackburn responded to the February 24th letter by appearing to provide Mr. Wardlow spiritual guidance. R 10:65. R. 9:22-23. During this meeting, Mr. Wardlow attempted to discuss Mr. Cole's death and Sheriff Blackburn told him that he "could not talk about the inner workings of the case without [Mr. Wardlow's] attorney present." R. 9:18; 35:568. Mr. Wardlow reported to Sheriff Blackburn that he was having trouble sleeping, having nightmares, and generally having problems dealing with everything. According to Sheriff Blackburn, it was in this context that Mr. Wardlow wanted to talk about his case. R 9:18. Mr. Wardlow had mentioned similar psychological problems in earlier letters, and the sheriff was of the opinion he was under a lot of stress. R. 35:549.

Sheriff Blackburn told Mr. Wardlow that when he had problems and was troubled that he often reduced the problems to writing in order to identify the problem. Sheriff Blackburn suggested that Mr. Wardlow do the same by writing down the things that had happened from the time he left Ft. Worth until the present. Sheriff Blackburn told Mr. Wardlow that by identifying his problem, writing it down and studying it, he could more clearly decide what to do about it. R 9:18-19; 10: 54; 35: 551.

During the meeting with Mr. Wardlow, Sheriff Blackburn had a Bible in his pocket, and he readily admitted that he gave Mr. Wardlow spiritual advice. R 9:73-75; 35:554, 555. He told Mr. Wardlow that he (Sheriff Blackburn) was a religious man and that he often read the Bible when he was troubled. R. 35:552. Sheriff Blackburn discussed salvation through belief in Christ

25

and the forgiveness of sins by God through Christ. R 9:76; 35:553-554. He told Mr. Wardlow that the first step in solving his problem and eliminating his trouble would be to seek the help of God. R. 35:553. Sheriff Blackburn also told him that "the truth would set him free ... once he could get everything down and clearly define and realize what his problem was being able to sit there and be able to read it back to himself." R. 35: 553. *See also* R 9:77 (he indicated to Billy that writing things down would help him). Sheriff Blackburn told Mr. Wardlow that if he wrote down what had happened, he could then tear it up and flush it down the commode. R. 35:568.

This meeting between Sheriff Blackburn and Mr. Wardlow lasted about 45 minutes to 1 1/4 hours. R. 9: 77; 35:566. The sheriff did not read Mr. Wardlow the *Miranda* warnings and did not inform Mr. Wardlow that he had the right to have an attorney present during their meeting or that he had a right to have an attorney represent him during this pretrial period. R 9:98; 35:566. In response to a question about his purpose in meeting with Mr. Wardlow, Sheriff Blackburn stated, "My sole intent was to simply talk to Billy about whatever he wanted to talk about." R 10:52. During the meeting, the message that Sheriff Blackburn gave to Mr. Wardlow was that forgiveness of sins was based upon confession of those sins and that God won't forgive you until you have asked for forgiveness. R 10:54.

After their meeting, Mr. Wardlow followed Sheriff Blackburn's advice about writing things down in an effort to relieve the extreme mental and psychological suffering he was experiencing. At first he attempted to write out what had happened as he was instructed by Sheriff Blackburn. Instead of having a calming effect, it left him more agitated and upset, as he explained in another letter to Sheriff Blackburn. In the letter he stated: "I wished I had never wrote that shit down because now it haunts me like a ghost." The letter concludes:

26

Don't let Tonya say she was there, because she wasn't with me. She was waiting
at my neighbors house until I came back. I will give you a full statement so that it
will be off my chest. I just can't take it anymore.

On February 28, 1994, Mr. Wardlow wrote a letter to Sheriff Blackburn in which he

purported to describe the events leading up to and surrounding Mr. Cole's death.   In the letter he

confessed to the murder of Carl Cole and assumed all of the responsibility for the planning and

commission of the offense.  He also attempted to exonerate his girl friend, Tonya Fulfer, who had

been arrested with him in South Dakota.  *See* State's Exhibit 73 (admitted at trial, R. 35:521, and

read to the jury, R. 35:524-528).

After sending his confession to Sheriff Blackburn, Mr. Wardlow continued to suffer from

extreme psychological and emotional distress.  In a letter dated March 7, 1994, to Patsy Martin,

Mr. Wardlow stated: "I am under so much stress and my nerves are on the verge of breakdown, I

request to be examined for stress or depression related problems."  Ms. Martin's notation on the

letter stated: "Sheriff to get Billy out and talk with him."  In a letter to Ms. Martin in June 1994,

Mr. Wardlow asked to be moved to a single cell to "regain his thoughts."  He said that he

couldn't think with the noise and was concerned that he might hurt someone if he were not

moved.  In a letter dated September 7, 1994 to Ms. Martin,  Mr. Wardlow again expressed severe

psychological distress and frustration over his own behavior:

> The reason for my actions could be blamed on a person I shouldn't be, but I have
> no control of it and afraid of being laughed at.  I've been laughed at all my life and
> just didn't want to add to it.  I know a lot of people who have a second person in
> them and they are constantly laughed at and always scorned.  I need to talk to
> someone who can help me sort this out and maybe help me control this rage I feel
> inside.  I have asked several officers to kill me, but none would fulfill that request,
> and don't have the guts to do it myself....  I wish I could at least talk to someone
> that might know what to say.

27

On September 11, 1994, Mr. Wardlow wrote a letter to Sheriff Blackburn retracting portions of his February 28, 1994 letter. T. 2:97-101. In the September letter, Mr. Wardlow explained that the shooting of Mr. Cole occurred during an unanticipated and frightening struggle over the gun and that he never intended to kill Mr. Cole. He also acknowledged that Tonya Fulfer was present when Mr. Cole was shot. Mr. Wardlow's description of the offense in this letter is consistent with his trial testimony. R. 37:644-656,663-664, 696-699, 719.

### 2. Rulings by Trial Court

Defense counsel moved to suppress both letters and objected to their introduction at trial. Counsel argued that the State's use of the letters violated Mr. Wardlow's rights under state law as well as his rights under the Fifth and Sixth Amendment of the United States Constitution. After determining that the facts were not in dispute, the trial court concluded as a matter of law that Sheriff Blackburn's communications with Mr. Wardlow were not the functional equivalent of a custodial interrogation. R. 35:544. Based on that determination, the court denied the motion to suppress and overruled Mr. Wardlow's objections to the introduction of the statements.

### 3. Ruling on Direct Appeal

The Court of Criminal Appeals adopted the trial court's finding that the communications between Mr. Wardlow and the sheriff did not constitute custodial interrogation for Fifth Amendment purposes and rejected the Fifth Amendment claim on that basis. *Wardlow v. State*, No. 72,102 (April 2, 1997) (unpublished manuscript opinion), at 11-12. The Court denied the Sixth Amendment claim because appellate counsel did not present any authority in support of the claim. *Id.* at 12-13.

4.    **Legal Basis for the Claim**

The Fifth and Sixth Amendments to the United States Constitution, made applicable to the states by the Fourteenth Amendment, both make provision for counsel during custodial interrogations. The Fifth Amendment, in protecting against involuntary confessions, provides for the right to counsel during any custodial interrogation at any time before or after arrest. *Edwards v. Arizona*, 451 U.S. 477, 482 (1981); *Miranda v. Arizona*, 384 U.S. 436, 474 (1966). The Sixth Amendment provides for the assistance of counsel at any critical stage of the proceeding once the defendant has been indicted; governmental efforts to elicit information from the accused are a critical stage. *Michigan v. Jackson*, 475 U.S. 625, 630, 632 (1986); *Maine v. Moulton*, 474 U.S. 159, 176 (1985); *United States v. Henry*, 447 U.S. 264, 270 (1980); *Massiah v. United States*, 377 U.S. 201, 205 (1964).

It is well-settled under both the Fifth and Sixth Amendments that once a defendant has invoked his right to counsel – by asking the police for an attorney or by asking a judge for an attorney at an arraignment or initial appearance – interrogation must cease, and any police-initiated interrogation thereafter that produces an incriminating statement is invalid. *Edwards*, 451 U.S. at 484-485; *Jackson*, 475 U.S. at 631-632.

Mr. Wardlow requested counsel when he was first taken into custody in South Dakota by Morris County, Texas law enforcement officers. He requested counsel again after his return to Morris County. On June 23, 1993, Mr. Wardlow was arraigned on capital murder charges in Morris County District Court, and on June 24, 1994, the court appointed Vernard Solomon to represent him. When his appointed counsel did not respond to his entreaties for assistance and advice, Mr. Wardlow sought assistance in obtaining other counsel from the county sheriff and the

29

district judge.  During this time, which encompassed the meeting between Sheriff Blackburn and

Mr. Wardlow that led to Mr. Wardlow's confession letter of February 28, 1994, Mr. Wardlow

had clearly invoked his Fifth Amendment right to counsel, his Sixth Amendment right to counsel

had attached, and he had also invoked his Sixth Amendment right.

Two issues control whether the February 28 letter was obtained in violation of Mr.

Wadrlow's Fifth and Sixth Amendment rights.  The first is whether Sheriff Blackburn engaged in

"interrogation," *Rhode Island v. Innis*, 446 U.S. 291, 300-301 (1980), for Fifth Amendment

purposes, or in "deliberately elicit[ing]" an incriminating statement, *Massiah*, 377 U.S. at 206,

for Sixth Amendment purposes.  The second is whether Mr. Wardlow waived his Fifth or Sixth

Amendment rights to counsel before or in the course of his meeting with Sheriff Blackburn.

In *Innis*, the Supreme Court defined "interrogation" as "either express questioning or its

functional equivalent."  446 U.S. at 300-301.  The Court continued:

> That is to say, the term 'interrogation' under *Miranda* refers not only to express
> questioning, but also to any words or actions on the part of the police (other than
> those normally attendant to arrest and custody) that the police should know are
> reasonably likely to elicit an incriminating response from the suspect.  The latter
> portion of this definition focuses primarily upon the perceptions of the suspect,
> rather than the intent of the police....  A practice that the police should know is
> reasonably likely to evoke an incriminating response from a suspect thus amounts
> to interrogation.  But, since the police surely cannot be held accountable for the
> unforeseeable results of their words or actions, the definition of interrogation can
> extend only to words or actions on the part of police officers that *should have*
> *known* were reasonably likely to elicit an incriminating response.

*Id.* At 301-302 (emphasis in original).

The prohibition against using "words or actions on the part of the police ... that the police

should know are reasonably likely to elicit an incriminating response from the suspect," *Innis*, is

materially the same as the prohibition against "deliberately elicit[ing]" an incriminating

statement, *Massiah*, 377 U.S. at 206, for Sixth Amendment purposes.   The Court amplified the

meaning of the Sixth Amendment prohibition in *Maine v. Moulton*:

> The Sixth Amendment guarantees the accused, at least after the initiation of
> formal charges, the right to rely on counsel as a 'medium' between him and the
> State.  As noted above, this guarantee includes the State's affirmative obligation
> not to act in a manner that circumvents the protections accorded the accused by
> invoking this right.... [K]nowing exploitation by the State of an opportunity to
> confront the accused without counsel being present is as much a breach of the
> State's obligation not to circumvent the right to the assistance of counsel as is the
> intentional creation of such an opportunity.  Accordingly, the Sixth Amendment is
> violated when the State obtains incriminating statements by knowingly
> circumventing the accused's right to have counsel present in a confrontation
> between the accused and a state agent.

474 U.S. at 170-171.  Thus, if in a meeting with an accused after the accused has invoked his

right to counsel under the Fifth and Sixth Amendments, a police officer employs "words or

actions... that the [officer] should know are reasonably likely to elicit an incriminating response

from the suspect," *Innis*, by definition there has been a "knowing exploitation by the State of an

opportunity to confront the accused without counsel being present."

   In Mr. Wardlow's case, Sheriff Blackburn's spiritual counseling of Mr. Wardlow and the

State's subsequent use of the confession letters that grew out of the counseling violated these

Fifth and Sixth Amendment safeguards.  All the circumstances surrounding the meeting with Mr.

Wardlow demonstrate that Sheriff Blackburn should have known that his approach to Mr.

Wardlow was reasonably likely to elicit a confession.

   First, Sheriff Blackburn was well aware that Mr. Wardlow wanted to have counsel "as a

'medium' between him and the State."  *Moulton*, 474 U.S. at 176.  He invoked his right to

counsel from the beginning.  He did not make any statements about his case.  He despaired in not

having a lawyer who saw him more and offered guidance and some modicum of reassurance.  He

sought the sheriff's help in getting different counsel appointed.  Against this background, Sheriff

Blackburn knew that if he let Mr. Solomon know of Mr. Wardlow's desire to talk with him,

Solomon might well intervene and provide the assistance Mr. Wardlow so desperately wanted –

so Sheriff Blackburn decided not to notify Mr. Solomon, ignoring Judge Porter's advice to notify

Solomon.  Sheriff Blackburn saw, or should have seen that this provided, an opening for getting

to Mr. Wardlow.

