IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
SHERMAN DIVISION

| | | |
|---|---|---|
| BILLY JOE WARDLOW, | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:04cv408 |
| | § | (Judge Richard A. Schell) |
| DOUG DRETKE, Director, | § | |
| Texas Department of Criminal Justice, | § | |
| Correctional Institutions Division, | § | |
| Respondent. | § | |

## RESPONDENT DRETKE'S ANSWER WITH BRIEF IN SUPPORT

Petitioner Billy Joe Wardlow was convicted and sentenced to death by a Texas court for the capital murder of 82-year-old Carl Cole. He now challenges the validity of his conviction and sentence in this Court pursuant to 28 U.S.C. §§ 2241 and 2254. However, Wardlow has failed to demonstrate that he is entitled to federal habeas corpus relief. His petition must therefore be denied with prejudice. Respondent Dretke ("the Director") denies all allegations of fact made by Wardlow, except those supported by the record[1] and those specifically admitted herein.

## PETITIONER'S ALLEGATIONS

In his federal habeas petition, Wardlow alleges seven separate constitutional violations during the course of his state capital murder trial and subsequent proceedings. Specifically, the Director understands Wardlow to raise the following grounds for federal relief:

---

[1] Copies of Wardlow's state trial, direct appeal, and habeas corpus records have previously been provided to the Court.

1.     That the State obtained Wardlow's confessial letter in violation of his Fifth and Sixth Amendment rights.(Wardlow's Petition at 21).

2.     That Wardlow was denied the effective assistance of counsel on direct appeal (Wardlow's Petition at 38).

3.     That the State substantially interfered with co-defendant Tonya Fulfer's choice to testify on Wardlow's behalf in violation of Wardlow's rights to due process and a fair trial under the Sixth, Eighth, and Fourteenth Amendments. (Wardlow's Petition at 40).

4.     That the State failed to disclose to the defense material, exculpatory evidence regarding co-defendant Tonya Fulfer's version of the events, in violation of Wardlow's due process rights. (Wardlow's Petition at 49).

5.     That Wardlow was denied the effective assistance of counsel at trial as guaranteed by the Sixth Amendment. (Wardlow's Petition at 53).

6.     That the State knowingly presented testimony creating a false impression before the jury in violation of Wardlow's due process rights. (Wardlow's Petition at 79).

7.     That trial counsel rendered constitutionally ineffective assistance by failing to rebut the allegedly false testimony presented by the State. (Wardlow's Petition at 88).

As discussed more fully below, all of Wardlow's requests for relief must fail.  In particular, Wardlow's claim that admission of his confessial letter violated the Fifth Amendment was adjudicated on the merits by the Texas Court of Criminal Appeals on direct appeal, and Wardlow has failed to show that that adjudication was either contrary to, or involved an unreasonable application of, clearly established Supreme Court precedent.  Thus, 28 U.S.C. § 2254(d) prohibits the grant of habeas corpus relief on this claim.  Wardlow's Sixth Amendment claim based on the same facts is procedurally defaulted based on the state

court's refusal to review the merits in light of Wardlow's failure to comply with a state procedural rule and is, alternatively, meritless. The remainder of Wardlow's claims are procedurally barred based on the Texas Court of Criminal Appeals' dismissal of Wardlow's state habeas application on procedural grounds. Alternatively, relief on these claims is foreclosed by factual findings of the state trial court, which must be presumed correct on federal habeas corpus review pursuant to 28 U.S.C. § 2254(e)(1) despite the absence of a final merits adjudication of the claims. Wardlow's federal petition for writ of habeas corpus therefore cannot be granted.

## STATEMENT OF THE CASE

In January and February of 1995, Wardlow was tried, convicted, and sentenced to death for the robbery and brutal murder of 82-year-old Carl Cole. 2 Tr 147-155, 157-164, 165-168;[2] *see also* TEX. PENAL CODE ANN. § 19.03(a)(2) (Vernon Supp. 1995). His conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals, which affirmed in an unpublished opinion on April 2, 1997. *Wardlow v. State,* No. 72,102 (Tex. Crim. App.). Wardlow did not petition the United States Supreme Court for certiorari review.

---

[2] "Tr" refers to the Transcript, which contains the pleadings, orders, and other documents filed with the clerk during the course of Wardlow's state trial, preceded by volume number and followed by page numbers. "SF" refers to the Statement of Facts, the record of transcribed trial proceedings, proceeded by volume number and followed by page numbers. "SX" refers to the numbered trial exhibits offered by the State at trial; "DX" refers to the numbered trial exhibits offered by the defense at trial. "SHTr" refers to the transcript of pleadings, orders, and other documents filed with the clerk during Wardlow's state habeas proceedings, followed by page numbers.

On July 21, 1997, the convicting court, Judge Gary Stephens presiding, conducted a hearing pursuant to Article 11.071 § 2(a-c) of the Texas Code of Criminal Procedure to determine whether Wardlow desired the appointment of counsel to assist him in filing an application for writ of habeas corpus.[3] *See* Respondent's Appendix 1. Wardlow appeared at this hearing in person and through counsel, James Clark, and indicated that he did not desire to have counsel appointed and did not desire to have any further appeals filed on his behalf. *Id.* Wardlow – whom Judge Stephens explicitly found to be competent – voluntarily and intelligently waived his right to appointed counsel and his right to proceed pro se in open court. *Id.* Judge Stephens signed his findings memorializing this hearing on September 2, 1997, and thereafter forwarded them to the Texas Court of Criminal Appeals. *Id.*

However, on September 25, 1997 – more than two months after standing in open court and waiving his rights to representation and to pursue further appeals, Wardlow "entered into a legal representation agreement with attorney Mandy Welch . . . in which she agreed to notify the appropriate courts that [Wardlow] did, in fact, wish to pursue his post-conviction remedies." Petitioner's Exhibit 4 at 2. On January 5, 1998, the convicting court entered supplemental fact findings confirming Wardlow's wish to pursue habeas relief. Respondent's Appendix 2. On that basis, the Court of Criminal Appeals, on January 21, 1998, appointed attorney Mandy Welch to represent Wardlow and ordered that his state

---

[3] Prior to this hearing, Wardlow had already corresponded to the Texas Court of Criminal Appeals "asking [the court] to refrain from appointing him counsel for habeas and to immediately set an execution date for him." Petitioner's Exhibit 4 at 2.

habeas application be filed within 180 days. Respondent's Appendix 3.

Then on July 2, 1998, eighteen days before Wardlow's filing deadline, the Court of Criminal Appeals received another letter from Wardlow yet again expressing a desire "to waive and forego all further appeals." Petitioner's Exhibit 1. The Court of Criminal Appeals granted Wardlow's request to abandon further appeals in an order dated July 14, 1998. Petitioner's Exhibit 2. Despite that order, however, counsel filed a state habeas application in the convicting court on July 20, 1998, the 180th day after her appointment. SHTr 1-67. The application raised essentially the same seven claims for relief raised in the instant petition. On March 2, 2004, Judge Stephens issued his findings of fact and conclusions of law and forwarded them to the Texas Court of Criminal Appeals along with his recommendation that the relief requested be denied. *See* Supplemental SHTr 3-21. However, in a written order issued on September 15, 2004, the Texas Court of Criminal Appeals dismissed Wardlow's application on procedural grounds, declining to review the merits of his claims. Specifically, the court dismissed the application based on its July 14, 1998 order granting Wardlow's request to abandon further appeals. *Ex parte Wardlow*, Writ No. 58,548-01. The court denied Wardlow's motion for rehearing on October 20, 2004.

## STATEMENT OF FACTS

### 1.   Guilt-Innocence Phase

In the late afternoon of June 14, 1993, Charles Cole arrived at the home of his 82-year-old father Carl Cole in the small community of Cason, Texas. 33 SF 90. He observed that his father's 1993 Chevrolet four-wheel-drive pickup was gone and noticed some blood

on the steps in front of the door. *Id*. at 93. Thinking that his father had injured himself and had gone for help, Charles tried to use the phone to call hospitals. *Id*. at 93-95. However, after discovering that the phone had been disconnected, Charles became alarmed and called Morris County Sheriff Ricky Blackburn from a neighbor's house. *Id*. at 95. Upon returning to his father's house, Charles found his father's blue jeans, shirt, and boots laid out on a rocking chair in his bedroom. *Id*. at 96. The house appeared undisturbed, but Carl Cole, his billfold, and the keys to his pickup were nowhere to be found. *Id*. at 97.

Sheriff Ricky Blackburn arrived at Carl Cole's home shortly thereafter. 33 SF 112-113. He discovered a pair of glasses broken in two, a partial set of dentures, and a small amount of blood in the carport near the door. *Id*. at 113. Authorities also discovered that Cole's phone lines had been disconnected from outside the house. 34 SF 177-178. At that point, Blackburn initiated a full-scale investigation into Carl Cole's whereabouts. 33 SF 130. Law enforcement officers combed the surrounding area searching for any sign of Carl Cole or his pickup, the registration number of which had been run on the National Crime Information Center. *Id*. at 131; 34 SF 181. Finally, at about midnight, Deputy Sheriff Bill Barnard discovered several items that appeared to have been dumped from Carl Cole's truck -- his checkbook, some farm tools, and an adding machine -- at a turnaround on a small backroad in nearby Titus County. 34 SF 182, 186. But there was still no sign of Carl Cole or his pickup.

In the pre-dawn hours of June 15, after an all-night search of the surrounding area, game warden Billy Dodd and state trooper David McFarland accompanied Charles Cole back to his father's house where the three conducted a thorough, room-by-room search. 33 SF 103; 34 SF 216-217. They scoured Carl Cole's bedroom in the darkness, looking behind doors and under the bed with a flashlight. 33 SF 103; 34 SF 218. Charles Cole opened his

father's closet and Dodd shone the flashlight in. 33 SF 103; 34 SF219. There in the closet stood the body of Carl Cole, a bullet hole between his eyes. 34 SF 219.

Dodd immediately closed the closet door and ushered Charles out of the room. 33 SF 104; 34 SF 219. He then returned to check the body. 34 SF 219. Carl Cole's face was swollen and there was a prominent wound between his eyes at the bridge of his nose. *Id*. at 221. He had on a pajama top and undershorts and was wrapped in a bedspread. *Id*. Dodd could not detect a pulse, and he noted that Cole's arm was cold and stiff. *Id*. at 220. The body was removed from the closet and transported to Dallas County for an autopsy. *Id*. at 226; 33 SF 139.

Medical examiner Dr. Jeffrey J. Barnard determined that Cole died as the result of a single gunshot wound to the head. 33 SF 146. The bullet, which Barnard recovered from Cole's body during the autopsy, entered between his eyes directly above his nose, traveled through the nasal bone, the mouth, and the spinal cord, and finally lodged in the lower portion of the cervical vertebra. *Id*. at 145. There were also abrasions and contusions on Cole's back, which Barnard testified were consistent with drag marks, and a laceration on the back of Cole's head, which Barnard stated could have been caused either by Cole falling backward or being struck from behind. *Id*. at 152. Barnard testified that the absence of any identifiable residue on the entrance wound indicated that the gun had been fired from a distance of three feet or more. *Id*. at 146. He testified further that the path of the bullet indicated the bullet had traveled basically downward, but that he could not conclude from this whether Cole had been standing, kneeling, sitting, or lying when he was shot. *Id*. at 149-150, 155.

On June 15, 1993, Linda Wardlow, the defendant's mother, informed Sheriff Blackburn that the previous morning she had noticed a Llama .45 semi-automatic pistol was

missing from her home. 34 SF 355-356. She gave Blackburn the serial number of the gun and some ammunition she had used in the gun. *Id*. She also stated that Wardlow and his girlfriend Tonya Fulfer had been staying at her house for a few days, but that she had not seen them since late on the evening of June 13. *Id*. at 362. Will Emery, Wardlow's neighbor, told authorities that on the evening of June 13, 1993, Wardlow and Fulfer had come to his house and Wardlow had shown Emery a blue steel .45 pistol with wooden handles. *Id*. at 247-252.

Dorothy Smith, live-in caregiver for Carl Cole's 86-year-old sister Waldine Henderson, testified that she had seen a young couple matching the description of Wardlow and Fulfer near Cole's house at about 6:30 a.m. on June 14, 1993.[4] 34 SF 264-266. Smith watched the couple from a window as they stood talking directly in front of Henderson's house. *Id*. at 266, 294. She saw them walk down the road toward Cole's house, which was down the street from Henderson's house, and stop at a van parked in the driveway of Cole's next-door neighbor. *Id*. at 267, 295-299. As the couple stood looking inside the back of the van, Smith saw a gun with brown handles in the man's back pocket. *Id*. at 267-268, 300. The man then walked under Cole's carport out of Smith's sight, and the woman followed. *Id*. at 320. A minute or two later, Smith heard a gunshot and saw the woman run out from under the carport, stop quickly, and bend over. *Id*. at 324, 326. Smith thought the man had

---

[4]     Smith's in-court identification of Wardlow was admittedly less than certain. In response to the prosecutor's question, "Do you see him in the courtroom today?" Smith replied, "I believe so. . . . I think that's him over there. . . . It looks like him. . . . I didn't see him in the face good." 34 SF 269-270. Smith maintained nonetheless that the man she had seen "walked like a Wardlow," and while she could not say for sure that the man was Wardlow, she believed that he was. *Id*. at 308, 276-278. Regardless of the vacillation of Smith's identification, Wardlow admitted in both his statement to police and his testimony during the guilt-innocence phase of trial that he had gone to Carl Cole's home on the morning of June 14, 1993, intending to rob him.

shot a snake behind Cole's house, and she returned to her housework unconcerned. *Id*. at 326, 332. About five minutes later, Smith returned to the window just in time to see Cole's pickup back out of the carport and drive away at a slow rate of speed. *Id*. at 326-327. Smith assumed that Cole was driving, but she could not see through the tinted windows of the pickup. *Id*. at 328-329, 340.

