# UNITED STATES DISTRICT COURT    EASTERN DISTRICT OF TEXAS

BILLY JOE WARDLOW           §
                            §
*versus*                    §        CIVIL ACTION NO. 4:04-CV-408
                            §
DIRECTOR, TDCJ-CID          §

## MEMORANDUM AND ORDER

Petitioner Billy Joe Wardlow ("Wardlow"), an inmate confined on death row in the Texas prison system, filed the above-styled and numbered petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Wardlow challenges his capital murder conviction and death sentence imposed by the 76th District Court of Titus County, Texas, in *Texas v. Wardlow*, Cause No. 12,764. For the reasons set forth below, the court finds that the petition is procedurally barred and otherwise without merit and, as a result, will be denied.

## I.    PROCEDURAL HISTORY

Wardlow was convicted and sentenced to death for the murder of 82-year-old Carl Cole ("Cole") during the course of a robbery or attempted robbery. *See* 2 Tr 147-55, 157-64, 165-68;[1] *see also* TEX. PENAL CODE § 19.03(a)(2).

The offense took place on June 14, 1993, in Morris County, Texas. On June 24, 1993, the trial court appointed Vernard Solomon ("Solomon") of Marshall, Texas, to represent Wardlow. One year later, the trial court granted Solomon's motion to withdraw as defense

---

[1] "Tr" refers to the transcript, which contains the pleadings, orders, and other documents filed with the clerk during the course of Wardlow's state trial, preceded by volume number and followed by page numbers. "SF" refers to the statement of facts, the record of transcribed trial proceedings, preceded by volume number and followed by page numbers. "SX" refers to the numbered trial exhibits offered by the State at trial; "DX" refers to the numbered trial exhibits offered by the defense at trial. "SHTr" refers to the transcript of pleadings, orders, and other documents filed with the clerk during Wardlow's state habeas proceedings, followed by page numbers.

counsel. On June 24, 1995, the trial court appointed Bird Old, III ("Old"), to represent Wardlow. Lance Hinson was appointed as co-counsel. Both attorneys practiced in Mt. Pleasant, Texas.

A change of venue was granted to Titus County, and Wardlow was tried by a jury in the 76th Judicial District, Titus County, Texas. Jury selection commenced on October 6, 1994, and was completed on January 10, 1995. The guilt/innocence phase of the trial began on January 31, 1995. The jury returned a guilty verdict on February 8, 1995.

After hearing evidence during the penalty phase of the trial, the jury returned an affirmative answer to the special issue concerning future dangerousness and a negative answer to the special issue concerning mitigating evidence on February 11, 1995. Based on the answers to the special issues set forth in the Texas Code of Criminal Procedure, Article 37.071, the trial court sentenced Wardlow to death.

Wardlow's conviction and sentence were automatically appealed to the Texas Court of Criminal Appeals (the "CCA" or the "Court of Criminal Appeals"). Wardlow was represented on direct appeal by Douglas Parks of Dallas, Texas. The Court of Appeals affirmed Wardlow's conviction and death sentence in an unpublished opinion on April 2, 1997. *Wardlow v. State*, No. 72,102 (Tex. Crim. App. Apr. 2, 1997). Wardlow did not file a petition for certiorari review in the United States Supreme Court.

On July 21, 1997, the trial court, Judge Gary Stephens presiding, conducted a hearing pursuant to Article 11.071 § 2(a-c) of the Texas Code of Criminal Procedure to determine whether Wardlow desired the appointment of counsel to assist him in filing an application for a writ of habeas corpus. *See* Director's Appendix 1. Prior to this hearing, Wardlow had already contacted

the CCA "asking [the court] to refrain from appointing him counsel for habeas and to immediately set an execution date for him." Wardlow's Exhibit 4 at 2.

Wardlow appeared at this hearing in person and through counsel, James Clark, and indicated that he did not wish to have counsel appointed and did not desire to have any further appeals filed on his behalf. *Id*. Wardlow—whom Judge Stephens explicitly found to be competent—voluntarily and intelligently waived his right to appointed counsel and his right to proceed *pro se* in open court. *Id*. Judge Stephens memorialized his findings in writing on September 2, 1997, and thereafter forwarded them to the Court of Criminal Appeals. *Id*.

On September 25, 1997—more than two months after appearing in open court and waiving his right to counsel and to pursue further appeals, Wardlow "entered into a legal representation agreement with attorney Mandy Welch ("Welch")," wherein Welch agreed to notify the appropriate courts that Wardlow did, in fact, wish to pursue his post-conviction remedies. *See* Wardlow's Exhibit 4 at 2. On January 5, 1998, the trial court entered supplemental findings of fact confirming Wardlow's wish to pursue habeas relief. Director's Appendix 2. On that basis, the Court of Criminal Appeals, on January 21, 1998, appointed Welch to represent Wardlow and ordered that his state habeas application be filed within 180 days. Director's Appendix 3.

On July 2, 1998, eighteen days before Wardlow's filing deadline, the Court of Criminal Appeals received another letter from Wardlow again expressing a desire "to waive and forego all further appeals." Wardlow's Exhibit 1. Wardlow has never rescinded this waiver.

The Court of Criminal Appeals granted Wardlow's request to abandon further appeals in an order dated July 14, 1998. Wardlow's Exhibit 2. Despite that order, however, Welch filed a state habeas application in the trial court on July 20, 1998, the 180th day after her appointment.

SHTR 1-67.  The application raised essentially the same seven claims for relief raised in the instant petition.

On March 2, 2004, Judge Stephens issued his findings of fact and conclusions of law and forwarded them to the Court of Criminal Appeals along with his recommendation that the relief requested be denied.  *See* Supplemental SHTr 3-21.  In a written order issued on September 15, 2004, the CCA dismissed Wardlow's application on procedural grounds, declining to review the merits of his claims.  Specifically, the court dismissed the application based on its July 14, 1998, order granting Wardlow's request to abandon further appeals.  *Ex parte Wardlow*, Writ No. 58,548-01.  The court also denied Wardlow's motion for rehearing on October 20, 2004.  Wardlow, represented by attorney Richard Burr, then filed a petition for a writ of habeas corpus with this court on November 23, 2004.

Wardlow presents the following grounds for relief:

1.    Wardlow's confessional letter was obtained in violation of his rights granted by the Fifth and Sixth Amendments to the United States Constitution.

2.    Wardlow was denied the effective assistance of counsel on direct appeal.

3.    The State substantially interfered with co-defendant Tonya Fulfer's ("Fulfer") choice to testify on Wardlow's behalf in violation of Wardlow's rights to due process and a fair trial under the Sixth, Eighth, and Fourteenth Amendments.

4.    The State failed to disclose to the defense exculpatory evidence regarding Fulfer's version of the events, in violation of Wardlow's due process rights.

5.    Wardlow was denied effective assistance of counsel at trial as guaranteed by the Sixth Amendment.

6.    The State knowingly presented testimony creating a false impression before the jury in violation of Wardlow's due process rights.

7.    Wardlow's trial counsel rendered constitutionally ineffective assistance by failing to rebut the allegedly false testimony presented by the State.

The Director filed an answer (#9) on May 16, 2005. Wardlow filed a reply brief (#12) on September 15, 2005. On October 18, 2016, Wardlow filed a supplemental brief (#25). On February 10, 2017, the Director filed a response to Wardlow's supplemental brief (#32). Wardlow filed a reply brief to the Director's response on March 20, 2017.

## II.   FACTUAL BACKGROUND

In the late afternoon of June 14, 1993, Charles Cole ("Charles") arrived at the home of his 82-year-old father, Cole, in the rural community of Cason, Texas. 33 SF 90. He observed that his father's 1993 Chevrolet four-wheel-drive pickup truck was missing, and he noticed blood on the steps in front of the door. *Id*. at 93. Fearing that his father had injured himself and had gone for help, Charles attempted to call nearby hospitals. *Id*. at 93-95. After discovering that the phone had been disconnected, Charles became alarmed and contacted Morris County Sheriff Ricky Blackburn ("Sheriff Blackburn") from a neighbor's house. *Id*. at 95. Upon returning to his father's house, Charles found his father's blue jeans, shirt, and boots laid out on a rocking chair in his bedroom. *Id*. at 96. The house reportedly appeared undisturbed, but Cole, his billfold, and the keys to his truck were missing. *Id*. at 97.

Sheriff Blackburn arrived at Cole's residence shortly thereafter. 33 SF 112-13. He discovered a broken pair of glasses, a partial set of dentures, and a small amount of blood in the carport near the door. *Id*. at 113. Authorities also discovered that Cole's phone lines had been disconnected from outside the house. 34 SF 177-78. At that point, the sheriff initiated a full-scale investigation into Cole's whereabouts. 33 SF 130.

Law enforcement officers combed the surrounding area searching for any sign of Cole or his pickup, the registration number of which had been forwarded to the National Crime

Information Center. *Id*. at 131; 34 SF 181. At about midnight, Morris County, Texas, Deputy Sheriff Bill Barnard ("Deputy Barnard") discovered several items that appeared to have been dumped from Cole's truck—his checkbook, some farm tools, and an adding machine—at a turnaround on a small backroad in nearby Titus County. 34 SF 182, 186. There was still no sign of Cole or his pickup.

In the pre-dawn hours of June 15, after an all-night search of the surrounding area, game warden Billy Dodd ("Game Warden Dodd") and state trooper David McFarland ("Trooper McFarland") accompanied Charles back to his father's house where the three conducted a thorough, room-by-room search. 33 SF 103; 34 SF 216-17. They scoured Cole's bedroom in the darkness, looking behind doors and under the bed with a flashlight. 33 SF 103; 34 SF 218. Charles opened his father's closet, and Game Warden Dodd shone the flashlight inside. 33 SF 103; 34 SF 219. There, in the closet, stood the body of Cole, a bullet hole between his eyes. 34 SF 219.

Game Warden Dodd immediately closed the closet door and ushered Charles out of the room. 33 SF 104; 34 SF 219. He then returned to check the body. 34 SF 219. Cole's face was swollen, and there was a prominent wound between his eyes at the bridge of his nose. *Id*. at 221. He had on a pajama top and undershorts and was wrapped in a bedspread. *Id*. Game Warden Dodd could not detect a pulse, and he noted that Cole's arm was cold and stiff. *Id*. at 220. The body was removed from the closet and transported to Dallas County for an autopsy. *Id*. at 226; 33 SF 139.

Medical examiner Dr. Jeffrey J. Barnard ("Dr. Barnard") determined that Cole died as the result of a single gunshot wound to the head. 33 SF 146. The bullet, which Dr. Barnard

recovered from Cole's body, entered between his eyes, directly above his nose, traveled through the nasal bone, the mouth, the spinal cord, and finally lodged in the lower portion of the cervical vertebra. *Id*. at 145. There were also abrasions and contusions on Cole's back, which Dr. Barnard testified were consistent with drag marks, and a laceration on the back of Cole's head, which reportedly could have been caused by either Cole falling backward or being struck from behind. *Id*. at 152. Dr. Barnard testified that the absence of any identifiable residue on the entrance wound indicated that the gun had been fired from a distance of three feet or more. *Id*. at 146. He further opined that the path of the bullet indicated that it had traveled downward; nonetheless, he could not determine whether Cole had been standing, kneeling, sitting, or lying when he was shot. *Id*. at 149-50, 155.

Later on June 15, Lynda Wardlow ("Lynda"), Wardlow's mother, reported to Sheriff Blackburn that the previous morning she had noticed that a Llama .45 semi-automatic pistol was missing from her home. 34 SF 355-56. She provided the gun's serial number and some ammunition she had used in the gun. *Id*. She also stated that Wardlow and his girlfriend, Fulfer, had been staying at her house for a few days; nonetheless, Lynda claimed she had not seen the couple since late on the evening of June 13. *Id*. at 362. Will Emery ("Emery"), Wardlow's neighbor, told authorities that on the evening of June 13, Wardlow and Fulfer visited his home, at which time Wardlow showed Emery a blue steel .45 pistol with a wooden handle. *Id*. at 247-52.

Dorothy Smith ("Smith"), a live-in caregiver for Cole's 86-year-old sister, Waldine Henderson ("Henderson"), testified that she had seen a young couple matching the description of Wardlow and Fulfer near Cole's house at about 6:30 a.m. on June 14. 34 SF 264-66. Smith

watched the couple from a window as they stood talking directly in front of Henderson's house. *Id*. at 266, 294. Smith saw them walk toward Cole's house, which was down the street from Henderson's house, and stop at a van parked in the driveway of Cole's next-door neighbor. *Id*. at 267, 295-99. As the couple stood looking inside the back of the van, Smith saw a gun with a brown handle in the man's back pocket. *Id*. at 267-68, 300.

The man then walked under Cole's carport out of Smith's sight, and the woman followed. *Id*. at 320. A minute or two later, Smith heard a gunshot and saw the woman run out from under the carport, stop quickly, and then bend over. *Id*. at 324, 326. Smith thought the man had shot a snake behind Cole's house, and she returned to her housework unconcerned. *Id*. at 326, 332. Approximately five minutes later, Smith returned to the window and observed Cole's pickup truck back out of the carport and drive away at a slow rate of speed. *Id*. at 326-27. She assumed that Cole was driving, but she could not see through the tinted windows of the pickup. *Id*. at 328-29, 340.

Also on June 15, Jerry Wagner, part owner of a used car dealership in Norfolk, Nebraska, finalized a deal with a young couple fitting the description of Wardlow and Fulfer. 35 SF 449-50. The couple drove off the lot in a black 1987 Ford Mustang convertible with $8,000 cash. The car and the cash were received in exchange for what was later determined to be Cole's 1993 Chevrolet pickup. *Id*. at 449, 451, 454.

