*72102*

ORAL ARGUMENT REQUESTED

NO. 72,102

IN THE

COURT OF CRIMINAL APPEALS OF TEXAS

AUSTIN, TEXAS

---

BILLY JOE WARDLOW,

Appellant,

v.

THE STATE OF TEXAS,

Appellee.

---

ON APPEAL FROM THE 76TH JUDICIAL DISTRICT COURT
OF TITUS COUNTY, TEXAS

---

BRIEF FOR THE APPELLANT

---

Douglas H. Parks
Attorney at Law
5016 McKinney Ave.
Dallas, Texas 75205
(214) 521-2670
Texas Bar No. 15520000

ATTORNEY FOR THE APPELLANT
ON APPEAL ONLY

FILED IN
COURT OF CRIMINAL APPEALS

APR 8   1996

Troy C. Bennett, Jr., Clerk

## TABLE OF CONTENTS

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . .ii

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . iv

STATEMENT OF POINTS OF ERROR. . . . . . . . . . . . . ix

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . xi

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . .1

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . .2

1.    THE TRIAL COURT ERRED IN EXCUSING JUROR NELL OWSLEY OVER
      DEFENSE    OBJECTIONS    BECAUSE    THE    ACTION    AMOUNTED    TO
      DISQUALIFICATION BASED ON GENDER IN VIOLATION OF THE
      FOURTEENTH AMENDMENT.

Argument and Authorities (Point 1). . . . . . . . . . . . . .4

2.    THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR
      CAUSE OF JUROR SUZANNE CHARLTON.

Argument and Authorities (Point 2). . . . . . . . . . . . . .9

3.    THE TRIAL COURT ERRED IN ADMITTING, OVER TIMELY OBJECTION,
      PHOTOGRAPHS WHICH WERE DUPLICITOUS OR CUMULATIVE.

4.    THE TRIAL COURT ERRED IN ADMITTING, OVER TIMELY OBJECTION,
      PHOTOGRAPHS WHICH WERE MORE PREJUDICIAL THAN PROBATIVE.

Argument and Authorities (Points 3 and 4 argued jointly). . . .14

5.    THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO
      SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF ART. 38.22,
      TEXAS CODE OF CRIMINAL PROCEDURE.

6.    THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO
      SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF THE FIFTH AND
      FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

7.    THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO
      SUPPRESS THIS CONFESSION OBTAINED IN VIOLATION OF HIS SIXTH
      AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL.

Argument and Authorities (Points 5, 6, and 7 argued jointly). . . .17

8.    THE TRIAL COURT ERRED IN REFUSING APPELLANT'S TIMELY REQUEST
      FOR A JURY INSTRUCTION OF THE ISSUE OF THE VOLUNTARINESS OF
      THE CONFESSION AS REQUIRED BY ART.38.23 (a), TEXAS CODE OF
      CRIMINAL  PROCEDURE.

9.    THE TRIAL COURT ERRED IN REFUSING TO ALLOW JUDGE PORTER'S TESTIMONY BEFORE THE JURY.

Argument and Authorities (Points 8 and 9 argued jointly). . . . .23

10.   THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE RESULTING FROM AN ILLEGAL SEARCH.

Argument and Authorities (Point 10). . . . . . . . . . . . . . 28

11.   THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S REQUESTED CHARGE ON THE LESSER INCLUDED OFFENSE OF AGGRAVATED ASSAULT.

Argument and Authorities (Point 11). . . . . . . . . . . . . . 30

12.   THE EVIDENCE IS INSUFFICIENT TO SUPPORT AN AFFIRMATIVE ANSWER TO SPECIAL ISSUE NUMBER ONE AS A MATTER OF LAW.

Argument and Authorities (Point 12). . . . . . . . . . . . . . 36

## TABLE OF AUTHORITIES

**United States Supreme Court Decisions:**

<u>Arizona</u> <u>v</u>. <u>Fulminante</u>, 499 U.S. 279 (1991). . . . . . . . . . . 9

<u>Batson</u> <u>v</u>. <u>Kentucky</u>, 475 U.S. 79 (1986). . . . . . . . . . . . 4

<u>Beck</u> <u>v</u>. <u>Alabama</u>, 447 U.S. 625, 637 (1980). . . . . . . . . . .30

<u>Eddings</u> <u>v</u>. <u>Oklahoma</u>, 455 U.S. 104, 115-116, 102 S.Ct. 869,

877 (1982). . . . . . . . . . . . . . . . . . . . . . . . 44

<u>Furman</u> <u>v</u>. <u>Georgia</u>, 408 U.S. 238, 239-240, 92 S.Ct. 2726, 2727,

33 L.Ed.2d 346 (1972). . . . . . . . . . . . . . . . . . .36

<u>J.E.B.</u> <u>v</u>. <u>Alabama</u> <u>ex</u> <u>rel</u>. <u>T.B.</u>, 114 S.Ct. 1419 (1994). . . . . . 4

<u>Jurek</u> <u>v</u>. <u>Texas</u>, 428 U.S. 262, 275, 96 S.Ct. 2950, 2957, 49 L.

Ed2d 929 (1976). . . . . . . . . . . . . . . . . . . . . .36

<u>Miller</u> <u>v</u>. <u>Fenton</u>, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d

405 (1985). . . . . . . . . . . . . . . . . . . . . . . . 23

<u>Miranda</u> <u>v</u>. <u>Arizona</u>, 384 U.S. 436 (1966). . . . . . . . . . . .18

<u>Powers</u> <u>v</u>. <u>Ohio</u>, 499 U.S. 400 (1991). . . . . . . . . . . . . 5

<u>Rhode Island</u> <u>v</u>. <u>Innis</u>, 446 U.S. 291, 64 L.Ed.2d 297, 100 S.Ct.

1682 (1980). . . . . . . . . . . . . . . . . . . . . 20, 22

<u>United States</u> <u>v</u>. <u>Leon</u>, 468 U.S. 897. . . . . . . . . . . . . .29

**Other Federal Decisions:**

Cordova <u>v</u>. <u>Lynaugh</u>, 838 F.2d 764 (5th Cir. 1988). . . . . . . . 30

<u>United</u> <u>States</u> <u>v</u>. <u>Mixon</u>, 977 F.2d 921 (5th Cir. 1992). . . . . . 5

**Texas Decisions:**

Almanza v. State, 686 S.W.2d 157 (Tex.Cr.App. 1985). . . . . . . 35

Barley v. State, 906 S.W.2d 27, 30 (Tex.Cr.App. 1995). . . . . . 36

Barnes v. State, 876 S.W.2d 27,30 (Tex.Cr.App. 1994). . . . . . .36

Beltran v. State, 728 S.W.2d 382, 388 (Tex.Cr.App. 1987). . . . .38

Brasfield v. State, 600 S.W.2d 288 (Tex.Cr.App 1980). . . . . . .37

Burdine v. State, 719 S.W.2d 309, 316 (Tex.Cr.App. 1986). . . . .15

Casarez v. State, ___ S.W.2d _____ (Tex.Cr.App. 1995). . . . . . 5

Castillo v. State, 913 S.W.2d 529 (Tex.Cr.App. 1995). . . . . . .13

Cook v State, 858 S.W.2d 467 (Tex.Cr.App. 1993). . . . . . . . . 5

Dinkins v. State,  894 S.W.2d 330 (Tex.Cr.App. 1995). . . . . . 24

Dowden v. State, 758 S.W.2d 264 (Tex.Cr.App. 1988). . . . . . . .30

Ellason v. State, 815 S.W.2d 656,660 (Tex.Cr.App. 1991)

. . . . . . . . . . . . . . . . . . . . . . 37, 42, 43, 44

Emerson v. State, 851 S.W.2d 269 (Tex.Cr.App. 1990). . . . . . . 5

Garcia v. State, 829 S.W.2d 796 (Tex.Cr.App. 1992). . . . . . . 29

Garrett v. State, 851 S.W.2d 853 (Tex.Cr.App. 1993). . . . . . . 13

Goodwin v. State, 799 S.W.2d 719 (Tex.Cr.App. 1990). . . . . . . 35

Hernandez v. State, 757 S.W.2d 744 (Tex.Cr.App. 1988). . . . . . 13

Horne v. State, 607 S.W.2d 556 (Tex.Cr.App. 1980). . . . . . . . 37

Huffman v. State, 746 S.W.2d 212 (Tex.Cr.App.1988). . . . . . . .43

Jones v. State, 742 S.W.2d 398 (Tex.Cr.App. 1987). . . . . . . . 21

Keeton v. State, 724 S.W.2d 58 (Tex.Cr.App. 1987). . . . . . 37, 38

Keeton v. State, 749 S.W.2d 861 (Tex.Cr.App. 1988). . . . . . . .7

Linscomb v. State, 823 S.W.2d 259 (Tex.Cr.App. 1991). . . . . . .5

Long v. State, 823 S.W.2d 259 (Tex.Cr.App. 1991). . . . . . . . .15

Martin <u>v</u>. <u>State</u>, 475 S.W.2d 265. 267 (Tex.Cr.App. 1972). . . . . 15

