*72102*

# IN THE COURT OF CRIMINAL APPEALS
## OF THE STATE OF TEXAS

No. 72,102

| | | |
|---|---|---|
| *BILLY JOE WARDLOW* | § | APPELLANT |
| | § | |
| *V.* | § | |
| | § | |
| *THE STATE OF TEXAS,* | § | APPELLEE |
| | § | |

APPEAL FROM THE 76TH JUDICIAL DISTRICT COURT
OF TITUS COUNTY, TEXAS
CAUSE NO. 12,764

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## STATE'S BRIEF

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

RICHARD B. TOWNSEND
District Attorney
Morris County
500 Broadnax Street
Daingerfield, TX 75638

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

DREW T. DURHAM
Deputy Attorney General for
 Criminal Justice

MARGARET PORTMAN GRIFFEY
Chief, Capital Litigation Division
Assistant Attorney General

*GENA A. BLOUNT
Assistant Attorney General
P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1600; Fax (512) 320-8132

*Counsel of Record

ATTORNEYS FOR STATE OF TEXAS

**FILED IN**
COURT OF CRIMINAL APPEALS

OCT 7 1996

Troy C. Bennett, Jr., Clerk

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ............................................................. 1

A. *Course of Proceedings and Disposition Below* ................................ 1

B. *Statement of Facts* ................................................................. 2

    1. **Guilt-Innocence Phase** ............................................. 2

    2. **Punishment Phase** ................................................... 8

STATE'S REPLY TO POINT OF ERROR ONE ................................... 10

THE PROSECUTION'S PEREMPTORY STRIKE OF
VENIRE MEMBER NELL OWSLEY DID NOT
VIOLATE THE EQUAL PROTECTION CLAUSE
OF THE FOURTEENTH AMENDMENT TO THE
UNITED STATES CONSTITUTION.................................................... 10

A. **Statement of Underlying Facts** .............................................. 11

B. **Argument and Authorities** ................................................... 11

STATE'S REPLY TO POINT OF ERROR TWO ................................... 20

THE TRIAL COURT PROPERLY GRANTED THE
STATE'S CHALLENGE FOR CAUSE OF VENIRE
MEMBER SUZANNE CHARLTON. ................................................. 20

A. **Statement of Underlying Facts** .............................................. 20

B. **Argument and Authorities** ................................................... 24

STATE'S REPLY TO POINTS OF ERROR THREE AND
FOUR ........................................................................................ 28

A. **Statement of Underlying Facts** .............................................. 28

## TABLE OF CONTENTS, CONTINUED

Page

B.      **Argument and Authorities** ............................................................. 29

STATE'S REPLY TO POINTS OF ERROR FIVE
THROUGH SEVEN .............................................................................. 31

      THE ADMISSION AT TRIAL OF WARDLOW'S
      UNSOLICITED CONFESSIONAL LETTER TO
      SHERIFF BLACKBURN VIOLATED NEITHER
      ARTICLE 38.22 OF THE TEXAS CODE OF
      CRIMINAL PROCEDURE NOR THE FIFTH,
      SIXTH, OR FOURTEENTH AMENDMENTS TO
      THE UNITED STATES CONSTITUTION. ....................................... 31

A.      **Statement of Underlying Facts** .................................................... 32

B.      **Argument and Authorities** ......................................................... 38

    1.      *Admission of the letter did not violate the Fifth*
        *Amendment.* ............................................................... 39

    2.      *Admission of the letter did not violate Article*
        *38.22.* ...................................................................... 42

    3.      *Admission of the letter did not violate the Due*
        *Process Clause of the Fourteenth Amendment.* ...................... 44

    4.      *Admission of the letter did not violate the Sixth*
        *Amendment.* ............................................................... 46

STATE'S REPLY TO POINTS OF ERROR EIGHT AND
NINE ................................................................................................... 48

# TABLE OF CONTENTS, CONTINUED

Page

THE TRIAL COURT PROPERLY DETERMINED THAT THE VOLUNTARINESS OF WARDLOW'S CONFESSION WAS NOT AN ISSUE FOR THE JURY, AND, THEREFORE, PROPERLY DENIED WARDLOW'S REQUEST FOR A JURY INSTRUCTION ON THE ISSUE AND EXCLUDED JUDGE PORTER'S TESTIMONY BEFORE THE JURY. ......... 48

A.	Statement of Underlying Facts .......... 48

B.	Argument and Authorities .......... 51

STATE'S REPLY TO POINT OF ERROR TEN .......... 56

THE THE GUN SEIZED FROM WARDLOW UPON ARREST WAS NOT THE RESULT OF AN UNLAWSUL ARREST INADMISSIBLE UNDER ARTICLE 38.23 OF THE TEXAS CODE OF CRIMINAL PROCEDURE. .......... 56

A.	Statement of Underlying Facts .......... 56

B.	Argument and Authorities .......... 61

STATE'S REPLY TO POINT OF ERROR ELEVEN .......... 66

THE TRIAL COURT PROPERLY DENIED WARDLOW'S REQUEST FOR A JURY INSTRUCTION ON THE OFFENSE OF AGGRAVATED ASSAULT. .......... 66

A.	Statement of Underlying Facts .......... 66

B.	Argument and Authorities .......... 66

## TABLE OF CONTENTS, CONTINUED

**Page**

STATE'S REPLY TO POINT OF ERROR TWELVE ...............................  69

THE JURY HAD SUFFICIENT EVIDENCE TO SUPPORT ITS AFFIRMATIVE ANSWER TO SPECIAL ISSUE NUMBER ONE. .................................................  70

A.    **Statement of Underlying Facts** ........................................  70

B.    **Argument and Authorities** ...........................................  70

CONCLUSION AND PRAYER ...............................................  75

CERTIFICATE OF SERVICE ..............................................  76

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

*Alexander v. State,* 740 S.W.2d 749 (Tex. Crim. App. 1987),
    *cert. denied,* 114 S. Ct. 1869, 128 L.Ed.2d 490 (1994) ........................   72

*Alvarado v. Texas,* 912 S.W.2d 199 (Tex. Crim. App. 1995) ........................   47,62

*Adanandus v. State,* 866 S.W.2d 210 (Tex. Crim. App. 1993)
    *cert. denied* 510 U.S. 1215, 114 S.Ct. 1338,
    127 L.Ed.2d 686 (1994) ........................................   26

*Arnold v. State,* 873 S.W.2d 27 (Tex. Crim. App. 1993)
    *cert denied,* 115 S.Ct. 103 (1994) ............................   43

*Barley v. State,* 906 S.W.2d 27 (Tex. Crim. App. 1995)
    *cert. denied,* 116 S.Ct. 1271, 134 L.Ed.2d 217 (1996) ........................   70

*Barnes v. State,* 876 S.W.2d 316 ((Tex. Crim. App. 1994)
    *cert denied,* 115 S.Ct. 174, 130 L.Ed.2d 110 (1994) ........................   70

*Barton v. State,* 605 S.W.2d 605 (Tex. Crim. App. 1980) ........................   45

*Bass v. State,* 723 S.W. 2d 687 (Tex. Crim. App. 1986) ........................   44

*Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712 (1986) ........................   *PASSIM*

*Beck v. Alabama,* 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) ..........   66

*Berry v. State,* 582 S.W.2d 463 (Tex. Crim. App. 1979)........................   45

*Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).........   39,47

*Brown v. State,* 913 S.W.2d 577 (Tex. Crim. App. 1996) ........................   26

*Burns v. State,* 761 S.W.2d 353 (Tex. Crim. App. 1988) ........................   71,72,73

*Butler v. State,* 872 S.W.2d 227 (Tex. Crim. App. 1994)
    *cert. denied* 115 S.Ct. 1115, 130 L.Ed.2d 1079(1995) ........................   25

*California v. Beheler,* 463 U.S. 1121, 103 S.Ct. 3517,
    77 L.Ed. 2d 1275 (1983) ........................................   54

*Callins v. State,* 780 S.W.2d 176 (Tex. Crim. App. 1989)
    *cert. denied* 497 U.S.1011, 110 S.Ct. 3256,
    111 L.Ed.2d 766 (1990) ........................................   25

# TABLE OF AUTHORITIES, CONTINUED

**Cases**                                                          **Page**

*Cantu v. State,* 842 S.W.2d 667 (Tex. Crim. App. 1992)
    *cert. denied ,* 509 U.S. 941, 114 S.Ct. 16,
    125 L.Ed.2d 768 (1993) ................................................................ 25

*Castillo v. State,* 913 S.W.2d 529 (Tex. Crim.. App. 1995) .............................. 26,27

*Casey v. State,* 527 S.W.2d 882 (Tex. Crim. App. 1975) ................................. 55

*Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824 (1967) ................................. PASSIM

*Cook v. State,* 858 S.W.2d 467 (Tex. Crim. App. 1993) ................................... 25

*Colorado v. Connelly,* 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986) ..... 44

*Davis v. North Carolina,* 348 U.S. 737, 86 S.Ct. 1761,
    16 L.Ed.2d 895 (1966) .................................................................. 45

*Dejarnette v. State,* 732 S.W.2d 346 (Tex. Crim. App. 1987) ........................... 64

*Dinkins v. State,* 894 S.W.2d 330 (Tex. Crim. App.)
    *cert denied,* 116 S.Ct. 106, 133 L.Ed.2d 59 (1995) .............................. 52,53

*Dowden v. State,* 758 S.W.2d 264 (Tex. Crim. App. 1988) ............................. 67

*Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880,
    68 L.Ed.2d 378 (1981) ................................................................ 41

*Floyd v. State,* 710 S.W.2d 807 (Tex. App.--Fort Worth 1986,
    pet. dism'd), 768 S.W.2d 307 (Tex. Crim. App. 1989) ........................ 43

*Garrett v State,* 851 S.W.2d 853 (Tex. Crim. App. 1993) ................................. 26

*Geesa v. State,* 820 S.W.2d 154 (Tex. Crim. App. 1991) ................................. 21

*Gibbs v. State,* 819 S.W.2d 821 (Tex. Crim. App. 1991)
    *cert. denied, .*502 U.S. 1107, 112 S.Ct. 1205,
    117 L.Ed.2d 444 (1992) ................................................................ 63

*Green v. State* 840 S.W.2d 394 (Tex. Crim. App. 1992)
    *cert. denied,* 507 U.S. 1020, 113 S.Ct. 1819,
    123 L.Ed.2d 449 (1993) ................................................................ 26

# TABLE OF AUTHORITIES, CONTINUED

Cases                                                                           Page

*Gressett v. State,* 723 S.W.2d 695 (Tex. Crim. App. 1986) ............................ 44

*Hamel v. State,* S.W.2d 424 (Tex. Crim. App. 1979) ...................................... 64

*Harris v. State,* 738 S.W.2d 207 (Tex. Crim. App. 1986)
    *cert. denied,* 484 U.S. 872, 108 S.Ct. 207,
    98 L.Ed.2d 158 (1987) ........................................ 72

*Harris v. State,* 790 S.W.2d 568 (Tex. Crim. App. 1989) ........................ *PASSIM*

*Harrell v. State,* 884 S.W.2d 154 (Tex. Crim. App. 1994) ........................... 30

*Hawkins v. State,* 628 S.W.2d 71 (Tex. Crim. App. 1982) ........................... 38

*Haynes v. Washington,* 373 U.S. 503, 83 S.Ct. 1336,
    10 L.Ed.2d 770 (1963) ........................................ 44

*Heckert v. State,* 612 S.W.2d 549 (Tex. Crim. App. 1981) ........................... 29

*Hennessy v. State,* 660 S.W.2d 87,91 (Tex. Crim. App. 1983) ..................... 62

*Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859 (1991) ................. 12,13

*Hernandez v. State,* 819 S.W.2d 806 (Tex. Crim. App. 1991)
    *cert denied,* 504 U.S. 974, 112 S.Ct. 2944 (1992) ............... 52

*Hicks v. State,* 860 S.W.2d 419 (Tex. Crim. App. 1993)
    *cert. denied.* 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994) ......... 29

*Hill v. State,* 827 S.W.2d 860, (Tex. Crim. App. 1992)
    *cert denied,* 506 U.S. 905, 113 S.Ct. 297 (1992) ............... 14

*Holt v. State,* 912 S.W.2d 294 (Tex. App.--San Antonio 1995,
    pet. ref'd 1996) ........................................ 13

*Holland v. State,* 788 S.W.2d 112 (Tex. App. -- Dallas 1990, pet. ref'd) .......... 64

*Hopper v. Evans,* 456 U.S. 605, 102 S.Ct. 2049. 72 L.Ed.2d 367 (1982) .......... 67

*Huffman v. State,* 746 S.W.2d 212 (Tex. Crim. App. 1988) ........................... 75

# TABLE OF AUTHORITIES, CONTINUED

**Cases**                       **Page**

*Jackson v. Denno,* 378 U.S. 368, 84 S.Ct. 1774,
12 L.Ed.2d 908 (1964) .......................................... 32,36

*Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) ........ 71,73

*Jackson v. State,* 548 S.W.2d 685 (Tex. Crim. App. 1977) ............................... 68

*Jacobs v. State,* 787 S.W.2d 397 (Tex. Crim. App.),
*cert. denied,* 498 U.S. 882, 111 S.Ct. 231,
112 L.Ed.2d 185 (1990) ....................................... 25

*Janecka v. State,* 739 S.W.2d 813 (Tex. Crim. App. 1987) ............................... 44

*J.E.B. V. Alabama,* 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) ........ 11,12

*Johnson v. State,* 651 S.W.2d 303 (Tex. App. -- San Antonio 1983) ............... 45

*Jones v. State,* 568 S.W.2d 847 (Tex. Crim. App.)
*cert. denied,* 439 U.S. 949, 99 S.Ct. 363,
58 L.Ed.2d 352 (1978) ....................................... 63

*Jones v. State,* 795 S.W.2d 171 n.3 (Tex. Crim. App. 1990) ............................ 44

*Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 LL.Ed.2d 929 (1976) ............. 72

*Keeton v. State,* 724 S.W.2d 58 (Tex. Crim. App. 1987) ......................... 71,72

*Keith v. State,* 782 S.W.2d 861 (Tex. Crim. App. 1989) ................................... 47,62

*Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) .............. 47

*Kunkle v. State,* 771 S.W.2d 435 (Tex. Crim. App. 1986)
*cert. denied,* 492 U.S. 925, 109 S.Ct. 3259,
106 S.Ed.2d 604 (1989) ....................................... 71

*LaGrone v. State,* 742 S.W.2d 659 (Tex. Crim. App. 1987)
*cert. denied,* 485 U.S. 937, 108 S.Ct. 1115,
99 L.Ed.2d 276 (1988) ....................................... 63

*Lewis v. Jeffers,* 497 U.S. 766, 110 S.Ct. 3092, 111 L.Ed.2d 606 (1990) .......... 72

# TABLE OF AUTHORITIES, CONTINUED

**Cases**                                                                                    **Page**

*Livingston v. State,* 739 S.W.2d 311 (Tex. Crim. App. 1987)
  *cert. denied,* 487 U.S.1210, 108 S.Ct. 2858,
  101 L.Ed.2d 895 (1988)  ...........................................................    72

*Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568  ................    72

*Long v. State,* 823 S.W.2d 259 (Tex. Crim. App. 1991)
  *cert. denied,* 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d (1992)  ........    39

*Lopez v. State,* 535 S.W.2d 643 (Tex. Crim. App. 1976 )  ...............................    63

*Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199,
  12 L.Ed.2d 246 (1964)  ...........................................................    47

*McCambridge v. State,* 712 S.W.2d 499 (Tex. Crim. App. 1986)
  *cert. denied,* 495 U.S. 910, 110 S.Ct. 1936,
  109 L.Ed.2d 299 (1990)  ...........................................................    46

*McCleskey v. Kemp,* 481 U.S. 279, 107 S.Ct. 1756,
  95 L.Ed.2d 262 (1987)  ...........................................................    72

*Melton v. State,* 511 S.W.2d 957 (Tex. Crim. App. 1974)  ...............................    55

*Michigan v. Jackson,* 475 U.S. 625, 106 S.Ct. 1404,
  89 L.Ed.2d 631 (1986)  ...........................................................    47

*Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408,
  57 L.Ed.2d 290 (1978)  ...........................................................    45

*Miniel v. State,* 831 S.W.2d 310 (Tex. Crim. App.)
  *cert. denied,* 506 U.S. 885, 113 S.Ct. 245,
  121 L.Ed.2d 178 (1992) ...........................................................    38,52

*Miranda v. Arizona.* 384 U.S. 436, 86 S.Ct. 1602 (1966)  ...............................    *PASSIM*

*Moreno v. State,* 721 S.W.295 (Tex. Crim. App. 1986)  ...............................    67

*Muniz v. State,* 851 S.W.2d 238 (Tex. Crim. App. 1993)
  *cert denied,* 114 S.Ct. 116 (1993)  ...........................................................    46

## TABLE OF AUTHORITIES, CONTINUED

**Cases**                                                       **Page**

*Narvaiz v. State,* 840 S.W.2d 415 (Tex. Crim. App. 1992)
  *cert. denied,* 507 U.S. 975, 113 S.Ct. ...... 30

*Nored v. State,* 875 S.W.2d 392 (Tex. Crim. App. 1990) ...... 64

*Oregon v. Bradshaw,* 462 U.S. 1039, 103 S.Ct. 2830,
  77 L.Ed.2d 405 (1983) ...... 41

*Oregon v. Hass,* 420 U.S. 714, 95 S.Ct. 1215,
  43 L.Ed.2d 570 (1975) ...... 54

*Oregon v. Mathiason,* 429 U.S. 492, 97 S.Ct. 711,
  50 L.Ed.2d 714 (1977) ...... 54

*Pierce v. State ,* 777 S.W.2d 399 (Tex. Crim. App. 1989),
  cert. denied, 496 U.S. 912, 110 S.Ct. 2603
  110 L.Ed.2d 283 (1990) ...... 13

*Powell v. State,* 898 S.W.2d 821 (Tex. Crim. App. 1994) ...... 64

*Pulley v. Harris,* 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984) ...... 72

*Rhode Island v. Innis,* 446 U.S. 291, 110 S.Ct. 1682 (1980) ...... 40,53

*Romero v. State,* 800 S.W. 539 (Tex. Crim. App. 1990) ...... 38,64

*Rousseau v. State,* 855 S.W.2d 666 (Tex. Crim. App.)
  cert. denied, 510 U.S. 919, 114 S.Ct. 313
  126 L.Ed.2d 260 (1993) ...... 68

*Royster v. State,* 622 S.W.2d 442 (Tex. Crim. App. 1981) ...... 67

*Salazar v. State,* 805 S.W.2d 538 (Tex. App.--
  Fort Worth 1991, pet. ref'd) ...... 12

*Sonnier v. State,* 913 S.W.2d 511 (Tex. Crim. App. 1995) ...... 29,30

*State v. Saiz,* 427 N.W.2d (S.D. 1988) ...... 59,61

*Sterling v. State,* 800 S.W.2d 513 (1990), *cert. denied,* 501 U.S. 1213,
  111 S.Ct. 2816, 115 L.Ed.2d 988 (1991) ...... 53

*Stickney v. State,* 169 Tex. Crim. 533, 336 S.W.2d 133 (Tex. Crim. App.)
  cert. denied, 363 U.S. 807, 80 S.Ct. 1245, 4 L.Ed.2d 1151 (1960)...... 65

## TABLE OF AUTHORITIES, CONTINUED

**Cases**                                                                 **Page**

*Taylor v. State*, 850 S.W.2d 594 (Tex. App.--Houston
    [1st Dist.] 1993), *judgement vacated on other grounds*
    863 S.W.2d 737 (1993) ........................................................................... 43

*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089,
    67 L.Ed.2d 207 (1981) ........................................................................... 12

*Thomas v. State*, 723 S.W.2d 696 (Tex. Crim. App. 1986) ................................. 53

*Thompson v. Keohane*, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995) ......................... 54

*Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) ............... 44

*United States v. Fernandez*, 887 F.2d 564 (5th Cir. 1989) ................................. 13

*United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405,
    82 L.Ed.2d 677 (1984) ........................................................................... 59,61

*Upton v. State*, 853 S.W.2d 548 (Tex. Crim. App. 1993) ................................... 47

*Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985) ......... 13

*Walton v. Arizona*, 497 U.S. 634, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990)....... 72

*Welch v. Butler*, 835 F.2d 92 (5th Cir.)
    *cert. denied*, 487 U.S. 1221, 108 S.Ct. 2877,
    101 L.Ed.2d 912 (1988) ........................................................................... 46

*Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1990) ........................... 14

*Wicker v. State*, 740 S.W.2d 779 (Tex. Crim. App. 1987)
    *cert denied*, 485 U.S. 938, 108 S.Ct. 1117 (1988) ................................... 44

*Wilkerson v. State*, 881 S.W.2d 321 (Tex. Crim. App. 1994)
    *cert denied*, 115 S.Ct. 671 (1994) ......................................................... 62

*Williams v. State*, 749 S.W.2d 183 (Tex. App. -- San Antonio 1988,
    pet. ref'd 1989) ................................................................................... 69

*Willingham v. State*, 897 S.W.2d 351 (Tex. Crim. App.)
    *cert. denied*, 116 S,Ct. 385, 133 L.Ed.2d 307 (1995) ............................. 71

## TABLE OF AUTHORITIES, continued

**Cases**                                                        **Page**

**Statutes and Rules**

28 U.S.C. § 2254 ...................................................... 54

U.S CONST. AMEND. V ............................................... 31,40,41,43

U.S. CONST. AMEND VI ............................................. PASSIM

U.S. CONST. AMEND. VIII ........................................... 72

U.S. CONST. AMEND XIV ........................................... PASSIM

TEX. CODE CRIM. PROC. ANN. ART. 215 ..................... 65

TEX. CODE CRIM. PROC. ANN ART. 14.03(A)(1) (VERNON 1977) ........................... 64

TEX. CODE CRIM. PROC. ANN. ART. 14.04 ................... 65

TEX. CODE CRIM PROC ANN ART. 15.17 ..................... 32

TEX. CODE CRIM. PROC. ART. 35.16(B)(3) VERNON 1993) ................................. 20,25

TEX. CODE CRIM. PROC. ANN. ART. 37.071 ................. 2,70

TEX. CODE CRIM. PROC. ANN. ART. 37.09 ................... 67

TEX. CODE CRIM. PROC. ART. 38.22 ........................... PASSIM

TEX. CODE CRIM. PROC. ART. 38.23 ........................... PASSIM

TEX. PENAL CODE ANN § 19.03 ................................. 72

TEX. PENAL CODE ANN. § 22.02 ................................ 67

TEXAS RULES OF CRIMINAL EVIDENCE, RULE 401 ...... 55

TEXAS RULES OF CRIMINAL EVIDENCE, RULE 402 ...... 55

TEXAS RULES OF CRIMINAL EVIDENCE, RULE 403 ...... 28,29,30,31

TEXAS RULES OF APPELLATE PROCEDURE, RULE 52(a) ............................. 24,52,61

TEXAS RULES OF APPELLATE PROCEDURE 74 (F) ....... 46,61

TEXAS RULES OF APPELLATE PROCEDURE 81(B)(2) ..... PASSIM

# TABLE OF AUTHORITIES, CONTINUED

**MISCELLANEOUS**                                                           **Page**

RULE 202 OF THE SOUTH DAKOTA RULES OF CRIMINAL EVIDENCE   ...................   58

# IN THE COURT OF CRIMINAL APPEALS
# OF THE STATE OF TEXAS

### No. 72,102

| | | |
|---|---|---|
| *BILLY JOE WARDLOW* | § | APPELLANT |
| | § | |
| *V.* | § | |
| | § | |
| *THE STATE OF TEXAS* | § | APPELLEE |
| | § | |

## APPEAL FROM THE 76TH JUDICIAL DISTRICT COURT
## OF TITUS COUNTY, TEXAS
## CAUSE NO. 12,764

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*
## STATE'S BRIEF
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
\*\*\*\*

## TO THE HONORABLE COURT OF CRIMINAL APPEALS:

Now comes the State of Texas, by and through the Attorney General of Texas, and files this brief for the State in this cause wherein appellant was found guilty of the offense of capital murder and sentenced to death.

## STATEMENT OF THE CASE

### A.    *Course of Proceedings and Disposition Below*

Appellant Billy Joe Wardlow ("Wardlow") was indicted in the 276th Judicial District Court of Morris County, Texas, for the capital murder of Carl Cole while in the course of committing and attempting to commit robbery. 2 Tr 62.[1] Prior to trial, venue was changed from Morris County to Titus County, Texas. 2 Tr 72. Wardlow pleaded not

---

[1] "Tr" refers to the transcript of papers filed with the court during the course of Wardlow's trial, preceded by volume number and followed by page numbers. "R" refers to the record of transcribed trial proceedings, preceded by volume number and followed by page numbers. "SX" refers to the numbered trial exhibits offered by the state and admitted as evidence at Wardlow's trial.

guilty, and on February 8, 1995, the jury found him guilty of the capital offense.  2 Tr 155.  On February 11, 1995, after a separate punishment hearing, the jury answered the two statutory special issues submitted pursuant to Texas Code of Criminal Procedure Article 37.071 "yes" and "no" respectively.  2 Tr 162-163.  Accordingly, punishment was assessed at death.  The trial court entered the formal judgment of conviction and sentence. 2 Tr 165-168.  Appeal to this Court is automatic.

**B.    Statement of Facts**

### 1.    Guilt-Innocence Phase

In the late afternoon of June 14, 1993, Charles Cole arrived at the home of his 82-year-old father Carl Cole in Cason, Texas.  33 R 90.  He observed that his father's 1993 Chevrolet four-wheel-drive pickup was gone and noticed some blood on the steps in front of the door.  *Id.* at 93.  Thinking that his father had injured himself and had gone for help, Charles tried to use the phone to call hospitals.  *Id.* at 93-95.  However, after discovering that the phone had been disconnected, Charles became alarmed and called Morris County Sheriff Ricky Blackburn from a neighbor's house.  *Id.* at 95.  Upon returning to his father's house, Charles found his father's blue jeans, shirt, and boots laid out on a rocking chair in his bedroom.  *Id.* at 96.  The house appeared undisturbed, but Carl Cole, his billfold, and the keys to his pickup were nowhere to be found.  *Id.* at 97.

Sheriff Ricky Blackburn arrived at Carl Cole's home shortly thereafter.  33 R 112-113.  He discovered a pair of glasses broken in two, a partial set of dentures, and a small amount of blood in the carport near the door.  *Id.* at 113.  Authorities also discovered that Cole's phone lines had been disconnected from outside the house.  34 R 177-178.  At that point, Blackburn initiated a full-scale investigation into Carl Cole's whereabouts.  33 R 130.  Law enforcement officers combed the surrounding area searching for any sign of Carl Cole or his pickup, the registration number of which had been run on the National Crime Information Center.  *Id.* at 131; 34 R 181.  Finally, at about midnight, Deputy Sheriff Bill Barnard discovered several items that appeared to have been dumped from Carl Cole's truck -- his checkbook, some farm tools, and an adding machine -- at a

turnaround on a small backroad in nearby Titus County. 34 R 182, 186. But there was still no sign of Carl Cole or his pickup.

In the pre-dawn hours of June 15, after an all-night search of the surrounding area, game warden Billy Dodd and state trooper David McFarland accompanied Charles Cole back to his father's house where the three conducted a thorough, room-by-room search. 33 R 103; 34 R 216-217. They scoured Carl Cole's bedroom in the darkness, looking behind doors and under the bed with a flashlight. 33 R 103; 34 R 218. Charles Cole opened his father's closet and Dodd shone the flashlight in. 33 R 103; 34 R 219. There in the closet stood the body of Carl Cole, a bullet hole between his eyes. 34 R 219.

Dodd immediately closed the closet door and ushered Charles out of the room. 33 R 104; 34 R 219. He then returned to check the body. 34 R 219. Carl Cole's face was swollen and there was a prominent wound between his eyes at the bridge of his nose. *Id.* at 221. He had on a pajama top and undershorts and was wrapped in a bedspread. *Id.* Dodd could not detect a pulse, and he noted that Cole's arm was cold and stiff. *Id.* at 220. The body was removed from the closet and transported to Dallas County for an autopsy. *Id.* at 226; 33 R 139.

Medical examiner Dr. Jeffrey J. Barnard determined that Cole died as the result of a single gunshot wound to the head. 33 R 146. The bullet, which Barnard recovered from Cole's body during the autopsy, entered between his eyes directly above his nose, traveled through the nasal bone, the mouth, and the spinal cord, and finally lodged in the lower portion of the cervical vertebra. *Id.* at 145. There were also abrasions and contusions on Cole's back, which Barnard testified were consistent with drag marks, and a laceration on the back of Cole's head, which Barnard stated could have been caused either by Cole falling backward or being struck from behind. *Id.* at 152. Barnard testified that the absence of any identifiable residue on the entrance wound indicated that the gun had been fired from a distance of three feet or more. *Id.* at 146. He testified further that the path of the bullet indicated the bullet had traveled basically downward, but that he could not conclude from this whether Cole had been standing, kneeling, sitting, or lying

when he was shot. *Id.* at 149-150, 155.

On June 15, 1993, Linda Wardlow, the defendant's mother, informed Sheriff Blackburn that the previous morning she had noticed a Llama .45 semi-automatic pistol was missing from her home. 34 R 355-356. She gave Blackburn the serial number of the gun and some ammunition she had used in the gun. *Id.* She also stated that Wardlow and his girlfriend Tonya Fulfer had been staying at her house for a few days, but that she had not seen them since late on the evening of June 13. *Id.* at 362. Will Emery, Wardlow's neighbor, told authorities that on the evening of June 13, 1993, Wardlow and Fulfer had come to his house and Wardlow had shown Emery a blue steel .45 pistol with wooden handles. *Id.* at 247-252.

Dorothy Smith, live-in caregiver for Carl Cole's 86-year-old sister Waldine Henderson, testified that she had seen a young couple matching the description of Wardlow and Fulfer near Cole's house at about 6:30 a.m. on June 14, 1993.[2] 34 R 264-266. Smith watched the couple from a window as they stood talking directly in front of Henderson's house. *Id.* at 266, 294. She saw them walk down the road toward Cole's house, which was down the street from Henderson's house, and stop at a van parked in the driveway of Cole's next-door neighbor. *Id.* at 267, 295-299. As the couple stood looking inside the back of the van, Smith saw a gun with brown handles in the man's back pocket. *Id.* at 267-268, 300. The man then walked under Cole's carport out of Smith's sight, and the woman followed. *Id.* at 320. A minute or two later, Smith heard a gunshot and saw the woman run out from under the carport, stop quickly, and bend

---

[2] Smith's in-court identification of Wardlow was admittedly less than certain. In response to the prosecutor's question, "Do you see him in the courtroom today?" Smith replied, "I believe so. . . . I think that's him over there. . . . It looks like him. . . . I didn't see him in the face good." 34 R 269-270. Smith maintained nonetheless that the man she had seen "walked like a Wardlow," and while she could not say for sure that the man was Wardlow, she believed that he was. *Id.* at 308, 276-278. Regardless of the vacillation of Smith's identification, Wardlow admitted in both his statement to police and his testimony during the guilt-innocence phase of trial that he had gone to Carl Cole's home on the morning of June 14, 1993, intending to rob him.

over. *Id.* at 324, 326. Smith thought the man had shot a snake behind Cole's house, and she returned to her housework unconcerned. *Id.* at 326, 332. About five minutes later, Smith returned to the window just in time to see Cole's pickup back out of the carport and drive away at a slow rate of speed. *Id.* at 326-327. Smith assumed that Cole was driving, but she could not see through the tinted windows of the pickup. *Id.* at 328-329, 340.

On June 15, 1993, Jerry Wagner, part owner of a used car dealership in Norfolk, Nebraska, finalized a deal with a young couple fitting the description of Wardlow and Fulfer. 35 R 449-450. The couple drove off the lot in a black 1987 Ford Mustang convertible with $8,000 cash, the car and the cash received in exchange for what was later determined to be Cole's 1993 Chevrolet pickup. *Id.* at 449, 451, 454.

Then on the evening of June 16, 1993, a patrolman in Madison, South Dakota, apprehended Wardlow and Fulfer and took them into custody after receiving a teletype advising that a Texas warrant had issued for their arrest on charges of capital murder. 35 R 471-472. A Llama .45 semi-automatic pistol was found under the passenger seat of the car and seized pursuant to an inventory search. *Id.* at 473, 481. Firearms examiner Raymond Cooper confirmed that the bullet recovered from Cole's body was, in fact, fired from this gun, which was admitted into evidence at trial. 34 R 377; SX 23. Blackburn, Dodd, and McFarland transported Wardlow back to Texas on June 22 and 23, 1993, and Wardlow was immediately incarcerated in the Morris County jail. 35 R 488-489.

On February 28, 1994, Wardlow wrote Sheriff Blackburn a letter, delivered through the jail's in-house mail system, in which Wardlow confessed to the robbery and shooting of Carl Cole. It read in pertinent part:

> Ricky,
> I told you I would give you a statement, so here is what happened on June 14, 1993. The night before I was at the neighbor's house me and my girlfriend, and we were watching a movie. I already had in my possession the Llama .45 Automatic that was used for the shooting. I showed the gun to my neighbor William Emery, who examined it and complemented me on it. At about 11:30 p.m. on 06/13/93 I left with my girlfriend to go and

check out the place and see if anyone was up. There were no lights on and not a sound to be heard. I reached the porch and undid the phone line, so that no one could call the police. I knocked on the door and there was no answer. I then decided to go back home after two other tries later that day and early the next morning. The intention was to get him to let me use the phone and once inside, I would rob him. I had stolen trucks before, but this time I had no money. When we got home I set the alarm for 5:00 a.m. so I could go and get the job done. My girlfriend followed me to my neighbor's house and there she stayed until I came back with the truck. It was actually about 6:05 a.m. when I left the house. I got there and still no one was up. I knocked on the door and there was no answer. I went up the road and waited at the house that had recently burned down and when his light came on I went back. I knocked on the door, and he answered. I told him my car was broke down, and wanted to know if I could use the phone so I could call my friend. He reached inside the door and picked up a cordless phone and handed it to me. It didn't work because the lines were disconnected. He set the phone down on the table and started to close the door. I then caught the door and ask if he had another phone and that that phone's batteries might be dead. He said no and persisted to close the door and then is when I drew out the .45 from in my pants. And as I brought it out, I corked [sic] a shell into the chamber. I raised it up and told him to walk inside the house. He ran at the door for me and screamed when he caught my arm. Being younger and stronger, I pushed him off and shot him right between the eyes. Just because he pissed me off. He was shot like an executioner would have done it. He fell to the ground lifeless and didn't even wiggle a hair. I proceeded inside found his jeans and removed all money and keys from it since I didn't know which keys were to the truck. I then thought of putting the body in the truck and hauling it off in the woods, but decided I didn't have any time to waste, since a .45 shot that early in the morning was abound to draw some attention. I went to the bedroom and grabbed the blanket, went outside and wrapped up the body. I picked up the body and went back into the bedroom. There I put him in the closet and shut the door thinking it would be some time before he would be found. I proceeded out of the house not even thinking of fingerprints. I got the truck which already had keys in it and left. I headed out toward 144 S. then onto 11. There I went toward Pittsburg and turned off on the road where the corner is right before you get to the bridge SE 35A. At the corner that goes to the creek I went down the trail in the truck and unloaded anything that wasn't paperwork for the truck. I then left going out the other way ending up on SE 35 then onto 144 N. I then turned up on the back roads to my neighbors house which is on the blacktop by my house. Here

I parked and got my girlfriend and we walked over to the house and got our things which were already packed and in the back of my pickup. Carried them to the truck and left by way of 144 N. to 49 and then to Mt. Pleasant. I gassed up with the 47 dollars I found in the wallet which I kept. Then I stopped at the store right by the interstate and got a Coke. I then thoroughly searched the wallet and found $100 bill and then threw it in the dumpster. We then proceeded to an destination along the way I told her the above things just as they happened and told her she didn't have to go if she didn't want to, but I assured her I wouldn't be caught.

The letter was admitted as evidence at Wardlow's trial and was read into the record in the jury's presence. 35 R 524-527; SX 73.

Wardlow took the stand on his own behalf at the guilt-innocence phase of trial to testify regarding the circumstances under which he wrote the letter confessing to the crime. 37 R 636-643. He also testified regarding the facts of the offense, and his trial testimony conformed for the most part with the facts as set forth in the letter. *Id.* at 644-657. Wardlow told the jury that, contrary to the letter, Fulfer did accompany him to Carl Cole's home. *Id.* at 643. He also stated that he did not intend to kill Cole when he went to his home. *Id.* at 644. They only intended to rob him and take his truck. *Id.* However, when Wardlow brought out the gun and told Cole to go back into the house, Cole lunged at Wardlow and grabbed his arm and the gun, attempting to push Wardlow away. *Id.* at 648-651. Wardlow testified that Cole was stronger than he expected him to be, and Wardlow was caught off balance and began to fall backwards.[3] *Id.* at 648, 652. Wardlow claimed he shot the gun, without aiming, hoping it would get the victim off of him. *Id.* at 648, 651, 653, 664. Wardlow shot Cole right between the eyes. *Id.* at 648.

Wardlow told the jury that he had been planning to rob Cole for less than a week, but that he had been planning to travel to Montana for some time; he and Fulfer were on their way to Montana when they were apprehended in South Dakota. 37 R 656-657, 670.

---

[3]  Testimony at trial revealed that Carl Cole, while strong and active for an 82-year-old man, stood five feet, seven inches tall and weighed about 145 pounds. 33 R 106-107. Wardlow stands well over six feet tall. 34 R 311; 35 R 450.

He admitted that he and Fulfer had discussed the danger of leaving a witness to their crime,[4] but that they had decided to incapacitate Cole by either kidnapping him and dumping him in some remote area or leaving him tied up so he could not contact the authorities.[5] *Id.* at 676-677. Wardlow also acknowledged that, before their arrest, he and Fulfer bought several personal items with the cash they received from the sale of Cole's pickup. *Id.* at 683-688.

### 2. Punishment Phase
#### State's Evidence

Morris County deputy Bill Barnard testified that while on patrol on January 11, 1993, he observed Wardlow driving at a high rate of speed and attempted to pull him over. 39 R 19. Wardlow refused to pull over, and Barnard was forced to pursue him. *Id.* at 20. Barnard followed Wardlow for several miles with his lights on, but Wardlow continued traveling at dangerous speeds in excess of 100 miles per hour on the highway and 70 miles per hour on a narrow county road. *Id.* at 20-21, 27-28. Finally, Wardlow pulled over, and Barnard placed him under arrest for fleeing. *Id.* at 28-30.

John Schultz, a salesman at a used car lot in Fort Worth, testified that on June 5, 1993, Wardlow, accompanied by a woman, took a 1989 Chevrolet pickup for a test drive and never brought it back. 39 R 31-34.

Morris County jailer J. P. Cobb testified that on February 20, 1994, while Wardlow

---

[4] This discussion apparently took place when the couple discovered, before knocking on Cole's door, that there was a set of keys to Cole's pickup on the dashboard of the pickup. 37 R 646. Thus, according to Wardlow's testimony, at that point they realized they could either take the pickup without having to confront Cole and risk him informing the authorities of the crime as soon as he awoke, or they could confront Cole, rob him, and "incapacitate" him by either kidnapping him or tying him up.

[5] When asked by the prosecutor why, if he intended to tie up Cole, he failed to bring any rope with him, Wardlow responded that he planned to use a telephone cord or anything else he might find in the victim's home. 37 R 678-680. It is also significant to note that evidence was presented at trial indicating that Carl Cole knew Wardlow and would likely have been able to identify him as the perpetrator if he had had the opportunity to do so. 33 R 102, 108; 34 R 363. Wardlow, no doubt, was fully aware of this fact. 37 R 689.

was incarcerated in the Morris County jail awaiting trial for the instant offense, jailers found a two-foot metal bar with a six- or eight-inch rod extending from the middle of it behind Wardlow's bunk in the cell he shared with three other inmates. 39 R 141-142. One of Wardlow's former cellmates testified that Wardlow had planned to use the metal bar to hit one of the jailers in the head then take his keys and escape. *Id.* at 145-147.

