

CAUSE NOS. 6,986, 7,127 & 7,130

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| | § | MORRIS COUNTY, TEXAS |
| VS. | § | |
| | § | 76TH JUDICIAL DISTRICT |
| | § | |
| BILLY JOE WARDLOW | § | AUGUST TERM, A.D. 1994 |

DEFENDANT'S MOTION FOR CHANGE OF VENUE

August 12, 1994

VOLUME 5 of 43 volumes

FILED IN
COURT OF CRIMINAL APPEALS

OCT 11 1995

Troy C. Bennett, Jr., Clerk


ORIGINAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

1

VOLUME 5 INDEX

2

AUGUST 12, 1994                                              PAGE/VOLUME

3

APPEARANCES . . . . . . . . . . . . . . . . .        1/5

4

WITNESSES SWORN . . . . . . . . . . . . .        16/5

5

TESTIMONY BY DEFENDANT  . . . . . . . . .        22/5

6

        RON GOETZ

7

                DIRECT . . . . . . . . .        22/5

8

                CROSS  . . . . . . . . .        36/5

9

                REDIRECT . . . . . . . .        37/5

10

        RONALD M. COWAN

11

                DIRECT . . . . . . . . .        38/5

12

                CROSS  . . . . . . . . .        48/5

13

                REDIRECT . . . . . . . .        52/5

14

        GROVER DYAS

15

                DIRECT . . . . . . . . .        54/5

16

                CROSS  . . . . . . . . .        57/5

17

                REDIRECT . . . . . . . .        58/5

18

        WILLIAM H. McCOY

19

                DIRECT . . . . . . . . .        60/5

20

                CROSS  . . . . . . . . .        66/5

21

                REDIRECT . . . . . . . .        68/5

22

                RECROSS  . . . . . . . .        69/5

23

                REDIRECT . . . . . . . .        70/5

24

        JOEL BUMPASS

25

                DIRECT . . . . . . . . .        71/5

VOLUME 5 INDEX (CONTINUED)

AUGUST 12, 1994                                          PAGE/VOLUME

JOEL BUMPASS (continued)

     CROSS   . . . . . . . . .          74/5

     REDIRECT . . . . . . . .          76/5

JOHNNY FLOYD

     DIRECT . . . . . . . . .          77/5

     CROSS   . . . . . . . . .          80/5

     REDIRECT . . . . . . . .          83/5

RUSSELL GUEST

     DIRECT . . . . . . . . .          85/5

     CROSS   . . . . . . . . .          88/5

     REDIRECT . . . . . . . .          90/5

FLETCHER HARTGROVE

     DIRECT . . . . . . . . .          91/5

     CROSS   . . . . . . . . .          94/5

     REDIRECT . . . . . . . .          95/5

ROBERT HENDERSON

     DIRECT . . . . . . . . .          96/5

JAMES HILL

     DIRECT . . . . . . . . .          99/5

     CROSS   . . . . . . . . .         102/5

SUE HILL

     DIRECT . . . . . . . . .         105/5

     CROSS   . . . . . . . . .         107/5

1

VOLUME 5 INDEX (CONTINUED)

2

AUGUST 12, 1994                                    PAGE/VOLUME

3              SUE HILL (continued)

4                   REDIRECT . . . . . . . . .      108/5

5              A.W. LAWTON

6                   DIRECT . . . . . . . . . .      109/5

7                   CROSS  . . . . . . . . . .      113/5

8                   REDIRECT . . . . . . . . .      113/5

9              CATHY BYRD

10                  DIRECT . . . . . . . . . .      115/5

11             PATSY MARTIN

12                  DIRECT . . . . . . . . . .      119/5

13             W.S. NASH

14                  DIRECT . . . . . . . . . .      124/5

15                  CROSS  . . . . . . . . . .      126/5

16             O.B. SENN, JR.

17                  DIRECT . . . . . . . . . .      128/5

18  DEFENDANT RESTED ITS CASE ON

19             MOTION FOR CHANGE OF VENUE  . . .    131/5

20  TESTIMONY BY STATE  . . . . . . . . . . . .    131/5

21             BOB SCAFF

22                  DIRECT . . . . . . . . . .      131/5

23                  CROSS  . . . . . . . . . .      137/5

24

25

1

VOLUME 5 INDEX (CONTINUED)

2      AUGUST 12, 1994                          PAGE/VOLUME

3      STATE RESTED ITS CASE ON

4              MOTION FOR CHANGE OF VENUE   . . .      140/5

5      COURT REPORTER'S CERTIFICATE PAGE . . . . .    152/5

6      JUDGE'S CERTIFICATE PAGE  . . . . . . . . .    154/5

7      ATTORNEYS' CERTIFICATE PAGE . . . . . . . .    155/5

8

9

10                            * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# ALPHABETICAL INDEX OF WITNESSES

<u>NAME</u>                                                    <u>PAGE/VOLUME</u>

<u>BUMPASS, JOEL</u>
Examination by Mr. Old . . . . . . . . . .          71/5
Examination by Mr. Townsend  . . . . . . .          74/5
Examination by Mr. Old . . . . . . . . . .          76/5

<u>BYRD, CATHY</u>
Examination by Mr. Old . . . . . . . . . .         115/5

<u>COWAN, RONALD M.</u>
Examination by Mr. Old . . . . . . . . . .          38/5
Examination by Mr. Townsend  . . . . . . .          48/5
Examination by Mr. Old . . . . . . . . . .          52/5

<u>DYAS, GROVER</u>
Examination by Mr. Old . . . . . . . . . .          54/5
Examination by Mr. Townsend  . . . . . . .          57/5
Examination by Mr. Old . . . . . . . . . .          58/5

<u>FLOYD, JOHNNY</u>
Examination by Mr. Old . . . . . . . . . .          77/5
Examination by Mr. Townsend  . . . . . . .          80/5
Examination by Mr. Old . . . . . . . . . .          83/5

<u>GOETZ, RON</u>
Examination by Mr. Old . . . . . . . . . .          22/5
Examination by Mr. Townsend  . . . . . . .          36/5
Examination by Mr. Old . . . . . . . . . .          37/5

<u>GUEST, RUSSELL</u>
Examination by Mr. Old . . . . . . . . . .          85/5
Examination by Mr. Townsend  . . . . . . .          88/5
Examination by Mr. Old . . . . . . . . . .          90/5

<u>HARTGROVE, FLETCHER</u>
Examination by Mr. Old . . . . . . . . . .          91/5
Examination by Mr. Townsend  . . . . . . .          94/5
Examination by Mr. Old . . . . . . . . . .          95/5

<u>HENDERSON, ROBERT</u>
Examination by Mr. Old . . . . . . . . . .          96/5

<u>HILL, JAMES</u>
Examination by Mr. Old . . . . . . . . . .          99/5
Examination by Mr. Townsend  . . . . . . .         102/5

ALPHABETICAL INDEX OF WITNESSES
(CONTINUED)

<u>NAME</u>                                                    <u>PAGE/VOLUME</u>

<u>HILL, SUE</u>
Examination by Mr. Old . . . . . . . . . .        105/5
Examination by Mr. Townsend  . . . . . . .        107/5
Examination by Mr. Old . . . . . . . . . .        108/5


<u>LAWTON, A.W.</u>
Examination by Mr. Old . . . . . . . . . .        109/5
Examination by Mr. Townsend  . . . . . . .        113/5
Examination by Mr. Old . . . . . . . . . .        113/5


<u>McCOY, WILLIAM H.</u>
Examination by Mr. Old . . . . . . . . . .         60/5
Examination by Mr. Townsend  . . . . . . .         66/5
Examination by Mr. Old . . . . . . . . . .         68/5
Examination by Mr. Townsend  . . . . . . .         69/5
Examination by Mr. Old . . . . . . . . . .         70/5


<u>MARTIN, PATSY</u>
Examination by Mr. Old . . . . . . . . . .        119/5


<u>NASH, W.S.</u>
Examination by Mr. Old . . . . . . . . . .        124/5
Examination by Mr. Townsend  . . . . . . .        126/5


<u>SCAFF, BOB</u>
Examination by Mr. Townsend  . . . . . . .        131/5
Examination by Mr. Old . . . . . . . . . .        137/5


<u>SENN, O.B., JR.</u>
Examination by Mr. Old . . . . . . . . . .        128/5

* * * * *

VOLUME 5 EXHIBIT INDEX

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| DEF. EXHIBIT 1 Texas Information System (TEXIS) Census Information | 14 | 18 | 18 | 19/ADM |
| DEF. EXHIBIT 2 Newspaper article | 26 | 26 | 26 | 26/ADM |
| DEF. EXHIBIT 3 Newspaper article | 27 | 27 | 27 | 27/ADM |
| DEF. EXHIBIT 4 Newspaper article | 27 | 28 | 28 | 28/ADM |
| DEF. EXHIBIT 5 Newspaper article | 28 | 28 | 28 | 28/ADM |
| DEF. EXHIBIT 6 Newspaper article | 29 | 29 | 29 | 29/ADM |
| DEF. EXHIBIT 7 Newspaper article | 29 | 30 | 30 | 30/ADM |
| DEF. EXHIBIT 8 Newspaper article | 30 | 30 | 30 | 30/ADM |
| DEF. EXHIBIT 9 Newspaper article | 31 | 31 | 31 | 31/ADM |

*****

1       CAUSE NOS. 6,986, 7,127 & 7,130

2 THE STATE OF TEXAS  § IN THE DISTRICT COURT OF
           §
3         § MORRIS COUNTY, TEXAS
  VS.        §
4         § 76TH JUDICIAL DISTRICT
           §
5 BILLY JOE WARDLOW  § AUGUST TERM, A.D. 1994

6

7     DEFENDANT'S MOTION FOR CHANGE OF VENUE

8        August 12, 1994

9       **VOLUME 5 of 43 volumes**

10

11     Before Honorable Paul Banner

12     Judge by Judicial Assignment

13

14        APPEARANCES

15

16 ATTORNEYS FOR THE STATE OF TEXAS:

17     MR. RICHARD TOWNSEND
      District Attorney
18     Morris County Courthouse
      Daingerfield, Texas 75638
19

20

21 ATTORNEYS FOR THE DEFENDANT:

22     MR. BIRD OLD, III
      Law Offices of Bird Old, III
23     P.O. Box 448
      Mt. Pleasant, Texas 75456-0448
24

25

On the 12th day of August, A.D. 1994, at the August Term, A.D. 1994, the above-entitled and numbered causes came on for hearing before said Honorable Court, Judge Paul Banner, Judge by Judicial Assignment presiding, and the following proceedings were had:

MR. OLD:  Judge, before we get started can I get the Sheriff to bring me my client?

THE COURT:  Okay.  This case originally is "6,986", apparently re-indicted to 7,127 and now this the presenting indictment as 7,130.

MR. TOWNSEND:  Your Honor --

THE COURT:  Capital murder.

MR. TOWNSEND:  -- Your Honor, I would ask that we, for the purpose of this hearing file to be carried forward from each case as far as the motion.

THE COURT:  Mr. Old, have you been in it all along?

MR. OLD:  No, sir.  I have not.

THE COURT:  Is there any reason that any motions or that might have been dealt with earlier, why they shouldn't be made part of the record of this without doing everything all over again?

1          MR. OLD:  No, Your Honor.

2          THE COURT:  Fine.

3          MR. TOWNSEND: Thank you, Your

4   Honor.

5          MR. OLD:  Your Honor, may I

6   call the Court's attention to a problem we may have?

7          THE COURT:  Yes, sir.

8          MR. OLD:  I was told when I

9   got to the courthouse this morning that your assignment

10  to the case read "Marion county."

11         THE COURT:  Actually there's

12  two assignments, one has been corrected, there is a

13  subsequent one that corrected it to indicate it.

14         MR. OLD:  I have not seen the

15  corrected.

16         THE COURT:  Morris county, I

17  didn't bring them but I have seen the one that says

18  "Morris county" on it.

19         MR. OLD: That's my objection.

20         THE COURT:  It was about four

21  days later.

22             That's  the  Defendant's  Motion  for

23  Abatement?

24         MR. OLD:  Yes, Your Honor.

25             Not on the assignment, Your Honor, no,

1   sir.  On a different matter.

2                THE COURT:   Okay.   What you

3   are asking on an abatement is that this hearing not be

4   done today?

5                MR. OLD: That's correct, Your

6   Honor.

7                THE COURT:  On the ground that

8   there might be something that I would hear on the

9   assumption another judge is assigned to actually preside

10  he wouldn't know what is heard?

11               MR. OLD:   That's correct.

12               THE COURT: Does that mean the

13  Defense concedes that the motion is not going to be

14  granted to transfer?

15               MR. OLD:   No, sir.   It does

16  not.  I would just like to have a judge at a later date

17  if my motion is denied either carry the motion or reopen

18  the motion without having to have the benefit of this

19  evidence.

20               THE COURT: Mr. Townsend, have

21  you got a position on his abatement?

22               MR. TOWNSEND:   Your Honor, I

23  was served, was given a copy of this by Mr. Old about an

24  hour and a half or two hours ago.  I have not had an

25  opportunity to research the law on it.  However, it would

1   seem to us that we have been waiting long enough for this

2   Motion for Change of Venue.  From a practical standpoint

3   we would like to go ahead and hear the motion.

4                       THE COURT:  Well, okay.  The

5   Motion to Abate is overruled.

6                       Mr. Old, I believe we have discussed on

7   -- by telephone a week or so ago or maybe earlier this

8   week is that the best I could tell there's not anything

9   that if the case stayed here -- in other words, if it's

10  not  transferred  and  if  there  are  problems  in  jury

11  selection because of having a tainted pool or difficult

12  pool from which to get a jury I don't know of any reason

13  a judge couldn't do it and my guess is that -- I am hard

14  pressed  to  figure  out  some  way  or  another  that  the

15  Defendant would be disadvantaged by proceeding on.

16                      Obviously the Defendant is in custody.

17                      MR.  OLD:   The  disadvantage

18  that I see, Your Honor, a judge at a later date is not

19  going to have the benefit of having heard this evidence

20  that is going to be presented today.  I don't believe

21  that  it  would  be  proper  to  be  offered  to  him  the

22  Statement of Facts.  In such things you have got to show

23  the unavailability of a witness to use such a thing, you

24  have  got  to  show  the  unavailability  of  a  witness  in  a

25  criminal case at least I believe that would be the law

1    and I think that even if he viewed it by Statement of

2    Facts he is deprived of the subjective judgment of the

3    witness seated, their demeanor, the way they testify.

4    It has an effect on credibility.

5                          MR. TOWNSEND: Your Honor, may

6    I speak to that briefly?

7                          THE COURT:  Yes.

8                          MR. TOWNSEND:  I think any

9    judge sitting during the jury selection that decided that

10   a fair panel could not be selected that decision is going

11   to be based on what he sees with that jury panel anyway,

12   he's not going to make his decision based on something

13   that another judge has already made a decision on.

14                         THE COURT:  You folks are

15   welcome to have a seat unless you just like to stand.

16                         MR. TOWNSEND:  And I believe

17   that --

18                         THE COURT:  I mean I had all

19   you guys up there standing, too.  I just thought you all

20   didn't have anything you were doing just wanted to stand.

21   I apologize.

22                         MR. TOWNSEND: My position is

23   that having a hearing today but later on that would have

24   to be determined by the judge at that time, it would not

25   be based on this earlier testimony after he saw the

1    panel.

2              Your Honor, I would like to add this,

3    I know you have a lot more experience in these matters

4    than I do and I have not had an opportunity to research

5    that, this is a capital murder case and I certainly don't

6    want to do anything to cause a problem in the future but

7    I don't believe it would.

8              THE COURT:  I fail to see that

9    there is anything that would prejudice Mr. Wardlow,

10   additionally there are two trips, two ways to get a case

11   transferred other than by agreement, one is that if a

12   hearing such as the one scheduled today, it would be that

13   the Defendant would not be accorded a fair trial because

14   of whatever the general population in which the jury to

15   be selected was prejudice, the other way is if in fact

16   in trying to select a jury that it become obvious that

17   a panel could not be, you know, jurors could not be

18   selected.

19             I just don't -- and one isn't going to

20   have a lot to do with the other as I see it.

21             Gentlemen, I think what I would like to

22   do, I'm going to have to take about a four or five minute

23   recess and we will be off the record.  Let me talk to the

24   lawyers in chambers now.

25

1          (Recess.)

2

3                    THE COURT:  Okay.  We will be

4     I guess on the record, 7,130 which is inclusive of the

5     two prior indictments.

6                    Mr. Wardlow, I am Paul Banner and I am

7     a District Judge that sits over in Hunt county which is

8     in Greenville.

9                    It is my understanding that because the

10    judge in the court in which this case is pending is not

11    going to hear it that the case will actually be presided

12    over by somebody assigned to it.  The indictment is in

13    the 276th, is that Judge Porter's court?

14                    THE DISTRICT CLERK:  "76th"

15    or Judge Moye really is the last one that passed on it,

16    the "76th."

17                    THE COURT:  Okay.  So both of

18    the sitting judges, elected judges for this district have

19    stepped aside?

20                    THE DISTRICT CLERK: Yes, sir.

21                    THE COURT:  Anyway what I need

22    to  do  is  it  has  been  called  to  my  attention  and  I

23    understand  that  your  lawyer  has  probably  already

24    discussed it with you and Mr. Old your counsel may or may

25    not  have  back  about  four  generations  upon  both  sides

1   somewhere in the past may or may not have been related

2   to the alleged deceased, that is to Mr. Cole.

3          I have discussed once it was called to

4   my attention that might or might not have been the case

5   as I discussed it with Mr. Old awhile ago and I'm given

6   to understand that you are aware that there might or

7   might not have been.

8          The problem that comes is that

9   apparently Mr. Old is trying to verify whether he is in

10  some way or another that there was by marriage some sort

11  of common ancestor back upstream.  When Mr. Old tried to

12  check that out he does not get any confirmation of any

13  kind of family tree history he's got but I do understand

14  that might or might not be the case.  There is no legal

15  problem that I'm aware of whether that were to be true

16  or not.

17          As far as you are concerned is there any

18  problem that you would have?

19                    THE DEFENDANT:  No, sir.

20                    THE COURT:  Okay.  Fine.

21          Let's go on to what I am really here

22  about and that is the transfer hearing or Change of Venue

23  Hearing.

24          The burden is on the Defense so I guess,

25  Mr. Old, you can begin to call some witnesses or whatever

1     it is that you are going to present.

2                         MR. TOWNSEND:   Judge, may I

3     approach the bench?

4                         THE COURT:   Sure.

5

6                         (Off the record discussion at the bench

7     out of the hearing of the Court Reporter.)

8

9                         THE COURT:   I asked the Clerk

10    too and I have read the motion to transfer it, okay.   In

11    7,130 the State of Texas Vs. Billy Joe Wardlow, if you

12    would arraign the Defendant.

