

CAUSE NO. 12,764

THE STATE OF TEXAS                §   IN THE DISTRICT COURT OF
                                  §
VS.                               §   TITUS COUNTY, TEXAS
                                  §
BILLY JOE WARDLOW                 §   76TH JUDICIAL DISTRICT

STATEMENT OF FACTS

DEFENDANT'S MOTION TO SUPPRESS CONFESSION(S)

October 17, 1994

VOLUME 9 of 43 volumes

FILED IN
COURT OF CRIMINAL APPEALS

OCT 11 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

1

## VOLUME 9

2

### DEFENDANT'S MOTION TO SUPPRESS CONFESSION(S)

3

OCTOBER 17, 1994                                    PAGE/VOLUME

4

APPEARANCES . . . . . . . . . . . . .              1/9

5

MORNING SESSION . . . . . . . . . . .              3/9

6

HEARING ON MOTION TO SUPPRESS CONFESSIONS(S)       3/9

7

WITNESS SWORN . . . . . . . . . . . .              6/9

8

RULE INVOKED . . . . . . . . . . . .               6/9

9

DEFENDANT SWORN . . . . . . . . . . .              8/9

10

WITNESS FOR THE STATE

11

RICKY BLACKBURN

12

        DIRECT EXAMINATION BY MR. TOWNSEND   .      9/9

13

        VOIR DIRE BY MR. OLD   . . . . . . .        23/9

14

        DIRECT EXAMINATION BY MR. TOWNSEND (CONT.)  26/9

15

        VOIR DIRE BY MR. OLD   . . . . . . .        28/9

16

        DIRECT EXAMINATION BY MR. TOWNSEND (CONT.)  32/9

17

        CROSS EXAMINATION BY MR. OLD   . . . .      49/9

18

RECESS . . . . . . . . . . . . .                   51/9

19

WITNESS FOR THE STATE

20

RICKY BLACKBURN

21

        CROSS EXAMINATION BY MR. OLD (CONT.)  .     51/9

22

COURT ADJOURNED . . . . . . . . . . .              104/9

23

COURT REPORTER'S CERTIFICATE . . . . . . .         105/9

24

25

                          * * * * *

1

VOLUME 9

2

ALPHABETICAL INDEX OF WITNESSES

3

UNDERLINE OCTOBER 17, 1994                                    PAGE/VOLUME

4

BLACKBURN, RICKY
Direct Examination by Mr. Townsend . . . . .        9/9
Voir Dire Examination by Mr. Old . . . . . .       23/9
Direct Examination by Mr. Townsend . . . . .       26/9
Voir Dire Examination by Mr. Old . . . . . .       28/9
Direct Examination by Mr. Townsend . . . . .       32/9
Cross Examination by Mr. Old . . . . . . . .       49/9
Cross Examination by Mr. Old (Cont.) . . . .       51/9

5

6

7

8

9

10

* * * * * *

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## VOLUME 9

### EXHIBIT INDEX

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| STATE'S PRE-TRIAL 1<br>Letter dated 1/25/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 15 | 15 | 15 | 16/ADM |
| STATE'S PRE-TRIAL 2<br>Letter dated 2/24/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 22 | 22 | 23 | 25/ADM |
| STATE'S PRE-TRIAL 3<br>Statement dated 2/28/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 27 | 27 | 31 | 31/ADM |
| STATE'S PRE-TRIAL 4<br>Envelope addressed<br>to Ricky Blackburn | 33 | 33 | 33 | 33/ADM |
| STATE'S PRE-TRIAL 5<br>Statement dated 9/11/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 37 | 37 | 38 | 38/ADM |
| STATE'S PRE-TRIAL 6<br>Letter dated 8/17/94<br>to Billy Joe Wardlow<br>from Ricky Blackburn | 40 | 44 | 45 | 46/ADM |
| STATE'S PRE-TRIAL 7<br>Undated Letter<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 8<br>Letter dated 1/13/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 9<br>Letter dated 3/7/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |

VOLUME 9

EXHIBIT INDEX

(CONTINUING)

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| STATE'S PRE-TRIAL 10<br>Letter dated 4/10/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 11<br>Letter dated 5/7/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 12<br>Letter dated 5/9/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 13<br>Letter dated 5/9/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 14<br>Letter dated 5/9/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 15<br>Letter dated 5/18/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 16<br>Letter dated 6/11/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 17<br>Undated Letter<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |

VOLUME 9

EXHIBIT INDEX

(CONTINUING)

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| STATE'S PRE-TRIAL 18<br>Letter dated 7/5/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 19<br>Letter dated 8/3/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 20<br>Letter dated 8/2/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 21<br>Letter dated 8/8/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 22<br>Letter dated 8/15/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 23<br>Letter dated 8/17/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 24<br>Letter dated 8/17/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 25<br>Letter dated 8/15/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |

VOLUME 9

EXHIBIT INDEX

(CONTINUING)

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| STATE'S PRE-TRIAL 26<br>Undated Letter<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 27<br>Letter dated 8/29/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 28<br>Letter dated 9/7/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 29<br>Letter dated 9/12/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 30<br>Letter dated 9/15/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 31<br>Letter dated 9/26/94<br>to Ricky Blackburn<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 32<br>Letter dated 9/27/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 33<br>Letter dated 10/4/94<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |

VOLUME 9

EXHIBIT INDEX

(CONTINUING)

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| STATE'S PRE-TRIAL 33A<br>Letter dated 2/24/94<br>to Billy Joe Wardlow<br>from Patsy Martin | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 34<br>Letter dated 7/15/93<br>to Whoever It May Concern<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 35<br>Letter dated 8/24/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 36<br>Letter dated 8/28/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 37<br>Undated Letter<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 38<br>Letter dated 9/7/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 39<br>Letter dated 9/9/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 40<br>Letter dated 10/3/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |

1

2

VOLUME 9

EXHIBIT INDEX

3

(CONTINUING)

4

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| STATE'S PRE-TRIAL 41<br>Letter dated 10/17/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| STATE'S PRE-TRIAL 42<br>Letter dated 10/26/93<br>to Patsy Martin<br>from Billy Joe Wardlow | 46 | 46 | 46 | 47/ADM |
| DEFENSE PRE-TRIAL 2<br>Cell Assignments | 128 | 128 | 128 | 128/ADM |

5

6

7

8

9

10

11

12

13

* * * * *

14

15

16

17

18

19

20

21

22

23

24

25

1

CAUSE NO. 12,764

2 THE STATE OF TEXAS  § IN THE DISTRICT COURT OF
           §
3 VS.         § TITUS COUNTY, TEXAS
           §
4 BILLY JOE WARDLOW   § 76TH JUDICIAL DISTRICT

5

6        STATEMENT OF FACTS

7  DEFENDANT'S MOTION TO SUPPRESS CONFESSION(S)

8       October 17, 1994

9      **VOLUME 9 of 43 volumes**

10

11   Before Honorable Gary R. Stephens

12    Judge by Judicial Assignment

13  (Venue changed from Morris County, Texas)

14

15        APPEARANCES

16

17 ATTORNEYS FOR THE STATE OF TEXAS:

18    MR. RICHARD TOWNSEND
     District Attorney
19    Morris County Texas
     Morris County Courthouse
20    Daingerfield, Texas 75638

21      and

22    MR. RANDY LEE
     Assistant District Attorney
23    Cass County Texas
     P.O. Box 940
24    Linden, Texas 75563

25

1    ATTORNEYS FOR THE DEFENDANT:

2              MR. BIRD OLD, III
               Old, Rolston & Old
3              P.O. Box 448
               Mt. Pleasant, Texas 75456-0448
4
                        and
5
               MR. LANCE HINSON
6              Law Offices of Danny Woodson
               P.O. Box 399
7              Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          On the 17th day of October, 1994, the

2     above-entitled and numbered cause came on for hearing

3     before said Honorable Court, Judge Gary R. Stephens of

4     Midlothian, Texas, serving by judicial assignment in the

5     District Court of Titus County, Texas, on change of venue

6     from Morris County, Texas, and the following proceedings

7     were had:

8                    THE COURT:   Okay.   Let's get

9     on the record in Cause No. 12,764, "The State Vs. Billy

10    Joe Wardlow."

11                   Let the record reflect that Mr. Wardlow

12    is present in Court with both of his appointed attorneys

13    and the State is represented by Mr. Townsend and Mr. Lee.

14                   The Court has received a faxed copy of

15    a "Motion to Suppress Evidence, Motion to Suppress and/or

16    Exclude Tonya Fulfer as a Witness" and further to

17    Suppress a Confession(s).

18                   Mr. Old, it is my understanding the only

19    thing that you are prepared to go forward on today is the

20    Motion to Suppress Confession(s) that concerns a series

21    of letters written by your client to the Morris County

22    Sheriff, is that correct?

23                   MR. OLD:   That's correct, Your

24    Honor.

25                   And for purposes of the record, it's the

1    motion that we filed October 12th, 1994.

2                         THE COURT:  That is the motion

3    I'm looking at, filed at 1:37 p.m.?

4                         MR. OLD:  Yes.

5                         We also have pending a motion that has

6    not been heard, that is a motion best characterized as

7    a Motion to Suppress and Arrest and the fruits of that

8    arrest as to items seized and as to admission or

9    confessions made because of the legality of an arrest.

10                        THE COURT:  That is an out of

11   state arrest, is that correct?

12                        MR. OLD:  That's correct.  We

13   had discussed with the Court I believe on the record

14   because of the need both by the State and the Defendant

15   of witnesses that are not available in this state and I

16   believe all in Madison, South Dakota, that motion be

17   carried until prior to, immediately prior to trial so it

18   may be heard without the witnesses coming at this time.

19                        THE COURT:  Mr. Townsend, you

20   did state last time that I was here that also you would

21   like to carry that motion so I assume nothing has changed

22   and that motion will be carried to a time prior to

23   beginning of testimony?

24                        MR. TOWNSEND:  That's correct.

25                        MR. OLD:    Our   reason   for

1   pointing that out, we do not want to prejudice ourself

2   to hearing of that motion and the presenting of evidence

3   on it that is not a matter -- the matter of that motion

4   is different from this Motion to Suppress.

5                       THE COURT:  You will be given

6   time, all the time necessary prior to trial.

7                       What I do want to dispose of will be any

8   motions that will effect the State or effect the State

9   or Defense on voir dire, any motions that will not effect

10  voir dire even though they might effect evidence will be

11  heard at some later time but before we begin voir dire

12  I want to hear all motions that might effect the State

13  or Defendant in the voir dire.

14                      I assume that's what we are here with

15  is such a motion?

16                      MR. OLD:  Yes.

17                      THE COURT:  Mr. Townsend, are

18  you ready to proceed?

19                      MR. TOWNSEND:  Yes.

20                      THE COURT:  Mr. Old, are you

21  ready to proceed?

22                      MR. OLD:  Mr. Hinson and I are

23  ready to go forward.

24                      THE COURT:  The State may call

25  its first witness.

1          MR. TOWNSEND:  The State would

2    call Ricky Blackburn.

3

4                    (Witness sworn.)

5

6          MR. OLD:  We would invoke the

7    Rule as to the witnesses in this case.

8          Mr. Wardlow would not be subject to the

9    Rule if he chooses to testify.

10         THE COURT:  As far as the Rule

11   is concerned as I understand the Rule has been invoked

12   only for purposes of this hearing so far as the Court is

13   concerned so if there's anything done about this case

14   with witnesses after this day if it does not concern the

15   Motion to Suppress it will not be a violation of the

16   Witness Rule.

17         MR. OLD:  Yes.

18         THE COURT:  Mr. Townsend, do

19   you have any other witnesses that are present that will

20   be testifying at that hearing?

21         MR. TOWNSEND:  We don't have

22   any further witnesses present.

23         Now then, I think we cleared this but

24   I want to be real clear on it; we don't have, for

25   instance, a witness that is a handwriting expert because

1   I feel like that may go to admissability of the evidence

2   later on at trial but does not go to the voluntariness

3   of it.

4                               THE COURT:   I concur with

5   that.

6                               MR. TOWNSEND:  And, you know,

7   for instance maybe a jailer who may have stuck a letter

8   in the Sheriff's receiving box there, we don't have a

9   person like that.

10                              THE COURT:  All right.

11                              MR. TOWNSEND:  You know, we

12  are strictly going -- I think we are just hearing the

13  voluntariness, not the admissability.  We wouldn't need

14  witnesses like that I am assuming.

15                              THE COURT:   As far as the

16  handwriting expert I don't see any need for the

17  handwriting expert today.  I do expect to hear from any

18  witnesses from either side that will be pertinent to

19  whether or not the letter writing or whatever occurred

20  was voluntary.  And I don't know where that is going to

21  come from but if we need some witnesses we don't have

22  here we will recess until you get them, the same for Mr.

23  Old on any motions he has.

24                  Now, Mr. Old, let me get clear on

25  invoking the Rule; are you going to have any witnesses

1   today other than Mr. Wardlow?

2                    MR. OLD:  No, Your Honor.  Not

3   that I'm aware of at this time, I don't have them present

4   nor do I know who they would be.

5                    THE COURT:   At this time I

6   would like to go ahead and instruct him.

7

8                    (Defendant sworn.)

9

10                   THE COURT:  You may lower your

11  hand and be seated.

