

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

DEFENDANT'S MOTION TO SUPPRESS CONFESSION(S)

October 18, 1994

**VOLUME 10 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

VOLUME 10

DEFENDANT'S MOTION TO SUPPRESS CONFESSION(S)

OCTOBER 18, 1994                                    PAGE/VOLUME

APPEARANCES  . . . . . . . . . . . . . .          1/10

MORNING SESSION  . . . . . . . . . . . .          3/10

WITNESS FOR THE STATE

RICKY BLACKBURN

      CROSS EXAMINATION BY MR. OLD . . . . .        3/10

RECESS . . . . . . . . . . . . . . . . .        38/10

WITNESS FOR THE STATE

RICKY BLACKBURN

      REDIRECT EXAMINATION BY MR. TOWNSEND .       40/10

      RECROSS EXAMINATION BY MR. OLD . . . .       53/10

STATE RESTED ITS CASE ON MOTION  . . . . . .       57/10

RECESS . . . . . . . . . . . . . . . . .        57/10

WITNESS FOR THE DEFENSE

BILLY JOE WARDLOW, the Defendant

      DIRECT EXAMINATION BY MR. HINSON . . .       58/10

      CROSS EXAMINATION BY MR. TOWNSEND  . .       71/10

      REDIRECT EXAMINATION BY MR. HINSON . .       77/10

      RECROSS EXAMINATION BY MR. TOWNSEND  .       80/10

DEFENSE RESTED ON MOTION TO SUPPRESS . . . .       81/10

STATE RESTED ON MOTION TO SUPPRESS . . . . .       81/10

COURT ADJOURNED  . . . . . . . . . . . .       82/10

COURT REPORTER'S CERTIFICATE . . . . . . . .       83/10

1

VOLUME 10

2

ALPHABETICAL INDEX OF WITNESSES

3

<u>OCTOBER 18, 1994</u>                          <u>PAGE/VOLUME</u>

4

<u>BLACKBURN, RICKY</u>
Cross Examination by Mr. Old . . . . . . .      3/10
Redirect Examination by Mr. Townsend . . .     40/10
Recross Examination by Mr. Old . . . . . .     53/10

<u>WARDLOW, BILLY JOE</u>
Direct Examination by Mr. Hinson . . . . .     58/10
Cross Examination by Mr. Townsend  . . . .     71/10
Redirect Examination by Mr. Hinson . . . .     77/10
Recross Examination by Mr. Townsend  . . .     80/10

5

6

7

8

9

10

11

*****

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

VOLUME 10

2

EXHIBIT INDEX

3

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| DEFENSE PRE-TRIAL 2 Cell Assignments | 27 | 27 | 27 | 27/ADM |

4

5

6

7

\* \* \* \* \*

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

DEFENDANT'S MOTION TO SUPPRESS CONFESSION(S)

October 18, 1994

**VOLUME 10 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)


APPEARANCES


ATTORNEYS FOR THE STATE OF TEXAS:

        MR. RICHARD TOWNSEND
        District Attorney
        Morris County Texas
        Morris County Courthouse
        Daingerfield, Texas 75638

            and

        MR. RANDY LEE
        Assistant District Attorney
        Cass County Texas
        P.O. Box 940
        Linden, Texas 75563

1    ATTORNEYS FOR THE DEFENDANT:

2              MR. BIRD OLD, III
               Old, Rolston & Old
3              P.O. Box 448
               Mt. Pleasant, Texas 75456-0448
4
                        and
5
               MR. LANCE HINSON
6              Law Offices of Danny Woodson
               P.O. Box 399
7              Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    On the 18th day of October, 1994, the

2 above-entitled and numbered cause came on for hearing

3 before said Honorable Court, Judge Gary R. Stephens of

4 Midlothian, Texas, serving by judicial assignment in the

5 District Court of Titus County, Texas, on change of venue

6 from Morris County, Texas, and the following proceedings

7 were had:

8    THE COURT:  Let's get back on

9 the record.

10    Mr. Old, when we recessed yesterday you

11 wanted a chance to look over some information that was

12 provided, I believe it was a notebook from the Sheriff,

13 have you had a chance to look over your information?

14    MR. OLD:  I have looked over

15 the information, Your Honor.

16    THE COURT:  Are you ready to

17 proceed with your cross examination?

18    MR. OLD:  Yes.  I am.

19    THE COURT:  You may proceed.

20    MR. OLD:  Your name, sir?

21    THE    WITNESS:    "Ricky

22 Blackburn."

23 Q    (BY MR. OLD)  And you are the same "Ricky

24 Blackburn" who is the Sheriff of Morris County, Texas who

25 testified yesterday in this case?

1   A        Yes, sir.

2   Q        Let me -- you had told me that prior to talking

3   to Mr. Wardlow in February of 1994 that you had a

4   conversation with a Judge Porter?

5   A        Yes, sir.

6   Q        And as to his -- that he gave you some advice?

7   A        Judge Porter said it could go either way.

8   Q        He gave you advice?

9   A        He made a statement.

10  Q        Did you ask him for advice?  He responded to

11  your question?

12  A        Basically.  Yes.

13  Q        That's the same "Judge Porter" who is the

14  District Judge of the 276th Judicial District Court?

15  A        Yes.

16  Q        And that is a court that has jurisdiction of

17  criminal matters in Morris County, Texas?

18  A        Yes, sir.

19  Q        The district -- there are two judges, district

20  judges who serve Morris County, Texas, both in civil and

21  criminal cases?

22  A        Yes, sir.

23  Q        And that's the "Honorable B.D. Moye" and

24  "Honorable William Porter?"

25  A        Yes.

1    Q          And this case is being tried in Titus County

2    on a change of venue?

3    A          Yes, sir.

4    Q          And Titus County also is served by those same

5    two District Judges?

6    A          Yes, sir.

7    Q          And the 76th and 276th District?

8    A          Yes, sir.

9    Q          Moye being the 76th Judicial District Court and

10   Judge Porter being the 276th?

11   A          Yes, sir.

12   Q          Yesterday you told me when this meeting time,

13   when you told Mr. Wardlow how you handled things and

14   suggested it might be helpful to him to write things

15   down?

16   A          Yes, sir.

17   Q          Okay.   You did not know the date of that

18   meeting?

19   A          No, sir.

20   Q          And you still do not know?

21   A          No, sir.

22   Q          State's Exhibit 3, and that is a letter

23   addressed to "Ricky" and purported to be from Mr. Wardlow

24   dated 2/28/94, 8:15 p.m., are you familiar with that

25   document?   (Indicating)

1  A        Yes, sir.

2  Q        You testified you found that in your box at the

3  Sheriff's Office?

4  A        Yes, sir.

5  Q        And that is a box where people leave things for

6  you as opposed to an official U.S. Post Office box?

7  A        Yes, sir.

8  Q        And of your own knowledge you do not know how

9  that letter got there, you only know what others tell

10  you?

11  A        That's correct.

12  Q        Sheriff, in the material that you supplied me

13  yesterday which was out of the notebook that you

14  testified from the inmate prisoner correspondence

15  document was enclosed, it's in the first section of the

16  notebook.   (Indicating)

17  A        The correspondence?

18  Q        Yes.

19  A        Okay.

20  Q        It starts, it has Roman numeral I, II, III and

21  IV on the first page and continues on Page 2.

22  (Indicating)

23  A        Okay.

24  Q        Roman numeral Section B provides "Inmates will

25  be allowed to retain or purchase writing materials and

1    stamps in reasonable amounts?"   (Indicating)

2    A        Yes.

3    Q        As to the word "retain" is it a policy that

4    they may retain their mail and their written documents?

5    A        Excuse me?

6    Q        Okay.  If I'm a prisoner and over a period of

7    time I accumulate 10 or 15 letters that have been sent

8    to me I am allowed to retain those?

9    A        Yes, sir.

10   Q        And you respect their right of privacy to those

11   letters?

12   A        Yes, sir.

13   Q        And as to documents that they write they are

14   allowed to retain them or copies of them?

15   A        Yes, sir.

16   Q        And you respect and honor their right or

17   privacy as to those documents?

18   A        Yes, sir.

19   Q        Is that the policy of the Morris County

20   Sheriff's Department?

21   A        Yes.

22   Q        Sheriff, I find in your notes what is --

23   appears to be a jail inmate mail log and if I can there

24   is a section in your notebook that I believe it's

25   entitled "Mail Log", that's what I'm looking at if you

1    want to look at it with me.  (Indicating)

2    A        Okay.

3    Q        Tell me when you think we are at the same --

4    on the same page.

5    A        I have the "Mail Log."

6    Q        It starts out, well, "September, '93, Linda

7    Wardlow, Box 147, Cason, Texas?"  (Indicating)

8    A        Yes.

9    Q        Now, each letter that an inmate writes or

10   receives is recorded in that mail log?

11   A        If it comes through the U.S. Mail.

12   Q        If a letter does not come by U.S. Postal

13   Service then it is not logged, is it?

14   A        That's correct.

15   Q        And there's no record kept of the logging of

16   those records anywhere?

17   A        If it's not sent through the U.S. Mail it is

18   not logged anywhere.  No.

19   Q        Okay.  Now, whether official or not there is

20   a system or communication and writing what amounts to

21   mail inside the jail itself, is that correct?

22   A        As far as correspondence from inmates to the

23   jailer?

24   Q        Yes.

25   A        Yes, sir.

1   Q        And your office does not log or keep up with

2   those items?

3   A        On some of the -- we have doctor's requests and

4   things of that nature, I believe those are kept up with.

5   Q        Okay.  But they are not kept up in the fashion

6   that a log or correspondence is kept?

7   A        Correct.

8   Q        And on this log that we are looking at we would

9   not find any logging of inner jail communication?

10  A        That's correct.

11  Q        In reading the policies, if I understand it

12  correctly that you all open all incoming mail?

13  A        No.

14  Q        Okay.  Let me -- correct me where I am wrong;

15  as I understand your policy there is -- there's two

16  policies, one is to ordinary mail and to privileged mail

17  which is legal mail?

18  A        Correct.

19  Q        That as to ordinary mail you all open each

20  envelope and search it for dope or contraband?

21  A        Yes, sir.

22  Q        As to outgoing mail, okay, and as to legal

23  mail, legal incoming -- incoming mail, your policy is to

24  open it in front of the prisoner?

