

*72102*

CAUSE NO. 12,764

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 24, 1994

**VOLUME 11 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

# VOLUME 11

## VOIR DIRE EXAMINATION

OCTOBER 24, 1994                                    PAGE/VOLUME

APPEARANCES . . . . . . . . . . . . . . .          1/11

MORNING SESSION . . . . . . . . . . . . .          3/11

NOON RECESS . . . . . . . . . . . . . .            21/11

AFTERNOON SESSION . . . . . . . . . . . .           21/11

POTENTIAL JUROR, TERRI D. LEE
        EXAMINATION BY MR. TOWNSEND . . . . .       28/11
        EXAMINATION BY MR. OLD  . . . . . . .       54/11

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .        77/11

DISCUSSION CONCLUDED  . . . . . . . . . .           81/11

RECESS  . . . . . . . . . . . . . . . .             90/11

POTENTIAL JUROR, MICHAEL CLARK PREDDY
        EXAMINATION BY MR. TOWNSEND . . . . .       93/11
        EXAMINATION BY MR. OLD  . . . . . . .      122/11

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .       139/11

DISCUSSION CONCLUDED  . . . . . . . . . .          141/11

POTENTIAL JUROR, NOLA JEAN LITTLES
        EXAMINATION BY MR. TOWNSEND . . . . .      142/11

POTENTIAL JUROR, JESSIE ROY COX
        EXAMINATION BY MR. TOWNSEND . . . . .      150/11
        EXAMINATION BY MR. OLD  . . . . . . .      176/11

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .       190/11

DISCUSSION CONCLUDED  . . . . . . . . . .          192/11

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .       202/11

DISCUSSION CONCLUDED  . . . . . . . . . .          204/11

VOLUME 11

VOIR DIRE EXAMINATION

(CONTINUING)

OCTOBER 24, 1994                                    PAGE/VOLUME

COURT ADJOURNED . . . . . . . . . . . . . .         206/11

COURT REPORTER'S CERTIFICATE  . . . . . . .·        207/11

* * * * *

1

## VOLUME 11

2

## ALPHABETICAL INDEX OF

3

## POTENTIAL JURORS

4

OCTOBER 24, 1994                                    PAGE/VOLUME

5

POTENTIAL JUROR, JESSIE ROY COX
EXAMINATION BY MR. TOWNSEND  . . . . . . . .        150/11

6
EXAMINATION BY MR. OLD   . . . . . . . . . .        176/11

7

POTENTIAL JUROR, TERRI D. LEE
EXAMINATION BY MR. TOWNSEND. . . . . . . . .         28/11

8
EXAMINATION BY MR. OLD . . . . . . . . . . .         54/11

9

POTENTIAL JUROR, NOLA JEAN LITTLES
EXAMINATION BY MR. TOWNSEND  . . . . . . . .        142/11

10

11

POTENTIAL JUROR, MICHAEL CLARK PREDDY
EXAMINATION BY MR. TOWNSEND  . . . . . . . .         93/11
EXAMINATION BY MR. OLD   . . . . . . . . . .        122/11

12

13

14

***** * * *

15

16

17

18

19

20

21

22

23

24

25

1

VOLUME 11

2

EXHIBIT INDEX

3

| EXHIBIT NO. | MKD. | IDENT. | OFFRD. | ADM/DEN |
|---|---|---|---|---|
| DEFENSE VOIR DIRE 1 Witness List | 9 | 9 | 9 | |
| STATE'S VOIR DIRE 3 Indictment | 11 | 11 | | |
| STATE'S VOIR DIRE 3 (substituted) Indictment | 13 | 13 | 21 | 21/ADM |
| STATE'S VOIR DIRE 4 Flow Chart | 11 | 13 | 21 | 21/ADM |
| STATE'S VOIR DIRE 5 Special Issues | 11 | 13 | 21 | 21/ADM |
| STATE'S VOIR DIRE 6 Legal Definitions | 79 | 80 | 80 | 80/ADM |

4

5

6

7

8

9

10

11

12

13

14

15

*****

16

17

18

19

20

21

22

23

24

25

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 24, 1994

**VOLUME 11 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)

APPEARANCES

ATTORNEYS FOR THE STATE OF TEXAS:

        MR. RICHARD TOWNSEND
        District Attorney
        Morris County Texas
        Morris County Courthouse
        Daingerfield, Texas 75638

           and

        MR. RANDY LEE
        Assistant District Attorney
        Cass County Texas
        P.O. Box 940
        Linden, Texas 75563

1    ATTORNEYS FOR THE DEFENDANT:

2          MR. BIRD OLD, III
           Old, Rolston & Old
3          P.O. Box 448
           Mt. Pleasant, Texas 75456-0448
4
                    and
5
           MR. LANCE HINSON
6          Law Offices of Danny Woodson
           P.O. Box 399
7          Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      On the 24th day of October, 1994, the

2 above-entitled and numbered cause came on for hearing

3 before said Honorable Court, Judge Gary R. Stephens of

4 Midlothian, Texas, serving by judicial assignment in the

5 District Court of Titus County, Texas, on change of venue

6 from Morris County, Texas, and the following proceedings

7 were had:

8      THE COURT:  Let's get on the

9 record.

10      This is Cause No. 12,764, "The State Vs.

11 Billy Joe Wardlow."

12      Let the record reflect that the two

13 Defense Attorneys appointed in this case are present in

14 the courtroom along with both of the District Attorneys

15 that are working on this case and the Defendant himself

16 is present.

17      When we recessed last week I requested

18 that each side present a brief to me which was done

19 within the time period specified.

20      I have studied the briefs, the briefs

21 were on the law as each side believed it applied to the

22 Motion to Suppress what is deemed a confession.

23      The Motion to Suppress went to two

24 letters that were forwarded to the Sheriff from in-house

25 mail by the Defendant.

1      After studying the briefs and doing some

2 independent research I'm going to deny the Motion to

3 Suppress and I will let both letters in that were written

4 by Mr. Wardlow, that's the February letter and September

5 letter.

6      I also want the record to reflect that

7 I called Mr. Old's office to leave a message on his

8 answering machine but I was surprised when he answered

9 the phone so I told him my ruling.

10     At that time he asked for Findings of

11 Fact and Conclusions of Law either this afternoon or

12 tomorrow.  I will state into the record my Findings of

13 Fact and Conclusions of Law and then direct the Reporter

14 to prepare them.

15     Now, Mr. Townsend, you informed the

16 Court that if both letters were to be admitted you would

17 not be calling the Co-Defendant.  The Witness List that

18 was filed in the last week or so listed the Co-Defendant

19 as an additional witness, there was an objection from the

20 Defense to her being listed.  Now, Mr. Townsend, are you

21 in a position now to tell me whether you will or will not

22 use the Co-Defendant in your case in chief?

23     MR. TOWNSEND:  Your Honor, I

24 understand that there is another motion that we are going

25 to hear later on that has to do with Suppression of

1    Evidence based on the illegality of the search warrant.

2    I am comfortable, I think I kind of got an advisory

3    opinion the other day from you, I'm comfortable enough

4    with that that we would not be using her as a witness.

5              THE COURT:  All right.  Now,

6    if you tell me that I'm going to grant the request from

7    the Defense to strike her from the Witness List as far

8    as your case in chief.  If you need to call her as

9    rebuttal I'm not going to stop anybody from -- from

10   calling someone in rebuttal when you don't anticipate

11   what the other side is going to present.

12             MR. TOWNSEND:  Yes.

13             THE COURT:  I will grant Mr.

14   Old's Motion to Strike Tonya Fulfer as a Witness for the

15   State from the Witness -- State's Witness List.

16             The Motion to Suppress heard over the

17   last couple of weeks was for the purpose of helping both

18   sides understand what would or would not be admissable

19   as to voir dire.

20             To begin, Mr. Old, do you know of any

21   other motions that we need to take up prior to beginning

22   the voir dire to aid or assist you in your voir dire

23   preparation?

24             MR. OLD:  Your Honor, there

25   are three matters I would like to take up with the Court,

1  they may be subject to another motion, I need some advice

2  and guidance of the Court on voir dire.  I do not think

3  there's anything else that needs to -- and what I have

4  is relatively a short matter, won't require testimony.

5              THE COURT:  Do you wish to go

6  into them now?

7              MR. OLD:  Yes.  I would like

8  to.

9              THE COURT:  You may proceed.

10             MR. OLD:  My first concern

11  about voir dire is how far you are going to allow us to

12  voir dire the jury on the law of parole.

13             THE COURT:  All right.

14             MR.  OLD:  I believe  I'm

15  entitled to tell the jury that they will be charged as

16  to the parole law as usually charged, in addition that

17  a life sentence in a capital murder case under Section

18  42.18, Section 82(b) -- excuse me, Section 8(b)2 requests

19  the Court to charge the jury that if a prisoner is

20  serving a life sentence for a capital felony the felon

21  is not eligible for release on parole until the actual

22  calendar time that the prisoner has served without

23  consideration for good time equals 40 calendar years,

24  which is in effect informing the jury that the results

25  of a life sentence for capital murder, you will serve 40

1   years, what we call "flat."

2                    THE COURT:   You say that it

3   calls for that or that is your interpretation?

4                    MR.   OLD:      That's   my

5   interpretation of the law.

6                    THE COURT:   I think we have

7   a difference of opinion on that law.

8        Before you go to your next point of your

9   speech with that I would like to address the District

10  Attorney, if you have more to add --

11                   MR.   OLD:   I'm   looking   for

12  guidance whether I should ask that question to the jury

13  or make my objection outside the presence of each juror

14  or the first juror and then have a running objection.

15                   THE COURT:   I have considered

16  whether or not to allow Defense Attorneys to voir dire

17  on that issue, I have not made my mind up in this

18  particular case.   I would like to hear from Mr. Townsend

19  on the State's position on as to whether or not the jury

20  or prospective juror should be informed to the 40 year

21  law.

22                   Mr. Townsend?

23                   MR. TOWNSEND:   Your Honor, I

24  think we filed a motion earlier that would preclude that

25  sort of information at this time.   I don't remember

1   exactly when I filed the motion, it has been a good long

2   while ago.   There has been some case law come out since

3   that time, since I filed the motion from the United

4   States Supreme Court that makes me reluctant to push my

5   position.

6                    THE COURT:   All right.   I am

7   of the opinion that under current Texas State Law the

8   parole law information is not available, I'm also under

9   the opinion that what I call truth in sentencing may very

10  well be applied which means I don't want to see this case

11  reversed over the parole law.

12                   I'm going to grant your request.   You

13  may discuss it.

14                   MR.  OLD:    Thank you, Your

15  Honor.

16                   My next question is in charging the jury

17  on the voluntariness of a confession, I think that we are

18  entitled to that definition which was the subject of our

19  previous discussion about the functional equivalent of

20  interrogation which I believe is -- it is McGinnis that

21  sets it out.

22                   If I could get an advisory opinion or

23  a view of the Court as to whether that should be charged

24  with the usual things on the voluntariness of the

25  confession.

1          THE COURT:  I'm not ready to

2  rule, I will let you get into the area on voir dire but

3  I'm not sure whether I'm going to charge the jury or not,

4  it depends on how the evidence evolves, I'm going to hear

5  the same thing in trial I heard on the motion but I will

6  allow you to get into that area on voir dire if you wish

7  to do so.

8          MR. OLD:  Thank you.

9          My third matter this morning, I have

10  prepared an exhibit which I would like to have marked

11  "Voir Dire 1."

12

13          (Defendant's Voir Dire Exhibit Number

14  1 was marked for identification.)

15

16          MR. OLD:  Your Honor, by way

17  of explanation; Defendant's Voir Dire 1 is a list of all

18  the witnesses that the State has given me by discovery

19  that they will be calling in their case in chief or they

20  were ordered to produce this at a certain time by pre-

21  trial order.

22          For the purposes of voir dire I would

23  like to have the State review it and tell me that it is

24  correct or whether it is deficient so I may use the list

25  to question witnesses.

1          THE COURT:   As far as their
2   knowledge of --
3          MR. TOWNSEND:  You are asking
4   me to do this by memory?
5          THE COURT:   Why don't you
6   check there at lunch and advise the Court, Mr. Old,
7   before we begin at 1:00?
8          MR. TOWNSEND:  Do you have a
9   copy of that?

10

11          (Handed to Mr. Townsend.)

12

13          MR. OLD:   The addresses are
14   not on that one but I think all the names.  (Indicating)
15          MR. TOWNSEND:  I will find it,
16   Mr. Old.
17          I don't really think this is necessary
18   that that be listed as an exhibit.
19          THE COURT:   What?
20          MR. TOWNSEND: What is usually
21   done is  just set them  up there and let the people on
22   the --
23          THE COURT:   Off the record.

24

25          (Off the record discussion.)

1            (State's Voir Dire Exhibit Numbers 3,

2  4 and 5 were marked for identification.)

3

4                     THE   COURT:      Back   on   the

5  record.

6                     MR. OLD:   Your Honor, as to

7  State's Exhibit 3 which appears to be a partial copy of

8  the indictment, we would object to it being offered in

9  evidence or displayed to any juror, potential juror in

10 this case in that the law is clear, an indictment is not

11 evidence of guilt and the displaying of this instrument

12 to them would be prejudicial to the Defendant and

13 additionally it's not -- it's a copy of part of the

14 indictment.

15                    THE COURT:  Mr. Townsend.

16                    MR. TOWNSEND:   Your Honor, I

17 think both sides will be pointing out to the potential

18 jurors during the jury selection process that the

19 indictment is not evidence.

20                    THE COURT:   Let me get this

21 clear, I'm going to overrule that objection, I will also

22 instruct the juror that it's not evidence but I think it

23 may very well be helpful for both sides, for the juror

24 to be able to review the charges for purposes of

25 discussing whether or not this is the type of case that

1   they could possibly consider for death penalty.

2            Since the indictment itself will be

3   presented and read to the jury I don't think they are

4   receiving any additional information that they would not

5   receive otherwise.

6            But I will require that the State

7   substitute for Exhibit 3 a full copy of the front page

8   of the indictment, not just the typed portion.  We are

9   either going to have the full copy of the indictment or

10  nothing but we don't need the back.

11                    MR. TOWNSEND:  Okay.

12                    THE COURT:  Next, Mr. Old?

13                    MR. OLD:  The third issue is

14  the issue of the law of parties, I believe.

15                    THE COURT:  Off the record.

16

17            (Off the record discussion.)

18

19                    THE COURT:  Back on the

20  record.

21            What was the exhibit marked as, what

22  exhibit number did we have on these documents?

23                    MR. TOWNSEND:  "3."

24                    THE COURT:  I had the Sheriff

25  make four copies, let's substitute for that exhibit

1    whatever that number was the entire indictment.  I will

2    keep a copy and give a copy to both sides.

3

4                    (State's Voir Dire Exhibit Number 3,

5    substituted, was marked for identification.)

6

7                              THE COURT:  Mr. Old?

8                              MR. OLD:  State's 3, State's

9    Exhibits 3, 4 and 5 are going to be used as a summary of

10   a question that Mr. Townsend is going to ask?

11                              THE    COURT:     That's    my

12   understanding.

13                              MR. OLD:  And they are only

14   being offered as summaries of the question and not as

15   evidence of anything?

16                              THE COURT:  Mr. Townsend, you

17   are not offering these three?

18                              MR. TOWNSEND:  No.  These are

19   not offered as evidence.

20                              THE  COURT:   Now,  they  are

21   offered for purposes of aiding the juror if it does, in

22   understanding our system and procedure.

23                              MR.  OLD:   We  would  only

24   request that the State supply us with a copy of this

25   prior to commencing voir dire.

1              THE COURT:   The State is so

2    ordered.

3              MR.  OLD:    Or  perhaps  two

4    copies of that.

5

6              THE COURT:  Okay.  Let's get

7    back on the record.

8              Mr. Old, do you have any other matters

9    to take up before we recess for lunch?

10             MR. OLD:   Not at this time,

11   Your Honor.

12             THE COURT:  Mr. Townsend?

13             MR. TOWNSEND:  Yes.

14             Your  Honor,  there  is  this  Motion  in

15   Limine.

16             THE COURT: Mr. Old, I believe

17   you have read this motion, haven't you?

18             MR. OLD:  Yes.  I have.

19             THE  COURT:   What  is  your

20   position?

21             MR.  OLD:    As  long  as  it

22   doesn't  restrict  us  from  approaching  the  bench  and

23   telling the Court we want to go into it I don't have any

24   problem.

25             THE COURT:  That's all you are

1     asking for.

2                 MR. TOWNSEND:  Yes.

3                 MR. OLD: It's procedure, it's

4     not asking to prevent anything.

5                 THE COURT:  Granted.

6                 MR. TOWNSEND:  A couple of

7     other brief matters, just for purposes of housekeeping,

8     for instance our number one juror today is on vacation

9     and I think Bobby has released him maybe, I don't know.

10     I believe he has.

11                 THE COURT:  I believe the

12     first one is a female.

13                 MR. TOWNSEND:  The first one

14     that actually is going to be here, but the first juror

15     listed, whatever his name.

16                 MR. HINSON:  "Mr. Seale."

17                 THE COURT:  All right.

18                 MR. TOWNSEND:  He has listed

19     on his questionnaire that he will be on vacation from

20     October 17th to October 31st and it's my understanding

21     from talking to Bobby he's not going to be here today.

22           I don't have any objection to that other

23     than I think we need some order of process, you know, if

24     he's not going to be here where is he going to go?  Is

25     he going to go on the end of the line or bring him back

1  in?

2                    As long as we do it the same way I am

3  happy with it but I just want to know how are we going

4  to handle it?

5                    THE COURT:  It's my intention

6  to go in order as much as we can, if we contact a juror

7  that has a legitimate excuse not to be here such as being

8  on vacation, out of town, sick or even if it's a work-

9  related problem that doesn't cause more than a day or so

10  we will bring that juror back when he or she is

11  available, he or she will not go to the end of the line,

12  they will just be bumped for a day or two until they are

13  available.

14                    MR. OLD:  Your Honor, are we

15  going to strike as we go or are we going to wait until

16  we get them back in order to exercise strikes?

17                    The Defendant is entitled to a draw.

18                    THE COURT:  Normally I prefer

19  to strike as we go.

20                    Let's have an off the record discussion

21  about that.

22

23                    (Off the record discussion.)

24

25                    THE COURT:  On the record.

1          MR. TOWNSEND:  The only other

2   matter I have is I notice in the audience Mrs. Wardlow

3   present in the audience, other than she is a witness for

4   the State and I would not want Mr. Old to come up at some

5   later time and object because she has been a witness to

6   part of the jury selection or whatever, you know.

7          I personally have no objection to her

8   being here and sitting here and this is her son.  I have

9   no objection to her watching all of this if she wants to.

10          THE COURT:  When trial starts

11  all witnesses will be placed under the Witness Rule.  Any

12  witness listed on the State's Witness List will be barred

13  from sitting in on the voir dire process unless both

14  parties agree that the witness will be here and this will

15  apply for Defense and State witnesses.  If either the

16  State or Defense knows today who they intend to call

17  during the punishment -- or excuse me, the guilt or

18  innocence stage of this case I want those witnesses

19  excluded from the courtroom unless both the State and

20  Defense agree that those witnesses can remain.

21          Mr. Old?

22          MR. OLD:  Your Honor, as to

23  both his mother and father, Mr. and Mrs. Wardlow, the

24  Defendant is -- has authorized me to enter into an

25  agreement with the State that the Rule shall not apply

1    to them.

2              THE COURT:  During voir dire.

3    All right.  We'll take up the trial when we get to trial

4    but right now I will exempt the Defendant's parents from

5    the Witness Rule and will allow them to remain in the

6    courtroom during voir dire.  That's fine.

7              Mr. Townsend, anything further?

8              MR. TOWNSEND:  No.

9              THE COURT:  Mr. Old, anything

10   further?

11             MR.  OLD:   Nothing  at  this

12   time.

13             THE COURT:  Okay.  I have been

14   contacted by ABC News as have both Defense and State's

15   attorneys, ABC News apparently is doing a story on the

16   cost of capital murder trials in the city and in smaller

17   communities.

18             Why they want to film here is not really

19   clear to me.

20             I have been assured that they are not

21   interested in the trial other than as background

22   information for their piece which is supposed to come out

23   in a week.

24             I have instructed them, meaning ABC

25   News, that if both State and Defense agree I will allow

1    them to film so long as no juror is filmed.  I will not

2    allow them to film nor show pictures of jurors.

3                Mr.   Townsend,   you   have   told   me

4    unofficially your position so on the record what is your

5    position concerning the ABC News request to film if they

6    are here this afternoon or tomorrow for that news filler?

7                THE COURT:  Mr. Old, you and

8    Your Honor.

9                THE COURT:  Mr. Old, you and

10   I  have  talked  about  it,  you  have  told  me  that  you

11   discussed it with your client.

12               Mr. Wardlow, you have heard what I've

13   been talking about, do you have an objection to ABC News

14   being present in this courtroom and filming you, your

15   lawyers, the State's lawyers and anyone else that is here

16   other than the jurors?

17               THE DEFENDANT:  No, sir.  I

18   have no objection.

19               THE COURT:  Then I will allow

20   ABC.

21               Mr. Old, let me ask you on the record,

22   do you have an objection?

23               MR. OLD:  Your Honor, I don't

24   have an objection.

25               It is my understanding that -- that this

1   will be less than a few minutes or a short time?

2                            THE COURT:   The filming may

3   be an hour or two, they assure me about two minutes will

4   make it to the news.

5                            MR. OLD:   But this -- it will

6   not be during a time when the juror is on the witness

7   stand?

8                            THE COURT:   It may be a time

9   when the juror is on the witness stand but the juror's

10  name nor face will be shown.

11                       So no objection?

12                           MR. OLD:   And will it be a

13  verbal, the sound, will what they are going to put on

14  television have sound, do you know?

15                           THE COURT:   I will have to

16  ask.   They told me they were only interested in just

17  showing a trial in progress and I have explained it is

18  voir dire.

19                       We didn't specifically talk about

20  whether they would be recording juror's answer.

21                           MR. OLD: As I understand what

22  was explained to me would be background without the

23  audio.

24                           THE COURT:   We'll get that

25  clarified before they roll.

1        We are recessed for lunch, be back at

2   1:00.

3        I want to talk briefly to the lawyers.

4        The exhibits that have been marked as

5   voir dire or pre-trial exhibits are all admitted for

6   purpose of the voir dire.

7

8        (State's Voir Dire Exhibit Numbers 3,

9   substituted, 4 and 5 and also Defendant's Voir Dire

10  Exhibit Number 1 were received.)

11

12       (Noon recess.)

13

14       THE COURT:  Let's get on the

15  record.

16       Mr. Townsend, you just told me off the

17  record that you did not have your Witness List present

18  or your file present to check those names but the names

19  tendered to you by the Defense appears to be the proper

20  listing of witnesses, is that correct?

21       MR. TOWNSEND:  To the best of

22  my memory.

23       THE COURT:  And then you

24  mentioned two additional names, what are those names?

25       MR. TOWNSEND:  Chris Sanders

1    and Bill Dunlap.

2                    THE COURT:  Those are not the

3    same two additional names that you turned over on the

4    Witness List with Tonya Fulfer last week?

5                    MR. TOWNSEND:  No.  They are

6    not, Your Honor.  These are names that we ascertained

7    within the last three or four days, would be an offense

8    that was located in the Sheriff's Office that was an old

9    Offense Report that I had to go back in the files to, it

10   took them some time and I had decided that they were not

11   going to find it.

12                    THE COURT:  And when did you

13   tender those names to Mr. Old?

14                    MR.  TOWNSEND:   The Offense

15   Report was mailed to Mr. Old I'm going to say Thursday.

16                    THE COURT:  Mr. Old, when did

17   you receive the statement from the -- or the Offense

18   Report?

19                    MR. OLD:  Your Honor, I'm not

20   sure that I have.  I don't know what he's talking about.

21                    THE COURT:  All right.

22         If it was mailed Thursday it's quite

23   possible it would not be in my mail this afternoon.

24                    MR. TOWNSEND:  The situation

25   I'm talking about, the one, the witnesses we mentioned

1   are possible punishment issue, the offense is regarding

2   theft of a firearm, firearm allegedly taken from Mr.

3   Dunlap.

4               Chris Sanders was apparently a witness

5   to that.

6               MR. OLD:  Your Honor, I don't

7   know what he's talking about.

8               THE COURT:  At this time --

9               MR. OLD:  I have had volumes

10  of information, I have no document designating those two

11  people to be witnesses.  Merely sending me a piece of

12  paper in response to discovery does not designate them

13  "witnesses."

14              MR. TOWNSEND:  That piece of

15  paper has a letter accompanying it stating -- I can't

16  swear that Mr. Old has received that Offense Report and

17  letter yet, I can call my secretary and find out for

18  certain when it was mailed if you like.

19              THE COURT:  I don't have a

20  motion to add any names to a Witness List and until I get

21  one I don't have anything to rule on, frankly.

22              Have you supplemented your Witness List

23  with the two names that you were discussing now, Mr.

24  Townsend?

25              MR. TOWNSEND:  That's what we

1   were attempting to do by notifying Mr. Old was to let him

2   know that we were supplementing.

