



CAUSE NO. 12,764

THE STATE OF TEXAS          §   IN THE DISTRICT COURT OF
                            §
VS.                         §   TITUS COUNTY, TEXAS
                            §
BILLY JOE WARDLOW           §   76TH JUDICIAL DISTRICT


STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 25, 1994

**VOLUME 12 of 43 volumes**


FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk


ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

# VOLUME 12

## VOIR DIRE EXAMINATION

OCTOBER 25, 1994                                    PAGE/VOLUME

APPEARANCES . . . . . . . . . . . . . . . .          1/12

MORNING SESSION . . . . . . . . . . . . .          3/12

POTENTIAL JUROR, NOLA JEAN LITTLES, (CONTINUING)
        EXAMINATION BY MR. TOWNSEND . . . .          6/12
        EXAMINATION BY MR. OLD  . . . . . .         15/12

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .         29/12

RECESS  . . . . . . . . . . . . . . . . .           30/12

POTENTIAL JUROR, FRED EARL BARKER
        EXAMINATION BY MR. TOWNSEND . . . .         34/12

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .         56/12

RECESS  . . . . . . . . . . . . . . . . .           57/12

DISCUSSION CONCLUDED  . . . . . . . . . . .          58/12

NOON RECESS . . . . . . . . . . . . . . .           59/12

AFTERNOON SESSION . . . . . . . . . . . . .          59/12

POTENTIAL JUROR, MARY NELL EDWARDS
        EXAMINATION BY MR. TOWNSEND . . . .         63/12
        EXAMINATION BY MR. OLD  . . . . . .         88/12

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . . .        119/12

RECESS  . . . . . . . . . . . . . . . . .          122/12

POTENTIAL JUROR, J.D. REYNOLDS
        EXAMINATION BY MR. TOWNSEND . . . .        130/12

RECESS  . . . . . . . . . . . . . . . . .          138/12

POTENTIAL JUROR, J.D. REYNOLDS, (CONTINUING)
        EXAMINATION BY MR. OLD  . . . . . .        147/12

VOLUME 12

VOIR DIRE EXAMINATION

(CONTINUING)

OCTOBER 25, 1994                                    PAGE/VOLUME

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . . .    178/12

DISCUSSION CONCLUDED  . . . . . . . . . . .        181/12

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . . .    187/12

COURT ADJOURNED . . . . . . . . . . . . . .        188/12

COURT REPORTER'S CERTIFICATE  . . . . . . .        189/12

*****

1

VOLUME 12

2

ALPHABETICAL INDEX OF

3

POTENTIAL JURORS

4

<u>OCTOBER 25, 1994</u>                                    <u>PAGE/VOLUME</u>

5

<u>POTENTIAL JUROR, FRED EARL BARKER</u>
EXAMINATION BY MR. TOWNSEND . . . . . . . .        34/12

6

7

<u>POTENTIAL JUROR, MARY NELL EDWARDS</u>
EXAMINATION BY MR. TOWNSEND . . . . . . . .        63/12
EXAMINATION BY MR. OLD  . . . . . . . . . .        88/12

8

9

<u>POTENTIAL JUROR, NOLA JEAN LITTLES</u>
EXAMINATION BY MR. TOWNSEND . . . . . . . .         6/12
EXAMINATION BY MR. OLD  . . . . . . . . . .        15/12

10

11

<u>POTENTIAL JUROR, J.D. REYNOLDS</u>
EXAMINATION BY MR. TOWNSEND . . . . . . . .       130/12
EXAMINATION BY MR. OLD  . . . . . . . . . .       147/12

12

13

14

***** *

15

16

17

18

19

20

21

22

23

24

25

3

1                          CAUSE NO. 12,764

2    THE STATE OF TEXAS        §   IN THE DISTRICT COURT OF
                               §
3    VS.                       §   TITUS COUNTY, TEXAS
                               §
4    BILLY JOE WARDLOW         §   76TH JUDICIAL DISTRICT

5

6                       STATEMENT OF FACTS

7                     VOIR DIRE EXAMINATION

8                        October 25, 1994

9                     **VOLUME 12 of 43 volumes**

10

11             Before Honorable Gary R. Stephens

12              Judge by Judicial Assignment

13          (Venue changed from Morris County, Texas)

14

15                         APPEARANCES

16

17   ATTORNEYS FOR THE STATE OF TEXAS:

18             MR. RICHARD TOWNSEND
               District Attorney
19             Morris County Texas
               Morris County Courthouse
20             Daingerfield, Texas 75638

21                       and

22             MR. RANDY LEE
               Assistant District Attorney
23             Cass County Texas
               P.O. Box 940
24             Linden, Texas 75563

25

1   ATTORNEYS FOR THE DEFENDANT:

2       MR. BIRD OLD, III
        Old, Rolston & Old
3       P.O. Box 448
        Mt. Pleasant, Texas 75456-0448

4
                and
5
        MR. LANCE HINSON
6       Law Offices of Danny Woodson
        P.O. Box 399
7       Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          On the 25th day of October, 1994, the

2   above-entitled and numbered cause came on for hearing

3   before said Honorable Court, Judge Gary R. Stephens of

4   Midlothian, Texas, serving by judicial assignment in the

5   District Court of Titus County, Texas, on change of venue

6   from Morris County, Texas, and the following proceedings

7   were had:


8

9       NOLA JEAN LITTLES, Potential Juror #462,

10  was recalled as a Potential Juror and, having been

11  previously sworn by the Court, testified further as

12  follows:

13               THE COURT:  Good morning, Ms.

14  Littles, how are you doing?

15               THE POTENTIAL JUROR:   Fine,

16  thank you.

17               THE COURT:  Go ahead and take

18  a seat, please, ma'am.

19          I know I introduced everyone yesterday

20  but let's do it again; I am Gary Stephens, I'm presiding

21  over the trial, we have two lawyers representing the

22  State of Texas, the District Attorney from Morris County,

23  Mr. Richard Townsend and the soon to be District Attorney

24  from Cass County, Mr. Randall Lee.

25          We have   two Defense Attorneys,   only

1    one is present with us today and that is Mr. Bird Old,

2    III.

3                    Next to Mr. Old is the Defendant Billy

4    Wardlow.

5                    Now, ma'am, yesterday I talked to you

6    briefly about your questionnaire.

7                    You are now here for the lawyers to

8    discuss with you the principles of law involved in a

9    capital murder trial.   You will be asked a lot of

10   questions and the answers will let us know whether or not

11   to put you on this case as a juror.

12                   In order to be a juror you have to

13   understand and follow the law but you don't necessarily

14   have to agree with the law, you know, it's like filing

15   taxes, we may not agree with filing taxes but if we do

16   it then we are complying with the law and that's the same

17   thing on some of these issues, you may not necessarily

18   agree with them but if you can truly follow the law and

19   set aside a disagreement you might have then you are

20   qualified but if you disagree to such an extent you can't

21   follow the law then you are not.

22                   We are going to talk about these issues

23   and find out where you stand but, ma'am, we have also

24   found out over the years of talking to jurors on cases

25   like this even though jurors understand the law that

1    doesn't necessarily mean that they are appropriate jurors

2    for a death penalty case.  That's why I asked you about

3    your feelings about the moral dilemma of doing what might

4    result in the execution of another human being.

5            So we need to know more about you, how

6    you feel and that's why we are going to ask all these

7    probing questions and what you can do to help us is just

8    be as open and honest as you can.  There's no right or

9    wrong answers, they are just answers and opinions.

10    That's what we want you to share with us and maybe they

11    will help us to tell whether to take you or not take you

12    on the jury.

13            But we cannot really tell you today

14    whether you are on the jury, we will make that decision,

15    we will go through a group of jurors then make that

16    decision in a week or two.

17            If we don't tell you you are -- excuse

18    me -- if we don't excuse you today then we will notify

19    you  in a week or two  about whether  you are on the

20    jury.

21            Do you have any questions?

22          THE POTENTIAL JUROR:  No.

23          THE COURT:  Mr. Townsend.

24

25

1

VOIR DIRE EXAMINATION

2

BY MR. TOWNSEND

3

4       Q       Ms. Littles, I'm Richard Townsend, like I say

5    we are going to talk to you about some areas of the law,

6    we just want to know how you feel about it.   There's

7    really no right or wrong answers to any of these

8    questions but I do want to make it clear to you from the

9    outset so that there is no mistake, that this table here

10   represents the State of Texas and the citizens of Morris

11   County in this case, we are clearly seeking the death

12   penalty in this case.   We are wanting this Defendant

13   executed on what we have alleged to be his crime.

14              And I know that sounds harsh but that's

15   what we are doing and that's what we are here for.

16              And you know, one of the great things

17   about our country is that we have the right to disagree

18   about certain things, about just about anything really

19   but we certainly have the right, you and I have the right

20   to disagree about the death penalty, we have the right

21   to disagree about any other area or law that we might

22   disagree about, that's one of the freedoms that we have,

23   that we are very fortunate to have in this country, that

24   we all don't have to think the same thing.

25              And you know, Ms. Littles, I read your

1   questionnaire and I see that you basically have said that

2   you don't believe in the death penalty, you have said

3   that you do not feel comfortable taking a life, you have

4   said that you have religious, you have moral religious

5   or personal feelings, beliefs that would prevent you from

6   returning a verdict that would ultimately result in the

7   execution of another human being.

8           Am I correct in that you said those

9   things?

10  A       Yes.

11  Q       Okay.  One of the things about the law is that

12  certainly we are not always in agreement with what the

13  law is, we are not always going to agree with what the

14  law is but you know a lot of people go to jury service

15  and they think, well, in order to be a good citizen I

16  have got to go along with the law, I have got to go along

17  with whatever the law is even if it's something that I

18  don't believe in.

19          That's not necessarily true.  That's not

20  really true at all.  You know, we all have the right to

21  our own personal points of view and the law does not

22  require you or me or anyone else to throw out our

23  religious belief, our moral belief, our personal belief

24  to serve on a jury and different people may be qualified

25  jurors in different kinds of cases, you know.

1          I know from what the Judge asked you

2  yesterday that you felt like there was some cases where

3  the death penalty wasn't involved that you could serve

4  as a juror, is that right?

5  A          That's right.

6  Q          But then you said that if the death penalty was

7  involved that is where you would have a problem?

8  A          That's right.  Unless the crime was so vicious,

9  there is always an exception.

10 Q          There's an exception?

11          You know when you talk about people that

12 serve on juries some people might be able to serve on

13 burglary juries then another person may feel like they

14 couldn't fairly serve and be fair on a burglary, maybe

15 because their house had been burglarized and they would

16 be particularly mad at somebody that committed burglary

17 or something like that.

18          So what we are seeking is a fair trial

19 for the Defendant and a fair trial for the State and we

20 need 12 jurors who can be fair and impartial regarding

21 a lot of different things and including the death

22 penalty.

23          When you filled our your questionnaire

24 are your feelings today about the death penalty pretty

25 much the same as they were two weeks ago when you filled

1    that questionnaire?

2    A        Yes.

3    Q        You indicated that you had a moral, religious

4    or personal belief that prevents you from rendering a

5    verdict that would ultimately result in the execution of

6    the death penalty.

7              Is that a belief that you have held for

8    a substantial period of time or something that you --

9    A        All my adult life.

10   Q        All your life?

11   A        Yes.

12   Q        So all your life you have felt like that that

13   is something that you could not do?

14   A        Yes.

15   Q        Okay.   I don't mean to be personal, Ms.

16   Littles, but I need to ask you; is this a moral belief

17   or religious belief or --

18   A        It's more a moral belief than anything else.

19   Q        Just a moral belief?

20             And a moral belief, you know, is

21   something like I said, if you serve on a jury, you know,

22   you have already shown yourself to be a good citizen by

23   showing up here for jury duty and letting us ask you all

24   these questions and all that stuff.  You are not required

25   to throw away your moral belief in order to serve on a

particular type of jury, do you understand that?

A      Yes.

Q      Let me talk to you a little bit about the way capital murder works in Texas; you will be on the jury and the first thing you will be required to decide is the guilt or innocence of the defendant.

Now, at that time you won't be deciding whether the defendant would receive the death penalty or not, you would just be deciding whether he was guilty of the crime or not.

The death penalty decision would be one that you would make later.

Do you think you could sit on a jury where the death penalty was involved when it came to the part of the trial where you would be deciding whether the person was guilty or not guilty or would the fact that the death penalty was in the background there bother you so much that you wouldn't be able to do that?

A      You mean decide whether he was guilty or not?

Q      Just deciding.

A      By the evidence if I was convinced he was guilty I would say he was guilty.

Q      Okay.  So you wouldn't have a problem with guilt and innocence?

A      No.

1    Q          Then in a capital murder trial if the defendant

2    is found guilty then you proceed into what is called "the

3    punishment phase", you will hear some more evidence and

4    at the end of that evidence you will be required to

5    answer two questions and in answering those two questions

6    you will know ahead of time that if those questions are

7    answered in a certain way that the defendant will receive

8    the death penalty.

9              Ma'am, I believe there is a sheet of

10   paper up there on the top, it looks kind of like this,

11   on the top it says "Special Issues."  (Indicating)

12   A          Yes, sir.

13   Q          Read that Special Issue #1 there for me and

14   then I will talk to you about it.

15             Okay.   Ms. Littles, is that first

16   Special Issue number there -- to me describes or

17   basically talks about the future or the probability of

18   the defendant being dangerous in the future, is that kind

19   of the way it reads to you?

20   A          Yes.  It is.

21   Q          Okay.  That's the first Special Issue.

22             If the defendant had been found guilty

23   then you would vote on that first Special Issue, if the

24   vote was "No" then the defendant would get a life

25   sentence, if the vote was "Yes" the defendant would

11

1    receive the death penalty -- excuse me, that's not right,

2    if the vote was "Yes" then we would go to that second

3    Special Issue and -- make sure I'm clear on that; if you

4    vote "No" on that first special issue the defendant would

5    receive a life sentence, you wouldn't even consider the

6    second special issue but if you vote "Yes" on that then

7    you are going to consider that second special issue.

8           So, you see, when you get to Special

9    Issue #1 that you are getting closer to giving somebody

10   the death penalty.

11          Would you be able to do that knowing

12   what the result of your answer might be?

13   A      It would depend on the information I had gained

14   in the trial of how -- if I decided he was guilty or have

15   -- how vicious his crime was, you know.

16   Q      If you felt like it was appropriate?

17   A      If I felt like it was appropriate I could.

18   Q      You could answer that Special Issue #1 "Yes"

19   if you felt it was appropriate?

20   A      Yes.

21   Q      Okay.  Then, Ms. Littles, it comes down to

22   Special Issue #2.

23          And Special Issue #2, if you will just

24   read Special Issue #2 then we will talk about it, I'm

25   sorry.

1          Okay, ma'am.    That Special Issue #2

2    whereas on the guilt or innocence part we have to prove

3    our case beyond a reasonable doubt and then whereas also

4    on Special Issue #1 the State has to prove it beyond a

5    reasonable doubt, Special Issue #2 is not an issue that

6    we have to prove beyond a reasonable doubt, it's just

7    kind of up to your opinion.    And Special Issue #2

8    basically says, you know, you have decided that the

9    defendant is guilty, you have already decided he's

10   probably dangerous in the future but is there something

11   in this case, something in the evidence you have heard

12   that makes you feel as if the defendant deserves a life

13   sentence rather than the death penalty?

14          So if you answered that question "Yes"

15   then what you are saying is, "Yes, I believe there is

16   something there and he should receive a life sentence",

17   if you answered that question "No" you are saying, "No,

18   I don't find anything in the evidence that makes me feel

19   that he should not receive the death penalty."

20          And you are going to know what the

21   result of your answers are, Ms. Littles, so when you get

22   to that Special Issue #2 you are going to know by that

23   time if you and the other jurors answer that question,

24   "No" this man is going to be executed.

25          My question to you is; you have made it

1   plain to us that you don't believe -- and, ma'am, we are

2   not trying to put you on the spot, we are not trying to

3   get you to say something you don't believe in or believe

4   but you have told us that you have a moral belief that

5   would prevent you from returning a verdict that would

6   result in the execution of another person and you have

7   told us that you do not feel comfortable taking a life,

8   my question to you is; when you get to Special Issue #2,

9   you know if you answer "No" to that that's exactly what

10   you are doing?

11   A          It would be hard.

12   Q          I am asking you.

13   A          I don't know how I would answer it until I

14   heard evidence but it would be hard for me to do.

15   Q          Well, ma'am, things that we need to know when

16   we are trying to select the jury is not whether it's hard

17   or not because we know it's hard.

18   A          Yes.

19   Q          We need to know either you can do it or you

20   can't and I need to know now.

21                    Can you do it?

22   A          If the -- sufficient -- if the evidence was

23   sufficient, yes, I could do it.

24   Q          You could do it?

25   A          It wouldn't be easy.

1                          MR. TOWNSEND:  No, ma'am.  I

2      know it wouldn't be.

3                          Pass the witness.

4                          THE COURT:  Mr. Old?

5

6                    VOIR DIRE EXAMINATION

7                       BY MR. OLD

8

9      Q        Thank you, Your Honor.

10                     Ms. Littles, from what you are telling

11     me  about  a  capital  case  and  your  answer  on  your

12     questionnaire,  you  have  answered  that  if  the  fact

13     justified there at first, there are circumstances that

14     you  could  conceive  of  to  where  you  could  answer  those

15     questions  to  the  effect  that  they  result  in  a  death

16     sentence?

17     A        Yes, sir.

18     Q        The  duty  of  a  juror  is  at  the  outset  in  the

19     oath  that  a  juror  takes  before  the  case  starts,  you

20     render -- "that you a true verdict render according to

21     the law and the evidence."

22                     That is jurors are not required to know

23     the law, the Judge is the law of this case.

24                     Have you ever served on a jury?

25     A        No.  I haven't.

1    Q        At the conclusion of evidence in this case the

2    Judge will give you a written instruction or what we call

3    a "charge" and it tells you what the law is, it tells you

4    what the law applies to the case and it tells you that

5    you are to be governed by that charge.

6             As to the law, now, the jurors -- that

7    the Judge is the exclusive judge of the law, the jurors

8    are the exclusive judge of the fact and that is to say

9    a jury determines, first, what witnesses they believe,

10   disbelieve in whole or in part, you judge the credibility

11   of the evidence.

12            Could you judge the credibility of --

13   credibility of witnesses?

14   A        I believe I could.

15   Q        Now, the law sets down a standard or a burden

16   of proof, that is what the State must prove to you in

17   order to get a finding of guilt or answers to its

18   questions.

19            And that standard is "a reasonable

20   doubt."

21            There is a piece -- may I approach the

22   witness?

23            THE COURT:  You may.

24            MR. OLD:  Let me refer you to

25   Exhibit 6 and I will -- let me give you a moment to

1  review it.

2      There is a sentence that starts "A

3  reasonable doubt is a doubt based on reason", that is the

4  instruction the Court will give you on the definition of

5  reasonable doubt.

6      To be a juror you have to take the

7  Court's definition of that word and if you have a

8  different one in your own mind you have to lay it aside

9  and apply the Court's definition, can you do that?

10     THE POTENTIAL JUROR:   Yes.

11  I can.

12  Q     (BY MR. OLD)  And that is true anytime in the

13  charge of the Court that he instructs you as to the

14  meaning of a word.   I mean it has a specific legal

15  meaning and if it varies from what its ordinary meaning

16  is or from what you think it means then you have to say,

17  "Well, I am using the Court's definition and not mine."

18     And you would do that?

19     The top of that page is what is called

20  the "presumption of innocence" and that is that all

21  people are presumed to be innocent until proven guilty

22  beyond a reasonable doubt.

23     If the State did not prove to you Mr.

24  Wardlow's guilt beyond a reasonable doubt -- and I think

25  the Court talked about this in their statement to you the

1    other day, that the Defendant, Mr. Wardlow and Mr.

2    Wardlow through myself don't have a duty or burden of

3    proof, we don't have to do anything -- let's say the

4    State proved their case and on behalf of Mr. Wardlow Mr.

5    Wardlow and I did nothing, we sat here, you went in the

6    jury room to deliberate, okay, would you consider the

7    fact that Mr. Wardlow did not testify or that Mr. Wardlow

8    did not call witnesses on his behalf as an inference or

9    evidence against him?

10   A        I don't know.  It would depend on the evidence

11   I had heard against him.

12   Q        You would make your finding on the evidence you

13   heard and not on the evidence you did not hear?

14   A        Yes.

15   Q        You would not consider the fact that Mr.

16   Wardlow did not testify as evidence against him?

17   A        I don't think so.

18            I don't know.  Those questions are hard

19   to answer when you have never been in that position.

20   Q        I know they are and it's many things we get to

21   do to you, we get to put you in a position that you have

22   never been in and ask you what you would do.

23   A        I don't think so.  It would depend on the

24   evidence that was put before me.

25   Q        But you would follow the law as to presumption

1    of innocence?

2    A        Yes, sir.

3    Q        The fact that Mr. Wardlow has been charged is

4    not evidence of guilt to you?

5    A        No.

6    Q        You understand that a charge merely is required

7    with the formality of that, that is you must charge a man

8    and tell him in writing what it is you said he did.  It

9    doesn't mean that he did it, it's just a written charge

10   that gives rise to a trial.

                  May I approach the witness again?

11                          THE COURT:  You may.

12                          MR. OLD:  Let me ask you to

13   review what is marked "Defendant's Exhibit 1", it's

14   entitled "Witness List" and let me ask you to read over

15   that list to see if you can recognize any names on there

16   and if you do, if you know them, know who they are or,

17   you know, what is your knowledge of that person.

18                          THE POTENTIAL JUROR:  No.   I

19   don't know any of these people.

20   Q        (BY MR. OLD)  You don't recognize any name, the

21   last name that brings up any flags in your mind?

22

23   A        No.

24   Q        Have you ever lived in Morris County?

25   A        No.

1    Q        In the Daingerfield area?

2    A        No.

3    Q        Around Cason?

4    A        No.

5    Q        Do you have friends or relatives in that

6    particular area?

7    A        No.  I haven't -- the people I work with at

8    work, some of them are from Daingerfield.

9    Q        Have you heard anything about this case?

10   A        When it happened I read about it, other than

11   that --

12   Q        Do you recall what you read?

13   A        Not really.  It was just in the paper and I

14   read it, I remember that but that's all.

15   Q        Anything from what you know that would go as

16   evidence against Mr. Wardlow?

17   A        No.  I haven't read anything about it since it

18   happened.  It was just something I read in the paper.

19   Q        You understand that is what somebody said about

20   it and not necessarily --

21   A        Yes.  Yes.

22   Q        -- not necessarily an accurate report?

23            You understand regardless of what you

24   read or other people have said you have got to make your

25   verdict on your judgment in this case based on the

1    evidence that comes to you through the Court?

