72102

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 26, 1994

**VOLUME 13 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

# VOLUME 13

## VOIR DIRE EXAMINATION

OCTOBER 26, 1994                                    PAGE/VOLUME

APPEARANCES . . . . . . . . . . . . . . . .          1/13

MORNING SESSION . . . . . . . . . . . . .            3/13

POTENTIAL JUROR, LORI BETH HENRY
          EXAMINATION BY MR. TOWNSEND . . .          6/13

RECESS  . . . . . . . . . . . . . . . .             36/13

POTENTIAL JUROR, LORI BETH HENRY, (CONTINUING)
          EXAMINATION BY MR. OLD . . . .            37/13

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR . . . . .          59/13

DISCUSSION CONCLUDED . . . . . . . . . .            62/13

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR . . . . .          73/13

DISCUSSION CONCLUDED . . . . . . . . . .            79/13

POTENTIAL JUROR, LORI BETH HENRY, (CONTINUING)
          CONTINUING EXAMINATION BY MR. OLD .       84/13

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR . . . . . .        95/13

RECESS  . . . . . . . . . . . . . . . .             97/13

DISCUSSION CONCLUDED . . . . . . . . . .            97/13

POTENTIAL JUROR, LORI BETH HENRY, (CONTINUING)
          CONTINUING EXAMINATION BY MR. OLD .       99/13
          REDIRECT EXAMINATION BY MR. TOWNSEND     102/13

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR . . . . . .       104/13

COURT ADJOURNED . . . . . . . . . . . . .          107/13

COURT REPORTER'S CERTIFICATE . . . . . . .         108/13

* * * * *

VOLUME 13

ALPHABETICAL INDEX OF

POTENTIAL JURORS

OCTOBER 26, 1994                                    PAGE/VOLUME

POTENTIAL JUROR, LORI BETH HENRY
EXAMINATION BY MR. TOWNSEND . . . . . . . .        6/13
EXAMINATION BY MR. OLD . . . . . . . . . .         37/13
EXAMINATION BY MR. OLD (CONT.) . . . . . .         84/13
EXAMINATION BY MR. OLD (CONT.) . . . . . .         99/13
EXAMINATION BY MR. TOWNSEND . . . . . . . .        102/13

* * * * * *

1    CAUSE NO. 12,764

2    THE STATE OF TEXAS          §    IN THE DISTRICT COURT OF
                                 §
3    VS.                         §    TITUS COUNTY, TEXAS
                                 §
4    BILLY JOE WARDLOW           §    76TH JUDICIAL DISTRICT

5

6                        STATEMENT OF FACTS

7                       VOIR DIRE EXAMINATION

8                        October 26, 1994

9                       **VOLUME 13 of 43 volumes**

10

11              Before Honorable Gary R. Stephens

12              Judge by Judicial Assignment

13          (Venue changed from Morris County, Texas)

14

15                          APPEARANCES

16

17   ATTORNEYS FOR THE STATE OF TEXAS:

18              MR. RICHARD TOWNSEND
                District Attorney
19              Morris County Texas
                Morris County Courthouse
20              Daingerfield, Texas 75638

21                   --and

22              MR. RANDY LEE
                Assistant District Attorney
23              Cass County Texas
                P.O. Box 940
24              Linden, Texas 75563

25

ATTORNEYS FOR THE DEFENDANT:

         MR. BIRD OLD, III
         Old, Rolston & Old
         P.O. Box 448
         Mt. Pleasant, Texas 75456-0448

                  and

         MR. LANCE HINSON
         Law Offices of Danny Woodson
         P.O. Box 399
         Mt. Pleasant, Texas 75456-0399

On the 26th day of October, 1994, the above-entitled and numbered cause came on for hearing before said Honorable Court, Judge Gary R. Stephens of Midlothian, Texas, serving by judicial assignment in the District Court of Titus County, Texas, on change of venue from Morris County, Texas, and the following proceedings were had:

THE COURT: Bring the first juror in.

THE BAILIFF: Watch your step here.

THE COURT: Right up here, ma'am.


LORI BETH HENRY, Potential Juror #372, was called as a Potential Juror and, having been previously sworn by the Court, testified as follows:


THE COURT: Ma'am, for the record, are you "Lori Henry?"

THE POTENTIAL JUROR: Yes.

THE COURT: "L O R I ?"

THE POTENTIAL JUROR: Yes.

THE COURT: Ma'am, I am Gary Stephens, I am presiding over this trial and jury

1  selection.

2      We have one lawyer present here

3  representing the State of Texas and that's the District

4  Attorney from Morris County, Mr. Richard Townsend.

5      We have two Defense Attorneys present,

6  we have Mr. Bird Old, III.

7      MR. OLD:  Hello.

8      THE COURT:  Lance Hinson, Mr.

9  Lance Hinson.

10      MR. HINSON:  Good morning.

11      THE COURT:  Next to Mr. Hinson

12  the Defendant, Mr. Billy Wardlow.

13      Now, Ms. Henry, the lawyers have read

14  your questionnaire, they are familiar with your answers

15  and they are going to talk about some of those answers,

16  they are going to discuss the principles of law involved

17  in a death penalty case.

18      Now, ma'am, the lawyers are going to ask

19  a lot of questions, the answers will let us know whether

20  or not to put you on the jury.

21      In order to be a qualified juror you

22  must be able to understand and follow the law, you don't

23  even have to agree with the law, if you disagree with

24  some aspect of law but you can still follow the law you

25  are qualified but if you disagree with some aspect of our

law to the extent you can't follow it then you are not qualified.

We have also found over the years picking jurors on this type of case that even though most jurors are qualified that doesn't mean they are appropriate jurors for a death penalty case so we need to know something about what your opinions are, what you think about our laws.

The only way to find out is to ask questions. It may seem like you are on trial but you are not.

Frankly there are no right or wrong answers or right or wrong opinions, frankly we don't care what the opinions are and I don't mean to be rude about this but we very much care to understand what those opinions are so we want you to just open up and share them with us without caring whether we agree or disagree with you.

If you have any question you stop us and ask us your questions.

If you are selected as a juror we can't talk to you after today so anything that is not clear you need to get cleared up today.

We also won't be able to tell you whether you are on the jury today, we are going to talk

to several jurors, make a decision on those and then talk
to some more so it will probably be toward the end of
next week.

Mr. Townsend, you may proceed.

MR. TOWNSEND: Thank you, Your
Honor.


VOIR DIRE EXAMINATION

BY MR. TOWNSEND


Q        Ms. Henry, I am Richard Townsend, I represent
the State of Texas in this case and I want to emphasize
to you the Judge has already told you that there are no
right or wrong answers, just tell us what you think.

A        Yes.

Q        We are seeking, actively seeking the death
penalty in this case.

I have read your questionnaire and I
kind of have an idea how you feel about the death penalty
and I want to talk to you a little more about the law in
Texas and how the death penalty takes place and that sort
of thing.

Your feelings about the death penalty,
are those pretty much the feelings you have had ever
since you were an adult or is this something that you

have changed over the last few years or is it just something you haven't thought about?

A          Are you referring to something I wrote?

Q          Your answer on the questionnaire.

A          Okay. May I see that again?

(Handed to the potential juror.)

THE POTENTIAL JUROR: Pretty much. Yeah. Yes.

MR. TOWNSEND: Okay. Do you know of any reason why you couldn't serve on a jury and return a verdict that resulted in the death penalty of an individual if the evidence and the facts were appropriate?

THE POTENTIAL JUROR: I don't see why I couldn't return the verdict.

Q          (BY MR. TOWNSEND) Let me talk to you a little bit about murder in Texas, and there are two basic types of murder, one is just a plain non-capital murder in which a person intentionally or knowingly murders another individual or causes the death of another individual and that is to say that they have done it without any legal justification or excuse, which, you know, it wasn't self defense and it wasn't an accident or something of that

nature that intentionally caused this person's death. The range of punishment in that is up to life imprisonment but they could not receive the death penalty.

On the other hand there is what we call "capital murder" and this case is about capital murder.

Capital murder is murder plus something else, it's that plain murder we talked about plus it has to have another element.

A        Yes.

Q        And that other element is that this murder has to be of a police officer, fireman in the line of duty, has to be a murder for hire, a murder that is done during the commission of a robbery, burglary, rape so you can see aside from murder you have got to have something else that we talked about.

A        Yes.

Q        There is a sheet of paper up there that I would like for you to look at, it's the indictment in this case.

THE COURT: To your left right there.   (Indicating)

MR. TOWNSEND:   If you will just read that over to yourself, just the top half there. (Indicating)

THE POTENTIAL JUROR:  Okay.

Q          (BY MR. TOWNSEND)  Then we'll talk about it.

A          Okay.

Q          Can you see based on what you have read there that if the State could prove that that would be what we just discussed as a capital murder rather than just a regular murder?

A          Yes.

Q          The kind of jurors we need in a death penalty case, Ms. Henry, are those kind of jurors who can keep an open mind throughout the trial, first as to guilt or innocence.

A          Yes.

Q          And then later on when you get into this punishment phase of the trial keep an open mind as to whether the proper punishment should be a life sentence or the death penalty.

A          Yes.

Q          Some people think, you know, if a person is convicted of capital murder they automatically get the death penalty.  That's not the way it is.  We need those kind of jurors who can follow the law all the way through the trial.

          The first phase of a capital murder trial you will hear evidence in relation to the crime

that is alleged to have been committed then after you
hear that evidence the jury will make a decision as to
whether the defendant is guilty or not guilty, if they
find the defendant not guilty then of course the trial
is over but on the other hand if they find the defendant
guilty then you go into what is called the punishment
phase of the trial and decide what the proper punishment
should be.

But the important thing to remember is
that none of this is automatic, you don't automatically
give the -- give a life sentence, you don't automatically
give the death penalty, it's only done after you have
heard more evidence during the punishment hearing.

A        Yes, sir.

MR. OLD:  I object.  That is
a misstatement of the law.  By finding a person guilty
-- a person guilty of capital murder you have in effect
given him a life sentence at least.

MR. TOWNSEND:  If I misstated
that --

THE COURT:   I'm going to
sustain the objection.

I do agree with you, Counsel, I don't
know that it was totally a misstatement but the net
effect of finding a person guilty is an automatic life

1    sentence so rephrase, Counsel.

2              MR. TOWNSEND:   I'm not sure

3    what I said but what I meant to say if a person is found

4    guilty of capital murder you are not automatically going

5    to give them a life sentence or you are not going to

6    automatically give them the death penalty, they are going

7    to receive one or the other and neither one is automatic.

8              THE POTENTIAL JUROR:  When we

9    -- but when we go into the punishment phase should it get

10   to that at this trial, you are seeking the death penalty

11   so the decision is whether to agree with that or not?

12   Q         (BY MR. TOWNSEND)   Your decision would be

13   either to go along and actually -- and I will explain

14   that a little more but actually you are not going to just

15   go in there and say, "Well, do you believe he should get

16   a life sentence or do you believe he should get a death

17   penalty?"

18   A         Yes.

19   Q         You are going to answer a couple of Special

20   Issue questions, the answer to those questions will

21   determine what the sentence is, of course you are going

22   to know --

23   A         Okay.

24   Q         -- you are going to know, "If I answer this way

25   it will be a life sentence, if I answer this way it will

1    be the death penalty", okay?

2    A        Okay.

3    Q        If you will there is a sheet up there that

4    looks kind of like that.  (Indicating)

5    A        Oh, yes.

6    Q        If you would glance at that I will go over that

7    with you.

8             The first phase of a murder, a capital

9    murder trial -- excuse me, the guilt or innocence phase

10   at the top then you are going to hear evidence about the

11   guilt or innocence of the defendant then you will -- the

12   jury will vote, if you vote "Not guilty" of course the

13   trial is over, if you vote "Guilty" then you go to the

14   next phase.

15            The next phase is what we call the

16   "punishment phase", it's down there in the middle of the

17   page.  (Indicating)

18   A        Yes.

19   Q        Then you are going to hear more evidence and

20   the kind of evidence you hear at that point of the trial

21   is not evidence of whether the defendant committed the

22   crime or not because you have already decided that he's

23   guilty, this is going to be evidence that relates to the

24   punishment issue.

25            And the type of evidence that would be,

of course, it could be just almost anything but you would

tend to hear possibly things like family history, whether

the defendant had a religious background or not, if --

has the defendant been involved in trouble before, things

of that nature.

