

72102

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 27, 1994

**VOLUME 14 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**FILED IN
COURT OF CRIMINAL APPEALS**

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

VOLUME 14

VOIR DIRE EXAMINATION

OCTOBER 27, 1994                                   PAGE/VOLUME

APPEARANCES . . . . . . . . . . . . . . . .            1/14

MORNING SESSION . . . . . . . . . . . . .              3/14

POTENTIAL JUROR, RONALD WAYNE BOOTH
        EXAMINATION BY MR. TOWNSEND . . .             15/14
        EXAMINATION BY MR. HINSON . . . .             38/14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . .             65/14

NOON RECESS . . . . . . . . . . . . . .               67/14

AFTERNOON SESSION . . . . . . . . . . . .             67/14

POTENTIAL JUROR, BOBBY KEITH PEARSON
        EXAMINATION BY MR. LEE  . . . . .             70/14
        EXAMINATION BY MR. HINSON . . . .             96/14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . .            126/14

DISCUSSION CONCLUDED  . . . . . . . . . .            139/14

POTENTIAL JUROR, BOBBY KEITH PEARSON, (CONTINUING)
        CONTINUING EXAMINATION BY MR. HINSON         143/14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . .            144/14

DISCUSSION CONCLUDED  . . . . . . . . . .            147/14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . .            154/14

RECESS  . . . . . . . . . . . . . . . .              156/14

POTENTIAL JUROR, ALTON DEAN ALEXANDER
        EXAMINATION BY MR. LEE  . . . . .            159/14
        EXAMINATION BY MR. OLD  . . . . .            179/14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
        OF THE POTENTIAL JUROR  . . . . .            216/14

VOLUME 14

VOIR DIRE EXAMINATION

(CONTINUING)

OCTOBER 27, 1994                              PAGE/VOLUME

DISCUSSION CONCLUDED  . . . . . . . . . .      221/14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR  . . . . .    229/14

DISCUSSION CONCLUDED  . . . . . . . . . .      229/14

POTENTIAL JUROR, DANIEL RAY SMYTH . . . . .    230/14

COURT ADJOURNED . . . . . . . . . . . . .      236/14

COURT REPORTER'S CERTIFICATE  . . . . . . .    237/14

*****

1

VOLUME 14

2

ALPHABETICAL INDEX OF

3

POTENTIAL JURORS

4

OCTOBER 27, 1994                                      PAGE/VOLUME

5

POTENTIAL JUROR, ALTON DEAN ALEXANDER
EXAMINATION BY MR. LEE   .  .  .  .  .  .  .  .  .  .      159/14

6

EXAMINATION BY MR. OLD   .  .  .  .  .  .  .  .  .  .      179/14

7

POTENTIAL JUROR, RONALD WAYNE BOOTH
EXAMINATION BY MR. TOWNSEND .  .  .  .  .  .  .  .         15/14

8

EXAMINATION BY MR. HINSON .  .  .  .  .  .  .  .  .        38/14

9

POTENTIAL JUROR, BOBBY KEITH PEARSON
EXAMINATION BY MR. LEE   .  .  .  .  .  .  .  .  .         70/14

10

EXAMINATION BY MR. HINSON .  .  .  .  .  .  .  .  .        96/14
EXAMINATION BY MR. HINSON (CONT.)  .  .  .  .  .          143/14

11

POTENTIAL JUROR, DANIEL RAY SMYTH

12

EXAMINATION BY THE COURT  .  .  .  .  .  .  .  .  .        230/14

13

14

15                                    * * * * *

16

17

18

19

20

21

22

23

24

25

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 27, 1994

**VOLUME 14 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)


APPEARANCES


ATTORNEYS FOR THE STATE OF TEXAS:

      MR. RICHARD TOWNSEND
      District Attorney
      Morris County Texas
      Morris County Courthouse
      Daingerfield, Texas 75638

          and

      MR. RANDY LEE
      Assistant District Attorney
      Cass County Texas
      P.O. Box 940
      Linden, Texas 75563

ATTORNEYS FOR THE DEFENDANT:

        MR. BIRD OLD, III
        Old, Rolston & Old
        P.O. Box 448
        Mt. Pleasant, Texas 75456-0448

             and

        MR. LANCE HINSON
        Law Offices of Danny Woodson
        P.O. Box 399
        Mt. Pleasant, Texas 75456-0399

1            On the 26th day of October, 1994, the

2     above-entitled and numbered cause came on for hearing

3     before said Honorable Court, Judge Gary R. Stephens of

4     Midlothian, Texas, serving by judicial assignment in the

5     District Court of Titus County, Texas, on change of venue

6     from Morris County, Texas, and the following proceedings

7     were had:

8                        THE COURT:    Let the record

9     reflect that there is no juror present.

10                       Mr.  Townsend,  off  the  record  you

11    informed the Court that you had some conversation with

12    a County or District Attorney in South Dakota, would you

13    like to state on the record what you told me?

14                       MR. TOWNSEND:   Yes.

15                       The County Attorney in South Dakota, I

16    don't recall his name right now, but anyway he's the

17    County Attorney, has jurisdiction over the area where the

18    Defendant was arrested and he informed me that the

19    officers up there in addition to getting a consent to

20    search and in addition to doing what they consider to be

21    an inventory search that prior to making any sort of

22    search that they obtained a search warrant.

23                       And he mentioned to me that they have

24    a search warrant law in South Dakota that allows them to

25    get a search warrant by orally dictating into a tape

1   something or another and I don't really understand

2   exactly how that happens and I'm not familiar with the

3   statute.

4   I requested that he send me a copy of

5   the search warrant, a copy of the audiotape, a copy of

6   the statute involved and any other information he has

7   regarding this particular search warrant.

8   He, you know, told me that he will get

9   that information to me as quickly as possible.

10   However, he does have a problem with the

11   tape in that he does not have possession of it and the

12   person who is in possession of it is out of town for a

13   few days.

14   THE COURT:  Mr. Old, you do

15   have a pending Motion to Suppress and as I understand the

16   motion it has to do with a search in South Dakota, is

17   that correct?

18   MR. OLD:  That is correct.

19   THE COURT:  I assume that you

20   were not aware of what Mr. Townsend just told us until

21   this morning?

22   MR. OLD:  No.  I was not

23   aware, I am aware of what he said, I am not aware of what

24   he's talking about.

25   THE COURT:  You have not been

1    privy to any information which he has?

2                    MR.  OLD:   No.   I haven't.

3    That information specifically requested in our Motion

4    for Discovery, the Judge sustained the order on May 18th,

5    1994 and I presumed that the Court is viewing what Mr.

6    Townsend has just told us as a matter of submission of

7    information but the Court is not acting on any motion at

8    this time.

9                    THE COURT:   No.   I am not.

10   I'm just letting the record reflect what Mr. Townsend has

11   learned, whether it will be admissable or not is

12   something we will take up at another time.

13                   MR.  TOWNSEND:   May I ask

14   something?

15                   MR. OLD:   I would certainly

16   further point out Section 18 of our Motion for Discovery,

17   it asks for and requests warrants and affidavits as to

18   what he is describing.  I have never seen anything to

19   indicate that such a thing existed.

20                   We would inform the Court that we really

21   think it has an effect on how quickly we can be ready to

22   start the trial of this case.

23                   I mean, I don't know what the law of

24   South Dakota is and how it would effect a Texas trial.

25   I mean I may in fact actually have to hire a lawyer up

1   there to advise me on that law.  I don't know.  I don't

2   know what I have got to do.

        But I mean I am -- if -- this will

3

4   certainly be made subject to a motion to suppress

5   evidence for an untimely production.

6                   THE COURT:  Mr. Townsend.

7                   MR. OLD:  I'm not asking the

8   Court to rule on anything.

9                   THE COURT:  I have nothing to

10  rule on.

11                  MR. TOWNSEND:  I want to also

12  state that my secretary, Pam, made phone calls back some

13  months ago in regard to this case and particularly asked

14  the officer that was involved in the arrest, I can't

15  recall his name right now, but anyway he was the

16  arresting officer, she asked him was there a search

17  warrant, he said, "No.  We did it based on consent to

18  search and based on inventory search."

19              Apparently he had forgotten there was

20  a search warrant or someone else got the search warrant,

21  I don't know.  But anyway our information was until this

22  attorney called me a couple of days ago was that there

23  was not a search warrant.

24                  THE COURT:  You are telling

25  me that you didn't know your office was aware of a search

1   warrant until a day or two ago?

2                        MR.   TOWNSEND:     Today   is

3   Thursday, it was on Tuesday.

4                        THE COURT:  The 25th?

5                        MR. TOWNSEND:  And not only

6   were we not aware but Pam had made inquiries about that

7   because she, you know, I asked her the question, you

8   know, make sure on that, you know, whether there was a

9   search warrant or warrant, a search warrant, I thought

10  there was not one but I wanted her to make sure.

11                       She made inquiries, she tells me that

12  she made an inquiry about that particular item and the

13  officer said, no, it was just -- just, no, there was a

14  consent to search signed and the search.

15                       THE COURT:  So you are telling

16  me you made an inquiry in good faith, you were unaware

17  of any search warrant until October 25th, 1994?

18                       MR.   TOWNSEND:     Yes,   Your

19  Honor.

20                  No.   Excuse me.

21                       THE COURT:   That would have

22  been Tuesday?

23                       MR. TOWNSEND:  What day did

24  we get out of here early?

25                       THE COURT:   We left early

1    yesterday.

2                    MR.  TOWNSEND:    It  wasn't

3    yesterday, it was one day we stayed until about 5:30, it

4    was not that day, it was the day that --

5                    MR. OLD:  Tuesday.

6                    MR. TOWNSEND:   It would have

7    been Tuesday, it would have been Tuesday.

8                    THE COURT:   The 25th?

9                    MR. TOWNSEND:   Right.

10                   THE  COURT:    All  right.    I

11   still have a pending motion.

12                   Mr. Old, I think the appropriate time

13   for  me  to  take  up  any  issue  concerning  the  newly

14   discovered  evidence  would  be  at  the  time  that  we  have

15   that motion hearing so I am not prepared to act on your

16   motion nor the information he gave you this morning.

17                   MR. OLD:  I am certainly not

18   going  to  be  put  in  the  position  to  argue  his  hearsay

19   statement, hearsay upon hearsay.

20                   THE COURT:  Mr. Old, you also

21   stated off the record that you were not prepared for

22   trial.

23                   I have actually not taken announcements

24   of ready for trial from either side.  I had assumed that

25   both sides were ready for trial but I also want both

1   sides to know if you are not ready it's not going to be

2   a problem with me to give whatever time is necessary for

3   both sides to be ready.

4           Now, I do intend to proceed with voir

5   dire and get a jury selected before we hear any other

6   motions.

7           So I don't think that the Motion to

8   Suppress will even be heard until the latter part of

9   November.

10          MR. OLD: Your Honor, I am not

11  -- if I were -- if I recall correctly I think the Court

12  agreed, you did not ask us for specific announcements of

13  ready.

14          I will tell the Court the morning we sat

15  down to do the general voir dire of the jury or even

16  perhaps the afternoon before I think I indicated to the

17  Court that I was ready and I mean if I did not I was

18  ready.

19          THE COURT: I don't know.

20          MR. OLD: Now as to about 16

21  or 17 or so items of discovery and new witnesses being

22  designated after dates those things should have been

23  furnished me, I cannot say at this point I am ready, I'm

24  trying to review that information and determine the

25  effect of our position of trying this case, whether or

1    not we are ready.

2              But it's coming to pass about every time

3    I resolve an issue I get a new issue and I'm behind,

4    Judge.

5              THE COURT:   I have been in a

6    conference with Judge Moye and Judge Porter and they have

7    been discussing with me the need for their courtroom.

8    They hope that we try the case in December.  I don't know

9    what you all's position is.  I don't care when we try it,

10   in November or December or January, frankly.  It will be

11   tried but I'm not going to force anybody to trial until

12   both sides have had adequate time to prepare so that

13   should not be a problem.

14              As both sides know I am from Dallas so

15   having a few weeks recess between voir dire and the trial

16   would not hurt my feelings at all if I had to go on.  So

17   I will give everybody sufficient time.  But I don't want

18   you to think by that that I'm just going to put this

19   thing on hold forever.

20              Are both sides still prepared to go

21   forward in the voir dire?

22              Mr. Townsend, are you prepared?

23              MR. TOWNSEND:   Yes.

24              THE COURT:   Mr. Old?

25              MR. OLD:   Yes, Your Honor.

1          THE COURT:  The record should

2     also reflect that Mr. Townsend brought to the Court's

3     attention that we have been acting under an improper

4     assumption, the parole law as I believe it to be now

5     requires a minimum sentence of 35 years because the date

6     of this offense was in June of '93 and I believe the

7     statute changed the minimum of 35 to 40 in September of

8     '93.

9          I propose to have the Court Reporter

10    review his notes to find out specifically which jurors

11    we told that parole meant 40 years.

12         Once those jurors are ascertained if

13    there's a need for either side to bring them back and

14    voir dire on the 35 as opposed to 40 I will do so.

15         I would hope that each side will act in

16    good faith if a decision has already been made to strike

17    that juror for other reasons I would hope that you will

18    inform the Court there's no need to talk to them.  But

19    if you do need to talk to them I certainly will honor

20    requests made and bring them in once we determine who

21    they are.

22         Let's proceed with voir dire and at this

23    time we will talk about 35 years instead of 40.

24

25         (Off the record discussion.)

1          THE COURT:   All right.   Who

2     is first?

3

4          RONALD WAYNE BOOTH, Potential Juror #83,

5     was  called  as  a  Potential  Juror  and,  having  been

6     previously sworn by the Court, testified as follows:

7

8          THE COURT:  Good morning, sir.

9          THE  POTENTIAL  JUROR:   Good

10    morning.

11         THE COURT:  Go ahead and take

12    your seat if you would.

13         Did you get your trip taken care of?

14         THE POTENTIAL JUROR:  Yes.

15         THE  COURT:   Mr.  Booth,  I'm

16    Gary Stephens, I am presiding over the jury selection and

17    trial in this case.

18         We have two attorneys representing the

19    State of Texas, we have Mr. Richard Townsend who is the

20    District Attorney from Morris County and then we have Mr.

21    Randall Lee who is an Assistant District Attorney in Cass

22    County and will be the District Attorney in Cass County

23    in January.

24         We have two Defense Attorneys present

25    in the courtroom, Mr. Lance Hinson.

1          MR.  HINSON:    How  are  you
2 doing?

3          THE COURT:   His partner for
4 this case, Mr. Bird Old was with us a moment ago, he had
5 to go tend to another matter, he will be back in just a
6 minute.

7          Sir, next to Mr. Hinson is the person
8 charged, the Defendant, Mr. Billy Wardlow.

9          Mr. Booth, the lawyers have read your
10 questionnaire and they are familiar with your answers,
11 they are going to talk to you about some of those answers
12 and most importantly they are going to talk to you about
13 the principles of law involved in a death penalty case.

14          You will be asked a lot of questions and
15 the answers will tell us whether or not to put you on the
16 jury.

17          In order to be qualified you have to
18 understand and follow the law, you don't even have to
19 agree with the law, it's kind of like filing taxes, you
20 don't have to agree but you have to file and as long as
21 you do it you have complied with the law, that's what we
22 expect of jurors, if you disagree with the law and can
23 follow the law you are qualified, if you disagree so much
24 and to such an extent that you are not able to follow it
25 you are not qualified, that's why we are going to talk

about the law and your ability to follow the law.

Mr. Booth, we have also discovered over years of picking jurors at death penalty cases that although a person may not be an appropriate juror for a death penalty case, even though you may be well qualified there could be something in your background or personal life that would let the lawyers know this is not the kind of case for you so we want to know how you think what you think and how you get to those conclusions.

It's going to seem like you are on trial but you are not.  There are no right or wrong answers, this is not a pop quiz, we are not trying to test you, we want to know how you think and where you are coming from and the only way we know to find that out is to ask questions and have you open up and share your views with us.

We will not be able to tell you whether you are on the jury today, we may be able to release you but we won't be able to tell you you are on the jury.

What we are doing is qualifying and every week or two we will go over the qualified jurors and make decisions who is or is not on the jury so in all probability it will be next week before you find out if you are on the jury.

Do you have any questions, sir?

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1            THE POTENTIAL JUROR:  No, sir.

2            THE COURT:  Mr. Townsend?

3            Before you begin let me ask Mr. Booth

4    one other question; Mr. Booth, you told us that you had

5    a kidney transplant?

6            THE POTENTIAL JUROR:  Yes.

7            THE COURT:  How long ago?

8            THE POTENTIAL JUROR:  Twenty

9    years.

10            THE COURT:  Would there be any

11    reason that you could not sit as a juror for a week?

12            THE POTENTIAL JUROR:  No.

13            THE COURT:  Or two weeks?

14            THE POTENTIAL JUROR:  No.

15            THE COURT:  Mr. Townsend.

16

17            VOIR DIRE EXAMINATION

18            BY MR. TOWNSEND

19

20    Q       Mr. Booth, how are you this morning?

21    A       Just fine.

22    Q       The Judge just took my first question.

23            Mr. Booth, from looking at your

24    questionnaire I have noticed a couple of things I want

25    to ask you about that won't take but just a minute.

1          You indicate that you knew Mr. Old?

2     A          Yes.

3     Q          The other attorney representing the Defendant

4     is Lance Hinson, do you know Lance?

5     A          Yes.

6     Q          Okay.  Let me ask you first about Mr. Old; how

7     well do you know him?

8     A          He represented my sister before in a divorce,

9     I think he has done some stuff for my dad, my sister

10    works for Jimmy White -- my sister -- my wife works for

11    Jimmy White and I know him through them and know him

12    around town.

13    Q          Okay.  Since Mr. Old represented your -- did

14    you say "sister?"

15    A          Yeah.  And he's representing her now.

16    Q          He is now?

17    A          She is in the process of a divorce and he's her

18    lawyer.

19    Q          Okay.  Since he -- he has represented her and

20    currently is representing her and since you know him

21    around town and that sort of thing is there anything

22    about that relationship, whether you might describe it

23    as a friendship or acquaintance or whatever, is there

24    anything about that relationship that would make it hard

25    for you to be fair and impartial or would it cause you

1   to want to lean one way or the other in this trial?

2   A       No.

3   Q       It wouldn't bother you to see Mr. Old on the

4   street a couple of weeks after the trial if is didn't

5   turn out the way he wanted it to?

6   A       No.  Not in the least.

7   Q       How about Mr. Hinson, basically the same

8   question?

9   A       No.

10  Q       How do you know Mr. Hinson?

11  A       School.

12  Q       What?

13  A       High school, went to school.

14  Q       You went to high school with him?

15  A       Yes.

16  Q       And you don't think that with either attorney

17  that would cause you any problem?

18  A       No.

19          I haven't seen Lance in years.

20  Q       Okay.  And I did note you mentioned your wife

21  worked for Jimmy White?

22  A       Yes.

23  Q       Of course Jimmy represents the defendant in

24  criminal -- not this defendant but, you know, at times

25  he does represent defendants in criminal cases?

1    A        Yes.

2    Q        Is there anything about that that would make

3    you partial to one side or the other?

4    A        No.

5    Q        In any way?

6    A        No, sir.

7    Q        Okay.  Do you know anything about the facts of

8    this case?

9    A        No, sir.  I don't.

10   Q        Let me talk to you some then about the death

11   penalty; I have looked at your questionnaire and saw what

12   your answers were on that first page.  If you remember

13   it we had some questions about the death penalty and on

14   there you said that you believed it was appropriate in

15   some murder cases?

16   A        Yes.

17   Q        Your feelings about the death penalty, are they

18   pretty much the same as they have always been or have you

19   had an opinion change at any point in your life?

20   A        No.  They have pretty much always been the

21   same.

22   Q        Okay.  Do you know of any reason why you

23   couldn't serve as a juror in this case and return a

24   verdict that resulted in the execution of this Defendant,

25   if the facts and the evidence was appropriate do you

think you could?

A        Yeah.  I could do that.

Q        You could do it?

A        Yes.

Q        Let me talk to you a little bit about murder in Texas and the different types of murder so far as the law is concerned; in Texas there's murder and then capital murder.

Murder is if you intentionally or knowingly cause someone's death, that's a murder.  Now, that is punishable by five years probation to 99 years or life in the penitentiary, it's not punishable by death.

On the other hand there's another type murder called "capital murder", that's the same murder we talked about plus something else and that "plus something else" is if a police officer, fireman is killed in the line of duty, murder done during the commission of a robbery or burglary or rape or something of that nature.

Are you with me on all this?

A        Yes.

MR. TOWNSEND:  There's a sheet up there that is an indictment -- approach the witness, Your Honor?

1          THE COURT:   You may.

2          MR. TOWNSEND:  Leo has got it.

3          If you will read that to yourself and
4     then I will talk to you about it.

5          Okay?

6          THE POTENTIAL JUROR:   Okay.

7          MR.  TOWNSEND:    That  is  the
8     indictment in this case where the State is charging the
9     Defendant with this crime, can you see after reading that
10    if the State could prove those charges that that would
11    be a capital murder rather than just a murder?

12         THE POTENTIAL JUROR:   Yes.

13    Q          (BY MR. TOWNSEND)  A capital murder in Texas,
14    Mr. Booth, the two choices as to punishment if a person
15    is found guilty of capital murder are life imprisonment
16    and the death penalty and the kind of juror we need in
17    capital murder cases are both people who can be fair and
18    impartial in making their decision both on guilt and
19    innocence and then when the appropriate punishment is a
20    life sentence or the death penalty.

21         In the old days maybe that decision was
22    just made by the jury going back there and saying, "How
23    many vote for life sentence and how many vote for the
24    death penalty",  but the way it is done now is there are
25    -- if a person is found guilty of capital murder then the

1    jury is going to hear some more evidence during what is

2    called "the punishment hearing" and that being all

3    different kinds of evidence and when they hear that

4    evidence then they go back and vote on two questions or

5    two Special Issues and their answers to those Special

6    Issues determine whether the defendant receives a life

7    sentence or death penalty.

8         Now, of course those answers, you would

9    know what the results of those answers would be.  I mean

10   you will know if you answer the question a certain way

11   that the defendant will receive the death penalty and you

12   know if you answer them another way the defendant will

13   receive the life sentence.

14        But you are just answering those two

15   questions, you are not saying, "Well, we decide to give

16   him the death penalty" even though you know what the

17   result of your answers will be.

18        We have got to have the type of juror

19   who can set aside their personal maybe feelings at some

20   point and decide those issues based on the law in the

21   case and follow that law.

22        Will you do that?

23   A        Yes.

24   Q        Do you agree to do that?

25   A        Yes.  I do.

1    Q         We all have disagreements with certain areas

2    of the law but in order to sit on the jury you have got

3    to be able to follow the law even if it's one you

4    disagree with.

5              Do you believe that you could do that?

6    A         Yes.

7    Q         On the first phase of a capital murder case the

8    decision is, is the person guilty or not guilty, did he

9    do it, then when you get to that second phase you are

10   talking about deciding the proper punishment.

11             The kind of juror we need in death

12   penalty cases are those kind of jurors who can listen to

13   the evidence and decide after hearing that evidence

14   whether the person is guilty or not guilty but not make

15   their decision on punishment until after they have heard

16   all that evidence in the punishment hearing.

17             Do you believe you could be that kind

18   of juror?

19   A         Yes.

20   Q         There is a sheet of paper up here, up there,

21   it's kind of a flow chart.

22   A         (Indicating)

23   Q         Yes.  That's it right there.

24             That kind -- it's kind of a flow chart,

25   how a capital murder trial goes.

1          If you will start at the top up here

2     that's the guilt or innocence phase, at that point you

3     are going to hear evidence, you are going to make a

4     decision, if you decide the defendant is not guilty the

5     trial is over, if you decide that the defendant is guilty

6     then you go to that next step, the next phase, that's the

7     punishment phase -- in the middle of the Page 3.

8     (Indicating)

9     A         Yes.

10    Q         And then you are going to hear more evidence.

11         Like I said, that evidence can be of all

12    types of variety, you are going to hear evidence of the

13    family history of the defendant, you may hear

14    psychological evidence, you may hear evidence of past

15    criminal history or history of past bad acts committed

16    by the defendant, that type of evidence, you know, it

17    could be any kind of other type evidence.

18         What I'm asking you, when you heard this

19    evidence during the punishment hearing there is going to

20    be some of that evidence that you probably think is

21    important and there's going to be some of that evidence

22    you think probably is not important.

23         My question is; would you be the fair

24    and impartial juror and be willing to listen and consider

25    all the evidence before casting it aside or before

1   deciding it's important?

2   A        Yes.

3   Q        Would you be able to do that?

4   A        Yes.

5   Q        You know some people have a bias or prejudice

6   against, let's say ministers, some people just

7   automatically think ministers are great or some people

8   don't like them, the same way with psychologists or

9   whoever it is.

10          And not only during the punishment phase

11  but during the entire trial you have got to be able to

12  be fair and impartial toward all the witnesses even if

13  they are -- no matter what their job is or lifestyle,

14  could you do that?

15  A        Yes.

16  Q        Okay.  When you get down -- after you heard

17  that evidence during the punishment hearing then you are

18  going to go to Special Issue #1 and in just a minute we

19  will talk about that, those Special Issues but right now

20  you are going to answer Special Issue #1, if your answer

21  is "No" to that then the defendant would automatically

22  receive a life sentence, if your answer on that is "Yes"

23  then you go to Special Issue #2.

24          Then in Special Issue #2 if your answer

25  to that is "Yes" this defendant gets a life sentence, if

1    your answer is "No" the defendant receives the death

2    penalty so you are going to know even though you are

3    going to be deciding those, the answers what you think

4    is the right answer based on the evidence is to those

5    questions and that's what you are going to be doing but

6    even though you are doing that you are going to know if

7    you answer "Yes" to Number One and "No" to Number Two the

8    defendant gets the death penalty.

9            And you are going to know if you answer

10   them any other way, any other combination -- when I say

11   "you", I don't mean "you individually" but the jury as

12   a whole, if you answer them any other way the defendant

13   is going to receive a life sentence.

14           Okay.  If you will there is a sheet up

15   there marked "Special Issues", read Special Issue #1 to

16   yourself and then we'll discuss it for a minute.

17   A        Okay.

18   Q        Okay.  Special Issue #1 to me is, I don't know,

19   I think it's basically asking you a question about the

20   future dangerousness of the defendant, is that kind of

21   the way it looks to you?

22   A        Yes.

23   Q        Okay.  I'm going to point out a couple of

24   things to you on Special Issue #1, one is that word

25   "probability", probability means that the State is not

1    required to prove to you beyond a reasonable doubt that

2    we can guarantee that he would commit another criminal

3    act of violence or that we are predicting that he would

4    commit another criminal act of violence but we are

5    required to prove to you beyond a reasonable doubt that

6    it's probable so that word "probability" is pretty

7    important because it's not saying it's a certainty or

8    anything like that, just that it's a probability.

9                   Are you with me?

10   A        Yes.

11   Q        Some other wording there that is important, at

12   the end there where at the end of the second line where

13   it talks about criminal acts of violence, the Defendant

14   is on trial for capital murder but there are other

15   criminal acts of violence so it's not required that we

16   prove to you that he commit another capital murder but

17   it's probable that he will commit some other criminal act

18   of violence.

19                   There are many other criminal acts of

20   violence, assault, rape, etcetera, etcetera.

21                   Okay.  Mr. Booth, on Special Issue #1

22   as you an see the State just like in the guilt or

23   innocence phase on Special Issue #1 we are required to

24   prove that to you beyond a reasonable doubt.

25                   Now -- and so basically I believe that

1    Special Issue #1 is pretty much a fact issue, you know,

2    can we prove that to you or not?

3                    And -- but it's a different issue than

4    guilt or innocence, you know, you have already heard the

5    guilt or innocence information evidence and you have

6    decided that the defendant is guilty then you have heard

7    all the evidence at the punishment hearing and after

8    hearing all that evidence then you go back and you decide

9    and you can -- you don't have to close your mind to that

10   evidence you heard during the guilt or innocence phase,

11   you can also use that in formulating your opinion but you

12   have also got to consider that evidence you heard during

13   the punishment hearing.

14                   And my question to you is that, you

15   know, I have had jurors say, "Well, if I find a person

16   guilty of capital murder I am automatically going to

17   answer 'Yes' on Special Issue #1, that he's probably

18   going to be dangerous in the future."

