

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 31, 1994

**VOLUME 15 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER

1

VOLUME 15

2

VOIR DIRE EXAMINATION

3

OCTOBER 31, 1994                              PAGE/VOLUME

4

APPEARANCES . . . . . . . . . . . . . . .          1/15

5

MORNING SESSION . . . . . . . . . . . . .          3/15

6

WITNESS SWORN . . . . . . . . . . . . . .          5/15

7

WITNESS
LEO SCHAKEL, the Bailiff
8              EXAMINATION BY THE COURT   . . . .      5/15

9

POTENTIAL JUROR, GLENDA SUE MORRIS
              EXAMINATION BY MR. TOWNSEND . . .     12/15
10              EXAMINATION BY MR. OLD  . . . . .     38/15

11

RECESS   . . . . . . . . . . . . . . . .           76/15

12

POTENTIAL JUROR, KENNETH WAYNE REESE
              EXAMINATION BY MR. LEE  . . . . .     79/15
13              EXAMINATION BY MR. HINSON . . . .    103/15

14

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
              OF THE POTENTIAL JUROR  . . . . .    136/15
15

COURT ADJOURNED . . . . . . . . . . . . .         142/15

16

COURT REPORTER'S CERTIFICATE  . . . . . . .       143/15

17

18

19

                              * * * * *

20

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME 15

ALPHABETICAL INDEX OF

POTENTIAL JURORS

OCTOBER 31, 1994                                    PAGE/VOLUME

POTENTIAL JUROR, GLENDA SUE MORRIS
EXAMINATION BY MR. TOWNSEND . . . . . . . .          12/15
EXAMINATION BY MR. OLD  . . . . . . . . . .          38/15

POTENTIAL JUROR, KENNETH WAYNE REESE
EXAMINATION BY MR. LEE  . . . . . . . . . .          79/15
EXAMINATION BY MR. HINSON . . . . . . . . .         103/15

LEO SCHAKEL
EXAMINATON BY THE COURT . . . . . . . . . .           5/15

* * * * *

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

October 31, 1994

**VOLUME 15 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)

APPEARANCES

ATTORNEYS FOR THE STATE OF TEXAS:

    MR. RICHARD TOWNSEND
    District Attorney
    Morris County Texas
    Morris County Courthouse
    Daingerfield, Texas 75638

        and

    MR. RANDY LEE
    Assistant District Attorney
    Cass County Texas
    P.O. Box 940
    Linden, Texas 75563

1

2

ATTORNEYS FOR THE DEFENDANT:

       MR. BIRD OLD, III
       Old, Rolston & Old

3
       P.O. Box 448
       Mt. Pleasant, Texas 75456-0448

4

          and

5

6
       MR. LANCE HINSON
       Law Offices of Danny Woodson
       P.O. Box 399

7
       Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    On the 31st day of October, 1994, the

2    above-entitled and numbered cause came on for hearing

3    before said Honorable Court, Judge Gary R. Stephens of

4    Midlothian, Texas, serving by judicial assignment in the

5    District Court of Titus County, Texas, on change of venue

6    from Morris County, Texas, and the following proceedings

7    were had:

8    THE COURT:  I guess the first

9    thing we need to do before we bring the juror in is to

10   get on the record.

11   Mr. Old, when we left here last week

12   there was a question as to how many jurors were informed

13   that the parole law provides for a 40 year calendar time

14   to be served on this case when in truth and in fact we

15   discovered it was 35 years after Mr. Townsend did some

16   research.

17   The Reporter tells me that three of the

18   four jurors we were concerned about have or were told

19   that the parole transaction would be 40 years as opposed

20   to 35.

21   I cannot remember those three jurors

22   names, I know Mr. Cox, the police officer was not one of

23   them, it was the other three and I'm sure that both sides

24   can find out from the record or from Lloyd which of those

25   three I'm talking about.

1          I'm not going to make you do it today

2    but tomorrow  morning I want to know whether you want to

3    -- whether you are in a position after we get caught up

4    to make your choice in strikes and jury selection or

5    whether you need to talk to those three.

6          And Mr. Townsend, I need the same for

7    you -- from you.

8          MR. OLD:  I believe if I have

9    got the order right it would be Littles, Edwards and

10   Henry.

11         THE  COURT:   Mr.  Townsend,

12   Littles and Edwards.

13         MR. OLD:   Your Honor, unless

14   -- excuse me, the next to the last witness that testified

15   and perhaps the last juror who was totally questioned did

16   not disqualify, Officer Alexander?

17         THE COURT:  Yes.  The one who

18   said they got a teletype?

19         MR. OLD:  Yes.

20         THE COURT:  We also did some

21   checking on that.  Has the information been given to you?

22         MR. OLD: No, sir.  It hasn't.

23         MR. HINSON:  No.

24         THE COURT:  I have got some

25   information from our Bailiff, he can either state it into

1   the record what he found or I will swear him in and he

2   can do so under oath.

3             Do you wish to have him swore?

4             We don't have any information, the

5   bottom line, but I do want explanation in the record.

6             Do you want me to swear him?

7                  MR. OLD:  Perhaps it would be

8   best, it's not a matter of --

9                  THE COURT:  I understand.

10

11             (Witness sworn.)

12

13       LEO SCHAKEL, the Court Bailiff,

14   was called as a witness and, having been first duly sworn

15   by the Court, testified as follows:

16

17                  THE COURT:  You may lower your

18   hand.

19             State your name, please.

20                  THE WITNESS:  Leo Schakel.

21                  THE COURT:    Officer   or

22   Sheriff, I asked you when we recessed Thursday to get a

23   copy of the teletype that our last juror referred to, I

24   did not want the officer receiving the teletype himself.

25             So would you please state into the

1   record what efforts you made to locate that teletype and

2   the results.

3                           THE WITNESS:   Yes, sir.   I,

4   when I left the courthouse I went directly to the police

5   department here in Mount Pleasant, checked with the

6   dispatcher, we went through the records for June 14th of

7   that year.

8                           I was -- it is a reasonable teletype

9   sent out to Region 1, which we are in Region 1, they keep

10  them for 30 days and disposed of them.

11                          I   was   sent   directly   to   the   Mount

12  Pleasant Police Department, a permanent record is kept,

13  we went through the permanent records and there was no

14  copy in there so most likely it was just a Region 1 send-

15  out to all the departments in the area.

16                          THE COURT:   Did you make any

17  attempt to contact Titus County?

18                          THE WITNESS:   No, I didn't,

19  Your Honor.

20                          THE COURT:   Do you have any

21  questions, Mr. Old?

22                          MR. OLD:   No.

23                          THE   COURT:   Thank   you,

24  Sheriff.

25                          Mr. Townsend, would you check with the

1    Titus County Sheriff's Office and find out what teletype

2    went out on June 14th too?

3                  MR. TOWNSEND:  "Morris County"

4    or "Titus?"

5                  THE COURT:  Check with Morris,

6    I'm sorry, check with Morris County and find out what

7    teletype they sent out that would have been received by

8    Titus or any other county.

9                  MR. TOWNSEND:  Okay.

10                 THE COURT:  See if you can

11    locate them for us in the next day or two.

12                 MR.  TOWNSEND:  The crime

13    occurred on the 14th, it wasn't discovered until late

14    that evening, it might -- they might not have sent any

15    to the county until --

16                 THE WITNESS:  We went through

17    a couple of days beyond the 14th.

18                 MR. TOWNSEND:  I'll check.

19                 THE COURT:  Check and see if

20    you can find it then we will just hold this issue for a

21    day or so.

22            Wednesday  morning I would like to have

23    -- and see if you can give me an answer and I propose

24    that we qualify as many jurors as we can between now and

25    Wednesday afternoon.

1      Wednesday afternoon I would also like

2   announcements or whether or not we need to re-voir dire

3   the three jurors with the wrong information and then

4   Thursday afternoon I think the last thing we'll do before

5   I leave is to get on the record with our preemptory

6   strikes and see where we stand.  We should have several

7   qualified by then.

8               MR. TOWNSEND: Do the striking

9   Thursday morning or afternoon?

10              THE COURT:  I figured we would

11   do it Thursday afternoon, all jurors through Wednesday,

12   I won't make you include those for Thursday morning.

13              I think we are in line.

14              MR. LEE:   If it's any help,

15   I happened to be at the Atlanta Police Department at the

16   time that this teletype went out, they received a

17   teletype to be on the lookout for the truck on the day,

18   I don't remember what day, it may have been the next day.

19   I assume it was a Region 1 teletype.

20              THE COURT:   Thank you, Mr.

21   Lee.

22              Do you have any other matters to take

23   up before we resume with our jurors?

24              I take it we don't.   Let's bring in

25   Glenda Morris.

1          THE BAILIFF: Watch your step,

2 ma'am.  Have a seat right there.  (Indicating)

3

4    GLENDA SUE MORRIS, Potential Juror #127

5 was called as a Potential Juror and, having been

6 previously sworn by the Court, testified as follows:

7

8          THE COURT:   Good morning or

9 good afternoon, ma'am.

10         THE POTENTIAL JUROR:   Good

11 afternoon.

12         THE COURT:  How are you?

13         THE POTENTIAL JUROR:   Just

14 fine.

15         THE COURT:   Ma'am, for the

16 -- well, I was going to ask you, here it is; for the

17 record are you "Glenda Morris?"

18         THE POTENTIAL JUROR:   Yes,

19 sir.  I am.

20         THE COURT:  This is Juror 14.

21      Ma'am, I am Gary Stephens, I am

22 presiding over the jury selection, we have two lawyers

23 representing the State of Texas, we have the elected

24 District Attorney from Morris County, Mr. Richard

25 Townsend, we have the elected District Attorney that will

1   be taking office in Cass County who is working with us

2   on this case until then and that's Mr. Randall Lee.

3            There are two Defense Attorneys present,

4   Mr. Bird Old, III.

5                      MR. OLD:  Hello.

6                      THE COURT:  Mr. Lance Hinson.

7            Next  to  Mr.  Hinson  is  the  person

8   charged, Mr. Billy Wardlow.

9            Ma'am, the lawyers have read your

10  questionnaire and they are familiar with your answers,

11  they are going to discuss some of those answers with you

12  and they are also going to talk to you about the

13  principles of law involved in a death penalty case.

14           You will be asked a lot of questions and

15  the answers will let us know whether or not to put you

16  on the jury.

17           In order to be a juror you must be able

18  to understand, follow the law but you don't necessarily

19  have to agree with our law.  It's kind of like filing

20  income tax, you may not want to but as long as we comply

21  with the law we have done what we are supposed to do.

22           If there's some law that you disagree

23  with that is involved in a trial but you can set aside

24  your disagreement with the law then you are qualified so

25  long as you can follow that law but if you disagree with

1    the law to such an extent that you can't follow it then

2    you are not qualified.

3              So we need to know what you think about

4    the law that will be involved in the type of case that

5    will be tried, we need to know how you think and what you

6    think and the only way as lawyers we know to find out is

7    to just ask.

8              So I hope that you just open up, relax,

9    be honest with us, because there's no right or wrong

10   answer and there's no right or wrong opinions, whether

11   your opinions are the same as ours is totally immaterial,

12   we just want to know where you are coming from so we can

13   decide if this is the appropriate case for you.

14             Most jurors we talk to are qualified,

15   meaning they can understand the law but that still

16   doesn't mean that they are appropriate jurors.

17             So just relax, tell us whatever you

18   think we need to know and answer our questions and if you

19   think there is something that will effect your ability

20   to be on this case and we don't ask you volunteer the

21   information.

22             Do you have any questions?

23             THE POTENTIAL JUROR:  Not at

24   this point.

25             THE COURT:   The State may

1    proceed.

2

3                    VOIR DIRE EXAMINATION

4                       BY MR. TOWNSEND

5

6    Q        Thank you, Your Honor.

7            Ms. Morris, I am Richard Townsend, I

8    represent the State of Texas along with Randy Lee here

9    in this capital murder trial and as the Judge said,

10    there's really no right or wrong answer to the questions

11    we ask, we just really want to know what you think and

12    kind of get an idea of what your opinions are about our

13    justice system and in particular about the death penalty.

14            I want to be honest with you from the

15    start and the State of Texas in this case is actively

16    seeking the death penalty against this Defendant Billy

17    Wardlow.

18            Now, I know that's not a pleasant thing

19    to say or pleasant thing to think about but I want you

20    to know right up front that that's what we are here for,

21    that's what we are trying to do.

22            I had a chance to look at your

23    questionnaire and I would just like at this time just to

24    give you an opportunity to just tell us how you feel

25    about the death penalty in your own words.

A        Well, I don't think that any of us want to see someone put to death but I am sure there are times when people do something so horrendous that they deserve to be put to death for that action.

Q        And that's -- that is your answer you just gave is kind of reflected in your answer to the questionnaire that said you thought it was appropriate in some murder cases?

A        Yes.

Q        Is that a feeling you have always had since you were an adult, you might say or has your position changed over the years?

A        No.  I don't think it's a feeling that I have always had.  I think that at one time I really felt like that maybe the death penalty was not appropriate for any case but I feel like taking someone else's life was just wrong under any circumstances.

Q        Yes.

A        But I think as you get older and live life a little longer you realize that there are some actions that you really cannot decide that someone has the right to live if they have committed that particular crime.

Q        Okay.  Ms. Morris, if you are selected on the jury you might to come to a point in the trial where the jury was making that decision after the person was found

1   guilty, then you would go back and make the decision

2   about the death penalty.

3           Do you know of any reason why you

4   couldn't serve on a jury and make the decision that is

5   required in order to see that the person received the

6   death penalty and was executed?  If you thought that the

7   facts and the evidence were appropriate for that could

8   you do it?

9   A       Could I do it?

10          Yes.  I could.

11  Q       Okay.  I'll talk to you a little bit about

12  murder cases; in Texas there are basically two types of

13  murder cases in Texas, one being what I would call just

14  "plain murder" or "non-capital murder" where someone has

15  intentionally or knowingly caused the death of another

16  individual and that is to say without an excuse such as

17  self defense or a legal justification such as self

18  defense or an accident or something like that.

19          In Texas that is punishable by up to a

20  life sentence but is not punishable by the death penalty,

21  not just that non-capital plain murder.

22          On the other hand there is what we call

23  "capital murder", capital murder is punishable by the

24  death penalty in Texas and that is the type murder where

25  you have got a plain murder like I just talked about plus

1    something else.  And that "plus something else" is the

2    murder of a police officer or fireman in the line of

3    duty, multiple murder situation where more than one

4    person is murdered in the same episode, murder that takes

5    place during the commission of a robbery or burglary or

6    rape.

7                    Those are what we call "capital murder."

8                    There is a sheet of paper up there that

9    is in this case and I believe that it's marked with a

10   circle and number one, it may have some other markings

11   on it, too.

12                    THE BAILIFF:   Right here,

13   ma'am.  (Indicating)

14                    MR. TOWNSEND:   If you will

15   just read to yourself and I will talk to you about it in

16   a minute.

17                    Ms. Morris, that is the indictment in

18   this case or a copy of it.

19                    Can you see by looking at that

20   indictment that if the State could prove everything on

21   there that that would not be just a plain murder but

22   would be a capital murder?

23                    THE POTENTIAL JUROR:   Yes.

24   I can see that.

25   Q           (BY MR. TOWNSEND)  Because it alleges a murder

and also alleges a robbery.

Okay.  What we need in the way of jurors in this case or any capital murder case is those people who can keep an open mind throughout the trial.

And when I say that I mean as you are going through hearing evidence and deciding first if the defendant is guilty or not guilty at that point you are not concerned with what his punishment is going to be on down the road.  You are just strictly determining whether he's guilty or innocent.

If he's found not guilty, of course this trial is over, everybody goes home.

But if the defendant is found guilty then you go into what is called the "punishment hearing" where if the person is found guilty of capital murder the punishment hearing is to decide whether the person would receive a life sentence or death penalty.  Those are the only two options.

Now, in making that decision we won't go back there and just vote for life or vote for death, you will have a punishment hearing and at that time you will hear evidence that relates not to whether the person is guilty or not guilty because you have already made this decision but it relates strictly as to what the proper punishment for the crime should be.

1        You might hear evidence of prior bad

2   acts by the defendant, prior criminal episodes by the

3   defendant, you might hear evidence of the defendant's

4   age, family background, psychological testimony, just

5   throw the kitchen sink in there because you hear just

6   about everything plus whatever evidence you heard during

7   the punishment hearing.

8        We have got to have the type of juror

9   who's not going to say "I know the person's guilty of

10  capital murder, I think he needs to get the death

11  penalty" or "I think he needs a life sentence."

12       We need jurors that cannot make that

13  decision at that time, that point, but wait until they

14  have heard all the evidence during the punishment hearing

15  before making their decision on that.

16       Do you believe that you could do that?

17  A        Yes.  I do.

18  Q        Okay.  A little bit about what I've been

19  talking about, to refer to that a little more, there is

20  what I call the "flow chart" up there that looks like

21  this.

22            THE COURT:   To your left.

23  (Indicating)

24            MR. TOWNSEND:   If you will

25  just kind of look at that and go along with me.