Second, Sheriff Blackburn knew that Mr. Wardlow was in a fragile emotional state.  The

numerous letters written by Mr. Wardlow to jail personnel readily revealed his fluctuations in

mood.  He was emotionally vulnerable – confused, anguished, depressed, volatile, and feeling

abandoned by his attorney – and law enforcement personnel were in an exceptional position to

exploit this vulnerability.  When Mr. Wardlow asked for Sheriff Blackburn's help in dealing with

all of this emotional turmoil, the sheriff saw, or should have seen that this provided, another

opening.

Third, Sheriff Blackburn knew that Mr. Wardlow was deeply religious.  His letters had

revealed his struggle to be a better person and to be with other inmates – whom he called his

"brothers in Christ" – who were engaged in the same struggle.  Through Mr. Wardlow's

susceptibility to religious precepts, Sheriff Blackburn saw, or should have seen that this

provided, yet another opening, through spiritual counsel designed to encourage Mr. Wardlow to

accept responsibility for his offense.

When viewed in context, there can be little doubt that Sheriff Blackburn's advice and

counseling was reasonably likely to elicit incriminating written statements and that he knew or

should have known that.  Whether or not the sheriff actually saw these openings to get to Mr.

Wardlow, and specifically intended to elicit his inculpatory statements, is irrelevant. The

constitutional point is that Sheriff Blackburn "*should have known* [his actions] were reasonably

likely to elicit an incriminating response." *Innis*, 446 U.S. at 302 (emphasis in original). In

*Innis*, the Court underscored that

> [a]ny knowledge the police may have had concerning the unusual susceptibility of
> a defendant to a particular form of persuasion might be an important factor in
> determining whether the police should have known that their words or actions
> were reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 302 n.8. Sheriff Blackburn knew that Mr. Wardlow was susceptible to someone who

would listen to him, offer advice, and offer spiritual guidance. Thus, he counseled and

encouraged Mr. Wardlow to write down everything that happened to him during the course of

time covering the offense, to review it, study it and make decisions about what to do about it. He

extolled the virtue of confession in leading to God's forgiveness of sins.

Regardless of Sheriff Blackburn's intent, there is a reasonable likelihood that religious

counseling which focuses on the accused's emotional response to the offense and proselytizes the

value of confession is likely to produce incriminating statements from someone who is in

emotional and spiritual turmoil about the offense and who is "deeply religious." *See Brewer v.*

*Williams*, 430 U.S. 387, 392, 399-400 (1977). Such communications from a state law

enforcement officer to an accused who has invoked his Fifth Amendment right to counsel, and

without notice to and outside the presence of appointed counsel, violates the Fifth and Sixth

Amendments.

Mr. Wardlow's letters seeking assistance from the sheriff in obtaining new counsel, and

his pleas for help dealing with his mental and psychological distress related to his case, did not

amount to a waiver of his Fifth and Sixth Amendment rights to counsel. Even if those letters are

interpreted as an invitation or an initiation of communication under *Edwards v. Arizona* and

*Michigan v. Jackson* (applying *Edwards*' rule to the Sixth Amendment right to counsel), they did

not constitute a waiver of Mr. Wardlow's Fifth and Sixth Amendment rights to have counsel

present during a conversation that was reasonably likely to elicit incriminating information.

In *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), the Supreme Court addressed the

distinction between the initiation of communications with the police by an accused who has

previously invoked his right to counsel and the waiver of that right.

> We did not... hold [in *Edwards*] that the 'initiation' of a conversation by a
> defendant such as respondent would amount to a waiver of a previously invoked
> right to counsel; we held that after the right to counsel had been asserted by an
> accused, further interrogation of the accused should not take place 'unless the
> accused himself initiates further communication, exchanges, or conversations
> with the police.' 451 U.S. at 485. This was in effect a prophylactic rule, designed
> to protect an accused in police custody from being badgered by police officers in
> the manner in which the defendant in *Edwards* was....
>
> But even if a conversation taking place after the accused has 'expressed his desire
> to deal with the police only through counsel,' is initiated by the accused, where
> reinterrogation follows, the burden remains upon the prosecution to show that
> subsequent events indicated a waiver of the Fifth Amendment right to have
> counsel present during the interrogation.

*Id.* at 1044. In sum, "The inquiries are separate, and clarity of application is not gained by

melding them together." This analysis applies equally to waiver of the Sixth Amendment right to

counsel. *See Michigan v. Jackson*, 475 U.S. at 632 ("the Sixth Amendment right to counsel at a

postarraignment interrogation requires at least as much protection as the Fifth Amendment right

to counsel at any custodial interrogation").

In determining whether there has been a waiver of the Fifth or Sixth Amendment right to

counsel in this context, the Court

34

has held that a waiver of the Sixth Amendment right to counsel is valid only when it reflects 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst*, [304 U.S. 458,] 464 [(1938)]. In other words, the accused must 'kno[w] what he is doing' so that 'his choice is made with eyes open.' *Adams v. United States ex rel. McCann*, 317 U.S. 269, 279 (1942). In a case arising under the Fifth Amendment, we described this requirement as 'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Whichever of these formulations is used, the key inquiry in a case such as this one must be: Was the accused, who waived his Sixth Amendment rights during postindictment questioning, made sufficiently aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel?

*Patterson v. Illinois*, 487 U.S. 285, 292-293 (1988).

In *Patterson*, the state met its burden of showing a valid waiver by "admonishing petitioner with *Miranda* warnings." *Id.* at 293. In Mr. Wardlow's case, however, Sheriff Blackburn readily acknowledged that he did not advise Mr. Wardlow that he had a right to have counsel present during their meeting. He specifically testified that he did not advise Mr. Wardlow of his *Miranda* rights. Moreover, he did not offer to notify Mr. Wardlow's counsel's or to request that he be present during their meeting. In sum, Sheriff Blackburn did nothing to make Mr. Wardlow "aware of his right to have counsel present during the questioning, and of the possible consequences of a decision to forgo the aid of counsel." *Id.* Accordingly, Mr. Wardlow did not waive his right to counsel, and his letters of both February 28, and September 11, 1994 should have been suppressed.[4]

_____

[4]Under the fruit of the poisonous tree doctrine, evidence derived directly or indirectly from illegal governmental activity must be excluded from trial. *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). The February 28 letter was the direct product of the violation of Mr. Wardlow's Fifth and Sixth Amendment rights. The September 11 letter was the product of the February 28 letter and thus the indirect product of the constitutional violation. Both it and Mr. Wardlow's trial testimony that tracked the contents of that letter are the fruit of the original violation. *See* Exhibit 9 (affidavit of lead trial counsel Bird Old), at 1 (showing that the testimony was produced by the non-suppression of the letters). As such they must be excluded in

## 5.    This Error Is Not Harmless

Without Mr. Wardlow's letter of February 28, the State would have had a much more difficult time establishing beyond a reasonable doubt that the killing of Mr. Cole was intentional, and therefore, capital murder.  Circumstantial evidence unconnected to Mr. Wardlow's confession sufficiently linked Mr. Wardlow to the crime to support a conviction of non-capital murder , *i.e.*, murder without the specific intent to kill.  T. 2:149-151 (guilt-innocence instructions).  Thus, the evidence demonstrated that Mr. Wardlow had Mr. Cole's truck and sold it in Nebraska the day after Mr Cole was killed, that Mr. Wardlow was arrested with the murder weapon in his possession, and that a man and a woman similar to Mr. Wardlow and Ms. Fulfer were seen at Mr. Cole's house by a neighbor at the time of the crime.  Apart from the February 28 letter, the only evidence that suggested that the murder was intentional came from the medical examiner, Dr. Jeffrey Barnard, who testified that he found no evidence of gunshot residue at the entry wound, R. 33:146, and surmised from this that the gun was fired from three feet or more.  *Id.*  While the prosecutor later argued that this corroborated Mr. Wardlow's February 28 confession, in which he said that the killing was intentional, R. 38:811, this evidence would have been a thin reed to support a finding beyond a reasonable doubt had it been the only evidence of intent to kill.  The only evidence of what actually happened in the course of Mr. Cole's killing – which established that the killing was intentional – was the February 28 letter.  Accordingly, the introduction of this evidence in violation of Mr. Wardlow's rights under the Fifth and Sixth Amendments "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

determining the harm associated with the constitutional violation.

36

6.      **The State Court's Rulings Deserve No Deference**

On direct appeal, the Court of Criminal Appeals denied the Fifth Amendment aspect of

this claim on the merits. After setting out the controlling language from *Rhode Island v. Innis*,

the Court's entire analysis was the following: "In the context of the instant case, refusing to talk

about a case and telling a suspect to write down the feelings that are bothering him, but then to

destroy the writing cannot be construed as 'reasonably likely to elicit an incriminating

response.'" *Wardlow v. State*, No. 72,102 (April 2, 1997) (unpublished manuscript opinion), at

11-12. The Court of Criminal Appeals' decision on this claim "was contrary to, [and] involved

an unreasonable application of, clearly established Federal law, as determined by the Supreme

Court of the United States." 28 U.S.C. § 2254(d)(1).

On direct appeal, the Court of Criminal Appeals denied the Sixth Amendment aspect of

this claim on the following basis: "Appellant groups this point with his fifth and sixth points of

error [which included Fifth Amendment claims], but does not provide any authority pertaining to

his right to counsel. Therefore, the point is not sufficiently briefed." *Wardlow v. State, supra,* at

13. The basis for this decision is, accordingly, procedural default. This, however, is not an

independent and adequate procedural ground as required for a default in state proceedings to bar

the merits of a claim in federal habeas. *See Harris v. Reed*, 489 U.S. 255, 260, 262 (1989)

(independent and adequate state ground doctrine precludes review in federal habeas proceedings,

as in direct review, only if the state court judgment rests on grounds that are "both 'independent'

of the merits of the federal claim and an 'adequate' basis for the state court's decision"). The

state court ground is inadequate since, as we have shown *supra*, the analysis of the Sixth

Amendment aspect of the claim is identical to, and draws from the same analysis as, the Fifth

Amendment claim.

In state habeas proceedings, the Sixth Amendment aspect of the claim was re-raised. The trial court proposed a disposition of this claim but on mandatory review, the Court of Criminal Appeals neither adopted nor rejected the recommended findings and conclusions by the trial court. Instead, the Court of Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission to waive further appeals, barred him from filing a state habeas application, and pursuant to that order dismissed his state habeas application. Exhibit 4. This ruling is not based on an independent and adequate procedural ground as required for a default in state proceedings to bar the merits of a claim in federal habeas. *See Harris v. Reed, supra.*

Accordingly, the trial court's proposed findings and conclusions cannot be given deference – because they were not adopted by the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be given deference. The Sixth Amendment aspect of the claim must be decided *de novo*.

### B.   Mr. Wardlow was deprived of effective assistance of counsel on direct appeal.

#### 1.   Relevant Facts

Mr. Wardlow incorporates the facts alleged in the foregoing claim in support of this claim. In addition, he sets forth the following:

On direct appeal, Mr. Wardlow was represented by Dallas attorney Douglas Parks. Mr. Parks specifically raised as a point of error the trial court's denial of Mr. Wardlow's motion to suppress his confession letters to Sheriff Blackburn and the admission of those letters into evidence in violation of Mr. Wardlow's Sixth Amendment right to counsel. However, Mr. Parks

failed to provide any separate argument or authority in support of the point of error. Accordingly the Court of Criminal Appeals rejected the claim as insufficiently briefed. *Wardlow v. State*, No. 72,102 (April 2, 1997) (unpublished manuscript opinion), at 13.

## 2.    Legal Basis for Claim

Criminal defendants have the right to effective assistance of counsel on their first appeal of right. *Evitts v. Lucey*, 469 U.S. 387, 396-397 (1985). Ineffective assistance of appellate counsel claims are governed by the standards of *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285-286 (2000). Thus, a habeas petitioner must first show that appellate counsel was "objectively unreasonable" in failing to raise a claim – *i.e.*, that counsel failed to discover a non-frivolous issue and brief it. *Id.* at 285. Second, the petitioner must show that "but for his counsel's unreasonable failure to file a merits brief [on this issue], he would have prevailed on his appeal." *Id. See also Briseno v. Johnson*, 274 F.3d at 207.

It cannot be seriously questioned that this claim meets the performance prong of *Strickland*. Direct appeal counsel's failure to provide any argument or authority in support of his Sixth Amendment claim clearly falls below a standard of professional reasonableness. As Mr. Wardlow's first claim (Claim A) demonstrates, the Sixth Amendment challenge to the State's use of his confession letters has substantial merit, and if it had been fully and properly presented on direct appeal there is a reasonable likelihood that his conviction and death sentence would have been reversed. Furthermore, without using the confession obtained in violation of Mr. Wardlow's Sixth Amendment rights, there is a reasonable probability that he would not have been convicted of capital murder and sentenced to death.