On June 15, 1993, Jerry Wagner, part owner of a used car dealership in Norfolk, Nebraska, finalized a deal with a young couple fitting the description of Wardlow and Fulfer. 35 SF 449-450. The couple drove off the lot in a black 1987 Ford Mustang convertible with $8,000 cash, the car and the cash received in exchange for what was later determined to be Cole's 1993 Chevrolet pickup. *Id*. at 449, 451, 454.

Then on the evening of June 16, 1993, a patrolman in Madison, South Dakota, apprehended Wardlow and Fulfer and took them into custody after receiving a teletype advising that a Texas warrant had issued for their arrest on charges of capital murder. 35 SF 471-472. A Llama .45 semi-automatic pistol was found under the passenger seat of the car and seized pursuant to an inventory search. *Id*. at 473, 481. Firearms examiner Raymond Cooper confirmed that the bullet recovered from Cole's body was, in fact, fired from this gun, which was admitted into evidence at trial. 34 SF 377; SX 23. Blackburn, Dodd, and McFarland transported Wardlow back to Texas on June 22 and 23, 1993, and Wardlow was immediately incarcerated in the Morris County jail. 35 SF 488-489.

On February 28, 1994, Wardlow wrote Sheriff Blackburn a letter, delivered through the jail's in-house mail system, in which Wardlow confessed to the robbery and shooting of Carl Cole. It read in pertinent part:

> Ricky,
> I told you I would give you a statement, so here is what happened on June 14, 1993. The night before I was at the neighbor's house me and my girlfriend,

and we were watching a movie. I already had in my possession the Llama .45 Automatic that was used for the shooting. I showed the gun to my neighbor William Emery, who examined it and complemented me on it. At about 11:30 p.m. on 06/13/93 I left with my girlfriend to go and check out the place and see if anyone was up. There were no lights on and not a sound to be heard. I reached the porch and undid the phone line, so that no one could call the police. I knocked on the door and there was no answer. I then decided to go back home after two other tries later that day and early the next morning. The intention was to get him to let me use the phone and once inside, I would rob him. I had stolen trucks before, but this time I had no money. When we got home I set the alarm for 5:00 a.m. so I could go and get the job done. My girlfriend followed me to my neighbor's house and there she stayed until I came back with the truck. It was actually about 6:05 a.m. when I left the house. I got there and still no one was up. I knocked on the door and there was no answer. I went up the road and waited at the house that had recently burned down and when his light came on I went back. I knocked on the door, and he answered. I told him my car was broke down, and wanted to know if I could use the phone so I could call my friend. He reached inside the door and picked up a cordless phone and handed it to me. It didn't work because the lines were disconnected. He set the phone down on the table and started to close the door. I then caught the door and ask if he had another phone and that that phone's batteries might be dead. He said no and persisted to close the door and then is when I drew out the .45 from in my pants. And as I brought it out, I corked [sic] a shell into the chamber. I raised it up and told him to walk inside the house. He ran at the door for me and screamed when he caught my arm. Being younger and stronger, I pushed him off and shot him right between the eyes. Just because he pissed me off. He was shot like an executioner would have done it. He fell to the ground lifeless and didn't even wiggle a hair. I proceeded inside found his jeans and removed all money and keys from it since I didn't know which keys were to the truck. I then thought of putting the body in the truck and hauling it off in the woods, but decided I didn't have any time to waste, since a .45 shot that early in the morning was abound to draw some attention. I went to the bedroom and grabbed the blanket, went outside and wrapped up the body. I picked up the body and went back into the bedroom. There I put him in the closet and shut the door thinking it would be some time before he would be found. I proceeded out of the house not even thinking of fingerprints. I got the truck which already had keys in it and left. I headed out toward 144 S. then onto 11. There I went toward Pittsburg and turned off on the road where the corner is right before you get to the bridge SE 35A. At the corner that goes to the creek I went down

the trail in the truck and unloaded anything that wasn't paperwork for the truck. I then left going out the other way ending up on SE 35 then onto 144 N. I then turned up on the back roads to my neighbors house which is on the blacktop by my house. Here I parked and got my girlfriend and we walked over to the house and got our things which were already packed and in the back of my pickup. Carried them to the truck and left by way of 144 N. to 49 and then to Mt. Pleasant. I gassed up with the 47 dollars I found in the wallet which I kept. Then I stopped at the store right by the interstate and got a Coke. I then thoroughly searched the wallet and found $100 bill and then threw it in the dumpster. We then proceeded to an destination along the way I told her the above things just as they happened and told her she didn't have to go if she didn't want to, but I assured her I wouldn't be caught.

The letter was admitted as evidence at Wardlow's trial and was read into the record in the jury's presence. 35 SF 524-527; SX 73.

Wardlow took the stand on his own behalf at the guilt-innocence phase of trial to testify regarding the circumstances under which he wrote the letter confessing to the crime. 37 SF 636-643. He also testified regarding the facts of the offense, and his trial testimony conformed for the most part with the facts as set forth in the letter. *Id*. at 644-657. Wardlow told the jury that, contrary to the letter, Fulfer did accompany him to Carl Cole's home. *Id*. at 643. He also stated that he did not intend to kill Cole when he went to his home. *Id*. at 644. They only intended to rob him and take his truck. *Id*. However, when Wardlow brought out the gun and told Cole to go back into the house, Cole lunged at Wardlow and grabbed his arm and the gun, attempting to push Wardlow away. *Id*. at 648-651. Wardlow testified that Cole was stronger than he expected him to be, and Wardlow was caught off balance and began to fall backwards.[5] *Id*. at 648, 652. Wardlow claimed he shot the gun,

---

[5] Testimony at trial revealed that Carl Cole, while strong and active for an 82-year-old man, stood five feet, seven inches tall and weighed about 145 pounds. 33 SF 106-107. Wardlow stands six feet, four inches tall. 34 SF 311; 35 SF 450.

without aiming, hoping it would get the victim off of him. *Id*. at 648, 651, 653, 664. Wardlow shot Cole right between the eyes. *Id*. at 648.

Wardlow told the jury that he had been planning to rob Cole for less than a week, but that he had been planning to travel to Montana for some time; he and Fulfer were on their way to Montana when they were apprehended in South Dakota. 37 SF 656-657, 670. He admitted that he and Fulfer had discussed the danger of leaving a witness to their crime. This discussion apparently took place when the couple discovered, before knocking on Cole's door, that there was a set of keys to Cole's pickup on the dashboard of the pickup. 37 SF 646. Thus, according to Wardlow's testimony, at that point they realized they could either take the pickup without having to confront Cole and risk him informing the authorities of the crime as soon as he awoke, or they could confront Cole, rob him, and "incapacitate" him by either kidnapping him and dumping him in some remote area or leaving him tied up so he could not contact the authorities. They ultimately decided on the latter course of action. *Id*. at 676-677. When asked by the prosecutor why, if he intended to tie up Cole, he failed to bring any rope with him, Wardlow responded that he planned to use a telephone cord or anything else he might find in the victim's home. 37 SF 678-680. Significantly, evidence was presented at trial indicating that Carl Cole knew Wardlow (also a resident of the same small community of Cason) and would likely have been able to identify him as the perpetrator if he had had the opportunity to do so. 33 SF 102, 108; 34 SF 363. Wardlow, no doubt, was fully aware of this fact. 37 SF 689. Wardlow also acknowledged that, before their arrest, he and Fulfer bought several personal items with the cash they received from the sale of Cole's pickup. *Id*. at 683-688.

## 2. Punishment Phase

### *State's Evidence*

Morris County deputy Bill Barnard testified that while on patrol on January 11, 1993, he observed Wardlow driving at a high rate of speed and attempted to pull him over. 39 SF 19. Wardlow refused to pull over, and Barnard was forced to pursue him. *Id*. at 20. Barnard followed Wardlow for several miles with his lights on, but Wardlow continued traveling at dangerous speeds in excess of 100 miles per hour on the highway and 70 miles per hour on a narrow county road. *Id*. at 20-21, 27-28. Finally, Wardlow pulled over, and Barnard placed him under arrest for fleeing. *Id*. at 28-30.

John Schultz, a salesman at a used car lot in Fort Worth, testified that on June 5, 1993, Wardlow, accompanied by a woman, took a 1989 Chevrolet pickup for a test drive and never brought it back. 39 SF 31-34.

Morris County jailer J. P. Cobb testified that on February 20, 1994, while Wardlow was incarcerated in the Morris County jail awaiting trial for the instant offense, jailers found a two-foot metal bar with a six- or eight-inch rod extending from the middle of it behind Wardlow's bunk in the cell he shared with three other inmates. 39 SF 141-142. One of Wardlow's former cellmates testified that Wardlow had planned to use the metal bar to hit one of the jailers in the head then take his keys and escape. *Id*. at 145-147.

The State also offered into evidence several letters Wardlow wrote to Sheriff Ricky Blackburn and jailer Patsy Martin while he was incarcerated in Morris County jail awaiting trial. In these letters, Wardlow threatened to harm other inmates, jailers, and the sheriff. 39 SF 173-176; SX 82-86.

Deputy sheriff Warren Minor testified that, while being transported from the Titus County jail to the courtroom on the morning of the second day of his trial, Wardlow stated

-13-

the jail was using trustees as guards and "if they don't stop using them I am going to double my time on one of them." 39 SF 177-178.

Harry Washington, an undercover narcotics agent, testified that on September 9, 1992, he and an informant approached Wardlow attempting to buy some marijuana from him. 40 SF 208-209. Wardlow, who was seated in his pickup, told Washington that he did not mess with drugs. *Id*. at 209. Washington then observed a .45 handgun lying on the seat next to Wardlow. *Id*. at 210. Washington asked Wardlow why he had a gun, and Wardlow laid his hand on top of the gun and said to Washington, "I'll shoot you with it." *Id*.

Royce Smithey, an investigator with the unit that prosecutes felony offenses occurring within the Texas prison system, testified regarding the different levels of security within the prison system. 40 SF 215-216, 220. He told the jury that while capital murder defendants who receive a death sentence are segregated from the general population and are strictly monitored and have limited access to prison employees, capital murder defendants who receive a life sentence go into the general population and are initially classified no differently than any other felony offender. *Id*. at 221-222, 225-227. Smithey testified further that violent crimes, which sometimes involve prison employees, occur fairly often within the Texas prison system, and that the incidence of such crime is much greater in the general population than on death row. *Id*. at 222-227.

### *Defense Evidence*

Amy Billingslea, Wardlow's former church youth minister, testified that she had known Wardlow since he was a baby and had worked with him when he became involved in the church youth group as a teenager. 40 SF 260-261. She described Wardlow as quiet, well mannered, hard working, bright, and respectful. *Id*. at 262-263. He played on the church basketball team and participated in church fundraisers. *Id*. at 261. Although

Wardlow attended church regularly during his early teens, he had quit attending several years before the instant offense occurred. *Id*. at 262, 265.

Glendon Gillean, a librarian at Daingerfield High School, testified that as a student there, Wardlow had often come to the library before school and during lunch to work on educational computer programs and had volunteered to help pack and move books when the library was relocated. 40 SF 267-269. Wardlow regularly checked out books on topics such as mechanics, technology, and aeronautics. *Id*. at 269. Wardlow never created a disciplinary problem for Gillean. *Id*. at 270. Assistant principal Gerald Singleton testified that Wardlow had attended school regularly and had never had any disciplinary procedures lodged against him. *Id*. at 271-272. But Wardlow had quit school before completing his junior year. *Id*. at 273.

## ANSWER

### STANDARD OF REVIEW

This proceeding is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which states in relevant part that:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (West 2004); *Riddle v. Cockrell,* 288 F.3d 713, 716 (5th Cir. 2002).

The Supreme Court has explained that a state court decision is "contrary" to established federal law if the state court "applies a rule that contradicts the governing law set forth in [the Court's] cases," or confronts facts that are "materially indistinguishable" from a relevant Supreme Court precedent, yet reaches an opposite result. *(Terry) Williams v. Taylor,* 529 U.S. 362, 405-06 (2000); *Hernandez v. Johnson,* 248 F.3d 344, 346 (5th Cir. 2001). Alternatively, a state court "unreasonably applies" clearly established federal law if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *(Terry) Williams,* 529 U.S. at 407-09; *Hernandez,* 248 F.3d at 346.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *(Terry) Williams,* 529 U.S. at 409-11; *Tucker v. Johnson,* 242 F.3d 617, 620 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable, "[w]hether or not [this Court] would reach the same conclusion."[6] *Woodford v. Visciotti,* 537 U.S. 19, 27 (2002); *(Terry) Williams,* 529 U.S. at 411; *Martin v. Cain,* 246 F.3d 471, 476 (5th Cir. 2001). Moreover, it

---

[6]     As the Supreme Court recently explained:

[T]he range of reasonable judgment can depend in part on the nature of the relevant rule. If a legal rule is specific, the range may be narrow. Applications of the rule may be plainly correct or incorrect. Other rules are more general, and their meaning must emerge in application over the course of time. Applying a general standard to a specific case can demand a substantial element of judgment. As a result, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations.

*Yarborough v. Alvarado,* 124 S. Ct. 2140, 2149 (2004).

is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell,* 271 F.3d 190, 193 (5th Cir. 2001); *see also Neal v. Puckett,* 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"), *cert. denied,* 537 U.S. 1104 (2003).