On the evening of June 16, 1993, a patrolman in Madison, South Dakota, apprehended Wardlow and Fulfer and took them into custody after receiving a teletype advising that a Texas warrant had issued for their arrest on charges of capital murder. 35 SF 471-72. A Llama .45 semi-automatic pistol was found under the passenger seat of the car and seized pursuant to an

inventory search.  *Id*. at 473, 481.  Firearms examiner Raymond Cooper confirmed that the bullet recovered from Cole's body was, in fact, fired from that gun, which was admitted into evidence at trial.  34 SF 377; SX 23.  Sheriff Blackburn, Game Warden Dodd, and Trooper McFarland transported Wardlow to Texas on June 22-23, 1993, and Wardlow was immediately incarcerated in the Morris County jail.  35 SF 488-89.

On February 28, 1994, Wardlow wrote Sheriff Blackburn a letter, delivered through the jail's in-house mail system, wherein he confessed to the robbery and shooting of Cole.  It read in pertinent part:

Ricky,

I told you I would give you a statement, so here is what happened on June 14, 1993.  The night before I was at the neighbor's house me and my girlfriend, and we were watching a movie.  I already had in my possession the Llama .45 Automatic that was used for the shooting.  I showed the gun to my neighbor William Emery, who examined it and complemented me on it.  At about 11:30 p.m. on 06/13/93 I left with my girlfriend to go and check out the place and see if anyone was up.  There were no lights on and not a sound to be heard.  I reached the porch and undid the phone line, so that no one could call the police.  I knocked on the door and there was no answer.  I then decided to go back home after two other tries later that day and early the next morning.  The intention was to get him to let me use the phone and once inside, I would rob him.  I had stolen trucks before, but this time I had no money.  When we got home I set the alarm for 5:00 a.m. so I could go and get the job done.  My girlfriend followed me to my neighbor's house and there she stayed until I came back with the truck.  It was actually about 6:05 a.m. when I left the house.  I got there and still no one was up.  I knocked on the door and there was no answer.  I went up the road and waited at the house that had recently burned down and when his light came on I went back.  I knocked on the door, and he answered.  I told him my car was broke down, and wanted to know if I could use the phone so I could call my friend.  He reached inside the door and picked up a cordless phone and handed it to me.  It didn't work because the lines were disconnected.  He set the phone down on the table and started to close the door.  I then caught the door and ask if he had another phone and that that phone's batteries might be dead.  He said no and persisted to close the door and then is when I drew out the .45 from in my pants.  And as I brought it out, I corked [sic] a shell into the chamber.  I raised it up and told him to walk inside the house.  He ran at the door for me and screamed when he caught my arm.

Being younger and stronger, I pushed him off and shot him right between the eyes. Just because he pissed me off. He was shot like an executioner would have done it. He fell to the ground lifeless and didn't even wiggle a hair. I proceeded inside found his jeans and removed all money and keys from it since I didn't know which keys were to the truck. I then thought of putting the body in the truck and hauling it off in the woods, but decided I didn't have any time to waste, since a .45 shot that early in the morning was abound to draw some attention. I went to the bedroom and grabbed the blanket, went outside and wrapped up the body. I picked up the body and went back into the bedroom. There I put him in the closet and shut the door thinking it would be some time before he would be found. I proceeded out of the house not even thinking of fingerprints. I got the truck which already had keys in it and left. I headed out toward 144 S. then onto 11. There I went toward Pittsburg and turned off on the road where the corner is right before you get to the bridge SE 35A. At the corner that goes to the creek I went down the trail in the truck and unloaded anything that wasn't paperwork for the truck. I then left going out the other way ending up on SE 35 then onto 144 N. I then turned up on the back roads to my neighbors house which is on the blacktop by my house. Here I parked and got my girlfriend and we walked over to the house and got our things which were already packed and in the back of my pickup. Carried them to the truck and left by way of 144 N. to 49 and then to Mt. Pleasant. I gassed up with the 47 dollars I found in the wallet which I kept. Then I stopped at the store right by the interstate and got a Coke. I then thoroughly searched the wallet and found $100 bill and then threw it in the dumpster. We then proceeded to an destination along the way I told her the above things just as they happened and told her she didn't have to go if she didn't want to, but I assured her I wouldn't be caught.

The letter was admitted as evidence at Wardlow's trial and was read into the record in the jury's presence. 35 SF 524-27; SX 73.

Wardlow testified at the guilt-innocence phase of trial regarding the circumstances under which he wrote the letter confessing to the crime. 37 SF 636-43. He also testified regarding the facts of the offense, and his trial testimony was consistent with the letter. *Id*. at 644-57. Wardlow told the jury, however, that contrary to the letter, Fulfer accompanied him to Cole's home. *Id*. at 643. He also stated that he did not intend to kill Cole when he went to his home; rather, he intended only to rob Cole and take his truck. *Id*. at 644. When Wardlow brought out the gun and told Cole to go back into the house, Cole lunged at Wardlow and grabbed his arm and the gun,

attempting to push Wardlow away. *Id*. at 648-51. Wardlow testified that Cole was stronger than expected and, as a result, Wardlow was caught off balance and began to fall backwards. *Id*. at 648, 652. Wardlow claimed he shot the gun without aiming, hoping it would get Cole off of him. *Id*. at 648, 651, 653, 664. Physical evidence, however, confirmed that Cole was shot between the eyes. *Id*. at 648. The trial testimony revealed that Cole, while strong and active for an 82-year-old man, stood five feet, seven inches tall and weighed approximately 145 pounds. 33 SF 106-07. Wardlow stands six feet, four inches tall. 34 SF 311; 35 SF 450.

Wardlow told the jury that he had been planning to rob Cole for less than a week, but that he had been planning to travel to Montana for some time. He and Fulfer were on their way to Montana when they were apprehended in South Dakota. 37 SF 656-57, 670. He admitted that he and Fulfer had discussed the danger of leaving a witness to their crime. This discussion apparently took place when the couple discovered, before knocking on Cole's door, that there was a set of keys to Cole's pickup on the dashboard. 37 SF 646. Thus, according to Wardlow, they realized they could either take the pickup without having to confront Cole and risk him informing the authorities as soon as he awoke, or they could confront Cole, rob him, and "incapacitate" him by either kidnapping and dumping him in some remote area or leaving him tied up so he could not contact the authorities. They ultimately decided on the latter course of action. *Id*. at 676-77.

When asked by the prosecutor why, if he intended to tie up Cole, he failed to bring any rope with him, Wardlow responded that he planned to use a telephone cord or anything else he might find in the victim's home. 37 SF 678-80. Significantly, evidence was presented at trial indicating that Cole knew Wardlow (also a resident of Cason) and would likely have been able to identify him as the perpetrator. 33 SF 102, 108; 34 SF 363. Wardlow, no doubt, was fully aware

of this fact. 37 SF 689. Wardlow also acknowledged that, before their arrest, he and Fulfer bought several personal items with the cash they received from the sale of Cole's pickup. *Id*. at 683-88.

During the trial's punishment phase, the State presented Deputy Barnard to testify. He stated that, while on patrol on January 11, 1993, he observed Wardlow driving at a high rate of speed and attempted to pull him over. 39 SF 19. Wardlow, however, refused to pull over, and the deputy was forced to pursue him. *Id*. at 20. Deputy Barnard followed Wardlow for several miles with his lights on, but Wardlow continued traveling at dangerous speeds in excess of 100 miles per hour on the highway and 70 miles per hour on a narrow county road. *Id*. at 20-21, 27-28. Eventually, Wardlow pulled over, and Deputy Barnard arrested him for fleeing. *Id*. at 28-30.

John Schultz, a salesman at a used car lot in Fort Worth, testified that on June 5, 1993, Wardlow, accompanied by a woman, took a 1989 Chevrolet pickup for a test drive and never brought it back. 39 SF 31-34.

Morris County jailer J. P. Cobb testified that on February 20, 1994, while Wardlow was incarcerated in the Morris County jail awaiting trial, jailers found a two-foot metal bar with a six-to eight-inch rod extending from the middle behind Wardlow's bunk in the cell he shared with three other inmates. 39 SF 141-42. One of Wardlow's former cellmates testified that Wardlow planned to use the metal bar to hit one of the jailers in the head, take his keys, and escape. *Id*. at 145-47. The State also offered into evidence several letters Wardlow wrote to Sheriff Blackburn and jailer Patsy Martin ("Martin") while he was incarcerated in the Morris County jail. In these letters, Wardlow threatened to harm other inmates, jailers, and the sheriff. 39 SF 173-76; SX 82-86.

Deputy Sheriff Warren Minor testified that, while being transported from the Titus County jail to the courtroom on the morning of the second day of his trial, Wardlow stated the jail was using trustees as guards and "if they don't stop using them I am going to double my time on one of them." 39 SF 177-78.

Harry Washington ("Washington"), an undercover narcotics agent, testified that on September 9, 1992, he and an informant approached Wardlow to buy some marijuana. 40 SF 208-09. Wardlow, who was seated in his pickup, told Washington that he did not mess with drugs. *Id*. at 209. Washington then observed a .45 handgun lying on the seat next to Wardlow. *Id*. at 210. Washington asked Wardlow why he had a gun, and Wardlow laid his hand on top of the gun and said to Washington, "I'll shoot you with it." *Id*.

Royce Smithey ("Smithey"), an investigator with the unit that prosecutes felony offenses occurring within the Texas prison system, testified about the different levels of security within the prison system. 40 SF 215-16, 220. He advised that although capital murder defendants who receive a death sentence are segregated from the general population and are strictly monitored and have limited access to prison employees, those who receive a life sentence are released into the general prison population and are initially classified no differently than any other felony offender. *Id*. at 221-22, 225-27. Smithey also testified that violent crimes, including those that involve prison employees, occur fairly often within the Texas prison system, and that the incidence of such crime is much greater in the general population than on death row. *Id*. at 222-27.

Wardlow's defense team also presented evidence. Amy Billingslea ("Billingslea"), Wardlow's former church youth minister, testified that she had known him since he was a baby and had worked with him when he became involved in the church youth group as a teenager. 40

SF 260-61. She described Wardlow as quiet, well mannered, hard working, bright, and respectful. *Id*. at 262-63. According to Billingslea, Wardlow played on the church basketball team and participated in church fundraisers. *Id*. at 261. Wardlow attended church regularly during his early teens; however, he reportedly ceased attending church several years before the instant offense occurred. *Id*. at 262, 265.

Glendon Gillean ("Gillean"), a librarian at Daingerfield High School, testified that as a student, Wardlow often came to the library before school and during lunch to work on educational computer programs. 40 SF 267-69. She said he also volunteered to help pack and move books when the library was relocated. *Id*. Wardlow regularly borrowed books on topics such as mechanics, technology, and aeronautics. *Id*. at 269. According to Gillean, Wardlow never created a disciplinary problem. *Id*. at 270. Assistant principal Gerald Singleton testified that Wardlow attended school regularly and had never had any disciplinary complaints lodged against him. *Id*. at 271-72. Nonetheless, Wardlow withdrew from school before completing his junior year of high school. *Id*. at 273.

Further details adduced at trial will be discussed below, as pertinent.

## III.    LEGAL STANDARD

Review of Wardlow's petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. No. 104-132, 110 Stat. 1214. *See Lindh v. Murphy*, 521 U.S. 320, 327 (1997).

### A. General Standards of Review

Under AEDPA, a petitioner who is in custody "pursuant to the judgment of a State court" is not entitled to federal habeas corpus relief with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). "By its terms § 2254 bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." *Harrington v. Richter*, 562 U.S. 86, 98 (2011). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citation and internal quotation marks omitted). With respect to the first provision, a "state court decision is 'contrary to' clearly established federal law if (1) the state court 'applies a rule that contradicts the governing law' announced in Supreme Court cases, or (2) the state court decides a case differently than the Supreme Court did on a set of materially indistinguishable facts." *Nelson v. Quarterman*, 472 F.3d 287, 292 (5th Cir. 2006) (en banc); *see Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (internal quotation marks omitted).

"[R]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). As such, "evidence later introduced in federal court is irrelevant." *Id.* at 184. "The same rule necessarily applies to a federal court's review of purely factual determinations under § 2254(d)(2), as all nine Justices acknowledged." *Blue v. Thaler*, 665 F.3d 647, 656 (5th Cir. 2011) (footnotes omitted),

*cert. denied*, 568 U.S. 1189 (2013). With respect to § 2254(d)(2), a Texas court's factual findings are presumed to be sound unless a petitioner rebuts the "presumption of correctness by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

The "standard is demanding but not insatiable; . . . [d]eference does not by definition preclude relief." *Id.* (citation and internal quotation marks omitted). Most recently, the Supreme Court stated that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Woods v. Etherton*, 136 S. Ct. 1149, 1151 (2016); *see Richter*, 562 U.S. at 101. The Supreme Court has explained that the provisions of AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). Federal habeas corpus relief is not available simply because a state court decision may have been incorrect; instead, a petitioner must show that a state court decision was unreasonable. *Cone*, 535 U.S. at 694.

A federal habeas court's inquiry into unreasonableness should be objective rather than subjective, and a court should not issue the writ simply because that court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. *Williams*, 529 U.S. at 409-11 (Stevens, J., concurring); *Tucker v. Johnson*, 242 F.3d 617, 620 (5th Cir. 2001). Rather, federal habeas relief is only merited where the state court decision is both incorrect *and* objectively unreasonable "[w]hether or not [this Court] would reach the same conclusion . . . ." *Woodford v. Visciotti*, 537 U.S. 19, 27 (2002);

*Williams*, 529 U.S. at 411; *Martin v. Cain*, 246 F.3d 471, 476 (5th Cir.), *cert. denied*, 885 (2001). Moreover, it is the state court's "ultimate decision" that is to be tested for unreasonableness, "not every jot of its reasoning." *Santellan v. Cockrell*, 271 F.3d 190, 193 (5th Cir. 2001), *cert. denied*, 535 U.S. 982 (2002); *see Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (holding that a federal court's "focus on the 'unreasonable application' test under section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence"), *cert. denied*, 537 U.S. 1104 (2003).