O'Bryan <u>v</u>. <u>State</u>, 591 S.W.2d 464,480 (Tex.Cr.App. 1979). . . . . 38

Penry <u>v</u>. <u>State</u>, 903 S.W.2d 715 (Tex.Cr.App. 1995). . . . . . . . 35

Reich - Bacot <u>v</u>. <u>State</u>, 789 S.W.2d 401 (Tex.Cr.App.-

Dallas 1990). . . . . . . . . . . . . . . . . . . . . . . 8

Roney <u>v</u>. <u>State</u>, 632 S.W.2d 598 (Tex.Cr.App. 1982). . . . . . 38, 42

Rousseau <u>v</u>. <u>State</u>, 855 S.W.2d 666 (Tex.Cr.App. 1993). . . . 31, 35

Royster <u>v</u>. <u>State</u>, 622 S.W.2d 442 (Tex.Cr.App. 1981). . . . . . . 30

Valdez <u>v</u>. <u>State</u>, 776 S.W.2d 162, 166-67 (Tex.Cr.App. 1989). . . 37

Wicker <u>v</u>. <u>State</u>, 740 S.W.2d 779 (Tex.Cr.App. 1987). . . . . . . .21

Williams <u>v</u>. <u>State</u>, 749 S.W.2d 183 (Tex.Cr.App. -

San Antonio 1988). . . . . . . . . . . . . . . . . . . . 35

Woods <u>v</u>. <u>State</u>, 801 S.W.2d 932 (Tex.Cr.App. - Austin 1990). . . 7

vii.

**Constitutional and Statutory Provisions**

U.S. Const., amend. V. . . . . . . . . . . . . . . . . . . 21, 22

U.S. Const., amend. VI. . . . . . . . . . . . . . . . . . .22

U.S. Const., amend. XIV. . . . . . . . . . . . . . . . . . 22

**Texas Code of Criminal Procedure,**

        art. 37.071 (b). . . . . . . . . . . . . . . . 36

        art. 38.22. . . . . . . . . . . . . . . 19, 21

        art. 38.23. . . . . . . . . . . . . . . . 29

**Texas Rules of Criminal Evidence,**

        Rule 403. . . . . . . . . . . . . . . . 15, 16

## STATEMENT OF POINTS OF ERROR

### POINT OF ERROR 1

THE TRIAL COURT ERRED IN EXCUSING JUROR NELL OWSLEY OVER DEFENSE OBJECTIONS BECAUSE THE ACTION AMOUNTED TO DISQUALIFICATION BASED ON GENDER IN VIOLATION OF THE FOURTEENTH AMENDMENT.

### POINT OF ERROR 2

THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE OF JUROR SUZANNE CHARLTON.

### POINT OF ERROR 3

THE TRIAL COURT ERRED IN ADMITTING, OVER TIMELY OBJECTION, PHOTOGRAPHS WHICH WERE DUPLICITOUS OR CUMULATIVE.

### POINT OF ERROR 4

THE TRIAL COURT ERRED IN ADMITTING, OVER TIMELY OBJECTION, PHOTOGRAPHS WHICH WERE MORE PREJUDICIAL THAN PROBATIVE.

### POINT OF ERROR 5

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF Art. 38.22, TEXAS CODE OF CRIMINAL PROCEDURE.

### POINT OF ERROR 6

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### POINT OF ERROR 7

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL.

### POINT OF ERROR 8

THE TRIAL COURT ERRED IN REFUSING APPELLANT'S TIMELY REQUEST FOR A JURY INSTRUCTION ON THE ISSUE OF A JURY INSTRUCTION ON THE ISSUE OF THE VOLUNTARINESS OF THE CONFESSION AS REQUIRED BY ART. 38.23 (a), TEXAS CODE OF CRIMINAL PROCEDURE.

### POINT OF ERROR 9

THE TRIAL COURT ERRED IN REFUSING TO ALLOW JUDGE PORTER'S TESTIMONY BEFORE THE JURY.

## POINT OF ERROR 10

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS EVIDENCE RESULTING FROM AN ILLEGAL SEARCH.

## POINT OF ERROR 11

THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S REQUESTED CHARGE ON THE LESSER INCLUDED OFFENSE OF AGGRAVATED ASSAULT.

## POINT OF ERROR 12

THE EVIDENCE IS INSUFFICIENT TO SUPPORT AN AFFIRMATIVE ANSWER TO SPECIAL ISSUE NUMBER ONE AS A MATTER OF LAW.

x.

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel for Appellant, Billy Joe Wardlow, certifies that the following parties have an interest in the outcome of this case. The representations are made in order that the Judges of the Court may evaluate possible disqualifications or refucals, pursuant to the Rules of Appellate Procedure.

| | |
|---|---|
| Douglas H. Parks | Counsel for Appellant |
| | (On Appeal Only) |
| Bird Old, III<br>Lance Hinson | Trial Attorneys for Appellant |
| Honorable Gary R. Stephens | Judge, by Judicial Assignment |
| The State of Texas | Appellee |
| Richard Townsend | District Attorney<br>Morris County, Texas |
| Randy Lee | Assistant District Attorney<br>Cass County, Texas |
| Carl Cole | Complainant |

Dated:    April 8 , 1996
          Dallas, Texas

Douglas H. Parks
Attorney at Law
5016 McKinney Ave
Dallas, Texas 75205
(214) 521-2670
State Bar No. 15520000
Attorney for Appellant
On Appeal Only

xi.

IN THE

COURT OF CRIMINAL APPEALS

AT AUSTIN

---

COURT OF APPEALS NO. 72,102

---

BILLY JOE WARDLOW,

Appellant,

v.

THE STATE OF TEXAS,

Appellee.

---

ON APPEAL FROM CAUSE NO. 12,764
IN THE 76TH DISTRICT COURT NUMBER
OF TITUS COUNTY, TEXAS

---

BRIEF FOR APPELLANT

---

## PRELIMINARY STATEMENT

Appellant, Billy Joe Wardlow, was indicted by a Morris County, Texas Grand Jury for the offense of capital murder, a capital felony. The indictment alleged that Appellant intentionally caused the death of Carl Cole, by intentionally shooting Carl Cole with a firearm, while Appellant was committing or attempting to commit the offense of robbery of Carl Cole on or about the 14th day of June,

APPELLANT'S BRIEF – Billy Joe Wardlow                                    1

1993.(R.Transcript Vol. 2 p.62).

On August 12, 1994 an order was entered granting Appellant's Motion For Change of Venue to Titus County, Texas (R.Transcript Vol.2 p.72). The cause number was changed from No. 7130 (Morris County) to No.12,764.(R.Transcript Vol.2,p.75). Appellant proceeded to trial before a jury on his plea of not guilty on January 31, 1995. The jury found the Appellant guilty of capital murder and answered the punishment questions set out in C.C.P. Art. 37.011 in a manner which invoked the death penalty. Appellant now raises issues of sufficiency, jury selection, trial errors, and errors related to the charges to the jury.

## STATEMENT OF THE FACTS

On June 14, 1993, the complainant's son, Charles Cole, came to his father's home in Morris County, Texas, from Austin, Texas, which was his usual habit every Monday. (R. Vol. 33 p.90-91). Upon arrival, the witness saw a small amount of blood on the steps and saw that his father's pick-up was gone.(R. Vol.33 p.93). The Morris County sheriff was called. Charles Cole and a neighbor went through the house without finding the complainant. In the early morning hours of June 15, investigators found property belonging to the complainant on a country road in Titus County.(R. Vol. 33 p. 98-99). Finally, after a more through search of the house, the complainant was found dead in a closet.(R. Vol. 33 p.103-104).

The complainant died as a result of a gunshot wound to the head. The bullet was recovered. (R. Vol. 33 p.136-137).

Will Emery, a friend of Appellant, testified that Appellant

visited him on June 13, 1993, with his girlfriend, Tonya Fulfer. During that visit Appellant showed him a .45 caliber handgun, blue steel with brown handles.(R. Vol. 34 p.245 et seq).

A neighbor, Dorothy Smith, testified that she saw a young male and female looking toward the complainant's house at approximately 5:45 a.m. on June 14, 1993. The male appeared to have a gun, with brown handles, in his right rear pocket. (R. Vol.34 p.265-268). The witness made a tentative identification of Appellant as the young man with the gun.(R. Vol.34 p.269). Thereafter, the witness heard a gunshot and saw the girl come running out of the complainant's carport.(R. Vol.34 p.324). Shortly thereafter, the witness saw the complainant's pick-up truck leave.(R. Vol.34 p.327).