The state also offered into evidence several letters Wardlow wrote to Sheriff Ricky Blackburn and jailer Patsy Martin while he was incarcerated in Morris County jail awaiting trial. In these letters, Wardlow threatened to harm other inmates, jailers, and the sheriff. 39 R 173-176; SX 82-86.

Deputy sheriff Warren Minor testified that, while being transported from the Titus County jail to the courtroom on the morning of the second day of his trial, Wardlow stated the jail was using trustees as guards and "if they don't stop using them I am going to double my time on one of them." 39 R 177-178.

Harry Washington, an undercover narcotics agent, testified that on September 9, 1992, he and an informant approached Wardlow attempting to buy some marijuana from him. 40 R 208-209. Wardlow, who was seated in his pickup, told Washington that he did not mess with drugs. *Id.* at 209. Washington then observed a .45 handgun lying on the seat next to Wardlow. *Id.* at 210. Washington asked Wardlow why he had a gun, and Wardlow laid his hand on top of the gun and said to Washington, "I'll shoot you with it." *Id.*

Royce Smithey, an investigator with the unit that prosecutes felony offenses occurring within the Texas prison system, testified regarding the different levels of security within the prison system. 40 R 215-216, 220. He told the jury that while capital murder defendants who receive a death sentence are segregated from the general population and are strictly monitored and have limited access to prison employees, capital murder defendants who receive a life sentence go into the general population and are initially classified no differently than any other felony offender. *Id.* at 221-222, 225-227. Smithey testified further that violent crimes, which sometimes involve prison employees,

occur fairly often within the Texas prison system, and that the incidence of such crime is much greater in the general population than on death row. *Id.* at 222-227.

### Defense Evidence

Amy Billingslea, Wardlow's former church youth minister, testified that she had known Wardlow since he was a baby and had worked with him when he became involved in the church youth group as a teenager. 40 R 260-261. She described Wardlow as quiet, well mannered, hard working, bright, and respectful. *Id.* at 262-263. He played on the church basketball team and participated in church fundraisers. *Id.* at 261. Although Wardlow attended church regularly during his early teens, he had quit attending several years before the instant offense occurred. *Id.* at 262, 265.

Glendon Gillean, a librarian at Daingerfield High School, testified that as a student there, Wardlow had often come to the library before school and during lunch to work on educational computer programs and had volunteered to help pack and move books when the library was relocated. 40 R 267-269. Wardlow regularly checked out books on topics such as mechanics, technology, and aeronautics. *Id.* at 269. Wardlow never created a disciplinary problem for Gillean. *Id.* at 270. Assistant principal Gerald Singleton testified that Wardlow had attended school regularly and had never had any disciplinary procedures lodged against him. *Id.* at 271-272. But Wardlow had quit school before completing his junior year. *Id.* at 273.

### STATE'S REPLY TO POINT OF ERROR ONE

THE PROSECUTION'S PEREMPTORY STRIKE OF VENIRE MEMBER NELL OWSLEY DID NOT VIOLATE THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION.

In his first point of error, Wardlow contends the state exercised a peremptory challenge against venire member Nell Owsley on the impermissible basis of sex, in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69

(1986).

## A.    Statement of Underlying Facts

After venire member Owsley qualified as a juror in Wardlow's case, the state exercised its fourth peremptory challenge to remove Owsley from the panel. 22 R 164. Wardlow timely objected to the state's use of a peremptory challenge against Owsley, claiming that the challenge was impermissibly based on Owsley's age and sex. *Id*. at 165. Wardlow pointed to the fact that, of the state's first three peremptory challenges, all were exercised to remove women over the age of 50. *Id.* The trial court then invited the prosecutor to set forth his gender- and age-neutral reasons for exercising a peremptory challenge on Owsley. *Id.* at 166. The prosecutor stated:

> My reason for striking Ms. Owsley was I felt she was indecisive in a lot of her answers, she was particularly indecisive in saying that she could find the defendant beyond a reasonable doubt, she tended to want to go toward "beyond a shadow of a doubt" and mainly my reason for striking her was her overall testimony with us. She was very indecisive on several issues, seemed to be unable to make up her mind, seemed to be very nervous about the possibility as serving as a juror, more so than your average juror.

*Id.* at 166. The trial court concluded, "I do recall the other three jurors, I do recall Ms. Owsley and I do believe that the State had some reasons independent of her sex and age to strike her so I'm going to overrule the Batson challenge." *Id.*

## B.    Argument and Authorities

In *Batson v. Kentucky*, the United States Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits a prosecutor from using peremptory challenges against venire members based solely on their race. 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The Court extended *Batson* to prohibit challenges based solely on gender in *J.E.B. v. Alabama*, 511 U.S. 127, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994). Under *Batson*, the ultimate burden of persuading the court that the state's peremptory challenges are attributable to a discriminatory purpose lies with and never shifts from the defendant. 476 U.S. at 94 n.18, 106 S.Ct. at 1721 n.18, *citing Texas Dept.*

*Of Community Affairs v. Burdine*, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981). The Supreme Court has set out a three-step process for evaluating claims that a prosecutor's use of peremptory challenges has violated equal protection. *Batson*, 476 U.S. at 96-98, 106 S.Ct. at 1723-24. First, the defendant must make a prima facie showing that the prosecutor has exercised peremptory challenges on the basis of race. *Id*. at 96-97, 106 S.Ct. at 1723. Second, if the requisite showing has been made, the burden shifts to the prosecutor to provide a race-neutral explanation for striking the juror in question. *Id*. at 97-98, 106 S.Ct. at 1723-24. Third, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. *Id*. at 98, 106 S.Ct. at 1724. This same test was applied in *J.E.B.* as well, only substituting the word "gender" for the word "race."

Where, as here, the state comes forward with gender-neutral explanations for the use of the peremptory challenges claimed to have been gender motivated and the trial court has made a ruling as to whether they were gender motivated, the requirement of a prima facie showing of gender discrimination no longer applies. *Hernandez v. New York*, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d395 (1991). To satisfy the second part of the three-step analysis, the prosecutor need only give an explanation based on something other than race. *Id*. at 359, 111 S.Ct. at 1866. "Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed [gender] neutral." *Id*. Moreover, the reason offered need not rise to the level of a challenge for cause. *Batson*, 476 U.S. at 97, 106 S.Ct. at 1723.

After the prosecutor has given gender-neutral reasons for his exercise of peremptory challenges, "[t]he trial court then [has] the duty to determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. This third step requires the trial court to determine whether the accused has proved by a preponderance of the evidence that the prosecutor's gender-neutral reasons are in fact a sham offered to cover the unconstitutional use of a peremptory strike. *Salazar v. State*, 818 S.W.2d 405, 409 (Tex. Crim. App. 1991); *Calderon v. State*, 847 S.W.2d 377, 382

(Tex. App.--El Paso 1993, pet. ref'd). The focus of the inquiry is upon the intent of the prosecutor in exercising his peremptory challenges.

> [O]fficial action will not be held unconstitutional solely because it results in a [] disproportionate impact. . . . Proof of [] discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. . . . "Discriminatory purpose" . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected . . . a particular course of action at least in part "because of," not merely "in spite of," its adverse effect upon an identifiable group.

*Hernandez*, 500 U.S. at 359-360, 111 S.Ct. at 1866 (quotations and citations omitted).

As the critical issue in establishing discrimination is the intent of the prosecutor in making his peremptory challenges, the credibility of the prosecutor will be the deciding factor. *Batson*, 476 U.S. at 98 n.21, 106 S.Ct. at 1724 n.21. *See also Hernandez*, 500 U.S. at 367, 111 S.Ct. at 1870 ("The credibility of the prosecutor's explanations goes to the heart of the equal protection analysis, and once that has been settled there seems nothing left to review."). The trial court is obviously in the best position to make this determination, as the "evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within the trial judge's province.'" *Hernandez*, 500 U.S. at 365, 111 S.Ct. at 1869, *quoting Wainwright v. Witt*, 469 U.S. 412, 428, 105 S.Ct. 844, 854, 83 L.Ed.2d 841 (1985). *See also Yarbough v. State*, 732 S.W.2d 86, 89 (Tex. App.-- Dallas 1987) ("Factors pertinent to credibility -- voice inflections, hesitancy, facial expressions, and demeanor of both counsel and prospective jurors -- may supply the basis for determining whether to infer unlawful discrimination by the State. The trial judge is accustomed to weighing such factors and is in a unique position to do so."), *j'ment vacated on other grounds*, 761 S.W.2d 17 (Tex. Crim. App. 1988); *Pierce v. State*, 777 S.W.2d 399 (Tex. Crim. App. 1989), *cert. denied*, 496 U.S. 912, 110 S.Ct. 2603, 110 L.Ed.2d 283 (1990); *Holt v. State*, 912 S.W.2d 294, 299 (Tex. App.--San Antonio 1995, pet. ref'd 1996).

Thus, under Texas law, a trial court's decision on a *Batson* challenge is reviewed

under the "clearly erroneous" standard. *Whitsey v. State*, 796 S.W.2d 707, 713-14 (Tex. Crim. App. 1989). The trial court's determination is upheld unless, after reviewing the record, the appellate court is "left with the 'definite and firm conviction that a mistake has been committed.'" *Hill v. State*, 827 S.W.2d 860, 865 (Tex. Crim. App.), *cert. denied*, 506 U.S. 905, 113 S.Ct. 297, 121 L.Ed.2d 221 (1992), *quoting United States v. Fernandez*, 887 F.2d 564 (5th Cir. 1989). Because the trial judge in the instant case had the opportunity to observe the demeanor of both venire member Owsley and the prosecutor, this Court should defer to the trial court "if there is any adequate basis in the record to support its decision." *Wolfe v. State*, 917 S.W.2d 270, 276 (Tex. Crim. App. 1996).

Contrary to Wardlow's assertions, the record of the voir dire examination of venire member Owsley fully supports the gender-neutral reasons offered by the prosecutor for exercising a peremptory strike to remove Owsley. The prosecutor stated that Owsley was indecisive on several issues, particularly on the meaning of "reasonable doubt." During her examination by the state, Owsley stated the standard of proof in terms of proof "without a shadow of a doubt" and "[b]eyond a shadow of a doubt." 19 R 11, 37, 51. During defense counsel's examination of Owsley, the following exchange occurred:

Q:   [Defense counsel] Now, you said twice this morning or maybe three times that "It would have to be proven to you beyond a shadow of a doubt before you could render a verdict of guilty in a capital case" and that is sentence -- reach a verdict that resulted in the death sentence?

A:   [Owsley] I believe. Yes.

Q:   Okay.

A:   Because --

Q:   Let me ask you something.

A:   Okay.

Q:    Does your -- do your words "beyond a shadow of a doubt" require a greater burden of proof that is defined as "beyond a reasonable doubt?"

A:    Well, I think -- I don't think that -- I don't think that -- I think this could make me have some questions.

Q:    Okay. I don't understand. When you say "this" you are talking about the definition of "reasonable doubt"?

A:    This say, the last sentence, "the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs."

Q:    Okay. Is that a greater or lesser burden of proof than your quote beyond a shadow of a doubt?

A:    I don't know.

Q:    In those three or four paragraphs you are saying that the operative word in there or the words that you come back to "act upon without hesitation in the most important of your own affairs?"

A:    Yes.

Q:    As to whether or not somebody committed the crime of capital murder, would you require more proof than proof that would be the same type that you rely on, act upon without hesitation in the most important of your own affairs?

A:    Well, I -- this is something that -- that you really can't give a concrete answer to I don't think.

*    *    *

Q:    And I'm not -- and what my question really is; can you render a verdict in this case on the definition of "reasonable doubt" that is given you or are you going to require less than that or more than that?

A:    Well, I just feel like I might have to have more.

19 R 51-54.  After an off-the-record discussion among the trial judge and both attorneys
outside Owsley's presence, the trial judge attempted to explain the standard to Owsley.
*Id.* at 54-57.  After this rather lengthy explanation, the following exchange occurred:

A:   [Owsley] I think I understand.  Right now I think I could apply this.

Q:   {Trial court] Here's where I am going to stop you and say I need
     more than "think", I need "Yes I can" or "No I can't."
     It doesn't get easy, does it?

A:   No.  It doesn't, it really doesn't.

Q:   Can you follow the instructions and not require more of the State or
     would you require more of the State?

                    *     *     *

A:   Well, I would keep an open mind.  I believe that I could.

Q:   And would you accept that definition and make the State prove
     beyond a reasonable doubt to you all of the elements of this offense
     before you would find the person guilty?

A:   I would.

19 R 57-59.  But after further explanation of the application of the "reasonable doubt"
standard at the punishment phase, the examination continued as follows:

A:   [Owsley] Well, I think that still is real hard to answer until you get
     there.  I don't think when I got in the jury room if I didn't feel
     comfortable one way or the other that I could just be swayed.

Q:   [Trial court] You are doing fine, you are doing fine.  You would not
     have to be an eyewitness in order to find somebody guilty of a crime,
     would you?  You wouldn't have had to have been there and to see
     it?

A:   No.  If I felt like the evidence -- if I was satisfied with the evidence
     that was presented.

Q:    And would you have to be convinced beyond all doubt that a person
      would be a continuing danger before you could answer that question
      "Yes" or would you be satisfied with the burden of proof that has
      been established by our courts?

A:    I think I could go by this.

Q:    You "think" or you "will"?  See, you will take an oath to follow the
      law and that's the law.

A:    I will.

19 R 62-63.  Then, defense counsel resumed examination of Owsley and the following
exchange took place:

Q:    [Defense counsel] Okay.  Could you find him not guilty if the State
      didn't quite live up to that burden of proof?  You would hesitate a
      little bit?  It wouldn't be like making the decision to buy the house,
      it would be almost that -- do we have to prove anything?

A:    [Owsley] These are real hard questions.  I have never encountered
      anything like this before and I will be perfectly frank with you, it's
      really hard for me to give a concrete answer.

                      *      *      *

Q:    We have never been in this position and for obvious reasons have not
      and I know -- we are not trying to embarrass you.

A:    I know you are not and I know that you all are doing exactly what
      you have to but at the same time it's not easy for me to sit up here
      and give you a "Yes" or "No" answer to everything that's asked.
      I left this morning after Counselor Townsend [the prosecutor] had
      questioned me and I got to thinking, you know, I said "Yes" to some
      of those things and I got to thinking, you know, do I really -- there's
      mixed emotions about this and I think anyone that would sit up here,
      if they didn't have mixed emotions must be something wrong with
      them.

19 R 64-66.  It is clear from the record that Owsley was very uncertain about her ability
to follow the law on certain issues.  19 R 13 ("I believe that I could [follow the law],"),

24 ("Well, I think I could [follow the law].").

The prosecutor also pointed to the fact that venire member Owsley "seemed to be very nervous about the possibility as serving as a juror, more so than your average juror." 22 R 166. This gender-neutral reason is certainly borne out by the record. In addition to the instances of apprehensiveness apparent in the record passages cited above, the record reveals that Owsley was very uncomfortable with the prospect of serving as a juror in this case.

> A:    [Owsley] Just let me say this; this has been a traumatic summer for me, I was the one that hit the little Hispanic boy on South Jefferson, you know.
>
> Q:    [Prosecutor] When did that happen?
>
> A:    That happened the 14th day of July. And of course when the accident happened I though I had killed the child. There wasn't anything I could have done to prevent it because he ran out in front of the car.
>
> Q:    Yes.
>
> A:    And I did everything I could. Fortunately, it just fractured his skull but he did have to be air lifted to Parkland and was over there. And when he came home we had to go through therapy so, you know, when I looked at that child and saw that I, you know, could have killed that child my mental -- this summer -- and then I lost my mother the 25th of August after being in the nursing home for six years. And it's really been a traumatic year and I just really feel that I am under -- I am taking medication and I, you know, I just really don't know if you people would want a juror like me or not.

19 R 14-15. Further along, during defense counsel's examination of Owsley, the following occurred:

> Q:    [Defense counsel] You said that you had been on one civil jury?
>
> A:    [Owsley] Yes.
>
> Q:    Do you remember the name of that case?

A:  I has been so long ago.

Q:  What kind was it?  An automobile accident case, a contract case?

A:  I don't really remember but we gave a five year probated sentence, that's what I recall on that.

Q:  Okay.  It was a criminal case then?

A:  No.  What did you say?

Q:  It was a criminal case?

A:  No.

Q:  I mean you gave -- someone was charged with a crime?

A:  Well, it was -- well, it was a criminal case I guess.  I think a "crime" is just "murder," okay?

Q:  Okay.

A:  Okay.  Like I say, I don't remember but the sentence was -- see, you all don't need me, I'm trying to tell you you all don't need me because I am dumb, you all.

Q:  [Trial court] Ma'am, I think you are doing just fine.

A:  You just don't know.

\*     \*     \*

A:  You are not going to keep me, you are going to let me go here in a minute because I'll tell you what, I got out the door -- let me tell you this, now, you all, this is how forgetful I am, you all need to let me go, I got out the door awhile ago and I went back and kissed my husband and I said, "Have I already kissed you?" He said, "Yes."

19 R 79-81.  Clearly, the prosecutor had gender-neutral reasons for wishing to strike venire member Owsley from the jury panel.  The trial court properly determined that

Wardlow failed to prove purposeful discrimination, and this Court is in no position to second-guess that determination. Wardlow's *Batson* claim is without merit and the point of error should be overruled.

## STATE'S REPLY TO POINT OF ERROR TWO

THE TRIAL COURT PROPERLY GRANTED THE STATE'S CHALLENGE FOR CAUSE OF VENIRE MEMBER SUZANNE CHARLTON.

Wardlow argues in his second point of error that his conviction should be reversed because the trial court erred in sustaining the state's challenge for cause against venire member Suzanne Charlton on the ground that she harbored a bias against some aspect of the law upon which the state was entitled to rely. TEX. CODE CRIM. APP. ANN. art. 35.16(b)(3) (Vernon 1993). Specifically, Charlton was challenged based on the fact that she would hold the state to a higher standard of proof than beyond a reasonable doubt.

A.    **Statement of Underlying Facts**

During the prosecutor's voir dire examination of venire member Charlton, the following exchange occurred:

Q:    [Prosecutor] The thing I need to know from you is assuming that we showed you evidence that was appropriate in your mind to give a defendant the death penalty could you personally vote that way?

A:    [Charlton] I would have to be absolutely sure before I could vote that way.

Q:    Absolutely sure of --

A:    If I was -- if there was no doubt that he was guilty I could vote that way but I mean I could not have any kind of a doubt in my mind.

Q:    Okay.

A:    Because that's serious -- that's serious.

STATE'S BRIEF - Billy Joe Wardlow                                                           20

Q:  When you say "no doubt", you mean no doubt as to guilt or innocence?

A:  Right.

* * *

Q:  As you probably know in a criminal case we are required to prove our case to you, the State is, beyond a reasonable doubt, on the other hand as you can see from that definition[6] beyond a reasonable doubt is not the same thing as "beyond all doubt," it's not "beyond any doubt," it's not "beyond a shadow of a doubt," it's "beyond a reasonable doubt."

* * *

Now, let me explain to you how the law of capital murder works; in a capital murder case the State is seeking the death penalty, the first determination the jury would make, "Is the defendant guilty or not guilty?" At that time they are not deciding whether the defendant should receive the death penalty or a life sentence, they are just deciding whether it should be guilty or not guilty. Okay. At that point you find the defendant guilty of capital murder if we proved our case to you beyond a reasonable doubt or would you require us to prove that case to you "beyond any doubt," I believe that's the way you said it?

A:  Oh, goodness, "Can I find him guilty if you proved your case beyond a reasonable doubt?"

Q:  "Beyond a reasonable doubt." And you have just read the definition of "reasonable doubt?"

A:  Yes.

Q:  As opposed to what you said a minute ago, "beyond all doubt" or

---

[6]  During the state's examination of Charlton, the prosecutor had Charlton read the definition of "reasonable doubt" as it was to be set forth in the charge in Wardlow's case. 29 R 15-16. The trial court defined "reasonable doubt," in conformity with this Court's directive in *Geesa v. State*, 820 S.W.2d 154 (Tex. Crim. App. 1991), as "the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs."