13                        MR. TOWNSEND:   "In the name

14    and by the authority of the State of Texas:   The Grand

15    Jurors for the County of Morris, State of Texas, duly

16    selected, empaneled, sworn, charged and organized as such

17    at the February-March Term, A.D. 1994 of the 276th

18    Judicial District Court of said county, upon their oaths

19    present in and to said court that Billy Joe Wardlow on

20    the 14th day of June, A.D. 1993 and before the

21    presentment of this indictment, in said county and state

22    did then and there intentionally cause the death of an

23    individual, namely Carl Cole, by intentionally shooting

24    the said Carl Cole with a firearm, and the Defendant was

25    then and there in the course of committing and attempting

1  to commit the offense of robbery of Carl Cole, against

2  the peace and dignity of the state, signed Bobby Brown,

3  Foreman of the Grand Jury."

4          THE     COURT:     And    the

5  indictment, does the Defendant have any suggestion that

6  his name is other than set out on the face of the

7  indictment?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  How does the

10 Defendant choose to plead to the indictment?

11         THE DEFENDANT:  Not guilty.

12         THE COURT:  A plea of not

13 guilty is received from the Defendant to the indictment

14 so I guess we need to go on to our motion then.

15         MR. OLD:  Are we to hear the

16 Change of Venue?

17     The Defendant is ready, Your Honor.

18         MR. TOWNSEND:  The State is

19 ready, Your Honor.

20         THE COURT:  Okay.

21         MR. OLD:  Your Honor, at this

22 time the Defendant would have the Motion for Instructed

23 Verdict on the Motion for Change of Venue.

24     There are two grounds set forth by 31.03

25 which the Court can change venue on.  As the Court well

1   knows that by raising those grounds and by obtaining

2   affidavits of two or three more persons the Defendant has

3   raised the issue.   The State must controvert by

4   controverting affidavit the facts alleged in the

5   Defendant's motion in order for the issue to be joined

6   and thereby a trial.  If the State does not join those

7   issues or does not file affidavits we are entitled to an

8   instructed verdict as a matter of law.   If those

9   affidavits do not controvert our affidavit then we are

10  also entitled to an instructed verdict and it is our

11  position that the affidavits controverting the

12  Defendant's affidavit must go to both the 31.03 grounds

13  and that is there exists in the county where the

14  prosecution is commenced such a great prejudice against

15  him that he cannot obtain a fair and impartial trial.

16          And the second issue is that there is

17  a dangerous combination against a -- against him

18  instigated by influential persons.

19          The State has not in any way

20  controverted that there is a dangerous combination

21  against him instigated by influential persons, secondly;

22  the State's affidavit, what it attempts to raise is the

23  credibility of the Defendant affiant, it makes the

24  statement that Defendant affiants are prejudice to said

25  Defendant as to the credibility issue and that is not

1   supported by any facts and it is a nonsense meaningless

2   statement, the affiants' affidavits do not show a

3   prejudice as to the Defendant.

4                    We have reduced our Motion for

5   Instructed Verdict to writing and request permission to

6   file the same with the Court.

7

8                    (Handed to the Court.)

9

10                    THE COURT:  Would you put a

11   stamp on that?

12                    MR. OLD:  And we would call

13   the Court's attention to the case of --

14                    THE COURT:  Did the Defendant

15   file a controverting affidavit?

16                    MR. TOWNSEND:  Yes, Your

17   Honor.

18                    THE COURT:  It may be in one

19   of these others, in 7,130, I don't --

20                    MR. TOWNSEND:  It's "7,127."

21                    THE COURT:  What case were you

22   going to call my attention?  That's where I interrupted

23   you.

24                    MR. OLD:  Excuse me.

25                    THE COURT:  The next thing you

1   may want to do if you have a photocopy of the case --

2                          MR. OLD:   It's "Turner Vs.

3   State, 641 383."

4                          THE COURT:  Do you have a copy

5   of that?

6                          MR. OLD:  Yes.  I do.  Excuse

7   me.

8                          If you don't mind, I have marked all

9   over it and I have marked it so many times --

10                         THE COURT:  I'm going to read

11  what was printed.

12                         The Motion for Judgment or Motion to

13  Grant Without the Change of Venue on the basis of it not

14  being contested, that motion is denied.

15

16                         (Defendant's Exhibit 1 was marked for

17  identification.)

18

19                         MR.  OLD:   I have I believe

20  nineteen witnesses in the hall, could we have them all

21  sworn in here?

22                         THE COURT:   If you can get

23  them in here we will swear them all.

24                         Is that including any witness the State

25  may call?

1          Let's get everybody sworn all at one

2     time.

3               MR. OLD:  May I call my roll

4     to be sure they are all here?

5               THE COURT:  You may.

6               Mr. Old, if you will tell me that cite

7     again.  I didn't write it down and I'm about to.

8               MR. OLD:  "Turner Vs. State,

9     641 Second, 383."

10              THE COURT:  And that was "El

11    Paso Appeal's Court?"

12              MR. OLD:  Yes.

13              THE COURT:  Okay.  I know you

14    all have been very patiently waiting and I owe you an

15    apology, I was sitting in Emory and it turned out the

16    drive from Emory to your county seat takes a little

17    longer than if I had pushed the speed limit.  I apologize

18    to you for the delay.  We had some preliminary matters.

19              What is going to happen, Mr. Old wants

20    to call the roll of the witnesses that are subpoenaed and

21    the County Attorney is going to call roll and we want to

22    make sure who is here.  If you are here to testify in

23    this matter the State of Texas Vs. Billy Joe Wardlow, if

24    you will kindly stand and raise your right hand.  I need

25    to swear all of you as a witness here in the Wardlow

1      matter.

2

3                    (Witnesses sworn.)

4

5                    THE COURT:  Okay.  Now, before

6      you start sitting down let's go down the front row from

7      your right and I need or Mr. Old do you want to just call

8      your roll?

9                    MR. OLD:  Yes, Your Honor.

10                   THE COURT:  Okay.  Once your

11     name is called then you can sit down but we are trying

12     to figure out who is here.

13                   MR. OLD:  "Mary Betts, Joel

14     Fomby, Cathy Byrd, Ron Cowan, Grover Dyas, Johnny Floyd,

15     Ron Goetz, Russell Guest."

16                   A VOICE:  Russell was out

17     there just a little while ago, he's here.

18                   THE BAILIFF:  You need Russell

19     Guest?  Is that him, "Russell Guest?"

20                   THE COURT:  If you would, sir,

21     raise your right hand and let me get you sworn.

22

23                    (Witness sworn.)

24

25                   THE COURT:  Fine.  You can

1    have a seat.

2                    Now, what we are doing, we are going

3    through calling the roll of who is here against the list

4    of who we expected to be here.

5                    MR. OLD:  "Fletcher Hartgrove,

6    Wanda Hartgrove, Robert W. Henderson, James Hill, Sue

7    Hill, Patsy Martin, William H. McCoy."

8                    A VOICE:  I am here, Bird.

9                    MR. OLD:  "W.S. Nash."

10                    THE BAILIFF:  He went to the

11   doctor, he's going to be late.

12                    MR. OLD:  "O.B. Senn."

13                    A VOICE:  Right here.

14                    MR. OLD:  "Welton Walker and

15   Mr. A.W. Lawton."

16                    Your Honor, Mr. Nash has talked to the

17   Clerk this morning, he had a doctor's appointment and

18   indicated that he would be here about 3:00 or 3:30.

19                    THE COURT:  I think we have

20   got enough people.

21                    WELTON WALKER, DISTRICT CLERK:

22   I didn't get swore in, Your Honor.

23

24                    (Whereupon Welton Walker, District Clerk

25   of Morris County was sworn as a witness.)

1          THE COURT:  Have a seat.

2          MR. OLD:  Your Honor, we are

3     ready to proceed.

4          THE COURT:  Anybody you need

5     to check on?

6          MR. TOWNSEND: I have just one

7     and he's here.

8          THE COURT:  Mr. Old, do you

9     want to call your first witness?

10         MR. OLD:  Yes, Your Honor.

11         We would offer into evidence what has

12    been marked "Defendant's Exhibit 1, 8/12/94" by the Court

13    Reporter, Mr. Billups, it is more information as to

14    Morris county, Titus, Camp and Marion county.  It was

15    provided by Mt. Pleasant Chamber of Commerce and Mr.

16    Townsend has agreed that it may be offered into evidence

17    without the witness here to authenticate the same.

18         MR. TOWNSEND: That is agreed,

19    Your Honor.

20         THE COURT:  Okay.  Exhibit 1

21    is received, received for the purpose of this hearing

22    which projects various demographical, statistical data

23    obviously obtained from the last federal census?

24         MR. OLD:  Yes.  And from some

25    other sources, there's a bibliography on the back where

1      all the information came from.

2                          THE   COURT:     It's   received

3      without objection.

4

5                          (Defendant's Exhibit 1 was received in

6      evidence.)

7

8                          MR. OLD:  On the next to last

9      page, the Data Source.

10                         MR. TOWNSEND:  Your Honor, I

11     would ask that the Rule be invoked.

12                         THE   COURT:    Okay.   Let  me

13     explain something to you folks that have been subpoenaed

14     and now sworn as a witness in this hearing, the Rule as

15     to witnesses has been invoked.  What that means if you

16     have  never  hung  around  the  courthouse  before  is  that

17     while this hearing is being conducted unless you are the

18     witness testifying you will not be in the courtroom to

19     hear what other witnesses testify to.

20                         There's some more explanation  to this

21     origin  of  this  Rule,  it  was  found  that  upon  the

22     desirability of witnesses giving what they presently

23     remember and recall about some prior event, not what some

24     other witness that has been sitting out in the hall for

25     the  last  hour  on  the  bench  would  remember  so  you  are

1   under an instruction that not only would you not be in

2   the courtroom to hear other witnesses' testimony, you may

3   not discuss with another witness what their testimony has

4   been and will be, you may not tell them what your

5   testimony has been or will be.

6            Now, probably a bunch of you are

7   acquainted with each other so you talk about anything

8   else in the world you want to.

9            Now, this issue in this proceeding has

10  to do with a pending charge against Mr. Billy Joe Wardlow

11  where he stands indicted with alleged to have caused the

12  death of a Mr. Cole, that's what it's about and the

13  question has to do with whether this is a proper county

14  for the case to be heard.

15           So, if you will just stay away from

16  discussing anything about Mr. Cole or about this case and

17  we will be in good shape.

18           The problem is that if you do violate

19  the instruction that I have given you then whatever you

20  know I will never learn because you are not going to be

21  able to tell me about it though you have already been and

22  spent several hours and when you could have been doing

23  something else you are already here and it would be a

24  shame whatever it is you came to tell us as far as your

25  recollection of the facts that I would never be able to

1    hear, okay?

2                    What I'm trying to tell you is just

3    don't talk about Mr. Cole, Mr. Wardlow or what this case

4    is about.  You can talk about whether we are going to get

5    baseball after today or not and so forth, talk about the

6    Court's starting late, whatever you want to talk about,

7    just do not talk about this specific case.

8                    Now, what I'm going to do is excuse you

9    out here and have a seat out in the hall some place,

10   probably each witness will be relatively short so

11   consequently we will be moving once we finally get

12   started now, I think we will move pretty quickly but if

13   you would, if you will be available so when your name is

14   called we can get you in because there's a lot of folks

15   here and if we spent more time looking for you than it

16   does to find out what you know then of course that means

17   everybody that is going to be called behind you or after

18   you will just mean that they will be later this afternoon

19   than they would, otherwise would have.

20                    So if you have been sworn as a witness

21   I'm going to excuse you out in the hall and we will get

22   to you just as quickly as we reasonably can.

23                    If you are not a witness of course you

24   are welcome to stay and observe the proceeding.

25                    Mr. Old, I'm going to exempt the Clerk

1    under the Rule save and except for that part, I'm not

2    going to exclude him from the courtroom, he's got an

3    official duty, needs to be stamping things and he can

4    stay in here.

5                    If that causes a problem I will be happy

6    to --

7                            MR. OLD:  No problem.

8                    Mr. McCoy also is an officer of the

9    Court.

10                           THE COURT:  As an officer of

11   the Court he is excluded from the Rule but he will be

12   bound by the instructions I gave him.

13                   Call your first witness.

14                           MR.  OLD:   I  call  Mr.  Ron

15   Goetz.

16

17                   RON GOETZ

18   was called as a witness and, having been first sworn by

19   the Court, testified as follows:

20

21                   DIRECT EXAMINATION

22                   BY MR. OLD

23

24   Q        Would you please state your name?

25   A        Ron Goetz.

1    Q        How do you spell that last name?

2    A        "G-O-E-T-Z."

3    Q        It has an "O" in it?

4    A        Right.

5    Q        Where do you reside?

6    A        In Daingerfield, Texas.

7    Q        How long have you lived in Daingerfield or

8    Morris county, Texas?

9    A        Six and a half years.

10   Q        How are you employed?

11   A        I am the Publisher of the Bee newspaper.

12   Q        How long have you been a publisher of the Bee

13   newspaper?

14   A        Six and a half years.

15   Q        What area does the Bee cover?

16   A        Mostly Morris county and into Hughes Springs.

17            Southern part of Morris county more than

18   the northern part.

19   Q        What is the circulation in Morris county?

20   A        In Morris county itself?

21   Q        Right.

22   A        About 2,500.

23   Q        Does that include your rack sales?

24   A        Yes, sir.

25   Q        Either by subscription or by sale you all sell

1    approximately 2,500 papers?

2    A        Both mail subscription and street sales about

3    2,500 within Morris county.

4    Q        "Within Morris county?"

5    A        Yes.

6    Q        What is your total circulation?

7    A        3,200.

8    Q        The additional 700, can you identify any part

9    of it, any particular locality?

10   A        I have got about 300 in Hughes Springs, about

11   a hundred in Avinger, less than a hundred down in Marion

12   county by the north side of Lake O' the Pines and the

13   rest is scattered.

14   Q        Part of the city of Hughes Springs is in Morris

15   county, is it not?  The line is close to it?

16   A        Well, the city limits is into Cass county but

17   their mailing address is in Hughes Springs and there is

18   a part in Morris county.  Yes.

19   Q        Has your newspaper -- are there any other

20   newspapers in the county?

21   A        Yes, sir.

22   Q        And what are they?

23   A        The Naples Monitor.

24   Q        And do you know what their circulation is?

25   A        No.  I don't.  I understand it's around 2,000

1        but I couldn't say for sure.

2        Q        How often does the Bee publish, once or twice?

3        A        Once a week.

4        Q        How often does the Monitor publish?

5        A        Once a week.

6        Q        You are familiar with the alleged situation

7        surrounding the death of Mr. Carl Cole?

8        A        Yes, sir.

9        Q        Has your paper reported that event?

10       A        Yes.  It has.

11       Q        When did it first report it?

12       A        On June 16th, 1993.

13       Q        Would that have been the first newspaper

14       published after Mr. Cole's death?

15       A        Yes.  It was.

16       Q        Did you receive a subpoena to bring all matters

17       as to Mr. Cole's death and as to Mr. Wardlow being

18       accused of having killed him into Court today?

19       A        Yes.  I did.

20       Q        Have you done so?

21       A        Yes.  I have.

22                         MR. OLD:  May I approach the

23       witness, Your Honor?

24                         THE COURT:  Yes.

25                         THE WITNESS:  Do you want the

1   whole folder?

2                              MR. OLD:  No.  Let's do them

3   one at a time.

4

5                              (Defendant's Exhibit 2 was marked for

6   identification.)

7

8                              MR. OLD:  I show you what is

9   marked "Defendant's Exhibit 2" and ask you if this was

10  the report in the Bee of Mr. Cole's death?

11

12                             (Handed to the witness.)

13

14                             THE WITNESS:  Yes.  It was.

15  Yes.  It was.

16                             MR.  OLD:  We would offer

17  Defendant's Exhibit 2 into evidence.

18                             MR. TOWNSEND:  No objection,

19  no objection, Your Honor.

20                             THE COURT:  It's received.

21

22                             (Defendant's Exhibit 2 was received in

23  evidence.)

24

25                             MR. OLD:  Approach the bench?

1     (Off the record discussion at the bench

2 out of the hearing of the Court Reporter.)

3

4       MR. OLD:  Can you show me the

5 next publication?

6       THE WITNESS:   June 23rd.

7

8     (Defendant's Exhibit 3 was marked for

9 identification.)

10

11       MR. TOWNSEND:  No objection.

12       MR. OLD:  Your Honor, we would

13 offer Defendant's Exhibit 3, the June 23rd publication

14 of the Bee and we would call the Court's attention to

15 there are three articles, two front page articles and

16 under "Obituaries", Mr. Cole's obituary.

17

18     (Defendant's Exhibit 3 was received in

19 evidence.)

20

21       THE WITNESS:  Okay. This was

22 June the 30th.

23

24     (Defendant's Exhibit 4 was marked for

25 identification.)

1            MR. TOWNSEND:  No objection.

2            MR. OLD:  Your Honor, we would

3  offer Defendant's Exhibit 4 into evidence.

4            THE COURT:  "4" is received.

5

6            (Defendant's Exhibit 4 was received in

7  evidence.)

8

9            THE WITNESS:  The next article

10  is May 25th, 1994, I didn't have the full paper or page

11  to bring you.

12

13            (Defendant's Exhibit 5 was marked for

14  identification.)

15

16            MR.  OLD:    We  would  offer

17  Defendant's Exhibit 5.

18            MR. TOWNSEND:  No objection.

19            THE COURT:  "5" is received.

20

21            (Defendant's Exhibit 5 was received in

22  evidence.)

23

24            THE WITNESS:   I'm sorry I

25  don't have a date on this paper, it was in May of this

1   year.

2               MR. OLD:  I think this is the

3   one we just looked at.

4               THE WITNESS:  It was?  Was it

5   the one you just got?  Is that the same?

6           Okay.

7               MR. OLD:  See the headline on

8   it is the same.  (Indicating)

9               THE WITNESS:    Okay.    I'm

10   sorry.  There was one on June 30th, 1993 also.

11

12            (Defendant's Exhibit 6 was marked for

13   identification.)

14

15               MR. TOWNSEND:  No objection,

16   Your Honor.

17               THE COURT:  It's received.

18

19            (Defendant's Exhibit 6 was received in

20   evidence.)

21

22               THE WITNESS:  The next one is

23   July 6th, 1994.

24

25            (Defendant's Exhibit 7 was marked for

1    identification.)

2

3                          MR. TOWNSEND:  No objection,

4    Your Honor.

5                          THE COURT:  "7" is received.

6

7                          (Defendant's Exhibit 7 was received in

8    evidence.)

9

10                         THE WITNESS:  The next one is

11   July 27th, 1994.

12

13                         (Defendant's Exhibit 8 was marked for

14   identification.)

15

16                         MR. OLD: We offer Defendant's

17   Exhibit 8.

18                         MR. TOWNSEND:  No objection,

19   Your Honor.

20                         THE COURT:  "8" is received.

21

22                         (Defendant's Exhibit 8 was received in

23   evidence.)