12                   Now, there's a Rule of Evidence invoked

13  that will require all witnesses in this hearing to not

14  discuss any matters that are brought up in this hearing.

15  I don't want you to talk to any other witnesses or

16  potential witnesses about the issues involving the

17  alleged confession or letter.

18                   Now, Mr. Wardlow, you certainly may talk

19  to your attorney and, Sheriff, you certainly may talk to

20  the District Attorneys but I don't want either one of

21  these two witnesses talking to each other about this

22  hearing nor any third party that is not an attorney.

23                   Any question about the Rule from either

24  side?

25                   All right, Mr. Townsend, you may

1  proceed.

2

3                    RICKY BLACKBURN

4  was called as a witness and, having been first duly sworn

5  by the Court, testified as follows:

6

7                    DIRECT EXAMINATION

8                    BY MR. TOWNSEND

9

10  Q        State your name, please.

11  A        My name is Ricky Blackburn.

12  Q        What is your occupation?

13  A        Sheriff of Morris County.

14  Q        How long have you been Sheriff of Morris

15  County?

16  A        A little over two -- two years.

17  Q        Okay.  Have you known the Defendant in this

18  case, Billy Wardlow, prior to today?

19  A        Yes.

20  Q        How long have you actually known him?

21  A        Eight, nine or ten years.

22  Q        Okay.  What was the first time -- the murder

23  the subject of this criminal investigation  occurred

24  in 1993 I believe, when was that exactly, I believe it

25  was --

1    A        I don't have the exact date.  I would have to

2    go back, see if I can find it.

3    Q        I believe it was June 14th, does that sound

4    right?

5    A        Yes.  That sounds close.

6    Q        When was the first time -- what was the

7    occasion for the first time you saw Mr. Wardlow after

8    this murder had occurred?

9    A        It was in detention in Madison, South Dakota.

10   Q        Did you go there along with a couple of other

11   officers to pick them up?

12   A        Myself and Game Warden Billy Dodd, Highway

13   Patrolman David McFarland journeyed to South Dakota.

14   Q        When you first saw Mr. Wardlow what did you do?

15   A        I read him his rights.

16   Q        When you say "read him his rights", for the

17   record what "rights" are you talking about?

18   A        His Miranda Warnings.

19   Q        And I think we all know what those are but for

20   the record what would you have told him?

21   A        "He had the right to remain silent, that he was

22   under arrest for capital murder, anything he said could

23   and would be used against him in a court of law, if he

24   didn't have an attorney one would be appointed to

25   represent him, any statements he made would be made

1    against him -- would be used against him."

2    Q        And after reading him those Miranda Rights did

3    Mr. Wardlow wish to talk to you?

4    A        No.  He did not.

5    Q        And did he request an attorney?

6    A        Yes.

7    Q        Okay.  At that time did you cease questioning

8    him?

9    A        I did.

10   Q        Have you since that time up until this day

11   today ever questioned him about this murder?

12   A        No.  I have not.

13   Q        Sheriff Blackburn, Morris County population

14   wise in relationship to most of the counties in Texas,

15   Morris County is pretty small, isn't it?

16   A        Yes.  It is.

17   Q        And it is not uncommon for you I would assume

18   to know many of the prisoners in your county jail?

19   A        The majority of them.  Yes.

20   Q        Sort of like you know Mr. Wardlow?

21   A        That's correct.

22   Q        Do you have occasion to visit with those

23   inmates from time to time?

24   A        Yes.  I do.

25   Q        Do you make an occasion to visit with an inmate

1    if they request to see you?

2    A        Yes.  I do.

3    Q        Is that something you do routinely?

4    A        Pretty well so.  Yes.

5    Q        Is that -- do you feel as if that sort of

6    alleviates some jail problems if you can talk to them

7    about what they might be unsatisfied about sometimes?

8    A        Yes.  I do.

9    Q        Since Mr. Wardlow has been incarcerated in your

10   county jail have you visited with him on several

11   occasions?

12   A        Yes.  I have.

13   Q        Have those occasions been at his request?

14   A        Yes.  They have.

15   Q        Have you in any way when you were visiting with

16   Mr. Wardlow, have you kind of laid down your own set of

17   ground rules with him so far as what things you will

18   discuss and what things you won't discuss?

19   A        Yes.  I have.

20   Q        And what sort of ground rules have you told

21   Billy about?

22   A        We would not get into the inner workings of the

23   case unless his attorney was present.

24   Q        What sort of matters have you talked to him

25   about?

1    A        Well, we have conditions there in the jail

2    while he was a volunteer fireman there in Cason, about

3    life in general.

4    Q        Have you gotten a request either verbally or

5    in writing of different sorts from Mr. Wardlow?

6    A        Yes.  I have.

7    Q        Have you been able to honor certain of those

8    requests?

9    A        Some of them.  Yes.

10   Q        Have there been other requests that you felt

11   like you couldn't honor them?

12   A        Actually the only request that I can remember

13   Billy wanting, he would request me move him into a single

14   cell occasionally to get his thoughts straightened out

15   then he would request to be moved back into the general

16   population at times.

17            He had -- that was granted.

18            And he had requested the use of a radio

19   approximately a month and a half ago.

20            At first that request was denied for the

21   simple reason that I provided a radio for one I would

22   have to provide it for all.

23   Q        Okay.

24   A        And after thinking about it I realized we have

25   cable there in our jail, one or more of the stations

1    probably has music on the stations so I felt we could

2    safely provide Billy a radio to listen to music without

3    having to furnish all the rest of the cells a radio.

4    Q        That was because he had the TV and therefore

5    had a radio?

6    A        That's correct.

7    Q        Mr. Wardlow's cell that he was in at that time,

8    was it not equipped with a TV?

9    A        No.  It was not.

10   Q        Mr. Blackburn did there ever come a time when

11   Mr. Wardlow requested to talk to you I believe in a

12   letter -- may I approach the witness, Your Honor?

13                      THE COURT:  You may.

14                      MR.    TOWNSEND:     Do    you

15   recognize this letter?  (Indicating)

16                      THE WITNESS:  Yes.  I do.

17   Q        (BY MR. TOWNSEND)  And could you tell the Court

18   what that is?

19   A        This is a request that was  addressed to Patsy

20   Martin and forwarded --

21                      MR. OLD:  We object to the

22   witness testifying to a document until it's offered in

23   evidence.

24                      THE COURT: I will sustain the

25   objection.  I will let you identify what, who sent you

1    the letter and when the letter was sent or received but

2    don't tell me about the contents of the letter.

3                        THE WITNESS:    Okay.    It was

4    sent by Billy Wardlow on 1/25/94.

5                        MR. TOWNSEND:    Who was the

6    letter to, to you or to --

7                        THE WITNESS:    The letter was

8    addressed to our chief dispatcher/jailer requesting --

9                        THE COURT:    You can't tell me

10   what the request was but again, sir, I missed the date;

11   what was the date?

12                       THE WITNESS:    January 25th,

13   '94.

14                       THE COURT:    Thank you.

15                       MR. TOWNSEND:    Mark it.

16

17               (Off the record discussion.)

18

19               (State's Pre-Trial Exhibit Number 1 was

20   marked for identification.)

21

22                       MR. TOWNSEND:    Your Honor, I

23   would like to offer this into evidence as "State's

24   Exhibit 1" just for purposes of this hearing today.

25               I believe that they had a copy of that.

1          (Handed to Mr. Old.)

2

3                    MR. OLD:  Your Honor, we do

4      not object to it.

5                    THE  COURT:    State's  1  is

6      admitted for purposes of this hearing only.

7

8                    (State's Pre-Trial Exhibit Number 1 was

9      received in evidence for purposes of the Suppression

10     Hearing.)

11

12                   MR. TOWNSEND: Sheriff, I show

13     you what has been marked as "State's Exhibit 1" and do

14     you recall seeing that?

15

16                   (Handed to the witness.)

17

18                   THE WITNESS:  Yes.  I do.

19                   MR. TOWNSEND: And as a result

20     of that did you find time at some point after that to

21     visit based -- first of all what does the letter say

22     basically?

23                   MR. OLD:  Your Honor, I would

24     object to him paraphrasing the letter.  It's a short

25     letter and it says what it says.

1                         THE COURT:  Sustained.

2                  Tender the letter to me, let me re-read

3  it again.

4

5                  (Handed to the Court.)

6

7                  MR. TOWNSEND: Okay. Sheriff,

8  you did have an opportunity to read the letter at on or

9  about the 25th of January?

10                THE WITNESS:   Somewhere --

11  yes.

12  Q      (BY MR. TOWNSEND)  After reading the letter did

13  you find time to visit with Mr. Wardlow?

14  A      Yes, sir.  I did.

15  Q      Would it have been that day or a week later or

16  do you recall?

17  A      I don't recall the exact day.

18  Q      Okay.  But at some time did you -- sometime

19  after that did you visit with Mr. Wardlow?

20  A      Yes.  I did.

21  Q      In visiting with Mr. Wardlow did he attempt to

22  discuss this case with you?

23  A      Yes, sir.

24  Q      When he attempted to discuss this case with you

25  what did he say?

1    A        He was wanting to tell me about the case and

2    I told him, "Billy, we can't talk about the inner

3    workings of the case without your attorney present."

4    Q        Did he want to tell you about the case or did

5    he want to write down what you might call a "confession"

6    or was he specific?

7    A        No.

8             We were talking and Billy was indicating

9    that he was having problems -- problem sleeping at night,

10   he was having nightmares and was having just problems

11   dealing with everything.

12            And we got into a discussion how best

13   he might be able to relieve himself of the nightmares and

14   of the troubles that he was having.

15            I suggested to Billy the best way to

16   solve a problem such as this is to confront it, you can't

17   sidestep it, you can't walk around it, the best way to

18   meet it is to simply meet it head on.

19            Many times whenever I'm having problems

20   I can sit down and write out, define what my problem is

21   and I can sit down and write the solution to that problem

22   and many times we know the solution to our own problems

23   and suggested that Billy do that.

24   Q        So you suggested that he simply write down his

25   feelings or about what was bothering him?

1   A        That's correct.

2   Q        And did you suggest what he should do with that

3   after he had written it down?

4   A        I told him he should destroy what he had

5   written down once he had written it down and looked and

6   everything and confronted it.

7   Q        Do you know if he actually did make such a

8   writing?

9   A        No.  I do not.

10  Q        You never saw such a writing?

11  A        No, sir.  I did not.

12  Q        Did you ever look for such a writing in his

13  cell?

14  A        No, sir.  I did not.

15  Q        Did you ever request anyone else to search his

16  cell to try to find any particular writing?

17  A        No.

18  Q        After -- Ricky, in your position as Sheriff is

19  it unusual for you to I guess you might say "counsel"

20  with a jail inmate as far as their personal problems or

21  try to help them out in dealing with some sort of

22  personal problem?

23  A        No.  It is not unusual and I do it with other

24  inmates.

25  Q        Is that something that you just -- sort of,

1   sort of is your personality to do?

2   A        A lot of times an inmate gets in jail, they

3   won't have anybody that they can talk to, a lot of these

4   basic problems that an inmate has has been experienced

5   by other people, a lot of times the only thing that

6   changes really is the name, and sit down with some

7   inmates and a lot of times they just simply want to talk.

8   Q        So in talking to Billy about writing down and

9   thinking out what was bothering him, that was what you

10  were doing?

11  A        That's correct.

12  Q        Just sort of trying to help him out with his

13  personal conflicts?

14  A        Yes, sir.

15  Q        Did you in any way ask him to write you a

16  confession?

17  A        No.  I did not.

18                    MR. OLD:   Your Honor, I

19  object.  It calls for a conclusion.

20                    THE COURT:  Sustained.

21                    MR. TOWNSEND:  Did you in any

22  way ask him to write you anything?

23                    THE WITNESS:  No.  I did not.

24  Q        (BY MR. TOWNSEND)  Did you encourage or did you

25  try to encourage him to do anything other than sort of

1  help himself out of his personal dilemma?

2  A        No.  I did not.

3  Q        At some time after January the 25th when you

4  talked to Billy on January the 25th was he in a cell by

5  himself or was he in a cell with other individuals?

6  A        I don't know that I talked to Billy on January

7  25th.

8  Q        I'm sorry.  That's my mistake, Your Honor.

9             After receiving the letter on January

10 the 25th I believe you testified that you don't recall

11 exactly when you actually talked to him?

12 A        That's correct.

13 Q        But whenever that was was he in a cell by

14 himself or was he in a cell with others?

15 A        I would have to go back and look but at that

16 time that I talked to Billy regardless of which cell he

17 was in I talked to him there in the chief dispatcher

18 jailer's office there within the confines of the jail and

19 it was later in the evening.

20 Q        So he wasn't in his cell when the conversation

21 took place?

22 A        No.  He was not.

23             MR. TOWNSEND:  May I approach

24 the witness, Your Honor?

25             THE COURT:  You may.

1              Sheriff, when you talk to other

2  prisoners do you do so in their cells or in this office?

3              THE WITNESS: No, sir. I will

4  take them either into the dispatcher/jailer's office

5  which is located right there, like I say, within the

6  confines of the jail close to the dispatch office and

7  that's where ninety-nine percent of them are talked to,

8  either there or in some office.