25  A        Not all the time.  No, sir.

1  Q       I'm asking you what the policy is, not what is

2  done.

3  A       No.  The incoming mail is opened up front.

4  Q       So legal --

5  A       Legal mail is not, is taken to the inmate.

6  Q       Okay.  Is it opened by the jailer or a person

7  with the Sheriff's Department in their presence?

8  A       Let me go back and see what it says.

9          It's to be opened only with the presence

10 of  the  inmate  with  inspection  limited  to  locating

11 contraband.

12 Q       Now, as to a prisoner's outgoing non-privileged

13 mail, is it opened?

14 A       Outgoing non-privileged will be opened not --

15 only if contraband is suspected or to prevent breach of

16 security of the jail.

17 Q       Have you opened any of Mr. Wardlow's outgoing

18 mail?

19 A       No, sir.  I haven't.

20 Q       Has anyone with the department?

21 A       We  would  have  to  ask  everyone  in  the

22 department.

23 Q       Do you have a report, do you keep a record of

24 those things?

25 A       Of when it's opened?

1    Q       Yes.

2    A       No.  We keep a record of the outgoing mail.

3    Q       I notice in your notebook there's a name,

4  letters that are addressed to someone named "Tonya" and

5  to Mr. Wardlow's mother?

6    A       Yes.

7    Q       How did you get those copies?

8    A       The jailer provided me with copies.

9    Q       And where did they get them?

10    A       Well, sir, they open the mail and that was the

11  -- falling under "to prevent breach of security of the

12  jail."

13    Q       Now, the purpose of that -- and they make

14  copies of them?

15    A       Yes, sir.

16    Q       And you all request the inmate to leave their

17  outgoing mail unsealed?

18    A       Yes.

19    Q       Why would it be necessary to make copies of

20  outgoing mail?

21    A       To have --

22    Q       For what purpose?

23    A       In case something were to happen.

24    Q       Well, like what would happen?

25    A       Like, for instance, okay, I'll tell you what

1    -- let me use -- over here, for instance would be

2    outgoing mail, "I have only one choice left, that choice

3    is to do whatever is necessary to leave this

4    confinement."

5              For security of the jail I think that

6    would be important to keep it.  (Indicating)

7    Q       Why would it be important to make a copy of the

8    letter?

9              You have read the letter.

10   A       Same thing is important on anything else, if

11   someone is planning on doing something it's nice to have

12   a copy of it showing their intent.

13   Q       Well, I mean would it aid, is it possible such

14   things to aid your investigation and in assisting your

15   prosecutor in the trial of the case?

16   A       It hasn't to my knowledge.

17   Q       Well, do you think it's possible it could in

18   any case?

19   A       Possible.

20             All inmates know that there is a

21   likelihood.

22   Q       Outgoing privilege -- "non-privileged mail",

23   the policy is "Roman numeral III" on the document that

24   you referred to earlier.

25             "Non-privileged outgoing mail will be

1    opened and if contraband is suspected or to prevent

2    breach of security of the jail?" (Indicating)

3    A        Okay.

4    Q        Is that correct?

5    A        "Number III, outgoing non-privileged mail?"

6    (Indicating)

7    Q        Yes.  Did I read it correctly?

8    A        Yes.

9    Q        There is a letter, I believe it has been

10   offered into evidence, it's dated by your office

11   "2/24/94", it is to "Ricky" and it purports to be from

12   Billy Wardlow, it's "State's Exhibit 2."

13

14               (Handed to the witness.)

15

16               MR. OLD:  Are you familiar

17   with that letter?

18               THE WITNESS:  Yes, sir.

19   Q        (BY MR. OLD)   Do you know whether or not the

20   conversation that we talked about yesterday, and again

21   referring to the conversation where you suggested the

22   benefit of writing things down, do you know whether or

23   not that conversation was before or after 2/24/94?

24   A        No, sir.

25   Q        Exhibit 1 which we talked about yesterday was

1  where Mr. Wardlow by letter attached requested a meeting

2  to you, stated that he wanted to talk to you concerning

3  his case?

4  A        Yes.

5  Q        Now, isn't State's Exhibit 2 the letter of

6  2/24/94 a renewal of the request and somehow, I mean is

7  it expressing the same problem that you told me he

8  expressed to you, that he was having problems which we

9  generally characterize as "depression?"

10 A        What?  I'm having trouble finding that letter.

11 Q        Excuse me, Sheriff, I am sorry.

12 A        "2/24?"

13              MR.  LEE:    I  believe  that

14 question  has  been  asked  and  answered  several  times

15 yesterday.

16              THE COURT:  Overruled.

17              MR. OLD:  Do you want me to

18 lay both of them up there?  (Indicating)

19              THE    WITNESS:    The    last

20 sentence  appears,  does  appear  to  be  a  carryover  of

21 2/24/94 from 1/25/94.

22 Q        (BY MR. OLD)  And that last sentence you are

23 referring to is "Please, it is urgent that you respond

24 before something happens you and I will both regret.

25 Thank you for understanding my problem and situation?"

1    (Indicating)

2    A        Yes, sir.

3    Q        So after having reviewed State's Exhibit 2 and

4    State's Exhibit 1 together would that refresh your

5    recollection or help you identify this conversation as

6    having been February 24th or immediately thereafter?

7    A        Well, as I said earlier I don't remember the

8    date.

9    Q        Okay.

10   A        According to the letter on 2/24 it did not

11   appear from the contents of that letter that I had talked

12   to him prior to that.

13   Q        And I'm just trying -- if there's anything that

14   would refresh your recollection as to when this meeting

15   is I consider that to be an important matter.

16   A        Sure.

17   Q        And I'm not trying to play games with you.

18   A        I understand.

19             Like I said, like I said yesterday it

20   could have been a week and a half or two weeks later but

21   from the contents of that letter there, 2/24 letter.

22   Q        Yes.

23   A        It did not appear as though I had talked to

24   Billy from the contents of that letter.

25   Q        Thank you, Sheriff.

1       Sheriff, did you review your notebook
2   last night or after trial -- after the hearing yesterday?
3   A          To a degree.
4               MR. OLD:  May I approach the
5   witness, Your Honor?
6               THE COURT:  You may.
7               MR. OLD:    Sheriff, let me
8   see if we can get on the same page and this is where I
9   am -- and it's mine, it's behind "Security tightened."
10              There ought to be a blue tab on it --
11  there we are.  (Indicating)
12              THE WITNESS:  Okay.  It was
13  on "Cell Assignments", you put it down wrong.
14              MR. OLD:  What is that page?
15              THE WITNESS:   This is the
16  assignment that the particular jailer did on that
17  particular day.  (Indicating)
18  Q          (BY MR. OLD)  Do you know which jailer that is?
19  A          The initials are "J.G.", it's "Jim Goodman",
20  starting there on "22" and from 11:00 to 7:00 right below
21  that appears to be "Jim Snider" on 2/23, below that would
22  be "Robby Gray" and on 2/23, 3:00 to 11:00 would be --
23  2/23, 3:00 to 11:00 would be Jim Goodman and 2/23/94 from
24  11:00 to 7:00, Jim Snider and 2/24/94, 7:00 to 3:00,
25  Robby Gray.  (Indicating)

Q        Let me go back, will you turn back to the page immediately before the one we were looking at, it has a heading    "Top    Classification    and    Separation." (Indicating)

A        Okay.

Q        Starting at the bottom of that page it has "Reclassification", is followed by handwriting, is that the start?

A        On 7 -- 7/4/94 "moved to general population."

Q        That's the document that I'm asking about, that goes to the last dated entry on that document is 10/27/94?  (Indicating)

A        Yes.

Q        And then when we turn the page we jump over to what date?

A        It appears mine -- something had --

Q        Do you know what happened to the record -- to the records that were made between 10/27/93 and what I believe to be February 19th, 1994?  (Indicating)

A        I could probably find them there at our office.

Q        I mean do you know why they were taken out of the notebook or not put in the notebook or whatever?

A        Well, probably looking at Cell Assignments, it evidently moved Billy from 158 to 160 and on the 22nd, "Moved Wardlow back into 160" and on 2/24, "Moved Billy

1   Wardlow from 145" on 2/20, "Moved Billy Wardlow to 145"

2   and we look back over on our jail -- or our jail Cell

3   Assignments and we can check to double-check to see if

4   that --

5   Q        My question is; where are the documents that

6   would be between those two dates?

7   A        I am sure that they would be there at our

8   office.

9   Q        Would they have concerned Billy Wardlow?

10  A        If he had been taken -- taking any kind of

11  medication.

12  Q        Or if he had been moved?

13  A        This is what that indicates, he had been moved.

14  (Indicating)

15  Q        Go to the page that we started on on February

16  20th, 1994 it indicates "Searched 160", is that correct?

17  (Indicating)

18  A        "Searched 160."

19           Yes.

20  Q        Immediately under it, "Moved Billy Wardlow to

21  145?"  (Indicating)

22  A        Yes.

23  Q        Was Billy Wardlow on 2/20/94 in cell 160?

24  A        Yes, sir.

25  Q        And you searched his cell, did you not?

1   A        Well, not his, the cell that he was in there,

2   searched other people in there with him.

3   Q        Who searched his cell?

4   A        The jailers.

5   Q        So you didn't?

6   A        No.

7   Q        You don't know what they did other than they

8   indicated they searched him?

9   A        Other than their reports.

10  Q        Well, I'm not asking you what the report says,

11  I'm asking you of your own knowledge right now.

12  A        Ask me the question again, please.

13  Q        That indicates they searched his cell, the

14  jailer did.

15  A        That indicates that cell number 160 was

16  searched.

17  Q        You were not present?

18  A        No, sir.

19  Q        And that was not a fire drill, was it?

20  A        No, sir.

21  Q        Sheriff, what was the first night that Mr.

22  Wardlow spent in your jail?

23  A        Just a second.

24  Q        Was it June 23rd?

25  A        June the 23rd.  Yes, sir.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    Q        1993?

2    A        Yes, sir.

3    Q        I am looking at the section of the notebook

4    which is entitled "Cell Assignments."  (Indicating)

5    A        Okay.

6    Q        The  first  page  of  that  is  "Wardlow  Cell

7    Assignments?"  (Indicating)

8    A        Yes, sir.

9    Q        Is that a document that you made?

10   A        The jailers made.  Yes.

11   Q        Was that made to bring to this hearing?

12   A        No.  We keep a record of it.  This is a photo

13   copy of it.  (Indicating)

14   Q        Is that something that entries were made as he

15   was moved from cell to cell or is this a summary of other

16   records?