3           THE COURT: The Court does not

4   have a copy of that letter.  If you would get a copy of

5   that letter -- I don't need the document, just a copy of

6   the letter with the names and then once I have it before

7   me I will rule on it.

8           Mr. Old objects but until I have

9   something to rule on there is no ruling I can make.

10          MR. TOWNSEND: Can we get her

11  to fax that over here?

12          THE COURT: However you want

13  to do it but I am ready to proceed with voir dire based

14  on the Witness List of the witnesses we all knew about

15  when we last recessed last Tuesday and from what I have

16  been told the State has no objection to Mr. Old using his

17  voir dire exhibits to have jurors review the list of

18  potential witnesses, is that correct?

19          MR. TOWNSEND: I have no

20  objection.

21          THE COURT: Mr. Old, are you

22  ready to proceed?

23          MR. OLD: Yes, Your Honor.

24          THE COURT: Mr. Townsend, are

25  you ready?

1    MR.   TOWNSEND:    Yes,   Your

2    Honor.

3    THE COURT:  Bring in our first

4    juror.

5

6    (The following occurred in the presence

7    of the potential juror:)

8

9    THE COURT:   Good afternoon,

10   ma'am.  How are you doing?

11   THE POTENTIAL JUROR:   Fine.

12   THE COURT:  Take a seat right

13   there in the witness stand.

14   You are "Terri Lee", is that correct?

15   THE POTENTIAL JUROR:  That's

16   correct.

17   THE COURT:  Ms. Lee, you were

18   sworn in with the entire panel so you are still under

19   oath.

20   THE POTENTIAL JUROR:   Yes,

21   sir.

22   THE COURT:   Ms. Lee, let me

23   again introduce myself and tell you why you are here,

24   first my name is Gary Stephens and I am the Judge that

25   will be presiding over the jury selection and trial.

1          We have two lawyers, we have one lawyer

2    representing the State and that is the District Attorney

3    of Morris County, Mr. Richard Townsend, he will be

4    assisted by Mr. Lee, Randy Lee who will probably join us

5    shortly.

6          I believe he's the elected District

7    Attorney of Cass County?

8          MR. TOWNSEND:   Yes, Your

9    Honor.

10          THE COURT:   And he will be

11    assisting in this case.

12          We have two Defense Attorneys, but again

13    only one in the courtroom and that's Mr. Bird Old, III.

14          We have another Defense Attorney who is

15    assisting him in that, Mr. Lance Hinson, who will join

16    us shortly.

17          Now, Ms. Lee, the lawyers are going to

18    talk to you today about some principles of law involved

19    in a death penalty case.  You will be questioned about

20    your feelings on the law and whether or not you can

21    follow the law that will apply in order to be a juror.

22    You don't necessarily have to agree with our law, if you

23    do disagree with the law but you can follow the law you

24    are still qualified but if you have a disagreement with

25    some aspect of our law that would prevent you from

1  following the law you would not be qualified, that's why

2  we need to know something about you.

3            The lawyers have read the questionnaire

4  but they need more than we have just got from you there

5  so what we want you to do is just open up and be honest

6  with us.

7            Frankly, you have a right to your

8  opinions so we don't really care what those opinions are

9  but we care very much to have you share these opinions

10  and we will make this as short as possible and the way

11  we do this is just open up and share those opinions with

12  us.

13            THE POTENTIAL JUROR:  Okay.

14            THE COURT:  You are not on

15  trial if it may seem like it.

16            If there's something that you don't

17  understand please stop the lawyers and tell them you

18  don't understand and get it clarified.

19            THE POTENTIAL JUROR:  Okay.

20            THE COURT:  Mr. Townsend, are

21  you ready to proceed?

22            MR. TOWNSEND:  Yes, Your

23  Honor.

24            THE COURT:  The State may

25  proceed.

1     TERRI D. LEE, Potential Juror #412,

2  was called as a Potential Juror and, having been

3  previously sworn by the Court, testified as follows:

4

5                    VOIR DIRE EXAMINATION

6                      BY MR. TOWNSEND

7

8  Q        Ms. Lee, I am Richard Townsend as the Judge

9  just said and I represent the State of Texas in Morris

10 County in this case.

11           Like the Judge said, there's no right

12 or wrong opinion, we just want to know what your opinion

13 is.   And if I mumble or for some reason you can't

14 understand me let me know that because my wife tells me

15 I mumble.

16           If you will, I have read your

17 questionnaire and I saw that your answer on the death

18 penalty, what we call "the death penalty" that you

19 believe the death penalty is appropriate in some murder

20 cases and you could return a verdict in a proper case

21 which assessed the death penalty.

22           Does this pretty well sum up your

23 feelings about the death penalty?

24 A        Yes, sir.

25           My only thing I would like to add to

1      that is that this may be irrelevant but I have two

2      children that are 10 and 13, they are boys and when I

3      realized when I got here that it was a 19 year old male

4      suspect --

5      Q       Yes.

6      A       -- that really concerned me.

7                I do believe in the death penalty if a

8      person without any doubt whatsoever took the life of

9      another person.

10      Q       Yes.

11      A       I really do.  But my heart, when it comes down

12      to convicting a young man it would be real hard for me.

13      Q       Are you saying that the age of the Defendant

14      would make a difference with you?

15      A       Yes, sir.  And that may not necessarily be

16      right but it might be.

17      Q       Well, see, we don't know how you feel and

18      that's what we are trying to find out.

19      A       I understand that and I don't know any other

20      way to express it to you but I, all I know to say is that

21      I am afraid my heart would come into play.

22      Q       Okay.

23      A       I would not have a problem putting him in

24      prison for life because I do feel like it may be harmful

25      to someone else if he were capable of doing that.

1    Q        Okay.  Do you believe that if you were given

2    an appropriate case, and we are not really going to talk

3    about the facts of this case, but if you were given an

4    appropriate case could you return a verdict that would

5    result in the execution of someone?

6    A        "Of anyone, if I knew without any question that

7    they had taken the life of someone else?"

8             Is that what you are asking?

9    Q        Yes.

10   A        Yes.  I think I could.  Yes.

11   Q        Okay.  Would the fact that the person was 19,

12   would that prevent you from being able to do it?

13   A        It might.  I know that's hard to understand.

14   I just have teenage boys and I have a hard time with

15   that.

16   Q        No, ma'am.  It's not hard to understand but

17   what we need I think is --

18   A        "Definite?"

19   Q        -- it's not "I can do it" or not "I might can

20   do it", can you do it if he's 19?

21            Are you telling us you can't do it or

22   are you telling us that you can do it if the facts are

23   appropriate?

24   A        If I had to say and it came down to it and I

25   knew in my heart that he had done it, yes, I think I

1   could.

2   Q        The fact that he was 19 wouldn't prevent you

3   from doing it then if you felt it was appropriate?

4   A        I don't think it would prevent me.  No.

5   Q        Let me go on a little further then, you know,

6   in Texas we have two kinds of murder, we have what we

7   call just "plain murder" where someone has intentionally

8   caused the death of another individual and that's without

9   an excuse or a legal justification, wasn't self defense,

10  it wasn't an accident, that sort of thing, just

11  intentionally, just murder someone, that's "murder."

12           And the most a person can receive in

13  punishment for that is a life sentence.

14           However, in Texas we also have what is

15  called "capital murder" and "capital murder", that's a

16  murder with your basic plain murder plus something and

17  that "plus something" is that the person that was

18  murdered is a police officer killed in the line of duty,

19  a person was murdered during the commission of a robbery,

20  during the commission of a rape, during the commission

21  of a burglary, something of that nature.

22           So, you see instead of me just saying

23  "I don't like this guy, I'm going to kill him" you have

24  got an additional crime involved.

25           Are you pretty clear on that?

A        Yes, sir.

Q        The kind of juror we need, Ms. Lee, are the kind of jurors who can keep an open mind during this trial as to first the guilt and innocence of the defendant and then if the defendant is found guilty keep an open mind as to what the punishment should be.

And in a capital murder case if the person is found guilty they don't automatically receive the death penalty or the life sentence, the jury then has to hear another hearing and hear more evidence to help them decide what the proper punishment should be.

Now, when they are setting that punishment they can go back to that first part of the trial and remember that and use that as part of their thought process in deciding what the proper punishment should be as long as you can focus, "refocus" you might say and say, "Okay, now, we have already decided this person is guilty, that part is over, we have got to re-think all of this stuff plus I have got to be able to think over all this evidence we heard during the punishment hearing before making my decision on that.

And that punishment hearing, you may hear all sorts of evidence about the defendant's background, criminal history, how his parents treated him and evidence from psychologists, psychiatrists, just

1    virtually anything.

2              And so we are starting over, we are

3    going to decide the guilt or innocence, of course if he's

4    not guilty then it's over, if he's guilty then you go and

5    you hear others, some more evidence and then you decide

6    life or death depending on what you feel after you heard

7    all of that evidence.

8              Do you believe that you could reserve

9    your judgment on whether you are going to give a person

10   a life sentence or death penalty until you heard all the

11   evidence and not just decide after you heard the guilt

12   or innocence part, "Well, that is terrible, I'm going to

13   give him the death penalty" or "I am just not going to

14   give him the death penalty" but just wait, could you do

15   that?

16   A         Yes.   I think I can.

17                       MR. TOWNSEND:   I want to show

18   you -- may I approach the witness, Your Honor?

19                       THE COURT:   You may.

20                       MR. TOWNSEND:   I want to show

21   you a little flow chart that we have got here that kind

22   of explains this if I can find it.

23

24              (Handed to the potential juror.)

25

1       MR. TOWNSEND:  And that kind

2 of shows you the way a capital murder trial goes and

3 basically, as I have said, you go to guilt or innocence

4 phase then once you have heard that then you go to the

5 punishment phase down there where it says "Phase II,

6 Punishment."  (Indicating)

7       THE POTENTIAL JUROR:  Yes.

8 Q  (BY MR. TOWNSEND)  Then you are going to hear

9 some more evidence and after you have heard that evidence

10 you will hear the Special Issues, at least two Special

11 Issues, we are going to talk about two of those in a

12 little bit but basically you are going to decide the

13 answer to Special Issue #1 and in a little bit, you don't

14 know what it is but we'll go over that in a minute, but

15 if you decide the answer to Special Issue #1 is "Yes"

16 then you are going to go on down to Special Issue #2.

17     If you decide the answer to Special

18 Issue #1 is "No" then the defendant will receive a life

19 sentence, if you decide the answer to Special Issue #1

20 is "Yes" then you go to Special Issue #2, if you decide

21 the answer to that is "Yes" then they would receive a

22 life sentence and if you decide the answer to that is

23 "No" then the defendant would receive the death sentence.

24    So there's never a time they are going

25 to say, "Who wants to give the death penalty" or "Who

1    wants to give him a life sentence in the penitentiary",

2    that's not how you -- when you go back and deliberate

3    punishment you are going to be answering these Special

4    Issues.

5              Now, it might be a little easier on you

6    if you didn't know what the answer to those Special

7    Issues meant so far as what would happen but you are

8    going to know, you are going to know if you answer "Yes"

9    to Number One and "No" to Number Two he's getting the

10   death penalty and if you answer them any other way then

11   the defendant is going to receive life sentence.

12             So even though you are not saying "life

13   or death" you are going to know what the result of your

14   answers are.

15   A       Right.

16   Q       And the kind of juror we need are those kind

17   of jurors who can look at all the evidence and base their

18   answer to those Special Issues on the evidence and

19   basically do what you might say, "Just let the chips fall

20   where they may."

21   A       Yes.

22   Q       And it turns out after honestly answering these

23   questions the defendant receives a life sentence, so be

24   it, and if he receives the death penalty so be it.

25             Do you believe you are the type juror

1    that could do that?

2    A        Yes, sir.

3                      MR. TOWNSEND: Okay. Approach

4    the witness, Your Honor?

5                      THE COURT:  You may.

6                      MR. TOWNSEND:  I have another

7    sheet for you to look at, if you will just read over that

8    Special Issue #1 and then we'll talk about it.

9

10                     (Handed to the potential juror.)

11

12                     MR. TOWNSEND: Okay.  Ms. Lee,

13   have you looked at Special Issue #1?

14                     THE POTENTIAL JUROR:  Yes.

15   Q        (BY MR. TOWNSEND)  Basically Special Issue #1

16   I think after you have read it if you disagree with me

17   let me know, it talks about basically the future

18   dangerousness of the defendant, is he going to be a

19   danger in the future, is that basically what it meant to

20   you?

21   A        Yes.

22   Q        And you are being asked in that question not

23   to predict whether he's going to be a danger in the

24   future but just is it probable, is there a probability?

25                     You are not expected to guarantee that

1    he's going to be a danger in the future, you are not

2    expected to predict whether he's going to be a danger in

3    the future or not but just to determine whether it's

4    probable or not and that's the reason that the word

5    "probable" is in there, you know, there is another word

6    in there or phrase in there where it talks about criminal

7    acts of violence.

8              Now, this trial is about a murder case

9    but criminal acts of violence doesn't necessarily have

10   to mean murder, it can mean assault or rape or, you know,

11   anything that would constitute a criminal act of

12   violence.

13             So when you are deciding the probability

14   you don't have to decide if it's probable that he will

15   commit another murder, just that it's probable that he

16   would commit some other criminal act of violence, are you

17   clear on that?

18   A        Yes.

19   Q        If you will look at Special Issue #2 and read

20   that over and then we will talk about it a little bit.

21   A        Okay.

22   Q        That's a bunch of legal mumbo-jumbo but I will

23   tell you kind of what it meant to me and you can tell me

24   whether you agree with it or not.

25             Basically what Special Issue #2 asks

1   is, okay, I found this person guilty of capital murder,

2   I have decided that, yes, he's going to probably be a

3   danger in the future because if you decided "No" then

4   you wouldn't be answering it so you have made those two

5   decisions already.

6            Then you have got to look at, is there

7   any evidence or enough sufficient evidence, sufficient

8   mitigating evidence to warrant giving this person a life

9   sentence rather than the death penalty.

10            So rather than -- this is a situation

11  where rather than the State having a burden of proving

12  beyond a reasonable doubt as we do on guilt or innocence,

13  as we do in Special Issue #1, we don't have to prove

14  anything to you on Special Issue #2.  It's just basically

15  your decision, do you feel like there is sufficient

16  mitigating circumstances to warrant a life sentence

17  rather than the death penalty?

18            For instance, a mitigating circumstance

19  might be one thing to you and it might be something else

20  to someone else, you know, someone might say, "Well, I

21  don't believe I would give the death penalty because he

22  seems like such a fine young man", someone else may say,

23  "Well, he doesn't seem that fine to me" or you might say,

24  one juror might think, "Well, I just don't believe I will

25  give him the death penalty because the victim didn't seem

1   like a very nice guy" and another person may say, "Well,

2   it doesn't matter whether the victim was a nice guy or

3   not."

4           So "sufficient mitigating circumstances"

5   can just mean anything to anybody, basically, but

6   basically a mitigating evidence is any evidence that

7   would reduce the defendant's moral blameworthiness for

8   the crime committed to make a person on the jury after

9   hearing that evidence think, well, he's just not quite

10  as responsible or quite as morally blameworthy for this.

11          Basically it's just saying after I have

12  heard all this stuff I have listened to all the evidence

13  and just don't think this is a death penalty case or I

14  believe they have shown me some evidence that convinces

15  me that a person shouldn't receive the death penalty.

16          Do you think you could, after hearing

17  all the evidence and even though you found the person

18  guilty of capital murder, even though you had found, yes,

19  they are going to be dangerous in the future, do you

20  think you could go back again and fairly consider all the

21  evidence before making your decision on Special Issue #2?

22  A       Yes.  I do.

23  Q       So what we are asking you to do is first on

24  guilt or innocence just concern yourself with that, don't

25  worry yourself with the rest of it at that point then

1    after you, okay, at that point you get Special Issue #1,

2    you found the person guilty of capital murder, a serious

3    crime, but that's over, that decision has been made.  You

4    have got to start over in your mind and you don't have

5    to ignore the evidence you heard during the guilt or

6    innocence phase because we certainly would want you to

7    consider that but that is only part of your

8    consideration, do you understand that?

9    A       Yes, sir.

10   Q       And then you also consider all that punishment

11   evidence and make your decision to Special Issue #1

12   without regard to the fact that you have already found

13   him guilty, could you do that?

14   A       Yes, sir.

15   Q       Okay.  When you get to Special Issue #2 you

16   have got another hurdle to jump, you have already found

17   him guilty, you have already decided he's dangerous in

18   the future.  Would you be able to put that aside and base

19   your answer to Special Issue #2 just on the facts of the

20   case and just on what you considered to be the

21   circumstances and not just automatically give him the

22   death penalty because you had found out, you had decided

23   that he was guilty and you had decided that he was

24   dangerous in the future, could you make that decision

25   independent of those other two decisions?

1     A          I think I could.

2                          MR. TOWNSEND: Okay. Approach

3     the witness, Your Honor?

4                          THE COURT:  You may.

5                          MR. TOWNSEND:  Let me -- I

6     meant to show you this earlier and I forgot; this is the

7     indictment, a copy of the indictment in this case.

8                          The Defendant in this case, Mr. Wardlow,

9     is charged with capital murder and we talked about how

10    capital murder is murder plus something?

11                         THE POTENTIAL JUROR:  Yes.

12    Q          (BY MR. TOWNSEND)  If you will read that, and

13    I don't think it's necessary that you read the entire

14    indictment maybe but if you will just read this, this

15    portion  right  here  I  think  you  can  see  there.

16    (Indicating)

17                         Okay.  Ms. Lee, do you understand or can

18    you see how that would be "capital murder" rather than

19    just a plain murder?   (Indicating)

20    A          Yes, sir.

21    Q          Because there's an allegation in there that a

22    robbery took place also?

23    A          Right.

24    Q          Ms. Lee, I want to shift gears a little bit and

25    instead of talking to you about capital murder I want to

1    just talk to you about some more -- a little generalized

2    area of the law; you know if a person is accused of

3    capital murder, and let's say for instance the jury

4    decides that, well, you know, I believe the State proved

5    their case as to the murder but I don't think they proved

6    the robbery, then the jury would find the defendant

7    guilty of murder but not capital murder.

8                    Can  you  see  where  that  would  be

9    possible?

10   A         Yes.

11   Q         Okay.  The punishment range for capital murder

12   is different than that for murder.  The punishment range

13   for murder is anywhere from five years probation up to

14   10 years probation or from five years in the penitentiary

15   up to 99 years or life so you have got a broad range, as

16   broad as one can imagine almost.

17                   And of course murder depends on, you

18   know, what you felt the appropriate punishment would be

19   depends upon the facts of the case and as you well

20   imagine an intentional murder, you know, that is a pretty

21   vague statement.  You can have all kinds of intentional

22   murders, some that you might consider to be terribly

23   vicious and violent you might feel like that that person

24   should receive a life sentence or 99 years, on the other

25   hand you might have other type murders that were

1  considerably less violent, you might have what you

2  probably heard referred to as "mercy killings" where

3  maybe a person is elderly, maybe they have cancer and

4  they are dying and they beg their husband or wife to end

5  it for them and they in fact do so.

6  So you might consider that that would

7  be, even though that is an intentional murder it's a much

8  less different situation, would you agree with me on

9  that?

10  A      Yes.

11  Q      So would you consider when I'm talking to you

12  about the range of punishment you have got anywhere from

13  five years probation up through 99 years or life.

14  If you were seated as a juror in this

15  case in order to be fair and impartial we have got to

16  have those jurors who can -- who can actually consider

17  that full range of punishment, whether it's 99, life, you

18  know, or the five years probation.

19  Do you think you could consider the full

20  range of punishment?

21  A      I do.

22  Q      And, you know, we are not asking you to say,

23  "Well, I would give him this" or "I would give him that"

24  but just that you would fairly consider the full range?

25  A      Right.

Q        In Texas and in most states as far as that --
probably all of them the burden of proof is beyond a
reasonable doubt, not beyond all doubt, just "beyond a
reasonable doubt", do you believe that you could hold the
State to our burden of proving this case to you beyond
a reasonable doubt and not just say, "Well, it looks like
he probably did it", would you hold us to our burden of
proving the case to you beyond a reasonable doubt?

        Am I confusing you?

A        Maybe a little.  I'm not sure I understand.

Q        Okay.  In a criminal case the State is required
to prove everything.

A        Yes.

Q        The defendant doesn't have to prove anything.

A        Right.

Q        We have got to prove he did it, he doesn't have
to prove he didn't do it, okay?

A        Okay.

Q        And we have got to prove that case by a certain
standard and that standard is we have to prove the case
"beyond a reasonable doubt."

A        Right.

Q        That is our burden and we accept that burden.

A        Yes, sir.

Q        If we didn't accept that burden we wouldn't be

1    here.

2    A        Right.

3    Q        Would you hold us to that burden and not some

4    lesser burden.   That's the burden we are accepting,

5    that's the burden we have to prove, would you hold us to

6    that burden and not give us a little leeway, not give us

7    more leeway than we should have?

8    A        I would.

9             I'm  just  not  still  sure  I  am

10   understanding what you are trying to ask me.

11   Q        If we are required to prove our case beyond a

12   reasonable doubt?

13   A        Yes, sir.

14   Q        Will you make us do it?

15   A        Yes.  Yes.

16   Q        You not find him guilty unless we do?

17   A        Yes.

18   Q        Okay.  I think I'm talking too much.

19   A        I just wanted to be sure I understood what you

20   were asking me.

21   Q        Okay.  Involved along with that burden is

22   something, you know, we have the burden of proof, like

23   I said, the Defense over there, they don't have a burden,

24   they can sit there quietly, they don't have to do

25   anything.  It's our job to prove the case and along with

1    that burden of proof comes something we have all probably

2    heard of on TV and read about, the Fifth Amendment

3    privilege.

4            That Fifth Amendment privilege is a

5    privilege that the defendant has to not testify if he so

6    chooses and to be a fair and impartial juror, you have

7    got to be able to sit there and listen to the evidence

8    that is presented and base your decision strictly on that

9    evidence.

10           Could you do that strictly on the

11   evidence that is presented to you?

12   A       Yes.  I think I could.  Yes.

13   Q       And if the defendant shows not to testify, he

14   might have a number of reasons on why not to testify but

15   it's not your job to be concerned as to that, could you

16   put aside -- it's kind of human nature for a person to

17   say, you know, "If I was on trial for this I would want

18   to get up there and tell my side."

19   A       Right.

20   Q       Or "I would sure like to hear what he's got to

21   say."

22           Now, that might be human nature but in

23   order to be a fair and impartial juror you can't let that

24   be involved in your decision-making process.  You can't

25   say, "Well, I'm not sure they proved it but since he

1    didn't testify."

2    A        Yes.

3    Q        Would you be able to put this all aside and

4    just base your decision on the evidence that is

5    presented, not on some speculation that you might have

6    as to why certain evidence wasn't presented?

7    A        I think I would.  Yes.

8                         THE    COURT:        Twenty-five

9    minutes.

10                        MR. TOWNSEND: Thank you, Your

11   Honor.

12             That Fifth Amendment privilege goes as

13   far as the guilt or innocence stage of the trial but it

14   also  goes  into  that  punishment  phase,  you  know,

15   particularly in a death penalty trial you might if a

16   person was found guilty of it you might sit then and

17   think, well, if he would just get up there and say he's

18   sorry that might make me some difference in the way I

19   felt about this case.

20             But the Fifth Amendment privilege still

21   applies there, he's got a right to testify during that

22   punishment hearing but he also has a right not to testify

23   if he so chooses.

24                        THE POTENTIAL JUROR:  Yes.

25   Q        (BY  MR.  TOWNSEND)   Just  like  in  guilt  or

1   innocence, you can't consider the fact that he doesn't

2   testify and we don't know, you know, if he's going to

3   testify in this trial or not.

4   A       Right.

5   Q       And I'm not really talking about this trial but

6   just murder trials in general.

7                If he doesn't testify on the punishment

8   hearing would you be able to be a fair and impartial

9   juror and set that aside and not consider that in your

10  answer to Special Issue #1 or Special Issue #2?

11  A       Yes.

12  Q       Okay.  In many trials or in all trials you have

13  all sorts of witnesses and to be a fair and impartial

14  juror you have got to be able to start those witnesses

15  out at the same point on the starting line, not give one

16  of them a head start, could you do that?

17  A       Yes.

18  Q       Give everybody a fair chance and listen to

19  everybody's testimony?

20  A       I think I would.  Yes.

21  Q       After you have listened to their testimony, you

22  know, it's perfectly okay for you to say, well, you know,

23  I think -- I believe what that person said or I'm not

24  sure if that person knew what they were talking about or

25  I just think that person was lying.

1   A        Yes, sir.

2   Q        But would you start them out on the same point

3   to begin with?

4   A        Yes.

5   Q        Okay.  And, you know, I doubt that this is

6   going to happen but could you do that in a case like this

7   if there were a witness that you knew?

8   A        I believe I could.

9   Q        Start them out at the same spot?

10  A        Yes.

11  Q        How about if the witness were a police officer,

12  would you be able to start, give them the same, you know,

13  not give them an advantage because they are a police

14  officer but on the other hand not give them a

15  disadvantage because they are a police officer?