2    A        Yes.

3    Q        The sheet entitled "Special Issues", can you

4    pick it up?  (Indicating)

5              As to Special Issue #2 at the top of

6    that it tells you mitigating evidence is evidence that

7    a juror might regard as regarding the defendant's moral

8    blameworthiness and it tells you in the question that you

9    may take into consideration the defendant's character and

10   his background and -- in answering that question would

11   you consider -- and I'm not asking you to tell me what

12   you would do with it -- would you consider evidence such

13   as age, background, family background, whether it be good

14   or bad, education, whether highly educated or uneducated

15   in considering that?

16             And I'm not asking you for a particular

17   result of that type evidence but would you at least hear

18   it and consider it?

19   A        Well, I hope I would take into fact whether or

20   not he was guilty.

21             As I said, that's a place I have never

22   been so I don't --

23   Q        Let me ask you, the evidence as to this

24   particular question and the question taking into

25   consideration all the evidence including the

1    circumstances of the offense, the defendant's character

2    and background and the personal moral culpability of the

3    defendant is there a sufficient mitigating circumstance

4    or circumstances -- circumstances to warrant that a

5    sentence of life imprisonment rather than the death

6    sentence be imposed, and in looking at it you are told

7    that you can consider evidence of his background.

8    A      I don't believe if anybody is guilty of murder

9    why he left before -- if he did the deed he's guilty.

10   Q      But I mean you have already found him guilty.

11   A      Yes.

12   Q      These are two questions that go to punishment

13   and as to whether or not -- you find a man guilty of

14   capital murder, he has at least a life sentence merely

15   by finding him guilty then you are asked to answer at

16   least these two Special Issues that determine what the

17   punishment is, a life sentence or a death sentence.

18   A      As I said, it's going to be hard for me but I

19   know there are some cases it's necessary.

20   Q      But I mean it's -- I don't think -- I mean what

21   you are saying -- I mean when a life is involved it's

22   hard but it is something that if the facts justified it

23   and you answered these questions you could keep the

24   result -- first, you do not give anybody a death

25   sentence, you answer questions on which the Court bases

1    a sentence and if you want to get real technical the

2    Judge doesn't impose the death sentence, the Legislature

3    of Texas did by the way the law is written.  It says that

4    if you are found guilty of capital murder you

5    automatically have a life sentence which amounts to, you

6    will serve at least 40 years before you are eligible for

7    parole and then it says if you answer these questions or

8    these questions are answered from the evidence that

9    beyond a reasonable doubt there is a possibility that the

10   defendant would commit criminal acts of violence that

11   would constitute a continuing threat to society, if you

12   answer that question then you are asked to answer another

13   question.

14           If you answer that question "No" then

15   that results in the law giving the man a life sentence

16   then you are asked the next, if you answer the first

17   question "Yes" you are asked to take into consideration

18   all the evidence including the circumstances of the

19   offense, the defendant's character, his background and

20   his personal and moral culpability of the defendant, you

21   are asked that based on that evidence, which is really

22   to say all the evidence, is there a sufficient mitigating

23   circumstance or circumstances to warrant that a sentence

24   of life imprisonment rather than a death sentence be

25   imposed?

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1        And if you answer that "Yes" then you

2    have the law instructs a life sentence, if you answer

3    that "No" then the law instructs a death sentence.

4        I mean this is, while you know the

5    result of your answers you as a juror do not determine

6    the sentence, the law determines the sentence.

7        You judge the facts of the case and

8    answer the questions.

9        And what I was asking you as to this

10   evidence you consider as to mitigating circumstances

11   could you consider the age of the person charged?

12   A        I hope that I could consider all the facts.

13   Q        I mean you wouldn't automatically reject the

14   evidence of age as going to mitigating, you would think

15   about it and consider it?

16   A        Yes.  I believe I would.

17   Q        You would consider the person's background?

18   A        Yes.

19   Q        If you heard perhaps some medical evidence like

20   a psychiatrist or psychologist testifying and express

21   opinions would you consider that evidence?

22        I'm not saying you would follow his

23   evidence but would you consider it as evidence and give

24   it your judgment for credibility whether you considered

25   it credible or not?

1 A  Yes.

2 Q  And I guess that is to say we have always

3 talked about weighing evidence in the room, you would

4 weigh the evidence?

5 A  Yes.

6 Q  And if it proved something to you or proved a

7 mitigating circumstance you would consider what you would

8 do based on it?

9 A  Yes.

10 Q  You work out at Titus County Memorial Hospital?

11 A  Yes.  I do.

12 Q  I believe you have been there for 16 years?

13 A  That's right.

14 Q  They had some kind of rehabilitation or

15 psychiatric hospital up on the top floor some time ago,

16 did you ever work there?

17 A  No.  I didn't.

18 Q  I believe in the questionnaire you indicated

19 that you read a lot and read a lot about history?

20 A  Yes.

21 Q  Any particular people or type history that

22 you --

23 A  The 1800s and American Indians I read about.

24 I don't know why.

25 Q  The 1800s?

1        And   you   have   a   passion   for   any

2   particular era?

3   A        I read a lot about the American Indians.

4   Q        "American Indians?"

5   A        It's just an interest of mine.

6   Q        One of the inquiries on the questionnaire you

7   indicated that you felt like this country had a good

8   system of justice?

9   A        Yes.  Not perfect but --

10  Q        What?

11  A        It's not perfect but it's the best I know of.

12  Q        In reaching your verdict, I mean we don't know

13  what law the Court is going to instruct you on because

14  the Court instructs you on the law that the facts raise,

15  I mean it depends on what happens and what is proven, but

16  the law that you are instructed on.

17          In some cases you may be instructed on

18  a statement of the defendant that is a written statement

19  and you may be asked to determine whether or not that was

20  a voluntary statement.

21          And   the   Court   will   tell   you   the

22  definition or what constitutes a voluntary statement and

23  the Court will instruct you that unless you believe

24  beyond a reasonable doubt the statement was voluntarily

25  made that you shall not consider that statement as

1   evidence.

2              Now,  I  mean,  let's  presume  that  a

3   statement  is  offered  into  evidence  and  the  Judge

4   instructs you to determine whether or not the statement

5   was voluntarily made and it tells you how to do that and

6   you  find  that  the  statement  was  involuntary  and  the

7   Court's instruction to you would be to lay that aside and

8   any other evidence that resulted from the making of that

9   statement and do not consider it.

10             Do you think that you could follow that

11  instruction, lay that evidence aside?

12  A         I think so.

13  Q         And  I  mean  that  would  be  --  I  mean  that  is

14  asking you not to consider something you heard?

15  A         I believe so.

16  Q         Okay.  You wouldn't have any great problem with

17  it, I mean it's -- if you were a juror in this case would

18  you  give  the  parties  to  this  case  the  benefit  of  your

19  independent judgment?

20  A         Would you say that again?

21  Q         Would you give both parties to this suit the

22  benefit of your independent judgment in deliberating?

23             Now,  when  jurors  deliberate  they

24  discuss, I presume, I have never been on a jury, either

25  they discuss the evidence and I mean one of them says,

1    "I believe this" and the other one says "I believe that."

2              If you disagreed with other people on

3    what you believe would you stand your ground?

4    A       Yes.

5    Q       Okay.  Now, I'm not saying you can't change

6    your mind but when you change your mind would it be based

7    on --

8    A       Facts.

9    Q       Facts?

10   A       Yes.

11   Q       I mean if you suddenly realized that everybody

12   but you thought a different way but you still were not

13   convinced they are right, you couldn't see why they were

14   and you disagreed with them would you stand there and

15   vote your independent conviction?

16   A       Yes.

17   Q       I mean it wouldn't get -- you wouldn't get

18   embarrassed?

19   A       Well, I probably would but --

20   Q       You wouldn't compromise what you believe the

21   truth to be?

22   A       No.  I don't think so.

23              THE    COURT:      Twenty-five

24   minutes.

25              MR.  OLD:     If   Your   Honor

1    please, that's all we have at this time.

2                    THE COURT:  Ma'am, if you will

3    step down and return back to the lounge I will bring you

4    back for some further instructions.

5                    THE BAILIFF:  Watch your step

6    there.

7

8                    (The following occurred outside the

9    presence and hearing of the potential juror:)

10

11                   THE COURT:  Does the State

12   have any challenges for cause?

13                   MR.  TOWNSEND:  Yes,  Your

14   Honor.

15                   In regard to the Fifth Amendment and

16   defendant's failure to testify Ms. Littles said that she

17   didn't know if she could put that aside.  I believe she

18   would have to be able to put that aside in order to serve

19   on a jury.

20                   I object on that basis.

21                   THE COURT:  Does the Defense

22   have any challenges?

23                   MR. OLD:  None, Your Honor.

24                   THE COURT:  First, I believe

25   that the failure to testify is a proposition of law that

1    only the Defense can rely on for a challenge but even if

2    the Defense offered a challenge I would overrule it

3    because I do believe that she said she could set it aside

4    and base it on the evidence.

5                    The State's challenge is denied.

6                    I find the juror qualified, I will put

7    her in the pool and make a decision next week.

8                    Just tell her that she is a prospective

9    member of the jury, that we will notify her by the end

10   of next week whether or not she will be on the jury.

11                   THE BAILIFF:   Are you ready

12   for the second one?

13                   THE COURT:  Are you ready for

14   number two?

15                   MR. OLD:   May I have just a

16   couple of minutes?

17

18                    (Recess.)

19

20                   THE COURT:  Okay.  Let's get

21   Mr. Barker, he's the last one we have this morning so we

22   got to him quicker like we did Ms. Littles, I guess we

23   will take an early lunch because the other three are

24   coming in at 1:00.

25

1          FRED EARL BARKER, Potential Juror #411,

2     was called as a Potential Juror and, having been

3     previously sworn by the Court, testified as follows:

4

5                    THE COURT:  How are you doing,

6     sir?

7                    Right over here.  Watch that step.

8                    Go ahead and take a seat, sir.

9                    Are you "Fred Barker?"

10                   THE POTENTIAL JUROR:  Yes.

11                   THE COURT:  Mr. Barker, I'm

12    Gary Stephens, I'm presiding over the jury selection and

13    trial in this case.

14                   And first I want to thank you for your

15    patience with us, we have recessed you and made you come

16    down yesterday and kept you all day and sent you home and

17    I apologize, we have to talk to our jurors in order and

18    we never know how long a session is going to last, it

19    might last 10 or 15 minutes, it might last a couple of

20    hours.

21                   Sir, the lawyers have read your

22    questionnaire and they want to talk to you about some of

23    your answers.

24                   The two lawyers that are representing

25    the State today is the elected District Attorney, Mr.

1   Richard Townsend from Morris County and the soon to be

2   District Attorney from Cass County, Mr. Randall Lee.

3           Mr. Lee, you are an Assistant District

4   Attorney there now?

5                   MR. LEE:  Presently.  Right.

6                   THE COURT:    We  have  two

7   Defense Attorneys, present in the courtroom is Mr. Bird

8   Old, III, his partner for the case is Lance Hinson.

9   Lance will not be with us today.

10          Next to Mr. Old is the Defendant, Mr.

11  Billy Wardlow.

12          Now, Mr. Barker, as I said, the lawyers

13  have read your questionnaire and they are going to talk

14  to you about some of those answers and more importantly

15  they are going to talk about the principles of law

16  involved in a capital case and they are going to ask

17  questions and the answers will tell us, you know, whether

18  or not to put you on the jury.

19          In order to be a qualified juror you

20  have to be able to understand and follow the law but in

21  following the law doesn't necessarily mean that you are

22  going to be an appropriate juror, we have found over the

23  years of picking cases like this that many jurors

24  understand and can follow the law but they are not

25  appropriate in a death penalty case so that's why we need

1    to know something about what your thoughts and ideas and

2    how you think and how you got to those thoughts and

3    ideas.

4              There's no right or wrong answers, only

5    your answers.  We are not looking for any particular

6    answer, we just want to know where you are coming from

7    and what your opinions are so we can decide whether or

8    not this is an appropriate case for you.

9              If you have any questions of us during

10   the session stop us, tell us what is on your mind so we

11   can clear it up.

12             If you are chosen as a juror we can't

13   talk to you about the case after today.

14             Sir, we won't probably be able to tell

15   you today about your jury service so far as whether you

16   are or not on the case as a juror, we are going to talk

17   to several jurors and then start picking some of those

18   jurors toward the end of next week.  So we will have to

19   notify you next week.

20             That means as long as you are a

21   prospective juror I don't want you to talk about this

22   case or read anything about it in the paper.

23             Mr. Townsend.

24

25

VOIR DIRE EXAMINATION

BY MR. TOWNSEND

Q        Mr. Barker, how are you?

A        Just fine.

Q        Mr. Barker, I have read your questionnaire and I have got a few questions based on some things I saw in your questionnaire that will take just a minute.

You indicate in your questionnaire that you know Mr. Old.  The other attorney involved is Lance Hinson, do you know Lance?

A        No.

Q        How do you know Mr. Old?

A        I just know he's a lawyer here in Mount Pleasant.

Q        Has he ever been your lawyer?

A        No.

Q        Would you consider yourself a friend of his or just an acquaintance or do you just know who he is?

A        I just know who he is.

Q        Nothing about that relationship that would cause you a problem in this trial?

A        No.

Q        I notice also that you mentioned that you had had prior jury service in a murder case?

1    A       That's correct.

2    Q       Was this here in Titus County?

3    A       That is correct.

4    Q       And what was the result of that case?

5    A       She was found not guilty.

6    Q       "Not guilty?"  Okay.

7               And I saw something here about a friend

8 or I assume it was a friend that you have that is on the

9 police force?

10    A       That was my daddy-in-law.

11    Q       Your father-in-law?

12               Is he still on the force?

13    A       No.  He passed away now.

14    Q       I notice that you have a brother who is, I

15 believe you said he's now in TDC?

16    A       That's correct.

17    Q       For arson?

18    A       Yes.

19    Q       Can you just tell me a little bit about that,

20 is that something that happened here locally?

21    A       That happened over in Franklin County.

22    Q       Okay.

23    A       Several years ago.  And he was on probation and

24 he broke that probation.

25    Q       Is that a situation that is -- let me ask it

1   this way; do you feel like that justice was served in

2   that situation or do you feel like he got a better deal

3   than he should have got or got a worse deal than he

4   should have got, how do you feel about it?

5   A        Considering that he had been in Terrell for two

6   times I didn't feel like he deserved to go to Huntsville

7   but --

8   Q        Okay.  So basically you felt like he got more

9   punishment than he should have?

10  A        Yes.

11  Q        Mr. Barker, I have read your questionnaire in

12  regard to the questions about the death penalty and I

13  want to ask you something, the question is, are you in

14  favor of the death penalty and you checked "Yes?"

15  A        Yes.

16  Q        And then it says with reference to the death

17  penalty which of the following statements would best

18  represent your feeling, you circled, you know, if you

19  remember -- there were five or six choices there?

20  A        Right.

21  Q        And the one you circled was "Although I do not

22  believe that the death penalty ever ought to be invoked,

23  as long as the law provides for it, I could assess it,

24  under the proper set of circumstances."

25            Is that the way you feel or --

1    A        Yes.

2    Q        Well, Mr. Barker, I think my confusion comes

3    in, do you have your questionnaire in front of you?

4

5                      (Handed to the potential juror.)

6

7                      MR. TOWNSEND:   My confusion

8    comes in up there in the middle of the first page.

9    (Indicating)

10                     THE POTENTIAL JUROR:   Okay.

11   Q        (BY MR. TOWNSEND)   Where it states, "Are you

12   in favor of the death penalty", your answer is, yes, you

13   are in favor of it?

14   A        Yes.

15   Q        Okay.   You are in favor of it?

16   A        Yes.

17   Q        Okay.   And then down here toward the bottom of

18   the page where it has this list of six different answers

19   -- do you see that?   (Indicating)

20   A        Yes.

21   Q        You had circled "Number 3" which is "Although

22   I do not believe in the death penalty", that sentence

23   starts out by saying, "Although I do not believe in that

24   the death penalty ought ever to be invoked", that sounds

25   like you don't believe in it or that you are not in favor

1    of it.

2         Maybe, let's just do it this way; how

3    do you feel about the death penalty?

4    A       I feel like if a person is guilty and proven

5    by the jury that they are guilty then they should get the

6    death penalty.

7    Q       Okay.  I guess my question is if you feel --

8    if you will read your answer there and your answer says,

9    "Although I do not believe that the death penalty every

10   ought to be invoked", is that still your answer?

11   (Indicating)

12   A       No.

13   Q       If you will just take a moment and go through

14   those six answers, possible answers there and tell me if

15   you think "3" would still be your answer or if you think

16   you would have a different and if so which one.

17   A       I would change that "Number 3" to "Number 1."

18   Q       "Number 1?"

19            "I believe that the death penalty is

20   appropriate in all murder cases?"

21   A       Yes.

22   Q       Okay.  Okay.  Mr. Barker, I want to talk to you

23   about some of your opinions and feelings and like the

24   Judge says, there's no right or wrong answer, we just

25   want to know how you feel, okay?

1    A        Okay.

2    Q        In this case the State is seeking the death

3    penalty.  Should the jury find the Defendant guilty the

4    State will be requesting that the jury assess the death

5    penalty.

6              Your feelings about the death penalty

7    were, you circled this "Number 3" and now today you are

8    saying "Number 1", is that -- have you changed your mind

9    since that date or was that just kind -- did you kind of

10   misunderstand what we meant?

11   A        I think I misunderstood the question.

12   Q        So actually you believe -- your opinion is

13   basically a "Number 1" and is that opinion one that you

14   have held for a substantial period?

15   A        Yes.  It is.

16   Q        Okay.  Have you ever felt any differently about

17   the death penalty?

18   A        No.

19   Q        So as long as you have been, you might say "a

20   grown up" this is kind of the way you felt about it?

21   A        Yes.

22   Q        Do you know of any reason why you couldn't

23   serve on a jury and make the decisions necessary that

24   would result in the execution of an individual if the

25   facts and the evidence was appropriate?

A        I do not.

Q        You could do it?

A        Yes.

Q        Let me talk to you a little bit about murder in Texas; in Texas there are basically sort of two kinds of murder, one is what we call or what I call "plain murder", just someone is -- intentionally killed another individual, they don't have a legal justification or excuse, you know.

When I say that I mean it wasn't self defense and they weren't insane, it wasn't an accident, they just did it, okay?

That's what we call "intentional murder", when -- where the murder has been intentionally or knowingly committed to cause the death of another individual. In Texas that is punishable by the -- from five years probation up to 99 years or life in the penitentiary but it's not punishable by the death penalty. A person cannot receive the death penalty for that.

The only situation in Texas that a person can receive the death penalty is if you have what we call "capital murder" and what that is, it's just like that plain murder I just discussed with you plus something and that "plus something" is the murder was of

1    a police officer or fireman in the line of duty or the

2    murder was murder for hire or murder done during the

3    commission of a robbery or burglary or rape.

4              So basically you might say capital

5    murder is murder plus another crime along with it,

6    another set of circumstances along with it.

7              Do you think you are with me on that?

8    A        Yes.

9                       MR. TOWNSEND:  Okay.  If you

10   will look at -- approach the witness, Your Honor?

11                       THE COURT:  You may.

12                       MR.  TOWNSEND:   There is a

13   sheet of paper up there that is the indictment in this

14   case -- yes, that's it right there.

15             If you will just read this part right

16   here then I will talk to you about that.  (Indicating)

17                       THE POTENTIAL JUROR:  Okay.

18   Q        (BY MR. TOWNSEND)  Okay.  Mr. Barker, can you

19   see from reading that indictment that if the State were

20   able to prove what is on that sheet of paper that rather

21   than that being murder that would be capital murder

22   because it alleges both the murder and the robbery?

23   A        Yes.

24   Q        Okay.  Mr. Barker, in Texas we need the kind

25   of jurors to be fair and open-minded as to guilt and

1    innocence but also as to the punishment because in a

2    capital murder case once the defendant, if that defendant

3    is found guilty then the question shifts, the defendant

4    is not automatically going to receive the death penalty

5    just because you found him guilty of capital murder, then

6    you go back and you have a decision to make as to whether

7    that person should get the life sentence or the death

8    penalty.

9              Now, that decision is not going to be

10   made by just saying, you know, "How many want life, how

11   many want death", what you are going to do is you are

12   going to have two questions to answer and the answer to

13   those questions is going to result in whether the person

14   received a life sentence or the death penalty.

15             Do you think you are the kind of juror

16   who could keep an open mind and not just automatically

17   say, "Well, I find him guilty of capital murder, I want

18   him to have a life sentence", or "I found him guilty of

19   capital murder, I want him to automatically have the

20   death penalty."

21             Could you keep -- or keep an open mind

22   during that second part of the trial before deciding what

23   the proper sentence should be?

24   A         I could.

25   Q         So what we are saying is that the trial is

1   going to have two phases, the first is that guilt or

2   innocence phase where you determine whether you believe

3   the defendant is guilty or not guilty.

4           Of course if he's not guilty you are

5   going -- that's going to be the end of it but if he's

6   found guilty then you are going to go on to the second

7   phase and hear additional evidence and that evidence

8   might be of all sorts of -- kinds of evidence but it

9   might be involving psychological testimony, it might be

10  involving the defendant's family background, it might

11  involve any prior criminal activity that the defendant

12  had been involved in or any bad acts that the defendant

13  may have committed.  All that sort of stuff could come

14  into that sort of hearing.

15          Would you be able to listen and consider

16  all that evidence as well as that evidence that you have

17  already heard before answering the question that you are

18  required to answer?

19  A          I could.

20  Q          You know, I have talked to you about those two

21  questions you have to answer, keep in mind that when you

22  are answering those questions -- and we will talk about

23  what those questions are in just a minute -- but when you

24  are answering those questions you are going to know what

25  the result of those answers are, you are going to know

1    if they say answer them in a certain way "Yes", know that

2    the defendant will receive a life sentence and you will

3    know if you answer them in another certain way that he

4    will receive the death penalty.

5            If you would there is a sheet up there

6    marked "Special Issues."   (Indicating)

7    A       Okay.

8    Q       Looks like this.   (Indicating)

9    A       Okay.

10   Q       Have you got it?

11           If you will read that Special Issue #1

12   to yourself then we will talk about that.

13   A       Okay.

14   Q       Okay.  Mr. Barker, that Special Issue #1 to me

15   basically asks you to look at the probability that the

16   defendant in the future will be dangerous to society, is

17   that what it says to you?

18   A       That's correct.

19   Q       Well, that first Special Issue number like I

20   say, you are going to have heard the guilt and innocence

21   testimony and evidence but you are also going to have

22   heard some more evidence before you decide that first

23   Special Issue.

24           If you vote -- first let me point some

25   things about that, the State is required to have the

1    burden on that issue as well, we don't have to prove that

2    to you beyond a reasonable doubt but what we have to

3    prove to you is that there is a probability, not that,

4    you know, we don't have to guarantee you that he is going

5    to commit another act of violence or you don't have to

6    predict whether he will or not but just that there is a

7    probability.