You might hear psychiatric testimony, you know, all sorts of stuff you might hear.

But anyway after you have heard that evidence then you vote on Special Issue #1, and we'll talk about that Special Issue, those Special Issues in a moment, but first you vote on Special Issue #1.

If you voted "No" on that then the defendant would get a life sentence, if on the other hand you voted "Yes" then you go to Special Issue #2.

When you got to Special Issue #2 if you voted "Yes" the defendant would get a life sentence, if you voted "No" the defendant would get the death penalty so you are going to know before you vote, okay, "If I vote 'Yes' to Number One and 'No' to Number Two the defendant is going to get the death penalty."

MR. OLD: We are going to object. That's a misstatement of the law, simply one person voting doesn't give anyone anything, it's a composite of the jury finding beyond a reasonable doubt being a unanimous issue.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1   THE COURT:   That was his
2   intent.  I'm going to overrule.  You might clarify that.
3                   MR. TOWNSEND:  I say, when you
4   vote, I mean the jury as a whole, of course one person
5   can't decide anything.
6                   THE POTENTIAL JUROR:   Is it
7   "majority?"
8   Q       (BY MR. TOWNSEND)  No, ma'am.
9   A       "Unanimous", it has to be "unanimous?"
10  Q       I will let the Court --
11                  THE COURT:  Yes, ma'am.
12                  In order to return a penalty of course
13  if you answer the first question "Yes" and the second
14  "No", all 12 must be in agreement, if must be a unanimous
15  sentence.
16                  MR. TOWNSEND:   I know that's
17  kind of confusing since you don't even know what those
18  Special Issue questions are but we are going to go over
19  that in just a minute.
20                  Do you feel like you understand that?
21                  THE POTENTIAL JUROR:   If you
22  answer "No", if the jury answers "No" to Special Issue
23  #1 is that a majority vote or unanimous?
24                  THE COURT:  That can be by 10
25  or more.

THE POTENTIAL JUROR: How many jurors are there?

THE COURT: Twelve.

That's the first time I have had that question asked.

MR. TOWNSEND: Me, too.

If you will, now, there is a sheet up there that on the top it says "Special Issues", have you got it?

THE POTENTIAL JUROR: Yes.

Q  (BY MR. TOWNSEND) Okay. If you will read to yourself Special Issue #1 then we'll talk about that.

A  Just "Number One?"

Q  Yes. Just Number One, we'll talk about it then we will talk about Number Two in a little bit.

A  Okay.

Q  Special Issue #1 refers to the future dangerousness of the defendant, would you agree with that?

A  Yeah.

Q  Okay. I will point out a little bit of a wording in there and see that word "probability?"

First before I point that out; just like in the guilt or innocence phase when the State has to prove beyond a reasonable doubt that the defendant is

15

1  guilty?

2  A          Yes.

3  Q          On Special Issue #1 the State also has to prove

4  beyond a reasonable doubt that issue so we have got to

5  prove to you beyond a reasonable doubt that there is a

6  probability of the defendant committing further acts of

7  violence.

8  A          Yes.

9  Q          Now, that word "probability", you know, that's

10  not saying it's a certainty, it's not saying that we can

11  guarantee that he's going to.

12  A          Yes.

13  Q          And you are not being asked as a member of the

14  jury to predict whether he will or not, it's just in it

15  can the State prove that probability that he would.

16  A          Right.

17  Q          Okay.  Another thing I want to refer you to is

18  that phrase where it says "criminal acts of violence."

19  (Indicating)

20  A          Yes, sir.

21  Q          Now, the Defendant in this case is on trial for

22  capital murder, certainly that's the criminal act of

23  violence, we are required to prove that there's a

24  probability that he would -- prove some other criminal

25  act of violence, it doesn't necessarily mean that we

would prove to you that he would commit another murder, just that he would commit some act of violence whether it be assault, rape, murder, attempted murder, whatever.

Are you with me on that?

A        "Carjacking?"

Q        There is violence involved in carjacking. Yes.

So are you clear on that part?

A        Yes. I think so.

Q        On Special Issue #1 if after -- you keep in mind that you are not going to decide Special Issue #1 until you have heard all this evidence I talked about during the punishment hearing, now, in deciding your answer to Special Issue #1 you can mentally go back to that guilt or innocence phase of the trial, remember what you heard there and then also consider that evidence that you have heard during the punishment hearing.

But to be a fair and impartial juror, the kind of jurors we need in a capital murder case we have got to have those type jurors who cannot say, "Well, I found him guilty of capital murder so automatically I'm going to have to answer 'Yes' to Special Issue #1" because, see, they are not withholding their determination or their decision until they have heard all the evidence.

A        Yes.

Q        Do you think you could wait and wait for the punishment hearing before making your --

THE COURT:  I'm sorry.  Could you repeat that question?

MR. TOWNSEND:  Do you think you could wait until you have heard all this evidence during the punishment hearing before making your decision on Special Issue #1?

THE POTENTIAL JUROR:  Yes.

Q        (BY MR. TOWNSEND)  Consider that evidence as well.  It is the evidence that you heard on guilt or innocence?

A        Yes.

Q        If you will read Special Issue #2 and we'll talk about that.

A        Okay.

Q        Now, I believe basically you can boil that down to saying, "Well, I have already decided the defendant guilty, the jury has, the jury has already decided that he probably is a danger to society" because if you voted "No" on Special Issue #1 that he was not probably going to be dangerous in the future you wouldn't even be looking at Special Issue #2 because that would have automatically given him a life sentence, but assuming you voted "Yes" on Special Issue #1 then you look at

Special Issue #2.

And I think that's basically saying, is this a death penalty case, is this a death penalty type defendant?

What you are being asked there is to decide if there's sufficient mitigating circumstances that would reduce the defendant's moral blameworthiness for the crime?

And I can't tell you what would be "sufficiently mitigating" to you or to me or to anyone else, different people on the jury might look at different types of evidence in a different way, something that might make you feel like, "Well, this piece of evidence of this combination of evidence is enough to convince me that the defendant should receive a life sentence rather than the death penalty" whereas someone else might look at the same evidence and not agree with me on that so -- but also I want you to understand on Special Issue #2 it's unlike guilt or innocence and unlike Special Issue #1 in that the State does not have to prove anything to you beyond a reasonable doubt. We don't have to prove anything to you period, it's just strictly a matter of your opinion and basically you are just looking at everything you have heard from the guilt or innocence phase, everything that you have heard during

the punishment hearing and you are saying, "Okay, I will listen to all this, I will have considered all of it, now, is there something in there that makes me feel like this case and this defendant should receive a life sentence rather than the death penalty."

A     Okay.

Q     Is that okay? Is that something you feel like you understand? Do you have any problem with that?

A     Sure. Is that done at the same time once you hear the evidence in the punishment phase then you go to a room to discuss and answer these two questions?

Q     Right. When you go back deliberate the guilt or innocence then you are going to go out and tell the Court -- the jury will announce their ruling, this is after you have heard all this punishment evidence, the jury will go back again, deliberate punishment, when you are deliberating punishment you will answer one and if you answer "No" the defendant will get a life sentence and if you answer "Yes" you move on to Number Two.

You don't come back out, is that what you are asking?

A     Yes, sir.

Q     You will decide Number One, if your answer is "Yes" then you go straight into deciding Number Two.

A     And what is a life sentence in Texas?

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    MR. TOWNSEND:    I believe I

2    will let the Court answer that.

3    THE COURT: Ma'am, in any life

4    sentence a person is eligible in Texas for parole at some

5    point in time.    That doesn't mean he or she will get a

6    parole but there is no "life without parole", if you

7    convict a person of capital murder and the sentence is

8    life as opposed to death that person will have to spend

9    a minimum of 40 calendar years before that person can be

10   considered eligible.

11   That doesn't mean in 40 years a person

12   is turned loose, that means that person will be there a

13   minimum of 40 years before the process can even begin.

14   You are also instructed, though, that

15   you are not to take into account parole when you answer

16   those questions, you are to answer those questions based

17   on the evidence, not on what you think a life sentence

18   is or should be.

19   THE POTENTIAL JUROR:  Yes.

20   THE COURT:    You answer the

21   questions and then your answers, of course dictate what

22   happens.

23   Mr. Townsend.

24   MR. TOWNSEND:  Thank you.

25   Also on Special Issue #2 I want to talk

1  to you a little bit about the sort of evidence that you

2  would hear. I have already talked to you about you might

3  hear -- all kinds of evidence you might hear, the

4  important thing in this regard is on both of these

5  Special Issues during that punishment phase of the

6  hearing you may hear all sorts of evidence and in order

7  to be a fair and impartial juror we have got to have

8  those people who can listen to that evidence and give it

9  consideration.

10  Now, that's not to say you have to

11  believe it, that's not to say that you have to give any

12  weight to it, you know, you can listen to it and decide

13  "That is very important" or you can listen to it and

14  decide "That is not important" but the main thing is we

15  have got to have jurors who are willing to listen and

16  consider all the evidence, whether it's psychiatric

17  testimony, whether it's testimony from family members,

18  you know, anything.

19  Would you be able to listen and consider

20  all the evidence irregardless of what type it was?

21  THE POTENTIAL JUROR: I think

22  so.

23  MR. TOWNSEND: Okay.

24  THE COURT: Ma'am, a lot of

25  us when we are asked questions say "I think I can" but

1  here we are going to have to pin you down to whether you

2  can or can't.

3              When you are questioned I would like for

4  you to be a little more affirmative, whether you can or

5  not.

6              You said you think you can do it, I have

7  got to know whether you can or can't.

8              THE POTENTIAL JUROR:  I could

9  consider all the evidence.

10             THE COURT:  Thank you, ma'am.

11             MR.  TOWNSEND:    That's  the

12  question you have to be able to consider it, we are not

13  going to get you to promise that you are going to decide

14  every piece of evidence that you hear is really good,

15  really worthwhile, but you will at least give it a fair

16  shot before making your decision, at least you will

17  listen and consider it?

18             Let me shift gears and talk to you a

19  little bit about murder versus capital murder.

20             Okay.   Now, you know from looking at

21  that indictment that the Defendant is charged with a

22  murder and robbery, basically?

23             THE POTENTIAL JUROR:  Okay.

24  Q          (BY MR. TOWNSEND)  Let's assume that you get

25  to the end of the trial and the jury goes back there and

they decide while the State has proved their case to us beyond a reasonable doubt that the defendant committed a murder but they didn't quite prove that he committed the robbery.

Well, then, you would have to find the defendant guilty of murder but not capital murder.

Do you follow me?

A       Right.

Q       Well, in a murder the punishment range as I talked to you a little bit earlier is different than in a capital murder.  In a murder the punishment range is from five years probation to 99 years or life in the penitentiary.

Now, that's a wide range of punishment and that, you know, there is of course a murder can be a wide range of different type crimes, you know, you can have extremely vicious murders or you can have something the Judge mentioned when you all were here a couple of weeks ago, you can have basically what is a mercy killing.

Are you familiar with that type murder?

A       Someone that is maybe terminally ill?

Q       Sure.  Something like that.

But if you look at the murder statute that is still "murder" because you have intentionally

1    caused the death of another individual.

2    A         Yes.

3    Q         So even though it's certainly a different type

4    crime it's still "murder."

5    A         Were different but it's still "murder."

6    Q         So there's a broad range of punishment there

7    and the broad range of punishment in murder and the kind

8    of juror we have to have is the kind of juror that can

9    consider the full range of punishment in a case.

10            The full range of punishment in murder

11   is from five years probation to 99 years, would you

12   consider the full range?

13   A         Yes.

14   Q         We are not trying to get you to look in and

15   say, "Well, I would give somebody five years probation"

16   or "I would give somebody 99 years", but you would

17   consider the full spectrum?

18   A         Yes.

19   Q         In criminal cases the burden of proof is with

20   the State of Texas, we have to prove our case to you

21   beyond a reasonable doubt.

22            Now, that is -- that is something that

23   we accept, we know that is our burden and we are here to

24   meet that.

25            On the other hand, the defendant has no

1    burden of proof, it's not up to them to prove that he's

2    innocent, it's up to us to prove that he's guilty.

3              Is that something that you are familiar

4    with and comfortable with?

5    A       Yes.

6    Q       Okay. Along with that burden of proof goes

7    what you might call or what is the constitutional Fifth

8    Amendment privilege and that is the privilege of the

9    defendant not to testify and that's his choice.