19                   And you can see why they would not be

20   qualified or because they are not being fair and

21   impartial and that they have already made their minds up

22   before they ever hear that evidence at the punishment

23   hearing.

24                   Could you withhold your determination

25   on Special Issue #1 until you have had the opportunity

1    to listen and consider all that evidence at the

2    punishment hearing?

3    A        Yes.

4    Q        Okay.  Special Issue #2, if you would read that

5    over and we'll talk about it.

6    A        Okay.

7    Q        In Special Issue #2 that is -- the wording to

8    that is sort of complicated, what it means to me

9    basically is, okay, we have already decided that this

10   person is guilty of capital murder and we have already

11   decided that he's probably dangerous in the future

12   because if you decided that he wasn't going to be

13   dangerous then, you know, you wouldn't be looking at

14   Special Issue #2, he would have already received a life

15   sentence?

16   A        Yes.

17   Q        So he's guilty of capital murder, he's probably

18   dangerous in the future, Special Issue #2 basically is

19   just -- and that's not an issue we have to prove to you

20   beyond a reasonable doubt or anything, it's just kind of

21   your opinion, the jury's opinion is what it is, your

22   opinion on whether there is sufficient mitigating

23   evidence or circumstances that would cause you to believe

24   that it would be proper to give this person a life

25   sentence rather than the death penalty.

1          And I can't tell you what those

2    circumstances are, circumstances might be.  That's just

3    for the jury to decide based on the evidence you heard

4    during the guilt or innocence phase and based on the

5    evidence you heard during the punishment hearing.

6          My question to you is that I have heard

7    jurors say, "Well, you know, I have decided this person

8    is guilty of capital murder, I have already decided, I

9    have already decided that he's probably going to be

10   dangerous in the future so I'm going to automatically

11   vote 'No' to Number Two because I want to make sure that

12   he gets the death penalty."

13         You see, they are not a qualified juror

14   because they are not being fair and impartial because

15   they are not waiting until they have heard all the

16   evidence and they are not going back and reconsidering

17   all the evidence before making their decision on Special

18   Issue #2.

19         Could you take that Special Issue #2

20   separately and go back and sort of reconsider all that

21   evidence before you make your decision on Special Issue

22   #2?

23   A       Yes.

24   Q       Okay.  You know, mitigating evidence is

25   evidence that can be of all sorts of stuff and that's why

1    I was talking about awhile ago something that you

2    consider to be mitigating, it might not, you know, we

3    might hear the same piece of evidence and have different

4    feelings about it.  You know, some people might think

5    that if a person was intoxicated when they committed a

6    crime they are not quite as responsible as they would be

7    otherwise.  Well, other people might think that wouldn't

8    make any difference so you and another juror might hear

9    the same evidence and might not agree as to whether that

10   was important or not.  But the important thing here is

11   not your opinion on any particular piece of evidence,

12   whether it's the age of the defendant, whether he was

13   intoxicated or not, whether -- anything about family

14   history or not, it's not important and we are not going

15   to pin you down or ask you what you think is important

16   but either myself or the Defense Attorney may at some

17   point as you if you will listen and consider that

18   evidence?

19   A        Yes.

20   Q        Whatever it is, could you do that?

21   A        Sure.

22   Q        Mr. Booth, the law tells us that and I believe

23   the Court will instruct you if you are a juror on this

24   case that prior to your deliberations you will receive

25   some instruction from the Court and I believe among the

1    instructions you would receive will be in determining

2    the guilt or innocence or determining the type of

3    punishment that you would not consider the possibility

4    of parole in any way, instead go -- let's just talk about

5    the sentencing, in deciding whether the defendant should

6    receive a life sentence or death penalty you are just to

7    presume that a life sentence is a life sentence and not

8    consider any possibility of parole in making your

9    decision.

10              Could you do that?

11   A        Yes.

12   Q        When talking about Special Issue #1

13   particularly you are talking about that future

14   dangerousness issue there, in answering that question

15   "Yes" or "No", could you put aside -- I mean, you know,

16   we don't expect you to put these things out of your mind,

17   when I say "Putting aside" you are not expected to put

18   it out of your mind but you are expected to not to

19   consider that in making your decision.

20              Could you do that to Special Issue #1?

21   A        Yes.

22   Q        And Number Two?

23   A        Yes.

24   Q        And I want to talk to you about some more --

25   some general areas of the law rather than just capital

1   murder; the punishment range in a murder case, as I said

2   earlier is five years probation to 99 years in the

3   penitentiary, let's just say, for instance, that you are

4   a juror on a capital murder trial and you decided that

5   the State has proven to you beyond a reasonable doubt

6   that the defendant committed the murder but they didn't

7   prove to you beyond a reasonable doubt that there was a

8   robbery committed.

9           Then you will be faced with a decision

10  where you find the defendant guilty of murder but not

11  capital murder, are you with me?

12  A        Right.

13  Q        Well, if you find a defendant guilty of murder

14  then the range of punishment is not the same as it was

15  for capital murder, it's from five years probation to 99

16  years or life if that's your decision, then you have to

17  look at that range of punishment.

18          Some murders might be extremely vicious,

19  some murders might be an entirely different situation.

20  I think the Judge mentioned mercy killing a couple of

21  weeks ago.

22  A        Right.

23  Q        Could you consider the full range of

24  punishment?

25          When I say that you don't have to agree

1    with that full range of 99 to five years probation but

2    could you consider the full range of punishment?

3    A        Yes.

4    Q        Okay.   The State of Texas in criminal cases

5    is required to prove our case beyond a reasonable doubt,

6    that is -- that's a term that you are familiar with?

7    A        Yes.

8    Q        Of course that's not beyond all doubt but it's

9    beyond a reasonable doubt, that's our burden of proof.

10                And the important thing to remember

11   about that is that that burden rests with us, we have got

12   to prove that the defendant in any criminal case, the

13   defendant is guilty, the Defense on the other hand, they

14   are under no burden at all to prove that the defendant

15   is innocent.

16   A        Right.

17   Q        And is that something that you understand and

18   agree with?

19   A        Yes.

20   Q        Okay.   In that burden of proof along with that

21   goes something that is called the "Fifth Amendment

22   privilege" and that basically is that the defendant has

23   the right not to testify, do you remember that?

24   A        Yes.

25   Q        Are you familiar with that?

1    A        Yes.

2    Q        The important thing is that we have got to have

3    those people on the jury who will make your determination

4    without using any way in making their decision on guilt

5    or innocence the fact that the defendant may have chosen

6    not to testify.

7              That's kind of human nature to be

8    curious as to why a person didn't testify or maybe think

9    that you would like to testify if you are in that

10   position or something like that.

11   A        Right.

12   Q        And again, we are not expecting you to put that

13   out of your mind but you have got to be able to be a fair

14   and impartial juror you have got to be able to give that

15   no consideration when you are making your decision

16   because after all your decision should be based strictly

17   on the evidence presented, not on anything that you don't

18   hear.

19             Could you do that?

20   A        Yes.

21   Q        Mr. Booth, in a criminal trial both during the

22   punishment hearing and during the main part -- the guilt

23   or innocence phase of the trial you are going to hear

24   witnesses of all shapes and sizes and some of them might

25   be psychologists, some of them might be peace officers,

1  you name it.

2  A        Right.

3  Q        The important part is that we have got to have

4  the type jurors who can start each witness out on the

5  same spot and not -- not give a witness a head start in

6  believing them or in thinking that their testimony is

7  important or unimportant, just based on who they are or

8  what they look like or what job title they may have.

9            Could you do that?

10  A        Yes.

11  Q        Mr. Booth, in some criminal cases you will have

12  written statements that are presented into Court, written

13  statements from the defendant.

14            Those statements, once they are -- once

15  you have heard those statements, let's assume that this

16  statement basically amounts to what you might call a

17  "confession."

18            If you heard a statement like that I

19  believe the Court or if that was presented into evidence

20  I believe the Court will instruct you that you would not

21  use that statement as evidence unless you found beyond

22  a reasonable doubt that that statement was both truthful

23  and voluntary.

24            And, you know, "voluntary" when you and

25  I are just shooting the bull might mean one thing,

1    "voluntary" under the law, you know, it means that the

2    person was not coerced.

3    A        Right.

4    Q        That they would have an opportunity to have

5    their Miranda Rights, I think you know basically that the

6    law requires that?

7    A        Yes.

8    Q        But anyway the Judge will instruct you on what

9    would constitute being voluntary in any particular case.

10   The important thing to remember is to be a fair juror.

11              To be qualified you have got to be able

12   to listen to that testimony about the confession, decide

13   whether or not that confession is truthful and voluntary

14   and after that decision is made you decide that that

15   beyond a reasonable doubt we have not proved that

16   confession was voluntary, even if you believe it to be

17   truthful if you decide that it was not voluntary you have

18   got to be able to base your decision on the other

19   evidence and base your decision in no way whatsoever on

20   that statement.

21              Now, again that's one of those

22   situations where we can't expect you to put that out of

23   your mind.

24   A        Right.

25   Q        But we do -- we do have to have those type

1    jurors that while they may not be able to put it out of

2    their mind they can make their decision based on the

3    evidence that was presented, if they decide it's

4    inadmissable and not that statement in any way in making

5    their decision.

6                    Can you do that?

7    A          Yes.

8                    THE COURT:  Thirty minutes.

9                    MR. TOWNSEND:  Not use that

10   statement as evidence, you know, in deciding your answer

11   to Special Issue #1 or Issue #2?

12                   THE POTENTIAL JUROR:  Yes.

13   Q          (BY MR. TOWNSEND)  Okay.  We showed you a

14   little earlier what is an indictment in this case and I

15   think the Judge told you a couple of weeks ago that

16   certainly an indictment is just a charging instrument and

17   is not evidence of anything, cannot be used as evidence?

18   A          Right.

19   Q          You would not do that, would you?

20   A          No.

21   Q          Mr. Booth, I haven't given you an opportunity,

22   I have done most of the talking, is there any question

23   you might have of me or of the Judge or is there any --

24   just things that you feel like you might need to tell us

25   that you would relate to your jury service that we

1   haven't given you an opportunity to say?

2   A        I don't believe so.   No.

3                          MR. TOWNSEND:   I'll pass the

4   juror.

5                          THE   COURT:    Mr.  Old,  Mr.

6   Hinson.

7

8                    VOIR DIRE EXAMINATION

9                      BY MR. HINSON

10

11  Q        Thank you, Your Honor.

12                 Good morning, Ronny.

13  A        Hi.

14  Q        Let me ask you, you understand that I represent

15  Billy Wardlow in this case or me and Mr. Old represent

16  Mr. Wardlow in this case, he has been charged with

17  capital murder, do you understand that?

18  A        Right.

19  Q        And what we do is look for fair and impartial

20  jurors that can sit on Mr. Wardlow's case without taking

21  any other evidence into consideration.

22                 I guess where I -- what I'm asking you

23  some questions about probably would relate to your wife

24  Cathy Booth?

25  A        Right.

Q        Now, you understand my representation of or explain, I guess to the Court my involvement in the case involving your wife, would you explain that to the Court?

A        Who?

Q        Excuse me?

A        Are you talking about you?

Q        Yes.

A        There is a -- well, I'm not sure what is going to take place with that because I'm not sure -- there is some things that is in the process that don't concern, you know, we have been involved in a custody hearing.

THE COURT:  You and your wife?

THE POTENTIAL JUROR:   Yes. Me and my wife and this other guy and there's some things that happened during that trial deal that are coming up and of course when you got a custody deal like we have got you have got one over here and constant back and forth, back and forth.

And I think the other "party" I guess you could call them, has hired Lance as his attorney.

THE COURT:   Your wife's ex-husband or father of the child?  What is his name?

THE POTENTIAL JUROR:   Dale King.

THE COURT:   "Dale King?"

1          THE POTENTIAL JUROR: He hired

2   him, there has been some papers filled but -- no papers

3   filed yet, some papers were filed but nothing has come

4   of it yet, I'm not sure if anything -- we will find out

5   within the next month.

6          THE COURT: Other than support

7   for your wife are you involved in the Court case?  Are

8   you a named party, are you trying to get visitation or

9   custody?

10          THE POTENTIAL JUROR: No.  All

11   this is done settled, all this is bickering back and

12   forward, what the deal is after the year you can have a

13   motion to modify, she filed a motion to modify so she can

14   have standard visitation like she was awarded, he says

15   she can't have it, she wants it, that's what the whole

16   deal is.

17          THE COURT:  If she prevails,

18   if she is the winner because of something that Mr. Hinson

19   does for her is that going to create a problem between

20   you and Mr. Hinson?

21          THE POTENTIAL JUROR:  No.

22          THE COURT:  Are you going to

23   hold it against Mr. Wardlow, that's the basic --

24          THE POTENTIAL JUROR:   No.

25   He's representing him, she is representing herself so,

1      "No."

2                          THE COURT:   Do you have any

3      ill will toward Mr. Hinson at all because of him?

4                          THE POTENTIAL JUROR:   No.   I

5      feel sorry for him but I don't have any ill will for him.

6                          MR. HINSON:    What is your

7      personal opinion of Dale King?

8                          THE POTENTIAL JUROR:   What is

9      my personal opinion of Dale King?

10     Q         (BY    MR.    HINSON,    CONTINUING   VOIR    DIRE

11     EXAMINATION)     Yes.

12     A         Do you -- I don't think you would want to know

13     my personal opinion of him.

14     Q         Is it positive or negative?

15     A         It's not positive, it's the total opposite of

16     positive.

17     Q         As you consider evidence in this case -- let

18     me change ears, I guess really maybe we can see three

19     parts to a capital case, the first part being the jury

20     selection, the second part being the guilt or innocence

21     of the defendant and the third part being the punishment

22     phase.

23                    As you consider evidence in the guilt

24     or innocence of Mr. Wardlow do you think knowing my

25     representation of Dale King is that going to come into

1    play in any manner?

2    A        You representing Dale is not going to have any

3    effect whatsoever on this.

4    Q        My representation of Dale King in a family law

5    matter and you being involved in this case, is your wife

6    going to have any influence on you that may effect Mr.

7    Wardlow in this matter?

8             Can you think of any coercion that she

9    might place on you?

10   A        No.

11   Q        I may have asked this in a different way, say

12   you were deliberating, assuming that you were a juror and

13   you were deliberating on the evidence that was presented

14   whether or not Mr. Wardlow was guilty or not, is there

15   a slight possibility that based on my representation of

16   someone that you have a negative attitude about will that

17   come into play in any manner?

18   A        No.   No.   Negative.

19   Q        Not the slimmest possibility?

20   A        Anything that you have to do is separate from

21   this, it's separate from this, you know.

22   Q        You could disregard this entire matter?

23   A        Yes, sir.

24   Q        When you sat and heard this case?

25   A        Yes, sir.

1    Q        And my presentation of this gentleman's case,

2    assuming that you were a juror, whatever evidence I

3    presented to you, you could consider just the context of

4    this trial?

5    A        Sure.

6    Q        Let me ask you sort of hypothetically, this

7    case may be four to six weeks before it gets to trial.

8    A        Yes.

9    Q        Let's assume that between these four to six

10   weeks the family matter -- the family law matter between

11   Dale King and your wife came up?

12   A        Yes.

13   Q        And your wife, let's assume the Judge ruled

14   adversely to her, she did not get what she requested.

15   A        Yes.

16   Q        Assuming that possibly the Judge awarded

17   attorney fees to Dale King, assume the worst possible

18   situation.

19   A        Okay.

20   Q        Assuming -- let's assume that he did decrease

21   visitation instead of increase visitation, is that going

22   to have any effect of you serving as a juror after that

23   point?

24   A        No.  It's not.

25   Q        You are going to be able to set aside any

1    detriment that your wife may receive from a Court order

2    in a family law matter between she and Dale King and then

3    later on come in and hear this evidence that I or Mr. Old

4    may present to you and you will consider that evidence

5    strictly from this case?

6    A          Right.

7    Q          Now, Mr. Booth, there's a Witness List up

8    there, just a -- I will just ask you to take a minute and

9    read down through here and as you read them if you see

10   one that you know or are acquaintance of or heard their

11   name would you just tell me who that is?

12   A          I don't know any of them.

13   Q          Now, I have a three-page list of witnesses,

14   have you looked over the entire three-page list?

15   A          Right.

16   Q          And each name that is listed on those three

17   pages you have no personal knowledge of any of those

18   person's names?

19   A          No.  I don't know any of them.  No.

20   Q          Mr. Townsend asked you a little bit about or

21   went over with you I guess lesser included offense of

22   murder, there is capital murder, murder, that could also

23   be considered by a juror, also went over the range of

24   punishment in a murder case, a five to 99 years in the

25   State penitentiary or life sentence.

1          And I represent to you that if you found

2     the defendant guilty of murder that if you assess less

3     than 10 years or less as that defendant's punishment that

4     he could receive probation?

5     A          All right.

6     Q          Now, in this or in my -- I guess in any case

7     if you were sitting on that case and you found the

8     defendant guilty of murder, not capital murder, could you

9     consider the aspect of that person being placed on

10    probation?

11    A          Yes.

12    Q          And you understand probation, there would be

13    no jail time, they would be placed back into society on

14    probation and see their probation officer monthly

15    usually?

16    A          Yes.

17    Q          From looking at your questionnaire which I

18    think affirms your answer that you consider the death

19    penalty appropriate under the proper circumstances?

20    A          Right.

21    Q          Is that still your opinion here today?

22    A          It is.

23    Q          Of course we mention 10 years as 10 years or

24    less, as far as considering five years if you found a

25    person guilty of murder and not capital murder could you

1   consider as punishment for that crime a five year

2   probated sentence?

3   A        Yes.  If the circumstances, you know, called

4   for it.  Yeah.

5   Q        What kind of circumstances would call for that

6   kind --

7                    MR. TOWNSEND: Your Honor, I'm

8   going to object.  I don't believe that he's required to

9   tell under which situation he would give a certain

10  sentence.

11                   THE COURT:  Sustained.

12                   MR. HINSON:  But, Mr. Booth,

13  on the document marked "Special Issues", did you find

14  that document?

15                   THE POTENTIAL JUROR:  Yes.

16  Q        (BY MR. HINSON)  And I understand that you have

17  read Special Issue #1?

18  A        Right.

19  Q        From the evidence presented you would find

20  beyond a reasonable doubt that there is a probability

21  that the defendant would commit criminal acts of violence

22  that would constitute a continuing threat to society.

23                   What that says is not that there is a

24  probability but that you find beyond a reasonable doubt

25  that there is a probability?

1   A        Yes.

2   Q          Would you agree with me that that would be a

3   higher burden that just a mere probability --

4                          MR. TOWNSEND:   Your Honor, I

5   want to object.   I don't believe that meets the standard

6   there, the legal standard is "probability", the State is

7   required to prove that probability beyond a reasonable

8   doubt.

9                          THE COURT:   Sustained.

10                      I will let you inquire as to what

11  probability means to him.

12                          MR.  HINSON:     You   see   the

13  highlighted "probability"?  (Indicating)

14                          THE POTENTIAL JUROR:  Yes.

15  Q        (BY MR. HINSON)   What would be your personal

16  definition of "probability?"

17  A          "Probability" is going to be, I guess you

18  consider -- I guess you know a person's past or whatever,

19  whether or not they are going to do something I guess if

20  you --

21                          THE COURT:   He's asking you

22  what "probability" means.

23                      Does it mean "more likely than not?"

24                          THE POTENTIAL JUROR:  I don't

25  remember.   It means more than likely going to happen,

1    yes.  "Probability" means it's pretty sure it's going to

2    happen sooner or later.

3                    MR. HINSON:  On Special Issue

4    #2, some question there about mitigating circumstances

5    to warrant whether a sentence of life rather than a death

6    sentence should be imposed.

7                    I guess -- what is your definition or

8    what would you say "mitigating evidence" would cause --

9    would be?

10                   THE  POTENTIAL  JUROR:    What

11   would be "mitigating evidence?"

12                   It would be -- well, you want to know

13   what I think "mitigating" is?

14   Q          (BY MR. HINSON)  Yes.

15   A          Just  special  circumstances  of  whatever  was

16   happening at the time or whatever something --

17   Q          Would "mitigating circumstances" be  for  or

18   against someone?

19   A          It would depend on -- it would depend on the

20   situation on what was -- whatever happens, I mean it's

21   kind --

22   Q          In regard --

23   A          "Mitigating", I can think of kind like he says

24   when he was here the first time, if I walked in and

25   caught my wife in bed with someone else I might shoot

1    both of them, to me it would be kind of mitigating, she

2    was screwing around, that would be kind of a circumstance

3    there that I would take them both or something like that.

4    Q          In considering a criminal act offense would

5    mitigating evidence to you be someone's age, whether it

6    be a young age or old age?

7                    MR. TOWNSEND:  I object, Your

8    Honor, he's not required to tell us what he considers

9    mitigating or what he considers not mitigating.

10                   It's an improper question, "Would he

11   consider that?"

12                   THE   COURT:     Agree   with

13   Counsel.

14                   You may ask him whether he would

15   consider it or whether he would just automatically

16   exclude that.

17                   MR.   HINSON:      Regarding

18   mitigating evidence; would you have the fact of the

19   defendant's age as mitigating evidence as to his

20   blameworthiness for the crime, for the -- as it is stated

21   in the indictment?

22                   THE POTENTIAL JUROR:   You

23   know, any -- you know stuff that was put up, yeah, I

24   would consider it.

25   Q          (BY MR. HINSON)  Would evidence, whatever that

1    evidence might be of the defendant's family history,

2    would you consider that as mitigating evidence?

3    A        Yes.

4    Q        To the offense?

5    A        Yes.

6    Q        Assuming that there was psychological evidence

7    presented to you, would you consider that as mitigating

8    evidence?

9              MR. TOWNSEND:  Your Honor, I

10   want to object to that again, the form of his question

11   is, "Would he consider something as mitigating evidence",

12   I think what he's asking, whether it's intended or not,

13   what he's asking the juror is will he consider something

14   to be mitigating?

15             THE COURT:  I agree that the

16   way it's being asked may very well be trying to commit.

17   I don't think that's your intent, Mr. Hinson.

18             MR. HINSON:  No, Your Honor.

19             THE COURT:  But I think the

20   way the question was asked it may very well be trying to

21   commit the juror.

22             MR. HINSON:  Okay.

23             THE COURT:  I think it would

24   be more appropriate if you would just maybe ask the juror

25   if in considering whether or not there was mitigating

1   evidence if he will consider such factors as a; family

2   background and whatever else you wish.

3                              MR. HINSON:  All right.

4                    Mr. Booth, if there were mitigating

5   evidence presented to you would you consider such

6   factors?

7                    I believe you already stated that you

8   would consider the factors of the age of the defendant?

9                              THE POTENTIAL JUROR:  Yes.

10  Q        (BY MR. HINSON)  Would you consider the fact

11  of such as family history of the defendant?

12  A        Yes.

13  Q        Would you consider psychological evidence?

14  A        Yes.

15  Q        Assuming that this evidence was presented?

16  A        Yes, sir.

17  Q        You can consider that?

18  A        Yes.

19  Q        Can you consider religious history of the

20  defendant?

21  A        Yes.

22  Q        Could you consider the defendant's educational

23  background?

24  A        Yes.

25  Q        Mr. Booth, you went over briefly a little bit

1    about the Fifth Amendment and you understand the Fifth

2    Amendment of the United States Constitution allows a

3    defendant the right to remain silent in a criminal trial?

4    A        Right.

5    Q        If the defendant did not testify in the guilt

6    or innocence phase of this trial how would that effect

7    your deliberation?

8    A        I don't think it would.

9    Q        If the defendant did not testify in either the

10   guilt or innocence stage of the trial and neither the

11   punishment phase of the trial could you still consider

12   a life sentence or the death penalty in this case?

13   A        Yes.

14   Q        If the defendant did not testify in either the

15   guilt phase or punishment phase of the trial could you

16   still consider -- you understand the indictment is --

17   it's a capital murder indictment, could you still

18   consider the lesser included offense of murder?

19   A        Yes.

20   Q        Could you consider the minimum punishment of

21   five years probation?

22   A        Yes.

23   Q        You talked a little bit about the death

24   penalty, a little bit about life sentence as the two

25   options if the defendant was found guilty of capital

1    murder, you went over that a little bit with Mr.

2    Townsend?

3    A       Right.

4    Q       And based on your questionnaire that the death

5    penalty would be appropriate under the proper

6    circumstances are you saying that even if you found the

7    defendant guilty, and I believe you may have answered

8    this question, even if he was found guilty of capital

9    murder you could still consider the punishment phase to

10   give the defendant either a life sentence or the death

11   penalty, either one?

12   A       Right.

13                  THE COURT:   It has been 32

14   minutes.

15                  MR. HINSON: And assuming that

16   you were on the jury that found the defendant guilty of

17   capital murder, would there be any automatic finding in

18   your mind that he would be a threat to society in the

19   future based on that decision and punishment -- I mean

20   in the guilt or innocence?

21                  THE POTENTIAL JUROR:   No.

22   Q       (BY MR. HINSON)  So once you found or as part

23   of the jury you found the defendant guilty of capital

24   murder you could come back and look at the evidence

25   presented to you at the punishment phase and determine

1    from all the evidence whether or not there would be a

2    continuing threat for Mr. Wardlow?

3    A        You know, after taking into all consideration

4    of everything, yes.

5    Q        Consider it mitigating evidence if it were?

6    A        Depending on what all were there, make a

7    decision off of that.

8    Q        You wouldn't make a decision at the guilt

9    phase, though?

10            Do your beliefs cause you to be more

11   inclined if you found a person guilty of capital murder,

12   your feelings on the death penalty, would these cause you

13   to find a person or cause you to be more inclined to find

14   a person a future threat to society a little more one way

15   or the other?

16   A        No.

17   Q        If you found the defendant guilty how would the

18   prospect of handing out the death penalty as part of the

19   jury effect your deliberations?

20   A        Say that again.

21   Q        Once you get through the guilt phase of the

22   trial?

23   A        Right.

24   Q        The defendant was found guilty of capital

25   murder, you are looking at two punishments, a life

1    sentence versus the death penalty?

2    A       Right.

3    Q       And you state under the proper circumstances

4    that the death penalty is warranted in some cases?

5    A       Yes.

6    Q       Is there any effect on you regarding you as

7    part of the jury handing down a death penalty that would

8    effect your deliberations in that manner?

9    A       No.

10   Q       Now, Mr. Booth, on your questionnaire on Page

11   10 at the bottom you stated that you didn't have any

12   personal feeling about law enforcement in general or

13   police officers in particular but on the previous page

14   you listed hey, it requests, list three men and three

15   women whom you most respect and you listed John Moss and

16   Ricky Poole, "John Moss" being the Sheriff of Titus

17   County, "Ricky Poole" being the Chief Deputy.

18               What is your relationship with John

19   Moss?

20   A       Just a friend.

21   Q       Is he a social acquaintance?

22   A       No.  We are just around town or whatever, you

23   know, I have known him ever since I have lived here,

24   about 20 years.

25   Q       And Ricky Poole, what is your relationship?

1    A       About the same, just known him from ever since

2    I moved here, you know, when I was in high school running

3    around, that type stuff.  Just a friend.

4    Q       Would  your  knowledge  of  them  effect  your

5    ability to be fair and impartial in hearing the evidence

6    here that will be presented in this trial?

7    A       No.

8    Q       In  this  trial  there  will  be  several  police

9    officers  possibly  --  probably  the  Sheriff  of  Morris

10    County, other deputies that will testify, would you give

11    their testimony any more credibility than you would the

12    person off the street?

13    A       No.

14    Q       So you are saying that any witness, assuming

15    that you were a juror, any witness that takes the witness

16    stand, they will all start on the same -- same position?

17    A       Right.

18    Q       And you will determine their credibility based

19    on what they say from the witness stand?

20    A       Right.

21    Q       Whether or not they are the Sheriff of Morris

22    County or a family member of Mr. Wardlow?

23    A       They are all the same.

24    Q       Have  you  looked  over  the  Witness  List  for

25    Morris  County?   Do  you  know  any  officers  in  Morris

1   County?

2   A        No.  I don't.

3   Q        Any constables?

4   A        No, sir.

5   Q        Have you or friends or relatives ever been

6   involved in a criminal case either as a victim or

7   defendant or witness in that case?

8   A        No.

9   Q        Are you related to anyone or know anyone that

10  died as a result of suspected criminal activity?