1    At the top of the page you can see where
2 the guilt or innocence phase of the trial is, right
3 underneath this that says, "Evidence", that's what I was
4 talking about, you are going to hear evidence as to
5 whether the defendant is guilty or not guilty and if he's
6 not guilty then of course the trial is over, if you found
7 him guilty you go to the next phase.
8    The next phase is called "the punishment
9 phase" and that's when -- that's when I said you are
10 going to hear more evidence, not in regard to whether the
11 defendant is guilty or innocent because that decision has
12 been made but more evidence as to what the proper
13 punishment should be.
14    Then you are going to go -- the jury as
15 a whole will go back and deliberate and they will vote
16 on Special Issues.
17    Now, that Special Issue is a question
18 that you answer "Yes" or "No."
19    For right now don't worry about what
20 that question is because I will go over this with you in
21 just a minute.
22    But you are going to answer Special
23 Issue #1, if the jury's answer to that is "No" then the
24 defendant -- the defendant would automatically receive
25 a life sentence.

1    However, if your answer is "Yes" then

2    you are going to Special Issue #2.

3         Now, Special Issue #2, if that question

4    is answered "Yes" then the defendant would get a life

5    sentence, if that answer is "No" then the defendant would

6    receive the death penalty.

7         So basically what you are looking at is

8    after Special Issue #1 and #2, you have looked at all

9    this evidence and voted on those, if you vote "Yes" on

10   Number One, "No" on Number Two the defendant will receive

11   the death penalty, if you vote any other way the

12   defendant will receive a life sentence.

13        Are you with me?

14            THE POTENTIAL JUROR:    Yes.

15   I think so.

16   Q       (BY MR. TOWNSEND)   Okay.  We'll go over those

17   questions in a minute but the important thing to remember

18   is we have got to have jurors who are able to withhold

19   their decision on those questions until they have heard

20   all the evidence on the punishment, they are not to

21   decide it based strictly on the crime or on the guilt or

22   innocence part.

23        Now, when you are making your decision

24   on Special Issue #2, Number One and Number Two,  you can

25   -- certainly we are not wanting you to block that first

1    part of the trial off, you can certainly use that in

2    helping you make your decision also but not just use

3    that, also consider that punishment evidence, could you

4    do that?

5    A        Yes.  I think I could.

6    Q        Okay.  If you will, ma'am, there is a sheet of

7    paper up there that on the front on top it says "Special

8    Issues."  (Indicating)

9    A        Okay.

10   Q        If you will look at that and read just to

11   yourself Special Issue #1 and then I will talk to you

12   about that.

13            Okay.  Ms. Morris, Special Issue #1

14   refers to the future dangerousness of the Defendant.

15            Is that kind of what you got from it?

16   A        Yes.

17   Q        Okay.  I want to talk to you about some of the

18   terminology in there in that Special Issue #1.

19            First is that word on the second line

20   of the word "probability."

21            Now, "probability" may be to a

22   mathematician or some different type people may look at

23   this different ways but "probability" means basically,

24   you know, we are not -- the State is required to prove

25   that Special Issue #1 beyond a reasonable doubt just like

we are "guilty", that the person is guilty in the first phase.   But we are not required to prove beyond a reasonable doubt that we are certain or that we guarantee that the defendant would commit some other criminal act of violence in the future.   We are only required to prove beyond a reasonable doubt that the defendant has the probability.

And the law in Texas defines probability as "more likely than not."

So basically we are required to prove beyond a reasonable doubt that it is more likely than not that the defendant will commit a criminal act of violence in the future.

Also that term "criminal act of violence there" at the end of the second line -- of course we are charging the defendant in this case with capital murder and certainly that is a criminal act of violence but there are many other criminal acts of violence that aren't capital murder, they are not as serious as capital murder such as assault, attempted murder, rape, many other type things that would be considered "acts of violence."

We are not required to prove that the defendant would be more likely than not to commit another capital murder, just that he would commit some criminal

act of violence in the future.

Do you feel like you understand Special Issue #1 and what you are being asked to decide there?

A        Yes.  I do.

Q        Okay.  In understanding that, you know, when you were making that decision on Special Issue #1 you can go back to that first part of the trial and sort of in your mind go back over that evidence in your mind and also that evidence that you hear at the punishment hearing before making your decision on that.  You are not, you know, you are not required to forget all that evidence you heard at the first part and in deciding Special Issue #1 that is also, as I said, something that the State has to prove to you beyond a reasonable doubt.

If you will look at the sheet of paper there where it says "Special Issue #2, read that over to yourself and then I will talk to you about that.

Ms. Morris, Special Issue #2 is -- first of all that Special Issue is not like the guilt or innocence and it's not like Special Issue #1 in that we do not have to prove Special Issue #2 to you beyond a reasonable doubt, it's just sort of your opinion.

And basically what it says, you found the defendant guilty of capital murder, you decided, yes, that he's going to probably be a danger in the future and

then you are looking at Special Issue #2 and what it's basically saying is this is a death penalty type case, is this a death penalty type defendant or is there some sufficient mitigating circumstance to make me believe that this defendant should receive a life sentence rather than the death penalty.

If you answer "Yes", you do believe that then the defendant would receive a life sentence, if your answer is "No" I don't see any sufficient mitigating circumstance here to warrant a life sentence then the defendant would receive the death penalty.

But the thing about sufficient mitigating circumstances, one; they have to be no just anything that is mitigating or that would reduce the blameworthiness but it has to be sufficient in your mind to reduce that moral blameworthiness to the point that the defendant deserves a life sentence rather than the death penalty.

And you may, you know, different jurors look at that different ways.  What might be sufficiently mitigating to you might not be to someone else even though they heard the same evidence you heard.

Let me give you an example; if I told you that someone had committed a murder and they had -- that they were intoxicated at the time, one person might

1   think that this, the fact that they were intoxicated

2   would be sufficiently mitigating because after all had

3   they not been intoxicated they might not have committed

4   the crime, whereas someone else might hear the same

5   evidence and say, well, you know, that shouldn't make any

6   difference, to me that doesn't excuse their behavior.

7               So you can see even though you have

8   heard the same evidence you might feel differently about

9   it.

10              Are you with me so far?

11  A       Yes.

12  Q       Okay.  That's where that that Special Issue #2

13  is the part of the punishment hearing where you have

14  heard this evidence, you know, I was telling -- you might

15  hear evidence from the psychological testimony or you

16  might hear evidence of family history, retardation -- and

17  bear in mind we are not talking particularly about this

18  case but any capital murder case -- you might hear

19  evidence of all sorts of things.

20              The important thing to remember is no

21  matter what kind of evidence you hear that you have to

22  be able to listen to that evidence and consider it in

23  making your decision both on Special Issue #1 and Special

24  Issue #2.

25              Now, that doesn't mean that you have to

1   believe everything you hear, it doesn't mean that you

2   have to place any importance on everything you hear as

3   long as you are willing to listen to and consider and

4   then make your decision.

5                         Could you do that?

6   A          Yes.

7   Q          Okay.  Another thing about mitigating evidence

8   is that mitigating evidence can come from anywhere.  You

9   might think, well, you know, the defendant would be who

10  you might hear the most.  Mitigating evidence would be

11  evidence that they presented.  But it might not

12  necessarily be, you know, that mitigating evidence may

13  come from us.  The State may present you with mitigating

14  evidence.

15                      For instance, if during the guilt or

16  innocence phase you decide that the defendant committed

17  capital murder but you also heard evidence that indicated

18  to you that the defendant was young and the defendant has

19  some family problem, that the defendant was intoxicated

20  or, you know, you might hear all sorts of stuff even

21  though the State presented the evidence that still might

22  in your mind be mitigating.

23                      So I guess what I'm saying is you just

24  kind of consider all that evidence and weigh it

25  irregardless of which side of the table it comes from.

1                              Could you do that?

2          A          Yes.

3          Q          I believe that you will be instructed at the

4          end of the trial that in the written instructions that

5          you receive from the Court that parole is something that

6          you are not to consider in any way in deciding the proper

7          punishment in the case.

8                              And that's to say that if the -- when

9          you were deciding whether to give the person a life

10         sentence or the death penalty as far as the jury is

11         concerned life is life and you are not to consider

12         whether or not parole might ever be granted or if so when

13         because after all that's not something that you can --

14         would have any control over or could determine.

15                             Could you make your decision as to the

16         proper punishment in the case without, you know, I don't

17         expect you to put parole completely out of your mind.

18         We can't expect you to come in there with a blank mind

19         but we do expect you to be able to set aside and not use

20         it in any way in making your decision on whether the

21         proper punishment should be a life sentence or death

22         penalty.

23                             Could you do that?

24         A          Yes.

25         Q          Okay.    And   when   I   say   "deciding   proper

1  punishment" that means those Special Issues.   So in

2  deciding Special Issue #1, that future dangerous issue,

3  could you not consider parole when deciding what your

4  answer would be on Special Issue #1?

5  A        Yes.

6  Q        Same question on Special Issue #2, could you

7  do that?

8  A        Yes.

9  Q        Ms. Morris, I want to talk to you a little bit

10  about some general areas of the law that don't

11  particularly necessarily have to do with just capital

12  murder but just most criminal cases in general; if in

13  this -- if in this case the State presented their

14  evidence or in any capital murder case and you decided

15  or the jury decided that, well, the State has proven

16  their case as to murder but they haven't proved the

17  robbery then the jury would be bound to find the

18  defendant guilty of murder but not capital murder.

19                  Are you with me on that?

20  A        Yes.

21  Q        Okay, well, then, you have a different range

22  of punishment.   Instead of having life or death you have

23  got anywhere from five years probation to 99 years or

24  life.

25                  That is a real broad range of punishment

1    as the Judge discussed it with you when you all had your

2    general jury selection a few weeks ago murder can be

3    something anywhere from an extremely vicious type crime

4    to -- all the way to what we generally describe as "mercy

5    killing", are you familiar with that terminology?

6    A       Yes, sir.

7    Q       So a mercy killing even though it's a mercy

8    type killing is the intentionally causing the death of

9    another individual?

10   A       Yes, sir.

11   Q       Do you think you could consider the full range

12   of punishment if a person was convicted of murder?  Do

13   you think that you could consider the 99 years to life

14   and also consider the five years probation?

15           Do you think you could consider that

16   full range?

17   A       Yes, sir.

18   Q       We are not asking you whether you would give

19   this or give that but would you give it all

20   consideration, could you do that?  Give it all

21   consideration before making your decision, could you do

22   that?

23   A       Yes, sir.

24   Q       The State is required to prove our case beyond

25   a reasonable doubt and that is not beyond all doubt but

1       it is beyond a reasonable doubt.

2                    And there is a legal definition for that

3       the Court will provide for you.

4                    Is that beyond a reasonable doubt

5       something that you are comfortable with and you don't

6       think that -- do you think that is a real burden for the

7       State?

8       A       Yes.  I think it is.

9       Q       Okay.  The burden of proof in any criminal case

10      rests with the State of Texas, it's our burden to prove

11      the defendant guilty in this case or any other case.

12      It's not their burden to prove that he's not guilty.

13                   All right.  We have got to prove our

14      case to you beyond a reasonable doubt, on the other hand

15      they don't have to prove anything.  They can sit over

16      there completely quiet during the whole trial and that

17      never shifts, that burden, that burden is still right

18      here with us.

19                   And we accept that burden.

20                   Is that okay with you?

21      A       Yes.  It is.

22      Q       Okay.  To go along with that burden of proof

23      is the Constitutional Fifth Amendment privilege which

24      means that the defendant in a criminal case does not have

25      to testify unless he chooses to.

1          Are you familiar with that?

2     A          Yes.

3     Q          And what that means is that you can't hold that

4     against the Defendant in any way if he did not testify.

5     You have got to decide the facts of the case based

6     strictly on the evidence that you hear and not what you

7     don't hear.

8          You know, I think it's human nature that

9     you may be curious as to why the defendant didn't testify

10    or what they would say if he did or anything of that

11    nature.

12          But could you not use that in making

13    your determination of guilt or innocence?

14    A          Yes.

15    Q          And, Ms. Morris, that goes along with the

16    punishment phase of the trial as well, this Fifth

17    Amendment privilege still applies there.  We might like

18    the defendant to get up there or you might or some other

19    juror might like the defendant to get up there and say

20    he is sorry.

21          That cannot be a determining factor in

22    making your decision on Special Issue #1 and Special

23    Issue #2 because if you hold that against the defendant

24    because he doesn't get up there and say he's sorry

25    basically what you are doing is you are denying him that

1   Fifth Amendment privilege.

2              Do you see what I'm saying?

3   A      Yes, sir.

4   Q      So could you make your decision as to Special

5   Issue #1 and Special Issue #2 without holding it against

6   the defendant in any way that he did not choose to

7   testify?

8   A      Yes.  I could.

9   Q      Okay.

10             THE COURT:  Thirty minutes.

11             MR. TOWNSEND:  Thank you, Your

12   Honor.

13             Ms. Morris, in criminal trials you hear

14   testimony   from   all   sorts   of   witnesses,   maybe

15   psychologists, psychiatrists, ministers, police officers,

16   teachers, family members.

17             It's possible that you might even have

18   testimony from someone that you know.  I don't think

19   that's likely in this case but it's possible.

20             Where I am going with this is that in

21   order to be a fair and impartial juror you have got to

22   be able to place all those witnesses on the same starting

23   block and not give anyone a head start just based on who

24   they are or how they are dressed or what professional job

25   they might have.

1          Could you do that?

2     A          Yes.

3     Q          And base your finding on the evidence that they

4     presented to you and determine their credibility after

5     you heard their testimony and not just decide that, you

6     know, when the guy sits on the stand when he's a police

7     officer, you know, he's going to tell the truth or

8     anything of that nature.

9          Could you do that?

10    A          Yes.  I could.

11    Q          Ms. Morris, what you looked at a little earlier

12    was the indictment in this case.  I know the Judge went

13    over this with you a few weeks ago.

14         That indictment is not evidence and I

15    believe you understand that it cannot be used in any way.

16         To use it against the defendant in

17    deciding whether he's guilty or not guilty, do you agree

18    with that?

19    A          Right.

20    Q          We have got to present our evidence to you here

21    in Court.

22         In criminal trials, Ms. Morris,

23    oftentimes you have written statements by the defendant

24    or you might call those "confessions" that the defendant

25    has made.

If you were a juror in a criminal case and there was a written confession involved I believe the Court would instruct you that that statement in order for you to use that statement as evidence that you have to find beyond a reasonable doubt that it was both voluntary and truthful.

My question to you is; if you heard the testimony or heard a written -- read a written confession, for instance, and you believed that the statement was true but because the defendant was coerced, because the defendant was not read his proper warnings, rights, Miranda Rights -- are you familiar with the term "Miranda Rights?"

A        Yes.  I am.

Q        If for whatever reason that statement -- when I say "voluntary" I mean voluntary from the legal standpoint means that he has his Miranda Rights read to him that was appropriate for the situation, that he was not coerced in some, you know, unfair or illegal manner -- if you decide after reading that confession, after hearing all the testimony that this confession in your mind was truthful, that it was not -- but it was not voluntary it would be your duty as a juror to not -- like I said on something else earlier we can't expect you to put that out of your mind but you have got to be able to

1    set that aside.  If you believe it to not be voluntary

2    or if you believe the State did not prove to you that it

3    was voluntary and not use it in any way when deciding the

4    guilt or innocence of the defendant.

5                    Could you do that?

6    A        Yes.  I could.

7    Q        Could you also do that in regard to punishment

8    hearing, you know, in answering those special questions

9    -- what I mean is if there's something in that confession

10   that would make you have ill will toward the defendant

11   would you not use that against him since that confession

12   has been adjudged by yourself to be not voluntary, could

13   you do that?

14   A        Yes.  I could.

15   Q        Okay.  Ms. Morris, do you -- I have been asking

16   all the questions.

17                    Is there anything that you would like

18   to ask me about or anything that maybe I haven't covered

19   that you think is important as far as you being a juror?

20   A        I can't think of anything right now.

21   Q        Okay.  I'm going to ask you about a few things

22   off your questionnaire; you mentioned that you had a

23   nephew in prison for aggravated robbery?

24   A        Yes.

25   Q        Was that a local situation here in Titus

1    County?

2    A          No.

3    Q          Where was that at?

4    A          In Mesquite.

5    Q          "In Mesquite?"

6    A          Yes.

7    Q          I don't know any nice way to ask this, I know

8    he's your nephew and most of us love our relatives; is

9    there anything about that situation that you felt ill

10   will toward   the police or   the District   Attorney's

11   Office or --

12   A          No.  He committed a crime he shouldn't have,

13   he's in prison for it.

14                     As far as I'm concerned he's getting

15   what he deserved.

16   Q          You felt like he was handled appropriately?

17   A          Yes.

18                     In fact he pled guilty.

19   Q          You mentioned that you had been on a criminal

20   jury in a drug case?

21   A          Yes, sir.

22   Q          Was that here in Morris County?

23   A          It was here in Titus County.

24   Q          Excuse me, "Titus County", I'm sorry.

25                     How did that case turn out?  Was the

1    defendant found guilty?

2    A        Yes.  Guilty.

3    .Q        Anything about that jury service that bothered

4    you or any questions that come to your mind that hamper

5    your service in this jury?

6    A        Not that I know of.

7                  We had -- we were able to agree on a

8    verdict and it turned out I think in an appropriate way.

9    Q        Do you remember what that -- what drug was

10   involved in that case?

11   A        Cocaine I believe.

12   Q        "Delivery of cocaine, sale of cocaine?"

13   A        "A sale of cocaine."  Yes.

14   Q        What sort of sentence did the jury give?

15   A        I think it was probated -- maybe less than 10

16   years probation.