39

3.    **The State Court's Rulings Deserve No Deference**

This claim was raised in state habeas proceedings. The trial court proposed a disposition

of this claim but on mandatory review, the Court of Criminal Appeals neither adopted nor

rejected the recommended findings and conclusions by the trial court. Instead, the Court of

Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission

to waive further appeals, barred him from filing a state habeas application, and pursuant to that

order dismissed his state habeas application. Exhibit 4. This ruling is not based on an

independent and adequate procedural ground as required for a default in state proceedings to bar

the merits of a claim in federal habeas. *See Harris v. Reed, supra.* Accordingly, the trial court's

proposed findings and conclusions cannot be given deference – because they were not adopted by

the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be

given deference. This claim must be decided *de novo.*

C.    **The State's pretrial plea offer to Tonya Fulfer deprived Mr. Wardlow of due
process and a fair trial in violation of the Sixth, Eighth, and Fourteenth
Amendments of the U.S. Constitution.**

1.    **Relevant Facts**

Tonya Fulfer, Mr. Wardlow's girl friend, was also charged with capital murder for the

death of Carl Cole. A neighbor of Carl Cole had seen a young man and woman at Mr. Cole's

residence around the time of his murder, and at least two witnesses had identified Ms. Fulfer as

having been with Mr. Wardlow the evening and night before Mr. Cole was killed. Ms. Fulfer

was arrested with Mr. Wardlow in South Dakota.

On August 24, 1993, the district attorney, Richard Townsend, offered a plea bargain to

Mr. Fulfer's attorney on the following terms: Ms. Fulfer would be required to "tell her story" to

40

Sheriff Blackburn and the district attorney, pass a lie detector test administered by D.P.S., and

testify in the case against Mr. Wardlow.  In return, the district attorney would dismiss the robbery

aspect of her charges and offer her a life sentence for murder, a non-capital crime.  Exhibit 10

(letter from Richard Townsend).  This agreement was not consummated.

Thereafter, the district attorney offered a modified plea bargain to Ms. Fulfer.  As

reflected in a letter to Mr. Wardlow's counsel on October 6, 1994, the bargain was the following:

> I have made an agreement with Mr. Mac Cobb regarding Tonya Michelle Fulfer's
> case, which is now pending.  I have agreed to allow Ms. Fulfer to plead guilty to
> murder and allow a jury to assess punishment if she will cooperate and testify in
> the trial against Billy Joe Wardlow should I need her.

Exhibit 9 (attachment, letter from Richard Townsend).

Later in October, 1994, the trial court denied Mr. Wardlow's motion to suppress his two

confession letters.  On the day of this ruling, the district attorney decided that he would not call

Ms. Fulfer as a witness.  As recounted by the court in a hearing outside the jury's presence later

at trial,

> [T]he decision to remove [Ms. Fulfer] from the Witness List was contingent on
> whether or not I was going to allow the two letters into evidence.
>
> After I made my ruling sometime in October, and that ruling is reflected in the
> record, the ruling I'm referring to, the Finding of Fact and Conclusion of Law
> wherein I decided to admit State's 73 for all purposes.
>
> When I so advised the parties I recall that Mr. Townsend then removed her from a
> Witness List and informed the Court and Defense Counsel that she would not be a
> witness for the State during the punishment – excuse me, during the guilt-
> innocence or punishment phase of the trial.

R. 37:732.

Sometime thereafter, the plea offer to Ms. Fulfer changed one last time.  A record of this

41

was made in the same mid-trial hearing in which the trial court recounted the district attorney's

decision to delete Ms. Fulfer from the State's witness list. Mac Cobb, Ms. Fulfer's attorney,

testified as to the terms of the plea offer:

> The State of Texas has offered prior to this trial beginning an arrangement that
> would allow my client to plead guilty to a reduced charge 'murder' and that with
> the understanding that she would plead guilty before a jury and ask the jury to
> assess punishment.
>
> . . . .
>
> The offer was contingent on the completion of this trial, it was with the
> understanding that the charge would not be reduced until the completion of the
> Billy Wardlow trial and was subject to being withdrawn as far as I know even at
> anytime.

R. 37: 730.

On cross-examination by the district attorney Richard Townsend, Townsend emphasized

with Cobb that the plea offer was entirely contingent on the completion of the Wardlow trial:

> Q.   Isn't it true, Mr. Cobb, that the offer was not contingent on testimony?
>
> A.   That's my understanding.
>
> Q.   Isn't it true that the offer was a preliminary offer that could not possibly go
>      into effect until the trial was over?
>
> A.   Yes.
>
> Q.   That trial not being over, that offer actually hasn't gone into effect yet?
>
> A.   Well, I asked you again today and you after the jury was impaneled in this
>      case if we couldn't go ahead and conclude Tonya's and you said that, 'No.
>      That the offer was not to become effective until after the conclusion of the
>      Billy Wardlow trial[,] period.'

R. 37:734.

The obvious reason for keeping the plea offer to Ms. Fulfer "preliminary" until the

conclusion of Mr. Wardlow's trial was to prevent Ms. Fulfer from testifying on behalf of Mr.

Wardlow.  The prosecution knew what Ms. Fulfer's testimony would be.  As part of the plea

negotiation process, she was required to "tell her story" to Sheriff Blackburn and the district

attorney.

.  After Mr. Wardlow's trial, it became apparent what that story would have been – and that

it would have helped Mr. Wardlow.  In her colloquy when she was permitted to plead guilty to

murder, Ms. Fulfer testified that she and Mr. Wardlow went to Mr. Cole's residence to rob him,

and that Mr. Wardlow never intended to kill him.  *Id.* at 28, 29.  The plan was "'to knock [Mr.

Cole] in the head and take the money.'"  *Id.* at 32.  She then described the confrontation between

Mr. Cole and Mr. Wardlow at Mr. Cole's door as follows:

> A.     Billy pulled the gun out and asked Mr. Cole to step inside and at that point
>        Carl Cole and Billy both started struggling over the gun.  And I took out of
>        the carport, I left where they was from.
>
> Q.     Were they still in the doorway near the steps?
>
> A.     Yes, sir.
>
> Q.     Did you run all the way out of the carport or did you stop?
>
> A.     I stopped.
>
> Q.     And what did you do then?
>
> A.     I turned and I – Billy – I hollered at Billy and asked him to drop the gun.
>
> Q.     Then what did you do?
>
> A.     That's when the gun went off.
>
> Q.     Were you looking right at them when the gun went off?
>
> A.     No, sir.

43

A.    So you didn't see exactly what happened?

A.    No, sir.

*State v. Tonya Michelle Fulfer*, No. 12,929, 76th Judicial District Court of Titus County (April

18, 1995), Reporter's Record of Guilty Plea, at 35.

In interviews with Mr. Wardlow's habeas counsel in 2001, Ms. Fulfer further explained

the events at Mr. Cole's house.  She described the shooting as "an accident."  Exhibit 11

(affidavit of Mandy Welch recounting interview with Tonya Fulfer and affidavit of Tonya Fulfer

deemed accurate but not signed by Ms. Fulfer).[5]  She recalled events exactly as she testified in

her plea colloquy, but Ms. Welch asked her a question that was not asked in the colloquy – what

was happening between Mr. Cole and Mr. Wardlow when she stopped at the end of the carport

and turned to yell at Wardlow to drop the gun.  Ms. Fulfer said, "They were still struggling over

the gun."  Exhibit 11.

In addition, Ms. Fulfer revealed more about what had gone on with her lawyer and the

plea negotiations.  She said that about two months before Mr. Wardlow's trial, she was told by

her attorney that the district attorney wanted her to testify that Billy intended to kill Mr. Cole and

that he went to the house intending to kill him.  Exhibit 11.  Ms. Fulfer said she continued to tell

her lawyer, as she had all along, that the shooting was an accident.  *Id.*  She told her attorney she

would not lie about that.  *Id.*

Neither Mr. Wardlow nor his attorneys knew what Ms. Fulfer's testimony would be if she

testified.  No one was able to interview Ms. Fulfer on behalf of Mr. Wardlow because charges

---

[5]As Ms. Welch explained, Ms. Fulfer "told me everything in the affidavit was true, but
that she was afraid to sign it because she thought providing an affidavit in Billy Joe Wardlow's
case would hurt her chances of obtaining parole."  Exhibit 11.

44

were still pending against her. When Bird Old, Wardlow's lead attorney, received the letter of

October 6, 1994, from the district attorney informing him of a plea offer to Ms. Fulfer contingent

on her "testify[ing] in the trial against Billy Joe Wardlow should I need her," Exhibit 9

(attachment, letter from Richard Townsend), Mr. Old "believe[d] that Ms. Fulfer's testimony

would support the State's theory of capital murder." Exhibit 9, at 2. "On the other hand," Old

continued, "Billy told me that Tonya's testimony, if it was truthful, would support his testimony

about the circumstances of the shooting. He also believed that she would tell the truth if she

testified." Id. For this reason, Old decided to call Ms. Fulfer as a witness and informed Ms.

Fulfer's attorney of that decision. Id. Her attorney tried to discourage Old, telling him that "her

testimony would not be helpful to Mr. Wardlow and that in any event, on his advice she would

assert her Fifth Amendment privilege and refuse to give any testimony." Id.

As planned, the defense subpoenaed Ms. Fulfer and called her as a witness at Mr.

Wardlow's trial. Prior to this, Ms. Fulfer's attorney advised her to assert her Fifth Amendment

right not to testify. Exhibit 11. He told her that testifying for Billy would hurt her own chances

of getting a good sentence. Id. Ms. Fulfer did not want to risk losing the State's offer of a more

lenient sentence, so she followed her attorney's advice. Id. When she took the witness stand, she

followed her attorney's advice and asserted her Fifth Amendment privilege and did not testify.

R. 37:726-727.

### 2. Legal Basis for Claim

Government conduct that interferes with a potential defense witness' free and

unhampered choice to testify violates due process. *United States v. Henricksen*, 564 F.2d 197,

198 (5th Cir. 1977). *See also United States v. Morrison*, 535 F.2d 223, 227-228 (3d Cir. 1976);

45

*United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973).  In *Henricksen*, the government entered

into a plea agreement with a codefendant.  As part of the agreement the codefendant agreed not

to testify regarding Henricksen and he was told that the agreement would be void if he did testify.

At Henricksen's trial, the codefendant refused to testify.  The defendant challenged the

government's conduct on appeal and the government confessed error.  The Fifth Circuit held that

"[s]ubstantial Government interference with a defense witness' free and unhampered choice to

testify violates due process."  564 F.2d at 198.  The court reversed the conviction and remanded

the case for a new trial.  *Id.*

     The Sixth and Third Circuits have also come to the conclusion that government conduct

which deprived defendants of the testimony of a favorable witness violated due process.  In

*United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973), a key defense witness was approached by

a secret service agent during a recess and told that if he testified for the defendant he would be

prosecuted for misprision of a felony.  Thereafter the witness refused to testify.  In *United States*

*v. Morrison*, 535 F.2d 223 (3rd Cir. 1976), the Third Circuit concluded that similar government

intimidation of a defense witness violated the defendant's right to due process.  The State's

conduct with respect to Tonya Fulfer amounts to substantial interference with a defense witness'

free and unhampered determination as to whether to testify.

     Initially the district attorney offered a plea bargain to Tonya Fulfer agreeing to forego

capital murder in exchange for her testimony at trial.  He fully anticipated that Ms. Fulfer's

testimony at Mr. Wardlow's trial would support a conviction for capital murder and a sentence of

death.  He also believed that Tonya Fulfer was far less culpable than Mr. Wardlow and not

deserving of the death penalty.  Because the district attorney believed that Mr. Wardlow planned

and intended to kill Carl Cole, he anticipated that Ms. Fulfer's testimony would help the state prove an intentional capital murder.   This did not happen.

Ms. Fulfer consistently told her attorney that she and Billy Wardlow did not go to Mr. Cole's residence intending to kill him, and that the shooting was an accident.  Ms. Fulfer was told by her attorney that the district attorney wanted her to testify that Mr. Wardlow intended to shoot Mr. Cole.  Because this was not true, Ms. Fulfer would not provide the state with the testimony it wanted despite the fact that she had the pressure of capital murder charges hanging over her head.

After the trial judge denied Mr. Wardlow's motion to suppress his confession letters to Sheriff Blackburn, the district attorney no longer wanted or needed the testimony of Ms. Fulfer. Nevertheless, because the district attorney did not think Ms. Fulfer was guilty of capital murder or deserving of the death penalty, he continued to hold out a plea offer for a non-capital offense which ensured that she could not receive the death sentence.  The offer carried one critical condition.  It was contingent upon the completion of Mr. Wardlow's trial.  In other words, until Mr. Wardlow' trial was over, the offer could be summarily withdrawn.

The State cannot credibly maintain that there was any purpose for holding these charges over Ms. Fulfer except to discourage her from providing exculpatory testimony for Mr. Wardlow. This was not a case where consideration for the plea bargain required Ms. Fulfer's testimony on behalf of the State at Mr. Wardlow's trial.  With Mr. Wardlow's confessions, the district attorney did not need her testimony.  In light of the fact that her testimony would not support the State's theory, the district attorney did not want her testimony.  During jury selection and after the State's case, Ms. Fulfer's attorney asked the district attorney to conclude Ms. Fulfer's plea

47

agreement. R. 37:734. The district attorney refused to do so until the trial was concluded,

knowing that Ms. Fulfer was subpoenaed as a defense witness and that she would find it very

difficult to risk his ire – and lose her plea bargain – by testifying on behalf of Mr. Wardlow.

Under these circumstances, the State conduct substantially interfered with Ms. Fulfer's "free and

unhampered choice to testify" at Mr. Wardlow's trial in violation of Mr. Wardlow's right to due

process.