Additionally, independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998). This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981) (interpreting pre-AEDPA version of statute); *see also Craker v. Procunier*, 756 F.2d 1212, 1213-14 (5th Cir. 1985) (holding that fact-findings of state habeas trial court favorable to petitioner were entitled to statutory presumption of correctness despite fact that Court of Criminal Appeals ultimately denied relief).

Finally, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v.*

*Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted).

**WARDLOW'S CLAIMS OF ERROR DO NOT ENTITLE HIM TO RELIEF**.

I.     **The Admission at Trial of Wardlow's Unsolicited Confessional Letter to Sheriff Blackburn Does Not Entitle Wardlow to Federal Habeas Corpus Relief. (Wardlow's Petition at 21)**

Wardlow contends in his first ground for relief that the admission of his February 28, 1994, letter to Sheriff Ricky Blackburn, in which he confessed to the armed robbery and murder of Carl Cole[7], violated the Fifth and Sixth Amendments to the United States Constitution.  *See* Wardlow's Petition at 21.  Federal habeas relief is not available to Wardlow on either of these legal bases.  The Fifth Amendment claim was adjudicated on the merits by the Texas Court of Criminal Appeals on direct appeal, and that adjudication is entitled to deference under §2254(d).  The Sixth Amendment claim is procedurally defaulted based on the state court's application of an independent and adequate state procedural rule; alternatively, the claim is meritless.

A.     **Statement of Underlying Facts**

Wardlow filed a pretrial motion to suppress his statements to law enforcement, which was the subject of a hearing conducted by the trial court on October 17 and 18, 1994, pursuant to Article 38.22 § 6 of the Texas Code of Criminal Procedure and *Jackson v. Denno*, 378 U.S. 368 (1964).  2 Tr 94-110; record volumes 9 & 10.  Both Wardlow and Blackburn testified at the hearing.  The facts are, for the most part, undisputed.

---

[7]     35 SF 524-527; SX 73.

On June 16, 1993, Wardlow was arrested by police officers in Madison, South Dakota, based on a teletype received from Texas, at which time the South Dakota police officers read Wardlow his *Miranda*[8] warnings and incarcerated him until the proper authorities could be notified. 10 SF 71. Morris County (Texas) Sheriff Ricky Blackburn, game warden Billy Dodd, and state trooper Davis McFarland arrived in Madison, South Dakota, on June 22, 1993, for the purpose of transporting Wardlow back to Texas. 9 SF 10, 63. Blackburn read Wardlow his *Miranda* warnings at that time, and Wardlow then exercised his right to remain silent and requested that he be appointed an attorney. 9 SF 10-11, 63; 10 SF 72. Wardlow was not questioned thereafter regarding the circumstances of the instant offense. 9 SF 11. Wardlow was transported back to Texas and placed in the Morris County Jail on June 23, 1993. 35 SF 488-489. On June 24, 1993, Blackburn took Wardlow before a magistrate who administered the warnings provided for in Articles 15.17 and 38.22 of the Texas Code of Criminal Procedure. 35 SF 532. District judge William R. Porter appointed Vernard Solomon to represent Wardlow. 35 SF 533. Shortly after his appointment in June of 1993, Solomon sent a letter to Blackburn requesting that he not communicate with Wardlow about the instant case outside Solomon's presence. 35 SF 534.

Sheriff Blackburn testified that Morris County jail was a small jail and that he knew a majority of the inmates at any given time. 9 SF 11. He would routinely make a point to visit with an inmate personally if that inmate requested a visit; he viewed this as a means of

---

[8]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

avoiding administrative problems that could arise if inmates' requests were ignored. 9 SF 11-12. Particularly with regard to Wardlow, Blackburn stated that he had known Wardlow for eight to ten years, and that during Wardlow's incarceration Blackburn had visited Wardlow on several occasions at Wardlow's request. 9 SF 9, 12. Indeed, he had received and honored certain requests from Wardlow concerning the conditions of his confinement, including moving him to and from a single cell and giving him a radio. 9 SF 12-13. However, Blackburn maintained that he had "laid down the ground rules" from the beginning that they would not discuss the circumstances of the case unless Wardlow's attorney was present. 9 SF 12.

Then on or about January 25, 1994, Blackburn was handed a note from the jail dispatcher which she had received through the jail's in-house mail system. It read as follows:

> Patsy,
>
> I request to speak with you concerning a matter of utmost importance. When you are at a point of availability and are ready to speak to me I will give you the request. I would also like to have a private consultation with Sheriff Blackburn, concerning my case, and will do what is necessary to receive this hearing.
>
> Thank you,
>
> Billy Wardlow

9 SF 15; SPTX 1.[9] After receiving this note, Blackburn consulted with the district attorney

---

[9] "SPTX" refers to the numbered exhibits offered by the state and admitted for purposes of the pretrial hearing on Wardlow's motion to suppress his statements, which was conducted in the trial court on October 17 and 18, 1994.

and district judge William R. Porter[10] concerning the propriety of honoring Wardlow's request for a meeting.  9 SF 96-97.  Porter was noncommittal regarding whether the meeting could be beneficial to the state; the district attorney counseled that as long as they did not discuss the case, there was nothing improper about Blackburn meeting with Wardlow.  9 SF 96-98.

At some point one week to ten days after the January 25 request,[11] Blackburn met with Wardlow in the jail dispatcher's office.  9 SF 17, 21, 65; 10 SF 45.  Blackburn did not read Wardlow the *Miranda* warnings prior to the meeting.  9 SF 98-99.  However, he did tell Wardlow that they would not talk about the case unless his attorney was present and that if he wanted to talk about the case to contact his attorney; at that point, all discussion relating to the case ceased.  9 SF 17-18, 73, 95-96 (Blackburn); 10 SF 74-75, 80 (Wardlow). Wardlow then told Blackburn that he was having difficulty sleeping, that he was having nightmares, that he was having trouble "dealing with things," and that he needed someone to talk to.  9 SF 18; 10 SF 48 (Blackburn); 10 SF 59-60 (Wardlow).  Blackburn, as he had on numerous occasions with other inmates, attempted to offer Wardlow encouragement and advice regarding his personal problems.  9 SF 19-20, 63; 10 SF 52.  He told Wardlow that he often found it helpful to write down the things that were bothering him and, thus confronted with the problems, that he found it simpler to think them through and deal with them effectively; he suggested that it might help Wardlow to do the same.  9 SF 18-19, 96; 10 SF 49-50 (Blackburn); 10 SF 64, 67 (Wardlow).  During the course of the conversation, which lasted between forty-five minutes and an hour and fifteen minutes, Blackburn and

---

[10]  Judge Porter did not preside at Wardlow's trial.

[11]  Wardlow testified at the guilt-innocence phase of trial that the meeting took place one week after the January 25 request, about February 1.  37 SF 636, 666.

Wardlow also discussed religion. 9 SF 73-74; 10 SF 49. They talked about the forgiveness of sins, salvation through confession and repentance of sin, and the scripture "The truth shall set you free." 9 SF 74-75; 10 SF 50, 54 (Blackburn); 10 SF 63 (Wardlow). Blackburn also told Wardlow that by writing out what was bothering him, it could help him "get right with God"; however, Blackburn never suggested that Wardlow needed to confess *to law enforcement* to "get right with God." 10 SF 79, 50. Further, Blackburn told Wardlow that if he wrote anything he did not want seen, he should destroy it by tearing it into pieces and flushing it down the toilet. 9 SF 19; 10 SF 50 (Blackburn); 10 SF 72-73, 80 (Wardlow).

On February 25, 1994, after receiving a letter from Wardlow which alarmed him and caused him to fear for the safety of Wardlow and his fellow inmates,[12] Blackburn moved Wardlow from a multiple-occupancy cell to a single cell, commonly known as the "suicide cell," where Wardlow could be watched through a window from the chief dispatcher's office.[13] 9 SF 23, 26-27; 10 SF 21, 32-33.[14]

Then on February 28, 1994, three to four weeks after the above-described meeting took place, Wardlow sent Blackburn a letter, again through the jail's in-house mail system, in which he confessed to the armed robbery and shooting of Carl Cole. 9 SF 28; SPTX 3. On September 11, 1994,[15] while still incarcerated awaiting trial, Wardlow sent Blackburn a

---

[12] The letter read in part, "In my opinion, and for the safety of the other inmates, I believe I should be moved to the back in a single cell. Certain persons, whom I will not state, have pushed me to the limit and could be hurt or maybe worse." SPTX 2.

[13] Wardlow remained in that cell until March 18, 1994. 9 SF 27; 10 SF 29.

[14] Apparently, Wardlow had been moved from multiple-occupancy cells to single cells and back on several occasions during his pretrial incarceration in the Morris County jail, the majority of the times at his request. 9 SF 13; 10 SF 27-29, 46-47.

[15] In June of 1994, Vernard Solomon withdrew as Wardlow's counsel, and Bird Old III was appointed to represent Wardlow from that point forward. 1 Tr 56-59; 9 SF 41-42.

second letter in which he related more details and corrected some assertions made in the first letter, primarily regarding co-defendant Tonya Fulfer's level of involvement in the offense. 10 SF 68-69; SPTX 5. The record plainly reveals, without contradiction, that Blackburn did not ask Wardlow to write him a confession and was surprised when he received the letters; in fact, Wardlow never indicated to Blackburn either in the January 25 note requesting the meeting or during the meeting that he intended to confess to Blackburn. 9 SF 20; 10 SF 52 (Blackburn); 10 SF 72, 81 (Wardlow). Wardlow testified that he did not know why he sent the letters to Blackburn. 10 SF 80.

At the conclusion of the pretrial hearing on Wardlow's motion to suppress his confessions, the trial court made the following findings of fact and conclusions of law in accordance with Article 38.22 § 6 of the Texas Code of Criminal Procedure and *Jackson v. Denno, supra*:

### Findings of Fact

1. There is no dispute over the material facts.

2. The Defendant was arrested by the Morris County Sheriff in South Dakota and returned to Morris County, Texas.

3. The Miranda Warnings were given to the Defendant in South Dakota and the Defendant requested an attorney.

4. The Defendant was appointed an attorney in June of 1993 when he was returned to Morris County.

5. The Defense Attorney told the Sheriff not to talk to the Defendant about the case unless he, the attorney, was present.

6. Morris County has a small jail population and it is the customary practice of the Sheriff to talk to and counsel with inmates if they request his help.

7.     The Defendant and Sheriff had known each other eight to 10 years.

8.     The Defendant wrote a note or a letter to the Sheriff in January of 19[9]4 requesting a meeting with the Sheriff.

9.     The meeting took place one week to 10 days after the request, the meeting lasted 45 minutes to an hour and a quarter.

10.    No Miranda Warnings were given prior to the meeting.

11.    The Defendant told the Sheriff that he was having trouble sleeping, that he was having nightmares and emotional problems.

12.    The Sheriff is a religious person and he discussed religion with the Defendant, the Sheriff also said that it often helped him to write down his problems and confront them.  The Sheriff also said that he, the Defendant, could lie to him but not to God.  The Sheriff further told the Defendant that people are saved by asking God for forgiveness and that the truth would set him free.

13.    The Sheriff suggested that the Defendant write out his problems and solutions and start at a period of time prior to the date of the alleged offense.

14.    The Defendant testified, as did the Sheriff, that the Sheriff told him not to discuss the case with him and if he wrote out something he didn't want seen he should destroy it, flush it down the toilet.

15.    The Defendant testified that the Sheriff never asked for a statement and never asked him to send a statement to him.

16.    The Defendant testified that he did not know why he sent the letters to the Sheriff.

17.    The Defendant sent several letters and notes to the Sheriff.

18.    The letters were received by the Sheriff through in-house mail.

19.    The Defendant was represented by Attorney Solomon when the February letter was sent by Attorney Old when the September letter was

sent.

20.　　No meeting occurred between the Defendant and the Sheriff before the September letter.

## Conclusions of Law

1.　　The February meeting between the Sheriff and the Defendant was not a psychological ploy to gain information for the State.

2.　　The meeting was not the functional equivalent of an interrogation.

3.　　Both the February 28th letter and the September letter amounts to a voluntary statement and admission of guilt.

4.　　The Sheriff advised he did not constitute entrapment.

5.　　The meeting between the Sheriff and the Defendant was not a violation of the Sixth Amendment Right to have counsel present during a confrontation between the State and Defendant.

6.　　The Sheriff made no attempt to elicit incriminating information during the meeting with the Defendant.

7.　　The meeting was not a custodial interview.

8.　　No promises nor rewards were offered nor given to Defendant.

9.　　Both letters are admissible.

12 SF 123-126. In accordance with these findings and conclusions, the February 28, 1994, letter was admitted into evidence and read to the jury at the guilt-innocence phase of Wardlow's trial. 35 SF 524-527, SX 73.

## B.　　Fifth Amendment Claim

The Fifth Amendment to the United States Constitution provides that a citizen accused shall not be required to incriminate himself. In *Miranda v. Arizona*, the Supreme Court held

that statements of the accused, arising out of custodial interrogation, could not be used in evidence unless certain safeguards were employed to protect the right against compelled self-incrimination.

> Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. . . .[16]

*Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogations implicate the Fifth Amendment privilege because of the danger that law enforcement officers might exert "informal compulsion" on suspects during the interrogation. *Id*. at 460-61. *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Id.* at 477-78. As the *Miranda* Court noted:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Id*. at 478.