Additionally, independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner "shall have the burden of rebutting the presumption by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *Jackson v. Johnson*, 150 F.3d 520, 524 (5th Cir. 1998), *cert. denied*, 526 U.S. 1041 (1999). This presumption applies to state court factfindings regardless whether those findings are made by a trial court or an appellate court. *See Sumner v. Mata*, 449 U.S. 539, 546-47 (1981) (interpreting pre-AEDPA version of statute); *see also Craker v. Procunier*, 756 F.2d 1212, 1213-14 (5th Cir. 1985) (holding that factfindings of state habeas trial court favorable to petitioner were entitled to statutory presumption of correctness despite fact that CCA ultimately denied relief).

Finally, pre-AEDPA precedent forecloses habeas relief if a claim (1) is procedurally barred as a consequence of a failure to comply with state procedural rules, *Coleman v. Thompson*, 501 U.S. 722 (1991); (2) seeks retroactive application of a new rule of law to a conviction that was final before the rule was announced, *Teague v. Lane*, 489 U.S. 288 (1989); or (3) asserts trial

error that, although of constitutional magnitude, did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).

## B.  Dismissal of Wardlow's State Habeas Application

"The general rule is that the federal habeas court will not consider a claim that the last state court rejected on the basis of an adequate and independent state procedural ground." *Busby v. Dretke*, 359 F.3d 708, 718 (5th Cir.), *cert. denied*, 541 U.S. 1087 (2004); *see Coleman*, 501 U.S. at 729-32.  The procedural default doctrine "has its roots in the general principle that federal courts will not disturb state court judgments based on adequate and independent state law procedural grounds." *Dretke v. Haley*, 541 U.S. 386, 392 (2004).  "[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default." *Id.* at 388.

On July 21, 1997, Wardlow expressed his desire to forgo state habeas proceedings.  After a hearing was held, the trial court found that Wardlow was "mentally competent and [had] a rational understanding as well as factual understanding of the proceedings" and that his waiver of both the right to counsel and the right to proceed *pro se* was voluntary and intelligent.  DE 2 at 2.  When Wardlow had a change of heart, the trial court recommended that counsel be appointed for the purposes of pursuing state habeas relief.  *Id.* at 4.

On January 21, 1998, the Court of Criminal Appeals "upon due consideration," appointed counsel and ordered that the writ application be filed 180 days later.  *Id.* at 6.  Wardlow, however, changed his mind again and expressed his desire to waive state habeas proceedings directly to the

Court of Criminal Appeals, DE 1-2, which then issued an order granting Wardlow's request, *Ex parte Wardlow*, No. 72,102 (July 14, 1998); *see* DE 1-3.

Despite this order, appointed counsel filed a writ application on the 180th day. SHCR at 1. The trial court issued findings with respect to each of the claims raised and forwarded everything to the Court of Criminal Appeals. The Court of Criminal Appeals, citing its previous order, dismissed the writ. *Ex parte Wardlow*, No. 58,548-01 (Tex. Crim. App. Sept. 15, 2004); *see* DE 1-5. Thus, Wardlow's claims are procedurally defaulted because they were not considered by the state's highest court. "A federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Beard v. Kindler*, 558 U.S. 53, 55 (2009) (quoting *Coleman*, 501 U.S. at 729). Federal review is precluded "whether the state law ground is substantive or procedural." *Coleman*, 501 U.S. at 729. When an inmate fails to raise a claim in state court properly, he "has deprived the state courts of an opportunity to address those claims in the first instance." *Id*. at 732. Accordingly, precluding review of claims decided on state grounds "ensures that the States' interest in correcting their own mistakes is respected in all federal cases." *Id*.

"A violation of 'firmly established and regularly' followed state rules will be adequate to foreclose review of a federal claim." *Lee v. Kemna*, 534 U.S. 362, 376 (2002) (quoting *James v. Kentucky*, 466 U.S. 341, 348 (1984)). The discretionary nature of such a bar does not make it any less "adequate," for a "discretionary rule can be 'firmly established' and 'regularly followed' even if the appropriate exercise of discretion may permit consideration of a federal claim

in some cases but not others." *Beard*, 558 U.S. at 60-61. Situations where a state-law ground is found inadequate are but a "small category of cases." *Kemna*, 534 U.S. at 381.

Wardlow asserts that the dismissal of his application was based on no existing "rule." DE 24 at 5-10. As such, he argues, it is not subject to the usual considerations of procedural default. The court disagrees. Wardlow validly waived his state habeas proceedings, first, after a hearing in the trial court and, second, via a letter sent directly to the Court of Criminal Appeals. The Court of Criminal Appeals was entitled to accept Wardlow's waivers. Nothing in the record establishes that Wardlow was not competent at the time he wrote the letter, and he points to no new evidence suggesting otherwise. Moreover, Wardlow has never rescinded his waiver. The CCA's dismissal of Wardlow's state habeas application, therefore, operates as a valid procedural bar to consideration of his claims.

## IV. 28 U.S.C. § 2254(E)(1)'S PRESUMPTION OF CORRECTNESS

Although the Court of Criminal Appeals dismissed Wardlow's state habeas application based on his waiver, he is still obligated to prove by clear and convincing evidence that the trial court's factual findings regarding his claims are incorrect. *See Sumner*, 449 U.S. at 546 (noting that § 2254(d) "makes no distinction between the factual determinations of a state trial court and those of a state appellate court"); *see also Craker*, 756 F.2d at 1213-14 (holding that fact-findings of state habeas trial court favorable to petitioner were entitled to statutory presumption of correctness despite the fact that the CCA ultimately denied relief).

Indeed, as the United States Court of Appeals for the Fifth Circuit noted in *Reed v. Stephens*:

> In Texas, "[o]n postconviction review of habeas corpus applications, the convicting court is the 'original factfinder,' and [the CCA] is the ultimate factfinder." *Ex*

*parte Chavez*, 371 S.W.3d 200, 207 (Tex. Crim. App. 2012). Although the CCA will "generally defer to and accept the convicting court's findings of fact and conclusions of law," the CCA may exercise its authority "to make contrary or alternative findings and conclusions" when its "independent review of the record reveals that the trial judge's findings and conclusions are not supported by the record." *Id.* (internal quotation marks and citations omitted); *see also Ex parte Flores*, 387 S.W.3d 626, 634-35 (Tex. Crim. App. 2012) (CCA acts as "the ultimate fact finder" when the lower court's findings "do not resolve the necessary factual issues").

739 F.3d 753, 765 n.3 (5th Cir.), *cert. denied*, 135 S. Ct. 435 (2014).

Here, there is no indication that the Court of Criminal Appeals disagreed with the trial court's findings on Wardlow's claims; rather, the court *dismissed* his application because it had previously accepted his wavier of state habeas proceedings. Nothing about the CCA's actions renders the trial court's findings invalid.

AEDPA's presumption of correctness is *independent* of the requirement that the state court's rejection of a petitioner's constitutional claims be examined for reasonableness. Consequently, Wardlow must overcome the presumption of correctness afforded the state habeas court's findings. Wardlow has not done so.

## V.    WARDLOW'S WRITTEN CONFESSION (CLAIM I)

In his first claim, Wardlow argues that the State obtained his confession in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. He contends that the admission of his February 28, 1994, letter to Sheriff Blackburn, wherein he confessed to the armed robbery and murder of Cole, violated the Fifth and Sixth Amendments. *See* Wardlow's Petition at 21.

While incarcerated and awaiting trial, Wardlow sent Sheriff Blackburn two letters detailing his involvement in Cole's murder. Defense counsel objected to the introduction of the letters, and the trial court held a pretrial hearing on Wardlow's motion to suppress the confessions. The trial

court made findings of fact and conclusions of law which allowed for the introduction of the letters. On direct appeal, the CCA held that the trial court properly admitted the letters into evidence. *See Wardlow v. Texas*, No. 72,102 at 12 (Tex. Crim. App. Apr. 2, 1997).

Federal habeas relief is not available to Wardlow on either of the legal bases he presents. The Fifth Amendment claim was adjudicated on the merits by the CCA on direct appeal. That adjudication is entitled to deference under § 2254(d). The Sixth Amendment claim is procedurally defaulted based on the state court's application of an independent and adequate state procedural rule; alternatively, the claim is meritless. The inquiry for this court is whether the state court's decision was contrary to, or an unreasonable application of, clearly established federal law, as determined by the Supreme Court. *See* 28 U.S.C. § 2254(d).

The facts surrounding the events leading up to the writing of the letters are largely undisputed. On June 16, 1993, Wardlow was arrested by police officers in Madison, South Dakota, based on a teletype received from authorities in Texas, at which time the officers in South Dakota read Wardlow his *Miranda* warnings. 10 SF 71. He was incarcerated until the proper authorities were notified. *Id.*

Sheriff Blackburn, Game Warden Dodd, and Trooper McFarland arrived in Madison, South Dakota, on June 22, 1993, for the purpose of transporting Wardlow back to Texas. 9 SF 10, 63. The sheriff read Wardlow his *Miranda* warnings, and Wardlow exercised his right to remain silent and requested an attorney. 9 SF 10-11, 63; 10 SF 72. Wardlow was not questioned thereafter regarding the circumstances of the instant offense. 9 SF 11. On June 24, he was arraigned before Judge William Porter ("Judge Porter") who, on the same day, appointed Solomon

as defense counsel.  Several days later, Solomon sent a letter to Sheriff Blackburn directing the sheriff not to speak with Wardlow outside his (Solomon's) presence.

From June to September 1993, Wardlow attempted unsuccessfully to communicate with Solomon.  Wardlow's mother also attempted to contact Solomon but was unable to reach him.  In the fall of 1993, Wardlow requested several times to meet with the prison minister and asked to be moved to general population so that he could help his "brothers in Christ to strengthen as [he had]."  In December 1993, Wardlow wrote several letters to Sheriff Blackburn expressing his dissatisfaction with Solomon and asking for help in obtaining another attorney.  He also wrote a letter to Judge Billy Moye requesting the appointment of new counsel.  Additionally, Wardlow lodged an official grievance against Solomon with the Texas Bar Association.  In January or February of 1994, a jailer contacted Wardlow's mother and expressed concern regarding his mental state.  Wardlow's mother again tried to contact Solomon, and when she finally reached him, Solomon stated that he was unhappy about the grievance Wardlow had filed.

On January 25, 1994, correctional officer Martin received a letter from Wardlow asking to meet with Sheriff Blackburn "concerning [his] case."  The note had been routed through the jail's in-house mail system.  It read as follows:

Patsy,

I request to speak with you concerning a matter of utmost importance.  When you are at a point of availability and are ready to speak to me I will give you the

request. I would also like to have a private consultation with Sheriff Blackburn concerning my case, and will do what is necessary to receive this hearing.

Thank you,

Billy Wardlow

9 SF 15; SPTX 1.[2]

Sheriff Blackburn sought Judge Porter's advice concerning Wardlow's request, and Judge Porter responded that the sheriff should contact Solomon prior to speaking with Wardlow and ask that Solomon be present for any such meeting. Sheriff Blackburn also sought counsel from the District Attorney's office and was told that it would "probably be okay" to meet with Wardlow as long as they did not discuss the case. Ultimately, Solomon was not notified about Wardlow's request for a meeting with the sheriff or of any other meetings between Wardlow and the sheriff.

Subsequently, Sheriff Blackburn met with Wardlow at the jail for approximately forty-five minutes to an hour and fifteen minutes. Sheriff Blackburn testified at the suppression hearing that he made it clear to Wardlow that he would not discuss the case. 9 SF 44. Sheriff Blackburn also testified that Wardlow needed someone to talk to and that he "simply spoke to [Wardlow]. There was no intent on doing anything other than talking to Wardlow." 10 SF 48. The sheriff stated that they had "an all around general type of discussion" in which they spoke about Wardlow's religion and mental state. 10 SF 49. Sheriff Blackburn explained his view that all individuals are saved by their belief in Jesus and God, and that by asking for forgiveness and repenting their sins, they would be "saved." 9 SF 76.

---

[2] "SPTX" refers to the numbered exhibits offered by the State and admitted for purposes of the pretrial hearing on Wardlow's motion to suppress his statements, which was conducted in the trial court on October 17 and 18, 1994.

The sheriff testified that Wardlow reported "that he was having nightmares about what had happened, he was having trouble sleeping." 10 SF 49. Sheriff Blackburn responded to Wardlow that it had been his personal experience that when he sat down and wrote things out, and went back and read them, that it helped him. 9 SF 77. Sheriff Blackburn suggested that if Wardlow engaged in such an exercise that it might help him to deal with his problems. 9 SF 78. Sheriff Blackburn testified that he advised Wardlow "to simply tear . . . up and destroy . . . and flush" anything he did not wish others to read. 10 SF 50.

Thereafter, Sheriff Blackburn received a letter from Wardlow that caused the sheriff to fear for the safety of Wardlow and his fellow inmates. As a result, on February 25, 1994, Sheriff Blackburn moved Wardlow from a multiple-occupancy cell to a single cell, commonly known as the "suicide cell," where Wardlow could be observed through a window from the chief dispatcher's office. 9 SF 23, 26-27; 10 SF 21, 23, 32-33. Apparently, Wardlow was moved from multiple-occupancy cells to single cells and back on several occasions during his pretrial incarceration in the Morris County jail, though, generally, transfers were at Wardlow's request. 9 SF 13; 10 SF 27-29, 46-47.