Appellant's mother, Linda Wardlow, testified that she noticed a .45 Llama automatic pistol missing from her home. She furnished Sheriff Ricky Blackburn the serial number and the last bullet to the weapon in her possession. (R. Vol.34 p.355-356).

Robert Haug, a city policeman for Madison, South Dakota arrested Appellant and Tonya Fulfer on June 16, 1993 pursuant to a teletype from Texas. (R. Vol.35 p.398). Appellant was arrested in a black Ford Mustang convertible, which had been traded for the complainant's pick-up truck. (R. Vol. 35 p.449-451). A search of the Mustang was conducted, without consent and without a warrant, and a pistol removed. (R. Vol. 35 p.424-425).

Sheriff Ricky Blackburn went to South Dakota and transported Appellant back to Morris County, Texas on June 23, 1993. (R. Vol.35

p.488).  On June 24, 1993 Sheriff Blackburn took Appellant before a district judge, who appointed Vernard Solomon of Marshall, Texas to represent Appellant. (R. Vol.35 p.533).  Thereafter, Sheriff Blackburn received a "letter" from Appellant, dated February 28, 1994, which was admitted as State's Exhibit No. 73, over Appellant's objection. (R. Vol. 35 p.521).

Appellant testified in his own behalf.  He stated he wrote State's Exhibit No. 73 as a result of Sheriff Blackburn's suggestion that he do so. (R. Vol. 37 p.637-639).

### POINT OF ERROR NO.1

**THE TRIAL COURT ERRED IN EXCUSING JUROR NELL OWSLEY OVER DEFENSE OBJECTIONS BECAUSE THE ACTION AMOUNTED TO DISQUALIFICATION BASED ON GENDER IN VIOLATION OF THE FOURTEENTH AMENDMENT.**

### Argument and Authorites

The United States Supreme Court, in the landmark case of Batson v. Kentucky, 475 U.S. 79 (1986), held that "the Equal Protections Clause forbids the prosecutor to challenge potential jurors solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant."

In J.E.B. v. Alabama ex rel. T.B., 114 S.Ct. 1419, 1430 (1994) the Court addressed the issue of gender and held that the Equal Protection Clause forbids litigants from striking potential jurors "on the basis of gender, or on the assumption that an individual will be biased in a particular case for no reason other than the fact that the person happens to be a woman or happens to be a man."

The extension of equal protection to gender as a classification was recognized by this Court in <u>Casarez</u> v. <u>State</u>, _____ S.W.2d _____ (Tex.Cr.App. 1995).

After qualifying as a potential juror, Ms. Owsley was struck by the prosecution (R. Vol. 22, p. 164). Appellant lodged a timely objection to the State's use of a peremptory challenge based upon sex and age. Appellant pointed out to the trial court that the State had used its first four peremptory challenges (including Juror Owsley) on females over the age of 50. (R. Vol. 22, p. 165).

A defendant does not have to share the same racial or ethnic background to have standing to object to racially discriminatory use of peremptory challenges. <u>Powers</u> v. <u>Ohio</u>, 499 U.S. 400 (1991); <u>United States</u> v. <u>Mixon</u>, 977 F.2d 921 (5th Cir. 1992); <u>Cook</u> v. <u>State</u>, 858 S.W.2d 467 (Tex.Cr.App. 1993). Appellant does not have to be female to have standing to claim his equal protection rights.

One claiming a discriminatory use of peremptory challenges has the burden of establishing a *prima facie* case, <u>Emerson</u> v. <u>State</u>, 851 S.W.2d 269 (Tex.Cr.App. 1990), but that burden is not onerous. <u>Linscomb</u> v. <u>State</u>, 829 S.W.2d 164 (Tex.Cr.App. 1992). Once a *prima facie* case has been established, the allegation of discrimination must by found to be true unless it is contradicted, impeached or rebutted by other evidence. <u>Cook</u> v. <u>State</u>, *supra*.

Appellant met the burden of proving a *prima facie* case by showing that, to the time of the objection, the State had used all four of its peremptory challenges on women. The record reflects that, ultimately, the State used five of its seven expended

peremptory challenges on women. In addition to the first four, the State struck Juror Linda Collins.

The jury ultimately consisted of two women and ten men.

While the trial court did not explicitly find that a *prima facie* case had been proven, it did so by implication when it invited the State to state its reason for striking Owsley. (R. Vol. 22, p. 166).

The prosecutor gave the following explanation:

THE COURT:    Mr. Townsend, do you wish to address the challenge?

MR. TOWNSEND:  My reason for striking Ms. Owsley was I felt she was indecisive in a lot of her answers, she was particularly indecisive in saying that she could find the defendant beyond a reasonable doubt, she tended to want to go toward "beyond a shadow of a doubt" and mainly my reason for striking her was her overall testimony with us. She was very indecisive on several issues, seemed to be unable to make up her mind, seemed to be very nervous about the possibility as serving as a juror, more so than your average juror. (R. Vol. 22, p. 166).

Courts are not bound to accept a Prosecutor's explanations at face value. <u>Keeton</u> <u>v</u>. <u>State</u>, 749 S.W.2d 861 (Tex.Cr.App. 1988).

A court can resolve an equal protection challenge by assessing three basic elements:

1. by considering the strength of the *prima facie* case;

2. By examining each reason provided by the responding party to determine whether it has been contrived to conceal a discriminatory purpose; and

3. by considering the totality of the explanations.

Woods v. State, 801 S.W.2d 932 (Tex.Cr.App.- Austin 1990).

Here, the strength of the *prima facie* case is substantial.  To the point of objection, the State had used 100% of its strikes on women.  The greater the number of peremptory challenges used to remove minority members the stronger the reasons must be to survive review.  Woods v. State, *supra*.

Of the reasons stated by the prosecutor, only the one about a shadow of a doubt finds any basis in the record.  The prosecutor struck her "mainly...for...her...overall testimony with us."  With respect to the juror's alleged indecisiveness, the record reveals she gave the State definite answers to all its questions except twice, where she said "Well, I think I could (R. Vol. 22, p.24) and "well, I think so." (R. Vol. 22, p. 32).  In both cases, after receiving an adequate explanation of the concept at issue, she gave precise, definite answers.  (R. Vol. 22, pp. 25; 33).  Nothing in the record substantiates the State's claim that the juror was nervous about the possibility of serving as a juror, whatever that means.  Owsley told the court she had no reason why she could not serve and had no questions regarding her potential service. (R.

Vol. 22, p. 8). In fact, when given an opportunity to use personal problems as an inability to serve, the juror was adamant her recent traumas would not interfere with her service. (R. Vol. 22, p. 14-16).

Finally, although it was not his main reason, the Prosecutor offered the juror's tendency to "go toward and beyond a shadow of a doubt". During the State's voir dire the juror uttered the phrase "shadow of a doubt" twice (R. Vol. 22, pp. 11;37). Both times the Prosecutor changed the subject. The juror showed some confusion during the defense voir dire but when the trial court, mercifully, explained the concept of beyond a reasonable doubt in terms she could understand she plainly stated she would apply that standard of proof. (R. Vol. 22, p. 59).

Regardless, the trial court overruled Appellant's challenge in these words:

> THE COURT:    I do recall the other three jurors,
> I do recall Ms. Owsley and I do believe
> that the State had some reasons independent
> of her sex and age to strike her so I'm going
> to overrule the Batson Challenge. (R. Vol.
> 22, p. 166).

This Court should sustain an equal protection challenge where the Prosecutor's explanations are plainly contradicted in the record. See Reich - Bacot v. State, 789 S.W.2d 401 (Tex.Cr.App. - Dallas 1990).

This error is structural under Arizona v. Fulminante, 499 U.S.

279 (1991), and not subject to harm analysis.

### POINT OF ERROR NO.2

**THE TRIAL COURT ERRED IN GRANTING THE STATE'S CHALLENGE FOR CAUSE OF JUROR SUZANNE CHARLTON.**

### Argument and Authourites

The State challenged the juror on the following grounds:

MR. TOWNSEND:  I would challenge her for cause
                in that she has stated that --
                two or three different times --
                that she would require us to --
                the burden on proof on us that
                we are not required to hold that
                is in order to give the death
                penalty she would have to find
                that he was guilty beyond any
                doubt and not only is that a
                doubt that we are not required
                to hold but it's an impossible
                burden. (R.Vol.29,p.20-21).

The Court granted the challenge, over Appellant's timely objection (R.Vol.29,p.25).