"beyond any doubt," would you hold us to a burden of "beyond any doubt" or "beyond all doubt" or would it be enough in your mind, in you mind if we proved the case to you beyond a reasonable doubt? And this is just as to guilt or innocence, that's not as to the guilt penalty.

A:   Yeah.  I understand.  I could probably -- I don't -- I think if it's beyond a reasonable doubt I could find a person guilty.

Q:   You could find them guilty?

A:   Yes.  If it was beyond a reasonable doubt.

                        *       *       *

Q:   Now, you get to the punishment part of the trial where you determine whether the appropriate punishment should be a life sentence or the death penalty.  Now, we have had jurors say this, and let me -- I think maybe this is what you are saying but let me ask you if this is what you were saying; we have had jurors say, "I could find a person guilty of capital murder using that standard of beyond a reasonable doubt, I wouldn't have to have beyond all doubt, just beyond a reasonable doubt, but when it comes to giving that same defendant the death penalty if I had any doubt at all, you know, if the case were proven to me beyond a reasonable doubt but not beyond all doubt --

A:   Yes.

Q:   -- I would have to go with a life sentence, I couldn't give him the death penalty unless that case was proven to me beyond any doubt or beyond all doubt."  Do you understand what I'm saying?

A:   Yes.

Q:   Is that the way you feel?

A:   Yes.  I agree.

Q:   Okay.  And so in order for you to find the defendant guilty of capital murder and then also assess the death penalty to that defendant we

would have to prove our case -- "we" being "the State" would have
to prove our case beyond any doubt whatever?

A:  Yes.

29 R 15-20. At that point, the prosecutor challenged Charlton for cause:

I would challenge her for cause in that she has stated that -- two or three
different times -- that she would require us to -- the burden of proof on us
that we are not required to hold that is in order to give the death penalty she
would have to find that he was guilty beyond any doubt and not only is that
a burden that we are not required to hold but it's an impossible burden.

*Id.* at 20-21. Before ruling on the state's challenge for cause, the trial court allowed
defense counsel to take Charlton on voir dire for the specific purpose of discussing
"beyond a reasonable doubt."

Q:  [Defense counsel] The law the Court in its charge, its instruction to
you will tell you that if you answer Special Issue #1 "No" then you
have in effect given a life sentence, if you answer Special Issue #1
"Yes" then you have taken the first step in giving the death penalty.
In order to give the death penalty you must then answer Special Issue
#2 and an answer of "No" to it results in the death penalty, to answer
"Yes" and "No" to the issues it results in the death penalty given.
That first question asks you to weigh the evidence beyond a
reasonable doubt, if there is a probability the defendant would
commit criminal acts of violence that would be a continuing threat
to society, knowing that a "Yes" answer to that could result in the
death penalty would you still require absolute proof or proof beyond
doubt that the answer to that question was "Yes" or would you
answer it by using the definition of "beyond a reasonable doubt"
meaning the same thing that you had used to find him guilty, would
you require more proof on that issue than on the innocence issue
simply because you know the "Yes" answer to that could result in a
death penalty?

A:  Yeah.  I believe I would.

Q:  You would?

A:  Yes.

Q:    [Trial court] "You would" what, ma'am?

A:    Require more proof.

Q:    [Defense counsel] Are you telling me that as to the definition that you were given of "reasonable doubt" as a legal definition -- in order to be a juror you don't have to agree with the law, you must have to be able to follow the law.

A:    Right.

Q:    And the standard of proof set for that definition is and you will -- you can require -- you would require more as to Special Issue #1 knowing it's going to result in the death penalty?

A:    Sure. Yes.

Q:    Pass the witness.

*Id.* at 23-25.

**B.    Argument and Authorities**

Wardlow failed to preserve error with regard to this claim. Rule 52 (a) of the Texas Rules of Appellate Procedure provides in part: "In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desires the court to make if the specific grounds were not apparent from the context." TEX. R. APP. P. 52(a). After defense counsel concluded his voir dire examination of venire member Charlton, the trial court addressed defense counsel: "What is the Defense's position? She gave the magic word to the State. I assume you have no objection to the Court sustaining the challenge?" Defense counsel responded, "Of course I object to it, Your Honor, but I don't know why." 29 R 25. This objection clearly was not sufficiently specific to apprise the trial court of the nature of the claim Wardlow now raises on appeal. Accordingly, Wardlow has failed to preserve this claim for review.

Alternatively, Wardlow's claim is without merit. The state may challenge for cause

any venire member who "has a bias or prejudice against any phase of the law upon which the State is entitled to rely for conviction or punishment." TEX. CODE CRIM. PROC. ANN. art. 35.16(b)(3) (Vernon 1993). One "phase of the law" upon which the state is entitled to rely is that the jury will not require a greater burden of proof than "beyond a reasonable doubt," and a venire member who states he would hold the state to such a burden is subject to challenge for cause. *Cook v. State*, 858 S.W.2d 467, 471 (Tex. Crim. App. 1993); *Butler v. State*, 872 S.W.2d 227, 235 (Tex. Crim. App. 1994), *cert. denied*, 115 S.Ct. 1115, 130 L.Ed.2d 1079 (1995). The trial court in the instant case ruled that venire member Charlton harbored such a bias against the law and, thus, properly sustained the state's challenge for cause on this basis.

While it is true that it is the burden of the party seeking exclusion of a prospective juror for cause to demonstrate that such exclusion is proper, on appeal, "great deference must be given to the trial court judge who is in the best position to see and hear the prospective jurors and to evaluate their responses." *Jacobs v. State*, 787 S.W.2d 397, 402 (Tex. Crim. App.), *cert. denied*, 498 U.S. 882, 111 S.Ct. 231, 112 L.Ed.2d 185 (1990). For this reason, this Court will reverse a trial court's ruling on a claim of juror bias "only when the record shows a clear abuse of discretion on the trial court's part." *Id. See also Callins v. State*, 780 S.W.2d 176, 194 (Tex. Crim. App. 1989), *cert. denied*, 497 U.S. 1011, 110 S.Ct. 3256, 111 L.Ed.2d 766 (1990); *Cantu v. State*, 842 S.W.2d 667, 683 (Tex. Crim. App. 1992) (Court will reverse such decision "only for clear abuse of discretion; i.e., only when the trial judge's decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree."), *cert. denied*, 509 U.S. 941, 114 S.Ct. 16, 125 L.Ed.2d 768 (1993).

When viewed in its entirety, with this standard of review in mind, Charlton's voir dire examination clearly indicates that she would require more proof than beyond a reasonable doubt to answer the special issues in such a way that the death penalty would be imposed. Charlton stated from the outset that she could not vote to impose the death penalty unless she was "absolutely sure" and had "no doubt" regarding the criminal

defendant's guilt. 29 R 15. Later, she stated she could "probably" find a criminal defendant guilty of capital murder if the state proved its case beyond a reasonable doubt, as that standard was defined by the trial court.[7] *Id.* at 18. However, she consistently maintained that she would require more than proof beyond a reasonable doubt -- that she would, in fact, require proof beyond all doubt -- to vote to impose the death penalty at the punishment phase.[8] *Id.* at 18-20, 24-25. Therefore, the trial court properly sustained the state's challenge for cause, and Wardlow's second point of error should be overruled.

Wardlow's reliance upon *Castillo v. State*, 913 S.W.2d 529 (Tex. Crim. App. 1995) (en banc), and *Garrett v. State*, 851 S.W.2d 853 (Tex. Crim. App. 1993), is misplaced. These cases are clearly distinguishable from the instant case. In *Garrett*, the venire member at issue had indicated that he could never find a capital defendant would constitute a continuing threat to society beyond a reasonable doubt based only on the facts of the instant offense. *Garrett*, 851 S.W.2d at 857-859. The venire member in *Castillo* had categorically refused to render a guilty verdict on the basis of a single eyewitness, stating, "No way I could find guilty with just one officer. There would be reasonable doubt. Be automatic." *Castillo*, 913 S.W.2d at 530-531. This Court held in these cases that the trial courts had improperly sustained the state's challenges for cause based on alleged bias against the law. *Garrett, id.* at 859; *Castillo, id.* at 533. According to the Court, the jurors' refusal to find sufficient certain types of evidence could merely reflect those particular jurors' understanding of proof beyond a reasonable doubt -- that such

---

[7] *See* Note 6, *supra.*

[8] At the very least, Charlton could be described as a "vacillating venireman." When a venire member offers contradictory responses to questions on voir dire, and both sides offer the relevant testimony to support their position, the conflicting testimony and interpretations result in what is known as a vacillating venireman. In such cases, it is well established that this Court must defer to the findings of the trial court. *Adanandus v. State*, 866 S.W.2d 210, 222 (Tex. Crim. App. 1993), *cert. denied*, 510 U.S. 1215, 114 S.Ct. 1338, 127 L.Ed.2d 686 (1994); *Green v. State*, 840 S.W.2d 394, 405 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 1020, 113 S.Ct. 1819, 123 L.Ed.2d 449 (1993); *Brown v. State*, 913 S.W.2d 577, 580 (Tex. Crim. App. 1996).

evidence was insufficient on its own to remove reasonable doubt in their minds -- and did not necessarily indicate that those jurors had actually increased the state's burden of proof. *Id.* Such a venire member would not be subject to challenge for cause, the Court held, merely because "his threshold for proof beyond a reasonable doubt is somewhat higher than the minimum that the law recognizes as sufficient."[9] *Castillo, id.* at 533.

> [I]t is up to the individual juror to decide for himself his own understanding of proof beyond a reasonable doubt, within the tolerances of the law. A venireman who indicates he will set his threshold for reasonable doubt higher than the minimum allowed by law does not thereby demonstrate an inability to follow the law.

*Id.* at 535.

Conversely, in the instant case, venire member Charlton was not challenged based on any indication on her part that she would set her reasonable doubt threshold higher than the legal minimum. Rather, after reading the definition of "reasonable doubt" given by the trial court -- that is, the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs -- Charlton stated that she would require more proof than proof beyond a reasonable doubt to vote to impose the death penalty. 29 R 18-20, 24-25. Thus, it was Charlton's refusal to apply the standard itself that rendered her unqualified as a juror in this case.

As Wardlow accurately notes, the law "permits a range of reasonable doubt," and the state "is not entitled to challenge for cause veniremembers whose definition of beyond a reasonable doubt is higher than the legal minimum." *Castillo,* 913 S.W.2d at 533 n.1 (Tex. Crim. App. 1995); *id.* at 537 (Baird, J., concurring). However, the Court in *Castillo*

---

[9] Significantly, the Court noted that a juror who categorically refuses to convict based on a certain type of evidence *is properly excused for cause* if that juror's refusal is predicated upon something other than his understanding of proof beyond a reasonable doubt, *i.e.*, where the juror would not convict based on certain evidence even if that evidence was enough to convince him of guilt beyond a reasonable doubt. *Castillo,* 913 S.W.2d at 534. In that instance, the juror would, in fact, be holding the state to a higher burden of proof than the law allows. *Id.*

specifically noted that, "[o]f course, a venireman who requires proof to a level of confidence 'beyond all doubt' is still challengeable for cause on the basis of inability to follow the law." *Id.* at 533 n.1. Clearly, venire member Charlton fits into this category. Wardlow's second point of error should be overruled.

## STATE'S REPLY TO POINTS OF ERROR THREE AND FOUR

### THE TRIAL COURT PROPERLY ADMITTED PHOTOGRAPHS OF THE CRIME SCENE.

In his third and fourth points of error, Wardlow argues that the trial court erred in admitting crime scene photos whose prejudicial effect, he alleges, outweighed their probative value. TEX. R. CRIM. EVID. 403.

### A.    Statement of Underlying Facts

During the guilt-innocence phase of Wardlow's trial, the prosecutor offered into evidence state's exhibits 5 through 11, a series of photographs depicting the scene outside the victim's home. 33 R 115. Wardlow objected to exhibits 6, 7, and 8, arguing that the photographs were cumulative and that their prejudicial effect outweighed their probative value; thus, he contended, the photographs were inadmissible under Rule 403 of the Texas Rules of Criminal Evidence. *Id.* at 119. The trial judge overruled the objections, and the exhibits were admitted into evidence. *Id.* State's witness Sheriff Ricky Blackburn went on to testify that each of the photographs, which were taken from different angles and from different distances, reflected something different about the condition of the scene upon arrival of police officers. *Id.* at 120-123. Indeed, examination of the photographs reveals that state's exhibit 6 is a close-up photograph depicting part of an eyeglass frame (only partially visible on the edge of the photograph) and a partial denture with blood on, both lying in front of a toolbox; the photo also shows some bloodstains on the steps to one side of the toolbox. State's exhibit 7 is another close-up photograph taken from a different vantage point which shows the broken eyeglass frame and another bloodstain on

the carport floor on the other side of the toolbox. State's exhibit 8, a photograph taken from a slightly greater distance, depicts the entire scene including the toolbox, the denture, the eyeglass frame, and the bloodstains, as well as the steps leading into the victim's home. None of these photographs depicted the victim's body.

## B.    Argument and Authorities

Generally, photographs are admissible as evidence when the subject matter of the photographs would be admissible as evidence. *Hicks v. State*, 860 S.W.2d 419, 426 (Tex. Crim. App. 1993), *cert. denied*, 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994). In a criminal trial, testimony describing a crime scene is admissible to reveal to the jury what transpired; thus, photographs depicting the crime scene as it appeared are also admissible. *Heckert v. State*, 612 S.W.2d 549, 551 (Tex. Crim. App. 1981).

However, under some instances, even relevant evidence, including photographic evidence, may be excluded. Wardlow accurately asserts that Rule 403 of the Texas Rules of Criminal Evidence controls the admission of photographs in this instance. Appellant's Brief at 15. Rule 403 provides:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.

TEX. R. CRIM. EVID. 403. This Court has set forth several factors which the trial judge should consider, when faced with a Rule 403 objection, in determining whether the danger of unfair prejudice substantially outweighs the probative value of offered photographs: 1) the number of exhibits offered, 2) their gruesomeness, 3) their detail, 4) their size, 5) whether they are black and white or color, 6) whether they are close-up, 7) whether the body is naked or clothed, 8) the availability of other means of proof, and 9) the circumstances unique to each individual case. *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Crim. App. 1995). While these factors offer guidance to appellate courts as well, the admissibility of photographs over Rule 403 objection is ultimately within the sound

discretion of the trial judge. *Id.* Thus, when reviewing a trial court's decision to overrule a Rule 403 objection to photographs, this Court should reverse only for an abuse of discretion, *i.e.*, when the decision is outside the zone of reasonable disagreement. *Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992), *cert. denied*, 507 U.S. 975, 113 S.Ct. 1422, 122 L.Ed.2d 791 (1993).

> This Court recognized in *Sonnier* that
>
> photographs are powerful visual evidence, probative of various aspects of the State's theory of the offense including the brutality and heinousness of the offense. Appellant must realize that it is precisely the quality which we describe as "powerful" which gives rise to his arguments that the photographs are prejudicially inflammatory. But when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence.

*Sonnier v. State*, 913 S.W.2d at 519.

The photographs admitted at the guilt-innocence phase of Wardlow's trial were not unfairly prejudicial, and their probative value, which stemmed from the necessity of presenting to the jury the condition of the crime scene as a possible indication of what may have taken place, certainly was not substantially outweighed by any alleged prejudicial effect. These photographs depicted the scene outside the victim's home and showed the location of various articles of evidence found at the scene. They did not depict the victim's body. Wardlow concedes that the photographs were not gruesome. He argues, rather, that their prejudicial effect flowed from the fact that the items portrayed in the photographs underscored the victim's advanced age. However, Wardlow fails to demonstrate how evidence of the victim's age, which is certainly admissible before the jury, is *unfairly prejudicial* or that such prejudice *substantially outweighs* its probative value. *See Harrell v. State*, 884 S.W.2d 154, 161 n.14 (Tex. Crim. App. 1994)(Rule 403 favors admissibility of relevant evidence and presumption exists that relevant evidence is more probative than prejudicial). These photographs, which show only the victim's dentures and eyeglasses, hardly drive home the victim's age any more than the properly

admitted photographs and videotape showing the victim's body (34 R 217, 225-227; SX 13, 18) or the trial testimony of witnesses, including Wardlow, who testified regarding the victim's age. 33 R 106, 156; 36 R 648, 652.

Moreover, the three photographs did not constitute "needless presentation of cumulative evidence." Tex. R. Crim. Evid. 403. The photographs were presented as a series to provide the jury with a complete picture of the scene as it appeared when police officers arrived. They were taken from different angles and from different distances. As the photographs themselves reveal, each depicted a distinct aspect of the scene as a whole.

Finally, even if Wardlow could demonstrate that the trial court committed error in admitting two of the three photographs, which the state strongly denies, any error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989); Tex. R. App. P. 81(b)(2). It is inconceivable that the jurors' viewing of two additional photographs depicting the outside of the victim's house from different angles and different distances had any impact on their deliberations or verdict. Accordingly, for these reasons, Wardlow's third and fourth points of error must also be overruled.

## STATE'S REPLY TO POINTS OF ERROR FIVE THROUGH SEVEN

THE ADMISSION AT TRIAL OF WARDLOW'S UNSOLICITED CONFESSIONAL LETTER TO SHERIFF BLACKBURN VIOLATED NEITHER ARTICLE 38.22 OF THE TEXAS CODE OF CRIMINAL PROCEDURE NOR THE FIFTH, SIXTH, OR FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION.

Wardlow next argues, in his fifth, sixth, and seventh points of error, that the admission of his February 28, 1994, letter to Sheriff Ricky Blackburn, in which he confessed to the armed robbery and shooting of Carl Cole[10], violated Article 38.22 of the Texas Code of Criminal Procedure and the Fifth, Sixth, and Fourteenth Amendments to

---

[10]    35 R 524-527; SX 73.

the United States Constitution.

## A.   Statement of Underlying Facts

Wardlow filed a pretrial motion to suppress his statements to law enforcement, which was the subject of a hearing conducted by the trial court on October 17 and 18, 1994, pursuant to Article 38.22 § 6 of the Texas Code of Criminal Procedure and *Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964). 2 Tr 94-110; record volumes 9 & 10. Both Wardlow and Blackburn testified at the hearing. The facts are, for the most part, undisputed.

On June 16, 1993, Wardlow was arrested by police officers in Madison, South Dakota, based on a teletype received from Texas, at which time the South Dakota police officers read Wardlow his *Miranda*[11] warnings and incarcerated him until the proper authorities could be notified. 10 R 71. Morris County (Texas) Sheriff Ricky Blackburn, game warden Billy Dodd, and state trooper Davis McFarland arrived in Madison, South Dakota, on June 22, 1993, for the purpose of transporting Wardlow back to Texas. 9 R 10, 63. Blackburn read Wardlow his *Miranda* warnings at that time, and Wardlow then exercised his right to remain silent and requested that he be appointed an attorney. 9 R 10-11, 63; 10 R 72. Wardlow was not questioned thereafter regarding the circumstances of the instant offense. 9 R 11. Wardlow was transported back to Texas and placed in the Morris County Jail on June 23, 1993. 35 R 488-489. On June 24, 1993, Blackburn took Wardlow before a magistrate who administered the warnings provided for in Articles 15.17 and 38.22 of the Texas Code of Criminal Procedure. 35 R 532. District judge William R. Porter appointed Vernard Solomon to represent Wardlow. 35 R 533. Shortly after his appointment in June of 1993, Solomon sent a letter to Blackburn requesting that he not communicate with Wardlow about the instant case outside Solomon's presence. 35 R 534.

Sheriff Blackburn testified that Morris County jail was a small jail and that he

---

[11]   *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1603, 16 L.Ed.2d 694 (1966).

knew a majority of the inmates at any given time.  9 R 11.  He would routinely make a point to visit with an inmate personally if that inmate requested a visit; he viewed this as a means of avoiding administrative problems that could arise if inmates' requests were ignored.  9 R 11-12.  Particularly with regard to Wardlow, Blackburn stated that he had known Wardlow for eight to ten years, and that during Wardlow's incarceration Blackburn had visited Wardlow on several occasions at Wardlow's request.  9 R 9, 12.  Indeed, he had received and honored certain requests from Wardlow concerning the conditions of his confinement, including moving him to and from a single cell and giving him a radio.  9 R 12-13.  However, Blackburn maintained that he had "laid down the ground rules" from the beginning that they would not discuss the circumstances of the case unless Wardlow's attorney was present.  9 R 12.