24

25                         THE WITNESS:  The next one is

1      August 3rd, 1994 and that's the last one.

2

3                          (Defendant's Exhibit 9 was marked for

4      identification.)

5

6                                  MR. OLD:   Offer Defendant's

7      Exhibit 9.

8                                  MR. TOWNSEND:  No objection,

9      Your Honor.

10                                 THE COURT:  Received.

11

12                         (Defendant's Exhibit 9 was received in

13     evidence.)

14

15                                 MR. OLD:  Your Honor, would

16     you like time to review?

17                                 THE COURT:  No.  Go ahead.

18                                 MR. OLD:  Did you do any of

19     the reporting of the story yourself?

20                                 THE WITNESS:  No, sir.

21     Q          (BY MR. OLD)  Was it done under your direction?

22     A          Well, everything up there is done under my

23     direction indirectly.

24     Q          Did you edit a copy that was submitted by your

25     reporter or writer?

1    A          No.  I read the story but I didn't edit it.

2    Q          Did you have the opportunity to edit if you 8

3    desire to?

4    A          Yes, sir.  I did.

5    Q          Do you know Mr. Cole or know of Mr. Cole?

6    A          The best of my knowledge I never met Mr. Cole.

7    Q          Did you know him by reputation?

8    A          Yes, sir.  Vaguely, vaguely.

9    Q          Did you read Mrs. Best's article of June 23rd

10   "Cole a friendly man with a friendly routine?"

11   A          Yes, sir.  I did.

12   Q          Starts out that the "cold-blooded murder last

13   week of a local rancher", do you recall the story?

14   A          I recall the story but I couldn't tell you

15   exactly how it started out.  I recall the story.

16   Q          Do you recall that statement?

17   A          Not really.

18   Q          I am being unfair with you, I have it here, I

19   didn't know whether you had read them well enough.

20

21                    (Handed to the witness.)

22

23                    THE  WITNESS:   Okay.   This

24   story here?  (Indicating)

25                    I remember the statement.

1          MR. OLD:  The article goes on

2    to point out that Mr. Cole was 82 years of age, he was

3    a pioneer of this county?

4                      THE WITNESS:  That's correct.

5    Q          (BY MR. OLD)  And that he was a person well-

6    known?

7    A          That's correct.

8    Q          All through the county?

9    A          That's correct.

10   Q          And that he was a man who people throughout

11   this county were fond of?

12   A          Yes, sir.

13   Q          Are you familiar with the other side, the other

14   article on the front page?

15   A          Yes.  I am.

16   Q          And it purports to be an interview of an

17   officer I believe in Madison?

18   A          South Dakota.

19   Q          South Dakota who claimed they arrested Mr.

20   Wardlow?

21   A          That's correct.

22   Q          Who wrote that article?

23   A          Charles Wright.

24   Q          Is he still with the paper?

25   A          Yes.  He is.

1    Q        Do you know whether or not that was by a phone

2    interview?

3    A        I beg your pardon?

4    Q        Do you recall whether or not that was a phone

5    interview?

6    A        Yes.  It was.

7    Q        What was the headline?

8    A        "Wardlow, Fulfer face death penalty, duo act

9    cool up north."

10   Q        Do you know whether or not that --

11                    MR.  TOWNSEND:   I want to

12   object to going into this, Your Honor.  It's -- you have

13   already told us that you can read, I feel sure that you

14   can, I feel sure that you are going to and I don't see

15   any purpose for going over verbatim what is in those

16   articles.

17                    MR. OLD:  I'm well aware that

18   the Court can read, Your Honor.

19                    THE COURT:  Well, I want you

20   to put on pretty much what you want to but if the witness

21   is going to be reading selected passages of the document

22   that is otherwise going to be received --

23                    MR. OLD:  That really wasn't

24   my intent.

25                    THE COURT:  Go ahead.  I'm

1    sorry for interrupting you.

2                           MR. OLD:  You were not a party

3    to the conversation that report was made from?

4                           THE WITNESS:    I beg your

5    pardon?

6    Q        (BY MR. OLD)  As to the article we were talking

7    about, you were not a party to the conversation between

8    Mr. Wright and the officer?

9    A        No, sir.

10   Q        Did you edit that particular article?

11   A        No, sir.

12   Q        But you had the opportunity to?

13   A        Yes.  Probably.  I can't recall exactly what

14   I was doing at that time that the article was written but

15   I'm sure I had the opportunity to edit it.

16                           That's what I pay an editor for is to

17   edit.

18   Q        You have read that article, are you familiar

19   with it?

20   A        Basically.  I haven't reread the whole thing

21   in the last two days.

22   Q        What it pretty well says is how the officer's

23   observation, his observation, his opinion of how Mr.

24   Wardlow acted?

25   A        That's correct.

1    Q         And that it is his from the subject?

2    A         That's correct.

3                        MR. OLD:  Pass the witness.

4                        THE COURT:   Mr. Townsend.

5

6                     CROSS EXAMINATION

7                   BY MR.  TOWNSEND

8

9    Q         Mr. Goetz, I believe you stated that you have

10   approximately 2,500 circulation in Morris county, is that

11   correct?

12   A         That's correct.

13   Q         Do you have any record as to how many of those

14   subscriptions are in the Naples or Omaha area?

15   A         I have records of it but I don't have them here

16   with me but I can tell you that we sell approximately a

17   hundred copies a week in the Naples-Omaha area off the

18   newsstand, "sell and get stolen" I should say and we

19   probably have about forty subscribers in Naples and maybe

20   thirty-five in Omaha.   And I would have to get those

21   figures from the computer.

22   Q         But it would be correct to say that basically

23   this --

24   A         My basic circulation --

25   Q         -- is a south end of the county paper?

1      A          Lone Star, Hughes Springs, is the bulk of my

2      circulation.

3                          MR. TOWNSEND:  And basically

4      the Monitor is the north end of the county?

5                          No further questions.

6

7                          REDIRECT EXAMINATION

8                          BY MR. OLD

9

10     Q          Do you know whether or not television and radio

11     carried this particular story?

12     A          I don't recall.  I believe a Mt. Pleasant radio

13     station covered it, carried it.  But I don't recall it

14     being on television, it might have been.

15                          That has been fifteen months ago,

16     fourteen months ago.

17                          MR. OLD:  Pass the witness,

18     Your Honor.

19                          MR. TOWNSEND:  No further

20     questions.

21                          THE COURT: May this gentleman

22     be excused?

23                          MR. OLD:  I have no objection.

24                          MR. TOWNSEND:  No objection,

25     Your Honor.

1          THE COURT:   Thank you very

2    much.   Thank you for being here.

3                The next witness, Mr. Old?

4                MR. OLD:  Mr. Ron Cowan.

5                THE COURT:   While we are

6    waiting for the witness to arrive, which date was the

7    last series of questions at the end of your direct, which

8    date was that?

9                MR. OLD:  June 23rd, 1993.

10               THE COURT:  All right.   That

11   headline, "A friendly man, friendly routine"?

12               MR. OLD:  Yes.  And "duo act

13   cool up north, Wardlow, Fulfer face death penalty."

14               THE COURT:  If you would just

15   have a seat over here, please, sir.

16

17               RONALD M. COWAN

18   was called as a witness and, having been first duly sworn

19   by the Court, testified as follows:

20

21               DIRECT EXAMINATION

22               BY MR. OLD

23

24   Q        Please state your name.

25   A        Ronald M. Cowan.

| | | |
|---|---|---|
| 1 | Q | Where do you live, Mr. Cowan? |
| 2 | A | I live at 116 Erin Circle, Daingerfield, Texas. |
| 3 | Q | Morris county, Texas? |
| 4 | A | Yes, sir. |
| 5 | Q | How long have you been a resident of Morris |
| 6 | | county, Texas? |
| 7 | A | From 1951 to '62 and from 1977 to present. |
| 8 | Q | Were you born and raised here in Morris county? |
| 9 | A | I wasn't born here. |
| 10 | Q | You were not? |
| 11 | A | No. |
| 12 | Q | How old were you when you came here? |
| 13 | A | I was in the third grade when I came here. |
| 14 | Q | You grew up here? |
| 15 | A | Yes, sir. |
| 16 | Q | And you came back here, you left for what |
| 17 | | purpose? |
| 18 | A | To go to school. |
| 19 | Q | And you came, you worked and came back in what |
| 20 | | year? |
| 21 | A | 1977. |
| 22 | Q | Since 1977 how have you been employed here in |
| 23 | | Morris county? |
| 24 | A | I have had my own business and I was County |
| 25 | | Judge here for eight years. |

1    Q        And what was your business when you were in

2    business for yourself?

3    A        I had a glass and mirror shop.

4    Q        And you were elected County Judge in what year?

5    A        I was elected in 1982.

6    Q        And what year was the last year you served this

7    county?

8    A        June, 1990.

9    Q        And since June, 1990 how have you been employed

10   or occupied?

11   A        I have been employed at Northeast Texas

12   Community College as a Sociology-English Instructor.

13   Q        And you are a sociology and English instructor

14   at the college?

15   A        Yes, sir.

16   Q        Are you the head of either one of those

17   departments?

18   A        I am the head of the Sociology Department.

19   Q        What is "Sociology"?

20   A        It's the study of how we become a human being,

21   how human interact in groups, social groups.

22   Q        Did you know Mr. Carl Cole during his lifetime?

23   A        Yes.  I did.

24   Q        Did you know him well?

25   A        Yes.  I did.

1    Q        Do you know whether or not he was well-known

2    in all parts of Morris county, Texas?

3    A        In my opinion he was.

4    Q        And would you tell His Honor the facts that you

5    base that opinion on, your observations?

6    A        For eight years I was County Judge, Carl Cole

7    helped my campaign when I was running, introduced me to

8    his brother in the north end, toured me around the

9    county, introduced me to a large number of people and

10   then over the years I watched him make his rounds.  I

11   have been into the coffee shops in the north end of the

12   county and south end when he has come in and talked to

13   people.

14   Q        And when you were running for judge he helped

15   you with your campaign?

16   A        Yes, sir.

17   Q        What was his brother's name?

18   A        "Homer."

19   Q        What did Homer do?

20   A        He was a rancher, farmer.

21   Q        Did he live in the north end of the county?

22   A        Yes, sir.

23   Q        At Omaha, Naples or near either one?

24   A        Generally the Naples area, that area.

25   Q        Was Homer a well-known man in this county?

1    A          In my opinion he was.

2    Q          Were he and Carl close based on your

3    observation?

4    A          Fairly close.

5    Q          Who else?  Do you know any other member of Mr.

6    Cole's family?

7    A          I knew Waldene Henderson.

8    Q          Who is "Waldene Henderson?"

9    A          His sister.

10   Q          How did you come to know her?

11   A          She taught in the public schools for years and

12   years and years.

13   Q          Did she teach here?

14   A          Yes.

15   Q          Did she teach at the time that you were going

16   to school?

17   A          She did.  Yes.

18   Q          Was she a well-known person in this county?

19   A          Based on the number of students that she has

20   taught down through the years I would say she was a well-

21   known person, a lot of people would know her simply

22   because they have been in her classes.

23   Q          Did you know Mr. Cole's son?

24   A          Yes.  I did.

25   Q          And I don't recall, do you recall his first

1   name?

2   A        His name is "Charles Cole."

3   Q        Did Charles live in Morris county any period

4   that you are aware of?

5   A        Yes, sir.

6   Q        When was that?

7   A        When I was growing up here he was the principal

8   of what is "West Elementary School" now, he ran for

9   County Judge at one time.

10  Q        Do you know how many years he was principal?

11  A        No.  I don't.

12  Q        Was it several?

13  A        Several years.

14  Q        Did he teach here before he became principal?

15  A        I believe so.

16  Q        Was he well-known and liked in this county?

17  A        Yes.   He was well-known and liked and well

18  respected.

19  Q        Have you kept up with the media coverage of Mr.

20  Cole's death?

21  A        By "keeping up" do you mean have I speed read

22  through the articles?

23          Yes.  In the local papers.  Yes.

24  Q        Have you heard a lot of people comment on the

25  facts giving rise to his death and accusation made

1    against Mr. Wardlow?

2    A        Initially when the even first occurred and when

3    all the initial publicity, yes, people were talking about

4    it all over the county widely.

5    Q        Based upon their comments to you did you form

6    an opinion whether or not they had formed an opinion as

7    to Mr. Wardlow's guilt?

8    A        Counselor, could you ask me that one more time?

9    Q        Based upon your observation --

10                    MR. TOWNSEND:  I object to

11   that, he's calling for an opinion, legally calling for

12   an opinion on the part of the witness based not on his

13   personal knowledge but strictly his opinion, he can give

14   an opinion as to what he feels, I don't know that he can

15   give an opinion as to whether everybody else is talking

16   about it.

17                    THE COURT:  Overruled.  You

18   can answer.

19                    Actually he didn't finish the question

20   so you might have to start at the front.

21                    MR. OLD:  Based upon the

22   comments that you heard from other people about Mr.

23   Cole's death and the accusations against Mr. Wardlow did

24   you form an opinion as to whether or not they had formed

25   an opinion as to Mr. Wardlow's guilt?

1                              THE   WITNESS:      Counselor,

2   that's an iffy question.

3                    In some cases people were -- had strong

4   opinions and in some cases people expressed concern and

5   things like that without expressing a strong opinion on

6   one side or another.   It was discussed but some people

7   had polarized.  Yes.

8   Q          (BY MR. OLD)  Did they express the opinion to

9   you that they believed Mr. Wardlow to be guilty?

10  A          I have had people express that opinion to me.

11  Yes.

12  Q          Do you have an opinion as to whether or not Mr.

13  Wardlow can get a fair trial in Morris county, Texas?

14  A          Yes.  I do.

15  Q          And what is that opinion?

16  A          My  opinion  is  that  it  would  be  difficult,

17  difficult to empanel a panel in Morris county that would

18  be  fair  and  impartial  and  not  know  Carl  Cole,  the

19  Wardlows or any of the Cole's kinfolks.

20  Q          And it is based upon the knowledge of people

21  of Mr. Cole?

22  A          That and the size of the county, you know.

23  Q          And the small jury pool?

24  A          You know, relatively speaking we have a small

25  jury pool.  Yes.

1   Q        Was Mr. Cole kin to a lot of people in this

2   county?

3   A        I'm not one of these people that keeps up with

4   everybody's genealogy.  I know that he was kin to several

5   people and they in turn kin to others but to be able to

6   draw a family tree, Counselor, I couldn't draw you one.

7   Q        Would you consider Mr. Cole to have been one

8   of the pioneer families -- the Cole family to be a

9   pioneer family in this area?

10  A        I think that is generally accepted.

11  Q        Do you know Jerry Pratt, Sr.?

12  A        Yes.  I do.

13  Q        Was he County Judge before you?

14  A        Yes.  He was.

15  Q        He has been quoted as having made the statement

16  that "Carl had an awful lot of friends?"

17  A        I think that would be an understatement.

18  Q        "An understatement?"

19  A        Yes.  I do.

20  Q        In what way would that be an understatement?

21  A        He had a lot of friends.

22  Q        Carl was 82 years of age, did he get around

23  well?

24  A        Yes.  He did.

25  Q        Was he still active in the cattle business at

1    the time of his death?

2    A     I think he was cutting back, he had pretty

3    substantially cut back but he still kept his hands in it.

4    Q     You mean he got out everyday and you saw him

5    about town?

6    A     I saw him virtually everyday.

7    Q     Where would you see him?

8    A     I would see him at the little store in Cason,

9    I would stop and get a cup of coffee and we would visit.

10    Q     Was he a friendly man who visited with a lot

11    of people?

12    A     Everybody that came in.

13    Q     I have also heard that he was a great story

14    teller?

15    A     Yes.

16    Q     Did Mr. Cole's popularity cross age groups,

17    that is was he known and liked by people much younger

18    than he?

19    A     I think that may have had a limit.  I think,

20    you know, I am considerably younger than Mr. Cole but a

21    lot of people in my age group who knew him and who liked

22    him and even the generation below me but as far as young

23    people, teenagers and people in their early 20s knowing

24    Mr. Cole I would say probably not.

25    Q     How old are you, Mr. Cowan?

1     A          I am 50.

2     Q          Do you think it goes down a generation below

3     you?

4     A          I would say the next group.  Yes.  People in

5     their 30s and 40s knew Mr. Cole.

6                          MR. OLD:  "People in their 30s

7     and 40s knew Mr. Cole?"

8                          Pass the witness.

9

10                    CROSS EXAMINATION

11                    BY MR. TOWNSEND

12

13    Q          Mr. Cowan, when you talked about Ms. Henderson

14    I believe you said she was a schoolteacher?

15    A          I think so, Waldene.

16    Q          Where did she teach if you know?

17    A          I think she taught in Garland, she substituted

18    in the Daingerfield system for years and years and years.

19    Q          She didn't work in the Naples-Omaha end of the

20    county?

21    A          Counselor, I don't know for sure.  She may have

22    when she first started.

23    Q          As far as you know she didn't?

24    A          As far as I know she did not.

25    Q          Mr. Charles Cole is Mr. Cole's son was

1    principal and worked in the Daingerfield school district,

2    is that right?

3    A       That's right.   West Elementary.

4    Q       He never worked in the Naples-Omaha end of the

5    county?

6    A       Not to my knowledge.

7    Q       On this popularity as regarding age would you

8    agree with me that Mr. Cole was certainly better known

9    in the 65 and older category than he would have been with

10    the younger people so far as his friends and those people

11    who felt close to him?

12    A       I think so.   I think the older the group gets

13    the longer they are going to have known -- to have known

14    him and longer he has been here so I think the older the

15    population is that knew Carl Cole the better they are

16    going to know him.   I will agree to that.

17    Q       When you said you had people that expressed to

18    you their prejudice or they felt as if the Defendant in

19    this case was guilty, I believe you also said or you sort

20    of indicated, I want to clear this up, there were people

21    who discussed the case without expressing that they felt

22    like they knew who did it or he was guilty, they knew he

23    was guilty or anything of that nature?

24    A       Yes.   In fact, Counselor, the whole range from

25    -- everybody from who adamantly was convinced that he was

1    guilty all the way through neutral and every once in

2    awhile, every great -- and I mean every once in a great

3    once in awhile you would have somebody express a

4    presumption of innocence, they were going to wait until

5    it was determined by the Court.

6    Q        So the opinions expressed would be kind of like

7    the opinion expressed in any criminal case, in some of

8    them some people are going to automatically think someone

9    is guilty and some people are going to wait and

10   everything in between?

11   A        Yes.   And virtually everything in between.

12   Yes.

13   Q        So there's nothing unusual about that?

14   A        I don't think so.

15   Q        You said earlier that initially there were a

16   lot of talk in the community about this case, do you find

17   that as of today, there is still as much talk or more

18   talk or less talk, how do you feel about that?