9              THE COURT:  Thank you.

10

11              (State's Pre-Trial Exhibit Number 2 was

12  marked for identification.)

13

14              MR. TOWNSEND: I show you what

15  has been marked "State's Pre-Trial 2" and ask you if you

16  can identify that?

17

18              (Handed to the witness.)

19

20              THE WITNESS: Yes, sir.  It's

21  another -- another note from Billy.

22              MR. TOWNSEND: Who is the note

23  to?

24              THE WITNESS:  It's to myself.

25    Q        (BY MR. TOWNSEND)  And what is the date on that

1  note?

2  A        2/24/94.

3  Q        Would that have been the date you received it

4  or the date it was written or would those dates be the

5  same?

6  A        It was the date that I was given a copy of it.

7                           MR. TOWNSEND:   Okay.   Your

8  Honor, for purposes of this hearing I would like to offer

9  in State's Exhibit 2.

10

11                    (Handed to Mr. Old.)

12

13                           MR. OLD:   Your Honor, can I

14  take the witness on voir dire examination about the

15  exhibit?

16                           THE COURT:   You may.

17

18                    VOIR DIRE EXAMINATION

19                       BY MR. OLD

20

21  Q        Sheriff, let me give you a copy of the exhibit

22  back.

23                      Is   that   "2/24/94"   date   in   your

24  handwriting?

25  A        No, sir.   It isn't.

1   Q        Do you know of your own knowledge whose

2   handwriting it is?

3   A        Yes, sir.  It appears to be that of Chief

4   Dispatcher/Jailer Patsy Martin.

5   Q        "It appears to be" I assume you are not a

6   handwriting expert but I assume it appears to be from

7   looking at other things?

8   A        Yes, sir.

9   Q        Do you know for a fact that date was written

10  2/24/94?

11  A        I did not personally observe.

12  Q        Okay.  Do you know when this exhibit first came

13  to your attention by date?

14  A        No, sir.  I do not.

15           MR. OLD:  Your Honor, we would

16  object to portions of the exhibit, the date "2/24/94" and

17  the copy given by the Sheriff that he was testifying to,

18  things that are hearsay to him which he does not have

19  personal knowledge and specifically the mentioning of

20  that date.

21           THE COURT:  Mr. Old, I assume

22  that all of the -- or let me just ask Mr. Townsend before

23  I make my assumption; Mr. Townsend, are the letters that

24  you are offering and intending to offer during this

25  hearing letters that are contained in the Morris County

1    Sheriff's Department and letters received by them from

2    Mr. Wardlow?

3                         MR. TOWNSEND:  Yes.

4                         THE COURT:  Mr. Old, I believe

5    that all of this could be proved up as a business record,

6    I'm not going to require the State to do so for purposes

7    of this hearing.

8                         Whether I admit them before the jury or

9    not is another issue but I'm going to overrule your

10   objection.

11                        I'm going to admit this document only

12   for record purposes, for purposes of this hearing and I

13   don't want the State to believe that I would rule the

14   same way if a jury were here.  If it's not properly

15   authenticated or proven up it won't come in whether it's

16   admissable or not.

17                        So with that explanation I'm going to

18   let State's Exhibit 2 in over objection.

19                        MR. TOWNSEND:  That was my

20   understanding, just for purposes of this hearing.

21

22                        (State's Pre-Trial Exhibit Number 2 was

23   received in evidence for purposes of this hearing.)

24

25                        MR.  TOWNSEND:       Sheriff

1    Blackburn, look at State's Exhibit 2, is that a letter

2    that you recall reading?

3                        THE WITNESS:  Yes.  It is.

4    Q         (BY   MR.   TOWNSEND,   CONTINUING   DIRECT

5    EXAMINATION)     And that was on the 24th of February?

6                   Do you have any records there, records

7    that would reflect when -- I believe you were asked to

8    bring those today, records that would reflect when Mr.

9    Wardlow was in a cell with other people and when he was

10   in a cell by himself?

11   A         Yes, sir.  I do.

12   Q         Okay.  And could you refer to those and when

13   you -- have you got them there where you can see them?

14   A         Yes.  I do.

15   Q         After reading that letter was there anything

16   in that letter that alarmed you?

17   A         Yes, sir.  There is.

18   Q         And did it alarm you, did it make you concerned

19   that other jail inmates might be harmed by Mr. Wardlow?

20   A         Yes.  It did.

21   Q         Did you -- did you take -- I guess I'll call

22   it "preventative measures?"

23   A         "Security of the jail."  Yes, sir.

24   Q         And what did you do as a result of that letter?

25   A         He was placed in a single cell, Billy was.

1    Q        He was placed into the single cell based on

2    your reports?

3                    When was that done?

4    A        On February 25th he was placed in a single

5    cell.

6    Q        And how long did he remain in a single cell?

7    A        Until March the 18th.

8                         MR. TOWNSEND:  Okay.  I show

9    you what has been -- mark that, please.

10

11                    (State's Pre-Trial Exhibit Number 3 was

12   marked for identification.)

13

14                         MR. TOWNSEND:  I show you what

15   has been marked as "State's Pre-Trial Exhibit 3" and ask

16   you if you can identify that?

17

18                    (Handed to the witness.)

19

20                    (State's Pre-Trial Exhibit Number 4 was

21   marked for identification.)

22

23                         THE WITNESS:  Yes.  This is

24   a letter I received by Billy.

25                         MR. TOWNSEND:  Is it a letter

1   addressed to you?

2                        THE WITNESS:  Yes.

3   Q          (BY MR. TOWNSEND)   On the 28th of February I

4   believe of '94?

5   A          Yes.

6                        MR. TOWNSEND:  Okay.  I offer

7   State's  Exhibit  3  in  evidence  for  purposes  of  this

8   hearing, Your Honor.

9

10                      (Off the record discussion.)

11

12                        MR.  OLD:    As  to  State's

13  Exhibit Number 3 I would like to take the witness on voir

14  dire.

15                        THE  COURT:    Back  on  the

16  record.

17

18                   VOIR DIRE EXAMINATION

19                      BY MR. OLD

20

21  Q          Sheriff,  I  believe  you  testified  that  you

22  received Exhibit 3, State's Exhibit 3 on the 25th?

23  A          Yes, sir.

24  Q          That would be the 25th of February?

25  A          Yes.  The 28th.

Q        Excuse me.  You testified -- you testified to the District Attorney you received it on the 25th was my question?

A        Well, if I did.

Q        So that's what you testified to?

A        If I did I was in error, it was the 28th.

Q        How do you know it was the 28th?

A        The letter was postmarked the 25th that Billy had gotten the -- another letter in, had used the same envelope and this was three days later, it was on the 28th.

Q        Did this letter, the envelope, how did you receive it?

A        It was placed in my mailbox.

Q        When you say "placed in your mailbox" do you mean by an agent of the Post Office Service or --

A        Inner office.

Q        "Inner office?"

A        Yes.

Q        How do you know you got it on the 28th?

A        I believe it was marked as the date of receipt. And it was signed -- see if it was not signed by Billy Wardlow on the 28th.

Q        You are saying that the statement -- that Mr. Wardlow dated it the 28th?

1   A        Yes, sir.

2   Q        Can I have a verbal response?

3   A        Yes.

4   Q        I will be honest with you, I had read at the

5   top of it as being the 23rd and I have never seen

6   anything except a reprocessed copy or Xeroxed copy, I

7   can't tell whether that is an "8" or "3", since you

8   testified to the 28th --

9

10              (Handed to the witness.)

11

12              THE WITNESS: Let's see. It's

13   not there but it is the -- it is the 28th.

14              MR. TOWNSEND: You are saying

15   you have personal knowledge of that or are you guessing?

16              THE WITNESS:   I'm saying

17   that's what's on the letter.

18   Q        (BY MR. TOWNSEND) No.  I'm talking about the

19   date that you received it.

20              Do you know in fact what day you

21   received it?

22   A        I did not make a note on the date that it was

23   received.  It was forwarded on to the District Attorney

24   the same date.

25              MR. OLD: For purposes of voir

1    dire we pass the witness.

2                    THE COURT:  Have you offered

3    State's Exhibit 3?

4                    MR. TOWNSEND:  I don't believe

5    I have but I will at this time.

6                    THE COURT: Any objection, Mr.

7    Old?

8                    MR. OLD:    Your Honor,  I am

9    -- the copy I have I have read as the 23rd and I think

10   that anyone that would have viewed the document that I

11   have would agree it's something that reasonable minds

12   would differ, I would like to know what the date of the

13   original instrument is, the "28th" or "23rd?"

14                   THE COURT:  I'm going to admit

15   State's Exhibit 3.   I cannot tell, it looks to me like

16   "the 28th" but I certainly don't know so I'm going to

17   instruct the District Attorney to make further inquiry

18   as to the date, look at the original and either produce

19   the original or satisfy Mr. Old as to what the original

20   date is on that letter subject to that.

21                   MR. TOWNSEND:  We can produce

22   that, Your Honor.

23                   THE COURT:   It's admitted.

24

25               (State's Pre-Trial Exhibit Number 3 was

1   received in evidence.)

2

3                           MR.   TOWNSEND:        Sheriff

4   Blackburn, on what has been marked as "State's Exhibit

5   3" you have identified as having seen in February of

6   1994, after receiving that I believe you said you brought

7   it to our office?

8                           THE WITNESS:   That's correct.

9   Q         (BY MR.   TOWNSEND)    The District Attorney's

10  Office?

11                           I   show you what has been marked as

12  "State's Exhibit 4" and ask you if you can identify that?

13

14                           (Handed to the witness.)

15

16                           THE WITNESS:   Yes,  sir.    I

17  can.

18                           MR. TOWNSEND:   What is that?

19                           THE WITNESS:   The envelope

20  that I received the letter in.

21  Q         (BY    MR.   TOWNSEND,   CONTINUING   DIRECT

22  EXAMINATION)    Okay.

23  A         Has initials "R.G." which would be the initials

24  of a jailer by the name of Robby Gray.   (Indicating)

25                           MR. TOWNSEND:   Okay.  I offer

1    State's Exhibit 4.

2

3                    (Handed to Mr. Old.)

4

5                    MR. OLD:  Your Honor, we have

6    no objection.

7                    Before we go any further I would like

8    to get a copy of this exhibit.

9                    THE  COURT:    I  will  admit

10   State's Exhibit 4 and order the State to make a copy, I'm

11   not sure whether it's on the record or not but I want the

12   record  to  reflect  that  all  the  exhibits  being  offered

13   today  are  copies  of  the  originals  so  Mr.  Townsend  I

14   assume you have all the originals in your possession, is

15   that correct?

16

17                    (State's Pre-Trial Exhibit Number 4 was

18   received in evidence.)

19

20                    MR.    TOWNSEND:        Sheriff

21   Blackburn does, Your Honor.

22                    THE COURT:  Sheriff, you have

23   all of them?

24                    THE WITNESS:  They are in our

25   evidence locker.

1        MR. TOWNSEND:  I think we can

2   probably proceed with the question when we are doing that

3   if Mr. Old has no objection.

4        THE COURT:  You may proceed.

5        MR. TOWNSEND:  What has been

6   marked   as   "State's   Exhibit   4",   what   was   that?

7   (Indicating)

8        THE WITNESS:  A letter that

9   Billy had written to me.

10  Q        (BY MR. TOWNSEND)  That was in the envelope?

11  A        Yes.  The envelope.

12  Q        The envelope appeared or a copy we saw appears

13  to be the type of envelope that you would use to mail

14  things through the U.S. Mail, did you in fact receive

15  this letter through the U.S. Mail?

16  A        No.  I did not.

17  Q        Okay.  Was it received by you through the --

18  received by you through the normal jail process?

19  A        Yes.  It was.

20  Q        What was that?

21  A        I guess the inmate gave the jailer a note.

22       MR. OLD:  Your Honor, we would

23  object to the question, it appears he does not have

24  personal knowledge.

25       He said he "guessed."

THE COURT:  Sustained.

MR. TOWNSEND:  Do you know of the normal process?

THE WITNESS:  An inmate will write a letter, write a request, give it to the jailer, the jailer will, they will --

THE COURT:  Excuse me, Sheriff.

MR. OLD:  "The normal process" is not what is in question, it's how this letter came to him.

THE COURT:  I believe the question, though, was trying to get into normal process so make it clear, Mr. Townsend.

MR. TOWNSEND:  Yes.

THE COURT:  Objection overruled.

MR. TOWNSEND:  What is the standard procedure for receiving inmate communication, written communication from an inmate?

THE WITNESS:  The inmate will give the note or request to the jailer, the jailer will then forward it to the proper person.

Q        (BY MR. TOWNSEND)  Do you have a box there that an inmate wrote a note or letter to you, do you have a

1    box in which the letter was placed?

2    A        I have an inner office box where the jailer

3    would place it.   Yes.

4    Q        Is that where you received this letter?

5    A        That's correct.

6                        MR. TOWNSEND:  Your Honor, on

7    what has been marked "State's Exhibit 4" there is some

8    writing up in the corner that indicates that this

9    envelope came from the U.S. -- United States District

10   Court in Marshall, Texas and that appears to be scratched

11   out.

12                        Was that scratched out when you received

13   the letter?

14                        THE WITNESS:   Yes.   It was

15   scratched out.