17   A        I believe this is going to be a summary of the

18   records.

19   Q        Did you summarize that?

20   A        No, sir.  I didn't.

21   Q        Who did?

22   A        It would  have  either been  Kathy Kimberly or

23   -- who is a secretary for the Sheriff's Department or

24   Patsy Martin who is the Chief Jailer or both.

25   Q        Have you reviewed it for accuracy?

1    A        I take their word as far as that goes.

2    Q        But you have not reviewed the record, right?

3    A        That is correct.

4    Q        What is cell 145?

5    A        Cell 145 is our suicide cell, use it for

6    someone has a possible suicidal tendency, we'll place

7    them in that cell.

8             If someone needs to be moved into a

9    single cell we use that cell.

10   Q        How is it furnished and how is it different

11   from other cells?

12   A        The basic difference is that it's located

13   within view of the dispatch so there is a window from

14   the dispatch room and the dispatch can look directly into

15   the cell.

16   Q        How is it furnished?    Is it furnished

17   differently?

18   A        It has a bunk, has a toilet and has a shower.

19   Q        Is it a padded cell?

20   A        No, sir.

21   Q        Does it have TV?

22   A        No, sir.

23   Q        Do the other cells have TVs?

24   A        Yes.

25   Q        Is that true of all other cells?

1    A        No, sir.

2    Q        Do they have the ability of TV in all other

3    cells?

4    A        No, sir.

5    Q        What determines whether you get a cell with TV

6    or not?

7    A        Well, if there is space and the -- like I say,

8    multiple occupancy cells, that's where the TVs are.

9    Q        Do prisoners have to pay for the privilege to

10   have a television?

11   A        No.  He did not.

12   Q        Do they pay a cable fee of some sort?

13   A        No.  He doesn't.

14           Let me back up; on the initial

15   installation the inmate may pay "X" amount, I can't even

16   tell you what the installation was, it may have been $18,

17   it may have been $22, I don't know.  That money was taken

18   up and they paid the initial hookup fee.

19   Q        Well, is that something happened several years

20   ago or does it happen every time you get a new prisoner?

21   A        Every time we get a new prisoner?

22   Q        Yes.

23   A        No.  That was a one time deal.

24   Q        If you put me into a cell that had a TV and I

25   was there by myself would I have to pay the $22 to turn

1  it on if someone else had not before me?

2  A        No.   It's not broken down like that.   It's

3  turned on in every cell.

4  Q        Okay.   Is cell 145 which you have named "the

5  suicide cell" are prisoners also placed in there for

6  punishment?

7  A        No.   They are not.

8  Q        Or for discipline?

9  A        No.   They are not.

10  Q        You never discipline anybody by putting them

11  off by themself?

12  A        No.   Not in that cell.

13  Q        Where would you put them for discipline?

14  A        In a separation cell.

15  Q        What separation cell?

16  A        It's a single cell.

17  Q        And the suicide cell is a single cell?

18  A        Yes, sir.

19  Q        How does a separation cell differ from the

20  suicide cell?

21  A        On a separation cell it's located in the back

22  portion of the jail and it has no windows for the --

23  where the jailer can see into.

24  Q        Would the difference in them be the fact that

25  the one you call "suicide cell" is where the dispatcher

1    can watch them at all times?

2    A        That's correct.

3    Q        What numbers are your separation cells?

4    A        I don't know and I don't have my cell

5    assignments with me -- well, wait a minute, it would be

6    "165, 164, 163 and 162."

7    Q        What is cell 160?

8    A        It's a multiple occupancy cell.

9    Q        If I saw notes referring to "GP", would that

10   be "General Population?"

11   A        More than likely.  Yes.

12   Q        And would that refer to a multiple occupancy

13   cell?

14   A        Occupancy cell.

15   Q        What is cell 170?

16   A        Oh, cell 170 -- let me look, it's going to be

17   a possibility that cell number 170 and two of our big

18   rooms, there are six inmates in one room, I, like I say,

19   it's a large room then there's six individual cells, six

20   individual small dorms inside of the one big cell.

21   Q        Let me see if I understand what you are telling

22   me, 170 describes a common area for six individual cells?

23   A        Pretty well.  Yes.

24   Q        What we will call "walk around?"

25   A        No.  It's -- we have our cells laid out, like

1    I say, it's just a large room like this, there would be

2    six small cells within the one large room.

3    Q        Okay.  Now, if I am in a cell off 170 -- first

4    in 170 itself are there places to sleep or are the places

5    to sleep in the cells surrounding?

6    A        Okay.  Inside, like I say, inside of 170 a

7    person has their bunk and that's their living area,

8    that's their house, their door leading into that they can

9    go in and out of.

10   Q        Oh.  If I was in cell 170 and dorm 168 would

11   that mean that I was locked up in 168 adjacent to 170?

12   A        No, sir.

13   Q        What would that mean?

14   A        If you were in cell number -- according to this

15   168 would run -- I'll tell you what, if you want I can

16   have one of the jailers, one of the officers to bring you

17   a blueprint of the jail over here and they can show you

18   what I'm talking about.

19   Q        I'm referring to on your summary that your

20   people made July 4th to July 28th, cell number 170 and

21   dorm 168?

22   A        On the Cell Assignments?

23   Q        Yes.  It's -- that's the first sheet, it's a

24   summary is the one we are looking at.  (Indicating)

25   A        Okay.

Q        I'm trying to understand from July 4th to July 28th where Mr. Wardlow was confined and what that means.

A        According to this it is 168, dorm 168 and then the various individual cells and they also have numbers so he would have been in number 170.

Q        Okay.  Would that have meant that he was confined to and locked in 170?

A        That would mean that he was assigned to cell number 170 in dorm 168.

Q        Well, is 168 the area that you described as a "common area?"

A        Yes, sir.

Q        Would he have had -- would the door between 168 and 170 have been locked at this time when he was in that cell or would he have had the privilege of roaming back and forth?

A        He would have the privilege of moving back and forth.

Q        At anytime of night or day do you lock them in their cells?

A        Yes, sir.  I believe like lock-down is what time, at 11:00 o'clock and then 1:00 o'clock on the weekends.

Q        You mean at night?

A        Yes, sir.

1              MR. OLD:   Sheriff, can you

2    remove that page from your notebook?

3              Mark that.

4

5              (Defendant's Pre-Trial Exhibit Number

6    2 was marked for identification.)

7

8              MR. TOWNSEND:   No objection,

9    Your Honor.

10             THE   COURT:      Defendant's

11   Exhibit 2 was admitted.

12

13             (Defendant's Pre-Trial Exhibit Number

14   2 was received in evidence.)

15

16             MR.   OLD:    (Handed  to  the

17   witness.)

18             Sheriff, going to January 1st, 1994 from

19   January the 1st to January the 31st Mr. Wardlow was in

20   cell 160 which is a multiple occupancy cell, is that

21   correct?

22             THE WITNESS:   Yes, sir.

23   Q         (BY MR. OLD)   And that meant that he had a

24   large area to be in and he was confined with people,

25   other people?

1     A         That's correct.

2     Q         Then it says from February 1st to February the

3     20th he remained in cell 160 with the general population?

4     A         Correct.

5     Q         February the 21st to February the 22nd he was

6     moved to cell 145?

7     A         Correct.

8     Q         That's the suicide cell?

9     A         Yes, sir.

10    Q         On the 23rd and 24th he went back to cell 160

11    which was a general population?

12    A         Yes, sir.

13    Q         On February 25th he was moved back to the

14    suicide cell?

15    A         Yes.

16    Q         And remained in it from February 25th until

17    February 28th?

18    A         Correct.

19    Q         Would you have any records that indicate to you

20    what time of day he was removed from that cell?

21    A         No, sir.

22    Q         Such a thing does not exist?

23    A         Well, I won't --

24              MR. TOWNSEND:   Judge, I want

25    to object just on that basis, the records on that exhibit

1    reflect that he was in cell 145 from February 25th to

2    March the 7th.

3                    MR. OLD: Well, that's my next

4    question, I don't understand why.

5                    THE COURT: Is this a document

6    that you are referring to, Mr. Townsend, Defendant's

7    Exhibit 2 or is it a different one?

8                    MR. TOWNSEND:    Yes, Your

9    Honor.

10                   THE COURT:    Or is it a

11   different exhibit?

12                   Well, the evidence will reflect whatever

13   the evidence reflects.  I'm not going to sustain the

14   objection but I certainly will review the evidence but

15   frankly, Mr. Old, what is the materiality of where we are

16   going?

17                   MR. OLD: Your Honor, this is

18   where he was confined at least when the State claims that

19   State's Exhibit 3, which is the -- what they are calling

20   an "Admission" or "Confession."

21                   THE COURT: February 28th?

22                   MR. OLD:  Was offered and I

23   do not understand, the summary shows February 25th to

24   February 28th to cell 145 and turns around and shows

25   March 1st to March 7th in the same cell, I don't

1    understand why a double entry was made.

2               MR. TOWNSEND: I think it does

3    that each month.

4               MR. OLD:  It may do it but I

5    don't understand why.

6               THE COURT:  I believe that's

7    the same kind of notation that occurred in January.

8               MR. TOWNSEND:  I assume -- I

9    said March 1st to March 7th, actually it's March 1st to

10   March 17th, I misread that.

11              THE WITNESS: Well, look back

12   through the letters and notes that Billy wrote, I'm

13   trying to find the documentation on whenever he was

14   requesting to be moved back -- to be moved back and

15   forth.

16              MR. TOWNSEND: Your Honor, is

17   this in response to a question?

18              THE COURT:  I can't answer

19   that, Mr. Townsend, I'm not sure where we are right now.

20              MR. TOWNSEND:  I guess I would

21   like to object.

22              THE COURT:  Sustained.

23              MR. OLD: Sheriff, my question

24   is; do you have any record that indicates that he was

25   taken out of that cell February the 28th and what time

1     he would have been taken out?