16  A        Yes, sir.

17  Q        Would you just hold them to the same

18  credibility standard that you would anyone else?

19  A        Yes.

20  Q        The thing that is important, Ms. Lee, is that

21  we need jurors that are fair, we need jurors that will

22  be impartial, we need jurors who can make the decision

23  that is needed.

24           I will be straightforward with you, the

25  State of Texas in this case is seeking the death penalty

against this Defendant.  And I know that those are harsh words.

          At this point do you have anything to say or any questions you might want to ask me about any of the legal matters that we have discussed or any burden of proof or anything else?

A          No, sir.

Q          Okay.  The important thing to remember is in a death penalty case it's not automatic, you know, once -- we have had people, you know, talked to people in jury selection previously who thought, well, if he's found guilty of capital murder he's automatically going to get the death penalty.

          I think you understand that's not the way it is.

A          Right.

Q          There are still other choices to make.

          Could you make those choices as to guilt and innocence and then having made that choice go through those Special Issues and basically, as I said, "Let the chips fall where they may?"

          If the State of Texas gives you an appropriate case, and only you will be the one to decide whether it's appropriate or not for the death penalty?

A          Yes.

1  Q       But if the State of Texas gives you an

2  appropriate case for the death penalty, an appropriate

3  defendant for the death penalty can you personally do it?

4  A       That's hard to answer if you have never been

5  in that position.

6  Q       I know it is.

7  A       I think I could if I was certain in my mind

8  that he had committed the murder.

9  Q       That he committed the murder?

10  A      That he deserved that penalty.

11  Q      When you say "deserved that penalty", you mean

12  not only "committed the murder" but also you had decided

13  beyond a reasonable doubt that he was going to be

14  dangerous in the future?

15  A      Yes, sir.

16  Q      And then went on to Special Issue #2 and this

17  Special Issue #2 is just strictly going to be kind of

18  your opinion?

19  A      Yes.

20  Q      Your opinion after answering, after looking at

21  Special Issue #2 you have decided there is just not any

22  mitigating circumstances there and you are going to have

23  to answer it "No", if you made that decision in your mind

24  and could you do it knowing what the result of your

25  answer would be?

1    A          I think I could.

2                             MR. TOWNSEND:   May I have a

3    moment, Your Honor?

4                             THE COURT:   You may.

5                             MR. TOWNSEND:  Ms. Lee, I have

6    noticed on your questionnaire that you mentioned that you

7    knew Mr. Old?

8                             THE POTENTIAL JUROR:   Yes.

9    Q          (BY MR. TOWNSEND)  The other attorney that is

10   working in this case, Lance Hinson, do you know him also?

11   A          No, sir.  I don't.

12   Q          Okay.  How do you know Mr. Old?

13   A          I work at a local bank here and I helped him

14   with business in the bank.

15   Q          Okay.

16   A          And especially knowing him from there, we also

17   have mutual friends.

18   Q          Let me ask you this and only you are going to

19   know the answer to it; do you visit in his home, for

20   instance?

21   A          No.  I have never been to his home.

22   Q          Does he visit in your home?

23   A          No.

24   Q          Does the fact that you have -- that you have

25   some sort of acquaintance or friendship with him in the

1    bank, the fact that you have mutual friends, would this

2    give you problems in this case?  Would you have a hard

3    time not leaning to one side or the other, would you lean

4    to his side because of your acquaintance or friendship

5    with him?

6    A        No.

7    Q        And do you feel certain in your mind that this

8    would not be a problem, you wouldn't mind seeing him in

9    the bank two weeks after the trial is over if it didn't

10   come out the way he wanted it to?

11   A        No.

12   Q        It wouldn't cause you a problem?

13   A        No.

14              MR. TOWNSEND:   I pass the

15   witness, Your Honor.

16              THE COURT:  Ma'am, would you

17   like a break or are you ready to proceed with the

18   Defense?

19              THE POTENTIAL JUROR:   I'm

20   fine.  Thank you.

21              THE COURT:  Mr. Old.

22

23

24

25

## VOIR DIRE EXAMINATION

### BY MR. OLD

Q        Ms. Lee, you were asked questions about if you could answer questions based on the premise of beyond a reasonable doubt?

A        Yes.

Q        In the trial of this case that is -- there is a fairly simple explanation of the trial of a case; His Honor the Judge is the Judge of the law in this case, he decides on the law, the facts are strictly in the province of the jury, that is what facts are found?

A        Yes.

Q        In giving you the law the Court gives you a set of written instructions, which have you been on a jury before?

A        Never have.

Q        The Court instructs you on the law in writing, you said you could make findings beyond a reasonable doubt, the law has a special definition of the term "beyond a reasonable doubt", as your oath will imply as a juror you must make your decision in this case based on the law.

A        Yes.

Q        And what that means is you have to accept the

1    Court's definition of a word, if he gives you a

2    definition that is saying that the word has a special

3    legal meaning and you are to use this definition and not

4    your own definition if it be different?

5    A        Right.

6    Q        Okay.  As to the words "beyond a reasonable

7    doubt", I anticipate the Court will instruct you similar

8    to what I'm getting ready to read, "It is not required

9    that the prosecution prove guilt beyond all possible

10   doubt, it is required that the prosecution prove

11   excluding all reasonable doubt concerning the defendant's

12   guilt, a reasonable doubt is a doubt based on reason and

13   common sense after a careful and impartial consideration

14   of all the evidence in the case.  It is the kind of doubt

15   that would make a reasonable person hesitate to act in

16   the most important of his own affairs.  Proof beyond a

17   reasonable doubt, therefore, must be proof of such a

18   convincing character that you would be willing to rely

19   and act upon it without hesitation in the most important

20   of your own affairs."

21            I do not know what you thought prior to

22   today "beyond a reasonable doubt" meant, if you had a

23   definition in your mind or it had a meaning to you that

24   is different from that can you follow the Court's

25   instruction on setting the burden of proof which is

1    beyond a reasonable doubt?

2    A        Yes.

3    Q        I mean can you go back to that definition and

4    say "Whether I agree with it or not I'm going to use that

5    as a standard in this case?"

6    A        I think I could.  Yes.

7    Q        You told Mr. Townsend that if you had a problem

8    with anything based on what you knew before coming to

9    Court today it was the age of the Defendant?

10   A        Yes.

11   Q        And you have two teenage sons?

12   A        Yes.

13   Q        And that caused you to relate to the Defendant?

14   A        Yes.

15   Q        In the questions that Mr. Townsend asked you

16   about as to what he has marked "Special Issue #2" it asks

17   you to take into consideration all of the evidence,

18   including the circumstances of the offense, the

19   defendant's character and background and the personal and

20   moral culpability of the defendant, it asks you then if

21   there is sufficient mitigating circumstances that a

22   sentence of life would be more appropriate than that of

23   death.

24          Do you consider age alone to be a

25   mitigating circumstance?

1          I'm not asking you whether or not you

2     would go one way or another based solely on age but would

3     you consider the age as evidence of mitigation?

4                    MR. TOWNSEND: Your Honor, I'm

5     going to object to that.  I think he's asking her to

6     commit at this time.

7                    THE COURT:  Overruled.

8          Ma'am, he's not trying to commit you one

9     way or the other, he just wants to know if it's one of

10    the factors that you would be willing to consider when

11    you decide whether or not there is a reason to spare a

12    persons' life?

13                   THE POTENTIAL JUROR:  I don't

14    think that that would keep me from making a decision I

15    would make otherwise due  to his age.  I think it's just

16    -- I guess because it's closer to home for me at this

17    particular time in my life and I have never been through

18    this but I do think that if without a reasonable doubt

19    in my mind that he had committed, I don't think that

20    would keep me from doing what needed to be done.

21                   MR. OLD:  I'm going to quarrel

22    with you a moment.

23                   THE   POTENTIAL   JUROR:   All

24    right.

25    Q          (BY   MR.   OLD)    I  don't  think  you  are

1  understanding my question.

2  A       Okay.

3  Q       I'm not asking if you would base your verdict

4  merely upon his age if proven?

5  A       Right.

6  Q       I'm asking you if the age would be evidence

7  that you would consider as mitigating evidence.

8         I'm not saying you would find a

9  particular answer based on it but it is something that

10  you would give your independent -- your deliberation?

11  A       That I would consider?

12  Q       Yes.

13  A       No.  I don't think so.

14  Q       You would not consider age as a mitigating

15  factor?

16  A       So, in other words, if I were deciding between

17  -- you think that might -- I might -- that might prevent

18  me from giving him the death penalty over life

19  imprisonment, is that what you are saying?

20  Q       I'm asking you if it's evidence that you would

21  consider in reaching that decision?

22  A       I honestly don't think his age would keep me

23  from -- no.  I don't.  I don't think that it would.

24  Q       I mean you are saying that age if part of the

25  evidence?

1    A        Sir?

2    Q        If age if proven to you in the trial of a case

3    -- okay, you are saying that you would reject that as

4    evidence in mitigation?

5    A        Well, I'm not saying I would reject it as

6    evidence but I don't think it -- I would -- I don't think

7    it would have bearing on my decision.

8    Q        Would you consider it in reaching your

9    decision?

10   A        No.

11   Q        Would you consider evidence of intoxication or

12   something like that as being a mitigating circumstance?

13   A        Yes.

14   Q        Excuse me, Ms. Lee.

15           In those written instructions you will

16   receive an instruction to the effect as stating a

17   presumption of innocence and that is to say that all men

18   are presumed to be innocent and no person may be

19   convicted of an offense unless each element of the

20   offense is proved beyond a reasonable doubt.

21           The fact that a person has been

22   arrested, confined or indicted for or otherwise charged

23   with the offense gives no rise to inference of guilt at

24   his trial.

25           The Court will further instruct you that

1    the law does not require the person charged with a crime

2    to prove his innocence or to produce any evidence at all

3    and that the presumption of innocence alone is sufficient

4    to acquit a defendant unless you are satisfied beyond a

5    reasonable doubt of the guilt after your deliberation.

6              May I approach the witness?

7              THE COURT:   You may.

8              MR. OLD:   You have been asked

9    to examine the State's Exhibit 3 which is a copy of the

10   indictment in this case.

11             THE POTENTIAL JUROR:   Yes.

12   Q         (BY MR. OLD)   Have you ever been on a Grand

13   Jury?

14   A         No, sir.

15   Q         Has anyone close to you ever been on a Grand

16   Jury, your husband or friends?

17   A         No, sir.

18   Q         Do you know anything about Grand Juries or

19   their procedures?

20   A         No.

21   Q         Can you just totally lay aside in making your

22   findings in this case beyond a reasonable doubt the fact

23   that the document, State's Exhibit 1 exists as any

24   evidence and that is the fact that this man has been

25   charged with a crime, can you totally lay that aside?

1    A        Yes.  Yes.

2    Q        Do you understand that the purpose of an

3    indictment is merely to comply with the law and to comply

4    with the Constitution of the United States in that he

5    must have a definite written charge in order to accuse

6    anybody of anything?

7    A        Okay.

8    Q        The State can just not verbally say, "He

9    committed murder and we want to try him", you must allege

10   what it is in a specific manner that he did?

11   A        Right.

12   Q        And the fact that a Grand Jury indicted this

13   man is evidence of nothing to you?

14   A        I think I could.  Yes.

15   Q        You say you "think you could?"

16   A        Yes.

17   Q        You could lay it aside?

18            But the question is is this evidence of

19   anything that would go to your finding beyond a

20   reasonable doubt in this case?

21   A        No.

22   Q        Back to the presumption of innocence; it tells

23   you that a person charged with a crime does not have to

24   defend himself?

25   A        Right.

1    Q         If -- I believe the example the Judge used the

2    other day, if Mr. Wardlow and I sat here and worked

3    crossword puzzles we were entitled to do that, we didn't

4    have to do anything?

5    A         Right.

6    Q         Just presume with me in the trial of a case,

7    not this case but any case that -- I'm not going to use

8    "crossword puzzles", I think that might offend a juror,

9    if the defendant remains silent?

10   A         Yes, sir.

11   Q         And to the extent that the State put its case

12   on and the defendant put no evidence on, whether he chose

13   to testify or not or called other witnesses, he has

14   offered you no evidence and there existed in your mind

15   a doubt based upon reason, which is a shorthand rendition

16   of "beyond a reasonable doubt", would you not consider

17   the fact that the defendant did not get up and at least

18   raise his right hand and swear to you "I didn't do it?"

19   A         I would base the decision on what I had heard,

20   that's all I could do.

21   Q         "What you had heard?"

22   A         Yes.

23   Q         But the question really is; would the fact that

24   the defendant did not take the opportunity to rebut the

25   State's case by testifying or by calling witnesses, would

1    that create a prejudice in your mind to his side of the

2    case?

3                    There aren't any right or wrong answers

4    to this and I mean, you know --

5    A          Right.  That is hard to answer.  I don't think

6    I would, you know, but I don't know.

7                    I would presume if he were innocent he

8    would want to defend himself.

9    Q          You would presume that?

10   A          That's what I would think.  But I would have

11   to base my opinion as a juror on the evidence that was

12   presented whether that came into the picture or not, Mr.

13   Old, you know -- I honestly don't know.

14   Q          I know you don't know because you have not done

15   this and I'm not making fun of you.

16   A          I understand that.

17   Q          Do you think that there is a chance that in

18   that situation that could, the fact that he didn't

19   testify influence your verdict?

20   A          I don't think so.  I still think I would have

21   to base my verdict on what I had heard.

22   Q          Now, oftentimes lawyers call that a "legal

23   fiction", that is if you are instructed to do something

24   that might be against what we all ordinarily do.

25                    I presume in dealing with your two

teenage sons if they come home late and mother says to them, "Why are you all late?"

And if their answer was "I take the Fifth Amendment" on violence, you certainly would in your judgment as a mother judge that fact against them?

A        Right.

Q        "Right?"

A        Yes, sir.

Q        I mean it's human nature to do that?

A        Yes.

Q        The question is whether you can lay aside that human nature and tendency in the trial of this case, if you will not let that be an indication of anything to you.

I mean, you know, I'm asking you if you think you can or cannot do it.

And I mean I think you are giving a lot of consideration to this, there's not a right or wrong answer, the fair answer is what you think you would do. Can you tell me?

A        I think I could.  Yes.

THE COURT:  Ma'am, you keep using "think" and we are going to talk to you until we get it out.

THE  POTENTIAL  JUROR:  I

1  understand.  I don't mind that.  It's just some of this

2  like he says, it's speculation, what you think you would

3  do and when you haven't been in that situation -- some

4  of this is hard for me to definitely say "Yes" or "No",

5  that's all I'm saying.

6            MR. OLD:  Ms. Lee, are you

7  telling me that you could not tell me the answer to that

8  with any degree of certainty?

9            THE POTENTIAL JUROR: Mr. Old,

10  all I am saying is that I do not think -- I do think I

11  would think over that.  I don't think it would make a

12  difference in my decision.

13  Q          (BY MR. OLD)   But you would -- at least it

14  would be in your mind?

15  A          Yes, sir.  It would be.  That's right.

16  Q          And you think you could lay it aside but you

17  are not sure?

18  A          That's right.

19  Q          Ms. Lee, in the trial of a case the State is

20  as part of their case offers into evidence a statement

21  made by the defendant under certain circumstances the

22  voluntary nature of that statement is a decision that a

23  juror has to make.

24            The question is not whether or not you

25  believe the statement to be true, it's whether or not

1    under those circumstances it was in fact a voluntary

2    statement. And what a juror is told to do and how the

3    Court would instruct you on the law pertaining to

4    statements or confessions would be "You are instructed

5    that under our law a confession of a defendant made while

6    the defendant was in jail or other place of confinement

7    or in the custody of a peace officer shall be admissable

8    in evidence if it appears that the statement was freely

9    and voluntarily made without compulsion or persuasion"

10   and that it goes on to tell you other things that the

11   State must prove to you for it to be voluntary, as in the

12   guilt and innocence and as to punishment issue hereto you

13   make your finding beyond a reasonable doubt?

14   A        Right.

15   Q        Okay. Then after the Court goes through

16   instructing you as to what must be found for you to find

17   it is voluntary the Court will instruct you that "Unless

18   you so find or if you have a reasonable doubt thereof you

19   will not consider the statement or confession for any

20   purpose whatsoever or any evidence obtained as a result

21   of the same."

22            And presume with me a document is

23   offered which the State intends or alleges is a statement

24   by the defendant and it comes into evidence. Then you

25   are asked if it is voluntarily made, you are not asked

1    if it's true or untrue, you are asked first to find

2    whether or not it was voluntary.   The truth of the

3    statement is not the issue at that time and after, of

4    course you will know when you are making your findings

5    you will know what the statement says.

6                    If you found that it was not voluntary

7    would you totally lay aside that statement and evidence

8    that was produced from that statement?

9    A        Yes.

10   Q          Even though you believed it to be true.   Truth

11   is not the issue, voluntariness is the issue.

12   A        Yes.

13   Q        You could lay it aside?

14   A        Yes.   Yes, sir.

15   Q        I would like to ask you a question about

16   lawyers and in considering the answer to this question

17   remember that Mr. Townsend while a prosecutor is still

18   a lawyer, I am just a lawyer, he's a prosecuting lawyer;

19   during the trial of the case the job of a lawyer is to

20   make objections to evidence or procedures and this is

21   what we are trained to do and that is part of -- we are

22   charged with that duty in our profession.

23                    Upon occasion it may be necessary to

24   determine whether or not certain evidence is admissible

25   and that His Honor takes those matters up outside of your

1    presence, that is you would be sent to the jury room or

2    perhaps even excused from the courthouse for some period

3    of time.

4              A lot of people say that that bothers

5    them because we are hiding something from them, as a

6    juror they think they out to be entitled to be present

7    and find out what is going on.   That is one of those

8    things I'm not sure you could tell me for sure how you

9    feel until it happens but I'm asking you to tell me

10   whether or not those instances if they occur in this

11   trial, that is knowing the Court was hearing something

12   without you, would influence your verdict in this case?

13   A      No, sir.

14              THE   COURT:   Twenty-five

15   minutes.

16              MR. OLD:  Okay.  I believe if

17   I am correct on your questionnaire that you were raised

18   in the Episcopal Church and after you were an adult you

19   became a member of the Church of Christ?

20              THE  POTENTIAL  JUROR:   Yes,

21   sir.

22   Q      (BY MR. OLD)  Is there anything in your

23   religious thinking or background -- I'm not implying to

24   a particular doctrine of the Church of Christ or

25   Episcopal Church, I'm not talking about anybody's beliefs

1   but is there anything in that background that goes to

2   capital punishment, whether you are for or against it?

3   A        No.

4   Q        Your answer to the question on capital

5   punishment is simply the first one, "Are you in favor of

6   the death penalty?"

7           And you answer "Yes" and you are given

8   an opportunity to explain.

9   A        Yes.

10  Q        You offered no explanation?

11  A        Yes.

12  Q        Then in the next question you were to circle

13  which statement best represents your feelings and you

14  circled I believe that the death penalty is appropriate

15  in some murder cases and to return a verdict in a proper

16  case which assessed the death penalty.

17          You are at least 29 years of age?

18  A        Yes, sir.

19  Q        Has that been your opinion all of your life,

20  have you changed on this issue from one side to the

21  other?

22  A        No.   That's basically the way I have always

23  felt.

24  Q        When I say "All of your life" I am certainly

25  not talking -- I'm talking about all of your adult life,

1   at the age you became into thinking of this.

2   A        Yes, sir.

3   Q        You have never changed from one side of that

4   issue to the other?

5   A        No, sir.

6   Q        As to peace officers, police, law enforcement

7   officers, whatever you want to call them, Mr. Townsend

8   asked you if any witness could have a head start over

9   another one perhaps because of what he did for a living.

10          My question is simply this; is the fact

11   that the man wears a badge or uniform, does that give him

12   any degree of credibility with you?

13          On the starting line are you saying

14   "Yes" it does give --

15   A        As far as this trial it doesn't give him

16   credibility of him over someone else.  No.

17   Q        I haven't asked you "this trial" yet.

18   A        Okay.

19   Q        I'm talking about in general?

20   A        In general, in everyday life?

21   Q        Yes.

22   A        Does that give that person automatic

23   credibility?

24   Q        Yes.

25   A        If they have a badge?

Q        Or more than someone that does not wear one, a total stranger to you?

A        Yes.

Q        Now, assuming that Mr. Wardlow testified in this case and assuming that, you know, that he's the person charged with a crime and, you know, whatever has been offered as evidence up to this point that the peace officer testifies, is that peace officer going to have more credibility with you when he testifies than Mr. Wardlow?

         The Court will in his charge tell you that you are the exclusive judge of the witness and the weight to be given their testimony.

         Is the fact that he's a peace officer alone going to have credibility in weighing the other?

A        No.

Q        It would not be -- have to be proven to you that he's a bad peace officer or incompetent peace officer or a not so well trained peace officer before his credibility would be lowered to that of another witness?

A        No.

Q        You were asked for your personal opinion about the criminal justice system, you answered, "I think it's not hard enough on offenders."

         Is that based upon general knowledge or

1    is -- does that refer to a specific set of circumstances

2    that you are aware of?

3    A        That is strictly general.

4    Q        And how is it more specifically that the

5    criminal justice -- first, what is the "criminal justice

6    system", what do you define it as being?

7    A        May I -- our system of laws to enforce crimes

8    that are made.

9    Q        Would it be the law, the courts, the appellate

10   courts?

11   A        Pardon me?

12   Q        The law itself, the court -- would the court

13   be part of the "criminal justice system?"

14   A        Yes, sir.  The whole system.  Yes.

15   Q        The penal institutions?

16   A        Yes, sir.

17   Q        If a person is found guilty of capital murder

18   and the issues are not answered in a fashion to result

19   in a death sentence then the sentence is life, you

20   understand that?

21   A        Yes, sir.

22   Q        Do the words "pardon and parole", are they part

23   of the criminal justice system so far as you are

24   concerned?

25   A        What?  I'm sorry.

1    Q        The Board of Pardons and Paroles?

2    A        Okay.

3    Q        Are they part of that criminal justice system

4    that you do not think is hard enough?

5    A        Yes, sir.

6    Q        Are you dissatisfied with at least what is

7    reported to you by the newspaper about the length of time

8    people actually serve on what appears to be long

9    sentences?

10   A        Yes, sir.

11   Q        Do you have any preconceived idea of what --

12   of what percentage of a sentence a defendant may serve

13   based on what you have read or heard?

14   A        No.  Not really.  No, sir.

15   Q        Assume with me in that the law of this State

16   is and that you will be charged with this at least when

17   we get to the punishment phase of this trial that a life

18   sentence for capital murder before you become eligible

19   for a parole that you must serve 40 years and if you are

20   going to assume with me if this is 1994, you add 40 to

21   it and you are not eligible to be even considered for

22   parole until you reached -- what would that be, "2034?"

23   A        "'34."

24   Q        "'34?"

25   A        Yes.

1   Q        Okay.   In knowing that and assuming with me

2   that is correct, going back to Special Issue #2 and you

3   are being asked if there is a sufficient mitigating

4   circumstance or circumstances to warrant that, a sentence

5   of life imprisonment rather than the death sentence be

6   imposed --

7                    MR. TOWNSEND:   Your Honor, I

8   want to object.   I believe Special Issue #2 and parole

9   are related in any way.   I don't believe that is

10  relevant.

11                   THE COURT:   The objection is

12  sustained.

13                   MR. OLD:   Do you understand

14  that -- probably you don't, I don't remember if the Judge

15  talked about it the other day or not, lesser and included

16  offenses that he will probably -- you may be asked in

17  this case if the evidence supports the submission of it,

18  the law as to whether or not he's guilty of capital

19  murder, the lesser included offense of murder, which I

20  think Mr. Townsend referenced to a "plain murder" or

21  "simple murder" and on down through voluntary

22  manslaughter and getting down to the bottom of what could

23  be charged.

24                   I'm not telling you it will be, it will

25  be what the facts would raise.

THE POTENTIAL JUROR:  Right.

Q        (BY MR. OLD)  That would give rise to a range of punishment from a five year probated sentence to a conviction of capital murder of a death sentence.

Now, in considering the range of punishment up into murder, murder is punishable by a term of up to life as opposed to simple murder if that clears it -- versus capital murder or let's say non-capital murder, can you consider the full range of that punishment?  Can you give a man a life sentence for murder?

A        Yes.

Q        And that's simply the intentionally or knowingly killing someone?

A        Right.

Q        As to your views on the criminal justice system, are you dissatisfied with this system because you believe there's not enough death sentences rendered and carried out?

A        That's not necessarily the reason I feel that way.

Q        That's not?

A        No.

Q        In determining mitigation on Special Issue #2 would you take into consideration Mr. Wardlow's family

1    history?

2    A          No.

3    Q          You would not?

4    A          I don't think I would.

5    Q          If he had --

6                        THE COURT:   Mr. Old, before

7    you go any further; I don't have a problem with the

8    question, I have a problem with the question being

9    directed toward your client.

10                       MR. OLD:   Your are correct.

11                       If the person who was on trial had a

12   troubled family history or background would you consider

13   that evidence of mitigation?   Is that something that you

14   would consider in answering Special Issue #2?