8              And that term "criminal act of

9    violence", we are not required -- you know, this trial

10   is about a murder case but we are not required to prove

11   to you that he would go out there and commit another

12   murder, just that he would commit some criminal act of

13   violence, whether it be murder, assault, rape or

14   whatever, just prove that it's probable that he would

15   commit some criminal act of violence.

16             Are you with me?

17   A         Yes.

18   Q         Okay.  After you have reviewed that question

19   and after you have heard all the evidence then you have

20   got to vote to Special Issue #1, if you vote "Yes" what

21   you are saying is basically that you believe that he

22   would probably commit other acts of violence, if you vote

23   "No" you are saying we haven't proved that to you.

24             If you vote "No" then the defendant is

25   automatically going to receive a life sentence, if you

1    vote "Yes" then we go down to that second Special Issue.

2                    Are you with me?

3    A          Yes.

4    Q          Read that second Special Issue and then we'll

5    talk about it.

6    A          Okay.

7    Q          That second Special Issue to me, Mr. Barker,

8    basically means that you have looked at the case and you

9    have decided the defendant is guilty of capital murder,

10   you have decided that he's probably going to be dangerous

11   in the future because if you decided "No" to that you

12   wouldn't be looking at this second one so you have

13   already answered "Yes" to that but then that second

14   Special Issue basically is, is there something in this

15   case that says to me as a juror or something that is

16   sufficiently mitigating or that reduces the defendant's

17   blameworthiness enough sufficiently an amount enough that

18   you feel like he should receive a life sentence rather

19   than the death penalty.

20                   Now, that is nothing that the State has

21   to prove, it's just left up to you and the other jurors'

22   opinion, okay?

23                   We found him guilty of capital murder,

24   we decided that he's going to be dangerous in the future

25   but there is some reason out there that is sufficiently

1    mitigating to me to make me think that he might should

2    receive a life sentence rather than the death penalty.

3         Now, that there is an issue that if you

4    answer that question "Yes" what you are saying is, "Yes,

5    he committed the crime", "Yes, he's going to be dangerous

6    in the future but I want to give him a life sentence

7    based on the sufficient mitigating circumstances."

8         If you answer "Yes" to that that's what

9    you are doing.

10   A         Okay.

11   Q         And you are going to know that if you answer

12   "No" to it he's going to get the death penalty and you

13   will know that, too.

14        My question to you, Mr. Barker, is if

15   the evidence and the facts were appropriate could you

16   answer those questions in such a way that the defendant

17   would receive the death penalty?

18   A         I could.

19   Q         Okay.  Let me ask you this way; we have had

20   jurors -- I have talked to jurors before who said, "Okay.

21   Now, if I find the defendant, if the evidence shows me

22   that the defendant is guilty of capital murder and the

23   evidence also shows me that the defendant is probably

24   going to be dangerous in the future that's enough for me.

25   I am giving him the death penalty, I'm not going to be

1  able to find anything in that Special Issue #2 that is

2  going to keep me from giving him the death penalty."

3          Do you understand what they are saying?

4  A       Yes.

5  Q       What they are saying is that they can't really

6  be fair and impartial, they can't really go back after

7  they have decided guilt or innocence and after they

8  decide he's probably going to be dangerous in the future,

9  they can't go back and reconsider all that evidence again

10 before making an answer to Special Issue #2 because you

11 see what I'm saying, they have already made up their mind

12 once they have answered that first question of guilt or

13 innocence, they have answered that first Special Issue

14 as to dangerousness, "Buddy, that's enough for them,

15 their mind is closed.  They know what they are going to

16 do."  You see, those people aren't qualified to serve on

17 a capital murder jury because they are not keeping an

18 open mind as to the possibility -- as to the possible

19 answers on these Special Issues.

20          Do you think that you could keep an open

21 mind throughout the trial?

22 A       I could.

23 Q       Let me talk to you about some general areas of

24 the law, Mr. Barker.

25          Do you have any questions or problems

1    right now with what we have talked about so far?

2    A        No.

3    Q        Okay.   Let's say for instance that the

4    defendant, you have looked at the evidence and you have

5    decided, well, the State has proved their case that the

6    defendant is guilty of murder but they haven't quite

7    proved that robbery part.

8             Then the jury would have to find the

9    defendant guilty of murder but not capital murder, do you

10   understand?

11   A        Yes.

12   Q        Okay.   And like I said earlier in murder the

13   range of punishment is not life or the death penalty, the

14   range of punishment in a murder is anywhere from five

15   years probation up to 99 years or life, a wide range, you

16   know.

17            As the Judge talked to you the other

18   day, murder can take on many different faces, it can be

19   an extremely vicious murder or it can be what we might

20   call a "mercy killing."

21            Do you know what a "mercy killing" is?

22            Someone is disabled or sick or whatever

23   and wants to die, do you understand that if someone out

24   of pity or sympathy or whatever reason, if someone kills

25   that person even if the person asks them to it's still

1    an intentional causing of another person's death or it's

2    still a murder and so I think you can see there that that

3    broad range of punishment is designed to fit a broad

4    range of crimes even though they are all called "murder."

5            Could you consider the full range of

6    punishment before deciding what punishment to give a

7    person if they were convicted of murder?

8            When I say "consider it" we are not

9    asking you to say, "Well, I would give a person life or

10    I would give a person five years probation" but could you

11    consider the full range of punishment?

12    A       Yes.

13    Q       Okay.  And you could consider even five years

14    probation?

15    A       Yes.

16    Q       The State is required to prove our case beyond

17    a reasonable doubt and I'm not going to go into an

18    explanation of that but it is certainly not beyond all

19    doubt but beyond reasonable doubt.

20            When I say that that is our burden of

21    proof, the State takes that burden of proof into any

22    criminal trial, we get out case and, you know, we are

23    required to prove it.

24            Do you understand that if the Defense

25    on the other hand, they are not required to prove their

1      client innocent, we are required to prove his guilt.

2                        Is that okay with you?

3      A          Yes.

4      Q          Okay.  Along with that goes what we call the

5      Fifth Amendment privilege.

6                        Now, the Fifth Amendment privilege talks

7      about how a defendant in a criminal case has the right

8      not to testify if they choose not to.  I think that is

9      something that you are probably familiar with from

10     reading the newspaper and watching TV and that sort of

11     thing?

12     A          That's correct.

13     Q          Would you be able to, you know, it's kind of

14     human nature thing that we would be curious about whether

15     or not a person -- "Well, I wonder why they didn't

16     testify" or "If it's me I sure would like to get up there

17     and tell my side of the story."

18                        That's kind of human nature, don't you

19     think?

20     A          Yes.

21     Q          But what we have got to have in the way of

22     jurors, we have got to have those people that can sit

23     there, listen to the evidence that is presented and base

24     their decision on that evidence.

25                        And of course if the defendant didn't

1    testify then there wouldn't be anything there so far as

2    his testimony.

3            Would you be able to base your decision

4    just on the evidence and not say, "Well, he must be

5    guilty, he didn't testify", you know, or, "If he's really

6    innocent he would want to get up there and testify",

7    would you be able to do that?

8    A        I could.

9    Q        And that also holds true not only during the

10   guilt or innocence phase of the trial but also during the

11   punishment phase.

12           Let me ask you this; if you found a

13   person guilty of capital murder and decided on, based on

14   the evidence that he was probably going to be a danger

15   to society in the future would it help you any or would

16   you feel better about giving him a life sentence or would

17   it sway you in any way if he got up there and told that

18   he was sorry, do you think that would have any bearing

19   on it?

20   A        No.

21   Q        So, see what I'm saying, that defendant has a

22   right also during that punishment phase not to testify

23   and when I asked you that question what I was getting at

24   is we need fair and impartial jurors who are going to

25   decide those punishment issues based on the evidence

1    presented and not hold it against the defendant or if he

2    did not testify during that punishment phase he has that

3    right then also and he may testify if he chooses to but

4    he doesn't have to, you wouldn't hold that against him?

5    A        No.

6    Q        If he chose not to testify at that part of the

7    hearing?

8    A        No.

9    Q        Let me ask you about testimony from different

10   types of individuals; you are going to hear testimony in

11   criminal cases -- and understand we are not particularly

12   talking about this case, we are talking about criminal

13   cases in general -- you are going to hear testimony from

14   psychologists, police officers, ministers, maybe people

15   you know, probably people you don't know but irregardless

16   of who that witness is or what their profession is we

17   need jurors who can start all the witnesses out at the

18   same place on the starting track, not give anybody a

19   little bit of head start and say, "Well, I know old Joe

20   Blow so I just know he's going to tell the truth" or

21   "That guy is a police officer, I know he's telling the

22   truth" or, you know, what we need is those people who can

23   start everybody off the same way and listen to their

24   testimony and then decide whether their testimony is

25   important or not important, truthful, not truthful, could

1    you do that?

2    A        I could.

3    Q        And could you do that fairly and in such a way

4    that you didn't give any head start to any particular

5    witness?

6    A        I could.

7    Q        Not start any particular witness behind the

8    rest of them?

9    A        Yes.

10                       THE     COURT:        Twenty-five

11   minutes.

12                       MR. TOWNSEND: Thank you, Your

13   Honor.

14             In this case and in every criminal case

15   in Texas that little piece of paper there that you read

16   up there at first talks about murder and robbery, that's

17   the indictment.  (Indicating)

18                       THE POTENTIAL JUROR:   Okay.

19   Q        (BY MR.  TOWNSEND)   The indictment is the

20   charging instrument that the Grand Jury charges a person

21   with a crime, do you realize that this indictment,

22   though, is not evidence?

23   A        Yes.

24   Q        Okay.  The evidence will come from the witness

25   stand and you will not be able to use that indictment as

1    evidence in any way?

2    A        Okay.

3    Q        Could you do that?

4    A        Yes.

5    Q        In some criminal cases you will have the

6    statement presented, written statement that might be

7    presented that -- that are supposed to be statements that

8    were written by the defendant or maybe statements --

9    statements that were written by maybe someone else --

10   let's assume that there is a statement that had been

11   presented to you as a juror that is from the defendant;

12   one of the things the Court will instruct you is that if

13   that statement in order for you to consider that

14   statement as evidence you have to first decide that this

15   statement was one that was voluntary, is that something

16   you could do?

17   A        Yes.

18   Q        Okay. So if that at first you have to decide

19   beyond a reasonable doubt that that statement was

20   voluntary before you consider it as evidence you would

21   be -- would you be able to if you heard a statement but

22   you weren't convinced beyond a reasonable doubt that it

23   was voluntary would you be able to put that statement out

24   of your mind and not consider it as evidence in any way?

25   A         I could.

1    Q        Mr. Barker, I have been asking you a lot of

2    questions and I think I'm about through.

3            Is there anything that you would like

4    to ask me or just anything that you would like to tell

5    us that maybe I didn't ask the right question that would

6    allow you to?

7    A        No.

8    Q        Is there any reason you feel like that you

9    could not return a verdict that results in the death

10   penalty in this case if the evidence was appropriate to

11   you?

12   A        No.

13            MR. TOWNSEND:   I pass the

14   juror.

15            THE COURT:  Let's take about

16   a 10 or 15 minute recess then we will start up with the

17   Defense.

18            You may step down, sir and the Sheriff

19   will take you back to the waiting room or lounge.

20

21            (The following occurred outside the

22   presence and hearing of the potential juror:)

23

24            THE COURT:  Let's stay on the

25   record a moment.

1          Mr. Wardlow, yesterday I asked you if

2     you had any objection to ABC filming part of the voir

3     dire proceeding and you said you did not.  This is your

4     last chance, do you have any objection?

5                    THE DEFENDANT:  No, sir.

6                    THE COURT:  You all may set

7     up.

8                    A VOICE:  Thank you, sir.

9

10                   (Recess.)

11

12                   THE COURT:  Let's get back on

13    the record.

14          Mr. Townsend, you and Mr. Old during our

15    recess there was an agreement to excuse Mr. Barker, juror

16    six, is that correct, Mr. Townsend?

17                   MR. TOWNSEND:  That's correct,

18    Your Honor.

19                   THE COURT:  Mr. Old, do you

20    agree?

21                   MR. OLD:  That is correct,

22    Your Honor.

23                   THE COURT:  I want the record

24    to reflect whenever we do discuss agreements to excuse

25    we are referring to Article 35.05 of the Code of Criminal

1    Procedure.

2            Bring Mr. Barker back in, please.

3            Mr. Barker, you don't have to come back

4    up on the witness stand.

5            There has been an agreement to excuse

6    you so you will not be on the jury.

7            I appreciate you coming in and you have

8    a good day, sir.

9            THE POTENTIAL JUROR:   Okay.

10   Thank you, sir.

11           THE COURT:   Yes.   The next

12   juror is not scheduled until 1:00 o'clock, we have tried

13   to call her to get her in early but I understand she is

14   showing a house.

15           Mr. Townsend, do you have any matters

16   that you wish to take up with the Court before we recess

17   for lunch?

18           MR. TOWNSEND:   Not at this

19   time, Your Honor.

20           THE COURT:   Mr. Old, do you

21   have any matters to take up?

22           MR. OLD:   Your Honor, we have

23   no new matters to take up.

24           You had indicated you would make your

25   Findings of Fact and Conclusions of Law today.

1            THE COURT:  I intend to do so

2   today, I have not really written out all my Findings of

3   Fact so I'm not prepared to read them into the record at

4   this time.  I will probably do it right after lunch.

5            MR.  OLD:    Thank  you,  Your

6   Honor.

7            THE COURT:  All right.  Let's

8   recess for lunch.

9

10            (Noon recess.)

11

12            THE COURT:  Is the State ready

13   to proceed?

14            MR. TOWNSEND:  Yes.

15            THE COURT:  Is the Defendant

16   ready to proceed?

17            MR. OLD:  Yes.

18            THE COURT: Let's bring in our

19   next juror.

20            THE BAILIFF:  Who's next on

21   the list?

22            MR. TOWNSEND:  I do not know.

23   I do not have my list.

24            THE COURT:  Leo, after you

25   bring her out I will need the original questionnaires.

1    I don't know where they are, let me get them first if you

2    don't mind.

3                    Bring in Mary Edwards.

4                    THE BAILIFF:  Yes, sir.

5                    Just go up through there and watch your

6    step.

7                    THE COURT:  Go ahead and take

8    a seat, ma'am.

9

10         MARY NELL EDWARDS, Potential Juror #26,

11   was called as a Potential Juror and, having been

12   previously sworn by the Court, testified as follows:

13

14                    THE COURT:   Ma'am, are you

15   Mary Edwards?

16                    THE POTENTIAL JUROR:  Right.

17                    THE COURT:  Ms. Edwards, I'm

18   Gary Stephens, I'm presiding over the jury selection and

19   the trial in this case.

20                    First, don't be nervous about the

21   camera, you will not be on film and the cameras will not

22   record what you are saying, the cameras are here for a

23   purpose not really associated with this trial, it has to

24   do with capital trials and the expense but it does not

25   have to do with this particular case so don't worry about

1    being on TV.

2                    THE POTENTIAL JUROR:   Okay.

3                    THE COURT:   Ma'am, you have

4    two lawyers for the State of Texas that will be talking

5    to you today, we have the elected District Attorney from

6    Morris County, Richard Townsend.

7                    THE POTENTIAL JUROR:   Yes.

8                    THE COURT:  And he's assisted

9    by  Mr.  Randall  Lee  who  will  take  over  as  District

10   Attorney in Cass County in January.

11                   We have two Defense Attorneys, in the

12   courtroom is Mr. Bird Old, III.

13                   MR. OLD:   How are you doing?

14                   THE COURT:   His partner for

15   this in this case, Mr. Lance Hinson will not be with us

16   this afternoon.

17                   Next to Mr. Old is the Defendant Billy

18   Wardlow.

19                   Now, ma'am, the attorneys have read your

20   answers to the questionnaire and this afternoon are going

21   to discuss with you some of those answers, the principles

22   of law involved in capital murder trials, you will be

23   asked a lot of questions and the answers will let us know

24   whether or not to put you on the jury.

25                   To be a qualified juror you have to be

1    able to understand, follow the law, you don't necessarily

2    have to agree with the law in order to be on a jury, if

3    you disagree with some aspect of the law but you can

4    clearly set aside your disagreement you are qualified.

5                    It's kind of like filing taxes, we may

6    not like it but we file taxes, we do it to comply with

7    the law.

8                    But, ma'am, if you have a disagreement

9    with some aspect of the law that will prevent you from

10   following the law you are not qualified.

11                   So we need to know how you think and

12   what you think, you are not on trial, there's no right

13   or wrong answers but your answers will let us know

14   whether or not to put you on the case.

15                   We have found over the years picking

16   jurors on this kind of case even though a juror may be

17   qualified that doesn't necessarily mean that juror is

18   appropriate for a capital murder case.

19                   So, just relax, open up, share your

20   opinions with us and we'll make this as quick as

21   possible.

22                   THE POTENTIAL JUROR:   Okay.

23                   THE COURT:   Do you have any

24   questions?

25                   THE POTENTIAL JUROR:   No.

1           THE COURT:  Mr. Townsend.

2

3                    VOIR DIRE EXAMINATION

4                      BY MR. TOWNSEND

5

6       Q          Okay.  Ms. Edwards, we want you to relax, we

7       are all just staring at you, we have got cameras going.

8       A          Yes.  "Relax."

9       Q          "But go ahead and relax." ·

10                  Ms. Edwards, we have had an opportunity

11      to read your questionnaire and I want to talk to you

12      about the death penalty and also just about some general

13      areas of the law.

14                  But first I want to let you know that

15      there's no right or wrong answers to these questions, we

16      just want you to tell us what your honest opinion is.

17                  If you don't understand one of my

18      questions be sure and ask me to restate it for you but

19      I, to let you know up front that the State of Texas in

20      this case is seeking the death penalty against this

21      Defendant Billy Wardlow.

22                  And that's not a very pleasant thing to

23      be involved in a lot of the time but it's part of our

24      justice system and that's what we are here for.

25                  You answered in your questionnaire that

1   basically that you believed in the death penalty and

2   thought it was appropriate in some murder cases and could

3   return a verdict in a proper case which consisted of the

4   death penalty, is that the way you still feel?

5   A       Yes.

6   Q       Have you ever felt differently about that?

7   A       In some cases I wouldn't have a problem with

8   it at all.

9   Q       Okay.  That's what we are asking you, not that

10  you would do that in every case but you feel it's

11  appropriate in some cases?

12  A       In some cases I could do it.

13  Q       Okay.  You mentioned in your questionnaire that

14  you could do it in rare cases, you mentioned mass murder

15  or a murder where children were involved?

16  A       That's correct.

17  Q       I assume you mean -- you mean where children

18  were the victims?

19  A       That's exactly right.

20  Q       Does your ability to assess the death penalty

21  be limited strictly to mass murder and children cases?

22  A       I'm not sure.  I'm not sure without knowing the

23  facts.

24  Q       You would just have to hear the case is what

25  you are saying?

1   A        That's exactly right.

2   Q        Okay.  Ms. Edwards, in Texas there are two

3   kinds of murder, one is where someone has intentionally

4   or knowingly caused the death of another individual, and

5   I'm just going to call that "plain murder" as opposed to

6   "capital murder", a person in that situation could be

7   given a sentence of anywhere from five years probation

8   to 99 years or life but they could not receive the death

9   penalty.

10           In  order to receive  the death penalty

11  -- of course this is without any kind of legal

12  justification such as self defense or accident or

13  insanity or anything of that nature but that person could

14  not receive the death penalty.

15           In order to receive the death penalty

16  in Texas you have to be convicted of capital murder and

17  that's the plain murder I have just described to you plus

18  something and that "plus something" has to do with murder

19  of a police officer in line of duty, the murder of

20  someone during the commission of a robbery or rape, a

21  burglary, something of that nature.

22           Do you think you are pretty clear on the

23  difference there between the two?

24  A        He made it pretty clear the day he went over

25  that with us.

1    Q        Okay.  The indictment in this case is sitting

2    up there by -- somewhere if you will refer to that.

3                        THE COURT:  Ma'am, it's right

4    in front of you.  It's that second page.

5                        THE POTENTIAL JUROR:  Let me

6    get my glasses, magnifying glasses.

7                        THE COURT:  Okay.

8                        MR.  TOWNSEND:    If  you  will

9    just read over that main portion there.

10                       THE COURT:  The next page --

11   next sheet, that one.  (Indicating)

12                       THE POTENTIAL JUROR:   Yes,

13   sir.

14                       MR. TOWNSEND: Okay.  Can you

15   see where by reading that if the State could prove what

16   is alleged in that indictment that that rather than being

17   what I described as a "plain murder" that would be a

18   capital murder?

19                       THE POTENTIAL JUROR:   Yes,

20   sir.  I do understand that.

21   Q        (BY MR. TOWNSEND)   Okay.  What we need as

22   jurors in a capital murder case, we need those people who

23   can keep an open mind as to whether first on indictment

24   or innocence but if the defendant is found guilty then

25   they would be able to keep an open mind as to what the

1   punishment would be because the punishment if a person

2   is even found guilty of capital murder the punishment is

3   either going to be a life sentence or the death penalty.

4   And we need those jurors who could be fair and open-

5   minded and listen to all of the evidence during the trial

6   and then listen to all the evidence during the punishment

7   hearing before making their decision as to whether the

8   appropriate punishment should be a life sentence or the

9   death penalty.

10          Do you believe that you could do that?

11  A       Yes.

12          At this point I would have to know a lot

13  more than I know now to have an opinion one way or the

14  other about this case or any case.

15  Q       So as of right now you are not leaning toward

16  the death penalty or leaning toward a life sentence, you

17  have got to hear it?

18  A       I would want to know exactly what happened.

19  Q       Okay.  In order to be able to follow the law

20  and through the death penalty case there are two phases

21  to the trial, first you hear all the evidence that the

22  State would present or any that the Defendant might

23  present would involve strictly is the defendant guilty

24  of the crime or not guilty, basically "Did he do it?"

25          Of course if you find him not guilty

then the trial is over but if you find him guilty then you go ahead and go to what we call the punishment phase where are you are going to hear additional evidence. And this evidence is not going to be about the crime itself, you have already heard that, this evidence is going to be evidence of the -- oh, it could be something about the family history or family that the defendant grew up in, it could be psychological testimony, it could be testimony of past criminal history for the bad acts that have been committed by the defendant, it could be almost a laundry list of things that you might hear during that punishment hearing.

Of course the State, the State's evidence would be designed to make you feel as if the death penalty might be appropriate.

If the Defense presents evidence it would probably be to try to sway you that way.

What we need in the way or jurors is we need those folks who can listen to all this evidence during the guilt or innocence phase and even if they find the defendant guilty not say at that point, "Okay, I found this person guilty of capital murder. That's all I need to hear, that's enough for me. He can get the death penalty", without considering this other evidence.

See, that person is not being fair and

1    that person is not following the law.

2            Do you think you could wait and not make

3    your decision on the death penalty until you have heard

4    all the evidence during the punishment hearing?