10              Of course the defendant has a right to

11    testify if he wants to but he also has a right not to

12    testify, is that something that you are familiar with?

13    A       Yes.

14    Q       We have got to have the type jurors who can be

15    fair-minded and decide their decision on this case based

16    on the evidence that they hear and not on something they

17    didn't hear.

18              And when I say that I mean if the

19    defendant chooses not to testify would you be able to put

20    that aside and not use that as part of your evidence or

21    part of your decision-making process?

22    A       Yes.

23    Q       Okay. Understanding that, you know, it's human

24    nature to be curious as to why the defendant didn't

25    testify or think, "Boy, if that was me I would sure want

1  to tell them what happened" or something, you know?

2  A   Yes.

3  Q   And that's human nature and that's okay and we

4  are not saying that you should be able to put that

5  completely out of your mind, just that you not consider

6  it when you are determining guilt or innocence in any

7  way, could you do that?

8  A   Yes.

9  Q   That Fifth Amendment privilege carries over

10  into the punishment phase of the trial also.  You found

11  someone guilty of capital murder let's say and you are

12  thinking and trying to decide what the proper punishment

13  would be and you might think, "Well, you know, if that

14  fellow just gets up here and tells me he's sorry it might

15  make me feel a little differently about this."

16         But the Fifth Amendment privilege still

17  applies and he doesn't have to get up there and testify

18  unless that is something that he chooses to do.

19         In order to be a fair and impartial

20  juror, qualified juror in this case you have got to be

21  able to also in that punishment phase make your decision

22  based on the evidence you hear and not hold it against

23  the defendant in any way if he chooses not to testify

24  during that part of the hearing.

25         In any kind of criminal trial, Ms.

Henry, you are going to have testimony from a lot of different kinds of people. You may have testimony from psychologists, you may have testimony from ministers, you may have testimony from police officers, you may have testimony from someone that you have heard of or someone that you do not even know but the important thing is to remember is that in order to be fair and impartial you have got to be able to start all those witnesses out at the same spot on the track, not give anybody a head start because they are a police officer or because they are a minister or doctor or whatever.

When I say that what I'm really saying is that you start everyone out at the same place, you listen to their testimony and after they have testified then decide whether their testimony was important, unimportant, believable, unbelievable, can you do that?

A        Yes.

            THE COURT:  Thirty minutes.

            MR. TOWNSEND:  Thank you, Your Honor.

            Ms. Henry, in some criminal trials you will have statements presented, written statements or you might call them confessions from the defendant in a criminal trial, if that confession was presented to you I would expect that the Judge would instruct you -- let's

just assume for the moment that you believe the confession is true, you believe that written statement is true, what the person said in there when he admitted, do you think -- whatever, you believe that that is true. The Judge is going to instruct you that you have got to find beyond a reasonable doubt that that confession was voluntary before you can use it as evidence.

Now, you already -- we are assuming this but we have already assumed that you have decided the confession is true?

THE POTENTIAL JUROR: Pardon me?

Q        (BY MR. TOWNSEND)   Let's just assume, if you will assume for me that you have decided that the confession or written statement is true.

A        Okay.

Q        That he's telling the truth when he wrote that down but you decide that we haven't proved to you beyond a reasonable doubt that it was voluntarily made because of lack of Miranda Warning, because of coercion or, you know, whatever.  You have decided that we haven't proved to you beyond a reasonable doubt that it was voluntary.

I believe the Court, the Judge would instruct you that if you found that that statement was not voluntary that you should not use that as evidence,

that you should not use that in your deliberation and not

consider it in any way in returning a guilt or innocence.

And in order to be a qualified juror we

have got to have people who can put that aside if in fact

they decided that we have not proved the voluntariness

of that statement, are you with me?

A       Yeah.

Q       Can you do it?

A       I think it's tough for anyone.

Q       That is tough.

You know we are not asking you to, you

know, say, "Well, I'm going to remove that from my mind",

of course you can't remove it from your mind but you have

got to be able to not necessarily remove it from your

mind but not use it in any way in considering guilt or

innocence.

A       Yeah.

Again, just like you don't like to nail

down things, I don't like to nail down things either but

I feel that I could, you know, follow the instruction in

not letting that weigh in the decision.

Q       When I say I expect the Judge would instruct

you that way, basically I'm saying the Judge is going to

tell you what the law is and I believe that's what the

law is and are you telling me that in that respect you

1     could follow the law?

2     A          I could follow the law.

3     Q          Okay.  What I showed you up there or what you

4     looked at a little earlier was an indictment.

5     A          Yes.

6     Q          Do you understand, probably from the Judge's

7     instruction a couple of weeks ago that an indictment is

8     not evidence whatsoever, would you be able to in your

9     decision-making process, would you be able to consider

10    that indictment as no evidence and not use it in any way?

11    A          This is what you are saying that you are going

12    to prove?

13    Q          Right.  All that is, that's just a charge.

14    A          Right.

15    Q          That is not evidence at all.

16    A          Right.

17    Q          Ms. Henry, I have been asking you a lot of

18    questions and I appreciate your openness and appreciate

19    your answers.

20                Is there any question that you might

21    have of me or of the Court that you can think of or just

22    anything that you might want to say that maybe I haven't

23    given you a full opportunity to say?

24    A          I can't think of anything at this time.

25    Q          Okay.  Let me ask you a little bit about the

Defense Attorneys in this case, Mr. Old and Mr. Lance

Hinson; do you know either one of these guys?

A        I know which one Mr. Old is but we have never

met.

Q        There's nothing in that relation --

A        I -- I feel like I have seen him before today.

Q        -- there's nothing in that relationship that

would cause you any problem so far as being fair and

impartial?

A        No.

Q        Do you know anything about the facts of the

case?

A        No.

Q        Nothing at all?

        Ms. Henry, now that we have talked about

the death penalty quite a bit, looking back on the first

page of your questionnaire -- do you have that in front

of you?  (Indicating)

A        Yes.

Q        Now, do you understand that in Texas that the

death penalty is only available during capital murder

cases and not just regular murder cases?

A        Do I understand that in Texas that the death

penalty is only in capital murder and not any other type

of murder case?

Q       Other murder case?

A       I do now.

Q       Okay.

A       I do now.

Q       You do now?

Okay.  Well, these questions that you were asked here refer to murder cases, these questions on the first page.

A       Yes.

Q       And so your answers related to that answer down at the bottom of the first page, if you are in favor of the death penalty in some murder cases do you agree that a life sentence rather than the death penalty would be appropriate under the proper circumstances, and you answered "No."

Now that we have discussed the law and now that we have discussed how the law works in regard to the death penalty, in order to be a qualified juror we have got to have people who are not biased and prejudiced toward a life sentence or biased and prejudiced toward the death penalty if that -- I have heard jurors say, "Well, you know, I'm just -- I don't believe in the death penalty and I'm not ever going to give anyone the death penalty."

See, that person is not a qualified

juror because they can't wait and hear all the evidence and fairly decide, you know, what the proper punishment should be.

On the other hand, if a person cannot conceive of, you know, this person is biased toward the death penalty as opposed to being biased against the death penalty then they are not fair and impartial, either.

And what I need to know from you is if a person is found guilty of capital murder can you give, after hearing all the evidence can you make your decision on those Special Issues and if you felt the defendant was appropriate for it give a death penalty and if you felt the evidence was appropriate for it give a death sentence?

A        Yes.  I could.

Q        So you are not locked in and saying, "If I find a person guilty of capital murder I just don't believe in the death penalty and I couldn't give it?"

And on the other hand you are not locked in to say, "Well, I am automatically going to give the death penalty", either?

You could go either, depending on the facts of the case and the evidence?

A        I feel that that is part of considering the

1   full range of punishment available.

2   Q          Right.

3   A          I think it would be my duty to consider the

4   choices.

5   Q          Right.

6              Looking back at Special Issue #1 it

7   talks about future dangerousness, let's say that you have

8   decided that a person is guilty of capital murder then

9   you heard this evidence on future dangerousness and you

10  have considered it and you have decided the answer is

11  "Yes" and the -- but then at that point you have got to

12  consider Special Issue #2, you have already found a

13  person guilty of capital murder, you have already decided

14  that they are probably going to be dangerous in the

15  future, we need the kind of person on the jury who can

16  be fair and impartial and consider all that evidence

17  again before deciding Special Issue #2 and not

18  automatically say, "Well, if he committed capital murder

19  and if he's going to be dangerous in the future I'm just

20  going to answer 'No' on number two.  I don't even need

21  to think about it."

22             Would you be able to go back and

23  reconsider everything, all the evidence that you have

24  heard before making your answer to Special Issue #2?

25  A          Yes.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    Q        Okay.   Keeping in mind, Ms. Henry, basically

2    what we are asking you to -- each time, well, whether

3    it's guilt or innocence, Number One or Number Two, we are

4    asking you to go back and reconsider everything before

5    making your decision, not make an automatic decision at

6    any stage but consider all the evidence before --

7    consider all the evidence before making a decision on any

8    of those.

9                    And you said you could do that?

10   A        Yes.

11                   MR. TOWNSEND:  I'll pass the

12   juror, Your Honor.

13                   THE COURT:  Let's take about

14   five minutes then we will start with the Defense.

15                   You may step down, you can just go right

16   there.

17

18                   (Recess.)

19

20                   (The following occurred in the presence

21   and hearing of the potential juror:)

22

23                   THE COURT:  Ms. Henry, are you

24   ready for some more questions?

25                   THE POTENTIAL JUROR:  I guess

so.

THE COURT:   Okay.

Mr. Old.


VOIR DIRE EXAMINATION

BY MR. OLD


Q        Ms. Henry, I have been introduced to you, I am
Bird Old.

You indicated you perhaps knew me on
site or knew me by reputation or otherwise?

A        Yes, sir.

Q        You and I have never had any -- never met?

A        "Never met formally?"  No.

Q        Anything in what you have heard about me, my
reputation that would go against Mr. Wardlow?

A        No.

Q        Now, I'm a lawyer and Mr. Townsend is a lawyer
also, he represents the State of Texas, I represent Mr.
Wardlow along with Mr. Hinson.

Mr. Hinson and I represent Mr. Wardlow
who is charged with a crime.

Now, simply because Mr. Townsend works
for the State of Texas would he have more credibility
with you than I would because I work for a man that is

37

1    charged with a crime?

2    A        No.

3    Q        Do you still have your questionnaire in front

4    of you?

5                        THE COURT:  It's right here.

6    (Indicating)

7                        THE POTENTIAL JUROR:  Yes.

8                        MR. OLD:  You indicate on the

9    first page that you are in favor of the death penalty,

10   you checked "Yes" and then you were asked to explain your

11   answer.

12                        THE POTENTIAL JUROR:  Yes.

13   Q        (BY MR. OLD)  And I believe we gave you five

14   lines to explain and I certainly doubt if that's adequate

15   to give anything on that shorthand rendition.

16                        Your first statement is "If a person is

17   to be imprisoned for the remainder of his life he should

18   be put to death."

19                        Can you expound some on that and tell

20   me your thinking behind that statement, what led you to

21   that opinion?

22   A        I just feel that the person's term that would

23   extend beyond what would be the person's natural life is

24   just in essence placing him out of society for the rest

25   of his life so why should we support the living within

prison walls?

Q        Let me ask you something; is 40 years in any circumstance pretty well equal to the rest of someone's meaningful life to you?

A        Not in a young person that wouldn't be 50 years old or something.

Q        Do you understand that is something that you are not to consider, you will be told you are not to consider the rules and laws of parole?

A        Right.  Right.

Q        Now, if I understand that instruction correctly it may -- you should consider life as life and not consider the possibility of parole.

A        Okay.

Q        Okay.

A        Okay.

Q        And you would agree, I mean in what the Judge told you what would probably be -- you will be instructed not to consider -- that you are not to consider the possibility of parole and I mean as the Judge told you just because it says you do 40 calendar years or what we call "doing 40 flat" that it doesn't mean by any means that someone is going to parole after 40 years.

A        Right.

Q        So in effect if he gets a life sentence you

1    have got to assume that you are giving them life?

2    A          "Natural life or 40 years minimum?"

3    Q          Giving them life.

4                    THE   COURT:      Ma'am,   the

5    sentence you assess is life, what the Board of Pardons

6    and Paroles does is out of your hands, my hands and

7    everyone's hands.