11  A        No.

12  Q        Now, you stated at the time that your

13  questionnaire was filled out that you didn't have any

14  knowledge of the facts of this case through any source?

15  A        No.

16  Q        Have you received any knowledge since the time

17  you filled out the questionnaire?

18  A        No.  I haven't.

19  Q        And you state that the decedent, Mr. Carl Cole,

20  that you didn't have any personal knowledge of him during

21  his life?

22  A        No.

23  Q        Has anyone discussed Mr. Cole with you since

24  that time?

25  A        No.

1   Q       Do you have an opinion as to whether or not a

2   person is probably guilty because of a criminal charge

3   has been brought against that person?

4   A       No.   Just because somebody is charged with

5   something doesn't mean anything.

6   Q       You are willing to start with the proposition

7   that they are presumed innocent whatever they are charged

8   with?

9   A       Right.   Right.

10  Q       Some people have religious convictions or just

11  personal convictions that an eye for an eye or tooth for

12  a tooth is proper punishment.

13  A       Yes.

14  Q       Is life for a life, is that inside you in any

15  way, that proposition?

16  A       No.   Not me.   I mean not just cut and dried.

17  No.

18  Q       So based on your questionnaire you stand by or

19  you still would stand by your --

20  A       It's whatever I put on there, I forget how I

21  put it.

22  Q       That the death penalty would be proper in some

23  situation even where it may not be appropriate in other

24  cases where a victim may have died as a result?

25  A       Right.   Right.

1  Q       You talked a little bit about the indictment,

2  you looked at the indictment and you would consider the

3  indictment as no evidence in this case?

4  A       No.  It's not.

5  Q       As you considered the punishment phase of the

6  capital murder trial where the defendant was found guilty

7  of capital murder and you know that you are required to

8  answer those Special Issues and you have looked at those

9  before, you answer those Special Issues, would you

10 consider the death penalty first and then the life

11 sentence?

12 A       No.

13 Q       Would you consider them both at the same time

14 and give them equal consideration before answering

15 Special Issue?

16 A       Yes.

17 Q       Could you consider a life sentence in a capital

18 murder case where the defendant is found guilty?

19         I believe I asked you -- where the

20 defendant did not testify?

21 A       If I understood that right you mean if he

22 didn't testify would I hold that against him?

23 Q       Yes.

24 A       No.

25 Q       If there were no mitigating circumstances could

1  you still consider a life sentence versus the death

2  penalty?

3  A        Yes.

4  Q        There is an exhibit up there that is

5  typewritten on one page, it's "Number 6", about halfway

6  down that page or a little more than half the paragraph

7  starts "Reasonable doubt is a doubt based on reason and

8  common sense after a careful and impartial consideration

9  of all the evidence in the case, it is the kind of doubt

10  that would make a reasonable person hesitate to act in

11  the most important of his own affairs."

12        Would you accept that reasonable doubt

13  definition as your own definition?

14  A        Yes.

15  Q        And you would require proof beyond a reasonable

16  doubt based on that definition?

17  A        Yes.

18  Q        As we have talked over this and as you filled

19  out these and have been present for our jury voir dire

20  have you formed any opinion as to the guilt of the

21  defendant?

22  A        No.

23  Q        During the course of a criminal trial and the

24  punishment phase there might be evidence of prior bad

25  acts or prior convictions of a defendant, could you

1   consider the age and seriousness of those offenses of

2   prior bad acts in assessing whether or not the defendant

3   would be a continuing threat to society?

4   A       Yes.

5   Q       Do you have any opinion regarding repeat

6   offenders?

7   A       No.  Not really.

8                   THE COURT:  Five minutes.

9                   MR. HINSON: Mr. Booth, I note

10  that you were unemployed when you filled this out?

11                  THE POTENTIAL JUROR:  Yes.

12  Q       (BY MR. HINSON)  Are you still unemployed?

13  A       So far as full time job, yes, sir.

14              All I do right now is substitute teach.

15  Q       Is that the Titus County Mount Pleasant

16  Independent School District?

17  A       Chapel Hill and the surrounding areas.

18  Q       Are you able to make you payments on what you

19  are making?

20  A       Yes.  Between me and my wife we make it.

21  Everything I have got is paid for.

22                  THE COURT:  Must be nice.

23                  MR.  HINSON:    If  you  were

24  involved as a juror in this case for let's say maybe two

25  weeks?

THE POTENTIAL JUROR:   Yes.

Q         (BY MR. HINSON)   You weren't able to work as a substitute teacher, would that be any particular hardship on your case?

A         No.  They don't pay that much, it wouldn't be that big a loss.

Q         Now, in your own opinion based on everything that we have presented to you, we have talked about your knowledge of the life sentence versus the death penalty and what a life sentence in years may mean, the parole possibility?

A         Yes.

Q         Based on your own life experiences and whatever limited knowledge of this case that you have would that cause you to lean toward finding the defendant guilty of this crime?

A         No.

Q         Would it cause you to lean toward assessing the death penalty in this case?

A         No.

Q         And as we talked about previously regarding the matter with your wife, is it still your position that you could be fair and impartial as you sat, assuming that you were selected as a juror, that you sat as a juror, that you could make your decision an impartial and honest

1    decision based on the evidence presented to you during

2    the course of this trial?

3    A        Because of the deal between us?

4    Q        Right.

5    A        Yeah.  Because this deal between you, you know

6    as well as I do that won't come up for months, by the

7    time you get through filing stuff and we get through

8    filing stuff that won't happen for months, this will be

9    long since over with.

10   Q        Whatever feelings you may have for my

11   representation in this matter your wife's father of her

12   child you would have no -- no ill feeling toward me as

13   we presented evidence in this case?

14   A        No.  No.

15   Q        Has Mr. Old represented Cathy Booth in the

16   past?

17   A        Yes.  He has.  Yeah.

18   Q        Is there anything in that representation that

19   would effect your decision-making ability in this case?

20   A        No.

21   Q        Would Mrs. Booth, Cathy Booth put any pressure

22   on you to find in such a way as to possibly embarrass Mr.

23   Old or myself?

24   A        No.

25   Q        Mr. Booth, I notice that you stated that you

1    were a moderate Democrat, is that still accurate?

2                    I understand the difference between a

3    liberal and moderate and conservative.

4    A         Yeah.

5    Q         You put yourself midstream.

6                    What is your particular line of work

7    that you usually do?

8    A         Mainly it's mainly in the sales deal, when it's

9    selling I have sold insurance for four or five years, we

10   had a furniture store in Tyler, sold furniture, mainly

11   selling.

12   Q         One question I didn't ask you is regarding Mr.

13   Townsend and Mr. Lee; do you have any personal knowledge

14   of Mr. Townsend or Mr. Lee in any manner?

15   A         No.  I don't.

16   Q         Never been represented by either one of them

17   in any capacity?

18   A         No.

19   Q         Do  you  know  anyone  that  has  ever  been

20   represented by either one of them in any capacity?

21   A         Not that I can think of.  No.

22   Q         Do you actually know where they are from?

23   A         Daingerfield, I think.

24   Q         We talked a little bit about Mr. Cole, the

25   decedent, do you know where this -- or where the decedent

1   resided at?

2   A        No.  I don't.

3   Q        Are you familiar with Cason very much?

4   A        I just know where it is.

5                          THE COURT:  Time to wrap it

6   up, Mr. Hinson.

7                          MR. HINSON:  Do you have any

8   friends or family in Cason?

9                          THE POTENTIAL JUROR:  No.

10                         MR. HINSON: Pass the witness,

11  Your Honor.

12                         THE COURT:  Sir, if you will

13  step down and go back into the waiting area I will bring

14  you back in a moment or send directions to you.

15                         THE BAILIFF: Watch your step.

16

17                         (The  following  occurred  outside  the

18  presence and hearing of the potential juror:)

19

20                         THE COURT:  Does  the  State

21  have any challenge for cause?

22                         MR. TOWNSEND: No, Your Honor.

23                         THE COURT: Mr. Hinson, do you

24  have any challenges?

25                         MR. HINSON:  No, Your Honor.

1        THE COURT:  All right.  Tell

2   Mr. Booth that we will let him know something toward the

3   end of next week about his jury service and thank him for

4   coming in.

5        I don't think we have time to finish the

6   next guy before lunch, we also have two to go.

7        From what you told me yesterday you

8   don't see any reason that either one of them will be

9   particularly quick, is that still the way you all feel?

10       We have got two left from this morning,

11  two from the afternoon, we can't do four this afternoon

12  so I guess we should cancel the two for this afternoon.

13       Bobby, just call them and tell them.

14       THE DISTRICT CLERK:  I will

15  see if I can get hold of them, it may not be possible to.

16       MR. TOWNSEND:  Your Honor,

17  this Mr. Alexander --

18       THE   COURT:   The   police

19  officer?

20       MR. TOWNSEND:  The police

21  officer, his answers on the questionnaire are the very

22  middle of the road, there might be a possibility that he

23  could hold but I don't know.

24       THE COURT:  See if you can

25  cancel the last one and we'll let one of them come in and

1    see how it goes.

2                          So  we  will  just  recess  until  1:00

3    o'clock and we will start up at 1:00.

4

5                          (Noon recess.)

6

7                          (Afternoon session.)

8

9                          THE  COURT:    Bring  in  Mr.

10   Pearson.

11                          THE BAILIFF:  Yes, sir.

12                          Watch your step and just have a seat up

13   there in the chair, please.

14

15         BOBBY  KEITH  PEARSON,  Potential  Juror  #8,

16   was  called  as  a  Potential  Juror  and,  having  been

17   previously sworn by the Court, testified as follows:

18

19                          THE COURT:    Good afternoon,

20   sir.

21                          THE POTENTIAL JUROR:    Hello.

22                          THE COURT:  Go ahead and take

23   your seat.

24         And you are Bobby Pearson?

25                          THE POTENTIAL JUROR:  Yes.

1          THE COURT:  Mr. Pearson, I am

2     Gary Stephens, I'm presiding over this trial.

3          First I appreciate your patience with

4     us, we have been rescheduling you and keeping you on hold

5     more or less and we never know how long we are going to

6     talk to a juror.  Sometimes we may talk to a juror for

7     an hour, sometimes two hours so we try to schedule people

8     to be the least inconvenienced as possible but it just

9     doesn't always work.  So thanks for your patience with

10    us.

11         Sir,    we    have    got    two    lawyers

12    representing the State of Texas, we have the District

13    Attorney from Morris County, Mr. Richard Townsend.

14         THE POTENTIAL JUROR:  Yes.

15         THE    COURT:    We    have    the

16    District Attorney from Cass County, Mr. Randall Lee.

17         There are two Defense Attorneys, Mr.

18    Bird Old, Mr. Lance Hinson.

19         Next to Mr. Hinson is the Defendant, Mr.

20    Billy Wardlow.

21         Now, Mr. Pearson, the lawyers have read

22    your questionnaire and they are familiar with your

23    answers, they are going to talk to you about some of your

24    answers and they are going to talk to you about the

25    principles of law involved in a death penalty case and

1   you are going to be asked a lot of questions that will

2   let us know whether or not to put you on the jury.

3           In order to be qualified you must be

4   able to understand and follow the law.   You don't

5   necessarily have to agree with the law, it's kind of like

6   filing income tax, you may not want to, you may not agree

7   with it but as long as you do it you are complying with

8   the law.

9           If there's some aspect of our law that

10  you don't agree with but you can still follow the law you

11  are qualified but if there is some part of our law that

12  you just disagree with so much that you can't follow it

13  then you are not qualified.

14          So we need to know what you think about

15  the laws that will be involved in this type of case and

16  the only way we can find out what you think is to ask.

17          We have also found that being qualified

18  doesn't necessarily mean that you would be an appropriate

19  juror for a death penalty, often there's something in a

20  person's view or background that doesn't disqualify them

21  yet it lets us know that he, maybe he or she would just

22  be better off as a juror in another case.

23          So we are going to talk to you now about

24  the law and the lawyers will want to know something about

25  how you think and how you get to your opinions and

1    conclusions.   The only way we know how to do this is by

2    asking questions and there's no right or wrong answers,

3    they are just questions and there's no right or wrong

4    opinions, whether we agree or disagree with you is

5    totally immaterial, it's your opinions that we need to

6    find out about.

7              So I hope that you will just open up and

8    be honest with us and don't worry about the answers, like

9    I said, it's immaterial, they will let us know whether

10   or not to put you on the jury but we do expect you to be

11   honest and open with us and we'll try to make this as

12   short as possible.

13             Do you have any questions before we

14   start?

15                        THE POTENTIAL JUROR:   No.

16                        THE COURT:   Mr. Lee.

17

18                    VOIR DIRE EXAMINATION

19                      BY MR. LEE

20

21   Q        Mr. Pearson, I am as the Judge mentioned, Randy

22   Lee, I'm from Cass County, it's a little bit far from

23   here to know much about you but as the Judge said, we are

24   not trying to pry, we just want people that can listen

25   to all the evidence and follow the law, decide fairly.

1          This is a death penalty case so it's not

2     like any other jury that you may have served on in that

3     we don't ask the jurors as a group a bunch of questions

4     and then decide, we ask them individually.   That's why

5     you are in here individually and it's to give us a chance

6     to get to know you a little bit better.   This is our only

7     time to ask you questions, after today you give us a

8     response, we can't ask you anything, you will give it

9     through your verdict and through listening if you are on

10    the jury.

11         And there's no right or wrong answer as

12    the Judge mentioned.

13         Frankly if I was to be asked to be on

14    the jury and some of my relatives were on trial some of

15    them I would believe them no matter what, I don't care

16    what the evidence is, I'm going to believe them and other

17    relatives, some of my other relatives I wouldn't believe

18    anything they say so it wouldn't be real good for me to

19    serve on some of those juries.

20         We have got your questionnaire and I

21    believe you stated that you believe in the death penalty

22    and you believe it ought to be used on serious cases, is

23    that correct?

24    A          That is correct.

25    Q          And that is that you are -- that has been your

1   belief all of your life or has that been changed?

2   A        I guess I have always felt that way.

3   Q        We are going to give you some examples and ask

4   you various questions.

5            For instance, the questionnaire talked

6   about murder but really on a death penalty it has to be

7   capital murder and in order for you to understand the

8   difference I'm going to have to explain a little bit; in

9   Texas murder, that's the intentionally and knowingly

10  killing someone is murder.  If I walk up to you or to

11  someone and just shoot them that's murder.

12           In order to be capital murder it has to

13  be murder plus something else and the law specifically

14  decides, says what that can be, for instance, if I walk

15  up and kill someone for money, if someone hires me to

16  kill them that can be capital murder or if I kill more

17  than one person or I am robbing a bank and kill somebody

18  or committing any kind of robbery, any kind of rape,

19  burglary, etcetera, it's murder plus something else.

20           Can  you  kind  of  understand  the

21  distinction there?

22           It's not just an ordinary murder.

23  A        Yes.

24  Q        Could you personally vote for the death penalty

25  in the right kind of case if you were on the jury and you

1    were the last juror to vote, all the 11 people voted

2    ahead of you and as a result of your vote it would result

3    in a death penalty verdict and you believe that it was

4    justified, could you be that last person to vote to where

5    your vote was the one causing someone else's death?

6    A        I have never been in that situation.    It

7    wouldn't be easy but I feel like I can.

8    Q        It's hard to think about it, most people don't

9    think about that until the time comes and that's why we

10   are asking the questions.

11              We are seeking the death penalty in this

12   case.

13   A        I understand.

14   Q        It's a bad case in our mind and that's what we

15   are going to ask for so that's why we want to know, can

16   you do it and if you can do it can you follow the law?

17              Texas has a two-part trial, that is we

18   have a guilty/innocence portion of the trial where all

19   the evidence we introduce is evidence as to guilt, did

20   a defendant do what they are charged with?

21              We don't -- we don't introduce evidence

22   as to punishment at that time, we are just trying to

23   prove that he did what he was charged with and then at

24   the conclusion of that the jury goes out and decides is

25   he guilty and if so what of.

1     Then we have a punishment section to

2     where we offer evidence as to, okay, now, you found him

3     guilty, what are you going to do with him?

4     And we offer -- the other side offers

5     evidence in both parts of the case as to what should be

6     done now that he's guilty of whatever, what shall we do

7     with him?

8     Of course if you find him not guilty

9     during the first part of the trial we don't go to the

10    second part and it's all over.

11    But under a capital case it's a little

12    bit different, let me -- it's a little bit more -- in

13    order to serve on a jury you have to be able to consider

14    the Judge's instructions in order -- for instance, in a

15    capital case he will give you some instructions, I

16    believe you will have a copy of it up there, it will --

17    if I can find it here -- called "Special Issues", it's

18    a -- it has two parts entitled "Special Issue."

19    If you have found a person guilty of

20    capital murder the Judge will give you instructions, a

21    lot of instructions but that is the basic one on Special

22    Issue #1.

23    Could you read that, please, kind of

24    slow and then I will ask questions on it.

25    That is talking about probability that

1    the defendant will commit future acts of violence.

2           What the law requires that even though

3    you found a person guilty of capital murder that you have

4    to withhold what you are going to decide to do with him

5    until all the evidence comes in and when all the evidence

6    -- at the conclusion, you can't make up your mind

7    beforehand, you have got to wait and hear our side, you

8    have got to hear the Defense side and you have got to be

9    able to consider, that is think about all the evidence

10   that is introduced before you make up your mind.

11          And on that we are talking -- we are not

12   talking about will a defendant commit necessarily a

13   future murder but it's a future act of violence.

14          That can be as little as punching

15   someone in the nose or it could be rape, you know,

16   various other -- you know, various other offenses.  And

17   we are required to prove that beyond a reasonable doubt,

18   reasonable doubt that he will probably -- there is a

19   probability he will commit future acts of violence.

20          If you found someone guilty could you

21   withhold judgment as to what should be done or withhold

22   judgment as that Special Issue and not immediately say

23   just because he did it he's going to do it again and wait

24   and listen to all the evidence, wait and go to that

25   Special Issue?

1    A        I feel like I can.

2    Q        And at the punishment stage we are just going

3    to offer evidence as to what should be done with him, is

4    he, you know, we may bring in reputation witnesses, we

5    may bring in other bad acts or threats or other crimes

6    that he may have done.  I'm not saying we will but we may

7    bring in that and also the Defense will bring in probably

8    evidence, things along in mitigation but you could

9    restrict your decision until the proper order?  The law

10   requires that you can't jump from one point finding him

11   guilty to finding -- to wanting the death penalty, that

12   you have to do it in order to make your decision based

13   on the evidence as it comes in.

14            Do you think that you could do that,

15   follow the instructions?

16   A        Yes.

17   Q        Special Issue #2, just below that, could you

18   read that?

19   A        Okay.

20   Q        That's a lot more complicated, to me it is

21   anyway.

22            That's basically talking about

23   mitigating evidence or evidence that might make him less

24   blameworthy, do you understand basically what that is

25   saying?

1    A        I think so.

2    Q        It's in legalese to some extent and -- but

3    mitigating evidence is evidence that might reduce the

4    moral blameworthiness, his responsibility, his -- it's

5    not an excuse for committing the crime but that because

6    of other factors that it might not be quite as -- he

7    might not be quite as blameworthy as someone else who

8    committed the same type of crime.

9              For example, many people believe that

10   age is a mitigating circumstance, it's not necessarily,

11   no one can tell you that age necessarily is mitigating

12   but for instance an 80 year old man -- I'll give you a

13   different example, a retarded person, a person severely

14   retarded, understands, can function but can't quite think

15   as clear as the average person, someone might consider

16   that he's not quite as responsible for his action as an

17   average individual that commits a crime.

18             Sometimes people feel like background

19   may be or an alcoholic that is intoxicated, some people

20   may look at that bit of evidence and say, "Well, he was

21   intoxicated, he wouldn't have done it he hadn't been

22   drunk so maybe he's not responsible."

23             But someone else may look at that same

24   evidence and say, "If he hadn't been drinking he wouldn't

25   have done it and that's really more of a blame."

1    And no one can tell you what mitigating

2   circumstance is but it's something that might lower a

3   person's responsibility.

4        What the law requires that you be able

5   to in a case of you -- of you finding him guilty of a

6   capital murder and you come back, you consider all the

7   evidence and you go to Special Issue #1 and if you listen

8   to the evidence and you decide a person, well, he's not

9   likely, it's not probable that he's going to commit

10  future acts of violence, at that point that's it, you

11  don't have to go any further on a case of that nature,

12  he automatically gets a life sentence.  He doesn't get

13  the death penalty.

14       But if you decide, yes, he's going to

15  be a danger to society you can't stop there, you can't

16  say he's going to get the death penalty just because he's

17  going to be dangerous, you have to then look at his

18  situation or mitigating circumstances and then if you can

19  answer "No" to Special Issue #2 that there is no

20  mitigating circumstance that is so big to lower his

21  responsibility then he gets the death penalty.

22       But if there is then he gets life.

23       So he gets a lot of chances to get life

24  but it only has to be answered a certain way to get

25  death.

1          Do you kind of understand what I'm
2  talking about?

3  A          I do.

4  Q          I know that's somewhat complicated whenever
5  lawyers get involved it's going to make everything
6  complicated but there's motive behind it and reason and
7  it's protection for society.

8          Could you consider all the evidence and
9  follow the Judge's instructions if he instructs you this
10  is the law and could do that and follow it if you are
11  selected on a jury?

12  A          Yes.

13  Q          And do what you think the evidence calls for?

14  A          Yes.

15  Q          There may be a possibility, I mentioned earlier
16  that capital murder is murder plus something else and in
17  this particular case it's murder plus a robbery, that in
18  the act of committing a robbery a murder has taken place,
19  you know, it might be that you decide our evidence is
20  weak on the robbery, can't prove that they committed a
21  robbery but if we prove that he committed murder in that
22  case you would be given the opportunity in the
23  guilt/innocence portion to find him guilty of murder,
24  intentionally, knowingly cause -- causing an individual's
25  death.

1          And if you do that then it's a different

2    range of punishment.

3          The law requires you to be able to

4    consider the full range of punishment.  In -- for a

5    murder case the range of punishment is anywhere from five

6    years probation to life in the penitentiary.

7          Do you think you could consider a full

8    range of punishment?

9          For instance, let me give you an

10   example, most people immediately think I couldn't

11   consider probation for murder, that sounds too horrible.

12   But the common example used among lawyers, I have an 80

13   year old couple, have been married since they were 16,

14   17 years old, have had grandkids and the wife has cancer

15   or some other disease and is dying, she is on life

16   support, she is in pain, she is going to die within a few

17   weeks but she is in terrible pain.  Begs her husband,

18   "Please unplug me, please kill me", you know, "I can't

19   take it anymore."

20          And her husband does.  He goes over and

21   unplugs the machine.

22          Then that's murder under Texas law.

23          However that might not be the same type

24   of murder that is planned out ahead of time in killing

25   so you might want to consider probation on that type of

1    case.

2            And there is also more horrible torture

3    type murders, do you think that under the right situation

4    that you could consider the full range of punishment on

5    a murder case?

6    A       Yes.

7    Q       Do you think you could consider probating

8    someone on murder on the fact situation, not that you

9    would do it but that you could consider a probation?

10   A       Under the example that you give I would say

11   that would be a possibility.

12   Q       And it's not that you have to do it but you

13   have to at least be able to think about it on any of the

14   full range.  And you don't know the facts and anything

15   that we say, anything that we tell you today is not fact,

16   it's not evidence, it's basically we are giving you

17   examples to get to -- to get input from you to see how

18   you feel, what you are thinking about.

19           So anything either one of us says,

20   either side, is not evidence and is not meant to be

21   evidence on our part.

22           The law also requires that you be able

23   to consider the evidence, give the witnesses an equal

24   footing.  Some people automatically believe a preacher,

25   for example, just because he's a preacher he gets up

1    there and testifies you are going to automatically

2    believe him, you are going to give him a head start over

3    someone else.

4                    The law requires that you give them an

5    equal footing.  Or policeman, some people were trained

6    from little bitty kids, were trained, "If you are in

7    trouble go to a policeman, he helps you."

8                    We hold a high esteem for what police

9    are supposed to do but the law requires that you be able

10   to consider them equal, you can consider all evidence,

11   you can consider their background and all to make a

12   decision whether they are telling the truth but you can't

13   give them a head start.  You can't automatically give

14   someone or somebody -- do you think that you could give

15   each witness a head start -- I mean "equal starting",

16   I'm sorry, and not give advantage to one or the other on

17   the witnesses?

18   A           I think I could.

19   Q           Some people have, for instance on

20   psychiatrists, a lot of people -- or chiropractors -- a

21   lot of people just think those type of occupations, they

22   have problems with them.

23                   If a psychiatrist is an eyewitness on

24   something would you have any problem listening to a

25   psychiatrist's testimony as to fact evidence as to what

1    he saw without giving him a disadvantage because you
2    don't like psychiatrists, if you don't?

3    A       I don't see any problem with that.

4    Q       Their occupation wouldn't make any difference
5    to you as to how you decide the evidence?

6    A       I can't picture it being a problem.

7    Q       Also in this case sometimes people feel like,
8    and you may have thought about it when you came in and
9    that will be a question, "What did he do" when you see
10   the Defendant, "What is he guilty of, what did he do,
11   he's indicted because he must have done something."

12           Did you kind of have that attitude or
13   would you wait until you hear the evidence and decide
14   based on the evidence?

15   A       I feel like I would wait on the evidence, you
16   know.  I mean I can't help from, you know, naturally --

17   Q       "Curious?"

18   A       Yeah.  Whatever.

19   Q       Obviously in order to get in Court a person on
20   a felony charge has to be indicted, that is a Grand Jury
21   listens to the evidence and decided there is enough to
22   go to Court.

23           Under Texas law or under the law
24   anywhere in the free world that you are not allowed to
25   consider the fact that a person is indicted.  That is

just merely a piece of paper stating out the charges and telling them what they are charged -- what the charges are.

Could you put aside the fact that he is indicted and not consider the indictment as evidence and wait until you hear the evidence and hear it in the courtroom?

A       I believe so.

Q       The law also requires that -- in many cases a confession or a statement is given by a defendant and they require -- require various things in order for it to be admissable, in order for you to be able to consider it.

For instance, obviously since we have had a country the law enforcement, police officers can't go in and beat a man until he confesses. That wouldn't be voluntary. If they just beat him until he signs the paper. The law requires that you be able to put aside evidence that is illegally -- may have been illegally taken, if you find that it is.

Everyone has heard of the "Miranda Warnings", that if an officer takes a statement from an individual that he has to give him the Miranda Warnings, if he takes a confession and there are various other technicalities.

1            If you heard evidence as to a confession

2    but you feel like it was illegally taken, that the

3    officer beat it out of him or for some other reason, if

4    it's illegal but you believe the confession is true, can

5    you push that aside, you can't forget that you heard the

6    evidence, you can't just ignore it but can you not

7    consider that evidence of a confession that is illegally

8    taken and put it -- and put it aside and base your

9    decision on the evidence, the other evidence that is

10   introduced?

11   A        I -- I feel like I can but that is, you know,

12   never been put in that spot.  I don't know.

13   Q        Most people don't even think about that sort

14   of thing, that's why we are here giving you bizarre fact

15   situations.

16            For instance, if a confession is beaten

17   out of someone?

18   A        Well, you know, if that was the case I don't

19   think I would have any trouble, you know, you know,

20   making -- I mean putting this aside.

21   Q        If a confession is taken under State law if the

22   officer goes in and the defendant wants to give a

23   statement the State law requires that Miranda Rights be

24   read and has various requirements.    Under that

25   circumstances if he violates those rights to some extent

1    can you put that aside if a statement was taken and you

2    hear the evidence, hear the confession but you have heard

3    all the other evidence can you push that aside if you

4    feel like it's illegally taken?

5    A        Now, what are the "Miranda Rights?"

6    Q        The right to remain silent, the right to have

7    an attorney, to have one appointed for you, if you are

8    -- a few years ago that was --

9    A        What you are saying --

10   Q        -- if you watched "Dragnet" a few years ago

11   that was a big --

12   A        -- what you are saying, if I think he wasn't

13   give his rights?

14   Q        If he -- if it was illegally taken, assume

15   that's a requirement that the rights be read, it's also

16   a requirement for a confession but sometimes that

17   requirement -- if the officer took it could you push that

18   aside and not consider it as evidence if the Judge tells

19   you that you have to do it?