17   Q        You mentioned in your questionnaire that you

18   did not know Mr. Old, you mentioned that you knew him but

19   then you said "Not personally?"

20   A        Well, I just know of him because I live here

21   in Titus County and I have not lived here a long time but

22   I do know of him.

23   Q        Anything about that relationship that would

24   cause you a problem sitting on this jury?

25   A        No.

Q        Okay.  Also representing the Defendant in this case is Lance Hinson.

Do you know Lance?

A        I don't think so.  He looks familiar but I don't know I know him.

Q        Nothing about that --

A        No.

Q        Okay.  You also mentioned that you knew something about the facts of this case.

Through what source do you know anything?

A        The day before I came for the jury pool there was an article or maybe it was that, there was an article in the paper, in the Tribune, I think it was a day before.  I read it and I think there was another one that same day.

Q        Is that basically all you know?

A        That's all I know.

Q        You haven't talked to anyone about the case?

A        Not anyone that knows anything about it I mean.

Q        Okay.  Was there anything of that, what you read in the newspaper that -- that would bother you sitting as a juror in this case?

When I say "that" what I mean is whatever you know about the facts of this case in order

1    to be a fair and impartial juror you have got to put that

2    aside and recognize that that is not evidence and that

3    you wouldn't use it in any way in making your decision.

4                    Could you do that?

5    A        Yes.   I could.

6                    MR. TOWNSEND: Pass the juror,

7    Your Honor.

8                    Thank you, ma'am.

9                    THE COURT:   Mr. Old.

10

11                  VOIR DIRE EXAMINATION

12                  BY MR. OLD

13

14   Q        Ms. Morris, I notice on your questionnaire you

15   have -- I think you lived in Kansas City for awhile and

16   Dallas and some other places?

17   A        Yes.

18   Q        I associate -- your maiden name is "Carpenter?"

19   A        That's correct.

20   Q        Are you a Titus County Carpenter?   Are you a

21   native of this county?

22   A        No.   I am a native of Camp County which is in

23   Pittsburg.

24   Q        Were you raised in Camp County?

25   A        Yes.   I was.

1   Q        Your husband or your married name is "Morris,

2   Morris" is a name I associate with Titus County and there

3   are several families of "Morris" in this county.

4   A        He's not related to any of the family of

5   "Morris."

6   Q        Where was he born?

7   A        He's also from Camp County.

8   Q        "Camp County?"

9   A        But his father -- he was adopted at a young age

10  but his name was not changed.   His name was still

11  "Morris", his adopted parents that lived in Camp County

12  were "McGraw."

13  Q        You stated that at one time you were probably

14  against the use of the death penalty as a punishment for

15  crime.

16              How long ago has that been?

17              And I mean I'm not asking for your day

18  and hour for the change, five years, 10 years ago?

19  A        Probably at least 10 or 15 years ago.

20  Q        I would presume you went through a period of

21  time where you weighed the issue in your mind?

22  A        Yes.

23  Q        Was there any particular event that happened

24  that changed your mind or changed your opinion?

25  A        I think it's just again, a gradual thing over

1     the years.

2                    I think we all start out in college a

3     lot more liberal than we end up in later life.

4     Q          Okay.  Now, you understand that there are only

5     certain types of cases which we call "capital murder

6     cases" that are punishable by death in Texas?

7     A          Yes.

8     Q          And the part of the capital murder statute

9     which is alleged in this case is intentionally taking the

10    life during the course or -- and the attempting to commit

11    the crime of robbery?

12    A          Yes.

13    Q          As to that particular crime, can you conceive

14    of a set of circumstances as to whether or not you could

15    answer the question as to the facts that we had a death

16    sentence?

17    A          I'm not sure I understood your question.

18    Q          The law -- the law of the case as the law of

19    capital murder is defined for this case that if a person

20    -- if the indictment that you read -- a person

21    intentionally kills another while committing or

22    attempting to commit the crime of robbery that that is

23    capital murder and punishable by life or death?

24    A          Right.

25    Q          Okay.  Can you conceive of a set of

1    circumstances where a person intentionally kills someone

2    in the commission of a robbery that you could answer the

3    question to the effect that you had a death sentence?

4    A        Yes.

5    Q        Okay.  Can you conceive of a set of

6    circumstances where a crime -- where a crime was

7    committed that fit capital punishment, intentionally

8    taking a life during a robbery where you could give a

9    life sentence or answer the question to a life sentence

10   being imposed?

11   A        I am sure if there was circumstances that if

12   they met the law that I could.

13   Q        Okay.  What do you mean "circumstances?"

14   A        I mean I suppose that once we get to the point

15   that we decide that it's a capital murder then we have

16   to listen to the evidence.

17            Is that what you are saying?  That we

18   have to listen to the evidence in the punishment phase?

19   Q        Presume that you found a person guilty of

20   capital murder and the law that makes the crime that you

21   found him guilty of is that he intentionally took the

22   life of another while attempting or committing a robbery?

23   A        Okay.

24   Q        Okay.  Now, first let me back up a little bit;

25   you do not write down "We give him life or we give him

death", you answer these Special Issue questions that have been -- that you have been asked about, you answer those questions, you are asked the question as to those questions and you were told the effect of those answers, you know if you answer question Number One "Yes" what happens and so forth, I mean you are not in the blind.

A        Right.

Q        Okay. Can you conceive of a set of circumstances that amount to capital murder -- and I'm speaking specifically about intentionally killing plus robbery -- to where you could answer those questions and the effect of those answers and give a life sentence?

A        I'm not sure. I'm trying to think of what circumstances that you might be referring to.

Q        I don't see -- you will find in front of you "State's 5", looks like this, I think you have looked at it before. (Indicating)

A        Yes.

Q        Except mine is all marked up and I don't think yours is. (Indicating)

A        All right.

Q        That first question asks as to the probability that the defendant would commit criminal acts of violence that will constitute a continuing threat to society and if you answered that issue "No" that results in a life

1    sentence.

2    A          Right.

3    Q          If you answered that issue "Yes" and then

4    answer Special Issue #2 "Yes" -- answer Special Issue #2

5    "No" that results in a death sentence, if you answer

6    Number One and Number Two "Yes and yes" you end up with

7    a life sentence.

8    A          Okay.

9    Q          I mean the written instructions of the Court

10   tell you the effect of your answer.

11              Can you conceive of a set of

12   circumstances to where you could answer those questions

13   with answers that amounted to a life sentence?

14   A          Through mitigating circumstances, is that what

15   you are referring to?

16   Q          Well, the first one -- okay, the first question

17   is a question   as to whether or not there is a

18   probability --

19   A          Okay.

20   Q          -- of criminal acts of violence that will

21   constitute a continuing threat to society, okay?

22   A          Okay.

23   Q          Now, if you had found someone guilty of capital

24   murder would you automatically answer that question

25   "Yes?"

1   A       No.  Not automatically.  Based on the evidence.

2   Q       I am -- you may -- the evidence in the case?

3   A       Yes.

4   Q       You found a man guilty and the evidence that

5   you found him guilty of, would that evidence alone

6   require you to answer that question "Yes?"

7   A       In other words, are you asking me if the

8   evidence that he gets at the --

9   Q       Yes.

10  A       -- would automatically require me to answer it

11  "Yes?"

12  Q       Yes.

13  A       No.

14  Q       I guess what I'm asking you is the fact that

15  you found someone -- you found them guilty of capital

16  murder, does that prove to you, you know, that there is

17  a probability?

18  A       No.

19  Q       You would then consider the other evidence

20  given you in the punishment phase of the trial?

21  A       Right.  Yes.

22  Q       The courts of this state have said that the

23  word "probability" in that issue means simply "more

24  likely than not."

25  A       Okay.

1    Q       Which I relate to the term "a preponderance",

2    more than just a little, more than -- would you require

3    greater proof to you than simply "more likely than not"

4    to answer that question "Yes?"

5    A       No.

6    Q       If it was proved to you that there was a

7    probability, was 50/50 would you answer the question

8    "Yes" or not?

9    A       If it was 50/50?

10    Q       "50/50?"

11    A       Then I would answer the question "No."

12    Q       Okay.  Criminal acts of violence -- would you

13    consider -- let's say the evidence clearly indicated to

14    you that there was more than a 50 percent chance that in

15    the future the person that you had convicted would steal

16    a car, commit the unauthorized use of a motor vehicle,

17    would you consider that to be a "criminal act of

18    violence?"

19    A       No.  I don't think I would.

20    Q       Okay.  Would it require -- the meaning of the

21    word "criminal acts of violence" indicate to you more

22    than simply committing a criminal act?

23    A       Yes.

24    Q       Okay.  If you believed that there was a

25    probability that a person would commit the crime of theft

1    would that prove to you -- would you answer the question

2    "Yes?"

3    A        No.

4    Q        It would take criminal acts as committed in

5    violence as to a person?

6    A        Yes.

7    Q        Okay.  Okay.  The word "society", the courts

8    of this state have said that "society" means both being

9    confined -- you are still in society if you are confined

10   in the penitentiary as opposed to being out of the

11   penitentiary, could you define "society" that way?

12   A        Could you repeat the question, please?

13   Q        Okay.  If according to the laws of the

14   Appellate Courts of this state and the laws of this state

15   the word "society" not only includes what we normally

16   consider "society" and that's our everyday walking up and

17   down the streets, you are still in society when you are

18   in the penitentiary, you are not removed from society for

19   the purposes of the definition of the word here.

20           I mean, would you consider the fact that

21   the State would have to prove to you beyond a reasonable

22   doubt that the probability of -- that the defendant would

23   commit criminal acts of violence that would constitute

24   a continuing threat to society if a man is in prison?

25   A        Yes.

Q        Okay.  Now Mr. Townsend spoke to you about the parole law and he told you that you would be instructed by His Honor not to consider the Law of Parole.

I presume that you have some idea of what the Law of Parole is?

A        I don't have a lot of knowledge of it.  I know what the word means.

Q        Now, you are in effect instructed that in defining the word "life" for the purpose of this trial, for a capital case, that life equals life, you are not to concern yourself with whether or not a party will ever be paroled, that you should not take that into consideration in arriving at your answers in reaching a verdict.

I mean you have got to presume that life means to lock him up until he's dead.

Can you do that?

A        Yes.  I can.

Q        Now, what I think the Court will instruct you as to parole, words to this effect, "You are further instructed that in determining the punishment in this case you are not to discuss among yourselves how long the defendant will be required to serve any sentence imposed, such matters come within the exclusive jurisdiction of the Board of Pardons and Parole and are no concern of

1    yours."

2          I think that you would if you are

3    instructed that in a capital murder case that where a

4    life sentence is imposed it means that a person will not

5    become eligible for parole until he had served 35 years

6    by calendar.

7          That the fact that if somebody becomes

8    eligible for parole it doesn't mean that they are going

9    to get it, just the fact that they qualify for it, to be

10   considered.

11         Now, having been told all of that, as

12   a juror can you lay it aside and assume for the purposes

13   of your deliberation that life means life?

14   A        Yes.

15   Q        Okay.   You told me that you served or you

16   answered a few moments ago that you served on a jury, was

17   that here in Titus County?

18   A        Yes.

19   Q        Did the defendant plead guilty or not guilty

20   in that case?

21   A        Not guilty.

22   Q        "Not guilty?"

23   A        "Not guilty."

24   Q        You first found him guilty and then found --

25   gave him a probated sentence?

1      A          It was not a separate trial for the punishment

2      phase of the trial, is that what you mean?

3      Q          Yes.

4                 That sounds to me like the person pled

5      guilty.

6      A          I don't think so.

7      Q          You don't think so?

8      A          No.

9      Q          But you didn't -- let me ask, did the jury

10     deliberate and find guilty or not guilty?

11     A          Yes.

12     Q          And then did you come back out?

13     A          No.  We did not come back out but we did have

14     instructions that we were supposed to.

15     Q          You were instructed to find the defendant

16     guilty?

17     A          No.  We decided on the guilt or innocence but

18     then with that we had information that we had to answer

19     certain questions that decided on a recommendation for

20     sentencing.

21     Q          But did -- after you made the determination of

22     guilt or innocence did the jury come back out from the

23     jury room and hear more evidence of -- from the lawyers?

24     A          No.

25     Q          Are you still satisfied with your deliberation

1    in that case?

2    A        Yes.

3    Q        Back to Special Issue #2; there is a definition

4    at the bottom of the page, "Mitigating evidence is

5    evidence that a juror might regard as reducing the

6    defendant's moral blameworthiness."

7                     I'm not asking you how you would rule

8    or to what extent you would, I'm asking you if you would

9    consider and not reject these types of evidence; would

10   you consider the age of the person?

11                     MR. TOWNSEND:    I'm going to

12   object, Your Honor, I believe the way he's stating that

13   he's stating would they consider it and not reject it,

14   I think she is entitled to consider it and in fact reject

15   it after considering it.

16                     THE COURT:   Sustained.

17                     MR. OLD:  Your Honor, I would

18   object to his objection until I finished the question.

19                     THE COURT:     Then I will

20   reserve my ruling and let you finish the question and

21   carry the objection.

22                     MR. OLD:  My objection -- I'm

23   not asking you how -- one of the factors or types of

24   evidence I'm going to ask you about, I'm not asking you

25   how you would determine mitigation, what I'm asking you

1   is would you summarily reject this type evidence and not

2   even consider?

3                               THE COURT:  The objection is

4   overruled.

5                               MR. OLD:  It doesn't mean that

6   you will rule one way or the other, it's the fact that

7   you will weigh the evidence.

8                               Would you consider age as a mitigating

9   circumstance and not automatically reject it?

10                              THE POTENTIAL JUROR:  Yes.

11  Q          (BY MR. OLD)  Okay.  And I mean that could be

12  a young age or an old age?

13                              Okay.  Would you consider someone's

14  family history?

15                              By  "family  history"  I  mean  the

16  environment and the circumstances of their raising?

17  A          As "mitigating circumstances?"

18  Q          Yes.

19  A          Yes.

20  Q          If you heard testimony from psychiatrists,

21  psychologist's testimony, would you weigh it or consider

22  it?

23  A          Yes.

24  Q          Mr. Townsend made a statement about -- in

25  asking you about the right of a person not to give

1  testimony against themself or give evidence against

2  themselves, he said that on the punishment stage you

3  might really want them to get up and say they were sorry.

4           Would you want them to do that?

5  A           Sure.   I think you would like to hear some

6  people say that but on the other hand I realize that it's

7  a Fifth Amendment right not to.

8  Q           I mean, "Yes, you would like to hear from

9  them?"

10 A           Yes.

11 Q           And I'm sure that would be true on the

12 innocence or guilt stage of the trial, that you would

13 like to hear it?

14 A           Sure.

15 Q           Now, is the fact that a person or the person

16 charged with a crime does not testify, does that infer

17 anything as to guilt to you?

18 A           No.

19 Q           You can detach and remove that circumstance

20 from your deliberation of the evidence considering the

21 evidence?

22 A           Yes.

23 Q           Now, as to -- at a point in the trial, you

24 know, the defendant is called on to plead and that is to

25 plead "guilty" or "not guilty."

1          Presume   that  a  man pled  "not guilty"

2     -- and I'm not talking about this case, I'm talking about

3     any case -- and you later find beyond a reasonable doubt

4     that he's guilty.

5               Is that evidence, is the fact that he

6     pled "not guilty" something that you would consider as

7     a circumstance against him as to punishment?

8     A          No.

9     Q          Okay.   If he plead "guilty" would that be

10    evidence that you would consider as mitigation or is that

11    something that you would weigh as -- in considering

12    mitigation?

13    A          If he pled guilty?

14    Q          Yes.

15    A          You would have to consider that.

16    Q          You would take that as a -- as a reason that

17    you could -- could consider as mitigating?

18    A          I'm not sure I understand what you are saying.

19    Q          Back to the same question I asked you about

20    age, I mean if someone --

21    A          The fact that they pled "guilty" could be

22    considered a mitigating circumstance, is that what you

23    are saying?

24    Q          "A mitigating fact?"

25    A          "A mitigating fact?"

1       I'm still not sure -- I don't know how

2   to answer because I'm not sure I understand what you are

3   saying.

4   Q       You know the trial is like a person pled

5   "guilty?"

6   A       Right.

7   Q       He does not testify or she does not testify,

8   is that evidence or is that fact that they pled "guilty"

9   fit and come into evidence, mitigating evidence?

10       Mitigating evidence is evidence that a

11  juror might regard as diminishing the person's moral

12  blameworthiness.

13  A       Okay.  I see what you are saying.

14       I'm not sure how I am supposed to

15  answer, I don't know how to answer that.  I'm sorry.  I

16  don't know how to answer that.

17  Q       I'm not trying to commit you to what verdict

18  that you would render if that was the case, I'm asking

19  you, would you weigh it as evidence and not reject it?

20  A       Oh, yes.  Yes.

21  Q       Okay.  It would be a factor that whether you

22  found life or death, a factor that you would take into

23  consideration?

24  A       Yes.

25  Q       Was the trial that you participated in in the

1   last couple of years?

2   A          Yes.   I don't know exactly, I lose track of

3   time, I can't tell you exactly when but I think it was.

4   Q          Do   you   recall   to   the   Court's   instruction

5   whether you had an instruction on reasonable doubt?

6   A          I don't know the definition of it.   I don't

7   recall that.