### 3.   This Error Is Not Harmless

As the trial record makes apparent, the pivotal issue for the jury to resolve in the guilt-

innocence phase of Mr. Wardlow's trial was whether Mr. Wardlow intentionally killed Mr. Cole

or unintentionally killed him in the course of a struggle over Mr. Wardlow's gun. Tonya Fulfer's

testimony would have offered substantial support for the theory that the killing was

unintentional. Accordingly, the prosecutor's manipulation of Ms. Fulfer to discourage her from

testifying, in violation of Mr. Wardlow's rights under Due process Clause of the Fourteenth

Amendment, "'had substantial and injurious effect or influence in determining the jury's

verdict.'" *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993).

### 4.   The State Court's Rulings Deserve No Deference

This claim was raised in state habeas proceedings. The trial court proposed a disposition

of this claim but on mandatory review, the Court of Criminal Appeals neither adopted nor

rejected the recommended findings and conclusions by the trial court. Instead, the Court of

Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission

to waive further appeals, barred him from filing a state habeas application, and pursuant to that

order dismissed his state habeas application. Exhibit 4. This ruling is not based on an

48

independent and adequate procedural ground as required for a default in state proceedings to bar

the merits of a claim in federal habeas. *See Harris v. Reed, supra.* Accordingly, the trial court's

proposed findings and conclusions cannot be given deference – because they were not adopted by

the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be

given deference. This claim must be decided *de novo.*

**D.     The State violated Mr. Wardlow's Fifth, Eighth, and Fourteenth Amendment rights when the district attorney failed to disclose to the defense that Ms. Fulfer's version of the offense and her anticipated testimony corroborated Mr. Wardlow's second confession letter and his trial testimony.**

**1.     Relevant Facts**

Mr. Wardlow incorporates the facts alleged in the foregoing claims in support of this

claim.

It is clear, based on the district attorney's August 24, 1994, plea letter to Ms. Fulfer's

attorney, Exhibit 10, that the district attorney expected that Ms. Fulfer would testify that Mr.

Wardlow intentionally killed Mr. Cole. Indeed, Ms. Fulfer's attorney conveyed to her "that the

district attorney wanted me to testify and say that Billy intentionally shot and killed Carl Cole

and that he went to his house intending to kill him." Exhibit 11. It is just as clear that, during the

course of the plea negotiations between Ms. Fulfer's counsel and the district attorney thereafter,

Ms. Fulfer's attorney would have informed the district attorney that Ms. Fulfer could not testify

that the killing was intentional. Exhibit 11.

Critically, Mr. Wardlow did not have access to this information, because Ms. Fulfer was

charged with capital murder and was represented by counsel. Ms. Fulfer could not be

interviewed or forced to give testimony. District attorney Richard Townsend did know what Ms.

Fulfer's testimony would be if she testified, however, and knew that it would be helpful to the defense. Nevertheless, he prevented the revelation of that information to the defense – and its presentation to the jury – by holding the threat over Ms. Fulfer of withdrawing a favorable plea offer if Ms. Fulfer testified for the defense.

### 2.    Legal Basis for Claim

In *Brady v. Maryland*, 373 U.S. 83 (1963), the United States Supreme Court held "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt *or punishment*, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87 (emphasis added). Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if the prosecution suppressed information favorable to the defense, and the information was material to either the guilt or punishment. *United States v. Bagley*, 473 U.S. 667, 683 (1985); *Kyles v. Whitley*, 514 U.S. 419, 432-434 (1995).

Knowing that Tonya Fulfer's testimony would confirm critical portions of Mr. Wardlow's testimony, the prosecutor had information that was clearly "favorable to the defense." In addition, there can be no doubt that the prosecution suppressed this information. The remaining question is whether this information was material to the determination of Mr. Wardlow's guilt or punishment.

Under *Brady* and its progeny, evidence is material "'if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U. S. at 433-434 (citing *United States v. Bagley*, 473 U.S. at 682). *See East v. Johnson*, 123 F.3d 235, 237 (5th Cir. 1997). *Kyles* clarified several significant aspects of the

50

materiality analysis under *Brady*. To demonstrate materiality, Mr. Wardlow is not required to demonstrate by a preponderance of the evidence that information concerning Ms. Fulfer's account of the shooting have ultimately resulted in acquittal of capital murder or a life sentence. *Kyles*, 514 U.S. at 434 ("[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence"). Additionally, materiality analysis "*is not a sufficiency of the evidence test.*" *Id.* at 1566 (emphasis added). The Supreme Court clearly stated, "[a] defendant need not demonstrate that after discounting the ... inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to ... [convict or return a sentence of death]." *Id. See East*, 123 F.3d at 239. Thus, in *Clemmons v. Delo*, 124 F.3d 944, 951 (8th Cir. 1997), the Eight Circuit wrote after *Kyles*, "[t]here is no question that the State's case would have remained strong with the new evidence, and that the jury could still have reasonably determined that Clemmons was guilty." Nevertheless, the court granted *Brady* relief because it could not "say with confidence that the jury would have reached the same verdict...." *Id.* at 951.

Having established that the State withheld favorable evidence, one demonstrates a *Brady* violation by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435 (footnote omitted). *See East*, 123 F.3d at 239; *Lindsey v. King*, 769 F.2d 1034, 1042 (5th Cir. 1985) (suppressed impeachment evidence may have consequences for the case far beyond discrediting the witness's testimony); *Clemmons*, 124 F.3d at 950 (framing the materiality inquiry, "[w]hat would the evidence have looked like if the defense had been given" the

suppressed evidence).

If the defense had been told that Ms. Fulfer had made statements about the offense which corroborated Mr. Wardlow's testimony, defense counsel would have taken steps to insure that the jury heard her testimony. As Mr. Old explained in his affidavit,

> If I had know [that Ms. Fulfer's testimony would have supported the defense theory of the shooting], I could have sought an order requiring the State to consummate its plea agreement with Ms. Fulfer or condition it upon Ms. Fulfer's giving truthful testimony. That way, the State's offer of a reduced charge after the completion of Billy's trial would not have stood as a barrier to her providing truthful testimony and exculpatory evidence.

Exhibit 9, at 2.

Had this happened, there is a reasonable likelihood that the outcome of Mr. Wardlow's trial would have been different. Mr. Wardlow's defense hinged on his testimony that Mr. Cole was killed intentionally in the course of a struggle. The State's theory turned on evidence that the murder was intentional. Ms. Fulfer's account of the offense, bearing as centrally as it did on this issue, "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. The prosecutor's failure to inform the jury and defense counsel of this information thus deprived Mr. Wardlow of due process of law.

### 3.    The State Court's Rulings Deserve No Deference

This claim was raised in state habeas proceedings. The trial court proposed a disposition of this claim but on mandatory review, the Court of Criminal Appeals neither adopted nor rejected the recommended findings and conclusions by the trial court. Instead, the Court of Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission

to waive further appeals, barred him from filing a state habeas application, and pursuant to that order dismissed his state habeas application. Exhibit 4. This ruling is not based on an independent and adequate procedural ground as required for a default in state proceedings to bar the merits of a claim in federal habeas. *See Harris v. Reed, supra.* Accordingly, the trial court's proposed findings and conclusions cannot be given deference – because they were not adopted by the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be given deference. This claim must be decided *de novo*.

E. **Mr. Wardlow was deprived of the effective assistance of counsel as a result of acts and omissions of his trial counsel.**

      1.    **Introduction**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court held that counsel was constitutionally ineffective if his conduct so undermined the proper functioning of the adversary process that the trial could not be relied upon as having produced a just result. *Id.* at 685. To determine whether counsel has been ineffective, the Court must undertake a twofold inquiry: whether counsel's performance was deficient; and, if so, whether the deficient performance was prejudicial to the defense. *Id.* at 687.

To make the first determination, the proper inquiry is whether any acts or omissions of counsel fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 690-91. To satisfy the prejudice requirement, the proper inquiry is whether there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

Mr. Wardlow claims that he was deprived of effective assistance of counsel at trial as the

result of his attorneys' various acts and omissions.  Specifically, he claims that his attorneys provided ineffective assistance in four respects:

(a)     Trial counsel failed to conduct a reasonable investigation of mitigating evidence and unreasonably failed to present available mitigating evidence in the penalty phase of trial.

(b)     Trial counsel failed to provide the defense mental health expert with the information concerning Mr. Wardlow's background and social history that was necessary for a competent and reliable evaluation.

(c)     Trial counsel failed to object to improper and irrelevant testimony from the prosecution's future dangerousness expert, Royce Smithey.

(d)     Trial counsel failed to object to the non-expert testimony of the medical examiner that the gun which killed Mr. Cole was fired from at least three feet away.

### 2.     Trial Counsel Did Not Conduct a Reasonable Investigation of Mitigating Evidence and Unreasonably Failed to Present Available Mitigating Evidence at the Penalty Phase of the Trial.

#### a.     Facts Relevant to the Claim

On June 24, 1994, the Court substituted Bird Old, III as counsel for Mr. Wardlow.  Mr. Old asked for the appointment of a second attorney in the case, and Lance Hinson was appointed. Exhibit 9, at 1.  They continued to represent Mr. Wardlow through trial.  Old was lead counsel and considerably more experienced than Hinson.  *See* Exhibits 9 and 12 (affidavit of Lance Hinson).

Both Old and Hinson worked on the penalty phase of the trial.  Exhibit 9, at 2; Exhibit 12, at 2.  Their strategy was to find character witnesses – people who could testify to "good things" about Mr. Wardlow.  Exhibit 9, at 2-3.  They found such witnesses hard to come by because the

victim, Carl Cole, was highly respected, and because Mr. Wardlow and his family were not well thought of.  Exhibit 9, at 3; Exhibit 12, at 2.

Mr. Old knew Mr. Wardlow's parents and talked with them about what they might testify about if he called them as witnesses.  Exhibit 9, at 2-3.  He decided not to call them because he believed they were "loose cannons" and did not present a good appearance or an appealing demeanor.  *Id.* at 3.  Ms. Wardlow, in particular, struck Old as "unstable and very unpredictable" and as not an affectionate person.  *Id.*  Both parents seemed "very cold."  *Id.*  He asked them "about any evidence of brain damage or other illnesses" and got "nothing remarkable" in response.  *Id.*

Mr. Wardlow's attorneys did not request or receive the services of a mitigation specialist or a capital defense investigator and did not conduct a social history investigation themselves.  As a result, the defense called only three witnesses in the penalty phase: the youth minister with the Cason Baptist Church who knew Billy Joe from the sixth grade through the ninth grade, a high school librarian who had contact with Billy Joe from his freshman year in high school until the spring of his junior year, and the assistant principal who was in charge of attendance and discipline while Billy Joe was in high school.

The youth minister testified that Billy participated in Church fundraisers, was a hard worker, well mannered, very bright and was respectful to her.  She knew that Billy Joe was involved in the youth group called the Royal Ambassadors, but since she was not connected with that group, she could not provide any information about the group's activities or Billy Joe's involvement in it.

The librarian testified that Billy often came into the library before school and during

lunch.  He enjoyed working with the computer programs and reading books about mechanics,

cars, and technology.  He also volunteered to help move the library books and equipment during

a school remodeling project.

. The assistant principal for Daingerfield High School testified that there were no

disciplinary procedures lodged against Billy Joe while he was in high school and that he was in

attendance 95% of the time.

On cross-examination, the prosecutor made the point that these witnesses had no contact

with Mr. Wardlow during the year and a half to two years before Mr. Cole was killed.

Had defense counsel known the necessity of seeking information concerning the life

histories of Mr. Wardlow and members of his family, and of trying to understand the crime with

which Mr. Wardlow was charged in the context of this information, they would have learned the

following:[6]

(a)     Billy Wardlow grew up in a family with very limited income, which made

a living through a variety of odd jobs performed by Mr. Wardlow's father, Jimmy Wardlow.

Despite their poverty, the Wardlows were the core volunteers – indeed, ran – the volunteer fire

department in the small community where they lived.

(b)     Billy's mother, Lynda, was the dominant adult in the Wardlow household.

She had grown up in a very poor, extremely abusive family, made worse by her father's

alcoholism.  She and her family were often homeless, evicted time and again because of their

inability to pay the rent.

(c)     Ms. Wardlow suffered deeply from the trauma of her childhood.

---

[6]The information in the sub-paragraphs that follow is set forth in detail, with cites to the
exhibits, in the Statement of Facts, section II. B., *supra*.

Throughout her adult life, she experienced frequent rage episodes, during which she would exhibit nearly superhuman strength, extraordinary anger, and uncontrollable violence. She experienced voices directing her during these episodes. Her family, especially Billy, lived in fear of these episodes. Ms. Wardlow also suffered profound depression after the loss of her second child to Sudden Infant Death Syndrome. She became dysfunctional until – she believed in answer to her prayers – she conceived Billy. At times she believed Billy was the product of Immaculate Conception. She passed this belief on to Billy. Ms. Wardlow also believed deeply that she had been abducted by aliens. Her belief was so strong that she became convinced that her first child was conceived during an abduction and was fearful that he would be taken back by the aliens on his twelfth birthday.

(d)     Ms. Wardlow shared her belief with Billy that she had been abducted by aliens. Billy thereafter believed he was similarly abducted.

(e)     Ms. Wardlow has also been, as she puts it, "cursed with paranoia most of my life." She has to "struggle to keep it from taking control of me."