**1.    The Court of Criminal Appeals reasonably concluded that admission of the confessional letter did not violate the Fifth Amendment because Sheriff Blackburn's conduct did not constitute "interrogation."**

Wardlow raised this claim on direct appeal, and the Court of Criminal Appeals rejected it on the merits, concluding that Sheriff Blackburn's conduct could not be construed

---

[16]   The Court explained that the right to counsel expressed in the opinion was not the Sixth Amendment right to counsel, but was a necessary correlative right of the Fifth Amendment to insure its protection and effectuation. *See Brewer v. Williams*, 430 U.S. 387 (1977).

as "interrogation" and thus did not implicate the Fifth Amendment. *Wardlow v. State*, No. 72,102, slip op. at 8-12. That conclusion is neither contrary to, nor an unreasonable application of, Supreme Court precedent. Therefore, § 2254(d) precludes the grant of federal habeas relief on the claim.

As the Court of Criminal Appeals held, the admission of Wardlow's statement at trial did not violate the Fifth Amendment because the statement was not given as a result of custodial interrogation. In *Rhode Island v. Innis*, 446 U.S. 291 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." *Id*. at 300-01. The Court stated that the functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[17] *Id*. at 301.

Wardlow does not assert that he was subjected to express questioning by Sheriff Blackburn; rather, he claims only that he was subjected to the functional equivalent of questioning. However, there is absolutely nothing in the record to suggest that Sheriff Blackburn should have known that his meeting with Wardlow was reasonably likely to elicit an incriminating response from Wardlow. It is clear from the record that, at the meeting, Wardlow appealed to Blackburn for help in dealing with his personal emotional difficulties; Blackburn listened to Wardlow and suggested to him possible solutions for dealing with these difficulties. It is undisputed that the circumstances of the offense were not even a subject of discussion at the meeting. The fact that Blackburn spoke with Wardlow concerning religion and salvation through confession of sins and suggested to Wardlow that

---

[17] The *Innis* Court determined that a conversation between police officers in the presence of the defendant concerning the possibility that a handicapped child might find the murder weapon did not constitute interrogation even though it led the defendant to make an incriminating statement. *Id*. at 294-95, 303.

he write down the things that were bothering him does not lead to the conclusion that Blackburn should have known this would cause Wardlow to write him a letter confessing to the crime. Indeed, though Blackburn counseled Wardlow concerning salvation through the confession of sins, he advised Wardlow to confess to God -- *not* to law enforcement officials; and while Blackburn suggested to Wardlow that it may help him to deal with his emotional problems if he wrote down what was bothering him, he told Wardlow to destroy whatever he wrote so no one else would see it. Finally, there is absolutely no indication in the record that Wardlow's unsolicited letter to Blackburn sent *three to four weeks after his meeting with Blackburn* was in fact *the result* of that meeting. The Fifth Amendment is simply not implicated under these circumstances, and the Court of Criminal Appeals reasonably so concluded.

Thus, § 2254(d) clearly prohibits the grant of relief. The Supreme Court's recent opinion in *Yarborough v. Alvarado*, 541 U.S. 652 (2004), is particularly instructive. At issue in *Alvarado* was whether a state court's conclusion that an inmate was not in custody for *Miranda* purposes was an unreasonable application of clearly established law under §2254(d)(1). The court of appeals had held that it was and, thus, had deemed itself unconstrained by the prohibition of § 2254(d)(1). But the Supreme Court disagreed. Acknowledging that "[a]pplying a general standard to a specific case can demand a substantial element of judgment," the Court concluded,

> . . . . [I]t can be said that fair-minded jurists could disagree over whether Alvarado was in custody. . . . These differing indications [of the evidence] lead us to hold that the state court's application of our custody standard was reasonable. The Court of Appeals was nowhere close to the mark when it concluded otherwise. Although the question of what an "unreasonable application" of law might be difficult in some cases, it is not difficult here. The custody test is general, and the state court's application of our law fits within the matrix of our prior decisions. We cannot grant relief under AEDPA

by conducting our own independent inquiry into whether the state court was correct as a *de novo* matter.

124 S. Ct. at 2149-50. While *Alvarado* concerned *Miranda*'s custody requirement, the "interrogation" requirement at issue here is equally "general" under the rationale of *Alvarado*, and the Texas court's adjudication of the issue is equally entitled to "leeway" on habeas review. 124 S. Ct. at 2149.

2.    **Alternatively, even if Wardlow were subjected to the functional equivalent of questioning, he waived his Fifth Amendment right to counsel before that questioning took place.**

Furthermore, even if Blackburn's discussion with Wardlow were held to constitute interrogation,[18] the circumstances surrounding the meeting and Wardlow's letter confessing to the crime lead to the conclusion that Wardlow waived his Fifth Amendment right to counsel before that "interrogation" took place.

When a suspect asserts his *Miranda* right to counsel, law enforcement officials must cease all interrogation until counsel is provided or the suspect subsequently waives his right. *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Communications may not continue after invocation of the *Miranda* right to counsel unless the accused initiates the interrogation. *Id*. In *Oregon v. Bradshaw*, a plurality of the Court ruled that a defendant who "evinced a willingness and a desire for a generalized discussion about the investigation" had effectively initiated conversation under *Edwards*, despite having earlier asserted his right to counsel. 462 U.S. 1039, (1983) (plurality) (accused's inquiry, "Well, what is going to happen to me now?" amounted to waiver of right to counsel). Once it is found that the accused initiated

_____

[18]    The Director asserts this argument only in the alternative, but maintains its primary position – and the holding of the Court of Criminal Appeals – that the meeting did not constitute interrogation.

further communication, it must then be determined whether the accused then waived his Fifth Amendment right to counsel prior to being interrogated. *Id* at 1044-45. This determination must be made based on the totality of the circumstances, "including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id*. at 1045, *quoting Edwards v. Arizona*, 451 U.S. at 486 n.9.

Clearly, though Wardlow had asserted his Fifth Amendment right to counsel at the time of his arrest and was in fact represented by counsel, he subsequently initiated contact with Blackburn by requesting a meeting with Blackburn and then attempting to discuss the case with Blackburn. When Blackburn refused to discuss the case with Wardlow outside his attorney's presence, Wardlow shifted the discussion to his emotional problems. Despite Blackburn's admonishments to Wardlow that he contact his attorney if he wished to discuss the case, Wardlow never expressed a desire to confer with his attorney and apparently never sought his attorney's advice before sending the unsolicited confessional letter three to four weeks later. The fact that Blackburn did not follow Wardlow's lead and launch into an interrogation of Wardlow regarding the circumstances of the instant offense does not alter the inevitable conclusion that Wardlow by his actions waived his Fifth Amendment right to have counsel present when he spoke with Blackburn. For this reason as well, Wardlow's Fifth Amendment claim must fail.

## C. Sixth Amendment Claim

The Sixth Amendment likewise offers no succor. Wardlow's Sixth Amendment claim is procedurally barred and, alternatively, meritless.

1. **Wardlow's Sixth Amendment claim is procedurally barred based on the state court's application of an independent and adequate state law ground to preclude merits review.**

As an initial matter, Wardlow's Sixth Amendment claim is procedurally defaulted based on the state court's application of an independent and adequate state ground to deny relief. The Court of Criminal Appeals refused to consider the merits of Wardlow's Sixth Amendment claim on direct appeal because Wardlow failed to brief the issue adequately in accordance with Rule 74(f) of the Texas Rules of Appellate Procedure.[19] Indeed, other than asserting *in a heading* that "the trial court erred in denying appellant's motion to suppress his confession obtained in violation of his Sixth Amendment right to assistance of counsel," Appellant's Brief at 17, Wardlow failed to cite any authority[20] or advance any argument or legal theory in support of his Sixth Amendment claim.

Where, as here, a petitioner fails to follow a state procedural rule, and review of a constitutional claim is refused by state courts, federal habeas review is also foreclosed unless the petitioner demonstrates either cause for the default and actual prejudice resulting therefrom or that failure to consider the claims would result in a "fundamental miscarriage of justice." *Murray v. Carrier*, 477 U.S. 478, 485 (1986); *Engle v. Isaac*, 456 U.S. 107, 129 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Wardlow fails to show cause for his

---

[19]     Rule 74(f) requires that a brief contain "such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue." Tex. R. App. P. 74(f).

[20]     Wardlow cited in his state direct appeal brief Fifth Amendment cases *Miranda v. Arizona* and *Rhode Island v. Innis* and discussed at length the holdings of those cases and their application to his case. But he failed to cite a single Sixth Amendment case or even allude to the holdings of any such case. *See* Wardlow's Appellant's Brief at 16-23; *compare to* Wardlow's Federal Petition at 29 (citing *Michigan v. Jackson*, 475 U.S. 625 (1986); *Maine v. Moulton*, 474 U.S. 159 (1985); *United States v. Henry*, 447 U.S. 264 (1980); *Massiah v. United States*, 377 U.S. 201 (1964)).

default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default. *Coleman v. Thompson,* 501 U.S. 722, 749-50 (1991).

**2.     Alternatively, admission of the letter did not violate the Sixth Amendment.**

Alternatively, the claim fails on its merits.  The Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," and no request for counsel need be made by the accused. *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality); *Brewer v. Williams*, 430 U.S. 387, 401, 404 (1977).  Once the Sixth Amendment right to counsel has attached, the accused is entitled to the assistance of counsel at each "critical" stage of the prosecution, absent a valid waiver. *Michigan v. Jackson*, 475 U.S. 625, 629 n.3 (1986).  Police interrogation is such a critical stage.  If the accused has, after being informed of his right to counsel, requested or secured counsel, then all questioning must cease.  Under these circumstances, law enforcement officials may not use incriminating statements "deliberately elicited" from the accused without the presence or waiver of counsel. *Massiah v. United States,* 377 U.S. 201, 206 (1964); *Brewer v. Williams*, 430 U.S. at 399.

In the instant case, the record simply does not support Wardlow's contention that Sheriff Blackburn offered Wardlow spiritual guidance and advice for the purpose of deliberately eliciting a confession from him.  It is clear from the record that, at the meeting, Wardlow appealed to Blackburn for help in dealing with his personal emotional difficulties; Blackburn listened to Wardlow and suggested to him possible solutions for dealing with these difficulties.  It is undisputed that the circumstances of the instant case were not even a subject of discussion at the meeting.  The fact that Blackburn spoke with Wardlow concerning religion and salvation through confession of sins and suggested to Wardlow that he write down the things that were bothering him does not lead to the conclusion that

Blackburn deliberately elicited a statement from Wardlow. Furthermore, there is absolutely no indication in the record that Wardlow's unsolicited letter to Blackburn sent three to four weeks after his meeting with Blackburn was in fact *the result* of that meeting. Blackburn never asked Wardlow to write a confession and, in fact, refused to discuss the case with Wardlow when Wardlow attempted to bring it up. As Blackburn testified, "The meeting was not to gather evidence, the meeting was simply to talk to someone that had requested to talk to me." 9 SF 99. Indeed, Blackburn did not expect Wardlow to send him a confession and was surprised when he received the letter through the jail's in-house mail system several weeks after the meeting took place. Clearly, Wardlow's unsolicited letter confessing to the offense was not the result of a violation of his Sixth Amendment right to counsel. Wardlow's first claim for relief is without merit and does not entitle him to habeas corpus relief.

## II. Wardlow Is Not Entitled to Habeas Corpus Relief Based on the Alleged Ineffectiveness of Direct Appeal Counsel. (Wardlow's Petition at 38)

Wardlow contends in his second claim for relief that he was denied constitutionally effective assistance of counsel on direct appeal. Specifically, he maintains that direct appeal counsel performed unreasonably by failing to brief adequately the Sixth Amendment claim raised as Wardlow's first claim for relief in the instant petition, addressed in this answer in Section I.C., *supra*.[21] However, this claim is procedurally barred and, alternatively, meritless. Because, as set forth in Section I.C., *supra*, Wardlow's Sixth Amendment claim is without

---

[21]   Wardlow accurately states that the Court of Criminal Appeals rejected his Sixth Amendment claim on direct appeal based on his failure to brief the issue adequately. *See Wardlow v. State*, No. 72,102, slip op. at 12-13.

merit, Wardlow can prove neither deficient performance nor prejudice regarding appellate counsel's failure to brief the issue adequately.

## A.     This claim is procedurally barred.

The Texas Court of Criminal Appeals refused to consider the merits of this and all claims raised in Wardlow's state habeas corpus application, dismissing the application based on its earlier order granting Wardlow's request to abandon his appeal.

The record in this case shows that Wardlow had vacillated regarding whether to pursue habeas corpus relief. *See* Statement of the Case at 4-5, *supra*. During the months following the conclusion of direct review, Wardlow consistently informed the courts through correspondence and even at a hearing in open court that he wished to forego further appeals. He expressly waived his statutory right to appointed counsel and to proceed pro se. But months later, he informed the courts through new counsel that he had changed his mind and wanted the assistance of counsel to pursue habeas corpus relief. Of course, during this intervening period of time, Wardlow had had no deadline for filing a state habeas application because he had indicated that he did not intend to file one. Despite Wardlow's apparent manipulation of the system, however, the Court of Criminal Appeals appointed him counsel and gave him the full 180 days set out by statute to file his application. *See* TEX. CODE CRIM. PROC. ANN. art. 11.071 § 4(a) (1996). Then just eighteen days before his application was due, the Court of Criminal Appeals received yet another letter from Wardlow requesting "to waive and forego all further appeals," which the court granted. Ultimately, the Court of

Criminal Appeals dismissed the subsequently filed application based on its previous order

granting Wardlow's request to abandon appeals.