On February 28, 1994, approximately three weeks after Sheriff Blackburn met with Wardlow, he received a letter from Wardlow detailing Wardlow's involvement in Cole's murder. On September 11, 1994, Sheriff Blackburn received another letter wherein Wardlow shared additional details about the offense and corrected some of his prior statements. Wardlow never told Sheriff Blackburn that he was going to write him a letter or send him a statement. 10 SF 47. Sheriff Blackburn testified that he did not promise Wardlow anything in exchange for the letters,

he did not anticipate receiving either letter, and he was extremely surprised to receive Wardlow's letters. 9 SF 39.

Wardlow also testified at the suppression hearing. Notably, Wardlow's testimony was consistent with that of Sheriff Blackburn. Wardlow stated that the sheriff advised that he would not discuss the case and that he could not take a confession because Wardlow had an attorney. 10 SF 74. Wardlow informed the court that the two discussed religion, repentance, and "getting right with God." 10 SF 63. He testified that Sheriff Blackburn suggested writing down the events that transpired from the time Wardlow left Fort Worth to the time of his conversation with Sheriff Blackburn, read it over, and that it would help solve his problems. 10 SF 64. Wardlow claimed that his statements were the result of his conversation with Sheriff Blackburn. *Id.* Nonetheless, Wardlow confirmed that Sheriff Blackburn did not direct him to send any letters, did not make any promises in exchange for the letters, and told him to tear up what he had written and flush it down the toilet if he did not want others to see it. 10 SF 72. When the trial court judge asked Wardlow why he mailed his statement to the sheriff, Wardlow stated, "I don't know." 10 SF 80.

At the conclusion of the suppression hearing, the trial judge ruled that both letters written by Wardlow were admissible and made the following pertinent findings of fact and conclusions of law in accordance with Article 38.22 § 6 of the Texas Code of Criminal Procedure and *Jackson v. Denno*, 378 U.S. 368 (1964):

### Findings of Fact

1.  There is no dispute over the material facts.

2.  The Defendant was arrested by the Morris County Sheriff in South Dakota and returned to Morris County, Texas.

3.      The *Miranda* Warnings were given to the Defendant in South Dakota and the Defendant requested an attorney.

4.      The Defendant was appointed an attorney in June of 1993 when he was returned to Morris County.

5.      The Defense Attorney told the Sheriff not to talk to the Defendant about the case unless he, the attorney, was present.

6.      Morris County has a small jail population and it is the customary practice of the Sheriff to talk to and counsel with inmates if they request his help.

7.      [Wardlow] and the Sheriff had known each other eight to 10 years.

8.      [Wardlow] wrote a note or a letter to the Sheriff in January of 1994 requesting a meeting with the Sheriff.

9.      The meeting took place one week to 10 days after the request, the meeting lasted 45 minutes to an hour and a quarter.

10.     No *Miranda* Warnings were given prior to the meeting.

11.     [Wardlow] told the Sheriff that he was having trouble sleeping, that he was having nightmares and emotional problems.

12.     The Sheriff is a religious person and he discussed religion with [Wardlow], the Sheriff also said that it often helped him to write down his problems and confront them. The Sheriff also said that he, [Wardlow], could lie to him but not to God. The Sheriff further told [Wardlow] that people are saved by asking God for forgiveness and that the truth would set him free.

13.     The Sheriff suggested that [Wardlow] write out his problems and solutions and start at a period of time prior to the date of the alleged offense.

14.     [Wardlow] testified, as did the Sheriff, that the Sheriff told him not to discuss the case with him and if he wrote out something he didn't want seen, he should destroy it, flush it down the toilet.

15.     [Wardlow] testified that the Sheriff never asked for a statement and never asked him to send a statement to him.

16.     [Wardlow] testified that he did not know why he sent the letters to the Sheriff.

17.     The Defendant sent several letters and notes to the Sheriff.

18.     The letters were received by the Sheriff through in-house mail.

19.     The Defendant was represented by Attorney Solomon when the February letter was sent and by Attorney Old when the September letter was sent.

20.     No meeting occurred between the Defendant and the Sheriff before the September letter.

## Conclusions of Law

1.     The February meeting between the Sheriff and [Wardlow] was not a psychological ploy to gain information for the State.

2.     The meeting was not the functional equivalent of an interrogation.

3.     Both the February 28th letter and the September letter amounts [sic] to a voluntary statement and admission of guilt.

4.     The Sheriff advised he [sic] did not constitute entrapment.

5.     The meeting between the Sheriff and [Wardlow] was not a violation of the Sixth Amendment Right to have counsel present during a confrontation between the State and [Wardlow].

6.     The Sheriff made no attempt to elicit incriminating information during the meeting with [Wardlow].

7.     The Meeting was not a custodial interview.

8.     No promises nor rewards were offered nor given to [Wardlow].

9.     Both letters are admissible.

12 SF 123-26.

In accordance with these findings and conclusions, the February 28, 1994, letter was admitted into evidence and read to the jury at the guilt-innocence phase of Wardlow's trial. 35 SF 524-27, SX 73.

The Fifth Amendment protection against compelled self-incrimination provides the right to counsel at custodial interrogations, while the Sixth Amendment guarantee of the assistance of

counsel provides the right to counsel at post-arraignment interrogations. *See Michigan v. Jackson*, 475 U.S. 625, 629 (1986). The Fifth Amendment provides that a citizen accused shall not be required to incriminate himself. U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court held that statements of the accused, arising out of custodial interrogation, could not be used in evidence unless certain safeguards were employed to protect the right against compelled self-incrimination.

> Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed . . . .

384 U.S. 436, 444 (1966).

Custodial interrogations implicate the Fifth Amendment privilege because of the danger that law enforcement officers might exert "informal compulsion" on suspects during the interrogation. *Id*. at 460-61. *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Id*. at 477-78.

As the *Miranda* Court noted:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated . . . . Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Id*. at 478.

In *Edwards v. Arizona*, the Supreme Court held that an accused in custody who has invoked his Fifth Amendment right to counsel "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates

further communication, exchanges, or conversations with the police." 451 U.S. 477, 484-85 (1981). The Supreme Court extended the rule in *Edwards* to cases involving the Sixth Amendment right to counsel holding that "if police officers initiate interrogations after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid." *See Jackson*, 475 U.S. at 636.

In *Rhode Island v. Innis*, the Supreme Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. 291, 300-01 (1980). The Court further defined functional equivalent as "words or actions on the part of police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301.

### A. Admission of Wardlow's Letter — Fifth Amendment

Wardlow contends that Sheriff Blackburn's "spiritual counseling" and the prosecution's use of the letters that grew out of the counseling violated the safeguards provided by the Fifth and Sixth Amendments. The Sheriff's tactics, Wardlow claims, amounted to the functional equivalent of an interrogation. Wardlow maintains that in light of the circumstances surrounding his meeting with the sheriff, Sheriff Blackburn should have known that his approach was reasonably likely to elicit a confession. Wardlow raised this claim on direct appeal, and the Court of Criminal Appeals rejected it on the merits, concluding that Sheriff Blackburn's conduct could not be construed as "interrogation" and, thus, did not implicate the Fifth Amendment. *Wardlow v. State*, No. 72,102, slip op. at 8-12. That conclusion is neither contrary to, nor an unreasonable application of, Supreme Court precedent. Therefore, § 2254(d) precludes the grant of federal habeas relief on the claim.

As the Court of Criminal Appeals held, the admission of Wardlow's statement at trial did not violate the Fifth Amendment because the statement was not given as a result of custodial interrogation. The *Innis* Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. at 300-01. It explained that the functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301. Wardlow does not claim that he was expressly questioned by Sheriff Blackburn; rather, he contends only that he was subjected to the functional equivalent of questioning.

Nothing in the record suggests that Sheriff Blackburn should have known that his meeting with Wardlow was reasonably likely to elicit an incriminating response from Wardlow. Rather, the record indicates that, at the meeting, Wardlow initiated contact with Sheriff Blackburn when he asked for help in dealing with his personal emotional difficulties, and the sheriff merely listened to Wardlow and suggested possible solutions. Importantly, it is undisputed that the circumstances of the offense were not discussed at the meeting.

The fact that Sheriff Blackburn spoke with Wardlow concerning religion and salvation through confession of sins and suggested that Wardlow write about things that were bothering him does not compel the conclusion that Sheriff Blackburn should have known his advice would prompt Wardlow to write and send him a written confession. To the contrary, although Sheriff Blackburn counseled Wardlow about salvation through the confession of sins, he advised Wardlow to confess to God—*not* to law enforcement officials. Moreover, he told Wardlow to destroy his writings so that others would not read them. Finally, there is no indication in the record that Wardlow's unsolicited letter to Sheriff Blackburn sent *three to four weeks after his meeting with*

*Blackburn* was in fact *the result* of that meeting. The Fifth Amendment is simply not implicated under these circumstances, and the CCA reasonably so concluded.

Nonetheless, Wardlow points to his inability to communicate with his attorney, his seeking the sheriff's assistance in obtaining other counsel, his fragile mental state, and his religious convictions as factors increasing the likelihood that Wardlow would make an incriminating statement. Sheriff Blackburn knew that Wardlow was frustrated with his inability to speak with Solomon and wished to have another attorney. Additionally, although Wardlow's attorney instructed the sheriff not to speak to with his client without first contacting him (Solomon), and Judge Porter advised the sheriff to notify Wardlow's counsel, the sheriff disregarded that advice. In addition to contacting Sheriff Blackburn, the record reveals that Wardlow wrote several letters to jailer Martin expressing his distress, depression, violent tendencies, and possible mental breakdown. These circumstances, Wardlow argues, made him particularly vulnerable. Finally, Wardlow asserts that his deeply-held religious beliefs served as an avenue for the sheriff to exploit Wardlow by encouraging him to seek forgiveness through repentance. The combination of these factors, Wardlow argues, necessitates the conclusion that Sheriff Blackburn should have known that his discussion with Wardlow was reasonably likely to elicit an incriminating statement.

After a careful review of the testimony from the hearing on Wardlow's motion to suppress, the court finds that the meeting between Wardlow and Sheriff Blackburn was not the functional equivalent of an interrogation. From the outset, Sheriff Blackburn advised that he would not discuss the case with Wardlow, and there is no evidence that it was discussed. The sheriff, a religious individual himself, knew that he was speaking to a troubled person and naturally found himself discussing what personally brought him comfort. Sheriff Blackburn suggested that

Wardlow write down the events that transpired from the time Wardlow left Fort Worth to the time of his conversation with Sheriff Blackburn, but the sheriff expressly instructed Wardlow that if he did not want anyone to see the document, he should destroy it. At no point did the sheriff ask Wardlow to mail him a letter. In fact, it was not until several weeks after their meeting that the sheriff received Wardlow's first letter. Sheriff Blackburn's surprise at receiving the correspondence is consistent with the conclusion that he had no reason to expect Wardlow to send him the letters.

The testimony given at the suppression hearing supports the trial court's conclusion that Sheriff Blackburn made no attempt to elicit the incriminating letters. Further, Wardlow's own sworn statements confirm that Sheriff Blackburn had no reason to believe that his conversation was reasonably likely to elicit an incriminating statement. Notably, Wardlow was unable to explain or articulate why he sent the letters to the sheriff. For these reasons, the court finds that Wardlow was not subjected to the functional equivalent of an interrogation and, consequently, his claim fails.

### B.    Waiver of Fifth Amendment Right to Counsel

Assuming *arguendo* that Sheriff Blackburn's discussion with Wardlow was the functional equivalent of interrogation, his claim nonetheless fails because he waived his Fifth Amendment right to counsel before the "interrogation" (i.e., the meeting) took place. When a suspect asserts his *Miranda* right to counsel, law enforcement officials must cease all interrogation until counsel is provided or the suspect subsequently waives his right. *Edwards*, 451 U.S. at 484-85. Communications may not continue after invocation of the *Miranda* right to counsel unless the accused initiates the interrogation. *Id*. In *Oregon v. Bradshaw*, a plurality of the Court ruled that

a defendant who "evinced a willingness and a desire for a generalized discussion about the investigation" had effectively initiated conversation under *Edwards*, despite having earlier asserted his right to counsel. *See generally* 462 U.S. 1039, 1045-46 (1983) (plurality) (stating that the accused's inquiry, "Well, what is going to happen to me now?" amounted to waiver of right to counsel).

Once it is found that the accused initiated further communication, it must then be determined whether the accused then waived his Fifth Amendment right to counsel prior to being interrogated. *Id* at 1044-45. This determination must be made based on the totality of the circumstances, "including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 1045; *see also Edwards*, 451 U.S. at 486 n.9.

Here, although Wardlow had asserted his right to counsel at the time of his arrest and was in fact represented by counsel, he subsequently initiated contact with Sheriff Blackburn by requesting a meeting with the sheriff and then attempting to discuss his case. When Sheriff Blackburn refused to discuss the case with Wardlow outside his attorney's presence, Wardlow shifted the discussion to his emotional problems. Additionally, despite Sheriff Blackburn's admonishments to Wardlow that he contact defense counsel if he wished to discuss the case, Wardlow never expressed a desire to confer with his attorney and apparently never sought his attorney's advice before sending the written confession three to four weeks later. The fact that Sheriff Blackburn did not accept Wardlow's invitation to discuss the case and launch into an interrogation does not alter the inevitable conclusion that Wardlow, by his actions, waived his Fifth Amendment right to have counsel present when he spoke with the sheriff.

### C.     Sixth Amendment Claim

Wardlow's Sixth Amendment claim is procedurally barred and, alternatively, is meritless.