However, the record is clear that the juror did not place an impossible burden on the State to prove Appellant guilty beyond any doubt, as alleged by the State in its challenge.  This is what the juror said:

        "Okay.  At that point you find the defendant

guilty of capital murder if we proved our case

to you beyond a reasonable doubt or would you

require us to prove that case to you "beyond

any doubt", I believe that's the way you said it?"

A. Oh, goodness, "Can I find him guilty if

you proved your case beyond a reasonable doubt?"

Q. "Beyond a reasonable doubt."

And you have just read the definition of

"reasonable doubt?"

A. Yes. (R.Vol.29,p.17-18).

Perhaps the State intended to complain that the juror would hold the State to a higher burden of proof on punishment than at the guilt stage of the trial. The State's objection came immediately after this exchange between the juror and the Prosecution:

Now, we have had jurors say this, and

let me -- I think maybe this is what you

are saying but let me ask you if this is

what you were saying; we have had jurors

say, "I could find a person guilty of

capital murder using that standard of

beyond a reasonable doubt, I wouldn't

have to have beyond all doubt, just

beyond a reasonable doubt, but when it

comes to giving that same defendant the

death penalty if I had any doubt at all,

you know, if the case were proven to me

beyond a reasonable doubt but not beyond

all doubt--

A.    Yes.

Q.    -- I would have to go with a life

sentence, I couldn't give him the death

penalty unless that case was proven to me

beyond any doubt or beyond all doubt."

Do you understand what I'm saying?

A.    Yes.

Q.    Is that the way you feel?

A.    Yes.  I agree.

Q.    Okay.  And so in order for you to find

the reasonable doubt?

A.    Yes. (R.Vol.29,p.19-20).

As can be seen, the juror was essentially agreeing to a statement by the Prosecution containing a false premise (that a jury assesses a death penalty) rather than expressing an opinion of her own.

Under questioning from defense counsel the following exchange occurred:

MR. OLD:  The law the Court in its charge,

its instruction to you will tell you that

if you answer Special Issue #1 "No" then

you have in effect given a life sentence,

if you answer Special Issue # 1 "Yes" then

you have taken the first step in giving the
death penalty.

In order to give the death penalty
you must then answer Special Issue # 2 and
an answer of "No" to it results in the
death penalty, to answer "Yes" and answer
"No" to the issues it results in the death
penalty given.

That first question asks you to weigh
the evidence beyond a reasonable doubt, if
there is a probability the defendant would
commit criminal acts of violence that would
be a continuing threat to society, knowing
that a "Yes" answer to that could result in
the death penalty would you still require
absolute proof or proof beyond doubt that
the answer to that question was "Yes" or
would you answer it by using the definition
of "beyond a reasonable doubt" meaning the
same thing that you had used to find him
guilty, would you require more proof on
that issue than on the innocence issue
simply because you know the "Yes" answer
to that could result in a death penalty?

THE POTENTIAL JUROR:      Yeah. I believe
I would.

Q.    (BY MR. OLD)    You would?

A.    Yes.

THE COURT:       "You would" what, ma'am?

THE POTENTIAL JUROR:       Require    more    proof.

(R.Vol.29,p.23-24).

Essentially, the juror said that she would raise the minimum threshold of proof, consistent with the legal standard, when she was called upon to answer Special Issue No. 1. This the juror was entitled to do.

That an individual juror would set her threshold of reasonable doubt higher than the minimum required to sustain a jury verdict does not indicate she has a bias or prejudice against the law. Garrett v. State, 851 S.W.2d 853 (Tex.Cr.App. 1993).

This Court has recently stated, "As long as the law permits a range of reasonable doubt, the individual venireman who says he will hold the State to the high end of the range is not requiring anything that the law does not tolerate. Castillo v. State, 913 S.W.2d 529 (Tex.Cr.App. 1995).

It is the challenging party's burden to demonstrate that the juror is incapable of, or substantially impaired from, following the law. Hernandez v. State, 757 S.W.2d 744 (Tex.Cr.App. 1988).

Here, the trial court could sustain the State's challenge only if it demonstrated the juror categorically refused to predicate her verdict upon a standard of beyond a reasonable doubt, as she understood it.  This the State failed to do.

This  Point  of  Error  should  be  sustained  and  Appellant's

conviction reversed because:

a.   the State's challenge is unsubstantiated in the record; and;

b.   the State has failed to demonstrate the juror had a bias or prejudice against the law.

### POINT OF ERROR NO.3

**THE TRIAL COURT ERRED IN ADMITTING, OVER TIMELY OBJECTION, PHOTOGRAPHS WHICH WERE DUPLICITOUS OR CUMULATIVE.**

### POINT OF ERROR NO. 4

**THE TRIAL COURT ERRED IN ADMITTING, OVER TIMELY OBJECTION, PHOTOGRAPHS WHICH WERE MORE PREJUDICIAL THAN PROBATIVE.**

### Argument and Authorities

During the guilt or innocence phase of the trial, the State offered exhibit numbers 5 through 11, depicting the crime scene outside the house, into evidence. (R.Vol. 33, p.10, Admitted Vol. 33 p.119).  If this Court has not received the original exhibits, Wardlow requests that this Court order them for the purpose of evaluating his points of error.  The State's exhibits depict the following:

5.   a view just inside the house, entering from the carport, depicting bloodstains;

6.   a scene depicting a bloodstained partial denture, a toolbox and part of a single eyeglass frame, one handle and one lens, with bloodstain by the step;

7.   depicts the same eyeglass frame, handle, lens, toolbox and bloodstain;

8.   depicts the same dentures, eyeglasses, toolbox and bloodstain;

9.   depicts blood stains on the first, second and third

steps from the carport into the house;

10. depicts the end of an antennae from a cordless telephone; and

11. depicts a paper towel with blood.

Wardlow did not object to State's Exhibits 5, 9, 10 and 11, but did object to exhibits 6, 7 and 8 for the following reasons:

1. that the photographs were cumulative; and

2. that the prejudicial effect outweighed their probative value. (R. Vol. 33 p.119).

The trial court overruled Wardlow's objections and admitted all the State's proffered exhibits. (R.Vol.33,p.119). The photographs were displayed to the jury and used in testimony.

The Texas Rules of Criminal Evidence control the admission of photographs. TRCE, 403. Prior to the rules, gruesome photographs were admissible in evidence unless they were offered solely to inflame the minds of the jury. Martin v. State, 475 S.W.2d 265, 267 (Tex.Cr.App. 1972); Burdine v. State, 719 S.W.2d 309, 316 (Tex. Cr.App. 1986). In Long v. State, 823 S.W.2d 259 (Tex.Cr.App. 1991) this Court specifically overruled that portion of Martin which required a finding that the photographs be presented solely to inflame the minds of the jury, and instead adopted the language of Rule 403, holding that such evidence, though relevant, was inadmissible if the probative value of such evidence was substantially outweighed by its prejudicial effect.

Rule 403 also speaks to exclusion of photographs which are merely cumulative despite their apparent relevance. The question of whether photographs are duplicitous goes not only to the rule

against cumulative evidence stated in Rule 403, but to the Court's consideration of the number of exhibits in the determination of the dynamic between probative value and prejudicial effect but also the motivation of the State in introducing repetitive photographs.

Here, the photographs admitted without objection, and one of the three admitted over objection, would have depicted the scene fairly and in such a way that the jury could have easily understood.

Wardlow concedes that the photographs of the broken eyeglasses and dentures, stained with blood, were not gruesome. The prejudicial effect of the pictures lay in their poignancy, underscoring that the victim was an eighty-two year old man.

State's exhibits 7 and 8 proved nothing that was not proven by 6. State's exhibits 6 and 8 proved nothing that was not proven by 7. State's exhibits 6 and 7 proved nothing that was not proven by 8.

A jury may be inflamed by sentimental photographs as well as by gruesome ones. Wardlow should have a new trial because the extra photographs were offered to prejudice the jury and were not admissible under Rule 403.

### POINT OF ERROR NO.5

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF Art. 38.22, TEXAS CODE OF CRIMINAL PROCEDURE.**

### POINT OF ERROR NO. 6

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS**

CONFESSION OBTAINED IN VIOLATION OF THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

### POINT OF ERROR NO. 7

THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS HIS CONFESSION OBTAINED IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT TO ASSISTANCE OF COUNSEL.

### Arguments and Authorities

The court admitted into evidence before the jury, over timely objection, Appellant's "letter" (St.Ex. 73) to Sheriff Ricky Blackburn. (R. Vol. 35, p.522). The court ruled that the letter was a voluntary statement obtained by the State without custodial interrogation.

The facts, circumstances and events leading up to, and culminating in the delivery of the letter to the State are largely uncontested.