Then on or about January 25, 1994, Blackburn was handed a note from the jail dispatcher which she had received through the jail's in-house mail system.  It read as follows:

> Patsy,
>
> I request to speak with you concerning a matter of utmost importance.  When you are at a point of availability and are ready to speak to me I will give you the request.  I would also like to have a private consultation with Sheriff Blackburn, concerning my case, and will do what is necessary to receive this hearing.
>
> Thank you,
>
> Billy Wardlow

9 R 15; SPTX 1.[12]  After receiving this note, Blackburn consulted with the district

---

[12] "SPTX" refers to the numbered exhibits offered by the state and admitted for purposes of the pretrial hearing on Wardlow's motion to suppress his statements, which was conducted in the trial court on October 17 and 18, 1994.

attorney and district judge William R. Porter[13] concerning the propriety of honoring Wardlow's request for a meeting. 9 R 96-97. Porter was noncommittal regarding whether the meeting could be beneficial to the state; the district attorney counseled that as long as they did not discuss the case, there was nothing improper about Blackburn meeting with Wardlow. 9 R 96-98.

At some point one week to ten days after the January 25 request,[14] Blackburn met with Wardlow in the jail dispatcher's office. 9 R 17, 21, 65; 10 R 45. Blackburn did not read Wardlow the *Miranda* warnings prior to the meeting. 9 R 98-99. However, he did tell Wardlow that they would not talk about the case unless his attorney was present and that if he wanted to talk about the case to contact his attorney; at that point, all discussion relating to the case ceased. 9 R 17-18, 73, 95-96 (Blackburn); 10 R 74-75, 80 (Wardlow). Wardlow then told Blackburn that he was having difficulty sleeping, that he was having nightmares, that he was having trouble "dealing with things," and that he needed someone to talk to. 9 R 18; 10 R 48 (Blackburn); 10 R 59-60 (Wardlow). Blackburn, as he had on numerous occasions with other inmates, attempted to offer Wardlow encouragement and advice regarding his personal problems. 9 R 19-20, 63; 10 R 52. He told Wardlow that he often found it helpful to write down the things that were bothering him and, thus confronted with the problems, that he found it simpler to think them through and deal with them effectively; he suggested that it might help Wardlow to do the same. 9 R 18-19, 96; 10 R 49-50 (Blackburn); 10 R 64, 67 (Wardlow). During the course of the conversation, which lasted between forty-five minutes and an hour and fifteen minutes, Blackburn and Wardlow also discussed religion. 9 R 73-74; 10 R 49. They talked about the forgiveness of sins, salvation through confession and repentence of sin, and the scripture "The truth shall set you free." 9 R 74-75; 10 R 50, 54 (Blackburn); 10 R 63

---

[13] Judge Porter did not preside at Wardlow's trial.

[14] Wardlow testified at the guilt-innocence phase of trial that the meeting took place one week after the January 25 request, about February 1. 37 R 636, 666.

(Wardlow).  Blackburn also told Wardlow that by writing out what was bothering him, it could help him "get right with God"; however, Blackburn never suggested that Wardlow needed to confess *to law enforcement* to "get right with God."  10 R 79, 50.  Further, Blackburn told Wardlow that if he wrote anything he did not want seen, he should destroy it by tearing it into pieces and flushing it down the toilet.  9 R 19; 10 R 50 (Blackburn); 10 R 72-73, 80 (Wardlow).

On February 25, 1994, after receiving a letter from Wardlow which alarmed him and caused him to fear for the safety of Wardlow and his fellow inmates,[15] Blackburn moved Wardlow from a multiple-occupancy cell to a single cell, commonly known as the "suicide cell," where Wardlow could be watched through a window from the chief dispatcher's office.[16]  9 R 23, 26-27; 10 R 21, 32-33.[17]

Then on February 28, 1994, three to four weeks after the above-described meeting took place, Wardlow sent Blackburn a letter, again through the jail's in-house mail system, in which he confessed to the armed robbery and shooting of Carl Cole.  9 R 28; SPTX 3.  On September 11, 1994,[18] while still incarcerated awaiting trial, Wardlow sent Blackburn a second letter in which he related more details and corrected some assertions made in the first letter, primarily regarding co-defendant Tonya Fulfer's level of involvement in the offense.  10 R 68-69; SPTX 5.  The record plainly reveals, without contradiction, that Blackburn did not ask Wardlow to write him a confession and was

---

[15]  The letter read in part, "In my opinion, and for the safety of the other inmates, I believe I should be moved to the back in a single cell.  Certain persons, whom I will not state, have pushed me to the limit and could be hurt or maybe worse."  SPTX 2.

[16]  Wardlow remained in that cell until March 18, 1994.  9 R 27; 10 R 29.

[17]  Apparently, Wardlow had been moved from multiple-occupancy cells to single cells and back on several occasions during his pretrial incarceration in the Morris County jail, the majority of the times at his request.  9 R 13; 10 R 27-29, 46-47.

[18]  In June of 1994, Vernard Solomon withdrew as Wardlow's counsel, and Bird Old III was appointed to represent Wardlow from that point forward.  1 Tr 56-59; 9 R 41-42.

surprised when he received the letters; in fact, Wardlow never indicated to Blackburn either in the January 25 note requesting the meeting or during the meeting that he intended to confess to Blackburn. 9 R 20; 10 R 52 (Blackburn); 10 R 72, 81 (Wardlow). Wardlow testified that he did not know why he sent the letters to Blackburn. 10 R 80.

At the conclusion of the pretrial hearing on Wardlow's motion to suppress his confessions, the trial court made the following findings of fact and conclusions of law in accordance with Article 38.22 § 6 of the Texas Code of Criminal Procedure and *Jackson v. Denno, supra*:

### Findings of Fact

1. There is no dispute over the material facts.

2. The Defendant was arrested by the Morris County Sheriff in South Dakota and returned to Morris County, Texas.

3. The Miranda Warnings were given to the Defendant in South Dakota and the Defendant requested an attorney.

4. The Defendant was appointed an attorney in June of 1993 when he was returned to Morris County.

5. The Defense Attorney told the Sheriff not to talk to the Defendant about the case unless he, the attorney, was present.

6. Morris County has a small jail population and it is the customary practice of the Sheriff to talk to and counsel with inmates if they request his help.

7. The Defendant and Sheriff had known each other eight to 10 years.

8. The Defendant wrote a note or a letter to the Sheriff in January of 19[9]4 requesting a meeting with the Sheriff.

9. The meeting took place one week to 10 days after the request, the meeting lasted 45 minutes to an hour and a quarter.

10. No Miranda Warnings were given prior to the meeting.

11.   The Defendant told the Sheriff that he was having trouble sleeping, that he was having nightmares and emotional problems.

12.   The Sheriff is a religious person and he discussed religion with the Defendant, the Sheriff also said that it often helped him to write down his problems and confront them. The Sheriff also said that he, the Defendant, could lie to him but not to God. The Sheriff further told the Defendant that people are saved by asking God for forgiveness and that the truth would set him free.

13.   The Sheriff suggested that the Defendant write out his problems and solutions and start at a period of time prior to the date of the alleged offense.

14.   The Defendant testified, as did the Sheriff, that the Sheriff told him not to discuss the case with him and if he wrote out something he didn't want seen he should destroy it, flush it down the toilet.

15.   The Defendant testified that the Sheriff never asked for a statement and never asked him to send a statement to him.

16.   The Defendant testified that he did not know why he sent the letters to the Sheriff.

17.   The Defendant sent several letters and notes to the Sheriff.

18.   The letters were received by the Sheriff through in-house mail.

19.   The Defendant was represented by Attorney Solomon when the February letter was sent by Attorney Old when the September letter was sent.

20.   No meeting occurred between the Defendant and the Sheriff before the September letter.

### Conclusions of Law

1.   The February meeting between the Sheriff and the Defendant was not a psychological ploy to gain information for the State.

2.   The meeting was not the functional equivalent of an interrogation.

3.    Both the February 28th letter and the September letter amounts to a voluntary statement and admission of guilt.

4.    The Sheriff advised he did not constitute entrapment.

5.    The meeting between the Sheriff and the Defendant was not a violation of the Sixth Amendment Right to have counsel present during a confrontation between the State and Defendant.

6.    The Sheriff made no attempt to elicit incriminating information during the meeting with the Defendant.

7.    The meeting was not a custodial interview.

8.    No promises nor rewards were offered nor given to Defendant.

9.    Both letters are admissible.

12 R 123-126.  In accordance with these findings and conclusions, the February 28, 1994, letter was admitted into evidence and read to the jury at the guilt-innocence phase of Wardlow's trial.  35 R 524-527, SX 73.

## B.    Argument and Authorities

It should be noted at the outset, before analyzing the legal bases Wardlow asserts in support of his claim that his statement was improperly admitted, that the determination of the voluntariness of a particular statement is based upon the totality of the circumstances presented by the particular case, and challenges to the trial court's findings and conclusions are resolved by determining whether the court abused its discretion in a particular case.  *Hawkins v. State*, 628 S.W.2d 71 (Tex. Crim. App. 1982).  In other words, the standard to be applied by an appellate court in examining a trial court's findings and conclusions is whether the trial court's findings are supported by the record.  *Romero v. State*, 800 S.W.2d 539 (Tex. Crim. App. 1990); *Miniel v. State*, 831 S.W.2d 310 (Tex. Crim. App.), *cert. denied*, 506 U.S. 885, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992).  Absent a showing of abuse of discretion, a trial court's findings will not be

disturbed. *Long v. State*, 823 S.W.2d 259, 277 (Tex. Crim. App. 1991), *cert. denied*, 505 U.S. 1224, 112 S.Ct. 3042, 120 L.Ed.2d 910 (1992).

### 1. *Admission of the letter did not violate the Fifth Amendment.*

Contrary to Wardlow's assertions in his sixth point of error, the admission of his February 28, 1994, letter to Sheriff Blackburn did not violate the Fifth Amendment. The Fifth Amendment to the United States Constitution provides that a citizen accused shall not be required to incriminate himself. In *Miranda v. Arizona*, the Supreme Court held that statements of the accused, arising out of custodial interrogation, could not be used in evidence unless certain safeguards were employed to protect the right against compelled self-incrimination.

> Prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. . . .[19]

*Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966). Custodial interrogations implicate the Fifth Amendment privilege because of the danger that law enforcement officers might exert "informal compulsion" on suspects during the interrogation. *Id.* at 460-61, 86 S.Ct. at 1620-21. *Miranda* warnings are required only when a suspect is both in custody and subject to interrogation. *Id.* at 477-78, 86 S.Ct. at 1629-30. As the *Miranda* Court noted:

> Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. . . . Volunteered statements of any kind are not barred by the

---

[19]    The Court explained that the right to counsel expressed in the opinion was not the Sixth Amendment right to counsel, but was a necessary correlative right of the Fifth Amendment to insure its protection and effectuation. *See Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

Fifth Amendment and their admissibility is not affected by our holding today.

*Id.* at 478, 86 S.Ct. at 1630.

The admission of Wardlow's statement at trial did not violate the Fifth Amendment because the statement was not given as a result of custodial interrogation. In *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), the Supreme Court defined interrogation as "express questioning or its functional equivalent." *Id.* at 300-01, 100 S.Ct. at 1689. The Court stated that the functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[20] *Id.* at 301, 100 S.Ct. at 1689-90. Wardlow does not assert that he was subjected to express questioning by Sheriff Blackburn; rather, he claims only that he was subjected to the functional equivalent of questioning. However, there is absolutely nothing in the record to suggest that Sheriff Blackburn should have known that his meeting with Wardlow was reasonably likely to elicit an incriminating response from Wardlow. It is clear from the record that, at the meeting, Wardlow appealed to Blackburn for help in dealing with his personal emotional difficulties; Blackburn listened to Wardlow and suggested to him possible solutions for dealing with these difficulties. It is undisputed that the circumstances of the instant case were not even a subject of discussion at the meeting. The fact that Blackburn spoke with Wardlow concerning religion and salvation through confession of sins and suggested to Wardlow that he write down the things that were bothering him does not lead to the conclusion that Blackburn should have known this would cause Wardlow to write him a letter confessing to the crime. Furthermore, there is absolutely no indication in the record that Wardlow's unsolicited letter to Blackburn sent three to four weeks after his

---

[20] The *Innis* Court determined that a conversation between police officers in the presence of the defendant concerning the possibility that a handicapped child might find the murder weapon did not constitute interrogation even though it led the defendant to make an incriminating statement. *Id.* at 294-95, 303, 100 S.Ct. at 1686-87, 1690-91.

meeting with Blackburn was in fact *the result* of that meeting.  The Fifth Amendment is simply not implicated under these circumstances, and Wardlow's sixth point of error must be overruled.

Furthermore, even if Blackburn's discussion with Wardlow were held to constitute interrogation,[21] the circumstances surrounding the meeting and Wardlow's letter confessing to the crime lead to the conclusion that Wardlow waived his Fifth Amendment right to counsel before that "interrogation" took place.  When a suspect asserts his *Miranda* right to counsel, law enforcement officials must cease all interrogation until counsel is provided or the suspect subsequently waives his right. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981).  Communications may not continue after invocation of the *Miranda* right to counsel unless the accused initiates the interrogation. *Id.*  In *Oregon v. Bradshaw*, a plurality of the Court ruled that a defendant who "evinced a willingness and a desire for a generalized discussion about the investigation" had effectively initiated conversation under *Edwards*, despite having earlier asserted his right to counsel. 462 U.S. 1039, 1045, 103 S.Ct. 2830, 2835, 77 L.Ed.2d 405 (1983) (plurality) (accused's inquiry, "Well, what is going to happen to me now?" amounted to waiver of right to counsel).  Once it is found that the accused initiated further communication, it must then be determined whether the accused then waived his Fifth Amendment right to counsel prior to being interrogated. *Id* at 1044-45, 103 S.Ct. at 2834.  This determination must be made based on the totality of the circumstances, "including the necessary fact that the accused, not the police, reopened the dialogue with the authorities." *Id.* at 1045, 103 S.Ct. at 2834, *quoting Edwards v. Arizona*, 451 U.S. at 486 n.9, 101 S.Ct. at 1885 n.9.

Clearly, though Wardlow had asserted his Fifth Amendment right to counsel at the

---

[21]  The state asserts this argument only in the alternative, to be considered by this Court only in the event the Court finds the meeting between Blackburn and Wardlow constituted interrogation within the meaning of the Fifth Amendment.  The state nonetheless maintains its primary position that the meeting did not constitute interrogation.

time of his arrest and was in fact represented by counsel, he subsequently initiated contact with Blackburn by requesting a meeting with Blackburn and then attempting to discuss the case with Blackburn. When Blackburn refused to discuss the case with Wardlow outside his attorney's presence, Wardlow shifted the discussion to his emotional problems. Despite Blackburn's admonishments to Wardlow that he contact his attorney if he wished to discuss the case, Wardlow never expressed a desire to confer with his attorney and apparently never sought his attorney's advice before sending the unsolicited confessional letter three to four weeks later. The fact that Blackburn did not follow Wardlow's lead and launch into an interrogation of Wardlow regarding the circumstances of the instant offense does not alter the inevitable conclusion that Wardlow by his actions waived his Fifth Amendment right to have counsel present when he spoke with Blackburn. For this reason as well, this portion of Wardlow's sixth point of error must be overruled.

### 2.    *Admission of the letter did not violate Article 38.22.*

Wardlow's claim based on Article 38.22 of the Texas Code of Criminal Procedure in his fifth point of error fares no better. Article 38.22 provides in pertinent part:

> No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:
>
> (a)    The accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:
>
>> (1)    he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
>>
>> (2)    any statement he makes may be used as evidence against him in court;
>>
>> (3)    he has the right to have a lawyer present to advise him prior to and during any questioning;

(4)    if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

(5)    he has the right to terminate the interview at any time; and

(b)    the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.

TEX. CODE CRIM. PROC. ANN. art. 38.22 § 2.  The foregoing analysis under federal law requires the same result when analyzed under state law.  Wardlow argues absolutely no basis for construing his rights under Texas law any broader than his rights under federal law.  He does not assert that Article 38.22 provides any broader protection than the *Miranda* warnings under federal law.  *See Taylor v. State*, 850 S.W.2d 594, 596 (Tex. App. -- Houston [1st Dist.] 1993) ("The applicable provisions of article 38.22 are substantially the same in scope as the Fifth Amendment right against self-incrimination."), *j'ment vacated on other grounds*, 863 S.W.2d 737 (Tex. Crim. App. 1993); *Floyd v. State*, 710 S.W.2d 807, 809 (Tex. App. -- Fort Worth 1986) (Article 38.22 substantially same in scope as Fifth Amendment right against self-incrimination and "the provisions of Article 38.22 provide no broader protection in this respect than the provisions of the U.S. Constitution."), *pet. dism'd*, 768 S.W.2d 307 (Tex. Crim. App. 1989).  Accordingly, on this basis alone, his fifth point of error should be overruled.  *See Arnold v. State*, 873 S.W.2d 27, 33 (Tex. Crim. App. 1993), *cert. denied*, 115 S.Ct. 103, 130 L.Ed.2d 51 (1994).

Moreover, the Article 38.22 warnings were not required in this case for the same reasons the *Miranda* warnings were not required under the Fifth Amendment, *i.e.*, because Wardlow's statement was not the result of custodial interrogation.  *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 5 ("Nothing in this article precludes the admission of a statement . . . that does not stem from custodial interrogation. . . .").  Wardlow does not assert any

basis for defining "custodial interrogation" more broadly under state law than under federal law. Indeed, this Court has concluded that "the term 'custodial interrogation' was intended by the legislature to be construed consistently with its meaning under the Fifth Amendment to the United States Constitution." *Wicker v. State*, 740 S.W.2d 779, 785 (Tex. Crim. App. 1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1117, 99 L.Ed.2d 278 (1988); *see also Gressett v. State*, 723 S.W.2d 695 (Tex. Crim. App. 1986); *Bass v. State*, 723 S.W.2d 687, 690-691 (Tex. Crim. App. 1986); *Janecka v. State*, 739 S.W.2d 813 (Tex. Crim. App. 1987) (citing *Innis*); *Jones v. State*, 742 S.W.2d 398 (Tex. Crim. App. 1987) (citing *Innis*). As demonstrated above, Wardlow was never subjected to custodial interrogation and his statement was not the result of custodial interrogation. Accordingly, his claim under Article 38.22 is without merit and his fifth point of error should be overruled.

### 3. *Admission of the letter did not violate the Due Process Clause of the Fourteenth Amendment.*

Likewise, Wardlow is not entitled to reversal of his conviction based on his claim, in his sixth point of error, that his unsolicited confessional letter to Sheriff Blackburn was the result of police coercion in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution. Whether or not *Miranda* is implicated, a confession must be voluntary to be valid; thus, a confession deemed coerced after *Miranda* warnings are given must be excluded. *Colorado v. Connelly*, 479 U.S. 157, 163, 107 S.Ct. 515, 519, 93 L.Ed.2d 473 (1986). To be voluntary, a confession must be the product of an essentially free and unconstrained choice by its maker. *Id.* A court must inquire whether, considering the totality of the circumstances, law enforcement officials have overborne the will of the accused. *Haynes v. Washington*, 373 U.S. 503, 513-14, 83 S.Ct. 1336, 1343, 10 L.Ed.2d 513 (1963); *Townsend v. Sain*, 372 U.S. 293, 307, 83 S.Ct. 745, 754, 9 L.Ed.2d 770 (1963); *Culombe v. Connecticut*, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961).