19   A        I think it's like any other newsworthy event,

20   in close proximity to when it took place the more talk

21   and more discussion, the more talk took place and as time

22   passed the talk diminished somewhat and as that case

23   comes to trial and makes the newspaper it's going to

24   increase again so it will come back up but it's a

25   circular thing.

1   Q      You said Mr. Cole was known in all parts of

2   Morris county that he did have a brother that lived in

3   Naples, is that correct?

4   A      In the north end of the county.

5   Q      Yes.

6            Mr. Carl Cole, his ranch was in the

7   Cason area, is that correct?

8   A      Yes, sir.

9   Q      Where was his brother's ranch?  Was it in the

10   Naples area?

11   A      Pretty much.  Yes.

12   Q      Would you agree with me that although Carl Cole

13   was known maybe county-wide he was certainly not as well-

14   known in the Naples-Omaha end of the county as he was in

15   Daingerfield?

16   A      I will agree to that.

17   Q      And certainly would not have been as well-known

18   in the Lone Star area or Hughes Springs area part of

19   Morris county as he would in the Daingerfield-Cason area?

20   A      That's quite true.

21   Q      When Mr. Cole was introducing you around when

22   you were running for County Judge and the various places

23   you went with him and were introduced to him were the

24   majority of the people that he introduced you to in the

25   age category that they would now be, although they may

1       not have been then, they would now be 65 or older?

2       A       I can't say what percentage but a large

3       percentage of them would probably be in that age range

4       now.

5       Q       Not all but a large percent?

6       A       A goodly number.

7                     MR. TOWNSEND:   Pass the

8       witness.

9

10                   REDIRECT EXAMINATION

11                      BY MR. OLD

12

13      Q       Of those people 65 years of age that he might

14      have introduced you to when he was campaigning with you

15      did they have children?

16      A       Oh, yeah.

17      Q       Grandchildren?

18      A       Yes.

19      Q       And was Mr. Cole influential in helping you

20      with those people?

21      A       Let me put it this way; when I first started

22      running I don't think I knew a soul on the north end of

23      the county and Mr. Cole introduced me to business people,

24      to farmers, to ranchers, to people in the coffee shops

25      so there was a kind of -- there was a broad cross section

1    of people that he introduced me to and then, yes, they

2    had children and --

3    Q          Back when you were campaigning it was what,

4    twelve, fifteen years ago?

5    A          Counselor, I can't -- it was in 1982.

6    Q          Did Mr. Cole seem to know a lot of people in

7    the north part of this county?

8    A          Yes.

9    Q          Were these people that were influential people,

10   that you consider to be "influential?"

11   A          Yes.

12   Q          And did he know less up there than he knew in

13   Daingerfield or in Lone Star?

14   A          "Less people?"

15   Q          Did he take you to see less people?

16   A          No.  Actually he took me to see a lot of people

17   in the north end of the county and didn't take -- he

18   didn't take me to see people in the south end of the

19   county.

20   Q          Did you carry the north end of the county?

21   A          Yes.  I did.

22   Q          What can you attribute to your success there?

23   A          I wish I could say my good looks and wisdom but

24   it may have been the weakness of my opponent or lots of

25   things.  I did meet a lot of people in the north end, I

1      formed a lot of good friendships in the north end.

2      Q        Do you think Carl Cole had anything to do with

3      that?

4      A        Carl Cole had -- he opened the door, yes, he

5      did.

6                              MR. OLD:  Pass the witness.

7                              MR.  TOWNSEND:    No  further

8      questions.

9                              THE COURT:  May this witness

10     be excused?

11                             MR. TOWNSEND:  Yes.

12                             THE  COURT:    Thank  you  for

13     being here.  You may be excused.

14                        Next witness, please.

15                             MR. OLD:  Grover Dyas.

16

17                        GROVER DYAS

18     was called as a witness and, having been first duly sworn

19     by the Court, testified as follows:

20

21                        DIRECT EXAMINATION

22                        BY MR. OLD

23

24     Q        Would you please state your name?

25     A        Grover Dyas, "D-Y-A-S."

1   Q        Where do you live, Mr. Dyas?

2   A        208 Highland.

3   Q        Is that Daingerfield or Lone Star?

4   A        Daingerfield.

5   Q        How long have you lived in Morris county?

6   A        About nine years I think.

7   Q        Did you know Carl Cole?

8   A        Yes, sir.

9   Q        And how did you come to know him?

10  A        I met him the first time I ever went to Cason,

11  that was back in the early 50s, he was -- he was a friend

12  of my wife's family.

13  Q        From the early 50s until you moved here did you

14  come back and forth into Morris county and visit?

15  A        Yes, sir.

16  Q        Who was your wife?

17  A        Pardon?

18  Q        What was her maiden name?

19  A        "Minter."

20  Q        Was Carl Cole   a well-known   man  in  this

21  county?

22  A        Yes, sir.

23  Q        How well-known would you say he was?

24  A        Well, I would say everyone I know knew him.

25  Q        How did -- from what they said about him how

1    did they feel about Mr. Cole?

2    A        Well, everyone I know spoke well of him.

3    Q        Do you know Mr. Wardlow?

4    A        Yes, sir.

5    Q        Have you heard people comment and talk about

6    the accusation against Mr. Wardlow so far as him being

7    accused and of having killed Mr. Cole?

8    A        Yes, sir.  I have.

9    Q        And people expressing opinions of guilt as to

10   Mr. Wardlow?

11   A        Well, just about everyone said he was

12   guilty.

13   Q        Do you have an opinion as to whether or not Mr.

14   Wardlow can get a fair trial in this county?

15   A        Well, like I said, everyone that I have talked

16   to or heard -- hear them speak of this case they say he's

17   guilty so I really don't know.

18   Q        Do you think that Mr. Carl Cole's popularity

19   would cause the prejudice against this -- against Mr.

20   Wardlow in this county?

21   A        I would say yes, sir.

22   Q        Do you believe that it would?

23   A        Yes, sir.

24                        MR. OLD:  Pass the witness.

25

CROSS EXAMINATION

BY MR. TOWNSEND

Q        Mr. Dyas, who asked you to testify today?

A        Pardon?

Q        Who brought this up to you and asked you to testify?  Was it members of the Wardlow family?

A        Well, yes, sir.  Jimmy asked me if I would come down to the hearing and I told him that I had a doctor's appointment and I couldn't make it today but then yesterday I got a subpoena.

Q        So you were asked by the Defendant in this case, you were asked by his father to appear?

A        Yes, sir.

Q        And are you friends with the Wardlow family?

A        Well, I have known Jimmy ever since I came to Cason the first time.

Q        Okay.  You said of the people you had talked to they thought that Mr. Wardlow was guilty, have you talked to people in the Lone Star, Naples, Omaha --

A        No, sir.  Just -- I haven't made it a point to talk to anyone but in passing people would mention it and last year well just about everyone that I knew said he was.

Q        And it was people in your -- in the

1          Daingerfield area?

2     A          Yes, sir.

3     Q          Not "Naples?"

4     A          No, sir.

5     Q          Not "Omaha?"

6     A          No, sir.

7     Q          Not "Lone Star?"

8     A          No, sir.

9     Q          Not "Hughes Springs?"

10    A          No, sir.  But --

11                          MR. TOWNSEND:   Thank you.

12

13                     REDIRECT EXAMINATION

14                       BY MR. OLD

15

16    Q          What do you do, Mr. Dyas?

17    A          I'm retired.

18    Q          Where are you retired?

19    A          From the railroad.

20    Q          What did you do?  Did you work for the railroad

21    for a living?

22    A          Yes, sir.  I am a signal maintainer.

23    Q          The District Attorney cut you off, you said

24    "But", what was your response?  You were trying to finish

25    an answer?

1    A       Well, he asked me if I had talked to people

2  here the last year.  We were -- we went to South Dakota

3  to visit my sister-in-law and in talking to some of their

4  friends there in South Dakota they said "Where are you

5  from?"

6             I told them "Daingerfield, Texas."

7             Well, then, they said that they had read

8  about the case of the boy from Daingerfield and that was

9  -- that was the only thing, they were talking about it.

10  Q      Have you talked to many people or you heard

11  many people comment that Mr. Wardlow is guilty?

12  A      I have heard quite a few people say it but I,

13  like I said, I have never discussed the case or anything

14  because I really don't know anything about it.

15  Q      But people have brought it up to you and

16  expressed the opinion of guilt?

17  A      Yeah.

18  Q      Approximately how many?

19  A      Oh, gosh.  I don't have any idea.

20  Q      Okay.  "Many?"

21  A      Numerous.

22             MR. OLD:  Pass the witness.

23             MR. TOWNSEND:  No further

24  questions, Your Honor.

25             THE COURT: May this gentleman

1    be excused?

2                            MR.   TOWNSEND:     Yes,   Your

3    Honor.

4                            MR.  OLD:  Yes, Your Honor.

5                            THE COURT:   You are excused.

6    That means you don't have to stay around.   Thanks for

7    being around here and I'm sorry about causing you to miss

8    your appointment.

9                        Next witness, please, Mr. Old.

10                           MR. OLD:   William McCoy.

11

12                        WILLIAM H. McCOY

13   was called as a witness and, having been first duly sworn

14   by the Court, testified as follows:

15

16                        DIRECT EXAMINATION

17                         BY MR. OLD

18

19   Q        Please state your name.

20   A        William H. McCoy.

21   Q        How are you employed, Mr. McCoy?

22   A        I'm  self-employed,  an  attorney  here  in

23   Daingerfield.

24   Q        How long have you been so?

25   A        I have had my own office here in Daingerfield

1   since the first week in August, 1987, I have been

2   practicing law since 1984.

3   Q       How long have you lived in Morris county?

4   A       All my life except for the seven years I went

5   off to be educated.

6   Q       You were born and raised here?

7   A       Yes, sir.

8   Q       What part of the county?

9   A       I was actually born in Hughes Springs at the

10  Steed Hospital and I was reared here in Daingerfield and

11  since I have been five years old I have lived on what

12  they call "the Black Mountain Road" or "Holt Road" now.

13  Q       Now in your practice and over the years have

14  you developed friends and clients in all parts of this

15  county?

16  A       Yes, sir.

17  Q       And you are aware of what Mr. Wardlow is

18  accused of?

19  A       Yes, sir.  I am.

20  Q       Have you heard a lot of discussion or talk

21  about that?

22  A       Yes, sir.  I have.

23  Q       More than you usually hear when someone is

24  charged with murder?

25  A       Much more just because of who the victim was.

1    Q        Who was the victim?

2    A        Carl Cole.

3    Q        What about the victim caused more talk than in

4    other cases?

5    A        Mr. Cole was well-known and he was well liked.

6    Everybody that knew him said he would give you the shirt

7    off his back, he would do anything to help you.

8             In particular "Mr. Wardlow didn't have

9    to do what he done to the old man, he would have gave him

10   the pickup without having to kill him."

11   Q        That's what you are hearing?

12   A        Yes, sir.

13            Not as much now as it was when it first

14   happened and even six or eight months later it was still

15   a lot of talk.

16   Q        Let me ask you, I mean you have been involved

17   in these matters both as a lawyer and observer on many

18   occasions?

19   A        Yes, sir.

20   Q        Is it reasonable to predict that the same talk

21   will start back up when this case commences for trial?

22   A        Yes, sir.  It can.

23            In fact we just had another capital

24   murder case in July of this year and everybody started,

25   said, "Well, what happened to the guy that killed Mr.

1    Cole?  What have they done with him?"

2              I am afraid because of this most recent

3    one there is going to be a lot of flack and fallback on

4    the Wardlow case because people are starting to ask "What

5    happened?  Why is it taking so long, hang him."

6    Q         Do you have an opinion whether or not Mr.

7    Wardlow can get a fair trial in this case?

8    A         I mean it would be extremely difficult for him

9    to get a fair trial here in Morris county.

10   Q         And it's based on your knowledge of Mr. Cole

11   and his popularity?

12   A         Yes, sir.

13   Q         What are people telling you?  What do they say

14   when they talk about the Wardlow charge?

15   A         Lots of people are saying, "Yeah, we'll give

16   him a fair trial then we will hang him, make sure the

17   tree is high enough that it breaks his neck as soon as

18   he falls."

19   Q         Have you heard that opinion expressed or

20   similar to that?

21   A         Yes, sir.

22   Q         On one occasion or several occasions?

23   A         I never kept a count but I would say that it's

24   probably going to be 75, 100, 150 occasions.

25   Q         Where people have flat said "Let's give him a

1    fair trial and then hang him?"

2    A        Yes, sir.

3    Q        When people make that statement "Let's give him

4    a fair trial and let's hang him" does that indicate to

5    you whether or not a man can get a fair trial in this

6    county?

7    A        It indicates to me, and I'm not representing

8    this man, and he's a dead duck here in Morris county,

9    he's going to get the death penalty.

10   Q        The people that you talked to can you identify

11   with any particular part of the county or spread over the

12   county?

13   A        There's more from the south end of the county

14   but then I represent and have friends in Omaha, Naples,

15   the north end in my age group and they have all expressed

16   the same opinion.

17   Q        Do you think there's any less prejudice against

18   him in the north part of this county than the south part?

19   A        I think it's the same because he was so well-

20   known.

21   Q        Do you practice criminal law?

22   A        I do, Mr. Old.

23   Q        What percentage of your practice is criminal

24   law?

25   A        Probably 60 to 65 percent of my practice is

1    devoted to criminal law.

2    Q        You are like I am, we are country lawyers and

3    we do a little bit of everything?

4    A        Yes.

5    Q        Your preference is for criminal law?

6    A        Yes.

7             In fact I have made the statement many

8    times if I could do nothing but criminal law that's all

9    I would choose to do in the practice of law.

10   Q        Has this crime received a lot more newspaper

11   coverage than is usually received by a crime in this

12   county?

13   A        Yes, sir.  I believe it has.

14   Q        You have been present in the courtroom, have

15   you not?

16   A        Yes, sir.

17   Q        One of the articles that was introduced in

18   evidence starts out "Mr." -- words to the effect that

19   "Mr. Cole was killed in cold blood?"

20   A        Yes, sir.

21   Q        Is that a pretty strong statement to have to

22   contend with in a newspaper if you are representing a

23   man?

24   A        It's a very strong statement.  The paper had

25   already found him guilty and is just waiting to execute

1    him in my opinion.

2                        MR. OLD:   Pass the witness.

3

4                   CROSS EXAMINATION

5                   BY MR. TOWNSEND

6

7    Q        Mr. McCoy, in the years that you have practiced

8    law I think all of this has been here in Morris county?

9    A            Practiced law, I originally started in Hughes

10   Springs with Pat Florence and I was working for her then

11   I went to Naples and officed with Jim Clark for awhile

12   and then opened my own in August in '87 then, it's not

13   limited to Morris county, I practice in surrounding

14   counties even so far as Lufkin and Nacogdoches on things.

15   Q        In all of your practice of law you have from

16   the criminal standpoint, we are talking about a criminal

17   case, you have always 100 percent of the time represented

18   the defendant, is that correct?

19   A            In criminal law?

20   Q            Yes, sir.

21   A            All except for the time I was City Attorney for

22   Lone Star and was City Prosecutor at that point in time.

23   Q            So you have never prosecuted felony cases, you

24   have never represented the State of Texas, you have

25   always represented the criminal defendant, is that

1    correct?

2    A        That's correct.

3    Q        In fact in addition to that you are a past

4    political opponent of mine, is that correct?

5    A        That's true.

6    Q        These people that you heard making these

7    statements about Billy Wardlow or about Carl Cole's death

8    about "hanging him" or "stringing him up" or something

9    like that, it's quite possible a lot of those people may

10   have been joking?

11   A        Well, --

12   Q        People saying stuff on the street doesn't mean

13   necessarily that's how they would act if they are on the

14   jury doing serious duty?

15   A        Mr. Townsend, I would like to give most

16   everybody the benefit of the doubt but these particular

17   individuals I took to be very sincere and earnest about

18   what they were saying because they -- they knew Mr. Cole

19   personally and had known him for years there.

20   Q        So each and everyone of them was

21   serious?

22   A        The particular ones that I have talked to on

23   numerous occasions, I'm sure some of them were just

24   somewhat joking but as a criminal defense lawyer you

25   don't take that as a joke, you know, when people start

1    talking about that when you have got a man's life in your

2    hands.

3                          MR.   TOWNSEND:      Pass   the

4    witness.

5

6                    REDIRECT EXAMINATION

7                       BY MR. OLD

8

9    Q          Are you for law enforcement?

10   A          I beg your pardon?

11   Q          Are you for law enforcement?   Do you believe

12   the laws of the State of Texas and United States ought

13   to be enforced?

14   A          Yes, sir.

15   Q          Do you believe that everyone, every man is

16   entitled to his right to a fair trial?

17   A          Yes, sir.

18   Q          Do you believe that Mr. Wardlow can get a fair

19   trial in this county based on the prejudice and the

20   attitude there is in this county toward him for

21   supposedly killing Mr. Cole?

22   A          No, sir.   I sure don't.

23                          MR. OLD:   Pass the witness.

24

25

RECROSS EXAMINATION

BY MR. TOWNSEND

Q        Mr. McCoy, we had a change of venue hearing about a year ago on another capital murder case, you testified on that capital murder case that he couldn't get a fair trial either?

A        Yes, sir.  Tony Walker case.

Q        "Tony Walker?"

A        Yes, sir.

Q        And that case received newspaper publicity and that was part of your reason, I assume would be part of your reason for saying he couldn't get a fair trial?

A        Yes.

              Of course at that time that Wardlow accusation came about also, Mr. Townsend, Tony Lee Walker was first and I believe the Carl Cole murder was next and there was a lot of publicity at that time with the Wardlow matter going on.

Q        There have been two capital murder cases in Morris county that -- since we can recall, since we have been practicing law?

A        Yes, sir.

Q        And you didn't think either one of them should be tried in Morris county by the citizens of Morris

1    county, is that correct?

2    A        No.  Sure didn't.

3

4                    REDIRECT EXAMINATION

5                    BY MR. OLD

6

7    Q        There are now three capital murder trials in

8    this county pending?

9    A        There's the one from Jenkins as I understand,

10   I don't remember the guy's name.

11   Q        Excuse me.  One of these has been tried?

12   A        Yes, sir.  Tony Lee Walker has been tried, the

13   one from Jenkins, I don't remember his name, burning of

14   some type of mobile home then there's the Wardlow case

15   and he's the defendant and the Randy Byas case that just

16   happened this past July.

17                        MR. OLD:  Pass the witness.

18                        MR.  TOWNSEND:    No  further

19   questions.

20                   You may step down.

21                   Joel Bumpass.

22                        THE COURT:   Okay, Mr. Old,

23   your witness.

24

25

1          JOEL BUMPASS

2    was called as a witness and, having been first duly sworn

3    by the Court, testified as follows:

4

5               DIRECT EXAMINATION

6                 BY MR. OLD

7

8    Q      Please state your name.

9    A      Joel Bumpass.

10   Q      Where do you live, Mr. Bumpass?

11   A      424 Lindsey, Daingerfield.

12   Q      Where do you work?

13   A      Lone Star Tubular Service in Lone Star, Texas.

14   Q      Do you understand that Billy Wardlow is accused

15   with having caused the death of Mr. Carl Cole?