16   Q        (BY MR. TOWNSEND)  And is there any change in

17   this envelope from the way it was that particular day?

18   A        No.

19   Q        Okay.  So when you received the letter it did

20   not come through the U.S. Mail, it had just come through

21   the process through the jail?

22   A        That's correct.

23   Q        As the result of receiving that letter I assume

24   after reading it you considered that letter to be some

25   sort of confession?

1   A        Yes.  I did.

2   Q        As the result of that, receiving that letter

3   did you take any action to in any way reward Mr. Wardlow,

4   do anything for him at that time?

5   A        No.  I didn't.

6                         MR. TOWNSEND:  Okay.

7

8                         (State's Pre-Trial Exhibit Number 5 was

9   marked for identification.)

10

11                        MR. TOWNSEND:  I show you what

12  has been marked as "State's Pre-Trial Exhibit 5" and ask

13  you if you can identify that?

14

15                        (Handed to the witness.)

16

17                        THE WITNESS:  This is a letter

18  addressed to me from Billy.

19                        MR. TOWNSEND:  When did you

20  receive that letter, if you know?

21                        THE WITNESS:  The date is

22  September 11th, it would have been September the 12th.

23  Q        (BY MR. TOWNSEND)  What year, Sheriff?

24  A        This year.

25                        MR. TOWNSEND:  I offer this

1    into evidence, Your Honor.

2

3                    (Handed to Mr. Old.)

4

5                            MR. TOWNSEND:  Any objection?

6                            THE COURT:   Any objection?

7                            MR. OLD:   None, Your Honor.

8                            THE   COURT:    State's  5  is

9    admitted.

10                           Let me see "3" again, please, Counsel.

11

12                           (State's Exhibit Number 3 was handed to

13   the Court.)

14

15                           (State's Pre-Trial Exhibit Number 5 was

16   received in evidence.)

17

18                            THE COURT:  And "5."

19

20                           (State's Exhibit Number 5 was handed to

21   the Court.)

22

23                            THE COURT:   I just wanted to

24   make sure everything I had in here was in your exhibit.

25                           Proceed.

1          "5" is admitted.

2                    MR. TOWNSEND:   Referring to

3    Exhibit 5, Sheriff Blackburn, how was it received,

4    through U.S. Mail or through the jail?

5                    THE WITNESS:    Through the

6    jail.

7    Q          (BY MR. TOWNSEND)   Again as the result of

8    receiving State's Exhibit 5 through the mail did you do

9    anything to encourage or compensate Mr. Wardlow for

10   having provided you with that letter?

11   A          No.  I did not.

12   Q          In regard to State's Exhibit 3 and State's

13   Exhibit 5, prior to receiving either one of those letters

14   did you ever promise Mr. Wardlow anything?

15   A          No.  I did not.

16   Q          Did you ever give him anything?

17   A          No.  I did not.

18   Q          Did you ever -- let me just ask you this in

19   regard to State's Exhibit 3, when you received that in

20   the mail or through the jail mail service were you

21   surprised?

22   A          Extremely.

23   Q          As to State's Exhibit 5, were you also

24   surprised?

25   A          Yes, sir.  I was.

1    Q        Did you have any reason to anticipate receiving

2    either of those letters?

3    A        No.  I did not.

4                        MR. OLD:    Object  to  the

5    question, Your Honor, it's not material or relevant

6    whether he expected to receive them or not.  I mean it's

7    calling for him to really speculate on Mr. Wardlow if he

8    wrote those letters.

9                        THE COURT:  Sustained.

10                       MR. TOWNSEND: Your Honor, can

11   we go off the record for a moment?

12                       THE COURT:  You may.

13

14                  (Off the record discussion.)

15

16                  (State's Pre-Trial Exhibit Numbers  6

17   through    42,    including    33A   were    marked    for

18   identification.)

19

20                  (Recess.)

21

22                       THE COURT:  Sheriff, if you

23   will get back on the stand we'll proceed.

24                       Okay.  Back on the record.  The State

25   may proceed.

1          MR. TOWNSEND:   Your Honor,

2    before we proceed with the questioning I would like the

3    Court to take judicial notice from the Court's records

4    when Mr. Wardlow was first appointed an attorney, I

5    believe the records, the Court records will reflect that

6    that was sometime in June of, I believe that's going to

7    be reflect that was June 24th of '93.

8                    THE COURT:   I will take

9    judicial notice of the contents of the Court's file and,

10   Counsel, I will assume that the date that you are giving

11   me is correct.

12               Mr. Old, do you dispute the date?

13              MR. OLD:   Your Honor, it was

14   in June of 1993.

15              THE COURT:   June of '93 was

16   when the Defendant was first appointed an attorney.

17              MR. TOWNSEND:   I believe June

18   24th was --

19              THE COURT:   June 14th was the

20   date of --

21              MR. TOWNSEND:   Ten days after

22   the date of the offense.

23              MR. OLD:   Could you also along

24   with that take judicial notice that it was not I?

25              THE COURT:   I will do so.   I

1   believe it was Vernard Solomon that was originally

2   appointed on June 24th, 1993.

3                    The Court will take judicial notice of

4   the same and Mr. Old, I understand you were appointed by

5   Judge Thorpe and that would have been sometime this past

6   summer or spring?

7                    MR. OLD:   I believe it was

8   July, it was late June or early July.

9                    THE COURT:  Of 1994.

10                   MR. TOWNSEND:   I don't have

11  that with me.

12                   THE COURT:   It's in the

13  Court's file.

14                   Approximately a year after the first

15  appointment?

16                   MR. OLD: Yes, Your Honor.

17                   THE COURT: Mr. Townsend, you

18  may proceed.

19                   MR. TOWNSEND:   Looking at

20  your jail records there, Sheriff, do you note on there

21  when -- and I'm not talking about phone calls but just

22  when Mr. Solomon made personal visits to Mr. Wardlow?

23                   THE WITNESS:  Just a second.

24  On June 20th, '93, on 12/27/93 Vernard Solomon, on 7/5/94

25  Bird Old, III, 8/19/94, Bird Old, III.

1   Q          (BY MR. TOWNSEND)   Sheriff, during the entire

2   time that Mr. Wardlow has been incarcerated in the jail

3   I believe his parents have been Morris County residents,

4   is that correct?

5   A          Yes, sir.

6   Q          They have made, I am not going to ask you to

7   go back into your records and go through all of them but

8   his folks, they have both made numerous visits to Mr.

9   Wardlow?

10  A          Yes, sir.

11  Q          And I believe he may have had other visitors

12  as well, is that correct?

13  A          Yes, sir.

14  Q          How would you characterize the visits with his

15  parents, was this weekly, monthly?

16  A          Daily.

17  Q          "Daily?"

18             And those visits haven't been restricted

19  in any manner, have they, other than to the jail

20  facilities themself?

21  A          Correct.

22  Q          He has been allowed to see them on a daily

23  basis?

24  A          Prior to the last month and a half that he was

25  there.

1    Q        What happened?

2    A        It was restricted as far as his visitation,

3    required two guards to be on duty at the time they

4    visited him.

5    Q        Okay.  Sheriff Blackburn, in your discussions

6    with Mr. Wardlow you have made it clear to him that you

7    won't discuss the case with him, is that correct?

8    A        That's correct.  Yes, sir.

9                     MR. TOWNSEND:  Your Honor, I

10   would like to offer State's Exhibits 6 through 42.

11                   And I believe we talked about that off

12   the record.

13                   THE COURT:  This is the group

14   of letters or notes?

15                   MR.  TOWNSEND:    Group   of

16   letters, this is, State's Exhibit 6 is actually the

17   letter from the Sheriff to Billy Wardlow, the other

18   exhibits are letters from Mr. Wardlow to either the

19   Sheriff or the jailer.

20                   THE COURT:   Mr. Old, do you

21   have any objection?

22                   I know you may have some objections to

23   individual letters based on materiality, do you have an

24   objection to the group as a whole being admitted for

25   purposes of this hearing?

1          MR. OLD:   Your Honor, my

2    objection would be the Sheriff has not identified them

3    as a group, subject to that being done I don't think I

4    have an objection.

5               "6" is a different predicate, it's a

6    letter from him.

7               THE COURT:  Prove up "6" then

8    "7 through 42."

9               MR. TOWNSEND: Sheriff, I show

10   you what has been marked as "State's Exhibit 6" and ask

11   you if you can identify that?

12

13          (Handed to the witness.)

14

15               THE WITNESS:  Yes.  I can.

16               MR. TOWNSEND:  What is that?

17               THE WITNESS:   It's a letter

18   I had written to Mr. Wardlow.  It was dated August 17th.

19   Q        (BY MR. TOWNSEND)  Of this year?

20   A        Of 1994.  Yes.

21               MR. TOWNSEND: I offer State's

22   Exhibit 6 at this time, Your Honor.

23               MR. OLD:  No objection, Your

24   Honor.

25               THE COURT:   State's Exhibit

1    6 is admitted.

2

3                    (State's Pre-Trial Exhibit Number 6 was

4    received in evidence.)

5

6                    MR. TOWNSEND: Sheriff, I show

7    you what has been marked as "State's Exhibit 7 through

8    State's Exhibit 42" and ask you if you can identify those

9    as a group?

10

11                   (Handed to the witness.)

12

13                   THE WITNESS: Notes, requests

14   and letters made by Billy Wardlow.

15                   MR. TOWNSEND:   And who are

16   they either addressed to, you or the chief jailer, is

17   that correct?

18                   THE WITNESS: Either to myself

19   or Patsy Martin.

20                   MR. TOWNSEND:   Offer them in

21   evidence, Your Honor.

22                   THE COURT:  Any objection?

23                   MR. OLD:  No objection.

24                   THE COURT:  "7 through 42" are

25   admitted.

1              (State's Pre-Trial Exhibits 7 through

2    42, including 33A were received in evidence.)

3

4                        MR. TOWNSEND: Sheriff, in "6"

5    what has been marked "6", what is marked as "State's

6    Exhibit 6" is a letter from Mr. Wardlow from you, I

7    believe there is something in that letter where you

8    indicated again to Mr. Wardlow basically to follow the

9    advice of his attorney and keep a low profile?

10                        THE WITNESS: That's correct.

11   Yes, sir.

12   Q         (BY MR. TOWNSEND)  So you are once again

13   advising him to "Keep his mouth shut", basically?

14   A         Yes.

15   Q         In State's Exhibit 6 one of the things I note

16   mentioned there was something about you carrying Mr.

17   Wardlow to be baptized?

18   A         Yes, sir.

19   Q         Tell us as best you can recall about when that

20   was.

21   A         I don't honestly remember.  It may have been

22   -- it was several months ago, I do remember that.

23   Q         Was that done I assume at his request?

24   A         Yes.  It was.

25   Q         Did you -- where did you carry him?

1    A         Took him to, I believe it was a Pentecostal

2    church there in Daingerfield.    It's located behind

3    Stott's Automotive on South Linda Drive there in

4    Daingerfield.

5    Q         Did you carry anybody else besides Mr. Wardlow?

6    A         Yes.   But I honestly don't remember who that

7    was.

8    Q         Was that person baptized that day also?

9    A         Yes, sir.

10   Q         Was it one person or was it Billy and one other

11   individual or was there --

12   A         I believe that it was Billy and one other

13   individual.

14   Q         Is that something -- did you personally do this

15   or have one of your deputies do this?

16   A         No.   I personally did this.

17   Q         Is that something that you do from time to time

18   or maybe have one of your deputies or jailers do from

19   time to time?

20   A         Yes.   I do.

21   Q         Did you consider that anything out of the

22   ordinary?

23   A         None whatsoever.

24                        MR.   TOWNSEND:    Pass   the

25   witness.

1      THE COURT:  Mr. Old?

2

3                 CROSS EXAMINATION

4                 BY MR. OLD

5

6      Q      Sheriff, I notice a notebook in front of you

7      while you were testifying.  I would presume that has your

8      notes as to this case in it?

9      A      Yes, sir.  It has.

10     Q      And did you review those notes prior to coming

11     here today in whole or at least in part?

12     A      In part.  Yes, sir.

13            MR. OLD:  Your Honor, we would

14     request permission to see the notes that he used to have

15     available to him for his testimony today.

16            THE COURT:  Mr. Townsend?

17            MR. TOWNSEND:  No objection,

18     Your Honor.

19            THE COURT:  Sheriff, is there

20     anything in there that you object to the Defense seeing?

21            THE WITNESS:  None whatsoever.

22            THE COURT:  Tender the book

23     or the notes to -- that's a pretty thick notebook, have

24     you reviewed the entire notebook before testifying today?

25            THE WITNESS:  At about 10:00

1    o'clock   I   received   a   subpoena   requesting   this

2    information.

3    The office personnel and myself put this

4    together as best as we could, provided Mr. Townsend with

5    information as best as we could on such short notice.

6    And like I say, I have looked, at some

7    point in time I have seen the majority of this but so far

8    as sitting down looking at it all, through it all

9    completely this morning I have not.

10   THE COURT: Does that notebook

11   refer only to the Wardlow case?

12   THE WITNESS: Yes, sir.

13   I was going to say it has various

14   visitation policies and things of that nature but those

15   are policies that pertain to everyone.

16   THE COURT: Tender the

17   notebook, please to Mr. Old for his review.