2                    THE WITNESS:   As far as the

3     time, no, sir.   No.

4     Q          (BY MR. OLD)   Let me go back and look at your

5     summary, the summary then turned around and says from

6     March 1st to March 17th he was kept in cell 145 or what

7     you call "the suicide cell?"

8     A          Yes.

9     Q          Why?  I mean by my question is why have you all

10    disturbed, you know, you could have put -- he was in that

11    cell from February 25th to March 17th, I thought that

12    meant there was a break in the chain?

13    A          No, sir.   It's a break in the months.

14    Q          So on February the 28th he was in the suicide

15    cell?

16    A          Yes, sir.

17    Q          He was isolated from the population of the

18    jail?

19    A          He was separated.   Yes.

20                    THE COURT:   Excuse me just a

21    minute, Mr. Old, are you saying -- Sheriff, are you

22    saying your notation even if a person is not moved from

23    a cell at the end of the month you will show that on

24    February 28th he's in cell so and so and then start a new

25    notation on March 1st?

1                    THE WITNESS:  Yes, sir.

2                    THE  COURT:    Because  of  the

3    break in the month?

4                    THE WITNESS:  Correct.

5                    THE    COURT:        That's    no

6    indication that he might have been moved from the 28th

7    to the 1st to any other location?

8                    THE WITNESS:  That's correct.

9                    THE COURT:   And you do that

10   for each prisoner for each month?

11                   THE WITNESS:   Yes, sir.   We

12   have a break-down, like I say, this is summarized.   We

13   have jail assignments that we can go back and look at

14   continuously.

15                   THE COURT:  But all prisoners

16   on the jail assignments will show an ending date on the

17   end of the month and a beginning date on the first of the

18   next month even though there may not be a change in their

19   physical location?

20                   THE WITNESS:  Yes, sir.

21                   THE COURT:   Thank you, sir.

22         You may continue.

23                   MR. OLD:  On February 28th he

24   was isolated from the rest of the population of the jail

25   by being in the suicide cell?

1                              THE WITNESS:  Yes, sir.

2       Q          (BY MR. OLD)  And I presume the lock on the

3  suicide cell is kept locked at all times?

4       A          Correct.

5       Q          And he was placed to where your jailer or other

6  security people could observe him easily?

7       A          Yes.

8       Q          Sheriff, I believe you testified yesterday to

9  a conversation that we have questioned you about, that

10  you changed his cell immediately after that meeting?

11                             MR. TOWNSEND:  Your Honor, I

12  want to object to that.  I don't remember any such

13  testimony.

14                             THE COURT:  I'm not going to

15  sustain the objection but I'm going to instruct Counsel

16  to be more specific on which meeting he's referring to.

17                             MR. OLD:  The meeting I'm

18  referring to, Mr. Blackburn, is where you had the

19  conversation with him, you all talked about religion, you

20  talked about his problems, his depression, not being able

21  to sleep at night, nightmares and you gave him the advice

22  to write everything down?

23                             THE WITNESS:  No.

24       Q          (BY MR. OLD)  Okay.  Did you move him from one

25  cell to another immediately after or shortly after that

1    meeting?

2    A         I don't know if it was before or after the

3    meeting.

4    Q         You don't?

5    A         No, sir.  I sure don't.

6    Q         Is cell 145 would be -- or what some prisoners

7    refer to as the "violent cell?"

8    A         Yes, sir.

9    Q         In the letter of 2/24/94, State's Exhibit 2,

10   Mr. Wardlow asked not to be put in that cell, is that

11   correct?

12   A         I believe that is what it said.  Yes.

13   Q         And on February 25th he was moved to that cell,

14   is that correct, in your summary?  (Indicating)

15   A         February 25th.  Yes, sir.  February 28th, cell

16   145.  Yes.

17   Q         Actually February 25th to March 17th he stayed

18   in the suicide cell?

19   A         Correct.  yes, sir.

20   Q         Sheriff, "6" is your letter of August 17th,

21   1994.

22

23             (Off the record discussion.)

24

25             MR.  OLD:    Sheriff,  after

1    having reviewed your records, your jail records and

2    everything that you brought in your notebook I find no

3    reference to anything concerning "baptism."

4                    THE WITNESS:  We talked about

5    it yesterday.

6    Q          (BY MR. OLD)  I know we did.  My question is,

7    I find nothing in your record showing anything about it.

8    A          No.  There isn't.

9    Q          And you left the jail with a prisoner?

10   A          Yes, sir.

11   Q          And you didn't log it?

12   A          No.  I didn't.

13   Q          And you can't tell us -- I believe you

14   testified in the last two or three months you took him

15   to be baptized?

16   A          No.  It was back --

17   Q          Do you have any idea when?

18   A          Oh, I think it was -- it has been several

19   months ago.  I may can go back and talk with Mr. Tony

20   Carr and he's a preacher that comes up to our jail and

21   Mr. Bob Proctor, I don't remember if Mr. Proctor or if

22   Tony baptized Billy that day.

23   Q          All right.

24   A          I just don't remember.

25   Q          I asked you in the last two or three months and

1  you said "In the last several months", maybe I better ask

2  you to define "several" for me, what do you mean by

3  "several?"

4     A      Oh, maybe early part of the spring, you know.

5     Q      And again when does -- what month do you

6  characterize "the early part of spring?"

7     A      "March."

8     Q      In your second paragraph of your last sentence

9  you remind Mr. Wardlow by saying, "Remember when you

10 needed someone to talk to and each time I would always

11 take time to talk to you?"

12    A      Yes.

13    Q      Now, yesterday you told me that there's a lot

14 of occasions you had times you had a "Hello, how are you,

15 it's a nice day" type conversation?

16    A      Yes, sir.

17    Q      That's not what you are referring to in that

18 letter?

19    A      Yes.  Referring to all of them.

20    Q      Okay.  The only time that you have identified

21 for me and you cannot do it by date is the conversations

22 which concerned and to where you at least suggested to

23 him to write everything down, what other conversations

24 are you referring to other than that one conversation?

25    A      Oh, let me see, like I said, not -- if I am

1    there whenever they are coming back in from recreation

2    when they had gone out sometimes I talked to a lot of the

3    inmates there if I happened to be coming by the

4    visitation booth whenever he was coming out, "How is

5    everything going, how is your mom and dad, what is

6    happening?"

7                    He had gone and got a tooth pulled or

8    filled or something, I may have saw him then for just a

9    few moments.

10   Q        Sheriff, in that answer are you guessing more

11   than telling me actually what happened?

12   A        Yes, sir.

13   Q        And you close that letter by quoting from the

14   scripture of St. Luke, Chapter 6, Verse 27?

15   A        Yes, sir.

16   Q        And quoted practically the rest of Chapter 6,

17   didn't you?

18   A        Quite a bit of it.  Yes, sir.

19                    MR. OLD:  Your Honor, at this

20   time we pass the witness.

21                    THE COURT:  Mr. Townsend?

22                    MR. TOWNSEND:  Your Honor, at

23   this time I know Sheriff Blackburn is somewhat

24   uncomfortable in that chair, we have been at it for about

25   an hour.

1    THE COURT:   Do you want to
2  take a break?
3          Ten minutes.
4
5          (Recess.)
6
7    THE COURT:   All right.   If
8  everyone is back let's go ahead and get back on the
9  record.
10          Mr. Old, you just mentioned off the
11  record that you had some more questions for the Sheriff,
12  you may proceed.
13          MR. OLD:   Yesterday my client
14  informed me that per the rules in Titus County Jail they
15  are only allowed two showers a week and he was concerned
16  about coming to this courtroom dirty.
17          I talked to the Bailiff, the Bailiff has
18  talked to the Sheriff's Department and they have assured
19  me if he will request a shower early on the morning that
20  he's coming to Court that they will see that he gets one.
21          THE COURT:   Okay.
22          MR. OLD:   There's no complaint
23  about the policy and I'm sure it's -- my man needs to be
24  fresh and clean to come to Court.
25          THE COURT:   You just wanted

1    to bring it to my attention and I agree that he should

2    be given access to shower every morning.

3                              And, Mr. Wardlow, if you are not just

4    let the lawyer know and he will inform me and I will take

5    care of it.

6                              MR. OLD: You have got to tell

7    them every morning and remind them.

8                              THE DEFENDANT: Okay.

9                              THE COURT: Is that it, Mr.

10   Old?

11                             MR. OLD: That's it, Your

12   Honor.

13                             MR. TOWNSEND: Go off the

14   record a moment, Your Honor?

15                             THE COURT: Sure.

16

17                   (Off the record discussion.)

18

19                             THE COURT: Let's get it on

20   the record.

21                             Let the record reflect that Mr. Townsend

22   has shown the Court and the Defense Attorney the original

23   of State's -- is that "3?"

24                             MR. TOWNSEND: "3", I believe.

25                             THE COURT: Of State's Exhibit

1   3 which is the letter dated February 28th, 1994, it is

2   in red ink.

3                    Mr. Old, you did review that letter,

4   that original, is that correct?

5                    MR. OLD:   Your Honor, my

6   concern was the date and I had misread it as the "23rd"

7   and it does appear to be dated "the 28th."

8                    THE COURT:   I don't see any

9   reason for the original to go into evidence at this time

10  since that matter has been cleared up.

11                   MR. TOWNSEND:  May I proceed,

12  Your Honor?

13                   THE COURT:   You may.

14                   MR. TOWNSEND:   Approach the

15  witness?

16                   THE COURT:   You may.

17

18                 REDIRECT EXAMINATION

19                 BY MR. TOWNSEND

20

21  Q          Sheriff, would you refer to your notebook again

22  and there is a letter under the -- I should say under

23  "security tightened", section and it's not really a

24  letter, it's sort of a note from Chief Jailer Patsy

25  Martin, it's dated at the top, January 26th of '94, 7:49

1    p.m.   (Indicating)

2    A         Which one did you say it would have been?

3    Q         It's this one that --   (Indicating)

4                        MR. OLD:  They put my tabs in

5    wrong.

6                        THE WITNESS:   I think they

7    have mine, too.

8                        MR. TOWNSEND: Under mine it's

9    on top of where it says, "Security Tightened" but

10   underneath where it says "Incident", maybe that's where

11   it should be up in the "Incident" section, I'm sorry.