15                       THE POTENTIAL JUROR:   No.

16                       MR. OLD:   Can I have just a

17   moment, Your Honor?

18                       THE COURT:   You may.

19                       You have about eight minutes left.

20                       MR. OLD:   As to what you told

21   us earlier on as to the relationship, you having teenage

22   sons and what you believe Mr. Wardlow's age to be, if I'm

23   understanding you correctly that makes you uneasy sitting

24   in this case, would that substantially impair the

25   performance of your duty as a juror if selected?

1              THE POTENTIAL JUROR:   There

2   again, that is hard to answer.  I don't think it would.

3   I don't think it would impair my decision but it might

4   bother -- you know, I can't say it wouldn't be on my mind

5   but I think it would anyone on the jury.

6              MR. OLD:  Your Honor, that's

7   all we have at this time.

8              THE COURT:  Thank you, ma'am.

9              I don't know where you have been waiting

10  but I would like for you to go back where that is and I

11  will bring you back out in a few moments for some more

12  instructions.

13             THE POTENTIAL JUROR:  Okay.

14

15             (The following occurred outside the

16  presence and hearing of the potential juror:)

17

18             THE COURT:  Does the State

19  have any challenges, please?

20             MR. TOWNSEND: No, Your Honor.

21             THE COURT:  Does the Defense

22  have any challenges?

23             MR. OLD:  Your Honor, we would

24  challenge her for cause in that she has clearly stated

25  that she would not consider age, troubled family history

1   or his family history as evidence that would go to

2   mitigation.

3                       THE COURT:  Okay.

4                       MR. OLD:  And the fact that

5   she could not with a degree of certainty tell us that

6   she would not consider the fact that a man did not

7   testify or present evidence on his own behalf.

8                       THE COURT:  Okay.  Any further

9   challenges, please?

10                      MR. OLD:  That's all.

11                      THE COURT:  Let's go off the

12  record.

13

14              (Off the record discussion.)

15

16                      THE COURT:  Let's go ahead and

17  get on the record.

18                      The Court proposes that when we finish

19  questioning or when the attorneys finish questioning a

20  juror I will consider any challenges for cause that are

21  made by either side.  If the Court has a concern or is

22  not sure on one of the issues raised by either side then

23  the Court will bring the juror back for further

24  interrogation by the Court.

25                      If the Court is still not satisfied the

1    Court may invite Counsel to question the juror further.

2            It will normally be my policy not to let

3    the lawyers talk to the juror any further unless I am

4    still unclear, if I do not invite either side to further

5    question the juror and you believe that you do need to

6    question this juror further request permission, I will

7    either grant or deny at that time.

8            As far as rebuttal time or additional

9    questions, sometimes I will consider it, I don't really

10   have any guideline upon you for limits, I would think

11   probably five, six minutes per challenge would be

12   sufficient.

13           Mr. Townsend, do you have any objection

14   to the procedure?

15           MR. TOWNSEND:  No objection,

16   Your Honor.

17           THE COURT:  Mr. Old?

18           MR. OLD:  I don't object to

19   the procedure.

20           THE COURT:  Let's bring back

21   Ms. Lee.

22

23           (State's Voir Dire Exhibit Number 6 was

24   marked for identification.)

25

1              THE COURT:  Let's get on the

2    record.

3              The Court has tendered to both sides the

4    definition of "reasonable doubt", it has been marked as

5    "State's Exhibit 6", even though the Court provided it

6    we are marking it as a "State's exhibit" just to keep it

7    in order with all voir dire exhibits.

8              Does either side have an objection to

9    State's Exhibit 6 which is the Court's definition of

10   reasonable doubt based on statute?

11             MR. OLD:  With the definition

12   of "presumption of innocence?"

13             THE    COURT:      With    the

14   definition of "presumption of innocence" as part of this

15   reasonable doubt definition.

16             MR. TOWNSEND:  No objection,

17   Your Honor.

18             THE COURT: Any objection, Mr.

19   Old?

20             MR. OLD:  No objection.

21             THE COURT:  It is admitted.

22

23             (State's Voir Dire Exhibit Number 6 was

24   received in evidence.)

25

1
2          (The following occurred in the presence
           and hearing of the potential juror:)

3

4                    THE COURT:   Ms. Lee, if you
5          would please go ahead and take your seat.   I have a
6          couple of questions for you.

7                    First, I appreciate your flexibility,
8          we have set you several times and had to reschedule you
9          and I do appreciate your cooperation.

10                   Now, ma'am, when you talked with the
11         lawyers there were a couple of areas that you went over
12         that I'm not clear about, frankly.

13                   Now, I told you at one point in time we
14         are going to try to push you until we get a position one
15         way or another.

16                   THE POTENTIAL JUROR:   Yes.

17                   THE COURT:   I don't like to
18         do that but in order to make sure both sides have a fair
19         trial we have to know where a person stands.

20                   You talked about two areas and that's
21         what you would and would not consider in evidence of
22         mitigation and whether you would or would not consider
23         failure to testify, those are the two areas I want to
24         talk to you about.

25                   Let's talk first about testifying, now,

1   as I told you and the entire group when we started

2   talking a person has the right to either testify or not

3   testify if he's charged with a crime, you said that you

4   would presume that if a person was innocent he would

5   defend himself?

6                        THE POTENTIAL JUROR:   Right.

7                        THE COURT:   Does that mean if

8   he doesn't testify that you may presume that he's guilty?

9                        THE POTENTIAL JUROR:  No, sir.

10  No.

11                       THE COURT:   All right.   You

12  said that you don't think you would consider and that you

13  wouldn't let it influence your decision but you would

14  wonder, what do you mean "you would wonder", are you

15  telling me you would wonder why he did not testify?

16                       THE POTENTIAL JUROR:   Yes,

17  sir.   I think that's what I meant and I think that's

18  human nature to do that.

19                       THE COURT:   I agree.

20            You will have to take an oath if you are

21  on this or any other jury, the oath will be to base your

22  verdict on the law and the evidence.

23                       THE POTENTIAL JUROR:   Yes,

24  sir.

25                       THE COURT:   The law says if

a person chooses not to testify you cannot consider it as any evidence for or against him, it's just nonexistent.

THE POTENTIAL JUROR:  Right.

THE COURT:  He's there but there's nothing to consider.

THE POTENTIAL JUROR:  Right.

THE COURT:  Of course the law says there's nothing to consider and since he didn't testify there is nothing to consider.

Would you be able to follow that direction and base your verdict only on the testimony you did hear?

THE POTENTIAL JUROR:  Yes, sir.

THE COURT:  If you were a juror in a criminal case and the defendant did not testify and you believe that the evidence proved that he was probably guilty but you are not convinced beyond a reasonable doubt, you think he probably is but as you have been told "Probably is not sufficient", you have to be convinced beyond a reasonable doubt?

THE POTENTIAL JUROR:  Right.

THE COURT:  You think he's probably guilty and he did not testify, would that fact

1   be enough then for you to say, "Well, I'm not sure he's

2   guilty but he didn't testify so he must be guilty so

3   therefore I'm going to find him guilty?"

4                    THE POTENTIAL JUROR: No, sir.

5   No.  If I didn't -- if I wasn't sure he was not guilty

6   anyway --

7                    THE COURT: You would not find

8   him guilty just because he didn't testify himself?

9                    THE POTENTIAL JUROR:  Right.

10  That would not be the reason.

11                   THE COURT: So you are telling

12  me, ma'am, that you would be curious, you would want to

13  know but you would set that, your curiosity aside and

14  base your verdict on the evidence that you hear?

15                   THE POTENTIAL JUROR:  That's

16  correct.

17                   THE COURT:  Let's talk about

18  this mitigation for a moment; before you get to the two

19  issues that are before you, the Special Issue asking you

20  whether or not the person would be dangerous and then

21  asking you whether or not there is a reason to spare his

22  life you would have already found a person guilty of

23  capital murder.

24                   THE POTENTIAL JUROR:  Right.

25                   THE COURT: Those issues don't

1   even come up until punishment so in punishment the Court

2   basically says, "Step back, take a look at the facts,

3   take a look at everything you know and then decide

4   punishment."

5           Mitigation is defined as evidence that

6   a juror might consider as reducing the moral

7   blameworthiness, not just forgiving or excusing the act

8   but maybe reducing the moral blameworthiness, maybe he's

9   not quite as blameworthy for this reason or that reason

10  as another person would be.

11          For instance, on family background it

12  could be good or bad family background, you might have

13  a person on trial that has had the best education, the

14  best upbringing and that might be something that you

15  would consider as, "My gosh, you know, as good a

16  background as he has he has no excuse."

17          You might have somebody that has bad

18  family background that has been abused all of his life

19  or early life and you might consider that as some reason

20  what the person did, why the person did it and in the law

21  it doesn't tell you what you have to consider or don't

22  have to consider.

23          You said that you wouldn't consider age

24  or background as mitigating, as to age, I don't want you

25  to look at Mr. Wardlow and think, "Oh, this is the case

1   we are talking about", but the law in general, it could

2   be an 80 year old person on trial in a capital murder,

3   you might take this person's age in consideration instead

4   of having him or her executed you would give him a life

5   sentence, you might have somebody on trial that is 16

6   years old and is certified to be an adult, that may be

7   a young age that you might think because of the young age

8   maybe a life sentence would be appropriate.

9            The law doesn't really tell us what is

10  and isn't mitigating.  It states if you hear evidence and

11  that evidence tells you basically in your heart this

12  isn't a death case, can you give effect to that evidence

13  without turning out any evidence about age or family

14  background or would you listen to it and if it did

15  influence you one way or another act on it or are you

16  just saying "I don't care what the background is, I don't

17  care what the age is, it will not effect my answer to

18  whether or not his life should be spared."

19            We are talking about whether a life

20  should be spared when we get to two, you have already

21  decided Issue #1, you have found he's a danger so at that

22  point it's kind of a safety valve, "Is there any reason

23  at all to spare this person's life?"

24            THE POTENTIAL JUROR:  I think

25  there could be some reason but I do not think that family

1  background or age would be sufficient reason.

2              THE COURT:  But if you hear

3  something that you thought was sufficient?

4              THE POTENTIAL JUROR:  I'm not

5  saying it's just cut and dried, there could be some

6  reasoning.

7              THE COURT:  Thank you, ma'am.

8      You may step down and I probably will

9  not be able to tell you this week whether or not you are

10  on the jury but if you would go back to wherever --

11  Sheriff, where are you keeping them?

12              THE BAILIFF:  In the lounge

13  here.  (Indicating)

14              THE COURT:  If you will go

15  back to the lounge I will send you word as to what to

16  expect next.

17              THE POTENTIAL JUROR:  I can't

18  leave?

19              THE COURT:  You can go back

20  to work shortly but I can't tell you whether or not you

21  will be on the jury until next week but I will have more

22  instruction for you shortly through the Sheriff.

23

24              (The following occurred outside the

25  presence and hearing of the potential juror:)

1

2

3

THE COURT:   I am satisfied that the juror is qualified, I'm going to overrule both challenges for cause.

4

5

6

Since this is the number two juror and not the first juror on our list I will not ask the State or Defense whether they do or don't accept the juror.

7

8

(Off the record discussion.)

9

10

11

THE COURT: Let's take a break and then we will go to our next person.

12

On the record?

13

14

15

16

17

MR. TOWNSEND:   Yes, Your Honor.  This is a letter that was sent to Mr. Old Friday requesting from the Court at this time that Mr. Dunlap, Mr. Bill Dunlap and Mr. Chris Sanders be added as supplemental witnesses.

18

19

I told you I thought this letter was sent Thursday, in fact it was sent Friday.

20

21

THE COURT:   This was the discussion we had prior to beginning voir dire.

22

23

24

MR. TOWNSEND: And the Offense Report is attached.  We had not sent him the Offense Report previously either because we didn't have it.

25

THE COURT:   Mr. Old, take a

1    look at that.

2                         MR. OLD:   So the record will

3    be clear; I have not even received it at this time.

4                         THE COURT:   I understand.

5                         MR. TOWNSEND:   I was thinking

6    it was mailed Thursday but it was mailed Friday.

7                         THE COURT:   I'm not going to

8    have Mr. Old state his position right now, I'm sure right

9    now he's going to oppose it.

10                        Take   a   look   at   it   and   make   your

11   objection in the morning if you have any.

12                        MR. OLD:   I think they need

13   a motion.

14                        THE COURT:   To add?

15                        I agree.

16                        MR. OLD:   Before it could come

17   for consideration.

18                        THE COURT:   Unless you are

19   going to agree I agree with you, Mr. Old, that there

20   needs to be a motion to add to the Witness List before

21   these two witnesses will be considered by me as witnesses

22   and then of course I may or may not allow them to be

23   added.   It depends on why they weren't listed and what

24   they are going to be witnesses for.

25                        Let's go off the record.

1            Everybody take a break.

2

3                  (Recess.)

4

5        MICHAEL CLARK PREDDY, Potential Juror #3,

6    was called as a Potential Juror and, having been

7    previously sworn by the Court, testified as follows:

8

9                          Good afternoon, sir, how are

10   you doing?

11                      THE POTENTIAL JUROR:  Fine.

12                      THE COURT:  Go ahead and take

13   a seat if you would.

14              Let me get your questionnaire out here;

15   you are "Michael Preddy?"

16                      THE POTENTIAL JUROR:  Yes,

17   sir.

18                      THE COURT:  Mr. Preddy, I am

19   Gary Stephens, I am presiding over the jury selection in

20   this case and the trial.

21              First I think you have been scheduled

22   a time or two and I appreciate you being so flexible with

23   us, we had some other matters and me going back and forth

24   from out of town didn't help so thank you for your

25   patience and hopefully now we can get this process done

1    and get you on your way.

2              Now, Mr. Preddy, today the lawyers are

3    going to talk to you about some laws, you have two

4    lawyers that are representing the State, you have the

5    District Attorney from Morris County, Mr. Richard

6    Townsend and you have the elected District Attorney that

7    will take office in January from Cass County, Mr. Randy

8    Lee.

9              MR. LEE:  How are you doing?

10             THE COURT:   Then there will

11   be two Defense Attorneys.   In the courtroom we have Mr.

12   Bird Old, III, his partner for this case is Lance Hinson.

13             Will Lance join us this afternoon, Mr.

14   Old?

15             MR. OLD:  Not this afternoon.

16             THE COURT:  He probably won't

17   be with us but if you are a juror you will see him during

18   the trial.

19             Now, Mr. Preddy, I went over a lot of

20   law with all the jurors, the lawyers are going to revisit

21   some of those areas and they are also going to talk to

22   you about the questionnaire that you filled out.

23             There's no right or wrong answer, you

24   are not on trial, you are under oath, all the answers

25   being given are to be given truthfully but you are not

on trial and your opinions are not on trial.

Frankly, it does not matter what your opinions are as long as you give us truthful opinions.

The lawyers are entitled to know something about you and how you think so they can decide whether or not this is an appropriate case for you.

Often we have jurors that are quite qualified but because of some reason or another they may just not be appropriate for a death penalty case and for the lawyers to decide whether you are appropriate they need to know more about you than we can get on the questionnaire.

So, like I said, your opinions -- we are not searching for answers, this is not a pop quiz, you don't have to try to please or displease us.  Tell us what you think about these issues and we will decide whether or not this is the kind of jury that you need to be on.

If there's a question you don't understand stop us and get us to clarify and if there's anything you want to ask this is your time to do so because if you are selected as a juror we can't talk to you about the case after today.

Also during the interview you are not having -- well, let me back up, we are not permitted to

1    talk about the facts of this case so if any examples are

2    given to illustrate a point don't assume that they are

3    talking about this case, we are talking to you about law

4    in general and the way it applies to the type of case but

5    we are not talking specifically about Mr. Wardlow or the

6    facts of his case.

7                    Mr. Townsend.

8

9                    VOIR DIRE EXAMINATION

10                   BY MR. TOWNSEND

11

12   Q        Mr. Preddy, I'm Richard Townsend, I represent

13   Morris County in this case and as the Judge says, there's

14   no right or wrong answers in these questions.   We are

15   just strictly seeking and want to know what your opinion

16   is.

17                   If you have any trouble understanding

18   me please be sure and let me know, if I'm not clear on

19   what I'm saying or if I'm mumbling or whatever.

20                   I have read your questionnaire, I think

21   I have an understanding of how you feel about the death

22   penalty and I want to talk to you about capital murder

23   cases  in  general  and  about  death  penalty  cases  in

24   particular.

25                   First in discussing, in looking at your

questionnaire I want to talk to you about a few things I see on there, one I see, I notice that you know Mr. Old?

A        Yes, sir.

Q        The other Defense Attorney in this case is Lance Hinson, do you know him?

A        I don't think so.  The name isn't familiar.

Q        How well do you know Mr. Old?

A        I just know who he is.

Q        The fact that you know Mr. Old, would that sway you to one side or the other in this case or would you be able to be fair and impartial without taking into consideration the fact that you know Mr. Old?

A        I would have no problem with it.

Q        I note also in your questionnaire that you have checked that you knew the victim in this case, Mr. Carl Cole?

A        Yes, sir.

Q        The fact that you knew the defendant or knew one of the attorneys involved and knew the victim does not -- does not disqualify you, however we do need to talk with you a little bit about, you know, about what your knowledge of that victim is and that sort of thing and we need fair and impartial jurors and to be a fair and impartial juror you have got to be able even though

1    you know a person involved in a case, even though it be

2    a police officer or victim or whoever it is be able to

3    put that aside, the knowledge that you knew him, put that

4    aside and decide the case strictly on the evidence and

5    not say, "Well, I'm not sure that he's guilty but I knew

6    the victim here and somebody needs to pay for this."

7              Would you be able to put your knowledge,

8    whatever knowledge that is of the victim, would you be

9    able to put that aside and base this case and base your

10   decision in this case strictly on the evidence?

11   A       Yeah.

12   Q       How well did you know Mr. Cole?

13   A       Not real well.  I knew who he was, I had a deer

14   lease, I had to cross the end of his property to get into

15   it.

16              I stopped several times and talked to

17   him there and also I had been to his place to talk to him

18   about cows that had gotten out on the deer lease.

19   Q       Is that the only knowledge that you had of him?

20   A       Yes, sir.

21   Q       You all weren't close friends or anything of

22   that nature?

23   A       No.

24   Q       You don't think that would cause you a problem

25   serving on this jury?

1  A       I wouldn't think so.   No.

2  Q       Going back to murder; in Texas there are two

3  kinds of murder, there's what I'm going to just call

4  "plain murder" and that's where someone has intentionally

5  caused the death of an individual.

6           Now, that's not capital murder, that's

7  just murder.   The punishment on that is five years

8  probation up to 99 years or life and that's to say a

9  murder that takes place intentionally without any legal

10 justification or excuse such as self defense or accident,

11 of course those aren't real murders, those are deaths or

12 homicides but it wouldn't be a murder if it was done in

13 self defense.

14           Do you understand me on that?

15 A       Yes.

16 Q       So we are talking about intentionally causing

17 someone's death but in order for that to be a capital

18 murder a person who is charged in Texas with just plain

19 murder or intentionally causing someone's death, they

20 cannot receive the death penalty, they can receive a life

21 sentence but not the death penalty.

22           In order to qualify for the death

23 penalty you have to be convicted of what we call "capital

24 murder", capital murder is murder as we talk about

25 intentionally causing someone's death plus the person

1    they murdered was a police officer killed in the line of

2    duty, it was a murder that took place during the

3    commission of a robbery, during the commission of a rape

4    or something of that nature.

5                So you have got murder plus another

6    crime involved with it, it's kind of basically what it

7    boils down to.

8                Do you feel like you understand the

9    difference between capital murder and what I'm just

10   calling "plain murder?"

11   A        I think so.

12   Q        And you understand the death penalty is only

13   possible in Texas if we have a capital murder?

14   A        Right.

15   Q        Okay.  In order to seat jurors in this case or

16   any case we have to have those jurors who can be fair and

17   impartial in regard to law and in regard to all sorts of

18   evidentiary matters.

19               In a capital murder case -- first of all

20   let me --

21               Approach the witness, Your Honor?

22               THE COURT:  You may.

23               MR. TOWNSEND:  Let me show you

24   what is the indictment in this case and if you would just

25   read this portion right here and I will ask you a couple

1       of questions about it.

2                      THE POTENTIAL JUROR:   Okay.

3       Q         (BY MR. TOWNSEND)   Can you see where if the

4       State was to prove what was charged in that indictment

5       instead of being just a plain murder that would be a

6       capital murder?

7       A         Right.

8       Q         Based on the allegations in there regarding

9       robbery?

10      A         Yes.

11      Q         Okay.  So that's the indictment in this case.

12                      However, Mr. Preddy, you understand that

13      the indictment is merely a charging instrument, it's not

14      evidence?

15      A         Right.

16      Q         And the fact that a person has been indicted

17      by a Grand Jury is absolutely no evidence of guilt in a

18      trial and could you -- could you put that indictment

19      aside and base your finding in this case strictly on the

20      evidence presented and not be swayed or determine your

21      decision in any part on the fact that a person has been

22      indicted by a Grand Jury?

23      A         Yes.

24      Q         In a capital murder case the possible

25      punishments are life in prison or the death penalty.

1           In order to be a fair and impartial

2    juror we have got to have those jurors -- we have got to

3    have those type jurors who will first decide the person's

4    guilty or not guilty, once they have made that decision

5    a life sentence is not automatic, the death penalty is

6    not automatic.

7           We then have a punishment hearing.  At

8    that punishment hearing there will be more evidence

9    presented and that evidence will tend to -- of course the

10   Defense will be trying to present evidence that would

11   make you want to give the defendant a life sentence, the

12   State on the other hand would probably be presenting

13   evidence that would make you feel that a person might

14   deserve the death penalty.

15          Could you wait and make your decision

16   on the death penalty after hearing all that evidence at

17   the punishment stage and not just based on the guilt or

18   innocence part?

19   A        I feel like you have got to do everything

20   before you can make a rightful decision.

21   Q        So you could wait and not just say "I found

22   this guy guilty of capital murder so I'm automatically

23   going to give him the death penalty?"

24   A        No.

25   Q        You could wait and hear all the evidence?

1    A        Yes, sir.

2    Q        In deciding the death penalty it's not just a

3    matter of hearing the evidence and saying, "Okay, how

4    many want to vote death, how many want to vote life", it

5    doesn't work that way.

6             The way it works in Texas you then go

7    back and decide Special Issues -- if you will there is

8    a sheet of paper up there, if you will look at it, looks

9    kind of like this, that's kind of a flow chart of how a

10   death penalty trial goes.

11            You go to the top, the guilt or

12   innocence, you hear the evidence, if the person is found

13   not guilty the trial is over, if the person is found

14   guilty you go to the punishment phase down in the middle

15   of the page.

16   A        Yes, sir.

17   Q        And then you are going to hear more evidence,

18   the evidence you hear, it might be from a psychologist

19   or psychiatrist, it might be from a family member, it

20   might be evidence of -- of other crimes that the person

21   may have committed, it could be just almost anything that

22   would -- that either the State or Defense might want to

23   use to convince you one way or the other about what the

24   appropriate punishment should be.

25            After you have heard all that evidence

1   you can consider that evidence and you also need to be

2   able to hear that evidence that you heard during the

3   guilt or innocence phase, just kind of reconsider it

4   again for purposes of punishment and you have got to

5   answer these Special Issues and we'll go over those in

6   just a minute.

7              But for right now you are going to

8   answer Special Issue #1, if you answer that issue "No"

9   then the defendant would automatically get a life

10  sentence.

11  A        All right.

12  Q         If you answer that Special Issue with a "Yes"

13  then the defendant  --  then you go to Special Issue #2

14  and Special Issue #2 -- we'll go over it a little bit

15  also -- if you answer Special Issue #2 with a "No" that

16  then the defendant is going to receive the death penalty,

17  if you answer Special Issue #2 with a "Yes" then the

18  defendant is going to receive a life sentence.

19             So you are not saying "life or death",

20  you are answering specific questions "Yes" or "No."

21             Of course you are going to know what

22  those answers are going to cause or you would know that

23  the answer to Number One "Yes" and Number Two "No" then

24  the defendant is going to receive the death penalty.  If

25  you answer them any other way then the defendant would

1    receive a life sentence, are you with me so far?

2    A      Yes, sir.

3    Q      Okay.  There is another sheet up there that

4    looks like this, it -- it's going to say "Special Issues"

5    on the top.

6                Have you got that?  (Indicating)

7    A      Yes.

8    Q      If you will read Special Issue #1 then I will

9    talk to you about that.

10    A      Okay.

11    Q      Okay.  Special Issue #1 I'm going to tell you

12    what it means to me and you tell me if you agree with

13    that or if it means something different to you but

14    basically to me Special Issue #1 just talks about the

15    future dangerousness of that defendant.

16    A      That's what it sounds like.  Yes, sir.

17    Q      We'll go over a couple of things with you,

18    first of all in that Special Issue #1 the State just like

19    they are required to prove guilt beyond a reasonable

20    doubt, we are also required to prove Special Issue #1

21    beyond a reasonable doubt so basically the State has to

22    convince you based on the guilt or innocence evidence and

23    based on the evidence that you heard during the

24    punishment phase that the person -- that there is a

25    probability that he would commit criminal acts of

1    violence in the future that would constitute a threat to

2    society.