5    A        I would have to hear it all before I could make

6    an opinion.

7    Q        Okay.

8    A        Or "have an opinion."

9    Q        Let me talk to you a little bit just about how

10   -- about that punishment decision; in Texas that decision

11   is based on two questions, you are not going to just go

12   back there and raise your hand after you have heard all

13   the evidence and say, "How many want life and how many

14   want death", what's going to happen is you're going to

15   have two issues to answer.

16           There is a sheet of paper up there and

17   on top of it it says "Special Issues", if you will pick

18   that up, please.   (Indicating)

19   A        Yes.

20   Q        Will you read that where it says "Special Issue

21   #1", would you just read that over to yourself and then

22   I will talk to you about it?

23   A        Okay.

24   Q        Okay.  Ms. Edwards, let me just tell you what

25   the Special Issue means to me and then you can tell me

1   whether you agree or disagree that it's kind of what it

2   meant to you, basically I think that Special Issue was

3   talking to you and asking you about the probability that

4   the defendant would commit future acts of violence or

5   future danger --

6   A          That is a danger to society, that's what it

7   means to me.

8   Q          Okay.  I want to point out a couple of things

9   about that one, just like the State has the burden of

10  proof to prove our case beyond a reasonable doubt in the

11  guilt and innocence stage, also as to Special Issue #1

12  we have got to be able to prove that to you also.

13          Now, in looking at Special Issue #1 you

14  can go back mentally and look at that evidence during the

15  guilt or innocence phase of the trial and consider that

16  and then also consider the evidence that you heard during

17  the punishment hearing to help you decide whether you

18  should answer that "Yes" or "No."

19          Bear in mind that that Special Issue

20  tunes  in there to the  word "probability",  if you will

21  --  the question  there  you  notice  that  you  are  not

22  required to decide for certain that the defendant would

23  commit future acts of violence, you are not required to

24  guarantee that he would or even predict that he would but

25  you are required to determine that we have proved beyond

1    a reasonable doubt that it's probable that he would

2    commit some criminal act of violence in the future.

3                And another phrase I would like you to

4    tune in on is where it says "criminal acts of violence",

5    what this trial is about is about capital murder but we

6    are not required to prove to you that it's probable that

7    he would commit another capital murder, just that it's

8    probable that he would commit some other criminal act of

9    violence in the future.

10                You know, "criminal act of violence" can

11   be a rape, it can be an attempted murder, it doesn't

12   necessarily have to be a murder.

13                Are you clear on what we have got to

14   prove there?

15   A         Yes.  I am.

16   Q         The next thing we are talking about is if you

17   vote "Yes" on Special Issue #1 then you will go to

18   Special Issue #2, if you vote "No" on Special Issue #2

19   and say, "No, I don't think he's going to be a danger in

20   the future" or "I don't think it's probable" then the

21   defendant would automatically get a life sentence.

22                But, on the other hand if you vote "Yes"

23   then you go to Special Issue #2.

24                If you would read that one over for a

25   moment and we'll talk about it.

A          All right.

Q          Okay.  Ma'am, Special Issue #2 is sort of a legal mumbo-jumbo that basically means to me that, okay, I have looked at this case, I have studied all the evidence, I have decided that this defendant is guilty of capital murder, I have decided that he's probably going to be dangerous in the future but now I have got to look at Special Issue #2, I have got to go back and look at all that evidence mentally again and decide is there anything in this case that is sufficiently mitigating to this defendant that would make me believe that the appropriate sentence in this case would be a life sentence rather than the death penalty.

And that term "sufficient and mitigating", that could be one circumstance that you heard evidence about or it could be a combination and that's not something that the State has to prove beyond a reasonable doubt to you, that is just something that is just left to your opinion and the other jurors and that sufficient mitigating circumstance that it's talking about, this is, it says in this definition here that "Would tend to reduce the defendant's blameworthiness for the crime."

Ms. Edwards, what we need in jurors or any of those kinds of jurors that are going to be able

1   to decide guilt and innocence and then hear all the other

2   testimony during the punishment hearing, decide Special

3   Issue #1, by this time they are at Special Issue #2 and

4   I have heard jurors say in the past, "Now, wait a minute.

5   If I decide this guy committed capital murder" and then

6   went ahead and looked at Special Issue #1 and decided,

7   "Well, I have got a guy here that has committed capital

8   murder and he's probably going to be dangerous in the

9   future, I'm going to give him the death penalty.  I'm not

10  going to worry with Special Issue #2, I know what I need

11  to do after Special Issue #1."

12           See, that person is not being a fair and

13  impartial juror because he's not following the law.  The

14  law says what you must do is you look at guilt or

15  innocence when you look at Special Issue #1 but before

16  looking at Special Issue #1 -- before deciding your

17  answer to Special Issue #2 you mentally reconsider all

18  the evidence that you have heard and then decide what

19  your answer is to Special Issue #2.

20           If you vote "Yes" on two you are saying,

21  well, yes, I found something that is sufficiently --

22  mitigates this case and makes me believe that he should

23  receive a life sentence rather than the death penalty.

24           If you vote "No" then you are in fact

25  assuring that this defendant gets the death penalty.

1                    Did I confuse you with all that?

2        A        No.  I understand.

3        Q        Okay.

4        A        But I would have to know all about that young

5    man before I would have an opinion one way or the other.

6        Q        So you would not make your decision on Special

7    Issue #2 until you have heard all the evidence and

8    consider everything?

9        A        I would have a lot of questions that I would

10   want to have answered.

11       Q        Well, Ms. Edwards, I'm not sure what your

12   questions would be but, you know, you would have to be

13   able to decide the case based on the evidence that you

14   heard.

15                    There may be some evidence that you

16   might want to hear that you wouldn't be presented, you

17   might be curious about some aspect of the defendant's

18   background or some aspect of the case that you might not

19   hear.

20                    Would you be able to make a decision

21   based on the evidence that you did hear?

22       A        That's what I would have to do.

23       Q        Okay.  Because I think it's natural that we are

24   all curious and there are things that come out in any

25   criminal trial that we are curious about but there are

1    usually things that don't come out, too and we all wonder

2    in our mind, "I wonder what -- why they didn't talk about

3    that."

4          Let me shift gears a little bit and talk

5    to you about just some general areas of the law that

6    relate to all cases, not necessarily capital murder

7    cases.

8          First of all in this case or in a

9    capital murder case, let's say if a person is charged

10   with murder, robbery and the State proved to you beyond

11   a reasonable doubt that the defendant committed the

12   murder but you are not quite sure that they proved to you

13   -- don't believe they proved to you that he also

14   committed the robbery then what you would do is you would

15   find that person guilty of murder but not capital murder.

16          Are you with me?

17   A        Yes.

18   Q        Okay.  And the punishment for murder in Texas

19   is different from capital murder, it's from five years

20   probation to 99 years or life in the pen and in order to

21   be a juror on a case like that you have got to be able

22   to consider that full range of punishment, it's five

23   years punishment on one end or 99 years to life on the

24   other end.

25          Could you consider that full range of

1   punishment?

2   A         Yes.

3   Q         In any criminal case the burden of proof starts

4   and ends with the State of Texas, that's our burden, we

5   accept that and I think you understand that when we have

6   to prove the defendant is guilty beyond a reasonable

7   doubt the defendant does not have to prove he's innocent,

8   so to speak, is that okay with you?

9   A         Yes.

10  Q         Okay.   In talking about that what we mean is

11  you can carry that to an extreme, you can carry it to an

12  extreme, the defendant can sit over there, his attorney

13  can sit over there and do absolutely nothing.   We have

14  still got to prove our case and you have to make your

15  decision based on the evidence and based on whether we

16  proved our case or not irregardless of what they chose

17  to do or chose not to do.

18                  Is that okay with you?

19  A         Yes.

20  Q         Along with that goes the Fifth Amendment

21  privilege and that, of course is your defendant's right

22  to remain silent and not testify if that's his choice.

23                  Is that okay with you?

24  A         I don't know.

25  Q         Well, let me explain, let me talk to you this

1   way; the defendant, of course has that right and of

2   course if he doesn't testify, if he chooses not to

3   testify -- and there can be any number of reasons for

4   that -- if he chooses not to testify then the burden of

5   the case is still right here where it is and where it

6   remains right here.

7              Could you decide your -- could you make

8   your mind up and decide what your opinion was as to the

9   guilt or innocence of the defendant?

10  A        That's what --

11  Q        Based strictly on the evidence that you hear.

12  A        -- that's what I would have to do.

13  Q        And not hold it against the defendant in any

14  way if he chose not to testify?

15  A        That's what I would have to do.

16  Q        Could you do it?

17  A        Yes.

18  Q        Okay.   And that carries over into the

19  punishment phase of the trial as well.   It's possible

20  that during the punishment phase -- it's kind of human

21  nature, you know, if you find a person guilty of a crime

22  whether it's capital murder or maybe some other crime

23  that when you get to that punishment phase you might feel

24  better about the defendant or you might prefer and have

25  a little more sympathy or be more likely to give a

1   lenient sentence if the defendant got up there on the

2   witness stand and said, "Hey, I'm sorry about this."

3                    And that's human nature.   Most of us

4   would probably feel that way to some extent.

5                    So do you understand that during the

6   punishment phase of that trial that the defendant still

7   has that right not to choose to testify?   Would you be

8   able to decide Special Issue #1 as well as Special Issue

9   #2 based strictly on the evidence that is presented and

10  not hold it against the defendant in any way if he chose

11  not to testify during that part of the trial?

12  A          I have never done this before but I believe I

13  could.

14  Q          Ma'am, during a murder trial or any other kind

15  of trial you are going to hear testimony from all sorts

16  of witnesses, some of those people would be -- and I'm

17  not talking about this trial, just "trials in general",

18  some of those people might be psychiatrists or doctors

19  or ministers or police officers or maybe even someone you

20  know.   It's not likely in this trial, it could be someone

21  you know testify but it's possible.

22                    In such a case you are going to have all

23  sorts of different types of witnesses and we need jurors

24  who can sit during that trial and hear those witnesses

25  and give them all -- start them all out at the same spot

1    so far as your believing them or not believing them, not

2    just automatically say, "Well, that guy is a minister,

3    I know he's telling the truth" or "This guy has got a

4    police uniform on so I don't think, you know, I feel like

5    I know everything he says is going to be right."

6              Would you be able to start everybody out

7    on the same starting block and then listen to their

8    testimony and then judge after you heard their testimony?

9    A        Yes.

10   Q        And not just automatically come to some

11   assumption whether it be good or bad?

12   A        No.  I would not do that.

13   Q        Okay.  The piece of paper I had you look at

14   earlier was the indictment in the case, you don't need

15   to refer back to it unless you just want to but again it

16   is a charging instrument from a Grand Jury that basically

17   just charges a person with a crime but you understand I

18   believe that that is not any evidence of guilt.  The

19   evidence in this case has to come from the witness stand.

20             You wouldn't use the fact that he had

21   been indicted as any evidence, would you?

22   A        No.

23   Q        Any murder cases or any criminal cases of any

24   sort you may have written statements where the defendant

25   has written out a statement that basically amounts to

1       what you might consider a confession.

2               The Judge will charge you I will expect

3       in that sort of situation if it were to come up that

4       before you could use that statement as part of the

5       evidence in the case you would have to decide beyond a

6       reasonable doubt that that statement was voluntary and

7       if you decide that this statement was not voluntary that

8       you wouldn't consider it in any way in deciding whether

9       the person was guilty or not guilty.

10              Would you be able to do that?

11      A       Yes.

12      Q       Okay.  I want to talk to you a little bit about

13      your questionnaire.

14              One thing I noted, back before I

15      practiced law I was a school teacher at Daingerfield High

16      School and I couldn't help but notice that you are a

17      sister to Tommy Walker?

18      A       That's right.

19      Q       I am surprised that you would admit that.

20      A       I would very definitely admit it since he's the

21      only one I have.  I am proud of him.

22      Q       Tommy was coaching there when I was teaching

23      there, I have known him for a long time, he's a good

24      fellow.

25              But anyway I did notice that about your

1    questionnaire and I had some other questions about your

2    questionnaire; you mentioned up here that you had a

3    friend who was in prison and your explanation for that

4    was where it says do you know any -- anyone who has been

5    to prison or had been or is in prison and if yes give

6    details.

7              And you said, "A friend, self defense?"

8    A        Right.

9    Q        Can you just tell me a little bit about that

10   situation?

11   A        It was -- it's a lady that her husband had just

12   beat her up and she killed him.

13   Q        Okay.  And was that something -- I know you are

14   from Titus County, was that something that happened in

15   Titus County or was it somewhere else?

16   A        It was in another -- I don't think it was in

17   Titus, it was very close by.

18   Q        And even though the situation was as you said

19   it -- she ended up doing some time in the pen for it --

20   is she currently still in the pen?

21   A        No.  I think she did maybe three months.  It

22   was very little.

23   Q        She didn't spend much time?

24   A        No.

25   Q        Is that a situation that you were involved with

1  personally?   I mean you weren't like a witness or

2  anything like that?

3  A       No.  I was not.

4  Q       Okay.  Was this friend someone that you were

5  pretty close friends with?

6  A       Her sister is my best friend.

7  Q       Okay.

8  A       And I know her but not as well.

9  Q       Is there anything about that case that would

10 bother you if you were serving as a juror in this case?

11                I mean did you have any hard feelings

12 toward men or did you have any hard feelings toward

13 police officers or anything of that nature?

14 A       No.  No.

15 Q       You mentioned in your questionnaire that you

16 had some prior experience as a juror in a case?

17 A       It was -- what is it called, the indictment

18 phase of it?

19 Q       "Grand Jury?"

20 A       The Grand Jury is the only thing I have ever

21 done.

22 Q       You have never been involved in -- as a juror

23 in a criminal case?

24 A       No.

25 Q       Were you on the Grand Jury here in Titus

1   County?

2   A         Right.

3   Q         How long ago was that?

4   A         Goodness, I mean it's been several years ago,

5   probably five years ago.

6   Q         Chuck Bailey is the District Attorney here, was

7   he the District Attorney at that time?

8   A         No.   It was --

9   Q         "Mr. Cobb?"

10  A         "Cobb", yes.

11  Q         You also mentioned that you know Mr. Old who

12  is the Defense Attorney, there is also another attorney

13  working this case, Lance Hinson, do you know him?

14  A         No.

15  Q         How do you know Mr. Old?

16  A         Well, I have been in Mount Pleasant for years,

17  I just know him.

18  Q         Have you -- has he represented you in any sort

19  of legal --

20  A         No.

21  Q         -- work?

22  A         No.

23  Q         You say you just know him, are you friends or

24  just acquainted with him?

25  A         Know him just to say "Hello, how are you,

1    what's going on", that's about it.

2    Q        Mr. Old is representing the Defendant in this

3    case, the fact that he represents the Defendant, would

4    that sway you in any way in this case?

5    A        No.

6    Q        You wouldn't mind meeting him on the street two

7    or three weeks after the case was over and if the

8    decision that you made was not one you felt he would

9    agree with that wouldn't bother you?

10   A        No.

11   Q        You also mentioned something about a friend

12   having a drug problem, do you remember that in your

13   questionnaire?

14   A        It's my daughter.

15   Q        Your daughter?

16            I'm not going to try to get personal

17   with you and I hope you don't feel as if I am but is

18   there anything about that situation with her drug problem

19   that would cause you a problem toward having any ill

20   feelings toward any group of people?

21   A        No.  It happened many years ago but it's okay

22   now but there was a bad period in her teen years.

23   Q        I have got teenagers.

24   A        Just pray it doesn't happen.

25   Q        I do quite frequently.

1        You also mentioned that you knew

2   something about the facts of the case, what is it that

3   you know about the case?

4   A        Well, what I have read in the papers and at

5   that time I was living close to where this happened, I

6   was living in Cason -- almost in Cason.

7   Q        Were you living in Titus County?

8   A        Yes.

9   Q        Of course Cason is very close to Titus County?

10  A        Right.

11  Q        Do you know the Defendant Mr. Wardlow?

12  A        No.  I don't.

13  Q        Do you know any of his family?

14  A        No.

15  Q        Do you know Mr. Cole, the victim?

16  A        No.

17  Q        Did you know -- you say you lived close to

18  Cason, from your -- did your knowledge come from the

19  newspaper or from hearing people talk about it?

20  A        Just in the office and in the papers.

21  Q        You said "In the office", this is at the real

22  estate office?

23  A        Right.

24  Q        Whatever your knowledge might be, whether it's

25  from the newspaper or from things you might have heard

1    in the office is there anything you know what -- that

2    doesn't disqualify you as a juror, the fact that you have

3    heard something in the office or that you have read

4    something in the newspaper as long as you could put that

5    information aside and realize that this is not evidence

6    and not used as evidence during this trial in any way.

7                    Could you do that?

8    A          Yes.

9    Q          Okay.   Because, you know, the stuff that

10   appears in the newspaper or the stuff you hear on the

11   street, some of it might be true, it might not be true,

12   you know, that sort of thing.

13                   You could do that?

14   A          Yes.

15   Q          Okay.

16                   THE COURT:   Thirty minutes.

17                   MR. TOWNSEND: Thank you, Your

18   Honor.

19                   Ms. Edwards, you mentioned up here on

20   the first page of your questionnaire, you said you are

21   in favor of the death penalty in certain cases and your

22   explanation -- I talked to you about it a little bit

23   before, you said, "Rare cases" and you mentioned mass

24   murder and children involved.

25                   I think what you are saying to me is

1    basically that you wouldn't know what you could do or

2    what you would feel appropriate until you heard

3    everything?

4                        MR. HINSON:   That's exactly

5    right.

6    Q         (BY MR. TOWNSEND)   And you are not saying or

7    -- or are you saying, you know, you have mentioned these

8    two specific instances, you have mentioned mass murder

9    type cases and you have mentioned cases where children

10   are involved?

11   A         Those were examples.

12   Q         Those were just examples?

13   A         Yes.

14   Q         You are not saying if it wasn't a mass murder

15   or wasn't children involved there wouldn't be a chance

16   that you could do it?

17   A         I'm saying I would have to know the

18   circumstances.

19   Q         Ms. Edwards, do you know of any reason why you

20   couldn't serve on this jury and return a decision in this

21   case that resulted in the death penalty and the execution

22   of this Defendant if you felt the evidence was

23   appropriate?

24   A         What was the question?   I didn't quite

25   understand what you are saying.

1    Q       Do you know of any reason that you could not

2  return a verdict?

3    A       No.  I don't.

4    Q       That resulted in his execution?

5    A       I don't.

6    Q       If you know --

7    A       If it warranted --

8    Q       You felt like the evidence was appropriate?

9    A       That's right.

10    Q       You could do it?

11    A       Yes.

12               MR. TOWNSEND:  I'll pass the

13  juror, Your Honor.

14               THE COURT:  Mr. Old.

15

16           VOIR DIRE EXAMINATION

17              BY MR. OLD

18

19    Q       Ms. Edwards, have you ever lived in Pittsburg?

20    A       Pardon me?

21    Q       Have you ever lived in Pittsburg?

22    A       As a child.

23    Q       Not in your adult life?

24    A       Pardon?

25    Q       Not in your adult life?

1    A          No.

2               Well, yes, I did, between Pittsburg and

3    Gilmer in the Brumley community.

4    Q          Did you build a house three or four years ago

5    in Camp County?

6    A          No.   No.

7    Q          You are in the real estate business, aren't

8    you?

9    A          Right.

10   Q          You say that at the time this event occurred

11   you were living near Cason?

12   A          Right.

13   Q          That would have been at the intersection of

14   Highway 11 and the Union Hill Road, I forget which Farm-

15   to-Market it is?

16   A          That's right.

17   Q          That's just about as far south as you can go

18   in Titus County and stay in Titus County?

19   A          Yes.

20   Q          You are about a mile, mile and a half to Cason?

21   A          Probably a mile and a half.

22   Q          I know you work here in Mount Pleasant, did you

23   shop in Cason?

24              I think there's one store in Cason, it's

25   a convenience store?

1     A        Yes.   That's where I bought bread and milk.

2     Q        Did you frequently go there?

3     A        I was probably there a dozen times the whole

4     time I lived there.

5     Q        You said you did not know Mr. Cole, did you

6     know of him?

7     A        No.

8     Q        Assume with me that he hung around that store

9     and frequented it himself, if you later became aware that

10     while you did not know him by name that you became aware

11     that, yes, you had seen him in there, perhaps spoke,

12     carried on a casual conversation --

13     A        It wouldn't have happened.   The times that I

14     went in there I ran in and got bread and walked out.   I

15     have never talked to any man.

16     Q        Never talked to anyone?

17     A        No.

18     Q        Ms. Edwards, what I understand you do for a

19     living, you are somewhat of an independent contractor?

20     A        Yes.

21     Q        And the effect of that is if you don't work you

22     don't get paid?

23     A        That's exactly right.

24                  MR. TOWNSEND:   I object, Your

25     Honor.   That is irrelevant.

1          THE COURT:  Overruled.

2          MR. TOWNSEND:  Economics.

3          MR. OLD:    As  I  think  was
4   explained to you by the Judge at general voir dire a
5   couple of weeks ago an economic excuse was not an excuse
6   that they would allow you as a juror.

7          THE POTENTIAL JUROR:  That's
8   what he said.

9   Q          (BY  MR.  OLD)    I'm  not  asking  you  about
10  necessarily  the loss of money, if you were tied up in
11  the trial of this case or any case for say two or three
12  weeks --

13  A          It would be -- it would be a very hardship if
14  that's what you are asking me.

15  Q          That's not so much the loss of money, would it
16  also be the loss of contacts in your business?

17  A          That's right.  Because if you don't work in my
18  business for two or three weeks, well, then you might -
19  -might put you three months behind.

20  Q          As a matter of fact for example what you will
21  make in the next two or three weeks actually so far as
22  realizing money, you know it's going to happen because
23  it's a contract that you have, that you already --

24  A          Right.  It could fall through.

25          Is that what you asked me?

1          In other words, if I don't stay on top

2     of what I have got going right now I could lose what I

3     already have started.

4     Q          Well, I mean could you have a prospect today

5     and you can't get back to him for two or three weeks, you

6     may lose him?

7     A          Correct.

8     Q          And in effect your business or your independent

9     business --

10    A          Yes.

11    Q          -- comes to a stop if you are taken away from

12    it for a prolonged period of time?

13    A          That's right.

14    Q          Will you agree with me that the trial of this

15    case demands your full attention?

16    A          Yes.

17    Q          I know you would not do this purposely or I

18    don't believe you would, would you -- could you be

19    inclined to hurry in your deliberations or perhaps

20    compromise not from an objective standpoint, from a

21    subjective standpoint, that is you might be in a little

22    bit too big of a hurry to get back to your job or your

23    profession?

24    A          I certainly wouldn't intend to.

25    Q          I know you wouldn't intend to but I mean from

1   a subjective standpoint could that be an influence on

2   your deliberations?