8                    A life sentence is a life sentence but

9    in Texas there is a possibility of parole at some point

10   in time.

11                   That point in time in a capital case is

12   40 years or longer, it may be less than that in some case

13   but in capital murder it's 40 minimum but you can't

14   assume that in 40 years that you get turned loose because

15   a life sentence is a life sentence period.   And if a

16   person is on parole they are on parole for the remainder

17   of their life because there's a life sentence hanging

18   over them.

19                   So like Mr. Old is telling you, you do

20   have to assume that a life sentence means exactly that.

21   For you to do anything other than assume that is

22   speculating on what these rules and regulations will be

23   years from now in the future and that is improper.

24                   MR. OLD: Now, can you follow

25   the instructions as the Judge has explained them?   Can

you consider life to be a life sentence?

"Yes" or "No", please, based on what you now know and what the Court now tells you and will tell you to be in his charge?

THE POTENTIAL JUROR: Consider a life sentence to be a life sentence?

Yes. I think I can.

Q    (BY MR. OLD) Okay. Does the fact that you now know that the eligibility for parole starts after 40 calendar years, would that influence you as to whether or not to give a life sentence?

A    I feel like it does.

Q    And you are answering me affirmatively, you think that -- that those instructions and the fact you know life equals at least 40?

A    Yes.

Q    You think that is going to influence your verdict and decision in this case?

A    Well, I need some clarification on "influence."

Q    Would that be something that you would consider in arriving at your verdict?

A    Oh, that a life sentence would be a minimum of 40?

No.

I think we are talking about what form

1    of punishment is appropriate.

2    Q        But I mean are you going to --

3    A        Speaking of life.

4    Q        -- are you going to consider the effect of your

5    answer that Issue #1 as to "Yes" or "No", are you going

6    to consider what you know about life sentences?

7    A        As to whether --

8    Q        I believe Mr. Townsend told you a jury answers

9    that first issue "No", it results in a life sentence.

10   A        I don't feel like I can consider the punishment

11   in deciding my answer to be Number One.

12   Q        You think it would influence that answer is my

13   question?

14   A        Pardon?

15   Q        Do you think what you have now been told about

16   a life sentence, 40 years before parole would influence

17   you in answering that question?

18            And I'm not asking you how you would

19   answer it but would it be something that you would think

20   about in answering that question?

21            You know, I mean you will be told the

22   outcome of your answer, you have already been told and

23   the Court in its charge, written instruction will tell

24   you the effect of the answer.

25   A        Yes.

LLOYD E. BILLUPS, CSR, #149.
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1  Q        Now what we have talked about life, 40 years

2  and the Court's instruction that you are to consider life

3  is life, is that going to be something that goes to the

4  answer to that question?

5  A        I don't think it's appropriate.  We have to

6  decide if they prove beyond a reasonable doubt that it's

7  a probability of committing criminal acts in the future.

8  Q        You are saying that is  --  I mean if you knew

9  -- I mean if let's say the instruction was different,

10 let's say it says life --

11             MR. TOWNSEND:  Object, Your

12 Honor.   That's not relevant "If an instruction is

13 different", the instruction is Special Issue #1, she has

14 answered that she can answer that question based on the

15 evidence and not on anything about parole.

16             THE COURT:  Sustained.

17             MR. OLD:  Now, in answering

18 Special Issue #2 can you tell me in your own words what

19 Special Issue #2 asks you as a juror?

20             THE POTENTIAL JUROR:  Okay.

21 Special Issue #2 is asking whether after hearing all the

22 evidence in both phases is there something in there that

23 I feel like would -- in a person's background or as it

24 says here, "character, background, life circumstances",

25 I suppose that would reduce his responsibility in the

1    offense that he's accused of.

2    Q         (BY MR. OLD)  Would the instruction as to what

3    we have talked about about parole in answering that

4    question, the effect of the answer is if you answer that

5    question "Yes" it's a life sentence, if you answer it

6    "No" it's a death sentence, would what we have talked

7    about about parole and what you are not to consider,

8    could that influence your answer to that question?

9    A         No.

10   Q         I mean I want to ask you a question about some

11   types of evidence you might hear as to that issue, I'm

12   not asking you whether to predetermine on how you would

13   act on that evidence, my question is would you reject it

14   as evidence, that is something that you would not weigh

15   as evidence, a juror's duty is to weigh the evidence --

16             MR. TOWNSEND:  I believe the

17   juror has the right not to weigh evidence if they decide

18   there's no weight to the evidence, all they have got to

19   do is listen to it and consider it.

20             THE COURT:  I think you are

21   correct, Mr. Townsend.

22             I will ask the Defense to rephrase.

23             I think certainly the juror can weigh

24   or not weigh, I think the question is does the juror have

25   a predisposed bias toward the type of evidence, is it

something that they would similarly reject without giving

consideration?

MR. OLD: By "weigh" I was
asking you if you would not act on it but consider it as
a type of evidence that you would take into consideration
on mitigation.

Would you have a prejudice against --
I'm going to ask you about several different kinds of
evidence as to being evidence to consider in mitigating
evidence, would you consider evidence of age as
mitigation, as mitigating?

THE POTENTIAL JUROR:
Possibly.

Q        (BY MR. OLD)  I am not -- you could conceive
of a case where you think you could consider that in
mitigation?

A        Yes.

MR. TOWNSEND: I object to the
form of the question, he's asking could they consider
that as mitigation, the wording that he uses implies that
they have to consider that mitigating and I think the
proper form of the question is "Will they consider that
evidence when they are determining whether there's any
mitigating factors or not", I don't think they are
required to consider age as a mitigating factor or

consider anything a mitigating factor. They are just to
consider whatever evidence is presented and then decide
whether any of those elements are mitigating or not.

THE COURT: Again, I agree
with you, we are getting into -- he may be taking -- he
has stated the proposition correctly, all he is asking
you, ma'am, is there some particular thing they are going
to offer that you would just automatically reject and not
give any consideration whatever.

You are not being asked to commit what
you would or wouldn't do, what you think is or is not
mitigating.

Mr. Old just wants to know if your mind
is open to the proposition that age or whatever he might
consider is proper, that you would consider in answering
that question.

THE POTENTIAL JUROR: Issue
#2.

MR. OLD: Yes.

THE POTENTIAL JUROR: Yes,
sir.

Q        (BY MR. OLD) Would you consider a person, the
circumstances and environment of their raising, their
family history?

A        Yes.

1    Q        Could you consider psychiatric evidence?

2    A        Yes.

3    Q        Is that an affirmative answer?

4    A        Yes.

5    Q        Would you consider somebody's religious and

6   moral history?

7    A        Yes.

8    Q        Religious belief?

9    A        Yes.

10    Q        Would you consider their education or lack of

11   education?

12    A        Yes.

13    Q        Going back to your questionnaire, the bottom

14   of the page there is a statement and it really only asks

15   of someone that is in favor of the death penalty and you

16   have indicated that you are in favor of the death penalty

17   and then the question is, "Do you agree that a life

18   sentence rather than the death penalty would be

19   appropriate under the proper circumstances?"

20           You answered "No" to that question?

21    A        Yeah. _

22    Q        Can you explain to me your answer, what you

23   base that on and, first, is that still your answer or

24   your opinion?

25    A        Well, I was sort of surprised when I saw it,

1    too. Maybe I didn't understand that.

2    Q        When you saw the question originally?

3    A        Because it sounds like, you know, sounds like

4    -- okay -- I think based on what I know now that there

5    -- that after hearing evidence you are to make a decision

6    on what is appropriate, I would have to say -- I would

7    have to say "Yes" to that.

8    Q        Let me -- what you are saying is you have now

9    found the law requires certain things?

10    A        Or allows certain things, I guess.

11    Q        I'm not asking you whether you agree or

12    disagree with the law, I'm asking you whether or not that

13    first was your opinion the day you filled this out and

14    that is still your opinion?

15    A        You -- now, I would have to say that -- that

16    this is not still my opinion, I'm not sure what I was

17    basing that on at the time except that it would have to

18    be limited knowledge.

19    Q        Okay. Well, up above in your explanation you

20    made it clear "I feel that a person should pay for a life

21    with a life."

22    A        "For a life with a life."

23    Q        Now, I mean you weren't asked about -- in these

24    questions about capital murder versus --

25    A        Yeah.

Q        -- non-capital murder, you were asked how you

felt about the taking of a life.

A        In a lot of ways I feel that.

Q        Okay.

A        I do.

Q        Would it be a fair statement that your views

and opinions on capital punishment favor the use of

capital punishment?

A        "The death penalty?"

Q        Yes.

A        No.  Not on what I now know.

Q        What is it that you now know that has changed

the opinion?

A        Capital murder is -- that the only difference

between -- between capital murder and murder is that

murder was committed in the -- during the course of

another --

Q        Of a robbery?

A        Yes.  Another offense.

Q        How did that change your opinion?

A        Well, the answer was, you know, the question

is not of capital murder, it was just asking "How do you

feel about the death penalty?"

Q        And I mean is it a fair statement in your

answers you were all for it?

```
1   A          I would be more in favor of the death penalty

2   as being an option in any murder case.

3   Q          Okay.   So your disagreement with the law --

4   and there is nothing wrong with disagreement with the law

5   -- is that the law that distinguishes between murder and

6   capital murder, you think for murder the range of

7   punishment ought to be from some number of years to death

8   in all murder cases?

9   A          Yes.

10  Q          And based upon your other statements that if

11  I understood you correctly, you correct me if I am

12  misstating you, that you really felt like as a death

13  penalty as opposed to life was a better punishment

14  because you saw -- you didn't see a benefit of keeping

15  somebody locked up for life?

16  A          Right.

17  Q          And whether the law calls it "capital murder,

18  murder", "homicide", the taking of a life should be

19  punished with the loss of life is your basic opinion?

20  A          An option.

21  Q          "An option?"

22  A          "An option."

23  Q          Do you think there is anything wrong -- wrong

24  with being biased to a certain position?

25  A          Whether the death penalty or --
```

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

Q        You are not offended by the word -- by saying someone is "biased", we are all biased to things, are we not?

A        Sure.  I think so.  We are all biased.

Q        "Biased" means we are for it?

A        We are biased in, some for or biased against it.

Q        If we are prejudiced against something?

A        I guess that would be your interpretation of the terms.

Q        Okay.

A        But "biased" to me could be for or against, it's just "set in the way."

Q        You have a bias of the -- in favor of a death penalty over a life sentence in the penitentiary where you think the death penalty is the appropriate option over life is not as appealing to you?

        MR. TOWNSEND:  Your Honor, I believe the question he asked was so superfluous I'm not even sure -- I think he asked her if she had a bias toward the death penalty in a case that she felt was appropriate for the death penalty, is that what you asked?

        MR. OLD:  Your Honor --

        MR. TOWNSEND:        The

question --

MR. OLD:    I object to him
asking the Court what I asked, he knows it's not a legal
objection to the question.

THE COURT:  Do you understand
the question as asked?

THE POTENTIAL JUROR:   Repeat
it.

MR. OLD:   I can't repeat it.
Can we have the Court Reporter read it back, Your Honor?

THE COURT:   Yes, sir.


(The question referred to was read back
as follows:  "You have a bias of the -- in favor of a
death penalty over a life sentence in the penitentiary
where you think the death penalty is the appropriate
option over life is not as appealing to you?")


THE POTENTIAL JUROR:   If you
are asking if I am to make the decision whether to give
the death penalty or the life sentence in the case, the
death penalty is more appealing to me, I would be biased
to use that instead of the life sentence

MR. OLD:   Do you think that
statement that you just made, the opinion that you have

1    and the attitude that you just expressed --

2                    THE POTENTIAL JUROR:    I was

3    just really repeating your question.

4    Q        (BY MR. OLD)  Was that your answer?

5    A        No.   I was repeating your question, you were

6    asking me is that, you know --

7    Q        When you stopped, I presume that was your

8    answer?