20   A        Yes.

21   Q        There's other ways that a statement can come

22   in, the defendant can get on the stand and he can testify

23   but obviously that's voluntary and admissable and he can

24   write letters to various people and those letters can be

25   recovered, those -- the Judge will give you the

1   requirements but if you feel like the law was violated
2   in getting those can you push that aside if you think
3   it's illegally taken?
4   A       Yes.
5   Q       I notice on your questionnaire that you know
6   a little bit about this case, where did you get your
7   information?
8   A       Just when I first come up here I didn't
9   remember the case but, you know, people, you know,
10  talking and I remember reading it in the paper or
11  whatever.
12  Q       You didn't get your information from anyone
13  that told you that they knew what happened or anyone that
14  said they really know?
15          You got it from various second hand
16  information?
17  A       Right.  Just from newspapers -- I may have saw
18  it on the news, you know.  I remember the incident is
19  what I'm trying to say.
20  Q       In receiving that information have you made up
21  your mind about the case or do you know enough about it
22  that it would interfere with your ability to listen to
23  the evidence and decide based on the evidence that comes
24  into today or during this trial?
25  A       I don't think that it would but, you know, it's

1    -- you know, I mean it's there, is a little bit of, you

2    know, knowledge -- I mean I just --

3    Q        I mean obviously we can't make you forget it,

4    you know, it happened?

5    A        I -- yeah.  I don't have any problem with that.

6    I don't see that I have any problem.

7    Q        Anyone -- I assume from what you are talking

8    to me saying anybody that has told you things were not

9    in a position to really know the facts and not from a

10   real reliable source?  I'm assuming it was from just talk

11   around on the streets?

12   A        Like I say, I just remember seeing it on the

13   news or whatever, you know, that the defendant was caught

14   with the truck or whatever in another state.

15   Q        Anything about hearing that on the news -- do

16   you consider the news a reliable source of information,

17   are they always correct?

18   A        No.  Definitely not.

19   Q        And about that information that you received,

20   would you -- could you push it aside and not consider it

21   in this trial, just listen, you will have the evidence

22   firsthand?

23   A        I feel like I can because, you know, as far as

24   I know that wasn't even the same person, you know.

25            I do remember, I do remember the case

1    or the incident.

2    Q        I think it was fairly well reported, I assume

3    in the local papers here?

4    A        I don't even --

5    Q        Are you from Cason or know anyone that lives

6    in the Cason area?

7    A        No.  I don't.

8    Q        Do you know Mr. Cole, the deceased person?

9    A        I don't know him.

10   Q        Or his family?

11            Do you know Mr. Wardlow?

12   A        No.

13   Q        You stated that you didn't know Mr. Old

14   personally, how do you know him?

15   A        I guess everybody in Titus County knows of him.

16   Q        Just see him?

17            Is there anything about that knowledge

18   that would interfere with your ability to decide fairly?

19   A        No.  I do not know him personally.  I just know

20   of him.

21   Q        Do you know Mr. Hinson, Lance?

22   A        I know Lance somewhat.  He lives close to where

23   I live.

24            I would say that, you know, we are not

25   personal friends but we do know each other.

1   Q        Would that interfere with your ability to

2   decide fairly?

3   A        No.  It wouldn't.

4   Q        If you had to vote in this case and you were

5   on the jury and you find the death penalty could you see

6   Lance the next day, would that give you any kind of

7   problem?

8   A        I don't feel like it would.

9   Q        Does he keep his grass mowed and all that,

10  something where you wouldn't hold it against him, we

11  would all have a clear shot?

12  A        He lives too far in the boonies.

13  Q        No noisy parties or anything like that?

14           THE    COURT:    Twenty-five

15  minutes.

16           MR. LEE:  Basically the law

17  requires that you be able to listen to the evidence that

18  is actually presented here from the stand, listen to the

19  various  other  evidence  and  scientific  reports  and

20  witness, that sort of thing and not consider what is not

21  in evidence.

22           And  sometimes  that  gives  people  a

23  problem, they want to guess, they want to know why didn't

24  something happen, why didn't they tell us.

25           There's various reasons that something

1    may not come in.  For one thing the rules may prevent us

2    from talking it, another may be strategy.

3                    For instance, a defendant has a right

4    not to testify, not to give out any evidence, not to say

5    a word.

6                    Would that fact that we are accusing him

7    of a horrible crime, we bring in a lot of evidence and

8    for whatever reason he decides not to testify, maybe he's

9    got a bad stuttering problem, it may be something silly

10   but for some reason they don't testify.

11                   Would you hold the fact that he didn't

12   testify against him?

13                   THE POTENTIAL JUROR:  I don't

14   think so.  No.

15   Q        (BY MR. LEE) And that wouldn't interfere, that

16   wouldn't go into your thought processes as far as you

17   wouldn't consider the fact that he didn't testify against

18   him?

19   A        I don't think so.

20   Q        Some people have the idea that -- in fact I was

21   taught that you stand up for yourself, you cover the

22   ground you stand on and you don't, you know, if someone

23   is saying something against you you stand up to it.

24                   But the law requires you not -- to be

25   able to not -- t be able to consider the facts.  If you

1    find him guilty of capital murder, he didn't -- still

2    doesn't testify in the punishment stage, sometimes the

3    jurors just want to hear him say, "I'm sorry" or give

4    some kind of explanation.

5             Can you still to the fact that he's got

6    the right to not testify and not hold that against him?

7    A       I don't see any problem.

8    Q       It could be any number of reasons that we won't

9    go into.

10            We are trying -- we have got two of us

11   here, that's the reason we have attorneys to make sure

12   we don't forget something.

13            If the fact, if we come -- if you are

14   selected on this jury and you heard the evidence and you

15   find him guilty of capital murder and you listen to the

16   evidence on the guilt/innocence portion the Judge will

17   probably give you an instruction as to the parole law in

18   Texas that the basic definition is that you are not

19   allowed to consider in that parole law when he's going

20   to get out, that you are to consider -- you are to make

21   your decision based on the evidence, not what someone

22   else might do in the future.

23            I anticipate an instruction to the

24   effect that the Defendant if given life in the

25   penitentiary will be eligible, not that he will get out

1    but will be eligible for parole in 35 years, after he

2    serves 35 years.

3                    But the law requires you to be able to

4    put that aside, that he may never get parole, he may stay

5    in the penitentiary for the rest of his life, he may get

6    out in 35 years.

7                    Can you put that aside, whatever might

8    happen in the future and not consider that in making your

9    decision?

10   A          I believe so.

11   Q          If it says "life" I think the law requires you

12   to presume that's going to be life and not adjust the

13   penalty to what you think might happen.

14                   Can you do that and do what you think

15   is best and let the system worry about what happens?

16                   THE   COURT:    I  need  verbal

17   responses.

18                   THE POTENTIAL JUROR:   Yes.

19                   THE COURT:   Thank you.

20                   MR. LEE:   You were a little

21   bit hesitant when we were talking about the punishment

22   and confused and I know it's because of the charges that

23   are complicated to some extent but I want to clarify and

24   make sure on the point of mitigating circumstances.

25                   Nobody can tell you what "mitigating

1    circumstances" is, that's up to you so basically if you

2    feel there is enough evidence that there is mitigating

3    or some reason that he's not quite as blameworthy as

4    someone else, for instance, some people consider age, the

5    fact that an individual might be young or old.   And I

6    can't tell you what that mitigating circumstance is but

7    can you at least listen to whatever evidence is presented

8    and make your determination as to what mitigating

9    circumstance  --  what  is  sufficient  mitigating

10    circumstances?

11                   Would you automatically assume that some

12    that's 18 or 19 that that is mitigating circumstances or

13    could you consider and make your decision based on the

14    whole circumstances?

15                   THE POTENTIAL JUROR:   What?

16    Q         (BY MR. LEE)   Would you automatically say

17    "Eighteen years old is mitigating circumstances and

18    shouldn't deserve the death penalty?"

19    A         No.   I wouldn't.

20    Q         Now, could you consider the fact that a person

21    is 18 years old and put it in the whole context of the

22    evidence?  Could you think about it and consider that age

23    as important?

24    A         I -- I can't say that, you know, that the age

25    factor wouldn't stick in the back of my head.

1  Q        Do you -- but I'm not sure I know what you are

2  getting at.

3           Basically the law requires that you

4  consider it or think about all the evidence that is

5  introduced.

6           And nobody can tell you that an 18 year

7  old is mitigating, no one can tell you it's not legally,

8  can you listen to the evidence and decide and base your

9  decision on the evidence as the picture of the whole

10  case, the whole case in chief and not automatically

11  decide something is not mitigating until you have heard

12  the whole case?

13  A        Yes.

14  Q        And I was a little confused about your age --

15  your statement on the age; when it's in the back of your

16  mind would it be in the back of your mind as kind of

17  bothering you to give somebody, an 18 year old or 19 year

18  old or 20 year old the death penalty?

19  A        I think that, you know -- you know, I have

20  never thought about anything like this until I got called

21  for this jury and, you know, quite honestly I have done

22  quite a bit of thinking about the death penalty due to

23  the fact that the defendant is 18 or 19 years old.

24           My conclusion in my mind was that, you

25  know, if I were to choose to, you know, vote for the

1    death penalty that, you know, it wouldn't matter if it

2    was -- who it was, you know, you know, if the

3    circumstances were one way then it, you know, just

4    whatever.

5    Q        Are you saying that you could listen to all the

6    evidence and make your decision not just on one single

7    factor, is that what you are saying?

8    A        Yes.

9                        MR. LEE:  Pass the witness.

10                       THE COURT:  Mr. Hinson.

11

12                   VOIR DIRE EXAMINATION

13                     BY MR. HINSON

14

15   Q        Thank you, Your Honor.

16                Mr. Pearson, again I am Lance Hinson,

17   we have met previously and Mr. Old and Mr. Wardlow, the

18   Defendant in this case.  (Indicating)

19                You were asked your knowledge of us, do

20   you have any prior knowledge about the State's Attorneys

21   in this case?

22   A        None whatsoever.

23   Q        Have you ever met anyone or discussed anything

24   about Mr. Richard Townsend on the far end?  (Indicating)

25   A        No.

1    Q        He's associated with the District -- he is the

2    District Attorney associated with the law enforcement

3    process in Morris County.

4              Do you have any friends or relatives or

5    acquaintances connected with Morris County in law

6    enforcement?

7    A        No.

8    Q        Mr. Randy Lee who has been asking you questions

9    is associated with the District Attorney's Office in Cass

10   County, is that correct, and has been elected Cass County

11   District Attorney.

12             I believe your term starts --

13                  MR. LEE:  In January.

14                  MR. HINSON:  January of '95.

15             Have you previously met Mr. Lee in any

16   capacity?

17                  THE POTENTIAL JUROR:  No.

18   Q        (BY MR. HINSON)  Ever used him for your

19   attorney in any manner, not ever used him for your

20   attorney?

21   A        No.

22   Q        Do you have any friends or acquaintances,

23   relatives connected with Cass County law enforcement

24   agencies?

25   A        No.

1    Q       You stated that you had some information

2    regarding this case, could you tell me where you gained

3    that information or do you recall?

4    A      No.

5               You know, I guess just in talking to

6    potential jurors we sit there talking and some people say

7    they never heard of it and I, you know, I have -- I

8    remember the incident but I don't -- I don't remember,

9    you know, exactly how I heard about it.  I feel like it

10    was on the news or whatever, you know.

11    Q       Do you have a police scanner at home or

12    anything like that?

13    A      No.

14    Q       You stated you could disregard what you had

15    heard, is that accurate?

16    A      Yes.

17    Q       You could disregard what you heard regarding

18    this case and if you were selected as a juror you could

19    come in and start with a level playing field, disregard

20    what you had heard and you would consider only the

21    evidence you heard presented to you as a juror, is that

22    accurate?

23    A      Yes.

24    Q       Just to sort of round that out; would you

25    require any evidence to overcome what you had heard?

1    A        What?

2    Q        Would you require controverting evidence?

3    A        No.

4             Like I said, I have heard the story as

5    far as I know, you know, I don't know the defendant so,

6    you know, the story could have been about somebody

7    completely different at the time.  I don't know the

8    details of the incident.

9    Q        Regarding what you had heard; do you have any

10   opinion as to the truth or veracity of those statements?

11   A        Do I have an opinion?

12   Q        Of whether what you heard or saw was the truth?

13   A        No.  I don't guess.  Not really.  No.

14            THE COURT:    The questions

15   don't get easier, do they?

16            MR. HINSON:    I know we are

17   sort of bouncing around.

18            What you had heard, did what you hear

19   relate to Mr. Wardlow or to a case in general?

20            THE POTENTIAL JUROR:    It

21   related to the case in general.

22   Q        (BY MR. HINSON)  Without any names mentioned?

23   A        I don't guess I ever heard his name until I

24   came up here.

25   Q        If evidence was presented to you -- and let's

99

1    just assume that the evidence supported what you had

2    heard; would you require -- would require any evidence

3    -- let me try to restate that.

4            Did you hear whether or not a defendant

5    was arrested out of state?

6    A        I did.  Well, I do remember that there was

7    something about, you know, it being in another state.

8    I do remember hearing it that way.

9    Q        And assuming that what you heard involved Mr.

10   Wardlow being arrested out of state and involved in

11   whatever offense you heard about, have you formed any

12   opinion based on what you heard as to the guilt or

13   innocence of that person?

14   A        That's hard to answer.

15           MR. TOWNSEND:  Your Honor, I

16   want to object.  I think he put facts in there that

17   weren't there.  I believe he stated he didn't know who

18   the guy was.

19           THE COURT:  Overruled.

20           Mr. Hinson, did you ask him if he had

21   formed a conclusion about the person he heard or about

22   Mr. Wardlow or --

23           MR. HINSON:  Had he formed an

24   opinion based on what he heard regarding that person's

25   guilt or innocence?

1                              THE   COURT:     I'm going   to

2    sustain the objection.

3                         I will let you ask that question but I

4    think it needs to relate to Wardlow.

5                              MR. HINSON:   Okay.  Assuming

6    that the person arrested out of state was Mr. Wardlow;

7    have you formed an opinion whether or not Mr. Wardlow was

8    guilty or innocent of that charge?

9                              THE POTENTIAL JUROR:   That's

10   a hard question.   I guess at the time I heard that I

11   guess the assumption was that they -- that, you know,

12   they had caught, you know, the person that was guilty.

13   I mean at that time.

14                         Like I said before, you know.  I don't

15   know how to say it but, you know, I don't know that that

16   was -- I don't know who that person was so, you know, but

17   I did see the news.

18                         I  guess that's basically what  I  was

19   saying.

20   Q        Taking your assumption one step further; would

21   that  influence  your  decision-making  when  you  were

22   deliberating on a verdict in this case?

23   A        I don't think so.  I think if I was one of the

24   jurors I would listen to it step by step and assume that,

25   you know, from the beginning that he was not guilty.

Q        You are saying you would start with the proposition that he was innocent until proven guilty?

A        Yes.

Q        Would you require any evidence -- and I may have asked this and I don't recall -- would you require any evidence to overcome your assumption or what you heard?

A        No.

Q        You would start with a level playing field?

A        I think so.

Q        On both sides?

A        I think so.

Q        "You think so, yes or no?"

A        Yes, sir.  I could.

THE COURT:   When we say "We think so" when we mean yes and "I don't think so" when we mean no so we do need to use "Yes" and "No" if we can, sir.

MR. HINSON:   I believe you stated -- or let me just ask you if you start with the proposition that a person is innocent until proven guilty beyond a reasonable doubt if you were selected as a juror, would you start with that?

THE POTENTIAL JUROR:   Yes.

"I think so."

1        No.   I was just kidding.

2    Q        (BY MR. HINSON)   The State has to prove to you

3    the defendant's guilt beyond a reasonable doubt, do you

4    understand the law?

5    A        Yes.

6    Q        So it is your understanding that every person

7    is innocent until proven guilty beyond a reasonable

8    doubt?

9    A        Yes.

10   Q        Now, I will just ask you if you will look

11   through those papers up there and find the indictment.

12                        THE COURT:   Right in front of

13   you.   (Indicating)

14                        MR.  HINSON:    "Number  3"  I

15   believe.

16                        You were asked a little bit about that

17   indictment, let me ask you a little bit about that

18   indictment.

19                        THE POTENTIAL JUROR:   Okay.

20   Q        (BY MR. HINSON)   Does the indictment support

21   anything that you have heard previously regarding this

22   case?

23   A        I mean that's basically what I remember seeing

24   on the news or whatever.   Yes.

25   Q        And do you understand that the indictment

1    itself is not evidence of any criminal act, that you

2    would be -- that you would be asked to disregard the

3    indictment as evidence of any criminal act, is that your

4    understanding of the law?

5    A         Yes.

6    Q         And could you disregard the indictment --

7    A         Yes.

8    Q         -- as evidence?

9    A         Yes.

10   Q         You could listen to what was presented to you

11   if you were selected as a juror, listen to what was

12   presented to you and the evidence, the testimony and

13   documents, consider that as the evidence as to guilt and

14   innocence and as to punishment disregarding what is

15   contained in the indictment?

16   A         Yes.

17   Q         The decedent, Mr. Cole, I believe you stated

18   you had no prior knowledge or contact with Mr. Cole, have

19   you ever met Mr. Cole?

20   A         Not that I know of.

21   Q         Has anyone discussed with you since -- well,

22   at anytime, facts regarding Mr. Cole?

23   A         Are you talking about this incident?

24   Q         No.  Just the decedent's life in general, have

25   you discussed any of those events with anyone?

1          You have no personal knowledge of him?

2          Has anyone told you anything about him?

3   A        The -- I know a person that used to know his

4   grandson or something like that but, you know, I think

5   basically I think that -- I don't guess I know.

6   Q          Would your knowledge of someone related to Mr.

7   Cole effect your ability to listen to the evidence and

8   honestly make a fair and impartial decision regarding the

9   guilt or innocence of Mr. Wardlow?

10  A        No.

11  Q          Going back to the indictment, I think my

12  question was -- my question which I have not asked, I

13  think I was trying to get to it; do you believe because

14  someone is charged in an indictment that they are guilty

15  of any crime?

16  A        No.

17  Q          Have you ever sat on a Grand Jury?

18  A        No.  I have never sat on one.

19          That's why I am hesitant to answer some

20  of the questions because I have never been in the spot.

21  Q          If you have any questions address either

22  myself, Mr. Lee or the Court.

23  A        All right.

24          THE COURT:   We can ask you

25  questions and you certainly can ask us questions so if

1    there's anything you don't understand we'll clarify it.

2                        MR. HINSON:   Up in front of

3    you there is another document, "State's Witnesses."

4    (Indicating)

5                        THE COURT:  No.  Right there.

6    (Indicating)

7                        MR. HINSON:   Exhibit Number

8    1, it's a three-page document.

9                   Do you have three pages attached to that

10   document?

11                       THE POTENTIAL JUROR:   Yes.

12   Q         (BY MR. HINSON)  Would you read those names and

13   if you run across a name that you have heard before would

14   you please stop and tell me who that name is?

15   A         This "Harry Washington", the guy that ran for

16   Sheriff here?

17   Q         I believe he is.

18   A         I don't know him but I have heard of him.

19   Q         Is that all the information that you have heard

20   about Mr. Washington?

21   A         I remember him running for Sheriff.  I wouldn't

22   know him if I saw him.

23                   That's the only one I recognize.

24   Q         Now, you will notice on Page 3 I am sure as you

25   went through that there were some out of state people

1    listed there.

2    A        Okay.  yes.

3    Q        Do you see that?

4    A        Yes.

5    Q        That may or may not support what you previously

6    heard about this case but seeing those persons named from

7    out of state there have you formed any conclusion as to

8    the guilt or innocence of Mr. Wardlow?

9    A        No.

10   Q        Does the information contained on the Witness

11   List support the allegations that you had heard

12   previously regarding this case, support them in any way?

13   A        No.

14            As a matter of fact the -- the out of

15   state people, I mean that's not even what I remember, you

16   know.

17   Q        So based on this information that you have now

18   learned you can still, if you are selected as a juror,

19   come in with a level playing field for both sides without

20   relating back to any prior information that you may have

21   learned, you could disregard the prior information?

22   A        Yes.  I could.

23   Q        Mr. Lee discussed with you the capital murder

24   and the lesser included offense of murder, do you recall

25   discussing that?

1    A        Yes.

2    Q        Do you understand if Mr. Wardlow was not found

3    guilty by the jury of capital murder the jury could

4    deliberate on whether or not Mr. Wardlow was guilty of

5    murder, that would be a lesser included offense?

6             Do you understand that legal effect?

7    A        If he was not found guilty of capital murder?

8    Q        As charged in the indictment.

9    A        And the jury could deliberate on whether he was

10   guilty of murder?

11   Q        Yes.

12   A        I don't guess I realized that.

13   Q        Do you understand now the punishment for

14   capital murder is either a life sentence or death

15   sentence?

16   A        Yes.

17   Q        Okay.  Now, the punishment for murder is five

18   to 99 years or life in prison.

19             Without looking at the facts of any

20   particular case if a person was not found guilty of

21   capital murder could you consider, when considering if

22   a person is guilty of murder could you consider a term

23   of five years as punishment for murder?

24   A        Yes.

25   Q        In the proper circumstances?

1    A        Yes.

2    Q        If you were part of the jury panel that

3    assessed 10 years or less as punishment for a defendant

4    found guilty of murder you could also assess probation,

5    which in effect means that the less amount of punishment

6    would be five years probated.

7              In the proper circumstances could you

8    consider for murder, for a person convicted of murder,

9    could you consider a sentence of five years probation?

10   A        It would depend on the circumstances.

11   Q        You could consider that punishment?

12   A        If you went to talking about some of his

13   examples awhile ago, yes.

14   Q        Mr. Lee gave you an example that you would

15   accept or you could consider five years probation?

16   A        Yes, sir.

17   Q        In understanding probation there would be no

18   actual jail time, that they would be required to see a

19   State representative --

20              MR. LEE:    Might be a good

21   idea.

22              MR. HINSON:    That would cut

23   out probation.

24              They would be required to see a person

25   employed by the State as their probation officer,

1    probably once a month or something along those lines, no

2    jail time.

3                    You could consider that in the proper

4    set of circumstances?

5                    THE POTENTIAL JUROR:   Yes.

6    Q          (BY MR. HINSON)   Mr. Lee informed you that a

7    life sentence in a capital murder case entailed the

8    defendant to be considered for parole after 35 calendar

9    years that he has been in jail.

10                   Now, understanding that if a defendant

11   was found guilty of capital murder could you still

12   consider a life sentence and the death penalty

13   alternatively?

14   A          Yes.

15   Q          Excuse me?

16   A          Yes.

17   Q          "Yes?"

18   A          "Yes."

19   Q          You were asked a little bit about the Fifth

20   Amendment; the Fifth Amendment guarantees a criminal

21   defendant the right to remain silent, the right not to

22   have to testify in a criminal case.

23                   Do you understand the implications of

24   the Fifth Amendment?

25   A          Yes.

Q       If Mr. Wardlow in this case chose not to testify -- well, let me back up; a capital murder case will break down into three parts, the first part being jury selection, as you are well aware, the second part would be the guilt or innocence, whether or not this defendant is guilty or innocent, the third -- and you would answer that question before going to the third part, which would be the punishment phase.

And there is a little outline that you have up there if you would find it, it's a little flow chart, it's "Phase I, Guilt/Innocence", we could start Phase I being jury selection if you will, but we will go to Phase I as guilt or innocence.

Evidence is presented and then whether or not the defendant is found guilty, and you will note Phase II is the punishment phase, if the defendant is found guilty then you go to the punishment phase where other evidence would be presented to you.

Do you follow me on that?  (Indicating)

A       Yes, sir.

Q       Now, in the Phase I, guilt or innocence, if Mr. Wardlow chose not to testify could you still consider life in prison and also consider the death penalty?

A       Yes.

Q       Would you require evidence from Mr. Wardlow

1   from him testifying for you to consider the life

2   imprisonment?

3   A        No.

4   Q        What is your response?  "No?"  I believe it was

5   "No?"

6   A        "No."

7   Q        Again, in Phase II in the punishment phase

8   again Mr. Wardlow has no legal obligation to testify.

9           After evidence was presented to you in

10  Phase I, assuming that the defendant was found guilty of

11  capital murder, could you set that evidence aside before

12  finding the defendant or before deciding that the death

13  penalty would be a proper punishment?

14  A        Yes.

15  Q        If someone -- well, in your opinion if someone

16  was found guilty of capital murder would you

17  automatically impose the death penalty in that case?

18  A        I want to say "I don't think so."

19           No.  I -- no.  I wouldn't.

20  Q        Based on the circumstances that were involved

21  you could still consider a life sentence or the death

22  penalty?

23  A        Yes.

24  Q        Is that what you are saying?

25  A        Yes.  Looking at this, seeing how it works,

1    yes, I could.  I could.

2                     I am new at this, I didn't even know

3    that you went to Phase II and all that kind of stuff.

4    Q         I believe you answered that you had never been

5    a juror in a criminal case?

6    A         That's true.

7    Q         Do you know anyone that has ever been a juror

8    in a criminal case, related to anyone, acquaintance?

9    A         No.  Not that I remember.

10   Q         Now, there is a document up there marked

11   "Number 5" called "Special Issues", would you find that

12   document?  (Indicating)

13   A         Okay.  Is this the same one that I had awhile

14   ago?

15                     Yes.  Now, mine says "3."

16                     THE BAILIFF:  It has "5" at

17   the bottom.

18                     MR. HINSON:  "3" at the top.

19                     THE POTENTIAL JUROR:  Oh,

20   okay.

21   Q         (BY MR. HINSON)  Have you read those two

22   issues, correct?

23   A         Yes.

24   Q         Going to Special Issue #2 there at the bottom

25   it states "Mitigating evidence is evidence that a juror

1      might   regard   as   reducing   the   defendant's   moral

2      blameworthiness."

3                      Mitigating evidence -- and would you go

4      over Special Issue #2 and read it to yourself?

5      A          What does "culpability" mean?

6                      THE   COURT:      "Culpability"

7      basically means "extent of blame, blameworthiness, guilt,

8      culpability, how knowledgeable, how" -- just basically

9      means "guilt and his knowledge of guilt, of his knowledge

10     of what he was doing, accountability."

11                      THE POTENTIAL JUROR:   Okay.

12                      MR. HINSON: Assuming that the

13     defendant was found guilty in the guilt/innocence, Phase

14     I of the trial, and you came to decide II, the punishment

15     phase, if the defendant did not testify and there was no

16     mitigating evidence in your mind could you still consider

17     imposing a life sentence?

18                      THE POTENTIAL JUROR:   Let me

19     clear this in my mind, ask that question again.   I'm

20     sorry.

21     Q          (BY MR. HINSON)   I'll try.

22                      After you have gone through Phase I of

23     guilt and innocence where the defendant is found guilty

24     of capital murder and you go to Phase II, the punishment

25     phase where you consider the evidence presented to you

1    in the punishment phase for that phase of the trial,

2    disregarding evidence from the guilt or innocence phase,

3    it's like two trials in one so we come to the second

4    phase, the punishment.

5                  The defendant again has a Fifth

6    Amendment right not to testify and the defendant does not

7    testify and no one testifies on his behalf and in your

8    mind there is no mitigating evidence that has been

9    offered; could you still have a life sentence for a

10   defendant convicted of capital murder?

11                 MR. LEE:   I believe that

12   question might be misleading as to what is --

13                 THE COURT: Did you understand

14   the question?

15                 THE POTENTIAL JUROR:  I think

16   I do.   I think what he's saying is if Mr. Wardlow was

17   -- I mean he was proven guilty of capital murder and he

18   didn't say anything in regard to his defense could I

19   consider the life sentence instead of the death penalty?

20                 THE COURT:  And your answer?

21                 THE POTENTIAL JUROR:  Is that

22   what you are asking?

23                 MR. HINSON:  I believe that's

24   right.

25                 THE POTENTIAL JUROR:  I guess

1    I could consider it but, you know --

2    Q         (BY MR. HINSON)  Would you tend to lean toward

3    the death penalty or life sentence in that situation?

4                     MR. TOWNSEND:   Object, Your

5    Honor.   I don't think he's required to tell them which

6    way he would lean in certain situations.

7                     THE COURT:   Sustained.

8                     MR. LEE:  We would further say

9    that if there's no mitigating evidence entered the answer

10   to the question of Special Issue #1 is obvious and the

11   jury does not put in --

12                     MR. HINSON:   Regarding the

13   answer that you gave that you could consider it, would

14   the fact that the defendant did not testify, would that

15   effect you decision?