8              MR. OLD:  Let me -- the Judge

9   is the exclusive judge of the law to be applied to this

10  case, jurors do not determine law, jurors are in effect

11  fact finders, the jury is the judge of the evidence and

12  they must make their determination in the case based

13  beyond a reasonable doubt.

14              There is a definition before you -- may

15  I approach the witness, Your Honor?

16              THE COURT:  You may.

17              Ma'am, it's right there.  (Indicating)

18              MR. OLD:  The definition of

19  "reasonable doubt" starts in the second paragraph on the

20  page and I will ask you to read there to the end of the

21  page and familiarize yourself with it.

22              THE POTENTIAL JUROR:  Okay.

23  Q          (BY MR. OLD)  You are, to serve as a juror you

24  must take the law as it comes from the Court, when a word

25  has a special legal meaning the Court will sometimes give

1   you a definition and what it is saying is for the

2   purposes of your deliberation in this case "beyond a

3   reasonable doubt" means this, can you take an instruction

4   or definition of what a word means from the Court and use

5   it and lay aside your own definition if it is in variance

6   with the Court's instructions?

7   A        Yes.

8   Q        Okay.  Does the "beyond a reasonable doubt" set

9   a higher standard of proof than what we talked about

10  "probability" in the first -- in the first Special Issue,

11  "more likely than not?"

12  A        A higher?

13  Q        Yes.  Would it require more to -- more evidence

14  to prove to you beyond a reasonable doubt?

15  A        Oh, yes.

16  Q        Than simply "more likely than not?"

17  A        Yes.

18  Q        Now, going back to that first issue, would you

19  agree with me that there is a double burden of proof?

20  The State must prove to you beyond a reasonable doubt

21  that it is more likely than not?

22  A        Must prove beyond a reasonable doubt that the

23  defendant is more likely than not to commit an act of

24  violence?

25  Q        Yes.

1   A       Yes.

2   Q       And if the evidence they produced, if you did

3   not believe more likely than not beyond a reasonable

4   doubt then you would answer that Special Issue "No?"

5   A       Yes.

6   Q       Now, a word or a legal theory that or law that

7   the Court may instruct you on is the law that deals with

8   confessions and statements of the accused.

9           Sometimes in the trial of a case you

10  will have offered a confession or written statement of

11  the party accused as evidence and that is whether or not

12  a statement is voluntarily made is a factual matter for

13  the jury.  It must be proved to you beyond a reasonable

14  doubt that the statement was voluntary before you can

15  consider it.

16          Okay.  The Court would instruct you what

17  the definition or the criteria that must be proven beyond

18  a reasonable doubt in order for you to find a statement

19  to be voluntary.

20          You would be instructed something to

21  effect that "Under our law a confession of a defendant

22  made while the defendant was in jail or other places of

23  confinement or in custody of an officer shall be

24  admissable in evidence if it appears that the same was

25  freely and voluntarily made without compulsion or

1    persuasion, provided, however, that it be made in writing

2    and signed by the accused and shows that the accused had

3    been warned prior to the making of such statement or

4    confession by the person by whom the statement is made."

5              That's basically it and it sets out your

6    Miranda Rights, your right to have a lawyer, you are

7    informed that a statement may be used against you, that

8    you have a right to remain silent and you have the right

9    to terminate the interview anytime you want to.

10             Now, let's presume that in weighing the

11   evidence the officer who took the statement and gets up

12   there and says, "Gosh, you know, I didn't tell them they

13   had the right to a lawyer, I didn't tell them that."

14             Will you find the confession to be

15   involuntary?

16   A        No.

17   Q        You would not?

18   A        Oh, "involuntary?"

19   Q        Yes.

20   A        I thought you said "voluntary."

21   Q        No.  "Involuntary?"

22   A        Yes.

23   Q        Now, let's say in your deliberation, no

24   question about it, by definition it was an involuntary

25   statement except that you believed that statement to be

1    true, the truth beyond a reasonable doubt and it in fact

2    says "I committed the crime" or states, you know, facts

3    that amount to that.

4             The Court will instruct you that you

5    would not consider the statement or confession for any

6    purpose whatsoever or any evidence obtained as a result

7    of the statement if you find it to be involuntary.

8             Now, at the same time you believe it to

9    be the truth beyond a reasonable doubt; can you follow

10   the instructions of the Court and totally lay aside that

11   statement and any evidence that was obtained from it?

12   A        Yes.

13   Q        Okay.  Now, I mean would you consider that

14   something to be difficult to do?

15   A        No.  Not for me.

16   Q        Okay.  Would the fact that you believed the

17   statement to be true, would that be evidence to you that

18   it was voluntary?

19   A        The fact that it's true?

20   Q        The fact that you believe it to be true beyond

21   a reasonable doubt, would that effect your deliberation

22   on the issue of voluntariness is my question?

23   A        No.

24   Q        There is a document before you that is entitled

25   "Witness List", will you go over it and tell me any name

1    on that list you recognize?

2                         And I want to know the extent that you

3    know them.

4                         And I would point out to you that there

5    are some people with Camp County addresses that you may

6    know as well, I'm not implying that you wouldn't know all

7    of them, there are some Camp County people on there and

8    I know you lived there 16 years.

9    A         I don't think I know any of them.

10   Q         There is no name on there that rings true to

11   you either by knowing about it, just having heard of

12   someone or knowing them?

13   A         I cannot place any of these people but that

14   doesn't mean that I don't --

15   Q         You made the statement that you knew of me but

16   did not know me personally?

17   A         Yes.

18   Q         I presume that you meant you knew me by

19   reputation or notoriety?

20   A         Yes.  Well, yes.

21   Q         Whether it be good or bad?

22   A         My husband has I think used your law partner

23   for a will or something and some other things.

24   Q         Is there anything in your knowledge of me,

25   whether by hearsay or otherwise that would effect your

1    deliberation in this case?

2    A          No.

3    Q          I mean even if in fact you didn't like me,

4    couldn't stand me and thought I was the worst thing in

5    the world, would you take that as an inference against

6    Mr. Wardlow?

7    A          No.

8    Q          Thank you.

9               You said that you knew something about

10   the facts or purported facts of this case?

11   A          Yes.

12   Q          After having read those facts did you form an

13   opinion as to the outcome of this case?

14   A          No.

15                         THE COURT:   It has been 38

16   minutes, I forgot to tell you at 25.

17                         MR. OLD:   Thank you.

18        Anything in what you read that you could not

19   totally lay aside?

20                         THE POTENTIAL JUROR:   No.

21   Q          (BY MR. OLD)  You understand that your duty as

22   a juror is to take the evidence as it comes to you in

23   this courtroom?

24   A          Yes.

25   Q          I mean you are not to rely on what you have

1   been told, heard, read outside of this courtroom?

2   A        Right.

3   Q        Okay.  That would be the same, I mean I believe

4   that jurors try to perform on their oath, I think jurors

5   take things seriously.

6                   If during the trial of this case if

7   someone approached you and said, "Oh, boy, I know all

8   about that" and started talking to you about it, that

9   wouldn't effect your deliberation in this matter, you

10  could lay it aside?

11  A        Yes.

12  Q        You teach fifth grade?

13  A        Yes.

14  Q        Have you always taught fifth grade?

15  A        "Fourth or fifth."

16  Q        "Fourth or fifth?"

17                  Is that still what we call "elementary?"

18  A        Well, it's referred to --

19  Q        No.  That's "elementary" --

20  A        -- it's refereed to "intermediate" here but,

21  yes, it's "elementary."

22  Q        You teach or have you had occasion to teach

23  Government?

24  A        Yes.

25  Q        Fifth grade?

1    A        Not "Government" per se, "history."

2    Q        "Citizenship?"

3    A        "History, citizenship", yes.

4    Q        I note on your questionnaire that you had, the

5    last book you read was "A Time To Kill?"

6    A        Yes.

7    Q        I have no idea -- I have not read "A Time To

8    Kill", is that anything about capital murder or have

9    anything to do with this type --

10   A        It's a murder case.  Yes.

11   Q        What?

12   A        It is a murder case.  Yes.

13   Q        Is it a report of a trial or is it a report of

14   circumstances giving rise to a crime?

15   A        No.  It's a report of the trial itself.

16   Q        Anything in that book -- I am sure that

17   somewhere in there they say, "The law is this" somewhere

18   and anything in what you read in that book or any other

19   that could influence you in this case?

20   A        No.

21   Q        You also referred to other books about murder,

22   "In Cold Blood?"

23   A        Yes.

24   Q        That was a -- is that the one that came out of

25   Houston?

1   A        It was a Truman Capote book.

2   Q        Okay.

3   A        Based on a case in Kansas.

4   Q        Nothing -- you would lay aside a novel and it
5   wouldn't effect your deliberations?

6   A        Yes.  I could.

7   Q        Anyone  in  your  family  connected  with  law
8   enforcement other than I think you had a close friend who
9   was some kind of federal agent?

10  A        Yes.  I have a close friend.

11  Q        A "friend of a friend?"

12  A        No.   It's a very close friend of mine that
13  lives in D.C. that is a DEA agent.

14  Q        So far as considering the evidence in a trial
15  of a case -- in the case that you were a juror on did a
16  law enforcement officer testify in it?

17  A        Yes.

18  Q        Did  you  have  any  trouble  weighing  their
19  testimony  as  against  non-officer  testimony  for
20  credibility?

21           Did they have a head start with you is
22  what I'm asking?

23  A        No.

24  Q        Simply because they are peace officers or law
25  enforcement officers?

1    A         No.

2    Q         If you were weighing the evidence in a two

3    witness case, one a law enforcement officer, the other

4    the mother of the accused party would the peace officer

5    have a head start simply on who they were?

6    A         No.

7    Q         You commented that you would hate to be away

8    from your job or your class for a long period of time?

9    A         Yes.  Definitely.

10   Q         Okay.  I don't -- Mount Pleasant Independent

11   School District pays teachers while they are on jury

12   duty?

13   A         Yes.  They do.

14             But that's not the problem, it's just

15   being away from the class, that effects the class as a

16   whole.

17   Q         Do you think you would be preoccupied worrying

18   or wondering what was going on in your classroom to the

19   extent that it would effect your ability to listen to the

20   evidence in this case and weigh it and reach a verdict?

21   A         I would not allow it to, on the other hand, I

22   would simply rather not be away from my class that long.

23   Q         Let me -- I'm not only -- you can answer this

24   question and I mean I am asking you to form an opinion

25   of how or what is going to effect you; if you were in the

1  trial of this case for let's say a period greater than

2  two and a half weeks and maybe up to three and a half or

3  four weeks, do you think that your concern about your

4  class, whether it was being carried on correctly would

5  weigh on your mind to the point that it could interfere

6  in your concentrating on hearing the evidence in this

7  case, deliberating and making a decision?

8  A         No.  I don't think it would effect that.

9  Q         You could put it aside?

10 A         Yes.  I could.

11            I would rather not have to but I could.

12 Q         Okay.  I have been referring to the indictment

13 in this case, it is an indictment evidence or inference

14 of anything to you?

15 A         Just that there was enough evidence the Grand

16 Jury thought that the defendant should be brought to

17 trial.

18 Q         So then you consider it to have been based upon

19 evidence?

20            Is that an inference of guilt?

21 A         No.

22 Q         To you?

23 A         No.

24 Q         Would you consider it as such in the trial of

25 this case or in your deliberation?

1    A         No.

2    Q         Do you understand that the State has to prove

3    to you beyond a reasonable doubt that in order for -- to

4    have a conviction for capital murder that a person

5    intentionally took the life of another while in the

6    course of committing robbery, do you understand that to

7    be the --

8    A         Yes.

9    Q         -- the definition of "capital murder" in this

10   case?

11   A         Yes.

12   Q         Our law has lesser included offenses, for

13   example -- and it depends on what facts are proven and

14   what is raised by law.

15             You may be charged in the event that the

16   State doesn't prove to you beyond a reasonable doubt that

17   this happened that you then may consider the lesser

18   included offense of murder which is simply intentionally

19   or knowingly killing another.

20             Let's say that you believe that the

21   Defendant or a defendant intentionally killed someone but

22   you don't believe it was in the course of a robbery;

23   would you find him not guilty or capital murder?

24   A         If he killed someone?

25   Q         He intentionally --

1    A        And was not in the -- in a robbery, is that

2    what you are asking me?

3    Q        Yes.  I mean as this offense is alleged it's

4    murder plus robbery.

5    A        Yes.

6    Q        And you find that he did it, the person

7    charged, the Defendant in this case intentionally killed

8    someone but you do not believe a reasonable doubt it was

9    in the course of committing an offense of robbery, would

10   you find him not guilty of capital murder?

11   A        He wouldn't be guilty of capital murder.

12   Q        Okay.  I think I understood your answers but

13   on those facts you would find him not guilty of capital

14   murder?

15   A        Yes.

16   Q        Then if instructed to consider the lesser

17   included offense of murder, which is just simply

18   intentionally or knowingly killing someone, killing

19   another, and the range of punishment for murder was five

20   years probated to life, could you consider, could you

21   conceive of a set of circumstances where you could give

22   a five year probated sentence?

23                    MR. TOWNSEND:  Your Honor, I

24   object.  I don't believe that she is required to conceive

25   of a set of circumstances.

1          I think that the proper question is
2  would she consider the full range of punishment depending
3  on the facts and circumstances.
4                    THE COURT:  You are correct,
5  Counsel.
6          I'm going to overrule the objection and
7  I will instruct the witness, ma'am, you don't have to
8  come up with any circumstances, if you can't you can tell
9  us that you can't, you are not required to, in other
10  words --
11                    MR. OLD:  Can you conceive of
12  a set of circumstances that could result -- a set of
13  circumstances how murder was committed that you could
14  consider the lower end of the punishment, five years
15  probated?
16                    THE POTENTIAL JUROR:  Now I
17  really can't think of what the circumstances would be but
18  I will be willing to consider the full range of
19  punishment.
20  Q          (BY MR. OLD)  I don't know what you have heard
21  about the case or what you read, that is not what I'm
22  asking, it is not -- if you are basing it on maybe what
23  you read about this case that is not my question.
24  A          No.  I am not.  I just -- I don't understand
25  what you mean by -- what circumstances would be involved?

1    Q          Well, let's say -- I don't know, what do they

2    call it on TV, this doctor up in the East that goes

3    around helping people commit suicide, are you familiar

4    with that?

5    A          Yes.

6    Q          If that is murder, and apparently it would be

7    intentionally or knowingly taking the life of another and

8    let's say that is your -- a set of circumstances along

9    those lines, if you believe this -- could you consider

10   the lower range of punishment?

11              MR. TOWNSEND:  I object, Your

12   Honor.   Now  he's  giving  her  a  specific  set  of

13   circumstances, he's asking her what she would do.

14              THE COURT:  Sustained.

15              MR. OLD:  That is a suggestion

16   to you of the type of crime or the means of a crime that

17   might give rise to that but I mean I'm not asking you to

18   consider that way but if I did -- I'm sorry but does that

19   help you think of a set of circumstances?

20              THE POTENTIAL JUROR:  Yes.

21              And  I  could  consider  that  set  of

22   circumstances -- consider it.

23              THE COURT:  Five minutes.

24              MR. OLD:  You are telling me

25   you now can conceive of a set of circumstances under

1  which someone could intentionally having taken a life,

2  that you could consider the lower range of punishment?

3                    THE POTENTIAL JUROR:  Yes.

4  Q       (BY MR. OLD)  Now, I presume that you consider

5  -- that you could conceive of a set of circumstances that

6  would result in the higher range of punishment, that is

7  a life sentence for the crime of murder or non-capital

8  murder?

9  A       Yes.

10  Q       Let me -- as to the two Special Issues, the

11  answer to Special Issue #2 is the probability of future

12  acts of violence?

13  A       That's Number One, isn't it?

14  Q       Excuse me, Issue #1.

15                    Assuming that the evidence -- not in

16  this case but any capital murder case resulted in your

17  answering that question "No?"

18  A       Was there a question with that?

19                    I'm sorry.

20  Q       I asked you to assume that you had answered

21  that question "No", at that time you, of course, had

22  Issue #2 before you, would you require any mitigating

23  evidence in order to answer Special Issue #1 "No?"

24  A       Are you saying that there is no evidence at all

25  presented in the punishment phase, is that what you are

1   saying?

2   Q          No.   What I'm saying is after the punishment

3   phase you have gone into the jury room and based on the

4   evidence you do not believe there is a probability that

5   the defendant will commit violent acts, criminal acts of

6   violence in the future or be a threat to society, you

7   have answered that question "No", let's say there is

8   absolutely no evidence of any mitigation, now, as to

9   answer Special Issue #1 would you require mitigating

10  evidence to answer it "No?"A

11  A          Yes.

12  Q          Let me go back to Special Issue #1; you would

13  require evidence of mitigation?

14  A          No.   Not for Special Issue #1.   I thought we

15  were talking --

16  Q          No.   Special Issue #1?

17  A          We are going back to "Special Issue #1?"

18  Q          Yes.

19  A          I'm sorry.

20  Q          Would you require evidence of mitigation to

21  answer Special Issue #1 "No?"

22  A          No.

23                            THE COURT:   Time.

24                            MR. OLD:   Okay.   What you are

25  telling me, you would only apply evidence on mitigation

1   to the answer to Special Issue #1?

2                        THE POTENTIAL JUROR:   That

3   is my understanding of what the law is, my reasoning on

4   that.