(f)     Ms. Wardlow was extremely protective of her children, Billy and his older brother John. She severely limited their activities, forbidding their contact with people whom she did not approve. Billy was not allowed to participate in sports or school-related social activities. The primary social outlet that his mother permitted was church activities.

(g)     As a result of his mother's protectiveness, Mr. Wardlow was not included in a social peer group, did not develop friendships, felt very different from other children and did not develop particularly close relationships with anyone outside of his family.

(h)     Mr. Wardlow's own life history was, in some ways, as hard and

marginalized as his mother's. He was born late and experienced a loss of oxygen and head trauma at birth. He developed slowly, though he grew quickly. He did not walk until 19 months. By that time he already weighed 37 pounds. As he grew up, Mr. Wardlow was painfully aware of the fact that he was socially isolated and socially inept. Machines were his friends. He was unable to socialize with other children. He was physically different from his peers due to the fact that he was six feet tall at age 11. Moreover, he continued to wet his pants at night and at school until age 10. He was painfully humiliated by this experience because children at school called him "Pissy Joe." At home his mother made him walk around with his wet underwear on his head as punishment for his enuresis.

(i)      As Mr. Wardlow grew into his mid-teenage years, life became more difficult for him. His parents' imposed isolation from other children meant that he was not a part of any "crowd" at school. He felt very different from the other kids and was not very close to anyone. There was also a growing tension between him and his mother during this time and Mr. Wardlow began to experience serious emotional distress. He had attempted suicide three times by the time he was arrested for the murder of Mr. Cole.

(j)      In October, 1991, Mr. Wardlow met Tonya Fulfur, who was a special education student at Daingerfield High School. They soon learned that they both considered themselves to be "black sheep" in their family, and they found it easy to open up to each other. Mr. Wardlow considered himself a good student. He was smart and did well in school. But he didn't consider Tonya as inferior at all. He appreciated her intuitive abilities which he thought were better than his. He was impressed with the fact that she could speak "sign"language. Tonya was the first person Mr. Wardlow ever opened up to and is the only person with whom he

58

has ever experienced love. They became inseparable. Often at night, they would go to the lake and sit up for hours talking about their problems and heartaches. Tonya had been severely abused at home and was able to talk to Mr. Wardlow about these problems. Also she was understanding of Mr. Wardlow's problems at home.

      (k)    In early 1993, Mr. Wardlow and Tonya were becoming more dependent upon each other and were very unhappy at home. In February, at the beginning of the second semester of their Senior year, they decided to leave Cason. They dropped out of school and went to Ft. Worth, where Mr. Wardlow's brother, John, lived, and they moved into his apartment. From March through May, Mr. Wardlow had several jobs. In late March, 1993, Mr. Wardlow's truck broke down and he was unable to get it fixed. For a while, he borrowed a vehicle from a friend of John's until he lost his job. He managed to get another job with a construction company, but he got a terrible sunburn the first day and lost the job after about 3 days.

      (l)    In early June, Mr. Wardlow started looking for another job. He was also needing a vehicle. On or about June 3, 1993, he and Tonya filled out a credit application at Charles Sessum Motor company and test drove a 1989 Black Chevrolet. Later that night, he and Tonya talked about what they were going to do and they decided they to move to Montana and start a new life. The next day, they went back to the same dealership and asked to test drive a pickup and they didn't return it. By evening, the car dealer had called Mr. Wardlow's brother about the stolen pick-up. The next day, Mr. Wardlow and Tonya removed the licence plate from the pickup and left Ft. Worth on their way to Montana where they planned to start all over. On June 6, 1993, a highway patrolman stopped Mr. Wardlow and Tonya in Franklin County, Texas, because the vehicle was missing a headlight and did not have any license plates. The trooper

obtained a report over his radio that the pick-up was stolen and Mr. Wardlow and Tonya were

arrested. They admitted stealing the pick-up after test driving it. Tonya told the officer that they

were on their way to Montana, and the officer found garbage bags full of their clothes in the bed

of the pick-up. Tonya called their parents from the jail and Ms. Wardlow came to get them and

took them back to Cason. The owner of the pickup dropped the charges after retrieving his pick-

up and being paid by Lynda Wardlow for minor damages.

        (m)    In Cason, Mr. Wardlow and Tonya continued to talk about leaving home

and going to Montana. They decided to steal some money and a pickup, thinking they could

escape their pain by leaving home and finding a new life in the wide open spaces of Montana.

The course they chose was tragically flawed and resulted in the murder of Mr. Cole.

### b.    Legal Basis for the Claim

    By the time of Mr. Wardlow's trial, the Eight Amendment plainly required sentencers in

capital trials to consider the background and character of the defendant. *Lockett v. Ohio*, 438

U.S. 586, 604 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982). The "background" of an

accused meant anything in that person's life history that might show that the crime was more the

product of deprivation, suffering, and human frailty than malice. Thus, Justice O'Connor wrote

in her foundational concurring opinion in *California v. Brown*, 479 U.S. 538, 545 (1987), "In my

view, evidence about the defendant's background and character is relevant because of the belief,

long held by this society, that defendants who commit criminal acts that are attributable to a

disadvantaged background, or to emotional and mental problems, may be less culpable than

defendants who have no such excuse."

    In *Williams v. Taylor*, 529 U.S. 362 (2000), the Supreme Court made clear that in capital

cases defense counsel have an ""obligation to conduct a thorough investigation of the defendant's background." 529 U.S. at 396, in order to make reasonable professional judgments about presenting mitigating evidence.  In *Wiggins v. Smith*, 539 U. S. 510 (2003), the Court articulated in much more explicit terms the scope of the mitigation investigation that must be conducted. Drawing upon the 1989 American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Supreme Court's analysis of counsel's deficient performance in *Wiggins* applies equally to the analysis of the performance of Mr. Wardlow's counsel:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA) – standards to which we long have referred as 'guides to determining what is reasonable.' *Strickland, supra,* at 688, 104 S.Ct. 2052; *Williams v. Taylor, supra,* at 396, 120 S.Ct. 1495.  The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.' ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.  Cf. *id.,* 11.8.6, p. 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history,* prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added);  1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 ('The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing .... Investigation is essential to fulfillment of these functions').

539 U.S. at 524-525 (emphasis in original).

Trial counsel for Mr. Wardlow did not understand this fundamental duty.  They believed that mitigation was tantamount to evidence of good character.  Because of this, they turned away from the most important signs that there was profound human frailty and deprivation in Mr.

61

Wardlow's life.  Mr. Wardlow's parents embodied those signs.  Their instability and

unpredictability, their seeming coldness, their unappealing appearance – all these were signs that

Mr. Wardlow may have come from a background of abuse, trauma, emotional volatility, and

perhaps mental illness.  The very unsavoriness of Mr. Wardlow's parents was the red flag that

should have pushed counsel to probe Mr. Wardlow's and his families' life histories.  "In

assessing counsel's performance, we look to such factors as what counsel did to prepare for

sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and

what results he might reasonably have expected from these leads." *Neal v. Puckett*, 286 F.3d

230, 237 (5th Cir. 2002) (*en banc*).  Mr. Wardlow's trial counsel unreasonably failed to pursue the

leads before them.

     Had counsel conducted a reasonable investigation, they would have discovered that Mr.

Wardlow grew up in a chaotic, traumatic environment, in which his mother could be loving one

moment and life-threatening the next, and in which his mother was frequently delusional and

gradually imbued in him not only some of her delusions but also the process of delusional

thinking.  Isolated and lonely because of his mother's strict control of his life, as a teenager Mr.

Wardlow began to try to separate himself from his family and from the pain in his life associated

with his family.  Finding a kindred spirit in Tonya Fulfur, Mr. Wardlow tried to escape.  The

naivete and ineptitude of this effort was strongly mitigating, because it showed that the murder

was more likely a disastrous mistake – born of desperation, immaturity, and flawed judgment,

rather than malice.  The failure to present such evidence satisfies *Strickland*'s test of prejudice.

*See Williams v. Taylor*, 529 U.S. at 398; *Wiggins v. Smith*, 539 U.S. at 537-538.

3.      **Trial counsel failed to provide the consulting mental health expert
with the information concerning Mr. Wardlow's background and
social history necessary for a competent and reliable evaluation and
failed to request an appropriate psychological evaluation relevant to
Mr. Wardlow's background and social history and his mental
condition at the time of the offense for use at the penalty phase of the
trial.**

a.      **Relevant Facts**

At trial counsel's request, a counseling psychologist, Dr. Don Walker, conducted a

clinical interview and psychological evaluation of Mr. Wardlow on or about January 26, 1995,

just five days before the guilt phase of the trial began. *See* Exhibit 9 (second attachment – report

from Don Walker, Ph.D.). Counsel were interested in whether Mr. Wardlow had the ability to

distinguish between right and wrong and would be considered a future danger. Exhibit 9, at 3.

Counsel provided no life history information to Dr. Walker because they had not obtained it. *See*

Exhibit 9, at 3.

The report of the evaluation, Exhibit 9 (second attachment), included a brief history

obtained from Mr. Wardlow during the interview, a mental status evaluation as of the date of the

interview, and the results of some psychological tests administered during the evaluation.  The

report specifically noted that the psychologist did not discuss the offense with Mr. Wardlow.

The reported MMPI profile, which provide the most extensive psychological information, is

merely a computer generated profile.  In order to determine whether specific aspects of the

profile are relevant and applicable to Mr. Wardlow, one would have to evaluate the results in the

context of a comprehensive social and developmental history.  This was not done and could not

have been done without an accurate and complete social history investigation.

The psychologist's report identified a number of areas that warranted further exploration

63

for purposes of developing a mitigation defense for a capital sentencing trial.  These included the suggestion that Mr. Wardlow probably suffered from Attention Deficit Disorder in high school and junior high.  The psychologist also reported that Mr. Wardlow had attempted suicide on a number of occasions and that he did not want to die, but thought that was his only alternative.  The Wechsler Adult Intelligence Scale showed wide disparities in levels of performance which can be an indication of brain damage or brain dysfunction requiring further testing.  Response to many test questions showed remorse for his involvement in the death of Mr. Cole.  For example, in response to the Rotter Incomplete Sentences Black, Mr. Wardlow stated that "[h]e regrets doing bad things during his lifetime" and "[h]e wishes he could change the past."

The report does not attempt to connect the results of the evaluation to Mr. Wardlow's background and childhood or the results to Mr. Wardlow's involvement in the death of Mr. Cole.  The report did not take into account any information about Mr. Wardlow's social history and past behavior in discerning whether and to what extent generalized MMPI computer profile was accurate or relevant to Mr. Wardlow.  Due to all these shortcomings, Dr. Walker's evaluation was not helpful to the defense, and so the defense did not call Dr. Walker as a witness.  Exhibit 9, at 3.

Counsel's omissions with respect to the psychological evaluation are no doubt the result of counsel's lack of knowledge and experience in the area of capital sentencing trials and their failure to obtain the assistance of a mitigation expert or capital investigator.  Counsel's lack of experience in this area is also evidenced by the scope and the timing of the evaluation.

A relevant and appropriate evaluation by a mental health expert for purposes of developing mitigation for a capital sentencing trial could only be done in the context of Mr.

64

Wardlow's social history and family background. Such an evaluation needed to address the facts

of the crime, and the nature and extent of Mr. Wardlow's involvement in it. It should have

considered Mr. Wardlow's mental state around the time of the crime beyond the questions of

insanity and competence as well as his mental state during pretrial detention and the significance

of his numerous letters to and encounters with jail personnel. The State's penalty phase evidence

presented a whole host of information that a relevant psychological evaluation should have

addressed.

In connection with state habeas corpus proceedings, Mr. Wardlow was seen and evaluated

by a clinical psychologist, Paula Lundberg-Love, Ph.D. who reviewed extensive information

about Mr. Wardlow's background and his family. She also interviewed Mr. Wardlow's parents,

which she felt was necessary after her initial evaluation of Mr. Wardlow. Some of her findings

and Dr. Walker's findings were similar. Exhibit 13, at 8-9 (finding that "perfection and

compulsivity were present," along with difficulties in "thinking and concentrating," "paranoid

delusions," mistaking fantasy for reality, and social isolation). However, Dr. Lundberg-Love

found other impressions reported by Dr. Walker to be "inaccurate," Exhibit 13, at 9, the "most

egregious" of which was Dr. Walker's conclusion that Mr. Wardlow had "Antisocial Personality

or Borderline Personality Disorder." *Id.* Dr. Lundberg-Love explained why these conclusions

were inaccurate:

> He ignored the data which indicated salient signs of depression, symptomatology
> indicative of a significant thought disorder such as delusional disorder or
> schizophrenia, and he did not even consider any type of Post-Traumatic Stress
> Disorder that might have been related to childhood physical and emotional
> maltreatment.

*Id.* In addressing "the difference between the circumstances surrounding the psychological

assessment performed by Dr. Walker and that performed by this interviewer," Dr. Lundberg-

Love reported, "[t]he answer to that question is information." *Id.* The information that Dr.

Walker lacked was the extensive social and family history that habeas counsel developed in state

habeas proceedings and provided to Dr. Lundberg-Love. *Id.*

Because of these significant differences, Dr. Lundberg-Love was able to explain how Mr.