Because the state court's holding was independent of federal law and adequate to

support the judgment, federal habeas corpus review is precluded. *Wainwright v. Sykes*, 433

U.S. 72, 87 (1977). Wardlow fails to show cause for his default, resultant prejudice, or a

fundamental miscarriage of justice that might excuse his default. *Coleman v. Thompson,* 501

U.S. 722, 749-50 (1991).

**B.     In any event, Wardlow was not denied constitutionally effective assistance on direct appeal.**

Because, as set forth in Section I.C., *supra*, Wardlow's Sixth Amendment/confession

admission claim is without merit, Wardlow can prove neither deficient performance nor

prejudice regarding appellate counsel's failure to brief the issue adequately.

The appellate-level right to counsel is guaranteed by the Due Process Clause of the

Fourteenth Amendment to an accused pursuing a direct appeal as of right. *Evitts v. Lucey*,

469 U.S. 387 (1985). The proper standard for evaluating Wardlow's claim that appellate

counsel was ineffective is that enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).

*Smith v. Robbins*, 528 U.S. 259, 285 (2000) (applying *Strickland* to claim of attorney error

on appeal). Wardlow must first show that his counsel was objectively unreasonable in failing

to raise certain issues on appeal--that is, that counsel unreasonably failed to discover

nonfrivolous issues and to file a brief raising them. *Smith v. Robbins,* 528 U.S. at 285. If

Wardlow succeeds in such a showing, he then has the burden of demonstrating prejudice.

That is, he must show a reasonable probability that, but for his counsel's unreasonable failure to brief an issue, he would have prevailed on his appeal. *Id.*

As set forth in Section I.C., *supra*, the admission of Wardlow's confessional letter at trial did not violate his Sixth Amendment right to counsel. Therefore, Wardlow has proved neither deficient performance nor prejudice regarding appellate counsel's failure to brief the issue adequately. Appellate counsel did not render unreasonably deficient performance by failing to brief the issue fully on direct appeal. And Wardlow cannot demonstrate that he was prejudiced by counsel's failure to raise the issue properly in the Court of Criminal Appeals since the issue was meritless in the first place. Wardlow's second claim for relief is also without merit.

**III.    Wardlow Is Not Entitled to Relief Based on His Claim That the State Substantially Interfered with Co-defendant Tonya Fulfer's Decision Whether to Testify on Wardlow's Behalf. (Wardlow's Petition at 40)**

In his third claim for relief, Wardlow maintains that he was denied due process and a fair trial in violation of the Sixth, Eighth, and Fourteenth Amendments because the State substantially interfered with co-defendant Tonya Fulfer's decision whether to testify on Wardlow's behalf at his trial. However, this claim is procedurally barred and, in any event, meritless.

**A.    This claim is procedurally barred.**

As an initial matter, this claim is procedurally barred because it was raised in Wardlow's state habeas application, which was dismissed by the Court of Criminal Appeals

based on its earlier order granting Wardlow's request to abandon his appeal. *See* discussion at Section II.A., *supra*, incorporated herein by reference. The state court's holding was independent of federal law and adequate to support the judgment. *Wainwright v. Sykes*, 433 U.S. at 87. Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default. *Coleman v. Thompson,* 501 U.S. at 749-50. Therefore, federal habeas corpus review is precluded.

Additionally, Wardlow's claim is barred for another, independent reason. The record demonstrates that Wardlow failed to object on this basis at trial.[22] Thus, the issue was not preserved for appellate review under the Texas contemporaneous objection rule.[23] Consequently, even if this Court were to conclude that the Court of Criminal Appeals' dismissal of Wardlow's habeas application was inadequate to bar review of this claim, the claim is nonetheless defaulted because of his failure to comply with the Texas rules for preserving error. *See Hogue v. Johnson*, 131 F.3d 466, 494-96 (5th Cir. 1997) (concluding that claim was defaulted where state court application of abuse bar was inadequate but

---

[22] As the state trial court found, Wardlow's counsel clearly were aware of the plea agreement between the State and Fulfer since they attempted to have the agreement included in the record of Wardlow's trial as an offer of proof. 37 SF 621. Thus, they were fully aware of the factual basis asserted in support of this claim for relief, yet failed to articulate a trial objection. *See* Supplemental SHTr at 4/6, FF 1.

[23] *See* TEX. SF. APP P. 33.1(a) (requiring that, as a prerequisite for obtaining appellate review, record must show that complaint was made by timely objection stating grounds with "sufficient specificity" to make trial court aware of complaint); *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App. 1998) ("It is axiomatic that error is forfeited when the complaint on appeal differs from the complaint at trial"); *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996) ("An objection stating one legal basis may not be used to support a different legal theory on appeal") (citation omitted).

where, if the state court had not found the application abusive, it would have found the claim

barred by the state's contemporaneous objection rule).

Both of these procedural bars preclude federal merits review of this claim.

**B.     The claim is meritless, relief precluded by the findings of the state trial court, which are entitled to deference under § 2254(e).**

Alternatively, the claim is meritless.  First, the record belies Wardlow's assertion that

state actors substantially interfered with Tonya Fulfer's decision whether to testify on

Wardlow's behalf; indeed, there is no indication that Fulfer's decision not to testify was

based on anything other than her own unwillingness to incriminate herself.  Second, Fulfer's

testimony at her subsequent plea hearing reveals that her testimony would not have helped

Wardlow in any event.

**1.     The record belies Wardlow's assertion that the State substantially interfered with Tonya Fulfer's decision whether to testify on Wardlow's behalf.**

The record does not support Wardlow's claim that the State substantially interfered

with co-defendant Tonya Fulfer's decision whether to testify on Wardlow's behalf.  In

support of this claim for relief, Wardlow cites *United States v. Henricksen*, 564 F.2d 197 (5th

Cir. 1977), in which the Fifth Circuit Court of Appeals found a due process violation where

the United States Attorney had made it a condition of a plea bargain of Henricksen's co-

defendant that he not testify at Henricksen's trial.  *Id.* at 198.  Thus, the Fifth Circuit

concluded that "[i]mproper intimidation of a witness may violate a defendant's due process

right to present his defense witnesses freely if the intimidation amounts to 'substantial

government interference with a defense witness' free and unhampered choice to testify.'"

*United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991) (quoting *Henricksen*, 564 F.2d

at 198).  This holding has been followed by various other circuits in cases presenting similar

circumstances.[24]

The record in the instant case reveals that, during the guilt-innocence phase of Wardlow's trial, Tonya Fulfer was bench-warranted from Morris County, where she was being held, to Titus County for the purpose of testifying in Wardlow's case-in-chief. 37 SF 609. Fulfer was accompanied by her attorney, Charles Cobb, who informed the trial court he believed Fulfer intended to assert her Fifth Amendment privilege not to incriminate herself and decline to testify. *Id.* at 611. Cobb objected to the court requiring Fulfer to assert her Fifth Amendment privilege in the jury's presence, and Cobb was allowed to examine Fulfer on voir dire outside the jury's presence. *Id.* at 611, 615. On the record, Cobb recommended that Fulfer not testify. *Id.* at 617. Fulfer responded that she wished to take her attorney's advice and that it was her decision not to testify at Wardlow's trial. *Id.* at 617-619. Wardlow's counsel requested that the plea agreement between the State and Fulfer be included in the record as an offer of proof, but that request was denied. *Id.* at 621-622.

Later that same day, during the State's cross-examination of Wardlow, the court agreed with defense counsel that the State had opened the door to allow the defense to present testimony *before the jury* that Fulfer had exercised her Fifth Amendment privilege

---

[24]     *See United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979) (due process violation found where FBI agent told defense witness that he would have "nothing but trouble" in pending state prosecution if he persisted in testifying); *United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (due process violation found where prosecutor telephoned attorney for witness, against whom charges had been dropped, and said that attorney "would be well-advised to remind his client that, if she testified at MacCloskey's trial, she could be reindicted if she incriminated herself during that testimony"); *United States v. Morrison*, 535 F.2d 223, 227-28 (3rd Cir. 1976) (due process violation found where prosecutor repeatedly warned prospective defense witness about possibility of federal perjury charge and culminated indirect warnings with highly intimidating personal interview of witness); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (due process violation found where prosecutor, through secret service agent, sought out witness and gratuitously admonished him of possibility that he might be prosecuted for misprision of felony).

and declined to testify. 37 SF 703-707. Wardlow then called Fulfer to the stand, and she asserted her Fifth Amendment privilege in the jury's presence. *Id.* at 726-727. Wardlow then called Charles Cobb, Fulfer's attorney, who testified outside the jury's presence that Fulfer was presently charged with capital murder for the same offense and that the State had offered Fulfer a plea bargain of a reduced charge of murder contingent on completion of Wardlow's trial. *Id.* at 729-730. However, Cobb made it clear that the agreement was not made in exchange for Fulfer's cooperation at Wardlow's trial. *Id.* at 730, 733, 734, 735. Cobb testified that the State had at one point indicated that it might call Fulfer as a witness at Wardlow's trial, and that the decision whether to call Fulfer as a witness was contingent on whether the court found Wardlow's confessional letters admissible. When the court ruled the letters were admissible, the State removed Fulfer's name from the witness list. According to Cobb, Fulfer's testimony was never part of the plea bargain offered to her by the State; indeed, the deal was made prior to the court's pretrial ruling on the admissibility of the letters. Though, according to Cobb, the deal would not be finalized until after Wardlow's trial, it was not in any way contingent on whether or not Fulfer testified at Wardlow's trial. *Id.* at 735. *See also* Supplemental SHTr at 4/6-5/7, FF 2-4.[25]

The facts of the instant case are readily distinguishable from the facts existing in those

---

[25]        These findings are entitled to the presumption of correctness set forth in 28 U.S.C. § 2254(e). Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d 520, 524 (5th Cir. 1998). This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981) (interpreting pre-AEDPA version of statute); *see also Craker v. Procunier*, 756 F.2d 1212, 1213-14 (5th Cir. 1985) (holding that fact-findings of state habeas trial court favorable to petitioner were entitled to statutory presumption of correctness despite fact that Court of Criminal Appeals ultimately denied relief).

cases where federal courts have found due process violations.[26]  Even accepting Wardlow's

factual allegations as true, he has failed to demonstrate that the State substantially interfered

with Tonya Fulfer's decision whether to testify on Wardlow's behalf.  Unlike the situation

presented in *Henricksen*, the State's plea agreement with Fulfer was not conditioned on her

not testifying for Wardlow.  This fact simply may not be inferred from the mere existence of

a plea agreement between the State and Fulfer and is, in fact, belied by the testimony of

Fulfer's attorney at Wardlow's trial.  Further, there is absolutely no indication in the record,

and indeed Wardlow does not even allege, that Fulfer was overtly threatened by government

actors.  Indeed, there is no indication that Fulfer's decision not to testify at Wardlow's trial

was based on anything other than her own unwillingness to incriminate herself.  And her

attorney's advice in this regard simply does not constitute the government conduct required

to state a due process claim.

**2.      In any event, Fulfer's testimony would not have aided Wardlow.**

Furthermore, even if facts existed that could support a finding of "interference,"

Wardlow cannot establish a due process violation because the record shows that Fulfer's

testimony would not have benefitted Wardlow.  State habeas judge Gary Stephens – the same

judge who presided over both Wardlow's trial and Tonya Fulfer's plea hearing – made the

following finding of fact:

> On April 18, 1995, about two and a half months after Wardlow's trial, Fulfer
> pled guilty to the lesser offense of murder, waived her right to jury trial on
> sentencing, and was sentenced by this court to eighteen years in prison.  At the
> guilty plea hearing, Fulfer testified on her own behalf concerning the events
> leading up to Carl Cole's murder.  She testified that the night before the
> murder took place, Wardlow told her about his plan to rob Carl Cole.  He told

---

[26]      In fact, to extend the holdings of those cases to grant relief in the instant case would
violate the non-retroactivity principle of *Teague v. Lane*, 489 U.S. 288 (1989).

her that he wanted her to be there with him but that she wouldn't have to do anything. Fulfer had nothing to do with planning the robbery; she only did what Wardlow told her to do. Wardlow explained his plan to Fulfer: He was going to knock on Cole's door, claim that his car had broken down, and ask to use the telephone; then after gaining entrance to the house, he was going to knock Cole over the head with a flashlight and take his money. Fulfer accompanied Wardlow to Cole's house twice that night, but they left both times because Cole was asleep; the second time, Wardlow cut the telephone lines. They returned a third time shortly after dawn. Wardlow knocked on the door, and Cole answered. Fulfer was standing behind Wardlow. Wardlow told Cole his car was broken down and he needed to use the telephone to call someone. Cole handed Wardlow a cordless phone. Finding the phone dead, Wardlow asked Cole if he could come inside and use another phone; Cole refused. Fulfer then saw Wardlow pull a gun out of the waistband of his pants and point it at Cole. Until that moment, Fulfer had not known that Wardlow had a gun on him. Wardlow had never said anything about shooting Cole; he had told Fulfer he was only going to hit Cole over the head and take his money. Fulfer saw Cole and Wardlow begin to struggle over the gun, then she turned and ran away out of the carport. Fulfer stopped at the end of the carport, turned, and asked Wardlow to drop the gun. According to her testimony, Fulfer wasn't looking at them when the gun went off, and she didn't see what happened. She was all the way out of the carport when the gun went off. Fulfer was very surprised by what had happened. She was shocked that Wardlow had done something like that, and she was afraid of him. Fulfer cooperated with Wardlow thereafter because she was afraid he would shoot her. Fulfer testified further that Wardlow accompanied Fulfer into a bank to cash the check they had gotten for Cole's truck; he had threatened her with the gun before they entered the bank and warned her not to try anything, then he carried the gun into the bank. Fulfer testified further that when they were finally stopped by police in South Dakota, Wardlow had instructed her to hand him the gun hidden under her seat and he would "take care of that right now." Fulfer refused, saying they were already in enough trouble.