### 1.     Independent and Adequate State Ground

As an initial matter, Wardlow's Sixth Amendment claim is procedurally defaulted based on the state court's application of an independent and adequate state ground to deny relief. The Court of Criminal Appeals refused to consider the merits of Wardlow's Sixth Amendment claim on direct appeal because Wardlow failed to brief the issue adequately in accordance with Rule 74(f) of the Texas Rules of Appellate Procedure. Other than asserting (in a heading) that "the trial court erred in denying appellant's motion to suppress his confession obtained in violation of his Sixth Amendment right to assistance of counsel," Appellant's Brief at 17, Wardlow did not cite any authority or advance any argument or legal theory in support of his Sixth Amendment claim. Where, as here, a petitioner does not follow a state procedural rule, and review of a constitutional claim is refused by a state court, federal habeas review is also foreclosed unless the petitioner demonstrates either cause for the default and actual prejudice resulting therefrom or that failure to consider the claims would result in a "fundamental miscarriage of justice." *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Engle v. Isaac*, 456 U.S. 107, 135 (1982); *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice to excuse his default. *Coleman*, 501 U.S. at 749-50.

### 2.     Admission of Wardlow's Letter — Sixth Amendment

This claim also fails on its merits. The Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," and no request for counsel need be made by

the accused.  *Kirby v. Illinois*, 406 U.S. 682, 689 (1972) (plurality); *Brewer v. Williams*, 430 U.S. 387, 398 (1977).  Once the Sixth Amendment right to counsel has attached, the accused is entitled to the assistance of counsel at each "critical" stage of the prosecution, absent a valid waiver. *Jackson*, 475 U.S. at 629.

Police interrogation is a critical stage.  *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009). If the accused has, after being informed of his right to counsel, requested or secured counsel, all questioning must cease.  Under these circumstances, law enforcement officials may not use incriminating statements "deliberately elicited" from the accused without the presence or waiver of counsel.  *Massiah v. United States*, 377 U.S. 201, 206 (1964); *Brewer*, 430 U.S. at 399.

In the instant case, the record simply does not support Wardlow's contention that Sheriff Blackburn offered Wardlow spiritual guidance and advice for the purpose of deliberately eliciting a confession from him.  As previously discussed, Wardlow appealed to Sheriff Blackburn for help in dealing with his personal emotional difficulties, and Sheriff Blackburn listened to Wardlow and suggested possible solutions.  The circumstances of Wardlow's murder charge were not discussed. Sheriff Blackburn's suggestion that Wardlow reduce his concerns to writing does not require the court to conclude that he deliberately sought and obtained a confession.  This is particularly true where, as here, Sheriff Blackburn counseled Wardlow to destroy his notes.

Moreover, other than Wardlow's uncorroborated responses to leading questions posed by his lawyer at the suppression hearing, there is no indication in the record that his unsolicited letters to the sheriff sent several weeks after the meeting were the result of his conversation with the sheriff.  In fact, when the trial court judge asked Wardlow for clarification as to why he mailed the letters to the sheriff, he testified, "I don't know."  Again, Sheriff Blackburn did not ask

Wardlow to confess and refused to discuss the case at all. As the sheriff testified, "The meeting was not to gather evidence, the meeting was simply to talk to someone that had requested to talk to me." 9 SF 99. Sheriff Blackburn left with no expectation of receiving a written confession and was surprised to have received the correspondence from Wardlow. In short, Wardlow's unsolicited letter confessing to the offense was not the result of a violation of his Sixth Amendment right to counsel.

Accordingly, the court finds that Wardlow's first claim for relief is without merit and does not entitle him to habeas corpus relief. The state court's decision allowing introduction of the letters confessing to the crime was not contrary to, or an unreasonable application of, Supreme Court precedent under *Edwards*, *Jackson*, and *Innis*. *See* 28 U.S.C. § 2254. Wardlow's claim must be denied.

## VI.   INEFFECTIVE ASSISTANCE OF COUNSEL (CLAIM II)

Wardlow next argues that he was denied constitutionally effective assistance of counsel on direct appeal because his appellate counsel failed to provide any argument or authority in support of Wardlow's point of error claiming that the trial court's denial of Wardlow's motion to suppress his confession letters violated Wardlow's Sixth Amendment right to counsel. On direct appeal, the CCA, noting that Wardlow did not provide any authority pertaining to his right to counsel under the Sixth Amendment, held that the point was not sufficiently briefed and overruled the claim pursuant to Texas Rule of Appellate Procedure 74(f). Wardlow raised this ineffective assistance claim in his state application. The CCA, however, dismissed Wardlow's entire application for habeas relief without reaching the merits of any of Wardlow's claims based on his

desire "to waive and forego all further appeals." *Ex parte Wardlow*, No. 58,548 (Tex. Crim. App. Sept. 15, 2004) (quoting *Ex parte Wardlow*, No. 72,102 (Tex. Crim. App. July 14, 1998)).

The Director argues that this claim is procedurally defaulted because the CCA's dismissal of Wardlow's state habeas application was based on an independent and adequate state ground to deny relief. *See Wainwright*, 433 U.S. at 87. The Director correctly notes that when a petitioner fails to follow a state procedural rule and review of a claim is refused by the state courts, federal habeas review is also foreclosed unless the petitioner demonstrates either cause for the default and actual prejudice resulting therefrom, or that failure to consider the claims would result in a "fundamental miscarriage of justice." *See Coleman*, 501 U.S. at 749-50.

Although Wardlow's ineffective assistance of counsel claim is procedurally barred, the court will nonetheless discuss the merits of the claim in the interest of justice.

Wardlow's claims regarding both trial and appellate counsel are governed by the Supreme Court's clearly established standard in *Strickland v. Washington*, 466 U.S. 668 (1984). *See Amador v. Quarterman*, 458 F.3d 397, 411 (5th Cir. 2006) (recognizing that *Strickland* applies to ineffective assistance of appellate counsel claims), *cert. denied*, 550 U.S. 920 (2007). To establish deficient performance, Wardlow must show that counsel's representation "fell below an objective standard of reasonableness." *Id*. To establish prejudice, Wardlow must show that, but for his counsel's deficient performance, there is a reasonable probability that the outcome of the appeal would have been different. *Id*. Because appellate counsel is not required to raise every nonfrivolous claim on appeal, but may select from among them in order to maximize the likelihood of success on appeal, it is difficult to demonstrate the incompetency of such counsel when a brief on the merits is filed. *Smith v. Robbins*, 528 U.S. 259, 288 (2000).

Wardlow has to overcome two deferential standards of review, the first set out in *Strickland*, the second under the AEDPA. *See Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (noting the "doubly deferential judicial review that applies to a *Strickland* claim evaluated under the § 2254(d)(1) standard"); *see also Yarborough v. Gentry*, 540 U.S. 1, 5-6 (2003).

An attorney's performance, which enjoys a strong presumption of adequacy, is deficient if it is objectively unreasonable. *Strickland*, 466 U.S. at 689. Counsel's deficient performance prejudiced the petitioner's defense if "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Because the court has already found that Sheriff Blackburn's conversation with Wardlow was not the functional equivalent of an interrogation, appellate counsel's failure to put forth argument and authority in support of Wardlow's claim that the trial court's denial of Wardlow's motion to suppress the letters violated Wardlow's Sixth Amendment right to counsel cannot succeed. Wardlow's Sixth Amendment claim would have been denied by the state appellate court and, as such, Wardlow is unable to demonstrate that he was prejudiced by counsel's conduct in failing to provide argument and authority for an unsuccessful claim. *See Wardlow v. Texas*, No. 72,102 at 12 (Tex. Crim. App. Apr. 2, 1997) (unpublished) (holding Sheriff Blackburn's conduct "cannot be construed as 'reasonably likely to elicit an incriminating response. . .' [so] statements cannot be said to have been made in the course of custodial interrogation").

Similarly, an attorney's failure to raise a meritless argument cannot form the basis of an ineffective assistance claim because the result of the proceeding would not have been different had the issue been raised. *See Clark v. Collins*, 19 F.3d 959, 966 (5th Cir.), *cert. denied*, 513 U.S. 966 (1994). Accordingly, Wardlow's second claim is unfounded.

## VII.    FULFER'S DECISION NOT TO TESTIFY (CLAIM III)

In his third claim, Wardlow argues that the prosecution's pretrial plea offer to Fulfer interfered with her decision whether to testify at his trial and, consequently, deprived him of due process and a fair trial.  Specifically, Wardlow asserts that Fulfer would have corroborated his testimony that the shooting occurred during a struggle for the gun, thus negating the intent necessary to sustain a capital murder conviction.  According to Wardlow, Fulfur's decision not to testify combined with the fact that the State conditioned her plea agreement on the completion of Wardlow's trial, suggests that it impermissibly interfered with his ability to mount a defense. DE 24 at 13-24; *see also* DE 1 at 45-54.

Without regard to the application of Texas's abuse-of the-writ doctrine, this claim is procedurally barred because trial counsel never objected on the basis of substantial interference at trial.  In any event, Wardlow's claim of substantial interference is based on nothing more than rank speculation and hearsay and, in fact, is belied by the record.  Ultimately, as established by Fulfer's testimony at her plea hearing, her testimony would *not* have aided Wardlow's defense.

### A.    Claim III — Procedurally Barred

Claim III was first raised in Wardlow's state application for post-conviction relief, which was dismissed by the CCA.  The Director contends, as he did in response to Claim II, that this claim is procedurally barred based on the state appellate court's dismissal of Wardlow's state writ. For the same reasons set forth in the court's analysis of Wardlow's second claim, this claim is procedurally barred.

Alternatively, the Director maintains that this claim is procedurally barred because defense counsel did not object to the prosecutor's conduct at trial.  *See Ex parte Dutchover*, 779 S.W.2d

76, 77 (Tex. Crim. App. 1989) (noting that contemporaneous objection is required to preserve due process error). *See* TEX. R. APP. P. 33.1(a) (requiring that, as a prerequisite for obtaining appellate review, record must show that complaint was made by timely objection stating grounds with "sufficient specificity" to make trial court aware of complaint); *McGinn v. State*, 961 S.W.2d 161, 166 (Tex. Crim. App. 1998) ("It is axiomatic that error is forfeited when the complaint on appeal differs from the complaint at trial"); *Bell v. State*, 938 S.W.2d 35, 54 (Tex. Crim. App. 1996) ("An objection stating one legal basis may not be used to support a different legal theory on appeal").

Wardlow has established neither cause and prejudice nor a fundamental miscarriage of justice so as to overcome the application of this default. *See Haley*, 541 U.S. at 288; *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

In the state habeas proceeding, the trial court made the following findings of fact and conclusions of law:

> [Wardlow] failed to object on this basis at trial. [Wardlow's] counsel were aware of the plea agreement between the State and Fulfer since they attempted to have the agreement included in the record of [Wardlow's] trial as an offer of proof. Despite being fully aware of the factual basis asserted in support of this claim for relief, [Wardlow] failed to articulate a trial objection.

> Because [Wardlow] failed to object on this basis at trial, he has failed to preserve any error for habeas review. On this basis, the claim is barred.

These findings by the state court are entitled to deference. In Wardlow's case, the state habeas judge and the trial judge were the same person; thus, his findings hold great weight. *Cf. Schriro v. Landrigan*, 550 U.S. 465, 476 (2007) (state habeas judge who presided over trial "was ideally suited" to assess credibility of defendant "because she is the same judge who sentenced Landrigan and discussed these issues with him[]").

Even assuming the absence of a procedural default, this court must honor state procedural default rules where it is clear that the state procedural rules would have led the state court to apply the rule had it been presented with the occasion to do so. *See Hogue v. Johnson*, 131 F.3d 466, 494-96 (5th Cir. 1997), *cert. denied*, 523 U.S. 1014 (1998). Wardlow maintains that it is not clear that the CCA would have applied the contemporaneous objection rule in this case because defense counsel lacked the information necessary to form a basis for an objection on the grounds that the prosecutor was interfering with Wardlow's ability to present Fulfer's testimony.

In his affidavit, Wardlow's trial counsel explained the following with regard to Fulfer's testimony:

> Before trial, the district attorney informed me by letter that he had entered into a plea bargain with Tonya Fulfer whereby he had agreed that she could plead to non-capital murder and be sentenced by a jury if she would cooperate and testify in the trial against [Wardlow]. . . . By that letter, I was led to believe that Ms. Fulfer's testimony would support the State's theory of capital murder. On the other hand, [Wardlow] told me that Tonya's testimony, if it was truthful, would support his testimony about the circumstances of the shooting. He also believed that she would tell the truth if she testified. At [Wardlow's] urging, I informed Ms. Fulfer's attorney that I would be calling Ms. Fulfer as a witness. He told me that her testimony would not be helpful to [Wardlow] and that in any event, on his advice, she would assert her Fifth Amendment privilege and refuse to give any testimony.
>
> Based on Ms. Fulfer's testimony at her own sentencing proceeding, I now know that her testimony would have supported [Wardlow's] testimony about a struggle with Mr. Cole over the gun just before the gun fired. This testimony would have supported [Wardlow's] testimony and been very helpful to his defense. Also, it would have contradicted the State's theory of the shooting. If I had known that, I could have sought an order requiring the State to consummate its plea agreement with Ms. Fulfer or condition it only upon Ms. Fulfer giving truthful testimony. That way, the State's offer of a reduced charge after the completion of [Wardlow's] trial would not have stood as a barrier to her providing truthful and exculpatory evidence.

Defense counsel's affidavit appears to support the theory that he did not know that Fulfer's testimony would benefit Wardlow. Although Wardlow informed his attorney that Fulfer's

testimony would help his defense, Fulfer's attorney led defense counsel to believe that the testimony would be unhelpful or even damaging. Until Fulfer testified at her sentencing hearing, Wardlow's attorney did not know what she was going to say about the events leading up to and culminating in Cole's murder.