On or about January 25, 1994, Appellant sent a note stating:

"Patsy,

> I request to speak with you concerning a matter of utmost importance. When you are at a point of availability and are ready to speak to me I will give you the request. I would also like to have a private consultation with Sheriff Blackburn, concerning my case, and will do what is necessary to receive this hearing.
>
>> Thank you,
>>
>> Billy Wardlow"

(St.Ex. 30).

At the time he received this communication, Sheriff Blackburn knew:

1.    Appellant was represented by attorney Vernard Solomon;

2.    Appellant was dissatisfied with Mr. Solomon; (R. Vol.10,p.55); and

3.    Appellant was having nightmares and trouble sleeping. (R. Vol. 9, p. 18).

In response to the note, Sheriff Blackburn took the following action:

1.    sought the advise of District Judge William R. Porter, who advised that a meeting with Appellant could "go for us or go against us" (R. Vol.9,p.96);

2.    sought the advise of District Attorney Richard Townsend, who advised it was alright to talk to Appellant if they didn't "get into the case" (R.Vol.9,p.97);

3.    decided not to advise Mr. Solomon of his intention to meet with Appellant (R.Vol.9,p.72); and

4.    met with Appellant in response to the note (R.Vol.9,p.17), without giving Appellant his warnings pursuant to Miranda v. Arizona, 384 U.S. 436 (1966). (R.Vol.37,p.636).

It should be noted here that Judge Porter testified, outside the presence of the jury, that he advised Sheriff Blackburn, if he really wanted to pursue a meeting, to call Vernard Solomon in Marshall so that they could all meet at the jail. (R.Vol.36,p.582). Judge Porter further testified that as early as two or three days after that conversation Sheriff Blackburn showed him the letter, admitted as State's Exhibit No. 73 in the trial. (R.Vol.36,p.583).

During the course of his meeting with Appellant Sheriff

Blackburn admitted:

1.    he suggested to Defendant that he write down his feelings about what was bothering him (R.Vol.9,p.18);

2.    that he probably talked to Defendant about the Biblical teaching that the "truth shall set you free" (R.Vol.9,p.74);

3.    he told Defendant, in effect, that forgiveness of sin was based upon confession of sins (R.Vol.10,p.54);

4.    he told Defendant to write down everything from the time he "left Fort Worth", which was a time prior to the death of complainant (R.Vol.10,p.55); and

5.    he told Appellant "that if he wrote down anything he did not want anyone else to see to simply tear it up and destroy it and flush it." (R.Vol.10,p.50).

A.    **Art. 38.22, Code of Criminal Procedure**

Art. 38.22, Sec. 2, C.C.P. states as follows:

> "No written statement made by an accused as
> a result of custodial interrogation is
> admissible as evidence against him in any
> criminal proceeding unless it is shown on
> the face of the statement that:
>
> (a) The accused, prior to making the statement,
> either received from a magistrate the warning
> provided in Article 15.17 of this code or received
> from the person to whom the statement is made a
> warning that:
>
> (1)    he has the right to remain silent and
>        not make any statement at all and that

any statement he makes may be used
against him at his trial;

(2) any statement he makes may be used as
evidence against him in court;

(3) he has the right to have a lawyer
present to advise him prior to and
during any questioning;

(4) if he is unable to employ a lawyer,
he has the right to have a lawyer
appointed to advise him prior to and
during any questioning; and

(5) he has the right to terminate the
interview at any time; and

(b) the accused, prior to and during the
making of the statement, knowingly,
intelligently, and voluntarily waived the
rights set out in the warning prescribed by
Subsection (a) of this section.

It is obvious that Appellant's confession does not meet the
requirements of this statute. Therefore, if this confession was
the result of custodial interrogation it is absolutely inadmissable
under the laws of the State of Texas.

**B.   Custodial Interrogation**

In defining custodial interrogation, the Supreme Court of the
United States, in <u>Rhode Island v. Innis</u>, 446 U.S. 291, 64 L.Ed.2nd
297, 100 S.Ct. 1682, (1980), stated as follows:

We conclude that the <u>Miranda</u> safeguards
come into play whenever a person in custody
is subjected to either express questioning
or its functional equivalent. That is to say,
the term "interrogation" under <u>Miranda</u> refers
not only to express questioning, but also to
any words or actions on the part of the police
(other than those normally attendant to arrest
and custody) that the police should know are
reasonably likely to elicit an incriminating
response from the suspect. <u>The latter portion
of this definition focuses primarily upon the</u>

> perceptions of the suspect, rather than the
> intent of the police. This focus reflects the
> fact that the Miranda safeguards were designed
> to vest a suspect in custody with an added
> measure of protection against coercive police
> practices, without regard to objective proof
> of the underlying intent of the police.
> A practice that the police should know is
> reasonably likely to evoke an incriminating
> response from a suspect thus amounts to
> interrogation. (emphasis added).

The Court of Criminal Appeals has stated that, for purposes of applying Art. 38.22, "custodial interrogation" would be interpreted and construed consistently with the Fifth Amendment jurisprudence of the Supreme Court. Wicker v. State, 742 S.W.2d 813 (Tex.Cr.App. 1987) and Jones v. State, 742 S.W.2d 398 (Tex.Cr.App., 1987).

This is a rather straightforward and, in the context of this case, easily applied definition.  It is uncontested that the conversation between Appellant and Sheriff Blackburn, which resulted in Appellant's confession resulted from his request to speak to the Sheriff concerning his case.  Therefore, no reasonable person could be under any apprehension regarding Defendant's desire to talk about his case and the likelihood that he would make an incriminating response.

In fact, it is clear that Sheriff Blackburn was so concerned about Defendant's wish to talk about his case that he sought guidance and advice from the District Attorney and a District Judge.

Appellant contends that Sheriff Blackburn subjected him to the functional equivalent of questioning by responding to Appellant's request to talk with him about the case.  Sheriff Blackburn knew,

or should have known, that his preaching the biblical virtues of
confession to Appellant, in his emotional state, was reasonably
likely to elicit an incriminating response whether that response
came then or later. In fact, it is no wonder that the response was
later, given the Sheriff's suggestion that the confession of sin be
written down.

## C. Due Process

Sheriff Blackburn cannot be all things to all men.  Whether or
not his intentions were good, in passing himself off as a
clergyman/counselor, Sheriff Blackburn has overborne Appellant
beyond all notions of due process.

The dangers inherent in Sheriff Blackburn's activities are
manifold.  Innis teaches us that an incriminating response is "any
response - whether inculpatory or exculpatory - that the
prosecution may seek to introduce at trial".  Appellant believes
that Sheriff Blackburn knew that his presence alone would evoke
incriminating responses of some kind from him.  The fact that
Sheriff Blackburn declined to talk about Appellant's case with him
did not prevent him from listening or prevent him from encouraging
a future response.

Manipulation practiced by law enforcement upon an accused can
raise a claim that inculpatory statements were obtained in
violation of the Due Process Clause of the Fourteenth Amendment
separate from Fifth and Sixth Amendment claims.  The use of
manipulation by police to obtain a confession is incompatible with
a system that presumes innocence and assures that a conviction will

not be secured by inquisitorial means. "<u>Miller</u> <u>v.</u> <u>Fenton</u>, 474 U.S. 104, 116, 106, S.Ct. 445, 452, 88 L.Ed.2d 405 (1985).

Despite Sheriff Blackburn's protestations that his going to see Appellant was "as one human being helping another human being" (R.Vol.10,p.52), the simple fact of the matter is that Sheriff Blackburn and Appellant were in adversarial positions and Sheriff Blackburn knew that.

Sheriff Blackburn may not have gone into that room with the specific intent to question Appellant and make him confess to a capital crime.  However, Sheriff Blackburn made himself available to Appellant, knowing he wanted to talk about his case, and directed the conversation, through biblical reference, to a cleansing of the soul by confession.  Sheriff Blackburn created an atmosphere for Appellant to write the letter of confession admitted against him.  To have done that while posing as a friend and counselor does not make it any less egregious.

### POINT OF ERROR NO. 8

**THE TRIAL COURT ERRED IN REFUSING APPELLANT'S TIMELY REQUEST FOR A JURY INSTRUCTION ON THE ISSUE OF A JURY INSTRUCTION ON THE ISSUE OF THE VOLUNTARINESS OF THE CONFESSION AS REQUIRED BY ART. 38.23 (a), CODE OF CRIMINAL PROCEDURE.**

### <u>POINT OF ERROR NO. 9</u>

**THE TRIAL COURT ERRED IN REFUSING TO ALLOW JUDGE PORTER'S TESTIMONY BEFORE THE JURY.**

### <u>Argument and Authorites</u>

When the evidence at the trial raises a factual dispute over

whether a defendant's statement was voluntary, he is entitled to an instruction in the jury charge advising the jury generally on the law pertaining to such statement. <u>Dinkins v.State</u>, 894 S.W.2d 330 (Tex.Cr.App. 1995).