The factual inquiry centers on (1) the conduct of law enforcement officials in

creating pressure and (2) the suspect's capacity to resist that pressure. *Mincey v. Arizona*, 437 U.S. 385, 399-401, 98 S.Ct. 2408, 2417-18, 57 L.Ed.2d 290 (1978) (confession involuntary when continued police interrogation of hospitalized suspect overwhelmed suspect's free will); *Davis v. North Carolina*, 384 U.S. 737, 752, 86 S.Ct. 1761, 1770, 16 L.Ed.2d 895 (1966) (confession involuntary when police repeatedly interrogated jailed suspect held incommunicado over 16-day period). However, even trickery and deception are permissible tools of interrogation unless calculated to produce an untruthful confession or are otherwise offensive to due process. *Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986) (failure of officers to inform suspect that attorney was waiting to consult with him not so offensive to due process as to make confession involuntary); *see also Johnson v. State*, 651 S.W.2d 303 (Tex. App. -- San Antonio 1983). Moreover, a lapse of time between the alleged coercive conduct and the confession is significant in determing whether a due process violation occurred. *Barton v. State*, 605 S.W.2d 605, 607 (Tex. Crim. App. 1980) (confession held voluntary when obtained from accused day after alleged beating by officers); *Berry v. State*, 582 S.W.2d 463, 465 (Tex. Crim. App. 1979) (confession held voluntary due to lapse of time and lack of causal connection between officers' assault on accused and subsequent confession).

Wardlow contends that Blackburn "ha[d] overborne [him] beyond all notions of due process" by "creat[ing] an atmosphere for [him] to write the letter of confession admitted against him." Appellant's Brief at 22, 23. However, Wardlow has failed to show that his will was overborne by Blackburn's actions or that his confession was less than the product of his essentially free and unconstrained choice.[22] Indeed, every indication is to the contrary. Prior to sending the letter confessing to the crime, Wardlow had at least twice been read his *Miranda* rights, had indicated that he understood them, and had in fact invoked them. Further, at the time of his meeting with Blackburn, Blackburn told

---

[22] It is also significant to note that Blackburn took the stand in front of the jury and testified that the contents of his confession were for the most part true and correct. 37 R 644-657.

Wardlow to contact his attorney before discussing the offense.  None of Sheriff Blackburn's actions at the meeting -- neither his discussion of religion with Wardlow nor his suggestion that Wardlow write down his problems -- amounted to impermissibly coercive police conduct.  There was nothing inherently coercive in the spiritual advice Blackburn offered Wardlow.  Though Blackburn counseled Wardlow concerning salvation through the confession of sins, he advised Wardlow to confess to God -- *not* to law enforcement officials.  *See Welch v. Butler*, 835 F.2d 92 (5th Cir.) (officer's prayer session with defendant, which coincidentally produced incriminating statements, was not so coercive as to render statements involuntary), *cert. denied*, 487 U.S. 1221, 108 S.Ct. 2877, 101 L.Ed.2d 912 (1988).  And while Blackburn suggested to Wardlow that it may help him to deal with his emotional problems if he wrote down what was bothering him, he told Wardlow to destroy whatever he wrote so no one else would see it.  Wardlow's unsolicited confessional letter sent three to four weeks after this meeting certainly resulted from the exercise of a rational intellect and not from any impermissibly coercive conduct on Blackburn's part.  For these reasons, this portion of Wardlow's sixth point of error must be overruled.

### 4.    *Admission of the letter did not violate the Sixth Amendment.*

Finally, contrary to Wardlow's claim in his seventh point of error, Wardlow's Sixth Amendment right to counsel was not violated by the admission of his confessional letter into evidence.  As an initial matter, Wardlow has failed to brief this issue adequately in accordance with rule 74(f) of the Texas Rules of Appellate Procedure, which requires that a brief contain "such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue."  TEX. R. APP. P. 74(f).[23]  Other than asserting *in*

---

[23]    When briefing constitutional questions, attorneys should provide substantive analyses for their arguments on each separate question, *Muniz v. State*, 851 S.W.2d 238, 251 (Tex. Crim. App.), *cert. denied*, 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *McCambridge v. State*, 712 S.W.2d 499, 501 n.9 (Tex. Crim. App. 1986), *cert. denied*, 495 U.S. 910, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990).

*a heading* that "the trial court erred in denying appellant's motion to suppress his confession obtained in violation of his Sixth Amendment right to assistance of counsel," Appellant's Brief at 17, Wardlow fails to cite any authority or advance any argument or legal theory in support of his Sixth Amendment claim. An inadequately briefed claim such as this presents nothing for review and is therefore waived. *Alvarado v. Texas*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995); *Keith v. State*, 782 S.W.2d 861, 863 n.3 (Tex. Crim. App. 1989). Wardlow's seventh point of error may be overruled on this basis alone.

Alternatively, the claim fails on its merits as well. The Sixth Amendment right to counsel attaches at the initiation of adversarial judicial proceedings "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment," and no request for counsel need be made by the accused. *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972) (plurality); *Brewer v. Williams*, 430 U.S. 387, 401, 404, 97 S.Ct. 1232, 1240, 1242, 51 L.Ed.2d 424 (1977). Once the Sixth Amendment right to counsel has attached, the accused is entitled to the assistance of counsel at each "critical" stage of the prosecution, absent a valid waiver. *Upton v. State*, 853 S.W.2d 548, 553 (Tex. Crim. App. 1993), *citing Michigan v. Jackson*, 475 U.S. 625, 629 n.3, 106 S.Ct.1404, 1407 n.3, 89 L.Ed.2d 631 (1986). Police interrogation is such a critical stage. *Id.* at 555. If the accused has, after being informed of his right to counsel, requested or secured counsel, then all questioning must cease. *Id.* at 553. Under these circumstances, law enforcement officials may not use incriminating statements "deliberately elicited" from the accused without the presence or waiver of counsel. *Massiah v. United States*, 377 U.S. 201, 206, 84 S.Ct. 1199, 1203, 12 L.Ed.2d 246 (1964); *Brewer v. Williams*, 430 U.S. at 399, 97 S.Ct. at 1240.

In the instant case, the record simply does not support Wardlow's implied

contention[24] that Sheriff Blackburn offered Wardlow spiritual guidance and advice for the purpose of deliberately eliciting a confession from him. Blackburn never asked Wardlow to write a confession and, in fact, refused to discuss the case with Wardlow when Wardlow attempted to bring it up. As Blackburn testified, "The meeting was not to gather evidence, the meeting was simply to talk to someone that had requested to talk to me." 9 R 99. Indeed, Blackburn did not expect Wardlow to send him a confession and was surprised when he received the letter through the jail's in-house mail system several weeks after the meeting took place. Clearly, Wardlow's unsolicited letter confessing to the offense was not the result of a violation of his Sixth Amendment right to counsel. His seventh point of error must be overruled.

### STATE'S REPLY TO POINTS OF ERROR EIGHT AND NINE

> THE TRIAL COURT PROPERLY DETERMINED THAT THE VOLUNTARINESS OF WARDLOW'S CONFESSION WAS NOT AN ISSUE FOR THE JURY, AND, THEREFORE, PROPERLY DENIED WARDLOW'S REQUEST FOR A JURY INSTRUCTION ON THE ISSUE AND EXCLUDED JUDGE PORTER'S TESTIMONY BEFORE THE JURY.

Wardlow argues in his eighth and ninth points of error that the issue of the voluntariness of Wardlow's confession was raised by the evidence presented at trial and, thus, that the trial court erred (1) in failing to instruct the jury on the issue and (2) in excluding the testimony of district judge William R. Porter before the jury.

### A.    Statement of Underlying Facts

As set forth in the Statement of Underlying Facts accompanying the State's Reply to Points of Error Five through Seven, *supra*, the trial court conducted an extensive

---

[24] Again, Wardlow has failed adequately to brief his Sixth Amendment claim; thus, the state may only infer from Wardlow's assertion of Sixth Amendment error that he contends Sheriff Blackburn spoke with Wardlow in an attempt to deliberately elicit a confession from him.

pretrial hearing on Wardlow's motion to suppress his statements.   Based upon the undisputed facts presented at that hearing,[25] the trial court concluded that Wardlow's statements were voluntary statements obtained by the state without custodial interrogation and were, thus, admissible at trial.

At the guilt-innocence phase of trial, the state offered into evidence the February 28, 1994, letter in which Wardlow confessed to the offense and called Sheriff Blackburn to testify regarding the voluntariness of that confession.   35 R 524-527; SX 73. Blackburn testified consistently with his testimony at the pretrial hearing.   35 R 488-502, 530-568.   In excluding as hearsay testimony from Blackburn regarding the advice he received from district judge William R. Porter before his meeting with Wardlow, the trial court stated the following outside the jury's presence:

> It is my opinion that the question as to whether or not this was a custodial interrogation or the functional equivalent thereof as a matter of law, and I have previously ruled.   I have ruled that it was not a custodial interrogation.
>
> If and when I hear disputed testimony on this issue I may change my mind and submit it to the jury.   So far there has not been a dispute.   If there is a dispute and if this does become a jury issue I will reconsider your request for this information to be or for this conversation to be related to the jury but at this point it is denied.

35 R 544-545.

Thereafter, Wardlow called as his first witness district judge William R. Porter who testified, outside the jury's presence, that Sheriff Blackburn had called him one evening at home seeking advice on how best to deal with a request Blackburn had received from Wardlow to speak with him.   36 R 581.   Porter told Blackburn that Wardlow had an attorney and that he should not talk to Wardlow about the case outside his attorney's presence or without notifying his attorney.   36 R 582, 589.   Porter suggested that

---

[25]   Wardlow concedes that there is no dispute as to the material facts.   Appellant's Brief at 17 ("The facts, circumstances and events leading up to, and culminating in the delivery of the letter to the State are largely uncontested.").

Blackburn call Wardlow's attorney and ask him to come to the jail for a meeting. 36 R 582. According to Porter, it was two to three days to two weeks later when Blackburn showed him the letter from Wardlow confessing to the armed robbery and shooting of Carl Cole; however, he did not recall whether his first contact with Blackburn occurred before or after January 25, 1994. 36 R 583, 591. Porter did not recall Blackburn inquiring specifically about the letter's potential admissibility at that time, but he agreed he may have told Blackburn it may or may not be admissible. 36 R 585-586.

After returning from a three-day recess, Wardlow requested that he be allowed to present Porter's testimony before the jury. 37 R 600-601. The state objected on the grounds that the testimony was not relevant to any issue before the jury. 37 R 601. The trial court held as follows:

> It is the Court's opinion that based on what I heard Friday [Porter's testimony outside jury's presence] the testimony would not be relevant to any issue other than possibly the issue of voluntariness of the confession, the Court has determined over the four day or three day recess that the issue of voluntariness has not at this point been raised and I do not see any relevant to Judge Porter's testimony.

> \*      \*      \*

> At this time the Court is still of the opinion that the question was whether or not the conversation between Mr. Wardlow and the sheriff amounted to a custodial interrogation or its functional equivalent is a matter of law. At this point based on what I have heard I am standing by my findings of fact and conclusions of law from the October, '94 hearing.

> I do find there's no fact issue at this point to go to the jury concerning the voluntariness of the confession, I have ruled as a matter of law it did not amount to custodial interrogation and did not amount to the functional equivalent of custodial interrogation.

> Your request is denied and I'm ordering you not to call him as a witness nor to request that he testify in the presence of the jury.

37 R 601, 602-603.  Finally, Wardlow took the stand on his own behalf to testify

regarding the circumstances under which he wrote the letter confessing to the crime, and he offered testimony largely duplicative of his testimony at the pretrial hearing. 37 R 636-643. Before Wardlow rested his case-in-chief, he again requested to present Judge Porter's testimony before the jury. 37 R 740. The trial court ruled, however, that the issue of the voluntariness of Wardlow's confession still had not been raised despite Wardlow's testimony and denied the request. 37 R 740. The trial court stated:

> . . . I cannot see that there is any issue since the testimony of Mr. Wardlow and the testimony of the sheriff do not conflict. I believe you are still getting into the question that I consider a question of law and that's whether or not the meeting constituted a custodial interrogation. I am still of the opinion that's a question of law and that question has been answered, will again be answered adversely to your position so I am going to re-deny your request to call Judge Porter in front of the jury and again instruct you not to call him once the jury is seated in the box.

37 R 741. The trial court informed the parties that he had no intention of charging the jury on the voluntariness issue, but that if he subsequently determined that the issue was raised by the evidence he would allow Wardlow to call Judge Porter. 37 R 742. Wardlow rested his case-in-chief without presenting any additional evidence, and the guilt-innocence phase of the trial came to a close. 37 R 743. The following day, before closing arguments, Wardlow lodged his objections to the charge and requested that the trial court submit a charge on the voluntariness of his confession, which the trial court denied. 38 R 751-752; 2 Tr 138-141.

## B.     Argument and Authorities

Wardlow first argues in his eighth point of error that the trial court erred in failing to charge the jury on the issue of the voluntariness of his confession at the guilt-innocence phase of trial, in violation of Article 38.23(a) of the Code of Criminal Procedure. *See also* TEX. CODE CRIM. PROC. ANN. art. 38.22 § 7.[26]

---

[26]  Wardlow asserts only Article 38.23(a) as a basis for requiring a jury instruction in his case; Article 38.23(a) is the general provision barring the admission of any evidence obtained in violation of law.  Appellant's Brief at 23-24, *citing* TEX. CODE CRIM. PROC. ANN.

However, this claim must fail due to Wardlow's failure properly to preserve error. Rule 52(a) of the Texas Rules of Appellate Procedure provides in part: "In order to preserve a complaint for appellate review, a party must have presented to the trial court a timely request, objection or motion, stating the specific grounds for the ruling he desires the court to make if the specific grounds were not apparent from the context." TEX. R. APP. P. 52(a).  Nowhere in the record -- neither in counsel's argument in open court nor in Wardlow's written objections submitted to the court -- is it indicated that Wardlow either requested such an instruction or objected to its exclusion on the basis that it was required under either Article 38.23(a) or Article 38.22 §7 of the Code of Criminal Procedure.  *See* 38 R 751-752; 2 Tr 138-141.  Accordingly, because Wardlow raises an issue on appeal that was never properly presented to the trial court, his eighth point of error is not preserved for review and should be overruled.

Alternatively, Wardlow's claim is without merit.  Wardlow acknowledges that, under Texas law, a defendant is entitled to an instruction advising the jury generally on the law pertaining to his written statement only "[w]hen the evidence presented at trial raises a factual dispute over whether [the] defendant's written statement was voluntary." Appellant's Brief at 23-24, *quoting Dinkins v. State*, 894 S.W.2d 330, 353 (Tex. Crim. App.), *cert. denied*, 116 S.Ct. 106, 133 L.Ed.2d 59 (1995); *see also Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App.), *cert. denied*, 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993); *Miniel v. State*, 831 S.W.2d 310, 316 (Tex. Crim. App.), *cert. denied*, 506 U.S. 885, 113 S.Ct. 245, 121 L.Ed.2d 178 (1992); *Hernandez v. State*, 819 S.W.2d 806, 812 (Tex. Crim. App. 1991), *cert. denied*, 504 U.S. 974, 112 S.Ct. 2944, 119

---

art. 38.23(a) ("In any case where the legal evidence raises an issue hereunder, the jury shall be instructed. . . ."). However, the case Wardlow cites in support of his claim addresses only application of Article 38.22 §7, the provision addressing the specific issue of the admissibility of a confession when the voluntariness of that confession is at issue. *Dinkins v. State*, 894 S.W.2d 330, 353 (Tex. Crim. App. 1995), *citing* TEX. CODE CRIM. PROC. ANN. art. 38.22 §7 ("When the issue is raised by the evidence, the trial judge shall appropriately instruct the jury, generally, on the law pertaining to such statement."). In any event, Wardlow fails to show that he was entitled to a jury instruction under either provision. *See discussion, infra.*

L.Ed.2d 568 (1992); *Thomas v. State*, 723 S.W.2d 696 (Tex. Crim. App. 1986).  Only when the evidence presented at trial raises a factual dispute, the resolution of which has repercussions upon the voluntariness of the statement, is a defendant entitled to a jury instruction on voluntariness. *Dinkins*, 894 S.W.2d at 353.[27]

As previously noted, Wardlow himself concedes that "[t]he facts, circumstances and events leading up to, and culminating in the delivery of the letter to the State are largely uncontested." Appellant's Brief at 17.  Thus, by Wardlow's own admission, no factual dispute remained for the jury to resolve.  The testimony of Wardlow and Sheriff Blackburn was in all material aspects consistent, so there were no credibility determinations to be made.  There were simply no disputed facts relevant to the question of the voluntariness of Wardlow's confession.

Contrary to Wardlow's assertions, the ultimate question of whether he was subjected to custodial interrogation is not a "factual dispute" that would entitle him to an Article 38.22 instruction.  Wardlow contends that the question whether he was subjected to custodial interrogation, under the undisputed facts of this case, was a question that should have been left for the jury to determine.  Appellant's Brief at 27.  However, in *Dinkins*, this Court held that while a defendant is entitled to a jury instruction where there is a factual dispute before the jury, "whether a defendant's statements to the police constitute an invocation of the right to counsel is a matter of law which must be determined by the trial judge."  894 S.W.2d at 354.  Likewise, the ultimate question of whether a criminal defendant was subjected to "custodial interrogation"[28] is properly

---

[27]  The *Dinkins* Court held that a jury charge was required where the record contained contradictory testimony on whether a police officer had informed the defendant that his confession could be used "for or against" him, which fact would have rendered the confession involuntary and inadmissible.  894 S.W.2d at 353, *citing Sterling v. State*, 800 S.W.2d 513, 518-519 (1990), *cert. denied*, 501 U.S. 1213, 111 S.Ct. 2816, 115 L.Ed.2d 988 (1991).

[28]  "Custodial interrogation" and "questioning or its functional equivalent" are most certainly terms of art which have been carefully defined and granted particular legal significance under *Miranda* and its progeny.  *See Rhode Island v. Innis*, 446 U.S. 291, 100

determined by the court when the facts relevant to the question are undisputed, as in the instant case. Articles 38.22 and 38.23 simply do not require a jury issue under these circumstances.

Furthermore, as the United States Supreme Court recently recognized with regard to the "in custody" prong of the "custodial interrogation" inquiry, "[j]udges alone make 'in custody' assessments for *Miranda* purposes, and they do so with a view to identifying recurrent patterns, and advancing uniform outcomes. If they cannot supply 'a definite rule,' they nonetheless can reduce the area of uncertainty."[29] *Thompson v. Keohane*, 116 S.Ct. 457, 466 n.13, 133 L.Ed.2d 383 (1995). Similarly, a court's determination of whether particular conduct on the part of law enforcement constitutes questioning or its functional equivalent, as those terms are defined by *Miranda* and its progeny, may serve to guide future decisions and, thus, may "guide police, unify precedent, and stabilize the law." *Id.* at 467. For these reasons as well, this Court should decline Wardlow's invitation to extend the Texas statutory provisions to require a jury issue where there is no factual dispute regarding the circumstances underlying the ultimate question of custodial interrogation. Wardlow is not entitled to reversal on this issue, and his eighth point of error must be overruled.

---

S.Ct. 1682, 64 L.Ed.2d 297 (1980). Thus, they must be distinguished from the "what happened" questions of historical fact -- *i.e.*, allegations regarding the actions of law enforcment officials and the circumstances of the defendant in a given case -- that underlie a claim of involuntariness.

[29] In *Thompson*, the Court was presented with the question whether a state-court determination that a suspect was "in custody" at the time of interrogation for purposes of *Miranda* was entitled to the statutory presumption of correctness on federal habeas corpus review. *See* 28 U.S.C. § 2254(d). The Court held in this context that such determinations resolve mixed questions of law and fact and thus warrant independent review in federal court. *Id.* at 465. The Court also noted that it had treated the "in custody" question as one of law when states complained on direct appeal that their courts had erroneously expanded the meaning of "custodial interrogation." *Id.* at 467, *citing California v. Beheler*, 463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520, 77 L.Ed.2d 1275 (1983); *Oregon v. Mathiason*, 429 U.S. 492, 494-496, 97 S.Ct. 711, 713-715, 50 L.Ed.2d 714 (1977); *Oregon v. Hass*, 420 U.S. 714, 719, 95 S.Ct. 1215, 1219, 43 L.Ed.2d 570 (1975).