16   A      Yes, sir.

17   Q      You heard a lot of people talk about that in

18   Morris county since Mr. Cole died?

19   A      Yes, sir.

20   Q      Have they expressed opinions to you that as to

21   whether he was innocent or guilty?

22   A      Yes.

23   Q      What opinions have they expressed to you?

24   A      That he was guilty.

25   Q      Were they pretty strong and firm in those

1    opinions?

2    A        Yes, sir.

3    Q        Have they pretty well determined what they want

4    to do with him?

5    A        Yes, sir.

6    Q        And what was that?

7    A        Death penalty.

8    Q        How many people do you think that you have

9    talked to that have expressed that opinion?

10   A        Well, I couldn't give you an accurate number,

11   seven, eight, ten people.

12   Q        Have you heard talk about a letter?

13   A        Yes.  I have.

14   Q        Will you tell the Court what you heard about

15   a letter?

16   A        Well, I heard that the Wardlow boy wrote a

17   letter to the sheriff explaining or confessing his guilt

18   and saying that he was ready to receive the needle.

19   Q        Okay.  And have you heard that on more than one

20   occasion?

21   A        I heard it a couple of times.  Yes.

22   Q        When those words were spoke were there other

23   people present other than you and the speaker?

24   A        Yes, sir.

25   Q        Was it spoke like in a break area or coffee

1   shop or that type?

2   A        Yes.   People talk.   We were just standing

3   around.   Yes.

4   Q        Do you know whether that was true, do you know

5   whether such a letter exists?

6   A        I do not know that.

7   Q        But people believe that it does based on what

8   they said to you?

9   A        Yes, sir.

10  Q        Did you know Mr. Cole?

11  A        No, sir.  I did not.

12  Q        Do you know of him?

13  A        No, sir.  I did not.

14  Q        Okay.  Since his death have you learned a lot

15  about him?

16  A        Yes, sir.  I have.

17  Q        What have you learned about him?

18  A        I heard -- I learned that he was a fine fellow

19  and that's about all.

20  Q        Did you learn that he was well-known in this

21  county?

22  A        Yes.

23  Q        Do you have an opinion as to whether or not

24  Billy can get a fair trial in this county?

25  A        I don't believe he can.

1    Q          Is that based upon the prejudice that you have

2    seen against him in this county?

3    A          Yes, sir.  It is.

4                        MR. OLD:  Pass the witness.

5

6                    CROSS EXAMINATION

7                    BY MR. TOWNSEND

8

9    Q          Mr. Bumpass, you talked about a letter that you

10   heard something about, you wouldn't think it would be

11   unusual to have rumors about all sorts of things in

12   criminal cases, would you?

13   A          Pardon me?

14   Q          You wouldn't consider it to be unusual to have

15   rumors floating around in criminal cases?

16   A          I don't think it would be unusual.  No.

17   Q          So that really wasn't anything unusual so far

18   as you could tell?

19   A          A letter?  Are you talking about the letter per

20   se?

21   Q          That was there, a rumor?

22   A          If you are talking about just a rumor, no, I

23   don't think that it's that unusual.

24   Q          How did you come to testify today, Mr. Bumpass?

25   Were you -- did -- who contacted you about testifying?

1                 You didn't show up, who talked to you

2    about it?

3    A       I was subpoenaed and the lawyer called me the

4    night before.

5    Q       Okay.  "The lawyer" you are talking about Mr.

6    Old here?  (Indicating)

7    A       Yes, sir.

8    Q       Okay.

9    A       And also Mr. Wardlow had asked me, you know,

10    would I, you know, if I could testify.

11    Q       Are you talking about the Defendant's father?

12    A       Yes, sir.  I am.

13    Q       And is he someone that you have known for a

14    period?

15    A       I have known Mr. Wardlow about three months.

16    Q       So as the result of that friendship with Mr.

17    Wardlow he talked to you about -- just in casual

18    conversation talked to you about the case?

19    A       No.  He didn't never really talk to me about

20    the case, he asked me one time if I thought that, you

21    know, whether I thought his boy could get a fair trial

22    or not.

23    Q       Yes.

24    A       But so far as our casual conversation, we have

25    never discussed the case with him.

1      Q          So you just -- I think I misstated what I mean,

2      I didn't mean that you had really discussed the facts of

3      the case with him but just that you discussed -- he asked

4      you about what you thought?

5      A          One time he did.  Yes.

6      Q          And did he, I suppose notified Mr. Old to

7      contact you?

8      A          I don't know how Mr. Old contacted me but he

9      did contact me.

10     Q          Mr. Bumpass, you live in Daingerfield I

11     believe?

12     A          Yes, sir.  I do.

13                          MR. TOWNSEND:     Pass the

14     witness.

15

16                     REDIRECT EXAMINATION

17                        BY MR. OLD

18

19     Q          Mr. Bumpass, do you associate with people from

20     all over Morris county as well as surrounding counties?

21     A          Well, I do in my work.  Yes.

22     Q          Do people from the north part of the county

23     that work with you?

24     A          You know, in the steel mill and around there

25     is a few people.  Yes.

1        MR. OLD:  Pass the witness.

2        MR. TOWNSEND:   No further

3  questions.

4        THE COURT:  Thank you, Mr.

5  Bumpass, I appreciate you being here, you do not have to

6  remain.

7        Next witness.

8        MR. OLD:  Johnny Floyd.

9        THE COURT:  Please have a

10  seat.

11        Mr. Old.

12

13             JOHNNY FLOYD

14  was called as a witness and, having been first duly sworn

15  by the Court, testified as follows:

16

17           DIRECT EXAMINATION

18             BY MR. OLD

19

20  Q        Please state your name.

21  A        Johnny Floyd.

22  Q        Where do you live, Mr. Floyd?

23  A        I live in Daingerfield.

24  Q        How long have you lived in Daingerfield?

25  A        Since 1949.

1     Q        Did you know Mr. Carl Cole during his lifetime?

2     A        Yes, sir.

3     Q        How well did you know him?

4     A        I have been knowing him since 1949 doing some

5     cow trading and just a good personal friend of the

6     family.

7     Q        Were your family and his family close friends?

8     A        Yes.

9     Q        Was Carl a popular man in this county?

10    A        Yes, sir.

11    Q        Was he a respected man?

12    A        Yes.  He was.

13    Q        And was he widely known or was he notoriously

14    known?

15    A        I would say farm-wise people -- farm-wise which

16    is about all there was in the country, knew him well.

17    Q        His popularity was not limited to any

18    particular part of this county?

19    A        No.  I would say no.

20             Mostly from here to the north end more

21    than anywhere else.

22    Q        And "north end" you are talking about Omaha-

23    Naples?

24    A        Omaha-Naples area.

25    Q        Have you heard a lot of talk about facts giving

1    rise to his death or the fact that Mr. Wardlow has been

2    charged with having murdered him?

3    A       Yes.

4    Q       And are people expressing opinions as to

5    whether or not Mr. Wardlow is guilty?

6    A       Have I heard that?

7    Q       Yes.

8    A       Oh, certainly.

9    Q       And I mean have you heard anybody express an

10   opinion that he wasn't guilty?

11   A       No.  I haven't.

12   Q       Are people pretty strong in their opinions?

13   A       Yeah.   Everybody that I -- that has ever

14   mentioned it or talked about it has been strong in their

15   opinion.

16   Q       Is there a lot of resentment toward Mr. Wardlow

17   for having --

18   A       Definitely.

19   Q       -- for having killed Mr. Cole?

20   A       Definitely.

21   Q       Would it be a fair statement that Mr. Cole was

22   a loved man throughout this county?

23   A       Mr. Cole was a businessman but he had a lot of

24   friends but he was a fair businessman.   I mean in

25   speaking if he put it on you a little bit, well, a lot

of business people might do that but he was  --  he was -- yeah.  He was a respected businessman.

Q        Do you have an opinion as to whether or not Billy Wardlow can get a fair trial in this county?

A        No.  I don't think he can get a fair trial in this county.  I don't personally.

Q        And it's based on your observation what others have said and upon Mr. Cole's general good reputation and popularity?

A        Well, like I said, I have been knowing Carl Cole and dealing in the cattle business and stuff a long time and I have used him a lot of times for advice and stuff like that because he was a well -- he knew cattle and he knew land and all that so I have used that as a stepping stone a lot of times when I needed some advice.

Q        And you were a good friend of his?

A        Yes.  Very good friend.

                    MR. OLD:   Pass the witness.


                    CROSS EXAMINATION

                  BY MR. TOWNSEND


Q        Mr. Floyd, let me guess on this; are you friends with the Wardlows?

A        Yes.  Yes.  The Wardlow family is a good

80

1    family.

2    Q        Did you come to testify today as a result of

3    talking to Jimmy Wardlow?

4    A        Yes.

5    Q        So he talked to you about this and later on you

6    received a subpoena?

7    A        Right.

8    Q        You said Mr. Cole was well-known among the

9    farmers?

10   A        Yes.

11   Q        Because he was involved in farming?

12   A        Farming and ranching.

13   Q        And you said something in your statement about

14   "That was about all that was known in this county", are

15   you talking about back in years past, that farming was

16   about all the industry that was going on?

17   A        Well, Morris county was basic farming and

18   ranching, there was no industry in Morris county so that

19   would be the area that it was most well-known for.

20   Q        And that would -- you used the term "was

21   known", are you talking about back in the past years?

22   A        No.  He had cattle up --

23   Q        When he was a younger man?

24   A        -- he had cattle up until the day he was

25   killed.

1    Q        Right.  But would it be your opinion that was

2    a -- how old are you, Johnny?

3    A        65.

4    Q        Would it be your opinion that Mr. Cole was very

5    well-known   among  those  folks  that  are  your  age  and

6    older?

7    A        Yes.

8    Q        Would  it  be  your  opinion  that  it  would  be

9    somewhat  less,  although  I  know  you  don't  know  exactly

10   but  he  would  be  somewhat  less  well-known  among  those

11   people  that  are  younger  than  you?

12   A        Right.  Yeah.  I would say -- say the younger

13   generation that he was nosey, he was -- kept up with what

14   was going on, he knew what was happening.

15   Q        He kept up with current affairs?

16   A        But the majority of people would be the older

17   generation, older people.

18   Q        So the majority of people that would consider

19   themselves to be good friends of his you might say would

20   be the older people?

21   A        That's right.

22                      MR.   TOWNSEND:    Pass   the

23   witness.

24

25

REDIRECT EXAMINATION

BY MR. OLD

1

2

3

4    Q       You are talking about a friend, you are talking

5    about somebody you socialize with, visit in their home,

6    go to church with?

7    A       Yes.

8            Are you talking about Carl?

9    Q       Yes.

10   A       Yes.

11   Q       And you say most of his friends were in his age

12   group?

13   A       Well, he said "majority", now, he had a lot of

14   friends in all age groups because he messed with

15   everybody and that but the majority I would say were

16   older people.

17   Q       "Friend" is kind of a relative term, I might

18   meet you one time and tell somebody that "Johnny Floyd

19   was my friend and a good man", I might not have ever

20   visited in your home but I may consider you to be "my

21   friend" and I might not even know you and say "You are

22   a good man and have a good reputation" just based on what

23   others had told me about you.

24           Despite Mr. Cole's age was he well-known

25   and that is known for who he was and his good reputation

1    by all age groups in this county?

2    A          Oh, absolutely.  Yes.  The answer is "yes."

3                              MR. OLD:  Pass the witness.

4                              MR.  TOWNSEND:   No  further

5    questions.

6                              MR. OLD:  One more question;

7    did anybody ask you to do anything other than --

8                              MR. TOWNSEND: Your Honor, --

9                              THE   COURT:    Wait  just  a

10   minute.

11                             MR.  TOWNSEND:   I didn't  ask

12   any question I believe.

13                             THE COURT:   What was it you

14   wanted to ask?

15                             MR. OLD:  I wanted to ask him

16   if anybody asked him to do anything but to come here and

17   tell the truth.

18                             MR.  TOWNSEND:   Your Honor,

19   that's not even a question, I didn't in any way --

20                             THE COURT:   The  problem  is

21   that there was not any recross so sustained.

22                    But for the purpose of the record I'm

23   going to let him answer just so we don't have to call him

24   back or something at some time later.

25                    The question would be; has anyone asked

1    you to say anything except whatever your truthful opinion

2    was?

3                              THE WITNESS:  No.  There has

4    not.

5                              MR. OLD:  Pass the witness.

6                              THE COURT:  That's in the

7    record as a "bill", not as "direct examination" but I

8    rule that it's not admissable.

9                    Now, can this gentleman be excused for

10   today?

11                   Thank you for being here, Mr. Floyd.

12                   Call your next witness.

13

14                    RUSSELL GUEST

15   was called as a witness and, having been first duly sworn

16   by the Court, testified as follows:

17

18                    DIRECT EXAMINATION

19                    BY MR. OLD

20

21   Q        Please state your name.

22   A        Curtis R. Guest.

23   Q        Where do you live, Mr. Guest?

24   A        Cason.

25   Q        How long have you lived in Morris county?

1    A        All my life.

2    Q        Did you know Mr. Carl Cole?

3    A        I knew who he was.  Yes, sir.  I knew him by,

4    you know, when I saw him around town a lot.

5    Q        Did you know him by reputation more than a

6    personal knowledge?

7    A        Probably.  Yes, sir.

8    Q        How old are you?

9    A        I am 34.

10    Q        Okay.  What reputation did you know him to

11    have?

12    A        Personally like I said I didn't know him that

13    well but everybody I knew, you know, liked him, nice man.

14    I knew him more through hearsay from my mother if I may

15    add that.

16    Q        And was what you knew of him through your

17    mother and through others good?

18    A        Yes, sir.

19    Q        Have you heard a lot of people talking about

20    the fact that Mr. Wardlow is accused of having murdered

21    him?

22    A        Yes, sir.

23    Q        Okay.  Have they expressed to you opinions as

24    to whether or not they believe Mr. Wardlow to be guilty?

25    A        More so in that they don't know that he's

1    guilty, that he's not -- you know what I'm saying,

2    everything I have heard was more towards that, you know,

3    he did do it -- I'm having trouble.

4    Q        It's not a matter of saying "He's guilty", they

5    just come out and say, "He murdered Mr. Cole?"

6    A        Yes.

7    Q        And have they expressed opinions as to what

8    ought to be done to him for doing it?

9    A        Well, yes, sir.

10   Q        What opinion have they expressed?

11   A        Everybody that I have heard, you know, leans

12   toward the maximum.

13   Q        That would be the death penalty?

14   A        Yes, sir.

15   Q        Is what you are telling me as to what people

16   have told you is kind of they take it as a forgone

17   conclusion or fact that he's guilty of having killed Mr.

18   Cole?

19   A        From everything they have seen and heard. Yes,

20   sir.

21   Q        Have you talked to them, have you heard a lot

22   of people say that?

23   A        I have changed jobs since this time so where

24   I work now at Lone Star I haven't, to be honest with you

25   I haven't thought a whole lot about the case until I was

1    approached, you know, to come in today.  But until then,

2    yes, sir.

3    Q        How many people have you heard comment on it?

4    A        A dozen.

5    Q        Your best estimate?

6    A        A dozen just where I work.  Yes, sir.

7    Q        And did any of that dozen say, "Well, he's

8    innocent, I believe he's innocent?"

9    A        No, sir.

10   Q        So your group of twelve has already found him

11   guilty?

12   A        Basically.  Yes, sir.

13                    MR. OLD:  Pass the witness.

14                    THE COURT:  Mr. Townsend.

15

16                    CROSS EXAMINATION

17                    BY MR. TOWNSEND

18

19   Q        Mr. Guest, you are from Cason, is that right?

20   A        Yes, sir.

21   Q        Are you friends with the Wardlow family?

22   A        I know them just in the last year, I have

23   joined the volunteer fire department and come to know

24   them, also I worked with Jimmy Wardlow for Collier I

25   guess about fifteen years ago.

1    Q         And Jimmy and his wife are both involved in

2    the volunteer fire department in Cason, is that correct?

3    A         Yes, sir.

4    Q         And you are a member there?

5    A         Yes, sir.

6    Q         Mr. Guest, you signed an affidavit I believe

7    stating that you -- that you had read the Motion for

8    Change of Venue, you basically -- and you are familiar

9    with what it said?

10   A         Yes.

11   Q         And that you felt that there was so great a

12   prejudice and combination against the Defendant that he

13   couldn't obtain a fair trial, it states in the chain of

14   venue, which you said that you have read, that there is

15   a dangerous combination instigated by influential persons

16   against the Defendant, it kind of makes it sound like

17   there's a conspiracy or something against the Defendant.

18             Do you know of anything such conspiracy

19   of anyone that is influential to deprive this man of his

20   rights?

21   A         I wouldn't use the term "conspiracy."

22   Q         How about the word "combination", do you know

23   of a combination instigated by any influential people?

24   A         No, sir.

25   Q         Even though you signed that affidavit and said

1   you did know of such a combination you in fact, you do

2   not know of any such combination?

3   A       No, sir.   I don't.

4                              MR.   TOWNSEND:     Pass   the

5   witness.

6

7                    REDIRECT EXAMINATION

8                    BY MR. OLD

9

10  Q       Do you believe the twelve people down there

11  that expressed opinions to you by what they have said are

12  against Billy Wardlow?

13  A       Yes, sir.

14  Q       Do you believe those people to some degree to

15  have influence in this county?

16  A       Yes, sir.

17  Q       Has anyone asked you to do anything other than

18  express your true opinion?

19  A       To be honest with you I haven't talked about

20  the case to anyone other than when you just basically

21  asked me if I felt like he could get a fair trial and

22  that was it.

23                    I haven't been influenced if that's what

24  you are asking.

25                              MR. OLD:   Pass the witness.

1          MR.  TOWNSEND:    No  further

2   questions.

3          THE  COURT:    Thank  you  for

4   being here, Mr. Guest.

5          You are excused.  That means you don't

6   have to hang around unless you want to.