18

19   (Handed to Mr. Old.)

20

21   MR. HINSON: May we take a

22   short recess?

23   THE COURT: Looks like it may

24   be more than "a short recess."

25   MR. OLD: Your Honor, why

1    don't we take a short recess and I'm hopeful that I have

2    seen a lot of this material through delivery and it may

3    not take near as long as the thickness of the notebook

4    indicates.

5                    THE COURT:   Take a 10 minute

6    recess and in 10 minutes tell me if you need more time.

7

8                    (Recess.)

9

10                   THE   COURT:     All   right.

11   Sheriff, if you will get back on the stand and we'll see

12   if we can proceed.

13                   We need to be back on the record.

14                   I don't remember who was questioning the

15   witness, I think that you just began.

16                   MR. TOWNSEND:   I had passed

17   the witness.

18                   MR. OLD:   Please state your

19   name.

20                   THE WITNESS: Ricky Blackburn.

21   Q          (BY MR. OLD, CONTINUING CROSS EXAMINATION) Are

22   you the Sheriff of Morris County, Texas?

23   A          Yes, sir.

24   Q          How old a man are you, Mr. Blackburn?

25   A          46.

1    Q        Are you a native of Morris County?

2    A        No, sir.

3    Q        Where was your birth home?

4    A        Spartanburg, South Carolina.

5    Q        How long have you lived in Morris County?

6    A        Since 1981.

7    Q        How did you come to Morris County?

8    A        I moved over from Bowie County.

9    Q        You were in the Military?

10   A        Yes, sir.

11   Q        What branch of the Military were you in?

12   A        The Marine Corp.

13   Q        When was that?

14   A        1966 to 1969.

15   Q        About how old were you then?

16   A        I was 18 whenever I went in and had turned 21

17   just prior to my getting out.

18   Q        That was during the Vietnam era, did you do a

19   tour?

20   A        Yes, sir.

21   Q        What was your rank on discharge?

22   A        Sergeant E-5.

23   Q        Were you in the Military police or any form of

24   law enforcement in the Armed Services?

25   A        No, sir.

1   Q          Were you a -- what was your specialty?

2   A          Infantry.

3   Q          You were a soldier?

4   A          Yes, sir.

5   Q          A true soldier?

6   A          Pretty well so.  Yes.

7   Q          Will you start with your first employment in

8   law enforcement and tell me where it was?

9   A          In DeKalb, Texas something like in April of

10  1970, 1972 until I believe September of 1977.  Left --

11  Q          Who was that with, Bowie County Sheriff, DeKalb

12  Police?

13  A          The DeKalb Police from '72 to '77.

14  Q          What did you do for the City of DeKalb?

15  A          Just all phases of law enforcement, just

16  general law enforcement, patrol, investigations.

17  Q          Did you receive a title or rank other than

18  "patrolman" if they in fact had a rank?

19  A          Well, there was three of us there, the chief

20  and me as a Sergeant, a Patrolman.

21  Q          You were not a sergeant?

22  A          Yes.  I was.

23  Q          Where did you go from the City of DeKalb?

24  A          To the Sheriff's Department in Bowie County.

25  Q          What did you go there as?

1    A        As a Traffic Enforcement Officer.

2    Q        And that was as a deputy?

3    A        Yes.

4    Q        And your duties were primarily traffic?

5    A        Yes, sir.

6    Q        How long did you work for Bowie County?

7    A        Through the end of 1980.

8    Q        And the entire time there were you in traffic

9    or --

10   A        The last maybe eight or nine months I was

11   supervisor or the deputies on the west end of the county.

12   Q        Were you a -- was that over all deputies

13   assigned to the west end or just those -- your primary

14   duty was to work traffic?

15   A        No.  I believe there was three of them, they

16   were -- kind of the dividing line I believe was Hooks and

17   Redwater, Texarkana serviced from there back east and

18   there was I believe four deputies served Redwater and

19   Hooks and into Oklahoma and then our adjoining counties,

20   Red River County and Cass County.

21   Q        In that last eight or nine months period you

22   became an administrator as opposed to a field officer?

23   A        Well, I was doubling as both.  I was working

24   investigations   and making   sure   that   the   other

25   officers --

1   Q        What were you doing in investigations?

2   A        Working everything from narcotics to cows on

3   the  roadway  to  burglaries  and  thefts  to  family

4   disturbances, DWIs.

5   Q        Why did you leave the Bowie County Sheriff's

6   Department?

7   A        There was a change in administration, there was

8   a change in sheriffs.

9   Q        Were you terminated or did you resign?

10  A        I quit.

11  Q        Were you asked to resign because of the change

12  in administration?

13  A        No.    I  was  not  asked  to  quit,  I  did

14  voluntarily.

15  Q        Why did you leave DeKalb City Police force?

16  A        To  go  with  the  Bowie  County  Sheriff's

17  Department.

18  Q        You resigned that position?

19  A        Yes, sir.

20  Q        Where  did  you  go  from  the  Bowie  County

21  Sheriff's Department in 1980 when you terminated your

22  employment with them?

23  A        I was unemployed from the end of December of

24  1980 until March of 1981, at which time I went to work

25  for the Daingerfield Police Department.

1    Q       City of Daingerfield?

2    A       Yes.

3    Q       What did you go to work as for them?

4    A       A Patrolman.

5    Q       How long did you work for them as a patrolman?

6    A       I think for two months.

7    Q       Were you promoted or assigned to different

8    tasks with them?

9    A       No.

10    Q       Did you work for them just two months?

11    A       Yes.

12    Q       You terminated after two months?

13    A       Yes.

14    Q       What did you do?

15            That would have been about May, 1981?

16    A       Close.  Yes, sir.

17    Q       Where did you go then?

18    A       I went to the City of Hooks as their Police

19    Chief.

20    Q       How long were you Chief of Police at the City

21    of Hooks?

22    A       Until December of 1981.

23    Q       And what brought that employment to an end?

24    A       A near divorce.

25    Q       Did you quit or were you fired?

1    A        No.  I resigned.

2    Q        You resigned?

3    A        Yes, sir.

4    Q        And in December of '81 where did you next work?

5    A        I   returned   to   the   Daingerfield   Police
6    Department.

7    Q        What as?

8    A        Patrolman.

9    Q        How long did you work for them in that time?

10   A        Until July the 3rd of 1982.

11   Q        In that stay with the City of Daingerfield were
12   you a patrolman?

13   A        Yes, sir.

14   Q        Were  you  ever  promoted  or  reassigned  to
15   anything else?

16   A        I got promoted to Sergeant.

17   Q        "Sergeant?"

18   A        Yes, sir.

19   Q        When you became a sergeant with them were you
20   in fact still a sergeant patrolman?

21   A        Yes, sir.

22   Q        Had some supervisory responsibility along with
23   patrolman?

24   A        A little bit.  Yes.

25   Q        In July, 1982 where did you go to work?

1   A         For the Morris County Sheriff's Department.

2   Q         As deputy?

3   A         Yes, sir.

4   Q         Any particular type of deputy, any specialized

5   deputy job?

6   A         No, sir.

7   Q         Who was sheriff then?

8   A         Mr. Joe Skipper.

9   Q         How long did you work as a deputy for the

10  Morris County Sheriff's Department?

11  A         At that time until October, 19 -- either

12  October or November of 1991.

13  Q         So that was about nine years?

14  A         Yes, sir.

15  Q         Were you promoted or reassigned to different

16  tasks other than this of general duty?

17  A         Yes.  I was promoted to Chief Deputy.

18  Q         In 1991 what was your next employment after the

19  -- did you resign as chief deputy or were you fired?

20  A         No.  I resigned as Chief Deputy to seek the

21  office of Sheriff of Morris County.

22  Q         And you ran against your employer, did you not?

23  A         Against Mr. Skipper.  Yes, sir.

24  Q         Did you work between October of '91 as a peace

25  officer and I presume you took office January 1st, 1993

1    or --

2    A         No, sir.  I was elected as Sheriff in April of

3    '92, there was a runoff between myself and Mr. Skipper

4    and -- yeah and then that was maybe on April the 8th or

5    the 10th and then I returned to employment as a Deputy

6    the latter part of April.

7    Q         And did you -- you took office January 1st,

8    1993?

9    A         Mr. Skipper resigned I believe in August of '92

10   and I was appointed to fill his unexpired term and in

11   January of '93 I was appointed or took over.

12   Q         So you have been Sheriff since sometime in

13   August of '92?

14   A         Yes, sir.

15   Q         What is your educational background?

16             First let me ask you; where did you

17   graduate from high school?

18   A         DeKalb High School.

19   Q         DeKalb, Texas?

20   A         Yes, sir.

21   Q         You were born in North Carolina?

22   A         "South Carolina."

23   Q         When did you move to Texas?

24   A         Not being vague or anything but I was adopted

25   in 1956 and I think that it would be somewhere in that

1    area, maybe '55 or '56.

2                        MR. TOWNSEND:   Your Honor, I

3    would like to object to this line of questioning, I think

4    we are -- it's just not relevant to issues at hand.

5                        THE COURT:   Mr. Old, what is

6    the purpose of this line of questioning?

7                        MR. OLD:   Your Honor, it is

8    relevant to know his background and experience in law

9    enforcement and the motion is a Motion to Suppress a

10   Confession(s) in light of being a voluntary confession

11   and his work experience and such are material and

12   relevant to that issue.

13                       THE COURT:   Overruled.

14                       MR. OLD:   You graduated from

15   high school in DeKalb what year?

16                       THE WITNESS:   19 -- what, May

17   28th of 1966.

18   Q          (BY MR. OLD)   You went to the Marine Corp I

19   presume shortly after?

20   A          Yes, sir.   June 15th, 1966.

21   Q          Do you have any college?

22   A          Yes, sir.   I have my Associate's Degree in

23   Police Science.

24   Q          Where from?

25   A          From Texarkana Community College.

1   Q          When did you obtain that degree?

2   A          It took me about seven years to get it but I
3   believe that it was in 1980.

4   Q          I presume taking seven years you went part-time
5   as you were working?

6   A          Yes, sir.  Some semesters I may not get to go
7   but three hours.

8   Q          Do you have any other college degrees or
9   certificates from schools relating to law enforcement?

10  A          I have no further degrees from college.  I have
11  from the Commission on Law Enforcement standards, I have
12  my advanced degree and waiting to get my Master's Degree
13  in  Law  Enforcement  from  the  Commission  on  Law
14  Enforcement.

15  Q          You received a subpoena to bring -- to come to
16  this hearing and to bring certain written materials with
17  you, did you not?

18  A          Yes, sir.

19  Q          You were requested to bring all letters of
20  correspondence between you your employees and Billy Joe
21  Wardlow?

22              The State has -- and that also includes
23  all documents, recordings showing the date sent and
24  received.

25              The State has introduced Exhibits 1

1    through 46, are those those documents?   (Indicating)

2    A        Yes, sir.

3    Q        Are there anymore documents or correspondence

4    or written matters passed between you and your department

5    and Mr. Wardlow, whether he sent them or you or your

6    department sent them?

7    A        None to my knowledge.

8                        THE REPORTER:   I think it's

9    "1 through 42", Mr. Old.

10                       MR. OLD:   "1 through 42?"

11            You were asked to bring all jail records

12   showing which cell Billy Joe Wardlow was kept in on each

13   date since his arrest?

14                       THE WITNESS:   Yes, sir.

15   Q        (BY MR. OLD)   Are those in the notebook that

16   is being copied?

17   A        Yes, sir.   They are.

18   Q        And all jail records as to security and

19   discipline pertaining to Billy Joe Wardlow?

20   A        Yes, sir.   It's in the notebook.

21   Q        They are in the notebook?

22   A        Yes, sir.

23   Q        I believe it was your testimony that you placed

24   Mr. Wardlow under arrest on behalf of the State of Texas

25   in Madison, South Dakota?

1   A          Yes, sir.

2   Q          And you testified that you read him his rights

3   at that time?

4   A          Yes, sir.

5   Q          "Rights" being what you referred to as "Miranda

6   Warnings?"

7   A          Yes, sir.

8   Q          Did you do that from memory?

9   A          I have a card.

10  Q          Did you use the card or did you advise him from

11  memory?

12  A          I have a card but I read.

13  Q          My question is; did you read him that card?

14  A          I read him the Miranda Warnings on the card.

15  Q          And there in Madison, South Dakota he invoked

16  and told you that he wanted a lawyer?

17  A          Yes, sir.

18  Q          You testified on -- in answer to questions from

19  the District Attorney, Mr. Townsend asked you about a

20  conversation or perhaps a series of conversations that

21  you had with Billy Wardlow concerning how to relieve his

22  depression and I'm not sure whether you said the word

23  "depression" or not, you said that he complained of

24  having -- had problems sleeping and having nightmares and

25  being unhappy?

1    A       He was having problems dealing with the

2    situation.  He was having nightmares and having problem

3    sleeping.

4    Q       And discussed with him how to deal with that?

5    A       The way that I dealt with it.

6    Q       When -- was this one conversation or several

7    conversations?

8    A       That was one conversation that --

9    Q       Was that conversation prior to 28 February of

10    1993?