12                       MR. OLD:   Give me just a

13   minute to catch up with it.

14                       THE WITNESS:   "Incident",

15   okay.  Okay.  I am on --

16                       MR. TOWNSEND:  Are you with

17   us?

18                       THE WITNESS:  Yes, sir.  I

19   believe so.

20                       MR. OLD:  I am not.

21

22              (Off the record discussion.)

23

24                       THE WITNESS:  "1/26?"

25                       MR. TOWNSEND:  What is that

1    letter?

2                    THE WITNESS:   Okay.   This is

3    a inner office memo report from Chief Jailer Patsy Martin

4    so --

5                    MR. OLD:   Your Honor, we are

6    going to object to the witness testifying as to the facts

7    in there because it's obviously hearsay to him and it,

8    at least part of it I believe to be hearsay as to the

9    last part of it, it's not only hearsay as to the witness,

10   part of it appears to me to be hearsay to the author,

11   it's "hearsay on hearsay."

12                   THE   COURT:    Response,   Mr.

13   Townsend?

14                   MR. TOWNSEND:   Your Honor, I

15   don't think any of the questions I ask will elicit a

16   hearsay response.

17                   THE COURT:   I haven't really

18   heard a question that elicited a hearsay response.   I

19   think right now you have only been directed to the

20   letter, I will carry the objection until a question has

21   been asked about the letter itself.

22                   MR. TOWNSEND:  Sheriff, after

23   reviewing that does that refresh your memory some as far

24   as the -- what has been marked as State's Exhibit, I

25   believe it was "1" which is the letter dated January

1    25th.

2

3                    (Handed to the witness.)

4

5                    MR. TOWNSEND:  Does that help

6    you in determining a time frame when you may have or what

7    you talked to Billy Wardlow in regard to the discussion

8    we have discussed here where you suggested that you liked

9    to write things down?

10                   THE WITNESS:  As far as the

11   last sentence, part of the last sentence and saying, "Do

12   what is necessary to receive this hearing", to me would

13   relate somewhat to the contents of this notation and

14   Chief Jailer Patsy Martin had it written down.

15   Q         (BY  MR.  TOWNSEND)    Do  you  believe  after

16   receiving the letter -- after receiving the letter that

17   has been marked as "State's Exhibit 1" and dated January

18   25th and after reviewing the document that is marked, on

19   January the 26th there that you would have "made time"

20   so to speak to visit with Billy Wardlow?

21                   MR. OLD:  Your Honor, it calls

22   for him to speculate, the question calls for him to

23   speculate on what he would have done, "would have made

24   time."

25                   THE COURT:  Sustained.

1          MR. TOWNSEND:  Does it refresh

2    your memory as far as at least in an approximate time

3    location as to when you would have visited with Billy

4    Wardlow?

5          THE WITNESS:  I honestly don't

6    know the date that I visited with Billy Wardlow, I

7    honestly can't say.

8    Q         (BY MR. TOWNSEND)  Do you believe based on your

9    normal procedure with inmates that after those sort of

10   notations and letters that you would have visited with

11   him?

12         MR. OLD:  Your Honor, I object

13   to the question, it calls for him to speculate as to what

14   he normally would have done and the issue is what he did.

15         MR. TOWNSEND:  Your Honor, I

16   believe the witness has demonstrated clearly that he does

17   not know exactly when he visited with him.  I'm simply

18   trying to ascertain what would be his normal habit in a

19   situation of that nature since he doesn't know.

20         THE COURT:  I will let you

21   rephrase and ask him what his normal habit would have

22   been.

23         But again, I don't think that

24   necessarily is going to clear up the date of the

25   conversation but you may ask that question.

1          MR. TOWNSEND:  In a situation

2  in your jail where you are having a prisoner who was

3  having problems similar to those we discussed what would

4  be your normal habit, your normal practice?

5          Would it be to visit with him in a

6  fairly prompt fashion or delay that quite some time?

7          THE WITNESS:   I would have

8  tried to visit with him as soon as possible.  It may have

9  been, it could have been three days, it may have been a

10  week or more later.

11  Q       (BY MR. TOWNSEND)  Even though you don't know

12  when the visit took place you don't believe it would have

13  been more than a week?

14          MR.  OLD:   Your Honor,  I'm

15  going to object.  He can't answer a question when he says

16  he truly does not know when it took place.

17          THE COURT:  Sustained.

18          MR. OLD:  He's asking him to

19  guess an answer.

20          THE COURT:  Sustained.

21          MR. TOWNSEND:   Going back to

22  -- let me ask you this before I forget; there is, based

23  on the Wardlow Jail Cell Assignments it's obvious that

24  he has been moved a few times, do you recall from your

25  own memory why he was moved on these occasions or not?

1    THE WITNESS:  The majority of

2  the time it was upon his request.  On one particular

3  instance he was -- just a second -- on one particular

4  instance on May the 15th of 19 --

5  Q          (BY MR. TOWNSEND)  Would that be this year?

6  A          Excuse me.

7               On May 15th of 1994 I have an Incident

8  Report on -- on Mr. Wardlow so far as him having a razor

9  there at his bunk, some of the other inmates had called

10  in.

11               If you wish, it's going to be -- excuse

12  me a second -- it's going to be under the "Incident",

13  Billy -- and this will start out "Incident Report on

14  Billy Wardlow", on May 15th at approximately 1:15 a.m.

15  Q          Was, Sheriff Blackburn, let me ask you, getting

16  back to the point; was he moved for that reason?

17               I believe based on the Cell Assignments

18  it appears that he was not moved?

19  A          Okay.  He -- that would have been one of the

20  reasons that he could have been moved.  I say the

21  majority of the reasons that he was moved was upon his

22  request, which those are mentioned throughout there.

23  (Indicating)

24  Q          Okay.  It appears -- are you looking at the

25  sheet that is marked "Cell Assignments?"  (Indicating)

1   A        Yes, sir.

2   Q        It appears that he was moved on February 21st,

3   do you know why he was moved on that occasion?

4   A        Well, we can find some documents in all those

5   that was admitted yesterday.

6   Q        Well, I'm just asking you from your

7   recollection.

8   A        From my recollection.  No.

9   Q        Would your recollection also be the same on

10  these other movements, you wouldn't remember?

11  A        No, sir.  I wouldn't.

12  Q        But usually it was because of a request from

13  him?

14  A        The majority of the time.  Yes, sir.

15  Q        Going back to this conversation you had with

16  Mr. Wardlow where you suggested that you wrote out your

17  problems, did at anytime during that conversation did he

18  tell you he was going to write you a letter or send you

19  a statement or anything of that nature?

20  A        No, sir.

21  Q        So that -- that was not something you expected?

22  A        I expected nothing.

23           MR. OLD:  Your Honor, we are

24  going to object to the line of questioning, it calls on

25  him to -- what he expected is not relevant, it's what he

1    got.

2                    THE   COURT:    I   think   his

3    intention might be relevant.   Overruled.

4                    MR.   TOWNSEND:        Sheriff

5    Blackburn, I believe yesterday you described that meeting

6    as being somewhere between 30 minutes and an hour and 15

7    minutes?

8                    THE   WITNESS:    Thereabouts.

9    Yes, sir.

10                   I don't think it would have extended

11   past that.

12   Q        (BY MR. TOWNSEND)   During that period of time

13   however long it may have been was religion and Billy's,

14   for lack of a better term, "depression or emotional

15   disturbances", were those the topic of that entire

16   discussion or would you all just talk about other

17   subjects?

18   A        Just in general round house discussion.

19                   Billy was needing someone to talk to,

20   sent a note out earlier requesting to speak to me and I

21   simply spoke to him.

22                   There was no intent on doing anything

23   other than talking to Billy.

24   Q        Okay.

25   A        And, yes, we covered -- I can't name you

1    specific areas that we talked about, go down the line,

2    but it was -- it was an all around general type of

3    discussion.

4    Q        So there was only a portion of the time where

5    religion or Billy's mental state was discussed?

6    A        That's correct.   Yes, sir.

7    Q        Would that have been a large portion, small

8    portion?  Do you recall?

9    A        No, sir.   It was just throwed in with

10   everything else, you know. As far as giving a break-down

11   on the time we spent from one thing to just having one

12   or general discussion, one thing led into another thing

13   and another thing to something else.

14               As far as making it something specific

15   that we talked about, you know, Billy did just as much

16   talking as I did.

17   Q        Okay.   During this meeting I believe you

18   testified that you told him to write out his problems.

19               Did you tell him to write out the

20   evidence surrounding the murder of Carl Cole?

21   A        I did not tell Billy to write out the evidence

22   surrounding the death of Mr. Cole.

23               Now, Billy was saying that he was having

24   nightmares about what had happened, he was having trouble

25   sleeping and I explained to Billy whenever I had problems

1    if I could put it down in black and white and look at it

2    and read it -- it was obvious that, you know, say Billy

3    was having problems in dealing with what had happened,

4    as far as ever indicating to him or to anyone else to

5    write down something specifically, there was no mention

6    of that.

7                 I did tell Billy that if he wrote down

8    anything he did not want anyone else to see to simply

9    tear it up and destroy it and flush it.

10   Q         Okay.  I believe you told him to -- I believe

11   at some point yesterday you told him to get right with

12   God.

13                What do you mean by "Get right with

14   God?"

15                Did you mean through prayer?

16   A         Through living.

17   Q         Did you ever suggest to him that that getting

18   right with God meant confessing?

19   A         No.

20   Q         So all you talked about was his relationship

21   between himself and his God?

22   A         Yes, sir.  That's what I was referring to.

23   Q         Officer Blackburn, were you concerned that just

24   simply talking with Billy about jail matters or about his

25   emotions or anything of that nature, did you feel like

1   you were violating any --

2                    MR.  OLD:    Your  Honor,  we

3   object to this line of questioning.  We don't feel that

4   it is relevant and we would cite the Court "Rhode Island

5   versus McGinnis", a United States Supreme Court case and

6   it talks about the function or equivalent of the present

7   questioning and the functional equivalent means words or

8   actions on the part of the police that the police should

9   know are reasonably likely to elicit an incriminating

10  response, the latter portion of this definition focuses

11  primarily on the perception of the suspect rather than

12  the intent of the police.