3             Now, Mr. Preddy, what we are doing here,

4    you are not going to be required to guarantee that he

5    would commit the further act of violence and you are not

6    even required to predict that he would commit further

7    acts of violence but you are to determine whether it's

8    probable or not.

9             Are you with me so far?

10   A        Yes, sir.

11   Q        I'm going to point out a couple of sentences

12   in here, one is this word "probability", and I think you

13   know what that means but again you are not required to

14   predict it or guarantee it, just the probability.

15            And   this   term   "criminal   act   of

16   violence", what this defendant is on trial for in a

17   capital murder case is a murder, of course, but a

18   criminal act of violence doesn't have to be a murder, it

19   could be an assault, it could be a rape, it could be, you

20   know, any type of violent behavior so we are not required

21   to show you it's probable that he would commit another

22   murder, just that he would commit some other criminal act

23   of violence.

24            Are you with me on that?

25   A        Yes, sir.

Q        Now, if you will now read Special Issue #2 and then I will talk to you about that, it's a little bit more wordy.

A        Okay.

Q        Okay.  Let me tell you what that one means to me and you can agree or disagree; to me Special Issue #2 basically is saying, "Okay, you found a person guilty of capital murder, you decided that he was a future danger to society" but if you have decided, "No" on that then you won't be looking at this issue.

A        Right.

Q        So you found him guilty of murder, capital murder, you decided he was probably going to be a danger to society in the future.  Special Issue #2 basically is saying after making those decisions you need to go back and re-look at all the evidence you have heard again and decide is there anything in there that is sufficiently mitigating to you to make you believe that this person should receive a life sentence rather than the death penalty?

        Now, if you find that there is not enough -- that word is hard for me -- find that there is not enough sufficient mitigating evidence then you answer that question "No" that then a person would receive the death penalty, if you find sufficient mitigating evidence

1    in there then you would answer that question "Yes" and

2    the person would receive a life sentence.

3                  Now, "sufficient mitigating evidence",

4    what is that?

5                  It could be any number of things, it

6    just depends on how you feel about things.  You know, one

7    person might consider the fact that the person was

8    intoxicated at the time the crime was committed, they

9    might consider that a mitigating circumstance, they might

10   say, you know, "If he hadn't been drunk it wouldn't have

11   happened and I think that's enough for me to give him a

12   life sentence" while another person hearing the same

13   evidence might say, "Well, that's no excuse whatever to

14   me.  That's not going to make me any difference."

15                  So you can see one juror as opposed to

16   another juror might hear the same evidence and feel

17   differently about it?

18   A        Yes.

19   Q        So the question you are being asked is just

20   strictly basically your opinion, did you hear something,

21   it doesn't matter whether it's one thing or maybe a

22   combination of things that makes you feel like this

23   defendant should receive a life sentence rather than the

24   death penalty.

25                  I can't tell you what the evidence will

1   be because I don't know but it could be certain things

2   like the age of the defendant, it could be family history

3   of the defendant, you know, he had a rough background or

4   he had a good background or it could be that the

5   defendant is a religious person, it could be the

6   defendant is not a religious person, you know, no telling

7   what kind of evidence you might hear.

8           And with mitigating evidence you are

9   going to hear all this evidence during the punishment

10  phase but it's up to you as a member of the jury, it's

11  up to you to decide whether that evidence is important

12  to you or whether you place much weight on it.

13          But my question to you is; would you

14  consider all the evidence you heard, whether it was

15  evidence of intoxication or age or family background or

16  whatever it might be, would you listen and consider that

17  evidence before making your decision and then make

18  whatever decision you feel is appropriate?

19  A       I think you would have to hear everything

20  before you could make a correct decision.

21  Q       So you would give consideration? You know, you

22  can consider all this evidence or any particular piece

23  of it and say, "Well, I think that's very important, I

24  am really going to, you know, I'm really going to use

25  that in my thought process a lot because I think that's

1    important" or you might say, "You know, that is just not

2    important to me."

3              But you would listen and consider all

4    the evidence before making your decision?

5    A         Yes, sir.  I would.

6    Q         Okay.  Mr. Preddy, on capital murder I want to

7    make sure we go through these steps and make sure that

8    you understand that it's a three step process basically,

9    first you wait and decide and hear the evidence and if

10   the person is guilty or not guilty you make that

11   decision.

12   A         Okay.

13   Q         Then you go to Special Issue #1 which is what

14   we call "future dangerousness", my question to you is if

15   you found a person guilty of capital murder and robbery

16   like we have got in that indictment or murder and rape,

17   whatever it might be, if you find a person guilty of

18   capital murder we need a fair and impartial jury, we need

19   a jury of people who can say, "Okay, I found this

20   defendant guilty of capital murder but I haven't decided

21   his punishment yet, I haven't decided the answer to

22   Special Issue #1 yet."

23              That's this question about future

24   dangerousness, could you wait and hear all the evidence

25   during the punishment phase before deciding your answer

1    on Special Issue #1?

2    A        Yes, sir.

3    Q        And not just automatically say, "Well, he's

4    guilty of capital murder, I am automatically going to

5    answer 'Yes' to Special Issue #1."

6             You wouldn't do that, would you?

7    A        No.  I don't think so.

8    Q        Then after you -- you have answered Special

9    Issue #1 -- let's assume that you answer "Yes" to that,

10   found that he's going to be a danger in the future, you

11   go to Special Issue #2, you have already found the person

12   guilty of capital murder, you have already decided they

13   are going to be dangerous in the future but you still

14   haven't given them the death penalty, you still haven't

15   given them a life sentence until after you have answered

16   Special Issue #2.

17            What we need you to do again is consider

18   all the evidence for the guilt and innocence phase and

19   then through to the punishment phase, consider all that

20   evidence and then answer Special Issue #2 based on that

21   evidence.

22            Could you do that without automatically

23   saying, "Well, I found this guy guilty of capital murder

24   -- we have had jurors in the past who would say, "Hey,

25   I found this guy guilty of capital murder, I decided he

1    was going to be a danger in the future.  I'm going to

2    automatically answer 'No' on that next Special Issue just

3    so I can give him the death penalty."

              But in order to be fair and impartial

5    you need to consider all that before making your

6    decision.

              Would you do that?

8    A        Yes, sir.  I would.

9    Q        Okay.  Let me shift gears with you for a

10   minute, first, let me stop and ask you if there's any

11   questions that you have right now?

12   A        No, sir.  Not right now.

13   Q        Okay.  Let me just talk to you about murder,

14   if you found -- if you heard all the evidence and

15   decided, well, you know, I believe the State has proved

16   to me that the person committed murder but I don't

17   believe they proved the robbery then if the jury decided

18   that then they would find that person guilty of murder

19   but not capital murder, do you see what I'm saying?

20   A        Yes, sir.

21   Q        Because we have not proved that robbery element

22   of the crime.

              Okay.  Then you get to what would be the

24   full range of punishment.

              The full range of punishment in a

1    murder, not capital murder because we have talked about

2    in capital murder it's life or death but in just a murder

3    the full range of punishment is five years probation up

4    through 99 years or life in the penitentiary.

5    A       Okay.

6    Q       Okay.  Now, I think the Judge talked to you all

7    a little bit about this during the jury selection process

8    or during the voir dire a couple of weeks ago.

9    A       Yes, sir.

10   Q       You know a murder can be anything from a

11   vicious act on the one hand that you might feel that you

12   want to give someone a long lengthy sentence or on the

13   other hand it might be something like a mercy killing

14   situation, a situation where an old old couple has lived

15   together for years and one of them is dying of cancer and

16   is in a lot of pain and asks the other one to end that

17   pain for them and that person does it.

18           But that's murder because you have

19   intentionally killed a person.

20           Most people don't see that as being the

21   same kind of thing as what you think of, a vicious

22   murder, so that's the reason the State Legislature gives

23   a broad range of punishment so that you could consider

24   anything from five years probation to 99 years to life,

25   depending on how mean and vicious of a crime it was I

1   suppose so in assessing a murder case could you give --

2   could you give consideration, and I don't mean just the

3   blinking of an eye, but could you consider the full range

4   of punishment before deciding what the proper punishment

5   could be?

6           And you know, we are not asking you to

7   say, "Well, I would give 99 years" or "I would give five

8   years probation", but would you just consider the full

9   range of punishment before making your decision?

10  A       Yes, sir.

11  Q       Okay.   In proving our case the State is

12  required to prove our case beyond a reasonable doubt and

13  we are prepared to do that, if we weren't, you know,

14  there wouldn't be any sense in us being here.

15          We are not required to prove our case

16  beyond all doubt and there's a definition of beyond a

17  reasonable doubt that the Court will probably read to you

18  at some point but for my purposes right now the fact that

19  we have to prove our case beyond a reasonable doubt,

20  would you hold us to that burden?  Is that something that

21  you are accustomed to do and that's okay with you?

22  A       Yes, sir.

23  Q       Okay.   Along with that holding us to our proof

24  beyond a reasonable doubt goes the burden of proof.  The

25  burden of proof in this case rests with the State and I

1   think you are familiar with that, we have got to prove

2   the defendant did it.

3   A         Right.

4   Q         The defendant doesn't have to prove that he

5   didn't do it.

6               Do you think that's fair?

7   A         Yes, sir.

8   Q         And that's kind of the way our system has

9   always worked and that's acceptable to you?

10  A         Yes, sir.

11  Q         Okay.  Now, in proving our case, you know, when

12  I say they don't have a burden of proof, I mean they can

13  sit over there and go to sleep, they are not going to but

14  they could literally.

15               MR. OLD:  Your Honor, I object

16  to him speculating on his question about what other

17  people are going to do or not.

18               THE COURT:  Sustained.

19               MR. TOWNSEND:  They are not

20  required to do anything.

21               You know we are required to prove it and

22  that's all you have -- that's all you can pay attention

23  to to be a fair and impartial juror, you can't sit over

24  there and say, "Well, they didn't do much" or "They

25  didn't do as much as I thought they would."

1    Would you be able to hold us to our

2  burden and make us prove out case beyond a reasonable

3  doubt irregardless of what the Defense may do or may not

4  do?

5                    THE POTENTIAL JUROR:   Yes,

6  sir.  I would.

7  Q          (BY MR. TOWNSEND)  And with that goes the Fifth

8  Amendment privilege that you are probably familiar with,

9  the Fifth Amendment privilege talks about that the

10 defendant has a right to not testify in a trial if he

11 chooses, of course he certainly has the right to testify

12 if he chooses to do that also but when we say that it's

13 our human nature to say or think a little bit, well, you

14 know, I sure would like to hear what he's got to say or

15 if that were me I would want to get up there and testify,

16 that's human nature to say that and think that and we do

17 expect you, you know, to be fair and impartial, you don't

18 have to be able to put that completely out of your mind

19 but just not consider it when you are making your

20 decision, the fact that the defendant didn't testify if

21 in fact that's the way it was.

22                    Would you be able to do that, put that

23 aside?

24 A          Yes, sir.

25 Q          And that goes back to just basing your decision

1    strictly on the evidence.  The evidence is what you hear

2    from the witness stand, anything you don't hear is not

3    evidence.

4    A        Right.

5    Q        So if the defendant didn't testify that's not

6    evidence of anything?

7    A        That's right.

8    Q        Okay.  Would you be able to put that aside?

9    A        Yes, sir.

10                      THE      COURT:        Twenty-five

11   minutes.

12                      MR. TOWNSEND: Thank you, Your

13   Honor.

14            In a criminal trial you have all sorts

15   of witnesses, you might have witnesses that are police

16   officers, you might have witnesses that might be someone

17   you know, might have witnesses of all -- psychiatrists,

18   psychologists, lab technicians, you know, you can go on

19   and on about the type witnesses you might have.

20            We need a fair and impartial juror, we

21   need fair people who can sit there and base all of their

22   decision on their witnesses and give them all -- all, you

23   know, if you are having a track meet you make everybody

24   start out in the same spot, that's what we need our

25   witnesses to do.

1          Would you be able to do that, give every

2     witness a fair chance?

3                    THE POTENTIAL JUROR:     Yes,

4     sir.

5     Q          (BY MR. TOWNSEND)   Okay.  Would you be able,

6     you know, we need you to judge the credibility of those

7     witnesses based on their testimony and based on what you

8     hear from the witness stand and not just automatically

9     believe or disbelieve or not even give a little bit of

10    a head start to anyone just because they were a minister

11    or a police officer or something of that nature.

12                    Could you do that?

13    A          Yes, sir.

14    Q          Start them all out on the same spot?

15    A          Right.

16    Q          I note you had in your questionnaire that you

17    have a relative who works in the police department?

18    A          Used to.  Yes, sir.

19    Q          "Used to work in the police department?"

20    A          Yes, sir.  He's passed away now.

21    Q          Okay.  In a situation like that, let's just

22    talk about police officers for a minute; would you be

23    able to start a police officer off just like you would

24    anybody else, not automatically giving them a little bit

25    of a head start so far as your believing them just

1    because they are police officers?

2    A        No, sir.

3    Q        Okay.  In this case, Mr. Preddy, the indictment

4    talks about a murder and robbery and all, talks about all

5    -- mentions all the elements of the crime, you know, that

6    it happened in Morris County, Texas and so on.

7            The State is required to prove our case

8    beyond a reasonable doubt that as to each and every

9    element.

10           Would you hold us to that burden?

11   A        Yes, sir.

12   Q        Okay.  Let's just talk about a scenario where

13   you have got, let's say you have got a statement

14   purported to be from the defendant, a statement in

15   writing that basically admits guilt.

16           In order to consider that sort of thing

17   you have got to consider one; do you believe the

18   statement is true, but you have also got to consider the

19   voluntariness of that statement, you know.

20           And when I say "Consider the

21   voluntariness of it", that's different than considering

22   did he tell the truth in the statement, you have also got

23   to consider was that statement taken voluntarily or was

24   he coerced or directed into making a statement or, you

25   know, that sort of thing?

1    A        Yes, sir.

2    Q        And I think the Judge's instructions in a

3    criminal case where there's a statement that comes in

4    like that, if they do, is that unless you consider the

5    statement to be truthful then you should give it no

6    weight, unless you consider and also unless you consider

7    the statement to be voluntary you should give it no

8    weight.  The State of Texas is required to prove any

9    statement like that just like we are anything else in the

10   trial, we are required to prove to you beyond a

11   reasonable doubt that that statement was voluntary if in

12   fact such a statement came into a trial.

13            Would you be able to sit on the jury and

14   basically not give any weight to a statement unless you

15   believe, one; that it's truthful and, two; that it was

16   voluntary?

17   A        Yes, sir.

18   Q        And you would hold us to that burden of proving

19   that voluntariness to you beyond a reasonable doubt?

20   A        Yes.  I would.

21   Q        Mr. Preddy, in looking at your answer on the

22   death penalty there you wrote you are in favor of the

23   death penalty -- I know this has been a couple of weeks

24   since you answered this, if you don't remember any of

25   this I can bring it to you and show it to you.

1              THE COURT:   I have got the

2    original here if he needs to refer to it.   If you need

3    your questionnaire let me know.

4              MR. TOWNSEND:   Right up there

5    on the first page, "Are you in favor of the death

6    penalty?"

7              And your answer was "I feel the death

8    penalty will help prevent serious crime."

9              And "With reference to the death penalty

10   which of the following statements would best represent

11   your feeling?"

12             And you circled both "Number 1" and

13   "Number 2."

14             I don't know if you recall what they

15   say.

16             THE POTENTIAL JUROR:   I do

17   not.   No.

18             THE COURT:   Let the record

19   reflect that the Court has handed the original to the

20   juror, the original questionnaire.

21

22             (Handed to the potential juror.)

23

24             THE POTENTIAL JUROR:   Okay.

25             MR. TOWNSEND:   I know, Mr.

1    Preddy, that you filled this questionnaire out before we

2    talked to you today and I have given you some information

3    about the difference between murder and capital murder

4    in Texas and that may have been information that you were

5    not familiar with or were familiar with, I don't know.

6              But after our discussion today you

7    understand that in a capital murder case we need those

8    jurors who can be fair and impartial as to the death

9    penalty and, you know, not automatically say, "Well, he's

10   been found guilty of capital murder, I am automatically

11   giving him the death penalty."

12             Could you do that?  Could you be fair

13   and impartial and not just automatically vote for the

14   death penalty?

15             THE POTENTIAL JUROR:  After

16   you explained it to me a little more I understand more

17   than I did.

18   Q         (BY MR. TOWNSEND)  Then down here at the very

19   bottom of the page it says, "If you are in favor of the

20   death penalty in some murder cases, do you agree that a

21   life sentence rather than the death penalty would be

22   appropriate under the proper circumstances?"

23             And your answer was "No."

24             Now that the law in Texas so far as

25   murder and capital murder has been explained to you do

1   you feel like you could base your decision on a capital

2   murder case, do you feel like that you could, if the

3   facts were appropriate and you are the one that would

4   decide whether they are appropriate or not, do you feel

5   like you could give the death penalty if the facts were

6   appropriate?

7   A       Yes, sir.  I do.

8   Q       Do you feel like if the facts were appropriate,

9   and I'm talking about Special Issue #1 and #2, do you

10  feel like you could give a life sentence if the facts

11  were appropriate?

12  A       Yes, sir.  If everything was proved.  Yes, sir.

13  Q       So Special Issue #1, do you remember -- I

14  remind you that is just like guilt or innocence, the

15  State has got to prove that to you beyond a reasonable

16  doubt?

17  A       Right.

18  Q       Basically we have to prove that the person

19  would be a future danger before you could vote "Yes" on

20  that.

21  A       Yes, sir.

22  Q       So Special Issue #2, that's a little different,

23  that's not a situation where the State has the burden of

24  proof to prove that to you beyond a reasonable doubt,

25  it's just kind of left up to you, it's kind of what is

1      your opinion type thing.

2      A       Okay.

3      Q       Now, do you understand now that we have -- now

4      that we have talked a little bit about murder and capital

5      murder in Texas do you feel that you could go through and

6      be fair and impartial through the entire trial, both the

7      guilt or innocence part and the punishment part and first

8      make your decision on guilt and innocence and then hear

9      all the punishment evidence before deciding your answer

10     to Special Issue #1?

11     A       Yes.

12     Q       Okay.  And just the fact that you found a

13     person guilty of capital murder you wouldn't be leaning

14     toward giving the death penalty until you had answered

15     Special Issue #1?

16     A       Right.

17     Q       And you, when you got to Special Issue #2 you

18     found him guilty of capital murder, you decide he was a

19     future danger to society, when you get to Special Issue

20     #2 would you be able to go back and sort of re-think all

21     the evidence that you have heard and base your answer to

22     Special Issue #2 on what you thought was appropriate and

23     not just automatically, you know, say, "Well, I am going

24     to say 'No' to give him the death penalty" or not

25     automatically say "I'm going to say 'Yes' to be sure he

1    doesn't get the death penalty?"

2    A          Yes, sir.

3    Q          Could you do that?

4    A          Yes, sir.  I could.

5                        MR.  TOWNSEND:     Pass  the

6    witness, Your Honor.

7

8                    VOIR DIRE EXAMINATION

9                        BY MR. OLD

10

11   Q          Mr. Preddy, going to your questionnaire you

12   state on the first page you are in favor of the death

13   penalty?

14   A          Yes, sir.

15   Q          That you think it is a deterrent to serious

16   crimes?

17   A          Yes, sir.  I do.

18   Q          On the next part of the question concerning the

19   death penalty you circled two answers, you first said,

20   "I believe that the death penalty is appropriate in all

21   murder cases" and you are speaking of any time that one

22   takes another's life without justification?

23   A          That's before it was explained different than

24   what it could be, if it was a matter of self defense or

25   defending somebody.

1   Q        You realize if you kill somebody in self

2   defense it's not murder, it's justified?

3            I'm talking about where you have a plain

4   murder, what they referred to as "plain murder", one that

5   is not capital.

6   A        Yes, sir.

7   Q        Do you believe the death penalty is appropriate

8   in this case?

9   A        Not necessarily.  Not now.  No.

10  Q        "Not now" but you did prior -- what changed

11  your thinking from the time you answered this?

12  A        When I sit here and it being explained to me

13  the difference in it.

14  Q        The difference in murder and capital murder?

15  A        Yes, sir.

16  Q        You also checked I believe that "The death

17  penalty is appropriate in some murder cases and I can

18  return a verdict in a proper case which assessed the

19  death penalty?"

20  A        Yes, sir.

21  Q        Now, I am not -- that question was not asked

22  into what you think the law is,  it asks your opinion

23  and you believe  if I am reading  your answer to the

24  first one correctly that in any murder case intentionally

25  or   knowingly   taking   another's   life   without

1    justification --

2                        MR. TOWNSEND:   Object, Your

3    Honor.   I believe he already answered that question that

4    he understands the law better now.

5                        THE COURT:   Overruled.

6                        MR. OLD:   And you are saying

7    that, I mean I'm not saying that you are saying the law

8    is -- you are saying that in your opinion that death

9    ought to be -- is an appropriate punishment for anyone

10   who intentionally or knowingly takes the life of another

11   without justification?

12                       THE POTENTIAL JUROR:   Without

13   justification.

14   Q          (BY MR. OLD)   And "justification" you spoke of

15   being "self defense?"

16   A          Yes, sir.

17   Q          Now, do you understand that capital murder is

18   the commission of the crime of murder with the additional

19   circumstance of having done so in the course of a robbery

20   or kidnapping or rape, killing a peace officer in the

21   line of duty, killing a child I believe under the age of

22   six?

23   A          Yes.

24   Q          Those are the only incidents that capital

25   murder is a legal punishment?

1    A        That's my understanding.   Yes.

2    Q        You then came down and answered "If you are in

3    favor of the death penalty in some murder cases do you

4    agree that a life sentence rather than a death penalty

5    would be appropriate under the proper circumstances?"

6             And you answered "No?"

7    A        Yes.

8    Q        Is that still your belief or your opinion?

9    A        I think that's my opinion.

10   Q        Okay.  Do you think that the correct punishment

11   for murder is death?

12   A        That's correct.

13            Well, --

14   Q        I'm not trying -- I'm just trying to figure out

15   what your thinking is and what your opinion is.

16   A        Like I said, it would have to be justifiable.

17   Q        Are you not -- for you not to give the death

18   penalty it would have to be legally justified to you?

19   A        Yes, sir.

20   Q        And that would be self defense?

21   A        Yes, sir.

22   Q        What else would justify it to you?

23   A        An accident.

24   Q        That's   where   perhaps   a  hunting   accident

25   were --

1    A        Yes.  Yeah.

2    Q        What else?

3    A        A car accident, something like that where

4    someone was killed.

5    Q        But whether in the commission of -- in the

6    commission of another crime such as robbery you think

7    that the death penalty is appropriate if you

8    intentionally or knowingly kill someone?

9    A        Yes, sir.

10   Q        So I mean what you are telling me is when a

11   life is taken without legal justification that it ought

12   to be an eye for an eye or a tooth for a tooth or a life

13   for a life?

14   A        Yes, sir.

15   Q        That's your belief?

16   A        Yes, sir.

17   Q        I'm not criticizing your belief.

18   A        Thank you.

19   Q        You have been told in this case that the range

20   of punishment can range from five years probated to

21   death?

22   A        Yes, sir.

23            MR. TOWNSEND:  Object, Your

24   Honor.  I believe he stated "five years probated to

25   death" and that's not the range of punishment.

1      THE COURT:  Mr. Old, I think

2      I know where you are going but I think since we are

3      talking about the death penalty you need to clarify it

4      would be --

5      THE POTENTIAL JUROR:    Five

6      years probation to life imprisonment?

7      MR. OLD:  Yes.  Depending on

8      what you find a man guilty of, whether you find him

9      guilty of voluntary manslaughter or murder or capital

10     murder?

11     THE POTENTIAL JUROR:    Yes,

12     sir.

13     Q        (BY MR. OLD)   Capital murder, the punishment

14     is life or death.

15     A        All right.

16     Q        And voluntary manslaughter, five years probated

17     to murder, life?

18     A        Yes, sir.

19     Q        Okay.  But you are telling me that your opinion

20     is that if he intentionally kills somebody he ought to

21     get the death penalty?

22     A        Unless it's justifiable cause of death, you

23     know.

24     Q        We -- we have defined justification so you

25     could not give someone a five year probated sentence for

1    intelligently taking the life?

2                    MR. TOWNSEND:   Object, Your

3    Honor.  He's asking him to tell him what he would do in

4    that situation.  He's only required to consider --

5                    THE   COURT:       Sustained.

6    Rephrase it.

7                    MR.  OLD:    You  could  not

8    consider  a  set  of  circumstances  where  a  life  was

9    intentionally taken without legal justification to where

10   you could sentence somebody to five years probation?

11                   THE POTENTIAL JUROR: It would

12   depend on the circumstances.  I would just have to sit

13   there and listen to it and see what all the deciding

14   factors are.

15   Q.       (BY MR. OLD)  Okay.  Now, you have told me that

16   a person is justified if he kills in self defense?