3   A        I don't think so.

4   Q        Now, let me -- you consider yourself to be an

5   independent thinker?

6   A        Yes.  I do.

7   Q        In order to influence you does it take someone

8   presenting to you a logical argument?

9   A        What?

10  Q        A logical argument based on something?

11           I'm not going to change your mind by

12  just saying "No, you are wrong, Mary?"

13  A        Not hardly.

14  Q        I will have to say, "No, you are wrong, Mary,

15  because?"

16  A        I want to know why I am wrong.

17  Q        You have been on a jury before?

18  A        Grand Jury.

19  Q        "Grand Jury?"

20           Yes.

21           Well, I have never been on a jury either

22  so we are even.

23  A        You don't want to be either.

24  Q        When I'm describing to you what I think happens

25  in deliberation and you are to vote your conscience, that

1    is your beliefs based on the evidence?

2    A        Yes.

3    Q        That is not to say that another juror cannot

4    change your mind by saying, "Yes.  But you are not

5    remembering this testimony and this testimony" and then

6    whether or not it's believable or not?

7    A        They would have to prove to me that I was wrong

8    if that's what you are asking me.

9    Q        Yes.

10   A        And I would listen to it.

11   Q        You would listen to it?

12   A        I would listen to it.

13   Q        But merely by people saying, "Mary, you are

14   wrong, we all think another way?"

15   A        No.

16   Q        That wouldn't do it?

17   A        No.  That wouldn't do it.

18   Q        In deliberation, I don't know whether it will

19   take four hours or four days or four weeks and no one

20   else knows or -- for 12 people to agree in any case I

21   mean when you go in there I mean there is no time limit

22   set on deliberations.

23   A        What was your question?

24   Q        My question is this, going back to -- you are

25   going to worry about your business while you are away

1    from it?

2    A          I probably would.    That's the way I pay my

3    bills.

4    Q          Is that going to effect your independent

5    judgment and/or is it going to perhaps allow your level

6    of persuasion by others to be reduced?

7    A          I don't think so.

8    Q          You don't think so?

9    A          No.   I don't.

10   Q          Is it a possibility?

11   A          I wouldn't think so.

12   Q          Your brother Tommy Walker, the fact that he and

13   Mr. Townsend talk to or know each other, does that have

14   anything to do with anything?

15   A          I wasn't even aware of it.

16   Q          Now that you are aware of it?

17   A          No.

18   Q          The fact that he thinks your brother is a fine

19   fellow, that's not going to influence you at all?

20   A          I wouldn't think so because I know him.

21   Q          The fact that he's your brother's -- a friend

22   of his, I don't know whether he is or not --

23   A          No.

24   Q          -- that's not going to effect your

25   deliberations?

1    A          No.

2    Q          You were on a Grand Jury?

3    A          Yes.

4    Q          And you deliberated and returned indictments?

5    A          Right.

6    Q          You will be instructed by the Judge in this

7    case when he gives you his charge -- and first let me

8    explain; His Honor is the exclusive Judge of the law of

9    this case and he will give you the law of the case at the

10   conclusion of evidence, you are instructed to take the

11   law and make certain fact findings, you decide, you are

12   the jury.

13              When I say "you" I'm talking about you

14   and the others are the exclusive judges of the facts of

15   this case.

16              Do you consider the fact of indictment

17   to be any inference of guilt?

18   A          No.

19   Q          Okay.  I mean -- I distinguish inference from

20   evidence, "inference" is -- simply does it infer to you

21   in any way that this man is guilty?

22   A          It indicates that there is enough evidence to

23   try him is the way I understand the law but not to prove

24   innocence or guilt.

25   Q          But  in  the  deliberating,  objectively  or

1   subjectively would you consider the fact that he had been

2   indicted and that indictment returned to be an inference

3   of guilt?

4   A       No.

5   Q       You can totally lay aside that fact?

6   A       Yes.

7   Q       You were questioned by the District Attorney

8   as to the Fifth Amendment and that basically is that Mr.

9   Wardlow does not have to testify, he does not -- I mean

10  he does not have to testify nor is he compelled to call

11  witnesses and those things are not inferences of guilt

12  or evidence of guilt, the Court will tell you that in his

13  charge.

14  A       Yes.

15  Q       That you shall not consider his failure to

16  testify as evidence against him or as an inference of

17  guilt.

18              In answering one of the questions I

19  thought you kind of stumbled at in your answer, I was not

20  sure, you said if I understood you correctly you said it

21  would raise a question in your mind and then I think you

22  said you thought you could set it aside?

23  A       What I said was it would make it a lot easier

24  for me if all questions were answered but if they were

25  not answered then I would have to go by what was put

1    before me.

2    Q         But in deliberating objectively or subjectively

3    are you sure that you are not -- in assuming that he did

4    not testify would you have to say, you know, "He could

5    have got up and at least said, no, that wasn't true and

6    the fact that he did not tends to make me think this is

7    true?"

8    A         I kind of felt that way until the Judge the

9    other day explained to us some of the reasons why he

10   didn't and he went into that pretty thoroughly with us

11   and I do understand why there would be some cases where

12   they wouldn't.

13   Q         Where they would not?

14             Okay.   I am not -- you understand the

15   law, what I'm asking you is about your ability, if you

16   are sure you could lay that aside?

17   A         Yes.

18   Q         There is a list in front of you, I believe it

19   has a "1" on it at the top, it says "Witness List."

20   (Indicating)

21   A         Yes.

22   Q         Will you review that list and in reviewing it

23   will you review it for me making mental notes of names

24   that you recognize or of people that you know.

25   A         I don't know any of them.

1    Q        You don't even recognize any name?

2    A        I don't recognize a name period.

3    Q        In the time that you lived near Morris County

4    either by name or just on site did you acquire the

5    knowledge of any of their law enforcement officers?

6    A        I don't recognize a name on here.

7    Q        In that as to law enforcement officers I think

8    you expressed the opinion that they are underpaid on your

9    questionnaire?

10   A        Very definitely.

11   Q        Do you hold in general law enforcement members,

12   officers in high esteem?

13   A        I just think for the work they do they need to

14   be paid more.

15   Q        You consider them generally to be credible

16   people?

17   A        Yes.  I do.

18   Q        Your -- one of your jobs in this case and one

19   of the things the Court will instruct you is that you are

20   the exclusive judge of the credibility and weight to be

21   given to the evidence.

22                    And that is you may reject or accept any

23   of the evidence or any -- any reason you find, I mean

24   simply "I didn't -- I just don't believe that person",

25   you don't have to sit down and say "I don't believe the

1    witness so and so because of this this and this", I mean

2    if you don't believe them you don't believe them.

3                    Would the fact that a witness was a law

4    enforcement officer give that witness a head start with

5    credibility in your mind?

6    A        Not necessarily.  No.

7    Q        Well, --

8    A        No.

9    Q        "No?"

10                   Okay.   I want to get rid of that

11   "necessarily?"

12   A        Okay.  "No."

13   Q        You would just every witness from the same

14   starting point?

15   A        Yes, sir.

16   Q        Would the mere fact that it was proven that the

17   person was a law enforcement officer go to the issue of

18   credibility?   I mean the officer or position would not

19   give you -- give him anymore credibility?

20   A        No.

21   Q        Would you set any different standard for

22   judging a law enforcement officer as a witness as you

23   would a lay witness?

24   A        No.

25                   MR. OLD:   May I approach the

1    witness, Your Honor?

2                          THE COURT:   You may.

3                          MR.  OLD:    There is a page

4    before you "6", there you go.

5                          Can I get you to review what has been

6    marked "State's Exhibit 6" starting with the second full

7    paragraph on the page?  (Indicating)

8                          THE POTENTIAL JUROR:   Right

9    here?  (Indicating)

10   Q         (BY MR. OLD)  Yes.

11   A         Okay.

12   Q         This is the legal definition of the word

13   "beyond a reasonable doubt", you were asked some

14   questions earlier about would you find beyond a

15   reasonable doubt.

16                          When the Court instructs you that a word

17   has a particular meaning or special definition or that

18   is the word's legal definition and you are required to

19   use the Court's definition as opposed to your own.  If

20   it is different, if you have a different criteria or

21   definition of reasonable doubt can you set it aside and

22   follow the instruction of the Court and use the Court's

23   meaning of the word reasonable doubt as opposed to your

24   own?

25   A         Yes.

1   Q           Okay.  As to the definition you read, are you

2   offended in any way by that definition, do you disagree

3   with it?

4   A           No.

5   Q           You would have no problem in making your

6   factual decision in this case based upon that definition?

7   A           I wouldn't think so.

8   Q           Let me -- Mr. Townsend spoke to you for a

9   moment about statements of the accused, I think he called

10  them "confessions" or "written statements", the issue of

11  whether a statement is voluntary or not is an issue for

12  the jury to decide, again, the voluntariness of a

13  statement has a special legal definition or a criteria,

14  that is the State must prove to you beyond a reasonable

15  doubt that the criteria for the statement to be voluntary

16  was met.

17  A           I don't understand the question.

18  Q           Okay.  I haven't got to the question yet.

19  A           Okay.

20  Q           In that instruction, and it is the law of this

21  case, that whether you believe the statement is true or

22  not if based upon the issue of voluntariness you find

23  that it was not voluntarily made that you are to totally

24  disregard that statement as evidence or any evidence that

25  came to you through that statement being made, can you

1    follow that instruction, and my question is this; your

2    belief is the statement is true, your finding as to

3    whether it was voluntary or not is that it was not proven

4    to you beyond a reasonable doubt that it was voluntary,

5    can you totally lay aside the knowledge of that, the fact

6    of that statement and make your decision based upon the

7    rest of the evidence in the case that is not related to

8    that confession, the confession itself?

9    A        I think I could.

10   Q        Okay.  And that is to say you could totally

11   follow the instructions, I mean you could just blank that

12   out of your mind?

13   A        I have never been here before.

14   Q        I know you haven't.

15   A        But I think I could.

16   Q        You think you could?

17            Do you have a doubt as to whether you

18   could or not?

19   A        If that was the way the law reads and that was

20   the way it was supposed to be done I would hope that I

21   could.

22   Q        Okay.  And that is even in a question assuming

23   that you believed the statement to be the truth, you

24   believe the statement is truthful but you do not believe

25   it is voluntary?

1    A          I think I could.   Okay.   I think I could.

2    Q          Do you think the knowledge of that statement

3    in that case might could or would effect your verdict in

4    the case?

5    A          I would hope that it wouldn't and I think I

6    could.

7               Like I said, I have never been here

8    before.

9    Q          You gave, "You might could or would", is that,

10   "Yes, I think it would might", is it "May?"

11              MR. LEE:  I don't think he can

12   limit the witness to her answer on the question as to all

13   of the implications that would enter in.

14              THE COURT:   Sustained.

15              If you feel like either side has tried

16   to put you in a position that you didn't say something

17   let them know "That's not what I said" and correct it.

18              THE POTENTIAL JUROR:  What I'm

19   saying, Your Honor, is that I think I could put it aside,

20   I don't know.   I have never been in this situation

21   before.

22              THE COURT:   Do you have any

23   reason to believe that you could not set it aside?

24              THE POTENTIAL JUROR:   No.

25              MR.   OLD:          In     your

1   questionnaire you have expressed this opinion, that you

2   are in favor of the death penalty?

                              THE POTENTIAL JUROR:   Right.

3   Q         (BY MR. OLD)   In your adult life has that

4   

5   opinion changed?

6   A         No.

7               I think in some instances it's the only

8   answer.

9   Q         I am not -- have you gone from being say a

10  person 15 years of age or at anytime in the past if you

11  had been put to that question would you have answered it

12  differently, I mean have you changed your opinion?

13  A         No.  In my adult life I have felt that way.

14  Q         I want to ask you a question about the answer

15  that you circled and that is that you believe the death

16  penalty is appropriate in some murder cases and you could

17  return a verdict in a proper case.

18              Okay.   That says "murder cases", it

19  doesn't say "capital murder cases", now, the question

20  is, it doesn't specify between what Mr. Townsend called

21  "plain murder" and capital murder.

22              Do you think that the death penalty is

23  an appropriate -- should be an appropriate punishment in

24  other cases other than capital murder cases?

25              I'm not testing you on what the law is,

1    I'm asking you what you think the law ought to be?

2    A        I'm not sure I fully understand what you are

3    asking me.   I am just saying that there has been some

4    cases where -- there has been some cases where I think

5    the death penalty was very definitely warranted.

6    Q        Mr. Townsend defined capital murder for you as

7    plain -- intentionally or knowingly killing someone while

8    in the course of a robbery?

9    A        Right.

10   Q        And so forth?

11   A        Right.

12   Q        The killing of a peace officer or fireman while

13   they are in the line of duty, I think it's also a child

14   under the age of six.

15           Now, in answering that question capital

16   punishment is appropriate in some murder cases, are there

17   murder cases or circumstances that you can think of --

18   I'm not asking you what the circumstances are whether -

19   -where you think it's appropriate or not, whether it fits

20   the Texas Penal Code definition of capital murder or not?

21   A        I can't think of any.

22   Q        You would limit it to circumstances that the

23   law defines?

24   A        Right.

25   Q        The punishment for capital murder as you have

been told results first on the finding of guilty of capital murder in at least a life sentence, life in this case is a 40 year sentence or it's 40 years before you become eligible for parole, are you generally familiar with the legal concept of parole?

A          Only what the Judge explained to us the other day in Court.

Q          And you will be instructed and charged by this Court not to consider parole but you will be told that if a person is convicted of capital murder a life sentence means that he will -- that he or she will serve at least 40 actual years before one becomes eligible for parole and eligibility does not equal parole, just because you are eligible does not mean that you are paroled, okay, that's the lower end of the range of punishment for capital murder.

The upper end, I mean it's one of two things, it's either that or death by lethal injection.

If in this case you found that -- in any murder case that the defendant had intentionally killed someone without justification and you found that beyond a reasonable doubt but there was a reasonable doubt in your mind as to whether or not it was in the course of a robbery, an arson, a kidnapping and those things we talked about then you would have found him guilty of the

1    lesser and included offense of murder or what Mr.

2    Townsend calls "plain murder", I would rather call it

3    "non-capital murder", the range of punishment for non-

4    capital ranges from a five year probated sentence to life

5    and you will be instructed on that and you will be

6    instructed again not to consider in your sentencing the

7    law of parole.

8            If you are instructed not to consider

9    the possibility of parole can you do that in assessing

10    a sentence?

11    A       Yes.

12    Q       Okay. Now, you don't really assess a sentence

13    in a capital murder case, you know the result of your

14    answers will result in either life or death. I mean the

15    law assesses the sentence, you make findings of fact in

16    a non-capital case, you assess a period between five

17    years probated and life, can you conceive of

18    circumstances where a murder had been committed to where

19    you could give as little as a five year probated

20    sentence, you have a murder?

21    A       I understand.

22    Q       I'm not asking -- I'm talking about a set of

23    circumstances and the way a murder could be committed

24    where you could consider the lower range of punishment?

25    A       Yes. I can think of some ways. Yes.

Q        And for non-capital murder can you conceive of
a set of circumstances where a life sentence would be
appropriate?

A        I would probably have a problem with that.

Q        You would?

A        Yes.

Q        You do no think you could consider the full
range of punishment for murder?

A        No.  No.  I misunderstood what you were -- what
you were asking me.  I'm sorry.

Q        You said you could have a problem with giving
a life sentence?

A        No.  What I said, I would have no problem if
it was proven to me that it was capital murder, the high
or low range.

Q        Okay.  Now, I'm not asking you about capital
murder, I'm talking about plain non-capital murder.

A        I thought you were finished with that and you
went on with capital murder.

Q        For plain -- plain vanilla or non-capital
murder can you conceive of a set of circumstances where
you could impose the upper range of the punishment for
non-capital murder?

A        Yes.

Q        Okay.

1          THE   COURT:      It's   been   35

2     minutes.

3                    MR.   OLD:      Thank   you,   Your

4     Honor.

5                    In answer to the Special Issues you were

6     looking at earlier, the top says "Special Issues", it's

7     marked "SVDX 5."    (Indicating)

8                    THE POTENTIAL JUROR:    Okay.

9     Q          (BY MR. OLD)    I want to talk to you about the

10    second issue, let's first talk about the first issue; you

11    were asked to find beyond a reasonable doubt the answer

12    to that question and the question is is there a

13    probability that the defendant would commit criminal acts

14    of violence that would constitute a continuing threat to

15    society, you were asked to find beyond a reasonable doubt

16    the possibility of something.

17                   Now, would the fact that -- and in

18    answering that question you have already found -- you

19    wouldn't be answering that question unless you found the

20    defendant guilty of capital murder, you understand that?

21    A          Yes.

22    Q          Okay.  Would the fact that you had found him

23    guilty of capital murder along convince you beyond a

24    reasonable doubt that there is a possibility that the

25    defendant would commit criminal acts of violence?

1          MR. TOWNSEND:   Object, Your

2    Honor, he's asking her a question that she is not going

3    to be required to answer, he's asking her the

4    "possibility", the word is "probability."

5          MR.   OLD:        I   said

6    "probability."

7          THE COURT:   I'm going to

8    sustain the objection.   I will let you rephrase.

9          MR. OLD:   My question is in

10   answering that question you are at a point to where you

11   and 11 other people have found a man guilty of capital

12   murder, the fact that you have found -- would the fact

13   that you have found him guilty of capital murder prove

14   to you beyond a reasonable doubt that there is a

15   probability that the defendant would commit criminal acts

16   of violence that would constitute a continuing threat to

17   society?

18          THE POTENTIAL JUROR:   There

19   could be cases where I might think not.

20   Q         (BY MR. OLD)  Would you tend to think that the

21   fact that you found him guilty of a capital crime, there

22   are cases where that alone would do it?

23   A         Then I didn't understand the last part of your

24   question.

25   Q         There are cases where the fact that you found

1    a man guilty of capital murder that would lead you to

2    find beyond a reasonable doubt that the probability that

3    we are talking about existed?

4    A        I think there could be circumstances where I

5    might believe either way.

6    Q        What I'm asking you, you could conceive of a

7    capital murder where the fact you found him guilty

8    wouldn't prove to you beyond a reasonable doubt?

9    A        Yes.

10   Q        Now, the next question, issue is as to

11   mitigating circumstances, you are familiar with that, you

12   have read that issue several times.

13   A        The second part of this?   (Indicating)

14   Q        Yes.   The Special Issue, what is marked

15   "Special Issue #2?"

16   A        Right.

17   Q        Would you consider evidence of age to be

18   evidence of mitigation?

19   A        It would depend on the age.

20   Q        Okay.

21   A        There's a difference in say 10 and 18.

22   Q        The difference, say 25 and 80?

23   A        There would be no difference.

24   Q        There would be no difference between you --

25   between 25 and 80?

1    A        Not really.  No.

2    Q        Is there a breaking point on age where you

3    would reject it as evidence in mitigation?

4    A        Not unless that person was 80 and senile or

5    whatever.

6    Q        I mean would you reject anybody over the age

7    of 18?  Would you reject evidence of age?

8    A        I don't think so.

9    Q        I'm not saying that you would find it to be

10   mitigating, would you consider it?

11   A        I think he used from 18 to 80, those figures?

12   Q        Yes.

13   A        I think anybody that age, I don't think it

14   would make a difference with me.

15   Q        You mean you would not -- you would reject 18

16   to 80 age alone as evidence of mitigation?

17   A        Right.

18   Q        Would  a  person's  family  history  or  the

19   environment that they were raised in, would that be

20   evidence  of  mitigation  that  should  be  considered

21   mitigating?

22   A        Possibly.

23   Q        Would you consider their belief in christianity

24   or any other religion as evidence of mitigation?

25   A        Possibly.

1    Q        You said that you had read an article about the

2    case on trial in the newspaper?

3    A        Yes.

4    Q        Is that correct?

5    A        Yes.  Yes.

6    Q        And you have heard it discussed, I think you

7    said at your office?

8    A        Yes.

9    Q        As to what you have heard, would it require

10   evidence to remove any fact or statement made to you?

11   A        Okay.  I don't quite understand what you are

12   asking me.

13   Q        I don't know what you have been told but let's

14   assume that --

15   A        It was not being told anything, it was just

16   talked about in discussion.

17   Q        Okay.  In discussion, I mean somebody said

18   something about it and talked something about it, can you

19   tell me who the speaker was?

20   A        I probably couldn't tell you, we were just a

21   round table discussion mostly, it was not what had been

22   done, it was why it had to happen, why it happened, that

23   was the extent of it.

24   Q        What source was quoted from whoever had

25   knowledge?

1    A       Someone in the office was reading the newspaper

2  article that was in the Tribune.

3    Q       Okay.   Anything that was stated in that

4  conversation or any source of authority, if you consider

5  the newspaper a source of authority, they make mistakes?

6    A       I don't consider the newspaper a source of

7  authority.

8    Q       There were factual statements in there about

9  what happened apparently?

10   A       I can't even remember now exactly what was

11 said.

12   Q       You don't remember what was in the newspaper?

13   A       No.

14   Q       Are you sure it was a Mount Pleasant newspaper?

15   A       I think so.

16   Q       How long ago was this?

17   A       It was right after it happened.

18   Q       Is there anything in your knowledge from

19 newspaper or from hearsay or otherwise, what other people

20 have said about it that is -- that would -- in order for

21 you to disbelieve that there would have to be proof made

22 to you or evidence produced?

23   A       It would have to be proof and in evidence.   I

24 don't know.   I don't know.

25   Q       Okay.

1    A        I mean I don't know what happened.

2    Q        Ms. Edwards, I was in the waiting room of your

3    office about 10 days ago, I was there picking up Mr. Joe

4    Redfearn who is one of your bosses?

5    A        Brokers.

6    Q        "Brokers?"

7    A        Yes.

8    Q        And you made the statement to me I didn't want

9    you on this jury or "You don't want me on your jury?"

10   A        Yes.

11            Again, that was based on the fact that

12   I need to work.

13   Q        You don't want to be on the jury?

14   A        No.  I don't.

15   Q        Okay.  And that was based on the fact you are

16   not -- that you don't want to take off from work, you

17   don't want to neglect your work?

18   A        I think I have several very good deals working

19   right now and I could run the risk of losing them if I

20   am not there.

21   Q        Let me go back to that; I know -- I don't

22   believe anyone would deliberately get in a hurry, force

23   a decision or agree with somebody just to agree to get

24   back to work or something like that?