9    A        Yeah.

10                   No.

11                   You are asking me in a case where --

12   where I am to decide to give the death penalty or a life

13   sentence, you are asking or you are asking for an

14   affirmation that I would be inclined to give the death

15   penalty rather than a life sentence and I have to say

16   that I could not, to be fair, I could not say that I

17   would always favor one over the other.   I think

18   that's --

19   Q        "Not always?"

20   A        "Not always."

21                   ...I mean you -- I may have an opinion on

22   paper but get, you know, if I am here being, you know,

23   asked to really think about this and take a

24   responsibility to make a decision that I'm thinking about

25   it more so I have never been --

```
1    Q          Would your attitudes toward the death penalty

2    that we have been talking about, do you think that they

3    could effect your deliberation in this matter in the

4    answer of the questions that you are asked as to

5    innocence or guilt and as to the Special Issues that you

6    are asked to answer as to punishment?

7    A          Will my attitude about the death penalty?

8    Q          Yes.  Effect the answers that you give.

9               First is innocence or guilt as to

10   capital murder and as to two Special Issues we talked

11   about.

12   A          It wouldn't in the guilt or innocence but I

13   certainly -- I think that -- I don't know.  You are

14   indirectly answering two questions when you answer the

15   one.

16   Q          When you answer --

17   A          When you answer a Special Issue question you

18   are answering another question also.

19   Q          You are answering, too, what's going to happen?

20   A          Pardon?

21   Q          You are answering the result of your answer?

22   A          Right.

23   Q          What you are saying is when the question --

24   A          So it is hard not to consider the ramifications

25   of your answer.
```

1    Q        Let me see if I understand you correctly; you

2 are telling me in answering Special Issue #1 or Issue #2

3 you are being asked a factual question or to find whether

4 certain facts exist, now, I mean the jury does not give

5 a death sentence, that is something that is done by the

6 law but it is based on your answers and you know

7 obviously what you are doing and whether it would have

8 the same effect on you you would know what you are doing?

9    A        Yes.

10    Q        And you are saying that your opinions that you

11 express in your questionnaire and your testimony are

12 going to effect your answer to those questions in that

13 you know the outcome of your answers?

14    A        More so in Number Two than in Number One.

15              In Number One I would be judging the

16 extent that they proved beyond a reasonable doubt of the

17 probability, Number Two appears to be my opinion of --

18 of evidence that -- in Number Two there appears, I feel,

19 that there is evidence that there are -- that is more

20 open to opinion than fact.

21    Q        Okay. ⎯

22    A        You know.

23    Q        It's your opinion based on facts?

24    A        Pardon?

25    Q        It may be asking your opinion based upon an

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

opinion that you have here in -- what you have told me

is that your attitude toward capital murder would effect

your answers to those questions?

MR. TOWNSEND:     I'm    not

sure --

MR. OLD: What you told me was

that you were actually -- there were two things you

considered, there would be two answers to Special Issue

#1?

THE POTENTIAL JUROR:     Yes.

And Number Two.

Q        (BY MR. OLD)  And I mean the other answer, that

is not directly asking for life or death?

A        Right.

Q        And the opinions that you have about capital

punishment would effect how you answered those questions?

MR. TOWNSEND:  Your Honor, I

want to object.  I think any juror's opinion is going to

effect --

MR. OLD:   I'm going to ask

that the prosecutor make a specific objection as set out

by the Rules, he's starting a jury argument.

THE COURT:  Sustained.   The

objection is sustained.

The State is overruled.

1    It's not easy, is it?

2              THE POTENTIAL JUROR:   My

3    opinion about the death penalty effects my answer to

4    Special Issue questions?

5              Yes.  To Number Two.

6              THE COURT:   What about to

7    Number One?

8              THE POTENTIAL JUROR:   Number

9    One -- Number One does not ask me to, Number Two, you

10   say, you know, "Is there a mitigating circumstance to

11   warrant a life imprisonment rather than a death

12   sentence", to me you are asking to make a decision on

13   which one you think is appropriate, deciding between the

14   type of punishment, and number one you are not deciding

15   on the type of punishment.

16             THE COURT: So are you telling

17   me your view on the death penalty would not effect your

18   answer to one but it is something you would take into

19   consideration in the answer to Number Two?

20             THE POTENTIAL JUROR:   Yes.

21             MR. OLD: Going back to Number

22   One; the fact -- and you asked a very good question, you

23   asked if you did this all in one jury meeting.

24             You obviously know what the question one

25   is and you know if you answer it a certain way you then

1 have to answer Special Issue #2?

2         THE POTENTIAL JUROR:  Yes.

3 Q      (BY MR. OLD)  Is that going to take you back

4 and have your opinions effect your answer to Special

5 Issue #1?

6 A      I don't think I understand the question.

7         In Number One I will consider where

8 there is a reasonable doubt that there is -- beyond a

9 reasonable doubt that this person would commit criminal

10 acts of violence in the future.  I would make a decision

11 on that question then I will go to Number Two and

12 consider the evidence in deciding which punishment is

13 appropriate.

14 Q      Would the fact that, you know, just as soon as

15 you answer Number One "Yes" that you then answer Issue

16 #2?

17 A      Yes.

18 Q      Okay.  And your opinions that you have

19 expressed about the death penalty, would those -- would

20 that carry back -- would your opinions about the death

21 penalty in any way influence your answer to Number One

22 a little bit, a lot?

23         I mean it doesn't make any difference,

24 just would it influence?

25         MR. TOWNSEND:  Your Honor, I

want to object, he's badgering this witness, she has already answered that question for Mr. Old, she has already answered the question for the Court.

THE COURT: Sustained on Special Issue #1.

The question has been asked and answered.

It has been 37 minutes, I forgot to give you the 30 minute warning.

MR. OLD: May we approach the bench?

THE COURT: I think it would be easier for the juror to step out.

Ma'am, would you step out for a moment?

(The following occurred outside the presence and hearing of the potential juror:)

THE COURT: Let the record reflect that the juror is not present in the courtroom.

Mr. Old?

MR. OLD: Your Honor, at this time after the -- we are in a position to challenge this witness or see if the State agrees with us about the challenge.

1    THE COURT: Does the State

2    agree?

3    MR. TOWNSEND: No, Your Honor.

4    I don't know what the challenge is.

5    THE COURT: State your

6    challenge.

7    MR. OLD: I understand what

8    you want us to do is go ahead and make a formal

9    challenge?

10    THE COURT: I'm sorry?

11    MR. OLD: You said you would

12    give us a warning at a certain point?

13    THE COURT: I usually give you

14    about 25 or 30 minutes warning so you know where you are,

15    when the State is on the beginning portion of voir dire

16    when I give the State a warning it's at 25 or 30 minutes,

17    if the State and Defense wish to excuse a juror for any

18    reason if you don't like the way they wear their ties or

19    if you don't like mustaches for whatever reason you can

20    agree to get rid of them.

21    Any warning I give for time is to help

22    you all as far as challenge for cause. If you think

23    somebody is totally and completely disqualified stop me

24    at the point you disqualify them, if you are not certain

25    I think we need to finish voir dire.

1    MR. OLD: I thought that when

2    you gave me my warning --

3                    THE COURT: "That I was giving

4    a signal or message?"

5                    No. I was not. The only thing the

6    warning means is when I do it for the State, guys, if you

7    all want to confer and excuse this juror let me know,

8    when I give a warning to the Defense it's just so you

9    will know about how much time you have used and where you

10   are.

11                   MR. TOWNSEND: I wasn't clear

12   on that, either.

13                   THE COURT: I'm sorry.

14                   I don't care whether the person is

15   qualified or disqualified in the first 25 or 30 minutes,

16   either side that doesn't like her, if they want to confer

17   with the other side and you two agree to excuse that

18   juror for any reason whatever I will accept the

19   agreement.

20                   MR. TOWNSEND: If we are in

21   the middle of this process and we feel that we have got

22   a challenge for cause and it's just a lay-down do you

23   want us to go ahead and ask to approach the bench at that

24   time?

25                   THE COURT: I think so or just

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

say "Judge, there's something that we need to take up out of the juror's presence", that's if you are really sure.

Right now in this case I do not believe she is disqualified.

MR. OLD: I was not -- when you gave me my warning I did not -- I thought you were trying to tell me something perhaps I didn't know.

THE COURT: I apologize. I'm sorry. That was no my intention. I didn't want you to get up to your 50 minutes and say "Judge, you never told me I had used so much time."

I was just trying to let you know where we stand.

(Off the record discussion.)

(The following occurred in the presence and hearing of the potential juror:)

THE COURT: Okay. You may proceed.

MR. OLD: Ms. Henry, if selected as a juror in this case you will be asked to take an oath and this oath provides, requires you to affirm that "you and each of you", referring to the

entire panel.

                    THE POTENTIAL JUROR:   Yes.

Q          (BY MR. OLD)   "Do solemnly swear in the case

The State of Texas against the Defendant you will a true

verdict render according to the law and the evidence so

help you God."

                    And basically I mean you are telling the

Court by your oath that you will render a true verdict

according to the law and the evidence.

                    Okay.   In our system the way we try a

case, His Honor is the exclusive judge of the law of the

case, at the conclusion of a trial or conclusion of

evidence and before you are sent to the jury room to

deliberate the Court will give you a written charge as

to the law of the case, as to what law applies.

A          Okay.

Q          Now, your instruction, the instruction implies

you will render a true verdict according to the law.

                    Now, as to the evidence that comes

before you the Court may instruct you how you may use

certain evidence, it may tell you that this evidence is

not submitted to you for proof of a particular thing, it

may limit its use but as to determining the credibility

of the evidence and that is what is true and not true,

the jury is the exclusive judge of the facts of this

case.

I mean when a word has a specific meaning, special legal meaning the Court may give you a definition of it and when he instructs you that a word means a particular thing then your duty as a juror is to use the Court's definition and not the ordinary definition or your definition.

A        Yes.

Q        There is a sheet before you, it starts "All persons are presumed to be innocent." (Indicating)

A        Yes.

Q        Okay. About the middle of that page, I believe it's the second full paragraph, "The prosecution has the burden", that is the legal definition of the word "beyond a reasonable doubt", I will give you a moment to read it. (Indicating)

A        This one paragraph here? (Indicating)

Q        Actually there to the end of the page. (Indicating)

A        Okay.

Q        Okay. That is the legal instruction that as your oath implied, you will render, you will take the law from the Court.

As to that particular definition can you accept that definition, the word "beyond a reasonable

doubt" or the words "beyond a reasonable doubt?"

A          This comes from a law?   Is this -- whose

writing, whose words are these?   (Indicating)

                THE     COURT:     Those     are

instructions that are given in all criminal cases, those

instructions have been mandated by the Court of Criminal

Appeals for hundreds -- I won't say "hundreds", for "many

years" we had no definition on "reasonable doubt", a few

years ago the Court came out with a definition, that's

what they say the definition is so that is the law in the

State of Texas at this point.

                THE POTENTIAL JUROR:     Yes.

I could accept it.

                MR.    OLD:     Does   your   own

definition of "beyond a reasonable doubt" conflict with

the law?

                THE POTENTIAL JUROR:     No.

Q          (BY MR. OLD)   Okay.   Let's assume that it did,

okay, could you lay aside your own definition of a word

and   use the Court's   definition of it in reaching your

own --

A          Are   we   talking   about   "reasonable   doubt

definition" or just any definition?

                I   mean   we   are   talking   about   any

definition, obviously I guess since I don't disagree with

this one I wouldn't have a problem using the Court's definition of a term that conflicted with my own.

I feel like I'm trying to give all the right answers but I am not.

Q       I'm not trying to get you to give right or wrong answers, I want your --

A .     Well, I realize that.

Q       -- your mental thoughts.

A       That's how I feel.  If I was on the -- if I was on the jury that, you know, that's the rules, to be fair and impartial, it doesn't matter what my definition of something is, if I have to interpret and use the law in this I have to use what the law says so --

Q       Let me go to another possibility that you could be charged, I think Mr. Townsend mentioned it to you.

A       Yes.

Q       That would be in the event the party being tried has made a statement or confession.

A       Yes.

Q       If that was the result of custodial interrogation then the law says that the jury has to first find it has been voluntarily made.

And the Court will give you the requirements of "voluntary" which is a definition of "voluntary", it will tell you to the effect that in order

1    for that statement to have been voluntary that the

2    Miranda Warnings must have been given at a particular

3    time.

4    A        Yes.

5    Q        He will tell you that the statement -- if the

6    statement was the subject of custodial interrogation or

7    its functional equivalent, you know, that "A, B, C, and

8    D" had to be done.

9    A        Yes.

10            Do I need to define "custodial

11   interrogation" before we go any further?