16                     THE POTENTIAL JUROR:   No.   I

17   don't believe that it would.   I mean --

18   Q         (BY MR. HINSON)  Would it make it less likely

19   that you would go with a life sentence for the defendant

20   based on that?

21   A         I object to him trying to pin him down, he

22   didn't say in what situation he would do what.  I don't

23   think he's required to do that.

24   Q         I agree.

25                     I think you are trying to commit the

1    juror to a specific set of circumstances and I'm going

2    to sustain the objection.

3                         MR. OLD:   Your Honor, if I

4    understand Mr. Hinson's question what he's asking is the

5    fact that if the man did not testify would it in fact

6    influence or would he consider that as evidence in

7    arriving at an answer?

8                         THE COURT:   I will allow that

9    question, it was the way it was phrased to me appears to

10   be committing the juror as to one position or another.

11                        MR. OLD:  I don't think it was

12   intended that way.

13                        THE COURT:   I don't think it

14   was intended but I just want the juror to understand

15   exactly what is being asked.

16                        MR. HINSON:   Would the fact

17   that the defendant did not testify, assuming that he did

18   not testify in any phase of the trial, would that effect

19   your decision-making process in the punishment phase?

20                        THE POTENTIAL JUROR:   No.

21                        THE   COURT:      Thirty-five

22   minutes.

23                        MR.  HINSON:   When  we  talk

24   about "mitigating circumstances" we read the bottom there

25   on the Special Issues about reducing a defendant's moral

1    blameworthiness, it's not that mitigating circumstances

2    would excuse any defendant's conduct but that this

3    mitigating circumstance might make you believe that

4    because of a defendant's age, family history or

5    background or other factors a life sentence is more

6    appropriate than death.

7              Relating    back    to    mitigating

8    circumstances in answering your Special Issue #2 there

9    that we are looking at regarding mitigating circumstances

10   would you take into account or consider the defendant's

11   age?

12             MR. TOWNSEND:   Object, Your

13   Honor, calling for him to again tell what he would

14   consider mitigating and what he wouldn't consider

15   mitigating.

16             THE COURT:   I think at this

17   point he's just asking him if these would be factors that

18   he would consider or exclude in his thought process or

19   decision process.

20             Do you understand the question?

21             THE POTENTIAL JUROR:   I think

22   I have kind of already been asked that question.

23             THE COURT:   It's a little bit

24   different.

25             What he's asking you is if there's any

1   particular factors that he mentioned that you would just

2   summarily exclude and not consider at all.

3           In   other   words,   do   you   have   a

4   predisposition to say that "I don't care what an age is,

5   I will never think about it" or "I don't care about

6   somebody's background, I wouldn't give it any thought or

7   consideration at all, I don't even want to hear about

8   it."

9           Is your mind closed to hearing certain

10  evidence when you decide the answer to Number Two, that's

11  what he's asking you.

12          THE   POTENTIAL   JUROR:    The

13  answer is, no, I am not closed-minded to that.

14          MR. HINSON: As you deliberate

15  in answering question Number Two on the Special Issue

16  will you take into account or consider the age of the

17  defendant?

18          THE   COURT:    Now,   he's not

19  asking you if you would consider it as something that

20  would make you answer "Yes" or "No", he's asking you if

21  it's something that you would be able to consider when

22  you decide whether to answer "Yes" or "No?"

23          THE POTENTIAL JUROR: He's not

24  asking me if the defendant's age is a mitigating

25  circumstance?

1          THE COURT:  He's asking you

2     if you would exclude and not even give it consideration.

3          In other words, he's not trying to get

4     you committed down to say "Yeah, if somebody is a certain

5     age I would answer this question this way, if he was

6     another age I would answer it another way."

7          You know, we have 18 year olds that have

8     the maturity of 30 year olds and we have 18 year olds

9     with the maturity of 14 year olds.

10          He's just asking you if you would be

11     able to give it some consideration when you decide

12     whether or not to answer that "Yes" or "No", he's not

13     asking you which way you would answer but is it a factor

14     that you would take into account when you made your

15     decision on Number Two.

16          THE POTENTIAL JUROR:  I guess

17     the answer would be that I might somewhat consider it.

18     I really don't know, to tell you the truth.

19          THE COURT:  But you are not

20     telling us that you would not automatically exclude it

21     and not listen to it?

22          THE POTENTIAL JUROR:  No.

23          THE COURT:  You just don't

24     know how much weight it might give, if any, but you will

25     listen?

1        THE POTENTIAL JUROR:   Yes,

2 sir.

3        MR. HINSON:   Is it the same

4 as her family background?

5        THE POTENTIAL JUROR:   Yes.

6 Q  (BY MR. HINSON)   Religious training?

7 A  Yes.

8 Q  Is that "Yes?"

9 A  "Yes."

10 Q  Now, on that same sheet, Special Issue there,

11 Special Issue #1 talks about a probability.

12      How would you define "probability?"

13 A  That there wouldn't be any shadow of a doubt

14 in my mind that he would continue to, you know, commit

15 criminal acts, I guess.

16 Q  When something is probable is it 99 to one it's

17 going to happen or 51-49 that it's going to happen?

18 A  I would --

19 Q  "If it's probably going to rain tomorrow?"

20 A  We can't compare it to the weather man here.

21        THE COURT:   Why don't you try

22 it on --

23        MR. HINSON: "Probability" --

24        THE COURT:   Try it on zero to

25 100, would you put probability below 50 percent, above

1    50 percent, above 55, above 90?

2                          THE   POTENTIAL   JUROR:     You

3    know,  I  would  say  above,  you  know,  I  would  say  75

4    percent.

5    Q          (BY MR. HINSON)  Could you define "probability"

6    as "more likely than not?"

7    A          Yes.

8    Q          In  Special  Issue  #1  where  it  talks  about  a

9    probability,  in  answering  that  question  would  you  define

10   probability  as  more  likely  than  not?

11   A          That's  not  the  same  thing  you  just  asked  me?

12                          THE  COURT:    I  think  he  just

13   worded it a little different.

14                          MR.   HINSON:    I'll  try  it

15   again.

16               In answering Special Issue #1 regarding

17   your  definition  of  probability  would  you  define  that  as

18   more  likely  than  not  that  the  defendant  would  commit

19   criminal  acts  of  violence  that  would  constitute  a

20   continuing  threat  to  society?

21                          THE  POTENTIAL  JUROR:   Yes.

22               I   am   not  --   I   hope   I   am   not

23   misunderstanding  what  he's  asking.

24                          THE  COURT:   You  are  not.

25                          MR.   HINSON:    Let  me  assume

1    that you looked at all the evidence when you are

2    answering Special Issue #1 and as a mathematician you

3    believe 50.001 percent, is that "probability", would you

4    answer that question "Yes?"

5                    THE POTENTIAL JUROR:    Yes.

6    I guess.

7    Q        (BY MR. HINSON)    Assuming the same set of

8    circumstances; would you require more evidence than

9    50.001 to answer that question "No?"

10                   MR. TOWNSEND:    I'm going to

11   object, Your Honor.  I don't think that has any relevance

12   at all, these numbers, we are required to prove this case

13   beyond a reasonable doubt.  There is not a percentage on

14   that, there is not a percentage on the number that -- we

15   are required to prove Special Issue #1 beyond a

16   reasonable doubt.

17                   THE COURT:    Mr. Hinson, I

18   think by answering the last question you may be lowering

19   the State's burden of proof.

20                   They have a twofold burden of proof,

21   they must prove beyond a reasonable doubt that it's more

22   likely than not so by asking the question the way you did

23   I think you are lessening the State's burden of proof

24   which I don't believe was your intent so I am going to

25   sustain the objection and let you rephrase.

1          MR. HINSON:   Let me try to

2    rephrase that question; when we are looking at

3    "probability" as "more likely than not" would you require

4    more evidence to answer that question "No?"

5          THE POTENTIAL JUROR:   Okay.

6    He would be proven guilty then you are going into Special

7    Issue #1?

8    Q      (BY MR. HINSON)   Yes.

9    A      And at that time he would be proven guilty of

10   capital murder?

11   Q      Right.

12   A      And now you are asking me if I would be

13   required to have more evidence to consider?

14   Q      Answer the question "No?"

15   A      "No" to make it a life sentence?

16   Q      Yes.

17   A      I would say that I would probably require more

18   evidence, probably.

19   Q      Are you saying you would require more evidence

20   than a probability, more likely than not?

21   A      Hasn't that been asked?

22          THE COURT:   We get off on this

23   occasionally.

24          THE POTENTIAL JUROR:   Okay.

25   I hope I am not misunderstanding what you are saying.

1         MR. LEE:  I believe the first

2    question  to  me  or  --  these  are  totally  different

3    questions, I would request that they repeat it so the

4    juror understands.

5         MR. OLD:  I think if the juror

6    wants the question repeated he can ask.  I don't think

7    the prosecutor needs to object, that's not an objection.

8         THE COURT:   The Defendant's

9    objection is sustained.

10        Anytime anyone asks a question, whether

11   me or the lawyer you don't understand you make us do it

12   again.

13        THE POTENTIAL JUROR:  Maybe

14   he ought to.

15        We are referring to Special Issue #1?

16        MR.  HINSON:   Right.   The

17   probability, more likely than not.

18        THE COURT:  Mr. Pearson, let

19   me get you to step out of the room for a moment, let me

20   have a discussion with the lawyers just a minute.

21        You can be thinking about that and clear

22   your head for a moment and we will start over.

23        THE BAILIFF:  Watch your step

24   there.

25

1          (The following occurred outside the

2     presence and hearing of the potential juror:)

3

4                    THE COURT:   I believe the

5     juror is totally confused, that's why I sent him out of

6     the room so he can kind of think about it.

7                    MR. LEE:   I was, too, for the

8     record.   I don't understand.

9                    THE COURT:   We are still on

10    the record.

11               The Court of Criminal Appeals in January

12    of '93 said the burden of proof on punishment Question

13    One requires the State to prove that the defendant will

14    more likely than not commit criminal acts of violence in

15    the future so as to constitute a continuing threat to

16    society whether in or out of prison.

17               That's 851 Second 238, Page 250.

18               So the burden of proof is that the State

19    must prove beyond a reasonable doubt that there -- that

20    the defendant more likely than not will commit criminal

21    acts of violence.

22               And frankly i am not sure exactly what

23    you are trying to pin him down to there, it's kind of

24    two pronged, first the State has the burden of proof

25    beyond a reasonable doubt and what their proof is, to

1   prove that it's more likely than not, if it's 75 percent

2   obviously that's more likely than not or 50 percent so

3   I think the proper inquiry is whether he could follow the

4   law and require the State to prove beyond a reasonable

5   doubt that it's more likely than not that he would commit

6   criminal acts in the future.

7           I think usually where we have a problem

8   is where we have mathematics majors which probability

9   means "Anything is probable."

10          So I think this is why the Court finally

11  clarified why it means "more likely than not" so I'm not

12  sure where you want to --

13          MR. OLD:  Does that case --

14  I have  read the case,  I don't think it says  --  does

15  it   instruct you to use that   instruction to -- as

16  opposed --

17          THE COURT:  No.

18          MR. OLD:  -- does it instruct

19  you to define "probability?"

20          THE COURT:  No.

21          MR. OLD:  By "more likely than

22  not?"

23          THE COURT:  No.  It just says,

24  it defines, it establishes the burden of proof, it does

25  not establish in my opinion a definition.

1          MR. OLD:   Okay.

2          THE COURT:  So it will not be

3   a definition that I intend to give but since it is the

4   law I will, any juror that says to him, "Probability is

5   less than 50 percent" I will read the law to him and ask

6   if   he   can   follow   that   law   and   if   he   says   "No.

7   Probability   is   less   than   50   percent"   then   he's

8   disqualified.

9          But as long as probability is more than

10  50 percent then he's okay.

11         MR. OLD:  I put Lance in a bad

12  position, the question he's asking is my question.

13         THE COURT:  It's hard to ask

14  other questions for people.

15         MR. OLD: Are you through with

16  him other than this?

17         MR. HINSON:  No.

18         THE COURT:  Your time is up

19  but we have used a lot of this on this issue and I'm

20  going to have you tell me the same as I did Bird earlier

21  what you need to cover and how much time you need to do

22  it.

23         MR. TOWNSEND:  Your Honor, I

24  would like to point out this witness has not been one of

25  these long-winded jurors.

1      THE COURT:  No.  He has not.

2      MR. TOWNSEND:  And, you know,

3  any hang-ups on this witness took place with about three

4  minutes left in the time to begin with.

5      THE COURT:  I think you are

6  exactly right.

7          Well, it started before that but I think

8  the hang-up did come in about the last five minutes.

9      MR. HINSON:  I believe the

10  potential juror did take several minutes in answering.

11      THE COURT:  Let's not worry

12  about what he did or didn't take, tell me what you have

13  not been able to cover and how much time you think you

14  need and I will decide whether to give it to you.

15      MR. HINSON:  Areas involving

16  criminal cases, whether he has friends or relatives who

17  were victims, defendants, witnesses.

18      THE COURT:  Is that in his

19  questionnaire?  Did he say that has been a -- did he

20  answer "Yes?"

21          What other areas?

22      MR. HINSON:  He answered "No."

23      THE COURT:  I have got it in

24  front of me.

25      MR. HINSON:  His religious

1   convictions, "Eye for an eye."

2                    MR. TOWNSEND: Your Honor, "An

3   eye for an eye" goes back into the death penalty, I

4   believe he's already covered the death penalty.

5                    THE COURT:   Let him finish

6   what areas then I will objections from the State.

7                    MR. HINSON:   To go over the

8   potential controversy, voluntariness of a confession, I

9   know he's sort of -- sort of went over this.

10                   MR. OLD:   You haven't.

11                   MR. HINSON:   I haven't.

12          I'm not sure at the beginning, that was

13   my understanding, several matters that were discussed

14   with him briefly.

15                   THE COURT:   Is it that you

16   discussed or that the State discussed?

17                   MR. HINSON:   And I have had

18   -- not discussed with him, it would be confessions, on

19   voluntariness versus for instance is it truthful versus

20   is it being voluntary.

21                   THE COURT:  What other areas?

22                   MR. HINSON:     Then the

23   definition of reasonable doubt.

24                   THE COURT:   I don't think

25   either side had him read that one.

1        Did he read that or not?

2                        MR. OLD:  I don't know.

3                        MR. LEE:   I referred to it

4    briefly.

5                        MR.   HINSON:     Considering

6    repeat offenses, prior bad acts or convictions.

7                        THE COURT:   While we are on

8    that subject; I don't know that the defendant is eligible

9    for probation, does the defendant have a juvenile record?

10                       MR.   TOWNSEND:    He  has  one

11   juvenile adjudication, Your Honor.

12                       THE COURT:   Does he have an

13   adult record?  Has he ever been on adult probation?

14                       MR. OLD:  No.

15                       THE COURT:   Does the State

16   have any other evidence of other bad acts that they

17   intend to introduce?

18                       MR.   OLD:    None  that  was

19   admissable at that time and none that was admissable at

20   the time the Court ordered to produce.

21                       THE COURT:  That's -- then wy

22   ask the question?

23                       MR. OLD:  I don't know how you

24   are going to rule on it.  I've got one in the mail this

25   week.

1             MR. TOWNSEND:   What did you

2     say "any prior bad acts?"

3             We have got some prior bad acts there

4     and might be sanity, hasn't been ruled on.

5             THE COURT:   So you do have

6     some bad acts that you are going to attempt to introduce?

7             MR. OLD:  I have got one since

8     we started questioning jurors by mail that's --

9             THE COURT:  If the State has

10    no bad acts they are going to try to get into evidence

11    then there's nothing to voir dire, if the State does,

12    whether it comes in or not I think you certainly have a

13    right to voir dire on it.

14             MR. TOWNSEND:   The prior bad

15    act that he talked about receiving in the mail is one he

16    received   prior   to   voir   dire,   it's   also   one   we

17    supplemented with information later.

18             MR. OLD:  He has to designate

19    those things, not really sending somebody some sort of

20    report, you don't have to just --

21             THE COURT:   This is not the

22    time to go into this.

23             If the State tells me there's no prior

24    bad acts they are going to introduce then I'm going to

25    cut you off on voir dire, if they tell me they do I'm

1   going to go forward so it's your advantage not to argue

2   with me about whether it's admissable, you are going to

3   cut yourself off.

4                   MR. TOWNSEND:  Your Honor, is

5   it my turn to talk about this?

6                   THE COURT:  That was my next

7   question; anything else, Mr. Hinson?

8                   MR. HINSON:  I would like to

9   ask him a roundhouse question based on everything he has

10  heard does he lean for or against life or death, has his

11  opinion changed since he filled out the questionnaire

12  because now he has certainly -- he has more information

13  to deal with than what he was dealing with when he first

14  came in.

15                  THE COURT:  I don't think

16  that's a proper question.

17                 I think a proper question would be

18  "Based on what you have heard today."

19                 Let me see -- if you asked him if he

20  leaned more toward life or death that's not really

21  telling us anything, I think asking him whether or not

22  what he has learned today --

23                  MR. LEE:  That's sort of

24  implying that he's going to consider conversations as

25  evidence if you word it anywhere near that.

1                              THE    COURT:    Maybe   not

2    "conversations."

3                                   MR.  LEE:   Or "questions" as

4    evidence.

5                              THE   COURT:    I'm  not  sure

6    exactly how that question should be asked.

7                         Let me think about that for a moment.

8                              MR. OLD: It's certainly "From

9    what you heard since you answered that question" or "What

10   you thought about has your opinion as to capital murder

11   changed from the statement made on page such and such."

12                              THE COURT:  That's the proper

13   question.

14                              MR. OLD:  Then I think you get

15   an affirmative answer.

16                              THE COURT:  Then you might be

17   entitled to go into it some more.

18                              MR. OLD:  Yes.

19                              THE    COURT:    "How  did  it

20   change?"

21                         First off the criminal cases, he checked

22   in his questionnaire, "No", that he has not had any

23   family members, close friends either arrested or accused,

24   he had no involvement in the criminal justice system

25   through the family and relatives, if that's the proper

1    inquiry -- you might ask him if he -- if they have

2    changed -- let me hear the State on the rest of it.

3                        MR. TOWNSEND:    "The rest of

4    it?"

5                        THE    COURT:    Yes.    He's

6    requesting to go into the voluntary confession and

7    reasonable doubt and whether or not a juvenile record and

8    bad acts will effect his answer to Number One.

9                        MR. TOWNSEND:  Your Honor, we

10   were told before this thing started that we were both

11   sides would receive 50 minutes, I assume that myself and

12   the State as well as the Defense is supposed to plan

13   their questioning to where it will take approximately 50

14   minutes.

15                        I understand from what the Court told

16   us the other day if we had a witness that was very

17   lengthy in their answers or very slow to answer that the

18   Court will allow -- would allow for that, give some

19   additional time.

20                        This potential juror was not that way.

21                        If the Defense has several more minutes

22   of questions they didn't ask I don't believe it is the

23   fault of the juror, I don't believe it's the fault of the

24   State or the Court.  I don't believe that we should, you

25   know, make additional allowances because they didn't

1    finish within their 50 minutes when there's really no

2    extenuating circumstances for their not having finished.

3    They had the same opportunity and he's not a recalcitrant

4    witness or witness that caused any problem with anybody

5    more than the last maybe three to five minutes at the

6    most.

7              THE COURT:   I have to agree

8    with the State, a lot of time was used in this area

9    concerning probability.   I think he answered that

10   question quite clearly and then we spent a lot of time

11   confusing him.

12             I'm not going to let you get back into

13   the credibility -- excuse me, "into the voluntary

14   statement", I think you had time to cover it and you

15   didn't.

16             I'm going to ask him to read the

17   definition of reasonable doubt and ask him whether or not

18   he can follow the Court's instruction and follow that

19   definition.

20             You need to specifically tell me what

21   you want to ask him about juvenile involvement or prior

22   acts and then I will decide whether those questions will

23   or won't be asked.

24             Not just a general area, I need a

25   specific question at this point.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1      MR. HINSON:    I believe I

2  addressed that "repeat offenders and juvenile."

3      THE COURT:   Repeat.

4      MR. HINSON:   And I believe my

5  question to the juror, potential juror, to consider the

6  age and seriousness and the conduct of the repeat

7  offender from the previous act, prior bad act or

8  conviction in assessing whether or not the defendant

9  would be a threat to society based on that Issue #1.

10     THE COURT:  Do you want to ask

11  if this juror would, assuming that -- they are assuming

12  that evidence of prior acts come in, would the juror be

13  able to consider the age of the defendant and the

14  seriousness of any prior bad act when answering Number

15  One?

16     MR. HINSON:   Yes.

17     THE COURT:   I will allow you

18  to ask that question.

19     I will have him read the reasonable

20  doubt and I will ask him if his answers on Page 9 changed

21  and if the answers have changed I think both sides are

22  entitled to get back into it, if the answers are -- has

23  not changed, neither side can get back into it.

24     MR. TOWNSEND:    On Page 9

25  -- this may not be anything but you are not going to get

1    back into who he likes better than Nolan Ryan?

2                    THE COURT:   No.   He's going

3    to start at "criminal justice system."

4                    MR.  HINSON:    The  latest,

5    whether or not he changed his opinion on the death

6    penalty based on what he heard today?

7                    THE COURT: I will allow those

8    two questions, the one on the age and whether or not he

9    has changed his opinion.

10                   Now,  let  me  be  more  specific;  what

11   opinion are you talking about?

12                   MR. HINSON:   The opinion as

13   he stated on his questionnaire.

14                   THE COURT:   The offense is

15   serious enough I believe it's justifiable.   Yes, sir.

16                   All right.   Bring him in.

17                   MR. OLD:  Your Honor, how did

18   you  rule  on  whether  or  not  he  can  ask  him  anymore

19   questions about "probability?"

20                   THE COURT:  He didn't ask to

21   ask anymore questions about probability but in my opinion

22   he has sufficiently covered it and I think all we have

23   done is confused the juror.

24                   I'm going to read the law to the juror

25   unless there's an objection from either side and ask him

1   if he can follow that law or if he disagrees with that

2   law.

3                    If he disagrees with it then I will --

4   I will take that up.

5                    MR. OLD:  You are taking the

6   questions only --

7                    THE COURT:  Mr. Hinson will

8   be allowed to ask the two questions I told him he could

9   ask.

10                    MR. OLD:  Thank you.

11                    THE COURT:  I am going over

12  "reasonable doubt", Page 9, and instruct him as to the

13  law on "more likely than not."

14

15                    (The following occurred in the presence

16  and hearing of the potential juror:)

17

18                    THE COURT:  Mr. Pearson, we

19  discussed with you or both sides have discussed with you

20  the fact that on that first issue, first Special Issue

21  on your paper before you.   (Indicating)

22                    THE POTENTIAL JUROR:  Okay.

23                    THE COURT:  That the State has

24  the burden of proof, meaning the State must prove beyond

25  a reasonable doubt that that answer must be "Yes."

1       In essence the law says the answer is

2   "No" because the State has to prove its question so if

3   they don't prove it's "Yes" what is it?  It's "No."

4       So the State's burden is to prove to you

5   beyond a reasonable doubt that this answer should be

6   "Yes."

7       And our courts have told us that the

8   State must prove beyond a reasonable doubt that the

9   defendant will more likely than not commit criminal acts

10  of violence in the future so as to constitute a

11  continuing threat to society.

12      Can you follow that law?

13              THE POTENTIAL JUROR:  Yes.

14              THE COURT:  And will you make

15  the State prove beyond a reasonable doubt that it's more

16  likely than not that a person would commit criminal acts

17  of violence in the future before you would answer that

18  question "Yes?"

19              THE POTENTIAL JUROR:  Yes.

20              THE COURT:  There is a paper

21  to your left, long sheet of paper.  (Indicating)

22              THE POTENTIAL JUROR:  All

23  right.

24              THE COURT:  Not -- not the

25  long sheet, a sheet with a lot of writing on it.

1   (Indicating)

2                    THE POTENTIAL JUROR:   Okay.

3                    THE   COURT:   That   is   an

4   instruction that is included in all criminal cases, it

5   tells all jurors that the defendant is presumed to be

6   innocent and then defines toward the middle half to the

7   bottom, "reasonable doubt."

8                    Please read that to yourself and tell

9   me when you finish.

10                   THE POTENTIAL JUROR:   Okay.

11                   THE COURT:  You have been told

12  that the State must prove beyond a reasonable doubt the

13  guilt and if they want a death penalty they must prove

14  beyond a reasonable doubt, the answer should be "Yes" to

15  question Number One.

16                   Do you agree or disagree with that type

17  of written definition of "reasonable doubt?"

18                   Can you follow that law is what I'm

19  asking you?

20                   THE POTENTIAL JUROR:   Yes.

21  I can.

22                   THE   COURT:   Does   your

23  definition of reasonable doubt differ from what you have

24  read?

25                   THE POTENTIAL JUROR:   No.

1          THE COURT:  I want you to look

2    back at your questionnaire, I'm going to hand it to you.

3          On  Page  9  starting  with  "criminal

4    justice  system"  you  answered  three  questions  "No",  on

5    Page 10 you answered five questions "No."

6          Now, it has been a couple of weeks since

7    you filled this out.  I just want you to look at it and

8    see if anyone of those answers have changed.

9          It's just asking about prior involvement

10   of you, your family and friends and the criminal justice

11   system.

12

13          (Handed to the potential juror.)

14

15          THE POTENTIAL JUROR:   No.

16          THE COURT:  None of those have

17   changed?

18          THE POTENTIAL JUROR:   No.

19          THE  COURT:   I  believe  Mr.

20   Hinson  has  a  couple  of  more  questions  for  you,  one  of

21   them  will  require  you  to  look  back  at  your  explanation

22   of  the  death  penalty  so  I  will  let  you  hold  that  for  a

23   moment.

24          Mr.  Hinson.

25          MR.  HINSON:  Mr.  Pearson,  let

1   me ask you that question that relates back to your

2   questionnaire; first you stated that under the proper

3   circumstances the death penalty is appropriate.

4            Now, based on what you have heard today

5   and what you have learned today has your opinion as to

6   -- your opinion as to the death penalty changed?

7            THE POTENTIAL JUROR:   No.

8   Q        (BY MR. HINSON, CONTINUING VOIR DIRE

9   EXAMINATION)   During the course of the second phase

10  of this trial, capital murder trial, the punishment

11  phase, there may or may not be evidence presented to you

12  regarding prior acts, prior convictions of the defendant.

13           If that evidence is presented to you

14  and as you answer jury Issue #1 -- do you have the jury

15  issues -- the jury questions, Special Issue #1?

16  (Indicating)

17  A        Okay.

18  Q        If you heard evidence of prior bad acts or

19  prior convictions could you consider age and the

20  seriousness of the conduct in assessing whether the

21  defendant would constitute a continuing threat to

22  society?

23  A        Yes.  If I am understanding your question

24  right.

25           MR. HINSON: Pass the witness.

1          THE COURT:    Thank you, Mr.

2     Hinson.

3               Sir, if you will step out we will have

4     some further directions for you in a moment and you are

5     almost finished.

6               THE POTENTIAL JUROR:    Okay.

7

8               (The following occurred outside the

9     presence and hearing of the potential juror:)

10

11               THE COURT:    Does the State

12     have any challenges?

13               MR. TOWNSEND:    None, Your

14     Honor.

15               THE COURT:  Mr. Hinson or Mr.

16     Old?

17               MR. OLD:    Yes, Your Honor.

18     We have a challenge for cause.

19               The potential juror, Bobby Keith

20     Pearson, stated that he would require in order to answer

21     Special Issue #1 "No" he would require more than a mere

22     probability, he would require 75 percent proof and also

23     used the word "shadow of a doubt" or that type of proof

24     as the meaning of "probability", that he would -- that

25     he would not judge it merely by "more likely than not"

1  and he has indicated a prejudice against the law as

2  charged and cannot follow the law.

3                    THE COURT:  Do you have any

4  other challenges?

5                    MR. OLD:  That's it, Your

6  Honor.

7                    THE COURT:  Mr. Lee?

8                    MR. LEE:  Your Honor, I

9  believe as a whole his testimony was that he could follow

10  the charge as given and if he wanted to give us a higher

11  standard of proof that's his prerogative.

12                    THE COURT:  I have to agree

13  with the State, a probability at 75 percent or more is

14  certainly that, it inures to the benefit of the Defense

15  and I don't see how you can rely on their putting a

16  higher burden on the State than on you.