5   Q        (BY MR. OLD)   I'm not asking you what the law

6   is.

7   A        I am just using the --

8   Q        Can you do that?

9   A        Yes.

10  Q        And even considering Number Two and saying and

11  being of the opinion there's no mitigating evidence to

12  reduce the defendant's moral blameworthiness can you

13  still, if you find beyond a reasonable doubt that there

14  is not a probability that the defendant will commit

15  criminal acts of violence that would constitute a threat

16  to society can you answer it "No" without any evidence

17  of mitigation?

18  A        Yes.

19  Q        I mean there's not one single mitigating factor

20  and evidence anywhere in your opinion and you can still

21  answer Number One "Yes" if -- Number One "No" if that's

22  what is proven to you or if the State does not prove to

23  you beyond a reasonable doubt that the answer is "Yes?"

24  A        Yes.

25                        MR. OLD:  That's all we have

1    from this juror, Your Honor.

2              THE COURT:  Ma'am, if you will

3    return to the waiting area I will send word to you

4    shortly.

5              It will probably be the end of the week

6    before we tell you whether or not you are on the jury.

7              THE BAILIFF:  Watch your step

8    there, ma'am.

9

10             (The following occurred outside the

11   presence and hearing of the potential juror:)

12

13             THE COURT:   Does the State

14   have any challenges?

15             MR. TOWNSEND:  Nothing, Your

16   Honor.

17             THE COURT:  Mr. Old?

18             MR. OLD:  No, Your Honor.

19             THE COURT:  All right.   We

20   will take a break but let her know that she is free to

21   go and we will contact her the latter part of the week.

22             I do want to stay on the record for a

23   moment.

24             Mr. Old, I have been giving you all the

25   warnings around 25 or 30 minutes, Richard do you want

that warning or not?

MR. TOWNSEND:  Yes.

THE COURT:  All I am giving it to you for is so you can know about where you are in the presentation.

MR. OLD:  I would like to have it, if you forget --

THE COURT: Well, if I forget, if I say "38" it's because I forget, I wanted to tell you it's because I forgot.

Now, one more thing; the State made an objection that I overruled even though I think the objection was valid.

In overruling the objection I did it so the Defense can maybe get a feel for the juror but I also think in overruling the objection and letting the question be asked that I'm letting the Defense get into an area that is causing more time to be taken than should.  It's not your fault, it's the juror's fault.

Jurors are not required to come up with any specific set of circumstances and if I allow either side to get into their set of circumstances or find out if they can consider a set of circumstances then we are really requiring the juror to use up part of the presentation time to redo something that the law says is

1   that warning or not?

2                       MR. TOWNSEND:  Yes.

3                       THE COURT:  All I am giving

4   it to you for is so you can know about where you are in

5   the presentation.

6                       MR. OLD:  I would like to have

7   it, if you forget --

8                       THE COURT: Well, if I forget,

9   if I say "38" it's because I forget, I wanted to tell

10  you it's because I forgot.

11                      Now, one more thing; the State made an

12  objection that I overruled even though I think the

13  objection was valid.

14                      In overruling the objection I did it so

15  the Defense can maybe get a feel for the juror but I also

16  think in overruling the objection and letting the

17  question be asked that I'm letting the Defense get into

18  an area that is causing more time to be taken than

19  should.  It's not your fault, it's the juror's fault.

20                      Jurors are not required to come up with

21  any specific set of circumstances and if I allow either

22  side to get into their set of circumstances or find out

23  if they can consider a set of circumstances then we are

24  really requiring the juror to use up part of the

25  presentation time to redo something that the law says is

1      not proper.

2                       So I'm gong to sustain the objection if

3      it's made from either side from this point forward and

4      I wanted to give both of you a warning.

5                       Let's take a break.

6

7                       (Recess.)

8

9                       THE COURT:  All right.  Let's

10     bring in Kenneth Reese.

11                      THE  BAILIFF:    Have  a  seat

12     right up there and be sure and watch your step.

13

14         KENNETH  WAYNE  REESE,  Potential  Juror  #252,

15     was   called   as   a   Potential   Juror   and,   having   been

16     previously sworn by the Court, testified as follows:

17

18                      THE COURT:  How are you doing,

19     sir?

20                      THE POTENTIAL JUROR:   Hi.

21                      THE COURT:   Go ahead and take

22     your seat.

23                  Sir, are you "Kenneth Reese?"

24                      THE  POTENTIAL  JUROR:    Yes.

25     I am.

1    THE COURT:  This is juror 14,

2    Mr. Reese.

3    I am Gary Stephens, I am presiding over

4    this trial, we have got two lawyers from the District

5    Attorney's Office, one is out of the District Attorney's

6    Office in Morris County, that's Mr. Richard Townsend, and

7    one is out of the District Attorney's Office in Cass

8    County, that's Mr. Randall Lee.

9    THE POTENTIAL JUROR:  Okay.

10    THE COURT:    We    have    two

11    Defense Attorneys, Mr. Bird Old, III.

12    MR. OLD:  How are you doing?

13    THE COURT:  Mr. Lance Hinson.

14    MR. HINSON:  Good afternoon.

15    THE COURT:  Next to Mr. Hinson

16    the person charged, Mr. Billy Wardlow.

17    Now, Mr. Reese, the lawyers have read

18    your questionnaire and are familiar with your answers.

19    THE POTENTIAL JUROR:  Okay.

20    THE COURT:  They are going to

21    talk to you about some of those answers, also they are

22    going to talk to you about the principles of law involved

23    in a death penalty case.

24    You will be asked a lot of questions and

25    the answers will let us know whether or not to put you

on the jury.

In order to be qualified you have to be able to understand, follow the law.  You don't even have to agree with the law but if you can set aside your disagreement and follow the law you are qualified.  But being qualified doesn't necessarily mean you are an appropriate juror so we want to know something about your thought processes, what you think so we can decide whether or not to put you on this case.

There's no right or wrong answers or right or wrong opinions but be honest and open with us and we will try to make this as short as possible.

Now, Mr. Reese, before I turn this over to the State on Page 2 you checked on the third question "Yes" to the question "Do you know of reasons why you could not sit as a juror in this case and be absolutely fair to both the Defendant and the State and render a verdict based solely on the evidence presented to you?"

Why could you not do so, sir?

THE POTENTIAL JUROR:  Well, I know the fellow that was killed.

THE COURT:  How well do you know him or did you know?

THE POTENTIAL JUROR:  Well, I had met him once or twice and John Edwards is a good

1    friend of mine, this fellow was his uncle.

2                        THE COURT:  Okay.

3                        THE POTENTIAL JUROR:   And I

4    have heard quite a bit, you know, of talk through the

5    family.   That's it.

6                        THE COURT:  Then there is no

7    other reason because of the facts of the case?

8                        THE POTENTIAL JUROR:   Yes,

9    sir.

10                        THE COURT:  It's not a moral

11   or religious problem, it's not a problem with sitting on

12   the death penalty, it's because you think you know too

13   much?

14               I will let the lawyers share this with

15   you.

16                    Mr. Townsend.

17                        MR. TOWNSEND:  Mr. Lee will

18   talk to him.

19                        THE COURT:  Excuse me.   Mr.

20   Lee.

21

22                    VOIR DIRE EXAMINATION

23                       BY MR. LEE

24

25   Q        Mr. Reese, I want to explore that answer a

1    little bit early on so that we might could save some time

2    if you know too much about the case, however, just the

3    fact that you know -- know the individual or know a

4    little bit about what might have happened or what someone

5    else said happened.

6                    The law requires that in order to serve

7    on a jury that you be able to put aside any knowledge

8    that you may have.

9                    For instance, you knew the man, I think

10   you said you met him a couple of times?

11   A        Yes, sir.

12   Q        Is there anything in that fact alone that you

13   met him a couple of times that would make you unable to

14   listen fairly to the evidence, nothing in this particular

15   knowledge?

16   A        No.

17   Q        Have you ever been to his house?

18   A        No, sir.

19   Q        Do you even know where he lived?

20   A        No.

21   Q        So he wasn't a close friend?

22   A        Right.

23   Q        The information that you have received, was

24   that from the family?

25   A        Well, it was talked through the family.  Yes,

1    sir.

2    Q        What kind of information was that?

3    A        Well, I was just told more or less what had

4    happened.

5    Q        Of course it's -- did -- the family wasn't

6    present during the murder or did they say they were

7    present during the murder?

8    A        No.

9    Q        So they were speculating I assume?

10   A        Right.

11   Q        Is that what was given to you, speculation as

12   to what had happened?

13   A        Basically what was in the newspaper.

14   Q        So you don't know anything more than what was

15   in the newspaper reports?

16   A        Right.

17   Q        And could you set aside that knowledge and base

18   your opinion solely on what comes from the witness chair

19   and comes from -- through this courtroom?

20   A        Yes.  I could.

21   Q        And you could put aside any knowledge that you

22   may have read in the newspaper and heard people talk and

23   decide the case based solely on the evidence?

24   A        Yes.  I could.

25   Q        No doubt in your mind that you could do that?

1    A        That's right.

2    Q        I believe you stated in your -- I will go ahead

3    and go over your questionnaire first, get out of my order

4    a little bit; I believe you stated that you know Mr. Bird

5    Old, how do you know him?

6    A        Went to school with him.

7    Q        Anything about that relationship that would

8    give him a one up on us?

9    A        Probably not.  No, sir.

10   Q        Anything you do know about him you wouldn't

11   hold against -- against his client, either?

12   A        No, sir.

13   Q        Lance Hinson is also an attorney, do you know

14   Mr. Hinson?

15            He's from Mount Pleasant here.

16   A        No.  I don't believe so.

17   Q        Okay.

18   A        I know of him, I know his family but I don't

19   know him.

20   Q        So knowing him or knowing of him wouldn't

21   interfere with your ability to decide fairly?

22   A        No.

23   Q        I will go a little bit with some of the other

24   law, I don't see any problem but basically there's no

25   right or wrong answer, both sides are wanting people that

1    can be fair, can listen to the evidence and decide

2    fairly, not have some bias or prejudice and everyone has

3    -- everyone has a certain type of case that they probably

4    couldn't be fair and I have got several relatives and

5    some of my relatives I'm going to believe whatever they

6    say, no matter what the evidence and some of the others

7    don't want me on the jury because I'm not going to

8    believe a word that they say.

9            I think we are all that way with certain

10   types of people and certain types of cases, that's part

11   of what we are trying to find out is whether you can

12   listen and decide fairly.

13           And another is the Judge mentioned if

14   you can, even if you disagree with the law, if you can

15   go ahead and put that aside and follow the law, if you

16   can do what the Court instructs you and if you can do

17   that then there shouldn't be any problem.

18           I will explain a little bit; this is a

19   capital murder case, that "capital" basically means that

20   the death penalty could be invoked and that we are asking

21   for it in this case, we are asking for the death penalty.

22           Do you have any personal problem with

23   the death penalty that you couldn't do that if in the

24   right situation?

25   A        No, sir.  I don't.

1   Q        You could do that if the facts called for it

2   and the situation called for it?

3   A        Yes, sir.

4   Q        In  Texas  it,  capital  murder  or  murder,

5   basically is intentionally and knowingly killing someone.

6            If I walked over and shot you, for

7   instance, then obviously that's intentionally killing

8   someone.

9            Capital murder is something more, it has

10  to be a little more, a bit more than just killing

11  someone, as if that weren't enough, it has to be murder

12  plus something else, another felony of specific origin,

13  like for instance, murder while you are committing a

14  robbery, killing more than one person, killing a

15  policeman, murdering a policeman or fireman in the line

16  of their duty, things along those lines.

17           Do you see the difference there?

18  A        Yes.

19  Q        In this case the Defendant is charged with

20  intentionally and knowingly causing the death of an

21  individual while committing a robbery or attempting to

22  commit a robbery and that -- and so that makes it capital

23  murder and in Texas as in every place in the United

24  States the burden of proof is on the State.

25           That means we have to prove the evidence

1    beyond a reasonable doubt.

2              Do you have any problem with this

3    burden?

4    A         No, sir.

5    Q         Do you think that's a fair burden?

6              The Judge will give you a definition of

7    reasonable doubt and it's about a page long and in fact

8    I believe you have one up there if you would like to go

9    ahead and read it.

10             THE COURT:   To your left

11   there, one more over.   Right.   (Indicating)

12             THE POTENTIAL JUROR:   Okay.

13             MR. LEE:   Because lawyers

14   wrote it that question is about twice as long as it

15   should have been.

16             But is that pretty close to your

17   definition or does your personal definition differ?

18             THE POTENTIAL JUROR:   No.

19   It's about right.

20   Q         (BY MR. LEE)  So you could go ahead with that

21   definition and apply it when the time comes in the trial?

22   A         Yes, sir.

23   Q         In Texas there are two-part trials, we have

24   what is called a "bifurcated trial", basically the first

25   part of the trial we introduce evidence or the evidence

1   is to guilt or innocence and that's all the evidence, not

2   punishment, not anything else but basically guilt or

3   innocence.

4            And we are required to prove beyond a

5   reasonable doubt that the person is guilty of the offense

6   which he is charged with.

7            And in the second part of the trial is

8   basically "Okay, now that you have found him guilty of

9   whatever what shall we do with him?"

10           The punishment in this case, it is

11  whether he deserves life in the penitentiary or the death

12  penalty.

13           The State still carries that burden of

14  beyond a reasonable doubt.

15           Can you hold us to that burden and make

16  sure we do our job in proving the case?

17  A        Yes.  I can.

18  Q        Thank you.

19           You have a piece of paper up there that

20  at the top of it it says "Special Issue", that's two

21  different questions.

22                    THE    COURT:      That    one.

23  (Indicating)

24                    THE POTENTIAL JUROR:  Okay.

25                    MR. LEE:  Special Issue #1,

1      would you read that and we will talk about it briefly.

2                      THE POTENTIAL JUROR:   Okay.

3      Q          (BY MR. LEE)   If you got to that question in

4      the trial you would have already found him guilty of

5      capital murder.   And the law requires that in order to

6      serve on jury that you be able to consider the evidence,

7      all the evidence and not make up your mind ahead of time.

8                      For instance, if you found an individual

9      guilty of capital murder and just basically guilty of

10     capital murder, you want to give him the death penalty

11     and make up your mind at that time, that point, obviously

12     you wouldn't be able to be eligible to serve on the trial

13     because they have a second part of the trial with new

14     evidence.

15                     Would the fact that you convicted him

16     alone of capital murder be enough, could you consider all

17     the evidence, could you wait until the punishment phase

18     to make up your mind as to -- to make up your mind as to

19     what to do with an individual capital murder case or

20     would you make up your mind based solely on the first

21     part?

22     A          I would base it on the evidence.

23     Q          And could you wait and do it at the appropriate

24     time in the order that the law requires?

25     A          Yes.   I could.

Q        I am sure you can.

Special Issue #2 talks about several things but  mainly it's the probability that a defendant -- I mean Number One -- yeah -- will commit violence in the future.

It's an -- it's our burden to prove beyond a reasonable doubt that it's probable that the defendant will commit future acts, not that he will commit another capital murder but -- or another murder but an act of violence.

That could be anything as low as punching someone in the nose on up to robbing or shooting or stabbing, various things.

Can you hold us to that burden and make sure we do it and if we do can you find the answer "Yes" to that Special Issue?

A        Yes, sir.

Q        If the Judge tells you that probability means more likely than not, not a certainty that he will do it but that it's more likely than not beyond a reasonable doubt that he will commit acts of violence can you hold us to that and make sure we follow it?

A        Yes, sir.

Q        On Special Issue #2, gets into a little more general area.

1        If you will, kind of read that.

2    A        Okay.

3    Q        That's obviously a more general Special Issue

4    basically but it talks about mitigating circumstances.

5        Now, the law is that nobody can tell you

6    as a juror what "mitigating" is, that is your own

7    personal application.  But basically you are required to

8    listen to all the evidence and consider the evidence.

9        What is mitigating to one person might

10   not be mitigating to someone else.

11       For instance, if a murder was committed

12   while the defendant was intoxicated someone might feel

13   like, one juror might feel that is mitigating, he

14   wouldn't have committed that murder if he hadn't been

15   drunk and another juror might say he had no business

16   drinking and that it's not mitigating.

17       Each person can apply their own standard

18   to some extent but they have to apply all the evidence.

19       Do you think you could do that?

20   A        Yes.  I could.

21   Q        Many people feel like age might be a

22   consideration, a 90 year old might not be held to the

23   same standard that a 30 year old man or 17 year old man

24   because of his youth might not be held to the same

25   standard as the 30 year old man but that's up to you to

1    decide but can you consider all the evidence that is

2    introduced and think about it, not that you do, not that

3    you think it's mitigating but can you think about it and

4    consider it?

5    A        Yes, sir.  I could.

6    Q        I appreciate that.

7                 Basically that is set aside, that is a

8    catch-all sort of a safety valve, in other words, there's

9    some reason, severely retarded, a person is severely

10   retarded and might not be held to the same standard as

11   a highly intelligent person, there's any number of

12   things, that's what that Special Issue is for, just for

13   a catch-all, just to make sure that some injustice might

14   not be done based on a certain fact situation.

15                 And I missed talking about something on

16   Special Issue #1, that is having to do with violence and

17   society; do you understand that "society" could also mean

18   TDC so if a person is violent they might not necessarily

19   want them to hurt the other state prisoners that are up

20   there and could you consider that also?