Wardlow functioned, in a manner that was steeped in the determinative facts of his life:

> Specifically, if Dr. Walker had been provided with the social history data given to
> this interviewer, then he would have been aware of the familial tendency for
> schizophreniform disorder. Schizophreniform disorders include a spectrum of
> disorders such as delusional disorder, shared psychotic disorder, schizophrenia, as
> well as schizoid, and schizotypal personality disorder. Central to the
> symptomatology of these disorders is the disruption of logical thought processes.
> Thoughts may be disorganized, loosely connected, and tangential. Delusions
> and/or hallucinations may be present. Affect (emotional tone) may be flat,
> somewhat detached, with a difficulty to experience pleasure (anhedonia). Such
> individuals also may lack close friends or confidants. They may possess odd
> beliefs, engage in magical thinking that influences their behavior, report unusual
> perceptual experiences, including bodily illusions, paranoid thinking, and
> behavior that may seem odd, eccentric, or peculiar. Indeed, both Lynda and Billy
> Wardlow possess some type of schizophreniform disorder. When one spends a
> significant time with Billy and remains astute, his schizoid and schizotypal
> characteristics are apparent. At times, particularly under stress, he may even
> appear overtly schizophrenic. However, because Billy Joe also has significant
> paranoid ideation and obsessive-compulsive tendencies, he often is able to mask
> his symptomatology. Indeed, Billy typically works very hard to hold himself
> together in order to appear 'normal,' and can sustain this perception for periods of
> time. Thus, if Dr. Walker had the opportunity to review social history data, even
> though he used the older MMPI instrument, instead of the MMPI-2, he could have
> been able to glean the importance of schizophreniform symptomatology in his
> diagnosis of Billy Joe Wardlow. Moreover, he would have been aware that Billy
> did not fit the criteria for Antisocial Personality disorder, that there was no
> evidence for the presence of conduct disorder prior to age 15, and he would have
> had to eliminate Antisocial Personality Disorder as his primary diagnosis. In
> effect, he would been better able to sort out the information in his computer
> generated MMPI analysis that was supported by social history data and rule out
> those features that were inconsistent with Billy's history.

Exhibit 13, at 10.

With an understanding of Mr. Wardlow grounded in his life history, a psychologist

provided the information Dr. Lundberg-Love was provided would have been able to help the jury

understand why Mr. Wardlow killed Mr. Cole:

> Finally, had Dr. Walker been able to review the rich, detailed social history
> information supplied to this interviewer, he would have understood the powerful
> role that Billy's schizophreniform symptomatology played in the etiology of the
> crime. Because both Billy and Tonya engaged in similar magical thinking, over
> time they came to reinforce each other's magical thinking/delusional beliefs, such
> that they truly believed that they could transform the pain in each others' lives by
> escaping to Montana. Their shared delusion was that if they just superficially
> threatened Mr. Cole, he would not offer any resistance, and would give them his
> vehicle and enable their dream to come true. Under the influence of this magical
> thinking and a shared delusion, Tonya and Billy were not prepared for the reality
> of a crime victim being frightened, resisting, and fighting back.

Exhibit 13, at 10.

### b.    Legal Basis for the Claim

Trial counsel did not understand that mental health experts cannot perform reliable and

accurate evaluations if they do not have a complete life history of their client.  As Dr. Lundberg-

Love explained, "It is not the responsibility of the mental health practitioner to conduct an

informational investigation. It is the responsibility of the attorneys to supply the mental health

practitioner evaluating the case with as much social, educational, health, mental health, and legal

data, as is possible so that he/she can provide an informed opinion." Exhibit 13, at 9. *See also*

*Wiggins v. Smith*, 539 U.S. at 524 (citing the ABA standard and "noting that among the topics

counsel should consider presenting are medical history, educational history, employment and

training history, *family and social history,* prior adult and juvenile correctional experience, and

religious and cultural influences"). In failing to provide Dr. Walker with such information,

67

counsel's performance virtually guaranteed that Dr. Walker's evaluation would not be useful to the defense. Counsel's performance was, accordingly, unreasonable and deficient.

This failure in performance prejudiced Mr. Wardlow under *Strickland's* test of prejudice. As demonstrated with respect to trial counsel's failure to investigate Mr. Wardlow's life history, *supra*, the life history alone would have provided the jury an understanding of the crime as a function of human frailty rather than human malice. Expert opinion would have further substantiated and strengthened that understanding. There is a reasonable likelihood that the outcome of the sentencing proceeding would have been different had counsel conducted a full life history investigation and provided it to Dr. Walker.

4.      **Trial counsel failed to object to improper and irrelevant testimony from Royce Smithey.**

a.      **Relevant Facts**

Royce Smithey's name was on the prosecution's witness list that was provided to defense counsel before trial. Exhibit 9, at 3. The district attorney informed Mr. Old that Smithey would testify concerning prison conditions and that this testimony would support the prosecution's case for future dangerousness. *Id.* Mr. Old questioned the admissibility of Smithey's proposed testimony and conducted some legal research, but found no authority helpful in excluding the testimony. Exhibit 9, at 3-4. Mr. Old interviewed Mr. Smithey at the courthouse during the penalty phase of the trial. Exhibit 9, at 3.

The prosecution presented the testimony of Royce Smithey to support its argument that Mr. Wardlow would be a future danger if he was sentenced to life imprisonment. Mr. Smithey was an investigator assigned to the Special Prosecution Unit of the district attorney's office in

68

Huntsville. R. 40:215, 230. His job was to "investigate the felony offenses and prosecute the felony offenses that occur within the prison system as well as property that belongs to the Texas Department of Criminal Justice." R. 40:216.

As a result of his experience, Mr. Smithey testified that he was familiar with the placement of death-sentenced prisoners and with the classification process through which prisoners serving life sentences or terms of years were assigned to various institutions and units. R. 40:218-220. According to Mr. Smithey, all death-sentenced prisoners are assigned to death row, a "segregated area" in the prison system where they are confined continuously except for "visitation and for specific medical treatment ... or [when they go] to ... areas of some type of special endeavor or visitation." R. 40:220-221. Unlike death-sentenced prisoners, persons convicted of capital murder who have been sentenced to life imprisonment are not assigned to a special confinement unit as a matter of course. They go through the classification process like anyone else who is not sentenced to death, which involves "a process of testing" "to determine such things as IQ, educational level, physical and mental ability or disability." R. 40:219. The classification they receive is not based on the type of crime they have committed. R. 40:220. When asked whether inmates convicted of violent crimes are placed in administrative segregation units "upon arrival," Mr. Smithey testified that even inmates who are known to be extremely violent based on their behavior in county jails and during transportation "would be housed as any other inmates even through Diagnostics." *Id.* at 228.

Mr. Smithey testified that this process can lead to placement of persons convicted of capital murder in the general prison population:

Q.     [I]f a person is convicted of capital murder and receives a life sentence are

69

they placed in special units or are they in with the general population?

A.    They can be in with the general population.

Q.    When you say 'in with the general population,' what sort of inmate do they come in contact with?

A.    Basically if they are in the general population they would come in contact with any prisoner that commits a felony in the State of Texas.

R. 40:221.

Mr. Smithey then was asked to focus on the prevalence of violence in the prison. Smithey testified that "at least some inmates continue criminal activities once they are in prison," R. 40:222, and that violent crimes "happen fairly often" in the prison system. *Id.*

Smithey then described in great detail the kinds of weapons "used by inmates inside the penitentiary," R. 40:222-223, including hard objects placed in socks to swing at someone, objects sharpened into knives, homemade bombs "made from different articles that the inmates are allowed to have" (such as nitroglycerine medication, razor blades, and sulphur from match tips, mixed together in a bottle with a fuse), sheets or towels with which to choke people, and steel-toed boots issued for various inmate jobs which are then used to "stomp" and "kick" people. R. 40:223-224.

According to Smithey, the number of murders that result from violent crimes in the prison system has ranged from 1-5 murders per year, except for two years in the mid-1980's where there were 24 one year and 25 the next. R. 40:224-225.

The figures for violent crimes on death row are lower than in the general prison population because of the more restricted confinement there. R. 40:225. Mr. Smithey testified that on death row the inmates' movement is severely restricted and it is easier to control and

70

maintain the prisoners than in the general population.  *Id.*  Also death row inmates, as opposed to

other inmates, don't have access to teachers, social workers, and other employees.  R. 40:225-

226.

   Mr. Smithey's testimony concluded with his opinion that there were almost no

constraints, except for self-restraint, against general population prisoners becoming involved in

violence:

> Q.     So basically what you are saying if a TDC inmate wants to be involved in
>        violent behavior they can certainly do so?
>
> A.     Very much so.

R. 40:227.

   On cross examination, defense counsel asked whether, during the classification process,

psychological tests were given which could determine a person's propensity for violence.  Mr.

Smithey knew of no such tests.  R. 40:222-223.

   In the defense penalty phase case, no evidence was introduced to establish that the prison

system utilized psychological testing to determine a prisoner's propensity for violence or to

address any other aspect of Smithey's testimony.

   In his closing arguments in the penalty phase, the prosecutor argued for a finding that Mr.

Wardlow would be dangerous in prison if he was sentenced to life imprisonment on the basis of

Mr. Smithey's testimony:

> You remember, too, and you are talking about 'a future danger to society,' the law
> defines 'society' as the prison system is part of society, too.  They are people in
> the prison system whether inmates or employees and if you are an employee you
> certainly deserve the right to live happy days.
>
> 'Life,' you have heard the testimony of the life sentence is those people are often

> times placed in the general population, have access to all sorts of inmates, not
> violent and violent inmates, have access to employees, do those employees
> deserve to be confronted at some point in their life by the Defendant in this case if
> for some reason one of them makes the terrible mistake of 'pissing him off'?
>
> We know from State's Exhibit 73 what happened to somebody that 'pisses him
> off.' If they do that he decides he's got the right to take their life from them.

R. 40:301.  Responding to defense counsel's suggestion on cross-examination of Mr. Smithey

that the prison system had a process for screening incoming prisoners for violent tendencies, the

prosecutor also argued that there was no evidence that such a safeguard was in place:

> Mr. Old wants you to think this diagnostic unit at the penitentiary
> can protect society from Billy Wardlow. That's not what the
> testimony from the witnesses said, that's what Mr. Old said for
> you.

R. 40:335.

### b.      Legal Basis for the Claim

The import of the testimony presented through Royce Smithey was that, if sentenced to

life imprisonment, Mr. Wardlow

(i)      would be placed in the general population of the prison system,

(ii)     where violent crimes "happen fairly often,"

(iii)    without having been screened for any propensity for violent behavior on the basis

of the crime for which he was convicted,

(iv)     and would have no constraints upon his own demonstrated willingness to kill

someone out of anger except for his own self-restraint.

On the basis of this testimony, the prosecutor was able to argue quite persuasively that

there was too great a risk of future danger for Mr. Wardlow to be sentenced to life.

72

The testimony of Royce Smithey was irrelevant and highly prejudicial, but defense counsel did not object to it and made no effort otherwise to limit its reach. Counsel's failure to object to the introduction of Smithey's testimony was not reasonable. *Strickland v. Washington*, 466 U.S. at 690. Further, counsel's constitutionally deficient performance prejudiced Mr Wardlow. "[T]here is a reasonable probability that, but for counsel's unprofessional error[], the result of the [sentencing] proceeding would have been different." *Id.* at 694.

The testimony of Mr. Smithey was objectionable under the principles of *Matson v. State*, 819 S.W.2d 839, 848-854 (Tex.Cr.App. 1991). In *Matson*, the defense proffered an expert in the penalty phase of a capital case who had studied rates of recidivism, including incidents of prison violence, among youthful offenders, and who had concluded that the longer the period of incarceration the less likely a youthful offender was to engage in future violent conduct. *Id.* at 848-849. This expert was also prepared to testify on the basis of a hypothetical that a person of Matson's age and prior criminal record who served a sentence as long as 20-30 years was a good candidate for rehabilitation and was unlikely to commit future acts of violence. *Id.* The trial court excluded the evidence, and Mr. Matson was sentenced to death.

On appeal, the state argued that the expert testimony was irrelevant because it was too generalized to be probative on the question of whether Matson posed a risk of future dangerousness:

> The State also argues that the witness based his opinion on experience in the criminal justice system and probability estimates 'in general' rather than on individuals with characteristics and backgrounds similar to those of appellant. The State points out that the witness had no personal knowledge of the appellant and argues that 'the only way to make predictions [of future dangerousness] relevant is to be able to substantially match the appellant's background with a corresponding group which served long sentences and had positive outside

73

> influence.' The State concludes that 'the bottom line is that the evidence offered
> was not individualized so as to be of help in predicting the appellant's future
> behavior.'...

819 S.W.2d at 852. The Court of Criminal Appeals accepted the principle underlying the state's

argument — that evidence based upon "experience in the criminal justice system and probability

estimates 'in general,'" *id.* at 852, was irrelevant unless particularized to the defendant in

question — but rejected its argument on the facts of the case:

> We disagree for the simple reason that the State's argument fails to consider that
> after appellant's witness explained the data upon which he was basing his
> testimony he was asked hypothetical questions which included the specific
> characteristics and background of appellant as developed during the trial of this
> case.