Supplemental SHTr at 5/7-6/8, FF 5. These findings must be presumed correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[27] *See also* Respondent's Appendix 4 (Transcript

---

[27] Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and

of Fulfer's Guilty Plea Hearing).

Thus, Wardlow cannot demonstrate that Fulfer's testimony would have aided his defense. Fulfer's version of the events was consistent with the State's theory set forth through the admission of Wardlow's first confessional letter and other witnesses. Because Fulfer did not actually witness the shooting, she could not corroborate Wardlow's claim that Cole was shot during a struggle over the gun. Her testimony also does not corroborate Wardlow's claim that he did not intend to kill Cole. She only testified that *she* did not intend to kill Cole. According to Fulfer, Wardlow had told her he only intended to hit Cole over the head with a flashlight; she didn't know Wardlow had a gun until he pulled it on Cole.

The state habeas court found: "In light of Fulfer's testimony in open court at her guilty plea hearing, the court finds incredible any assertion that Fulfer would have testified that the shooting was an accident, was not intended by Wardlow, or occurred during a struggle over the gun." Supplemental SHTr at 6/8, FF 6. This finding is entitled to § 2254(e)'s presumption of correctness and precludes the grant of relief on this claim.

## IV.  Wardlow Is Not Entitled to Relief Based on His Claim That the State Withheld Material, Exculpatory Evidence from the Defense. (Wardlow's Petition at 49).

Wardlow contends in his fourth claim for relief that the State violated his due process rights by failing to disclose material, exculpatory evidence at trial. *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Wardlow argues that the State failed to inform the defense that co-defendant Tonya Fulfer's version of the events corroborated Wardlow's. This claim is

---

convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

procedurally barred and, alternatively, meritless.

**A.     The claim is procedurally barred.**

As an initial matter, this claim is procedurally barred because it was raised in Wardlow's state habeas application, which was dismissed by the Court of Criminal Appeals based on its earlier order granting Wardlow's request to abandon his appeal. *See* discussion at Section II.A., *supra*, incorporated herein by reference. The state court's holding was independent of federal law and adequate to support the judgment. *Wainwright v. Sykes*, 433 U.S. at 87. Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default. *Coleman v. Thompson,* 501 U.S. at 749-50. Therefore, federal habeas corpus review is precluded.

**B.     The State did not suppress material, exculpatory evidence regarding co-defendant Tonya Fulfer's version of the events.**

Procedural bar aside, the record does not support this claim for relief. Under *Brady*, the State has an affirmative duty to disclose to the defense evidence that is both favorable to the accused and material either to guilt or to punishment. *United States v. Bagley*, 473 U.S. 667, 674 (1985) (citation omitted). To succeed on a *Brady* claim, the petitioner must establish: (1) the prosecution suppressed evidence; (2) the evidence was favorable; and (3) the evidence was material either to guilt or punishment. *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir. 1994) (citation omitted). "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682. A "reasonable probability" is a

probability sufficient to undermine confidence in the trial's outcome. *Id.* Further, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *United States v. Agurs*, 427 U.S. at 109-10. Rather, the petitioner must show that the evidence in question could reasonably be taken to put the whole case in a different light so as to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419 (1995).

Wardlow's *Brady* claim is belied by the record. First, Wardlow cannot show that the State *suppressed* anything. The state habeas court made the following findings regarding this claim:

> There is no evidence that Fulfer ever gave the State a statement setting forth her version of the events leading to Carl Cole's death. In fact, Fulfer testified [at her guilty plea hearing] that, until the time of her guilty plea hearing, she had never given a statement to anyone except her attorney and investigator. There is no evidence that the State suppressed any information known to them regarding Fulfer's version of the events. The defense attempted to call Fulfer as a witness at the guilt-innocence phase of Wardlow's trial, but Fulfer asserted her Fifth Amendment privilege and declined to testify.

Supplemental SHTR at 7/9, FF 1-3. This finding must be presumed correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[28] Because Fulfer had not given a statement to

---

[28] Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

the prosecution regarding her version of the events, the prosecution had no information in its possession to suppress. Therefore, the information was not suppressed within the meaning of *Brady*.

But in any event, Wardlow cannot demonstrate that Fulfer's testimony was either favorable or material to his defense. The state habeas court made the following findings regarding Fulfer's testimony:

> Fulfer testified at her guilty plea hearing (two and a half months after Wardlow's trial) as follows: She testified that the night before the murder took place, Wardlow told her about his plan to rob Carl Cole. He told her that he wanted her to be there with him but that she wouldn't have to do anything. Fulfer had nothing to do with planning the robbery; she only did what Wardlow told her to do. Wardlow explained his plan to Fulfer: He was going to knock on Cole's door, claim that his car had broken down, and ask to use the telephone; then after gaining entrance to the house, he was going to knock Cole over the head with a flashlight and take his money. Fulfer accompanied Wardlow to Cole's house twice that night, but they left both times because Cole was asleep; the second time, Wardlow cut the telephone lines. They returned a third time shortly after dawn. Wardlow knocked on the door, and Cole answered. Fulfer was standing behind Wardlow. Wardlow told Cole his car was broken down and he needed to use the telephone to call someone. Cole handed Wardlow a cordless phone. Finding the phone dead, Wardlow asked Cole if he could come inside and use another phone; Cole refused. Fulfer then saw Wardlow pull a gun out of the waistband of his pants and point it at Cole. Until that moment, Fulfer had not known that Wardlow had a gun on him. Wardlow had never said anything about shooting Cole; he had told Fulfer he was only going to hit Cole over the head and take his money. Fulfer saw Cole and Wardlow begin to struggle over the gun, then she turned and ran away out of the carport. Fulfer stopped at the end of the carport, turned, and asked Wardlow to drop the gun. According to her testimony, Fulfer wasn't looking at them when the gun went off, and she didn't see what happened. She was all the way out of the carport when the gun went off. Fulfer was very surprised by what had happened. She was shocked that Wardlow had done something like that, and she was afraid of him. Fulfer cooperated with Wardlow thereafter because she was afraid he would shoot her. Fulfer

testified further that Wardlow accompanied Fulfer into a bank to cash the check they had gotten for Cole's truck; he had threatened her with the gun before they entered the bank and warned her not to try anything, then he carried the gun into the bank. Fulfer testified further that when they were finally stopped by police in South Dakota, Wardlow had instructed her to hand him the gun hidden under her seat and he would "take care of that right now." Fulfer refused, saying they were already in enough trouble. In light of Fulfer's testimony in open court at her guilty plea hearing, the court finds incredible any assertion that Fulfer would have testified that the shooting was an accident, was not intended by Wardlow, or occurred during a struggle over the gun.

Supplemental SHTr at 8/10, FF 4-5. These findings must be presumed correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[29]

Fulfer's testimony was not favorable to Wardlow within the meaning of *Brady*. Fulfer's version of the events was consistent with the State's theory set forth through the admission of Wardlow's first confessional letter and other witnesses. Because Fulfer did not actually witness the shooting, she could not corroborate Wardlow's claim that Cole was shot during a struggle over the gun. Her testimony also does not corroborate Wardlow's claim that he did not intend to kill Cole. She only testified that *she* did not intend to kill Cole. According to Fulfer, Wardlow had told her he only intended to hit Cole over the head with a flashlight; she didn't know Wardlow had a gun until he pulled it on Cole.

---

[29]    Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

Fulfer's testimony was also not material within the meaning of *Brady* because there is no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. First, the record reveals that Fulfer asserted her Fifth Amendment privilege to remain silent and declined to testify at Wardlow's trial. Counsel being aware of the exact nature of Fulfer's testimony wouldn't have changed that. Second, even if Fulfer had testified, her testimony would not have benefitted Wardlow. Wardlow's fourth claim for relief is also meritless.

**V.    Wardlow Is Not Entitled to Relief Based on His Claims of Ineffective Assistance of Trial Counsel. (Wardlow's Petition at 53, 88).**

Wardlow contends in his fifth and seventh claims for relief that trial counsel rendered ineffective assistance of counsel in violation of Wardlow's Sixth Amendment right to counsel. However, these claims are procedurally barred and, in any event, meritless.

**A.    Wardlow's ineffective-assistance claims are procedurally barred.**

As an initial matter, these claims are procedurally barred because they were raised in Wardlow's state habeas application, which was dismissed by the Court of Criminal Appeals based on its earlier order granting Wardlow's request to abandon his appeal. *See* discussion at Section II.A., *supra*, incorporated herein by reference. The state court's holding was independent of federal law and adequate to support the judgment. *Wainwright v. Sykes*, 433 U.S. at 87. Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default. *Coleman v. Thompson,* 501 U.S. at 749-50. Therefore, federal habeas corpus review is precluded.

**B.     Wardlow was not denied the effective assistance of counsel at trial.**

Procedural bar aside, Wardlow was not denied the effective assistance of counsel at trial.  In order to establish a Sixth Amendment ineffective assistance of counsel violation, a petitioner must affirmatively prove that: (1) in light of all the circumstances as they appeared at the time of the conduct, "counsel's representation fell below an objective standard of reasonableness," *i.e.,* counsel's performance was deficient under "prevailing professional norms;" and (2) the resultant prejudice was "so serious as to deprive [him] of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687-88, 690.  The failure to prove either element is fatal to the claim.  *Id.* at 697.

In applying the "deficiency" prong, judicial scrutiny of counsel's performance "must be highly deferential," with every effort made to avoid "the distorting effect of hindsight" and to "evaluate the conduct from counsel's perspective at the time." *Wiggins v. Smith,* 539 U.S. 510, 523 (2003); *Strickland,* 466 U.S. at 689-90.  Accordingly, there is a "strong presumption" that the alleged deficiency "falls within the wide range of reasonable professional assistance," and a court may "not find ineffective assistance of counsel merely because it disagrees with counsel's trial strategy." *Bell v. Cone,* 535 U.S. 685, 698 (2002); *Strickland,* 466 U.S. at 689.

Counsel has a duty to make reasonable investigations on behalf of his client. *Strickland,* 466 U.S. at 690-691.  However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and

strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.* The Fifth Circuit has echoed this reasoning, holding that an attorney's strategic choices, based on information supplied by the defendant and a thorough investigation of the relevant law and facts, are virtually unchallengeable. *Bryant v. Scott,* 28 F.3d 1411, 1415 (5th Cir. 1994). "Counsel's decision to pursue one course rather than another is not to be judged in hindsight," and the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance. *Gray v. Lucas,* 677 F.2d 1086, 1094 (5th Cir. 1982). Indeed, the Court should "be particularly wary of 'argument[s] [that] essentially come[ ] down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to judicial second-guessing.'" *Dowthitt v. Johnson,* 230 F.3d 733, 743 (5th Cir. 2000) (quoting *Kitchens v. Johnson,* 190 F.3d 698, 703 (5th Cir. 1999)).

Finally, in order to prove prejudice on his guilt-innocence claims, Wardlow must show a reasonable probability that, absent the alleged errors, the jury would have had a reasonable doubt respecting his guilt. *Wiggins,* 539 U.S. at 534; *Strickland,* 466 U.S. at 694-95. With regard to his punishment-phase claims, Wardlow is obligated to demonstrate a reasonable probability that, but for counsel's assumed deficiencies during punishment, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death;" a "reasonable probability" is one sufficient to undermine confidence in the outcome.

*Strickland,* 466 U.S. at 694-95. In either case, "it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding." *Williams v. Taylor,* 529 U.S. 362, 394 (2000); *Strickland,* 466 U.S. at 693. Wardlow fails to make the required showing of deficient performance and prejudice regarding each claimed act or omission of counsel.

**1.     Failure to investigate and present mitigating evidence**

First, Wardlow contends that trial counsel rendered constitutionally deficient performance by failing to investigate and present all available mitigating evidence at the punishment phase of trial. But Wardlow can prove neither deficient performance nor prejudice regarding this claim.

Counsel has a duty to make reasonable investigations on behalf of his client. *Strickland,* 466 U.S. at 690-691. As the Supreme Court recently explained:

> In light of [*Strickland* and *Williams*], our principle concern in deciding whether [trial counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence ... *was itself reasonable.* In assessing counsel's investigation, we must conduct an objective review of their performance, measured for "reasonableness under prevailing professional norms," which includes a context-dependent consideration of the challenged conduct as seen "from counsel's perspective at the time."

*Wiggins,* 539 U.S. at 522-23 (internal citations omitted, emphasis in original). The Fifth Circuit has further explained that in assessing counsel's performance for its reasonableness, "we look to such factors as what counsel did to prepare for sentencing, what mitigating evidence he had accumulated, what additional 'leads' he had, and what results he might

reasonably have expected from these leads." *Ladd v. Cockrell,* 311 F.3d 349, 358 (5th Cir. 2002) (quoting *Neal,* 286 F.3d at 237).