### B. Due Process

Assuming that the Court of Criminal Appeals would not have applied the contemporaneous objection rule, and barring any other procedural hurdles, the court is left to the task of reaching the merits of Wardlow's claim. The Fifth Circuit has held that substantial governmental interference with a defense witness's free and unhampered choice to testify may violate the due process rights of the defendant. *See United States v. Binker*, 795 F.2d 1218, 1228 (5th Cir. 1986), *cert. denied*, 479 U.S. 1085 (1987). Wardlow's premise is that the prosecution's plea agreement with Fulfer, which would not be finalized until after the completion of Wardlow's trial, influenced Fulfer's decision not to testify at Wardlow's trial.

Wardlow, however, has offered no support for his position other than the terms of the plea offer. The court is unpersuaded that the terms of the offer alone impacted Fulfer's decision. Further, in an unsigned affidavit from Fulfer submitted to the court, she states that her lawyer "advised [her] to assert [her] Fifth Amendment right not to testify. He told me that there wasn't anything I could do to help [Wardlow] and that testifying for him would only hurt my chances of getting a good sentence. I followed his advise [sic] and asserted the Fifth Amendment." The record, therefore, contradicts Wardlow's assertion that the State substantially interfered with Fulfer's decision whether to testify; rather, it indicates that her choice was based solely on her

unwillingness to incriminate herself. Moreover, Fulfer's testimony at her plea hearing reinforces the conclusion that her testimony would not have been beneficial to the defense.

Wardlow's state habeas attorney, Welch, stated in an affidavit that Fulfer told her that "she was told by her lawyer that testifying for [Wardlow] would hurt her chances for a lenient sentence" and that Fulfer's attorney's investigator tried to persuade her to testify that [Wardlow] intended to kill the victim. These statements contradict the claim that the prosecution influenced Fulfer's decision not to testify at Wardlow's trial.

During the guilt/innocence phase, Fulfer was bench-warranted from Morris County, where she was being held, to Titus County for the purpose of testifying on Wardlow's behalf. 37 RR 609. She was accompanied by her attorney, Charles Cobb ("Cobb"), who informed the trial court he believed she intended to assert her Fifth Amendment privilege not to incriminate herself and decline to testify. *Id*. at 611. Cobb objected to the court requiring Fulfer to assert her Fifth Amendment privilege in the jury's presence. *Id*. at 611, 615.

On the record, Cobb recommended that Fulfer not testify. *Id*. at 617. Fulfer responded that she wished to take her attorney's advice and that it was her decision not to testify at Wardlow's trial. *Id*. at 617-19. Wardlow's counsel asked that Fulfer's plea agreement be included in the record as an offer of proof, but his request was denied. *Id*. at 621-22.

Later that same day, during the State's cross-examination of Wardlow, the court agreed with defense counsel that the State had opened the door to allow the defense to present testimony before the jury that Fulfer had exercised her Fifth Amendment privilege and declined to testify. *Id*. at 703-07. Wardlow then called Fulfer to the stand, and she asserted her Fifth Amendment privilege in front of the jury. *Id*. at 726-27. Wardlow then called Cobb, who testified outside the

jury's presence that Fulfer was presently charged with capital murder for the same offense and that the State had offered her a plea bargain of a reduced charge of murder contingent on the completion of Wardlow's trial. *Id*. at 729-30.

Cobb made it clear, however, that the deal was *not* made in exchange for Fulfer's cooperation at Wardlow's trial. *Id*. at 730, 733-35. Cobb explained that at one point, the State had indicated that it *might* call Fulfer as a witness, but that decision was dependent on the admissibility of Wardlow's confession letters. *Id*. at 733. Thus, when those letters were admitted, the State removed Fulfer from the witness list. *Id*. at 732. According to Cobb, Fulfer's testimony was *never* part of the plea bargain offered by the State; indeed, the deal was made prior to the court's pretrial ruling on the admissibility of the letters. Though the agreement would not be finalized until after Wardlow's trial, it was *not in any way* contingent on whether Fulfer testified at Wardlow's trial. *Id*. at 735; *see also* Supplemental SHCR at 6-7 (¶¶2–4).

In support of his claim of substantial interference, Wardlow cites *United States v. Hendrickson*, in which the Fifth Circuit found a due process violation where the United States Attorney conditioned the plea of Henrickson's co-defendant on him *not* testifying at Henrickson's trial. 564 F.2d 197, 198 (5th Cir. 1977) (per curiam). There is a significant difference between this case and *Hendrickson*: the co-defendant's testimony "would have tended to *exonerate* Henrickson." *Id*. (emphasis added).

Thus, in that situation, "[i]mproper intimidation of a witness may violate a defendant's due process right to present his defense witness if the intimidation amounts to 'substantial governmental interference with a defense witness'[s] free and unhampered choice to testify.'" *United States v. Saunders*, 943 F.2d 388, 392 (4th Cir. 1991), *cert. denied*, 502 U.S. 1105

(1992).   This holding has been followed by other circuits in cases presenting similar circumstances.  *See United States v. Hammond*, 598 F.2d 1008, 1012 (5th Cir. 1979) (finding due process violation where FBI agent told defense witness he would have "nothing but trouble" in pending state prosecution if he persisted in testifying); *see also United States v. MacCloskey*, 682 F.2d 468, 479 (4th Cir. 1982) (due process violation found where prosecutor telephoned attorney for witness, against whom charges had  been dropped, and said that attorney "would be well-advised to remind his client that if she testified at MacCloskey's trial, should could be reindicted if she incriminated  herself during that testimony"); *United States v. Morrison*, 535 F.2d 223, 227-28 (3d Cir. 1976) (due process violation found where prosecutor repeatedly warned prospective defense witness about possibility of federal perjury charge and culminated indirect warnings with highly intimidating personal interview of witness); *United States v. Thomas*, 488 F.2d 334 (6th Cir. 1973) (per curiam) (due process violation found where prosecutor, through Secret Service agent, sought out witness and gratuitously admonished him of possibility that he might be prosecuted for misprision of a felony).

The facts of this case are readily distinguishable from the aforementioned decisions, as the State's plea bargain offer was *not* conditioned on Fulfer *not* testifying for Wardlow.  Accordingly, Wardlow is unable to show that the State substantially interfered with Fulfer's decision whether to testify.   Additionally, there is no evidence in the record, and Wardlow does not allege, that Fulfer was overtly threatened by any State actors.   Further, there is no indication that Fulfer's decision not to testify was based on anything other than her own unwillingness to incriminate herself.   Her attorney's advice in this regard simply does not amount to the governmental conduct

necessary to establish a due process violation. In short, the record clearly establishes that her decision not to testify was Fulfer's and Fulfer's alone, based on her attorney's advice.

## C.    Fulfer's Testimony

Fulfer's testimony would not have corroborated Wardlow's claims that the gun went off during a struggle with Cole and, therefore, that he did not intend to kill Cole. Putting aside the evidence that contradicts Wardlow's testimony, other key facts support the jury's verdict that Wardlow intentionally murdered Cole. For instance, Wardlow came to Cole's house armed with a gun and cut the telephone lines, Cole was shot "execution style" right between the eyes, and Wardlow admitted that he shot Cole because "he pissed me off." Based on this evidence, Fulfer's testimony would not have exonerated Wardlow.

As the state habeas court found:

> On April 18, 1995, about two and a half months after Wardlow's trial, Fulfer plead [sic] guilty to the lesser included offense of murder, waived her right to a jury trial on sentencing, and was sentenced to eighteen years in prison. At the guilty plea hearing, Fulfer testified on her own behalf concerning the events leading up to Carl Cole's murder. She testified that the night before the murder took place, Wardlow told her about his plan to rob Carl Cole. He told her that he wanted her to be there with him but that she [would not] have to do anything. Fulfer had nothing to do with planning the robbery; she only did what Wardlow told her to do. Wardlow explained his plan to Fulfer: He was going to knock on Cole's door, claim that his car had broken down, and ask to use the telephone; then after gaining entrance to the house, he was going to knock Cole over the head with a flashlight and take his money. Fulfer accompanied Wardlow to Cole's house twice that night, but they left both times because Cole was asleep; the second time, Wardlow cut the telephone lines. They returned a third time shortly after dawn. Wardlow knocked on the door, and Cole answered. Fulfer was standing behind Wardlow. Wardlow told Cole his car was broken down and he needed to use the telephone to call someone. Cole handed Wardlow a cordless phone. Finding the phone dead, Wardlow asked Cole if he could come inside and use another phone; Cole refused. Fulfer then saw Wardlow pull a gun out of the waistband of his pants and point it at Cole. Until that moment, Fulfer had not known that Wardlow had a gun on him. Wardlow had never said anything about shooting Cole; he had told Fulfer he was only going to hit Cole over the head and take his money. *Fulfer saw Cole and*

> *Wardlow begin to struggle over the gun*, *then she turned and ran away out of the carport*. *Fulfer stopped at the end of the carport*, *turned*, *and asked Wardlow to drop the gun*. *According to her testimony*, *Fulfer* [*was not*] *looking at them when the gun went off*, *and she* [*did not*] *see what happened*. *She was all the way out of the carport when the gun went off*. Fulfer was very surprised by what had happened. She was shocked that Wardlow had done something like that, and she was afraid of him. Fulfer cooperated with Wardlow thereafter because she was afraid he would shoot her. Fulfer testified further that Wardlow accompanied Fulfer into a bank to cash the check they had gotten for Cole's truck; he had threatened her with the gun before they entered the bank. Fulfer testified further that when they were finally stopped by the police in South Dakota, Wardlow had instructed her to hand him the gun hidden under the seat and he would "take care of that right now." Fulfer refused, saying they were already in enough trouble.

Supplemental SHCR at 7-8 (¶5); *see also* DE 9-2 at 81-86, 91-92, 96.

Fulfer's version of the events was consistent with the State's theory of the case as established by Wardlow's first letter and other witnesses. Because Fulfer did not actually witness the shooting, she could not corroborate Wardlow's claim that Cole was shot during a struggle over the gun, and she certainly could not corroborate his claim that he did not intend to kill Cole. Indeed, Fulfer testified only that *she* did not intend to kill Cole. As the state habeas court found: "In light of Fulfer's testimony at her guilty plea hearing, the court finds incredible that Fulfer would have testified that the shooting was an accident, was not intended by Wardlow, or occurred during a struggle over the gun." Supplemental SHCR at 8 (¶6).

Wardlow fails to overcome the presumption of correctness afforded this finding because he cannot. It is fully supported by the record.

Wardlow's supplemental briefing focuses primarily on the appropriate harm standard; however, because he cannot establish constitutional error, the court need not engage in a harm analysis. Even so, it is well settled that the harm analysis as set out in *Brecht*, 507 U.S. at 619, applies to federal habeas proceedings. *See Fry v. Pliler*, 551 U.S. 112, 121-22 (2007) (stating that

*Brecht* must be applied "whether or not the state appellate court recognized the error and reviewed it for harmlessness"). Wardlow fails to point to a different rule.

Accordingly, Wardlow's third claim is without basis.

## VIII. EXCULPATORY EVIDENCE (CLAIM IV)

In his fourth claim, Wardlow argues that the prosecution violated his Fifth, Eighth, and Fourteenth Amendment rights when the district attorney failed to disclose that Fulfer's version of the offense corroborated Wardlow's second confession and trial testimony in which he claimed that he did not intend to kill the victim. Wardlow relies upon the Supreme Court's decision in *Brady v. Maryland* which held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). Summarily stating that the prosecution suppressed favorable evidence, Wardlow contends that the remaining issue is whether Fulfer's information was material to the determination of Wardlow's guilt or punishment. Assuming *arguendo* that the prosecution suppressed favorable evidence, the court will address the materiality prong. Under *Brady*, evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Stated differently, one demonstrates materiality by "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

## A.    Claim IV — Procedurally Barred

Like Claim III, this claim is procedurally barred because it was raised in Wardlow's state habeas application, which was dismissed by the CCA based on its prior order granting Wardlow's request to abandon his appeal.   The state court's holding was independent of federal law and adequate to support the judgment.  *Wainwright*, 433 U.S. at 87.  Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default.  *Coleman*, 501 U.S. at 749-50.  Therefore, federal habeas corpus review is precluded.

## B.    Exculpatory Evidence

Wardlow also challenges his conviction and sentence on the basis that the State withheld *Brady* material; namely, Fulfer's version of the events.  Under *Brady*, the State has an affirmative duty to disclose to the defense evidence that is both favorable to the accused and material either to guilt or to punishment.  *Bagley*, 473 U.S. at 674.  To succeed on a *Brady* claim, the petitioner must establish: (1) the prosecution suppressed evidence; (2) the evidence was favorable; and (3) the evidence was material either to guilt or punishment.  *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir.), *cert. denied*, 513 U.S. 1060 (1994).   "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  *Bagley*, 473 U.S. at 682.  A "reasonable probability" is a  probability sufficient to undermine confidence in the trial's outcome.  *Id.*  Further, "[t]he mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense."  *United States v. Agurs*, 427 U.S. 97, 109-10 (1976).  Rather, the petitioner must show that the evidence in

question could reasonably be taken to put the whole case in a different light so as to undermine confidence in the verdict.  *Kyles*, 514 U.S. at 435.

Wardlow's *Brady* claim is not supported by the record.  First, Wardlow cannot show that the State *suppressed* anything.  The state habeas court made the following findings regarding this claim:

> There is no evidence that Fulfer ever gave the State a statement setting forth her version of the events leading to Carl Cole's death.  In fact, Fulfer testified [at her guilty plea hearing] that, until the time of her guilty plea hearing, she had never given a statement to anyone except her attorney and investigator.  There is no evidence that the State suppressed any information known to them regarding Fulfer's version of the events.  The defense attempted to call Fulfer as a witness at the guilt-innocence phase of Wardlow's trial, but Fulfer asserted her Fifth Amendment privilege and declined to testify.