Appellant testified when he talked with Sheriff Blackburn regarding the subject of the confession of sins, he was having trouble sleeping, was having nightmares and was depressed, all of which he expressed to Sheriff Blackburn. (R.Vol.37,p.636). He also testified that, but for Sheriff Blackburn's statements to him he would not have written the statement. (R.Vol.37,p. 638).

Appellant requested a charge pursuant to Art. 38.23 (a), which was denied. (R.Vol.38,p,752).

In addition to his own testimony, Appellant offered that of Judge William R. Porter. The proffer of Judge Porter's testimony, offer of proof and ruling were as follows:

Mr. Old, do you still persist in your

assertion that Judge Porter is relevant

to issues before this jury and do you

still intend to call him as a witness

before this jury?

MR. OLD:  Yes, Your Honor.

THE COURT:    Mr. Townsend, what is the

State's position?

MR. TOWNSEND:  Your Honor, we would object

to that.  We heard Judge Porter's testimony

and we don't see any relevance to any issue

that is before the Court.

THE COURT:     Do you have any argument you

wish to make for the record at this time,

Mr. Old?

It is the Court's opinion that based on

what I heard Friday the testimony would

not be relevant to any issue other than

possible the issue of voluntariness of

the confession, the Court has determined

over the four day or three day recess

that the issue of voluntariness has not

at this point been raised and I do not

see any relevance to Judge Porter's

testimony.

MR. OLD:  Your Honor, we would request permission

of the Court to call Judge William R.

Porter as a witness, that it is our

contention and belief and having heard

his testimony which was to the effect

that he received a call from the sheriff

of Morris County, Mr. Ricky Blackburn,

informed the sheriff that Mr. Wardlow

wanted to talk to him and asked his advice

on the issue and the Judge told him to the

effect to notify his lawyer and do not talk

to him without his lawyer present or words

to that effect, I am summarizing his

testimony, I am not purporting to quote

him exactly.

We believe that goes directly to the

issue of voluntariness of the confession,

we believe the law of this state is that

it is a jury issue and there's a fact issue

involved and that evidence, and that being

the entire testimony of Judge Porter that

was heard on offer of proof outside the

presence of the jury is probative and

relevant to the issue of voluntariness of

the confession. As to specifically whether

or not there was custodial interrogation

I think it is quite relevant and would

go to show motive or the state of mind

of the sheriff when he went to talk to

Mr. Wardlow.

THE COURT:     At this time the Court is still

of the opinion that he question was whether

or not the conversation between Mr. Wardlow

and the sheriff amounted to a custodial

interrogation or its functional equivalent

is a matter of law.  At this point based

on what I have heard I am standing by my

findings of fact and conclusions of law

from the October, '94 hearing.

I do find there's no fact issue at this

point to go to the jury concerning the

voluntariness of the confession, I have

ruled as a matter of law it did not amount

to custodial interrogation and did not

amount to the functional equivalent of

custodial interrogation.

Your request is denied and I'm ordering

you not to call him as a witness nor to

request that he testify in the presence

of the jury. (R.Vol.37,p.601-603).

Appellant contends that the question of  whether or not

Appellant was subjected to custodial interrogation, under the facts

of this case, was properly an issue for the jury.

Judge Porter's testimony was relevant to the state of Sheriff

Blackburn's mind at the time he went to talk with Appellant.  It is

expected that, had he been allowed to do so, Judge Porter would

have testified as he did outside the presence of the jury as

follows:

Well, in effect I said, "Mr. Wardlow has

a lawyer, once he has a lawyer he can't

give up that right without the consent

of the lawyer therefore you can't talk

to him, leave him alone."

I then said, "His lawyer is Vernard Solomon,

he lives in Marshall, if you really want to
pursue this I would suggest you call Mr.
Solomon, tell him what has happened and
ask him if he will come meet with you and
his client at the jail and see what he wants
to do." (R.Vol.36,p.582).

The jury should have been given the opportunity to decide the
issue based upon all the available evidence.

### POINT OF ERROR NO. 10

**THE TRIAL COURT ERRED IN DENYING APPELLANT'S MOTION TO SUPPRESS
EVIDENCE RESULTING FROM AN ILLEGAL SEARCH.**

#### Argument and Authorities

Appellant was arrested in Madison, S.D. on the basis of a
teletype received by the police department of that city indicating
that an arrest warrant had been issued for Appellant for capital
murder.

Pursuant to the arrest, Appellant's automobile was impounded
and subjected to an inventory search. (R.Vol.35,p.423). A .45
caliber Llama handgun was recovered and State's witness James
Johnson was allowed to testify regarding its recovery from
Appellant. (R.Vol.35,p.479-483).

Appellant's motion to suppress this evidence, based upon its
being the fruits of an illegal arrest, had previously been denied.
(R.Vol.35,p.444). However, the court had earlier granted
Appellant's Motion to Quash Arrest Warrant because the affidavit
did not state probable cause. (R.Vol.33,p.62).

Therefore, the State's witness was allowed to testify about a gun and events recovered as a result of an illegal arrest and search.

The trial court allowed the testimony based upon the erroneous belief that the law of South Dakota governed the admissibility of the evidence in question.  The court was persuaded that the "good faith" exception to the exclusionary rule, as stated in <u>United States</u> <u>v</u> <u>Leon</u>, 468 U.S. 897, 905 (1984) applied in South Dakota.

The Texas Code of Criminal Procedure, A. 38.23, states:

(a)   No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States Of America, shall be admitted in evidence against the accused on the trial of any criminal case.  In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

(b)   It is an exception to the provisions of Subsections (a) of this Article that the evidence was obtained by a law enforcement officer acting in objective good faith reliance upon  a warrant issued by a neutral magistrate based on probable cause.

There is no exception in Texas for good faith reliance by law enforcement officers except as expressly stated in the statute. <u>Garcia</u> <u>v</u>. <u>State</u>, 829 S.W.2d 796, 799 (Tex.Cr.App. 1992).  The admissibility of the evidence is governed by Art. 38.23, not the law of South Dakota.

Since the trial court specifically found the warrant for

Appellant's arrest was not based on probable cause the fruits of the search were inadmissable.

The harm in admitting the illegally obtained evidence requires reversal.

### POINT OF ERROR NO. 11

**THE TRIAL COURT ERRED IN FAILING TO GRANT DEFENDANT'S REQUESTED CHARGE ON THE LESSER INCLUDED OFFENSE OF AGGRAVATED ASSAULT.**

### Argument and Authorities

After the close of testimony on the guilt-innocence phase of the trial, Appellant submitted his requested charge on the lesser included offense of aggravated assault. (R.Transcript Vol.2,p.140). This request was denied. (R.Vol.38,p.752).

Aggravated assault has been held to be a lesser included offense of capital murder. Dowden v. State 758 S.W.2d 264 (Tex.Cr.App. 1988).

Where evidence in a capital murder case supports a verdict of guilty of a lesser included offense, due process requires a jury instruction on that offense. Beck v. Alabama, 447 U.S. 625, 637 (1980). A jury must be instructed on any lesser included offense where "the jury could rationally acquit on the capital crime and convict for the non capital crime." Cordova v. Lynaugh, 838 F.2d 764,767 (5th Cir.) cert. denied, 108 S.Ct. 2832 (1988).

The Federal test, as set out in Cordova, applied to the two-prong test of Royster v.State, 622 S.W.2d 442 (Tex.Cr.App. 1981) has resulted in the following test:

1. the lesser included offense must be included within the

proof necessary to establish the offense charged, and

2. some evidence must exist in the record that would permit a jury rationally to find that if the defendant is guilty, he is guilty only of the lesser offense. Rouseseau v. State, 855 S.W.2d 666 (Tex.Cr.App. 1993).

The State offered no witnesses to the actual circumstances surrounding the killing of the complainant. The only potential eyewitness was Tonya Fulfer, who was called by Appellant. (R.Vol.37,p.726). However, on advice of counsel, Ms. Fulfer declined to testify. (R.Vol.37,p.727).

Therefore, we can only look to the testimony of Appellant to determine if the test was met.

Appellant testified that he and Tonya Fulfer went to the complainant's home intending to rob and incapacitate him. He testified he did not intend to kill the complainant when he went there. (R.Vol.37,p.644). This lack of intent is logically borne out by the fact that Appellant had disconnected the complainant's telephone line during the night. (R.Vol.37,p.644). Appellant did not want the complainant to be able to call the police after the robbery. (R.Vol.37,p.645).

Appellant then testified how the shooting occurred as follows:

> And I asked him if he had another phone in
> the house and he persisted to close the door
> and that's when I put my foot into the door
> and blocked the door, brought out the Llama .45,
> cocked a shell into it, pumped it off safety

and told him to go back into the house.