And finally, even assuming the trial court erred in failing to instruct the jury on the voluntariness issue, such error was harmless beyond a reasonable doubt since Wardlow testified before the jury that the contents of his confession were correct. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harris v. State*, 790 S.W.2d 568, 584 (Tex. Crim. App. 1989); TEX. R. APP. P. 81(b)(2). This Court in *Casey v. State*, 527 S.W.2d 882, 884 (Tex. Crim. App. 1975), held that such conduct on the part of the defendant, which it stated was "tantamount to a judicial confession," rendered any error in instructing the jury on the issue harmless.

> To hold that the court should have instructed the jury not to consider the confession in this case would be requiring an exercise in futility because the jury still had before it the same evidence, the admission of the appellant in open court that he committed the offense.

*Id.* at 884, *quoting Melton v. State*, 511 S.W.2d 957 (Tex. Crim. App. 1974).

Next, in his ninth point of error, Wardlow argues that the trial court erred in refusing to allow him to present the testimony of Judge Porter before the jury. This claim must also fail, for the reasons stated above, because Judge Porter's testimony simply was not relevant to any issue properly before the jury. TEX. R. CRIM. EVID. 401, 402. As the trial court determined, and as demonstrated in the foregoing reply to Wardlow's eighth point of error, the issue of the voluntariness of Wardlow's confession was not raised by the evidence presented at trial. Thus, Judge Porter's testimony concerning the advice he gave Sheriff Blackburn after Wardlow requested a meeting with Blackburn was properly excluded as irrelevant. Moreover, even if there existed a factual dispute with regard to the voluntariness of Wardlow's confession and the trial court had submitted a jury instruction on the issue, Wardlow has failed to demonstrate just how Judge Porter's proffered testimony -- confined as it was to the contact between him and Sheriff Blackburn before and after Wardlow sent the letter confessing to the crime -- would have been relevant to the issue of the voluntariness of the confession. In any event, even assuming the trial court erred in failing to the instruct the jury on the issue and in

excluding the testimony of Judge Porter before the jury, such error was harmless beyond a reasonable doubt and, as such, does not constitute reversible error. *See Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harris v. State*, 790 S.W.2d 568, 584 (Tex. Crim. App. 1989); TEX. R. APP. P. 81(b)(2). Because the undisputed evidence presented at trial indicated that Wardlow's confession was not obtained in violation of his statutory or constitutional rights, the exclusion of Judge Porter's testimony, which was only marginally relevant at best, did not contribute to Wardlow's conviction. Wardlow's ninth point of error must be overruled.

<u>STATE'S REPLY TO POINT OF ERROR TEN</u>

THE GUN SEIZED FROM WARDLOW UPON ARREST
WAS NOT THE RESULT OF AN UNLAWFUL ARREST
INADMISSIBLE UNDER ARTICLE 38.23 OF THE TEXAS
CODE OF CRIMINAL PROCEDURE

Wardlow argues in his tenth point of error that the trial court erred in applying South Dakota law and denying his motion to suppress evidence which he claims was seized incident to an illegal arrest, in violation of Article 38.23 of the Texas Code of Criminal Procedure.

**A.    Statement of Underlying Facts**

Before trial, Wardlow filed a Motion to Suppress Evidence Seized after Illegal Arrest claiming that the affidavit upon which the arrest warrant was issued was insufficient to establish probable cause. 2 Tr 78-79. On the first day of trial, the trial court conducted a hearing outside the jury's presence on Wardlow's motion to quash the arrest warrant. 33 R 14-62. The state presented the testimony of Vernon Cope, the law enforcement officer who drafted and submitted the affidavit in support of the arrest warrant, and Claudine Stanley, the magistrate who issued the warrant.

Cope, the deputy sheriff of Morris County, testified that he had been involved in the investigation of the murder of Carl Cole since he was discovered missing on June 14, 1993. 33 R 15. On June 15, he drafted and submitted an affidavit for probable cause,

based on information obtained through that investigation, to the justice of the peace seeking a warrant for the arrest of Billy Joe Wardlow on a charge of capital murder. 33 R 16-18. The affidavit read as follows:

AFFIDAVIT FOR PROBABLE CAUSE

STATE OF TEXAS
COUNTY OF MORRIS

I, Vernon Cope, being duly sworn, on oath state that I have good reason to believe and believe and charge before making complaint, that:

On or about the 14th day of June, 1993, in Morris County, Texas, Precinct 1, Defendant, Billy Joe Wardlow, did then and there, Intentionally caused the death of an individual, to-wit: Carl Cole, in the course of committing robbery of Carl Cole, to-wit; theft of Carl Cole's truck with the intent to obtain control of the truck.

My belief is based on the following facts which I have personal knowledge.

Billy Wardlow is a known individual in the area where the offense was committed. Wardlow was developed as a suspect in this offense. Information was developed that Wardlow had taken his mother's Llama 45 Auto pistol from the residence and that Wardlow had left the residence the evening before this offense occurred. A neighbor stated that on Sunday night before this offense, Wardlow was at his residence with his girlfriend, Tonya Fulfer, and that Wardlow had the 45 Auto. A white male and female fitting description of Wardlow and Fulfer were seen by a witness on the morning of this offense at the victim's residence. Lab results indicated victim was shot with a 45 cal. weapon and bullet was of the hard ball type with 6 gruve to the right rifleing, which is standard for a Llama 45 Auto. Wardlow's mother gave Deputies a box of Federal 45 cal. hard ball ammunition which is what her 45 Auto Llama was loaded with.

/s/ Vernon H. Cope

SX 1. While Cope conceded that the majority of the information contained in the affidavit was derived from what others had told him and not from his own personal knowledge, he stated that when he submitted the affidavit he specifically identified his

sources and related to the magistrate the information they provided. 33 R 30-31, 23-24, 27.

Stanley, the Morris County justice of the peace, testified that after reading the affidavit and speaking with Cope, she believed that probable cause existed to issue the warrant. 33 R 52-53. She also stated that Cope identified by name the sources of the information contained within the affidavit when he submitted the affidavit. 33 R 55, 57. Stanley did, in fact, issue a warrant for the arrest of Billy Joe Wardlow on a charge of capital murder. SX 2; 33 R 20.

At the conclusion of this testimony, the trial court granted Wardlow's motion to quash the arrest warrant concluding that the affidavit was insufficient to support the issuance of an arrest warrant.[30] 33 R 61-62. The trial court indicated that it would address the admissibility of evidence procured incident to Wardlow's arrest when and if the state attempted to introduce such evidence at trial. 33 R 62.

On the third day of trial, the trial court conducted a hearing outside the jury's presence to determine whether two South Dakota police officers would be allowed to testify regarding a firearm they seized during an inventory search of Wardlow's automobile after his arrest in South Dakota on June 16, 1993. 35 R 386-445. A Llama .45 automatic pistol previously admitted into evidence had been identified as the murder weapon by unrefuted expert testimony. 34 R 377; SX 23. At the commencement of the hearing, the state requested that the trial court take judicial notice of the law of South Dakota on the issue,[31] and the trial court indicated he would apply South Dakota law in

---

[30]   It is unclear from the record the precise basis for the trial court's conclusion due to the fact that the court made its determination after conducting off-the-record "informal arguments" in chambers during a recess. 33 R 61. However, the nature of the testimony presented by the witnesses, as well as defense counsel's cross-examination of those witnesses, suggests that the affidavit was deemed insufficient on the grounds that the information contained within the affidavit was not within the affiant's personal knowledge.

[31]   The state specifically referred the trial court to Rule 202 of the South Dakota Rules of Criminal Evidence and to an opinion of the South Dakota Supreme Court adopting the

the instant case. 35 R 387-389.

Robert Haug, a police officer from Madison, South Dakota, testified outside the jury's presence that on June 16, 1993, while working as a dispatcher at the Madison Police Department, he received a teletype regarding a capital murder suspect who had recently fled Morris County, Texas. 35 R 392. The teletype advised that Billy Joe Wardlow was suspected in the shooting death/robbery of Carl Cole, which had occurred on June 14, 1993; that the vehicle taken during the robbery had been discovered in Nebraska where it had been traded for another vehicle; that a warrant had issued for Wardlow's arrest on charges of capital murder; that Wardlow, who was thought to be accompanied by Tonya Fulfer, could possibly be in route to Montana; and that Wardlow should be considered armed and dangerous. SX 27. The teletype also included physical descriptions of both Wardlow and Fulfer, as well as a detailed description of the vehicle they had obtained in Nebraska.[32] SX 27.

Haug testified further that later the same day while he was out on patrol in downtown Madison, he observed a vehicle which he determined matched the description contained in the teletype.[33] 35 R 393. The vehicle's top was down, and Haug identified the occupants as two young people he did not recognize.[34] 35 R 394. Haug followed the

---

good faith exception to the warrant requirement as set forth in *United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984) (exclusionary rule does not ban evidence obtained by officers acting in reasonable reliance on search warrant issued by neutral magistrate but later found to be invalid for lack of probable cause). *State v. Saiz*, 427 N.W.2d 825 (S.D. 1988).

[32] The teletype described the vehicle as a black 1987 Ford Mustang convertible with gray pinstripes, black top, gray leather interior, and spoke hubcaps bearing in-transit tags. SX 27.

[33] Haug described the vehicle in his testimony as a black Mustang convertible with gray leather interior, spoked hubcaps, and no license plates. 35 R 393-394.

[34] Haug noted that as a patrolling officer in a town with a population of about 6,000, as Madison then had, he was familiar with the majority of the local population as well as the vehicles they drove. 35 R 394.

vehicle in his patrol car for about six blocks, then the vehicle pulled into the parking lot of a Hardee's Restaurant. 35 R 395. Haug pulled in behind them, parked, and radioed the dispatcher to reaffirm the descriptions of the vehicle and the suspects. 35 R 395. Haug observed the woman getting out of the car and concluded that she "matched [the description] to a 'T'." 35 R 395. The man, who was still in the car, started to put the top up, while the woman appeared nervous and kept trying to look at Haug without him noticing. 35 R 395. The couple then left without getting anything to eat. 35 R 396. Haug followed the vehicle out of the parking lot and down a side street. 35 R 397. Meanwhile, police officer James Johnson was approaching the vehicle from the opposite direction in an unmarked car. 35 R 397. Johnson and Haug, who were communicating by radio, determined that the vehicle and its occupants matched the descriptions in the teletype and decided to stop them. 35 R 397. Haug activated his overhead lights, and the vehicle pulled over. 35 R 398. The driver of the vehicle complied with the officers' request to exit the vehicle. 35 R 398. Haug held a gun on the man as Johnson patted him down and handcuffed him. 35 R 398. When asked his name, the man responded, "Billy Joe Wardlow." 35 R 398. As the woman was exiting the vehicle through the passenger-side door, Haug saw a handgun underneath the front passenger seat, which he pointed out to Johnson. 35 R 398, 418. Both Wardlow and Fulfer were read the *Miranda* warnings at the scene and then transported in separate patrol cars to the Lake County sheriff's department, where they were booked and arrested on the Texas charges. 35 R 398, 400-401, 409-411.

Johnson remained at the scene with the vehicle until a wrecker arrived to tow it to a nearby towing facility. 35 R 422. Once there, Johnson conducted an inventory search of the vehicle[35] and seized a Llama .45 automatic pistol found underneath the front passenger seat. 35 R422, 419. Johnson identified the firearm previously admitted into

---

[35] Johnson testified that it was the policy of the Madison Police Department to conduct inventory searches of all seized vehicles and that the search of the vehicle in the instant case was conducted pursuant to standard departmental procedures. 35 R 427.

evidence as the firearm he had seized after Wardlow's arrest.  35 R 419; SX23.

After the presentation of the foregoing testimony and argument by counsel, the trial court overruled Wardlow's objections to the testimony of the police officers, concluding that the officers had acted in good faith reliance upon the Texas warrant when they arrested Wardlow.  35 R 442-445, *citing United States v. Leon*, 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984), and *State v. Saiz*, 427 N.W.2d 825 (S.D. 1988).  The trial court also noted that while he had previously found the affidavit supporting the issuance of the Texas warrant technically insufficient, he "believe[d] probable cause exi[s]ted" when the warrant issued.  35 R 442.

Officers Haug and Johnson testified before the jury regarding the recovery of a firearm in Wardlow's possession when they arrested him in South Dakota on June 16, 1993.  35 R 458-478, 479-484.  They identified the Llama .45 automatic pistol previously admitted into evidence as the one they had seized from Wardlow's vehicle.  35 R 482; SX 23.

**B.   Argument and Authorities**

Initially, Wardlow has failed to preserve his tenth point of error for review. Wardlow claims on appeal that the trial court erred when it applied South Dakota law to deny his motion to suppress the evidence.  Appellant's Brief at 29.  However, in the trial court, Wardlow argued this issue based on South Dakota law.  35 R 438-441.  He never argued that South Dakota law should not apply in the instant case.  Nor did he lodge any specific objection to the application of South Dakota law in the instant case.  In fact, Wardlow's only objection in this regard was that he had not had sufficient time to research South Dakota law in order to challenge the state's argument based on South Dakota law.  35 R 388-389, 428-437.  Clearly, the trial court was never apprised of the nature of the claim Wardlow now raises on appeal.  Accordingly, Wardlow has failed to preserve this claim for review, and his tenth point of error must be overruled.  TEX. R. APP. P. 52(a).

Additionally, Wardlow has failed to brief this issue adequately in accordance with

rule 74(f) of the Texas Rules of Appellate Procedure, which requires that a brief contain "such discussion of the facts and the authorities relied upon as may be requisite to maintain the point at issue." TEX. R. APP. PROC. 74(f). In his appellate brief, Wardlow cites Article 38.23 of the Texas Code of Criminal Procedure, which provides in part: "No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case." Appellant's Brief at 29. He makes the conclusory assertion that "the State's witness was allowed to testify about a gun and events recovered *as a result of an illegal arrest and search*." Appellant's Brief at 29 (emphasis added). However, Wardlow fails to provide any controlling authority to support this assertion. And, in fact, the trial court, though he quashed the arrest warrant, concluded that the arrest and search of Wardlow's vehicle were lawful. Certainly, establishing by citation to precedent that the arrest and search were indeed illegal is "requisite to maintain the point at issue" since otherwise Article 38.23 would not even apply. An inadequately briefed claim such as this presents nothing for review and is therefore waived. *Alvarado v. Texas*, 912 S.W.2d 199, 210 (Tex. Crim. App. 1995); *Keith v. State*, 782 S.W.2d 861, 863 n.3 (Tex. Crim. App. 1989). Wardlow's tenth point of error may be overruled on this basis alone.

Alternatively, the claim is without merit. First, it is not at all clear that the arrest warrant should have been quashed in the first place. Presumably, the trial court found the probable cause affidavit in support of the arrest warrant technically deficient based on the fact that the affiant did not have personal knowledge of all the facts contained within the affidavit. However, it is not necessary that the officer-affiant have personal knowledge of every fact averred in support of probable cause. It is well established under Texas law that hearsay, and even "hearsay-upon-hearsay", may be utilized to show probable cause in an arrest affidavit. *Wilkerson v. State*, 726 S.W.2d 542, 545 (Tex. Crim. App. 1986), *cert. denied*, 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987); *Hennessy v. State*, 660 S.W.2d 87, 91 (Tex. Crim. App. 1983); *see also Gibbs v. State*, 819 S.W.2d 821, 830

(Tex. Crim. App. 1991) (affidavit supporting arrest warrant sufficient where officer-affiant named and identified each of his sources of information and that information rose to level of probable cause), *cert. denied*, 502 U.S. 1107, 112 S.Ct. 1205, 117 L.Ed.2d 444 (1992). Further, as this Court has noted,

> Though we are limited to the four corners of the affidavit on the question of sufficiency, we do not place blinders on the process whereby a neutral and detached magistrate must decide whether there are sufficient facts stated to validate the issuance of a proper warrant. A warrant affidavit should be interpreted in a common sense and realistic manner. The reviewing magistrate is permitted to draw reasonable inferences from the facts supporting the averments.

*Gibbs v. State*, 819 S.W.2d at 830, *citing Lagrone v. State*, 742 S.W.2d 659, 661 (Tex. Crim. App. 1987), *cert. denied*, 485 U.S. 937, 108 S.Ct. 1115, 99 L.Ed.2d 276 (1988); *Lopez v. State*, 535 S.W.2d 643 (Tex. Crim. App. 1976); *Jones v. State*, 568 S.W.2d 847 (Tex. Crim. App.), *cert. denied*, 439 U.S. 959, 99 S.Ct. 363, 58 L.Ed.2d 352 (1978). The trial court in the instant case had no doubt that the facts averred in the affidavit stated probable cause; his sole concern with regard to the sufficiency of the affidavit was that the officer-affiant "just didn't prepare his affidavit properly." 35 R 443-444. The probable cause affidavit submitted in the instant case was sufficient under Texas law; thus, the arrest warrant was properly issued and the subsequent arrest and seizure of evidence were lawful.

Moreover, even if the trial court did, in fact, have a legitimate basis for quashing the arrest warrant, that does not preclude this Court from considering whether an exception to the warrant requirement applied in the instant case. *Powell v. State*,[36] 898

---

[36]   The defendant in *Powell* challenged the state's use of a search warrant to search his motor home where the state district judge, acting as magistrate, signed the search warrant for the property which was located outside his judicial district. *Id.* at 826. This Court concluded on appeal that even if the judge lacked the authority to sign the warrant, it could nonetheless consider whether the facts supported a warrantless search. *Id.* at 827 n.4. The Court went on to hold that the automobile exception applied to authorize the search even if the warrant were considered invalid. *Id.* at 827.

S.W.2d 821, 827 n.4 (Tex. Crim. App. 1994) (trial court's decision regarding legality of search will be sustained on appeal if correct on any theory of law applicable to case), *citing Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990); *see also Nored v. State*, 875 S.W.2d 392 (Tex. App.--Dallas 1994, pet. ref'd). And, indeed, even if it is assumed that the arrest warrant was invalid and that the good faith exception as recognized by the South Dakota courts did not apply or should not have been applied in the instant case, at least two of Texas' statutory exceptions to the warrant requirement do apply.

As a general rule, police officers must always obtain an arrest warrant prior to taking someone into custody. *Dejarnette v. State*, 732 S.W.2d 346, 349 (Tex. Crim. App. 1987). There are, however, exceptions to this rule which are set forth in chapter 14 of the Texas Code of Criminal Procedure. The exception contained in Article 14.03(a)(1) may be applied to vitiate the warrant requirement in the instant case. It provides as follows: "Any peace officer may arrest without a warrant: persons found in suspicious places and under circumstances which reasonably show that such persons have been guilty of some felony or breach of the peace, or threaten, or are about to commit some offense against the laws." TEX. CODE CRIM. PROC. ANN. art. 14.03(a)(1). In *Hamel v. State*, this Court held that the detention of a defendant's vehicle (and the defendant) was reasonable where the defendant's apartment had been under surveillance for some time by officers acting on informant's tips, he had previous convictions which the officers knew of, and he was known by the officers as the subject of numerous burglary investigations. 582 S.W.2d 424, 426-427 (Tex. Crim. App. 1979). Thus, the Court held that the defendant's vehicle was a "suspicious place" under the facts. *Id.; see Holland v. State*, 788 S.W.2d 112, 114 (Tex. App. -- Dallas 1990, pet. ref'd). In the instant case, South Dakota police officers detained Wardlow's vehicle when they determined that the vehicle and its occupants matched the descriptions contained within a teletype they had received regarding a capital murder suspect who had fled from Texas. The teletype informed officers that Wardlow was suspected of killing and robbing Carl Cole and that a warrant

had issued for his arrest on capital murder charges. Certainly, under these circumstances, the officers found Wardlow in a suspicious place and under circumstances which reasonably showed that he had been guilty of a felony.