7

8                  FLETCHER HARTGROVE

9   was called as a witness and, having been first duly sworn

10  by the Court, testified as follows:

11

12                  DIRECT EXAMINATION

13                  BY MR. OLD

14

15  Q       Please state your name.

16  A       Fletcher Hartgrove.

17  Q       Where do you live, Mr. Hargrove?

18  A       Daingerfield.

19  Q       Where do you work?

20  A       Brown & Root, Longview.

21  Q       How long have you lived in Morris county?

22  A       Probably 45 years total.

23  Q       How old are you?

24  A       50.

25  Q       Did you know Mr. Carl Cole during his lifetime?

| | | |
|---|---|---|
| 1 | A | Yes, sir. |
| 2 | Q | Did you know him well? |
| 3 | A | Yes, sir. |
| 4 | Q | And did you like him? |
| 5 | A | Yes, sir. |
| 6 | Q | Was he a popular man in this county? |
| 7 | A | Yes, sir.  He was. |
| 8 | Q | Was he a well-known man in this county? |
| 9 | A | Yes, sir.  He was. |
| 10 | Q | Was he known pretty well all over the county? |
| 11 | A | Yes, sir. |
| 12 | Q | Do you know his brother? |
| 13 | A | Yes, sir.  Homer. |
| 14 | Q | How well do you know his brother? |
| 15 | A | Not as well as I knew Carl. |
| 16 | Q | Through a speaking acquaintance with him at |
| 17 | | least? |
| 18 | A | Yes, sir. |
| 19 | Q | Do you know Mr. Wardlow, Billy Wardlow? |
| 20 | A | Sure do.  Yes, sir. |
| 21 | Q | Have you heard talk about Mr. Wardlow having |
| 22 | | murdered Mr. Cole? |
| 23 | A | Yes, sir.  I have. |
| 24 | Q | Have you heard people express opinions about |
| 25 | | what happened? |

1    A        Yes, sir.

2    Q        Have they expressed an opinion as to whether

3    or not he is guilty?

4    A        Yes, sir.

5    Q        How many occasions have you heard people

6    expressed that opinion?

7    A        Do you want -- several different times.

8    Q        I mean five, ten, fifteen?

9    A        Yeah.  Ten or fifteen times.

10   Q        Have they treated it like it's a forgone

11   conclusion and they believe it?

12   A        Yes.

13   Q        And have they commented to you what they

14   thought ought to be done to it?

15   A        Some have and some haven't.

16   Q        And those that have, what has their

17   recollection been?

18   A        Death penalty.

19   Q        Do you have an opinion as to whether or not

20   Billy can get a fair trial in this county?

21   A        No, sir.  I don't think he could.

22   Q        You don't think he could get a fair trial?

23   A        No, sir.

24                          MR. OLD:  Pass the witness.

25                          THE COURT:  Mr. Townsend.

1                        CROSS EXAMINATION

2                        BY MR. TOWNSEND

3

4        Q        Mr. Hartgrove, are you friends with the Wardlow

5    family?

6        A        Yes.

7        Q        Are you here after talking to Jimmy Wardlow,

8    he talked to you about this change of venue hearing?

9        A        Yes, sir.

10       Q        Had he talked to you about everything in the

11   change of venue hearing?

12       A        Yes.  He did.

13       Q        Have you known the Wardlow family, you know,

14   approximately as long as you have know the Cole family?

15       A        Yes, sir.

16       Q        So your friendship with them would be strong

17   as well?

18       A        Yes, sir.  It would.

19       Q        Okay.  So basically you are here today to try

20   to help the Wardlow family?

21       A        Right.

22                        MR.  TOWNSEND:     Pass    the

23   witness.

24

25

REDIRECT EXAMINATION

BY MR. OLD

Q        Did you come here to express an opinion that was not your opinion?

A        No.

Q        You were a friend of Carl Cole's and you are a friend of the Wardlows?

A        Right.

Q        Is your opinion based on what you believe?

A        Yes.

Q        Hasn't been influenced by Jimmy Wardlow or any of the Wardlow family?

A        No.  I have not.

MR. OLD:  Pass the witness.

MR. TOWNSEND:  No further questions, Your Honor.

MR. OLD:  Your Honor, can we excuse this witness?  I would excuse him.

I also had his wife Wanda Hartgrove subpoenaed and I would excuse her at this time.

THE COURT: That means you and your wife don't have to hang around the courthouse any further today.

Thank you for being here.

1          Who will be next?

2

3                    ROBERT HENDERSON

4    was called as a witness and, having been first duly sworn

5    by the Court, testified as follows:

6

7                    DIRECT EXAMINATION

8                     BY MR. OLD

9

10   Q      Please state your name, sir.

11   A      Robert Henderson.

12   Q      Where do you live, Mr. Henderson?

13   A      Cason.

14   Q      Is that in Morris county, Texas?

15   A      Yes, sir.

16   Q      How long have you lived in Morris county?

17   A      About 65 years.

18   Q      How old a man are you?

19   A      76.

20   Q      Did you know Mr. Carl Cole during his lifetime?

21   A      Yes, sir.

22   Q      And how long -- when did you first remember Mr.

23   Cole?

24   A      Oh, I imagine around fifteen or twenty years

25   ago, something like that.

1          MR. OLD:  Judge, can you hear

2    the witness?

3                    THE COURT:  Sure.

4                    MR. OLD:  What was Mr. Cole's

5    reputation in this county, that is what did people think

6    about him, what was Mr. Cole's reputation in this county?

7                    THE WITNESS:  Well, I really

8    don't know.

9    Q          (BY MR. OLD)  Sir?

10   A          I don't know what his reputation was in the

11   county.

12   Q          Did people like him?

13   A          Some did and some didn't, you know, just like

14   you will, other people.

15   Q          Do you know Billy Wardlow is charged with

16   having murdered him?

17   A          Yes.  I have heard that.

18   Q          Have you heard a lot of people talking about

19   this?

20   A          Yeah.  I have heard them talk about it.

21   Q          Have they told you whether or not they think

22   he's guilty or they didn't?

23   A          They didn't say that.

24   Q          What?

25   A          No.  They didn't say whether he was or not.

1    Q        Do you have an opinion as to whether or not Mr.

2    Wardlow can get a fair trial in this county?

3    A        I don't think he would.   I don't think he

4    would.   Not in this county.

5    Q        Can you tell me why he wouldn't get a fair

6    trial in this county?

7    A        My idea would be because Mr. Carl was an older

8    citizen and he's better known than the kid.

9    Q        People  angry  about  Mr.  Cole  having  been

10   murdered?

11   A        Not that I've heard of.

12   Q        You haven't?

13   A        No.

14                         MR. OLD:   Pass the witness.

15                         MR. TOWNSEND:   No questions,

16   Your Honor.

17                         THE COURT:   Thank you, Mr.

18   Henderson.   You may step down.

19                         You don't have to hang around unless you

20   want to.

21                         Mr. Hill.

22

23

24

25

1          JAMES HILL

2    was called as a witness and, having been first duly sworn

3    by the Court, testified as follows:

4

5                    DIRECT EXAMINATION

6                     BY MR. OLD

7

8    Q        Please state your name.

9    A        James Hill.

10   Q        Where do you live, Mr. Hill?

11   A        1100 Webb in Daingerfield.

12   Q        How are you employed, what do you do for a

13   living?

14   A        I am retired, I'm retired and work volunteer

15   around town.

16                              THE COURT:  Volunteer what?

17                              THE   WITNESS:      Volunteer

18   fireman, volunteer EMS.

19                              THE COURT:  Thank you.

20                              MR.  OLD:   What did you do

21   prior to retiring?

22                              THE WITNESS:  I was a truck

23   driver, hauled automobiles.

24   Q        (BY MR. OLD)  How long have you lived here?

25   A        Almost nine years.

1    Q         Did you know Mr. Carl Cole?

2    A         I knew him when I met him, when I seen him.

3    I didn't know him that well.

4    Q         Did you know him by reputation?

5    A         Reputation and I have met him a couple of

6    times.

7    Q         What was his reputation?

8    A         So far as I know he was known as a contrary

9    person but he was a good man.

10   Q         Have you heard a lot of talk about him having

11   been murdered by Billy Wardlow?

12   A         For several months right after it happened,

13   yes, for about three or four months right after it

14   happened that's about all you could hear in the Dairy

15   Queen and other place.

16   Q         Do you go to the Dairy Queen and drink coffee

17   a lot?

18   A         Yes.

19   Q         Go other places and drink coffee and socialize?

20   A         Yes.

21   Q         What were people saying?   What was the

22   consensus of opinion?

23   A         Well, it was just as far as I could tell it was

24   they -- everybody was talking about Billy murdering the

25   man when he was so old and everything and couldn't have

1    hurt him if he had wanted to and so forth.

2    Q        Were they outraged about it?

3    A        Some.  Yes.

4    Q        Did they express the opinion that he did it?

5    A        His name was mentioned by everyone that I heard

6    as the one that did it, you know.

7    Q        Do you have an opinion based upon what you have

8    heard as to whether or not Mr. Wardlow could get a fair

9    trial?

10   A        Do I have an opinion?

11   Q        Yes.

12   A        Yes.  I do have an opinion.

13   Q        What is that opinion?

14   A        From what I have heard and all that he did it.

15   Yes.

16   Q        Do you have an opinion that he committed the

17   crime?

18   A        That Billy committed the crime.  Yes.

19   Q        You believe that?

20   A        I wouldn't say I believe it but from what I

21   have heard that's the opinion that I have drawn.  I

22   haven't heard any of the evidence.

23   Q        Now, do you have an opinion as to whether or

24   not he can get a fair trial in this county?

25   A        I have the opinion that he probably cannot

1    because everyone knows him, everyone knows his family and

2    everyone knows Mr. Cole's family and from all everybody

3    has been saying that I have heard they think he did it

4    and I don't see how anyone can put all that aside to

5    listen to the evidence.  I know I would have -- I would

6    have a tough time doing it.

7    Q        Have they expressed an opinion to you as to

8    what ought to be done to him for killing him?

9    A        A few.  Have made statements like "The same

10   thing should be done to him that he did to Mr. Cole" or

11   "He should spend the rest of his life in jail" or

12   something like that.

13            But that's just the normal way people

14   talk.

15                    MR. OLD:  Pass the witness.

16

17                    CROSS EXAMINATION

18                    BY MR. TOWNSEND

19

20   Q        Mr. Hill, are you friends with the Defendant

21   Billy Wardlow?

22   A        I consider myself to be friends with them, with

23   his mother and father and him.  I have known him since

24   he was just a kid.

25   Q        More so friends with his parents?

1    A         More so because I have had more dealing with

2    them for over a longer period.

3    Q         Mr. Hill, you don't -- your knowledge of people

4    in Morris county, you have a lot of knowledge of people

5    in the Daingerfield area and Cason area, is that right?

6    A         In the Daingerfield-Cason and all this south

7    end of the county that I was raised or I was born in the

8    north end of the county and I know a lot of people up

9    there, a lot of my relatives up there and I know a lot

10   of people through them.

11   Q         But your discussion about this case would be

12   discussions with people that are basically from this end

13   of the county for the most part?

14   A         Basically.

15             At the time this happened I was working

16   ambulance 24 hours a day seven days a week on standby and

17   I would stop at the Dairy Queen and in Omaha and I talked

18   to a number of people up there and the opinion was the

19   same.  The discussions were primarily the same as going

20   on down here.

21   Q         You said you signed an affidavit supporting

22   this change of venue and basically without me reading

23   verbatim you basically said that you had read the change

24   of venue motion that you basically agreed with it and in

25   that change of venue motion it says "There's a dangerous

1    combination instigated by influential persons against the

2    Defendant."

3                    Do you know of any dangerous combination

4    instigated by influential persons against the Defendant

5    to deprive him of a fair trial?

6    A          Just that people, the comments people have made

7    -- have made about him being the one that did that to Mr.

8    Cole, Mr. Cole was an elderly person that couldn't have

9    harmed him.

10    Q          But you don't know of any dangerous combination

11    instigated by --

12                    MR. OLD:   I object to that.

13    He just answered that question.

14                    THE COURT:   Overruled.   Go

15    ahead.

16                    MR. TOWNSEND:   Isn't it true

17    that, Mr. Hill, that you don't know of any dangerous

18    combination that was instigated by any influential person

19    or group of influential persons that would be against the

20    Defendant?

21                    THE WITNESS:   I don't know.

22    I don't know of anyone that has actually threatened him

23    but the -- no.

24    Q          (BY MR. TOWNSEND)   Nothing that you know of?

25    A          No.   Not if you put it in those terms.

1       MR. TOWNSEND:  Thank you.

2     I'll pass the witness, Your Honor.

3       MR.    OLD:     No    further

4 questions.

5       THE COURT:  Thank you.   You

6 may step down, Mr. Hill, appreciate you being here, Mr.

7 Hill.

8      Who is next?

9       MR. OLD:  A.W. Lawton.

10      THE COURT:  Go ahead, please.

11

12       SUE HILL

13 was called as a witness and, having been first duly sworn

14 by the Court, testified as follows:

15

16     DIRECT EXAMINATION

17      BY MR. OLD

18

19 Q  Please state your name.

20 A  Mary Sue Hill.

21 Q  Where do you live, Mrs. Hill?

22 A  1100 Webb, Daingerfield.

23 Q  How long have you lived in Morris county?

24 A  Since January 1st, 1986.

25 Q  Had you ever lived here prior to that or in

1    this area?

2    A        No, sir.

3    Q        Have you heard a lot about Mr. Wardlow being

4    accused of having murdered Mr. Cole?

5    A        I read quite a bit of it in the paper and I

6    have heard several people talking about it in the county.

7    Yes, sir.

8    Q        And have people commented to you as to whether

9    or not they believed him to be guilty?

10   A        I have heard several people say that they

11   thought he was.

12   Q        And did they tell you what they had in mind for

13   him if he was?

14   A        Yes, sir.

15   Q        What did they tell you?

16   A        That he needed to be put to death just like Mr.

17   Cole was.

18   Q        Have you read the newspaper articles?

19   A        Yes, sir.

20   Q        And after reading those articles did you

21   conclude based on those articles that he had done it?

22   A        They sounded like he had if I hadn't already

23   known him myself.

24   Q        Do you have an opinion -- did you know Mr.

25   Cole?

1    A        I did not know him personally.  No, sir.  But

2    I had heard a lot of people talk about him and -- but I

3    did not know him personally.  No, sir.

4    Q        Did he have a good reputation?

5    A        Yes, sir.

6    Q        People fond of him?

7    A        Yes, sir.  Very much so.

8    Q        Okay.  Do you have an opinion as to whether or

9    not that Mr. Wardlow can get a fair trial in this county?

10   A        As much publicity as has been given I just

11   don't see how.

12   Q        All right.  Those that you have talked to --

13   A        Seemed to have already formed opinions and it

14   would be kind of hard to put everything you heard out of

15   your mind.

16                        MR. OLD:  Pass the witness.

17                        THE COURT:  Mr. Townsend.

18

19                        CROSS EXAMINATION

20                        BY MR. TOWNSEND

21

22   Q        Mrs. Hill, you are friends with the Wardlow

23   family?

24   A        Yes, sir.  I have known them since I have been

25   in Morris county.

1  Q        You came to testify as a result of talking with

2  either Mr. or Mrs. Wardlow?

3  A        Yes, sir.

4  Q        So you are here basically today seeking to help

5  the Wardlow family?

6  A        Yes, sir.

7  Q        You are doing this sort of as a favor to them?

8  A        Yes, sir.

9                      MR.   TOWNSEND:    Pass   the

10  witness.

11

12                  REDIRECT EXAMINATION

13                     BY MR. OLD

14

15  Q        Have you made any statements that you truly did

16  not believe in your testimony?

17  A        No, sir.

18                      MR. OLD:  Pass the witness.

19                      MR.  TOWNSEND:    No   further

20  questions.

21                      THE COURT:  Thank you, Mrs.

22  Hill, you and your husband have been excused which means

23  you don't have to hang around unless you just want to.

24                      Who is next after Lawton, Mr. Old?  Who

25  is going to follow Mr. Lawton, please?

1          MR. OLD:  Cathy Byrd.

2                    THE COURT:  Go ahead, please.

3          Mr. Lawton is in the box.

4

5                    A.W. LAWTON

6      was called as a witness and, having been first duly sworn

7      by the Court, testified as follows:

8

9                    DIRECT EXAMINATION

10                   BY MR. OLD

11

12     Q          Please state your name.

13     A          My name is A.W. Lawton.

14     Q          Where do you live, Mr. Lawton?

15                   THE COURT:  Is it "Lawton" or

16     "Lawson?"

17                   THE WITNESS:  "Lawton, O-N."

18                   THE COURT:  That's the way I

19     had it.

20                   THE WITNESS:  I live on

21     Highway 49 about four and a half miles north.

22                   MR. OLD:  North toward Mt.

23     Pleasant?

24                   THE WITNESS:  Yeah.

25     Q          (BY MR. OLD)  How long have you lived in Morris

1    county?

2    A        This is my home.   I lived -- I came back and

3    lived, been here living since 1967.

4    Q        You were born here and raised here?

5    A        Born and raised here.

6    Q        Went off and came back?

7    A        Yeah.

8    Q        How old a man are you?

9    A        64.

10   Q        Did you know Mr. Cole during his lifetime?

11   A        I did.

12   Q        Did you know him personally?

13   A        I knowed him pretty good because being Public

14   Works Director worked for the city here for 24 years and

15   I knowed him, saw him practically everyday here in town.

16   Q        You were the Public City Works Director for the

17   City of Daingerfield?

18   A        I retired as City of Daingerfield Public Works

19   Director.

20   Q        Was Mr. Cole pretty well-known all over Morris

21   county?

22   A        As far as I know I really would say that he was

23   well-known all through Morris county.

24   Q        Was he considered to be a good man?

25   A        Indeed.

1   Q        Did you know of your own knowledge?

2   A        Indeed.  I say he's a good man.

3   Q        Was he a popular man?

4   A        I would say so.

5   Q        Do you know that Mr. Wardlow is accused of

6   having murdered Mr. Cole?

7   A        I know his daddy real good but I didn't really

8   know him.  I have been knowing --

9   Q        Do you know Billy?

10  A        I didn't really know him.

11  Q        You know that he's accused of having murdered

12  Mr. Cole?

13  A        Yes, sir.

14  Q        Have you heard a lot of talk about that?

15  A        Not lately.

16  Q        Back when it happened?

17  A        Early.

18  Q        Back when it happened did you hear a lot of

19  talk about it?

20  A        Right.

21  Q        What were people -- were they expressing

22  opinions whether he did it or not?

23  A        They was.

24  Q        What were they saying?

25  A        Well, they was all against Mr. Wardlow at the

1    time, didn't know what to call it but what has been said

2    really was against him.

3    Q        They were against him?

4    A        Yes, sir.

5    Q        And did they express opinions as to what ought

6    to be done to him for killing Mr. Cole?

7    A        Some did.

8    Q        Okay.  And those expressed opinions, what was

9    generally the opinion?

10   A        Well, the maximum penalty.

11   Q        That is the death penalty?

12   A        Yes.

13   Q        Have you heard anyone that commented on it that

14   did not express the opinion that he was guilty?

15   A        Well, they said you don't know really exactly

16   what happened, you can't really say for sure when you

17   really don't know, you just go by hearsay.

18   Q        Do you have an opinion as to whether or not Mr.

19   Wardlow can get a fair trial in this county?

20   A        Well, my opinion I believe because of Mr. Cole

21   I believe it would be a little difficult.

22   Q        What about Mr. Cole?

23   A        Because of being well-known as he was.

24   Q        Would it be a fair statement that he was loved

25   by many in this county?