11    A       Yes, sir.

12    Q       Was it after January the 1st,  19  --  excuse

13    me --

14    A       Excuse me.

15    Q       I said -- was that conversation before February

16    28th, 1994?

17    A       Yes, sir.

18    Q       And was it -- was it after February the 1st,

19    1994?

20    A       I honestly don't remember.  I believe the

21    letter -- the letter was dated 1/24/94 where Billy had

22    asked to speak to me and I don't have the exact date of

23    when I did talk to Billy.

24    Q       Let me -- are you making reference to Exhibit

25    1?

1                     I will show you a copy of Exhibit 1.

2

3                          (Handed to the witness.)

4

5                          THE WITNESS:  Yes, sir.

6                          MR. OLD:  Okay.  That is dated

7      you said "1/24", it's dated "1/25/94."  (Indicating)

8                          THE WITNESS:   Okay.

9      Q        (BY MR. OLD)  How long after 1/25/1994 did this

10     conversation take place?

11     A         I honestly don't remember.  It may have been

12     a week to ten days.  It may have been that evening.   I

13     honestly don't remember.

14                     Whenever I had time and whenever time

15     allowed for it is whenever I speak to various inmates.

16     Q         But you think it was at least a week or ten

17     days after the date of the letter?

18     A         That would just be a total estimation.  I could

19     not --

20     Q         You don't know?

21     A         No, sir.

22     Q         It could have been a week before the letter?

23     A         Yes, sir.

24     Q         Okay.

25     A         Yeah.

1    Q        Was the meeting that was brought -- was the

2    meeting the result of Billy's request 1/25/94 as

3    reflected by Exhibit 1, was it the first time that you

4    had met with him up in the dispatcher's office as you

5    testified to?

6    A        There in the chief dispatcher -- the chief

7    dispatcher's office.

8    Q        Was that the first time that you had had such

9    a meeting with him?

10   A        I honestly don't remember.

11   Q        You don't recall having other meetings with him

12   prior to that?

13   A        No, sir.  I sure don't.

14   Q        You are not telling me you did not?

15   A        I'm not telling you that I did not and I'm not

16   telling you that I did.  I just simply don't know.

17   Q        Did you ever bring Billy up -- you have a no

18   smoking facility, do you not?

19   A        Yes, sir.

20   Q        Did Billy smoke at that time?

21   A        This was in February?

22   Q        Yeah.  February of this year, '94.

23   A        I was trying to remember whenever our jail

24   inspection was.

25            I don't know if Billy smoked then or

1   not.  He could have.

2   Q        Okay.  Did you ever bring him up to the office

3   where he could smoke a cigarette?

4   A        Not for the sole purpose of that.  No.

5   Q        Did you ever allow him to smoke while he was

6   up there?

7   A        If he smoked anything it would have been just

8   a cigarette.

9   Q        That's what I meant, just a cigarette, did you

10  bring him up?

11           I'm not saying you brought him up there

12  only to smoke a cigarette but when a prisoner is up there

13  counseling with you is it your practice to allow them to

14  smoke a cigarette?

15  A        If they want to smoke a cigarette I normally

16  allow them to smoke one.

17  Q        Do you smoke, Sheriff?

18  A        Yes, sir.

19  Q        I do, Sheriff, and you kind of have sympathy

20  for those people that do and put into a no smoking

21  facility.

22  A        Sure.

23  Q        What?

24  A        Sure.

25  Q        You knew Billy Wardlow prior to the date of his

1      arrest for the offense which he is charged?

2      A        Yes, sir.

3      Q        You knew him well?

4      A        Knew him pretty good.  Yes, sir.

5      Q        Had you through your work in the -- over the

6      years in Morris County had you had contact and worked in

7      conjunction side by side with the Cason Fire Department?

8      A        Yes, sir.

9      Q        Do you recall Billy Wardlow being a member of

10     that organization at any time?

11     A        Yes, sir.

12     Q        Isn't it a fact that his mother and father are

13     the head of the organization or at least the de facto

14     heads of it?

15     A        Yes, sir.

16     Q        That is to say for the last twenty years they

17     had been the people who kept it going and were most

18     interested in it?

19     A        Ever since I have been they are normally on a

20     fire call in the Cason area, Mr. and Mrs. Wardlow are

21     always there.  Yes, sir.

22     Q        And Billy Wardlow was riding those fire trucks

23     with them when he was nine or ten years old, wasn't he?

24     A        I don't remember how old Billy was.

25     Q        A kid?

1    A        He was a kid.  Yes, sir.

2    Q        I mean "a kid" as opposed to being in high

3    school or something like that?

4    A        Yeah.

5    Q        Is that when you first met him or came to know

6    who he was?

7    A        Actually I think I first came to know Billy

8    and his brother, you know, they had vandalized a church

9    there in Cason.

10   Q        What year was that?

11   A        I don't know.  They were just little bitty

12   kids.

13   Q        Well, how old were they?

14   A        Ten, 11, 12, something like that.

15   Q        Did you ever work in conjunction with the Cason

16   Fire Department in such things as trying to find a

17   drowning victim or missing person?

18   A        Not right off the top of my head I can't

19   remember a drowning victim.

20   Q        A wreck?

21   A        Yes.  "Wreck" would be more in line, wrecks and

22   fires.  Yes.

23   Q        Will you characterize your relationship with

24   his mother and father and him?

25   A        I would say that we were acquaintances.

1   Q      Acquaintances?  First name acquaintances?

2   A      Yes, sir.

3   Q      Did you all go to church together?

4   A      No, sir.

5   Q      Exhibit 1 is addressed to "Patsy" and at the

6   bottom it says, "cc to Sheriff Blackburn", I presume that

7   you received a copy of it?

8   A      Yes, sir.

9   Q      He requested that he speak to you on a matter

10  of utmost importance?

11  A      Yes, sir.

12  Q      It says that "When you are at the point of

13  availability and ready to speak to me I will give you the

14  request."

15          What had been requested of him?

16  A      That was his request to speak to me, that's the

17  way I took it.

18  Q      And  he wanted a private consultation with you

19  -- excuse me, I'm sorry.

20  A      I don't see that.  Let me look at these.

21  (Indicating)

22  Q      There "1" is, that's the one.

23

24          (Handed to the witness.)

25

1              THE COURT:   Let me see "1" before he

2    starts in.

3

4              (Handed to the Court.)

5

6              THE WITNESS:   Okay.

7              MR. OLD:   It states that he

8    would like to have a private consultation with Sheriff

9    Blackburn "concerning my case" -- referring, of course,

10   to the case we are here on today?

11             THE WITNESS:   Yes, sir.

12   Q        (BY MR. OLD)   And would do, "whatever is

13   necessary to receive this hearing?"

14             And that is referring to a hearing

15   before you, is it not?

16             MR. TOWNSEND:   I'm going to

17   object, Your Honor, I think he's asking the Sheriff to

18   assume what the letter means.

19             THE COURT:   Sustained.

20             MR. OLD:   What did you take

21   the letter to mean?

22             THE WITNESS:   I took it that

23   Billy wanted to talk to me.

24   Q        (BY MR. OLD)   About his case?

25   A        Right.   Yes, sir.

1    Q        At that time had he been indicted?

2    A        Yes, sir.

3    Q        And he had a -- he had a lawyer appointed?

4    A        Yes, sir.

5    Q        Did you contact his lawyer informing him that

6    Mr. Wardlow has requested he talk to you concerning the

7    case?

8    A        Contacted Mr. Townsend and --

9                        MR. OLD:  Object, Your Honor,

10   it's non-responsive.

11                       THE COURT:  Non-responsive?

12                   Sustained.

13                       MR. OLD:  Did you contact Mr.

14   Vernard Solomon?

15                       THE WITNESS:  No, sir.

16   Q        (BY  MR.  OLD)    At  that  time  he  had  been

17   indicted?

18   A        Yes, sir.

19   Q        Had you received any notice from Mr. Solomon

20   that he did not want his client discussing this case with

21   anyone without him being present?

22   A        Yes, sir.  I believe so.

23   Q        And how did you receive that?

24   A        Through a letter, I think.

25   Q        And you did not contact Mr. Solomon?

1   A        No, sir.  I told Billy to contact him.

2   Q        Okay.  And when did you tell Billy to contact

3   him?  Prior to this meeting?

4   A        It was at the time of the meeting.

5   Q        Once you got to the meeting you told him to

6   contact him?

7   A        Yes.

8   Q        But before you brought him in to talk to him

9   about his case or talk to him about the request

10  concerning his request to talk to you about his case you

11  did not notify his attorney?

12  A        I did not.  No, sir.

13  Q        And Billy had stated he would do whatever

14  necessary to receive or have this meeting with you?

15  A        Yes, sir.

16  Q        Did you and Billy Wardlow in that meeting talk

17  about the Bible?

18  A        I don't know if we talked about the Bible

19  during that one or not.

20  Q        Did you tell him in that meeting that since you

21  had been in the Military you always carried a pocket

22  Bible, when you were troubled that you reached in your

23  pocket, opened that Bible and wherever it opened up you

24  read and you thought that was how you received direction

25  concerning your problems from God?

1    A        Yes.

2    Q        You told him that?

3    A        Yes, sir.

4    Q        Did you talk about the scripture that -- I

5    apologize, I don't recall where it comes from but it is

6    known as "You shall know the truth and the truth shall

7    set you free?"

8    A        I don't know if we talked about that one

9    specifically or not.

10            What I was referring to, I do carry my

11   Bible with me wherever I go, it has been through Vietnam

12   and I'm a firm believer in the Bible and as I mentioned,

13   if something is bothering me, if I'm having problems many

14   times I can open the Bible just blindly, not even knowing

15   where it is and normally there is something there that

16   will deal with the problem that I have.

17            I find a great deal of comfort in the

18   Bible, a great deal of instruction, you know.

19   (Indicating)

20   Q        Do you recall specifically whether or not you

21   all discussed typically the truth freeing men?

22   A        Specifically, no.  But I feel as though we

23   probably did.

24   Q        Did you discuss the repentance of sin?

25   A        Again, I'm sure that we were -- that if we were

1   discussing the Bible and we probably went through it,

2   went through everything.

3                    Billy remembers it as being that then

4   as far as knowing which scripture it is in, as far as

5   talking about the truth and the truth setting you free,

6   I'm sure that we did talk along those lines there.

7   Q       And that would be no different than if you told

8   a man that we were "forgiven for our sins through our

9   belief in Christ and upon asking through Christ and our

10  Lord, the Lord would forgive us?"

11  A       Yes, sir.

12  Q       That is saying the same thing as "The truth

13  shall set you free?"

14  A       Pretty well.  Yes.

15  Q       You agree?

16  A       I agree with that.

17  Q       Did you talk to him about such things as the

18  "repentance of sin?"

19  A       When Billy was baptized I talked to him about

20  that.

21  Q       Let's talk about this meeting --

22  A       As far as "the repentance of sin", as long as

23  you get yourself right with God that's the main person

24  and like I told him, and I tell many people that I talk

25  to, "You can tell me one thing and you can lie to me but

1    you are not going to lie to God" and that's the way that

2    it is.

3    Q        I think that's something that you and I can

4    agree on.

5                     Generally what would you -- are you a

6    member of a particular church?

7    A        I am a member of the Church of Christ.  Yes,

8    sir.

9    Q        Are you a strong member of the Church of Christ

10   as opposed to your belief in Christ?

11   A        I am --

12   Q        My question, some people believe in the church

13   and some people believe in God and Christ.

14   A        I believe in God and Christ, I go to the Church

15   of Christ to worship with other people and show my belief

16   in God.

17   Q        In this meeting that we are talking about that

18   resulted from Billy's request that is set forth in

19   Exhibit 1, did you explain to him that we were all saved

20   by our belief in Christ and God?

21   A        Yes, sir.

22   Q        And that by our belief and the asking for

23   forgiveness for the repentance of sin that we would be

24   saved?

25   A        Yes, sir.

1   Q       How long was this meeting -- how long was the

2   meeting?

3   A       Forty-five minutes, 30 minutes, an hour.

4           Honestly I honestly can't tell you.

5   Q       All right.

6   A       It was not a meeting of great length but it

7   wasn't a short meeting, either.   I would estimate 45

8   minutes.

9   Q       If we put it in the range of 45 minutes to an

10  hour and 15 minutes would that be fair?

11  A       I believe so.   Probably.

12  Q       When you are having a meaningful conversation

13  time really slips by?

14  A       Time has no meaning.

15  Q       And in this conversation you told Billy that

16  it had been your experience when you sat down and wrote

17  things out from one point to another and after you wrote

18  them out you sat back and read them, went back and added

19  to them and studied there was benefit?

20  A       It helps me personally to be able to do that.

21  Q       And you believe it helps you and you believed

22  it would help him?

23  A       There may have been that thought, I believe it

24  would help anyone.   Yes, sir.

25  Q       Are you suggesting to him that perhaps he ought

1      to try that which gave you comfort?

2      A          Yes, sir.  I felt as though that Billy once he

3      had admitted to the truth and was able to sit there and

4      look at it it would help him to deal with his problems.

5      Q          We don't have your jail records in front of us.

6      Do you recall at that time whether or not Billy requested

7      to be put into a cell by himself?

8      A          That was in February -- that was -- in February

9      of '94?

10     Q          At this meeting that you and he had that we are

11     talking about.