13                    I mean it's --

14                    MR.  TOWNSEND:    Your  Honor,

15  there are cases that discuss whether -- there is a "Maine

16  versus Moulton" being one that discusses specifically

17  situations like this and it talks about whether it's the

18  officer was involved in a knowing exploitation, it has

19  to do with the intent of the officers.

20                    THE  COURT:    I'm  going  to

21  overrule the objection.

22                    Frankly after testimony I expect both

23  sides to give me some law to review and, if Mr. Old, what

24  you told me is correct I assume it is, then I will look

25  at whatever testimony I believe is relevant to make my

1    decision.

2              So your objection is overruled.

3              You may answer the question.

4              And Mr. Townsend, if you wish to repeat

5    the question you may do so.

6              Sheriff, do you recall the question?

7                   THE WITNESS:  Pretty well.

8              What I would like to say is this; Billy

9    had sent out a request to speak to me and I spoke to

10   Billy.  Billy didn't say in his letter "I want to give

11   you a statement" nor at anytime did I tell Billy "I want

12   you to write me down a statement" nor at anytime did I

13   indicate to Billy to write me a letter of any kind about

14   anything.

15             I simply did it as one human being

16   helping another human being.

17             Now, people can say what they want to

18   say and think what they want to think.  My sole intent

19   was to simply talk to Billy about whatever he wanted to

20   talk about and I believe that Billy will tell you the

21   same thing.

22                   MR.  TOWNSEND:    No  further

23   questions, Your Honor.

24             Pass the witness.

25                   THE COURT:  Mr. Old?

## RECROSS EXAMINATION

### BY MR. OLD

Q        Back to your statement that you just made; Billy sent you a request to talk to you about his case, that's State's Exhibit 1, we have been over it several times and it says --

A        Yes, sir.

Q        -- "I would like to talk to Sheriff Blackburn about my case?"

A        Correct.

Q        Whenever this conversation took place from the time you got that request and you went to talk to him you talked to both the District Attorney and to the District Judge of the 276th Judicial District Court, William Porter?

A        That's correct.

Q        You said you didn't ask him for a confession?

A        No, sir.

Q        But getting in what Mr. Townsend characterized as "him getting right with God", you did tell him that forgiveness of sins was based upon confession of those sins, did you not?

A        Repeat that question, please.

Q        You told him words to the effect that the

1   forgiveness of sin was based upon the confession of those

2   sins, God won't forgive you until you asked for

3   forgiveness?

4   A          I don't know if I said it --

5   Q          Words to that effect?

6   A          Probably so.  Yes, sir.

7   Q          And I believe what you testified to yesterday

8   was that you told him to write down everything from the

9   time he had left Fort Worth until present?

10                         MR. TOWNSEND:   Object, Your

11  Honor.  I don't believe that was his testimony at all.

12                         THE COURT:  Sustained.

13                         You may ask him but I don't recall that

14  specific testimony, either.

15                         MR. OLD:  Was that what you

16  told him?

17                         THE WITNESS:      Yes,   sir.

18  That's correct.

19  Q          (BY MR. OLD)  You told him to write down

20  everything from the time he left Fort Worth?

21  A          Yes, sir.  I -- I would almost bet on that part

22  of it.

23  Q          You would agree with me whether you testified

24  to that or not that is correct, that is what you told

25  him?

1   A          I agree with that.  Yes, sir.

2   Q          And leaving Fort Worth was a time prior to the

3   death of Mr. Cole?

4   A          Yes, sir.

5   Q          In this conversation I think Mr. Townsend

6   characterized part of it as a "round house conversation",

7   you all talked about a bunch of things.

8              Did you all talk about lawyers?

9   A          "Talk about lawyers?"

10  Q          Yes.  I'm not talking about any particular

11  lawyer, did you all talk about lawyers?

12  A          Since they are not one of my favorite subjects,

13  no offense to you fellows -- I don't know that we talked

14  -- that we would talk about attorneys or not.

15  Q          Has Billy explained to you about the lack of

16  communication of the lawyer that was appointed at that

17  time, Mr. Solomon?

18  A          That's what I was looking for.  In December of

19  '93 I had gotten several notes from Billy expressing --

20  and that is going to be under --

21  Q          Let me just ask you --

22  A          -- requests Billy -- where he was expressing

23  disregard with his attorney, of his attorney Mr. Solomon.

24  Q          "Dissatisfaction with Mr. Solomon?"

25  A          Yes, sir.

1   Q        Did you all discuss that at this meeting and

2   if not Mr. Solomon perhaps lawyers in general?

3   A        I honestly don't --

4   Q        You don't know?

5   A        -- I honestly don't remember bringing up --

6   bringing up "attorneys", it's a possibility but I

7   honestly don't.

8   Q        If I may summarize what I think you told me,

9   and correct me if I am wrong; what you are saying is you

10  do not specifically recall lawyers specifically or

11  generally being discussed but you will not raise your

12  right hand and swear that you all did not discuss

13  lawyers?

14  A        Or that we did.  No.

15                  MR. OLD:   Your Honor, we'll

16  pass the witness.

17                  THE COURT:  Mr. Townsend?

18                  MR. TOWNSEND:   No further

19  questions, Your Honor.

20                  THE COURT:  Sheriff, you may

21  step down.

22                  The State may call their next witness.

23                  MR. TOWNSEND:    The State

24  rests, Your Honor.

25

1                              (State rested its case on the Motion.)

2

3                                        MR. OLD:  Your Honor, can we

4       have about five or 10 minutes to talk to our client?

5                                        THE COURT:  You may.

6                                        MR.  OLD:     And   determine

7       whether to go forward at this time?

8                                        THE COURT:  You may.

9

10                             (Recess.)

11

12                                        THE COURT:  Let's get back on

13      the record.

14                                        The State has rested, is the Defense

15      ready to proceed?

16                                        MR. HINSON:  Yes, Your Honor.

17                             We would call Billy Joe Wardlow at this

18      time.

19                                        THE COURT:  Again, I want the

20      record to again reflect that I did grant the Defense

21      motion to limit cross examination in that the hearing

22      will be limited to the evidence covered by the Motion to

23      Suppress the Alleged Confession(s).

24                             Mr. Hinson, you may proceed.

25

1       BILLY JOE WARDLOW,

2   the Defendant, was called as a witness and, having been

3   first duly sworn by the Court, testified as follows:

4

5       DIRECT EXAMINATION

6       BY MR. HINSON

7

8   Q       State your name for the record, please.

9   A       Billy Wardlow.

10  Q       What is your full name?

11  A       "Billy Joe Wardlow."

12  Q       Mr. Wardlow, how long have you been

13  incarcerated in jail for the offense for which you are

14  charged at this time?

15  A       Since June of 1993.

16  Q       And you recently were transferred to the Titus

17  County Texas Jail facility?

18  A       In September.  Yes, sir.

19  Q       Starting back in June of 1993 can you describe

20  to the Court your sleeping schedule?

21  A       Pretty erratic, not very much sleep, maybe --

22  maybe an hour or two a day, sometimes I wouldn't sleep

23  for days on end, sometimes I would sleep for two or three

24  days.

25  Q       That was beginning in June of '93 up through

1    February of '94 and then through today has that schedule

2    changed and how has it changed?

3    A        It straightened out since the beginning of this

4    year.  I have worked through some of the problems that

5    I have been going through and I have been able to sleep

6    pretty regularly through this year.

7    Q        At the time you had a conversation with Mr.

8    Blackburn somewhere in January or February of '94 you

9    discussed with him the nightmares and sleeping -- erratic

10   sleeping patterns that you had?

11   A        Yes, sir.

12   Q        So at the time you had a conversation -- well,

13   you requested a conversation with Mr. Blackburn

14   approximately January the 25th of '94?

15   A        Yes, sir.

16   Q        And then after that date you had discussed your

17   sleeping patterns and nightmares with Mr. Blackburn?

18   A        Yes, sir.

19   Q        And you would have discussed that more fully

20   with him at the time that you had a visit with him at the

21   Chief Jailer's Office there in the Morris County Jail?

22   A        Yes, sir.

23   Q        Can you describe to the Court what you may have

24   told Mr. Blackburn regarding your sleeping habits, what

25   he was aware of?

1    A         I told him I was having problems sleeping,

2    facing the problem, just events that happened and

3    different things.  I was having problems emotionally, I

4    was feeling stressed out, just felt like I was about to

5    be over the edge.

6              I told him, you know, I just needed

7    somebody to help -- to talk to to be able to help me

8    through these problems.

9    Q         How many hours a night were you sleeping an

10   approximate time prior to the time you had a conversation

11   with Mr. Blackburn in the Chief Jailer's Office?

12   A         Off and on I would say every other day maybe

13   two hours a night.

14             THE COURT:  So you are telling

15   me that you would have about two hours of sleep in a 48-

16   hour period?

17             THE WITNESS:  Yes, sir.

18             MR. HINSON:  Can you relate

19   to the Court any other experiences that you may have had

20   with any other inmates regarding your sleeping habits?

21             MR. TOWNSEND:  Your Honor, I

22   object.  I don't see any relevance to this.

23             MR. HINSON: Well, Your Honor,

24   the mental capacity or mental state of the Defendant at

25   the time he was counseled by Mr. Blackburn is what is at

1    issue and Mr. Wardlow can explain the circumstances that

2    he was personally involved in in his sleeping and what

3    he may have been involved in, you know, on a daily basis,

4    what his routine was and it basically reflects his

5    emotional state at this time.

6                    THE COURT:   Overruled.   You

7    may proceed.

8                    THE WITNESS: Just mainly with

9    the inmates telling me, "Oh, you are going to get the

10   death penalty, you are going to do this, you are going

11   to do that", just other inmates picking on me making fun

12   of me and this and that for the situation that I was in.

13                   MR. HINSON: Had you requested

14   any kind of counseling in a written statement or orally?

15                   THE WITNESS:  I had requested

16   several times orally, I got no response.

17                   I requested from my attorney and I got

18   no response so I wrote to the Sheriff to request

19   psychological examination.

20   Q         (BY MR. HINSON)   Now, when you referred to

21   "your attorney" are you referring to Mr. Vernard Solomon?