17   A        Yes, sir.

18   Q        And it is justified if it is an accident?

19   A        Say that again, now.

20   Q        Justified if it is an accidental death such as

21   a hunting accident?

22   A        I'm not understanding, apparently.

23   Q        Okay.  Murder?

24   A        "Murder."

25   Q        Murder is the intentional -- intentionally and

1    knowingly killing another without justification, legal

2    justification is that you act in self defense and under

3    the law of self defense.

4    A       Okay.

5    Q       If it was an accident such as I think you

6    mentioned an automobile accident?

7    A       Okay.

8    Q       What else would -- and you told me anytime

9    someone intentionally and knowingly killed someone that

10   you think it ought to be a life for a life, what else

11   would justify to you --

12               MR. TOWNSEND:   Object, Your

13   Honor.  I don't believe that he's required to tell what

14   he considers justification.

15               THE COURT:  Sustained.

16               MR. OLD:  If you found someone

17   guilty of the crime of voluntary manslaughter or of

18   murder based on your answer you have said that a -- you

19   have been asked if a life sentence rather than the death

20   penalty would be appropriate under the proper

21   circumstances and your answer on your questionnaire, you

22   said, "No.  It would not", is that correct?

23               THE POTENTIAL JUROR:  That's

24   what I put down.   Yes.

25   Q       (BY MR. OLD)  Is it a fair statement that based

1   upon your opinions that you have a bias toward the upper

2   end of punishment or the giving of a death penalty?

3   A          I wouldn't say it was "bias", no.

4   Q          What would you say it is?

5   A          I just think that the punishment ought to suit

6   the crime that has been committed.

7   Q          And in response to questions -- upon questions

8   you answered I believe that the death penalty is

9   appropriate in all murder cases, is that still your

10  answer?

11  A          No.

12  Q          You have changed your mind?

13  A          Yes, sir.

14  Q          You said it was after Mr. Townsend explained

15  to you something?

16  A          The difference between murder and capital

17  murder.

18  Q          How -- I mean the question that you responded

19  to by circling "Number 1" one was not asking you what the

20  law was, it asked you what you thought and you said you

21  believe the death penalty is appropriate in all murder

22  cases and it didn't say in just capital murder cases.

23          Now, simply by him telling you that it

24  was not, that simple murder was not punishable by death

25  did that change your opinion?

1    A        To some degree.  Yes.

2    Q        To a degree?

3    A        Yes.

4    Q        But not totally?

5    A        I wouldn't say "totally", no.

6    Q        It is your preference or opinion or belief that

7    simple murder ought to be punished by up to death?

8    A        It could.  Yes.

9    Q        I mean you are in favor of the death penalty

10   being an appropriate punishment in any murder case?

11   A        Not "any", no.

12   Q        In any charge of murder, I'm not talking about

13   the circumstances?

14   A        Okay.

15   Q        You think the range of punishment for the crime

16   of simple murder ought to be from -- well, let's say five

17   years probated to death?

18   A        Yes, sir.

19   Q        In place of "five years to life?"

20   A        Yes, sir.

21   Q        Let me ask you something, can you conceive of

22   a set of circumstances under which a life may be taken

23   or murder committed that you could give as little as a

24   five year probated sentence?

25   A        Yes, sir.

1   Q        Let's presume that -- and I'm not in this
2   particular case -- do you know anything about the facts
3   of this case by hearsay, newspaper or otherwise?

4   A        No.   All I ever read about it was in the
5   newspaper.

6   Q        You have read the newspaper about it?

7   A        Yes, sir.

8   Q        Do you recall what you read?  I'm not asking
9   you what you read.

10  A        That's too long ago.

11  Q        What I mean, back when you read those things
12  did you form an opinion as to anyone's guilt for having
13  caused that?

14  A        No.   Because I don't know what all happened.

15  Q        You knew Mr. Cole?

16  A        Yes, sir.

17  Q        You had been to his house?

18  A        Yes, sir.

19  Q        Do you recall whether or not the report that
20  you read indicated this happened at his house?

21  A        I don't remember.

22  Q        Will you assume with me that it did.

23  A        Okay.

24  Q        Okay.   You have been to that location?

25  A        Yes, sir.

1    Q        I believe you said a couple of times?

2             Did you mean specifically "two times"

3  or "two or more times?"

4    A        I know it's less than a dozen times that I have

5  been there.

6    Q        You have been there more than twice then?

7    A        Yes, sir.

8    Q        Perhaps 10 or 12 times?

9             Did you go in his house?

10    A        No, sir.

11    Q        Did you go to the door?

12    A        Yes, sir.

13    Q        Do you recall whether you went in the front

14  door or carport door or both?

15    A        Usually just walked to the carport and knocked

16  on the door.

17    Q        Do you generally recall what his house looked

18  like, where it is?

19    A        "Where it is?"

20    Q        Do you recall the carport, the door?

21    A        Pretty much.  Yeah.

22    Q        If that particular area that you were in there

23  at the carport door was an issue in this case do you

24  think you could -- excuse me -- was at issue, I mean if

25  that was introduced into evidence do you think that you

1    could lay aside your knowledge of that area and make your

2    decision based upon the evidence here?

3    A        I think you would have to.

4    Q        I think you would have to, too, but can you?

5    I mean you have been there and you know that the door is

6    red -- I'm not saying it's red but just for example, but

7    basically say all the testimony was that it was green and

8    that really was an issue in this case, could you lay

9    aside what you knew of your own knowledge and base your

10   decision on the evidence?

11   A        I think so.  Yes, sir.

12   Q        You mean I could disprove to you something that

13   you knew as a fact, you are just not saying, "Oh, it was

14   red, I'm not sure, I know it was red" and the evidence

15   was that it was green, you could lay that aside?

16   A        Probably not.  No.

17   Q        Let's say that the issue as to the scene was

18   whether or not the door had a glass in it or window and

19   you knew of your own knowledge it did and there was just

20   no evidence offered as to whether it did or not, could

21   you lay aside the knowledge that you had and make your

22   decision on the evidence?  I mean you know it has a glass

23   and that is something that is in issue in your mind, I

24   mean it proves something to you but it wasn't proven, no

25   one asked it in the trial of this case, the evidence

1    wasn't offered, you could totally lay aside something you

2    knew because it wasn't offered in evidence?

3    A         Yeah.  I think so.

4    Q         You think you could?

5    A         Yeah.

6    Q         You could?

7    A         Something as simple as that.

8    Q         Let's say that was crucial on the issue as to

9    whether you would find him guilty or not guilty and you

10   knew there was a glass, a window in the door, there's no

11   evidence to change it, you were going to have to render

12   your verdict from the evidence, you get here in the

13   courtroom?

14   A         Yes, sir.

15   Q         You could lay that aside?

16   A         I think so.  Yes.

17   Q         But you couldn't lay aside knowing what color

18   the door was when they proved to you or testimony was it

19   was another color?

20   A         I don't think -- I don't know, Bird, I really

21   don't know.

22   Q         I mean I'm not trying to play games with you.

23             If in fact you know where you went was

24   the scene of the crime you have some knowledge of it and

25   the more testimony you hear the more you may recall about

1    that particular area.

2            If it came down to the evidence being

3    at variance as to what you accepted in your mind to be

4    true because you have been there could you lay that

5    aside?

6            That is probably the dumbest question

7    I have ever asked but I think I know the answer.

8    A        I couldn't.

9    Q        You could not?

10   A        No.

11   Q        I'm not trying to play games with you, I mean

12   I don't -- you may know something that may be in dispute

13   in evidence.

14            THE COURT:   Excuse me a

15   moment, Mr. Old.

16            Mr. Preddy, when was the last time you

17   went to Mr. Cole's house?  When was the last time you saw

18   it?

19            THE POTENTIAL JUROR:  It would

20   have been over two years ago.

21            THE COURT:  Thank you, sir.

22            THE POTENTIAL JUROR:  I want

23   to say closer to three years because it -- I spent a year

24   and a half in Saudi Arabia.

25            THE COURT:  It would have been

1    before you went to Saudi Arabia?

2                    THE  POTENTIAL  JUROR:    Yes,

3    sir.

4                    THE  COURT:    When  did  you

5    leave?

6                    THE  POTENTIAL  JUROR:    In

7    December of '92.

8                    THE COURT:  So it would have

9    been prior to December of '92?

10                   THE  POTENTIAL  JUROR:    Yes,

11   sir.

12                   THE COURT:  How far back, can

13   you tell me?

14           You said you usually went in that area

15   on a deer lease?

16                   THE  POTENTIAL  JUROR:    I

17   crossed his property to get onto the deer lease.

18                   THE COURT:  Did you see him

19   that season before you went to Saudi Arabia?

20                   THE  POTENTIAL  JUROR:    Yes,

21   sir.

22                   THE COURT:  At his house?

23                   THE POTENTIAL JUROR: No, sir.

24   Saw him on the property.  I did not go to his house.

25                   THE  COURT:    You  didn't  go

1       there?

2                               THE POTENTIAL JUROR:   No.

3                               THE COURT:   You may continue,

4       Mr. Old.

5                               MR. OLD:   You went to Saudi

6       Arabia in December of '92, is that right?

7                       Do you know if in the fall or December

8       of 1992, which would be October through --

9                               THE POTENTIAL JUROR:   October-

10      November.

11                              MR. OLD:   Do you know whether

12      or not you went to his house during that period?

13                              THE POTENTIAL JUROR:  No, sir.

14      I am almost positive that I didn't.

15      Q          (BY MR. OLD)   But you are not sure?

16      A          No.

17      Q          How many times -- did you see him in '92?

18      A          Maybe, Bird.   I'm not sure.

19      Q          A couple of times, more than once?

20      A          Before hunting season or during hunting season?

21      Q          Anytime in that year?

22      A          Maybe seven or eight times.

23                      I would see him -- we would see him up

24      there at the store at Cason several times early on

25      Saturday morning.

```
1    Q         I presume that you go to the deer lease out of

2    deer season, I don't know what you all do but I know you

3    build your stand and maybe plant some wheat or grain or

4    something?

5    A         Yes, sir.

6    Q         Work on your camp?

7    A         Yes, sir.

8    Q         So I mean when you would be going, not just in

9    deer season but pretty well all year around?

10   A         Pretty much.  Yes.

11                        THE    COURT:      Twenty-five

12   minutes.

13                        MR. OLD:  Your Honor, may we

14   approach the bench?

15                        THE COURT:  You may.

16              Sir, could I get you to step out in the

17   hallway for just a minute, right over -- the door you

18   came in.

19

20              (The  following  occurred  outside  the

21   presence and hearing of the potential juror:)

22

23                        THE  COURT:   Let  the  record

24   reflect that the juror is not present.

25              Yes, Mr. Old.
```

1          MR. OLD: Your Honor, the area

2    that he identified as being so far -- the area of Mr.

3    Cole's home is the exact area that as I understand it's

4    the area that the State alleges the crime was committed

5    in the location, it was right there at the door.

6          The fact that he has personal knowledge

7    of that scene and the fact that he cannot totally set

8    aside what he knows of his own personal knowledge if in

9    conflict with testimony would disqualify him as a juror

10   in this case.

11          THE COURT:  I don't know how

12   difficult it will be to find a jury that is not familiar

13   with the area but if the State is willing to agree to

14   excuse the juror will certainly entertain any agreement.

15          MR. TOWNSEND:  I agree on this

16   one, Your Honor.

17          THE COURT:  Do you agree, Mr.

18   Old?

19          MR. OLD:  Your Honor, it was

20   apparent that he knew where the house was, he would be

21   standing at the door.

22          THE COURT:  Do you agree to

23   excuse him?

24          MR. OLD:  Yes, sir.

25          THE COURT:  Mr. Wardlow, do

1        you agree to excuse him?

2                         THE DEFENDANT:  Yes, sir.

3                         THE COURT:  Sheriff, tell him

4        he has been excused, thank him.

5                         And let's stay on the record for just

6        a moment.

7                         Mr. Old, whenever we excuse a juror I

8        normally will ask you and your client if you both agree,

9        if you will tell me in the presence of your client I

10       don't need to ask your client, I will dispense with

11       asking him and just look to you for any agreement.

12                        MR. OLD:  Yes, Your Honor.

13                        THE COURT:  Let's take a short

14       recess and we will talk to number three.

15                        MR. TOWNSEND:  Your Honor?

16                        THE COURT:  On the record?

17                        MR. TOWNSEND:  No.  It doesn't

18       have to be on the record.

19                        THE COURT:  Off the record.

20                        Take a break.

21

22                        (Recess.)

23

24                        (The following occurred in the presence

25       and hearing of the potential juror:)

1       NOLA JEAN LITTLES, Potential Juror #462,

2  was called as a Potential Juror and, having been

3  previously sworn by the Court, testified as follows:

4

5              VOIR DIRE EXAMINATION

6                BY MR. TOWNSEND

7

8                      THE COURT:  "L I T T L E S ?"

9                      THE POTENTIAL JUROR:  Yes,

10  sir.  That's right.

11                      THE COURT:  How are you doing,

12  Ms. Littles?

13              I'm Gary Stephens, we kept you back

14  there for awhile and we are not going to be able to talk

15  to you today but I want to be able to ask you a couple

16  of questions before I reschedule you; first I want to

17  introduce you to two lawyers representing the State of

18  Texas, that's Mr. Richard Townsend, Mr. Randall Lee.

19              We have two Defense Attorneys, only one

20  is present today and that is Mr. Bird Old, III.

21              Seated next to Mr. Old is the Defendant,

22  Mr. Wardlow.

23              Now, ma'am, you filled out a

24  questionnaire and you are here today to talk to us about

25  jury service on a capital murder case.

1          On the second page of the questionnaire

2     you answered a question and it states that you have a

3     moral, religious or personal belief that would prevent

4     you from sitting in judgment on another human.

5          You also answered a question that

6     indicated that you have a moral, religious or personal

7     belief that would prevent you from returning a verdict

8     that would result in the execution of another person?

9          Do you recall answering those questions?

10         THE POTENTIAL JUROR:   Yes,

11    sir.   I do.

12         THE COURT:  Have you ever been

13    called for jury service before in a criminal case?

14         THE POTENTIAL JUROR:   No.

15         THE COURT:   So this is your

16    first experience?

17         THE POTENTIAL JUROR:   Yes.

18         THE COURT:   Ma'am, in most

19    criminal cases a juror is not called upon to ever assess

20    a death penalty, most criminal cases you are called upon

21    to determine whether a person is or is not guilty and if

22    you find that person is guilty then you are called upon

23    to set punishment.

24         If this were a non-death case, if this

25    were a case involving a theft or a burglary would you

1    have any personal or religious view that would prohibit

2    you from sitting as a juror in judgment of a person?

3                    THE POTENTIAL JUROR:   No.

4                    THE COURT:   So it's the death

5    penalty that gives you a problem?

6                    THE POTENTIAL JUROR:   Yes.

7                    THE COURT:   Ma'am, if you were

8    to sit on a case and be called upon to answer certain

9    questions and the questions -- let me back up; in a death

10   penalty case a person does not vote life or death, they

11   answer certain questions, based upon the results of those

12   answers the sentence is either life or death.

13                    A juror is entitled to know the effect

14   of his or her answer so that you would know by answering

15   questions certain ways that the Judge would have no

16   choice but to order a person executed.

17                    If you were to be on a capital murder

18   case the first part of the trial would be for you to

19   determine whether or not the person is guilty.

20                    From what you have told me you could do

21   that?

22                    THE POTENTIAL JUROR:   Yes.

23                    THE COURT:   Now, was that a

24   "Yes?"

25                    Everything is being recorded so I need

1       a verbal answer.

2                            THE POTENTIAL JUROR:    I'm

3       sorry.

4                            THE COURT:  So, now, we are

5       going to assume that you have been selected as a jury

6       member, you have decided a person is guilty of capital

7       murder  and  now  you  are  called  upon  to  determine

8       punishment;  if  you  believed  that  the  evidence  just

9       without any doubt at all, any, led you to believe the

10      answer  should  be  "Yes"  and  "No",  forget  what  the

11      questions are,  just assume that the evidence proves to

12      you  the  answer  to  the  two  questions,  the  first  one  is

13      "Yes",  the  second  one  is  "No",  that's  what  the  evidence

14      tells you but you also know if you answer "Yes" and "No"

15      the Judge will order that person executed, would you be

16      able  to  answer  "Yes"  and  "No"  knowing  that  it  would

17      result in execution?

18                           THE POTENTIAL JUROR:    Well,

19      I would answer truthfully what I felt.   Yes.

20                           THE COURT:  All right, ma'am.

21               I'm going to have you come back, I just

22      wanted to talk to you about those two areas, don't sit

23      there and think, oh, my gosh, I should have answered some

24      other way because I would have asked you a lot of other

25      questions just to get in mind where you are coming from,

1    what you are telling us it would weigh heavily on your

2    mind, you don't want to but if you are sworn in as a

3    juror you are going to follow your oath and do what the

4    law says?

5                              THE POTENTIAL JUROR:   That's

6    right.

7                              THE COURT:   We need to talk

8    to you further, you are not the next in line, I don't

9    want to keep you here until 6:00 or 7:00.

10                   I need you to come back tomorrow morning

11   at 9:00 o'clock, tomorrow morning at 9:30, and we will

12   start with you.

13                   Can you be here?

14                              THE POTENTIAL JUROR:   Yes,

15   sir.

16                              THE COURT:   Then is that

17   agreeable with both Counsel?

18                              MR. TOWNSEND:   Yes, sir.

19                              MR. OLD:   Yes.

20                              THE COURT:   Okay, Sheriff.

21                   Bring out our next juror.

22                   Ma'am, you have a good afternoon.

23                              THE POTENTIAL JUROR:   Thank

24   you.

25                              THE BAILIFF:  Watch your step

1   here, please and have a seat right up there next to the

2   Judge.

3

4           JESSIE ROY COX, Potential Juror #292,

5   was called as a Potential Juror and, having been

6   previously sworn by the Court, testified as follows:

7

8                           THE COURT:   Good afternoon,

9   sir.   How are you doing?

10                          THE     POTENTIAL     JUROR:

11  Tolerable.

12                          THE COURT:   Go ahead and take

13  a seat there and let me find your questionnaire, sir.

14              You are "Jessie Cox", is that correct?

15                          THE POTENTIAL JUROR:   That's

16  correct.

17                          THE COURT:   This is juror

18  number four.

19              Mr. Cox, I am Gary Stephens, I have been

20  assigned to pick a jury and hear testimony in this case

21  and you have been summoned as a prospective juror.

22              We have two lawyers representing the

23  State of Texas, Mr. Richard Townsend, Mr. Randy Lee.

24              We have two lawyers representing the

25  Defendant but only one is present in the courtroom and

1       that's Bird Old, III.

2               His partner for this case is Mr. Lance

3       Hinson who is not present today but will be during the

4       trial.

5               Seated next to Mr. Old is the Defendant,

6       Mr. Billy Wardlow.

7               Now, Mr. Cox, you have filled out a

8       questionnaire and the lawyers are familiar with your

9       answers, they are going to talk to you some about some

10      of the answers and they are also going to talk about the

11      principles of law involved in a death penalty case.

12              You will be asked a lot of questions,

13      the answers will let us know whether or not to put you

14      on the jury.

15              In order to be a juror you must able to

16      understand and follow the law.  You don't necessarily

17      have to agree with the law, you could disagree with the

18      law completely but if you can follow the law you are

19      qualified but if you disagree to such an extent that you

20      can't follow the law you are not qualified.

21              We have also found on death penalty

22      cases even though a person is qualified it doesn't

23      necessarily mean that the person is an appropriate juror

24      so we need to know something about you and how you think.

25      Not only what you think but how you get to those

1    thoughts, it's going to seem like maybe you are on trial

2    and/or your opinions are on trial and I guess you could

3    say they are in a way but we don't really have any --

4    excuse me -- we don't have any right or wrong answers we

5    are looking for.  It's not a pop quiz, it's not a test.

6    We want to know where you are coming from and how you

7    think so we can decide whether to put you on the jury.

8         What you can do to help us, sir, is just

9    be as open and honest as you can and we will make this

10   as short as possible.

11        If there's anything you don't understand

12   you stop us and get us to clarify, if you have a question

13   about the proceedings stop us, ask us what's on your mind

14   because if you are chosen as a juror we can't talk to you

15   about this case after today.

16        I also want you to know when the lawyers

17   are  talking  we  are  not  talking  to  you  about  this

18   particular case unless the lawyer tells you that they are

19   doing so.

20        Usually if an example is given it has

21   to do with some example that the lawyers have made up

22   just to illustrate a point.  The law does not permit us

23   to talk about this case so we are talking about law in

24   general and sometimes we'll apply that to certain facts

25   just to see what your opinions are.

1          Do you have any questions, sir?

2               THE POTENTIAL JUROR: No, sir.

3               THE COURT:   All right.   Mr.

4     Townsend, you may proceed.

5

6               VOIR DIRE EXAMINATION

7               BY MR. TOWNSEND

8

9     Q       Mr. Cox, I'm Richard Townsend, I'm representing

10    the State in this case and I'm the District Attorney in

11    Morris County.

12              Mr. Lee is from Cass county and helping

13    me in this case.

14              I have had a chance to read your

15    questionnaire and I have got a few questions about your

16    questionnaire and I will talk to you also about the law

17    in general.

18              You mentioned in your questionnaire that

19    you have been involved in a court martial, was that as

20    a juror or was it as a witness?

21    A       A witness.

22    Q       Were you a witness for the --

23    A       For the State.

24    Q       -- for the State basically?

25              Okay.  You mentioned in here that you

1    know Bird Old, the Defense Attorney and you said you know

2    him by reputation.

3                    Do you personally know him?

4    A        No.

5    Q        Anything about this situation where you know

6    Mr. Old that would cause you to lean one way or another

7    in this case or could you be fair and impartial to both

8    sides?

9    A        I could be fair and impartial.

10   Q        Okay.  To both the State and the Defense?

11   A        Yes, sir.

12   Q        The other attorney working for the Defense in

13   this case, Lance Hinson, do you know him?

14   A        No.

15   Q        You mentioned somewhere in your questionnaire

16   that you knew some people in prison, could you talk to

17   me about that a minute?

18   A        I had a cousin that was sentenced to some time

19   and a friend of my brother's was sentenced to some time.

20   Q        Okay.  Was that around here locally?

21   A        Yes, sir.  Local.

22   Q        Anything about that situation that made you

23   feel, leave you with hard feelings about defense

24   attorneys or hard feelings about prosecutors or about

25   police officers?

1    A         No.   They got caught.

2    Q         So they deserved what they got?

3    A         They deserved it.

4    Q         You mentioned also in your questionnaire that

5    you had had some prior jury experience I believe, is that

6    right?

7    A         Yes.

8    Q         Okay.   Was that on a criminal case?

9    A         No.

10   Q         Civil case?

11   A         Yes.

12   Q         Okay.   You have never been a juror in a

13   criminal case?

14   A         No.

15   Q         You also mentioned that you knew something

16   about the facts of this case, would that be from the --

17   the day before I was summoned there was an article in the

18   newspaper.

19   Q         Is that all you know about it?

20   A         That's it.

21   Q         Assuming that's all you know or even if you

22   knew something else or heard something else do you, in

23   order to be a fair and impartial juror you have got to

24   be -- only to decide the case based on the evidence

25   presented during the trial.  Would you be able to do that

1    and put aside whatever knowledge you might have, whether

2    it be newspaper or whatever and not consider that as

3    evidence in any way?

4    A        I believe I could.

5    Q        Okay.   Okay.   Mr. Cox, I'm going to ask you

6    some questions about your opinions and things like that,

7    there's no right or wrong answers and if you don't

8    understand any question be sure and ask me again or if

9    I mumble or something make sure you understand what I'm

10   asking.

11   A        I will.

12   Q        I have looked at your questionnaire in

13   reference to your answer about the death penalty, you

14   have answered that you thought the death penalty was

15   appropriate in some murder cases and could return a

16   verdict in a case that assessed the death penalty.

17            I assume from that answer you believe

18   that some murder cases, some capital murders deserve the

19   death penalty?

20   A        That's true.

21   Q        And some capital murder case would deserve a

22   life sentence rather than the death penalty?

23   A        I'm not so sure about that if it's a capital

24   murder case then if a man is convicted or the person is

25   convicted in capital murder then the death penalty should

1    be appropriate.

2    Q        Okay.   Let me talk to you a little bit about

3    murder cases in Texas versus capital murder and about the

4    law in regard to both of those; murder in Texas is a

5    situation where you have intentionally caused someone's

6    death.

7                    And when I say that that's without legal

8    justification such as self defense or accident or

9    something like that.

10                   MR. OLD:   I object.   That is

11   a misstatement of the law.   It's "intentionally or

12   knowingly."

13                   THE COURT:   Sustained.

14                   Rephrase.

15                   MR. TOWNSEND:   Okay.   Murder

16   in Texas is where someone has intentionally or knowingly

17   caused someone's death and that's without self defense

18   or anything like that, they have intentionally or

19   knowingly caused the death of another person.   In Texas

20   that's murder punishable by five years probation up to

21   99 years or life in the penitentiary.