25   A        I would not do that.

```
 1    Q         I know you would deliberate, you have some --

 2    some things so to speak that are important to you that

 3    are -- may materialize in the next --

 4                        MR.   TOWNSEND:     I   want   to

 5    object, this ground has already been plowed.

 6                        THE COURT:   Overruled.

 7                   I think he has a right to inquire for

 8    purposes of exercising a preemptory strike.

 9                        MR. OLD:   You are concerned

10    about some business matters of yours?

11                        THE POTENTIAL JUROR:    Yes,

12    sir.  I am.

13    Q         (BY MR. OLD)   And you are preoccupied with

14    those things?

15    A         Naturally.

16    Q         They are on your mind all the time?

17    A         Certainly.

18    Q         All right.  And they are of great significance

19    to you?

20    A         Right.

21    Q         If selected on a jury are those things still

22    going to be on your mind?

23    A         I would try my darndest for them not to be.

24    I don't know.

25                   I haven't been here before.
```

1    Q        I mean --

2    A        But I do know that this thing is too serious

3    for -- to let this enter into my mind.  It would be hard

4    not to but I would have to do it.

5    Q        I don't know if I am ridiculous I am

6    ridiculous, if you have a real estate transaction out you

7    are trying to get a contract on, have a good contract on

8    and you are sent down there and you are unable to attend

9    to that, not so much the money that you are going to make

10   from it, there's a large commission involved, is there

11   a great deal of satisfaction in making the sale or

12   handling the sale?

13   A        True.

14   Q        Do you think that could take away from your

15   attention, just being here and thinking about that or

16   trying not to think about that?

17            Do you think it could interfere with

18   your deliberations in this matter?

19   A        I would hope not but again I have not been here

20   before.

21   Q        Do you think it might?

22   A        It's possible.

23            THE COURT:  Five minutes.

24            MR. OLD:  Your Honor, that's

25   all we have at this time.

1    THE COURT:  Ma'am, if you will

2  return to the waiting room I will bring you back in a few

3  minutes or send someone with instructions.

4    We will probably not be able to tell you

5  today whether you are on the jury.  We are going to talk

6  to several jurors and then sometime next week we will

7  start eliminating some jurors so it will be the end of

8  next week probably.

9    THE POTENTIAL JUROR:  But do

10  I have to stay here?

11    THE COURT:  For just a few

12  minutes and I will talk to the lawyers as to whether we

13  need to talk to you further.

14    THE BAILIFF:  Please watch

15  your step, ma'am.

16    THE COURT:  You are just about

17  finished, though.

18

19    (The following occurred outside the

20  presence and hearing of the potential juror:)

21

22    THE COURT:  Does the State

23  have any challenges for cause?

24    MR. TOWNSEND:  None, Your

25  Honor.

1          THE COURT:   Does the Defense

2    have any?

3               MR. OLD:  Yes, Your Honor, the

4    State would challenge for cause the juror Mary Edwards

5    in that she clearly stated that she would reject as

6    circumstances of mitigation age between the age of 18 and

7    80, that by stating she would reject that and not

8    consider it she disqualified herself as a juror in this

9    case for cause.

10              Additionally we challenge her for cause

11   on her testimony about the extent that her work beared

12   on her mind.

13              While economic excuse is not one that

14   a Judge may make for an economic excuse if the factors

15   surrounding that is anything else that would be on our

16   mind or her mind would effect her ability to sit as a

17   juror in this case it certainly is a challenge for cause.

18              It would be the same thing as putting

19   a person who is deaf on a jury, someone who is so

20   preoccupied in their mind with other things that they

21   cannot hear or there is a probability or possibility that

22   they will not.

23              THE COURT:  Mr. Townsend?

24              MR. TOWNSEND:  As to his last

25   challenge, Your Honor, taking her statement as a whole

1    she testified that she could do it, testified that she

2    would do her best to do it, he finally, after asking her

3    questions for ten minutes on that issue got her to say

4    she might possibly be distracted a little bit, she didn't

5    know.

6            That's the most -- closest to saying she

7    couldn't handle it.

8            As to the other objection, I'm not

9    certain that at this point how the question was phrased

10   to her but she basically said in my questioning she also

11   said in some of Mr. Old's questioning that she would

12   consider these issues.

13           I think her answer was that she would

14   not consider age in any way, I think it might have been

15   based on a misunderstanding, I think she was answering

16   in her opinion did she consider that to be mitigating

17   rather than would she consider it.

18           I think the word "consider" was in there

19   but I think her understanding and the way he asked the

20   question was "Would she consider it", well, you know

21   "Would she consider that mitigating", she has the right

22   to consider mitigating or not as long as she is willing

23   to consider all of it and then make up her mind.

24           And I think what she stated she would

25   do.

1          MR. LEE:   The question was

2   that and that alone as mitigating circumstance is what

3   I understood.

4          THE COURT:   I believe that

5   she was very clear that it is something that she does not

6   want to do, that if she does not work she won't get paid

7   and it will be on her mind but she also stated very

8   clearly that she was "rather hardheaded", I guess I'll

9   use that terminology, it wasn't her words, and the fact

10  that she was having to miss work would not influence her

11  decision.

12          So I'm going to overrule the challenge.

13          I also do not -- excuse me, that's the

14  second challenge -- I also do not believe that the first

15  challenge is valid.

16          I am overruling both challenges for

17  cause, Mr. Old.

18          Let's take a recess.

19

20          (Whereupon Court was recessed and at the

21  conclusion of which the following transpired:)

22

23          THE COURT:   Let the record

24  reflect that there are no jurors present in the

25  courtroom.

1          Let the record further reflect that the

2   following Findings of Fact and Conclusions of Law are

3   being dictated into the record at the request of the

4   Defense Attorney, Mr. Bird Old, III.

5          I will state into the record my Findings

6   of Fact and Conclusions and then I will request this

7   Reporter transcribe same.

8          Finding of Fact are as follows:

9          1.    There  is  no  dispute  over  the

10  material facts.

11         2.    The Defendant was arrested by the

12  Morris  County  Sheriff  in  South  Dakota  and returned  to

13  Morris County, Texas.

14         3.    The Miranda Warnings were given to

15  the Defendant in South Dakota and the Defendant requested

16  an attorney.

17         4.    The  Defendant  was  appointed  an

18  attorney in June of 1993 when he was returned to Morris

19  County.

20         5.    The  Defense  Attorney  told  the

21  Sheriff  not  to  talk  to  the  Defendant  about  the  case

22  unless he, the attorney, was present.

23         6.    Morris  County  has  a  small  jail

24  population  and  it  is  the  customary  practice  of  the

25  Sheriff  to  talk  to  and  counsel  with  inmates  if  they

1   request his help.

2            7.  The Defendant and Sheriff had known
3   each other eight to 10 years.

4            8.  The Defendant wrote a note or a
5   letter to the Sheriff in January of 194 requesting a
6   meeting with the Sheriff.

7            9.  The meeting took place one week to
8   10 days after the request, the meeting lasted 45 minutes
9   to an hour and a quarter.

10           10.  No Miranda Warnings were given
11  prior to the meeting.

12           11.  The Defendant told the Sheriff that
13  he was having trouble sleeping, that he was having
14  nightmares and emotional problems.

15           12.  The Sheriff is a religious person
16  and he discussed religion with the Defendant, the Sheriff
17  also said that it often helped him to write down his
18  problems and confront them.  The Sheriff also said that
19  he, the Defendant, could lie to him but not to God.  The
20  Sheriff further told the Defendant that people are saved
21  by asking God for forgiveness and that the truth would
22  set him free.

23           13.  The Sheriff suggested that the
24  Defendant write out his problems and solutions and start
25  at a period of time prior to the date of the alleged

1    offense.

2         14.  The Defendant testified, as did the
3    Sheriff, that the Sheriff told him not to discuss the
4    case with him and if he wrote out something he didn't
5    want seen he should destroy it, flush it down the toilet.

6         15.   The Defendant testified that the
7    Sheriff never asked for a statement and never asked him
8    to send a statement to him.

9         16.  The Defendant testified that he did
10   not know why he sent the letters to the Sheriff.

11        17.  The Defendant sent several letters
12   and notes to the Sheriff.

13        18.   The letters were received by the
14   Sheriff through in-house mail.

15        19.   The Defendant was represented by
16   Attorney Solomon when the February letter was sent by
17   Attorney Old when the September letter was sent.

18        20.   No meeting occurred between the
19   Defendant and the Sheriff before the September letter.

20        Conclusions of Law are as follows:

21        1.   The February meeting between the
22   Sheriff and the Defendant was not a psychological ploy
23   to gain information for the State.

24        2.   The meeting was not the functional
25   equivalent of an interrogation.

3.    Both the February 28th letter and the September letter amounts to a voluntary statement and admission of guilt.

4.    The Sheriff advised he did not constitute entrapment.

5.    The meeting between the Sheriff and the Defendant was not a violation of the Sixth Amendment Right to have counsel present during a confrontation between the State and Defendant.

6.    The Sheriff made no attempt to elicit incriminating information during the meeting with the Defendant.

7.    The meeting was not a custodial interview.

8.    No promises nor rewards were offered nor given to Defendant.

9.    Both letters are admissable.

If either side requests additional Findings of Fact or Conclusions of Law they may submit them to the Court in writing.

MR. OLD:    We request one verbally at this time, Your Honor.

THE COURT:  I would prefer to sign the ones I have just dictated into the record, get a copy to both sides, let you review them then if you

1  have a question then you may do so in writing.

2                              MR. OLD:  Thank you.

3                              THE COURT:  Are we ready?  Is

4  the State ready?  Defense ready?

5                              MR.  TOWNSEND:    Yes,  Your

6  Honor.

7                              MR. OLD:  Yes, Your Honor.

8                              THE BAILIFF:  Watch your step

9  there, you will be falling all over LLoyd there.

10                             Have a seat right there.

11

12              J.D. REYNOLDS, Potential Juror #330,

13  was  called  as  a  Potential  Juror  and,  having  been

14  previously sworn by the Court, testified as follows:

15

16                              THE COURT:  How are you doing,

17  Mr. Reynolds?

18                              THE POTENTIAL JUROR:   Pretty

19  good.

20                              THE COURT:  For the record is

21  your name "J.D. Reynolds?"

22                              THE POTENTIAL JUROR:    Yes.

23  It is.

24                              THE COURT:  Mr. Reynolds, I'm

25  Gary Stephens, I'm presiding over jury selection in the

1    trial in this case.

2              We have two lawyers present representing

3    the State of Texas, we have the District Attorney from

4    Morris County, Mr. Richard Townsend and the attorney from

5    -- District Attorney from Cass County, Mr. Randall Lee.

6              There are two Defense Attorneys assigned

7    to this case, present in the courtroom is Mr. Bird Old,

8    III.

9              MR. OLD:  How do you do, sir?

10             THE COURT:  Next to him is the

11   Defendant, Mr. Billy Wardlow.

12             The other attorney, Lance Hinson, is not

13   present this afternoon.

14             Now, Mr. Reynolds, the lawyers have read

15   your  questionnaire  and  they  are  familiar  with  your

16   answers.   They are going to discuss those answers with

17   you and they are also going to talk to you about the

18   principles of law involved in a death penalty case.

19             You will be asked a lot of questions and

20   the answers will let us know whether or not to put you

21   on this jury.

22             In order to be a juror you must be able

23   to understand and follow the law, you don't necessarily

24   have to agree with the law but if you disagree with some

25   part  of  it,  if  you  can  set  it  aside  you  are  still

qualified but if you disagree with the law so much and to the extent that you can't follow the law you are not qualified.

So we need to know what your opinions are about some of our laws so we can decide whether or not you are qualified.

We have also found over the years of picking jurors in this type of case that just being qualified does not necessarily mean that you are an appropriate juror so we need to know more than whether you could follow the law, we need to know how you think and why you think so, we need to decide whether it is an appropriate  task or duty for you to be on the jury, there are no right  or wrong answers, there's no right or wrong opinions, they are opinions, we frankly don't care why they are your opinions and I don't mean to be rude by that but we very much care what those opinions are.

If you have questions during the process stop us  and let us know what is on  your mind and we will try to clear up and answer any questions that you have.

Mr. Townsend.

MR. TOWNSEND: Thank you, Your Honor.

VOIR DIRE EXAMINATION

BY MR. TOWNSEND

Q        Mr. Reynolds, if I ask you any questions you don't understand or mumble, I have mumbled or something, be sure and let me know and I will restate that for you.

The State of Texas in this case is actively seeking the death penalty and I'm not trying to scare you or shake you up, I'm just trying to lay our cards out here and that's what we are here for.

I have your questionnaire, I think I have a good idea from that questionnaire what your attitude about the death penalty is but if you could for a moment just tell us how you feel about the death penalty.

A        I believe in it, I mean I believe that if the crime called for it, you know, I don't -- I don't believe we see enough of it nowadays, I think that's the reason we have more crime going on in the United States than we should have.

Q        So you believe it appropriate in some cases?

A        Yes, sir.

Q        Mr. Reynolds, in Texas there are two kinds of murder, I referred to the first kind as "plain murder" or you might say non-capital murder, that's the type of

1    murder where someone was intentionally or knowingly

2    caused the death of another individual and that's without

3    any sort of legal justification or excuse like self

4    defense or accident or something like that, they have

5    just intentionally or knowingly caused someone's death.

6              If they have done that in Texas that's

7    punishable from anything from five years probation up to

8    99 years or life in the penitentiary.

9              And we have got another type murder

10   called "capital murder" and that's a murder like we just

11   talked about the plain murder plus some and that plus

12   something is a police officer has been murdered, a

13   fireman has been murdered while they are in the line of

14   duty, perhaps you have a murder done during the

15   commission of a robbery, done during the commission of

16   a burglary or rape but basically you are talking about

17   murder plus something else.

18             And those situations, those are called

19   what we call capital murder.

20             In this case what the State is alleging

21   is that a murder took place and also a robbery.

22             Can you see how that would fit under

23   capital murder rather than just regular murder because

24   we are alleging both a murder plus something else and

25   that being a robbery?

1     The type jurors we need, Mr. Reynolds,

2 are those people who can keep an open mind throughout the

3 trial until it's time at the end to make up their minds

4 as to guilt or innocence and not decide until they have

5 heard all the evidence whether the Defendant is guilty

6 or not guilty.

7     Do you believe you could do that?

8 A   I think I could.

9 Q   Another decision that comes along in capital

10 murder cases is that's the decision on punishment and

11 it's not like it may have been back in the old days where

12 the jury went back and they had already decided and found

13 the defendant guilty and then they went back and they

14 just said, well, you know, "How many of you want to give

15 the death penalty, how many of you want to give him a

16 life sentence", we don't do it that way anymore.

17     What we do in Texas now is that during

18 that --

19     MR. OLD:  I want to object to

20 that.   It's as always required a unanimous verdict, it

21 wasn't a matter of a simple vote.

22     THE COURT:  Sustained.

23    Rephrase.

24     MR. TOWNSEND:  The way it's

25 done in Texas now is that after a defendant is found

1    guilty then you go into the punishment phase of the

2    trial.

3              During that punishment phase you are

4    going to hear more evidence and it's not going to be

5    evidence about the guilt and innocence of the defendant

6    in that case because you have already made that decision,

7    it's going to be evidence such as maybe psychological

8    evidence or maybe the life history or the life history

9    of the defendant or something about his family background

10   or it may be evidence about his criminal history or his

11   history or incidents of bad acts by the defendant, it

12   could be just any number of different type things that

13   you might hear during that hearing.

14             And after you have heard all that

15   evidence then you will be called upon to decide two

16   Special Issues and your answer to those two Special

17   Issues or those two questions will determine whether the

18   defendant gets a life sentence or the death penalty.

19             And I have heard jurors in the past say,

20   "Well, okay.  Now, I have already found him guilty of

21   capital murder and since I found him guilty of capital

22   murder I don't need to hear all this other stuff.  I want

23   to give him the death penalty."

24             You see, now, they are not being -- they

25   are not maintaining and following the law because to

1   follow the law you have got to hear all that evidence in

2   the punishment phase before you make your decision.

3            Do you think you could do that?

4            THE POTENTIAL JUROR:  I hope

5   that I could.  I mean, you know, I kind of -- I can't

6   guarantee you I would.  I think I could.  I hope I could.

7   Q        (BY MR. TOWNSEND)  You believe you could do

8   that?

9   A        I think I could.

10  Q        Now, when you are deciding the death penalty,

11  life imprisonment you can certainly, can consider that

12  testimony that you heard during the guilt or innocence

13  phase, you don't have to forget that or block that out

14  of your mind, you can consider that also but you also

15  have to hear the evidence here during the punishment

16  part, can you give consideration to it?

17  A        I believe I can.

18  Q        The important thing to remember is that the

19  death penalty is not automatic or life imprisonment is

20  not automatic, you have got to head into this punishment

21  hearing and in order to be a fair and impartial juror you

22  have got to be able to give credence or give

23  consideration and listen to that punishment evidence

24  before making your mind up on these two Special Issues

25  or two questions that you are going to have to answer.

1        There is a sheet up there, Mr. Reynolds,

2 on the top it says "Special Issues", would you look at

3 that if you will, read that Special Issue #1 and read it

4 to yourself and then when you have finished with it we'll

5 talk about it.

6 A   I am not -- I am not sure I understand all

7 this.

8 Q   Let me tell you what it means to me and then

9 you can tell me if you agree or disagree or if you still

10 don't understand it; what it means to me basically is

11 that Special Issue #1 talks about is it probable that the

12 defendant would commit a criminal act of violence in the

13 future, does that kind of -- what it meant to you?

14 A   Yeah.   Somewhere thereabouts.

15 Q   I think the key language in there is that word

16 "probability", what that means is that just like we have

17 to prove his guilt, we have also got to prove this

18 Special Issue #1 beyond a reasonable doubt, we have got

19 to prove to you beyond a reasonable doubt that it's

20 probable that he would commit a criminal act of violence

21 in the future that would constitute a continuing threat

22 to society.

23        Now, you are not required when you vote

24 to guarantee that he's going to or even predict whether

25 he will or not but just that we prove to you beyond a

1    reasonable doubt that it's probable.

2                And the other key words in there are

3    "criminal acts of violence."

4                Now, what the Defendant is on trial for

5    is capital murder but we are not required to prove to you

6    that it's probable that he would commit another capital

7    murder, it's just that it's probable that he will commit

8    some criminal act of violence whether it be assault,

9    rape, criminal act of murder or any other -- any number

10   of criminal acts of violence.

11               Do you believe that after hearing all

12   the evidence that you could answer that question after

13   you have heard all the evidence during the main part of

14   the trial and you have heard all the punishment evidence

15   could you make a decision and vote "Yes" or "No" on that

16   Special Issue?

17   A        Well, I think I could but if a man -- I mean

18   if I feel like a man is found guilty of it, you know,

19   he's going to -- if he gets off I feel like a man would

20   do it again, commit a crime, he doesn't pay for it I feel

21   like he's going to commit another crime.

22   Q        Mr. Reynolds, do you understand that when you

23   are considering your answer to Special Issue #1 it's

24   perfectly permissible for you to consider that evidence

25   you heard during the guilt or innocence stage, you can

1    certainly consider that but in order to be a fair and

2    impartial juror you have to also give consideration to

3    that evidence you heard during the punishment hearing,

4    could you consider, you know, let's just call it "both

5    sections of evidence", could you consider -- would you

6    consider both of those before making your decision on

7    Special Issue #1?

8    A        Well, I think I would.

9    Q        Okay.  Certainly we are not asking you to

10   ignore that guilt or innocence stuff but you also have

11   to be able to fairly consider, you know, not just

12   automatically say,   "Well,   I found him   guilty of

13   capital murder so automatically I'm going to say 'Yes',

14   on Number One."

15             Would you be able to not do that and

16   consider the other evidence before making your decision?

17             Whatever decision you make it's up to

18   you but you need to be able to consider it all before you

19   make your decision.

20   A        I think any kind of -- I think I would consider

21   all of it, I think I would take deep thoughts on it

22   before I made my decision.

23   Q        That's all we are asking you to do.  We are not

24   asking you to ignore that first part of the trial or

25   anything like that, just not make your decision on that

1    Special Issue until you have heard everything.

2    A        Yeah.

3    Q        Then go back and make your decision.

4             Okay.  If you will read Special Issue

5    #2 and read that to yourself then we will talk about it.

6             It's a bunch of legal mumbo-jumbo but

7    read it anyway.

8                       MR. OLD:  I object to it being

9    "legal mumbo-jumbo", it's the law of the State.

10                      THE COURT:  Sustained.

11                      MR. TOWNSEND:  Withdraw it.

12                      MR.  OLD:        It's   highly

13   prejudicial.

14                      THE COURT:   I need  to  see

15   Counsel in chambers for a minute.

16             Just take the witness, let the Sheriff

17   take you back to the waiting room for a moment, I need

18   to talk to the lawyers for a moment.

19             Why don't you all come back to the

20   Judge's Office?

21

22             (Recess.)

23

24             (The following occurred in the presence

25   and hearing of the potential juror:)

1                    THE COURT:  Sir, did you have

2      a chance to finish reading that statement?

3                    THE  POTENTIAL  JUROR:    Yes.

4      I did.

5                    THE COURT:  Mr. Townsend, you

6      may proceed.

7                    MR.  TOWNSEND:    Okay.   Mr.

8      Reynolds, you are kind of like I did on the first one,

9      let me -- I first -- kind of what this meant to me,

10     basically what you are looking at there is a person has

11     been found guilty of capital murder, you have already

12     made the decision and answered "Yes."

13                    MR. OLD:  I'm going to object

14     to him suggesting what it meant to him.

15                    The question is what it means to the

16     juror.

17                    THE COURT:  Sustained.

18                    MR.  TOWNSEND:    In  order  to

19     answer Special Issue #2 you would have had to answer

20     Special Issue #1 "Yes", if you answered "No" to Special

21     Issue #1 the defendant would automatically receive a life

22     sentence but if you answer "Yes" to Special Issue #1 then

23     you are going to go to Special Issue #2.

24                    Two talks about receiving mitigating

25     circumstances that would reduce the defendant's moral

1    blameworthiness and basically, you know, after having

2    found a person guilty of capital murder, answered "Yes"

3    to Special Issue #1 then you see something in the case,

4    something you heard during the guilt or innocence or

5    something you heard during the punishment hearing that

6    makes you feel as if the defendant should receive a life

7    sentence rather than the death penalty.

8              And if you answer that question "Yes"

9    then the defendant would receive a life sentence because,

10   you know, basically that would that you did find

11   something there, whether it was, you know, it might be

12   any number of things but if you answer that question "No"

13   the defendant receives the death penalty.

14             My question is; after first having found

15   the defendant guilty of capital murder and after having

16   decided that the answer on the probability of future

17   dangerousness was "Yes" and that's the first question,

18   could you keep an open mind, go back and review all that

19   evidence during the punishment phase and during the

20   entire trial before deciding what your answer would be

21   on Special Issue #2?

22             THE POTENTIAL JUROR:   Yeah.

23   I think I could.

24   Q         (BY MR. TOWNSEND)  Okay.  Keeping in mind that

25   in Special Issue #2 you are going to be considering

1    things like the type evidence you heard during the

2    punishment hearing, it might be relative to the age of

3    the defendant, it might be related to the sort of family

4    history that was involved there, it might be related to

5    whether the defendant was intoxicated or not, it might

6    relate to educational background, prior criminal history

7    and, you know, you are not required by law to be a fair

8    and impartial juror to give a certain amount of weight

9    to any of that evidence or give any weight to it.  You

10   might just think, "Why, that is not important", but you

11   are required to listen to the evidence and consider, for

12   instance the age of the defendant or the family history

13   of the defendant, consider all those things and then make

14   your decision.