12   Q        It's one of those words, I'm just saying --

13   let's say the Court tells you, gives you a definition of

14   that.

15   A        And if we have to throw out the --

16   Q        You get to the point that you have decided

17   because -- what is your -- if I asked you what the word

18   "voluntarily", it's ordinary meaning was, what would your

19   answer be?

20   A        If you are asking me the definition of

21   "voluntary?"

22   Q        Yes.  What does "voluntary" mean to you?

23   A        "Of my own choice, of my own choosing."

24   Q        "Your own choice?"

25            Now, let's say that the legal definition

67

LLOYD E. BILLUPS, CSR. #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

or the requirement of voluntariness is that the person who made the statement had to have been told by an official that he had the right to have an attorney present or he had the right to stop the interrogation at any time and he found out, he just flat wasn't told that but after having read the statement, which I mean it has been read to you, it's in evidence, you are deciding whether it's voluntary or not.

A          Yes.

Q          That in your mind beyond a reasonable doubt you believe that statement or confession to be true.

The Court then instructs you and says if you find that not to be a voluntary statement do not consider it as any evidence.

A          Yes.

Q          I hope my question is obvious, after having, believing beyond a reasonable doubt that something is true can you lay that aside and exclude it from the rest of the evidence and make your finding on whatever evidence there is exists for that?

A          I don't mean to be argumentative but something wouldn't be produced, I mean, is it possible that we could have heard enough evidence to decide something beyond a reasonable doubt and then it be thrown out or is it not that, you know, you would make those decisions

1    before you went further with listening to certain

2    evidence or viewing evidence?

3    Q        When you say you would "make those decisions",

4    are you referring to the jury?

5    A        "The jury."

6                 Because  I  mean  if  I  read  a

7    statement --

8    Q        I mean --

9    A        -- a piece of paper, if I just read -- if I

10   just read his statement I don't know what I have to judge

11   beyond a reasonable doubt that is true just by simply

12   reading that piece of paper.

13   Q        You are convinced that is true?

14   A        How would I be convinced that it was true just

15   by reading it?

16   Q        I don't know.  I'm asking you to assume that

17   you are but I mean you can be in that position -- the

18   jury is the exclusive judge of the credibility of the

19   evidence, there is nothing that says in the instructions

20   if the witness is fidgety you are not to believe it, if

21   he's argumentative you are not to believe it, I mean it

22   is your subjective intent, your subjective, you know,

23   mental deliberation that tells you how much to believe

24   a witness, you may believe a witness on one issue, you

25   may say he's lying out his teeth on another one.

| | |
|---|---|
| 1 | A       Yes. Yes. |
| 2 | Q       And I mean there is no -- |
| 3 | A       But had to throw out evidence that I felt was |
| 4 | true? |
| 5 | Q       Yeah. |
| 6 | A       And said that "You can't consider that?" |
| 7 | Q       Yeah. "You can't consider it, forget about it, |
| 8 | strike it from your mind and strike it from your |
| 9 | deliberation." |
| 10 | A       I would do it. |
| 11 | Q       You would do it? |
| 12 | THE COURT: One minute. |
| 13 | MR. OLD: I'm asking you the |
| 14 | question is "Yes" or "No", can you do that? |
| 15 | MR. TOWNSEND: Your Honor, |
| 16 | he's badgering this juror. |
| 17 | THE COURT: Overruled. |
| 18 | MR. OLD: Your Honor, I'm |
| 19 | going to object to his making his objection of |
| 20 | "badgering", I do not think there is a legal objection |
| 21 | to that. |
| 22 | THE COURT: Overruled. |
| 23 | THE POTENTIAL JUROR: I can |
| 24 | do that. I can do that. I think I would be lying if I |
| 25 | said it wouldn't be tough to -- to say, okay, you know, |

but then -- and then say "No, we can't consider that, you know, I can't consider that", it would probably be a constant conscious effort to suppress what you have already seen or heard.

MR. OLD: Let me turn the question around on you; would the fact that when you are considering the issue of whether or not the statement is voluntary would the fact that you believed it to be true beyond a reasonable doubt influence your process in determining voluntary or involuntary?

THE POTENTIAL JUROR: If I were being asked to apply the law and judge whether it was voluntary and -- and admissable, is that what we are saying, we are judging it to be admissable so we would have to I guess answer certain questions about --

Q        (BY MR. OLD) Let me --

A        The way we --

Q        I think we are on the same frequency; admissability is principally the function of the Court. Now, what you have in this case is a statement is admissable if it's voluntarily made as the law defines "voluntary."

As we talked about earlier, the jury is the fact finders, voluntariness is a fact issue, it's not a -- in the case I'm talking about a legal issue that His

71

1      Honor would be responsible for.

2      A         Right.

3      Q         Okay.  Now, I mean it's a fact issue and it's

4      actually the juror -- the jury's determination, first,

5      if it was voluntary and then secondly whether it's true

6      or not, whether it would be considered as evidence, I

7      mean -- I mean the voluntariness is determined by facts

8      which you have to decide and then the weight to be given

9      it as evidence, if any, is factually determined by the

10     jury so I mean --

11     A         Those are two separate issues.

12     Q         When you asked if is it admissable, I mean the

13     ultimate issue on it belongs to the juror as to voluntary

14     and the Court as to the other issues, what weight you

15     should give it, do you still think you could go through

16     both thought processes in this case where you believe the

17     document to be true and correct without --

18     A         Yes.

19               And I think it goes back to our

20     discussion on these Special Issue questions, there are

21     two different issues that you are asking me there.

22               Could I -- you are asking me could I

23     hear evidence and determine evidence or I guess the

24     statement to be voluntary based on the evidence

25     presented, not based on what it said?

1    Q         That's correct.

2    A         And I believe I could.

3    Q         When you say "based on what it said", that's
4    where you believe it's true?

5    A         I believe that I could just the statement
6    voluntary or not based on evidence presented and not
7    based on what the statement says and my feelings about
8    what it says.

9    Q         I notice that you have a degree from the
10   University of Texas?

11   A         Yes.

12   Q         And this is what, a psychology degree?

13   A         It is.

14                        THE COURT:  Time has expired,
15   Mr. Old.

16                        Do you have some particular area that
17   you need to go into with this juror?

18                        MR. OLD:    I have several
19   remaining, I would request additional time.

20                        THE COURT:  Ma'am, you need
21   to step out for a moment.  I need to have a conference
22   with the lawyers.

23

24                        (The following occurred outside the
25   presence and hearing of the potential juror:)

                                                          73

1      THE COURT:   For the record,

2 you will need to tell me what area you need to cover and

3 how much time you need for each.

4      MR. OLD:   Your Honor, I need

5 to finish covering really some background material in her

6 questionnaire, I am groping about what I have asked her

7 about and what I have not asked her about, I need to go

8 over the Witness List with her and I probably have one

9 more question as to death penalty.

10      THE  COURT:      How  much

11 additional time are you asking for?

12      Do  you  want  to  ask  an  additional

13 question on death penalty, you want her to read the

14 Witness List and you said "some background?"

15      MR. OLD:   Her background.

16      Right  now  my  next  question  is  her

17 knowledge as to her degreed area and if someone else in

18 that area testified the way it would effect the evidence.

19      THE COURT:   How much time are

20 you requesting?

21      MR. OLD:   The witness answers

22 questions and gives interesting answers.

23      THE COURT:   She does that.

24      MR. OLD:   I would hope 15

25 minutes.

1    THE COURT:   Mr. Townsend?

2        MR. TOWNSEND:   First, Your

3   Honor, I object to him going back into the death penalty

4   with her, he had plenty of opportunity to go into the

5   death penalty, he spent considerable time on that

6   already. Now he's requesting additional time to go into

7   the death penalty.  I do object to that.

8        THE COURT:   What specific

9   question do you have on death penalty or specific area

10  of inquiry?

11       MR. OLD:   Your Honor, back to

12  what she talked about as to the effect of her opinion on

13  the death penalty as to the   --   as to Issue #1 on

14  exhibit --

15       THE COURT:   I think that has

16  been thoroughly covered.

17       First, neither side has the burden of

18  proof on Number Two and it's just an absolute out if a

19  juror wants it and I think an opinion as to whether life

20  is more appropriate or death is more appropriate on

21  answering two, I don't think that you can say that it can

22  or can't effect your answer because Number Two is out

23  there with no burden, it's just an escape valve for the

24  juror.

25       I believe that area has been covered and

1    with the objection made by the State I would not allow

2    you to go back into it.

3                        MR. OLD:   We would like to

4    make a bill on it.

5                        THE COURT:  Bills will be made

6    at the end of voir dire.

7                        Bring her back.

8                        MR. TOWNSEND:  Your Honor, I

9    have -- I have a further objection; I think if I

10   understand what he was saying he was wanting to go into

11   areas of her degrees in psychology or something like that

12   and whether she would consider that as evidence, she

13   could consider psychological testimony and that sort of

14   thing as evidence.

15                       He's already gone into the area, you

16   know, Special Issue #1, Special Issue #2, will you

17   consider these type things of evidence, will you give

18   fair  consideration  to  this,  will  you  give  fair

19   consideration to that?

20                       I don't see any reason to go back and

21   re-plow that ground again.

22                       THE COURT:  I don't think he

23   has gone into what her particular degree or education

24   would do as far as her giving credibility to other

25   witnesses.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1       And if I understand you, Mr. Old, that's

2  what you want to get into?

3                              MR. OLD:  Yes, Your Honor.

4                              THE COURT:  That objection is

5  overruled and I will give you 15 minutes.

6                              MR. OLD:  Thank you.

7                              THE COURT:  I also would like

8  to explain a little more to the juror how she would come

9  about making the decision on voluntary statement since

10  that seems to be paramount in your mind, just the

11  semantics -- not "semantics", actually the way it works

12  and what I propose to do is tell her if there is a

13  statement made  that's in a trial she will be instructed

14  -- and they are in issue -- that she will be instructed

15  to disregard until, number one; she finds it true beyond

16  a reasonable doubt and, number two; she finds it to be

17  voluntary beyond a reasonable doubt and that is not a

18  separate issue, it's just something that will be in the

19  charge.

20                              Does either side have a problem with me

21  explaining that procedure to her?

22                              MR. OLD:  No, Your Honor.

23                              MR. TOWNSEND: No, Your Honor.

24                              THE COURT:  She just really

25  is caught up in how all this works, I think that's

1    keeping her from concentrating on it.

2    - - - - - - - - - - - - - - - - - - - -

3                    (Off the record discussion.)

4

5                    THE  COURT:    Bring  in  Ms.

6    Henry.

7                    I  don't  think  we  are  going  to  get  to

8    both  of  the  other  two  today,  which  one  do  you  all  want

9    and,  well,  I  guess  we  need  to  go  in  order.

10                    Do  you  want  to  let  the  policeman  --  do

11    you  all  want  to  talk  to  the  policeman?

12                    MR.  TOWNSEND:  Mr.  Alexander,

13    we  are  apparently  not  going  to  go  to  him.

14                    THE  COURT:  Do  you  want  to  let

15    him  go  or  do  you  want  to  talk  to  him?

16                    MR.  TOWNSEND:   I  want  to  talk

17    to  him  at  some  point  after  Ms.  Henry.

18                    THE  COURT:   You  can  tell  Mr.

19    Alexander,  tell  him  we  are  not  going  to  get  to  him  today

20    and  see  if  he  can  be  here  in  the  morning  at  9:30,  I'm

21    sure  he  can,  he's  a  City  policeman.

22                    THE  BAILIFF:    Tomorrow  at

23    9:30?

24                    THE  COURT:   He's  not  working

25    nights,  you  can  tell  him  he's  free  to  go  and  be  back  at

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

9:30 in the morning and bring Ms. Henry back in.

I will not take my explanation out of your 15 minutes, Mr. Old.

(The following occurred in the presence and hearing of the potential juror:)

THE COURT: You may be seated, ma'am.

There is something I want to explain to you and Mr. Old has a couple more questions for you but you seem to be concerned over how this statement issue might come about in a trial if it does.

Now, first I want you to understand that when we are discussing principles of law we are not particularly talking about this case, we are talking about the trial of a murder case or a capital murder case or whatever example we are giving.

THE POTENTIAL JUROR: Yes.