17                    The State only has to prove it's more

18  likely than not, this man stated the State has to prove

19  it's more likely than not.

20                    MR. OLD:  That's not what I

21  understood he said.

22                    THE COURT:  It's what I

23  understood he said.

24                    MR. OLD:  We vary on what we

25  think he said.

                                                    145

1          MR. LEE:  Also the Court asked

2    him direct when you brought him back that he would follow

3    the law and I think that clears up any statement he might

4    have made.

5          THE COURT:  What do you think,

6    Mr. Old?

7          MR. OLD:  What he said was to

8    answer Special Issue #1 "No" saying that there -- there

9    is not a probability that the defendant would commit an

10   act of violence in the future being a danger to society.

11         THE COURT:   I think he may

12   have misunderstood.

13         MR.  OLD:   He said that he

14   would require, he first said "Probability means shadow

15   of a doubt" then he defines that as a 25 percent weight

16   to it, not that he would have to believe that not by 75

17   percent.

18         THE COURT:   Then the proper

19   challenge is he's requiring you --

20         MR. OLD:  To prove something.

21         THE  COURT:    -- to  prove

22   something?

23         If that's what he meant I certainly

24   agree that he's disqualified, I do not believe that's

25   what he meant.

1    I will certainly not rely on what I

2   remember, I will bring him back and ask him.

3                    MR. OLD:  Okay.

4                    THE COURT:  But I think he

5   meant that it required 75 percent before he answered

6   "Yes."

7                    MR.   LEE:   When   you   did

8   question him you questioned him on that, he said he could

9   go by the law.

10                    THE COURT:  I understand and

11  he did say that but I don't -- I do remember at some

12  point there was a question asked that could establish a

13  burden of proof and I think that may have been the

14  question.

15                    I think again it was confusion on the

16  juror's part but I am not going to just assume I am right

17  without talking with him.

18                    Are there any other challenges?

19                    Bring back Mr. Pearson.

20

21                    (The following occurred in the presence

22  and hearing of the potential juror:)

23

24                    THE COURT:  I'll bet you will

25  be glad when we finish up.

1          THE POTENTIAL JUROR:  Actually

2     I'm heading to Fort Worth on a big bus for a golf

3     tournament.

4          THE COURT:   Mr. Pearson, we

5     have a misunderstanding on how you answered a question,

6     some seem to remember it one way and some seem to

7     remember another way and it goes back to this question,

8     Number One, the Special Issue number.

9          Now, you understand the Special Issue,

10    you understand the State has the burden of proof, do you

11    also understand the defendant has no burden anywhere

12    during this trial, they don't have to bring anything to

13    you, they don't have to disprove anything to you, they

14    don't have to disprove anything, do you understand that?

15          THE POTENTIAL JUROR:      I

16    understand.

17          THE COURT:   I believe there

18    was a question asked by Mr. Hinson and I think the

19    question was in order to answer that question "No" would

20    you have to be convinced that there was -- well, I don't

21    know that I can paraphrase your question; "Are you going

22    to require the Defense to prove that the person will not

23    be dangerous in the future or are you going to have the

24    State have to prove to you that he will be dangerous?"

25          See, before you answer that question you

1    have already found this person guilty of capital murder.

2                          THE POTENTIAL JUROR:  Right.

3                          THE COURT:    Now  you  have

4    decided by answering that question "Yes" means "death

5    penalty", "No" means "life sentence?"

6                          THE POTENTIAL JUROR:  I think

7    I see where the confusion is.  I was confused, too.

8                          I would say that I am going to require

9    the State to prove to me that he is -- let me think about

10   that -- I think that I would require them to prove to me

11   that.

12                         THE   COURT:    Now,  who  is

13   "them?"

14                         THE  POTENTIAL  JUROR:    The

15   State.

16                         THE COURT:  Okay.

17                         THE  POTENTIAL  JUROR:    That

18   before I would answer that question "Yes."

19                         THE  COURT:    If  the  State

20   failed to prove it would you answer "No?"

21                         THE POTENTIAL JUROR:  Let me

22   think about that.

23                         THE COURT:   I just want to

24   make sure that all jurors understand exactly how this

25   works, they have the burden of proof.

1          THE POTENTIAL JUROR:  I would

2  say the answer is "Yes."

3          THE COURT:  See, the State has

4  all the burden, the defendant never has to prove anything

5  to you so the defendant doesn't have to give you any

6  evidence saying he wouldn't be a danger, he very well

7  may want to give that evidence and you can certainly take

8  into account where the evidence comes from, you can look

9  back at the facts of the case to answer these questions.

10          It very well could be in the trial of

11  this case or any capital case if the State gets a

12  conviction at the punishment phase you may not hear

13  anything different, it may not be anything else and then

14  at that point you go back and reexamine the facts of the

15  case.

16          So in answering that question you look

17  at the facts of the case and any additional evidence that

18  has been presented but the lawyers seated over here,

19  meaning the Defense, don't have to prove anything to you

20  so they don't have to disprove that, it's an automatic

21  "No" until the State can prove that it should be "Yes."

22          Can you follow that law and make the

23  State prove it?

24          THE POTENTIAL JUROR:  Yes.

25          THE COURT:  Would you require

1    the Defense to disprove it -- well, that's not a fair

2    question.

3                    THE POTENTIAL JUROR:  I think

4    I was forgetting that it was Phase II, I was forgetting

5    it was Phase II of the trial awhile ago.

6                    THE COURT:  Does that satisfy

7    the inquiry we had a moment ago or discussion we had a

8    moment ago, Mr. Old?

9                    MR. OLD:  He was beginning to

10   say something, I was real curious as to what he was going

11   to say, he said "Phase II of the trial."

12                    THE POTENTIAL JUROR:  I think

13   awhile ago I had, you know, neglected to realize the

14   sequence of events there and I was assuming that we were

15   already past this part right here and, you know, the

16   decision had already been made, you know, whether the

17   defendant was guilty or not guilty or whatever but -- but

18   by looking at the deal here.  (Indicating)

19                    THE COURT:  "The flow chart?"

20                    THE POTENTIAL JUROR:   "The

21   flow chart", I think I got out of sequence awhile ago

22   when I answered that question.

23                    THE COURT:  So you are telling

24   me now, though, you understand the State has the burden

25   and if they don't prove it you are going to answer it

1    "No?"

2                        THE POTENTIAL JUROR:   Yes.

3                        THE COURT: And if that should

4    be answered "Yes" you will answer it "Yes?"

5                        THE POTENTIAL JUROR:   Yes.

6                        THE COURT:   That is that the

7    State must prove beyond a reasonable doubt that it's more

8    likely than not?

9                        THE POTENTIAL JUROR:   Yes.

10                       THE COURT:   Do you have any

11   questions?

12                       MR.  HINSON:    I  think  Bird

13   does.

14                       THE COURT:  Mr. Old?

15                       MR. OLD:   Judge, I may have

16   been confused again, is his inquiry that he started and

17   finished -- he said that, if I understood him correctly,

18   he didn't realize he would be finding him guilty and

19   answering those questions in one deliberation think.

20                       As   a   result  I'm  not  sure  he's

21   understanding the flow chart.   The fact that the jury

22   first deliberates as to whether he's guilty or innocent

23   or --

24                       MR.  TOWNSEND:    I  want  to

25   object.

1      Are we starting over again?

2                    THE COURT:   No.   We are not

3      going to start over again.

4                    MR.   TOWNSEND:      Is   Mr.   Old

5      going to start questioning him again?

6                    THE COURT:   But I do see Mr.

7      Old's concern and I'm going to explain it to him and if

8      he appears to be confused we'll go over it again.

9                    There are two phases to the trial, in

10     the first part of the trial the State puts on their

11     evidence, they rest, the Defense if they wish to put on

12     their evidence if they wish to do so then they rest.

13                   Each side presents their argument, you

14     are retired to deliberate, you have one decision to make,

15     "Is he or is he not guilty?"

16                   THE POTENTIAL JUROR:   Yes.

17                   THE COURT:   If you find that

18     he's guilty of capital murder then we go into the second

19     phase of the trial which has to do with punishment, once

20     you find a person guilty of capital murder the best that

21     can happen is a life sentence so in essence we have an

22     automatic life sentence when you find him guilty.

23                   THE POTENTIAL JUROR:   Yes.

24                   THE COURT:   Then if the State

25     can prove to you that he's going to be a danger in the

1    future that elevates that life sentence up to death and

2    all 12 of you have to agree if the answer should be

3    "Yes."

4            If the State can't prove that he's going

5    to be a danger in the future then you have to answer that

6    "No", which means a life sentence.

7            If you do answer it "Yes, that he will

8    be a danger" then you look to that second question and

9    all that second question is is a relief valve.

10            Basically "Do you see anything in his

11    background, his age, his moral culpability, his

12    blameworthiness, do you see anything in there that tells

13    you that he should be spared a death sentence?"

14            If you think he should be spared the

15    death sentence you say "Yes", if you think he should not

16    be spared you answer "No."

17            Do you understand the process?

18                THE POTENTIAL JUROR:  Yes.

19                THE COURT:  Thank you, sir.

20            I will have some instructions for you

21    in just a minute then you are going to be free to go but

22    we won't bring you back in.

23

24           (The following occurred outside the

25    presence and hearing of the potential juror:)

1          THE COURT:    Challenge for

2   cause overruled.

3          I find the juror qualified.

4          Go ahead and tell him he's free to

5   leave, we will let him know next week.

6          MR. OLD:    I have another

7   challenge for cause to make which is something that arose

8   after I made my last one.

9          THE COURT:  You may do so.

10          MR. OLD:    Mr. Townsend

11  objected to me questioning the witness, I directed my

12  remarks directly to the Court, I did that intentionally

13  because at this point I felt the Court was interrogating

14  the witness.

15          The witness directed his response to

16  me, I paused for the Court to answer the question really

17  that he asked before I answered.

18          That remark is from the side bar, I had

19  addressed the Court, I was not attempting to question the

20  witness and it is inflammatory to the point that it's

21  done in the presence of this juror, he should be excused.

22          THE COURT:  I do not believe

23  that it upset the juror.  I don't think the juror paid

24  much attention to what we were doing, he was more

25  concerned with what he was supposed to do in trying to

1     figure out the answer.

2              The challenge is denied.

3              I'm going to instruct both sides if you

4     have an objection address them to the Court and they must

5     be legal objections.  He has objected several times and

6     it wasn't a legal objection and you objected several

7     times and they were not legal objections.  I want proper

8     legal objections if they are not properly stated I don't

9     want any argument.

10             Make your objection.  If I want further

11    comment I will ask for it, otherwise we will tell him to

12    go to Fort Worth.

13             We will take a break.

14

15             (Recess.)

16

17             (The following occurred in the presence

18    and hearing of the potential juror:)

19

20      ALTON DEAN ALEXANDER, Potential Juror #358,

21    was called as a Potential Juror and, having been

22    previously sworn by the Court, testified as follows:

23

24             THE COURT:  How are you doing,

25    Mr. Alexander?

1          THE POTENTIAL JUROR:   Pretty

2   good.

3          THE COURT:  We have taken up

4   a lot of your day and the last couple of days and I'm

5   sorry we haven't gotten to you as quick as we hoped to.

6          We just never know how long you are

7   going to last, sometimes we may talk to a juror for just

8   a few minutes, sometimes like with the last day it has

9   been a couple of hours.

10          Mr. Alexander, I am Gary Stephens, I am

11   presiding over this trial.

12          We have two lawyers representing the

13   State of Texas, we have the elected District Attorney

14   from Morris County, Mr. Richard Townsend, we have the

15   newly elected District Attorney of Cass County that will

16   take office in January, Mr. Randall Lee.

17          We have two lawyers for the Defense, Mr.

18   Bird Old, III, Mr. Lance Hinson.

19          MR. HINSON:  Good afternoon.

20          THE COURT:  Next to Mr. Hinson

21   is the person charged, Mr. Billy Wardlow.

22          Now, Mr. Alexander, the lawyers have

23   read your questionnaire, they are familiar with the

24   answers.

25          They need to discuss some of those

1    answers with you and they are also going to discuss the

2    law that applies.

3              You will be asked a lot of questions and

4    the answers will let us know whether or not to put you

5    on the jury.

6              In order to answer the questions you

7    have to be able to understand and follow the law, as a

8    policeman you probably know that you don't have to

9    necessarily agree with the law, you have to follow the

10   law but if you disagree with the law and you can still

11   put aside that disagreement you are a qualified juror.

12   But if you disagree with the law to such an extent that

13   you can't follow it then you are not qualified so we need

14   to question you about your ability to follow the law.

15             A person can be legally qualified and

16   that does not necessarily mean he's going to be a good

17   juror or an appropriate juror, there can be something in

18   a juror's background or juror's opinion that just lets

19   us know that this isn't the case for you.

20             So we want to know something about you,

21   what your thoughts are, how you got there.  In general

22   we want to find out all we can about you and the best way

23   we can do that is to ask questions and have you just open

24   up and be as honest as you can.

25             We don't really care what your answers

1    are, I don't mean to be rude by that, it doesn't matter

2    what your answers are but it very much matters that we

3    understand where you are coming from.

4              There aren't any right or wrong answers,

5    there's no right or wrong opinions.

6              So just open up and share your views

7    with us and we will try to make this as short as

8    possible.

9              Who's going for the State?

10             Mr. Lee.

11

12             VOIR DIRE EXAMINATION

13             BY MR. LEE

14

15   Q        Mr. Alexander, as the Judge just mentioned, my

16   name is Randy Lee and I'm from Cass County.

17             I don't believe I know you, do I?

18   A        No.

19   Q        I know some peace officers in various counties

20   but I don't believe -- and this is Richard Townsend.

21   (Indicating)

22             Have you been over in Morris County or

23   done any work over there that you have worked with him?

24   A        No.  Never worked with him.

25   Q        Do you know him?

1    A        I have seen him, you know, but never met him.

2    Q        Anything about seeing him around or knowing

3    him, who he is, that would interfere with your ability

4    to decide fairly in this case?

5    A        No.

6    Q        And Bird Old is the -- is one of the Defense

7    Attorneys, I believe you stated that you do know him.

8            How do you know him?

9    A        I have just seen him around.

10   Q        Through your job?

11   A        Through my job.

12            I have never been on trial or anything

13   where he was involved.

14   Q        Anything about that or knowing him or his

15   reputation that would interfere with your ability to

16   decide fairly?

17   A        No.

18   Q        And Lance Hinson is an attorney here in Mount

19   Pleasant, I assume you know him or know of him?

20   A        I just know of him.

21   Q        There's nothing about that that would interfere

22   with your ability, is that fair?

23   A        Yes.

24   Q        As the Judge mentioned, there's no right or

25   wrong answer, we are just trying to -- sometimes you have

1   to get the appearance of propriety or avoid impropriety

2   more so than even what happened and that's what we are

3   trying to do is find 12 people to listen to the evidence

4   and decide fairly.

5   A         Yes.

6   Q         I assume as a peace officer you are used to

7   enforcing the laws and some of the laws you may or may

8   not agree with?

9   A         Yes.

10  Q         And really what we are trying to find, each

11  person can't be fair or couldn't serve on every type or

12  type of case, for instance I have several relatives and

13  some of my relatives I am going to believe them no matter

14  what they say, I wouldn't be fair on that, and some of

15  my relatives don't want me on their jury because I'm not

16  going to believe that Easter falls on Sunday.

17             So that's what we are doing, trying to

18  decide whether you can be fair and whether you can decide

19  and obviously you are going to get a lot of questions

20  because you are a peace officer and whether you can put

21  that aside and your knowledge and whether you can decide

22  fairly.

23             First of all; can you?

24  A         Yes, sir.

25  Q         Do you think your job will interfere with your

1    ability to decide fairly?

2    A        I don't think so.

3    Q        It hasn't changed your view on life?

4    A        No.

5    Q        I am sure you understand as an officer the

6    difference between murder and capital murder?

7    A        Yes, sir.

8    Q        Just in case I will go over briefly some of the

9    explanation, obviously murder is the intentionally and

10   knowingly killing someone.

11            Have you ever investigated a murder in

12   your job or --

13   A        Yes.

14   Q        -- have you ever investigated capital murder?

15   A        Yes.

16   Q        Capital murder obviously is murder plus

17   something, a felony, killing a police officer, fireman,

18   in the line of duty or killing more than one person,

19   committing a robbery and murdering someone or rape,

20   burglary, etcetera.

21            And in this case it's a robbery

22   resulting -- a death resulting in a robbery and you kind

23   of understand the difference between murder and capital

24   murder?

25   A        Yes.

1  Q        I am sure you would.

2           Would you have any problem -- what is

3  your feeling on the death penalty?

4  A        What are my feelings on the death penalty?

5  Q        Do you think it's appropriate?

6  A        In some cases.

7  Q        I'm sure you can understand the law, do you

8  agree with the law on the death penalty as to when it's

9  appropriate?

10  A        Yes.

11  Q        Is it too harsh or too soft, about the way you

12  feel?

13  A        It all depends on the case.

14  Q        You personally could, if 11 people had decided

15  that the death penalty was appropriate by their answer

16  and you were the twelfth person, make the decision?

17  Could you vote in such a way that would require the death

18  penalty if you felt it was --

19  A        If that's what I felt.

20  Q        And do you understand that the State has the

21  burden beyond a reasonable doubt?

22  A        Yes.

23  Q        And the Defense has no burden whatever?

24  A        Yes.

25  Q        That in fact the defendant -- I am sure that

1    you are familiar with the Fifth Amendment rights, the

2    defendant can sit there and not say a word and the law

3    requires you to be able not to hold that against him, can

4    you do that?

5    A        Yes.

6    Q        Could you make us prove our case beyond a

7    reasonable doubt?

8    A        In this case we are seeking the death penalty

9    so it's a very serious case and that's one of the reasons

10   that we are talking to you individually, not like the big

11   group in general make doubly sure and it's the only

12   chance we get to talk to you and the only chance that you

13   get to talk to us with the exception of Bird, so if you

14   get confused or misunderstood what I'm saying or the

15   Judge just say so and we'll rephrase the question.

              Obviously there it's a two-part trial

16

17   in Texas, we have the first part of guilt/innocence and

18   we only present evidence of guilt or innocence, we don't

19   go into punishment.

              And then if you find him guilty of

20

21   capital murder then we go to the sentence part, that's

22   when we introduce evidence as to punishment.

              Have you testified in trial?

23

24   A        Yes, sir.

25   Q        And kind of understand the difference there?

1     A       Yes.

2     Q       And obviously the much criticized parole.

3              In the State of Texas the law requires

4 and the Judge will give you an instruction to parole,

5 however in this case I anticipate him giving instruction

6 that if the Defendant receives a life sentence for

7 capital murder he will receive a mandatory minimum of 35

8 years before he's even eligible.  However, you are not

9 to allow, to consider whether or if he ever gets out of

10 the pen, can you put your knowledge, especially your

11 personal knowledge of the parole system aside and decide

12 based on the evidence and not consider whether he will

13 get out on parole or not?

14    A       Yes, sir.

15    Q       Probably or I am assuming you are not real

16 knowledgeable on the Special Issues or at least I wasn't

17 coming into this case that is required on capital cases

18 and the extra procedures that are involved.

19             You have an exhibit up there entitled

20 "Special Issues", see if you can find it.

21    A       Here.  (Indicating)

22    Q       All right.  Could you read Special Issue #1 to

23 yourself?

24    A       Okay.

25    Q       This Special Issue would come to you if you are

1    on the jury after the guilt/innocence portion, you would

2    have already found the man guilty of capital murder and

3    we have a Special Issue and obviously the law requires

4    you be able to consider the full case, full range and

5    consider it.

6              In other words, you can't jump from one

7    all the way to the end and decide what you want after you

8    have already decided that person is guilty of capital

9    murder and then there is a second part of the trial where

10   we introduce evidence, can you withhold your decision as

11   to what should be done to a defendant until the second

12   part of the case and consider all the evidence that comes

13   in the punishment phase?

14   A        Yes, sir.

15   Q        Let's say you went back up in your mind in the

16   first part, you heard the evidence, "I find him guilty

17   of capital murder, he needs the death penalty or he needs

18   life", can you withhold that until all the evidence?

19   A        Yes.

20   Q        Obviously that talks about criminal acts of

21   violence and I'm sure you are very familiar with that,

22   doesn't necessarily require murder, it's any type of

23   violence, criminal violence, it could be assault, simple

24   assault, wife beating, robbery, any number of violent

25   acts and the standard there is that we prove -- the State

1    proved beyond a reasonable doubt that there is a

2    probability he will commit future acts of violence.

3                   Can you hold us to that burden?

4    A        Yes.  I believe so.

5    Q        And will the fact that you are a peace officer

6    interfere and what you see on the street interfere with

7    that or make you a little likely to give it to him or

8    less likely?

9                   You are allowed to take your personal

10   experiences in, obviously you can't ignore that you are

11   a cop and if the Court gives you an instruction to burden

12   of proof and what we have to prove can you hold us to

13   that, make sure we do our job?

14   A        Yes, sir.

15   Q        The Special Issue #2, could you read that and

16   we'll talk about it?

17   A        Okay.

18   Q        That's basically in legalese but the way

19   understand the reading of that that it's basically a

20   safety valve to allow -- okay, you found the defendant

21   guilty of capital murder, he's committed capital murder

22   and you have already found that he's going to be a danger

23   to society in the future, there's a probability that he

24   will commit acts of violence, whether that's in the

25   penitentiary or whether that's on the streets but the law

1    requires you to be able to at least consider listening

2    to the evidence that is introduced to mitigating

3    circumstances. The law doesn't tell you what "mitigating

4    circumstances" is but the evidence that is offered, that

5    you at least have to listen to it, think about it and

6    consider it, not that you will do it but that you have

7    to consider, have to think about it and consider it.

8         For instance, many people like to

9    consider background, how a child was raised, how, you

10   know, whether his daddy was with him, whether he had a

11   daddy, that sort of thing or age, intelligence --

12   obviously people sometimes don't feel like a mentally

13   retarded person shouldn't be held to the same standard

14   as the average citizen who can function.

15        But that's really your definition, what

16   you can do and what you can consider.

17        Can you listen to the evidence, decide

18   it as a whole, whether you feel like there's mitigating

19   circumstances that would make a defendant deserve live

20   rather than death or get life?

21   A         Yes.

22   Q         And it's our burden to prove to you, can you

23   hold us to that burden?

24   A         Yes.

25   Q         And obviously in the trial there's no

1    guarantees, for instance in this case he's charged with

2    committing a murder during the course of a robbery, it

3    may be or if there's no evidence submitted as to the

4    robbery or insufficient evidence that there was a robbery

5    even take place would you have any problem finding him

6    guilty of murder as opposed to capital murder?

7    A       No.

8    Q       If we don't do our job you can do that?

9    A       Right.

10   Q       And when you have murder obviously there's a

11   wide range of punishment, anywhere from five years

12   probation to life in the penitentiary and obviously as

13   an officer you know there's different types of murder?

14   A       Yes, sir.

15   Q       There could be a mercy killing where an 80 year

16   old couple lived together all their life, been married,

17   had their kids and say the wife is dying of cancer, is

18   on life support and in very much pain, begging her

19   husband, "Please unplug me, I can't take it anymore" and

20   then he does.

21           Obviously under Texas law that's murder.

22           In a situation like that would that be

23   a situation that you could consider say five years

24   probation?

25   A       Yes, sir.

1    Q        And of course it's not what you would do but

2    that could you consider?

3             And obviously there's more violent

4    individuals and gruesome killings that maybe life would

5    be more appropriate, can you consider that full range of

6    punishment?

7    A        Yes.

8    Q        And this is something I wasn't anticipating

9    asking a peace officer but the law requires that you,

10   while they are on the stand you give each witness an

11   equal footing or you don't let one person start ahead of

12   another, that you make your determination on their

13   testimony, what you see and what you hear.

14            For instance, as a peace officer would

15   you take another policeman's word over an average

16   citizen?  Would you give them a head start?

17   A        No.

18   Q        Are there good cops and, well, "bad cops?"

19   A        Yes.   There are.

20   Q        Efficient cops as well as inefficient cops?

21   A        Yes.

22   Q        And you would make that decision on what you

23   see or hear, make a determination whether a person is

24   telling the truth like you would on anyone else?

25   A        Yes.

1    Q          Other professions, preachers, would you give

2    a preacher an advantage over an average citizen?

3    A          No.

4    Q          Obviously there are good preachers and bad

5    preachers.

6               Do you know many of the officers in

7    Morris County?

8    A          No.

9    Q          Do you work with them regularly?

10   A          I don't work with them.

11   Q          What are your duties here?

12   A          I am a patrolman here in the City.

13   Q          So you pretty much stay on the streets here

14   locally?

15   A          Yes.

16   Q          Do you even know any of the officers in Morris

17   County?

18   A          Not personally.  I have met one, I can't even

19   think of his name right now.

20   Q          We'll give a list or there is a list, the

21   Defense Exhibit.  (Indicating)

22   A          "Witness List."  (Indicating)

23   Q          Are you close friends with any of these people

24   on this Witness List?

25   A          No.  I met Vernon Cope, that's who I was trying

1    to think of.

2                          THE COURT:   Look.   There are

3    three pages.

4                          MR. LEE:   Go ahead and kind

5    of glance over there and see if there's any obvious --

6                          THE POTENTIAL JUROR:   I met

7    David McFarland.

8    Q         (BY MR. LEE)   Basically I will narrow it a

9    little bit, you will know or know of some of them, is

10   there -- is there anyone that you know so well that it

11   would interfere with your ability to decide fairly?

12   A         No.

13   Q         That you would take care of?

14   A         I have worked with one here.   (Indicating)

15   Q         Who is that?

16   A         "Harry Washington."

17   Q         Anything   about   your   knowledge   of   Harry

18   Washington?

19   A         No.

20   Q         The fact that he was unsuccessful candidate for

21   Sheriff,   would   that   interfere   with   your   ability   to

22   decide?

23   A         No.

24   Q         I'm going on a little different topic now and

25   obviously the defendant has the Fifth Amendment -- are

1    you finished reading, I'm sorry, I am rushing you?

2    A        That's okay.  I am through.

3    Q        Is there anybody on that list that would

4    interfere with your ability to decide fairly if they

5    testified?

6    A        No.

7    Q        Obviously you are familiar with the Fifth

8    Amendment right to remain silent.

9            If it develops in this case that the

10   State offers their evidence and the Defendant does not

11   testify, just remains quiet would you hold the fact that

12   he remains quiet against him?

13   A        No.

14   Q        Would you -- that goes for the punishment, too.

15   A lot of people just want to hear someone get up and say,

16   "I'm sorry" or something to that effect, would you hold

17   the fact that he just remained quiet and didn't say

18   anything against him?

19   A        No.

20   Q        Would you give us a little bit -- the fact --

21   would you give our evidence a little more credibility if

22   he remained quiet or if the Defense Attorneys don't

23   introduce any evidence?

24   A        No.

25   Q        And base your decision on what you see and not

1    what you don't see or hear?

2    A        Yes.

3    Q        And obviously you have probably testified to

4    Grand Juries before?

5    A        Yes, sir.

6    Q        And you realize that indictment is not

7    evidence?

8    A        No.

9    Q        It's that, just simply the charge gets them

10   into Court?

11   A        Yes.

12   Q        Another area that is a common concern of

13   officers and complaint of officers but obviously -- many

14   times people, defendants give confessions or give

15   statements and there is various requirements that are

16   necessary for an officer to take a statement, for

17   instance; an officer can't beat it out of them, right?

18   A        No.

19   Q        That's involuntary.

20           Say in this case if the evidence comes

21   in, the statement comes in, a confession comes in but it

22   turns out it was beat out of the Defendant, could you set

23   aside that confession, the knowledge of that confession?

24   A        Yes, sir.

25   Q        And consider it on the other evidence?

1    A        Yes, sir.

2    Q        If some other rights -- if you believe that

3    some of the other rights were violated based on the

4    direction of the Judge can you also set that aside and

5    don't effect -- if they forgot to read him his Miranda

6    Rights, that's not the case in this case but if they

7    forgot to read him his Miranda Rights would you set that

8    aside?

9    A        Yes.

10   Q        Obviously, you know, you are going to know it

11   took place, could you set aside that if -- if it's not

12   legally obtained?

13   A        Yes.

14   Q        I will go over your questionnaire.

15            Is there any reason that you can think

16   of that why you could not decide and sit fairly on this

17   case?