21   A        Yes, sir.

22   Q        Nurses or doctors or State personnel?

23   A        Yes, sir.  I could.

24   Q        I will give you a hypothetical situation; if

25   you served on a jury and you found the defendant guilty

1  of capital murder and you could answer that "Yes" to

2  Special Issue #1, yes, that he's going to be dangerous

3  in the future in all probability but you feel like

4  there's some mitigating circumstances, whatever they are

5  -- the Judge will give you an instruction as to parole,

6  says basically to the effect that a defendant found

7  guilty and convicted and given a life sentence on a

8  capital murder will be paroled but under the law it would

9  be 35 years, he would be eligible.

10          MR. OLD:   I object to his

11  statement, it's a misstatement of law.

12          He said he "will be paroled", it's not

13  the law.

14          THE COURT:  Sustained.

15          MR. OLD:  That's not the law.

16          MR.   LEE:    I'm  trying  to

17  correct that.

18          Will be eligible for parole in 35 years,

19  not "He will be paroled" but "eligible for parole in 35

20  years", might never be paroled.

21          In  a  hypothetical  situation  you  are

22  required not to consider the parole, not to consider the

23  possibility and not to try to adjust your sentence for

24  that fact.

25          If you found a man guilty of capital

1    murder and you felt he's a danger and you -- but there

2    might be mitigating circumstances, can you put aside the

3    fact of the possibility of parole and make your decision

4    based upon the evidence, not on the fact that a person

5    may be paroled in the future?

6                    THE POTENTIAL JUROR:   AYes,

7    sir.  I could.

8    Q          (BY MR. LEE)  On Special Issue #2, talks about

9    several things, "moral blameworthiness", obviously that's

10   a  flexible  standard  to  some  extent  and  I  believe  we

11   covered that topic pretty well.

12                   The  law  requires  that  you  do  these

13   things, in other words, as the guilt/innocence, obviously

14   you could consider during the punishment stage, you can

15   consider everything you heard in the first part of the

16   trial but you also have to wait to make up your mind

17   until you heard the evidence in the second part and

18   obviously if you -- if you feel like that the State

19   doesn't prove that he's going to be a danger in the

20   future could you -- but you feel like there was no

21   mitigating circumstances, could you do it, in other

22   words, could you answer Special Issue #1 if we don't

23   prove it, can you say, "No, they didn't prove it on that"

24   and not even consider the result of that answer if you

25   feel like we don't do our job and didn't prove it to you?

A        You are going to have to run that by me one more time.

Q        It's a complicated fact, say we proved a fact, we proved that he's guilty but we don't prove to you that he's going to be a danger to society in the future, we don't -- we didn't prove to you that that was there beyond a reasonable doubt but you feel like there's no mitigating circumstances.

        The law requires that you go to Special Issue #1 and answer that and maybe you just -- you just don't like the way we did it but if we did not prove it to you can you hold us to the standard and to the law required and say, "No" on that?

A        Yes.  I could.

Q        And automatically get life and you could hold us to that legal standard?

A        I could do it.

Q        There's several things to consider in punishment and in a case of that nature that's one reason we get to talk to you for so long because it's very complicated and a lot riding on it.

        The range of punishment is another area that is considered and kind of gets confusing sometimes, frankly.

        In a case of capital murder he's charged

1  with killing someone and committing a robbery, if the

2  State does not prove that he was committing the robbery

3  and can prove that he killed someone but didn't prove

4  that he was committing a robbery at the time that took

5  place then obviously the jury would have to find him

6  guilty not of capital murder but of murder.

7        And the range of punishment is a little

8  different, anywhere from five years probated to 99 years

9  or life.

10        In a case of that nature could you

11  consider the full range of punishment, not that you would

12  to it, anyone -- nobody can tell, you can't tell anybody

13  what you would do, you haven't heard the evidence but

14  could you consider that is my question?

15  A      Yes.  I could.

16  Q      And if a defendant is eligible for probation

17  even on a murder case it could be as little as five years

18  probation to 99 years or life, could you -- could you

19  consider the full range of punishment?

20  A      Yes, sir.  I could.

21  Q      And I appreciate it.

22        Murder covers a broad range, ordinary

23  murder, it covers everywhere from the mercy killing to

24  some very cold blooded type killing.

25        For instance along the mercy killing,

1   if there's an 80 year old couple, been married since they

2   were 16 years old, wife gets cancer, is on life support,

3   is dying, is going to die within a few weeks but she is

4   suffering tremendously and begs her husband to "Help me

5   out, do something, I can't stand it any longer" and he

6   bends down and unplugs the machine or turns it off and

7   she dies as a result of that.

8                   Under Texas law that would be murder.

9                   Anyway you can go to the extreme of 99

10  years or life, some violent offenses of, you know, we all

11  read about it in the newspaper type thing.

12                  Could you consider as little as five

13  years probation on some types of murder?

14  A         Yes, sir.

15  Q         Could you consider 99 years or life for some

16  kinds of murder?

17  A         "Four?"

18  Q         "For some kinds of murder?"

19  A         Yes.  I could.

20  Q         The law requires basically that witnesses be

21  kind of given equal status, that you don't give one

22  witness just because of their position or just because

23  of -- for instance if a policeman, the law requires that

24  you can't give a policeman, you can't just believe a

25  policeman automatically just because he was a policeman,

1   that you have to base your decision on what you heard

2   from the stand and determine whether he's lying or

3   telling the truth based on how you would determine anyone

4   else, listening to the evidence, listen to how he talks,

5   what he says, how he handles himself, however your

6   standard is for determining the truth.

7               Can you hold a policeman, for instance,

8   to the same standard you would hold to an ordinary

9   citizen?

10  A        Yes, sir.

11  Q        And would that go for the other professions,

12  a preacher?

13  A        Yes, sir.

14  Q        Or psychiatrist or dog catcher?

15  A        Yes, sir.

16  Q        Obviously we have all heard a lot about Fifth

17  Amendment rights, that's the right to remain silent.

18              As I mentioned, the burden of proof is

19  on us to prove the case.  They don't have to do anything,

20  the Defense doesn't have to even ask a question, the

21  Defendant does not have to testify and in many many cases

22  for many many reasons will not testify.

23              The fact that a defendant is accused of

24  a horrible crime and says nothing, does not testify,

25  would you hold that against him?

1    A        No.  I would not.

2    Q        Basically the law requires, the burden is on

3    us and you make a decision on the evidence, what you

4    heard, not what you don't hear.

5              And you can hold us to that standard?

6    A        Yes, sir.

7    Q        And that goes for the punishment stage, too.

8              You know, a lot of people just want to

9    hear, even if they are guilty, if they get up and say,

10   "I'm sorry" or something that they want to hear that.

11             will you still not hold it against him

12   if he doesn't testify in the punishment stage?

13   A        No, sir.  I won't hold it against him.

14   Q        Would you hold it against the defendant if his

15   attorney just doesn't produce any evidence at all, if

16   they just sit, there's no evidence, just totally the

17   State's case, would you hold the fact that his attorney

18   may or may not produce anything against the defendant?

19             Can you base your decision on what

20   evidence you did hear?

21   A        Yes, sir.

22   Q        We have an indictment in this case, basically

23   the indictment is just a charge what an individual is

24   charged with.  The Grand Jury makes the indictment and

25   charges an individual and the Judge will instruct you

1    that the indictment is not to be considered as evidence

2    in any way.

3             Can you follow those instructions and

4    not consider the indictment?

5    A       Yes.  I could.

6    Q       And base your decision on the evidence you hear

7    here in the courtroom?

8    A       Yes, sir.

9    Q       In some cases confessions are introduced or not

10    necessarily "confessions, statements" sometimes of

11    various nature are introduced in a trial.

12             The law requires that in order for a

13    statement or a confession to be introduced that it be

14    voluntary.  That is obviously the State officers can't

15    beat a confession out of somebody, they have got to go

16    through certain procedures to get a statement.

17             If they are taking a statement or

18    confession they have to read them what is known as the

19    "Miranda Warnings", I assume that you have heard of

20    those, the right to remain silent?

21    A       Yes, sir.  I have heard of it.

22    Q       Right to have an attorney and etcetera.

23             And in certain circumstances the law

24    requires that those rights be given to an individual.

25             I will give you a hypothetical

1   situation; if we were in trial and a statement is offered

2   and the -- say the defendant admits the offense, that he

3   -- that he committed the murder but you listen to the

4   evidence and you feel like that conviction was beaten out

5   of him or you feel like that the officer when he made him

6   write the statement didn't even -- didn't read him is

7   rights and that he didn't know his rights and they had

8   never been read to him but you believed that his

9   confession is true, in fact in your own mind you know

10  it's true; can you put aside the fact if you believe the

11  confession is not voluntary can you put that aside and

12  not consider it for any purpose?

13  A          Yes, sir.  I could.

14  Q          I will change the facts a little bit, if it was

15  -- if that was the only evidence the State offered but

16  you feel like the State violated the law in getting the

17  statement could you let a person you feel was guilty go

18  free because the State screwed up because they beat a

19  confession out of him or tricked a confession out of him,

20  if there was no other evidence?

21              Obviously that's an outlandish fact

22  situation but could you do that?

23  A          I would like for you to repeat what you said.

24  Q          Okay.  Basically the way we make our --

25  basically what we are doing, we are coming up with

1   outlandish theories just to make sure that you can follow

2   the law and obviously on the 80 year old question that's

3   not the case in here.

4                           MR. OLD:   I object to him

5   saying -- he's talking about the facts of this case by

6   inferring "That's not the case here."

7                           THE COURT:   Sustained.

8                 You may rephrase.

9                           MR. OLD:   And the use of the

10  word  "outlandish", it's a very  real  fact  situation

11  and --

12                          MR. LEE:   I was referring to

13  the 80 year old hypothetical that I gave earlier, it

14  obviously doesn't apply to this case at all, the

15  Defendant is not 80 years old and he was not married and

16  it's not his wife.

17                          THE  COURT:   With  that

18  explanation then I'm going to let you continue.

19                          MR. LEE:   Basically when we

20  give you fact situations those are not evidence and you

21  are not to consider any of these fact situations that we

22  give as evidence.  The evidence is what comes from the

23  stand and what is produced.

24                 With  that  explanation;  if  the  law

25  requires you that if a statement is taken voluntarily

1    that means it was not given properly, beaten out of him

2    or some other situations and there is a hypothetical case

3    where the State comes in and offers a confession and you

4    believe the confession was illegally taken, that's the

5    only evidence the State has so if this was illegally

6    taken we have no evidence.

7                    Can you find a defendant not guilty on

8    that fact?

9                    THE POTENTIAL JUROR:   Yes,

10   sir.  I could.

11   Q         (BY MR. LEE)  Even if you believe it's true?

12                    And you would hold the State to their

13   burden and require us to live by the same law everybody

14   else has to?

15   A         Yes, sir.

16   Q         In going over your statement, briefly, you can

17   put aside the fact that you knew Mr. Cole's relatives?

18   A         Yes, sir.

19   Q         And you can base your decision on the evidence

20   that comes through this stand and not base it upon what

21   you heard on the street or you heard from anyone?

22   A         Yes, sir.

23                    THE COURT:   It has been 28

24   minutes.

25                    MR. LEE:   I will go over a

1    couple of parts to make sure I got it clear; can you keep

2    an open mind and listen to the evidence and specifically

3    on those Special Issues and can you listen to all the

4    evidence and put whatever weight to that evidence that

5    you think should be done and follow the Court's

6    directions?

7                              THE POTENTIAL JUROR:   Yes,

8    sir.

9    Q        (BY MR. LEE)   And if it comes down to it on

10   like a Special Issue #1, if you feel like he is going to

11   be a future danger to society, that he's going to commit

12   acts of violence that he -- highly probable or probable

13   and you believe that there is no mitigating

14   circumstances, that is something that would make him less

15   blameworthy, and you know the result of those answers,

16   can you give those answers that would result in him

17   getting the death penalty?

18                              Obviously when you give those answers

19   you will be able to figure out what is going to result

20   from that.

21   A        Yes, sir.

22   Q        And can you follow the law and do it at the

23   appropriate time and keep an open mind?

24   A        Yes, sir.

25                              MR. LEE:  Basically until all

1    the evidence is in?

2                       Pass the witness.

3                       THE COURT:  Mr. Hinson.

4

5              VOIR DIRE EXAMINATION

6              BY MR. HINSON

7

8    Q        Thank you, Your Honor.

9              Mr. Reese, as the Judge introduced

10   myself and Mr. Old I am Lance Hinson, I'm just going to

11   ask you some questions here this afternoon, one question

12   I had; are you aware of anyone that has been represented

13   by either myself or Mr. Old recently involving any family

14   member of may have been represented by anyone in our

15   offices?

16   A        No.

17   Q        Is there anything in the -- you have been in

18   Titus County several years?

19   A        Forty-eight years.

20   Q        All your life?

21   A        Yes.

22   Q        Your father is "Jack Reese?"

23   A        Yes, sir.

24   Q        Worked for the County a long time?

25   A        Yes, sir.

1    Q        Is there any, I guess "predisposition" on your

2    behalf, on your behalf as you -- say you were a juror in

3    this case and as you listen to the evidence based on your

4    living in this county for that long would you tend to

5    hold anything against myself or Mr. Old as an attorney

6    in the county?

7    A        No.  I would not.

8    Q        Would you tend to find us more credible because

9    of being in the county?

10   A        "More credible?"

11            No.

12   Q        Start off even with the State?

13   A        Yes.  I would.

14   Q        There is a document up there called a "Witness

15   List."  (Indicating)

16   A        Okay.

17   Q        It's three pages, can you find that?

18            Do you have those three pages?

19   A        Yes.  I do.

20   Q        Would you look, would you read those names and

21   if you come across one that you know or you have heard

22   about would you let me know?

23   A        By "someone I know", do you mean someone I know

24   like a friend or just an acquaintance?

25   Q        If you have heard of their name.

1    A        Just "heard of the name?"

2            The only one that I have met or know is

3    Dewayne McClung and I only met him one time.

4    Q        Where did you meet him at?

5    A        I was squirrel hunting with him one time and

6    I met him.

7    Q        How long ago was that?

8    A        It has been 20 years probably.

9            I wouldn't know the man if I seen him.

10   Q        All right.  Thanks.

11           Now, you mentioned a "John Edwards?"

12   A        Yes.

13   Q        Are you related to John Edwards?

14   A        No.  I am not.

15   Q        How do you characterize your relationship with

16   John Edwards, friends, acquaintances?

17   A        "Best friends."

18   Q        "Best friends?"

19           I believe there is a "John Edwards" that

20   is a plumber in town?

21   A        That's him.

22   Q        "That's him?"

23           All right.  And you mentioned that Mr.

24   Edwards was related to Mr. Cole?

25   A        It's John's uncle.

1   Q         How often do you see John Edwards?

2   A         Twice a week.

3   Q         When the event occurred in June of '93 how long

4   after that, Mr. Cole's death, did you discuss any facts

5   regarding the case with John Edwards?

6   A         I never discussed it with him.

7   Q         Did Mr. Edwards ever bring up the subject to

8   you?

9   A         He was just telling me, you know, what had

10  happened, you know.

11  Q         And you are telling me that that was a time

12  when you didn't have any personal knowledge of the case?

13  A         That's true.

14  Q         And since that time you have acquired some

15  personal knowledge based on what was in the newspaper?

16  A         The only thing I know is what was in the

17  newspaper and what John -- what he said.

18            Basically everything he heard was what

19  was in the newspaper I think.

20  Q         What newspaper -- does John live in Mount

21  Pleasant?

22  A         Yeah.   Titus County.

23  Q         Do you know if he gets the Daingerfield paper?

24  A         I have no idea.

25  Q         Regarding whatever John had learned what did

1  he first tell you about the case?

2  A        Well, he just told me his uncle was killed.

3          Basically it was just what was in the

4  newspaper, you know, I just vaguely remember him, you

5  know, just bringing it up.

6  Q        Do you recall any specific facts that he may

7  have told you about the incident?

8  A        No.

9  Q        I don't get the newspaper and -- from Titus

10 County -- the Tribune -- if you want to call it that so

11 I don't know what was in the paper, can you tell me what

12 he would have told you based on what was in the

13 newspaper?

14 A        He just told me that his uncle was -- was

15 killed and put in a closet and his truck was stole,

16 that's the only thing I know.

17 Q        In relation to time when did he tell you that?

18 When -- we are talking about Mr. Edwards, was it shortly

19 after the incident or a couple of months or six months?

20 A        Probably a month after that.

21 Q        Did he ever say who committed that crime?

22 A        No, sir.

23 Q        Did he ever discuss with you whether anyone had

24 been caught or arrested for that crime?

25 A        No, sir.

1    Q        Prior to your being -- being called for the

2    jury in this case were you aware of who had been arrested

3    and charged with that incident?

4    A        Rephrase that.

5    Q        Since or prior to the time that you were called

6    as a juror in this case and you learned some facts from

7    the first day, I believe it was October 6th when you were

8    first called for jury service, prior to that time had you

9    learned anything about who had been arrested or charged

10   with that crime?

11   A        I knew anything other than what was in the

12   paper -- that's the only thing that I know.

13   Q        Based on what Mr. Edwards had told you and then

14   later you read some things in the newspaper, have you

15   ever repeated those facts to anyone as being the truth

16   as you know them?