*Id.*

Since *Matson* and since the trial in Mr. Wardlow's case in 1995, the Court of Criminal

Appeals has maintained this position with respect to this kind of evidence. *See, e.g., Rachal v.

State*, 917 S.W.2d 799, 815-818 (Tex.Cr.App.), *cert. denied*, ___ U.S. ___, 117 S.Ct. 614 (1996)

("[b]ecause it did not address appellant's individual propensity or lack of it for continuing future

acts of violence, such information simply is not of assistance in the factual determination before

the jury...[;] [u]nlike [the expert in *Matson*] Marquart [the expert here] did not intend to testify

about appellant's individual profile within the context of his studies and research"); *Mosley v.

State*, 1998 WL 348513 *17 (Tex.Cr.App. 1998) (same).

*Matson* required the exclusion of Royce Smithey's testimony. Smithey's testimony had

nothing to do with Mr. Wardlow individually. He testified on the basis of his "experience in the

criminal justice system and probability estimates 'in general,'" *Matson*, 817 S.W.2d at 852, that

"violent crimes ... happen fairly often in the prison system," R. 40:222, and that the prison

classification process ignores the nature of a prisoner's crime in deciding whether to place him in the general population. The implication of Smithey's testimony — made explicit in the prosecutor's penalty phase argument — was that a person who committed a crime like Mr. Wardlow's was more likely to commit the crimes of violence which occurred "fairly often" in the prison system. Thus, while Smithey himself did not conclude that Mr. Wardlow was likely to be a future danger in prison, his testimony provided the predicate for the prosecutor to urge the jury to reach that conclusion. For these reasons, Smithey's testimony must be measured under *Matson*.

As with expert analysis that is not individualized to a particular defendant, Smithey's testimony provided no factual basis for the conclusion that, based on classification procedures and the "fairly" frequent occurrence of acts of violence by inmates in general, Mr. Wardlow would likely be dangerous. Smithey's testimony did not specify the proportion of violent crimes, if any, committed by persons who had been convicted of capital murder and sentenced to life. It did not attempt to explain whether persons who were convicted of murders similar to Mr. Wardlow's were responsible for any crimes of violence in prison. It did not explain how a prisoner's pretrial behavior in jail or any other factors that might be predictive of violent behavior in prison were taken into account in the prison classification process.

Having no individualized connection to Mr. Wardlow, this evidence would have been excluded under *Matson*. Counsel's failure to interpose an objection under *Matson*, decided four years before Mr. Wardlow's trial, was, therefore, unreasonable.

There is also a reasonable probability that the sentencing decision would have been different had this testimony not been admitted. As the Court of Criminal Appeals' direct appeal

75

opinion makes clear, there was little hard evidence, other than the crime itself, upon which the

jury could have based its finding of future dangerousness. *See Wardlow v. State*, No. 72,102,

Mem. Op. at 1-5. On the basis of Smithey's testimony, the prosecutor was able to take the facts

of the crime and to project that Mr. Wardlow would be able to repeat these behaviors at will in a

prison environment that offered no constraints upon those who had murdered before. Even

though this projection had nothing to do with Mr. Wardlow individually, the jury could well have

believed that if Mr. Wardlow were sentenced to life imprisonment they were condemning

countless others to death by his hand. In these circumstances, defense counsel's failure to object

to the Smithey testimony played a significant enough role in the outcome of the sentencing

proceeding to "undermine confidence in the outcome." *Strickland v. Washington*, 466 U.S. at

694.

> **5.     Trial counsel failed to object to the non-expert testimony of the
> medical examiner that the gun which killed Mr. Cole was fired from
> at least three feet away, and failed to obtain the assistance of firearms
> and crime scene reconstruction experts to help explain how the
> physical evidence was consistent with Mr. Wardlow's testimony
> concerning the manner in which Mr. Cole was killed.**

> **a.     Relevant Facts**

The medical examiner, Dr. Jeffrey Barnard, testified on behalf of the prosecution that

during the autopsy on Mr. Cole he found no evidence of gunpowder residue at the entrance

wound. R. 33:146. On this basis, he then expressed the opinion that the gun was fired from

"somewhere around three feet or greater." *Id.*

In his closing argument in the guilt phase, the prosecutor used this aspect of the medical

examiner's testimony to rebut Mr. Wardlow's trial testimony that the gun went off during a

76

struggle with Mr. Cole: "[T]he only problem with [Mr. Wardlow's testimony] ... of course, is that that doesn't jibe [sic] with what the medical examiner said. The medical examiner said that it had to be over three feet." R. 38:811.

The defense failed to object to this testimony by Dr. Barnard even though the opinion he expressed was not within his expertise. Trial counsel gives no reason for his failure to object except that he was not expecting a pathologist to give this kind of testimony, and "it just got by me." Exhibit 9, at 2.

As a medical examiner, Dr. Barnard had the expertise to determine whether there was a foreign substance such as gunshot residue on the skin of a homicide victim. However, absent specialized training and experience in firearms analysis, Dr. Barnard was not qualified to render an opinion about the likely distance from which a weapon was fired. Nothing in the record established that Dr. Barnard had any special training or expertise in firearms analysis. In addition, there was no testimony from a qualified expert that the murder weapon itself was test-fired to determine how far away the weapon would have to be to leave no gunshot residue on the skin of the victim.

In the present proceeding, counsel for Mr. Wardlow submitted the affidavit of C.E. Anderson, former director of the Houston Police Department firearms laboratory. Exhibit 14. Mr. Anderson makes the point that the only way to determine the distance from which a weapon is fired is for a qualified firearms examiner to test-fire that weapon and examine the residue that is deposited in the field of fire. *Id.* He points out that there was no evidence that such a procedure was followed prior to the time Dr. Barnard testified. *Id.* The prosecution firearms expert, Raymond Cooper, testified concerning the gun and the ammunition in it, but he did not

indicate that a test-firing had been done.  R. 34:364-378.  Thus, at the time Dr. Barnard testified, there was no evidentiary basis for this aspect of his testimony.

### b.      Legal Basis for the Claim

Trial counsel's failure to object to the testimony of Dr. Barnard concerning the distance from which the fatal shot was fired was unreasonable.  As Mr. Old admitted in his affidavit, Dr. Barnard does not appear to have the expertise to give this kind of opinion testimony.  Exhibit 9, at 2.  Mr. Old does not attempt to provide a reason for failing to object.  *Id.*

Accordingly, because of defense counsel's unreasonable failure to object, an unqualified expert gave an opinion on a matter that was, perhaps, dispositive of the case.  The opinion given by Dr. Barnard at trial should not have been allowed and would not have been allowed had the defense objected.  At the time of trial, the prosecution had not test-fired the murder weapon. Thus, there was no evidentiary support for this unqualified expert opinion.

The prejudice to Mr. Wardlow from counsel's failure to object is palpable.  As the prosecutor summed it up in his guilt phase closing, "when you boil it all down everything is undisputed except one part, there's only one part for us to argue about and that is whether this guy here did it intentionally or not."  R. 38:772.  The evidence concerning the distance from which the gun was fired was crucial evidence on this issue.  Nevertheless, trial counsel permitted an unqualified witness to express an adverse opinion on this very issue without objection.  Had a proper objection been interposed, the prosecution would have had no factual basis upon which to argue that the physical evidence made implausible Mr. Wardlow's testimonial claim that the killing was the unintended result of a struggle.  Because of this deficit in counsel's performance, the only issue that was in dispute was bound to be resolved in favor of the state.  There is a

78

reasonable probability that the outcome of the trial would have been different had trial counsel performed reasonably concerning this issue.

### 6. The State Court's Rulings Deserve No Deference

These claims of ineffective assistance of counsel were raised in state habeas proceedings. The trial court proposed a disposition of the claims, but on mandatory review, the Court of Criminal Appeals neither adopted nor rejected the recommended findings and conclusions by the trial court. Instead, the Court of Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission to waive further appeals, barred him from filing a state habeas application, and pursuant to that order dismissed his state habeas application. Exhibit 4. This ruling is not based on an independent and adequate procedural ground as required for a default in state proceedings to bar the merits of a claim in federal habeas. *See Harris v. Reed, supra.* Accordingly, the trial court's proposed findings and conclusions cannot be given deference – because they were not adopted by the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be given deference. These claims must be decided *de novo.*

**F.** **Mr. Wardlow was denied due process in the sentencing phase of his trial because (a) the testimony of Royce Smithey created false impressions about the prison classification process, the frequency of violent acts by prison inmates, and the frequency of violent acts by inmates convicted of capital murder and sentenced to life imprisonment, and (b) the prosecutor should have known that Smithey's testimony was misleading and would create false impressions with the jury that were material to the outcome of the sentencing process.**

### 1. Relevant Facts

The relevant facts set forth in Claim E (4)(a), *supra,* concerning the testimony of Royce Smithey and the prosecutor's argument in reliance on it, are incorporated by reference.

79

Royce Smithey's testimony created a number of false impressions because of Mr. Smithey's omission of relevant information. These false impressions have been detailed in the Affidavit of Dr. Mark Cunningham, Exhibit 15.

Mr. Smithey used the term "general population" as an umbrella designation for all inmates who are not on death row or in administrative segregation. Mr. Smithey went on to testify that classification of Mr. Wardlow to "general population" would mean that Mr. Wardlow would have regular, unsupervised contact with any inmate not on death row or in administrative segregation. Exhibit 15, at 17. This reference to "general population" as if there are no restrictions and classifications within general population is misleading. *Id.* The degree of movement of a given "general population" inmate is determined by the security level of that institution, the section of the institution to which the inmate is assigned, and the security classification within that unit. *Id.* As that security level goes up, movement is increasingly controlled, restricted, and supervised. *Id.* Inmates are classified according to a determination of their security needs – and their level of restriction, supervision, and contact with staff and other inmates varies accordingly. *Id.*

Mr. Smithey's testimony left a false impression that classification of the inmate population within TDCJ did not meaningfully incorporate the offense of conviction. Exhibit 15, at 17. Thus, Smithey testified:

> Q.   So there – are you telling me basically that their classification is not necessarily based on the type crime they have committed?
>
> A.   No. It's not.

R. 40:220. While Mr. Smithey's testimony is technically accurate, it is incomplete. Exhibit 15, 1t 17. The seriousness of the offense of conviction and the associated length of sentence are a

part of the classification scheme, but not the only variables considered. *Id.* The fundamental

issue, not acknowledged by Mr. Smithey, is that TDCJ appraises the threat that each inmate

represents and assigns them to a security classification within TDCJ that corresponds to that

assessment. *Id.*

In giving the impression that the crime of conviction was ignored, Mr. Smithey also fed

into the intuitive sense of most jurors that persons convicted of capital murder are likely to be

more violent in prison than persons convicted of other crimes. Exhibit 15, at 16. The empirical

data shows just the opposite to be true. Persons convicted of murder and other serious crimes of

violence and sentenced to life imprisonment have a low base rate of serious institutional violence

~~compared to other inmate groups. *Id.* Studies have consistently shown — counter-intuitively —~~

that inmates convicted of more serious offenses and facing longer prison sentences displayed

better prison adjustment than short-term less serious offenders. *Id.*

Mr. Smithey's testimony left the impression that the likelihood of prison violence would

be less if Mr. Wardlow were on death row rather than in general population of TDCJ. R.

40:225-227. Exhibit 15, at 17. Mr. Smithey acknowledged that violence occurs on death row as

well, but his characterizations conveyed an assumption that the rates were lower on death row

because of death row's enhanced security procedures. *Id.* at 17-18. Such a conclusion is not

supported by empirical research. *Id.* at 18. The sentence a capital defendant receives does not

appear to significantly affect subsequent base rates of violence while incarcerated. *Id.* Persons

convicted of capital murder and sentenced to death have the same base rates of violence as

persons sentenced to life imprisonment. *Id.*

Similarly, Mr. Smithey's testimony regarding death row procedures did not clearly and

candidly portray the movement and contact with other inmates and staff available to many death

row inmates in 1995. Exhibit 15, at 18. Approximately one-third of death row inmates were classified as work capable, placed in two man cells without wire mesh, not handcuffed, and fed buffet style from steam tables so that they could choose to eat in their cells or in a common area. *Id.* Work-capable inmates took showers in the general prison population bathhouse and were permitted to be out of their cells for 14 hours a day on weekdays and 10 hours a day on weekends. *Id.* A portion of these inmates worked as orderlies and janitors on the cellblock, but most worked in a garment factory. *Id.*

Mr. Smithey's testimony regarding the rate of inmate-on-inmate homicide in TDCJ was incomplete. Exhibit 15, at 19. The rate of homicide in TDCJ had not wildly fluctuated across the seven years prior to Mr. Wardlow's 1995 punishment proceedings, as his testimony suggested. *Id.* Rather, Mr. Smithey failed to explain that his description of 24 and 25 homicides annually for two years in the mid 1980's referred to a period of time in TDCJ when the "building tender" system had been rejected by the courts, there were marked staffing shortages, and a sudden rise in prison gang population and turf battles was occurring. *Id.* The number of the inmate-on-inmate homicides rate fell dramatically across 1985-1986 with the administrative segregation confinement of known and suspected gang members and other policy, staffing, and procedure changes that fundamentally altered the context of confinement in TDCJ. *Id.* Thereafter, essentially the same inmate population displayed markedly different rates of serious violence depending on the context of confinement. *Id.*

Mr. Smithey's description of the frequency of assaults of inmates and staff within TDCJ, as "fairly often," R. 40:222, was misleading. Exhibit 15, at 14.