However, "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins,* 539 U.S. at 521 (quoting *Strickland,* 466 U.S. at 690-91). This is because "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Id.* at 2541. "Nor does *Strickland* require defense counsel to present mitigating evidence at sentencing in every case." *Id.*

The state trial court made the following finding of fact regarding this claim during state habeas corpus proceedings:

> Wardlow's trial attorneys conducted a punishment-phase investigation in this case. They interviewed a number of potential character witnesses. Most either did not want to testify for Wardlow or had nothing that counsel believed would be helpful to the defense. Counsel also spoke with Wardlow's parents, but ultimately determined that they would not be good witnesses. They concluded that Wardlow's parents did not have a good demeanor or appearance, gave inconsistent information, appeared unaffectionate and very cold, and were "loose cannons." Wardlow's mother appeared "unstable and very unpredictable." Counsel determined that their testimony would not be beneficial to Wardlow's defense. Counsel also asked Wardlow and his parents whether there was any evidence of brain damages or other illnesses, but they provided no remarkable information. Wardlow's trial counsel did in fact present the testimony of three witnesses at the punishment phase of trial, witnesses who were acquainted with him through school and church and who could testify as to his positive character traits. Further, at the conclusion of the punishment phase of Wardlow's trial, outside the jury's presence, Wardlow himself acknowledged in open court that he did not wish to testify at the punishment phase and that he did not wish to call any further witnesses. Counsel had explained the tactical reasons for that decision. It is evident from the evidence presented and arguments made by counsel at the punishment

phase of trial that trial counsel employed a punishment-phase strategy of emphasizing the lack of violent history on the part of Wardlow and arguing that the State had failed to prove future dangerousness. Wardlow now presents additional evidence, not presented by his trial attorneys at the punishment phase of his trial, concerning his background and the circumstances of his upbringing.

Supplemental SHTr at 11/13, FF 2; *see also* Petitioner's Exhibit 9 (Affidavit of Trial

Counsel). These findings must be presumed correct in this proceeding pursuant to 28 U.S.C.

§ 2254(e).[30]

Wardlow has failed to prove that his trial counsel performed deficiently simply

because they did not uncover and present the additional mitigating evidence Wardlow's

habeas counsel have uncovered and presented in the instant habeas application. The record

reveals that trial counsel interviewed Wardlow and his parents, as well as other individuals,

attempting to uncover any available mitigating evidence. They also employed the services

of a clinical psychologist to examine Wardlow prior to trial. Apparently, Wardlow and his

family were not as forthcoming with trial counsel as they were with habeas counsel.

Wardlow and his parents denied the existence of any brain damage or other illnesses when

queried on the subject by trial counsel. And when examined by defense expert Don Walker,

Wardlow denied ever being abused. Moreover, unlike the unpresented evidence at issue in

---

[30]        Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

*Wiggins* and *Williams*, the evidence Wardlow now relies upon was not necessarily available to counsel through means independent of Wardlow himself or his family members. In Wardlow's case, there are no government agency records or medical records documenting child abuse or neglect. There are no records of psychiatric or psychological treatment of either Wardlow or his mother.

In light of the information trial counsel uncovered through their interviews of Wardlow and Wardlow's parents and the report of psychologist expert Don Walker, trial counsel chose not to pursue a punishment-phase strategy based on family background or expert psychological testimony. Rather, Wardlow's trial counsel employed a punishment-phase strategy of emphasizing the lack of any violent history by Wardlow and arguing that the State had failed to prove that he would constitute a continuing threat to society. This was a reasonable trial strategy.

But even if Wardlow could prove that counsel performed deficiently by failing to present the evidence he now proffers, Wardlow cannot demonstrate prejudice resulting from that omission. In order to prove prejudice, Wardlow must show a reasonable probability that, but for counsel's assumed deficiencies during punishment, the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death;" a "reasonable probability" is one sufficient to undermine confidence in the outcome. *Wiggins,* 539 U.S. at 534; *Strickland,* 466 U.S. at 694-95. However, "it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding." *Williams,*

529 U.S. at 394; *Strickland,* 466 U.S. at 693.

The evidence Wardlow claims counsel deficiently failed to present at trial differs markedly in nature and extent from that presented in *Wiggins* and *Williams*. Unlike in *Wiggins,* Wardlow was not the victim of sexual abuse, and his primary participation in this brutal crime is unquestioned. *See* 539 U.S. at 516-17, 534-35 (noting severe sexual abuse suffered at the hands of Wiggins' mother and in foster homes, multiple gang-rapes, sexual molestation by an employer, and the lack of direct evidence implicating Wiggins in a run-of-the-mill murder). And unlike in *Williams*, Wardlow presents no evidence of mental retardation or good conduct while incarcerated. *Cf. Williams,* 529 U.S. at 370, 395-96.

There is simply no reasonable probability that, had the jury heard this additional evidence – that Wardlow's mother apparently suffered from some undiagnosed mental illness resulting from *her own* abusive upbringing; that she experienced episodes of rage and that Wardlow and other family members lived in fear of these episodes; that Wardlow's mother believed she had been abducted by aliens and shared this belief with Wardlow, who in turn believed that he had been abducted by aliens; that due to his mother's paranoia and excessive protectiveness, Wardlow did not experience normal social development – the jury would not have answered the punishment special issues as it did. Thus, no harm accrued as a result of trial counsel's decision. Because Wardlow fails to establish either element of *Strickland,* his ineffective assistance of counsel claim should be denied.

**2.      Failure to provide all relevant information to mental health expert**

Wardlow next maintains that trial counsel rendered ineffective assistance at punishment by failing to provide the defense mental health expert with all relevant information concerning Wardlow's background.  This claim is likewise meritless.

The state habeas trial court made the following finding regarding this claim:

> Wardlow's trial attorneys arranged for a psychological evaluation of Wardlow by psychologist Don Walker prior to trial.  Counsel explained to Walker what the State alleged as to how the crime was committed and gave him some background information, such as Wardlow's age and education.  Walker interviewed Wardlow and conducted some psychological tests.  During the interview, Wardlow denied being abused as a child but indicated he was bruised as a child when he was "butt whipped"; he claimed to have "attempted suicide" on a couple of occasions five years prior to the interview; and he expressed anger over his mother "turning him in," stating that he could not understand his mother and believed she had turned against him.  Counsel received a written report of the evaluation from Walker and concluded it contained nothing helpful to Wardlow's defense.  Indeed, Walker found no evidence of mental illness or defect and arrived at a primary diagnosis of antisocial personality disorder or borderline personality disorder.  Counsel made the decision not to call Walker as a witness at trial. Wardlow now presents the report of an evaluation of Wardlow performed by licensed professional counselor Paula Lundberg-Love at the request of his habeas counsel. Lundberg-Love disagrees with Walker's diagnosis of antisocial personality disorder, criticizing him for failing to consider other possible diagnoses such as post-traumatic stress disorder, schizophrenia, or schizophreniform disorder. However, there is no evidence that Walker did not consider and reject such alternative diagnoses.

Supplemental SHTr at 11/13-12/14, FF 3.  *See also* Petitioner's Exhibit 9 (Affidavit of Trial Counsel, attached to which is defense expert Don Walker's psychological evaluation of Wardlow).  These findings must be presumed correct in this proceeding pursuant to 28

U.S.C. § 2254(e).[31]

Wardlow can prove neither deficient performance nor prejudice as a result of trial counsel's failure to develop and present the psychological testimony habeas counsel has developed and presented in the instant petition. Counsel were not deficient in their attempts to develop psychological evidence for use at the punishment phase of trial. The fact that habeas counsel has managed to locate a licensed professional counselor/psychological associate willing to expound more favorable testimony does not mean that trial counsel were deficient in their efforts.[32] Indeed, the Fifth Circuit recently held that "testimony of experts

---

[31] Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

[32] Furthermore, any controverting opinions Lundberg-Love purports to assert in her affidavit are incredible for two reasons: First, as a licensed professional counselor and psychological associate (Lundberg-Love is not a licensed psychologist), Lundberg-Love is not qualified to diagnose Wardlow with any mental disease or disorder. According to the Texas Board of Examiners of Professional Counselors (TBEPC), as a licensed professional counselor (LPC), Lundberg-Love may interpret instruments designed to assess a person's mental disorders and she may evaluate and assess by counseling methods but may *not* use standardized projective techniques, e.g. Rorschack Test, or diagnose a physical condition or disorder. Lundberg-Love's licensure as a psychological associate requires that her work be *supervised. See* Licensing Requirements of the Texas Sate Board of Examiners of Psychologists, the legislatively authorized licensing body for the State of Texas located at http://www.tsbep.state.tx.us. licensed.html. Lundberg-Love's affidavit does not reflect that she conducted her evaluation of Wardlow under supervision or even submitted her evaluation to a supervising licensed psychologist for review. Second, even if Lundberg-Love were qualified to render the opinions she purported to in her affidavit, some of the information upon which Lundberg-Love bases her diagnoses of post-traumatic stress disorder, schizophrenia, or schizophreniform disorder, appears to be inconsistent with the evidence presented in this case: Wardlow's trial testimony; information provided by Wardlow to defense expert Walker during the pretrial evaluation; Walker's findings noting the absence of any delusional thought processes; and

-57-

not involved in the [] trial proceedings" is "irrelevant to counsel's perspective" at the time of trial. *Martinez v. Dretke*, 404 F.3d 878, 886 (5th Cir. 2005).

Nor can Wardlow demonstrate deficient performance or prejudice regarding the manner in which trial counsel communicated with their mental health expert. As noted in the previous subsection, there was really no evidence independent of Wardlow himself (or his family) regarding his background and social history. It was certainly reasonable for counsel to believe that Wardlow was infinitely more able than they to relate to Dr. Walker his family background and history. Had counsel discovered anything notable through their discussions with Wardlow and his parents, they likely would have relayed the information to Dr. Walker; but as noted in the previous subsection, neither Wardlow nor his parents divulged any such information to trial counsel. In any event, Wardlow has failed to demonstrate that Walker's diagnosis would have changed had he been privy to any additional information about Wardlow's childhood or background. Further, even if counsel performed deficiently in this regard, there is no reasonable probability that, had the jury heard Lundberg-Love's opinion regarding Wardlow, Wardlow would not have received the death penalty.

### 3.   Failure to object to Smithey's testimony

Wardlow next faults trial counsel for not objecting to the testimony of State's witness Royce Smithey at the punishment phase of trial. This claim is also meritless.

---

Wardlow's own affidavit in these proceedings, which contains no indication of "magical thinking."

The state habeas trial court made the following finding regarding this claim:

Royce Smithey's name was on the State's witness list provided to Wardlow's counsel prior to trial; counsel was also informed prior to trial that Smithey would be testifying concerning prison conditions in relation to future dangerousness. Counsel interviewed Smithey prior to his testimony. He also conducted some legal research to determine whether there was any basis to object to Smithey's testimony, but found no authority which would support an objection. Smithey, an investigator with the unit that prosecutes felony offenses occurring within the Texas prison system, testified on direct examination regarding the different levels of security within the prison system. He told the jury that while capital murder defendants who receive a death sentence are segregated from the general population and are strictly monitored and have limited access to prison employees, capital murder defendants who receive a life sentence go into the general population and are initially classified no differently than any other felony offender. Smithey testified further that violent crimes, which sometimes involve prison employees, occur fairly often within the Texas prison system, and that the incidence of such crime is greater in the general population than on death row. Smithey did not purport to render an opinion regarding whether Wardlow constituted a future danger in prison. Rather, his testimony merely described for the jury the conditions present in the Texas prison system. Wardlow's counsel elicited on cross examination of Smithey that inmates go through a diagnostic screening upon entrance into the penitentiary and that an inmate may be placed directly into administrative segregation if diagnostic personnel receive information that he has been a problem.

Supplemental SHTr at 12/14, FF 4; *see also* Petitioner's Exhibit 9 (Affidavit of Trial Counsel). These findings must be presumed correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[33]

---

[33] Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

Wardlow argues that Smithey's testimony was "irrelevant and highly prejudicial" and, thus, trial counsel performed deficiently by failing to object to the testimony. Contrary to Wardlow's assertions, however, Smithey's testimony was not objectionable under Texas law. Therefore, Wardlow can prove neither deficient performance nor prejudice with regard to trial counsel's failure to object to Smithey's testimony.

Neither *Matson v. State*, 819 S.W.2d 839, 848-854 (Tex. Crim. App. 1991), nor *Rachal v. State*, 917 S.W.2d 799, 815-818 (Tex. Crim. App. 1996), the cases upon which Wardlow relies, would have compelled the exclusion of Smithey's testimony. The court in *Matson* acknowledged the principle that expert opinion testimony regarding a defendant's future dangerousness based on "experience in the criminal justice system and probability estimates 'in general'" was irrelevant, and thus objectionable, unless particularized to the defendant. *Matson*, 819 S.W.2d at 852. In contrast, Smithey did not purport to render an opinion regarding whether Wardlow constituted a future danger in prison. Rather, his testimony merely described for the jury the conditions present in the Texas prison system. Therefore, the concerns of *Matson* were not implicated by Smithey's testimony.

Smithey's testimony is also distinguishable from the testimony at issue in *Rachal*. There, the state court upheld the exclusion of expert testimony that predictions about the future dangerousness of capital murder defendants, including predictions made by juries in answering the special issues under Article 37.071, had proven to be generally inaccurate. 917 S.W.2d at 816. The court determined that such testimony, essentially "an attack [on] the

-60-

validity of Article 37.071(b)(2) as a trustworthy indicator of deathworthiness," was irrelevant because it would not assist the jury in its deliberations on the punishment-phase issues. In contrast, Smithey's testimony was relevant to the first special: "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," because in making that determination, the jury was entitled to take into account the nature of the "society" at issue, in the case of a life sentence, prison society. Because Smithey's testimony was not objectionable under Texas law, Wardlow can prove neither deficient performance nor prejudice regarding counsel's failure to object to it.