Supplemental SHTR at 7/9, FF 1-3.

This finding must be presumed to be correct in this proceeding pursuant to 28 U.S.C. § 2254(e).[3]  Because Fulfer had not given a statement to the prosecution regarding her version of the events, the prosecution had no information in its possession to suppress.  Therefore, the information was not suppressed within the meaning of *Brady*.

The following is a summary of pertinent evidence from Wardlow's trial testimony, pretrial confessions, and Fulfer's testimony at her sentencing hearing.

---

[3]  Independent of the operation of § 2254(d) relating to state court merits adjudications, § 2254(e) provides that "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner shall "have the burden of rebutting the presumption by clear and convincing evidence."  28 U.S.C. § 2254(e)(1); *Jackson*, 150 F.3d at 524.  This presumption applies to state court fact-findings regardless whether those findings are made by a trial court or an appellate court.  *Sumner*, 449 U.S. at 546-47; *see also Craker*, 756 F.2d at 1213-14.

*Wardlow's Trial Testimony*

Wardlow testified that he planned to "incapacitate" the victim by tying him up or by taking the victim with him and that he did not intend to kill the victim. Although Wardlow realized that he would have to tie the victim up if he took the victim with him, Wardlow did not bring any rope with him to the victim's house. Wardlow explained that he anticipated finding something in the victim's home to use to tie up the victim. Wardlow stated that he planned to steal the victim's truck and that when he checked the truck he found the keys inside. He testified that he did not take the truck immediately upon finding the keys because he did not want anyone to discover the truck missing and then contact the authorities.

Wardlow tried to get into the victim's house by pretending that his car was broken down and asking to use the victim's phone. When Wardlow attempted to get into the victim's house, the victim tried to close the door on Wardlow. At that point, Wardlow took out his gun, "cocked a shell into it, and pumped it off safety and told [the victim] to go back into the house." Instead of going into the house, Wardlow stated that the victim "rushed out the door and grabbed [his] arm throwing [him] off, caught [him] off balance." Wardlow fired the gun "just to let him go, it hit him right between the eyes . . . and catapulted him against the wall." He did not aim the gun between the victim's eyes. Wardlow testified that he did not know what to do because everything had gone wrong.

*Wardlow's Pretrial Confessions*

In his first written confession, Wardlow stated that after he told the victim to get back inside the house, the victim ran at him and caught the petitioner's arm. "Being younger and

stronger, [Wardlow] pushed him off and shot [the victim] right between the eyes. Just because he pissed [Wardlow] off. He was shot like an executioner would have done it."

Almost seven months later, Wardlow revised his written confession because his first statement "bent the truth to make [Fulfer] appear uninvolved." Wardlow stated that the plan involved tying up the victim and "taking him with us in his truck, and leaving him somewhere away from the main road or a phone." Fulfer reminded Wardlow of their recent incarceration for unauthorized use of a motor vehicle and said, "We can't leave a witness this time." Wardlow stated that when he struggled with the victim the shot he fired was "simply in hopes [the victim] would let go and back up." Wardlow claimed to be "stunned and couldn't believe what had happened."

### Fulfer's Sentencing Hearing Testimony

At her sentencing hearing, Fulfer testified that when Wardlow told her about committing the crime he said that he was going to "knock out" the victim but that he never said anything about shooting him. She testified that when Wardlow pulled out the gun and asked the victim to step back inside his house, the victim and Wardlow began struggling over the gun. At that point Fulfer ran away from the petitioner and the victim. She then stopped, turned around, and yelled at Wardlow, asking him to drop the gun. When the gun went off, Fulfer was not looking "right at" Wardlow and the victim, and she did not see exactly what happened. Fulfer testified that she never intended that the victim would be seriously hurt or killed and that she did not know that Wardlow was going to shoot the victim. Fulfer further stated that it was unusual for Wardlow to carry a pistol, but that he had one with him when they were visiting a friend's house the night of the murder.

The record does not indicate that Fulfer's testimony was either favorable or material to his defense. The state habeas court made the following findings regarding Fulfer's testimony:

Fulfer testified at her guilty plea hearing (two and a half months after Wardlow's trial) as follows: She testified that the night before the murder took place, Wardlow told her about his plan to rob [Cole]. He told her that he wanted her to be there with him but that she wouldn't have to do anything. Fulfer had nothing to do with planning the robbery; she only did what Wardlow told her to do. Wardlow explained his plan to Fulfer: He was going to knock on Cole's door, claim that his car had broken down, and ask to use the telephone; then after gaining entrance to the house, he was going to knock Cole over the head with a flashlight and take his money. Fulfer accompanied Wardlow to Cole's house twice that night, but they left both times because Cole was asleep; the second time, Wardlow cut the telephone lines. They returned a third time shortly after dawn. Wardlow knocked on the door, and Cole answered. Fulfer was standing behind Wardlow. Wardlow told Cole his car was broken down and he needed to use the telephone to call someone.

Cole handed Wardlow a cordless phone. Finding the phone dead, Wardlow asked Cole if he could come inside and use another phone; Cole refused. Fulfer then saw Wardlow pull a gun out of the waistband of his pants and point it at Cole. Until that moment, Fulfer had not known that Wardlow had a gun on him. Wardlow had never said anything about shooting Cole; he had told Fulfer he was only going to hit Cole over the head and take his money. Fulfer saw Cole and Wardlow begin to struggle over the gun, then she turned and ran away out of the carport. Fulfer stopped at the end of the carport, turned, and asked Wardlow to drop the gun. According to her testimony, Fulfer wasn't looking at them when the gun went off, and she didn't see what happened. She was all the way out of the carport when the gun went off. Fulfer was very surprised by what had happened. She was shocked that Wardlow had done something like that, and she was afraid of him. Fulfer cooperated with Wardlow thereafter because she was afraid he would shoot her. Fulfer testified further that Wardlow accompanied Fulfer into a bank to cash the check they had gotten for Cole's truck; he had threatened her with the gun before they entered the bank and warned her not to try anything, then he carried the gun into the bank. Fulfer testified further that when they were finally stopped by police in South Dakota, Wardlow had instructed her to hand him the gun hidden under her seat and he would "take care of that right now." Fulfer refused, saying they were already in enough trouble. In light of Fulfer's testimony in open court at her guilty plea hearing, the court finds incredible any assertion that Fulfer would have testified that the shooting was an accident, was not intended by Wardlow, or occurred during a struggle over the gun.

Supplemental SHTr at 8/10, FF 4-5. These findings must be presumed to be correct in this proceeding pursuant to 28 U.S.C. § 2254(e).

The court is also not persuaded that there is a reasonable probability that had Fulfer's testimony been heard by the jury, the outcome of the case would have been different. The absence of Fulfer's testimony does not undermine confidence in the verdict. Fulfer saw Wardlow and the victim begin to struggle over the gun but then turned and ran away. She testified that she did not see exactly what happened when the gun went off, and therefore could not corroborate Wardlow's claim that the shooting occurred during the struggle. While Fulfer stated that she did not intend to hurt or kill the victim, she knew before they went to Cole's house that Wardlow was in possession of a gun. Fulfer did not know that Wardlow had brought the gun to the victim's house, however, until Wardlow pulled it out of the waistband of his pants. Moreover, Wardlow's claim that the gun went off during a struggle with Cole is not supported by the medical examiner's opinion that the gun was fired from at least three feet away based on a lack of gunshot residue on the wound.

In view of Fulfer's inability to corroborate his story, as well as its inconsistency with the medical examiner's findings, Wardlow's contention that he lacked the necessary intent to commit murder is untenable.[4] Under the circumstances, Wardlow's fourth claim provides no basis for relief.

---

[4] In fact, in light of Wardlow's expressed desire to have no witnesses to the crime, it is unclear how he could have assured such a result without killing Cole. Merely incapacitating or tying up Cole for a period of time would not have eliminated Cole as a witness.

## IX.    INEFFECTIVE ASSISTANCE OF COUNSEL — PUNISHMENT (CLAIM V)

In his fifth claim, Wardlow argues that his trial counsel rendered ineffective assistance of counsel during the punishment phase in violation of the Sixth Amendment.  Wardlow sets forth four specific instances of ineffective assistance:  (1) failure to investigate and present mitigating evidence; (2) failure to provide relevant information to mental health expert; (3) failure to object to testimony on future dangerousness; and (4) failure to object to non-expert testimony.[5]  As previously discussed, to prevail on a Sixth Amendment ineffective assistance claim, Wardlow must show that counsel's performance was deficient, meaning that counsel's representation fell below an objective standard of reasonableness.  *See Strickland*, 466 U.S. at 687-88.  Additionally, Wardlow must demonstrate a reasonable probability that, but for counsel's deficiencies, the jury would have reached a different result.  A reasonable probability is one sufficient to undermine confidence in the outcome of the trial.  *Id*. at 694-95.[6]

### A.    Failure to Investigate and Present Mitigating Evidence

Wardlow contends that trial counsel rendered ineffective assistance because they failed to investigate and present mitigating evidence of Wardlow's family and social history.  Specifically, Wardlow argues that trial counsel should have investigated and presented evidence to the jury regarding his mother's delusional and controlling personality, which resulted in abuse and neglect. Wardlow relies upon the Supreme Court's decision in *Wiggins v. Smith*, 539 U.S. 510 (2003),

---

[5]    Wardlow concedes that his claim of ineffective assistance based on defense counsel's failure to object to prosecution investigator Smithey's testimony on "future dangerousness" is without merit.  Accordingly, the court will not address the claim.

[6]    The Director again argues that this claim is barred because it was raised in Wardlow's state habeas application which was dismissed by the CCA.  For the same reasons set forth in the analysis of Wardlow's second claim, this claim is procedurally barred.  The court will discuss the merits of the claim in the interest of justice.

which sets forth the standard for trial counsel conducting investigations of mitigating evidence in capital cases. The *Wiggins* Court announced:

> our principle concern in deciding whether [trial counsel] exercised "reasonable professional judgmen[t]" is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable.

*Id*. at 522-23.

In an affidavit submitted to this court, Wardlow's lead trial counsel discussed how the defense prepared for the penalty phase of Wardlow's trial:

> I had a lot of knowledge about the Cason community where [Wardlow] and his family were from. It is a very small, rural community. I know [Wardlow's] parents- his father better than his mother- and I knew the [victim's] family.

> *         *         *         *         *

> I also talked to [Wardlow's parents] about what they would testify about if I called them as witnesses. I concluded they were loose cannons and would not make good witnesses. [Wardlow's] mother appeared unstable and very unpredictable. Physically, they didn't have a good appearance and I did not think that their demeanor was appealing. Some of the information they gave me about [Wardlow] was inconsistent. Also, [Wardlow's mother] had helped the sheriff find [Wardlow].

> [Wardlow's] mother did not appear to be an affectionate person. In my opinion, [Wardlow's] parents gave the appearance of being very cold and I didn't think them testifying would help. I also asked [Wardlow] and his parents about any evidence of brain damage or other illnesses. I do not recall anything remarkable and I do not have any notes from my interview with either [Wardlow] or his family.

> I never interviewed [Wardlow's] brother. I think he had been in prison or had a conviction of some kind and did not think his testimony would help.

Wardlow argues that the very character traits that counsel cites as reasons for choosing not to call Wardlow's parents as witnesses were signs that Wardlow "may have come from a background of abuse, trauma, emotional volatility, and perhaps mental illness" and "should have

pushed counsel to probe [Wardlow's] and his families' [sic] life histories." Assuming that counsels' investigation of mitigating evidence was deficient, Wardlow is not entitled to relief unless he can demonstrate that but for the deficient performance, he would not have received the death penalty. *Strickland*, 466 U.S. at 695. The court must "reweigh the evidence in aggravation against the totality of the available mitigating evidence." *Wiggins*, 539 U.S. at 534.

Wardlow's mother, Lynda, discussed her mental problems and family history in an affidavit submitted to the court. She claims to have had a mental breakdown after her second child died and reveals that she was on medication for several years. When she became pregnant with Wardlow, she believed that he was literally a gift from God. She states that during labor, Wardlow was deprived of oxygen for several hours and that God intervened to bring him back to life. According to his mother, Wardlow did not walk until he was nineteen months old and wet his bed and pants until he was ten years old. His mother would make him wear his wet pants on his head in an effort to break him from bed wetting.

Lynda claims that she was overprotective of Wardlow and would not let him take part in school activities. She says that she "came down hard on him when [she] thought he was wrong or when he lied" and believed that "it's fair to say that [she has] a violent temper." On one occasion, when they were working for the Cason volunteer fire department, Lynda and Wardlow were involved in an accident. A Cason fire truck turned over and the two were taken to the hospital for their injuries. Disturbingly, Lynda also revealed that she believes that she was abducted by aliens and that her oldest son Johnny might have been fathered by an alien.

Lynda claims that none of Wardlow's lawyers ever talked to her about Wardlow's childhood or asked any questions about her family or background. She claims that she does not

remember being asked if Wardlow had brain damage or other problems. If she had been asked, she says that she would have told the lawyers everything they wanted to know, no matter how crazy it might have sounded.

Wardlow also submitted an affidavit to the court in which he states that his mother told him that he was "a real child of God[ ] and that my father . . . was not my real father. I grew up thinking that I was supposed to be special and that a lot was expected of me." He claims that his mother would "whip" him as a child, using belts, a car antenna, and PVC pipe, which would sometimes leave marks. Wardlow states that he was afraid of his mother because of her frequent tantrums which caused her to act crazy and violent. Examples of his mother's violent tantrums involved her hitting Wardlow's father in the head with a steel pipe and pulling guns on Wardlow and others she was confronting. On occasion, Wardlow wet his pants at school and his classmates would tease him. Wardlow also claims that none of his lawyers ever asked him questions about his childhood, his experiences in school, or his family.