He wouldn't go back into the house, he rushed

out the door and grabbed my arm throwing me off,

caught me off balance, it caught me by surprise

that he was stronger, it scared me that he was

stronger than I though he was or guessed he was

and so forth that he held me, I fired the gun

just to let him go, it hit him right between

the eyes and catapulted him -- in between the

eyes, catapulted him against the wall.

I stood there, I didn't know what to do,

everything had gone wrong, the plans had blown up.

I didn't know what to do. (R.Vol.37,p.648).

                    •   •   •

MR. OLD:  Were you on -- at the time that you

pulled the gun out and injected shell into the

chamber and took it off safety were you on the

steps at the bottom of them?

THE WITNESS:   I believe I had my right foot on

the bottom and my left foot on one step holding

the door open. (Indicating).

Q.       (BY MR. OLD)   Okay.  You had the gun

           out and had it in your hand?

A.       That's correct.

Q.       And I'm using my right arm, am I

           correctly doing it as you were

doing it?   (Indicating.)

A.      Correct.

Q.      Will you tell me what -- show me
        what Mr. Cole did?

A.      He grabbed the butt of the gun and
        grabbed my arm pushing me back.
        (Indicating.)

Q.      Did you go backward?

A.      I Lost my balance because I was only
        half on the step. (Indicating.)

Q.      Do you know whether or not he had a
        hold of your arm when the gun fire?

A.      Yes. He did.

Q.      Okay. Do you know how -- the best of
        your recollection how did he have it?

A.      When it fired I believe he had it the
        same way, just had hold of the butt of
        the gun and my hand and my arm. (Indicating.)

Q.      I believe you said that Mr. Cole had more
        strength than you thought he would have had?

A.      More than I expected for a man of that age.

Q.      Go back. (Indicating.) (R.Vol.37,p.650-651).

                        .   .   .

Q.      Mr. Cole was shot between the eyes, did you
        aim the gun?

A.      To that direct spot?   No.

Q.    At the time the gun discharged did you know how it was pointed?

A.    I had no control over where it was at that time. No.

Q.    And how was that?

A.    As I said, he had his hand on my hand, the butt of the gun and my arm so I had no way to be in control of the direction that it would fire.

Q.    In your -- you still have the statement before you?

A.    Yes. I do.

Q.    At the bottom of I believe the first page -- excuse me, I am wrong, the second page -- you make the statement "He was shot like an executioner."

Q.    When you wrote that down were you describing what you had intended to do or the result of the shot?

A.    Looking back that's what it appeared to be, that's what it appeared, that's the way it appeared to have happened by the way the bullet was placed.

Q.    I mean you did not aim the gun between his eyes and shoot him between the eyes?

A.    No. I did not. (R.Vol.37,p.652-653).

Since aggravated assault is a lesser included offense of capital murder, Appellant has met the first prong of the test.

In determining whether the second prong has been met the Court must consider all the evidence introduced during trial, whether produced by the State or the defendant. <u>Goodwin</u> <u>v</u>. <u>State</u>, 799 S.W.2d 719,740 (Tex.Cr.App. 1990). The credibility of the evidence and whether it conflicts with other evidence or is controverted may not be considered in determining whether an instruction on a lesser-included offense should be given. <u>Rousseau</u> <u>v</u>. <u>State</u>, <i>supra</i>; - <u>Penry</u> <u>v</u>. <u>State</u>, 903 S.W.2d 183 (Tex.Cr.App. 1995).

In <u>Williams</u> <u>v</u>. <u>State</u>, 749 S.W.2d 183 (Tex.Cr.App.-San Antonio 1988) the Court reversed the defendant's attempted capital murder conviction because the trial court refused to charge on the lesser - included offense of aggravated assault. There, the defendant was surprised by a homeowner during a burglary. A struggle ensued over a rifle, several shots fired and, ultimately, the homeowner was wounded. The defendant testified he did not intend to shoot the complainant. The Court held that the evidence raised a reasonable issue regarding lack of intent and the charge should have been given.

Likewise, Appellant's testimony reasonably raises the issue of lack of intent to kill. The trial court should have charged the jury on the lesser included offense of aggravated assault.

Since Appellant properly preserved the error, the question is whether the omission of the requested charge resulted in "some harm" to Appellant. <u>Almanza</u> <u>v</u>.<u>State</u>, 686 S.W.2d 157 (Tex.Cr.App.

1985).

Appellant submits that this Court has no way of knowing how the jury would have applied the law to the facts had it been properly instructed on aggravated assault and must hold that Appellant was harmed by the error.

### POINT OF ERROR NO. 12

**THE EVIDENCE IS INSUFFICIENT TO SUPPORT AN AFFIRMATIVE ANSWER TO SPECIAL ISSUE NUMBER ONE AS A MATTER OF LAW.**

#### Argument and Authorities

This case was tried after the amendment of Vernon's Ann. Texas C.C.P. art. 37.071(b), which eliminated the special issue regarding "deliberateness." The former special issue number two (referred to as such in many of the cases cited by Wardlow) is now special issue number one. It asks:

> "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society".

Wardlow is aware that, in reviewing the sufficiency of the evidence at punishment, this Court must view the evidence in the light most favorable to the verdict to determine whether any rational jury could make an affirmative finding beyond a reasonable doubt. Barnes v. State, 876 S.W.2d 316, 322 (Tex.Cr.App. 1994), cert denied, _____ v. _____, 115 S.ct. 174, 130 L.Ed.2d 110 (1994); Barley v. State, 906 S.W.2d 27, 30 (Tex.Cr.App. 1995).

However, in reviewing the evidence under this standard, the Court must be mindful of Furman v. Georgia, 408 U.S. 238, 239-40, 92 S.Ct. 2726, 2727, 33 L.Ed. 2d 346 (1972) and Jurek v. Texas, 428

U.S. 262, 275, 96 S.Ct. 2950, 2957, 49 L.Ed.2d 929 (1976), which teach that the death penalty cannot constitutionally be imposed by juries acting with virtually unfiltered discretion.

Not every capital murder case calls for the death penalty. This Court is charged with the duty of making certain the death penalty is not "wantonly or freakishly" imposed and that the purposes of Art. 37.071(b) are carried out. Horne v. State, 607 S.W. 2d 556 (Tex.Cr.App. 1980); Keeton v. State, 724 S.W. 2d 58 (Tex.Cr.App.1987); Ellason v. State, 815 S.W.2d 656, 660 (Tex.Cr.App. 1991).

The Court has set out several factors which a jury can consider in determining whether a defendant would constitute a continuing threat to society. Brasfield v. State, 600 S.W.2d 288 (Tex.Cr.App. 1980). They are:

1.  the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties;
2.  the calculated nature of the acts;
3.  the forethought and deliberateness exhibited by the carrying out of the offense;
4.  the existence of a prior criminal record, and the severity of the prior crimes;
5.  the defendant's age and personal circumstances at the time of the offense;
6.  whether the defendant was acting under duress or the domination of another at the time of the commission of the offense;
7.  psychiatric evidence; and
8.  character evidence, e.g. whether the State presented any "bad" reputation evidence against the defendant.

A jury is not limited to these factors, and may consider all the evidence admitted during the entire trial. Valdez v. State, 776 S.W.2d 162, 166-67 (Tex.Cr.App. 1989), cert denied, 495 U.S.

963, 110 S.Ct. 2575, 109L.Ed.2d 757 (1990).

If severe enough, the circumstances of the offense alone may be sufficient to support an affirmative answer to the "future danger" special issue. Beltran v. State, 728 S.W.2d 382,388 (Tex.Cr.App. 1987).

In Keeton v. State, *supra* , this Court stated:

> ...we are bound by the law to make
> certain that the death penalty is
> not "wantonly or freakishly" imposed,
> and that the purposes of the jury's
> consideration of the special issues...
> are accomplished. Every murder committed
> in the course of robbery is in some
> way cold-blooded and senseless.  Each
> such murder does not, however, merit
> the death penalty, our most final
> punishment.

Recall, also, what this Court said in Roney v. State, 632 S.W.2d 598, 603 (Tex.Cr.App. 1982):

> Although this was a senseless murder,
> that fact is true of every murder in
> the course of a robbery. The facts of
> this offense, standing alone, do not
> carry the marks of a 'calculated and
> cold blooded crime, such as appeared
> in O'Bryan v. State, 591 S.W.2d 464,
> 480 (Tex.Cr.App. 1979), where the
> defendant for months planned the
> candy poisoning of his own child to
> collect life insurance.  To support a
> yes answer to the second punishment
> issue, the evidence must show beyond
> a reasonable doubt that there is a
> probability appellant would commit
> criminal acts of violence that would
> constitute a continuing threat to
> society.  To hold that the facts
> of this offense, standing alone,
> would support such a verdict, would
> mean that virtually every murder in
> the course of a robbery would warrant
> the death penalty.  Such a construction
> would destroy the purpose of the

> punishment stage in capital murder,
> which is to provide a reasonable and
> controlled decision on whether the
> death penalty should be imposed, and
> to guard against its capricious and
> arbitrary imposition." [citations
> omitted and emphasis on original].