Likewise, the facts of the case fall under the exception to the warrant requirement contained in Article 14.04 of the Texas Code of Criminal Procedure, which provides: "Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant, such peace officer may, without warrant, pursue and arrest the accused." TEX. CODE CRIM. PROC. ANN. art. 14.04. In a case which presented facts virtually identical to the facts in the instant case, this Court held that former Article 215 of the Code of Criminal Procedure, which was the precursor to Article 14.04, applied. *Stickney v. State*, 169 Tex. Crim. 533, 537-538, 336 S.W.2d 133, 136 (Tex. Crim. App.), *cert. denied*, 363 U.S. 807, 80 S.Ct. 1245, 4 L.Ed.2d 1151 (1960). The defendant in *Stickney* had been arrested two days after the offense by a law enforcement officer in Canada who had previously received information through a broadcast from his headquarters that a warrant existed in Texas for the defendant's arrest on a murder charge. *Id.* at 535-536, 336 S.W.2d at 135. The Court held,

> The testimony of Constable Crawford, the arresting officer, clearly shows that he had received information, which he considered reliable that a felony had been committed in Texas and that the accused was escaping in a certain described automobile. This information and the fact appellant's automobile fitted the description of the automobile in which the accused were reported to be traveling was sufficient to authorize the appellant's arrest without a warrant under the provisions of Art. 215 of the Code of Criminal Procedure.
> . . .

*Id.* at 537-538, 336 S.W.2d at 136. The instant case is indistinguishable.

Finally, even if the testimony of the South Dakota police officers was erroneously admitted, such error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989); TEX. R. APP. PROC. 81(b)(2). Wardlow himself testified at the guilt-

innocence phase of trial that the Llama .45 automatic pistol previously admitted into evidence and identified as the murder weapon was, in fact, the same gun officers found in his possession when he was arrested in South Dakota.  37 R 692.   Under these circumstances, it is inconceivable that the officers' testimony regarding the recovery of the gun had any impact on the jury's deliberations or verdict.  For all of the foregoing reasons, Wardlow's tenth point of error must be overruled.

STATE'S REPLY TO POINT OF ERROR ELEVEN

THE TRIAL COURT PROPERLY DENIED WARDLOW'S
REQUEST FOR A JURY INSTRUCTION ON THE
OFFENSE OF AGGRAVATED ASSAULT.

Wardlow argues in his eleventh point of error that the trial court erred in denying his request for a jury instruction on the lesser-included offense of aggravated assault, in violation of the Due Process Clause of the Fourteeth Amendment to the United States Constitution.

**A.  Statement of Underlying Facts**

After the close of testimony at the guilt-innocence phase of trial, Wardlow requested that the jury be charged on the lesser-included offense of aggravated assault. 38 R 751-752; 2 Tr 139-140.  That request was denied.  *Id*.  The jury was charged on the lesser-included offenses of murder and aggravated robbery as well as the primary offense of capital murder.  2 Tr 147-155.

*See also* Statement of Facts, Guilt-Innocence Phase, set forth in the state's Statement of the Case, *supra*.

**B.  Argument and Authorities**

In *Beck v. Alabama,* the United States Supreme Court held that the death penalty could not be imposed "after a jury verdict of guilt of a capital offense, when the jury was not permitted to consider a verdict of a lesser included non-capital offense, and when the evidence would have supported such a verdict."  447 U.S. 625, 627, 100 S.Ct. 2382, 2384, 65 L.Ed.2d 392 (1980).  *Accord Hopper v. Evans,* 456 U.S. 605, 609, 102 S.Ct. 2049,

2051-52, 72 L.Ed.2d 367 (1982). In light of *Beck*, this Court set forth a two-pronged test for determining whether due process requires a charge on a lesser-included offense in a given case:

> First, the lesser included offense must be included within the proof necessary to establish the offense charged. Secondly, there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense.

*Royster v. State*, 622 S.W.2d 442, 446 (Tex. Crim. App. 1981).

This Court has previously held that in proving the alleged offense of capital murder, the state also proves the lesser-included offense of aggravated assault; therefore, the first prong of the *Royster* test is satisfied. *Dowden v. State*, 758 S.W.2d 264, 269 (Tex. Crim. App. 1988). *See also* TEX. PENAL CODE § 22.02 (penal statute defining "aggravated assault"); TEX. CODE CRIM. PROC. ANN. art. 37.09 (provision defining "lesser-included offense").

It is on the second prong of the *Royster* test that Wardlow's claim breaks down. A charge on aggravated assault was required in the instant case "only if testimony was introduced from sources indicating a lack of intent on the part of appellant to kill the deceased." *Dowden, supra.* It is established that the second prong must be determined on a case-by-case basis, and in determining this question all of the evidence at the trial, whether produced by the state or the defendant, must be considered. *Dowden, supra*; *Moreno v. State,* 721 S.W.2d 295, 301-302 (Tex. Crim. App. 1986). Wardlow fails to point to any evidence in the record indicating that he lacked the intent to kill Cole. In fact, the excerpts of Wardlow's trial testimony which he cites in his brief clearly illustrate that he had the requisite mental intent. *See* Appellant's Brief at 31-34. According to his own words,

> I put my foot into the door and blocked the door, brought out the Llama .45, cocked a shell into it, pumped it off safety and told him to go back into the house. He wouldn't go back into the house, he rushed out the door and grabbed my arm throwing me off, caught me off balance, it caught me by surprise that he was stronger, it scared me that he was stronger than I

thought he was or guessed he was and so forth that he held me, I fired the gun just to let him go, it him him right between the eyes and catapulted him -- in between the eyes, catapulted him against the wall.

37 R 648. Wardlow admits that he fired the gun, and the resulting death of Cole would not have occurred but for Wardlow's intentional conduct. An intent to kill is presumed where a deadly weapon, such as a pistol, is used in a deadly manner. *Jackson v. State*, 548 S.W.2d 685 (Tex. Crim. App. 1977). Further, the fact that Wardlow took the time to load the weapon when Cole presumably had no way of knowing it was not loaded indicates in itself that Wardlow intended to shoot Cole.

Wardlow points to evidence which he claims indicated that he and Fulfer went to Cole's home intending to rob him and "incapacitate" him, but not to kill him. Appellant's Brief at 31. However, "[t]he possibility that initially or at some point during the commission of the robbery the offender did not have an intent to cause death *does not amount to evidence* that the offender did not intend to cause the victim's death when the murder was committed." *Rousseau v. State*, 855 S.W.2d 666, 674 (Tex. Crim. App.) (emphasis added), *cert. denied*, 510 U.S. 919, 114 S.Ct. 313, 126 L.Ed.2d 260 (1993). Therefore, this evidence should not even be considered in determining whether Wardlow's jury should have been charged on aggravated assault.

Finally, Wardlow points to portions of his testimony where he claimed Cole had his hand on the gun and Wardlow's arm when Wardlow shot it, thus suggesting that he did not have control over the direction of the shot. However, it is significant to note that after being confronted on cross examination with unrefuted expert testimony indicating that the gun was at least three feet from Cole when it was fired, Wardlow altered his testimony on redirect examination stating that "I can't state that for sure [that Cole still hand his hand on the gun and my arm when the gun was fired]." 37 R 696-699, 719, 721-722. Furthermore, though Wardlow may have denied intending to shoot Cole between the eyes, he did not deny intending to shoot Cole. In light of the evidence presented at Wardlow's trial, no rational jury would acquit on capital murder and convict

on aggravated assault. There was absolutely no evidence indicating that if Wardlow was guilty, he was guilty only of aggravated assault.

In any event, even if the trial court erred in denying Wardlow's request for a charge on the lesser-included offense of aggravated assault, such error was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Harris v. State*, 790 S.W.2d 568 (Tex. Crim. App. 1989); TEX. R. APP. PROC. 81(b)(2). Wardlow's jury did not have the all-or-nothing options presented in *Beck* (choice between death penalty and acquittal) and *Williams v. State*, 749 S.W.2d 183, 185 (Tex. App. -- San Antonio 1988, pet. ref'd 1989) (choice between attempted capital murder and acquittal). Wardlow's jury was charged on the offenses of capital murder, murder, and aggravated robbery, in that order. 2 Tr 150-151. At the end of the application paragraph for capital murder, the jury was instructed, "if you have a reasonable doubt thereof, you will acquit the defendant of capital murder and next consider whether the defendant is guilty of murder." 2 Tr 150. That instruction was followed by the application paragraph for murder, then by the application paragraph for aggravated robbery, which began, "[i]f you have found the defendant is not guilty of capital murder or murder, as defined above, then you will next consider whether the defendant is guilty of aggravated robbery." 2 Tr 151. Thus, Wardlow's jury was instructed not to consider the lesser-included offenses unless and until it determined that Wardlow was not guilty of capital murder. Wardlow's jury found him guilty of capital murder presumably without considering the lesser-included offenses of murder and aggravated robbery. 2 Tr 155. It is, therefore, inconceivable that including a charge on aggravated assault would have had any impact on the jury's deliberations or verdict. For all of the foregoing reasons, Wardlow's eleventh point of error must be overruled.

## STATE'S REPLY TO POINT OF ERROR TWELVE

THE JURY HAD SUFFICIENT EVIDENCE TO SUPPORT ITS AFFIRMATIVE ANSWER TO SPECIAL ISSUE NUMBER ONE.

Wardlow asserts in his twelfth and final point of error that there was insufficient evidence to support the jury's affirmative finding on the first special issue: "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. art. 37.071(b); *see* 2 Tr 162.

### A.   Statement of Underlying Facts

*See* Statement of Facts, Guilt-Innocence and Punishment Phases, as set forth in the state's Statement of the Case, *supra*.

### B.   Argument and Authorities

In reviewing the sufficiency of the evidence at punishment, this Court must view the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could make the finding beyond a reasonable doubt. *Barley v. State*, 906 S.W.2d 27, 30 (Tex. Crim. App. 1995), *cert. denied*, 116 S.Ct. 1271, 134 L.Ed.2d 217 (1996); *Barnes v. State*, 876 S.W.2d 316, 322 (Tex. Crim. App.), *cert. denied*, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994).  A jury may consider several factors when determining whether a defendant will pose a continuing threat to society.  Among those factors are:

1.   The circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties;

2.   The calculated nature of the defendant's acts;

3.   The forethought and deliberateness exhibited by the crime's execution;

4.   The existence of a prior criminal record, and the severity of the prior crimes;

5.   The defendant's age and personal circumstances at the time of the offense;

6.   Whether the defendant was acting under duress or the domination of

another at the time of the offense;
7.   Psychiatric evidence; and
8.   Character evidence.

*Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987).   These factors are also helpful in this Court's evaluation of the sufficiency of the evidence of future dangerousness on appeal.   However, this list is not exhaustive.

In determining the sufficiency of evidence on appeal, the reviewing court will look first to the facts of the crime itself.

> If the offense was shown to be sufficiently cold-blooded or calculated, then the facts of the offense alone may support a finding that the defendant will pose a continuing threat to society.   If, however, the facts of the case were not sufficiently compelling, we look for other evidence to support the jury's finding, such as psychiatric evidence, character evidence, prior criminal record, prior extraneous offenses, and possible mitigating factors such as the defendant's youth or state of mind at the time of the offense.

*Kunkle v. State*, 771 S.W.2d 435, 449 (Tex. Crim. App. 1986), *cert. denied*, 492 U.S. 925, 109 S.Ct. 3259, 106 L.Ed.2d 604 (1989); *accord Willingham v. State*, 897 S.W.2d 351, 356 (Tex. Crim. App.), *cert. denied*, 116 S.Ct. 385, 133 L.Ed.2d 307 (1995).

Moreover, while this Court has recognized in analyzing sufficiency claims the utility of reviewing prior cases in which it reversed a capital sentence based on insufficiency of the evidence at punishment,[37] it is clear that the Court has "abandoned any pretense of . . . balancing mitigating and aggravating evidence so as to determine, independently of the jury's verdict, the 'appropriateness' or 'justness' of imposition of the death sentence in a given case."   *Burns v. State*, 761 S.W.2d 353, 356 n.4 (Tex. Crim. App. 1988).   Thus, this Court will not independently reweigh the aggravating and mitigating evidence presented at trial; rather, it will apply an "unadulterated *Jackson v. Virginia*[38] standard":   Whether *any rational trier of fact* could have made the finding

---

[37]   *Ellason v. State*, 815 S.W.2d 656, 660 (Tex. Crim. App. 1991).

[38]   443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

beyond a reasonable doubt.[39] *Burns v. State*, 761 S.W.2d at 355-356; *Harris v. State*, 738 S.W.2d 207, 225-226 (Tex. Crim. App. 1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987); *Alexander v. State*, 740 S.W.2d 749, 761 (Tex. Crim. App. 1987) (". . . applying the 'rational trier of fact' test. . . ."), *cert. denied*, 114 S.Ct. 1869, 128 L.Ed.2d 490 (1994); *Livingston v. State*, 739 S.W.2d 311, 340 (Tex. Crim. App. 1987) (". . . whether the evidence . . . would lead any rational trier of fact to make the finding. . . ."), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988); *Keeton v. State*, 724 S.W.2d at 61, 63 (opining that this appellate standard will adequately serve to "make certain that the death sentence is not 'wantonly or freakishly' imposed[.]"). Under this standard, the jury's finding will be upheld as long as the evidence presented at trial

---

[39] Clearly, neither the Eighth Amendment nor the Due Process Clause of the Fourteenth Amendment require this Court to compare the evidence in the present case to that in other death penalty cases and to independently reweigh the sufficiency of the evidence presented. *McCleskey v. Kemp*, 481 U.S. 279, 308, 107 S.Ct. 1756, 1775, 95 L.Ed.2d 262 (1987); *Pulley v. Harris*, 465 U.S. 37, 45-46, 104 S.Ct. 871, 876-877, 79 L.Ed.2d 29 (1984). In *Pulley v. Harris*, the United States Supreme Court specifically held that comparative proportionality review is not mandated by the Constitution. 465 U.S. at 45, 50, 104 S.Ct. at 876, 879. Indeed, the *Pulley* Court cited its decision in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), upholding the Texas statute "even though neither the statute, as in Georgia, nor state case law, as in Florida, provided for comparative proportionality review." 465 U.S. at 48, 104 S.Ct. at 878; *see also Lewis v. Jeffers*, 497 U.S. 766, 779, 110 S.Ct. 3092, 3101, 111 L.Ed.2d 606 (1990) (Court upheld Arizona capital-sentencing statute against vagueness challenge despite Justice Blackmun's concerns about comparative review). This is so in part because, under the Texas scheme, the constitutionally required narrowing function is performed at the guilt-innocence phase by the penal statute defining the offense of capital murder, TEX. PENAL CODE ANN. § 19.03, which encompasses aggravating elements that distinguish capital murder from simple murder. *Jurek v. Texas*, 428 U.S. at 268-71, 96 S.Ct. at 2955-56 (opinion of Stevens, J., joined by Stewart and Powell, JJ.); *Lowenfield v. Phelps*, 484 U.S. 231, 244-46, 108 S.Ct. 546, 554-555, 98 L.Ed.2d 568 (discussing narrowing function of Texas penal statute). Once a challenged aggravating factor is found to "furnish[] sufficient guidance to the sentencer . . . proportionality review is not constitutionally required, and we 'lawfully may presume that [the defendant's] death sentence was not "wantonly and freakishly" imposed -- and thus that the sentence is not disproportionate within any recognized meaning of the Eighth Amendment.'" *Walton v. Arizona*, 497 U.S. 634, 655-656, 110 S.Ct. 3047, 3058, 111 L.Ed.2d 511 (1990), *quoting McCleskey v. Kemp*, 481 U.S. at 306, 308, 107 S.Ct. at 1774, 1775 (1987).

represents more than a "mere modicum" of evidence to support the jury's conclusion. *Burns v.State*, 761 S.W.2d at 356, *citing Jackson v. Virginia*, 443 U.S. at 319-320, 99 S.Ct. at 2789; *see also Lackey v. State*, 819 S.W.2d 111, 117 (Tex. Crim. App. 1989).

The evidence presented at trial, when viewed in the light most favorable to the jury's verdict, showed that Wardlow had been planning the armed robbery of Carl Cole for about a week prior to the offense; that he stole a Llama .45 automatic pistol and ammunition from his mother in preparation for the offense; that he went to Cole's house the night before the offense to "check out the place" and disconnected the telephone lines from the outside so that the victim would not be able to call the police; that he went to the victim's house two more times later that evening and early the next morning to see if he was awake; that apparently the fourth time he went to Cole's house, accompanied by Fulfer, he saw that Cole had left a set of keys in his pickup and that he could, thus, steal the pickup without having to assault Cole; that, after he and Fulfer discussed the risk of leaving a witness to their crime, Wardlow approached the door of Cole's home armed with the Llama .45 automatic pistol[40]; that Wardlow then knocked on the door and attempted to gain entrance into the victim's home by asking to use the telephone; that when the victim refused to let him enter, Wardlow pulled out the Llama .45 automatic pistol, loaded it, released the safety mechanism, and aimed it at the victim; that the victim tried to resist; that Wardlow then shot and killed the unarmed 82-year-old victim and hid his body in a closet; that Wardlow and Fulfer took Cole's billfold and left in his pickup; that Wardlow and Fulfer left town immediately and fled north, arriving eventually in Nebraska where they traded the victim's pickup for another vehicle and a sum of cash; that they used this money to buy several personal items; and that they were ultimately

---

[40]  It should also be noted that Wardlow knew Carl Cole and was no doubt aware that Cole would probably be able to identify him as the perpetrator if given the opportunity. The jury certainly could have reasonably concluded from this evidence that it would have been illogical for Wardlow to risk a face-to-face confrontation with a victim who could later identify him if he had not intended to kill the victim from the beginning.

apprehended at gunpoint by police officers in South Dakota.

Even if these circumstances are not sufficient in themselves to support the jury's finding of future dangerousness, the state presented additional evidence at the punishment phase which, when considered in the light most favorable to the jury's verdict, indicated that about six months before the instant offense Wardlow was involved in a high-speed chase with a local deputy and was arrested for fleeing; that a little more than a week before the instant offense Wardlow took a 1989 Chevrolet pickup for a test drive and did not return it; that while incarcerated awaiting trial in the instant offense, Wardlow hid in his cell a two-foot metal bar with a six- or eight-inch rod extending from the middle of it, which he planned to use to assault a jailer and thereby escape; that also while incarcerated awaiting trial, Wardlow wrote several letters to Sheriff Ricky Blackburn and jailer Patsy Martin in which he threatened to harm other inmates, jailers, and the sheriff; that while being transported from jail to the courtroom on the second day of trial in the instant case, Wardlow told his jailer-escort that the jailers were using trustees as guards and "if they don't stop using them I am going to double my time on one of them."

Certainly, the evidence of the circumstances surrounding the instant offense as well as evidence of Wardlow's conduct before and after the instant offense represent more than a "mere modicum" of evidence supporting the jury's finding that Wardlow would probably commit criminal acts of violence that would constitute a continuing threat to society. The good character testimony of Wardlow's former youth minister and a librarian and assistant principal of the high school he attended simply does not outweigh the evidence supporting an affirmative finding on the future dangerousness issue, particularly in light of the fact that none of these witnesses had been in contact with Wardlow for years. Clearly, a rational juror could have answered "yes" to the first special issue based on the evidence presented.[41] Wardlow's twelfth point of error is without merit and must

---

[41] Even if this Court were to compare the facts in the instant case with the facts presented in the cases cited by Wardlow, the present case is easily distinguished. *See* Appellant's Brief at 42-44, *citing Roney v. State*, 632 S.W.2d 598, 603 (Tex. Crim. App.

be overruled.

## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, the State prays that this Court overrule appellant's points of error and affirm his conviction and sentence.

Respectfully submitted,

DAN MORALES
Attorney General of Texas

JORGE VEGA
First Assistant Attorney General

DREW T. DURHAM
Deputy Attorney General
For Criminal Justice

MARGARET PORTMAN GRIFFEY
Assistant Attorney General
Chief, Capital Litigation Division

GENA A. BLOUNT
Assistant Attorney General
Texas State Bar No. 00790323

P.O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1600
Fax No. (512) 320-8132

---

1982), *Ellason v. State*, 815 S.W.2d 656, 660 (Tex. Crim. App. 1991), and *Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1988).

## CERTIFICATE OF SERVICE

I, Gena A. Blount, Assistant Attorney General of Texas, do hereby certify that a true and correct copy of the above and foregoing **State's Brief** has been served by placing same in the United States Mail on this the _7th_ day of _October_, 1996, addressed to: Douglas H. Parks, Attorney at Law, 3300 Oak Lawn, Suite 600, Dallas, Texas 75219.

GENA A. BLOUNT
Assistant Attorney General