1    A        I believe that would be a fair statement.

2                          MR. OLD:  Pass the witness.

3

4                      CROSS EXAMINATION

5                      BY MR. TOWNSEND

6

7    Q        Mr. Lawton, you are friends of the Defendant's

8    father, Jimmy Wardlow?

9    A        Yes, sir.

10   Q        Is Jimmy the one that asked you to come

11   testify?

12   A        Yes, sir.

13            I have been knowing him for a long time.

14   He's a real good friend.

15   Q        And you are basically here today to try to help

16   Jimmy, the Wardlow family?

17   A        I am here to do the thing that is right.  Yes.

18                          MR. TOWNSEND: Okay.  Pass the

19   witness.

20

21                      REDIRECT EXAMINATION

22                      BY MR. OLD

23

24   Q        Mr. Lawton, you are a friend of Mr. Jimmy

25   Wardlow?

1    A        Yes, sir.

2    Q          Have you stated anything that wasn't true to

3    help Mr. Wardlow or help Mr. Wardlow's son?

4    A          No, sir.

5                          MR. OLD:  Pass the witness.

6                          MR. TOWNSEND:    No further

7    questions.

8                          THE COURT:   Thank you, Mr.

9    Lawton.   You may step down and I appreciate you being

10   here.

11                         You are excused, meaning you don't have

12   to hang around unless you want to.

13                         Cathy Byrd.

14                         THE WITNESS:  Thank you very

15   much.

16                         THE COURT:    Thank you, Mr.

17   Lawton.

18                         Who is going to be after Ms. Byrd?

19                         MR. OLD:  Patsy Martin.

20                         THE COURT:  Go ahead.

21

22

23

24

25

1                           CATHY BYRD

2    was called as a witness and, having been first duly sworn

3    by the Court, testified as follows:

4

5                        DIRECT EXAMINATION

6                          BY MR. OLD

7

8    Q        Please state your name.

9    A        Cathy Byrd.

10   Q        Where do you live, Ms. Byrd?

11   A        Cason.

12   Q        How long have you lived in Cason or Morris

13   county?

14   A        All my life, 27 years.

15   Q        What do you do for a living?

16   A        A housewife.

17   Q        Do you work at all?

18   A        I did.  I worked at --

19                     THE COURT:  Excuse me.

20              Counsel, housewives probably do a lot

21   more work than us fellows that don't so they generally

22   have their hands full, it's not as if they don't work,

23   just that they don't get paid.

24                     MR. OLD:  You interrupted me

25   before I asked her if she worked outside the home, Your

1    Honor.

2                              THE COURT:  I'm sorry.

3                              MR. OLD:  Have you in the past

4    worked outside the home?

5                              THE WITNESS:  I worked for a

6    couple of years at Cason store at Cason.

7    Q         (BY MR. OLD)  Did you work there during the

8    period of time that Mr. Cole was murdered?

9    A         No.  I had just quit and went to Mt. Pleasant

10   to work.

11   Q         Did you come back and work at the store in

12   Cason after that?

13   A         Yes.

14   Q         Have you heard a lot of people talk about Mr.

15   Cole's murder?

16   A         Yes.

17   Q         And the fact that Mr. Wardlow is charged with

18   it?

19   A         Yes.

20   Q         Have people told you what they thought?

21   A         Yes.

22   Q         What did they say?

23   A         Well, they, a lot of people said that, you

24   know, he deserved to die just like Carl Cole did.

25   Q         Do they -- I mean they are already punishing

1    him and he hasn't been found guilty?

2    A        Well, just people talk.

3    Q        Okay.  And was most of that in the Cason area

4    where you heard that?

5    A        Most of it.

6    Q        Did you hear it other places in Daingerfield?

7    A        Sometimes.

8    Q        You are Billy's first cousin, is that correct?

9    A        Yes.

10   Q        And people -- I mean it's well-known in the

11   Cason area, isn't it, his mother and your mother are

12   sisters?

13   A        No.  His mother and my father are brothers.

14   Q        "Brother and sister?"

15   A        Yes.

16   Q        That's well-known in the Cason area?

17   A        Yes.

18   Q        And people would get up and make that statement

19   in your presence?

20   A        Yes.  But some people don't know, don't really

21   connect me with them all the time, people who don't know

22   that I belong to the Martins.

23   Q        Did you know Mr. Cole?

24   A        Yes, sir.

25   Q        How did you know Mr. Cole?

1    A        I knew him from -- I had known him all my life

2    but I really got close to him when I was working at Cason

3    store.

4    Q        And when you say you have known him all of your

5    life did you know him on site all of your life?

6    A        I had just seen him around and I really got to

7    talk to him a lot, though, when I was working.

8    Q        Was he likeable?

9    A        Yes, sir.

10   Q        Was your observation of him he was a good man?

11   A        Yes, sir.

12   Q        Did he hang around the Cason store?

13   A        Yes.

14   Q        A lot of people hang around the Cason store?

15   A        Yes, sir.

16   Q        You all liked Mr. Cole?

17   A        Yes, sir.

18   Q        Was he kind of the deacon or the dean of the

19   store?

20   A        Yes, sir.  He always joked about "being an

21   employee."

22   Q        Do you have an opinion as to whether or not

23   your cousin Billy can get a fair trial in this county?

24   A        I don't think he will.

25   Q        And what do you base that on?

1    A        Because of talk, you know, everybody -- Mr.

2    Cole being so well-known.

3    Q        And what you have heard since?

4    A        Yes, sir.

5                         MR. OLD:  Pass the witness.

6                         MR. TOWNSEND:  No questions,

7    Your Honor.

8                         THE COURT: You may step down,

9    ma'am.  Thank you.  You are excused.

10                        That means you don't have to hang

11   around.

12                        "Patsy Martin", who is after "Ms.

13   Martin"?

14                        MR. OLD:  Mr. Nash.

15

16                        PATSY MARTIN

17   was called as a witness and, having been first duly sworn

18   by the Court, testified as follows:

19

20                        DIRECT EXAMINATION

21                        BY MR. OLD

22

23   Q        Please state your name.

24   A        Patsy Martin.

25   Q        You live near Cason?

```
1    A          Yes, sir.

2    Q          Have you lived there a long time?

3    A          Yes, sir.

4    Q          How long have you lived there?

5    A          All my life just about.

6    Q          I believe you actually live across the line in

7    Titus county?

8    A          Yes, sir.

9    Q          Have you lived in Morris county in the past?

10   A          Yes.

11   Q          How far do you live from Morris county -- yeah

12   "Morris county"?

13   A          It's kind of just across the road.

14   Q          Part of your land is in Morris county?

15   A          Not -- not actually but it is across the road.

16   Q          The land that adjoins you across the road is?

17   A          Yes, sir.

18   Q          The community that you live in and you do

19   business in, is it more acquainted to Morris county,

20   Cason and Daingerfield than to Titus county?

21   A          Yes.

22   Q          You are Billy Wardlow's aunt, is that correct?

23   A          Yes.

24   Q          Do you work outside the home?

25   A          No, sir.
```

1    Q       You know that Billy is charged with having

2  murdered Mr. Cole?

3    A       Yes, sir.

4    Q       Have you heard a lot of comment or talk about

5  that?

6    A       Yes, sir.

7    Q       And what are people saying as to whether or not

8  he did it or not or whether he's guilty or not?

9    A       They say he's guilty.

10    Q       And have people made that comment in your

11  presence?

12    A       Yes, sir.

13    Q       Have people who should have known that you were

14  his aunt made that comment in your presence?

15    A       Yes.

16    Q       Doesn't seem to bother them to make that

17  statement to you even though they know you are a

18  relative?

19    A       Doesn't seem to.  No, sir.

20    Q       Have they expressed to you what they think

21  ought to be done to Billy?

22    A       Sometimes.  Yes, sir.

23    Q       What opinion have they expressed as to how he

24  ought to be dealt with?

25    A       That he ought to be put in prison for life or

1    death or --

2    Q        But they are already willing to sentence him

3    even though he hasn't been found guilty?

4    A        No, sir.  Yes.

5    Q        Did you know Mr. Cole?

6    A        Yes, sir.

7    Q        How long have you known Mr. Cole?

8    A        All my life.

9    Q        Was Mr. Cole well-known in Morris county?

10   A        Very well-known.  Yes, sir.

11   Q        Did he have a good reputation?

12   A        Yes, sir.

13   Q        Was he a liked or loved man?

14   A        Yes, sir.

15   Q        Do you have an opinion as to whether or not

16   Billy can get a fair trial in this county?

17   A        Probably not.

18   Q        Okay.  And why is that?

19   A        It's just been so well talked about so much.

20   Q        Is it -- how about Mr. Cole's popularity, does

21   that effect it?

22   A        I think so.

23   Q        Now, you are his blood --

24   A        I am his -- I am his uncle's wife.

25   Q        You are his uncle's wife?

1      A       Yes.

2      Q       People have made the statement to you that he's

3  guilty?

4      A       Yes, sir.

5      Q       And they have made the statement to you he

6  ought to get life?

7      A       Yes, sir.

8      Q       Life or death sentence?

9      A       Yes, sir.

10     Q       Don't you think it takes -- I mean people know

11  your relationship with him but yet they go ahead and say

12  those things in your presence?

13     A       Yes, sir.

14                         MR. OLD:  Pass the witness.

15                         MR. TOWNSEND:  No questions,

16  Your Honor.

17                         THE COURT:  Thank you, ma'am.

18  You may step down.

19                         Mr. Nash.

20                         You are excused, that means you don't

21  have to wait around unless you choose to.

22                         Who will be after Mr. Nash?

23                         MR. OLD:  O.B. Senn.

24                         THE COURT:  Go ahead.

25

W.S. NASH

was called as a witness and, having been first duly sworn

by the Court, testified as follows:


DIRECT EXAMINATION

BY MR. OLD


Q        Please state your name.

A        It's William Simpson Nash.

Q        Where do you live, Mr. Nash?

A        Route 1, Box 175-C, Daingerfield which is in

the Jenkins community.

Q        "Jenkins", is that kind of toward Lone Star?

A        Yes.

Q        How long have you lived in Morris county?

A        Approximately 22 years.

Q        Did you know Mr. Cole during his lifetime?

A        Yes.  I did.

Q        How well did you know him?

A        I saw him at the Cason store, saw him up here

in town, just knew him when I saw him.

Q        Was he a popular man in this county?

A        I feel like that he was.

Q        Was he well liked?

A        I feel like he was.

1    Q        Do you know Billy Wardlow?

2    A        Yes.  I know him.

3    Q        Do you know Billy's parents?

4    A        Yes, sir.  I do.

5    Q        You all are not related, are you?

6    A        No.  We are not.

7    Q        Have you heard a lot of talk about him having

8    killed Mr. Cole?

9    A        Yes.  I have.

10    Q        Have people expressed an opinion to you as to

11    whether or not they think he did it?

12    A        I have heard people express their opinion that

13    he did it.

14    Q        On numerous occasions?

15    A        I would say "numerous", yes, sir.

16    Q        And have they expressed their opinion as to

17    what ought to be done to him for doing that?

18    A        Probably so but I didn't pay that much

19    attention to it, you know.

20    Q        Anybody indicated to you he ought to get the

21    death penalty?

22    A        I have heard that if he was guilty.

23    Q        Where do you work?

24    A        Lone Star Steel.

25    Q        And have you heard -- have you heard people

1    talk about it at work?

2    A       I am not sure it has been discussed, I am sure

3    but I don't work with that many people, you know, that

4    live up in this area.  Most of them live in Longview or

5    Gilmer or somewhere like that.

6    Q       Outside this county?

7    A       Outside of the county.

8    Q       Do you have an opinion as to whether or not

9    Billy can get a fair trial in this county?

10   A       Do I have an opinion?

11   Q       Yes.  Do you have a belief?

12   A       It's possible that he could.

13   Q       Do you have doubt about it?

14   A       All the publicity and everything I would have

15   some doubt about it.

16   Q       Has there been more publicity about this than

17   other offenses or crimes?

18   A       Maybe because I knew everybody involved would

19   be the only way.

20                   MR. OLD:  Pass the witness.

21

22                   CROSS EXAMINATION

23                   BY MR. TOWNSEND

24

25   Q       Mr. Nash, you are friends of friends of Jimmy

1    Wardlow's?

2    A          That's correct.

3    Q          And as a result of talking with Jimmy Wardlow

4    that's the reason that you are here today?

5    A          That's correct.

6                              MR.   TOWNSEND:    Pass   the

7    witness.

8                              MR.   OLD:     No    further

9    questions.

10                             THE COURT:   Thank you,  sir,

11   and you may step down, appreciate you being here.

12                             THE WITNESS:  Thank you.

13                             THE COURT:  Mr. Senn.

14                        Who is after Mr. Senn?  Mr. Old, who

15   would be after Mr. Senn?

16                             MR. OLD:  Your Honor, I might

17   be  through.   I have got to be sure I haven't marked

18   through somebody's name.

19                             THE COURT:  Okay.  Fine.

20                        Mr. Senn, if you will just have a seat

21   over here in the witness chair, please, sir.

22                             THE WITNESS:  All right, sir.

23                             THE COURT:  Please spell your

24   last name.

25                             THE WITNESS: "Senn, S-E-N-N."

1      O.B. SENN, JR.

2 was called as a witness and, having been first duly sworn

3 by the Court, testified as follows:

4

5       DIRECT EXAMINATION

6       BY MR. OLD

7

8 Q   Please state your name.

9 A   O.B. Senn, Jr.

10 Q   Where do you work?

11 A   I don't work.

12 Q   Are you retired?

13 A   Retired.

14 Q   What are you retired from?

15 A   Carpenter.

16 Q   Where do you live?

17 A   I live at Route 2, Box 187-X, Daingerfield,

18 Texas.

19 Q   What community or area of Morris county is

20 that?

21 A   That's about two and an eighth miles west on

22 Highway 11 from Daingerfield city limits.

23 Q   That's between here and Cason?

24 A   Yes, sir.

25 Q   Did you know Mr. Cole during his lifetime?

1    A       All my life.

2    Q       Was he a well-known man in Morris county?

3    A       Yes, sir.

4    Q       Was he a well liked man in Morris county?

5    A       As far as I know he was.

6    Q       Do you know that Mr. Wardlow is accused of

7    having murdered him?

8    A       Yes, sir.

9    Q       Have you heard people talk about that?

10   A       Oh, yes.  There has been talk about it, sure

11   has.

12   Q       Have you read a lot in the paper about it?

13   A       I beg your pardon?

14   Q       Have you read the newspaper?

15   A       Oh, yes.  I read the paper.

16   Q       The talk that you have heard and what

17   people are saying, has it been disfavorable to Mr.

18   Wardlow?

19   A       Well, pro and con.

20   Q       People have expressed to you the opinion that

21   he's guilty?

22   A       Yes.  I have heard that.

23   Q       And they feel pretty strongly about it when

24   they express that opinion?

25   A       Well, some have and some just couldn't figure

1     out what possessed him to do it if he did it.

2     Q       Do you have an opinion as to whether or not Mr.

3     Wardlow can get a fair trial in this county?

4     A       I believe he could.

5     Q       You don't think that the popularity of Mr. Cole

6     would effect a jury in this county?

7     A       Well, I don't think so.

8     Q       You don't think so?

9     A       No, sir.

10                          MR. OLD:  Pass the witness.

11                          MR. TOWNSEND:   No questions

12    of this witness, Your Honor.

13                          THE COURT:   Thank you, Mr.

14    Senn.   You are excused.   You don't have to hang around

15    any further today, we appreciate you being here.

16                          THE WITNESS:  All right, sir.

17                          MR. OLD:  Your Honor, we rest

18    on the motion.

19                          MR. TOWNSEND: The State would

20    call Bob Scaff.

21                          THE COURT:   Spell that last

22    name for me.

23                          THE DISTRICT CLERK:   "Scaff,

24    S-C-A-F-F."

25

1          (The Defendant rested its case on Motion

2     for Change of Venue.)

3

4                    BOB SCAFF

5     was called as a witness and, having been first duly sworn

6     by the Court, testified as follows:

7

8                    DIRECT EXAMINATION

9                    BY MR. TOWNSEND

10

11    Q          State your name, please.

12    A          Bob Scaff.

13    Q          And, Bob, how are you employed?

14    A          I'm Morris County Commissioner.

15    Q          And you are a commissioner of what precinct?

16    A          Precinct One.

17    Q          Okay.  You have just been elected commissioner

18    of a new precinct I believe, what is the number for that?

19    A          It will be "Precinct Four."

20    Q          What is Precinct One, the old Precinct One,

21    basically what area does that encompass?

22    A          That is part of the City of Daingerfield and

23    the Cason area.

24    Q          Okay.  What about your new precinct, what area

25    does that encompass?

1    A        It will be part of the City of Daingerfield and

2    go east and north to the Rocky Branch area.

3    Q        Does it actually go north of Rocky Branch?

4    A        Yes.

5    Q        Goes east all the way to the Cass county line

6    to Hughes Springs?

7    A        Yes.

8    Q        What sort of education do you have, Bob?

9    A        I graduated from high school in Paul Pewitt at

10   Naples and Omaha, graduated from Southern Arkansas

11   University with a BBA.

12   Q        Have you lived the majority of your life in

13   Morris county?

14   A        Yes.

15   Q        How long have you lived here in the

16   Daingerfield area?

17   A        I have lived in Daingerfield nine years.

18   Q        Prior to that time were you born and raised in

19   the Omaha area?

20   A        Yes.  I was born in Naples and raised in Naples

21   and Omaha up until I was twenty years old.

22   Q        After that time, after getting out of college

23   I believe you worked at the Morris county bank at Naples?

24   A        I worked at Morris county bank in Naples six

25   years.

1    Q        And what years were those?

2    A        From 1974 through 1980.

3    Q        You still have relatives in the Naples-Omaha

4    area?

5    A        Yes.

6    Q        Does that include your mom and dad?

7    A        Yes.

8    Q        I guess them living up there you still spend

9    quite a bit of time in the north end of the county?

10   A        Yes.  I do.

11   Q        As well as your commissioner's job?

12   A        Yes.

13   Q        For instance a few years ago when you were

14   working at the bank in Naples did you know Mr. Homer

15   Cole?

16   A        Yes.  I did.

17   Q        And I believe Homer was Carl Cole's brother,

18   is that right?

19   A        That's right.

20   Q        And did Homer live there in Naples?

21   A        Yes.

22   Q        And during that period of time in knowing Mr.

23   Homer Cole and working at the bank of Naples and growing

24   up in this area did you know Carl Cole?

25   A        No.

1    Q        When did you meet Carl Cole?

2    A        I didn't meet Carl Cole until I moved to

3    Daingerfield in 1985.

4    Q        Sometime after that you found out that he and

5    Homer were brothers?

6    A        Yes.

7    Q        Based on your knowledge of people, particularly

8    in the Omaha and Naples end of the county there has been

9    publicity in this case from the Daingerfield newspaper

10   presented, do you believe that publicity or just word of

11   mouth publicity has had such a strong effect that there

12   are substantial numbers of people in the north end of the

13   county that could not be fair jurors?