12     A          I honestly don't remember.  I think Billy was

13     mostly in cell number 160, a multiple occupancy cell and

14     -- no.  I don't.

15     Q          If you had your records in here could you

16     answer that question?

17     A          Yes, sir.

18                     I believe in going through the

19     information earlier that was in cell number 160 but I

20     just had --

21     Q          At which time?

22     A          I would just have to look at the records.   In

23     February during -- it would be I guess from January 25th

24     until the time I received the letter on the 28th.

25     Q          We'll come back to that record and look at it

1   later on.

2                   Okay.   After this meeting when was the

3   next time that you met with him?

4   A        I believe that Billy had filed a lawsuit on

5   second hand smoke -- that was '93 -- it was on -- it was

6   a meeting with Mr. Bob Patterson on -- who is our jail

7   inspector and Billy filed a grievance with the Jail

8   Commission on second hand smoke and Mr. Patterson had

9   talked to Billy about it but I don't remember if it was

10  in April of this year --

11  Q        What did you and Billy talk about at that

12  meeting?

13  A        Billy and I didn't talk to anybody about

14  anything at that meeting, Billy talked to Mr. Patterson.

15  Q        When did you next talk to Billy that occurred

16  as the result of the January 25th letter, 1994?

17  A        I don't honestly remember.

18  Q        How many times have you met with him since

19  then?

20  A        I don't know.   Sometimes Billy, say whenever

21  he was in the single cell I would just drop by for two

22  or three minutes, "How is it going, what's going on, how

23  are you making it", things of that nature.

24  Q        Other than saying, "Hello, how are you,

25  goodbye", would you all talk about perhaps the Bible or

1   other events?

2   A          Last -- the last time that I can remember he

3   had short-circuited our surveillance camera.

4   Q          When was that?

5   A          This is what?  A month and a half ago, a month

6   ago?

7   Q          What was the conversation between you and he

8   at that time?

9   A          About him, like I say, where Billy was -- Billy

10  had taken the --

11  Q          What was the conversation between you and he?

12  What did you say to him?

13  A          Just asked him, "how it was going, how he was

14  making it."

15  Q          Talk about the Bible?

16  A          Not at that time.  No.

17  Q          Have you talked about the Bible with Billy at

18  other times other than the meeting that occurred as the

19  result of Exhibit 1?

20  A          I don't honestly remember.

21  Q          Did you keep records of when you have these

22  meetings with your prisoners?

23  A          No, sir.  I don't.

24  Q          Is it set forth in your jail policy that

25  employees of the Sheriff's Department shall make notes

1    on such things?

2    A        No, sir.  Not that I'm aware of.

3            You have to remember, you know, we have

4    anywhere from 45 to 50 people, sometimes you may just

5    visit with one of them for two or three or four minutes.

6    Q        Okay.

7    A        Like one day last week one of them kept sending

8    requests up to talk to me, he was wanting to be sent out

9    as a trustee.

10           The majority of the time they want to

11   go out and work either as a trustee, they need to sign

12   some kind of financial papers or whatever.

13   Q        In January of 1994 Mr. Wardlow requested the

14   use  of  law  books  to  examine  information  concerning

15   certain legal matters, did you have a conversation with

16   him about that?

17   A        Not that I remember.  That would have -- the

18   jailer  or  Mrs.  Martin,  Chief  Dispatcher,  would  have

19   handled something of that nature.

20                    MR. OLD:  Your Honor, may I

21   approach the witness?

22                    THE COURT:  You may.

23                    MR. OLD:  Where is the other

24   stack?

25

1     (Handed to Mr. Old.)

2

3          MR. OLD:   I'm going to show

4     you State's Exhibit 8 and ask you if -- I believe you

5     just told me that you did not recall having a

6     conversation concerning that with Mr. Wardlow?

7          THE WITNESS:   No.  I do not.

8     Q          (BY MR. OLD)   You are not telling me you

9     didn't, you are just telling me you don't recall it?

10    A          I don't recall it.

11    Q          And you have not found a record of you having

12    done so?

13    A          No.

14    Q          Let me show you State's Exhibit 9.

15

16          (Handed to the witness.)

17

18          THE WITNESS:   Okay.

19          MR. OLD:   Okay.

20          THE WITNESS:   That --

21    Q          (BY MR. OLD)   Let me -- at the bottom of that

22    Patsy apparently made a note that you were going to get

23    Billy out and talk to him, did you do that?

24    A          I told Billy his request had been forwarded on

25    to the District Attorney and to his attorney.

82

1   Q        What request?

2   A        To be examined for psychological.

3   Q        Did you have a conversation with him at that

4   time about his depression, his stress?

5            Did you talk to him about maybe reading

6   the Bible to help him?

7   A        I don't recall.

8   Q        Are you going to tell me you did not or you

9   don't recall?

10  A        I don't recall.

11  Q        But if you had a conversation and that came up

12  it would be consistent with what you usually do that you

13  did talk to him about spiritual matters?

14  A        Rephrase that question for me again.

15  Q        Okay.  When you talk to prisoners, not only Mr.

16  Wardlow but other prisoners, Exhibit 9, Billy states that

17  "I am under so much stress and my nerves on the verge of

18  breaking down" then he requested to be examined.

19           When a prisoner came to you with that

20  problem you would -- it would be consistent with your

21  practices to give them spiritual advice?

22  A        Not all the time.  On something like that I

23  would probably tell him, you know, "You were to notify

24  the District Attorney and your attorney and it would be

25  up to them to have an exam made."

1   Q        After you talked to Billy concerning the

2   1/25/94 request you found out at that time he was having

3   trouble sleeping, he was having nightmares and you told

4   him at that time to read the Bible?

5   A        On 1/25?

6   Q        Yes.  After the 1/25, the meeting brought about

7   by State's Exhibit 1.

8            Now, his letter says, State's Exhibit

9   9 expresses the same problem, perhaps a different word,

10  "stress, nerves, on the verge of a breakdown", you didn't

11  counsel him then, did you?

12  A        To me he was indicating he was in need of

13  medical attention.

14  Q        Wasn't he indicating to you the same thing back

15  after January 25th, 1994 when he told you that he was

16  having problems sleeping, he was having nightmares, he

17  was depressed?

18  A        On that one that he's requesting to have an

19  examination.

20           Did he not request an examination in one

21  of those?

22  Q        Yes.  He did but I mean --

23  A        Okay.

24  Q        -- but I mean you weren't concerned at this

25  point about the same problem that he had expressed to you

1    back in your first meeting?

2    A        No.  No.  I was concerned.  He had requested

3    that an examination be conducted.

4    Q        Well, why didn't you give him the same advice

5    at that time "I will send your request on but why don't

6    you write everything down and review it and look at it

7    and perhaps it will help you?"

8    A        Because he had requested an examination we was

9    forwarding it on to a professional examiner that could

10   come in and look at him.

11   Q        Who has authority over your jail?

12   A        I do.

13   Q        And when a medical prisoner has a medical

14   problem it is your duty to get for him, it is not the

15   District Attorney's, is it?

16   A        No.

17   Q        I mean you have the authority to take them to

18   any doctor you want to take them to?

19   A        Correct.

20   Q        But you sought Mr. Townsend on this?

21   A        On the medical examination?

22   Q        Yes.

23   A        So many times an attorney will request to have

24   their -- just like the female inmate there and requested

25   the same thing, I contacted her attorney and they came

1  and had the examination.

2  Q       But I mean he wasn't asking for an examination

3  to go to court, he was telling you that he was mentally

4  sick, he was stressed out, nervous, he was about ready

5  to have a nervous breakdown.   He was asking you for

6  medical help, wasn't he?

7  A       No.

8  Q       "No?"

9          He wanted an examination?

10  A       Well, a psychiatrist -- well, I guess -- let's

11  go back to the definition of "medical help", he was

12  wanting a psychiatrist to come in and examine him.

13  Q       Where does it say that he wanted a

14  psychiatrist?

15

16          (Handed to the witness.)

17

18          MR. OLD:   Refer back to

19  Exhibit 9.   (Indicating)

20          THE WITNESS: Well, "I request

21  to be examined for stress or depression related

22  problems."   (Indicating)

23  Q       (BY MR. OLD)  Don't medical doctors treat

24  people for depression?

25  A       So do psychiatrists and psychologists.

1    Q        Why didn't you follow your jail guidelines and

2    take him to a doctor and see if he had a problem?

3    A        He didn't request to see a doctor.

4                    MR. TOWNSEND:   I object to

5    this.  This witness has already testified why he did what

6    he did, what his interpretation of that letter was.

7                    THE COURT:  Sustained.

8                    MR.    OLD:      You    had    a

9    conversation with Mr. Townsend concerning whether or not

10   to get him medical help?

11                   THE WITNESS:  No.

12   Q        (BY MR. OLD)  You did not?

13   A        No.  I did not.

14   Q        Did you have any conversation with Mr. Townsend

15   as to Mr. Wardlow's request for an examination?

16   A        Yes.

17            And also told him -- asked if he was

18   going to contact Mr. Solomon and let him know about it.

19            I may can go back and check and see when

20   Miss Fulfer's exam was to see if that's going to be in

21   the same time frame or same area.

22   Q        But I mean, Miss Fulfer doesn't have anything

23   to do with Mr. Wardlow's health problem?

24   A        It's a guide to me to see if it was along about

25   the same period of time that if Tonya was getting -- or

1   Miss Fulfer was getting examined by a psychologist and

2   Billy may have felt that he needed to be examined by a

3   psychologist or a psychiatrist also.

4   Q       September 15th -- excuse me, on 5/18/94, per

5   State's Exhibit 15 you had a communication from Mr.

6   Wardlow.

7

8               (Handed to the witness.)

9

10               MR. OLD:   Did you have a

11   conversation with him about his request which I believe

12   was to be moved to a different cell?

13               THE WITNESS:   No.   On this I

14   talked to the Chief Jailer.

15   Q       (BY MR. OLD)   Okay.   It says that -- is that

16   a copy of your handwriting at the bottom of the page?

17   (Indicating)

18   A       No.   That's Patsy -- Chief Jailer Martin's

19   handwriting.

20   Q       Says "Leave where he's at", was that your

21   direction?

22   A       Yes, sir.

23   Q       June 11th, 1994, another request to change

24   cells.

25

1          (Handed to the witness.)

2

3                    MR. OLD:   Did you have a

4   conversation with Mr. Wardlow concerning that?

5                    THE WITNESS:   That's Patsy.

6   No.   No.

7   Q          (BY MR. OLD)  Did you have a conversation with

8   Patsy?

9   A          I don't even know if I had a conversation with

10  her or not.

11  Q          Your answer is you don't know?

12  A          I don't know.  We get those quite often.   It

13  would be various inmates.

14  Q          State's Exhibit 17 is another request to be

15  moved and it is not dated.

16

17          (Handed to the witness.)

18

19                    THE WITNESS:   I don't know.

20                    MR. OLD:   Let me -- I notice

21  some of these communications are dated as to when they

22  are received and some are not, why is that?

23                    THE WITNESS:   Personnel error.

24  Q          (BY MR. OLD)   Is that a rule that you are to

25  date something when you receive it?

1    A        If it comes through the -- through the mail of

2    course we have a jail log sheet and we log all that down,

3    the date it's received and if mailed or something of that

4    nature, sometimes the dispatchers do and sometimes they

5    don't.

6    Q        Let me ask you a question; when you say

7    "through the mail" I may be getting -- I may be wrong,

8    you may correct me; there's two kinds of mail, there's

9    United States Postal mail that comes in and out of the

10   jail and then apparently you all operate your in-house

11   mail service?

12   A        Through -- if it comes through -- if it comes

13   through the U.S. Mail it's logged down on our mail log.

14   Q        Okay.   And if it comes through your inner

15   facility mail it's not logged?

16   A        No, sir.

17   Q        And it's not dated "received?"

18   A        Not all the time.   No.

19   Q        Is it supposed to be per your rule?

20   A        No.

21   Q        Why is that?

22   A        If it's going through U.S. Mail, like I say,

23   we keep a record of it.

24            You have to understand that we get, run

25   anywhere from 45 to 50 inmates, you may get 15 or 20 of

1    them a day.

2               The jailers, they try to, may run back

3    and while they are passing out trays with an inmate may

4    poke a note to them.

5    Q        I presume that someone in your office or

6    yourself reviews each and every one of those

7    communications?

8    A        The majority of them go to Patsy Martin.

9    Q        But sometimes Patsy dates them, sometimes she

10   doesn't?

11   A        Yes, sir.

12   Q        What is your practice when you receive them?

13   A        Just take them and look at them.

14   Q        You date them?

15   A        No, sir.

16   Q        Do you consider that to be important, the date

17   that you receive something?

18   A        Well, on the important stuff it is dated on

19   what I consider to be important.

20   Q        You write the date down?

21   A        Patsy writes the date down.  Like I say, if

22   it's important it will be documented.

23   Q        State's Exhibit 3 which is addressed to you,

24   who was the first person in your department to read that

25   letter?

1    A        Let's see, this was this one.   I was.

2             Then I carried it over to Mr. Townsend.

3    Q        Okay.   I mean did you consider that letter to

4    be as important a matter as you had ever received through

5    jail communications?