22   A         Yes, sir.

23   Q         And that was your first Court appointed

24   attorney, correct?

25   A         Yes, sir.

1    Q        And are you stating that you had requested

2    psychological help with your problem?

3    A        Yes, sir.

4    Q        And you had requested that through your

5    attorney?

6    A        Yes, sir.

7    Q        Had anything come of that request?

8    A        No, sir.

9    Q        Had anything come of that request to the --

10   well, who did you make a request to in the Morris County

11   Sheriff's Department?

12   A        Sheriff Blackburn.

13   Q        Did anything come out of that request for

14   counseling?

15   A        He had simply talked to me and told me that I

16   would have to make a request through my attorney.

17   Q        Was it about that time or thereafter or prior

18   to that that you lost confidence in your first appointed

19   attorney?

20   A        Yes, sir.

21   Q        Approximately at that time?

22   A        Approximately -- approximately around that

23   time, maybe a little later.

24   Q        Getting back to your conversation with Mr.

25   Blackburn; it's State's Pre-Trial Exhibit Number 1 where

1   you requested to Patsy that you would like to have a

2   private consultation with Sheriff Blackburn?

3   A          Yes, sir.

4   Q          And specifically concerning your case?

5   A          Yes, sir.

6   Q          And that document is designated that someone

7   received it somewhere around January 25th of '94.

8              Now, after that date did you have a

9   conversation that we have all talked about with Sheriff

10  Blackburn?

11  A          Yes, sir.  Approximately a week later.

12  Q          At the time that you consulted with Mr.

13  Blackburn and you heard his testimony, you discussed

14  religious matters at that time?

15  A          Yes, sir.

16  Q          You discussed repentance at that time?

17  A          Yes, sir.

18  Q          And I believe Mr. Blackburn stated something

19  along the lines of "getting right with God?"

20  A          Yes, sir.

21  Q          "The truth shall set you free?"

22  A          Yes, sir.

23  Q          During that conversation with Mr. Blackburn I

24  believe he testified that he suggested or he stated that

25  you could write a statement from the time that you had

1    left Fort Worth until the present time?

2    A          Yes, sir.

3                He said from the time that I had left

4    Fort Worth until the present time, which was the time we

5    had the conversation, just to write down everything that

6    had happened between that time, go back and proofread it,

7    correct it, rewrite it and just read over it and that

8    would help me solve my own problem or at least it would

9    help him.

10   Q        So as the result of talking with Mr. Blackburn

11   after your request was made to him you wrote a statement

12   to Ricky Blackburn?

13   A          Yes, sir.

14   Q        As the result of talking to Mr. Blackburn at

15   the time that you had requested a hearing and

16   approximately a week thereafter your conversation you had

17   with Mr. Blackburn caused you to write a statement to

18   Ricky Blackburn?

19   A          Yes.

20   Q          Now, at that time that you had this

21   conversation with Mr. Blackburn you had had no

22   psychological counseling?

23   A          None whatsoever.

24   Q          And your own Court appointed attorney had

25   failed to counsel you on several matters?

1    A       Yes.  He had failed to do so.

2    Q       You weren't satisfied with your Court appointed

3    attorney?

4    A       No, sir.  I was not.

5    Q       At the time you had a conversation with Mr.

6    Blackburn were you looking to him for counseling at that

7    time?

8    A       Yes, sir.

9    Q       Did you consider Mr. Blackburn to be a

10   reputable authority figure?

11   A       When I talked to him I considered him just as

12   a friend and not as an authority over the facility I was

13   in or Sheriff of Morris County, I considered him just as

14   a human, someone to look up to, a big brother, someone

15   that I could -- had confidence in that I could trust as

16   a friend.

17   Q       You placed trust in Ricky Blackburn?

18   A       Yes, sir.

19   Q       He provided spiritual guidance for you at the

20   time you had this conversation in the Chief Jailer's

21   Office?

22   A       Yes, sir.  He gave me an example to follow.

23   Q       Did you rely on the suggestions that he made

24   to you?

25   A       I felt that it would help me as well if it

1    helped him.

2    Q        And had Mr. Blackburn -- I believe he testified

3    that he relayed to you his past experiences and how he

4    had relied on looking at the Bible that he carries and

5    how those occurrences of his life had helped him?

6    A        Yes, sir.  He said that he was -- that he would

7    just flip to a page and whatever was there there was

8    usually something generally there that helped him to make

9    it through his problem or dealt with it in some manner,

10   shape, form or fashion.

11                       MR.  HINSON:    Approach  the

12   witness, Your Honor?

13                       THE COURT:   You may.

14                       MR. HINSON:  Mr. Wardlow, I

15   hand you what has been marked "State's Pre-Trial Exhibit

16   Number 3" which is the -- I believe it's dated February

17   28th, 1994, is that correct, the date on it?

18

19                       (Handed to the witness.)

20

21                       THE WITNESS:  Yes, sir.

22                       MR. HINSON:  As the result of

23   your conversation with Mr. Blackburn on or after --

24   approximately a week after January 25th, 1994 you had a

25   conversation with Mr. Blackburn and that conversation you

1    previously stated caused you to write a letter to Ricky

2    Blackburn, correct?

3                              THE WITNESS:    Yes, sir.    It

4    influenced me to write that letter.

5    Q          (BY MR. HINSON)    Is State's Pre-Trial Exhibit

6    Number 3 the letter that you wrote to Ricky Blackburn?

7    (Indicating)

8    A          Yes, sir. 'It is.

9    Q          Now, at the time that you had a conversation

10   with Mr. Blackburn his advice was to you and I believe

11   I'll try to paraphrase it as best I could, told you to

12   write a statement regarding what had happened to you

13   since you left Fort Worth until the present time, the

14   time that you were talking to him?

15   A          Yes, sir.

16   Q          And that time included the events on or about

17   June 19th, '94 or '93 -- "'93", I'm sorry?

18   A          Yes, sir.

19   Q          It would have included any events during that

20   time and he counseled with you and told you that his

21   usual deal was to write these things down?

22   A          Yes, sir.

23   Q          Look at them, reflect on whatever was written

24   in there, correct those and eventually you would find the

25   answer in yourself to the problem that you were having,

1  is that correct?

2  A        Yes, sir.  That's correct.

3  Q        As to State's Pre-Trial Exhibit Number 3 which

4  was written as the result of your conversation with Mr.

5  Blackburn?

6  A        Yes, sir.

7  Q        At his suggestion, caused you to write?

8           Did you eventually write Mr. Blackburn

9  another letter?

10 A        Yes, sir.

11 Q        And in that what I call the "second letter" did

12 you relate more events than what you had in what has been

13 marked as "State's Pre-Trial Exhibit Number 3?"

14 A        Yes, sir.  It was a correction to the first

15 letter.

16 Q        So in addition or from the time you talked to

17 Mr. Blackburn somewhere around January or February of '93

18 or "'94", I'm sorry, it was suggested or counseled to you

19 that you write a letter or write a statement, go back and

20 reflect on that letter, reread that letter, make

21 corrections.

22           As the result of that counseling from

23 Mr. Blackburn you wrote a second letter?

24 A        Yes, sir.

25           MR.  HINSON:    Approach   the

1    witness, Your Honor?

2                          THE COURT:   You may.

3                          MR. HINSON:   Mr. Wardlow, I

4    hand you what has been marked "State's Pre-Trial Exhibit

5    Number 5", have you seen that document before?

6                          THE WITNESS:   Yes, sir.

7    Q          (BY MR. HINSON)   Now, as the result of your

8    conversation with Mr. Blackburn in approximately February

9    of '94 you eventually wrote the first document, the Pre-

10   Trial Exhibit Number 3 and as a result of your continued

11   reflection did you write State's Pre-Trial Number 5?

12   A          Yes, sir.

13   Q          And there are various references in there that

14   go back to what you had discussed with Mr. Blackburn back

15   in February, could you read those from State's Pre-Trial

16   Exhibit Number 5?

17                          I believe that they are highlighted.

18   (Indicating)

19   A          The highlighted references?   (Indicating)

20   Q          Yes.

21   A          It says, "Now God has shown me that the truth

22   shall set me free" and the second one says, "But -- where

23   you have started -- says, "kill me, but can't touch my

24   soul which Jesus has cleansed, making it ready for his

25   glory and presence."

1    Q          Now, the second part there, would you

2    characterize that as "repentance?"

3    A          Yes, sir.

4    Q          That you had repented, you had sought

5    forgiveness and now Jesus had forgiven you?

6    A          I looked at it as upon repentance through that.

7    Yes, sir.

8    Q          Are both of those statements contained in that

9    letter, both of those statements were discussed with Mr.

10   Blackburn in approximately February of '94?

11   A          Yes, sir.  They were.

12                              MR. HINSON:    Approach the

13   witness, Your Honor?

14                              THE COURT:  You may.

15                              MR. HINSON:    Could I have

16   those copies back?

17

18                    (Handed to Mr. Hinson.)

19

20                              MR. HINSON: Pass the witness,

21   Your Honor.

22                              THE COURT:  Mr. Townsend?

23

24

25

CROSS EXAMINATION

BY MR. TOWNSEND


Q        Mr. Wardlow, when you were arrested in South Dakota did the officer read you what we call the "Miranda Rights?"

A        No, sir.

Q        That officer did not do that?

A        Not immediately.

Q        Did he do that at some time in South Dakota?

THE COURT:    Mr. Townsend, would you clarify whether you are talking about a Texas officer or South Dakota officer?

MR. TOWNSEND:    Sorry, Your Honor.

Did a South Dakota officer at anytime read you what I'm calling your "Miranda Rights?"

THE WITNESS:    Immediately following incarceration in the jail there in Madison.

Q        (BY MR. TOWNSEND)  And that would be that you have the right to an attorney, you have the right to remain silent, that you did -- if you could not afford an attorney one would be appointed for you and so on and so forth?

A        Yes, sir.

1    Q        And then when Mr. Blackburn got to South Dakota

2    did he read you the Miranda Rights again?

3    A        Yes, sir.

4    Q        Did you -- I believe when Mr. Blackburn talked

5    to you that you invoked your right at that time and chose

6    not to speak with him, is that correct?

7    A        Yes, sir.  I pled the Fifth, I requested an

8    attorney.