22                   Now, capital murder on the other hand

23   is punishable by either life imprisonment or the death

24   penalty but in order to have capital murder -- in Texas

25   you have got to have what I call "plain murder" what I

1  just talked about, which is intentionally or knowingly

2  causing a person's death but in addition to this you have

3  got to have something else, you have got that murder, the

4  victim must have been a police officer killed in the line

5  of duty or a murder during commission of a robbery,

6  murder during the commission of a rape, something of that

7  nature.

8            So basically what we are talking about

9  for a capital murder is a murder plus something else,

10  plus another felony, you know, robbery or something like

11  that.

12            Can you see the difference between that

13  and capital murder -- excuse me, that and "plain murder?"

14            THE POTENTIAL JUROR:  Yes.

15  Q        (BY MR. TOWNSEND)  Okay.  There's a sheet of

16  paper up there I would like for you to look at -- and

17  approach the witness, Your Honor?

18            THE COURT:  You may.

19            MR. TOWNSEND:  It's basically

20  the indictment in this case.

21            If you will just read over this part

22  right here and then I will talk to you about it.

23  (Indicating)

24            Okay.  Mr. Cox, could you see where if

25  the State could prove all that that rather than just

1   being a plain murder that would be a capital murder

2   because there is a murder and also robbery?

3                         THE POTENTIAL JUROR:   Yes.

4   Q         (BY MR. TOWNSEND)   Okay.   Now, that sheet of

5   paper there is actually the indictment or a copy of the

6   indictment in this case.

7                    Do you understand that an indictment is

8   something that the Grand Jury returns that allows a case

9   to go forward to reach the point where a jury looks at

10  it?

11  A         Yes.

12  Q         Just like I talked to you a minute ago, like

13  you have to decide the facts of the case based on the

14  evidence to be fair and impartial you have got to -- to

15  do just that and that indictment is not evidence in this

16  case of any kind, you know, we have got to prove our case

17  through the witnesses.

18                    Would you be able to put the fact that

19  an individual has been indicted by a Grand Jury, would

20  you be able to put that aside and decide the case just

21  strictly on the evidence presented?

22  A         I believe I could.

23  Q         Okay.   Let me talk to you a little bit about

24  the procedure in a capital murder case, they are a little

25  different than any other kind of case; in a capital

1    murder case the first thing you are going to do -- if you

2    will there is a sheet up there that looks kind of like

3    that that you might refer to that.

4             The first thing you are going to do

5    right there at the top of the page -- you are going to

6    hear evidence on guilt or innocence and after you have

7    heard that evidence you are going to decide one thing and

8    one thing only and that's basically, did he do it?

9             MR. OLD: I'm going to object

10   to that statement and ask that it be removed.  The State

11   has the burden of proving him guilty beyond a reasonable

12   doubt and by his statement -- his statement implies that

13   we have a burden of proof.

14             THE COURT:  Rephrase.

15             Sustained.

16             MR. TOWNSEND:   I'm not sure

17   what I said but basically, Mr. Cox, during the guilt or

18   innocence phase of the trial the State would present

19   evidence and the Defense would present evidence if they

20   chose to and after all that, after you have heard all

21   that evidence you have got to decide first of all the

22   guilt and innocence part of the trial, you decide

23   basically did the State prove their case, did he do it

24   or not?

25             If you decide that the person is not

1    guilty then, of course the trial is over, everybody goes

2    home.

3                   If you find the person guilty then you

4    go on to the next phase and that's what we call in a

5    criminal trial we call that "the punishment phase."

6                   Do you see that down there in the middle

7    of the page?  (Indicating)

8                        THE POTENTIAL JUROR:   Yes,

9    sir.

10   Q        (BY MR. TOWNSEND)   Once you get to the

11   punishment phase you are going to hear more evidence, you

12   are going to hear evidence from the State, you might or

13   might not hear evidence from the Defense side of the

14   table and that -- it's not going to be about whether the

15   person committed the crime or not because you have

16   already decided that he committed the crime in the guilt

17   or innocence stage but that evidence is going to be

18   evidence just about the proper punishment in the case,

19   whether it should be a life sentence or death penalty.

20   And that evidence is going to be anything, it could be

21   evidence of -- that the defendant had a good family

22   history or had a good family background or had a poor

23   family background, it could be evidence from a

24   psychologist or psychiatrist, it could be evidence from

25   the State that the defendant has been involved in

1    criminal activity previously, it could be evidence that

2    he's a religious man, evidence that he's not a religious

3    man, any number of things, just use your own imagination.

4    But basically it would be evidence presented by the State

5    to try to show that the defendant deserved the death

6    penalty and evidence presented by the defendant to show

7    that they felt like the defendant deserved the life

8    sentence.

9             MR. OLD:  It presumes that we

10   have a duty or implies that we have a duty to produce

11   evidence.

12            THE COURT:  Mr. Townsend?

13            MR. TOWNSEND:  Your Honor, I

14   was not allowed to finish my sentence, I was going to

15   finish the sentence with -- was "If they produced

16   evidence."

17            THE COURT:  Overruled.

18            MR. TOWNSEND:  You understand?

19            I was going to maybe cover this a little

20   later but I will cover it right now; the Defense does not

21   have a burden of proof, we have got to prove this case

22   to you beyond a reasonable doubt, the Defense, they don't

23   have to prove that the defendant in a criminal case did

24   not do the crime, we have got to prove that he did.

25            Do you understand that?

THE   POTENTIAL   JUROR:     I

understand that.

Q          (BY MR. TOWNSEND)   It's the same way in the

punishment phase as to the first Special Issue number and

we'll talk about that in a little bit but we have got to

prove that -- that first Special Issue number to you, the

Defense does not have -- when I say "They might choose

to put on evidence", they have the right to do that but

they also have the right not to put on evidence, that's

what their choice is.

          Would that be okay with you if they did

or didn't?

A          Be fine with me.

Q          Okay.   Let me try and get back in line here;

after you hear evidence during the punishment phase then

you are going to go to what we call "Special Issue #1"

and you are going to consider -- I will tell you what

Special Issue #1 is in a little bit but first it's going

down the chart, Special Issue #1, if you vote "Yes" on

that then you would go to Special Issue #2, if you vote

"No" on that then the defendant would automatically get

a life sentence but if you vote "Yes" on Special Issue

#1 then you are going to go to Special Issue #2 and we'll

talk about that in a minute, if you vote "Yes" on Number

Two then the defendant gets a life sentence, if you vote

1    "No" on Number Two the defendant gets the death penalty.

2              If you will, there is another sheet of

3    paper there that looks about like this and on the top it

4    says "Special Issue", do you see that up there?

5    A         Yes.

6    Q         Read Special Issue #1 then we will talk about

7    it.

8              Okay?

9              To me Special Issue #1 basically means

10   that it's a question about the defendant's future

11   dangerousness, is that kind of the way it looks to you?

12   A         That's the way it read to me.

13   Q         Okay.  Special Issue #1 in talking about future

14   dangerousness says that, and again, that's an issue of

15   where the State, we have got to prove beyond a reasonable

16   doubt that there is a possibility that the defendant

17   would commit criminal acts of violence in the future,

18   that would he serve as a continuing threat to society.

19             Now, what it doesn't say, it doesn't say

20   that you are required to predict what he's going to do,

21   you are not.  You are not required to guarantee what he's

22   going to do.

23             MR. OLD:    Your Honor, we

24   object to the statement.  The State is couching it in

25   that it's the State's position that he's speaking to him

1   like that is the law and those are his instructions.

2             THE COURT:  Overruled.

3             MR. TOWNSEND:  Mr. Cox, there

4   is a word here, the word "probability", like I was

5   saying, you are not required -- the State is not required

6   to prove beyond a reasonable doubt or guarantee you that

7   he would commit another act of violence, just prove to

8   you beyond a reasonable doubt that there is a possibility

9   that that would happen.

10            Do you understand the difference there?

11            THE POTENTIAL JUROR:  Yes,

12  sir.  I do.

13  Q         (BY MR. TOWNSEND)  Okay.  And then there is a

14  phrase down here at the end of the second line, it says

15  "Criminal acts of violence."

16            Now, what the defendant would be on

17  trial for is a capital murder but there are many other

18  criminal acts of violence rather than capital murder, an

19  assault is a criminal act of violence, rape, attempted

20  murder, there's a number of criminal acts of violence.

21            You're not required to prove that he

22  will commit another murder, just that it would be

23  probable that he would commit some criminal act of

24  violence.

25            Are you with me so far?

1   A         I'm following you.

2   Q         Okay.  The important thing, Mr. Cox is we have

3   got to have fair and impartial jurors, we have got to

4   have the kind of jurors that can look at the guilt and

5   innocence phase of that trial and at that point you have

6   already decided that person is guilty of the crime but

7   then there are other decisions to make and the Special

8   Issue #1 is, you are required to make a decision on the

9   future dangerousness of that defendant.

10        And we have had jurors who said in the

11  past, who said things like, "Well, you know, if I find

12  a person guilty of capital murder, forget it.   I am

13  automatically going to give them the death penalty."

14        They are not being fair and impartial

15  because in order to be fair and impartial you have got

16  to be able to show, you have got to be able to honestly

17  consider all those issues before answering Special Issue

18  #1, consider all that evidence, both the evidence at

19  guilt and innocence and evidence that you heard during

20  the punishment phase of the trial.

21        Could you do that?  Could you weigh all

22  that evidence before deciding your answer to Special

23  Issue #1?

24  A         I believe I could.

25  Q         Okay.  See, what we are looking for is jurors

1    who are not going to just automatically go one direction

2    or another but base their decision on Special Issue #1

3    on the evidence just like they did the guilt or innocence

4    on the evidence.

5              You could do that?

6    A         I believe so.

7    Q         Okay.  Take a minute there and read Special

8    Issue #2 and then let's talk about it.

9              Okay.  That is kind of a legal mouthful

10   there, isn't it?

11   A         Yeah.  Some pretty long words there.

12   Q         Let me tell you what it means to me and you can

13   tell me whether your agree or disagree; basically Special

14   Issue #2, what it says is, okay, you have already found

15   this person guilty of capital murder, you have already

16   decided in Special Issue #1 that they are a future danger

17   or probably a future danger, in Special Issue #2 it says

18   basically now that you have found those two things is

19   there anything in this case, anything in the evidence

20   that you find that is sufficiently mitigating or reduces

21   the defendant's blameworthiness enough that he should

22   receive a life sentence rather than the death penalty.

23             And so what you are being asked is if

24   you answer "Yes" you are saying, "Well, yes, there's

25   something in this case that makes me think he should

1   receive a life sentence and not the death penalty."

2            If you answer "No" then you have

3   basically said, "Well, I have reviewed all the evidence

4   again and I don't see any reason to give this guy -- any

5   sufficiently mitigating reason to give this guy a life

6   sentence, you know, I think that he should go ahead and

7   get the death penalty."

8            Mitigating evidence, sufficient

9   mitigating evidence is that evidence that reduces the

10  defendant's moral blameworthiness or kind of reduces the

11  blame I guess you might say and that is an issue that the

12  State does not have the burden of proof on, we don't have

13  to prove that to you beyond a reasonable doubt.  That

14  Special Issue #2 is just kind of each juror's opinion.

15           Is there something in there that, you

16  know, it might -- that "something" might be the fact that

17  the defendant is very old, the fact that the defendant

18  is very young, the fact that the defendant was

19  intoxicated when he did it, you know, some people might

20  say, different jurors will look at the same evidence in

21  different ways, one juror might say, "Well, if he was

22  intoxicated that doesn't make any difference to me, he

23  still did it."

24           Another juror might look at the same

25  evidence and say, "Well, you know, I don't believe that

1    would have happened if he hadn't been intoxicated so that

2    makes a difference to me."

3            Do you see what I'm saying?

4    A       Yes.

5    Q       Basically Special Issue #2 is asking you to

6    look back again at all the evidence and see if there's

7    anything in the -- anything there that you find that

8    makes you think the person should receive a life sentence

9    rather than the death penalty, are you with me?

10   A       Yes.

11   Q       And these matters of evidence that I have

12   talked about, it may be psychiatric testimony, it may be

13   testimony about the person's family history, their age,

14   the fact that they were intoxicated or not, it could be

15   any number of things.

16           And the law requires you in order to be

17   a fair and impartial juror, in order to be qualified to

18   sit on a case like this you have got to be able to

19   consider all that evidence.

20           Now, that's not to say you have to put

21   a lot of weight on the evidence, you might consider the

22   evidence and decide that this is really important or you

23   might consider the evidence and decide, well, that's not

24   important at all, as long as you are willing and able to

25   fairly consider the evidence.

1              Do you believe that you could fairly

2   consider any of this type of evidence then make your

3   decision?

4   A        Yes, sir.

5   Q        Okay.  When you say that I mean, you know, you

6   already decided the guy is guilty of capital murder, you

7   have already decided that the defendant is probably going

8   to be a danger to society and you have got to be able to

9   be fair and go back and go over all the evidence and

10  decide that second Special Issue even though you made

11  those decisions on guilt or innocence, even though you

12  made that in Special Issue #1 because after all this is

13  a different question so you have got to re-think

14  everything, could you do that?

15  A        Yes.

16  Q        Okay.  Mr. Cox, I know a lot of this stuff

17  about capital murder and murder is a little -- may be

18  something you are not that familiar with, have not been

19  that familiar with in the past, I know that you have your

20  answer here on the first page was if you are in favor of

21  the death penalty in some murder cases do you agree that

22  a life sentence would be appropriate under the proper

23  circumstances and your answer was "No."

24              Now that we have explained to you the

25  process to go through, what we need are those jurors who

1   can, if they have heard the facts of the case and they

2   have heard all the punishment evidence, they can in an

3   appropriate case give a person a life sentence if they

4   believe the facts are appropriate, on the other hand if

5   they believe that the facts are appropriate give the

6   person the death penalty.

7              Could you just as readily give the

8   person the death penalty or a life sentence if you felt

9   the facts were appropriate for that case?

10  A       If it was appropriate I feel that I could do

11  that.

12  Q       Mr. Cox, we are not -- let me remind you we are

13  not asking you today what you would do in this case or

14  what you would do if this were the evidence, we are just,

15  you know, if the facts were appropriate based on the way

16  you viewed those facts and viewed that evidence could you

17  go one direction or the other, is that right?

18  A       Yes.

19              THE   COURT:     Twenty-five

20  minutes.

21              MR. TOWNSEND: Thank you, Your

22  Honor.

23              Let me back up and talk to you a little

24  bit about some general areas of the law that don't

25  particularly refer to death penalty cases but just about

1    the law in general; in a murder case, not a capital

2    murder but just what I talked about awhile ago as being

3    "plain murder", the punishment range is anywhere from

4    five years probation up to 99 years or life in the

5    penitentiary and the Legislature when they made that

6    decision I think they kept in mind the fact that, you

7    know, there are a lot of different --

8                          MR. OLD:    I object to his

9    speculating about the Legislature did something.

10                         THE COURT:  Sustained.

11                         MR. TOWNSEND: Anyway there's

12   a broad range of punishment there, I think you will agree

13   with me that's a large difference between five years

14   probation and 99 years or life in the penitentiary.

15                    Of course jurors have to take into

16   account the type crime that was involved, vicious murder

17   would be treated probably more severely than as the Judge

18   remarked the other day a mercy killing, a situation where

19   maybe two elderly people have lived together for years

20   and one of the parties has cancer and is in a great deal

21   of pain and really begs the other party to kill them to

22   get them out of their misery.  If that person did that

23   maybe that might not be looked on as severely as your

24   regular vicious type murder.

25                    But anyway, in any case in any criminal

1    case there is a range of punishment.  In murder the range

2    of punishment is from five years probation to 99 years

3    to life.

4              We are asking you today to look in and

5    say, "Well, if I found a person guilty of murder, not the

6    robbery so it was only murder" -- do you see what I'm

7    saying?

8              If you decided that the State had proven

9    beyond a reasonable doubt that a defendant committed a

10   murder, we didn't prove the robbery then that person --

11             THE  POTENTIAL  JUROR:    The

12   difference in a capital murder case and just a murder

13   case?

14   Q        (BY MR. TOWNSEND)  Correct.

15             And keeping in mind that broad range of

16   punishment and all the type murders that if you found a

17   person guilty of murder in order to be a fair and

18   impartial juror and a qualified juror you have got to be

19   able  to  consider  that  full  range  of  punishment,

20   everything from 99 years to five years probation.

21             You  don't  have  to  give  five  years

22   probation, you don't have to give 99 years or life but

23   you have got to be able to fairly -- fairly consider that

24   full range of punishment.

25             Could you do that?

1    A        Yes.  I could.

2    Q        The burden of proof in a criminal case rests

3    with the State of Texas, we accept that and that burden

4    of proof is beyond a reasonable doubt.

5              There is a definition for that and I'm

6    not going to take time to read it to you but basically

7    we are not required to prove the burden -- we are not

8    required to prove our case beyond all doubt but are

9    required to prove it beyond a reasonable doubt and I

10   think we talked a little bit earlier that the defendant

11   on the other hand does not have a burden, they don't have

12   to prove anything, we have got to prove the case, that's

13   the way the law is.

14             You don't have a problem with that, do

15   you?

16   A        No.  I don't.

17   Q        Okay.  Along with that burden of proof there

18   is a couple of things, one is that in a criminal case the

19   defendant can sit quietly, not put on any evidence but

20   you still in order to be a fair juror you have got to

21   base your ruling -- base your decision on the facts

22   presented to you and in the evidence, could you do that

23   and not hold that against the Defense if they didn't

24   produce as much evidence or didn't produce any evidence?

25   A        The way I understand it you have to prove the

1    man is guilty, he doesn't have to prove a thing.

2    Q           Correct.

3                Along with that there is another element

4    of law or another area of the law, the Fifth Amendment

5    privilege and that's where that is concerned is that the

6    defendant has the right not to -- to choose not to

7    testify and the defendant may choose not to testify in

8    a trial.

9                You know, it's kind of human nature if

10   you are sitting on a jury to say, "Well, I would like to

11   hear what he's got to say" or, you know, "If that were

12   me I would want to get up there and tell my side."

13               But there's any number of reasons why

14   a defendant might not testify and what is important about

15   that is that it goes right back to the burden of proof.

16   The burden of proof is still here and what -- what is

17   presented as evidence, the fact that the defendant does

18   present or does not testify, if that happens that is not

19   evidence.

20               Would you be able to base your decision

21   strictly on the evidence and not hold it against the

22   defendant in any way if he chose not to testify?

23   A           I believe I could.

24   Q           Okay.  That also goes, follows and is true when

25   you talk about the punishment phase of a capital murder

1   trial, you might like to hear the defendant get up there

2   and say, "Well, I'm sorry", but the defendant also has

3   the right not to testify during the punishment phase if

4   that's their choice and you have got to base your

5   decision in that punishment phase on the evidence that

6   is presented to you and not on the fact that the

7   defendant chose not to testify even during that phase.

8           Would you be able to do that?

9   A        I believe I could.

10  Q        Mr. Cox, in a criminal case you hear all sorts

11  of testimony from all sorts of witnesses, you might hear

12  testimony from ministers, police officers, lab

13  technicians, doctors, you know, any -- just might have

14  -- hear testimony from someone you know, I wouldn't think

15  so but you never know but the basic thing in a criminal

16  trial is you have got to be able in order to be fair and

17  impartial you have got to start each witness out at the

18  same starting line, not give one of them a little edge

19  before they testify and say, "Well, you know, that guy

20  is a priest, I know he's not going to lie to us" or "That

21  guy is a lab technician, I know he couldn't be mistaken."

22          Do you think you could take each

23  witness, whether he were a police officer or whoever he

24  might be and start them out at the same starting point

25  and not give one a little bit of an advantage, could you

1    do that?

2    A        Well, it would be harder for me to say that a

3    preacher is lying than it would be for a lab technician

4    but I believe I could listen to them and come up with

5    whether they are telling the truth or not.

6    Q        What we are asking you to do is take each

7    witness and start them out at the same spot, listen to

8    their testimony and then after listening to their

9    testimony decide their credibility.

10   A        I could do that.

11   Q        Okay.  And not give that -- what I say, when

12   I say don't give anyone an edge to start out with do you

13   know what I mean?

14           Don't say, "Well, you know, the guy is

15   a minister", you know, we need jurors that are going to

16   be able to say, "I don't care if he's a minister or

17   police officer or who he is, I want to listen to what he

18   has got to say" and then you would decide whether he's

19   telling the truth or not and you wouldn't give them a

20   head start?

21   A        I don't think so.  I don't consider anybody to

22   lie to me until I have caught them in one so I believe

23   I could take each person at his word.

24   Q        Are you saying that you are going to start off

25   believing each witness until they testify in such a way

1    that they bring their believability into question to you?

2    A        Yes.

3    Q        And that would be irregardless of who they

4    were?

5    A        That would be irregardless.

6    Q        Okay.  I have asked you a lot of questions and

7    maybe this is a good time for me to stop and see if

8    there's any question you might want to ask me or anything

9    you want to comment about that I haven't given you an

10   opportunity.

11   A        No.

12   Q        The main thing we are talking about, Mr. Cox,

13   that is important is that you be able to be fair and

14   impartial in this case or in any criminal case and that

15   you be able to follow the law and you and I, everybody

16   else in this room has opinions about the law, if the

17   Judge instructs you on an area of the law would you

18   follow that law even if it was a law that you don't

19   particularly agree with?

20   A        If I could.

21   Q        And that would include the law in Texas about

22   capital murder, the law in Texas about murder or anything

23   else?

24   A        That's -- I am trained to follow instructions.

25   Q        I forgot from your questionnaire, where do you

1      work?

2      A        I'm a mechanic at Pilgrim's.

3      Q        And they -- if the boss tells you what to do

4      you are going to do it?

5      A        That's right.

6      Q        The Court -- in our system the Court is the

7      boss and the Judge will give the instructions of law and

8      those instructions of law, you would be able to read

9      those and follow those?

10     A        I believe I could.

11                        MR. TOWNSEND:    Pass the

12     witness, Your Honor.

13                        THE COURT:   Mr. Old?

14

15                   VOIR DIRE EXAMINATION

16                     BY MR. OLD

17

18     Q        Mr. Cox, I believe your questionnaire -- do you

19     have the questionnaire in front of you?

20     A        No.

21                        THE COURT:    I   have   his

22     questionnaire, I will tender it to him.

23                        There you go, Mr. Cox.

24

25                   (Handed to the potential juror.)

1        MR. OLD:  At the bottom of the

2    first page there is a statement which you answered "No"

3    and if you are in favor of the death penalty -- and you

4    said you were in favor of the death penalty, is that

5    correct?

6        THE POTENTIAL JUROR:   That's

7    what I have got.

8    Q        (BY MR. OLD)  And it says then in some murder

9    cases you agree that a life sentence rather than the

10   death penalty would be appropriate under the proper

11   circumstances and you answered "No, a life sentence would

12   not be proper under the proper circumstances?"

13   A        That's what I said.

14   Q        Is that your answer?

15   A        Well, the way that this man over here put it

16   to me awhile ago I'm not so sure about that.

17   Q        Let me -- the difference is I think Mr.

18   Townsend was telling you the law of when you could give

19   a death sentence and this -- for capital murder and

20   defined capital murder as the commission of murder with

21   the additional --

22   A        With another crime attached.

23   Q        A robbery or -- what?

24   A        "With another crime attached."

25   Q        Yeah.  Okay.

1          Now, the question is just to murder, it

2    doesn't say capital murder or murder, you could conceive

3    of circumstances to where if you were making the law

4    whether -- or confined in this definition of capital

5    murder you can consider whether a plain murder, knowingly

6    and intentionally killing someone, you can consider that

7    it would not be appropriate?

8    A          No.   That's not the way --

9    Q          I'm not trying to put words in your mouth, I'm

10   trying to figure out what you mean.

11   A          No.   In some murder cases another penalty would

12   be appropriate.

13   Q          But I mean you are -- I'm not asking you to

14   agree with what the law is, I mean in your opinion could

15   the death sentence be passed -- passed, extended past the

16   offense of capital murder, is that what you are saying?

17          MR. TOWNSEND:  I don't believe

18   it's relevant on what his opinion is as to what the

19   punishment should be on plain murder.

20          THE COURT:  Overruled.

21          I think it may help both of you to

22   decide whether or not to accept the juror in this, it may

23   not be a legal disqualification, he's just asking,

24   basically asking you if you could change the law would

25   you make death for all murder cases?

1          MR. OLD:   Would you make it

2    for more or --

3                    THE POTENTIAL JUROR:   No.

4    Q          (BY MR. OLD)   You would leave it like it is,

5    that the death penalty would apply in killing a policeman

6    or fireman while he's engaged in his duties, in the

7    commission of a robbery, a kidnapping, a rape and I

8    believe another one is killing a child under six years

9    old.

10             You would not extend the death penalty

11   to any other circumstances under which you could see

12   murder could be committed?

13   A          It   would   have   to   be   some   pretty   bad

14   circumstances.

15   Q          But there are other circumstances that you

16   would include that if you were to -- if you were "King

17   for a Day" so to speak?

18   A          I would hate to have this burden put on my

19   shoulders.