15              Would    you    give    those    things

16   consideration prior to making your decision?

17   A         Yes.  I would.

18   Q         Okay.  Let me just talk to you about some

19   general areas of the law.

20              You know, if you found a person guilty

21   of murder and believe that the State had proved that

22   beyond a reasonable doubt but you didn't think that we

23   proved the -- let's say the robbery part of the charge

24   then of course the defendant then would be guilty of

25   murder but not capital murder.

1      Do you follow me?

2    A        Yes.

3    Q        Okay.  In a murder case the range of punishment

4    is anywhere from five years probation up to 99 years or

5    life in the penitentiary.

6             In order to be a fair and impartial

7    juror in a murder case or capital murder you have got to

8    be able to consider that full range of punishment, five

9    years probation to 99 years or life.

10            Do you, as the Judge talked to you a

11   couple of weeks ago one of those things you look at is,

12   you know, what type murder was it?  Was it an extremely

13   vicious one, was it a mercy killing or was it the type

14   situation where a person was extremely ill and in a lot

15   of pain, maybe their husband or wife killed them at their

16   request or was it an extremely vicious type murder.

17            The range of punishment is extremely

18   broad for those reasons.

19            Could you give consideration to the full

20   range of punishment, whether it be on one end or the

21   other?

22   A        Yes.  I could.

23   Q        So you could consider 99 years and decide

24   whether that was appropriate or not, you could consider

25   five years probation and decide whether that was

1    appropriate or not?

2    A        Yes.

3    Q        Could you do that?

4    A        I think I could.

5    Q        Okay.  The burden of proof in this case and any

6    criminal case is with the State of Texas, we have got to

7    prove to you beyond a reasonable doubt that the defendant

8    committed the crime, is that something you are familiar

9    with?

10   A        Yeah.

11   Q        Okay.  In proving that what goes along with

12   that is that the defendant on the other hand doesn't have

13   to prove anything to you, it's entirely up to us, they

14   don't have to prove that the defendant is innocent, we

15   have got to prove that he's guilty.

16              Going along with that is what we always

17   refer to as the Fifth Amendment privilege and that is

18   basically the defendant has a right to testify if he

19   chooses to but he also has a right not to testify if he

20   chooses to and we have got to have the type jurors who

21   are going to decide this case based on the evidence that

22   is presented to them.

23              And I know it's kind of human nature to

24   say, you know, "I would like to hear what the defendant

25   says about this" or "If I was on trial I would want to

1   testify."

2          But we have got to have jurors who can

3   decide the case based strictly on the evidence that is

4   presented and not in any way decide the case just because

5   the defendant chose not to testify if that happened,

6   could you do that?

7   A        Yeah.

8   Q        And that's true also of the punishment phase

9   where you might have a tendency to think, "Well, I would

10  like for him to get up there and say he's sorry" but

11  still you have got to decide the facts of the punishment

12  hearing, you have got to decide those two special

13  questions or Special Issues based on the evidence that

14  you hear and not hold him or hold it against him in any

15  way if he chose not to testify at this punishment

16  hearing, could you do that?

17  A        Yes.

18  Q        In all criminal cases that go to trial, felony

19  criminal cases the State has already receive an

20  indictment from the Grand Jury and that indictment

21  basically is a charging instrument that gets the case to

22  trial but that is not evidence.  You don't hear that in

23  the courtroom.  That is just a piece of paper that gets

24  a trial going, basically.

25         Would you hold it against the defendant

1    in any way, the fact that he had been indicted because

2    that is not evidence, could you do that?

3    A        Yeah.

4    Q        In some criminal cases, Mr. Reynolds, the State

5    will introduce evidence of a written statement that has

6    been done by the defendant, not called a "confession",

7    if such a statement come in I believe the Judge will

8    instruct you that before considering that statement and

9    using it for your determination and considering it as

10   evidence you will have to determine -- let's assume you

11   think the statement is true, you also have to determine

12   that the statement was voluntarily -- that it was

13   voluntarily taken, that the person wasn't coerced or

14   directed in any way, would you do that? Would you be

15   able to if you decide the State has to prove that beyond

16   a reasonable doubt also, would you be able to put aside

17   if you decided that this statement was not voluntary

18   would you be able to not use that as evidence and decide

19   your verdict based on the evidence that was admissable

20   and that you had heard in the courtroom?

21   A        Yes.

22   Q        Mr. Reynolds, do you -- one of the attorneys

23   that is representing the Defendant in this case is not

24   here today, his name is "Lance Hinson", do you know him?

25   A        I don't think so.  I don't recall him.

Q          Okay.  The other attorney is Bird Old and he's from Mount Pleasant, do you know him?

A          Yeah.

Q          Has he ever represented you or your family?

A          No.

Q          Has -- is there anything about your acquaintance with him, do you consider him a friend or just an acquaintance?

A          I just know him.

Q          Just kind of know who he is?

A          Yes.

Q          Anything about that that would cause you a problem in serving on this jury?

A          No.

Q          Mr. Reynolds, I think somewhere in your questionnaire you mentioned -- well, there was a question, have a family member or friend -- excuse me -- that's the wrong question -- the question is do you know anyone that has been to prison or in prison and your answer was "Yes" and you listed a name there.

          Can you give me a little background about that?

A          Well, I got a cousin that has been in prison, got out and I think he's back in jail again now.

Q          Is that someone that is local here?

1    A        Yeah.   From here in Titus County.

2    Q        Okay.   Is he -- I don't know, I guess the best

3    way to ask it; do you think he pretty well deserved what

4    he got or do you think he got a raw deal or what?

5    A        No.   He probably deserved it.

6    Q        Okay.   Do you know any -- the Defendant in this

7    case, Billy Joe Wardlow is from Cason, Texas, do you

8    happen to know Mr. Wardlow or any of his relatives?

9    A        Not that I know of.

10   Q        The victim in this case was also from Cason,

11   his name is "Carl Cole", do you know him?

12   A        No.

13                        MR. TOWNSEND: Pass the juror,

14   Your Honor.

15                        THE COURT:   Mr. Old.

16

17                    VOIR DIRE EXAMINATION

18                        BY MR. OLD

19

20   Q        Mr. Reynolds, you work for H.E. Spann &

21   Company?

22   A        Yes, sir.

23   Q        You worked there five years?

24   A        This time.   Yes.

25   Q        "This time?"

1          You have been with them on and off?

2   A        I have been with them off and on for 20 years.

3   Q        What do you do for H.E. Spann & Company?

4   A        A little bit of everything.  I run a dozer and

5   lay the hot mix, everything.

6   Q        Operate machinery, basically?

7   A        Operator.  Yes.

8   Q        Other than working for Spann what else have you

9   done in the last 20 years?

10  A        Well, I had my own business for five years.

11  Q        What was that?

12  A        East Texas Asphalt, I done driveways and septic

13  tank work and just a little bit of any kind of

14  construction work.

15  Q        Have you worked for anyone else other than

16  yourself and Mr. Spann in the last 20 years?

17  A        I worked for Pilgrim's about six months.

18  Q        What did you do for them?

19  A        Drove a truck.

20  Q        Were you in the Armed Services?

21  A        No.

22  Q        Mr. Reynolds, on the first page of your

23  questionnaire it asks you some questions about your

24  dealings or opinions as to the death penalty, you

25  answered that you are in favor of the death penalty and

1    you were asked to explain that and if I understand you

2    correctly you -- if I understand you said "When called

3    for?"

4    A        That's right.

5    Q        And you further said that you believe that it

6    to be appropriate in some cases and you could return a

7    verdict in the proper case?

8    A        Yes.

9    Q        Okay.  In answer to Mr. Townsend you made the

10   statement as to the death penalty that "We don't see

11   enough of it?"

12   A        I don't believe we do see enough of it.

13   Q        I'm not -- I'm not taking issue with you, I

14   just want to know what you mean by it and how you feel.

15   A        I just feel like the death penalty is passed

16   over too many times.

17   Q        Would you say you are a real prone death

18   penalty, you are for it?

19   A        I don't know how I would say it, just some

20   cases deserve the death penalty that don't get it.

21   Q        I take it from your statement that you have

22   seen or are aware through news or your own knowledge

23   cases to where you thought the result should have been

24   the death penalty and it was not?

25   A        Well, not cases that I know personally but

1    cases that I have heard of and things.

2    Q       Through the newspaper, television, radio or

3    whatever, articles?

4    A       All of it.

5    Q       Mr. Townsend was questioning you about Special

6    Issue #1 and you have that before you, what does that

7    question ask you as a juror to do?

8    A       My opinion, it's asking if they was -- that we

9    found him guilty but yet released him would he commit

10   another crime.

11   Q       Does it say anything in that question about

12   "releasing?"

13   A       No.  It doesn't say nothing about it.

14   Q       You said in response to that question if I

15   understood you correctly, tell me if I am wrong about

16   what you said, that if you had found a man guilty of

17   capital murder that that fact alone would require you to

18   answer that question "Yes, that the defendant would

19   commit criminal acts of violence that would constitute

20   a continuing threat to society?"

21   A       Yes.  That pretty wells says that.  Yes.

22   Q       That fact alone would do it,  I mean once that

23   -- once he had been convicted of capital murder there is

24   no other evidence that you would consider?

25   A       I don't know exactly  how I worded it,  what

1    I -- what I mean to apply is if a man is found guilty and

2    he done deserves -- if he doesn't get the punishment he

3    deserves he probably will commit crime again.

4    Q        Okay.  Well, in answering Special Issue #1 and

5    the question is beyond a reasonable doubt you find a

6    probability that the defendant would commit criminal acts

7    of violence that would constitute a continuing threat to

8    society, once you have found that man guilty that proves

9    to you beyond a reasonable doubt that there is a

10   probability that he would commit criminal acts of

11   violence that would constitute a continuing threat to

12   society?

13   A        I think so.

14   Q        Okay.  That alone would do it for you?

15   A        I believe so.

16   Q        And you would reject any other evidence as to

17   answer that question -- you would answer that question

18   "Yes" solely on the fact that you found him guilty of

19   capital murder?

20   A        Yeah.

21   Q        Okay.

22              THE COURT:    Excuse me a

23   moment, Mr. Old.

24              Sir, the first part of the trial is

25   where you decide whether a person is or is not guilty and

1   the second part of the trial you decide his or her

2   punishment.

3                    In a capital case you do it by answering

4   those questions.

5                    It seems like what you are saying, you

6   don't need those questions, that if you find somebody

7   guilty of capital murder then you believe the appropriate

8   sentence is death.

9                    Is that what you are saying?

10                   THE POTENTIAL JUROR: No. No.

11  I am not really.  I may be -- I may not be understanding

12  all of it.

13                   What I'm saying is if a man is found

14  guilty of murder an if I believe it in my heart without

15  a reasonable doubt that he committed murder and if he's

16  not punished for that murder then he is capable or he

17  probably would commit other crimes.

18                   THE COURT:   The purpose of

19  that first question is to determine whether there will

20  be a death sentence or life sentence.  If a person is

21  convicted of capital murder he will either get life or

22  death.  If you find him guilty the best that can happen

23  is a life sentence, that is why we have those questions,

24  the questions will determine whether it's life or death.

25                   So by saying that he wouldn't be a

1   threat doesn't say that he's going to be released, it

2   says that he gets a life sentence.

3                    So if you find, "Yes, he will be a

4   danger", that's death, if you find that he wouldn't be

5   a danger then that is going to be a life sentence based

6   on those questions and you keep saying that you believe

7   a person is guilty and they don't get the appropriate

8   punishment then they would be a danger so I'm having

9   trouble understanding.

10                    THE POTENTIAL JUROR:   I'm

11  having trouble -- if he gets life imprisonment then how

12  would that be a threat to society?

13                    THE COURT:  It depends on your

14  definition of "society", our law says that "society"

15  means everybody everywhere including prison.  You have

16  prison guards, you have prison family, you have visitors

17  that come to prison so that question is not asking you

18  whether or not he would be a danger on the street, it's

19  saying do you believe based on the evidence that you

20  heard that he will be a danger to society wherever that

21  society may be.

22                    THE POTENTIAL JUROR:  I guess

23  I was more or less misunderstanding the question.  I mean

24  I believe like I said, I could find somebody guilty of

25  murder and I could also give a lesser sentence than the

1    death penalty if the circumstances called for it.

2                    THE COURT:   So just because

3    you found someone guilty of capital murder does not mean

4    that you automatically answer that question "Yes", is

5    that correct?

6                    THE POTENTIAL JUROR:   That's

7    right.

8                    THE COURT:  You will reexamine

9    the evidence and do it based on the evidence?

10                   THE POTENTIAL JUROR:   Yes,

11   sir.

12                   THE COURT:   Mr. Old.

13                   MR. OLD:   Mr. Reynolds, one

14   of the first questions that a juror will be asked by the

15   Court, I mean is whether or not you find beyond a

16   reasonable doubt that the defendant committed the crime

17   of capital murder.

18                    Presume that you have answered that

19   question "Yes", now, in determining punishment the jury

20   does not directly say "We give him life, we give him

21   death."

22                    As a matter of fact once you have found

23   him guilty of capital murder you have in effect given him

24   at least life, are you with me?

25                   THE POTENTIAL JUROR:   Yes.

Q         (BY MR. OLD)  Okay.  Then you are asked some questions and the Court bases the sentence of life or death on the basis of those questions, the first question is one we have been discussing and that is if you find beyond a reasonable doubt there is a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society.

If you answer that "Yes" as you will be told in the Court's instructions that results in a death sentence subject to another answer.

Would   you   answer   that   question, considering the facts -- consider the fact alone that you found him guilty of capital murder, would that in itself dictate to you that the answer to that question was "Yes, I  believe  beyond  a  reasonable  doubt  there  is  a probability that defendant will commit criminal acts of violence that would constitute a continuing threat to society?"

A         No.

Q         Okay.  Just the fact you found him guilty alone would not do it?

A         No.

Q         The next issue questions you as to sufficient mitigating circumstances, you have read that issue, haven't you?

1     A        Yes.

2     Q        Can you tell me the question that that's asking

3     you?

4     A        It asks me just because we found someone guilty

5     but based on maybe his upbringing, maybe different

6     factors if we could find a different, I mean a lesser

7     punishment than the death penalty.

8     Q        Did you note the definition of "mitigating

9     evidence" below the question?

10               "Mitigating evidence is evidence that

11    a juror might regard as reducing the defendant's moral

12    blameworthiness?"

13    A        I read it.  I'm not exactly -- exactly what it

14    means.

15    Q        Do you have any idea what it means?

16    A        Yeah.  I don't know how to -- how really -- how

17    to say it.  I feel like there are some people in the

18    world today that -- that have not been taught moral

19    values, they don't know moral values and I don't know how

20    I want to say this but I have known people that -- that

21    would think immorally but they have no conscience that

22    it was -- that it was wrong.

23               If that's what it asks that's what I am

24    getting from it.

25    Q        You are saying what you would determine on that

1  question is whether or not someone possessed morals, is

2  that right?

3  A       Yes.

4  Q       And would evidence of a person's age be

5  mitigating evidence to you or would you reject it as not

6  being mitigating?

7  A       No.  I believe taken into consideration the age

8  would make a difference.

9  Q       You would take into consideration age?

10 A       Yes.

11 Q       Would you take into consideration the

12 environment they have been raised in?

13 A       Yes.  I would.

14 Q       Would you take into consideration the amount

15 of education that they had had?

16 A       Probably.  Maybe.

17 Q       You wouldn't reject evidence of education?

18 A       No.

19 Q       Could you take into consideration the testimony

20 of a psychiatrist or a psychologist?

21 A       Yeah.  I would take it into consideration.

22         I say personally I don't believe in it

23 a whole lot but --

24 Q       Let's talk about that, what is the

25 psychologist?

1    A        Someone to me -- someone that tries to find out

2    stuff you don't know yourself, dig into your head and I

3    don't much believe it.

4    Q        Would you have a hard time accepting opinions

5    of a man who claims to be a psychologist because you

6    don't believe in it?

7    A        If that -- all -- if that was all I was basing

8    my evidence on I might would but I think it with the

9    other evidence I might hear, I think I might could.

10   Q        Assume with me there was no other evidence than

11   the testimony of a witness who claimed to be a

12   psychologist or psychiatrist.

13   A        I really don't know to tell you the truth.

14   Q        You don't place much value in them?

15   A        No.  I don't.

16   Q        Would it be fair to say you have a prejudice

17   as to them, that is you don't think much of them?

18   A        That's right.

19   Q        In comparing a psychiatrist's testimony against

20   another witness would I be at a disadvantage with you,

21   that is you don't think much of his profession?

22   A        I am -- I'm afraid to say.  It probably would

23   be.

                        THE COURT:  Mr. Old, I think

24   you need to clarify whether it would be a fact or an

25

1  opinion witness.

2          MR. OLD:   In comparing a

3  psychiatrist to his expressing opinions, that is he's

4  done this and this and read this and this and he's

5  interviewed so and so and my opinion, whatever, in

6  comparing his testimony to say a regular ordinary person

7  expressing an opinion, would the psychiatrist's testimony

8  be a disadvantage?

9          THE POTENTIAL JUROR:   To me

10  everyone have an opinion.

11  Q        (BY MR. OLD)  Sir?

12  A        To me everyone have an opinion.

13  Q        "Everyone have an opinion?"

14  A        And to me the psychologist's opinion even

15  though he's supposed to be a trained doctor, to me his

16  opinion wouldn't be to me no more stronger than some

17  else's opinion.

18  Q        Then you would not consider his credentials,

19  that is his education and training in that particular

20  field?

21  A        I think you are probably right.

22  Q        You would reject it, you would not give -- if

23  proven to you that he held a degree in such and such and

24  so and so and had so many years experience in doing

25  certain things you would reject that testimony, you

1    would, it would not go to his credibility?

2    A     I am afraid you are probably right.

3    Q     In comparing his opinion testimony to a witness

4    just testifying to facts would the fact witness have a

5    head start and more credibility with you than the

6    psychiatrist?

7    A     Yes.

8    Q     Is it a fair statement that if you heard that

9    type of testimony from a psychiatrist that you could not

10   weigh that testimony equally with other testimony, it's

11   a disadvantage?

12   A     If that -- I mean if that's the only testimony

13   I could -- I couldn't weigh it much with the one that had

14   the facts, if that's what you are asking.

15   Q     Would it require evidence for me to remove from

16   your mind the opinion that you have of psychiatrists?

17   A     I didn't really follow you there.

18   Q     You do not place any credibility in

19   psychiatrists?

20   A     No.

21   Q     And that is you have -- you have a prejudice

22   or it is to say you don't like them?

23   A     I've never known one.

24   Q     I'm not talking about them personally, you

25   don't like this as a profession?

1   A        That's right.

2   Q        That in order for me to get you to consider

3   their testimony I would have to prove to you the accuracy

4   of their profession?

5   A        Well, I don't know how you go about doing that

6   but --

7   Q        I don't know either but I would have to prove

8   something to you to get you to consider, to start them

9   equally with another witness?

10  A        I would probably think so.

11            Don't get me wrong, I'm not saying that

12  they are unlearned or ignorant or anything like that, I'm

13  just saying I don't put much confidence in one.

14  Q        You have got a prejudice against them, no one

15  is criticizing you, we all have prejudices.

16            Mr. Reynolds, the term beyond a

17  reasonable doubt -- have you ever been on a jury before?

18  A        Yes.  I have.

19  Q        What kind of case did you serve in?

20  A        It was a jail break.

21  Q        Was it here in this county?

22  A        Yes.  It was.

23  Q        Do you recall the name of the defendant?

24  A        No.  I don't.

25  Q        About how long ago was it?

1   A        Probably 10 years, something like that.

2   Q        Let me ask you another question about

3   witnesses; do you hold policemen, peace officers in high

4   esteem?

5   A        Most of them.

6   Q        Okay.  For a law enforcement officer, if one

7   was called as a witness would he have a head start with

8   you as opposed to a non-peace officer witness?

9   A        No.  I don't think so.

10  Q        You wouldn't be inclined to believe him anymore

11  than any witness?

12  A        No.  I don't believe I would.

13  Q        Okay.  But his testimony, if any, would be more

14  believable to you than that of a psychiatrist?

15  A        Yes.  It would.

16  Q        Mr. Reynolds, there's a document in front of

17  you that is titled "Witness List."   (Indicating)

18  A        Okay.

19  Q        Will you read that list and give me the names

20  of the people that you recognize, whether you know them

21  or know of them or have heard of them, just the first

22  page.

23           No, the whole thing.

24           Anybody on the first page that you knew?

25  A        I don't know none of them.  I have heard of two

1    of them.

2    Q        Who have you heard of?

3    A        The Morris County, Ricky Blackburn and to be

4    honest I think that was on account of all the posters I

5    seen when he was running for Sheriff but I'm not for

6    sure.

7             And then Dewayne McClung, Pittsburg, and

8    I just heard of him, you know, I don't know him.

9    Q        Let's talk about any of your knowledge of them

10   that would effect your view of their testimony, if they

11   testified would they have more credibility with you?

12   A        I know neither one of them.

13   Q        They are just familiar names to you?

14   A        Just familiar names.

15   Q        Would you go to the second page?

16   A        I don't think I know any of them -- "Ragsdale",

17   I know a bunch of "Ragsdales" down -- down in

18   Daingerfield but I don't know him I don't think.

19   Q        Anybody else on the second page?

20   A        No.

21   Q        The third page?

22   A        I don't know none of that.

23   Q        How many years ago was it that you were on a

24   jury in the jail break case?

25   A        Somewhere around 10 years.

1    Q      Do you recall the Court giving you a charge or

2    written instrument after the case -- after the evidence

3    was over?

4    A      They told us -- well, they told us what -- he

5    told us it could go no less than two, no more than 10.

6    Q      But you had some written instructions that you

7    carried into the jury room with you that the Judge gave

8    you?

9    A      I don't remember to tell you the truth.

10   Q      Do you remember the words "reasonable doubt,

11   beyond a reasonable doubt?"

12   A      Yeah.  I remember all that.  Yeah.

13          But if I was saying this, he wasn't

14   pleading not guilty, this jail break, they was just

15   trying to determine -- actually his lawyer give a

16   defense, it was so easy for him to get out they ought not

17   to do anything to him.

18   Q      Did he plead guilty or not guilty?

19   A      He plead not guilty but not to jail break, he

20   said he went out, you know, he followed -- two others

21   broke out and he followed them out.

22   Q      Okay.  There is a page before you that is

23   marked "SVDX 6."  (Indicating)

24   A      All right.

25   Q      I will ask you to go to the second paragraph

1    on that page and be sure we are in the same place, read

2    me the first line.