THE COURT: If a statement is made by the person charged during the trial that statement will be offered, the State has to go through proving certain things and then if I find that it's admissable then I admit it then you may hear other evidence during the trial that may create an issue of

fact as to whether or not it was voluntary.

To be voluntary, like Mr. Old told you, you have to give Miranda Warnings, those are the rights, you have the right to an attorney, you have a right to have an attorney present at all questions, you have a right to terminate the questioning, if you can't afford a lawyer we'll provide one.

THE POTENTIAL JUROR: Yes.

THE COURT: So, for instance, if a statement was given by a person yet that person was never told he had a right to a lawyer, even though that statement is absolutely true, you may find it to be absolutely true.

THE POTENTIAL JUROR: Yes.

THE COURT: It's not something you can consider and should not have been admitted because it was not voluntary.

"Voluntary" means no coercion, no promises, no threats and all the proper warnings are given.

So what you will do, you will have the evidence before you and we have to assume that it has been admitted and then let's assume that some issue comes up over the fact as to whether certain warnings were given or maybe there's some testimony about a guy was

kept in a room for 48 hours without sleep and finally wrote a statement so he could go to his cell. Let's assume you heard some evidence such as that. That could cause, as we say, raise a fact issue as to whether it's voluntary.

In the Court's charge you will -- "the Court's charge" is a document is anywhere from eight to 15 or 20 pages long to define all the legal terms that differ from your normal usage, it will define the elements of the offense, it will kind of be your guideline, one of the things, if a statement is in evidence and there's some question as to whether it's voluntary one of the instructions will be you cannot base your verdict on the statement unless, once it becomes -- unless you believe beyond a reasonable doubt that the statement is true and you believe beyond a reasonable doubt that it's voluntary you don't stop and analyze the evidence every time it's put in, you listen to everything that happens in a trial, you can go back to deliberate, you refer to the Court's charge.

THE POTENTIAL JUROR: Yes.

THE COURT: And if there is any evidence like that and there's a question as to whether it's voluntary then you are instructed, number one, you can't consider it unless two things occur, what

has to be believed by you has to be voluntary.

THE POTENTIAL JUROR: Yes.

THE COURT: Is that -- does that clear up any of your confusion as to how you get to that issue?

THE POTENTIAL JUROR: I think so. And it's a decision that I could make as an individual?

THE COURT: Well, it takes all of you to decide.

THE POTENTIAL JUROR: Oh, okay.

THE COURT: Again, the verdict has to be unanimous and if some of you believe it or some of you don't you are going to have to decide whether to disregard it or not.

THE POTENTIAL JUROR: Yes.

THE COURT: All right. Now, there's a couple of other areas we are going to go into that doesn't have anything to do with this so do you have anymore questions about how we get to that issue or what the effect of that type of an issue is?

THE POTENTIAL JUROR: I don't think so.

But to clarify, are we talking about

1  -- I'm not trying to make an issue of this, either.

2                    THE COURT:  I understand.

3                    THE POTENTIAL JUROR:  Are we

4  talking about the written statement, we are talking about

5  a written statement or recorded statement that was made

6  when a person --

7                    THE COURT:  For purposes of

8  his questions, yes, we are assuming -- let's use the word

9  "confession", we are assuming that a confession was

10 given.

11                   THE POTENTIAL JUROR:  Yes.

12                   THE COURT:  And then the jury

13 finds that -- let's make it real simple, let's say the

14 Sheriff gets up and testifies, "You know, I forgot to

15 tell him he had a right to a lawyer before he gave me

16 that confession."

17                   THE POTENTIAL JUROR:  Yes,

18 sir.

19                   THE COURT:  And you have got

20 a confession that you believe and then you have the

21 Sheriff saying, you know, "I didn't give him the

22 warnings", so it's absolutely not voluntary under the

23 law.

24                   THE POTENTIAL JUROR:  Yes.

25                   THE COURT:  And you would have

to set it aside, not consider it.

Could you do it?

THE POTENTIAL JUROR:  I could do it.

THE COURT:  Do you have anymore questions about that area before we move on?

THE POTENTIAL JUROR:  No.

THE COURT:  Okay.  Mr. Old.

MR. OLD:  I was asking you about your degree from the University of Texas, it is possible in a trial of this kind or any criminal trial that as to some issues and in this case perhaps issues Number One and Number Two that you have been over that, you might hear some psychological testimony from a psychiatrist or a psychologist.

THE POTENTIAL JUROR:  Yes.

Q        (BY MR. OLD, CONTINUING VOIR DIRE EXAMINATION)

That is a field that you have expert training in?

A        No.

Q        Do you have a degree?

A        Yeah.

Q        Okay.  Do you specialize in any particular field?

A        No.  It's a Bachelor of Arts in Psychology.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

```
 1   Q          But you will agree with me that you know more
 2   about psychology than somebody that does not have a
 3   degree?
 4   A          I don't know.
 5   Q          You studied?
 6   A          It was 1985 when I graduated.
 7   Q          Have you ever worked in that field?
 8   A          No.
 9   Q          You work out at the college?
10   A          I work out at the college and currently I am
11   director of a truck driving program so it's very business
12   administrative type.
13   Q          Did you use directly or indirectly your
14   training in psychology doing your job?
15              That's probably not a fair question, we
16   all practice a little psychology.
17   A          You know, that degree doesn't give me any --
18   any license to exercise any kind of psychology work.   I
19   am, you know, not a licensed counselor.
20              I guess I feel the word "training" is
21   not appropriate, I have the education in psychology, a
22   degree.
23   Q          Let me --
24   A          And, yes, I have probably, you know, I have
25   been exposed to more than the average person.
```

Q       And "expert" is someone who possesses special knowledge in a field that we consider to be a specialized area?

A       Yes.  And the experience.

Q       I know that you are not licensed to practice, it's the fact that you had those courses and training and there are things that you know about psychology that people who don't have that degree --

A       Yes.

Q       -- don't know?

A       Yes.

Q       So you --

A       But I won't consider myself an expert anyway.

Q       You are more of an expert than somebody that hadn't had it.  I'm not saying --

A       Might be more knowledge but I am --

Q       Here I am trying to make you an expert, you don't want to be one?

A       I know.

Q       And I'm not implying that you have a license to practice or that you practiced, I am simply saying that you possess special knowledge?

A       Yes.  And I just don't want -- simply don't want to over-represent myself.

Q       I'm not trying to get you to.

Would your knowledge of the field and the effect of your degree, would you be measuring testimony from a psychiatrist based on your knowledge or would you -- I mean if he said that he administered such and such tests and based on such and such a theory, you know, this is his opinion of whatever, if you disagreed with him about it it's a field that you know about you have some expertise in, you have the knowledge of the tests, you remember studying the tests, can you categorically reject his testimony because his theory of psychology differed from yours?

A        As with any evidence that was presented, any opinion, I would have to consider their professional judgment in that and specifically in the area of psychology I have, I -- like I said, I graduated 10 years ago. I have not been in the field, I probably can remember maybe two tests that may be used and I certainly don't know how to interpret them if, you know, no, I could not, but I feel that there is a broader implication here rather than just my college degree and, you know, he could be talking about very little of what -- I don't know, but he could be talking about, you know, forensics or something, I certainly don't know anything about that.

I certainly would have to take into account what they are saying, what their proof is, what

their --

Q       Let me see if I can narrow you down with some of my questions; you would not -- you would consider a witness such as a psychiatrist, you would weigh his credibility as you would any other type of witness?

A       Yes.

Q       You would not -- I'm not saying that you would have to agree with him opinion or you would have to accept his opinion, I'm saying that you would not automatically reject his opinion because, "Well, I know as much about that as he does and he's wrong", you won't substitute your knowledge of psychology for his?

A       No.

Q       Do you have any prejudice against opinions of psychiatrists?  That is do you believe that they can express opinions that would go to the ultimate issue of Issue #1 and Issue #2, the possibility of future violence?

A       Pardon?  We are talking about Special Issues?

Q       Yes.  A possibility of future violence.

        I'm not asking you to predispose the answer, in psychology testimony something, an opinion expressed, is that something that you would not reject as evidence?

A       Yes.  I would not reject it.  That's right.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

```
1          I would consider psychological testimony

2     as evidence.

3     Q          Would the same be true as to Issue #2?

4     A          Yes.

5     Q          There is a list in front of you that is at the

6     top it has "Witness List", it's about a three page

7     document.

8     A          (Indicating)

9     Q          Yes.

10    A          Okay.

11    Q          Will you go over that and what I want you to

12    identify, to do is to identify for me any name that you

13    know and are familiar with and especially if you just

14    know the person but if you have just heard of them I

15    would like to know it.

16    A          There is some handwritten names.  (Indicating)

17    Q          Yes.  Those are to be considered, too.

18    A          I don't know anyone.

19    Q          You do not know anyone?  Not any name that jogs

20    your memory?

21    A          Like the only thing would be maybe "Billy

22    Dodd", did he run for some -- maybe County Commissioner

23    or something?

24               I saw a sign, I don't know why but I

25    don't know.
```

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1   Q          Whether he ran for County Commissioner or not?

2   A          I live over on the Harts Bluff Road, there's

3   a lot of signs out.

4   Q          You live on Harts Bluff?

5   A          I have no idea who they are.

6   Q          That's fine.

7              You checked that you have not heard

8   anything about the facts giving rise to the case.

9              That was a couple of weeks ago, have you

10  heard anything since?

11  A          I heard that the man lived in Cason, he was a

12  70 year old man that lived in Cason.

13  Q          You work at the college, the college is close

14  to Cason?

15  A          Yes.

16  Q          Did you come by this knowledge by newspaper,

17  hearsay, what someone else said?

18  A          Yes.  It -- it may have been here while we were

19  waiting to go in but I was -- I was out -- I left the

20  college for about six months and I left in June, early

21  June of last year and returned in November and I don't

22  take the paper.

23  Q          Let me -- anything that you have heard and you

24  answered that you had not heard anything at the time of

25  the questionnaire?

```
 1    A        Yes, sir.

 2    Q        Anything that you have heard since or even if

 3   you now recall that you did hear something?

 4    A        Yes.

 5    Q        Have you formed any opinion as to innocence or

 6   guilt?

 7    A        No.

 8    Q        Have you formed any opinion as to the existence

 9   of a particular fact --

10    A        No.

11    Q        -- about this particular offense?

12    A        No.

13    Q        I'm sure you notice on that list there are

14   people who are listed as law enforcement officers, for

15   instance, Billy Dodd, Game Warden, Ricky Blackburn, the

16   Sheriff of Morris County, Texas?

17    A        Okay.

18    Q        Can you consider, I mean do you consider peace

19   officers to be generally credible people?

20    A        Generally I suppose.

21    Q        Over a non-peace officer?  Does the fact that

22   someone is a law enforcement officer give them a head

23   start in being credible with you?

24    A        No.

25    Q        I mean that is a fact, you would consider it,
```

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1  you would view their credibility as any other witness?

2  A       Pardon?  "I would view their credibility?"

3  Q       Yes.

4  A       What?  I'm sorry.  Repeat the question.

5  Q       So far you must be required to start all

6  witnesses even.

7  A       Yes.

8  Q       Now, I mean when, well, an imaginary race

9  between witnesses, you have a peace officer and just a

10 plain ordinary person, at that point does the peace

11 officer have more credibility with you before you hear

12 his testimony?

13 A       No.

14 Q       Your complaints about the criminal justice

15 system are "Too many appeals allowed and too many chances

16 for repeat offenders."

17                 THE COURT:  One minute.

18                 MR. OLD:  Anything in that

19 opinion that you think would go to the detriment of the

20 defendant in the trial of a case?

21                 THE POTENTIAL JUROR:  If it

22 was their third offense or fourth offense, fifth offense.

23 Q       (BY MR. OLD)  You mean by an offense -- what

24 is an "offense", are you talking about a prior

25 conviction?

| | |
|---|---|
| 1 | A        Prior convictions. |
| 2 | Q        Would the type of crime that they had committed |
| 3 | go to the weight, how you felt about supposedly a second |
| 4 | chance? |
| 5 | A        No. |
| 6 | Q        It wouldn't make any difference what they are |
| 7 | convicted for? |
| 8 | A        No. |
| 9 | Q        It wouldn't have to be a serious crime? |
| 10 | A        Wouldn't have to be a serious crime.  No. |
| 11 | Q        Do you know the difference between "a |
| 12 | misdemeanor" and a "felony?" |
| 13 | A        No. |
| 14 | Q        You know there is a difference? |
| 15 | A        Yes. |
| 16 | Q        Misdemeanor basically is punished by time in |
| 17 | jail up to one year and a felony is punishable by more |
| 18 | time in the State penitentiary. |
| 19 | A        Okay. |
| 20 | Q        Would that make any difference to you? |
| 21 | A        Whether it was a felony or misdemeanor crime? |
| 22 | Q        Yes. |
| 23 | A        No. |
| 24 | Q        Would it make any difference whether or not |
| 25 | they were actually convicted of it? |

A       Yes.