18   A        No.  Not that I can think of.

19   Q        Are you very knowledgeable of Cason area?

20   A        Not real  knowledgeable.  I know where it is.

21   Q        Do you know Mr. Cole?

22            I believe you stated you didn't?

23   A        No.  I don't.

24   Q        And did you know the -- Mr. Wardlow?

25   A        No.

1    Q        His parents I believe are voluntary firemen

2    down in the Cason area, to your knowledge have you worked

3    with them?

4    A        What is his dad's name?

5                           MR. TOWNSEND:   "Jimmy."

6                           MR. LEE:   "Jimmy Wardlow."

7                           THE POTENTIAL JUROR:   I have

8    met him.

9    Q        (BY MR. LEE)  I believe he runs the voluntary

10   fire department.

11   A        About three or four years ago I worked on fire

12   trucks for him on the side.

13   Q        Anything about that that would interfere with

14   your ability to decide fairly?

15   A        No.

16   Q        Basically I will probably be briefer than I am

17   with most of you because I think you are knowledgeable

18   of the system and knowledgeable of what is required but

19   can you make us and hold us to our burden and not jump

20   ahead if the Judge or if the instruction -- obviously you

21   can't make a decision at the end of guilt or innocence

22   to the defendant, what the punishment should be because

23   you haven't heard all the evidence?

24   A        No.

25   Q        And can you hold us to the burden that we are

1   required by law to produce?

2   A       Yes, sir.

3   Q       And can you not jump from -- on the Special

4   Issue can you take the Special Issues in order and fairly

5   consider the evidence and decide?

6   A       Yes.

7   Q       On mitigating evidence, that is Special Issue

8   #2, that can come from us, the State, you know, obviously

9   we are going to introduce his age, we will probably

10  introduce some of his family life, there will be some

11  evidence --

12                  MR. OLD:   I object to him

13  telling what they are going to do in this case.   That is

14  not the test.

15                  THE COURT:   Overruled.

16                  MR. LEE:   -- there will be

17  evidence that is used even if the Defense doesn't produce

18  anything.

19                  If we produce some evidence that might

20  be mitigating can you consider what that evidence -- you

21  don't know what you are going to do but can you consider

22  all the evidence in deciding?

23                  THE POTENTIAL JUROR:   Yes.

24  Q       (BY MR. LEE)  Many people feel like a young man

25  of 18, 19, 20 years of age may be that ought to be

1   mitigating, other people, they are adults, they are grown

2   and feel like it shouldn't be.

3                But can you at least listen to that

4   evidence without saying what you would do but

5   listen to it and make your decision based on that

6   evidence?

7   A        Yes.

8   Q        Can you listen to family background, you know,

9   that evidence and just kind of put it in the pot and

10  decide whether as a total all the evidence that might be

11  mitigating that you think is mitigating -- nobody can

12  tell you what is "mitigating" and if it is and if you

13  feel -- all that evidence comes -- maybe means

14  that he's not quite as blameworthy, he's not quite as

15  responsible as maybe -- or as bad enough to deserve

16  the   death penalty,   can you consider  all   that

17  evidence?

18  A        Yes.

19  Q        And be fair?

20  A        Yes, sir.

21               MR. LEE:  Pass the witness,

22  Your Honor.

23               THE COURT:  Mr. Old.

24

25

1                    VOIR DIRE EXAMINATION

2                        BY MR. OLD

3

4                            MR. OLD:  May I proceed, Your

5    Honor?

6                            THE COURT:  You may.

7                            MR. OLD:   Mr. Alexander, I

8    talked to you a little bit about my relationship with you

9    or with your department, as a lawyer in the past with

10   your family?

11                           THE POTENTIAL JUROR:  Yes.

12   Q         (BY MR. OLD)  Your wife's name is "Hope?"

13   A         Yes, sir.

14   Q         I think, and I'm not sure I represented another

15   party in a lawsuit she was involved in, that would be

16   with Brad?

17   A         Oh, okay.

18   Q         I mean if I -- if I recall it wasn't really a

19   contested matter.

20   A         Yes.

21   Q         I consider Hope a nice person, if there was any

22   animosity in that lawsuit I don't remember it.

23                           What I'm asking you is this, if there

24   was an -- and I don't think there was but sometimes we

25   don't know as lawyers, would that carry over to this

1    trial either in you holding it against me or perhaps

2    holding it against me or Mr. Wardlow?

3    A        No.

4    Q        I don't think I have ever tried a case where

5    you were a witness or were perhaps -- even you were an

6    investigating officer, if I have I don't recall it.

7    A        I don't recall it either.

8    Q        Have we ever gotten crossways and I didn't know

9    it over police matters?

10   A        Excuse me?

11   Q        Have you and I ever gotten crossways over a

12   police matter?

13   A        No.

14   Q        Okay.

15   A        No.   No.

16   Q        I have been crossways with other people that

17   you work with from time to time?

18   A        No.

19   Q        And I suspect it's probably been talked around

20   and I mean what I want to know is I can't make anybody

21   like me, I can't make anybody agree with me.  What I want

22   to know is if you have friends or associates that have

23   a grudge, don't like me, whether it's for a particular

24   reason or not.

25   A        Yes.

1    Q        Is that going to effect how you deliberate in

2    this case?

3    A        No.

4    Q        Now, you work for the Government, do you not?

5    A        Yes, sir.

6    Q        And I'm not going to try to stretch things too

7    far but the City of Mount Pleasant is a political

8    subdivision of the State of Texas?

9    A        It's a municipality.  Yes.

10   Q        But I mean a political subdivision of the

11   State?

12   A        Yes.

13   Q        If you really get down to it you and Mr.

14   Townsend, the prosecutor in this case, you all both work

15   for the State or for Government?

16   A        Well, I work for the municipality, you know,

17   the City of Mount Pleasant.

18   Q        You both work for Government?

19   A        Yes.  "For Government."

20   Q        And you work with the prosecutor here which is

21   Mr. Townsend's equivalent in this county?

22   A        Yes.

23   Q        He's your prosecutor as to felony cases?

24   A        "Mr. Bailey?"

25   Q        Yes.

1    A        Do you relate to the State's side of the case

2    in any case because of that?

3    A        "Do I relate to it?"

4    Q        Do you relate to it, are you pro-State?

5             I mean you all work together?

6    A        Yes.  We work together.

7    Q        I mean -- and your prosecution -- prosecution

8    does not necessarily result in punishment, I mean you are

9    for active prosecution and good prosecution?

10   A        Yes, sir.

11   Q        And I mean you are in fact a member of -- in

12   this county and perhaps in other counties, too, because

13   your work can have effect in other counties, you are part

14   of the prosecution team when you investigate something

15   and you become the investigating officer you have a

16   direct relationship with prosecution and you aid

17   prosecution?

18   A        Yes, sir.

19   Q        I mean that's -- you are trained to do that and

20   that's your job, you are an adversary along with the

21   District Attorney, an adversary of that, true?

22   A        Yes.

23   Q        Is that going to tilt your view of the evidence

24   to the prosecution, of the State's side of this case?

25   A        No.

1   Q        I am not saying that you would intentionally.

2   A        No.

3   Q        Objectively say, "Hey, I don't care what

4   happens, I'm for the State" but subjectively are you

5   going to view -- and you told them as a peace officer you

6   would view him as any other witness, you would give him

7   more credibility merely because he was a peace officer?

8   A        Yes.

9   Q        I don't think you would objectively, I don't

10  think you would but subjectively you really can't control

11  -- are you going to favor the officer's testimony more

12  than a non-officer witness?

13  A        No.  I wouldn't.

14  Q        Do you agree it's a possibility that could

15  happen?

16  A        I wouldn't --

17  Q        I'm not saying that you would intentionally do

18  it nor am I implying it, you see, what I'm asking you

19  relates to other officers.

20  A        What do you mean "relates?"

21  Q        Well, you stand in the same position -- let me

22  give you an example; when the Defense or when Mr. Hinson

23  and myself, there is an officer on the stand, you know,

24  we are going to -- if we have the means to do it we are

25  going to try to discredit him?

1    A        Sure.

2    Q        But that's fair?

3    A        That's your job?

4    Q        You agree it's fair and I have the right to

5    discredit his testimony?

6    A        Yes.

7    Q        When I start doing that are you going to get

8    defensive for that officer?

9    A        No.

10   Q        I mean you are not going to relate to him or

11   have sympathy for him and say I am going -- I am leaning

12   his way?

13   A        No.  I wouldn't.

14   Q        Let me ask you something.

15   A        Yes.

16   Q        So far as giving a witness a head start, Mr.

17   Townsend asked the question the other day, he used the

18   analogy of witnesses all on the starting line when they

19   get on the witness stand and let's say in lane one

20   getting ready to start the race for credibility of

21   evidence is a peace officer?

22   A        Yes.

23   Q        In lane two is the defendant's mother, just an

24   ordinary person, she is going to testify to facts the

25   peace officer is going to be testifying to facts?

1   A       Yes.

2   Q       Are you more likely to believe the peace

3   officer than the mother?

4   A       No.

5   Q       On the same issue let's say the peace officer,

6   the witness gets on the stand, I am a peace officer and

7   "The color of the car was black", the mother gets on the

8   stand, I am a mother, I am the defendant's mother and

9   "The car was green", are you going to take into

10  consideration the fact that the witness was a peace

11  officer in judging the credibility?  Are you going to

12  lean in that situation just because he's a peace officer

13  to him?

14  A       No.

15  Q       I am -- on your questionnaire as to the first

16  page?

17  A       Yes.

18  Q       Do you have it in front of you?

19                      THE COURT:  I think I have his

20  questionnaire.

21                      MR. OLD:   Was the City of

22  Mount Pleasant your first police job?

23                      THE POTENTIAL JUROR:   Yes.

24  It was.

25  Q       (BY MR. OLD)  Did you do an internship anywhere

1    prior to --

2    A       No.

3    Q       What is your training, your background as a

4    peace officer?

5            How did you get your training?

6    A       Went through Kilgore College Police Academy.

7    Q       How far did you go, what certificate do you

8    hold?

9    A       Hold a Basic.

10   Q       You came to work in Mount Pleasant as a

11   patrolman?

12   A       Yes, sir.

13   Q       How long have you been here in Mount Pleasant

14   as a patrolman?

15   A       Since January 12th, 1990.

16   Q       Patrolman -- is it a fair statement, the

17   department you work for has been reorganized in the last

18   year?

19   A       That's pretty fair.

20   Q       Do you work anything other than traffic?

21   A       Yeah.

22   Q       I mean you go to the scene of crimes?

23   A       Yes, sir.

24   Q       If you all get a call somebody has been shot

25   or injured in the City of Mount Pleasant by violence you

1    answer those calls?

2    A       Yes, sir.

3    Q       You fill out reports?

4    A       Yes, sir.

5    Q       And to some extent you do investigate?

6    A       Yes, sir.  To some extent.

7    Q       You take it and gather everything you can and

8    you turn it over to you all's CID, is that correct?

9    A       "Investigator."

10   Q       Turn it over to the investigator?

11   A       Yes, sir.

12   Q       You have been trained to some extent in

13   investigation?

14   A       Yes, sir.

15   Q       Did you take an oath when you went to work for

16   the City of Mount Pleasant as an officer?

17   A       Yes.  I did.

18   Q       Do you think that you are sworn to uphold the

19   State of Texas -- the United States of America, the State

20   of Texas and maybe the City of Mount Pleasant?

21   A       Yes.

22   Q       On your questionnaire on Page 1 you answer,

23   yes, that you favor the death penalty for capital murder?

24   A       Yes.

25   Q       The next sentence you were asked to explain and

1   you state "I believe in the laws of the State of Texas,

2   if Texas statutes dictate -- if Texas statutes dictate

3   I believe in some circumstances it should be carried

4   out."

5                   That is in reference to the death

6   penalty?

7   A       Yes.

8   Q       Okay.  Are you -- I mean I want to understand

9   your answer that -- are you saying because you are sworn

10  to uphold the law plus believe in capital punishment?

11  A       No.

12  Q       What do you mean by "dictate?"

13  A       What I mean is what the laws dictate.

14  Q       Yes.

15  A       I believe in the law and it should be, you

16  know, follow the law is what I'm saying.

17  Q       Are you saying you really don't have a personal

18  opinion, you have something that you let the law decide

19  for you?

20  A       As far as capital murder?

21                  No.

22  Q       Let me go on down, you circled "Number 2?"

23  A       Yes.

24  Q       And what you say is you believe it, being the

25  death penalty, is appropriate in some murder cases and

1    you could return in the proper case, return a verdict of

2    death?

3    A        Yes.

4    Q        And then down below "Number 6" you really state

5    after you state some murder cases you think a life

6    sentence is appropriate?

7    A        Some cases.  Yes.

8    Q        That question is directed at murder and as Mr.

9    Lee pointed out murder covers a lot of territory?

10   A        Yes, sir.

11   Q        It covers from that five year probated he asked

12   you about that you said you could consider?

13   A        Yes.

14   Q        And it goes all the way to death.

15            Now, I want to narrow that question down

16   as to capital murder and capital murder in this case and

17   the law that makes -- that the State is relying on is the

18   intentionally killing someone while in the course of

19   committing a robbery and attempting to commit a robbery

20   I believe is the way -- did you read it?

21   A        No.  I didn't.

22   Q        Do you want to take a second and read it?

23   A        Okay.

24   Q        Okay.  What does that say to you so far as what

25   law has been violated?

1    A         That says that he has been charged with murder.

2    Q         "Murder" or "capital murder?"

3    A         "Capital murder."

4    Q         Okay.  And the law that is charged there is the

5    intentionally causing the death of a person?

6    A         Yes.

7    Q         In the course of committing and attempting to

8    commit the offense of robbery of that person?

9    A         Yes, sir.

10   Q         So I mean, you know, that if someone kills you

11   while you are on duty that could be capital murder?

12   A         Yes.

13   Q         But that's not the law of this case.

14   A         Yes.

15   Q         No one is alleging that.  You know, the State

16   must prove its allegation?

17   A         Yes, sir.

18   Q         Do you agree with me that if they prove to you

19   that the Defendant did in fact kill Mr. Cole with a

20   firearm and that proof turned out he wasn't in the course

21   of committing a robbery, he was in the course of

22   committing an arson, which two is capital murder but

23   that's not what this indictment says, if you found the

24   evidence showed that, that the offense giving rise to the

25   elevation of capital murder was in fact arson and not

1    robbery would you find the Defendant not guilty of

2    capital murder?

3              My question is this; you believe the

4    State did not prove to you beyond a reasonable doubt?

5    A        That he was committing a robbery?

6    Q        A robbery but you are sitting there saying no,

7    in my mind beyond a reasonable doubt he was in the course

8    of committing an arson, could you find him not guilty of

9    capital murder?

10   A        Yes.

11   Q        What?

12   A        I don't -- what you are saying is he didn't

13   commit a robbery that he was charged with?

14   Q        You are sitting there saying in the jury room,

15   saying "It's arson, it wasn't robbery, there's no doubt

16   in my mind about it.  I don't even have -- you know, it

17   wasn't even close to robbery, he was committing arson,

18   not robbery."

19              Could you return a verdict of not

20   guilty?

21   A        Yes.

22   Q        Would it be hard for you to do?

23   A        What?

24   Q        Would it be hard for you to do that?

25   A        No.  He wouldn't be guilty with what he's

1    charged with.

2    Q        I mean you could say not guilty by your

3    verdict?

4    A        Yes.

5    Q        Let me ask you another question.

6    A        Yes.

7    Q        You know the indictment alleges that the

8    alleged offense occurred in Morris County, Texas?

9    A        Yes.

10   Q        This case has been transferred here from Morris

11   County, Texas.

12                    Let's say you believed that the

13   defendant did intentionally kill somebody while in the

14   course and committing the offense of robbery but they

15   didn't prove to you that it was in Morris County, he was

16   never asked where was he, there was no evidence to you

17   of where this happened, could you find the defendant not

18   guilty?

19   A        That they proved -- they proved it happened but

20   they didn't prove where?

21   Q        They proved that it happened, they didn't prove

22   where, there is no evidence to where you can say beyond

23   a reasonable doubt I believe this occurred in Morris

24   County, Texas?

25   A        I don't -- I'm not following you.

1  Q        I mean they proved everything else to you,

2  every other element of the offense.

3  A        Yes.

4  Q        But I mean you aren't arguing with yourself

5  about what the evidence is, you are sitting there saying,

6  you know, the charge says they must prove each and every

7  element of the offense beyond a reasonable doubt?

8  A        Yes.

9  Q        In Morris County it happened, there is an

10 element of the offense and they didn't prove it?

11 A        All right.

12 Q        They proved that murder happened, I believe

13 this and everything else but I don't have any evidence

14 to prove to me beyond a reasonable doubt that this crime

15 occurred in Morris County.

16 A        Okay.

17 Q        Can you write a verdict of not guilty?

18 A        I could.

19 Q        What?

20 A        I could.

21 Q        You could?

22 A        Yes.

23 Q        Would that be hard for you to?

24 A        It would be tough.

25 Q        Do you have a hard time following the law in

1    this case?

2    A        Well, --

3    Q        I am not -- I'm not trying --

4    A        Yes.

5    Q        You can or you can't?

6    A        Yes.  Yes.

7    Q        It would be hard?

8    A        It would be hard.

9                        THE COURT:  Could you do it?

10                       THE POTENTIAL JUROR: I could.

11                       THE COURT:  Could you do it?

12                       THE POTENTIAL JUROR:  Yes,

13   sir.  I mean if all they know is they had a murder but

14   they don't know where it occurred --

15                       MR. OLD:  Let me go to -- you

16   have been schooled in how to take a confession?

17                       THE POTENTIAL JUROR:  Yes,

18   sir.

19   Q        (BY MR. OLD)  Mirandaizing the suspect while

20   he's in custody?

21   A        Yes.

22   Q        I don't know how you study -- do you all study

23   in school, you have been to seminars and things since you

24   got out of Kilgore, haven't you?

25   A        Yes, sir.

Q        Is that a subject that you had more than one class on or maybe classes, seminars?

A        I have had classes on it.

Q        Let's say, you know what the Court's charge is?

A        "The course of charge?"

Q        "The Court's charge", the written instruction that the jury gets at the conclusion of evidence?

A        Yes.

Q        You understand that His Honor is the exclusive judge of the law, he will tell us what the law is and what law to apply to this case.

        Now, you as a juror is the exclusive judge of what facts are proved or of the evidence?

A        Yes.

Q        And what weight to be given?

        Let's say in this charge the issue of whether a confession was voluntary or not was raised by the evidence, which would mean the Court would then charge you on the requirement of the statement being voluntary and you as a juror would have to make a fact finding as to whether or not it was voluntary?

A        Yes.

Q        And basically the Court would instruct you that in order for a confession or a statement of the defendant made while in custody and the question being submitted

1    to you, custodial interrogation, that first it was made

2    without compulsion or persuasion, nobody beat him up,

3    nobody kept him up 48 hours, played him rock-and-roll

4    records until he said whatever then it would have to be

5    proven that he was given his Miranda Warnings at the time

6    required.

7                    Now, if you found the statement was

8    involuntary, you know, the State has to prove to you

9    beyond a reasonable doubt that the statement was

10   voluntary?

11   A          Yes.

12   Q          And let's just say what the evidence was, the

13   officer taking the statement testified, "Well, I told him

14   all of his Miranda Rights except I forgot to tell him he

15   was entitled to stop interrogation and get himself a

16   lawyer, I just flat forgot to tell him."

17                   That would make it involuntary, you

18   would have to find it involuntary simply because those

19   words were not spoken?

20   A          Yes, sir.

21   Q          No issue about it?

22   A          That's right.

23   Q          But you believe that the confession to be true,

24   I mean whether it was voluntary, involuntary, you sat

25   there and said, you know, it's already been introduced

1    in evidence, you have read it, you know what it says and

2    you said "No doubt about it in my mind, that is a true

3    statement.  I believe it."

4                    Okay.   And  in  the  course  of  the

5    instructions, written instructions it said to you as a

6    juror, "Unless you so find" and that is the statement

7    being voluntary -- "Or if you have a reasonable doubt

8    thereof you will not consider the statement or confession

9    for any purpose whatsoever or any evidence obtained as

10   a  result  of  the  statement",  referring  back  to  the

11   statement?

12   A        Yes.

13   Q        Okay.  Now, let me be sure; you are a juror in

14   that   situation,   you   believe   the   statement   was

15   involuntary, no question about it?

16   A        Yes.

17   Q        But you believe the truth of the matter in the

18   statement beyond a reasonable doubt; can you follow that

19   charge,  instruction  and  can  you  not  consider  the

20   statement or confession for any purpose?

21   A        Yes.  I could.

22   Q        You could?

23   A        Yes.

24   Q        Would that be hard to do?

25   A        No.

1    Q        I mean you would sit there it's horrible, it

2    describes a horrible crime and you believe it to be true?

3    A        Yes.

4    Q        But can you exclude that evidence just because

5    you find it  to be involuntary because the officer did

6    not --

7    A        Yes.  I could.

8    Q        -- did not tell him he had the right to have

9    a lawyer?

10   A        Yes, sir.

11   Q        You can set it aside and not consider it?

12   A        Yes.

13   Q        Going back to the Witness List; you indicated

14   that you knew Vernon Cope?

15   A        I don't know him, I have met him.

16   Q        Well, just -- you know him because some other

17   officer has talked about it or talked to him on the

18   radio?

19   A        Never talked to him.  Where -- if I met him was

20   we was in a gun shop, that's where I met him.

21   Q        Anything in your knowledge of him that would

22   make you consider him to be more credible not simply

23   because he was a peace officer but because you met him?

24   A        No.

25   Q        Trooper David McFarland, how well acquainted

1      are you with him?

2      A        Not real well.  I have seen him around the

3      Sheriff's Office.  That's about it.

4      Q        Sheriff's Office here in Morris County?

5      A        Seen him over here, like I would be going out

6      and he would be coming in, you know.

7      Q        Nothing in that relationship that would effect

8      you as a juror?

9      A        No.

10     Q        Harry Washington?  Harry worked for the City

11     of Mount Pleasant at one time, didn't he?

12     A        Yes.

13     Q        Was that before you worked for them?

14     A        Well, he came to work before I did but I did

15     work with him.

16     Q        You all worked together for some period of

17     time?

18     A        I don't remember how long, probably about a

19     year.

20     Q        Okay.  I mean you know Harry?

21     A        Yes.

22     Q        Did you all patrol together?

23     A        Some.

24     Q        Work the same shift?

25     A        Sometimes.

1    Q        On occasions?

2    A        On occasions.  Yes.

3    Q        Did you all socialize together outside of

4    police functions or Christmas parties, whatever you all

5    have?

6    A        No.  We didn't socialize together.

7    Q        All right.  Anything in your relationship with

8    Mr. Washington that could effect your deliberations in

9    this matter?

10            And specifically would your formal

11   knowledge of him effect the way you weighed his evidence?

12   A        No.

13   Q        I mean you wouldn't consider him more credible

14   or less credible based upon your and his -- your prior

15   knowledge of him?

16   A        No.

17   Q        I am not -- I think Mr. Lee started asking you

18   another question while you were still on Page 2 of the

19   list, let me get you to go over it.

20            There are some names on there from out

21   of state?

22   A        Yes.

23   Q        There's some -- just go down and tell me if you

24   know any of them and the ones I pointed out to you, there

25   is some people on there from Pittburg and I understand

1    correctly you grew up in Pittsburg or at least lived

2    there for some time?

3    A        I lived there for a little while.

4    Q        Do your parents still live over there?

5    A        Yes.

6                          THE    COURT:        Twenty-two

7    minutes.

8                          MR. OLD:   Thank you.

9            Do you know Mr. Ragsdale, he's got a

10   Pittsburg address?

11                         THE POTENTIAL JUROR:   No.   I

12   don't.

13   Q        (BY MR. OLD)  Dorothy Marie Smith?

14   A        No.  I don't.

15   Q        Fred Cook, and I believe he's an officer with

16   the Pittsburg Police Department, he may be with the

17   Sheriff's Department.  I don't remember.

18   A        I have met Fred.

19   Q        Well, can you tell me the extent of meeting

20   him?

21   A        He -- most I remember, he came over one night

22   at the police department he was off, maybe and that's

23   about all.  I met him.

24   Q        Did not come over there specifically to see you

25   or see about business?

1   A       No.  He was singing at the opera that night.

2   Q       "Singing at the opera that night?"

3   A       I think is what he was doing.

4           "Dewayne McClung."

5   Q       Excuse me?

6   A       "Dewayne McClung", awhile ago you forgot that.

7   Q       "Dewayne McClung?"

8   A       Yes.

9   Q       Dewayne is from Mount Pleasant originally, that

10  may not mean anything.

11  A       That's before my time.

12  Q       How well do you know Dewayne?

13  A       I have met him, talked to him on several

14  occasions.

15          He used to come up to the police

16  department all the time.

17  Q       Okay.  Anything in your relationship with Mr.

18  McClung or Cook or any of the officers that we have

19  talked about that might could or would influence your

20  verdict in this case?

21  A       No.

22  Q       I mean they don't have a head start with you

23  as witnesses over non-officer witnesses?

24  A       No.

25  Q       As to Special Issue #1, you were looking at it

1    a minute ago?

2    A       Yes.

3    Q       There is a -- first there's a definition of

4    reasonable doubt laying up there by you, it's on a long

5    typed page.

6                       THE COURT:    To your left.

7    (Indicating)

8                       THE POTENTIAL JUROR:    There

9    it is.   (Indicating)

10                      MR. OLD:   Could I get you to

11   look over that page and I believe it starts off the

12   second paragraph --   (Indicating)

13                      THE POTENTIAL JUROR:   Okay.

14   Q       (BY MR. OLD)   Prior to coming here today did

15   you have your own definition of reasonable doubt or in

16   your mind what it meant?

17   A       Yes, sir.

18   Q       I mean it could be but I seriously doubt if you

19   had written me out a definition in your own words it

20   would have been the words used in there?

21   A       No.   It wouldn't.

22   Q       Is what you required in your own definition of

23   reasonable doubt a greater or lesser burden of proof?

24   A       Probably greater.

25   Q       About the same?

1    A        Yeah.

2    Q        I'm not asking you if you know, that's your

3    definition, but your definition is not in contradiction

4    to the one that you just read?

5    A        No.

6    Q        You would have no problem laying aside your own

7    definition of reasonable doubt and deliberating in this

8    case in making your findings by the Court's definition?

9    A        Yes.  I would use the Court's definition.

10   Q        Go back to Special Issue #1 and it reads,

11   starts off, "Do you find from the evidence beyond a

12   reasonable doubt" and we just -- read reasonable doubt.

13   A        Yes.

14   Q        So that is the standard you have to answer this

15   question by then the question is do you find that there

16   is a probability that the defendant would commit criminal

17   acts of violence that would constitute a continuing

18   threat to society.

19                  What does the word "probability" mean

20   to you?

21   A        "Probability?"

22   Q        Yes.

23   A        It means that it's probably to happen again,

24   you know.

25   Q        Would -- I will suggest some words and you are

1      not obligated to agree with them.

2      A        Okay.

3      Q        "More likely than not?"

4      A        No.

5      Q        That doesn't mean -- is your definition of

6      "probability" just that it's "possible?"

7      A        "Possible."

8      Q        And the way you would answer that question is,

9      "Do you find from beyond a reasonable doubt that there

10     is a possibility that the defendant would commit criminal

11     acts of violence that would constitute a continuing

12     threat to society?"

13     A        Yeah.

14     Q        Okay.  I mean you are -- what you are looking

15     at there is "possibilities?"

16     A        Yes.

17     Q        Not a preponderance of evidence, just a

18     possibility, just that it could happen?

19     A        It could or could not.

20     Q        The evidence would have to indicate to you that

21     there was not any possibility that the defendant would

22     commit any criminal act of violence?

23     A        No.

24     Q        What?

25     A        What are you saying?

1    Q        Okay.    Okay.    You    have    told    me    that

2    "probability" means that it can happen?

3    A        "It can happen."

4    Q        Just one in one thousand chances?

5    A        Yes.

6    Q        Is that fair?

7    A        Yes.

8    Q        One in a million?

9    A        Whatever.

10   Q        Just one chance in ever how many we add them

11   up to, correct?

12   A        Yes.

13   Q        And as long as there existed any chance that

14   the defendant would commit criminal acts of violence that

15   would constitute a threat to society you would answer

16   that question "Yes?"