17   A        I don't know that any of it's true.

18   Q        Mr.  Edwards  ever  express  what  type  of

19   punishment that he would suggest as a result of someone

20   killing Mr. Cole?

21   A        We have never discussed that.

22   Q        Based on your conversations with Mr. Edwards

23   and what you have read in the papers did you form an

24   opinion as to guilt or innocence right now as to the

25   guilt of Mr. Wardlow in this case?

1    A          No, sir.   I couldn't.   From what I heard I

2    couldn't.

3    Q          Based on what you had heard from Mr. Edwards,

4    and I assume there there was some newspaper articles, you

5    stated that he had learned from newspaper articles, I

6    assume that --

7    A          No.   I was the one that said "newspaper

8    articles", what I have read in the newspaper.

9    Q          Do you think Mr. Edwards learned the

10   information from sources other than newspaper articles?

11   A          I have no idea.   I don't know.

12   Q          At the time he informed you of these facts you

13   had not read any newspaper articles, is that what you are

14   telling me?

15   A          I think probably I had read the paper before

16   I talked to him about it but I'm not sure.   I'm not sure

17   on that.   I don't know.

18   Q          Based on what he had told you had you formed

19   an opinion as to whether or not Mr. Cole had been

20   murdered?

21   A          I hadn't formed an opinion on anything.

22   Q          You stated you didn't have an opinion to the

23   guilt of Mr. Wardlow and based on what you all have heard

24   as part of being part of this jury selection process have

25   you formed any opinion as to the guilt or innocence?

1    A        No, sir.  I haven't.

2    Q        Of Mr. Wardlow as of through today?

3    A        No, sir.  I have not.

4    Q        If you are picked as a juror in this cause and

5    as a result of your deliberation with the other jurors

6    that you render a verdict that you thought John Edwards

7    would not be satisfied with would that have any effect

8    on your deliberations as a juror?

9    A        No.  It would not.

10   Q        If the Defendant was found not guilty would you

11   have any problem talking to John Edwards the next day you

12   met him out on the street and buy him a cup of coffee?

13   A        No.  I would not.

14   Q        Any problem with that?

15            Are you willing to listen, if you were

16   chosen as a juror are you willing to listen to the

17   evidence that will be presented to you in the courtroom

18   and not consider anything that you have heard or read and

19   base your decision on the information that you have

20   presented to you here?

21   A        Yes.  I could.

22   Q        You could disregard whatever Mr. Edwards may

23   have told you about the case?

24   A        That's true.

25   Q        Disregard what you have read in the newspaper?

1       A          Yes, sir.  I could.

2       Q          You stated that you had met Mr. Cole, what

3    context did you meet Mr. Cole?

4       A          I believe it was one time John and I were going

5    squirrel hunting down at Cason, south of Cason down

6    there, we had a deer lease down there and I met him one

7    time down there.

8       Q          Was this Mr. Cole's house?  I believe you --

9       A          No.

10      Q          Did you know where Mr. Cole resided?

11      A          No.  I did not.

12      Q          Did you go squirrel hunting on any of Mr.

13   Cole's land?

14      A          No.  I did not.

15      Q          Is there anything as the result of meeting Mr.

16   Cole, is there anything in there that would cause you to

17   weigh as you deliberate, weigh more heavily or to lean

18   toward the State's side of the case?

19      A          No.  It would not.

20      Q          What was your opinion of Mr. Cole?

21      A          Well, from what I saw of the man he was just

22   an average man, a nice fellow.

23                 That was a long time ago.

24      Q          All right.

25      A          I wouldn't know the man if I would see him

1   today.

2   Q        How many years ago would that have been?

3   A        Probably 20 or 25 years ago.

4                   MR. HINSON:  Oh, okay.

5            You answered on your questionnaire and

6   the Judge asked you about this about do you know of any

7   reason why you could not sit as a juror in this case and

8   be absolutely fair to both Defendant and the State and

9   render a verdict based solely on the evidence presented

10  to you.

11           And at the time that you filled out your

12  questionnaire -- Your Honor, does the --

13                  THE COURT:    I  have  the

14  original.

15                  MR. HINSON:  -- does the juror

16  have it?

17                  THE COURT:   No.   I  have  it

18  right here.

19           Here you go, Mr. Reese.

20

21           (Handed to the potential juror.)

22

23                  MR. HINSON:   On  the  second

24  page of that questionnaire, it's the third question, and

25  you answered that question "Yes."

1          Could you explain a little bit about

2   what you were thinking at that time when you stated that

3   you could not be absolutely fair to the Defendant and to

4   the State?

5                              THE POTENTIAL JUROR:   I just

6   answered it wrong.

7   Q          (BY MR. HINSON)   Did you misread it?

8   A          I misread it.   It should have been "No."

9   Q          So what you are telling us if you are selected

10  as a juror you would come in here starting with a clean

11  slate?

12  A          Yes.   I could.

13  Q          Be absolutely fair to both the State and to the

14  Defendant?

15  A          That's right.

16  Q          On Page 10 of your questionnaire you stated

17  that someone had been a juror in a case, in a civil case.

18             Had either you or your wife ever served

19  on a Grand Jury?

20  A          No, sir.

21  Q          And the civil case, did that case go to trial?

22  A          Yes, sir.

23  Q          Was that you or your wife that sat on that

24  jury?

25  A          Me.

1    Q        Here in Titus County?

2    A        Yes, sir.  It was.

3    Q        How many years ago was that?

4    A        Oh, gosh, I don't know.  It's -- let's see --

5    Q        Five, 10, 15?

6    A        It's been longer than that, probably 25.

7    Q        On Page 11 there at the top, "What is your
8    personal opinion about the criminal justice system?"

9              And I know personally I could write more
10   than four lines, you wrote four words.

11             Is there anything beyond that, I know
12   you were limited in time to what you could write, is
13   there anything that causes you concern about our criminal
14   justice system?

15   A        No, sir.

16   Q        You are happy with the prison system in the
17   State of Texas?

18   A        "The prison system?"

19   Q        Yes.

20   A        I think it could be better.

21   Q        And I know you don't work for the prison system
22   but your opinion as to how it could be better?

23   A        You want my opinion as to how it could be
24   better?

25   Q        Yes, sir.

A          Quit letting so many of the criminals back out on the streets.

Q          Is there any other problem that you can think of, you know, not being inside the prison system itself but any other problem?

I think what you are talking about is parole?

A          Right.  I don't have a problem with that.  I have a problem with repeat people that have been down there three or four times and they still get out and go back, you know, three or four trips down there.

Q          Are you saying you won't hold any prejudice -- and I'm putting words in your mouth -- do you hold any prejudice against anyone that has been tried and convicted and goes down?

A          I don't have a problem with it.  No.  I don't have a problem with it.  I just think it's not right but that's our -- that's the way the system works.

Q          Do you have a strong moral conviction or not of whether or not a person deserves one chance?

And what I'm relating that to is what you said about parole, about repeat offenders.

Now, I'm not saying one chance on probation, I'm saying one chance going down to the penitentiary and coming back?

1    A        My belief, a man ought to live right, and he

2    won't have to go to jail.

3            Is that the kind of answer you want?

4    Q        Well, there's no right or wrong answer, we are

5    just wanting answers.

6    A        Okay.

7    Q        I will just listen to what your answers are.

8            Mr. Reese, I'm going to read to you what

9    I believe the Judge will instruct you regarding the

10   parole law in this case, assuming that you were a juror

11   and that the Defendant was found guilty of capital murder

12   and I believe the instruction will go something along

13   these lines that "As a juror you are further instructed

14   that in determining the punishment in this case you are

15   not to discuss among yourself how long the Defendant will

16   be required to serve any sentence imposed.  Such matters

17   come within the exclusive jurisdiction of the Board of

18   Pardons and Paroles and are of no concern of yours.

19           And based on the time of this offense

20   in June of '93 the instruction I presume that you would

21   be given is that if the Defendant was found guilty of

22   capital murder there are two sentences that as a juror

23   you could consider, number one would be life in prison

24   and number two would be the death penalty.

25           And life in prison is a maximum of 35

1    calendar -- not a "maximum", excuse me, is "35 calendar

2    years" before that Defendant could be considered eligible

3    for parole.

4                    Do you follow me?

5    A        I follow you.

6    Q        So the parole, this Defendant is convicted of

7    a   capital   crime,   in   35   years   could   be   eligible,

8    considered eligible for parole.  Not that he's going to

9    get it or not that any capital defendant would get out

10   in 35 years, just it comes up for parole at that time.

11                   Now, based on that information of what

12   I believe the instruction would be how would that effect

13   your deliberation as a juror in this case?

14   A        I wouldn't.  If the Judge gives the parole I

15   don't have no problem with that, I don't have to agree

16   with it but I don't have a problem with it.

17                   THE COURT:  Let me stop you

18   right  there;  we  don't  have  any  control  over  parole

19   either, that's something that comes out of the Parole

20   Board.  The Judge does have to do with probation before

21   a person goes to prison, parole is what happens if they

22   are out before they serve their sentence.

23                   I just want to get me off the hook.

24                   THE   POTENTIAL   JUROR:     I

25   understand.

1          MR. HINSON:    Knowing that

2    information -- before I confuse us both, would you find

3    the capital murder trial flow chart?

4          THE   COURT:    Twenty-five

5    minutes.

6          MR. HINSON:    Thank you, Your

7    Honor.

8          And you see there at the top it starts

9    "Phase I, Guilt and Innocence" and we are starting Phase

10   I after jury selection so we have gone through jury

11   selection, picked the jury, we have gone to Phase I;

12   guilt or innocence evidence is presented to the jury, at

13   that time the Defendant to be found either guilty or not

14   guilty and if the Defendant was found guilty it would go

15   to Phase II, the punishment phase.

16         And at that time evidence is presented

17   on which you will consider answering the Special Issues.

18         And I believe you have a copy of those

19   up there, too, Special Issue #1 and Special Issue #2?

20   (Indicating)

21         THE POTENTIAL JUROR:   Yes.

22   Q.        (BY MR. HINSON)  Now, as you went into Phase

23   II let's assume that the Defendant, any defendant was

24   found guilty of capital murder, Phase I, you have gone

25   to Phase II, there's evidence presented, let's just

1    assume that maybe he was a repeat offender, he or she,

2    any capital defendant and knowing what you know that a

3    life sentence is a minimum of 35 calendar years at which

4    time that defendant is eligible for parole, not that he's

5    going to get out on parole but he becomes eligible in 35

6    years and as you consider Special Issue #1 is your belief

7    or your conviction regarding repeat offenders, is that

8    going to effect your deliberation regarding Special Issue

9    #1?

10                   And I guess I would ask you to read

11   Special Issue #1.

12   A        Your question was what?

13   Q        Special Issue -- do you have that sheet,

14   Special Issue #1?

15   A        I have got it.  (Indicating)

16   Q        And I'm trying to throw a lot at you, I know,

17   and we have the flow chart which says if you answer

18   Special Issue #1 "No" but that there is a life sentence

19   imposed.

20   A        Okay.

21   Q        And knowing the life sentence is, 35 calendar

22   years there then they are eligible for parole, knowing

23   that is that going to cause you to lean toward answering

24   Special Issue #2 -- or Issue #1 "Yes?"

25   A        No.  It would not.

Q        You would be able to look at the evidence as a juror disregarding everything you have read and seen and heard, go to the punishment phase and answer the Special Issue number disregarding your own beliefs regarding repeat offenders?

A        Yes, sir.

Q        You would also be able to disregard the parole law knowing that the defendant would be eligible for parole in 35 years, you would be -- still be able to look at that case based on the evidence you saw and consider whether or not it should be a life sentence or a death sentence?

A        Yes, sir.

Q        Now, about two Special Issues, Number One or now back to Special Issue #1; the State is required to prove to you beyond a reasonable doubt that there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

        "Probability" has several meanings to several people, the State law has defined "probability" as "more likely than not", can you accept that definition of "probability?"

A        Yes, sir.  I could.

Q        And I guess just to back up; what is your

1    personal definition of "probability", the weather man

2    says, "It's probably going to rain tomorrow?"

3    A        It's probably going to happen.

4    Q        Is "probability more likely than not" to you?

5    A        Yes.  It is.

6                        THE COURT:  When you finish

7    this area I need to talk to Counsel for just a minute

8    about scheduling.

9                        MR. HINSON:  Thank you.

10                       MR. OLD:  Do you want us to

11   approach the bench, Your Honor?

12                       THE COURT:  Just right over

13   here if you would, sir.

14                   Excuse me for a moment, I'm not sure we

15   are going to talk to our next guy and I need to talk to

16   the lawyers.

17

18                   (Off the record discussion at the bench

19   out of the hearing of the potential juror and Court

20   Reporter.)

21

22                       THE COURT:  Excuse us, Mr.

23   Reese, we sometimes get out of order and have to

24   sometimes see where we are.

25                   I don't think we need to keep everybody

1    here until 6:00 so I'm letting someone go.

2                   All right.  Mr. Hinson, you may proceed.

3                   MR. HINSON:   Thank you, Your

4    Honor.

5                   Mr. Reese, I think we had cleared up

6    "probability" as "more likely than not" and you were able

7    to agree with that?

8                   THE POTENTIAL JUROR:   That's

9    right.

10   Q         (BY MR. HINSON)  And the probability would have

11   to be proven to you beyond a reasonable doubt or beyond

12   a reasonable doubt is the standard proof for the State,

13   could you hold the State to that standard on Special

14   Issue #1?

15   A         Yes, sir.

16   Q         Taking these in conjunction, the flow chart and

17   Special Issue again or getting to Special Issue #2, you

18   note at the bottom of the flow chart answer to Special

19   Issue #2 "Yes", a life sentence is imposed, answer that

20   question "No", a death sentence would be imposed.

21                  Based on what you know, what Mr. Edwards

22   has told you, what you have seen in the paper, your own

23   personal conviction regarding repeat offenders, our

24   criminal justice system, would you be predisposed to

25   answer Special Issue #2 "No" so that would go into the

1    death sentence in a capital murder conviction?

2    A          If you are talking about this case -- are you

3    talking about this case?

4    Q          Any capital case.  I'm sorry.  On this case

5    -- I asked you based on what you know on this case and

6    what you --

7                         MR. TOWNSEND:  Object, Your

8    Honor, I know that some of the list of items he just

9    listed were permissible items for a juror to consider,

10   others were not and I would like him to differentiate

11   those items.

12                        MR. HINSON:  I'm just asking

13   him to consider what all he knows and if he can set that

14   aside.

15                        THE COURT:  Do you understand

16   the question?

17                        THE POTENTIAL JUROR:  No, sir.

18   I don't.

19                        THE COURT:  Let's start over

20   and rephrase it.

21                        MR. HINSON:  All right.  Mr.

22   Reese, what I was trying to -- do you understand in

23   conjunction with  Special Issue #2 is a life sentence in

24   -- you answer "Yes", a life sentence is 35 years and he

25   becomes eligible for parole, not that he's going to get

1   out, if you answer that question "No", it's a death

2   sentence?

3                          THE POTENTIAL JUROR:  Yes.

4   Q          (BY MR. HINSON)  Based on what you have heard

5   and seen, met Mr. Cole, talked to John Edwards, are you

6   going to set this all aside, your own conviction regard

7   repeat offenders, be able to set that aside and answer

8   Special Issue #2 either "Yes" or "No" without leaning

9   toward either side?

10  A          Yes.  I could.  Sure could.

11  Q          You will note there at the bottom of Special

12  Issue #2 it says "Mitigating evidence is evidence that

13  a juror might regard as reducing the defendant's moral

14  blameworthiness."

15                 Now, assume -- not "assuming" but we are

16  still at Special Issue #2 and it's now your job to either

17  answer that question with a "Yes" or "No", a life

18  sentence or death sentence,if there's no mitigating

19  circumstances offered by the Defendant -- I believe Mr.

20  Lee asked something along the lines if Mr. Wardlow did

21  not testify in either Phase I or Phase II and Mr.

22  Wardlow's attorney puts on no evidence, no mitigating

23  evidence and then you get to Special Issue #2 and in your

24  own mind there hasn't been any mitigating evidence

25  presented can you still consider, answer that question

1    either "Yes" or "No"?

2    A        Are you talking about answering the Special

3    Issue #2?

4    Q        Yes.

5    A        Okay.

6    Q        Knowing that "Yes" he gets a life sentence of

7    35 years plus and "No" equals the death sentence without

8    mitigating circumstances that you saw presented to you

9    would you still be able to consider answering that

10   question either "Yes" or "No"?

11   A        Yes, sir.  I could.

12   Q        I will direct your attention to the indictment,

13   I believe you have a copy there.

14                        THE COURT:   That one right

15   there.  (Indicating)

16                        MR. HINSON:   Have you found

17   that indictment?

18                        THE POTENTIAL JUROR:   Yes.

19   I have.

20   Q        (BY MR. HINSON)   Now, the indictment makes

21   allegations -- you have read those allegations, they are

22   typed out there in the middle of the page.  (Indicating)

23   A        I have read it.

24   Q        Assuming that you sat on a jury as a juror and

25   have knowledge of having read the indictment, I believe

1    that the Court would instruct you that the indictment is

2    not evidence for you to consider in this case, could you

3    disregard what you just read if this case was presented

4    to you if you were a juror?

5    A        Yes.  I could.

6    Q        And whatever is alleged in the indictment, is

7    that just an allegation?