      (a)    According to statistical data from TDCJ, in 1994 there were 652 assaults

82

on inmates and 311 assaults on staff. *Id.* "As an absolute number, 963 assaults could be considered 'fairly often.'" *Id.* However, when more meaningfully considered in relation to the inmate population of TDCJ, a characterization of "infrequent" becomes more accurate. *Id.* Specifically, in 1994, the inmate population of TDCJ was 95,945. *Id.* "Thus the 963 assaults in 1994 involved only 1% of the inmate population or less (multiple assaults may have been perpetrated by the same offender thus reducing the percentage of inmates involved)." *Id.* The 1% rate of assault is "markedly less if the definition of assaults is limited to those involving the use of an actual weapon and/or resulting serious injury." *Id.* "In other words, if these statistics are applied as reference points for a violence risk assessment of Mr. Wardlow, he would have no more than a 1% likelihood of any assault in a given year." *Id.*

      (b)    Even raw numbers such as these tend to be misleading, however, in determining absolute and comparative levels of violence risk. Exhibit 15, at 19. "More important is the rate, or frequency of event as a function of population. The marked *infrequency* of inmate homicide in TDCJ becomes evident when it is viewed as a rate." *Id.* For example, the average annual rate of inmate-on-inmate homicide across the three years prior to Mr. Wardlow's 1995 punishment proceedings was 4.46 per 100,000 inmates per year. *Id.* This low rate of homicide is particularly extraordinary when it is noted that 37,766 (46%) inmates confined in TDCJ in 1994 had violent offenses of conviction, and over 8,000 had been convicted of a homicide in the community. *Id.* In spite of this concentration of violent felons, the rate of homicide in TDCJ in 1992-1994 was substantially *below* that of the community. *Id.* For example, for the same period of time, the rate of homicide in Dallas was 30.4 per 100,000; Houston, 25.9 per 100,000; Texas, 11.9 per 100,000; United States, 9.5 per 100,000. *Id.* "The

83

rates of homicide in the community are even higher if the community base rates are adjusted to match the prison population for gender, age, and ethnicity." *Id.* at 19-20.

Finally, Mr. Smithey's testimony gave the impression that TDCJ was not able to engage in effective assessment of the risk of inmate violence, R. 40:232-233 (no knowledge of psychological testing for propensity for violence) or to interpose any security measures that would prevent inmate violence other than death row. His testimony "conveyed the impression that the increased security of death row was the only viable intervention for limiting an inmate's opportunities to perpetrate serious violence." Exhibit 15, at 20. Thus, Smithey testified:

> Q.    So basically what you are saying [is] if a TDC inmate wants to be involved
>        in violent behavior they can certainly do so?
>
> A.    Very much so.

R. 40:227. While the availability of administrative segregation was acknowledged by Mr. Smithey, the associated procedures and extensive availability of administrative segregation were not fully or coherently presented. Exhibit 15, at 20.

In particular, Mr. Smithey did not report that in 1995 there were thousands of administrative segregation cells in TDCJ and many more in planning or under construction. Exhibit 15, at 21. He did not report that the vast majority of inmates in administrative segregation are single-celled and thus effectively isolated from physical contact with other inmates. *Id.* He did not report that in administrative segregation the inmate is locked down in his cell 23 hours a day, and that his "recreation" is solitary. *Id.* He did not report that an inmate in administrative segregation is shackled behind his back before the cell door is opened, and that any time the inmate comes out of his cells he is shackled and under close escort. *Id.* He did not

84

report that an inmate on administrative segregation may be subjected to restricted communication and visitation. *Id.* He did not report that this high-security administrative confinement can be continued indefinitely if risk factors continue to warrant it. *Id.*

The truth is that TDCJ relies on institutional security and supervision rather than inmate self-restraint to control inmate violence. The impression given by Mr. Smithey that TDCJ is apathetic, inept, or incompetent in its classification functions was false.

## 2.     Legal Basis for the Claim

No objection was made by the defense to the admission of Royce Smithey's testimony or to any aspect of it. Ordinarily under Texas law, the failure to object to a matter at the time that it is known or should have been known fails to preserve a claim for review. *See, e.g., Ex parte Dutchover*, 779 S.W.2d 76, 77 (Tex. Crim. App. 1989). This bar is not operative here, however, because prosecutors have a duty – independent of the diligence of defense counsel – not to present false testimony. *See Ex parte Fierro*, 934 S.W.2d 370, 374 n.10 (Tex. Crim. App. 1996) (ruling on the merits of a false testimony claim first raised in a successive habeas application even though "the facts supporting applicant's claim were available in time to raise the issue on direct appeal"). *Accord United States v. Barham*, 595 F.2d 231, 243 n.17 (5th Cir. 1979).

The law is clear. If a prosecutor knows or *should have known* that he is presenting false or misleading evidence, the prosecutor's introduction of the evidence violates due process. *United States v. Agurs*, 427 U.S. 97, 103 (1976) (citing *Mooney v. Holohan*, 294 U.S. 103 (1935), for the principle that the presentation of false evidence violates due process when the prosecutor "knew or should have known, of the perjury"); *Napue v. Illinois*, 360 U.S. 264 (1959). *See also Chambers v. Johnson*, 218 F.3d 360, 364 (5th Cir.), *cert. denied*, 121 S.Ct. 508 (2000)

85

(in establishing a false evidence claim, the habeas petitioner must show, *inter alia*, that "[the] prosecutors knew or should have known of the[] falsity" of the evidence). The same rule applies when the testimony is technically true but creates a false impression because of what is omitted. *Alcorta v. Texas*, 355 U.S. 28, 31 (1957).

The testimony of Royce Smithey created false impressions about (a) the ineptitude of the Texas Department of Criminal Justice in assessing incoming non-death-sentenced inmates' propensity for violence, classifying them appropriately, and housing them in a manner that does not put other inmates and staff at risk, (b) the frequency of violent acts perpetrated in TDCJ by inmates sentenced to life for capital murder, and (c) TDCJ's failure to take into account the nature of the crime of conviction in the classification process. These impressions were created, as in *Alcorta v. Texas*, by omission of information rather than by perjury.

The district attorney should have known that the impressions created by Mr. Smithey's testimony were false. Many of the studies showing that inmates convicted of capital murder, regardless of whether their sentence was death or life, were less likely than most other TDCJ inmates to be involved in violence in prison, were published and widely publicized in 1989, long before Mr. Wardlow's trial. Moreover, in *Matson v. State*, 817 S.W.2d at 848-849, in 1991, studies raising similar questions about future dangerousness, based upon empirical data drawn from the behavior of Texas prisoners, were discussed. The implication of the ineffectiveness of TDCJ's classification process was so extreme that a reasonable prosecutor should have known to verify the accuracy of Mr. Smithey's account. Any independent investigation would have revealed that Smithey was – consciously or not – providing a woefully incomplete account of TDCJ's classification process and its proven ability to deal effectively with, and reduce, prison violence. The reason for, and TDCJ's response to, the unusually high inmate homicide rate in

86

1985-1986 demonstrated quite dramatically TDCJ's effectiveness in recognizing the cause of

and curbing prison violence. Moreover, even a simple comparison between the homicide rates

in Texas and the homicide rates within TDCJ would have led a reasonable prosecutor not to rely

on Smithey. At the very least, therefore, Mr. Wardlow's prosecutor should have known, in

1995, that the impressions created by Mr. Smithey's testimony were questionable and should not

have proceeded with his testimony until he had researched its accuracy.

### 3.     This Error Is Not Harmless

The inference drawn by the prosecutor from the Smithey testimony – that Mr. Wardlow

would be free and likely to repeat his murderous behavior in prison – undoubtedly influenced the

jury in finding future dangerousness. As the Court of Criminal Appeals' direct appeal opinion

makes clear, there was little hard evidence, other than the crime itself, upon which the jury could

have based its finding of future dangerousness. *See Wardlow v. State*, No. 72,102, Mem. Op. at

1-5. The background evidence  provided by Mr. Smithey, of a prison system with rampant

violence unchecked by any consideration of the nature of the crimes that brought prisoners into

the system, provided a powerful context for the prosecutor's portrayal of a life sentence as an

invitation for Mr. Wardlow to kill again. Accordingly, the prosecutor's violation of Mr.

Wardlow's rights under Due process Clause of the Fourteenth Amendment, "'had substantial and

injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson*, 507 U.S.

619, 637 (1993).

### 4.     The State Court's Rulings Deserve No Deference

This claim was raised in state habeas proceedings. The trial court proposed a disposition

of this claim but on mandatory review, the Court of Criminal Appeals neither adopted nor

rejected the recommended findings and conclusions by the trial court. Instead, the Court of

Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission

to waive further appeals, barred him from filing a state habeas application, and pursuant to that

order dismissed his state habeas application. Exhibit 4. This ruling is not based on an

independent and adequate procedural ground as required for a default in state proceedings to bar

the merits of a claim in federal habeas. *See Harris v. Reed, supra.* Accordingly, the trial court's

proposed findings and conclusions cannot be given deference – because they were not adopted by

the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be

given deference. This claim must be decided *de novo.*

G.  **Trial counsel provided ineffective assistance in failing to confront the
testimony of Royce Smithey with cross-examination and expert rebuttal
testimony that would have exposed the misleading, false impressions created
by his testimony.**

1.  **Relevant Facts**

The only preparation trial counsel undertook to confront Royce Smithey was to interview

him at the courthouse during a recess in the penalty phase proceedings, shortly before he

testified.

Trial counsel did nothing to verify the accuracy of any of the information put forward by

Smithey, even though at least one aspect of it – TDCJ's purported failure to conduct

psychological assessment of inmates' propensity for violence – did not ring true to Mr. Old (as

shown by Old's cross-examination of Smithey).

Based on the Affidavit of Dr. Mark Cunningham (Exhibit 15), all of the information

necessary to confront Smithey and show that his testimony was incomplete and misleading was

available at the time of Mr. Wardlow's trial in 1995.

88

## 2.    Legal Basis for the Claim

Counsel performing reasonably should have recognized, at least by the end of his interview with Mr. Smithey, that Smithey's testimony was going to be quite damaging and that it was probably misleading.

The very same factors that should have led a reasonable prosecutor to know that Smithey's testimony would give rise to false impressions should have led reasonable defense counsel to investigate the accuracy of Smithey's testimony. *See* Claim F, § 2, *supra.* Counsel's performance was, therefore, deficient under the *Strickland* standard.

Counsel's performance was also prejudicial under the *Strickland* standard. *See* Claim F, § 3, *supra.*

## 3.    The State Court's Rulings Deserve No Deference

This claim was raised in state habeas proceedings. The trial court proposed a disposition of this claim but on mandatory review, the Court of Criminal Appeals neither adopted nor rejected the recommended findings and conclusions by the trial court. Instead, the Court of Criminal Appeals held that its previous order of July 14, 1998, granting Mr. Wardlow permission to waive further appeals, barred him from filing a state habeas application, and pursuant to that order dismissed his state habeas application. Exhibit 4. This ruling is not based on an independent and adequate procedural ground as required for a default in state proceedings to bar the merits of a claim in federal habeas. *See Harris v. Reed*, *supra.* Accordingly, the trial court's proposed findings and conclusions cannot be given deference – because they were not adopted by the Court of Criminal Appeals – and the Court of Criminal Appeals' default ruling cannot be given deference. This claim must be decided *de novo.*

89

## VI.  PRAYER FOR RELIEF

Wherefore, BILLY JOE WARDLOW prays that this Court:

A.      Order Respondent to provide this court with the record of all state court proceedings;

B.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be

discharged from his unconstitutional confinement and restraint and/or relieved of his

unconstitutional sentence of death;

C.      Grant an evidentiary hearing so that he may present evidence in support of these claims;

and

D.      Grant such other relief as law and justice require.

Respectfully submitted,

MANDY WELCH                          RICHARD BURR
TBA No. 21125380                      TBA No. 24001005
412 Main Street, Suite 1100          412 Main Street, Suite 1100
Houston, Texas 77007                 Houston, Texas 77002
(713) 516-5229                       (713) 628-3391
(713) 893-2500 fax                   (713) 893-2500 fax


By   _Mandy Welch_____
COUNSEL FOR BILLY JOE WARDLOW


## VERIFICATION

Under penalty of perjury, I hereby declare that all the factual allegations made herein are true and accurate except for those allegations made upon information and belief.


Dated:   _11/22/04_____                        _Mandy Welch_____
                                                Mandy Welch

90

## CERTIFICATE OF SERVICE

I, Mandy Welch, hereby certify that the foregoing petition, together with the exhibits, was served on the Attorney General for the State of Texas, Counsel for Respondent, by mailing the petition and exhibits on ___Nov 22_____, 2004, with first class postage affixed to:

> Gena Bunn, Esquire
> Chief, Postconviction Litigation Division
> P.O. Box 12548
> Austin, Texas  78711-2548


_____
Mandy Welch

91