Finally, Wardlow has failed to demonstrate a reasonable probability that, had his attorney objected to the testimony *and had that objection been sustained and Smithey's testimony excluded*, the jury would have answered the special issues any differently. The record shows, in addition to Wardlow's brutal slaying of 82-year-old Carl Cole, extensive evidence of future dangerousness: that about six months before the instant offense Wardlow was involved in a high-speed chase with a local deputy and was arrested for fleeing; that a little more than a week before the instant offense Wardlow took a pickup for a test drive and did not return it; that while incarcerated awaiting trial in the instant offense, Wardlow hid in his cell a two-foot metal bar with a six- or eight-inch rod extending from the middle of it, which he planned to use to assault a jailer and thereby escape; that also while incarcerated awaiting trial, Wardlow wrote several letters to Sheriff Ricky Blackburn and jailer Patsy Martin in which he threatened to harm other inmates, jailers, and the sheriff; that while being

transported from jail to the courtroom on the second day of trial in the instant case, Wardlow told his jailer-escort that the jailers were using trustees as guards and "if they don't stop using them I am going to double my time on one of them." This claim is meritless.

### 4. Failure to rebut Smithey's testimony

Also, contrary to Wardlow's seventh claim for relief, *see* Wardlow's Petition at 88 and Section VI, *infra*, trial counsel did not deny Wardlow the effective assistance of counsel by failing to rebut Smithey's testimony with "easily accessible" contradicting testimony.

Even assuming such evidence was generally available at the time of Wardlow's trial, counsel cannot be judged to have performed deficiently based simply on the fact that he did not present it. In light of all the circumstances as they appeared at the time of Wardlow's trial, counsel's performance did not fall below any objective standard of reasonableness. Further, Wardlow has failed to demonstrate a reasonable probability that, had his attorney proffered the rebuttal evidence, the jury would have answered the special issues any differently. This claim is also meritless.

### 5. Failure to object to medical examiner's testimony

Finally, Wardlow argues that trial counsel rendered ineffective assistance at the guilt-innocence phase of trial by failing to object to testimony of medical examiner Dr. Jeffrey Barnard regarding the distance between the gun and victim when the gun was fired.

The state habeas trial court made the following finding of fact regarding this claim:

Dr. Jeffrey Barnard, chief medical examiner of Dallas County, testified at Wardlow's trial. Dr. Barnard testified that he had performed an autopsy on the

victim's body on June 15, 1993, and had determined the cause of death to be a gunshot wound to the head. He further testified that the absence of any identifiable residue on the entrance wound indicated that there was a distance of three feet or more between the weapon and the victim when the weapon was fired. While the State presented evidence of Dr. Barnard's qualifications as a medical examiner to testify regarding cause of death, they did not present evidence of his qualifications to render an opinion on the issue of distance, and trial counsel did not object to the testimony on that basis. Nonetheless, the affidavit submitted by Dr. Barnard in these proceedings indicates that Dr. Barnard has been a medical examiner in Dallas County since 1987 and the chief medical examiner since 1991; prior to working at Dallas County he trained in a Forensic Pathology Fellowship at the Medical Examiner's Office in Suffolk County, New York; he is board-certified in anatomical pathology, clinical pathology, and forensic pathology; he has spent significant time in the Firearms Examiner's section and examining firearms related injuries; his opinions are based on his experience and training as well as range-of-fire testing performed at his office; he has performed between 4,000 and 5,000 autopsies, many of which involved firearms, and has testified in court approximately 400 to 500 times on criminal cases, many of which also involved firearms injuries. Dr. Barnard's affidavit also indicates that his office conducted test-firing of a weapon similar to the murder weapon in this case (a .45 caliber Llama semi-automatic pistol) discharging a .45 caliber auto Federal cartridge with the same 230 grain full metal jacketed projectile as was involved in the death of Mr. Cole. The testing indicated that gunpowder deposited densely at 12 inches to 24 inches, but was also present from 24 inches, with a few gunpowder particles at 36 inches. These results are consistent with Dr. Barnard's testimony at Wardlow's trial. C.E. Anderson, who submitted an affidavit in this case on Wardlow's behalf in which he opined that a .45 caliber Llama semi-automatic pistol discharging a .45 auto Federal cartridge would leave stippling up to fourteen inches, but not three feet, did not personally examine the murder weapon in this case nor conduct test-firing of similar weapons; Anderson also did not have the opportunity, as Dr. Barnard did, to examine the victim's body.

Supplemental SHTR at 12/14-13/15, FF 5; *see also* SHTr at 305-306 (Affidavit of Jeffrey

J. Barnard M.D., submitted during state habeas corpus proceedings). These findings must

be presumed correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[34]

Dr. Barnard was in fact qualified to testify on the issue of the distance from the murder weapon to the victim when the murder weapon was fired. Therefore, Wardlow can prove neither deficient performance nor prejudice with regard to trial counsel's failure to object to Dr. Barnard's qualifications. Counsel cannot be deemed deficient for failing to advance a meritless objection. And even if counsel had objected, the State would have had the opportunity to establish Dr. Barnard's qualifications and the objection would have been overruled. This claim is meritless as well.

## VI.    Wardlow Is Not Entitled to Relief Based on His Claim That the State Knowingly Presented False or Misleading Testimony at Trial. (Wardlow's Petition at 79).

In his sixth claim for relief, Wardlow contends that the State violated his due process rights by knowingly presenting materially false testimony from witness Royce Smithey at the punishment phase of Wardlow's trial. Wardlow is not entitled to relief based on this claim, first because it is procedurally barred, and second because it is meritless.

### A.    This claim is procedurally barred.

As an initial matter, this claim is procedurally barred because it was raised in Wardlow's state habeas application, which was dismissed by the Court of Criminal Appeals

---

[34]        Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

based on its earlier order granting Wardlow's request to abandon his appeal. *See* discussion at Section II.A., *supra*, incorporated herein by reference. The state court's holding was independent of federal law and adequate to support the judgment. *Wainwright v. Sykes*, 433 U.S. at 87. Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default. *Coleman v. Thompson,* 501 U.S. at 749-50. Therefore, federal habeas corpus review is precluded.

Additionally, Wardlow's claim is barred for another, independent reason. The record demonstrates that Wardlow failed to object on this basis at trial, though his allegations show that he was aware of its factual basis. Thus, the issue was not preserved for appellate review under the Texas contemporaneous objection rule.[35] Consequently, even if this Court were to conclude that the Court of Criminal Appeals' dismissal of Wardlow's habeas application was inadequate to bar review of this claim, the claim is nonetheless defaulted because of his failure to comply with the Texas rules for preserving error. *See Hogue v. Johnson*, 131 F.3d 466, 494-96 (5th Cir. 1997) (concluding that claim was defaulted where state court application of abuse bar was inadequate but where, if the state court had not found the application abusive, it would have found the claim barred by the state's contemporaneous

---

[35] *See* TEX. R. APP P. 33.1(a) (requiring that, as a prerequisite for obtaining appellate review, record must show that complaint was made by timely objection stating grounds with "sufficient specificity" to make trial court aware of complaint); *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App. 1998) ("It is axiomatic that error is forfeited when the complaint on appeal differs from the complaint at trial"); *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996) ("An objection stating one legal basis may not be used to support a different legal theory on appeal") (citation omitted).

objection rule).

Both of these procedural bars preclude federal merits review of this claim.

**B.    The State did not knowingly present false or misleading testimony at trial, and defense counsel did not render ineffective assistance by failing to rebut such evidence.[36]**

Procedural bars aside, Wardlow is not entitled to relief based on this claim.  To obtain relief on his claim that the State knowingly introduced false testimony, Wardlow bears the burden of establishing that the evidence was false, that the false testimony was material, and that the prosecution offered the testimony knowing it to be false.  *Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *see also Chambers v. Johnson*, 218 F.3d 360, 363-64 (5th Cir. 2000); *Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001).  Wardlow has wholly failed to meet his burden under the foregoing standard.

The state habeas trial court made the following findings of fact regarding this claim:

> Wardlow has failed to prove that Smithey's testimony was false. Smithey, an investigator with the unit that prosecutes felony offenses occurring within the Texas prison system, testified regarding the different levels of security within the prison system.  He told the jury that while capital murder defendants who receive a death sentence are segregated from the general population and are strictly monitored and have limited access to prison employees, capital murder defendants who receive a life sentence go into the general population and are initially classified no differently than any other felony offender.  Smithey testified further that violent crimes, which sometimes involve prison employees, occur fairly often within the Texas prison system, and that the incidence of such crime is greater in the general population than on death row. Smithey did not purport to render an opinion regarding whether Wardlow constituted a future danger in prison.  Rather, his testimony merely described for the jury the conditions present in the Texas prison system.  To support the

---

[36]  Wardlow's seventh claim for relief, that trial counsel rendered ineffective assistance by failing to rebut Smithey's testimony, is addressed in Section V.B.4., *supra*.

alleged inaccuracy of Smithey's testimony, Wardlow relies primarily upon compilations of statistics and studies purporting to mark a lower rate of prison violence. However, this information does not specifically contradict Smithey's general assertions. And in any event, the mere existence of contradictory evidence does not prove that Smithey's testimony was false. Even assuming Smithey's testimony was false, there is no evidence that the State knew or believed it to be false.

Supplemental SHTr at 16/13, FF 2-3. These findings must be presumed correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[37]

Wardlow's due process rights were not violated by the admission of Smithey's testimony. First, Wardlow cannot establish that Smithey's testimony was false or misleading. As the state court noted, the competing information upon which Wardlow relies does not specifically contradict Smithey's general assertions. Furthermore, the mere existence of contradictory evidence does not prove that Smithey's testimony was false. Indeed, the most Wardlow could establish is the existence of expert testimony or evidence that could potentially impugn the credibility of Smithey's testimony. Such evidence is insufficient to establish perjury. *See Kutzner*, 242 F.3d at 609 (inconsistencies in witnesses' testimony insufficient to establish perjury); *Koch v. Puckett*, 907 F.2d 524, 531 (5th Cir. 1990) (same).

Wardlow attempts to liken the facts at issue here to *Alcorta v. Texas*, 355 U.S. 28 (1957), but that attempt is unavailing. In *Alcorta*, the defendant relied on a Texas statute treating killing under the influence of sudden passion arising from an adequate cause as

---

[37]     Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson,* 150 F.3d at 524. This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court. *Sumner v. Mata*, 449 U.S. at 546-47; *see also Craker v. Procunier*, 756 F.2d at 1213-14.

murder without malice. *Id.* at 29. A State's witness testified inconsistent with the defendant's claim that he had come upon his wife kissing such witness in a parked automobile. *Id.* at 29-30. However, after trial, the witness admitted that he had had sexual intercourse with the defendant's wife on many occasions. *Id.* at 30-31. Further, the prosecutor admitted he knew about this fact, but told the witness not to volunteer any information about it unless asked. *Id.* at 31. This clearly misleading testimony is not even remotely akin to Smithey's testimony at the punishment phase of Wardlow's trial.

Even if the testimony were considered to be false, however, there is absolutely nothing in the record that suggests, much less demonstrates, that the prosecutor knew of the falsity.

> [D]ue process is not implicated by the prosecution's introduction or allowance of false or perjured testimony unless the prosecution *actually knows or believes* the testimony to be false or perjured; it is not enough that the testimony is challenged by another witness or is inconsistent with prior statements.

*United States v. Sutherland*, 656 F.2d 1181, 1203 (5th Cir. 1981) (emphasis added); *see Mooney v. Holohan*, 294 U.S. 103, 110-112 (1935). Wardlow cannot demonstrate that the prosecutor actually knew or believed that Smithey's testimony was false.[38]

And finally, even if it is assumed that Smithey's testimony was false, this testimony was hardly material. The standard of materiality is "whether it is reasonably likely that the truth would have affected the outcome of the trial," that is, whether the jury would have reached a different verdict had it not been for the perjured testimony. *Giglio v. United States*, 405 U.S. at 153. Applying this standard to the instant case, it is unlikely that Wardlow's jury would have reached a different verdict had it heard the competing testimony Wardlow now

---

[38] There is no authority to support Wardlow's assertion that the State may be charged with constructive knowledge of an alleged falsity. The case law supports a finding of a due process violation only where the State actually knew or believed the testimony was false.

proffers, or even if Smithey's testimony had not been presented at all.  For all the foregoing reasons, Wardlow's claim must fail.

## CONCLUSION

As established *supra,* Wardlow has failed to demonstrate an entitlement to relief on any claim.  As such, his petition for writ of habeas corpus should be denied.  Further, Wardlow has not made a substantial showing of the denial of a federal constitutional right concerning any of his claims.  This Court should therefore also deny him a certificate of appealability on all of the issues raised in the instant proceeding.  28 U.S.C. § 2253(c)(2).

WHEREFORE, PREMISES CONSIDERED, the Director respectfully requests that Wardlow's federal petition for writ of habeas corpus be summarily denied with prejudice, and that no certificate of appealability issue with regard to any of the claims raised in the instant federal habeas petition.

Respectfully submitted,

GREG ABBOTT
Attorney General of Texas

BARRY R. McBEE
First Assistant Attorney General

DON CLEMMER
Deputy Attorney General
for Criminal Justice

/s/ Gena Bunn
_____

*GENA BUNN
Chief, Postconviction Litigation Division
Assistant Attorney General
*Attorney-in-charge
State Bar No. 00790323

P.O. Box 12548, Capitol Station
Austin, Texas  78711-2548
(512) 936-1600
(512) 320-8132 (Fax)

ATTORNEYS FOR RESPONDENT

## CERTIFICATE OF SERVICE

I, Gena Bunn, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **Answer with Brief in Support** has been electronically served pursuant to Local Rule CV-5(a)(3)(C) on this the 16th day of May, 2005.

/s/ Gena Bunn
GENA BUNN
Assistant Attorney General