A review of the affidavits and the totality of the evidence at trial fails to reveal the requisite prejudice to Wardlow due to any deficiencies in counsels' failure to investigate or present evidence of Wardlow's family history and background. Wardlow's mitigating evidence is not substantial in quantity and does not present an overly sympathetic case. *See Woodford*, 537 U.S. at 26 (upholding rejection of ineffective assistance claim where counsel failed to discover and present evidence of the defendant's dysfunctional family in which he suffered psychological abuse, low self-esteem, depression, and feelings of inadequacy and incompetence). Wardlow recognizes that the mitigating evidence in the instant case is not of the same character as the evidence in *Wiggins*

or *Williams*, but argues that in light of the mild aggravating evidence, failure to inform the jury of Wardlow's background prejudiced his case.

Wardlow contends that he had never previously committed any act of violence and the manner of the murder was not cruel. He fails to acknowledge, however, that the victim was an elderly man, that he planned the crime and concocted a ruse to get into the victim's home, that he took his mother's gun and concealed it in his waistband, that he cut the victim's phone lines, that he went to the victim's house several times before finding the most opportune moment to commit the crime, and that he knew the keys were in the victim's truck thereby obviating any need to confront the victim if all he wanted to do was secure a vehicle to leave town. In this situation, there is not a reasonable probability that introduction of the foregoing evidence regarding Wardlow's family history and background would have caused the jury to decline to impose the death penalty, and the failure of counsel to discover and present the evidence does not undermine the court's confidence in the jury's decision.

### B. Failure to Provide Evidence to Defense Expert

Wardlow next argues that his counsel were ineffective because they did not provide relevant information to his mental health expert, Dr. Don Walker ("Dr. Walker"). According to Wardlow, had the defense team known about and informed Dr. Walker about Wardlow's family history and background and provided Dr. Walker with the facts of the crime and Wardlow's involvement, Dr. Walker would have reached conclusions beneficial to Wardlow's mitigation case. Wardlow relies on the affidavit of clinical psychologist Dr. Paula Lundberg-Love ("Dr. Lundberg-Love"). Dr. Lundberg-Love received extensive information about Wardlow's background and family history, which she credits as the reason she is able to explain how Wardlow functioned and why he killed the victim, as well as the reason she disagrees with Dr. Walker's evaluation of

Wardlow. Specifically, Dr. Lundberg-Love claims that "if Dr. Walker had been provided with the social history data [she was given], then he would have been aware of the familial tendency for schizophreniform disorder."

Assuming *arguendo* that defense counsel was deficient in failing to provide the aforementioned information to Dr. Walker, the court must determine whether the failure was prejudicial. Put another way, the issue is whether there is a reasonable probability that providing Dr. Walker with the foregoing evidence would have changed the outcome of the penalty phase of the case.

Wardlow does not meet this burden. Dr. Lundberg-Love reached specific conclusions based upon her interviews of Wardlow and his family, administration of personality and intelligence tests, as well as her review of Wardlow's background and family history; nonetheless, the court cannot assume that Dr. Walker would have reached the same conclusions. There is nothing to suggest that Dr. Lundberg-Love's interpretation of the information was correct or reasonable. Even if Dr. Walker had reached the same conclusions, defense counsel might have made the strategic decision to forego presenting the evidence to the jury, deciding instead to argue, as counsel actually did, that Wardlow was not a future danger.[7] Moreover, submitting evidence suggesting that Wardlow was unstable, lacked family support, or had mental problems could have contributed to a future dangerousness finding. Accordingly, the court is not convinced that there is a reasonable probability that information about Wardlow's background and family history,

---

[7] Old, Wardlow's lead defense counsel, testified that he told Dr. Walker what the prosecution had alleged as to how the crime was committed by Wardlow. Old expected that Dr. Walker would evaluate Wardlow's ability to distinguish between right and wrong and his lack of future dangerousness, which became the basis for Wardlow's case against the death penalty. Wardlow told Dr. Walker during his evaluation that he had difficulty with anger in the past, denied being abused as a child, but indicated that he was "butt whipped." He revealed that he had attempted suicide on several occasions and denied having hallucinations.

provided to Dr. Walker, would have affected the outcome of the punishment phase of Wardlow's trial.

### C.    Failure to Object to Medical Examiner's Testimony

Dr. Barnard testified for the prosecution that during the autopsy of the victim he did not find any evidence of gunpowder residue at the entrance wound. As a result, he opined that the gun used to kill Cole was fired from "somewhere around three feet or greater." The prosecution used Dr. Barnard's testimony in its closing argument at the guilt/innocent phase to rebut Wardlow's trial testimony that the gun fired during a struggle with the victim. Wardlow argues that Dr. Barnard's opinions were not within his field of expertise and, therefore, defense counsel should have objected to the testimony. In support of his argument, Wardlow submitted the affidavit of C.E. Anderson, the former director of the Houston Police Department firearms laboratory, which states that the only way to determine the distance from which a weapon is fired is for a qualified firearms examiner to test-fire the weapon and examine the residue that is deposited in the field of fire.

Despite Wardlow's assertion, medical examiners who perform autopsies on crime victims often testify as to the distance from which a fatal gunshot was fired based on the presence or absence of gunpowder residue. *See, e.g.*, *Turner v. Johnson*, 106 F.3d 1178, 1182 (5th Cir. 1997) (medical examiner testified that absence of gunpowder stippling on victim's body meant that fatal bullet fired from at least 24 inches away); *Westley v. Johnson*, 83 F.3d 714, 717 (5th Cir. 1996) (medical examiner testified gunshot was fired within six inches of victim), *cert. denied*, 519 U.S. 1094 (1997). Consequently, the court rejects the suggestion that Dr. Barnard was not qualified to give the same type of testimony in Wardlow's case. If defense counsel had objected

to the medical examiner's testimony on this topic, the trial court would have overruled the objection.

Wardlow has failed to demonstrate that his counsel were ineffective in any of the situations raised. *See Wiggins*, 539 U.S. at 522-23. Accordingly, Wardlow's fifth claim must be rejected.

## X.    FALSE OR MISLEADING TRIAL TESTIMONY (CLAIM VI)

In his sixth claim, Wardlow argues that he was denied due process in the sentencing phase because the prosecution knowingly allowed Smithey to testify and create false impressions about the Texas prison system. Specifically, Wardlow contends that Smithey's testimony left a false impression about (a) the ineptitude of the Texas Department of Criminal Justice ("TDCJ") in assessing incoming non-death-sentenced inmates' propensity for violence, classifying them appropriately, and housing them in a manner that does not put other inmates and staff at risk; (b) the frequency of violent acts perpetrated in TDCJ by inmates sentenced to life for capital murder; and (c) TDCJ's failure to take into account the nature of the crime of conviction in the classification process. These false impressions, he argues, were ultimately material to the outcome of the sentencing phase.

The Director raises the same procedural default argument in response to this claim as has been asserted previously based on the CCA's dismissal of Wardlow's state habeas application, and the court agrees. Additionally, the Director maintains that review of this claim is barred because counsel failed to object to Smithey's testimony at trial. Assuming *arguendo* that this claim is not barred from further review as a result of trial counsel's failure to object, to obtain relief, Wardlow bears the burden of establishing that (1) the testimony was false; (2) the testimony was material;

and (3) the prosecution offered the testimony knowing it to be false. *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972). The standard of materiality is "a reasonable probability of a different result," or stated differently, whether the jury would have reached a different verdict had it not been for the false testimony. *See Kyles*, 514 U.S. at 434. Smithey's testimony was offered on the issue of future dangerousness. The inquiry for this court becomes whether there is a reasonable probability that the jury would have found that Wardlow did not present a future danger absent Smithey's testimony.

Putting Smithey's testimony regarding the prison classification system aside, there was adequate evidence for the jury to conclude that Wardlow presented a future danger. Wardlow planned the crime in advance, took his mother's gun, concealed it in his waistband, and visited the victim's home several times on the night of the murder before finally confronting him. Wardlow cut the phone lines which suggests that he anticipated an encounter with someone in the home. Wardlow was aware Cole's truck keys were inside the vehicle and could have taken the truck without a confrontation; nonetheless, he chose to confront Cole and attempt to enter his home after luring him to the door with a ruse about a broken vehicle.

Additionally, in the years leading up to the instant offense, Wardlow had pulled a gun on an undercover narcotics officer as well as led law enforcement officers on a high-speed chase. Shortly before the murder, Wardlow took a truck from a used car lot for a test drive and failed to return it. During his pretrial incarceration, Wardlow hid a homemade weapon in his cell which he intended to use to assault prison officials. In light of this evidence, Smithey's testimony was not material because there is not a reasonable probability that the outcome of the punishment phase

of the trial would have been different absent Smithey's testimony. Wardlow's sixth claim, therefore, is unfounded.

## XI. FAILURE TO REBUT FALSE TESTIMONY (CLAIM VII)

Wardlow alleges in his seventh claim, as he did in his fifth claim, that defense counsel were ineffective for failing to "confront" Smithey's testimony with cross-examination and expert rebuttal testimony. Wardlow states that the only preparation defense counsel undertook in response to Smithey's testimony was to interview Smithey at the courthouse during a recess in the penalty phase proceedings. Again, the court finds this claim to be procedurally barred. Like the others, this claim was raised in Wardlow's state habeas application, which was dismissed by the CCA based on its earlier order granting Wardlow's request to abandon his appeal. The state court's holding was independent of federal law and adequate to support the judgment. *Wainwright*, 433 U.S. at 87. Wardlow fails to show cause for his default, resultant prejudice, or a fundamental miscarriage of justice that might excuse his default. *Coleman*, 501 U.S. at 749-50. Therefore, federal habeas corpus review is precluded.

Furthermore, Wardlow cannot prevail on the merits of this claim. To establish ineffective assistance of counsel, Wardlow must prove (1) that counsel's performance was deficient and (2) that the deficient performance prejudiced his defense. *See Strickland*, 466 U.S. at 697. To establish prejudice, Wardlow must demonstrate a reasonable probability that, but for counsel's deficiencies, the jury would have reached a different result. *Id*. at 694-95. In the preceding claim, the court found that it was not reasonably likely that the jury would have answered the special issues in such a way that Wardlow would have received a life sentence absent Smithey's testimony. Because the analysis of materiality in this context is consistent with the review of

prejudice under *Strickland*, and having found that Smithey's testimony was not material, the court also concludes that Wardlow has failed to demonstrate prejudice from counsel's conduct in cross-examining Smithey.

Procedural bars aside, Wardlow is not entitled to relief based on this claim. To obtain relief on his claim that the State knowingly introduced false testimony, Wardlow bears the burden of establishing that the evidence was false, that the false testimony was material, and that the prosecution offered the testimony knowing it to be false. *See Giglio*, 405 U.S. at 153-54; *see also Kutzner v. Johnson*, 242 F.3d 605, 609 (5th Cir. 2001); *Chambers v. Johnson*, 218 F.3d 360, 363-64 (5th Cir.), *cert. denied*, 531 U.S. 1002 (2000). Wardlow has wholly failed to meet his burden under the foregoing standard.

The state habeas trial court made the following findings of fact regarding this claim:

Wardlow has failed to prove that Smithey's testimony was false. Smithey, an investigator with the unit that prosecutes felony offenses occurring within the Texas prison system, testified regarding the different levels of security within the prison system. He told the jury that while capital murder defendants who receive a death sentence are segregated from the general population and are strictly monitored and have limited access to prison employees, capital murder defendants who receive a life sentence go into the general population and are initially classified no differently than any other felony offender. Smithey testified further that violent crimes, which sometimes involve prison employees, occur fairly often within the Texas prison system, and that the incidence of such crime is greater in the general population than on death row. Smithey did not purport to render an opinion regarding whether Wardlow constituted a future danger in prison. Rather, his testimony merely described for the jury the conditions present in the Texas prison system. To support the alleged inaccuracy of Smithey's testimony, Wardlow relies primarily upon compilations of statistics and studies purporting to mark a lower rate of prison violence. However, this information does not specifically contradict Smithey's general assertions. And in any event, the mere existence of contradictory evidence does not prove that Smithey's testimony was false. Even assuming Smithey's testimony was false, there is no evidence that the State knew or believed it to be false.

Supplemental SHTR at 16/13, FF 2-3. These findings are presumed to be correct in this proceeding pursuant to 28 U.S.C. § 2254(e). As a consequence, Wardlow's seventh claim is without foundation.

In conclusion, Wardlow has not shown that he is entitled to federal habeas corpus relief. The petition for a writ of habeas corpus should be denied in its entirety.

## XII.   CERTIFICATE OF APPEALABILITY

An appeal may not be taken to the court of appeals from a final order in a habeas corpus proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Wardlow has not yet filed a notice of appeal, the court may address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."

*Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir.), *cert. denied*, 540 U.S. 956 (2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

In this case, reasonable jurists could not debate the denial of Wardlow's § 2254 petition on substantive or procedural grounds or find that the issues presented are adequate to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, the court finds that Wardlow is not entitled to a certificate of appealability as to his claims.

## XIII.  CONCLUSION

It is accordingly

**ORDERED** that the petition for a writ of habeas corpus is **DENIED**, and the case is **DISMISSED WITH PREJUDICE**. It is further

**ORDERED** that a certificate of appealability is **DENIED**. It is finally

**ORDERED** that all motions not previously ruled on are **DENIED**.

 SIGNED at Plano, Texas, this 21st day of August, 2017.

_____
MARCIA A. CRONE
UNITED STATES DISTRICT JUDGE