At the time of this offense Appellant was eighteen (18) years of age (Def.'s Ex.4, Record Only, R.Vol.43) and had no prior criminal record. Viewed in the light most favorable to the verdict, Appellant and his girlfriend, Tonya Fulfer planned to rob the complainant. Appellant and Fulfer went to the complainant's home early on the morning of June 14, 1993 and lured him outside by claiming a need to use the telephone. Appellant pointed a pistol at complainant, who ran screaming at Appellant and grabbed the gun. Appellant pushed him off and shot him once because "he pissed me off". (State's Ex.73, R. Vol.35, p.522).

While the evidence shows some forethought and planning for the robbery, the act of killing the complainant was impulsive and an angry reaction to provocation.

The State offered no evidence of prior criminal convictions, either for impeachment when Appellant testified, or during punishment.

The State did offer the testimony of Deputy Sheriff Bill Benard, who testified that, on January 11, 1993, he pursued Appellant, who was driving his pickup truck at a high rate of speed and arrested him for fleeing. (R. Vol.39, p.26-29).

John Schultz, a used car salesman, testified that, on June 5, 1993, Appellant took a 1989 Chevrolet pickup truck for a test drive

and did not come back. (R. Vol. 39, p. 31-39).

Morris County Jailer J.P. Cobb testified he found a two foot metal rod from a T.V. set near Appellant's bunk in a cell he shared with other inmates. (R. Vol. 39, p.141-142).

Jimmy Stewart, burglar and Appellant's cell-mate, testified he overheard a conversation between Appellant and a third party wherein Appellant said he was going to hit a jailer with the metal rod and escape. (R. Vol. 39, p.145-147).

Deputy Warren Minor testified that, on February 1, 1995, while he was bringing Appellant to Court, Appellant remarked that if they didn't quit using trustees as guards he was "going to double his time on one of them." (R. Vol. 39, p. 178).

Harry Washington, an undercover narcotics officer for the Ark-LA-Tex Narcotics Task Force testified for the State. He said that, while working undercover on September 9, 1992, he approached Appellant, who was sitting in a pickup truck. The witness saw a .45 caliber handgun on the seat beside Appellant. When the witness tried to buy drugs Appellant told him he didn't fool with drugs. When asked what he was going to do with the gun, Appellant placed his hand on the gun and said "I'll shoot you." Appellant then drove off. (R. Vol.40, p.207-210).

The State also introduced various notes written by Appellant to Sheriff Richard Blackburn and Jailer Patsy Martin. (State's Exs. 83,84,85,86 R. Vol. 39, p. 171). Each of these notes contained a threat to be disruptive, destroy property or hurt someone if he did not get something he wanted.

It is significant that Appellant never followed through with any of the threats.   There is no evidence that Appellant ever attacked any guards or fellow inmates during his incarceration. There is no evidence that Appellant was actually disruptive in jail.  These were the tools of an immature young man trying to get attention and special treatment.

Appellant called three witnesses in the punishment phase of the trial.

Amy Billingslea, a substitute teacher and former Youth Minister at the First Baptist Church of Cason, Texas, testified she had known Appellant since he was a baby.  She described Appellant as a regular church-goer who was very quite, well mannered, bright and respectful. She testified Appellant was a member of the Royal Ambassadors who participated in car washes, bake sales, and the like. (R. Vol. 40, p.259-263)

William Gilliam, librarian at the Daingerfield High School, testified he had contact with Appellant, in that capacity, from 1989 until the spring of 1992.  He said Appellant came regularly to the library to work with the educational computer programs.  He also was interested in books dealing with mechanics and technology, which he would borrow.  In the spring of 1992, he joined other student volunteers in boxing books and moving equipment into a new library building.  He testified Appellant was never a discipline problem to him. (R. Vol.40, p.267-270).

Gerald Singleton, assistant principal of Daingerfield High School, testified that Appellant had no disciplinary procedures

lodged against him during his attendance at that school. (R. Vol.40, p.271-273).

Any reversal of a capital murder case based on the insufficiency of the evidence to support any special issue submitted under Article 37.071, V.A.C.C.P. is a precedent to be carefully considered as a guideline in future cases. Ellason v State, supra.

In Roney v State, supra, the seventeen year old defendant robbed a U-Totem store in Houston, with two accomplices. After the accomplices left the store and went back to their car, the defendant shot the victim, at a range of about three feet, with a shotgun, while the victim had his hands raised. The state offered evidence of an extraneous robbery shortly before the primary offense. The defendant had no prior criminal convictions. The State offered no psychiatric or character evidence. The defendant surrendered to authorities three days after the police contacted his mother.

While no two cases are alike, this case bears a remarkable resemblance to Roney. While Appellant did not turn himself in, he did allow himself to be arrested peacefully, although he was armed, and he cooperated with the arresting officers. The State offered no psychiatric or reputation evidence. Unlike Roney, Appellant introduced evidence of positive character traits. Finally, the evidence shows Appellant shot the complainant after he became aggressive, while the complainant in Roney was apparently completely passive.

The Court, in Roney, found the evidence insufficient to support the jury's affirmative finding that the defendant would be a continuing threat to society.

In Ellason v. State, *supra*, this Court held the evidence to be insufficient on the issue of future dangerousness where the nineteen year old defendant burglarized the home of an invalid neighbor he had known for several years.  When the complainant woke up and recognized the defendant he struck the complainant and fled. On the way out he saw a butcher knife, picked it up, returned to complainant's bedroom and stabbed her three times, killing her. While the defendant had a history of drug dependency, he also had some prior physical altercations with his father-in-law.  A deputy sheriff testified his reputation for being peaceful and law-abiding in jail was bad.

In Huffman v. State 746 S.W.2d 212 (Tex.Cr.App. 1988), this Court found the evidence to be insufficient on the future dangerousness issue where the twenty-two year old defendant strangled his victim to death during the course of a robbery.  He was seen in the victim's car, led police on a wild chase, crashed into two police cars in which officers were riding, resisted arrest and attacked another person at the police station.  He kicked and screamed and had to be restrained.  He was taken to a hospital where he was found to have a .19 blood alcohol content.  Twenty-seven hours later he attacked a guard in the jail.  The defendant had a history of drug abuse and one prior burglary conviction.

After a comparison of the evidence, how could one logically

say that the evidence was not sufficient to justify the execution of <u>Roney</u>, <u>Essason</u> and <u>Huffman</u> and not include Wardlow in that company? This was not a calculated act of murder, done with forethought and deliberateness. Appellant was not acting alone and his desire to protect Tonya Fulfer may well have made the offense seem worse than it was. See Appellant's testimony that he gave a confession (State's Ex.73) in an effort to protect Tonya. (R.Vol.37,p.712)

Appellant had no prior convictions and the prior "bad acts" introduced against him did not involve acts of violence.

Appellant is entitled to have his age considered as a mitigating factor. <u>Eddings v Oklahoma</u>, 455 U.S. 104,115-116, 102 S.Ct. 869, 877 (1982). <u>Ellason v State</u>, supra, at 663.

While there was no evidence that Appellant was acting under the domination of Tonya Fulfer, neither was there any psychiatric evidence that he would constitute a continuing threat to society.

Finally, the State called no one to testify regarding bad reputation. In fact, all the character evidence was favorable to Appellant.

The evidence does not prove that this offense, and this Appellant, is deserving of the ultimate punishment.

### CONCLUSION AND PRAYER FOR RELIEF

Based on the foregoing points of error and supporting argument, Appellant prays the Court will reverse the conviction and sentence in this case and order entry of judgment of acquittal, or reverse and remand this cause for new trial. Appellant further

moves the Court to vacate the sentence of death in this cause and modify the sentence to life imprisonment or alternatively, remand for a new sentencing proceeding.

                              Respectfully submitted,


                              Douglas H. Parks
                              Texas Bar No. 15520000
                              5016 McKinney Avenue
                              Dallas, Texas 75205
                              (214) 521-2670
                              (214) 520-7064 - Fax

                              ATTORNEY FOR APPELLANT
                              ON APPEAL ONLY


## CERTIFICATE OF SERVICE

     I hereby that a true and correct copy of the foregoing brief was served upon counsel for the State by hand delivery to the Morris County District Attorney, on this 8th day of April, 1996.


                              Douglas H. Parks