14   A        No.  I do not believe that.

15   Q        Do you believe that the Defendant in this case,

16   Billy Wardlow, could get a fair trial in Morris county?

17   A        Yes.

18   Q        I think you said you knew Carl, knew him to be

19   an older person, is that correct?

20   A        That's correct.

21   Q        How old are you, Mr. Scaff?

22   A        47.

23   Q        Do most of the people that you know of that

24   know Carl Cole, would they be in the 65 and older

25   category?

1          MR. OLD:   I object to the

2   question, it calls for him to speculate who knew Carl

3   Cole, those people that he knew of that knew Carl Cole.

4          THE COURT:   Sustained until

5   you word it some kind of way differently.

6          MR. TOWNSEND:  We are talking

7   opinions today, Your Honor, so I would ask him his

8   opinion, would that be all right?

9          THE COURT:   You can put your

10  question however you want to and I will see if anybody

11  objects.

12          MR.   TOWNSEND:      In   your

13  opinion, Mr. Scaff, are most of the people that would be

14  closely  --  would  have  close  ties,  relatives,

15  relationships, friendships with Mr. Cole, would they

16  be --

17          MR.  OLD:    Object  to  the

18  question, it calls for him to speculate who had close

19  ties to Mr. Cole, "Most of the people had close ties."

20          THE COURT:   Overruled.

21          Commissioner, try to base your opinion

22  as close as you can as to what you know by virtue of your

23  own experience as opposed to trying to project out to

24  unknown people if you can.

25          If you can answer it without relying on

1   just a guess, based on a guess I will let you answer, if

2   you can make that distinction the best you can.

3           Okay.  Would you ask the question one

4   more time and let me --

5           MR. TOWNSEND:  Basically the

6   question boils down to; is it your opinion that most of

7   the people that -- who have been close to Carl within

8   your knowledge would be in the 65 and older category?

9           THE WITNESS:  In my opinion

10  the people that I know and that I know these people knew

11  Carl Cole, most of them would be over 65.

12  Q       (BY MR. TOWNSEND)  Mr. Scaff, you have lived

13  pretty well over the county as far as living in the south

14  end and you have lived in the north end, is that correct?

15  A       That's correct.

16  Q       Do you feel you have a good working knowledge

17  of the people in the county so far as do you still feel

18  that you know people well in both ends?

19  A       Yes.

20  Q       Do you feel like or do you feel like that there

21  would be a difference as far as knowledge of this case

22  basically from one end of the county to the other or do

23  you think it would be about the same all over?

24  A       It would be different.

25  Q       Mr. Scaff, I think you are familiar with the

1     newspaper, the Bee?

2     A       Yes.

3     Q       Is that a newspaper that many people to your

4     knowledge read in Naples and Omaha?

5                MR. OLD:   I object to him

6     testifying as to whether he thinks it's read in Naples,

7     it calls for speculation.

8                MR. TOWNSEND:   I will

9     withdraw.

10               MR. OLD:   People read the Bee

11     or don't read the Bee, that's fine.

12               MR. TOWNSEND:   I have already

13     withdrawn it.

14               THE COURT:   Next question.

15               MR. TOWNSEND:   I'll pass the

16     witness.

17

18               CROSS EXAMINATION

19                  BY MR. OLD

20

21     Q       You are a County Commissioner, how many years

22     have you been a commissioner?

23     A       How many have I been County Commissioner, two,

24     two years.   This is my second year, in January I will

25     have served two years.

1    Q        You came in at midterm?

2    A        No.  We had a redistricting, I had two -- my

3    term was shortened.

4    Q        You mean you got to run two years ago for a

5    four year term then you got to run for a four year term

6    again this year?

7    A        That's correct.

8    Q        Are you as a Commissioner in Morris county, are

9    the finances of Morris county of your concern?

10   A        Yes.

11   Q        And it is something that you have to answer to

12   those people who vote in this county for?

13   A        That's correct.

14   Q        You are aware that if the Court should grant

15   a change of venue in this and this case should be moved

16   to another county that that would create additional costs

17   to Morris county, Texas?

18   A        Yes.

19   Q        Have    you    as    a    Commissioner    and    the

20   Commissioner's Court together, done any sort of study or

21   investigation as to how much that is going to cost?

22   A        No.

23   Q        Mr. Cole was a well-known man in this county,

24   wasn't he?

25   A        He was well-known in Cason.

1    Q        He was one of the pioneers of the county,

2    wasn't he?

3    A        I don't know.

4    Q        You don't know?

5    A        No.

6    Q        Do you know Ray Cochran?

7    A        Yes.

8    Q        Do you know if Ray Cochran would be a person

9    for you to take a position to know who the pioneer

10   families of this county were?

11                         MR. TOWNSEND:   Your Honor,

12   this calls for opinion, calls for speculation.

13                         THE COURT:   Sustained.

14                         MR. OLD:   Do you know Jerry

15   Pratt, Sr.?

16                         THE WITNESS:   Yes.   I do.

17   Q        (BY MR. OLD)   Would you agree that Carl Cole

18   had a lot of friends?

19   A        Yes.

20   Q        And those friends weren't particularly limited

21   to any geographic area, he had friends in the north part

22   of this county, didn't he?

23   A        I don't know.

24   Q        You don't know?

25   A        No.

1  Q        You are not saying he did, you are not saying

2  he didn't, you are saying you don't know?

3  A        Correct.

4                        MR. OLD:  Pass the witness.

5                        MR. TOWNSEND:    No  further

6  questions.

7                        THE  COURT:    Thank  you,

8  Commissioner.  You may step down.  You are excused.

9                        You are free to stay or leave as you

10  choose.

11                        Any further witnesses, Mr. Townsend?

12                        MR. TOWNSEND:  That's all we

13  have.

14                        THE COURT:  All right.  The

15  evidence then is closed on the change of venue.

16                        Mr. Bailiff, have we got anybody that

17  was sworn as a witness and they are out there and they

18  want to come in when they are part of the public now.

19                        THE BAILIFF:  I think they are

20  all gone, they was too anxious.

21                        THE COURT:  Okay.  Mr. Old.

22                        MR. OLD:  Yes.

23                        THE COURT:  Argument?

24                        MR. OLD:  May we approach the

25  bench?

1                THE COURT:   Sure.

2

3                (Off the record hearing at the bench out

4  of the hearing of the Court Reporter.)

5

6                THE COURT:   Okay.  Back on the

7  record.

8                Mr.  Old  indicates  that  he  wants  to

9  reserve a closing argument but doesn't necessarily need

10  to do one now.

11                Mr. County Attorney?

12                MR.  TOWNSEND:   Well,  as  the

13  Court knows one of the things that has been pointed out

14  repeatedly, the amount of publicity --

15                THE COURT:   Let me stop just

16  a second, it might shorten everybody, the two statements

17  under 316, "A dangerous combination", under subpart A,

18  that motion is denied.

19             Now, the issue has to do with whether

20  or not there can be a fair and impartial jury trial which

21  is "Item One", in other words, I am not -- there's

22  nothing to support "a combination" in this so let's, if

23  the motion is to be granted it has to be granted on One,

24  not on Two.

25            Go ahead.

1             MR. TOWNSEND:  There has been,

2    it's lots of talk about publicity in the newspaper, you

3    know, we have got two local newspapers in the county.

4             We have got evidence presented that one

5    of those newspapers had some publicity, we have no

6    evidence presented that it was on TV.  I think there was

7    mention of one radio station discussing it.

8             We don't know how much or whether --

9    there's no evidence that any of the newspapers outside

10   of the county that are widely circulated within the

11   county such as Longview, Texarkana, Mt. Pleasant

12   newspapers, there's no evidence that those papers

13   presented any publicity so when we are talking about

14   "publicity", all we are talking about is one little local

15   newspaper presenting publicity or presenting this stuff

16   that would largely go to this end of the county.

17             I think that we are pretty much in

18   agreement, of course, as the Court knows simply having

19   publicity in a case doesn't call for a change of venue.

20   Simply having knowledge of the victim is really not a

21   reason for change of venue, if so John F. Kennedy's

22   killer would never have been tried.

23             As for the witnesses presented, they all

24   seemed like good folks to me but they are all friends of

25   the Wardlows for the most part with the exception of

1   maybe one, they are either friends or relatives of the

2   Wardlows.  I believe they were without exception from the

3   Daingerfield-Cason -- Jenkins, there was one from

4   Jenkins, the rest were all from Daingerfield or Cason.

5   If you look at your demographics, Your Honor, there's not

6   a witness from Omaha, there's not a witness from Naples,

7   there was not a witness from Lone Star, there was not a

8   witness from Hughes Springs, those four cities are all

9   in part of Morris county, that there was not one single

10  witness from any of those places.

11         I suggest to you that if the Defense in

12  this case is going to go to all the trouble to parade

13  twenty witnesses in front of you if they could have got

14  anybody to be a witness from those communities you would

15  have them here today, they had the opportunity but not

16  one witness from any of those and that's a substantial

17  part of our county, it's really a much larger part of our

18  county than the small part that the people that did

19  appear from Daingerfield and Cason represents.

20         But basically, Your Honor, it's just my

21  feeling that publicity happens in any criminal case,

22  particularly in any capital murder case you are certainly

23  going to have publicity.  I don't believe there has been

24  any showing, any substantial showing by the Defendant

25  that would require change of venue to another district

1        or to just another county within the district.

2                         THE COURT:  Thank you.

3                         MR. OLD:  May I respond, Your

4        Honor?

5                         THE COURT:  Mr. Old.

6                         MR.    OLD:    It   has   been

7        interesting to me in the witnesses in this case, I think

8        it's obvious, I don't think there's any question about

9        it, close to half of those witnesses testified that Mr.

10       Cole was their friend and they respected him and yet they

11       got on the witness stand and said a man could not get a

12       fair trial in this county for killing him.

13                         Now, that is contrary to the experience

14       I have had in the practice of law in trying to get

15       changes of venue, I have been told a million times, "No,

16       Mr. so and so was my friend, I'm not going to testify."

17                         But there is no rule that says the

18       witnesses have to be from the area of the county, just

19       have good knowledge of the county and of our twenty or

20       so witnesses today Mr. Ron Cowan, ex-county judge, Head

21       of the Department of Sociology at North -- Northeast

22       Texas Community College is the most credible and

23       informative source there is.  He told you how Mr. Cole

24       knew this county, he told you that when he was a young

25       man running for county judge, "He took me up north" and

1    they talk about Morris county like there was a Civil War

2    going on here, the north and the south, it's not fifteen

3    miles up there, it's about a fifteen minute drive and

4    that's doing it legally.

5                Now, Mr. Cole took Mr. Cowan up into the

6    northern territory and he introduced him around and Mr.

7    Cowan told you what good he did up in the northern

8    territory as well as the southern territory.  And he told

9    you that because of the way this county felt about Carl

10   Cole, one of its pioneer favorite sons and a man of 82

11   years of age being murdered that the man could not get

12   a fair trial if he was accused of having killed Mr. Cole.

13               I feel that we have produced sufficient

14   evidence, more than sufficient evidence to be entitled

15   to our change of venue and we would rest the same with

16   His Honor.

17               THE COURT:  Thank you.

18               As if the Defendant's position, Mr. Old,

19   that it's throughout the entire district or just this

20   county?  There is no evidence, of course, and the motion

21   under law if it's transferred it must go to a county,

22   adjacent county or at least a county within the district.

23               MR. OLD:  Your Honor, when you

24   get beyond this county I have -- I'm not going to waive

25   the issue, I would be satisfied for a change of venue.

1          THE COURT:   If you get the

2     relief that you ask for you can hardly complain about it.

3          MR. OLD:   If I get to another

4     county I might have to file another motion but I don't

5     anticipate that, Your Honor.   I don't believe it exists

6     outside this county.

7          I would urge the Court if they are going

8     to consider the motion and grant it consider Titus county

9     because of the size.

10          THE COURT:   My logic is that

11     it's the only county with any substantial -- that it's

12     the biggest by population.

13          MR. OLD:   It's the only county

14     that I'm aware of, I believe I am right, it can have two

15     courtrooms that can be -- where court can go on in one

16     county.

17          THE COURT:   Yes.   I have

18     noticed -- I don't know that there is ever a reason that

19     a judge needs to assign when he or she steps aside, I do

20     note that both of the elected judges of this county did

21     step aside.

22          Mt. Pleasant is how many miles from

23     here?

24          MR. OLD:   Seventeen, eighteen

25     miles.

THE COURT:  I know we talked about it in chambers.  The Court is always faced with the problem if a case is transferred is that it could be contributive or suggestive that the people of a community somehow or another are not -- it could be interpreted as being criticism of the county.  I think into that it is not inappropriate, however I don't have the statistical abstract of the last United States census for this county, it's certainly something that I can take note of and I'm reasonably satisfied that the average population of the county, age of this county is substantially high, certainly when it's compared with a fast growing county such as Dallas or Collin or Denton.

I don't think that it would be all that burdensome if it's only relatively few miles, not talking about taking a host of witnesses and putting them in a hotel and so forth like you take a Tarrant county case and move it up to the panhandle somewhere.

The Defendant has had the opportunity to suggest if there was some kind of problem about this case being tried anywhere but in the district outside of this county that the most logical one obviously would be Titus county and since you are going to use a visiting judge, a visiting judge is to try this case it's only fifteen miles to transfer it, to transfer it to Titus

1      county within the district.

2                    Gentlemen, on the assumption that some

3      judge actually gets designated to hear this case within

4      a relatively short order -- I'm aware of why Judge Thorpe

5      had to step aside because of his family, a death in the

6      family, is this case ready to go to trial?

7                    Apparently the Defendant has been in

8      jail what, a year?

9                    MR. TOWNSEND:   Longer than

10     that.

11                   THE COURT:  More than a year?

12                   MR. OLD:  Not -- it's not my

13     fault.

14                   THE COURT:  I know you haven't

15     had much time but could you give the Court some

16     suggestion about how long it would take you to get ready?

17                   MR. OLD:  Your Honor, if I can

18     get -- if the Court gave the date mid to late September

19     and I knew that in the next week I am confident I could

20     be ready, I would like at least --

21                   THE COURT:  How much?

22                   MR. OLD:   -- at least four

23     weeks before jury selection.

24                   MR. TOWNSEND:  That's as much

25     notice as I need.

1          MR. OLD:   I don't want it to

2   rock along and not have a setting and hear it the week

3   before it's set.

4          MR. TOWNSEND:   I would hope

5   we would be able to do something by then.

6          MR. OLD:   When I took this

7   assignment I represented that I could do my work and get

8   ready.

9          THE COURT:   I have absolute

10  confidence in both of the lawyers in the case being, to

11  be able to take care of your half of the case without any

12  problem.

13          Would there be, so far as anything new,

14  any particular business between the 19th of September

15  and the 27th?

16          Now, I'm speaking real fast here knowing

17  I don't know who the judge is going to be but if there

18  are two courtrooms so far as you know I would assume that

19  given the age of the case and the cooperation of both

20  judges that would it -- in Titus county, is the usual

21  time for them to have jury panels?

22          MR. OLD:   There's a statute

23  on it, in this case we have to have it in our hands ten

24  business days before selection in a capital case, there's

25  a rule on it.

1          THE COURT:  I understand.  But

2     I also think this case needs to go forward, whatever its

3     outcome is going to be it needs to be tried.

4               Maybe the best thing to do is suggest

5     the 26th.

6               What I'm going to do is just set it for

7     Monday, the 26th of September, obviously that whoever is

8     assigned permanently to the case may have a different

9     date but at least we can start getting somewhere to go

10    to trial.

11              Now, Mr. Old, I note that the statute

12    provides that the Clerk of the Court move the records and

13    so forth over.

14              As a practical matter is there any

15    particular -- given testimony that the Defendant's family

16    is here is there any reason to transfer the Defendant at

17    any time early?

18              MR. OLD:  You mean from the

19    county?

20              THE COURT:  Yes.  I would

21    assume that he would prefer to be closer to where his

22    people are and this county not bear the burden of per

23    diem if Titus county would choose to charge a per diem.

24              MR. OLD:  He would be happy

25    staying here and prefer staying here.

1          The only thing I would like when trial

2    starts that --

3               THE COURT:  Once it begins I

4    would think there is a lot of reasons for the ability to

5    try the case at that time or sometime shortly before an

6    actual trial starts to physically transfer the Defendant.

7    In the meantime at the Defendant's request he's going to

8    be left here.

9               Anything else at all that we can deal

10   with, gentlemen?

11              MR. TOWNSEND:  No.

12              THE COURT:  All right.  We

13   will stand in recess in this matter until -- is 9:00 the

14   usual starting time in Titus county?

15              MR. OLD:  That's the usual

16   starting time in Titus county.

17              THE COURT:  Mr. Clerk, if you

18   would be kind enough to oblige me by talking with your

19   counterpart Monday and see if there's any logistical

20   problem and see if they can gear up to do a jury list and

21   summons for that.  Don't send them out yet but just get

22   he work started so that it could be done.

23              We don't need any further record.

24

25                    *****

1
STATE OF TEXAS        §
                      §
2
COUNTY OF TITUS       §

3

4
          I, Lloyd E. Billups, CSR #149 and

5
Official Court Reporter in and for the 76th Judicial

6
District, State of Texas, do hereby certify that the

7
above and foregoing contains a true and correct

8
transcription of the proceedings in the above-styled and

9
numbered causes, all of which occurred in open court or

10
in chambers on August 12, 1994 and were reported by me.

11
          I further certify that this

12
transcription of the record of the proceedings truly and

13
correctly reflects the exhibits, if any, offered by the

14
respective parties.

15
          WITNESS MY HAND this _29 TH_ day of

16
September, 1995.

17

18
_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
19
76TH JUDICIAL DISTRICT, STATE OF TEXAS

20

21

22

23

24

25

Certification Number of Reporter:  149

Expiration Date of Certification:  12/31/96

Business Address:  Drawer 1868
                   Mt. Pleasant, Texas 75456-1868

Telephone Number:  903/577-6735

Transcribed By:   Tandra K. Gibson

The within and foregoing pages, including this page, having been examined by the Court are found to be a true and correct transcription of the statement of facts and other proceedings, all of which occurred in open court or in chambers and were reported by the Official Court Reporter.

SIGNED this_____ day of _____, A.D., 1995.

_____
PAUL BANNER
Judge by Judicial Assignment

1    We, the undersigned attorneys of record

2 for the respective parties, do hereby agree that the

3 foregoing pages constitute a true and correct

4 transcription of the statement of facts, and other

5 proceedings in the above-styled and numbered cause, all

6 of which occurred in open court or in chambers and were

7 reported by the Official Court Reporter.

8    SIGNED this _____ day of

9 _____, A.D., 1995.

10

11

12

13    _____

14    Attorney for the State

15    _____

16    Attorney for the Defendant

17

18

19

20

21

22

23

24

25