6    A        Well, it was important.   Yes, sir.

7    Q        You were surprised to get it?

8    A        Yes, sir.

9    Q        And you did not make a note on what date you

10   received it, did you?

11   A        I made a note on the date it was written.

12   Q        You dated that up at the top, "2/28" or "3",

13   whatever it is?

14   A        It's "2/28/94."

15            No.   It's Billy.

16   Q        It's Billy's?   (Indicating)

17   A        Yes, sir.

18   Q        But you did not consider it important enough

19   to date yourself, did you?

20   A        Oh, yeah.   It's extremely important and I'm not

21   saying that while I didn't put it down there I put it

22   somewhere else as far as notifying the District Attorney.

23   Q        As to the death of Mr. Cole; at what point in

24   time did you consider that as to who had killed him, that

25   the crime had been solved?

1          MR. TOWNSEND: Your Honor, I'm

2    going to object.  I don't see the relevance for purposes

3    of this hearing.

4          THE    COURT:    What   is   the

5    relevance?

6          MR.  OLD:   It's relevant to

7    show his interest sometime prior to February 28th, 1994

8    when he induced this man to make a confession by when he

9    told him to write everything down.

10         THE    COURT:       Overruled.

11         Restate the question.

12         MR.  OLD:   At what point in

13   time by date if you can did you consider that you or law

14   enforcement had solved as to who had killed Mr. Cole?

15         THE WITNESS: Do you have that

16   report with you?

17         MR. TOWNSEND:  No.

18         THE WITNESS:  A copy of the

19   Offense Report?

20         MR. TOWNSEND:  No.

21         THE WITNESS:  The date of the

22   offense is what is what, June 13th?

23         THE COURT:   I believe it was

24   "June 14th."

25         THE WITNESS:  "June 14th?"

1        MR. TOWNSEND:  "June 14th."

2                June 14th is the date of the offense.

3                THE WITNESS: Okay.  You asked

4    me a question that is not going to be a one word answer.

5                At the time that we discovered the .45

6    bullet or the medical examiner discovered it in Mr.

7    Cole's head, the time that we learned that Billy had

8    taken his mother's .45 Llama, .45 calibre weapon and had

9    made a box that the weapon had come in and the box of

10   shells which was empty and the bullet found in Mr. Cole's

11   head was of the same type and brand that would have been

12   fired by a Llama .45.

13               MR. OLD:  What date was that?

14               THE WITNESS:   Excuse me?

15   Q         (BY MR. OLD)  What date was that?

16   A         I don't have the report, that's why I'm trying

17   to tell you, I'm trying to recall this, it was between

18   June the 14th and June the 17th.

19   Q         So in your mind you had resolved that Billy Joe

20   Wardlow had committed this crime in June or July of 1993?

21   A         In my mind I had resolved that we had

22   sufficient evidence to take Mr. Wardlow to Court on this

23   crime.

24   Q         And when did you resolve that you had

25   sufficient evidence to convict him?

1    A        I haven't.

2    Q        When you received that letter February 28th,

3    1994 did you consider that -- that letter as evidence

4    which could be used to convict him?

5    A        It's possible evidence.  Yes.

6    Q        You are pleased to get it from a law

7    enforcement standpoint of accumulating evidence?

8    A        Let's back up and reword the question, please.

9             You are acting as though this was some

10   kind of far out scheme where I had ambushed Mr. Wardlow.

11            MR. OLD:   I object to the

12   answer.  He's not being responsive to it, he's arguing

13   with the question.

14            THE COURT:  Overruled.

15        You may complete your answer.

16            THE WITNESS:  That was not the

17   case.

18            If Mr. Wardlow had not requested to

19   speak to me I would not have spoke to him.

20            MR. OLD:  But he requested to

21   talk to you about his case and you talked to him?

22            THE WITNESS:  No.  He started

23   talking to me about the case and I told him that I could

24   not talk to him about the case unless his attorney was

25   present.

1    Q        (BY MR. OLD)   And then you went into this

2    business of talking about his spiritual well-being and

3    you told him to write it all down?

4    A        That is correct.

5    Q        And you did not notify his attorney and give

6    him an opportunity to be present at that meeting?

7    A        No.  I did not.

8             I advised Billy to contact his attorney.

9             I not only talked to Mr. Townsend, I

10   also talked to the District Judge.

11   Q        To who?

12   A        The District Judge.

13   Q        Which District Judge?

14   A        A Mr. Porter, Judge Porter.

15   Q        About what?

16   A        Billy requesting to speak to me.

17   Q        What did he advise you?

18   A        He said it could go either way.

19   Q        What do you mean "go either way?"

20   A        Could go for us or go against us.

21   Q        As to what regard?

22   A        As to whether if anything came out of it about

23   what Billy said, about anything could go either way.

24   Q        And you talked to Judge Porter prior to meeting

25   with Billy?

1    A        Yes, sir.

2                        THE COURT:  Excuse me just a

3    minute, Mr. Old.

4                        Sheriff, you said that you told the

5    District Attorney, I assume you mean "Mr. Townsend?"

6                        THE WITNESS:  "Mr. Townsend."

7                        THE COURT:  And you talked to

8    Judge Porter, you told me that you talked to Judge Porter

9    before this conversation, before this conversation with

10   Mr. Wardlow, talked to Mr. Townsend prior to talking to

11   Mr. Wardlow?

12                       THE WITNESS:  Yes, sir.  I

13   talked to both of them trying to seek some guidance on

14   that.

15                       THE COURT:  Before you had

16   that conversation with Mr. Wardlow that is related in the

17   letter?

18                       THE WITNESS:  Mr. Townsend

19   said as long as you didn't go -- get into the case.

20                       THE COURT:  I just wanted to

21   get my time down, I will let him ask you what they wanted

22   to know about it.

23                       MR. OLD:  Judge Porter advised

24   that talking to him could go either for or against you?

25                       By "you" I assume that he was referring

1     to the State?

2                    THE WITNESS:   Yeah.   Right.

3     Q        (BY MR. OLD)   And he was referring to what

4     would be the fruits of that conversation, if any?

5     A        Referring to any problem that might arise by

6     me talking to him.

7     Q        But he advised you to go ahead and talk to him?

8     A        No.   He didn't.

9     Q        He just said it could go for you or against

10    you?

11    A        He did not tell me not to and he did not tell

12    me to talk to him.

13

14               (Off the record discussion.)

15

16               THE COURT:   Let's go back on

17    the record.

18               MR. OLD:   When you met -- and

19    the meeting I'm referring to, the meeting that is --

20    Exhibit 1 gave rise to after January 25th, 1994 when you

21    met with Mr. Wardlow did you read him the Miranda

22    Warnings from the card that you carry in your pocket?

23               THE WITNESS:   No, sir.   I

24    don't think so.

25     Q        (BY MR. OLD)   Did you advise him -- did you

1    immediately advise him that he had the right to be

2    present -- have an attorney to be present?

3    A        He had requested to see me, I hadn't requested

4    to see him.

5    Q        But you went to see Judge Porter about the

6    effect of finding out -- the effect of talking to him and

7    he said it could be good for the State or bad for the

8    State so far as gathering evidence?

9    A        No.  It could have been good for me -- he said

10   that it could go either way.

11            The meeting was not to gather evidence,

12   the meeting was simply to talk to someone that had

13   requested to talk to me.

14   Q        If that was all it was why did you talk to the

15   Judge or District Attorney?

16   A        Because I didn't want to mess up the case.

17   Q        But you did not read him his Miranda Warning

18   at that time?

19   A        No.  I didn't.

20   Q        You simply suggested that he write it all down

21   and read it?

22   A        No.  I didn't.

23   Q        You made that suggestion to him?

24   A        I told him that helped me.

25   Q        Okay.  I believe you testified earlier that you

1   never, you or your office never searched the cells of

2   Billy Joe Wardlow?

3   A        No.  I didn't say that.

4   Q        You didn't?  I thought you said --

5   A        I don't remember us talking about it.

6   Q        Did you search his cell or have it searched?

7   A        Yeah.  Yes.

8   Q        When?

9   A        Several times.

10  Q        Prior to February 28th, 1994?

11  A        We have fire drills and all, the whole place

12  is searched if we --

13  Q        What are you looking for on a fire drill?

14  A        What?

15  Q        What are you looking for on a fire drill when

16  you search?

17  A        Any kind of contraband.

18           A lot of the people will squirrel away

19  extra pillows, might want to keep an extra mattress, some

20  of them will try to make -- they get paper clips, try to

21  make something out of that, razor blades, just anything

22  they are not supposed to have.

23  Q        When you say "fire drill" do you mean something

24  for the prevention and detection of fire?

25  A        Yes, sir.  We are required to have a fire

1    drill.

2    Q        I mean I asked you about "searches" and you

3    told me about "drills", how do the two relate?

4    A        While everyone is out we use that opportunity

5    to go ahead and look through, make sure there is not any

6    extra, like I said, blankets or quilts or mattresses.

7    Q        How would I get an extra mattress in the jail,

8    Sheriff?

9    A        Okay.  For instance Billy was, you are in the

10   same cell that you were in and say the jailer goes down

11   there to get Billy and at the same time the secretary

12   calls him and tells him that Mr. Lee has a visitor, the

13   jailer gets detracted and doesn't get Billy to get his

14   mattress out.

15   Q        The purpose of that is merely to regather

16   property that you all have disbursed to prisoners?

17   A        Part of it.

18            And like I say, any type of contraband

19   that they can get.

20   Q        Define "contraband" to me.

21   A        Anything a person should not be in possession,

22   it's illegal to have.

23   Q        What should you not be in possession of at the

24   jail?

25   A        Well, used razor blades, excess food, a lot of

1    them will try to squirrel away processed food that -- try

2    to keep a close watch out on that to keep down germs and

3    cleanliness there, anything that can be made or adapted

4    to be used as a weapon, things of that nature.

5    Q        Well, I mean you aren't looking for their, what

6    private belongings they have in jail, there's nothing

7    wrong with a prisoner having a Bible?

8    A        No.

9    Q        Nothing wrong with him having a diary?

10   A        No.

11   Q        There's no police interest in a diary?

12   A        No.

13   Q        There's no fire hazard in a diary?

14   A        No.

15   Q        In his correspondence with his lawyers and his

16   family there's no police interest in those things?

17   A        No.

18   Q        So you are searching for materials that could

19   cause fires and to get back the number of mattresses and

20   pillows and such that might accumulate by mistake and

21   error?

22   A        And any type of contraband.

23   Q        And guns and weapons?

24   A        Yes.

25                    MR. OLD:  Your Honor, without

1    the notebook I don't think I can go any further.

2                         THE COURT:    I will recess

3    until 9:00 a.m.

4                         The last time we talked there was a

5    problem with somebody getting here at 9:00, is that a

6    problem, Randy?

7                         MR. LEE:  No.

8                         THE COURT:  9:00 a.m., we'll

9    be in recess until then.

10                         For the record before we close for the

11   day I have granted the Defendant's Motion to Restrict the

12   State's Cross Examination of the Defendant and I am also

13   going to issue a gag order.  I do not want the Defendant

14   nor the Defense Attorneys or the State's Attorneys nor

15   any of the witnesses including the Sheriff's Department

16   and deputy, Court personnel to discuss this case with

17   anyone that might be from the press or associated with

18   the press.

19                         If you have a doubt as to whether the

20   person is from the press or media just tell them that you

21   have been ordered not to talk about it and if any

22   occasion comes up where you think you need to talk to me

23   about it we'll discuss it.

24                         MR. OLD:  Being asked where

25   we are, saying we are still in the process of selecting

1   a jury?

2              THE COURT:   I don't have a

3   problem with that.   I don't want you to discuss the case

4   meaning "evidence" I have no objection to either saying,

5   giving a report to whoever asks where we are in the

6   proceedings, we are here, for instance, "Motions are

7   pending, the Judge has not made a ruling, jury selection

8   is underway", matters that they can discover through

9   public record I don't have a problem with.

10             MR. OLD:   I can't say what a

11   great job I'm doing?

12             THE COURT:   No.   That's not

13   a matter of public record.

14

15           (Record closed for October 17th, 1994.)

16

17           (Whereupon Court was recessed until

18   10:00 a.m., October 18th, 1994.)

19

20

21                * * * * *

22

23

24

25

1  STATE OF TEXAS      §
2  COUNTY OF TITUS     §
3

4          I, Lloyd E. Billups, CSR #149 and
5  Official Court Reporter in and for the 76th Judicial
6  District, State of Texas, do hereby certify that the
7  above and foregoing contains a true and correct
8  transcription of the proceedings in the above-styled and
9  numbered cause, all of which occurred in open court or
10 in chambers on October 17, 1994 and were reported by me.
11         I further certify that this
12 transcription of the record of the proceedings truly and
13 correctly reflects the exhibits, if any, offered by the
14 respective parties.
15         WITNESS MY HAND this 31ST day of
16 January, 1995.
17
18
   LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
19 76TH JUDICIAL DISTRICT, STATE OF TEXAS
20
21
22
23
24
25

1    Certification Number of Reporter:   149

2    Expiration Date of Certification:   12/31/96

3    Business Address:    Drawer 1868
                          Mt. Pleasant, Texas 75456-1868

4
     Telephone Number:    903/577-6735
5
     Transcribed By:      Tandra K. Gibson
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25