9    Q        You requested an attorney?

10   A        Yes.

11   Q        So you knew that you had all those rights and

12   that they were yours to use if you chose to, is that

13   correct?

14   A        Yes, sir.

15   Q        When the Sheriff was talking to you about the

16   way he handled his problems, that he would write those

17   problems down, he didn't tell you that he would send his

18   problems to anyone or send his letter to anyone, did he?

19   A        No, sir.

20   Q        Or his notations?

21            He didn't tell you or didn't request

22   that you send anything to him, did he?

23   A        No, sir.

24   Q        As a matter of fact he told you to tear it up

25   and flush it down the toilet, didn't he?

1    A        Yes, sir.

2    Q        And in this, what has been marked as "State's

3    Exhibit 3" which is, if you will refer to it as the first

4    letter dated the 28th of February of 1994, you said that

5    Officer Blackburn suggested to you write down everything

6    beginning in Fort Worth?

7    A        Yes, sir.

8    Q        But in fact the letter you sent Officer

9    Blackburn, it didn't start in Fort Worth at all, did it?

10   A        No, sir.  It didn't.

11                 MR. OLD:   Your Honor, I'm

12   going to him questioning him about the contents of the

13   document.

14                 THE COURT:   The document

15   clearly speaks for itself but since the document is

16   basically at a variance from what the conversation

17   allegedly instructed him to do I'm going to overrule the

18   objection.

19                 MR. TOWNSEND:  Did you answer

20   that question?

21                 I'm not sure.  The letter does not start

22   in Fort Worth, does it?

23                 THE WITNESS:  No, sir.

24   Q        (BY MR. TOWNSEND)  The Sheriff didn't have any

25   idea that you were sending him any type of letter?

1      MR. OLD:   I object to that,

2  calls for him to speculate.

3      THE COURT:  Sustained.

4      MR. OLD:  As to the Sheriff's

5  mind, state of mind or what he expected or planned.

6      THE COURT:  Sustained.

7      MR. TOWNSEND: You didn't tell

8  the Sheriff you were going to send him any kind of

9  letter, did you?

10      THE WITNESS:   I did at one

11  time.

12  Q      (BY MR. TOWNSEND)  "At one time?"

13          Did you tell him that evening?

14  A      No, sir.  Beforehand.

15  Q      That would have been a few days before he got

16  the letter?

17  A      Possibly weeks before.

18  Q      Okay.  But not during this discussion?

19  A      No.

20  Q      I believe he told you, you know, that he

21  couldn't take a confession from you because you had an

22  attorney, is that correct?

23  A      Yes, sir.  He told me that.

24  Q      Told you not to talk about the case with him,

25  didn't he?

1   A          He wouldn't discuss it.  No, sir.

2   Q          He would not discuss the case with you?

3   A          No, sir.

4   Q          The second letter you wrote was dated I believe

5   -- that's marked as State's Exhibit -- let me check, I

6   believe it's "4."

7                    MR. OLD:  I believe what you

8   are looking for is "Number 5."

9                    MR. TOWNSEND:  Is that "Number

10  5?"

11                   The second letter is marked as "State's

12  Exhibit Number 5" and look at it, make sure you are

13  familiar with it.

14                   Is that the -- is that letter, is it

15  dated the 11th of September, the 11th of September of

16  1994 you had no longer had  --  I have forgotten his name

17  -- "Mr. Solomon" as your attorney, is that correct?

18                   THE WITNESS:  Yes, sir.

19  Q          (BY MR. TOWNSEND)  At that time Mr. Old was

20  your attorney?

21  A          Yes, sir.

22  Q          During the time that Mr. Old was your attorney

23  I assume you had discussed the case with him?

24                   MR. OLD:   Your Honor, I'm

25  going to object to this, it invades the attorney-client

1    privilege.

2                         MR. TOWNSEND:    We are not

3    asking the question the question what he discussed, we

4    just want to know had he had an opportunity to meet with

5    his attorney.

6                         THE COURT:  I will let you ask

7    him if he met with his attorney but I think asking if he

8    discussed the case may very well get into a conversation

9    that could be privileged.

10                         I will sustain the objection.

11                         MR. OLD:    Thank you, Your

12   Honor.

13                         MR. TOWNSEND:  Had you had an

14   opportunity to meet with Mr. Old?

15                         THE WITNESS:  Yes.

16   Q        (BY MR. TOWNSEND)  You had in fact met with

17   him?

18   A        Yes, sir.

19   Q        When you were discussing the situation and you

20   were dealing with Officer Blackburn he didn't threaten

21   you in any way, did he?

22   A        No, sir.

23   Q        He didn't promise you anything?

24   A        No, sir.

25                         MR. TOWNSEND:    Pass the

1    witness, Your Honor.

2                        THE COURT:  Mr. Hinson?

3                        MR. HINSON:  Thank you, Your

4    Honor.

5

6                    REDIRECT EXAMINATION

7                      BY MR. HINSON

8

9    Q        Mr. Wardlow, did Sheriff Blackburn, Ricky

10   Blackburn, he stated that he would not discuss the case

11   with you, is that correct?

12   A        Yes, sir.

13   Q        Did he state to you that he would listen to

14   you, discuss the case or that he would listen to you make

15   statements regarding the case?

16   A        He didn't make the statement but I had made

17   some statement concerning my case and he listened.

18   Q        And you had made these statements prior to your

19   meeting with him in the Chief Jailer's Office?

20   A        No.  During the meeting.

21   Q        During the meeting, factual statement from you?

22   A        Not "factual statement", just some statement

23   concerning the case.

24   Q        We are talking about the statement that you

25   wrote down and we talked about events from February or

1    -- not "February" from Fort Worth through the present

2    time, at the time that you were talking to him did Mr.

3    Blackburn represent to you to write down those events?

4                    Did he also represent to you to write

5    down the things that were bothering you?

6    A          Those are the main things that he stressed,

7    anything that I was having problems with to write that

8    down.

9                    He just gave me "Fort Worth" as a

10   referencing point.

11   Q          And in the letter you wrote down what was

12   bothering you, in the letters you wrote down what was

13   bothering you?

14   A          Yes, sir.

15   Q          And in your conversation with Mr. Blackburn,

16   approximately February of '94 you discussed -- I believe

17   we talked about "repentance?"

18   A          Yes, sir.

19   Q          "Redemption of your soul?"

20   A          Yes, sir.

21   Q          In making admission or making a statement,

22   confession to God, were you promised or was there some

23   indication to you based on the representation made by Mr.

24   Blackburn that your soul would be saved?

25   A          Could you restate that?

1    Q        I don't think I can.

2                        MR. OLD:  Why don't you start

3    over and try again, Lance?

4                        MR. HINSON:  All right.  You

5    talked with Mr. Blackburn in February, early February,

6    '94?

7                        THE WITNESS:  Yes, sir.

8    Q        (BY MR. HINSON)  And at the time you talked to

9    him you talked about "repentance?"

10   A        Yes, sir.

11   Q        "Saving your soul?"

12   A        Yes, sir.

13   Q        You had been baptized or were going to be

14   baptized?

15   A        Yes, sir.

16   Q        Seeking forgiveness from God, from a higher

17   being?

18   A        Yes, sir.  That was a top priority?

19   Q        And based on what you had talked about Mr.

20   Blackburn represented to you that there would be a

21   benefit to you by making a statement, getting right with

22   God?

23   A        Yes.

24                        MR. HINSON: Pass the witness,

25   Your Honor.

1          THE COURT:  Mr. Townsend?

2

3                    RECROSS EXAMINATION

4                    BY MR. TOWNSEND

5

6    Q        Mr. Wardlow, you said you mentioned a few

7    things about the case to Mr. Blackburn, each time that

8    you mentioned anything about the case to Mr. Blackburn

9    he told you that he could not discuss it with you and you

10   should not discus it with him, didn't he?

11   A        Yes.

12             MR.  TOWNSEND:   No further

13   questions.

14             THE COURT:  Mr. Hinson?

15             MR. HINSON: Nothing more from

16   the Defense, Your Honor.

17             THE COURT:  Mr. Wardlow, you

18   stated a moment ago that the Sheriff never asked you to

19   send a statement to him and told you to destroy it, is

20   that correct?

21             THE WITNESS:  Yes.

22             THE COURT:  Why did you mail

23   it to him?

24             THE WITNESS:  I don't know.

25             THE COURT:  Why did you send

1    him the one in September?

2                              THE WITNESS:  I don't know.

3                              THE   COURT:   Any   further

4    questions from either side?

5                              MR. HINSON:  No, Your Honor.

6                              MR.   TOWNSEND:        Nothing

7    further, Your Honor.

8                              THE COURT:  You may step down.

9                    Call your next witness.

10                             MR. OLD:  Your Honor, on Mr.

11   Wardlow's Motion to Suppress we rest.

12

13                             (The Defense rested on the Motion to

14   Suppress.)

15

16                             THE  COURT:        Does   the

17   State --

18                             MR.  TOWNSEND:     The  State

19   rests, Your Honor.

20                             THE COURT:  Both sides close?

21                             MR.  TOWNSEND:     Yes,  Your

22   Honor.

23

24                             (Both sides closed on the Motion to

25   Suppress.)

1          THE    COURT:     It's   12:00

2    o'clock.  Do you want to go to lunch and then argue after

3    lunch or are you prepared for argument?

4                    MR. OLD:  I would rather make

5    written argument by submitting a brief.

6                    THE COURT:  Let's go off the

7    record.

8

9              (Off the record discussion.)

10

11                   THE    COURT:     Recess   until

12   10:30.  Briefs to be submitted by parties, the Court is

13   to rule.

14

15              (Record closed for October 18th, 1994.)

16

17              (Whereupon  Court  was  recessed  until

18   10:30 a.m., October 24th, 1994.)

19

20

21                       *****

22

23

24

25

STATE OF TEXAS          §
                        §
COUNTY OF TITUS         §

I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on October 18, 1994 and were reported by me.

I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY HAND this _31ST_ day of January, 1995.

_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

Certification Number of Reporter:   149

Expiration Date of Certification:   12/31/96

Business Address:   Drawer 1868
                    Mt. Pleasant, Texas 75456-1868

Telephone Number:   903/577-6735

Transcribed By:     Tandra K. Gibson