20   Q          Let's presume that you have found a man or a

21   person guilty of murder, I mean how -- and I will let you

22   imagine the facts, you consider it to be a vicious act

23   to which you could not justify in any way and yet it is

24   simply the intentionally or knowingly killing someone,

25   it is not a capital offense.

1    Would you be of the opinion that

2    punishment ought to be greater than life?

3         MR. TOWNSEND: I object again.

4    I'm not sure where he's going with that.   That's not

5    relevant to any issue here.

6         THE COURT:  Sustained.

7         I think you certainly have a right to

8    inquire as to whether or not he would expand or narrow

9    the law but I think that last question is a bit too

10   broad.

11        MR. OLD:   You have made a

12   statement in your answer in your questionnaire to the

13   question you agree that a life sentence rather than the

14   death penalty would be appropriate under the proper

15   circumstances and you say "No."

16        My question is; other than the

17   definition of capital murder that you have been given,

18   the question is as to some murder cases, it doesn't say

19   "Some capital murder cases", were -- do you think as to

20   a plain and ordinary murder case that is non-capital

21   murder death is really more appropriate than life is what

22   the answer --that you may prefer the death penalty?

23        MR. TOWNSEND: Your Honor, now

24   he's trying to get him to tell him a series of facts

25   which he would make a certain decision.  I don't see the

1    relevance there.   I don't believe it's proper to try to

2    tie the juror, potential juror to a certain list of

3    facts.

4                         THE COURT:   I agree that it's

5    improper to try to commit the juror to a specific set of

6    facts.   I don't think that's the question so I'm going

7    to overrule the objection but I'm also going to instruct

8    Mr. Cox if you can answer his question, fine, but if you

9    can't take the circumstances -- excuse me -- you are not

10   required to come up with a set of circumstances.

11                        THE POTENTIAL JUROR:   Let me

12   ask the question and then I will try to answer your

13   question as best I can, all right?

14                        A capital murder case is a murder that

15   is committed with another crime, another felony, is that

16   not right?

17                        MR. OLD:   With some other

18   felony.

19                        THE POTENTIAL JUROR:   Okay.

20   And a murder case is just a murder with no other crime

21   attached?

22   Q           (BY MR. OLD)   The definition of murder is

23   intentionally or knowingly killing someone without

24   justification.

25                        Justification and proof of justification

1    is like self defense which is a defense to murder or

2    perhaps an accident but that negates the intent of

3    intentionally or knowingly.

4                    Where you find someone intentionally and

5    knowingly killed someone without justification is murder.

6    A        If a man was to just walk through that door and

7    not do anything else, just open that door up, stick a gun

8    in and shoot somebody in here for no other reason at all

9    then just to shoot somebody I believe I could give him

10   the death penalty.

11   Q        I mean you believe that the law ought to be

12   that that ought to be punishable by death?

13   A        Some murder cases. Yes.

14   Q        If I suggested to you what you just described

15   what was probably the equivalent of what a drive-by

16   shooting is?

17   A        Yes.

18   Q        And that does not fall into the definition of

19   capital murder.

20   A        I don't know.

21                   MR. TOWNSEND: Object. Calls

22   for a legal conclusion.

23                   THE COURT: Sustained.

24                   MR. OLD: You understand Mr.

25   Townsend's definition of capital murder that does not

1    fall into it?

2                              THE POTENTIAL JUROR:  I guess.

3    I'm not sure whether a drive-by shooting other than the

4    shooting part would be a felony or not.  I am not --

5    Q         (BY MR. OLD)  Let's just assume that that does

6    not fall into capital murder.

7    A         Okay.

8    Q         Now, you are of the opinion or you believe that

9    is something that the law permitting you could punish by

10   death?

11   A         Yes.  I could.

12   Q         I'm not talking about the circumstances of this

13   case.

14   A         I understand.

15   Q         If you heard a case, ended up to be a murder

16   case, not a capital murder and you were of the opinion,

17   well, this is one I think the death penalty ought to be

18   the law in because if you are bias in that case that is

19   being for the death punishment, under those circumstances

20   that's going to effect your verdict or sentence that you

21   give that case?

22   A         No.

23   Q         I mean you will be instructed that you are to

24   follow the law and the Court will tell you what the law

25   is, the Court will give you a written charge telling you

1       the law in this case, that is which law applies and what

2       law applies, he may give you a definition and he may give

3       you instructions as to what you are to do if you are to

4       find -- can you lay aside your pro-capital punishment

5       feelings and set them aside and not have them influence

6       you in reaching a verdict?

7       A       I can stay within the bounds of the guidelines

8       given me.

9       Q       How long have you worked out at Pilgrim's?

10      A       It will be nine years in April.

11      Q       You are a -- are you a supervisor, maintenance

12      supervisor?

13      A       No.

14      Q       I believe when the Judge talked to you all the

15      other day as a group he told you that the trial was going

16      to last, estimated two weeks or more?

17      A       Yes.   That's what the Judge said.

18      Q       That's your recollection?

19              Do you know whether or not Pilgrim's

20      pays employees when they are on jury duty?

21      A       They do.

22      Q       They do?

23              So you will be paid when you are here

24      or there?

25      A       Yes, sir.

1  Q        You are a Sergeant in the Texas National Guard?

2  A        I am a "Sergeant 1st Class."

3  Q        Are you connected to the Army here, the

4  division that is here?

5  A        Yes, sir.

6  Q        What is your specialty?  You are engineers?

7  A        No.  We are infantry.

8  Q        "Infantry?"

9           Other than a "Sergeant 1st Class" are

10  you an infantry sergeant?

11  A        I am an infantry sergeant.

12  Q        Do you have any specialized training?

13  A        No.

14  Q        I see that you belong to Talco Volunteer Fire

15  Department?

16  A        I do.

17  Q        How long have you belonged to that entity?

18  A        Over five years.

19  Q        Are you active in that organization?

20  A        I make every meeting I can.

21  Q        Do you make an effort to make those meetings?

22  A        Yes.  I do.

23  Q        I mean it's a serious undertaking to you?

24  A        Yes.  It is.

25  Q        I mean I am sure as in every organization there

1    are some of those people that joined and never show up?

2    A        There are those.

3    Q        But you are a serious member of that

4    organization?

5    A        Yes.  I am.

6    Q        Do you hold any rank in that organization?

7             I don't know how you all do that.

8    A        I am pretty low on the totem pole, I am

9    Assistant Training Officer.

10   Q        "Assistant Training Officer?"

11   A        Yes.

12   Q        Mr. Townsend asked you about giving equality

13   to the witnesses, that is the fact that one of them I

14   believe was a preacher and a law enforcement officer,

15   maybe you answered with or he asked with do law

16   enforcement officers if witnesses are testifying does

17   that badge of authority or their office, does that give

18   them some degree of credibility with you merely because

19   they are a peace officer?

20   A        Well, I have known some good ones and I've

21   known some bad ones.

22   Q        Okay.

23   A        But --

24   Q        You told me that you took everybody to tell you

25   the truth until you found different?

1   A       That's true.

2   Q       Do you consider it more likely for a peace

3   officer to tell the truth than a non-peace officer?

4   A       It's like I said, I take everybody for their

5   word.

6   Q       I mean they don't have anymore credibility with

7   you than just a plain old person would have?

8   A       Yes, sir.  They do.

9   Q       What is that?

10  A       They are -- that's their job, they are supposed

11  to be honest and -- in everything that they do.

12  Q       Now, you believe them to be that?

13  A       Not all of them.

14          There's got to be some good ones and

15  there's got to be some bad ones.

16  Q       But you are going to make that judgment after

17  you observe them?

18  A       I'm going to do the best I can.

19  Q       You are not going to say, "I really believe

20  that we are going to hear the truth from this man because

21  he's wearing a badge", you are going to say "Let's hear

22  what he's got to say and judge him on what we see?"

23  A       That's the way I will do it.

24                  MR.   OLD:    Approach   the

25  witness?

1    THE COURT:  You may.

2    MR. OLD:  I'm looking for --

3    I show you what has been marked "Defendant's Voir Dire

4    Exhibit 1", it is a Witness List and I would like to give

5    you a minute to review it and what I'm asking you about

6    this list is if you know or think you know any of the

7    people on this list.

8

9    (Handed to the potential juror.)

10

11   THE POTENTIAL JUROR:  The only

12   witness in here, that "Ragsdale."  (Indicating)

13   MR. OLD:  What page are you

14   on?

15   THE POTENTIAL JUROR:  Number

16   2.

17   Q    (BY MR. OLD)  Do you know Mr. Ragsdale?

18   A    I don't -- the last name is the only one that

19   is familiar with me and I worked with a "Ragsdale" but

20   his name was "Jessie."

21   That's the only name that is familiar

22   with me.

23   Q    You don't know James Franklin Ragsdale?

24   A    Not that I know of.

25   Q    Anyone else?

1    A      I don't see anybody on here.  I'm not familiar

2  with any of the law enforcement people in Daingerfield

3  other than my aunt.

4    Q      Who is your aunt?

5    A      Martha Cox.

6    Q      And is she in law enforcement?

7    A      She is a deputy in Daingerfield.

8    Q      What type deputy is she?

9    A      I really don't know.  I don't know if she works

10  for the City or the County.

11    Q      She is your --

12    A      My aunt.

13    Q      Do you have a fairly close relationship with

14  her?

15    A      I see -- well, I love her if that's what you

16  mean.

17    Q      Let me -- do you all see each other at

18  Thanksgiving, Christmas, family reunions?

19    A      Just about that, Thanksgiving, maybe Christmas

20  every other year, it's not --

21    Q      Is she your mother's --

22    A      She's on my daddy's side.

23    Q      Your father's sister?

24    A      No.

25    Q      Your father's --

1    A          Sister-in-law.

2    Q          Did you and she have a close relationship at

3    anytime, for instance when you were a child?

4    A          No.

5    Q          Did you go visit in their home?

6    A          Yes.  We did -- do that.

7    Q          Spend a few days with them from time to time?

8    A          Yes, sir.  Spent the night with them a few

9    times.

10                       MR. OLD:  Your Honor, could

11   we have a short break?

12                       THE COURT:  You mean like a

13   couple of minutes?

14                       Sir, could you step down, please and

15   return back to the lounge and we'll come get you in a

16   moment.

17                       MR. OLD:  May we approach the

18   bench?

19                       THE COURT:  You may.

20

21                       (The following occurred outside the

22   presence and hearing of the potential juror:)

23

24                       MR. OLD: Your Honor, I cannot

25   identify with certainty, I believe that in some of the

1    information that I have been provided and particularly

2    records that were part of the Sheriff's Department the

3    name "Martha Cox" rings a bell.  I would not swear that

4    it is in there, I need to know if it is there, if Mr.

5    Townsend knows her I need an opportunity to look and if

6    my understanding -- correct me if I'm wrong, I think she

7    is a juvenile officer, that is her expertise.

8             MR. TOWNSEND:  I can't answer

9    that for you but she is not listed as a witness either

10   on the guilt or innocence phase nor on the punishment

11   phase.  I don't foresee any circumstance were she would

12   be a witness.

13            MR. OLD:  I'm not telling you

14   it is there, it rang a bell when I heard Martha Cox's

15   name.  I don't know if it appeared on any of the

16   documentation of the file, that discovery is through

17   another witness, it is possible that's a document that

18   she authorized, approved.

19            THE COURT:  Let's finish voir

20   dire, ask him if she has mentioned the Defendant's name

21   if you wish.

22            MR. OLD:  Yes.

23            THE COURT:  And then after we

24   finish the voir dire and recess since we are not getting

25   challenges stated on the record today I will let you look

1   over your record and if you find that she is connected

2   with the case we'll either work something out or bring

3   him back.

4               Bring him back in.

5

6               (The following occurred in the presence

7   and hearing of the potential juror:)

8

9               THE COURT:   Mr. Cox, if you

10  would take a seat right back upon the stand, please.

11              Mr. Old, you may proceed.

12              MR. OLD:   Mr. Cox, has your

13  Aunt Martha Cox mentioned to you specifically or

14  generally anything about the incident that gives rise to

15  the charge that is being tried here?

16              THE   POTENTIAL   JUROR:   I

17  haven't seen Aunt Martha in four or five months.

18  Q       (BY MR. OLD)  Well, I mean this -- if you will

19  look at the indictment the date alleged is within that

20  period of time, about a year ago.  (Indicating)

21  A       I didn't pay any attention to it.

22  Q       I mean --

23  A       As far as I know of I can't remember anything

24  that she would say.

25  Q       You never heard her discussing it?

1    A        No.

2    Q        Is there a probability that you are going to

3    see her say this Thanksgiving?

4    A        I can't say.

5    Q        I mean --

6    A        As far as I know we are not going over to their

7    house or they are not coming to our house but I can't say

8    whether or not I will see her or not.

9    Q        Well, that's fine.  At any family gathering?

10   A        We are not planning any.

11   Q        Is it in the realm of possibility that within

12   the next month that you would see her?

13   A        Yes.

14   Q        Okay.  You checked that you or one of your

15   family had been a victim of a crime.

16   A        What page are you on?

17   Q        That's on page 10, victim of a crime, a witness

18   to  a  crime  or  been  interested  in  the  outcome.

19   (Indicating)

20   A        Yes.

21   Q        Okay.  Can you tell me what crime?  Were you

22   personally the victim of a crime?

23   A        No.  I have never been so far as I know, I have

24   never been a victim of a crime.

25   Q        It was somebody near you a victim of a crime?

1    A        My brother.

2    Q        What type of crime was it?

3    A        He was accused of stealing some gas or

4    something at Talco at the school.

5    Q        When he was accused -- what is your brother's

6    name?

7    A        "Michael Cox, Billy Michael Cox."

8    Q        Which store was that?

9    A        I think it was the school.

10   Q        "At the school?"

11   A        Yes.

12   Q        I thought you said "At the store in Talco."

13   A        No.

14   Q        You were a juror in a civil case?

15   A        Yes, sir.

16   Q        And did you all try it to a conclusion?

17   A        Yes.

18   Q        Did you all render a verdict?

19   A        Yes, sir.

20   Q        Do you remember the name of the case?

21   A        I remember half of it.  It was a pharmacist.

22   Q        "Bill Chambers?"

23   A        Yes.

24   Q        Was it over a stock transaction?

25   A        Yes.  It was.

1    Q        You said that you had read an account in the

2    newspaper about this trial or the facts giving rise to

3    it or alleged facts?

4    A        Yes.

5    Q        Would it take evidence to remove from your mind

6    what you have read?

7    A        I can't even remember what it was about.

8    Q        You just remember --

9    A        It was a small deal and --

10   Q        It was not anyone purporting to know what

11   happened or commenting on what happened?

12   A        Not that I could -- it was just upcoming trial

13   or something, I'm not even -- I can't even remember what

14   it was all about but within a couple of days after I read

15   that I got the summons to appear.

16   Q        Did it say something about maybe the jury

17   selection would be starting at some point?

18   A        I think that was it.

19   Q        Do you know anyone that lives in the Cason

20   area?

21   A        I know some people that did.

22   Q        Who are they?

23   A        Willie Simpson, I work with him.

24   Q        Do you -- Cason has a volunteer fire

25   department, does Talco train with them, work with them,

1    assist them or --

2    A        We would if they called us but I'm not -- I

3    don't remember ever going over this away, I have never

4    gone past Mount Pleasant.

5    Q        Do you all have meetings together?

6    A        No.

7    Q        Or perhaps trained some together?

8    A        No.

9    Q        Does the term "beyond a reasonable doubt" have

10   a meaning to you?

11   A        Yes.  It does.

12                    MR.   OLD:      Approach    the

13   witness?

14                    THE COURT:  You may.

15   Q        (BY MR. OLD) Let me show you Exhibit 6 and I'm

16   pointing at the sentence starts, "The prosecution has the

17   burden of proving" and let me get you to read the rest

18   of that page.

19                    That  is  the  legal  definition  of

20   "reasonable doubt", at the conclusion of the trial when

21   His Honor instructs you that is part of the law that he

22   will instruct you on.

23                    Now, that definition may or may not vary

24   from your definition, if it does can you lay aside what

25   you believe a reasonable doubt to be and follow the

1   instruction of the Court?

2   A        I can follow the instructions of the Court.

3   Q        Okay.  But I mean if you had prior to reading

4   that definition, if you had another definition of it can

5   you lay that aside and not let it influence you?

6   A        That is the way that reads is the way I think.

7   Q        That's the way you think?

8   A        That's the way I think.

9   Q        You have been shown a copy of the indictment

10  earlier?

11  A        Yes.  And I was instructed to read this part

12  right here.  (Indicating)

13  Q        Yes.

14               Do you consider the fact that -- the

15  fact that a man has been indicted or charged any

16  inference, not evidence, "any inference" of guilt, does

17  it say anything to you that makes you believe he's

18  guilty?

19  A        It means that he has been accused of it.

20  Q        But it means it -- it's not evidence of

21  anything?

22  A        No.

23               My brother was accused of stealing the

24  gas but he was innocent.

25  Q        The State has got to prove it?

1   A       The State has got to prove it.

2   Q       Back to the presumption of innocence, the

3   defendant is not required as you have been told to do

4   anything and I mean -- let's assume that in the trial of

5   this case so far as offering you evidence the defendant

6   did absolutely nothing, he orderly sat here, he did not

7   call witness, he did not testify himself.

8           Would you consider the fact that he did

9   not present evidence to you or testify himself, would you

10  consider that as evidence against him?

11  A       No.

12  Q       Okay.  Can you totally lay aside that fact if

13  this were the case that he didn't testify?

14          I mean does that -- I mean do you think

15  that would raise a question of curiosity in your mind

16  wondering why he did not?

17  A       I am sure I would have a question but --

18  Q       But can you lay it aside and not let it

19  influence your verdict?

20  A       Yes.

21  Q       Did you know Mr. Townsend prior to the other

22  day?

23  A       I don't believe so.  Never met him before in

24  my life.

25  Q       Do you know the Sheriff or any other law

1    enforcement officers in Morris County?

2    A          Other than my aunt.  No.

3               Well, wait a minute.  I believe one of

4    my cousins is a law enforcement officer over there, too,

5    it's her daughter Gina.

6    Q          "Zena?"

7    A          "Gina."

8    Q          "Gina Cox?"

9    A          It used to be, I don't even know her last name

10   now.

11              MR. TOWNSEND:  "Cornelius."

12              MR. OLD:  "Cornelius" ring a

13   bell?

14              THE POTENTIAL JUROR:  Yeah.

15   He's a big guy.

16              MR. TOWNSEND:  No he's not.

17              MR. OLD:  Is she with the

18   Sheriff's Department?

19              THE POTENTIAL JUROR:  She is

20   not but her husband is, he's a pretty big guy.

21              MR.  OLD:  And  he  is  an

22   officer?

23              MR. TOWNSEND:  No.  Yeah.

24   He's a reserve for the City, "Jimmy Cornelius."

25              MR. OLD:  Do you know Jimmy

1    Cornelius, her husband?

2                    THE POTENTIAL JUROR:   I have

3    met him about three times.

4    Q        (BY MR. OLD)  Well, I mean his name was not on

5    the Witness List, could that create any problem with you,

6    the fact that you have got three relatives that are law

7    enforcement officers in Morris County and this is a

8    Morris County case?

9    A        It wouldn't be a problem to me.

10   Q        If you were selected on the jury and you would

11   be instructed not to talk to anybody about the case, you

12   would have no problem obeying that instruction even if

13   you had Thanksgiving dinner with them?

14   A        It wouldn't bother me a bit.

15   Q        It wouldn't bother you a bit?

16                    If they tried to discuss it with you

17   what would you do?

18   A        I would tell them I couldn't talk about it.

19   Q        If they persisted what would you do?

20   A        I would politely ask them not to ask me those

21   questions, that I couldn't talk about it.

22   Q        Well, you know, I am sure you have had a

23   conversation at least with your wife sometime or another

24   when you told her you didn't want to talk about it and

25   she told you that she didn't and the question kept being

1   asked?

2   A        Well, that could cause a problem.

3   Q        Would your solution to such an encounter be to

4   get up and leave if you felt like it got to that

5   point?

6   A        If it got to the point where it would create

7   an argument, yes, I would.

8   Q        Create an argument or you heard information

9   that you shouldn't hear or wouldn't want to hear, I mean

10  I presume if you are sitting on this jury and were

11  going to obey your oath you certainly would not want

12  somebody coming around whispering in your ear talking to

13  you about --

14  A        If I was instructed not to talk about the

15  case I would do the best of my ability not to talk about

16  it.

17  Q        Okay.  I believe you when you say that and I

18  believe you wouldn't do it but I'm talking about if

19  somebody perhaps tried to tell you something, would you

20  put distance between you and them quickly?

21  A        Yes.  I would.

22  Q        The Cox's -- I cannot think of the man's name,

23  there used to be a "Cox" in Daingerfield, perhaps he

24  still is, had "Cox's Relish?"

25  A        Different.

1        MR. TOWNSEND:  "Melvin."

2        MR. OLD:  "Melvin Cox?"

3        That's not a relation?

4        THE POTENTIAL JUROR:  No.

5        MR. OLD:  Your Honor, we have

6   nothing else.

7        THE COURT:  Mr. Cox, if you

8   will step down and step out of the room for a moment.

9   I will have some further instructions for you in just a

10  minute.  We are about finished.

11

12        (The following occurred outside the

13  presence and hearing of the potential juror:)

14

15        THE COURT:  Does the State

16  have any challenges, please?

17        MR. TOWNSEND:  None, Your

18  Honor.

19        THE COURT: Does the Defendant

20  have any challenges?

21        MR. OLD: Other than reserving

22  for review some documents in this case to see if any of

23  his relations, be blood or marriage turn out to be a

24  potential witness in this case we do not have any

25  challenges.

1              THE COURT:   Like I said, I

2    will give you a chance to look over your evidence and if

3    it becomes an issue you can recall him or we will discuss

4    it among ourselves.

5              I'm going to instruct Mr. Cox not to

6    discuss this matter with anyone until a decision has been

7    made.

8              Bring Mr. Cox.

9              THE BAILIFF:   Mr. Cox.

10             MR. OLD:   Your Honor, can we

11   hold on just a moment?

12             THE COURT:   Please hold on,

13   Leo, hold up just one moment.

14             MR. OLD:   Mr. Wardlow tells

15   me that on two occasions Gene Cox has transported him to

16   this courthouse, I don't -- was it today?

17             THE COURT:  Well, then, until

18   he -- until we decide whether or not he's a juror I'm

19   going to order the Sheriff's Department not use her to

20   transport him or have any of the Cox's talk to him

21   whatsoever.

22             And I will let Mr. Townsend relay that

23   message.

24             MR. TOWNSEND:   I will get a

25   letter out there.

1    Actually there's Jim Cornelius, he's a

2 dispatcher, her husband who is a City reserve police

3 officer, Martha Cox who is a deputy, her husband Gene

4 Cox is a reserve  deputy so there's  actually four

5 people.

6    Gene Cox who is the reserve deputy is

7 the one who has transported Billy.

8    THE COURT:  "Gene Cox?"

9    MR. TOWNSEND:  At least more

10 than -- once I know, maybe more than once but I know

11 once.

12    THE COURT:  Mr. Townsend, you

13 make  sure  that  Morris  County  knows  that  no  law

14 enforcement  agent  associated  with  Mr.  Cox  be  involved

15 with  Mr.  Wardlow  from  this  point  forward  until  the

16 decision is made about Mr. Cox's jury service.

17    MR. TOWNSEND:  I will do that

18 this evening, Your Honor.

19    THE COURT:  Bring in Mr. Cox.

20

21    (The following occurred in the presence

22 and hearing of the potential juror:)

23

24    THE COURT:  Mr. Cox, you don't

25 have to come back up here.

1      We are going to release you for the day

2   but I cannot tell you whether or not you will be part of

3   this jury, I can probably not tell you until the latter

4   part of next week, we are going to go through several

5   jurors then we will make a decision about that group then

6   we will go through another group so until you are told

7   you are not on the jury consider yourself a prospective

8   juror.

9           I don't want you to discuss this case

10   with your wife, your family, your friends or with anyone,

11   especially law enforcement in Morris County.

12           So if anyone attempts to talk to you

13   just tell them that I told you you can't talk about it

14   until   I have told you whether or not you are on the

15   jury.

16           And if you are on the jury I will have

17   more instructions for you, if you are told that you are

18   not on the jury you can talk to anybody as much as you

19   want.

20           Do you have any questions today?

21           THE POTENTIAL JUROR: No, sir.

22           THE COURT:   We will be in

23   contact toward the end of next week.

24           Have a nice day.

25           We will recess until tomorrow morning,

1   9:30.

2

3                        (Record closed for October 24th, 1994.)

4

5                        (Whereupon Court was recessed until 9:00

6   a.m., October 25th, 1994.)

7

8

9                              *****

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

STATE OF TEXAS      §
                    §
COUNTY OF TITUS     §

I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on October 24, 1994, and were reported by me.

I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY HAND this 31ST day of January, 1995.

_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

Certification Number of Reporter:  149

Expiration Date of Certification:  12/31/96

Business Address:   Drawer 1868
                    Mt. Pleasant, Texas 75456-1868

Telephone Number:   903/577-6735

Transcribed By:   Tandra K. Gibson