3    A        "The prosecution has the burden of proving the

4    defendant?"

5    Q        Yeah.  Will you read from there to the bottom

6    of the page to me -- to yourself?

7    A        Okay.

8    Q        That is an instruction that the Court will give

9    you in writing in his charge and that is the legal

10   definition of "reasonable doubt."

11            Do you have a definition of your own or

12   of reasonable doubt different from that definition?

13   A        No.  It's pretty close, it goes back to what

14   you consider a reasonable doubt, you know, what reason

15   or what unreason but it's pretty close to what my

16   definition would be.

17   Q        You are not offended by that definition?

18   A        No.

19   Q        And you could follow it in place of your own

20   definition if the Court instructed you to?

21   A        I think I could.

22   Q        That is something that a juror is required to

23   do, when a word has special meaning in law the Court

24   tells it what a word means and whether you agree with it

25   or not you have got to follow that.

A        Yes.

Q        And you can do that as to that word?

A        I think I can.

Q        In the trial of a murder case it's possible that the State may offer a document which is a statement of a -- a written statement of the defendant and they may be offering his written statement as evidence.

The law requires the jury not only to believe the statement but it requires the jury before they consider the statement as evidence to make a determination beyond a reasonable doubt whether or not it is a voluntary statement.

Basically for a statement to be voluntary certain things must have occurred and there are some things that cannot occur.

For instance, for a statement to be voluntary it may be that the Court will instruct you that prior to the statement being made was the person given their Miranda Rights and that being the right not to give evidence against themself and to an attorney and we hear them on television everyday, I presume that you are familiar with it?

A        Yes.

Q        It may also tell you that other definitions or requirements that the law says makes a statement

1    voluntary or involuntary, that again is a special legal

2    instruction, the word -- the word "voluntariness" of that

3    statement is confined to what the Court tells you to

4    consider and how to do it.  And you shall not consider

5    the statement if you find it to be involuntary.

6              Now, even if you were totally convinced

7    that -- and it was undisputed that the defendant wrote

8    the statement, maybe even signed the statement, could you

9    find it involuntary if it did not meet the requirements

10   of the law?

11   A        I'm not sure I understood it all completely but

12   I think --

13   Q        Let's say -- you ask me a question if you want

14   to.

15   A        If the Judge -- I mean if the Court orders me

16   to base something on say this is evidence, one part is

17   evidence and not the other -- well, let's back up and say

18   this; I don't agree with lots of things and after all the

19   jail break he came out there and told us that the man was

20   in jail for rape but now you can't use -- you have got

21   to put this plum out of your mind.

22   Q        Yes.

23   A        I didn't see the point them -- in doing it, we

24   didn't even know -- to know what he was in jail for, were

25   going to consider the jail break -- I'm not sure -- well,

1    I'm not sure exactly what you are asking or what you --

2    Q        Let me ask you a question; in the written

3    instructions in this case it said that the defendant was

4    in jail for rape and while in jail for rape he escaped

5    but you are not to consider as evidence the fact or let

6    the fact he was in jail for rape influence your verdict?

7    A        Yes.

8    Q        Okay.  Was that hard to do?

9    A        It was hard to do.

10   Q        Now, I'm asking you about the same thing about

11   an alleged statement and the question is not whether it's

12   to prove, not whether the defendant wrote the statement

13   but the Court will tell you a statement is voluntary if

14   you find that -- wait a minute -- if you find certain

15   things to be true that -- and the Miranda Warnings were

16   given, that it was not a result of coercion, that that

17   statement was the result of custodial interrogation or

18   the equivalent of custodial interrogation.

19              Now, I mean it tells you what you have

20   to find, find whether or not it's voluntary, that is

21   whether it's admissable.

22              Now, the issue there is not whether the

23   statement is true or not, okay, you go through and you

24   find that the statement is not voluntary, you find that

25   they forgot to tell him that he had the right for a

1    lawyer, that alone, you say, no, it's not voluntary.

2           You have already read the statement, it

3    has been read to you, it's in the jury room with you, you

4    believe the statement to be true whether voluntary or

5    not.

6           Can you set that aside and not consider

7    it?

8           I understand you are going to try to

9    follow the instructions of the Court, is that something

10   that you can discipline your mind to do?

11   A        I think I can.

12   Q        You think you can?

13   A        I think I can.

14   Q        And in your thinking are you thinking that you

15   believe beyond a reasonable doubt every word written on

16   that piece of paper is true -- I want you to think -- you

17   may have beyond a reasonable doubt every -- every word

18   on that piece of paper is true, it says the defendant did

19   it, okay, but you find they forgot to inform him he had

20   the right to have an attorney during questioning; can you

21   totally reject that statement and not consider it as

22   evidence?

23   A        Yeah.  I hope I can.

24          That would be what the Court would be

25   telling and I hope that I could follow it and I think I

1    probably could.

2    Q        You think you could?

3    A        Yes.

4             I ain't going to give you no guarantees

5    here but my opinion, I think I could.

6    Q        Do you think it would be a difficult thing to

7    do?

8    A        It would be hard.

9    Q        You don't think that you belief about that

10   statement being true would influence your verdict?

11   A        I don't think it would.

12   Q        Mr. Reynolds, I'm not implying that you would

13   intentionally do anything wrong.

14   A        I understand that.

15            Same deal on that jail break and they

16   told me about rape, it was hard to keep from thinking

17   about that but I do think I based my belief on the

18   evidence I heard and not -- not the rape.

19   Q        But you all found him guilty, I presume?

20   A        Yes.  We did.

21   Q        Let me -- we have got a little different

22   question in that case and this case; in that particular

23   case he had just been charged with rape, he hadn't been

24   convicted?

25   A        That's right.

1    Q        I mean that's just kind of like this man has

2    been charged with capital murder but I mean he's clothed

3    in the presumption of innocence and he's innocent until

4    proven guilty?

5    A        I believe that.

6    Q        Okay.  Now, you were -- you had a hard time

7    laying aside what he was accused of in your jail break

8    case, now, this is a different situation, it's not a

9    matter of being accused of something, you are looking at

10   a confession, you believe it to be true but yet you don't

11   believe it to be voluntary.

12           Can you not consider the statement in

13   reaching your verdict?

14   A        I think I could if I believed it not to be

15   voluntary.

16   Q        You think you can distinguish between the two?

17   A        I think so.

18   Q        Let me ask you something, the fact that you

19   believe the statement true, would that be evidence that

20   would effect your finding as to whether it was voluntary

21   or not?

22   A        I don't know to tell you the truth.  I'm going

23   to be honest.

24   Q        I believe you are giving me honest answers, I

25   want you if you can think about it and tell me whether

1   or not the fact you believe the statement is going to

2   effect your finding on the voluntariness of the

3   statement?

4   A        I don't know how would you -- would -- I mean

5   if I honestly believe that the statement was true, you

6   know, it would be hard to just more or less disregard it

7   and put it out of my mind, not even use it -- I mean if

8   I be -- well, I don't know what I'm trying to say.

9            There ain't no guarantees here but I

10  think  I could  if I looked at it and  I believed it was

11  -- wait -- I mean if I believed it was true, the

12  statement was true, the same as the letter, if I believe

13  this  here is right but  yet it wasn't voluntarily wrote

14  -- I don't know positive but I believe I could, might

15  could go with what the Court ordered me.

16  Q        Okay.

17  A        You done got me confused here.

18  Q        I'm not trying to confuse you.

19  A        I understand that.

20  Q        Could you even lay that information aside in

21  determining other testimony?

22           Let's say another witness got up and

23  testified as to the same thing that was is in the

24  statement, would the fact that you knew the statement

25  existed, was involuntary, would the fact that this

1   witness's testimony matched the statement, would you be

2   considering the statement to support your credibility of

3   that witness?

4   A       I don't know.  But, you know, that's where it

5   comes in a reasonable doubt, each one got their thinking

6   of what, you know, of what their mind is on this here and

7   on where does the reasonable come in, the reasonable --

8   I mean if I believe this or if I heard and then I heard

9   another witness say the same thing it would have to

10   effect you.

11   Q       Okay.   You  made  a  question  there  about

12   "reasonable doubt?"

13   A       Yes.

14   Q       "Reasonable doubt" is on that page.

15   A       But what I'm saying, my reason and someone

16   else's reason may differ.

17   Q       What you are saying, you could not help from

18   comparing the statement to the testimony and --

19   A       I'm saying that's a possibility that I may not

20   have to, like I say, I ain't go no guarantees.

21   Q       Okay.

22   A       I don't know if I am answering the question the

23   way I should.

24   Q       Mr. Reynolds, I know that you are going to try

25   to follow the law, my question is in this case can you

1    tell me that you can?

2    A        I would say I think I can.

3    Q        You think you can?

4                         THE COURT:   Eight minutes.

5                         MR.  OLD:   Thank you, Your

6    Honor.

7                         Are you unsure as to whether you an or

8    not?

9                         THE POTENTIAL JUROR:   I have

10   a doubt in my mind if that's what you are asking.

11   Q        (BY MR. OLD)   What you are telling me, you

12   would try your best but you really doubt that you could

13   totally do it?

14   A        I'm saying I don't really know whether I could.

15   Q        But you doubt it?

16   A        I know it's -- it's a doubt that I could jump

17   up and hit this light there but, you know, it ain't no

18   guarantee, I don't know.   I think I could but --

19   (Indicating)

20   Q        What church do you belong to?

21   A        Old Union and Missionary Baptist.

22   Q        You have lived in the Cookville area most of

23   your life?

24   A        Around Old Union, about halfway between Mount

25   Pleasant and Cookville.

```
1    Q        Have you heard anything about this case?

2    A        I have heard a little.

3    Q        Well, have you heard people say what happened

4    or what they think happened?

5    A        I heard one thing about -- well, I worked with

6    a man from Cason.

7    Q        Who is that?

8    A        I don't know his whole name, called him

9    "Gholston" but I'm not sure.

10   Q        I know Mr. Gholston.

11            He told you what happened or --

12   A        He told me what he heard.

13   Q        What had he heard?

14   A        He heard that the woman that was involved was

15   having an affair with the man that was -- she knew where

16   the money was at.

17   Q        Okay.   And did he tell you about how the

18   killing, if any, happened?

19   A        No.

20   Q        Would the fact that you have heard from some

21   source facts about the case --

22   A        No.   He told me he heard it himself.

23   Q        Would it require evidence to remove that belief

24   from your mind if you have a belief?

25   A        Well, he told me -- I heard it but I mean that
```

1    don't mean I believe it, it's just that I heard it.

2    Q        Would you totally lay that aside and not even

3    consider it?

4    A        Yeah.   Yeah.

5    Q        I mean it would not have to be something that

6    had to be disproved to you?

7    A        No.

8    Q        Your statement that -- as to the death penalty,

9    "We do not see enough of it" and your belief behind that

10   in answering the Special Issues in this case or answering

11   the questions that you are going to be asked in this

12   case, is that belief of yours that "We do not see enough

13   of the death penalty" going to effect your answers?

14   A        I don't think so.

15             And if I may rephrase that statement,

16   it's not "We don't see enough of the death penalty" but

17   "We don't see enough punishment for crimes", not

18   necessarily just the death penalty.   I mean I think

19   sometimes the death penalty should be used more but all

20   punishment needs to be used more.

21   Q        Now, in considering -- back in the Special

22   Issue #2, in considering mitigating circumstances or the

23   first Special Issue as to the propensity to commit acts

24   of violence; would the fact that the person was being

25   tried, the fact that it was proved to you that he

1    committed other criminal acts or had a conviction or

2    something else, would that be evidence that you would

3    consider in answering both those questions?

4    A        I think I would probably consider it.

5    Q        Would it go to the issue -- to question one and

6    as to question two or just one of the questions?

7    A        I am not -- I am not following you.

8    Q        Question one is the question that asks you if

9    beyond a reasonable doubt if there is a probability that

10   the defendant would commit criminal acts of violence that

11   would constitute a continuing threat to society.

12   A        Yeah.  If he have -- I mean if he have always

13   been in trouble or had a problem, I mean you would have

14   to consider that, you know.

15   Q        All right.  Would it -- also we talked about

16   mitigating evidence and as defined on the exhibit you are

17   given, "Mitigating evidence is evidence that a juror

18   might regard as reducing the defendant's moral

19   blameworthiness", is that something that you would

20   consider, his prior criminal record or acts in answering

21   that question?

22   A        Yeah.  I would consider it.

23   Q        Let me go back for one question one more time;

24   you were talking about being on the jury for escape and

25   the fact that you knew the man was charged with rape, can

1   you tell me with any certainty that this did not -- the

2   fact that you knew, that did not effect your verdict in

3   that case?

4   A          It didn't effect my verdict.

5                      What I was saying was that -- that was

6   some of the disagreement I have with the law.  I do not

7   believe that they had a right to even tell us what he was

8   in jail for.

9   Q          In other words, your argument was with the law

10  and you really felt like it would be fair if it just said

11  that he was in jail and escaped?

12  A          That's right.

13  Q          You do not think that was fair to the defendant

14  to put in what he was in jail for?

15  A          No.

16                     MR. OLD:  Your Honor, we stop

17  at this time.

18                     THE COURT:  Sir, I would like

19  for you to go back to the waiting room for a moment then

20  I will probably bring you back out in a minute for some

21  more questions.

22

23                     (The following occurred outside the

24  presence and hearing of the potential juror:)

25

1          THE COURT:  All right.  On the

2    record.

3          Does the State have any challenges for

4    cause?

5          MR.  TOWNSEND:    None,  Your

6    Honor.

7          THE COURT:  Does the Defense

8    have any challenges?

9          MR. OLD:  The Defense would

10   challenge the witness for cause as to his prejudice as

11   to medical or psychiatric or psychological testimony

12   opinion, he testified that they would not be considered

13   equal with other opinions or with fact witnesses or as

14   fact witnesses and he would reject their testimony as to

15   their opinions regardless of how many degrees you proved

16   they had or their credentials and experience.

17          THE COURT:  I don't see where

18   that is a challenge for cause, Mr. Old.

19          I have been looking through the Code,

20   that's not a bias or prejudice against any phase of the

21   law.

22          MR. OLD:  Well, Your Honor,

23   the law allows for the admission of that type testimony

24   and I think that is a prejudice against something that

25   the defendant is allowed to prove which is the law and

1    I realize it's not the bold letter law but it's the law

2    of evidence, it's a prejudice against the law of

3    evidence.

4                              THE COURT:   Do you have any

5    other challenges?

6                              MR. OLD:   Your Honor, as to

7    being able to follow the instructions of the Court as to

8    the issue of the confession being voluntary and the

9    effect of the instruction if found not voluntary, the

10   witness expressed doubt and concern to the extent of

11   whether he could follow those instructions and not lay

12   that evidence aside if found  to be voluntary and he has

13   -- involuntary -- and he has by his answer expressed an

14   admission that he probably could not follow the law in

15   that particular situation.

16                             THE COURT:   Do you have any

17   other challenges?

18                             MR. OLD:   That's all my

19   challenges.

20                             THE COURT:   Bring out Mr.

21   Reynolds for a moment.

22                             While we are waiting for Mr. Reynolds,

23   I don't think we are going to get to the next guy, we

24   might as well as excuse him until tomorrow morning.

25

1          (Off the record discussion.)

2

3                    THE COURT:  Bring him back.

4

5                    (The following occurred in the presence

6     and hearing of the potential juror:)

7

8                    THE COURT:  Mr. Reynolds, it

9     is my turn, I have got a couple of questions for you.

10                   Before I ask you these questions I need

11    to explain something to you, in order for me to determine

12    whether or not a juror is qualified or not under the law

13    I have got to get that juror committed to a certain

14    position and a lot of what you said was "I think" or

15    "Maybe" or "I don't know."

16                   And that's not enough, I'm going to have

17    to talk to you and get a commitment from you "Yes" or

18    "No", let's talk about this psychological testimony; you

19    told me that you just don't particularly believe in

20    psychologists or psychiatrists but you indicated also you

21    would listen to whatever they had to say and you would

22    evaluate it with anything else you heard, is that correct

23    or not?

24                   THE POTENTIAL JUROR:  That's

25    right.

1    THE COURT:   Would you just
2  totally disregard anything a psychiatrist said because
3  he's a psychiatrist or would you listen to it?
4    THE POTENTIAL JUROR:   No.   I
5  would listen to it.   I just don't put much confidence in
6  it, the same way with a chiropractor, I don't put much
7  confidence in a chiropractor.
8    THE COURT:   If you listened
9  and believed it could you act upon it?
10    THE POTENTIAL JUROR:   I might
11  could.   I'm not saying I would totally disregard but I
12  don't know if I could use just that part -- I mean that
13  evidence to persuade me one way or another.
14    THE COURT:   You would simply
15  give it some -- if you believed it you could act on it
16  and if you didn't believe it you wouldn't and you are
17  telling me it might be hard for you to believe what a
18  psychologist says?
19    THE POTENTIAL JUROR:   Yeah.
20  Exactly.
21    THE COURT:   Does it matter
22  whether it's a psychologist for the State or Defense?
23    THE POTENTIAL JUROR:   Either
24  way.
25    THE COURT:   We talked about

the difference between the psychologist or psychiatrist giving an opinion and testifying to a fact, a fact is where I testify that I saw somebody go out the door or I saw someone -- somebody run a red light or I saw somebody hit someone.

An opinion would be, let's take "hitting", the opinion would be that I believe based upon the fact that somebody was hit caused them internal pain, that's an opinion because I don't know whether it did or didn't.

And you indicated that you just wouldn't believe a psychologist or psychiatrist as much as you might some other witness.

Now, are you talking about as a fact witness or an opinion witness?

In other words, if a psychologist said "I saw Joe go down the street and I saw him reach into the window and take a vase", would you discount his testimony because he's a psychologist?

THE POTENTIAL JUROR:  No.  If it were a fact, if he had seen it, you know, I would believe it like anyone else.

THE COURT:  His opinions are what you might not believe?

THE POTENTIAL JUROR:  His

1    opinions.

2              THE COURT:   Let's go to the

3    next thing that gives me a little concern and that is

4    talking about disregarding evidence; if a person makes

5    a statement and that statement is used in the trial

6    sometimes the jury, if there's any evidence the jury has

7    to decide whether it's voluntary or not voluntary, means

8    that the person understood his rights, he was given his

9    rights, there was no coercion, nobody forced him to do

10   it and he knew he had a right to a lawyer.

11             Now, one of the things that could make

12   a statement non-voluntary would be the fact that he

13   wasn't read his Miranda Rights and I'm sure you have

14   heard on TV shows, the cops have to tell you you have a

15   right to a lawyer, a right not to speak and if you do

16   anything said will be used against you so let's make an

17   assumption for a minute, you are in a murder trial --

18   let's get away from a murder, you are in a burglary

19   trial, someone supposedly broke into someone's house and

20   stole something, there aren't any fingerprints, there

21   aren't any eyewitnesses but the defendant wrote out a

22   confession saying, "Yes.  I went over to the Smith's

23   house and I broke into that house, I knocked in the door,

24   I took his safe and left and nobody gave me permission

25   to do it."

That statement is read to the jury, you don't have much other evidence, somebody says, "Yes.  I saw the defendant in the neighborhood" or "Yeah, you know, he has been -- he has been hanging around that house", but you don't have anybody that really saw him come or go, you don't have any fingerprints but he admitted he did it.

Now, let's assume then the Sheriff gets up and testifies, "You know, I forgot to tell him that he had a right to a lawyer and he didn't have a lawyer when he gave that statement."

Now, you believe the statement, the statement is absolutely   true so far as   you are concerned and you believe that the Sheriff didn't give him his rights because the Sheriff says he just flat forgot.

That doesn't change the fact that the statement says he broke into that house and stole but what does change is the law says a jury can't use that as evidence so I instruct you that you can't use that as evidence.

Now, you don't have enough evidence to convict him without that statement.

What are you going to do?

Can you set aside and find that person

1    not guilty knowing he has confessed?

2                        THE POTENTIAL JUROR:   To be

3    honest, I don't know.

4                        THE COURT:  You see, I'm going

5    to have to get a "Yes" or "No", that's why I gave you a

6    fact situation that was about as strong as I could.

7                        That's all you have with the statement

8    and you have got enough to convict him, he's guilty,

9    without that statement you don't have enough to convict

10   him and you are going to have to cut him loose and let

11   him walk knowing that he robbed somebody's house or

12   burglarized a house.

13                       Do you have the mental willpower to do

14   that?

15                       I'm not taking issue with your position

16   one way or another, I have just got to know whether you

17   can do it or not.

18                       THE POTENTIAL JUROR:   Like I

19   say, I hope I could but I couldn't a hundred percent

20   guarantee you that, yeah, I could put it aside, I could

21   sit here and tell you and lie and say "I'll put it

22   aside."

23                       I think I could but I'm not a hundred

24   percent.

25                       THE COURT:   You can't assure

1    me that you can?

2                            THE POTENTIAL JUROR:  I can't

3    assure you that, that I can't.

4                            THE COURT:  Thank you.

5              You may step down.  Don't leave yet, I

6    will send the Sheriff back with some more instruction.

7              You didn't know you were going to be

8    here all day, did you?

9                            THE POTENTIAL JUROR:  No.  I

10   sure didn't.

11

12             (The following occurred outside the

13   presence and hearing of the potential juror:)

14

15                           THE COURT:  I'm going to

16   sustain the challenge, he's dismissed for cause.

17             Okay.  Let him know that he's no longer

18   a prospective juror.

19             Tell Me. Booth that he will need to be

20   here at 9:00 in the morning and we better  start at 9:00

21   -- 9:00 is what we agreed on, 9:00 tomorrow?

22                           MR. OLD:  Yes.

23                           THE COURT:  Tell him he will

24   be first at 9:00 o'clock.

25

1          (Record closed for October 25th, 1994.)

2

3          (Whereupon Court was recessed until 9:00

4    a.m., October 26th, 1994.)

5

6

7                              *****

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS      §
                    §
COUNTY OF TITUS     §

1
2
3
4          I, Lloyd E. Billups, CSR #149 and
5  Official Court Reporter in and for the 76th Judicial
6  District, State of Texas, do hereby certify that the
7  above and foreground contains a true and correct
8  transcription of the proceedings in the above-styled and
9  numbered cause, all of which occurred in open court or
10 in chambers on October 25, 1994 and were reported by me.
11          I further certify that this
12 transcription of the record of the proceedings truly and
13 correctly reflects the exhibits, if any, offered by the
14 respective parties.
15          WITNESS MY HAND this 31ST day of
16 January, 1995.
17
18 _____
   LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
19 76TH JUDICIAL DISTRICT, STATE OF TEXAS
20
21
22
23
24
25

1

Certification Number of Reporter:  149

2

Expiration Date of Certification:  12/31/96

3

Business Address:  Drawer 1868
                   Mt. Pleasant, Texas 75456-1868

4

Telephone Number:  903/577-6735

5

Transcribed By:    Tandra K. Gibson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25