Q       Okay. I mean, let's say you heard somebody committed a prior act which is in fact is a crime but was not convicted, not charged with it?

A       I can't use that against them.

Q       You can't?

        It would only be -- would perhaps the age and circumstances of the person when the offense occurred have something to do with the way that you would give it?

A       On repeat offenses?

Q       Is that a question or an answer?

A       It's a question. Are we talking, still talking about repeat offenses?

Q       Yes. Let's say you are trying a man and you become aware that perhaps as a juvenile --

A       Yes.

Q       -- he had committed -- a juvenile cannot commit a crime in law, I mean they are not punished in most cases, there are exceptions to that.

A       Yes.

Q       But would a juvenile incident, would you consider that, you know, in repeat offenses, repeat offenses?

A       Yes.

MR. OLD: Your Honor, other than the matter that has been indicated to the Court that we wanted to make a bill on we have nothing else at this time.

THE COURT: Ma'am, if you will step down I will have some further instructions for you in a few moments.

You will be out of here shortly.

THE POTENTIAL JUROR: Okay.

THE BAILIFF: Would you like to take your purse with you?

THE POTENTIAL JUROR: Okay.

(The following occurred outside the presence and hearing of the potential juror:)

THE COURT: Let the record reflect the juror is not present.

Mr. Old, you said you wanted to make a bill on the area I would not let you go back into, I would not let you go back into her view on death as it might effect her answer.

Can you give me any specific question you wish to ask her at this time that you have not covered?

I'm really not sure how you are going to make a bill without asking her the question so if you can demonstrate to me questions that you have not asked her in that area that you think are relevant I may reconsider.

MR. OLD: What I want to ask her is it goes back to her questionnaire statement which she has been questioned about to some extent which indicates that.

THE COURT: Where are we again?

MR. OLD: The questionnaire on "Please explain your answer" after "death penalty."

THE COURT: Okay. I am here.

MR. OLD: "If a person is to be imprisoned for the remainder of his life he should be put to death."

And then she, in brackets, put "That is not really the point. I feel a person should pay for a life with a life."

And then after the selection of --
circled the bottom statement where she answered, no, that she did not agree to a life sentence rather than a death penalty would be appropriate under certain circumstances.

Those are, I mean they are not hedging

answers, she says she could not give a life sentence, she told me in her testimony that they would influence -- one question she told me they would influence her answer to both Special Issue #1 and Issue #2.

THE COURT: She never said that, Mr. Old.

MR. OLD: I disagree with you.

THE COURT: Let's go back and I believe she said it -- let's go back -- Lloyd, we are off the record.

(Off the record discussion.)

(Recess.)

(The following transpired in the presence and hearing of the potential juror:)

THE COURT: Ma'am, let me just for your own information, other jurors that we have talked to have not been as inquisitive as you and your questions have caused the lawyers to take up some of the time I normally give them to ask questions so Mr. Old has requested some additional time to go into something that I think was previously covered and I'm going to give him

that time.

But normally we don't bring jurors back and forth like this and I just wanted to explain that to you and tell you that I'm sorry, that I'm sorry we're taking so much time with you but we want all jurors to have all their questions fully answered and I'm not criticizing you for asking, I wish more jurors would ask because if you have something on your mind that you don't get explained then it's still going to be a question.

THE POTENTIAL JUROR: Yes.

THE COURT: So I am not criticizing you, I'm just trying to explain why it's taken so long but there's still one area he needs to cover.

THE POTENTIAL JUROR: Okay.

THE COURT: And if you ask anymore questions, that's fine, I am not telling you not to ask a question if there is anything.

THE POTENTIAL JUROR: That would be difficult.

THE COURT: If there's anything you don't understand, we don't understand we still want you to tell us and it is our job to explain it and if you walk out without knowing we are not doing our job.

THE POTENTIAL JUROR:  Okay.

THE COURT:  Mr. Old.

MR. OLD:  Ms. Henry, first you have been an excellent prospective juror in the fact that you asked questions and have answered questions and are obviously working at answering these questions correctly.

What I would like to ask you before we talk about -- when I say "we", Mr. Townsend, the Court and myself, murder and capital murder; "murder" by definition is intentionally and knowingly killing someone, the range of punishment for murder is from five years probated --

THE POTENTIAL JUROR:  Yes.

Q        (BY MR. OLD, CONTINUING VOIR DIRE EXAMINATION)

-- to life.

Again a murder is or can be a lesser included offense that is a -- you may be asked in the charge "Is the person on trial guilty of capital murder, if you do not find so beyond a reasonable doubt you shall find him not guilty of capital murder", then it may come back and say, "A person commits murder when he intentionally or knowingly takes the life of another" and you will be asked if he is guilty of that or not guilty.

A        Yes.

Q        The lesser included offense.

1    In your questionnaire and in your

2 testimony you indicated your feelings about capital

3 punishment and in doing so indicated your feeling about

4 life sentences and you have been told by His Honor that

5 you shall consider life as meaning life?

6 A        Yes.

7 Q        Now, in deliberating as to punishment for

8 murder and not capital murder the lesser included offense

9 of murder, are your opinions on capital murder, capital

10 punishment and your opinions as to life sentences, are

11 those things that you are going to consider in reaching

12 punishment on a non-capital murder?

13 A        On a non-capital murder the death penalty is

14 not an option --

15 Q        That's correct.

16 A        -- for punishment?

17 Q        Yes.  Okay.  You may --

18 A        So my feelings about that are voided by the

19 fact that there is not that option to exercise.

20 Q        Let me -- I may not be communicating.

21              In your questionnaire, and I'm quoting

22 from it.

23 A        Yes.

24 Q        "The remainder of his life, if a person is to

25 be in prison for the remainder of his life he should be

```
 1    put to death?"

 2    A         Yes.

 3    Q         And then you made the statement at the bottom

 4    of the page that you agree that a life sentence rather

 5    than the death penalty would be appropriate under the

 6    proper circumstances.

 7              Those two statements together tell me

 8    that you have a prejudice against life being used --

 9    A         Yes.

10    Q         -- as a punishment?

11    A         Yes.  Yes.

12    Q         That life equals life then that the more

13    appropriate punishment is death?

14    A         Yes.

15    Q         Would those opinions effect you in deliberating

16    in that range of punishment between five years probated

17    and life?

18              I'm not saying that it would make you

19    go either way but it would make you favor the lower end

20    or -- I'm not asking you to favor either end.

21    A         Yeah. _ I'm not sure what my exact response

22    would be but, yeah, I think it causes some concern with

23    me.

24    Q         Just going -- your opinion about life --

25    A         Right.
```

1    Q          -- is going to effect --

2    A          How --

3    Q          -- your deliberating on sentencing in a regular

4    or a non-capital murder case?

5    A          Yes.

6                              MR. OLD:  We would pass the

7    witness.

8                              THE COURT:  Mr. Townsend, do

9    you have any questions?

10                             MR. TOWNSEND:  Just briefly,

11   Your Honor.

12

13                   REDIRECT VOIR DIRE EXAMINATION

14                        BY MR. TOWNSEND

15

16   Q          Ms. Henry, you stated when I was talking to

17   you, I believe you stated that you in deciding punishment

18   on a murder case knowing that the range of punishment was

19   between five years probation and 99 years to life, that

20   you would base your punishment decision on the different

21   facts and circumstances and events of that particular

22   case, is that correct?

23   A          I believe I said that.  Yes.

24   Q          Okay.  Is that still the way you feel, that you

25   would base your decision as to the proper punishment on

1    the -- on that case and the evidence in that case and not

2    on some -- not on anything else, your decision is going

3    to be based on the evidence in that case and that case

4    alone?

5    A          Yes.

6                        MR. TOWNSEND:    No further

7    questions, Your Honor.

8                        THE COURT:  Ma'am, you also

9    said earlier that if you heard a murder case and again

10   you realize when we are talking we are not talking about

11   Mr. Wardlow, we are talking about a murder case or a

12   capital murder case?

13                        THE POTENTIAL JUROR:  Yes.

14                        THE COURT:    You told us

15   earlier if I remember correct that if you heard a murder

16   case and you felt like based on the evidence that the

17   appropriate punishment would be probation you could give

18   probation and you felt like the appropriate punishment

19   would be life you could give life?

20                        THE POTENTIAL JUROR:  Yes.

21                        THE COURT:    In other words,

22   you told us you could consider the full range and go

23   either the high or the low?

24                        THE POTENTIAL JUROR:  Yes.

25                        THE COURT:  Is that still your

position?

THE POTENTIAL JUROR: Yes.

THE COURT: Thank you, ma'am.

You may step down.

Hopefully this will be the last time but I will make no promises.

THE POTENTIAL JUROR: So I still need to hang around?

THE COURT: I need to talk to the lawyers for a minute then I need to send the Sheriff back to give you a couple of instructions then you will be free to go.

(The following occurred outside the presence and hearing of the potential juror:)

THE COURT: Does the State have any challenges?

MR. TOWNSEND: None, Your Honor.

THE COURT: The Defense?

MR. OLD: Yes, Your Honor. The Defense would challenge the juror Lori Henry, first that in her voir dire examination she made the statement that her opinions on capital punishment and those

opinions that she affirmed from her questionnaire that she would -- that she did have a bias in favor of the death penalty as a punishment for crime as opposed to life and that in answering the Special Issue #1 and Issue #2 that she would -- that the opinions that she held on capital punishment would effect her answers to those two issues and more to Issue #1, more to Issue #2 than Number One but she did indicate it would effect her answer to Number One.

And once she has testified to that she is disqualified and should not rehabilitated.

I think there was testimony that amounted to rehabilitation at a later point.

Secondly as to those same opinions as to her belief about capital punishment perhaps better stated that her opinion, if a person is to be imprisoned for the remainder of his life he should be put to death.

That she indicates directly that in the deliberating in a non-capital murder case and in assessing punishment that that opinion would effect her deliberating and her sentencing.

THE COURT: In a non-capital?

MR. OLD: And in a non-capital and that is to say that she cannot consider the full range of punishment without that bias effecting her, bias

or prejudice effecting her deliberations.

THE COURT: Do you have any other challenges?

MR. OLD: That's all, Your Honor.

THE COURT: Mr. Townsend, do you wish to respond?

MR. TOWNSEND: As to this first challenge, Your Honor, I don't believe the full record indicates that she has a bias toward the death penalty, as to his second challenge, I don't believe her testimony was that she would use any such bias or any such previous position in answering Special Issue #1.

I think if she has expressed an opinion and uses that to Special Issue #2 that is precisely what she is supposed to do.

As far as Mr. Old's allegation, and I'm not who he thinks rehabilitated her testimony since I was not -- did not question her on that area of the law. I don't believe that challenge.

THE COURT: I think he was referring to the Court's rehabilitation.

MR. TOWNSEND: As to "Number 3", I think she clearly testified both in my questioning and Mr. Old's questioning and the Court's

questioning that she could and would consider the full range of punishment in a non-capital case.

THE COURT: I'm going to overrule all challenges on Ms. Henry and I do find her to be qualified.

We are in recess until 9:30 tomorrow morning.

Leo, tell her she is free to go, she is still a prospective juror, we will notify her toward the end of next week.

(Record closed for October 26th, 1994.)

(Whereupon Court was recessed until 9:30 a.m., October 27th, 1994.)

*****

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

STATE OF TEXAS        §
                      §
COUNTY OF TITUS       §


I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on October 26, 1994 and were reported by me.

I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

WITNESS MY HAND this ___31 ST___ day of January, 1995.


_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    Certification Number of Reporter:   149

2    Expiration Date of Certification:   12/31/96

3    Business Address:    Drawer 1868
                          Mt. Pleasant, Texas 75456-1868

4
     Telephone Number:    903/577-6735
5
     Transcribed By:      Tandra K. Gibson
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25