17   A        Yes.

18   Q        You would say, "There is a chance?"

19   A        If I felt there was a chance.

20   Q        Now, do you understand the double question,

21   first the evidence that the State proves must be beyond

22   a reasonable doubt?

23   A        Yes.

24   Q        But then as you say they must prove to you that

25   any chance exists?

1   A        Yes.

2   Q        In answering that question the fact you know,

3   you have already found someone guilty of capital murder,

4   if you answer that question -- the question doesn't get

5   asked until after you find someone guilty?

6   A        Yes.

7   Q        If in fact you found someone has committed a

8   crime of capital murder is there any way you could answer

9   that question "No?"

10  A        Yes, sir.

11  Q        Okay.  I mean just simply because somebody had

12  committed a capital crime you would not automatically

13  answer it "No", automatically answer it "Yes?"

14  A        Yes.

15  Q        Would you automatically answer it "Yes?"

16  A        No.

17  Q        Just on the fact that you convicted them of it,

18  found beyond a reasonable doubt that they committed

19  capital murder?

20  A        No.  I wouldn't.

21  Q        You would listen to the rest of the evidence?

22  A        Yes, sir.

23  Q        To determine whether or not there was any

24  chance that they would commit another act of violence?

25  A        Yes.

1   Q        You indicated that you had been interested in

2   the Billy Joe Brown murder?

3   A        I was involved in it.

4   Q        Were you interested or did you work on that

5   case?

6   A        I worked on that case.

7   Q        Were you --

8   A        I was the first officer on the scene.

9   Q        Okay.  To the extent the first knowledge of

10  that case was yours it was your case?

11  A        Well, I wasn't the investigator on it.

12  Q        I know.  But I mean you handled the scene of

13  the crime until the investigator got there?

14  A        Until they arrived.

15  Q        And I presume you kept up with that case and

16  were interested -- I'm not saying you wouldn't be

17  interested in any case but maybe a little more interested

18  in this case because of your involvement in being the

19  first officer there?

20  A        I -- yes, sir.

21  Q        Did you testify in that case?

22  A        Yes.

23  Q        That was tried as a capital murder case and the

24  defendant was found guilty of murder but not capital

25  murder?

1   A        Yes.

2   Q        And you well understood that murder is a lesser

3   included offense of capital murder?

4   A        Yes.

5   Q        Or can be based on the facts proven?

6   A        Yes.

7   Q        All the State has to prove, you have got it,

8   beyond a reasonable doubt is intentionally and knowingly

9   killing someone?

10  A        Yes.

11  Q        I'm not asking you what the law is, I'm asking

12  you what your opinion is and I guess I'm asking you if

13  you were the person who wrote the laws would plain murder

14  or non-capital murder be punishable by a maximum penalty

15  of the death penalty?

16  A        Plain murder?

17  Q        If you were the person writing the laws?

18  A        No.

19  Q        I mean it would not intentionally and knowingly

20  killing someone would not be a punishment by death if you

21  were "King for a Day?"

22  A        No.  It wouldn't.

23  Q        But be punishable by any worse punishment than

24  death?

25  A        No.

1  Q        You were asked about the rules of parole, you

2  know you can't consider that --

3  A        Yes, sir.

4  Q        -- in reaching a verdict either for non-capital

5  murder or capital murder.  What you are instructed to do

6  by the charge is you have got to consider life life, you

7  have got to consider a number of years as that number of

8  years, you aren't to sit around and say, "Well, they will

9  let him out of Huntsville in six months if we just give

10 him 10 years?"

11 A        Yes.

12 Q        Okay.   Do you have -- I mean do you have

13 criticism of the Texas parole rules?

14 A        No.

15 Q        You don't?  You think they are fine?

16 A        Yeah.

17 Q        Have there been people that you thought were

18 paroled too early?

19 A        Probably.

20 Q        Okay.  I agree there are people that I thought

21 were paroled too early.

22 A        Yes.

23 Q        My question is this; can you lay aside that

24 feeling and say, "No, we aren't going to figure out when

25 he's going to parole, 60 years is how we want to punish

1    him, we are going to write down 60 years?"

2    A        Yes.

3    Q        And if we want to give him life we're going to

4    give him life but we are not going to go back and look

5    and see when he's eligible for parole?

6    A        Yes.

7    Q        And you do understand just because someone

8    becomes eligible for parole at some point doesn't mean

9    they get a parole?

10   A        Yes.

11   Q        To guess what would happen 15 years from now

12   would not be fair?

13   A        No.

14   Q        We don't know.  You might have the suspicion

15   of what might happen next month but 15 years from now it

16   wouldn't be fair to anybody to guess, you would strictly

17   be speculating?

18   A        Yes.

19   Q        And not -- in trying to figure out how long the

20   minimum time you are going to lock somebody up would you

21   speculate, you would just write down the number of years

22   you wanted to give and let the law take care of it?

23   A        Yes.

24   Q        You  served on a  civil jury,  do you remember

25   the --

| | |
|---|---|
| 1 | A        Yes. |
| 2 | Q        -- do you remember the name of the case? |
| 3 | A        No.  I don't. |
| 4 | Q        What kind of case was it other than "civil?" |
| 5 | A        Personal injury. |
| 6 | Q        Do you remember who the lawyers were? |
| 7 | A        No.  One out of Pittsburg I believe. |
| 8 | Q        Okay. |
| 9 | A        I think. |
| 10 | Q        Do you remember whether or not you gave them |
| 11 | any money, if you ever knew? |
| 12 | A        We gave them a little bit. |
| 13 | Q        Did you enjoy your jury service? |
| 14 | A        Well, -- |
| 15 | Q        After hindsight, I'm not saying you enjoyed it |
| 16 | but was it an experience that you were glad you had? |
| 17 | A        Yes. |
| 18 | Q        Okay.  You checked you knew nothing of this |
| 19 | case -- or let me ask you; do you know anything or heard |
| 20 | anything about the facts of this case? |
| 21 | A        No. |
| 22 | Q        Read anything in the newspaper? |
| 23 | A        No. |
| 24 |          The only thing I will say I know about |
| 25 | this case, I don't know it -- the only thing I remember |

1    about this case, we got a teletype from Morris County,

2    "Look out for some type of pickup", I don't know what it

3    was.

4    Q        Did you patrol looking for that truck?

5    A        While I was out I keep an eye out for it.

6    Q        But that became part of your duties that day?

7    A        To watch for this pickup.

8    Q        Did you --

9    A        I don't know what kind of pickup it was.

10   Q        -- did you stop anybody pursuing that?

11   A        No.

12   Q        But I mean to the extent that you watched for

13   the truck you did aid in the investigation in this case?

14            That is to say you looked for the truck?

15   A        I watched for it.

16   Q        Do you know anything about the facts of the

17   arrest in this case?

18   A        No.

19   Q        When it was, where it was, who made it?

20   A        No.

21   Q        Have you -- I mean I'm not asking you, I say,

22   know -- I know -- has anyone told you anything about it?

23   A        No.

24   Q        Anyone told you how the crime was committed?

25   A        No.

1    Q        Are you telling me, "No, they haven't" or "No,

2    that you know that you know that you don't recall anybody

3    mentioning it?"

4    A        I don't recall anyone mentioning anything about

5    it.

6                        THE   COURT:    Six   minutes

7    remaining.

8                        MR. OLD:  Thank you.

9                As to Special Issue #2, I'm probably

10   going to read part of it to you but I need to read it to

11   understand my own question.

12                       THE POTENTIAL JUROR:  Okay.

13   Q        (BY MR. OLD)  Mitigating evidence is evidence

14   that might reduce the moral blameworthiness of the

15   accused or the defendant, okay, it does not excuse his

16   conduct but it might make you believe that because of the

17   evidence that a life sentence is more appropriate than

18   death.

19                Now, in determining mitigating evidence,

20   and I'm not asking you how you would rule on certain

21   evidence, I think you were asked something by the State

22   about age, I'm not asking you to tell me if the person

23   is 20 years six months old you would give them a plus

24   three on mitigation, that's not what I'm asking.  What

25   I'm asking you is this; would you at least consider the

1    evidence, I mean you could still reach an answer of "Yes"

2    or "No" but would you consider evidence of age, religion,

3    someone's background and education?

4    A        Yes, sir.

5    Q        Would you consider psychiatric testimony?

6    A        Yes, sir.

7    Q        You have any problems with psychiatrists?

8    A        No.

9    Q        You consider them to be of value to society?

10   A        Yes.

11   Q        So those things I have asked you about, there's

12   nothing you would tell me, "I don't care whether you

13   proved to me he was one year old or 99 years old, I'm not

14   going to consider age period."

15            There's nothing that you could think of

16   that you could do that to?

17   A        No.

18   Q        You would listen to the evidence?

19   A        Yes, sir.

20   Q        And make your decision as to "Yes" or "No" on

21   the evidence?

22   A        Yes.

23            MR. OLD: Your Honor, we would

24   pass the witness.

25            THE COURT:    Sir,   if you

1    will --

2                          MR. LEE:  He's a "juror", he's

3    not a "witness."

4                          THE COURT:  Sir, if you will

5    step out for a moment, we will discuss your service and

6    bring you back in a moment and talk to you a little

7    further.

8                          THE  POTENTIAL  JUROR:    All

9    right.

10

11                        (The  following  occurred  outside  the

12   presence and hearing of the potential juror:)

13

14                          THE  COURT:    State  have  any

15   challenges?

16                          MR. LEE:  No challenges.

17                          THE COURT:  Mr. Old, do you

18   have any challenges?

19                          MR. OLD:   Yes, Your Honor.

20   We have two.

21                          The witness testified as to the Special

22   Issue #1 which he's referring to that "probability" means

23   "any chance",  the  Court  read  into  the  record  earlier

24   today the Supreme Court requirement that --

25                          THE COURT:  I believe that was

1    "Court of Criminal Appeals."

2              MR. OLD:    Court of Criminal

3    Appeals that "probability" meant "more likely than not."

4              Also it suggests that "probability"

5    means the exact same thing as "preponderance of the

6    evidence, more likely than not."

7              He first indicated that the proof

8    required would have to be that there was no chance of

9    that the defendant would commit the acts in question in

10   order for him to answer it.

11             Additionally, we would object to the

12   witness and challenge him for cause in that he testified

13   that to some extent he participated in the investigation

14   of the offense charged.  And that was his testimony about

15   while on patrol he had the truck identified to him and

16   he was looking for it.

17             And he is a potential witness in this

18   case.

19             MR. LEE:    Your Honor, in

20   response?

21             THE COURT:  You may.

22             MR. LEE:    We would like to

23   point out that he has testified to him that

24   "probability", he also said he would go along with the

25   Court's charge and if the Defense wants to request in the

1    charge a definition along the lines the Court cited we

2    wouldn't object to it.   And the definition was to him

3    what probability means so I think that's just a question

4    of interpretation.

5                    THE COURT: Well, Mr. Lee, and

6    Mr. Old, assuming that we did not have the Court case

7    that I now have we would have a question as to whether

8    or not that meant a legal requirement of probability but

9    now since we now have a definition or at least a

10   guideline on what the burden of proof is I think before

11   anyone can be disqualified they have to be told what the

12   law is and then be asked whether or not they can follow

13   the law.

14                    If he says his definition of probability

15   is still just a mere chance then he would be disqualified

16   but without telling a juror what the law is and giving

17   him or her a chance to say "Yes" or "No", I don't think

18   we reached the disqualification stage.

19                    I'm going to bring him back and read

20   that definition and if he says that he can follow the law

21   I'm going to overrule the challenge, if he says he

22   cannot, challenge him and if he does end up on the jury

23   I will feel compelled to include that instruction in the

24   charge.

25                    MR. OLD:   That is the reason

1   I did not tell him the law is this.

2                        THE COURT:   Right.   Because

3   I told you I wasn't sure what I was going to do.

4                        MR. OLD:   You told me that you

5   didn't think it was appropriate to charge it and for me

6   to imply that the law -- and sit here and tell him other

7   things in the charge that we know are going to be here

8   they actually go to my credibility during deliberation

9   or say, "Well, Old was wrong, it meant what I thought it

10  meant."

11                       That is why I did not approach it that

12  way and if it's the Court's charge I will approach it

13  that way.

14                       THE COURT:   Based on this

15  man's answer, based on his answer I believe at this point

16  it would be appropriate for this definition or

17  instruction to be included in the charge so I intend to

18  read it to him.

19                       You actually gave me back a minute or

20  two, I will let you read it to him if you feel like I

21  mislead him by not letting you do it.

22                       MR. OLD:   No, Your Honor.   As

23  long as he -- I may -- I may want to take him after you

24  ask him.

25                       THE COURT:   We'll see what he

1   says.

2          What I'm worried about more so is this

3   potential witness probability.

4          He's not on the Witness List so he's not

5   going to be called by the State?

6          MR. TOWNSEND:   No.   He would

7   not be called by the State, Your Honor, the only

8   knowledge he has is what you heard him say, he can't

9   remember.

10          THE COURT:   He doesn't even

11   remember.

12          MR. TOWNSEND:   He doesn't

13   remember the vehicle.

14          MR. OLD:  There's other people

15   that can call witnesses in this case, that being the

16   Defendant.   I'm not going to sit here and tell you that

17   I expect to call this man as a witness.   I can see a

18   possibility of one in some chance that I might want to

19   prove they looked for the truck at a certain time in

20   Texas and it wasn't here.

21          MR. LEE:   I would point out

22   on that that would effectively in any criminal case

23   exclude any peace officer which the law is clearly not

24   the case because any peace officer has daily reports as

25   to what goes on in the area.

1          THE COURT:  I'm going to bring

2    him back in, read the law to him, see if he can follow

3    the law.

4          I'm  going  to  ask  him  a  couple  more

5    questions about his participation then I'm going to take

6    under advisement the challenge or participation and I

7    will not rule on that challenge until Monday.

8          Bring in Mr. Alexander.

9

10          (Off the record discussion.)

11

12          (The following occurred in the presence

13    and hearing of the potential juror:)

14

15          THE COURT:  Have a couple of

16    questions for you.

17          THE POTENTIAL JUROR:  Okay.

18          THE COURT:  Let's go back to

19    your definition of "probability", I think a mathematical

20    definition of probability is basically "In a chance if

21    it can happen there's a probability that it's going to

22    happen."

23          Until about a year or so ago the courts

24    didn't really give us any guideline of "probability" but

25    a case came out in January of last year, '93 that stated

1   that the burden of proof on punishment question one, that

2   the Special Issue #1, requires the State to prove that

3   the defendant will more likely than not commit criminal

4   acts of violence in the future so as to constitute a

5   continuing threat to society so the law, they haven't

6   really given us a definition but in essence they have,

7   they have said that "Probability means more likely than

8   not, not a mere chance, not a hundred percent more likely

9   than not."

10          If this instruction is in the Court's

11  charge will you be able to follow that instruction and

12  disregard your personal definition of "probability" and

13  apply the Court's definition of "more likely than not"

14  before you answer that question "Yes?"

15          THE POTENTIAL JUROR:   Yes,

16  sir.

17          THE COURT:   So what I was

18  asking you to do is can you assure the Court that you

19  would not answer that question "Yes" unless the State

20  proved beyond a reasonable doubt that it was more likely

21  than not that this defendant would commit criminal acts

22  of violence in the future?

23          THE POTENTIAL JUROR:   Yes.

24          THE COURT:   Let's talk a

25  little more about your participation in this alleged

1    offense; did you receive a radio call stating that there

2    had been a murder, a killing, a missing truck, a stolen

3    truck?

4                        What alerted you to the fact that you

5    were to look for a truck?

6                                THE   POTENTIAL   JUROR:    We

7    received teletype from over the computer.

8                                THE COURT:  Where were you?

9                                THE POTENTIAL JUROR:  I just

10   come to work.

11                               THE  COURT:   Do  you  have  a

12   computer in the patrol car?

13                               THE POTENTIAL JUROR:  No.  It

14   was I believe during briefing that day that they brought

15   it out to us.

16                               THE  COURT:   Do  you  recall

17   whether the name -- were you told what the suspected

18   offense was or just to look for a truck?

19                               THE   POTENTIAL   JUROR:    I

20   believe I was told what the suspected offense was also.

21                               THE COURT:  So you believe you

22   were told that it looked like a murder has been committed

23   and truck was missing?

24                                THE   POTENTIAL   JUROR:    I

25   believe so.  The best I remember.

1       THE COURT:  Do you recall the

2  description of the truck?

3       THE POTENTIAL JUROR:  No.   I

4  don't.

5       THE COURT:  Do you recall the

6  year?

7       THE POTENTIAL JUROR:  No.

8       THE COURT:  Did you recognize

9  the name of the deceased when you got the teletype or the

10  instruction to look for a pickup?

11       THE POTENTIAL JUROR:  No.

12       THE COURT:  Do you recall

13  whether the name was even given to you that day?

14       THE POTENTIAL JUROR:  I don't

15  recall whether it was or not.

16       THE COURT:  Did you look for

17  that truck more than just that first day or only that

18  first day?

19       THE POTENTIAL JUROR:  Best I

20  can remember only that day.

21       THE COURT:  And I believe you

22  earlier testified you never stopped anyone in an attempt

23  to ascertain whether that was the missing truck?

24       THE POTENTIAL JUROR:  No.

25       THE   COURT:      Did   you

1    participate any further in this case in any -- by looking

2    for it, any evidence by going to the scene, by

3    interviewing witnesses, was there any other participation

4    no matter how slight?

5                          THE POTENTIAL JUROR:  No.

6                          THE COURT:  Does either side

7    have a question concerning his participation in or

8    potential participation in this case?

9                          Mr. Lee?

10                         MR. LEE:  Do you have any

11   specific recollection as to what they said or you just

12   know that the bulletin came out?

13                         THE POTENTIAL JUROR:  I just

14   know it came out.

15                         MR. LEE:  That's all.

16                         THE COURT:  Mr. Old?

17                         MR. OLD:  My question to him

18   and the Court, may I may it, is -- is this case to the

19   best of his knowledge is this case we are talking about?

20                         THE COURT:  Are you sure that

21   the bulletin referred to this case or could have been

22   another case?

23                         THE POTENTIAL JUROR:  We get

24   them really everyday.

25                         THE COURT: When Mr. Old asked

1    you about that you seemed to be fairly sure it had to do

2    with this case?

3                              THE POTENTIAL JUROR:   I am

4    pretty sure it was this case.  I remember it was from the

5    Cason area.

6                              THE COURT:  So your bulletin

7    said or your report said it was a missing truck in a

8    murder case from the Cason area?

9                              THE POTENTIAL JUROR:  Morris

10   County.  It come out of Morris County.

11                             THE COURT:   So you put

12   together the fact that you were looking for a missing

13   truck out of Morris County at or about the time of this

14   murder and decided in your own mind since then that it

15   had to be that alleged offense?

16                             THE POTENTIAL JUROR:   I

17   believe that it said "In the Cason area", I can't really

18   remember the teletype.

19                             THE COURT:   And you can't

20   remember whether the victim's name was mentioned to you?

21                             THE POTENTIAL JUROR:  No.  I

22   don't.  I don't know.

23                             THE COURT:  Is that teletype

24   still available?

25                             THE POTENTIAL JUROR:   Yes,

1    sir.  It should be.

2                          THE COURT:  Would you see if

3    you could locate it and if you do would you deliver a

4    copy back to either our Court Reporter, Lloyd, or our

5    Bailiff, Leo?

6                          THE POTENTIAL JUROR:  Yes.

7                          THE COURT:  And could you do

8    that by 9:00 o'clock or say 10:00 o'clock Monday morning?

9                          THE POTENTIAL JUROR:   Yes,

10   sir.

11                         THE COURT:  Mr. Old?

12                         MR.  OLD:   I  have  nothing

13   further.

14                         MR. LEE:  Your Honor, we would

15   offer  our  services  as  far  as  contacting  the  police

16   department and --

17                         THE COURT:  Since he works for

18   the police department I would rather have him do it.  I

19   am -- if he can't locate it then I may request your

20   assistance but I would rather keep it independent.

21                         Mr. Old, anything else?

22                         MR. OLD:  Nothing else before

23   the juror.

24                         THE COURT:  You are free to

25   go but you are still a potential juror.

1          THE POTENTIAL JUROR:  If I am

2     not able to locate it at our department sometimes they

3     keep them and sometimes they don't.

4          THE COURT:     If  you  can't

5     locate it --

6          MR. TOWNSEND: Your Honor, I'm

7     sorry, I thought you were through talking to him.

8          THE COURT:   Well, I thought

9     so, too, but apparently not; if you can't locate it in

10    your department is there any other place it would be?

11         THE POTENTIAL JUROR:  Whoever

12    sent the teletype out keeps a copy of it.

13         THE COURT:    If  you  can't

14    locate it in your office let one of these two gentlemen

15    know by 10:00 o'clock.

16         I will as the State to maybe locate it.

17         MR.    TOWNSEND:    The   only

18    problem, the only thing I am concerned with, if he's

19    looking for the teletype he might --

20         MR. LEE:  Potential juror.

21         MR.  TOWNSEND:    --  he  might

22    find some other information that would relate to the case

23    for that reason.

24         THE COURT:  Good point.

25         MR. TOWNSEND: So we look for

1    the teletype or the Court or the Bailiff or something.

2                        THE COURT:  Let's go off the

3    record.

4

5                        (Off the record discussion out of the

6    presence and hearing of the potential juror:)

7

8                        THE COURT:  Ask Mr. Alexander

9    to step in, have Mr. Alexander step in so I make sure

10   that I tell him not to look for it and I want this on the

11   record.

12

13                       (The following occurred in the presence

14   and hearing of the potential juror:)

15

16                        THE COURT:  Officer, I think

17   the lawyer pointed out and I think it may be

18   inappropriate for you to look for that teletype, you

19   might run across more information.

20                        So I'm going to have someone else look

21   for that teletype.

22                        Did you ever receive more than or read

23   or have read to you more than one teletype?

24                        THE POTENTIAL JUROR:  No.

25                        THE COURT:  And was it to the

1    best of your knowledge on the alleged date of this

2    offense which would have been last June -- June of '93?

3                               THE POTENTIAL JUROR:   To the

4    best of my knowledge that's when it was.

5                               THE COURT:  But there was only

6    one teletype?

7                               THE POTENTIAL JUROR:   That's

8    all I remember is one.

9                               THE COURT:   Thank you, sir.

10   We will talk to you some next week.

11                               We are in recess until 1:00 o'clock

12   Monday.

13                               THE BAILIFF:  Do you want to

14   talk to this other gentleman out here?

15                               THE COURT:   Yes.

16                               We are not in recess.

17                               Bring him in here.

18

19                               (The following occurred in the presence

20   and hearing of the potential juror:)

21

22       DANIEL RAY SMYTH, Potential Juror #59

23   was called as a Potential Juror and, having been

24   previously sworn by the Court, testified as follows:

25

1       THE COURT:   Okay.  Let's get

2   on the record.

3               Sir, are you "Daniel Smyth" or "Smyth"?

4               THE POTENTIAL JUROR:  "Smyth."

5               THE COURT:  We kept you back

6   there quite awhile, haven't we?

7               THE POTENTIAL JUROR:  Y e s ,

8   sir.

9               THE COURT:  Mr. Smyth, we are

10  not going to be able to talk today, it's getting too late

11  but you answered a couple of questions in here that have

12  given us some concern and I want to go over a couple of

13  these questions.

14              You said that you are in favor of the

15  death penalty?

16              THE POTENTIAL JUROR:   Yes,

17  sir.

18              THE COURT:  You said that you

19  believed the death penalty is appropriate in all murder

20  cases?

21              THE POTENTIAL JUROR:   Yes,

22  sir.

23              THE COURT:  There is another

24  question that says, "If you are in favor of the death

25  penalty in some murder case do you agree that a life

1   sentence would be appropriate under the proper

2   circumstances"?

3          And you have left that blank.  Do you

4   believe a life sentence would be appropriate in a murder

5   case under some circumstances?

6              THE POTENTIAL JUROR:  Yes,

7   sir.

8              THE COURT:  Let's go to the

9   next page which is the one that really gives me some

10  concern, I'm going to read the question to you and the

11  first question, "Do you have any moral, religious or

12  personal feeling that would prevent you from sitting

13  judgment on another human"?

14          And you said, "No."

15          The second question is, "Do you have any

16  moral, religious or personal belief that would prevent

17  you from returning a verdict which would result in the

18  execution of another human"?

19          You said, "Yes."

20          Would you explain to me why you answer

21  "Yes" and where you feel that you could not sit in a case

22  that might result in a death penalty?

23              THE POTENTIAL JUROR:  I -- I

24  don't know, I just have a little touch of dyslexia and

25  sometimes I see stuff backwards and forwards.

1          THE COURT:  You also said that

2  you know of a reason that you can't sit as a juror in

3  this case and be fair to both sides, is that the reason,

4  the dyslexia?

5          THE POTENTIAL JUROR:    Yes,

6  sir.

7          THE COURT:  So you are saying

8  -- do you know Mr. Wardlow?

9          THE POTENTIAL JUROR: No, sir.

10          THE COURT:    Do  you  know

11  anything about the facts of this case?

12          THE POTENTIAL JUROR:  I know

13  the man, I know some of his land, I used to fish on it.

14          THE COURT:  Did you ever meet

15  the alleged victim?

16          THE POTENTIAL JUROR:  No.

17          THE COURT:  So you don't know

18  him?

19          Have you read about this case and heard

20  about it?

21          THE POTENTIAL JUROR:  I have

22  heard about it.

23          THE COURT:  Do you have an

24  opinion, have you formed an opinion as to the guilt

25  or innocence  of Mr. Wardlow?

1           THE POTENTIAL JUROR:   Yes,

2    sir.

3           THE COURT: Would that opinion

4    effect your verdict?

5           THE   POTENTIAL   JUROR:

6    Probably.

7           THE COURT:  I need a "Yes" or

8    "No."

9           THE POTENTIAL JUROR:   Yes,

10   sir.

11          THE COURT:  Okay.  You may

12   step out for a moment.

13      Do you all agree?

14      Sir, don't leave, I want to talk to the

15   lawyers for a moment then I will have some more

16   instructions for you.

17

18      (Off the record discussion.)

19

20          THE COURT:  Let's get back on

21   the record.

22      The Court believes first that the juror

23   believes his physical condition impairs him to the point

24   that he should not be in this case.

25      Further  I  believe  he's  absolutely

1    disqualified by Article 35.16, 10 of the Code of Criminal

2    Procedure, he stated that he does have a conclusion as

3    to the guilt or innocence of the Defendant and that it

4    would effect his opinion.

5                 I read that Rule as prohibiting me or

6    any other party from further questioning the juror.

7                 I'm going to find the juror is

8    disqualified.

9                 Mr. Old, do you have anything you want

10   to put on the record?

11                MR. OLD:  Your Honor, we would

12   except from the ruling of the Court if necessary.

13                THE COURT:  All right.

14                MR. OLD:  As to both findings.

15                THE COURT:  Both findings?

16                MR. OLD:  As to the dyslexia,

17   he indicated he had a little problem with it, my best

18   friend in law school had a big problem with his, he

19   passed the  State Bar and is doing a lot better than I

20   am.

21                THE COURT:  Maybe it would

22   help us all to have dyslexia.

23                MR. OLD:     He read so he

24   could read and he could write and the other, we still

25   except to it, do not feel like the answer disqualifies

1   him.

2              THE COURT:  I'm going to find

3   him disqualified under 35.16 for the reason that I

4   believe his dyslexia would impair his ability to be a

5   fair and impartial juror over the objection of the

6   Defense.

7              Tell Mr. Smyth that we are going to

8   excuse him, he's free to go.

9              And we are in recess until 1:00 p.m.

10  Monday.

11

12              (Record closed for October 27th, 1994.)

13

14              (Whereupon Court was recessed until 1:00

15  p.m., October 31st, 1994.)

16

17

18                          *****

19

20

21

22

23

24

25

STATE OF TEXAS     §
                     §
COUNTY OF TITUS    §

        I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on October 27, 1994 and were reported by me.

        I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

        WITNESS MY HAND this 31ST day of January, 1995.

_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    Certification Number of Reporter:   149

2    Expiration Date of Certification:   12/31/96

3    Business Address:   Drawer 1868
                      Mt. Pleasant, Texas 75456-1868

4

5    Telephone Number:   903/577-6735

6    Transcribed By:     Tandra K. Gibson

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25