8    A        That's right.

9    Q        I believe Mr. Lee went over with you the fact

10   that capital murder is murder and what is charged in this

11   case that you read from the indictment committed in the

12   course of committing and attempting to commit the offense

13   of  robbery,  another  offense  and  the  lesser  included

14   offense of capital murder is murder.

15           Let's assume that the State failed to

16   prove to you beyond a reasonable doubt that there was no

17   robbery,  no  attempt  or  no  actual  robbery  committed  so

18   would you agree with me that the lesser included offense

19   of murder would be properly considered in that case?

20   A        Yes.  I would.

21   Q        And we talked a little bit about going over the

22   flow chart, a defendant convicted of capital murder is

23   faced with a life sentence or the death penalty.

24           Now, a defendant convicted of murder,

25   the range of punishment in that case is five to 99 years

1    in the penitentiary or a life sentence and the minimum

2    is   five   years   probation   and   under   the   proper

3    circumstances in a murder case could you consider giving

4    a defendant five years probation?

5    A          I could.  Yes.  I could.

6                     I wouldn't have to like it but I could.

7    Q          You  said  --  could  you  set  aside  your  own

8    personal conviction regarding repeat offenders, whatever

9    your opinion is of that case, and I'm talking about any

10   case?

11   A          Yes, sir.

12   Q          And consider that?

13   A          Yes, sir.

14   Q          And assuming that we have a defendant convicted

15   of murder and other jurors suggest to you that five years

16   probation is possibly a good sentence, you stated that

17   you could consider it but you might not like it.

18                     And "not liking it", what do you mean

19   by that?

20   A          Well, you asked me my feelings, opinions about

21   the criminal system, that's the way I feel about it.  I

22   can live within, you know, what the law says, I fully

23   agree with it.  I don't have a problem with it other than

24   I don't think that's the way it should be.

25                     A man does a crime he should serve the

1   time, that's the way I look at it.

2   Q        All right.  Assuming that you were deliberating

3   with other jurors, the defendant has been found guilty

4   of murder, 11 persons on that jury say that the defendant

5   should get five years probation and you are totally

6   against that --

7           MR. TOWNSEND:  I object, Your

8   Honor, this question has been asked and answered.

9           He has already said he would consider

10  the full range of punishment.

11          THE COURT:  I will carry the

12  objection until I hear the remainder of the question.

13          MR. HINSON:  Eleven jurors say

14  five years probation is a good sentence and you believe

15  five years probation is not a good sentence, would you

16  stick by your convictions?

17          THE COURT:  Overruled.

18          MR. HINSON:  Regardless of

19  what your decision meant would you stick by your

20  convictions and vote the way that you believed it's

21  proper?

22          THE POTENTIAL JUROR:  Yes,

23  sir.  I would.

24  Q        (BY MR. HINSON)  Even if it means a mistrial

25  in that case and the whole case would have to be tried

```
 1    again   with   that   expense   and   that   cost   with   the

 2    inconvenience to members of the community?

 3    A        Just because 11 said it was right doesn't mean

 4    I am wrong.

 5    Q        And I have explained to you what I believe to

 6    be -- what would be the instruction to you regarding the

 7    law of parole and that is a person would be, based on

 8    this indictment, June of '93, that a person would be

 9    eligible for parole after serving 35 calendar years.

10             Do you have any prejudices against that

11    parole?

12    A        No.

13    Q        That would be invoked in this case?

14    A        No.  I don't.

15    Q        On the other hand we talked about, said you

16    wouldn't like looking at five years probation, said you

17    could stand by your conviction.

18             If you didn't think that was proper do

19    you have any prejudice in the proper circumstances of

20    giving probation to a defendant?

21             MR. TOWNSEND:   Your Honor, I

22    want to object to this point.   He has answered the

23    question about probation being full range of punishment

24    two or three times and that he could consider it in the

25    proper case.
```

1          THE COURT:  Overruled.

2          Do you understand that question?

3          THE POTENTIAL JUROR:  No.  I

4    would like for you to say it one more time.

5          MR. HINSON:  All right.  We

6    talked about parole -- what I was asking you about went

7    to probation, we talked about parole, said you could set

8    aside your personal convictions, I believe is what you

9    said?

10         THE POTENTIAL JUROR:  Yes.

11   Q         (BY MR. HINSON)   Do you have any personal

12   convictions against probation?

13         Considering probation and the proper

14   circumstances?

15   A         Would I have a problem with giving probation,

16   is that what you are saying?

17   Q         Yes.

18   A         I wouldn't have a problem doing it.  I would

19   -- I wouldn't like it probably but I wouldn't have a

20   problem doing it.

21         Do you know what I mean by that?

22         That is my convictions.

23   Q         Can you explain what you mean?

24   A         Well, I don't really know if I can or not.  I

25   just -- I think it's a waste of taxpayer's money, you

1    know, if they are convicted and get probated -- probated

2    sentence.

3    Q        Do you know anyone personally that ever served

4    probation in your family or --

5    A        No.

6    Q        -- and in a case in which you are a juror and

7    based on what you believe about probation would that

8    cause you to lean toward giving time in the penitentiary

9    versus giving probation in the proper case?

10   A        No.

11   Q        You would start both of them off with a level

12   field?

13   A        That's right.

14   Q        Set aside what your personal feelings were

15   regarding probation?

16   A        That's right.

17                      THE COURT:   Five minutes.

18            Mr. Hinson, I'm not going to take this

19   from your time but I have one question for Mr. Reese.

20            Mr. Reese, I think I understand what you

21   are saying but let me make sure I understand.

22                      THE POTENTIAL JUROR:   Okay.

23                      THE COURT:   You keep saying

24   that you don't -- well, what you said was that you think

25   giving probation is a waste of taxpayer's money.

1          If you saw a case that you thought was

2    appropriate for probation would you be able to set aside

3    your personal feeling and give that person probation?

4                              THE  POTENTIAL  JUROR:   Yes,

5    sir.  I could.

6                              THE  COURT:   I  thought  you

7    could.

8                              THE POTENTIAL JUROR: What I'm

9    trying to answer, I'm trying to answer it the way I feel

10   about it, not the way the law, you know, how the law is

11   going to be but the way I feel about it personally.

12                              THE COURT: You don't like it

13   but  you  could  do  it  if  you  thought  it  was  the  right

14   thing?

15                              THE  POTENTIAL  JUROR:   Right.

16                              THE COURT:  All right.  Thank

17   you.

18              All right.  Mr. Hinson, five minutes.

19                              MR. HINSON:  Mr. Reese, I am

20   sure you understand that the defendant in a criminal case

21   does not have the burden to show you anything as a juror,

22   would you hold the State to their burden of proof in a

23   criminal case beyond a reasonable doubt?

24                              THE  POTENTIAL  JUROR:   Could

25   I?

```
 1    Q          (BY MR. HINSON)  Yes, sir.

 2    A          Yes, sir.

 3    Q          Even  if  the  defendant  did  not  testify  and

 4    presented no evidence to you could you hold the State to

 5    their burden?

 6    A          Yes, sir.

 7    Q          You talked about Mr. Cole, do you know anyone

 8    other than Mr. Cole who died as a result of suspected

 9    criminal activity?

10    A          No, sir.  I do not.

11    Q          Mr. Lee may have asked you this question, going

12    back to the flow chart; if a person was found guilty of

13    the offense -- guilt and innocence in Phase I?

14    A          Okay.

15    Q          Would  you  automatically  in  Phase  II  consider

16    the death penalty a little more heavily, lean toward the

17    death penalty in any manner?

18    A          Based on -- based on what?

19    Q          Based  on  the  evidence  that  you  have  presented

20    to you?

21    A          I  don't  think  it  would  weigh  one  way  or  the

22    other heavy or what.

23    Q          If  the  defendant  was  found  guilty  of  capital

24    murder, you come to Phase II in the punishment phase and

25    you would start over with a clean slate again, is that
```

1    what you are saying?

2    A        Yes, sir.

3    Q        Whether you would give the death penalty or a

4    life sentence?

5    A        Yes, sir.

6    Q        Would you form any opinion about a defendant

7    merely because he's charged by an indictment and brought

8    to trial of whether or not that defendant is guilty?

9    A        I don't follow what you are saying.

10   Q        In your own mind as you look at the indictment

11   we looked at?

12   A        Yes.

13   Q        And we are going through jury selection here

14   so it clearly implies that a jury will hear evidence and

15   be presented evidence regarding the defendant's guilt?

16   A        Yes.

17   Q        Just because a person is charged by an

18   indictment and brought to trial do you form any opinion

19   as to that person's guilt or innocence?

20   A        No.  I do not.

21   Q        Do you tend to rely more on the State's

22   evidence if you were a juror in this case, would you give

23   the State, the police officers and their testimony more

24   credibility than you would the defendant?

25   A        Probably not.

1    Q        When you say "probably?"

2    A        I would not.

3    Q        Would you be able to start off with a clean

4    slate on Phase I, guilt and innocence, the State comes

5    in the same position that the defendant comes in?

6    A        Yes, sir.

7    Q        Erasing everything out of your mind that you

8    have heard and disregard your convictions?

9    A        Yes.  I could.

10   Q        Have you formed any opinion as to whether time

11   in prison or probation would be appropriate based on what

12   you heard in this case, what you have heard about it?

13   A        I don't know enough about it right now to form

14   an opinion on it.

15   Q        You will start with the presumption of -- in

16   the United States of America that the defendant is guilty

17   -- I'm sorry, that a defendant is innocent until guilt

18   or until proven guilty?

19   A        Yes, sir.

20            THE COURT:  It's time to start

21   wrapping it up.

22            MR. HINSON:  Thank you, Your

23   Honor.

24            One last question; as you listen --

25   assuming that you were picked as a juror and listened to

1    the evidence in either Phase I, the guilt or innocence

2    or Phase II, the punishment part of this trial, would you

3    disregard what you have heard from Mr. Edwards, what you

4    have read in the paper, disregard your personal

5    convictions regarding prison offenders, regarding your

6    belief on the probation system, come into one of those

7    chairs with an open mind and with an open mind and base

8    your decision on what is presented to you?

9                        THE POTENTIAL JUROR:    Yes.

10   I could.

11                       MR. HINSON:    Pass the juror,

12   Your Honor.

13                       THE COURT:    All right, sir.

14   If you will step back into the waiting area and I will

15   send the Sheriff back with some more instructions in a

16   moment.

17                       We probably will not be able to tell you

18   whether you are on the jury but we hope to tell you by

19   the end of the week.   Okay.

20                       THE BAILIFF:  Watch your step

21   there.   Back in the lounge there.    (Indicating)

22

23                       (The following occurred outside the

24   presence and hearing of the potential juror:)

25

1          THE COURT:   Does the State

2     have any challenges?

3          MR. LEE:   No, Your Honor.

4          THE COURT:  Does the Defendant

5     have any challenges?

6          MR. OLD:   Yes, Your Honor.

7     The Defendant would challenge the prospective juror Reese

8     for cause based on 35.16, Section 9, Code of Criminal

9     Procedures that is referring to the juror has a bias or

10    prejudice in favor or against the defendant.

11          As to Mr. Reese's questionnaire, he

12    answered on the questionnaire, "Do you know of any reason

13    why you could not sit as a juror in this case and be

14    absolutely fair to both Defendant and State and render

15    a verdict based solely on the evidence presented to you?"

16          To which he answered "Yes.   I do know

17    of a reason."

18          On inquiry and questioning by His Honor

19    in the beginning of the voir dire he indicated to you

20    that that was true, that it was based on the fact that

21    he knew Mr. Cole during his lifetime and more than that

22    he knew Mr. Reese's nephew -- Mr. Cole's nephew, a "John

23    Edwards" who was, I believe I'm characterizing his

24    testimony correctly, "My best friend."

25          That and in addition he has also -- it

1    has been a long time ago since he had met Mr. Cole, that

2    he thought he was a nice fellow.

3                    Once he had stated that he has expressed

4    a prejudice against the Defendant and perhaps a bias in

5    favor of which amounts to the same thing, to the State

6    or the State's facts and is disqualified.

7                    Secondly; we would challenge him for

8    cause as to the fact that he expressed such a prejudice

9    against the laws of probation to the extent that he did

10   not like law of probation, might be able to give

11   probation but he wouldn't like it even if he gave it.

12                    And as to his prejudice singularly we

13   submit that he's challengeable for cause.

14                    And it is my understanding the

15   questionnaires are being filed in this case?

16                    THE COURT: The questionnaires

17   will be kept in three different categories, we will keep

18   all the jurors separate, all of the challenge for cause

19   that was sustained or overruled separate.

20                    I guess that's basically how we are

21   going to keep them so the answer is "Yes."

22                    MR. OLD:  They are going to

23   be part of the record in this case as an exhibit?

24                    THE COURT: The originals will

25   be kept.

1          You want them all as exhibits?

2          Normally I would  prefer at the request

3  -- all jurors will be exhibits, all challenges for cause

4  that  are  denied  will  be  exhibits,  if  there's  no

5  challenges and they're struck I don't see any reason to

6  keep them.

7          MR. OLD:  I did not think we

8  needed to go through the formality of marking them at

9  this time.

10          THE COURT:  No.  Just to make

11  it simple every juror that we talk to will have a

12  questionnaire that will be made part of this record.

13          MR. OLD:  But if a challenge

14  for cause is made and overruled then it will be a part

15  of the record?

16          THE COURT:  Every one will be

17  a part of the record, even if there's no challenges.

18          Is that it?

19          MR. OLD:  Those are our two

20  challenges.

21          THE COURT:  Mr. Townsend, do

22  you wish to respond?

23          MR. TOWNSEND:  In regard to

24  the second challenge, the probation; the juror testified

25  that on several occasions that he would consider

1    probation and could give it in the appropriate case.

2         I think that pretty well covers that.

3    He's not required to like it or anything of that nature

4    as long as he's willing to follow the law in that regard.

5         As to his bias or prejudice in the first

6    challenge; his testimony taken as a whole indicates no

7    bias or prejudice.   He said that his answer on the

8    questionnaire on Page 2 was a mistake, that it was based

9    on his misreading of the question or something of that

10   nature, that his truthful answer was opposite to the

11   answer that he gave on the questionnaire.

12        He did testify to some knowledge about

13   the case but he also testified that he could set that

14   aside and decide the case based on the evidence.

15        I    don't    think    there's    any

16   disqualification.

17             THE   COURT:   Both   of   the

18   challenges are overruled.

19             The   Court   finds   the   juror   to   be

20   qualified.

21             Tell Mr. Reese that he's free to go and

22   we will let him know something toward the end of the

23   week.

24             MR.  OLD:   Your   Honor,   you

25   indicated that we would make our first strikes I believe

1    Thursday afternoon?

2                        THE COURT:   I think what we

3    should do, Mr. Old, is do all the jurors that we have and

4    through -- let me back up; when we finish Wednesday my

5    intent is Thursday afternoon to get you and Mr. Townsend

6    on the record as to your strikes or acceptance of the

7    jurors through Wednesday jurors, not Thursday morning.

8                        MR. OLD:   Okay.

9                        THE   COURT:    So   Thursday

10   morning we will go back into the next pool, if we want

11   to continue doing them the same way and I assume that

12   both sides do.

13                       MR. OLD:    Your Honor, as to

14   -- we need some  time to sit  down with  our client in

15   the jury room or some place where we can meet in order

16   to --

17                       THE COURT:   "Talk?"

18                       MR. OLD:   "Talk."

19                       Would   the   Court   consider   either

20   Wednesday afternoon or Thursday prior to the time he has

21   given us?

22                       I don't think it will take more than an

23   hour, I'm not sure it will take that long.  I would like

24   the luxury of knowing I have that long.

25                       THE COURT:   I will give you

1    one hour but I need to know tomorrow whether or not you

2    want to bring in these three people.

3                              MR. OLD:   Yes.

4                              THE COURT:   You don't want to

5    bring them in?

6                              MR. OLD:   I will let you know

7    tomorrow.

8                              THE COURT:   Same for you, Mr.

9    Townsend, if you believe you have a need to talk to these

10   three jurors we gave the wrong information to let me

11   know.

12                         Frankly if both of you have agreed to

13   strike them I don't want to talk to them but I'm not

14   going to make you tell me what you are going to do, I

15   just ask for you to be reasonable.

16                              MR. TOWNSEND: You are talking

17   about Ms. Lee, Ms. Littles and Ms. Edwards?

18                              THE COURT:   Correct.

19                         All right.   We are in recess.

20

21                         (Record closed for October 31st, 1994.)

22

23                         (Whereupon Court was recessed until 9:00

24   a.m., November 1st, 1994.)

25                              * * * * *

STATE OF TEXAS      §
                    §
COUNTY OF TITUS     §


          I, Lloyd E. Billups, CSR #149 and

Official Court Reporter in and for the 76th Judicial

District, State of Texas, do hereby certify that the

above and foregoing contains a true and correct

transcription of the proceedings in the above-styled and

numbered cause, all of which occurred in open court or

in chambers on October 31, 1994 and were reported by me.

          I further certify that this

transcription of the record of the proceedings truly and

correctly reflects the exhibits, if any, offered by the

respective parties.

          WITNESS MY HAND this _31ST_ day of

January, 1995.


_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

1    Certification Number of Reporter:   149

2    Expiration Date of Certification:   12/31/96

3    Business Address:   Drawer 1868
                         Mt. Pleasant, Texas 75456-1868

4

     Telephone Number:   903/577-6735

5

     Transcribed By:   Tandra K. Gibson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25