*72102*

CAUSE NO. 12,764

THE STATE OF TEXAS           §   IN THE DISTRICT COURT OF
                             §
VS.                          §   TITUS COUNTY, TEXAS
                             §
BILLY JOE WARDLOW            §   76TH JUDICIAL DISTRICT


STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 2, 1994

**VOLUME 17 of 43 volumes**


FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk


ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

VOLUME 17

VOIR DIRE EXAMINATION

NOVEMBER 2, 1994                              PAGE/VOLUME

APPEARANCES . . . . . . . . . . . . . . . .        1/17

MORNING SESSION . . . . . . . . . . . . .          3/17

POTENTIAL JUROR, TERRY D. LEE, (RECALLED)
            DISCUSSION BY COURT . . . . . .        3/17

POTENTIAL JUROR, BOBBY WAYNE TOSH
            EXAMINATION BY MR. LEE  . . . . .      9/17

RECESS  . . . . . . . . . . . . . . . .           28/17

POTENTIAL JUROR, GREGORY SCOTT HAMMONDS
            EXAMINATION BY MR. TOWNSEND . . .     32/17

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . .     54/17

DISCUSSION CONCLUDED  . . . . . . . . . .         60/17

POTENTIAL JUROR, GREGORY SCOTT HAMMONDS, (CONTINUING)
            CONTINUING EXAMINATION BY MR. TOWNSEND 60/17
            EXAMINATION BY MR. OLD  . . . . .      64/17

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . .     72/17

RECESS  . . . . . . . . . . . . . . . .           76/17

POTENTIAL JUROR, REAGAN LEE EAVES
            EXAMINATION BY MR. LEE  . . . . .      79/17
            EXAMINATION BY MR. HINSON . . . .      98/17

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . .    121/17

NOON RECESS . . . . . . . . . . . . . .          122/17

AFTERNOON SESSION . . . . . . . . . . . .        122/17

POTENTIAL JUROR, LaWYANDA JOYCE PRINCE
            EXAMINATION BY MR. TOWNSEND . . .    125/17
            EXAMINATION BY MR. OLD  . . . . .     147/17

VOLUME 17

VOIR DIRE EXAMINATION

(CONTINUING)

NOVEMBER 2, 1994                              PAGE/VOLUME

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR  . . . . .      166/17

DISCUSSION CONCLUDED  . . . . . . . . . .        167/17

RECESS  . . . . . . . . . . . . . . . .          168/17

POTENTIAL JUROR, JANELL ANN SMITH
          EXAMINATION BY MR. LEE  . . . . .      173/17

COURT ADJOURNED . . . . . . . . . . . .          201/17

COURT REPORTER'S CERTIFICATE  . . . . . .        202/17

*****

VOLUME 17

ALPHABETICAL INDEX OF

POTENTIAL JURORS

NOVEMBER 2, 1994                                    PAGE/VOLUME

POTENTIAL JUROR, REAGAN LEE EAVES
EXAMINATION BY MR. LEE  . . . . . . . . . .      79/17
EXAMINATION BY MR. HINSON . . . . . . . . .      98/17

POTENTIAL JUROR, GREGORY SCOTT HAMMONDS
EXAMINATION BY MR. TOWNSEND . . . . . . . .      32/17
EXAMINATION BY MR. TOWNSEND (CONT.) . . . .      60/17
EXAMINATION BY MR. OLD  . . . . . . . . . .      64/17

POTENTIAL JUROR, TERRY D. LEE
DISCUSSION BY COURT . . . . . . . . . . . .       3/17

POTENTIAL JUROR, LaWYANDA JOYCE PRINCE
EXAMINATION BY MR. TOWNSEND . . . . . . . .     125/17
EXAMINATION BY MR. OLD  . . . . . . . . . .     147/17

POTENTIAL JUROR, JANELL ANN SMITH
EXAMINATION BY MR. LEE  . . . . . . . . . .     173/17

POTENTIAL JUROR, BOBBY WAYNE TOSH
EXAMINATION BY MR. LEE  . . . . . . . . . .       9/17

* * * * *

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 2, 1994

**VOLUME 17 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)

APPEARANCES

ATTORNEYS FOR THE STATE OF TEXAS:

        MR. RICHARD TOWNSEND
        District Attorney
        Morris County Texas
        Morris County Courthouse
        Daingerfield, Texas 75638

            and

        MR. RANDY LEE
        Assistant District Attorney
        Cass County Texas
        P.O. Box 940
        Linden, Texas 75563

1    ATTORNEYS FOR THE DEFENDANT:

2          MR. BIRD OLD, III
           Old, Rolston & Old
3          P.O. Box 448
           Mt. Pleasant, Texas 75456-0448

4                   and

5
           MR. LANCE HINSON
6          Law Offices of Danny Woodson
           P.O. Box 399
7          Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    On the 2nd day of November, 1994, the

2    above-entitled and numbered cause came on for hearing

3    before said Honorable Court, Judge Gary R. Stephens of

4    Midlothian, Texas, serving by judicial assignment in the

5    District Court of Titus County, Texas, on change of venue

6    from Morris County, Texas, and the following proceedings

7    were had:

8

9    (The following occurred outside the

10   presence and hearing of the potential juror:)

11

12   THE COURT:  All right.  Let's

13   bring in Terri Lee and then after we get settled I will

14   need two copies of this.  (Indicating)

15   THE BAILIFF:  Yes, sir.

16

17   (Off the record discussion.)

18

19   TERRI D. LEE, Potential Juror #412,

20   was recalled as a Potential Juror and, having been

21   previously sworn by the Court, testified further as

22   follows:

23

24   THE COURT:  Ms. Lee, when you

25   were here before we discussed various principles of law.

1          THE POTENTIAL JUROR:  Yes.

2          THE COURT:  Talked about what

3    law would be applied to this case and when we talked

4    about the law we also informed you that in this state a

5    person with a life sentence does have a possibility of

6    parole, that we do not have life without parole.

7          THE POTENTIAL JUROR:  Yes.

8          THE COURT:  You were also told

9    that you would be instructed that in answering the issue,

10   assuming that you find the verdict of guilty then when

11   you get into the punishment stage you would be answering

12   some issues and you were told that if you found a person

13   guilty of capital murder you would be instructed that you

14   cannot consider the fact that parole exists in answering

15   the questions.

16          In other words, you must be able to

17   assume that life can mean a life sentence and you are not

18   to answer the questions based upon the fact that you

19   don't want a person to be out so you are going to take

20   into account parole and answers so that a death sentence

21   may apply, you were also told that in the event you found

22   a person guilty of something less than capital murder you

23   might be called upon to assess a certain number of years

24   as a sentence and that you were not to take into account

25   the possibility of parole, you are to determine what you

1   as a juror think would be an appropriate just sentence

2   and accept the sentence there without regard to parole.

3          You told us that you could do that.

4          You were also informed that in this

5   state if a person is convicted of capital murder that

6   person must spend 40 calendar years in prison before that

7   person would be considered eligible for parole,

8   absolutely no chance of parole until 40 years is served.

9          Ma'am, we misinformed you, the law is

10  40 years but that law took effect about a month or so

11  after the alleged date of this offense.

12         On the date of this alleged offense the

13  law provides that if a person is convicted of capital

14  murder that person must spend a minimum of 35 years in

15  prison, calendar time before he or she could be eligible

16  for parole.

17         So we misinformed you by five years.

18         Does the knowledge that a life sentence

19  in a capital murder case equals a minimum of 35 years

20  change any of your answers about your ability to

21  disregard parole?

22         THE POTENTIAL JUROR: No, sir.

23         THE COURT: Does it give you

24  any concern about your ability to disregard parole in

25  answering questions?

1          THE POTENTIAL JUROR:  No.

2          THE COURT:  That's all we have

3   got.

4          You can go back to work.

5          We will let you know something Friday,

6   hopefully.

7          THE BAILIFF:    Thank you,

8   Terri.

9

10          (The following occurred outside the

11   presence and hearing of the potential juror:)

12

13          THE COURT:  Are you ready for

14   Mr. Tosh?

15          THE BAILIFF:  Watch your step

16   as you go up there.

17

18      BOBBY WAYNE TOSH, Potential Juror #293,

19   was called as a Potential Juror and, having been

20   previously sworn by the Court, testified as follows:

21

22          THE COURT: Good morning, sir.

23          THE POTENTIAL JUROR:    Good

24   morning.

25          Are you doing all right?

1          THE COURT:  Doing just fine.

2               For the record,  are you Bobby Tosh,

3     " T O S H ?"

4          THE POTENTIAL JUROR:   Yes,

5     sir.  I am.

6          THE COURT:   This is juror

7     number 20.

8               Sir, I am Gary Stephens, I'm presiding

9     over the jury selection in this case and the trial.

10         THE POTENTIAL JUROR:   All

11    right.

12         THE COURT:   We have two

13    lawyers present representing the State of Texas, we have

14    the District Attorney from Morris County, Mr. Richard

15    Townsend.

16         THE POTENTIAL JUROR:  Okay.

17         THE COURT:  And we have the

18    District Attorney to be from Cass County, Mr. "Randy",

19    "Randall" Lee, we have two Defense Attorneys, we have Mr.

20    Bird Old, III.  (Indicating)

21         MR. OLD:  How are you doing?

22         THE COURT:   And Mr. Lance

23    Hinson.

24         MR. HINSON:  Good morning.

25         THE COURT: Next to Mr. Hinson

1   is the person charged, Billy Joe Wardlow.

2   Sir, the lawyers have read your

3   questionnaire and are familiar with your answers, they

4   are going to be talking to you about some of those

5   answers and they are also going to talk to you about the

6   principles of law involved in a death penalty case.

7   You will be asked a lot of questions and

8   the answers will let us know whether or not to put you

9   on the jury.

10   In order to be a qualified juror you

11   must be able to understand and follow the law, you don't

12   even necessarily have to agree with our law.  If you do

13   disagree with some facet of our law but you can set aside

14   your disagreement and follow the law then you are a

15   qualified juror but if you have a disagreement with the

16   law that might prevent you from following the law you are

17   not qualified.

18   So we are going to explain the law to

19   you, talk to you about some principles of law, maybe

20   explain some of the issues and get your feelings and

21   thoughts on this and decide whether you are qualified

22   and, more importantly, decide whether to put you on the

23   jury.

24   We have found that most people that we

25   have talked to are qualified but that doesn't necessarily

1    mean they are an appropriate juror for a death case.

2           The only way we can decide whether this

3    is the type of case for you to serve on is for you to be

4    open and honest with us and just share your thoughts and

5    opinions.

6           There's no right or wrong answers and

7    there's no right or wrong opinions, it's your opinions

8    that we are concerned with, whether they agree with ours

9    is immaterial.  You are the one that we are concerned

10   with today so just don't worry about the effect of your

11   answers and just tell us the way that you think.

12          Now, if you have questions of us also,

13   sir, be sure you tell us what is on your mind and stop

14   us and ask your questions.

15          This will be the only time we will be

16   able to talk to you if you are chosen as a juror.

17          Do you have any questions?

18                    THE POTENTIAL JUROR:  No, sir.

19                    THE COURT:   All right.   Mr.

20   Lee.

21

22               VOIR DIRE EXAMINATION

23               BY MR. LEE

24

25   Q        My name is Randy Lee and as the Judge mentioned

1   I will be asking you a few questions and as he stated

2   there's no right or wrong answers.

3                    Basically what the purpose of this is

4   is to allow us to get to know you, get to know a little

5   bit about the way you think, your opinions.

6                    And in order for us to decide that is,

7   both sides to decide whether we think you are fair in

8   this case or whether this is a case for you to serve on,

9   you know, if it's a relative or some situation to where

10  this just might not be the case then that's the purpose,

11  part of the purpose of voir dire.

12                   And that's all we want is just basically

13  your opinions and maybe a little bit about how you arrive

14  at your opinions and that's just to help us decide.

15                   I believe you stated in your

16  questionnaire that you don't really have a particular

17  problem with the death penalty per se, that you think

18  it's -- that it's appropriate in some cases?

19  A        Yes.

20  Q        And do you feel like that you personally could

21  do it if in the right case if you were on the jury?

22  A        Yes, sir.  I could.

23  Q        That you could vote for it?

24  A        Yes, sir.

25  Q        In Texas in order for you to interpret our

1    questions you kind of need to understand a little bit of

2    the law as to that, you know, what we are talking about.

3        When we say "capital murder" in Texas

4    there is several types of homicide.  Capital murder is

5    the highest form of homicide then there's murder and then

6    there's some lesser included type of offenses, for

7    instance murder would be intentionally and knowingly

8    cause someone's death without any legal justification

9    like self defense or some of the other justifications.

10       If you shoot your neighbor just to kill

11   them then you are obviously, that's murder, then there's

12   another kind of murder also.

13       Capital murder is murder plus something

14   and the statute outlines the various somethings that

15   could make it capital.

16       For instance, killing a policeman or

17   fireman in the line of duty then that is murder plus

18   something making it a little different, a little more

19   serious.  Killing more than one person, committing a

20   robbery and murdering someone or kidnapping, various

21   offenses that the statutes allow for capital murder.

22       Do you kind of see the difference there?

23   A        Yes, sir.

24   Q        Where it's making capital murder -- murder is

25   serious but capital murder may be a little more serious.

1          You say you in a capital murder
2   situation don't -- you think -- could you give the death
3   penalty in the right fact situation?
4   A          Yes, sir.  I do.
5   Q          In the right fact situation could you consider
6   a life sentence on a capital case?
7   A          I don't believe I could.
8   Q          You think every capital case or every murder
9   case deserves the death penalty?
10  A          I believe some of them do.
11  Q          Some of them would, some of them wouldn't, is
12  that what you are saying?
13  A          Yes, sir.
14  Q          In Texas the range of punishment in a capital
15  case is one of two things, you either get the death
16  penalty or get a life sentence and that is the range.
17             So you think -- could you consider --
18  the law requires that you consider or at least be able
19  to think about this sentence and you have to be able to
20  consider or think about the full range of punishment in
21  a case.
22  A          Yes, sir.
23  Q          And of course you don't know the facts in this
24  situation, do you?
25  A          No.

1    Q        Do you know anything about it?

2    A        No, sir.  No really.

3    Q        Do you recall reading anything about it in the

4    paper?

5    A        No.  Just what I had heard from other people.

6    Q        Okay.  And those other people, did they act

7    like they knew what happened or were they just reporting

8    what the paper said or what they heard?

9    A        Basically what they had heard.

10   Q        So they weren't witnesses to the offense or

11   anything, that someone telling you --

12   A        No, sir.

13   Q        -- purporting to know what they were really

14   talking about?

15   A        No.

16   Q        Anything about hearing that through the rumor

17   mill that would interfere with your ability to decide

18   fairly?

19   A        No, sir.

20   Q        Obviously the law requires that you be able to

21   be fair and impartial and that pretty much means put

22   aside anything that you have heard about it and if you

23   have personal feelings that are strong that you be able

24   to put aside those feelings and follow the law, follow

25   the instructions.

1    A        Yes, sir.

2    Q        Do you think you could do that?

3    A        Yes, sir.

4    Q        Sometimes in cases that -- the State has the

5    burden of proof in all cases and we have to prove beyond

6    a reasonable doubt that what we allege happen happened.

7             Do you have any problem with that?

8    A        No, sir.

9    Q        You would hold us to our burden of proof, make

10   us do our job?

11   A        Yes, sir.

12   Q        And we welcome this burden, obviously it

13   wouldn't be fair if there was any other type of burden,

14   nobody wants an innocent man to go to the pen and be

15   punished and obviously that's a fair burden?

16   A        Yes, sir.

17   Q        And the range of punishment, for instance in

18   a case of this nature we are alleging that the Defendant

19   committed murder in the course of committing a robbery

20   or attempted robbery?

21   A        Yes, sir.

22   Q        So that makes it capital.

23            And I explained earlier if it came down

24   that we couldn't for some reason -- and this is just

25   hypothetical -- for some reason couldn't prove the

1   robbery and therefore it would be a -- it would actually

2   just be a murder, could you kind of see that if we don't

3   prove beyond a reasonable doubt a robbery took place then

4   it would be murder?

5          Under Texas law murder has a wide range

6   of punishment, anywhere from five years probation to 99

7   years or life.   And the reason they have such a wide

8   range  of  punishment  is  because  there's  all  types  of

9   murder.

10          I mean you could have a situation where

11  an 80 year old couple had lived together since they were

12  grown,  married,  raised  their  kids  but  the  wife  has

13  cancer,  terminally  ill,  is  going  to  die  within  a  few

14  months but is in intense pain and just begs her husband

15  to help her die and he rushes down and unplugs the life

16  support machine and she does.

17          In Texas that would be murder but that

18  might be the type of murder that you could consider the

19  lesser punishment like five years probation or some other

20  lower form.

21          Then we have the more harsh murder, the

22  cruel murder that obviously you would look at the upper

23  ranges.

24          Do you think you could consider the full

25  range of punishment in a murder that you --

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT

1    A         Yes.

2    Q         -- in a murder case?

3    A         Yes.

4    Q         And there are situations where you could

5    consider five years probation as well as life in the

6    penitentiary and other type cases?

7    A         Yes, sir.

8    Q         In Texas we, the State has the burden of proof

9    not only in the guilt portion, it's a two-part trial, in

10   Texas we have the guilt/innocence portion where we -- the

11   only evidence that is introduced is as to guilt or

12   innocence, not as to what to do with -- and not as to

13   punishment and not as to any other element but just

14   simply guilt or innocence and if the person is convicted,

15   found guilty during the first portion we go to a

16   punishment stage and now if you find him guilty then you

17   decide what do you do with them.

18           Then there's a little mini trial or

19   trial within a trial all over again, evidence is

20   introduced as to what we should do with a person once we

21   found them guilty.

22           That will be all kinds of evidence, age,

23   background of the defendant, criminal history, just

24   various information that could come out in this part of

25   the trial.

1              The law requires that you basically --

2    that you not make up your mind or that you make up your

3    mind in order -- not make it up ahead of time -- for

4    instance, if you are in the guilt and innocence portion

5    and you decide this man killed him, he committed capital

6    murder, he's guilty and ought to hang, obviously you

7    haven't heard all the evidence yet and you are judging

8    the guy on that.

9              The law requires that you be able to

10   withhold decision-making until the right time.

11             Do you think you could do that?

12   A          Yes, sir.  On that part I could.

13   Q          And in a case like this obviously you could or

14   what I'm asking you, can, you can wait until all the

15   evidence is in to make up your mind fairly?

16             Obviously during the trial you are going

17   to be thinking about it, evaluating the evidence as it

18   comes in.  Everybody does that.  But can you hold off

19   making your decision until you -- all the evidence is in

20   and you have heard the whole case?

21   A          Yes, sir.  I believe I could.

22   Q          Texas, in Texas on a capital case during the

23   punishment phase after you found them guilty then we go

24   to a punishment stage and there are two questions that

25   are asked in that, one is -- I can -- you have a list up

1    there called "Special Issues" at the top.  (Indicating)

2                    THE  COURT:    It's  under  that

3    page right there.   No.   To your right, the second one.

4                    That's it.  (Indicating)

5                    MR.   LEE:    Could  you  read

6    Special  Issue  #1  then  we  will  ask  you  some  questions

7    about it?

8                    THE POTENTIAL JUROR:  "Do you

9    find from a" --

10   Q         (BY MR. LEE)  You can read it to yourself if

11   you like, it will save some time.

12                    In  case  you  don't  realize  the  Court

13   Reporter is taking down everything we say and putting it

14   down.

15   A         Okay.

16   Q         On Special Issue #1 -- I forgot where I was for

17   a  second  --  it's  talking  about  the  probability  of

18   committing future acts of violence.

19                    Assuming   the   Judge   gives   you   a

20   definition of that "probability" means "more likely than

21   not", do you think you could follow that instruction and

22   use that definition and not another definition that you

23   might  have  in  your  mind  just  on  the  definition  of

24   "probability?"

25   A         I believe I could.

1   Q        Do you have another definition in your own

2   mind?   Would you think "probability" to be a little

3   higher or a little lower standard than that?

4            I don't think most people think about

5   definitions, would that sort of fit within your range of

6   your own personal definition, "more likely than not?"

7            So, in Texas the way Special Issue #1

8   -- we have to prove beyond a reasonable doubt that there

9   is a probability, that is they are more likely than not

10  -- to commit -- the defendant will commit criminal acts

11  of violence.

12           That's not that he will necessarily

13  commit another murder because obviously you can't, you

14  know, you can't or it's very difficult to prove something

15  that high but "acts of violence", this could be anywhere

16  from touching somebody in the nose to robbing banks to

17  pulling guns on people and shooting them, just various

18  things, just a wide range of violence.

19           And it says "society."

20           "Society" can also mean out on the

21  streets as well as the people in the penitentiary, you

22  know, nurses in the penitentiary, doctors, there are

23  guards, there are prisoners.  Obviously we don't want

24  anybody committing acts of violence.

25           Do you think you can hold us to that

1    standard and make us prove that beyond a reasonable doubt

2    the defendant is guilty -- there is a probability that

3    he will commit criminal acts of violence in the future

4    that after you found him guilty?

5    A          Yes, sir.

6    Q          And probability or more likely than not would

7    kind of mean probably more than 50 percent chance, you

8    know, like 51 or 52.  It would be more than 50/50 I would

9    think.

10                      Would that kind of fit with what you

11   would define "more likely than not?"

12   A          Yes, sir.

13   Q          And what we are talking about, "criminal acts

14   of violence", actually -- obviously we are talking about

15   "acts of violence", not necessarily violating the law,

16   there are many ways of violating the law from speeding

17   tickets to fairly serious offenses but they are not

18   violent offenses.

19                      Can you hold us to that, make us prove

20   that the person will be a danger and there's a

21   probability that he will commit acts of violence?

22   A          Yes, sir.

23   Q          And I will explain a little.

24                      Let's go to Special Issue #2 on that

25   paper, if you will read it and we will talk about it.

1          THE BAILIFF:  Your Honor, can

2    I interrupt a minute?

3          This is Spec Johnson from Morris County,

4    he will be taking care for me while I go to the other

5    courtroom.

6          THE    COURT:    Thank    you,

7    Sheriff.

8          THE BAILIFF:  I will be going

9    to right around the corner if you need me for anything.

10   We have got two of them.

11         THE    COURT:    Thank you  for

12   letting me know.

13         Welcome aboard.

14         MR.  LEE:   Special Issue #2

15   talks about mitigating circumstances or circumstances

16   that might make a person less blameworthy than another

17   person.

18         You know, it's comparing to other people

19   or maybe society or as to your own personal experiences

20   nobody can tell you as a juror if you are selected what

21   "mitigating  circumstances"  is  but  to  some  people

22   mitigating circumstances could be, for instance, if the

23   defendant was severely mentally retarded, someone thinks

24   that, you know, he's so retarded he may be -- he doesn't

25   just understand as much, he understands what is going on,

1    he intentionally did it but he doesn't quite understand

2    quite as much as the average person.

3            But another person might think he still

4    needs to be held to the same standard or if the defendant

5    was intoxicated one person might feel like if he hadn't

6    have been drunk he wouldn't have done the offense, the

7    next person will feel like, well, he shouldn't have been

8    drunk, he still needs to be held responsible, some person

9    consider an age, young age or extreme age as mitigating

10    circumstances in felonies, background, the nature of the

11    offense, how it took place, any number of things can be

12    considered "mitigating circumstances."

13            Some of that might come from the State,

14    might come from the Defendant but the law requires that

15    you be able to -- this would be after you have already

16    decided he committed capital murder and that he's going

17    to have the potential or probability of being violent,

18    the law requires that you be able to consider or, wait,

19    look at the whole situation, be fair and look at all the

20    evidence including mitigating before you decide whether

21    a person should get the death penalty or not.

22            Do you think you could do that?

23              THE POTENTIAL JUROR:   Yes,

24    sir.

25    Q     (BY MR. LEE)   You can wait until all the

1       evidence comes in and then make that decision?

2                   Actually you will not be -- if you are

3       selected on the jury you will not have a blank to fill

4       in whether the person gets the death penalty or not, it's

5       basically decided on your answer to the questions.

6                   Obviously you will be able to figure out

7       what the right answer will be to get a death penalty,

8       however you are not -- that's not supposed to be your

9       goal.  Your goal is to answer the questions appropriately

10      and honestly and not try to bend the answers to get the

11      verdict that you think is appropriate.

12                  Do you think you can do that and decide

13      fairly on those questions?

14      A       Yes.

15      Q       The law also requires -- everyone knows that

16      in Texas there is parole, that people become eligible,

17      that's true in capital cases, too.

18                  The way the parole law is written that

19      person must serve 35 years in the penitentiary, calendar

20      time before he is even eligible for parole.

21                  However, the law requires that you not

22      be -- that you not consider that or the fact that he --

23      that he even may get a parole.  In deciding that you are

24      to make your decision only on what you think is fair,

25      whether it's life or death but not on the -- or the fact

1    there's parole.

2              Can you set aside the fact that you know

3    there's parole, you are going to know it but can you set

4    aside this and not consider that in setting your

5    punishment?

6    A        Yes.

7    Q        And in all these questions that we are asking

8    you kind of have to decide them in order -- obviously

9    there will be the guilt or innocence portion, you have

10   to make that decision, then you come to punishment, you

11   have to listen to all the evidence then you go to Special

12   Issue #1.

13             If you decide that there is no

14   probability of future acts of violence then you don't

15   even go to Number Two, you just answer that question,

16   "No", he wouldn't commit violence and he automatically

17   gets a life sentence.

18             However, if you feel like there's

19   probable acts of violence then you go to Special Issue

20   #2 and that's a catchall; is there anything about this

21   case that would make you not want to give him the death

22   penalty or to make you -- make you think life might be

23   the most appropriate punishment.

24             Can you make those decisions in order

25   and in the proper circumstances as the Judge requires in

1   his instructions?

2   A        Yes.

3   Q        The law requires basically that you not give

4   a head start to either side, that you be able to be fair

5   and that includes the witnesses.

6            For instance, the law requires if a

7   policeman testifies that you not automatically believe

8   him just because he's a policeman, that you will listen

9   to his testimony, see if it makes sense, whatever

10  standard you use to determine whether a person is lying

11  or not, that you use that on a policeman as well as the

12  defendant if he testifies or the defendant's mother, that

13  you listen to them, see what they are saying, make a

14  decision whether they are telling the truth, not give one

15  side a head start?

16  A        Yes, sir.

17  Q        Do you think you could do that?

18  A        Yes.

19  Q        Another profession that someone might want to

20  give a head start, if a preacher testifies obviously they

21  are not supposed to lie, either.

22           Would you give a preacher a head start

23  or anyone else or would you hold him to the same

24  standard?

25  A        I wouldn't hold him to the same standard.

1    Q        You would give him a head start or --

2    A        No, sir.

3    Q        Basically I don't think you understood my

4    question; basically you are supposed to hold all the

5    witnesses to the same standard in deciding whether they

6    are telling the truth or not give anyone a head start,

7    not automatically believe anyone so my question is; would

8    you automatically believe or would you give any advantage

9    if a preacher testified?

10   A        No.  I wouldn't.

11   Q        Pardon?

12   A        I would.

13   Q        Repeat it to me once more.

              Do you believe there's good preachers

15   or bad preachers, good policemen or bad policemen?

16   A        I believe they are good.

17   Q        Okay.  Are you saying that you would give a

18   preacher a head start, that you would automatically

19   believe anything a preacher would say?

20   A        Yes, sir.  Yes, sir.

21   Q        No matter what denomination?

22   A        No.

23   Q        You know, and you would not hold him to the

24   same standard as anyone else, you would just

25   automatically believe him?

1    A          Yes.

2                        Well, that's what I was raised to

3    believe.

4    Q          And you can't set that aside and that standard

5    aside and hold the preacher or policeman to the same

6    standard as you would everybody else?

7    A          No, sir.

8                        MR. LEE:  Your Honor, I think

9    that's all.

10                        THE COURT:  Sir, would you

11   step back into the waiting room for just a minute and let

12   me have a discussion with the lawyers?

13                        THE POTENTIAL JUROR:  Out

14   here?

15                        THE COURT:  There's so many

16   people here, just follow him, he will take you somewhere.

17

18                        (Off the record discussion.)

19

20                        THE COURT:  Let's get on the

21   record.

22                        It appears that this prospective juror

23   will basically say whatever either side wants and I want

24   the record to reflect there was a brief off the record

25   discussion and it has been indicated to me the parties

1    will excuse him.

2                    Mr. Old, do you agree to excuse juror

3    number 20, Bobby Tosh?

4                            MR. OLD:   On the State's

5    motion we do not oppose it and Mr. Wardlow has authorized

6    me to do so.

7                            THE COURT:  All right.

8                            MR. LEE:  We so move.

9                    We    feel   like   he   didn't   answer

10   appropriately and could not be fair so we do move to

11   excuse him.

12                           THE COURT:  Then I will excuse

13   this juror.

14                   Sheriff, just tell him that he has been

15   excused as a prospective juror then bring in our next

16   juror.

17                   Do you all want a break first?

18                           MR.  TOWNSEND:   Yes.   About

19   five minutes.

20                           THE COURT:  Give us a couple

21   of minutes.

22                   Just go ahead and tell him he's excused.

23

24                   (Recess.)

25

1          GREGORY SCOTT HAMMONDS, Potential Juror #129,

2    was called as a Potential Juror and, having been

3    previously sworn by the Court, testified as follows:

4

5                THE COURT:  Sir, if you would

6    come right up here and watch out for that first step.

7                Take a seat right there on that witness

8    stand.

9                Are you Gregory Hammonds?

10               THE POTENTIAL JUROR:  Yes,

11    sir.

12               THE COURT: "H A M M O N D S?"

13               THE POTENTIAL JUROR:  Yes,

14    sir.

15               THE COURT:  This is juror 21.

16           Sir, I am Gary Stephens, I'm presiding

17    over this trial.

18           We have two lawyers representing the

19    State of Texas, we have the District Attorney from Morris

20    County, Mr. Richard Townsend, we have an Assistant

21    District Attorney soon to be the District Attorney from

22    Cass County, Mr. "Randy" or "Randall" Lee.

23           We have two Defense Attorneys, Mr. Bird

24    Old, III.

25              MR. OLD:  Howdy.

THE COURT:  Mr. Lance Hinson.

MR. HINSON:   Good morning.

THE COURT:  Next to Mr. Hinson is the person charged, Billy Joe Wardlow.

Now, Mr. Hammonds, the lawyers have read your questionnaire and they are familiar with your answers.

We are going to discuss those answers with you and they also are going to discuss with you the principles of law involved in a death penalty case.

You are going to be asked a lot of questions, the answers will let us know whether or not we should put you on this jury.

In order to be a juror you must be able to understand and follow the law.  You don't even necessarily have to agree with the law, if you can set aside any disagreement you have with our laws and follow the law you are qualified.

It's kind of like filing income tax, you may not like that but if you comply with it then you have done what you are supposed to do.

THE POTENTIAL JUROR:   Yes.

THE COURT:  Sir, if you have a disagreement with our law or some aspect of the law to such an extent that you can't follow the law then you are

1   not qualified.

2            So, we need to discuss the laws with you

3   that will apply and find out what you think about those

4   laws.

5            We have also found, though, that even

6   jurors that understand and can follow the law and are

7   absolutely qualified aren't always an appropriate juror

8   in a death penalty case.

9            In other words, there can be something

10  in your background or your viewpoints that let us know

11  that even though you are a good juror maybe this isn't

12  the kind of case you need to sit on.

13           So we want you to share your thoughts

14  and opinions with us.

15           There are no right or wrong answers,

16  there's no right or wrong opinions, just yours.

17           THE POTENTIAL JUROR:  Okay.

18           THE COURT:  And if you will

19  be open and honest with us we will try to get you through

20  this as quickly as we can.

21           And if you have any questions you tell

22  us what is on your mind, stop whoever is talking to you

23  if you don't understand what they are asking, get them

24  to clarify.  If you have a question that you want some

25  of us to answer direct your question to whoever you want

1    to answer it and we will try to answer anything that's

2    on your mind.

3                              THE POTENTIAL JUROR:   All

4    right.

5                              THE COURT:  This trial itself

6    will probably start just after the first of the year.

7                    Do you know of any reason you would

8    not be available for a trial that might last anywhere

9    from -- well, let's just say two weeks after the first

10   of the year, first couple of weeks in January?

11                             THE POTENTIAL JUROR:  No.

12                             THE COURT:  All right.  The

13   State may proceed.

14

15                    VOIR DIRE EXAMINATION

16                    BY MR. TOWNSEND

17

18   Q        Mr. Hammonds, I'm Richard Townsend, along with

19   Randy Lee I represent the State of Texas in this case and

20   we, like the Judge says, we are going to ask you a lot

21   of questions that don't necessarily have any right or

22   wrong answers.  We just want you to give us what your

23   opinion is.

24                    I want to tell you right up front we are

25   seeking the death penalty against Mr. Wardlow in this

1   case and I have read your questionnaire and I believe I

2   have a pretty good understanding of your feelings about

3   the death penalty after looking at your answers to your

4   questions.

5                   Is your feelings today basically the

6   same   as   they   were   the   day   you   filled   out   the

7   questionnaire?

8   A          Yes, sir.

9   Q          Is that pretty well -- since you have been an

10  adult has that pretty much been your feeling about the

11  death penalty?

12  A          Yes.

13  Q          You said that it was appropriate in some cases

14  and that -- is that the way you feel?

15  A          Yes.

16  Q          Okay.  Well, the kind of juror we need, Mr.

17  Hammonds, are those kind who can keep an open mind even

18  if a person is found guilty of capital murder as to what

19  the punishment should be, either a life sentence or the

20  death penalty.

21                  And in order to be a fair and impartial

22  juror you have got to be able to keep an open mind about

23  that and not just automatically say, "Well, I just don't

24  think the death penalty is ever right" or on the other

25  hand say "I think the death penalty should happen in any

1    capital murder."

2            And based on your answers I believe you

3    could keep an open mind.

4            Do you believe you could?

5    A       Yes.

6    Q       Okay.  Mr. Hammonds, I notice that you are a

7    certified peace officer and working as a security officer

8    so some of these things I'm talking to you about will be

9    things that you are probably familiar with so -- and if

10   so I apologize for that in advance but we are going to

11   need to go over some areas of the law and see how

12   familiar and whether you agree with that or not and that

13   sort of thing.

14           I think there are basically two kinds

15   of murder, one is non-capital or plain murder, that's

16   where someone has intentionally or knowingly caused

17   another person's death.  Now, and that is to say there

18   wasn't self defense, it wasn't an accident, it was

19   intentionally and knowingly killed someone.

20           That is "murder" and it's punishable by

21   up to 99 years to life in the penitentiary.

22           On the other hand we have another type

23   murder, "capital murder" and that is another

24   intentionally causing someone's death as in the non-

25   capital murder plus something else and that "plus

1    something else" is that the murder was of a police

2    officer or fireman in the line of duty, that the murder

3    was a multiple murder of more than one person murdered

4    in the same episode or the murder took place during the

5    commission of a burglary or robbery or rape or something

6    of that nature.

7              Are you with me on that?

8    A       Yes.

9    Q       Do you feel like you understand the difference

10   between the two types of murder?

11   A       I understand.

12   Q       There's a copy of the indictment up there.  If

13   you would take a look at that.

14             Do you see a copy of the indictment in

15   this case?

16             Do you see it up there?  I think it's

17   marked.

18             THE COURT:   Let me see what

19   -- no, it's that one right there.  (Indicating)

20             MR.  TOWNSEND:   "Voir Dire

21   Exhibit 3."

22             If you would read that to yourself and

23   then I will talk to you about it.

24             THE POTENTIAL JUROR:  Okay.

25   Q       (BY MR. TOWNSEND)  Okay.  Can you see that if

1    the State could prove everything charged in that

2    indictment that would not just be a plain murder but

3    would be a capital murder?

4    A         Yes.

5    Q         Because of the murder and the robbery alleged,

6    okay?

7              The kind of juror we need, as I said,

8    you would be able to keep an open mind as to what the

9    proper punishment should be if the person is found guilty

10   of that.

11             The procedure in a capital murder trial

12   in Texas is such that the first part of the hearing is

13   involved in -- the first part of the trial is involved

14   in determining the guilt or innocence of the defendant.

15             At that point you are not concerned with

16   what the appropriate sentence would be, you are just

17   concerned with determining whether the person is guilty

18   or not guilty.

19             "Did he do it?"

20             And the important part for you to

21   remember is that the death penalty is not automatic.  In

22   this case if a person is found guilty they are then --

23   you are going to hear more evidence during the punishment

24   hearing to determine what you believe the proper penalty

25   should be.

1      I want you to look at a sheet that is

2  up there, it looks like this, I call it a "flow chart"

3  and that kind of goes along with how a capital murder

4  trial goes.

5      Start up here at the top; you hear --

6  there is the guilt and innocence phase of the trial, up

7  underneath it says "Evidence", that means you are going

8  to hear evidence that would help you determine whether

9  the defendant is guilty or not guilty.

10      If the jury decides that the defendant

11  was not guilty then the trial is over, everybody goes

12  home.

13      If the jury decides on the other hand

14  that the defendant is guilty then you are going to go on

15  to that next phase of the trial I talked to you about a

16  little bit and that's called "the punishment phase."

17      About the middle of the page there.

18  (Indicating)

19      When you get to the punishment phase you

20  are going to hear more evidence but this evidence is not

21  going to be about the guilt and innocence of the

22  defendant because you have already made that decision,

23  this is going to be evidence that bears on the punishment

24  phase of the trial and you may hear evidence of prior bad

25  acts by the defendant, you may hear evidence of prior

crimes by the defendant, you may hear evidence of family history, evidence of the defendant's religious belief, evidence of retardation, alcoholism, psychological evidence. And bear in mind when I'm talking to you about this I'm not talking about this case, I'm talking about any capital murder case.

You might hear almost anything, might come in during that punishment phase of the capital murder trial.

After you have heard all that then you are going to vote, you are going to Special Issue #1 which is a question that you answer "Yes" or "No" and we will go over that question in just a minute.

But you go to Special Issue #1.

If you vote, if the jury votes "No" to Special Issue #1 the defendant will receive a life sentence, if on the other hand if the jury votes "Yes" to Special Issue #1 then you are going to go to Special Issue #2.

Special Issue #2, again is a question that you answer "Yes" or "No" which we'll go over in a little bit, for right now you need to know is that after when you answer Special Issue #2 if you answer that question "Yes" the defendant receives a life sentence, if you answered "No" he receives the death penalty.

1          So basically what happens is you hear

2     that punishment evidence and then you vote on Special

3     Issue #1 and Special Issue #2.

4          If you vote "Yes" to Number One, "No"

5     to Number Two the defendant receives the death penalty,

6     if you go any other way then the defendant would receive

7     a life sentence.

8          In deciding Special Issue #1 and Issue

9     #2 you are going to be able to go back in your mind to

10    that evidence you heard during the guilt and innocence

11    phase, you can consider that in making your decision on

12    those questions but you have also got to be able to

13    consider, listen and consider all that evidence that is

14    presented during the punishment hearing and not just base

15    your decision based on that evidence that you heard at

16    guilt or innocence.

17          Could you do that?

18    A          Yes.

19    Q          If you will there is a sheet there that on the

20    top it says "Special Issues."

21          Do you have that sheet?   (Indicating)

22    A          Yes.   (Indicating)

23    Q          Read Special Issue #1 and let me talk to you

24    about that a little bit after you have had a chance to

25    read it.

1   A       Okay.

2   Q       Okay.  Special Issue #1 refers to the future

3   dangerousness of the defendant, is that kind of what it

4   looks like to you?

5   A       Yes.

6   Q       Okay.  I want to point out some things about

7   that first Special Issue there, one, if you will notice

8   there the State is required to prove that to you beyond

9   a  reasonable  doubt  just  like  we  are  the  guilt  or

10  innocence, we are required to prove beyond a reasonable

11  doubt that there's a probability that he would commit

12  criminal acts of violence in the future.

13          And the second thing I want to point out

14  to you is that word "probability."

15          You know "probability", the State law

16  defines "probability" as being "more likely than not",

17  just  a  little  more  than  50/50,  you  know,  51/49  or

18  something like that.

19          Is  that  --  would  that  definition  of

20  "probability" be close to the same definition you would

21  give to "probability?"

22  A       Yes.

23  Q       Okay.  And is that a definition that you can

24  follow and follow the law in that regard?

25  A       Yes.

Q         Okay.   So the State is required not to prove that it's a certainty or that we can guarantee that, it's just that it's a probability that he would do that.

The second thing I want to refer you to is that term "criminal acts of violence."

Of course he's charged with capital murder.  Of course that's a criminal act of violence but we are not required to prove that he would commit another capital murder, just that he would commit some criminal act of violence, assault, attempted murder, rape, something of that nature.

Of course as you know there are crimes that are not acts of violence, forgery, for instance, it's a crime but it's not an act of violence so we have got to prove to you beyond a reasonable doubt that it's probable that he would commit some criminal act of violence that would constitute a continuing threat to society.

That word "society" at the end there, "society" is a term that, you know, you and I may think of it as just folks out here walking on the street.  But the law defines "society" as including the penitentiary.

And where that is important is if we prove to you beyond a reasonable doubt that he might commit a criminal act of violence even if that criminal

act of violence might take place in the penitentiary --

MR. OLD:  I object to "the penitentiary", it implies a standard that is less than the law and he says "If we prove to you that it might."

THE COURT:  Sustained.

Rephrase.

MR. TOWNSEND: Excuse me, Your Honor.

Right.  We are required to prove to you beyond a reasonable doubt that it's probable that he would commit a criminal act of violence and if we prove that to you it doesn't matter whether you believe that criminal act of violence would take place in the penitentiary there.  You know, there are people there that could be injured as well as out on the street, inmates, guards, doctors, nurses, that sort of thing.

Are you with me so far?

THE POTENTIAL JUROR:  Yes.

Q       (BY MR. TOWNSEND)  Okay.  So in answering Special Issue #1 you can go back, take that evidence you heard at guilt or innocence, consider that, consider all that evidence you heard during the punishment phase and decide whether your answer to Special Issue #1 should be "Yes" or "No"?

And the important thing, Mr. Hammonds,

1   is that you be able to do that only after you have

2   considered that evidence during the punishment hearing.

3                Could you do that?

4   A       Yes.

5   Q       Okay.  If you will read over Special Issue #2

6   and then we will talk about it.

7                Okay.  Special Issue #2 is kind of a

8   legal mouthful but basically I believe what Special Issue

9   #2 is saying, you know, this is -- you have already

10   decided this person is guilty of capital murder, you have

11   already decided that he's going to be a threat to society

12   or else you wouldn't be considering Number Two.

13                You know if you answer "No" to Number

14   One then you don't consider Number Two.  You have already

15   decided those things.

16                Special Issue #2 is not something that

17   the State has to prove to you beyond a reasonable doubt,

18   it's just kind of your opinion.  And what it says to you

19   basically is that a death penalty type of case with a

20   death penalty type defendant or is there some reason that

21   you have heard throughout the evidence that is

22   sufficiently mitigating or sufficiently reduces his

23   blame, doesn't excuse it but reduces his blame to the

24   point that you believe the person should receive a life

25   sentence rather than the death penalty.

1          And if your answer is "No" then you are

2    saying, "No. I didn't see anything there that should

3    reduce his blame."

4          If you are saying "Yes" then you are

5    saying "Well, I found something in that case, whether it

6    was from the guilt or innocence part or whether it was

7    from the punishment part that made me believe that this

8    defendant should receive a life sentence."

9          And that evidence could be something

10   that you have heard from one of our witnesses, it could

11   be something that you might hear from the Defense side.

12          Are you with me?

13   A         Yes.

14   Q         The important part, Mr. Hammonds, is -- I have

15   heard jurors say, "Now, wait a minute.  I found this

16   defendant guilty of capital murder.  I have decided they

17   are probably going to be dangerous in the future.  That's

18   enough right there for me.  My answer to Special Issue

19   #2 is going to be 'No' because I'm going to make sure

20   this guy gets the death penalty."

21          You see, they are not a qualified juror

22   because they are not waiting until they have heard all

23   the answers -- I mean "heard all the testimony" in that

24   punishment hearing, they are not going back and

25   reconsidering all that evidence before they answer

1    Special Issue #2.

2              Do you believe you could go back and

3    sort of mentally rethink all that evidence before giving

4    your answer to Special Issue #2?

5    A        Yes.

6    Q        The important part is that you answer Special

7    Issue #2 and Issue #1 based on the evidence that you have

8    heard and I guess basically just let the chips fall where

9    they may, not say, "Well, I want to give this guy a life

10   sentence so I'm going to answer them this way, I want to

11   give this guy the death penalty so I'm going to answer

12   it this way" but just answer the questions based on what

13   you have heard on the evidence after you have given it

14   all consideration.

15             Could you do that?

16   A        Yes.

17   Q        Okay.  That word "sufficiently mitigating" or

18   those two words, "mitigating evidence" can be all sorts

19   of things, you know.

20             I talked to you about the punishment

21   hearing that you might hear evidence of all sorts and

22   type stuff like retardation, intoxication, drug use,

23   family history, age, all sorts of things, psychological

24   testimony.

25             The important part about that is that

1    you understand that in order to be a qualified juror

2    whatever that evidence is, whether it be evidence of age,

3    evidence of family history, evidence of -- from

4    psychologists, evidence from a minister, evidence from

5    a family member, wherever that testimony might come from

6    that you be willing to listen to that evidence and

7    consider it.

8              Now, once you have listened to it and

9    considered it you may decide, "Well, that's important or

10   that is not important or that is -- that's honest or

11   that's dishonest, as long as you are willing to listen

12   to it and consider it and then make that decision then

13   that's okay.

14             But on the other hand if you are the

15   type juror that is going to say, "Well, that person is

16   a family member of his.  I'm not going to pay any

17   attention to her testimony or his testimony" -- do you

18   see what I'm saying?

19   A        Yes, sir.

20   Q        As long as you are willing to listen and

21   consider the evidence then you are a qualified juror.

22             Do you believe that you could do that?

23   A        Yes, sir.

24   Q        Okay.  Mr. Hammonds, in deciding Special Issue

25   #1 and Issue #2 I believe you will be instructed by the

1    Court that in making those determinations in determining

2    whether a life sentence or death penalty is assessed that

3    you cannot consider in any way the possibility of parole.

4               And what that means is basically that

5    you are going to decide the death penalty or life

6    sentence and when you come to that you will just consider

7    that life is life, you know, a life sentence is a life

8    sentence and that's what it means.

9               Now, of course we don't expect you to

10   put it out of your mind that there is parole possibility,

11   just that you won't consider those in making your

12   decision.

13              And that goes to Special Issue #1.

14              Could you do that?

15   A       Yes.

16   Q       Same way with Special Issue #2, could you do

17   that?

18   A       Yes.

19   Q       And not let that play any part in your

20   deliberation?

21   A       Yes.

22   Q       I believe the Court will probably instruct you

23   that in this case the Defendant would be eligible for

24   parole at the end of 35 calendar years.

25              Now, that of course doesn't necessarily

1    mean he would get parole at the end of 35 years but it's

2    possible that he could.  It's also possible that he might

3    never get parole but the important part is that that

4    should not be any part of your consideration in your

5    deliberating what the proper answer should be to Special

6    Issue #1 and Issue #2.

7            Could you do that?

8    A        Yes.

9    Q        Let me talk to you about some general areas of

10   the law, Mr. Hammonds, that relate to all criminal cases

11   basically as well as capital murder cases.

12           Let's assume for the moment that the

13   State has proved to you beyond a reasonable doubt that

14   the Defendant in this case committed the murder but did

15   not commit the robbery or we do not prove to you beyond

16   a reasonable doubt that he committed the robbery, then

17   the proper thing for the jury to do would be to find the

18   Defendant guilty of murder but not guilty of capital

19   murder.

20           Okay.  Now, if you found this person

21   guilty of murder then the range of punishment changes.

22   We are not looking at life or death anymore, we are

23   looking at a different range of punishment.

24           The range of punishment on a plain

25   murder is anywhere from five years probation up through

1   99 years or life.

2            In order to be a qualified juror you

3   have got to be able to consider that full range of

4   punishment.   You know, 'some murders are extremely

5   violent, vicious type murders, maybe you might consider

6   those the upper end of the range, whereas on the lower

7   end of the range maybe -- the Judge talked to you a few

8   weeks ago about mercy killing, a situation where maybe

9   an 80 year old man and wife lived together for, oh, 50

10  years and the husband or wife was in a lot of pain due

11  to cancer and begs the other spouse to end her life for

12  her, the other spouse pulls the plug; well, that's not

13  what we usually think of when we think of "murder" but

14  under the Texas law that is intentionally or knowingly

15  causing the death of an individual and that is murder.

16           But you can see where there are all

17  kinds of different murders.

18           And do you think considering the fact

19  that there are all -- are all sorts of different kinds

20  of murder do you think that you could consider the full

21  range of punishment?

22           And I say that to mean anywhere from

23  five years probation to 99 years of life, could you

24  consider the full range of punishment in a murder case?

25  A        Yes.

1    Q          Let's assume for a moment that you have looked

2    at the evidence in this case and you have decided that

3    the State had proved to you beyond a reasonable doubt

4    that the defendant committed the murder but rather than

5    believing that we proved to you beyond a reasonable doubt

6    that the defendant committed the robbery we have proved

7    to you beyond a reasonable doubt that the defendant

8    committed arson.

9              Of course arson -- murder and arson is

10   also a capital murder but that's not what we alleged in

11   the indictment, is it?

12   A          No.

13   Q          We alleged murder and robbery so it would be

14   your responsibility at that point as a juror to find the

15   defendant guilty of murder but not capital murder because

16   we -- because we didn't prove the robbery to you.

17             The fact there was arson involved

18   doesn't matter because we didn't allege that, did we?

19   A          No.

20   Q          Do you think in that situation you could find

21   the defendant not guilty of capital murder and guilty of

22   murder even though you knew there was a murder and arson

23   there?

24   A          Yes.

25   Q          The burden of proof in this case and in any

1    criminal case is beyond a reasonable doubt.

2              Of course you know that is not beyond

3    all doubt or beyond a shadow of a doubt.

4              The Court has a definition for you of

5    "beyond a reasonable doubt" that you will be able to

6    read.

7              Do you think that you could hold the

8    State to that burden of beyond a reasonable doubt?

9    A        Yes, sir.

10             MR. OLD:    Your Honor, I'm

11   going to object to the question, he's trying to commit

12   the juror to a definition that has not been shown that

13   the juror knows.

14             THE COURT:   Sustained.

15             Sir, there's a definition you have

16   there, I want you to read it.

17             Right there.   (Indicating)

18             It has been 22 minutes, Mr. Townsend.

19             MR. TOWNSEND:  Okay.  What you

20   have read there is a definition of "beyond a reasonable

21   doubt", does that definition of "beyond a reasonable

22   doubt", is it similar to what your definition would be?

23             THE POTENTIAL JUROR:   Yes.

24   Q        (BY MR. TOWNSEND)   Is that something you could

25   hold us to to make us prove our case?

1    A       Yes.

2    Q       When I say "We have to prove our case", that

3    goes back to the burden of proof and of course the burden

4    of proof in any criminal case rests with the State of

5    Texas, we are required to prove the defendant guilty,

6    they are not required to prove that he's not guilty.

7            Is that something that you are familiar

8    with and can hold us to?

9    A       Yes.  I am familiar with it.

10   Q       Okay.  It kind of -- along with that goes the

11   Fifth Amendment privilege, that's the defendant's right

12   not to testify if he chooses not to.

13           And is that something you are familiar

14   with?

15   A       Yes.  I am familiar with it.

16   Q       And that's to say that you can't hold that

17   against the defendant in any way in determining whether

18   he was guilty or not guilty, you know, you take the

19   evidence that you heard and you make your decision based

20   on that and not hold it against him even in a small way,

21   the fact that he failed to testify.

22           Could you do that?

23   A       Yes.

24   Q       Mr. Hammonds, that holds true also during the

25   punishment phase of the hearing and that is to say that,

1    you know, during that punishment phase you are going to

2    hear all sorts of evidence and you might wish that you

3    could hear from the defendant, you might think, "Well,

4    it might make me a little difference if he told us that

5    he was sorry."

6                  But again, he's not required to testify

7    during that punishment hearing.

8                  And in order to be a qualified juror you

9    cannot hold it against him if he chooses not to testify

10   during that punishment hearing.

11                 Could you do that?

12   A         Yes.

13   Q         Okay.   During any criminal trial as you are

14   aware you are going to hear from all sorts of witnesses.

15   You might hear from doctors, lawyers, Indian chiefs,

16   police officers, psychologists, ministers, might even

17   hear testimony from someone that you might know.

18                 The important part is that in judging

19   people's credibility and judging their testimony you not

20   give any particular witness a head start, so to speak.

21                 And when I say "a head start" I mean if

22   some guy gets up there on the stand and you happen to

23   know him and you just say, "Well, I am automatically

24   going to believe that fellow", you know, but listen to

25   his evidence just like you do everybody else's and after

1    you have heard his testimony then judge the credibility

2    of it and not give him an advantage to start with.

3                    Could you do that?

4    A          Yes.

5    Q          Could you do that in -- in regard to police

6    officers since you have police officer training and since

7    you are a security officer I think you probably --

8                         MR. OLD: Your Honor, approach

9    the bench?

10                        THE COURT:  You may.

11                        Sir, we can't really have much of a

12   conference in this courtroom with you sitting here so I'm

13   going to have to ask you to step out for just a moment

14   so we can get a couple of matters on the record.

15                    We will bring you right back.

16

17                    (The following occurred outside the

18   presence and hearing of the potential juror:)

19

20                        THE COURT:  Let the record

21   reflect that the juror is not present in the courtroom.

22                    Mr. Old?

23                        MR. OLD:  Your Honor, we

24   request first that the record reflect that since the

25   questioning of this juror started we have gone from two

1    uniformed officers in this courtroom to having had a

2    total of five, including the Sheriff of Titus County.

3            No one has told us any reason for beefed

4    up security.

5            We also have another Bailiff in the

6    courtroom that is not in uniform, there has been at

7    least, including Mr. Johnston who is the Bailiff from

8    Morris County who is not in uniform there has been at

9    least six bailiffs or law enforcement officers in this

10   room including the Sheriff of this county.

11           We don't know of any reason why security

12   has been increased but we do believe that we do suspect

13   and we do accuse the State of having paraded them in here

14   to influence this juror Hammonds who is a security guard

15   who holds a certificate of law enforcement in whose

16   questionnaire says he has applications for employment in

17   with police departments in this area.

18           And I think the purpose of that has been

19   to taint this witness to the State's favor and if it was

20   unintentional I think the fact that it has happened would

21   have that effect.

22           THE COURT:  Let me state for

23   the record that the Court has not ordered any additional

24   security.

25           Mr. Townsend, do you wish to address

1    his objection?

2                        MR. TOWNSEND:  I know nothing

3    about the reason for the officers being here more than

4    usual.  I would have to inquire from them to find out

5    those reasons.

6                        However, I would like to note for the

7    record that Mr. Johnston who is the Bailiff in Morris

8    County but he's also an elderly gentleman, he's not

9    armed, he's dressed in civilian clothing.  I don't think

10   he's a threat to anyone.  I don't think he was

11   influencing in any way this juror or any other juror in

12   their answer and to insinuate that he's done anything or

13   that his presence does anything to influence a juror is

14   simply ridiculous.

15                        As for the Bailiff and the Sheriff that

16   were in here, I don't know what their reasons were.  They

17   were only in here briefly, it hasn't been established

18   that they have influenced this juror in any way.

19                        We can ask the juror.

20                        THE COURT:  There has been a

21   change in Bailiffs because the Bailiff normally

22   associated with this case informed the Court in the

23   presence of the State and Defense I think on the last

24   juror that he was needed for the Grand Jury or elsewhere

25   and Mr. Johnston is sitting in for him until he is

1    available so I certainly am going to keep Mr. Johnston

2    here as our Bailiff until needed.

3                   I don't know what -- why the other

4    deputies are coming and going.  I know at this point

5    other than the deputy that is always here we had one

6    additional deputy in the courtroom, they have been coming

7    and going observing the proceedings.

8                   This is an open courtroom, it's part of

9    the public, they are part of the public and the objection

10   is overruled.

11                  MR. OLD:  Could we also have

12   noted in the record that the Sheriff of Titus County,

13   John Moss, was present in the courtroom?

14                  THE COURT:  I don't know the

15   Sheriff.  If you tell me that then I am sure you would

16   not deceive the Court.

17                  THE BAILIFF:  May I explain

18   that to you?

19                  THE COURT:  Mr. Johnston, you

20   may.

21                  THE BAILIFF:  I am fixing to

22   leave, I was just called up here for temporary and he

23   brought this one and he's going to relieve me because I

24   have a doctor's appointment in Longview.

25                  THE COURT:  Certainly, Mr.

1    Johnston, you say he's going to relieve you and you

2    pointed --

3                         THE BAILIFF:   He's going to

4    relieve me and he will be here the rest of the time,

5    that's why Mr. Moss brought him in here.

6                         THE COURT:   And Mr. Moss is

7    the Sheriff?

8                         MR. OLD:   Of Titus County.

9                         THE BAILIFF:   They just called

10   me for an emergency to relieve the other Bailiff, he had

11   more than he could handle.

12                        THE COURT:   You are free to

13   go whenever necessary, Mr. Johnston.

14                        And Officer, what is your name?

15                        A VOICE:   James Moss.

16                        THE COURT:   And you are

17   filling in for us?

18                        THE BAILIFF:   He will be

19   sitting in for the next witness.

20                        THE COURT:   Is that true, Mr.

21   Johnston?

22                        Are you "Sheriff Moss?"

23                        A VOICE:   No, sir.   I am a

24   Reserve Deputy.

25                        THE COURT:   Reserve Deputy?

1   I'm sorry.  I don't know all of you guys and I may get

2   everyone mixed up.

3                   MR. TOWNSEND:    I would like

4   for the record to reflect when Sheriff Moss did come in

5   here he was certainly here less than five minutes.

6                   THE COURT:    Again, I don't

7   know Sheriff Moss and I'm going to take the lawyers at

8   their word and the record will reflect that so far as I'm

9   concerned what the lawyer is stating is true and correct

10  so far as factual observation.

11                  MR. OLD:    Then, Your Honor,

12  so far as factual observation I would like to controvert

13  the State's conclusion that Mr. Johnston is "not a threat

14  to anybody", I would be scared to wrestle him whether he

15  was armed or not.  In spite of his age he's alive and

16  well.

17                  THE BAILIFF:    That's right.

18  But I was just called to sit for a short time and I had

19  an appointment with the doctor and I have got to leave

20  to go to that appointment.

21                  THE COURT:    I appreciate it.

22  You are free to go.

23                  THE BAILIFF:    Mr. Moss will

24  be here for the rest of the time.

25                  THE COURT:    You are free to

1    go.   Thanks for your assistance.

2                         THE BAILIFF:  I appreciate it.

3                         THE COURT:  One last duty, Mr.

4    Johnston, would you bring the juror back in, please, Mr.

5    Hammonds?

6

7                         (The following occurred in the presence

8    and hearing of the potential juror:)

9

10                        THE COURT:   Mr. Townsend.

11                        MR. TOWNSEND:  Thank you, Your

12   Honor.

13                        Mr.  Hammonds, I think we were talking

14   about  testimony  of  various  parties  and  not  letting

15   somebody get a head start.

16                        So far in your mind with their testimony

17   in your training as a -- or your police officer training

18   and working as a security guard I am sure that you are

19   aware that there are what you might call "good cops and

20   bad cops and in between cops?"

21                        THE POTENTIAL JUROR:   Yes.

22   Q          (BY MR. TOWNSEND)   Is that right?

23   A          I have seen them all.

24   Q          Okay.   Do you -- would you be able to judge a

25   police officer's testimony just like you would anybody

1   else's and not just automatically give him a head start

2   because he has got a uniform on?

3   A       Yes.

4   Q       Okay.  What you looked at a few minutes ago was

5   the indictment in this case and/or a copy of it and I

6   think you understand from what the Judge told you a few

7   weeks ago that that indictment is not evidence of any

8   sort and that that is not to be taken as evidence in this

9   trial.

              Could you do that?

10

11  A       Yes, sir.

12  Q       Not consider it in any way?

13  A       Yes.

14  Q       Mr. Hammonds, in many criminal trials you will

15  see or hear written statements taken from the defendant

16  or what you might call "confessions."

17              Those confessions, I believe the Court

18  would  instruct  you  in  a  criminal  trial  that  those

19  confessions  are  not  to  be  taken  and  used  as  evidence

20  unless you decide beyond a reasonable doubt that they are

21  both truthful and voluntary.

22              And when I say "voluntary", I mean, you

23  know,  voluntary  legally  which  includes  if  it's

24  appropriate to the situation the reading of the Miranda

25  Rights.

1           And I know you are aware of what those

2    Miranda Rights are, aren't you?

3    A       Yes.

4    Q       Of course you know in taking an extreme

5    situation where a defendant is beaten in order to sign

6    a confession then of course that wouldn't -- that

7    wouldn't be voluntary but it's also not considered

8    voluntary if the defendant and the situation is

9    appropriate for it and the defendant is not given his

10    Miranda Rights -- what I'm getting to is let's take a

11    situation where you have heard a statement, it has been

12    read to you as a member of the jury or you have had an

13    opportunity to read it yourself and you had decided based

14    on the evidence beyond a reasonable doubt that that in

15    your mind that confession is truthful but you don't

16    believe it's voluntary because the officer failed to read

17    him his rights or failed to read him part of his rights.

18           Then of course legally that confession

19    is not voluntary, is it?

20    A       Correct.

21    Q      If that confession is not voluntary then the

22    Judge's instructions are going to be that you use that

23    confession in no way in deciding the guilt or innocence

24    of that defendant, that you not consider, that you not

25    use it and tie it together with some other evidence and

1    say, "Well, you know, this person over here testified

2    this way and that goes along with what that confession

3    said so it must be right."

4              Would you be able to take that

5    confession -- and I'm not asking -- I know you couldn't

6    put it out of your mind but would you be able to just

7    kind of set it aside and not use it in any way if you

8    found beyond a reasonable doubt or that we did not prove

9    to you beyond a reasonable doubt that it was voluntary?

10   A         Yes.

11   Q         Mr. Hammonds, I have been doing all the talking

12   and you have been answering my questions.

13             Is there anything you would like to say

14   or any questions you have of me right now?

15   A         No.

16   Q         Okay.  Mr. Hammonds, do you know of any reason

17   if the evidence was appropriate in you mind that you

18   could not make the decisions needed to give someone the

19   death penalty?  Do you believe you could do it if the

20   evidence was appropriate?

21   A         Yes.

22   Q         Mr. Hammonds, the Defense Attorneys in this

23   case are Mr. Bird Old and Lance Hinson, do you know

24   either one of these fellows?

25   A         No.  I do not.

1          MR. TOWNSEND: Okay.  Pass the

2    juror, Your Honor.

3                    THE COURT:  Mr. Old.

4

5                  VOIR DIRE EXAMINATION

6                    BY MR. OLD

7

8    Q        Mr. Hammonds, who is your mother?

9    A        Blenda Hammonds.

10   Q        She works at the bank?

11   A        Yes.  She does.

12   Q        Which one, "First National, Guaranty Bank?"

13   A        Across from the Guaranty, "American National."

14   Q        "American National?"

15   A        That's it.

16   Q        Were you raised here in Titus County?

17   A        Yes.  I was.

18   Q        Who is your grandfather Hammonds?

19   A        I can't remember his first name.  I never met

20   him.

21   Q        In order to be a juror you must meet certain

22   qualifications,  serving  on  juries,  I  think  it's  a

23   fundamental part of being a good citizen.  I presume that

24   you agree with that?

25   A        Yes.

1    Q        And the statement was made that someone has

2    fulfilled their obligation of citizenship so far as jury

3    service when they answer the summons and show up, you

4    know, like you showed up the other day and it has been

5    three or four weeks ago that whether or not you are

6    qualified or selected after that does not reflect on

7    whether you are a good citizen or not.

8              Do you agree with that?

9    A        I understand.

10   Q        I mean there are some people that just can't

11   do certain things and that is not a criticism of them as

12   a citizen.

13   A        Yes, sir.

14   Q        If a person is selected as a juror he takes an

15   oath -- have you worked as a law enforcement officer?

16   A        No.  I have not.

17   Q        Do you know that law enforcement officers take

18   an oath?

19   A        Yes.

20   Q        And he basically swears to uphold the law of

21   the State of Texas and the United States?

22   A        Yes.

23   Q        Okay.  A juror takes his oath:  "You and each

24   of you do solemnly swear in the case of the State of

25   Texas versus this Defendant" or "the defendant you will

1   a  true  verdict  render  according  to  the  law  and  the

2   evidence so help you God."

3           That  is  to  say  you  affirm  or  promise

4   that  you  will  make  your  verdict  on  the  law  and  the

5   evidence?

6   A        Yes.

7   Q        Now,  I  know  you  have  had  a  lot  of  training  in

8   law enforcement, I suspect that you studied a lot of law

9   and  in  my  training  I  studied  a  lot  of  law  and  I  suspect

10  we  both  studied  the  Texas  Penal  Code  and  Code  of  Criminal

11  Procedure?

12  A        Yes.

13  Q        And  that  oath  is  right  out  of  the  Code  of

14  Criminal Procedure.

15          The  Judge  of  this  Court  is  the  exclusive

16  judge  of  the  law  of  this  case.   He,  at  the  conclusion  of

17  evidence  will  give  you  written  instructions  and  those

18  instructions  are  the  law  of  this  case.   It's  called  "the

19  charge",  some  people  call  it  a  "charge",  some  people  call

20  it  "the  instructions  to  the  jury",  but  that  states  the

21  law.

22          For  example;  you  read  the  definition  of

23  "beyond  a  reasonable  doubt",  that  is  something  that  will

24  be  in  that  charge  and  when  a  court  --  when  the  Court

25  tells  you  that  a  word  has  a  meaning  then  as  your  oath

1   implies you have got to follow the meaning of that word

2   as the Court gave it to you, that's the law.

3               Okay.  Do you have any variance in your

4   mind with the definition that you read?

5   A        What?

6   Q        The definition that you read earlier and you

7   are invited to read it again.

8   A        Okay.

9   Q        That  is  the  law  of  the  definition  of

10  "reasonable doubt", that's not your definition, the guy

11  down the street, that's not the words that we would have

12  written  down  as  our  meaning  of  "reasonable  doubt"

13  perhaps.

14              Now, do you think that you would -- that

15  you could make your determination of what "reasonable

16  doubt" is within the boundaries of that definition?

17  A        Yes, sir.

18  Q        And if you felt like the definition and the law

19  required too much you would still require the amount of

20  proof required by it?

21  A        Yes, sir.

22  Q        You  wouldn't  hold  the  State  to  a  lesser

23  standard because you thought the definition put too much,

24  too large a burden on the State?

25  A        Yes.

1   Q        Where did you take your training in law

2   enforcement?

3   A        Eastfield College in Dallas.

4   Q        I believe I saw in there you did maybe an

5   internship for the police department?

6   A        No.  I did not.

7   Q        Let me -- that's not what you said, I was

8   guessing, you said that you have witnessed a lot of

9   arrests?

10  A        I worked as a security officer in Dallas.

11  Q        That was not as a --

12  A        No.

13  Q        Did you not do any kind of internship?

14  A        No.  I did not.

15  Q        Do you hold a certificate that would allow you

16  to go to work as a peace officer?

17  A        Yes.

18  Q        I mean I don't know, you work at Pilgrim's as

19  a security guard?

20  A        Yes.  I do.

21  Q        I notice that you commented that you had

22  applications in or had made application at various law

23  enforcement agencies --

24  A        Yes, sir.

25  Q        -- for employment?

1          Is it your desire to become a peace

2    officer as opposed to a security guard?

3    A          Yes.

4    Q          You want to be a true law enforcement officer?

5    A          Yes.

6    Q          Do you have application with local agencies?

7    A          Yes, sir.

8    Q          Have them in with the Sheriff's Department of

9    Titus County?

10   A          Not "the Sheriff's Department."

11   Q          Not what?

12   A          Not "the Sheriff's Department."

13   Q          With the City Police?

14   A          "City Police."

15   Q          Any other towns around here?

16   A          Several.

17   Q          Daingerfield?

18   A          I have turned in an application there.

19   Q          To the Sheriff?

20   A          Police Department in Daingerfield.

21   Q          To the Police Department?

22              Are those applications -- I mean are

23   they still live applications?

24   A          No.  Not in Daingerfield.

25   Q          What?

1   A            Not in Daingerfield.   Mount Pleasant Police

2   Department is.

3   Q            Okay.  I mean did Daingerfield reject you for

4   employment?

5   A            Yes.  They hired somebody else.  Yes.

6   Q            Well, I mean you hope your employment -- your

7   application is still on file if and when they needed

8   someone they would give you another opportunity?

9   A            Yes.

10  Q            They obviously didn't tell you "Take this back,

11  we don't want it, don't ever come back here", they just

12  selected somebody over you?

13  A            Yes.

14  Q            Do you belong to any police organizations at

15  this time?

16  A            No.

17  Q            Law enforcement organizations?

18  A            No.

19  Q            Do you receive literature from law -- you know,

20  the American Police Officer's Society, anything by mail?

21  A            No, sir.

22  Q            Anything, any such organizations?

23  A            No.

24  Q            Would you agree with me that peace officers are

25  an informal fraternity?

70

1    A        Yes.

2    Q        And do you consider whether you are working as

3    a police officer or not, being trained to be one do you

4    consider yourself a member of that group, that loose

5    group?

6    A        No.   I do not.

7    Q        You would like to belong to it?

8    A        Yes.

9    Q        One thing that a juror must do is he must make

10   his decision on the evidence that comes before him in

11   this case, if he knows something of his own knowledge

12   that doesn't get offered in evidence he must lay it aside

13   and not violate the evidence of this case with his

14   personal knowledge.

15            Do you follow me?

16   A        Yes.

17   Q        Now, you must be able to start out with each

18   witness on equal footing.

19   A        Yes.

20   Q        Now, as to peace officers, law enforcement

21   officers or people who work for the State, people who are

22   officials of the State of Texas and specifically law

23   enforcement officers, is the fact that they are trained

24   to be a law enforcement officer and are one, is that

25   going to -- that fact alone, I mean, you know, they sit

1   down and they have their badge on, is that going to give

2   them just a little more credibility with you than a

3   witness who is not?

4   A          Yes.

5   Q          I mean an officer is going to start off with

6   just a little more credibility once you realize that he

7   trains -- he's law enforcement?

8   A          Yes.

9   Q          And not to say by the time he gets through

10  testifying you may have changed your mind but when he

11  starts off you are going to consider him to be more

12  credible?

13  A          Yes.

14                    MR. OLD:  Your Honor, may we

15  approach?

16                    THE COURT:  Sir, I'm going to

17  ask you to step out for just a moment.

18                    I'm giving you a lot of exercise.

19                    THE POTENTIAL JUROR:  I need

20  it.

21

22                    (Off the record discussion.)

23

24                    (The following occurred outside the

25  presence and hearing of the potential juror:)

1          THE COURT:  Let's get on the

2   record and make your challenge.

3          Let the record reflect that the juror

4   is not present.

5          MR. OLD:  Your Honor, as to

6   juror number 21, Gregory Scott Hammonds, the Defendant

7   has challenged the officer.

8          He answered as to being able to consider

9   witnesses equal that a man who was a peace officer and

10  that fact alone would give him a head start when he sat

11  down on the witness stand.  That is to say you would have

12  more credibility with him than a witness who was not a

13  peace officer.

14          THE     COURT:     You     are

15  challenging him for cause on that ground?

16          MR. OLD:  Yes.

17          THE COURT:  Does the State

18  have a response?

19          MR. LEE:  That was pretty much

20  what he said, Your Honor, and there's not much we can

21  respond to.

22          THE COURT:  The challenge is

23  sustained.

24          He is excused.

25          Officer, let him know that we are

1    excusing him.

2              And we will take a short break before

3    the next juror.

4              When we are -- while we are discussing

5    challenges -- let's stay on the record, when we finish

6    with a juror by the name of "Alexander", his juror number

7    is 12, I have two challenges, the first challenge from

8    the Defense was on the definition of "probability", that

9    was overruled, the next challenge was that the

10   prospective juror had participated in the offense by

11   watching for an allegedly stolen pickup truck owned by

12   the alleged victim in this case.

13             He said he had received an all points

14   bulletin.

15             I want the record to reflect that Mr.

16   Townsend has provided the Court and the Defense with a

17   copy of the all points bulletin that was received by or

18   read by witness Alexander.

19             The Court indicated this morning that

20   I was going to find the juror qualified, I have been

21   reflecting upon that decision.

22             Like I told you guys in the beginning;

23   grey areas go to the Defense.   I think my desire to

24   qualify jurors may overcome my reason, I'm now leaning

25   the other way so Mr. Old, I don't need any argument, Mr.

1    Old, I don't need to hear argument from you since at this

2    point I'm inclined to sustain the challenge.

3              If the State wishes to argue that point

4    now they may or if the State wishes to do some research

5    and argue later this afternoon or in the morning they

6    may.

7                        Mr. Townsend?

8                        MR. TOWNSEND: Possibly in the

9    morning.   I wouldn't have any opportunity to do any

10   research today.

11                       THE COURT:   Then I will hold

12   off until tomorrow morning on my announcement but at this

13   point I do believe that he's a potential witness.   I

14   think he's very remote but I think there is a possibility

15   that he very well could be called since he participated

16   to some extent in this offense.

17              And if the State wishes to convince me

18   otherwise I will give you until tomorrow morning.

19                       MR. TOWNSEND: Your Honor, if

20   this police officer was a police officer in El Paso and

21   we had a change of venue to El Paso I assume that he

22   would be counted a potential witness?

23                       THE COURT: Probably if he had

24   read the bulletin.

25              I didn't make the law.

1          Let's take a break.

2

3                    (Recess.)

4

5                    (The following occurred in the presence

6     and hearing of the potential juror:)

7

8          REAGAN LEE EAVES, Potential Juror #400,

9     was  called  as  a  Potential  Juror  and,  having  been

10    previously sworn by the Court, testified as follows:

11

12                    THE COURT:  If you would come

13    around here and watch that first step here and take your

14    seat right up there on the witness stand.

15          Are you "Reagan Eaves?"

16                    THE POTENTIAL JUROR:  Yes,

17    sir.

18                    THE COURT:  This is juror 22.

19          Mr. Eaves, I am Gary Stephens, I'm

20    presiding over this trial.

21          We have two lawyers present representing

22    the State of Texas, we have the District Attorney from

23    Morris County, Mr. Richard Townsend and we have Mr.

24    Randall Lee who is with the Cass County District

25    Attorney's Office.

1          We have two Defense Attorneys, Mr. Bird

2     Old, III.

3                         MR. OLD:   Howdy.

4                         THE COURT:   And Mr. Lance

5     Hinson.

6                         MR. HINSON:   Good morning.

7                         THE COURT:  Next to Mr. Hinson

8     the person that is charged, Billy Joe Wardlow.

9               Now, Mr. Eaves, the lawyers have read

10    your questionnaire, they are going to talk to you about

11    some of your answers and they are also going to talk to

12    you about the principles of law involved in a death

13    penalty case.

14              You will be asked a lot of questions and

15    the answers will let us know whether or not to put you

16    on the jury.

17              In order to be a qualified juror you

18    must be able to understand and follow the law.   You don't

19    even have to agree with all of our laws, if you disagree

20    with some aspect of the law but you can set aside your

21    disagreement and follow the law you are qualified but if

22    you disagree with some aspect of our law to such an

23    extent that you can't follow the law then you are not

24    qualified.

25              So we are going to explain some of the

1   law to you and ask you whether you could follow the law

2   and in general try to find out what you think about these

3   laws.

4         We have also found just because a person

5   is qualified doesn't necessarily mean that person would

6   be a good or appropriate juror in a death case so we need

7   to know kind of where you are going, where you are coming

8   from and how you think.  The only way as lawyers that we

9   know how to find out is to ask a lot of questions and

10  what we want you to do, Mr. Eaves, is to be as open and

11  honest with us as you can and give us true answers.

12        There aren't any right or wrong answers

13  to these questions, there are no right or wrong opinions,

14  you have an absolute right to agree or disagree with our

15  law and it's your opinions that we are concerned with so

16  don't worry about what the effect of those opinions are,

17  just share them with us so we can decide whether or not

18  to put you on this jury.

19        The trial itself will not begin until

20  probably January the 3rd and the trial will last anywhere

21  from one to two weeks, maybe a little longer but probably

22  not much longer.

23        Do you know of any reason that you could

24  not serve on a jury for the first couple of weeks of

25  1995?

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1          THE POTENTIAL JUROR: No, sir.

2          THE COURT:   Do you have any
3     questions, sir?

4          THE POTENTIAL JUROR:   No.

5          THE COURT:   You may proceed.

6

7               VOIR DIRE EXAMINATION

8                    BY MR. LEE

9

10     Q          Mr. Eaves, as the Judge introduced me I am
11     Randall Lee.

12               Are you any kin to P.D. or Ronald Lee
13     over in Linden?

14     A          Not that I know of.

15     Q          I was just curious.

16               As the Judge mentioned we are asking
17     questions to find out a little bit about you, about your
18     approach, whether you can follow the law, whether you
19     disagree with the law but can still follow it, that kind
20     of thing and just to find out if we think you are
21     appropriate in this kind of case.

22               There is no right or wrong answers, some
23     of my questions are going to sound like I am arguing for
24     the Defense but basically that's because we want to know
25     if you can follow the law and can you be a fair juror.

1         First of all right off the bat; we are

2    going to ask for the death penalty in this case.

3         Do you feel like in an appropriate case

4    could you vote in such a way that could -- would give the

5    death   penalty   to   an   individual   in   the   right

6    circumstances?

7    A         Yes, sir.

8    Q         You think it's appropriate and you agree with

9    that part of the law on certain cases?

10   A         Yes, sir.  Certain cases.

11   Q         In order to answer some of the questions I'm

12   going to have to explain just a little bit about the law

13   in Texas, a little bit about how we get to that; in Texas

14   there are several types of homicides but we are going to

15   be talking to you more along the lines of the types of

16   murder, there are capital murder and there's murder.

17         Murder   in   Texas   is   basically   just

18   intentionally   and   knowingly   causing   the death of an

19   individual, someone walking over, shooting their neighbor

20   and getting into an argument and shooting someone or

21   things along that line and capital murder is murder plus

22   something else, something else to make it a little more

23   serious than murder.

24         For instance; killing a police officer

25   or fireman in the line of duty, killing more than one

1    person in the same episode, committing a robbery or rape

2    and killing someone and killing someone -- killing

3    someone under six years of age now is also a capital

4    case.

5              Do you kind of understand how capital

6    murder is a little different or more serious than murder

7    the way the Legislature has set it up?

8    A         Yes, sir.

9    Q         That sounds appropriate to you that perhaps

10   certain types of murder ought to be punished much more

11   harshly than other types?

12   A         Yes, sir.

13   Q         We are required to prove to you in this case

14   beyond a reasonable doubt that the Defendant committed

15   a murder in the course of committing a robbery or

16   attempted robbery.  So that we are basically proving two

17   different felonies.

18             Can you hold us to that burden, make us

19   prove our case the way the law requires?

20   A         Yes, sir.

21   Q         In Texas we have a two-part trial basically and

22   we are one of the few states in the union that has a two-

23   part trial.   That is we have a guilt/innocence portion

24   of the trial where all the evidence we bring to you if

25   you are on the jury is evidence to establish guilt, that

1    a person did the offense as alleged.

2           And then if the person is found guilty,

3    found guilty -- excuse me -- then we have a separate

4    trial, a shorter version generally as to not that he's

5    guilty, "What do we do with him" and then we bring in

6    evidence to you as to punishment, "Why should he have

7    been punished, how much should he be punished", that sort

8    of thing.

9           And the law requires that you be able

10   to keep an open mind all the way through and make your

11   decision at the appropriate times and places.

12          For instance, some jurors like to go in

13   and in a case like this especially it's a problem that,

14   "Okay, I have decided that he's guilty of capital murder

15   and then we need give him the death penalty" during the

16   guilt/innocence portion and obviously they haven't heard

17   all the evidence.

18          Can you withhold your judgment and make

19   the decision at the appropriate time and consider all the

20   evidence as it is brought in?

21   A        I think so.  Yes.

22   Q        During the punishment phase you will be given

23   two questions, two separate questions to answer and the

24   answer to those questions will determine the sentence,

25   that of course is assuming that you find him guilty of

1      capital murder.

2              You have a document up there, I believe

3      it's Number 3 or "Voir Dire Number 3", called "Special

4      Issues", have you found that?

5      A       Yes.

6      Q       If you could read Special Issue #1 to yourself

7      then we will talk about it.

8              Okay.  Does that -- obviously it talked

9      about "Is there a probability that the defendant will

10     commit future acts of violence" and the State is required

11     to prove that beyond a reasonable doubt.

12             Can you hold us to that burden and make

13     us bring evidence?

14             You will be allowed to consider not only

15     what you heard in the first part of the trial but

16     evidence in the second part, can you reserve your

17     judgment to that answer until the evidence is in and make

18     it based upon the evidence?

19     A       Yes, sir.

20     Q       There is several key words there that we need

21     to make sure you understand in deciding that, one of them

22     is "probability."

23             A lot of people would have a different

24     definition of that but assuming the Court gives you a

25     definition that "Probability means more likely than not",

1     is that pretty close to your definition, first?

2     A        Yes.  Pretty close.

3     Q        And can you follow that?

4     A        Yes, sir.

5     Q        Obviously that would be, you know, if you are

6     talking percentages that would be a little more than 50

7     percent, 51 percent or "more likely than not", it's

8     leaning that direction.

9              And you could listen to the evidence and

10    make that decision based on what you hear up there?

11    A        Yes, sir.

12    Q        And then "criminal acts of violence", obviously

13    predicting future behavior of an individual is very

14    difficult, some of the ways to predict is what they have

15    done in the past, the best predictor of the future is

16    what has happened in the past, that's one way.  There are

17    other ways to prove it but obviously we can't prove to

18    you that an individual will commit an act of violence

19    completely, we can only predict probabilities.

20             And "violence", we definitely can't

21    prove that a person will commit another capital murder,

22    that's in the future and nobody really knows what is

23    going to happen but "violence" is a general term that can

24    be anywhere from punching somebody in the nose to rape,

25    robbery, killing someone, shoot someone, it's a broad

1   range and it doesn't include other offenses, you could

2   commit a forgery, that's not "violence", that's passing

3   a check that belongs to someone else or a theft or

4   burglary.

5                   But can you when you answer that

6   question can you look at the evidence as to "violence"

7   and make a decision based on the evidence that comes in

8   as to potential violence that's going to happen and not

9   on maybe other potential criminal activity or some other

10  reason.

11                  Can you hold us to the burden that we

12  are required to prove?

13  A          Yes.

14  Q          "Society" also has a special meaning.

15                  Obviously it means the people on the

16  street, it means you and me and the general public but

17  the law says basically it also means people in the

18  penitentiary since there's a lot of people that work in

19  the penitentiary, wardens, guards, nurses, doctors, other

20  inmates and nobody wants those necessarily killed either

21  except under a normal proper legal manner.

22                  And can you consider society as a whole

23  when you are making that determination as to future

24  violence?

25  A          Yes.

Q        When you are deciding on this case if you get

to this question obviously you have already decided that

he's guilty, that he committed a capital murder and now

you have decided there is evidence that he's going to be

a danger in the future, that it's a probability that he's

going to commit some violence in the future then you go

to Special Issue #2 if on Number One you decide that

there is no -- no chance that he's going or there's no

probability that he's going to commit violence you don't

even get to Number Two, he automatically gets life.

But assuming that you find there is a

danger you would go to Special Issue #2.

Could you read Number Two and we will

talk about it briefly?

A        Okay.

Q        That is a fairly long question but basically

it's talking about mitigating circumstances, something

that might make the defendant less blameworthy or some

reason that might make him deserve life rather than the

death penalty.

Nobody can tell you as a juror what

mitigating circumstances are because what is mitigating

to one person wouldn't be mitigating to the next person.

If a person is intoxicated, perhaps

alcoholic and gets intoxicated, commits a crime, many

1    people feel like that is mitigating, if he hadn't been

2    drinking he wouldn't have committed the crime.

3                    Others will feel like that may be

4    evidence that he's more dangerous, that he can't control

5    himself or that he shouldn't have been drinking in the

6    first place and different people will look at that

7    different, some people consider retardation, a severely

8    retarded individual shouldn't be held to the same

9    standard as the rest of the community.

10                   Some people consider age as a mitigating

11   circumstance, the elderly or the very young shouldn't be

12   held to the same standard.

13                   But nobody can tell you what is

14   mitigating and we are not asking you to tell us what

15   you think is mitigating, sometimes psychological

16   background -- the requirement is that you be able to

17   listen to all the evidence, not that it applies in any

18   particular case, but that you will listen to it and

19   consider it, can you do that?

20   A        Yes.

21   Q        Mitigating circumstances sometimes comes

22   through our evidence, you know, sometimes comes through

23   the Defense, it can come from various sources but

24   basically you are required to consider that.

25                   And it's a safety valve to prevent some

1    injustice at someone that didn't really deserve the death

2    penalty, keep them from getting it, that's for the public

3    or for the jury to decide basically.

4              The law is real particular in a lot of

5    areas, it requires you to consider everything in order

6    not to jump from one part to another or not to bend what

7    your personal beliefs are or your personal goals, not to

8    change your answers when it's not based on the evidence.

9              For instance, if you decide early on

10   that you wanted him to get the death penalty and it's

11   obvious from the answers to these questions which will

12   result in the death penalty you are -- you are not

13   supposed to bend your belief, make up your mind ahead of

14   time and bend your answers to those questions in order

15   to get the desired result.

16             Can you answer those questions based on

17   the evidence?

18   A        Yes.

19   Q        And based on what you believe is right?

20   A        Yes.

21   Q        And can you do it in order as required in the

22   instructions that the Judge gives you?

23   A        I think so.  Yes.

24   Q        The State is required to prove its case beyond

25   a reasonable doubt.

1              Now, there is a long definition up there

2    in front of you, I won't ask you to read it right now but

3    basically it gives you a definition of reasonable doubt

4    and if yours means a little bit different can you apply

5    the Judge's definition, the legal definition?

6    A         Yes.

7    Q         And put aside any personal definition that you

8    might have?

9    A         Yes.

10   Q         Can you hold us to that burden of proof and not

11   hold us to some other standard?

12             Sometimes you hear on TV that the State

13   is required to prove it "beyond a reasonable doubt, a

14   shadow of a doubt or any doubt whatsoever" and that is

15   obviously not the legal gauge.

16             Can you hold us to an appropriate legal

17   standard, not add some or take it away, make it an easier

18   burden?

19   A         No.

20   Q         Also when you are deciding on the answers

21   everyone knows there is a parole system in the State of

22   Texas and nobody can predict the result of parole, how

23   quick or how long a person or if a person will ever get

24   paroled.

25             You will note the parole -- the Judge

1   will give you an instruction on parole but the law

2   requires that you not bend your verdict because of the

3   existence of a parole law.

4           Can you put aside the fact if you feel

5   like a person deserves a life sentence, can you put aside

6   the fact that he might get off a little earlier or get

7   off early and that possibility, can you put aside that

8   and find a life sentence and ignore the fact that he may

9   or may not parole early?

10  A       Yes.

11  Q       And the same thing, if you feel like you cannot

12  predict how long an individual will be in the

13  penitentiary but if you think you do from reading the

14  definition and make that determination do you think the

15  individual probably deserves death but you think that

16  he's going to be put away for the rest of his life but

17  you really feel like he deserves death and we have proved

18  our case can you vote death rather than trying to lock

19  someone up the rest of their life?

20  A       Yes.

21  Q           To actually -- to vote when your vote is

22  required and your answer as long as the other 11 -- it

23  takes all 12 of you to decide and will boil down to your

24  shoulders and your decision and a lot of people don't

25  have the mental fortitude to make that vote, do you think

1    you do, can you do it in the right circumstances?

2    A        Yes, sir.  I think so.

3    Q        The State has the burden of proof in the guilt

4    and innocence portion as we mentioned and we have to

5    prove the entire case.

6             For instance; the defendant is charged

7    with capital murder, to intentionally and knowingly cause

8    the death while committing a robbery and in some cases

9    in the past the State has taken on a burden and for

10   instance in this case maybe didn't prove robbery, proved

11   everything else but didn't prove robbery therefore you

12   could only find him guilty of the murder, it would be a

13   lesser included.

14            Do you think you could do that if the

15   State -- if we don't do our job and don't prove our case

16   could you find him guilty of murder rather than capital

17   murder?

18   A        Yes, sir.

19   Q        If we really screw up and prove that he

20   committed arson, which would still be capital murder or

21   we proved that the deceased was a police officer in the

22   line of duty, some other type of capital murder and, you

23   know, it's capital murder but we don't -- we don't do it

24   right and we don't prove that he's committing a robbery,

25   can you put aside that fact and find him guilty of murder

1  or whatever offense that was committed if a lesser

2  included but not capital murder even though you know he

3  committed capital murder we don't do our job right -- can

4  you make us do our job right?

5  A      Yes, sir.

6  Q      And vote appropriately?

7         And you would have to find him not

8  guilty on capital murder and some lesser?

9  A      Yes.

10 Q      Murder is a very very broad range of punishment

11 in Texas and in order to serve on a jury for a murder

12 case you have to be able to consider the full range, not

13 do it but consider it.

14        The punishment is probably the broadest

15 of any offense, anywhere from five years probation to 99

16 years or life.

17        Most people can think of a circumstance

18 where they could sentence someone to life on a murder

19 but some people have trouble thinking of the probation

20 end of it.

21        Under Texas -- I will give you an

22 example; if a man and wife had been married for many many

23 years, they are in their 80s, one of them gets cancer,

24 they are on life support, they are going to die within

25 the next few weeks, they are in tremendous pain and she

1    begs her husband, you know, "Do something, I can't stand

2    it any longer, please put me out of my misery."

3                    And he bends down and unplugs the life

4    support.

5                    Under Texas law that would be "murder"

6    and you know that might be a range where you could

7    consider the lower range of five years probation, 10

8    years probation.

9                    And obviously there is a horrible --

10   horrible murder that you could consider life.

11                   Do you feel like you could consider the

12   full range of punishment in a murder case?

13   A        Yes, sir.

14   Q        And you could consider the five year probation

15   or the 99 years or life?

16   A        Yes, sir.

17   Q        Also this kind of comes into the burden and

18   fairness and keeping an open mind; the law requires that

19   you be able to start each witness off on equal footing,

20   if you don't know anything about them when they get up

21   there and you make your decision on whether someone is

22   lying based on how you decide on anybody lying is

23   whatever your personal habit is, for instance, you can't

24   give a policeman a head start just because he's a

25   policeman, that you would listen to his testimony and

1   make sure it's -- makes sense, make sure it fits and make

2   your determination on truthfulness based on how you would

3   make a determination on anybody or a preacher, sometimes

4   people want to give preachers a head start.

5              Can you give each person that testifies

6   an equal chance and make your decision based on what they

7   say, how they say it, how their mannerisms are?

8   A        Yes.

9   Q        You won't give a policeman or a preacher or

10  somebody else a head start just because of their job?

11  A        No, sir.

12  Q        Obviously there are good policemen and bad

13  policemen, good preachers, bad preachers, etcetera, just

14  good people and bad people.

15             Sometimes people think that because a

16  person has been indicted, the Grand Jury chose to indict

17  them, they take that as some inference of guilt because

18  of that.

19             As a prosecutor I can tell you they

20  don't hear both sides of the story in the Grand Jury,

21  they don't hear all the evidence and the law and the

22  Judge will require that you put aside, that you not

23  consider an indictment evidence, that is merely the

24  official -- the charge he's charged with to let them know

25  exactly what they are charged with.

1          Can you not count the indictment as any

2   evidence of guilt and base your decision on what you hear

3   from the stand?

4   A          Yes, sir.

5   Q          Along that same line; every defendant has the

6   right to remain silent, not to say anything and whatever

7   -- if he doesn't say anything you are not allowed to use

8   that against him.

9          Can you base your decision on what you

10  hear from the stand, what we bring you and not what --

11  if he doesn't testify not the fact that he didn't

12  testify?

13  A          Yes.

14  Q          There may be many reasons that a defendant

15  doesn't testify, he may stutter, there could be any

16  number -- there are some legal reasons for a person not

17  to testify but you are required not to consider that

18  against him and base your decision on the evidence.

19          Do you think you can do that?

20  A          Yes.

21  Q          That goes to the punishment phase, too.  A lot

22  of times if you find someone guilty many jurors just want

23  to hear him get up and say "I did it but I'm sorry."

24          If he doesn't get up there and say that

25  will you hold that against them if he doesn't say that,

1    if he remains silent?

2    A        No, sir.

3    Q        Sometimes  during  trial  statements  that  a

4    defendant has made is used against him, confessions or

5    other evidence against him.  The law has requirements,

6    general  requirements  in  order  for  a  confession  to  be

7    introduced in evidence.

8              For instance, obviously it can't be beat

9    out of him and there are some others.

10             We have all heard of "Miranda Rights",

11   the right to an attorney, right to remain silent.

12             The law requires that if you as a juror

13   hear  the  evidence and there is a confession  comes in

14   but  if  you  make  the  determination  that  it  was  not

15   voluntary -- "voluntary" means it was not properly taken,

16   that you not consider that confession in any way.

17             Do you think you could fulfill -- like

18   in your own mind the State may get up and admit they

19   didn't do it or you just feel like it's from the evidence

20   that it was not properly taken and involuntary legally

21   as a result, could you put aside that confession and base

22   your  decision  the  evidence,  the  other  evidence  in  a

23   trial?

24   A        Yes.

25   Q        And if there's insufficient evidence, although

1    you believe the confession and there is insufficient

2    evidence otherwise but the statement was taken properly,

3    could you find him not guilty?

4    A        Yes, sir.

5    Q        I have gone over your questionnaire and I don't

6    really see anything that seems -- do you know Mr. Hinson

7    or Mr. Old in this case?

8    A        Not until the other day when I seen them,

9    that's the only time I ever seen them.

10   Q        You don't know anything about the facts, you

11   haven't heard about it, read about it in the newspaper?

12   A        I haven't read it in the newspaper.  I have

13   heard a few people mention something about it.

14   Q        Was that since you found you might get on the

15   jury?

16   A        Yes.

17            Before that I didn't even know what I

18   was coming up here for.

19   Q        This is not witnesses that say they know what

20   happened?

21   A        No.

22   Q        Just hearsay?

23   A        Yes, sir.  What they --

24   Q        Can you put aside anything you may have heard

25   and base your decision only on what you hear up here?

1    A         Yes, sir.

2    Q         In the proper situation can you vote in such

3    a way that would result in the death penalty?

4    A         Right circumstances.   Yes.

5                        MR. LEE:  Pass the juror.

6                        THE COURT:   Mr. Old, if we

7    start now it will probably be 12:15 to 12:30 before we

8    break for lunch.

9                        Are you prepared to go now or do you

10   want to break for lunch and do this?

11                       MR. OLD:  Your Honor, we are

12   prepared to go along with the convenience of the Court

13   and the juror.

14                       THE COURT:   Then the Defense

15   may proceed.

16

17                  VOIR DIRE EXAMINATION

18                     BY MR. HINSON

19

20   Q         Thank you, Your Honor, I'll proceed.

21                       Mr. Eaves, my name is Lance Hinson, I

22   along with Mr. Old as you now understand represent Mr.

23   Wardlow in this matter.

24                       I will be asking you several questions,

25   the facts or circumstances that will relate to your

1    service if you are picked as a juror or if you have any

2    question, have any -- if I fail to communicate a question

3    to you please let me know that because if we can't

4    communicate then the answers that we need from you we

5    can't get.

6                        There is a document up there entitled

7    "Witness List."   (Indicating)

8    A         Okay.

9    Q         Do you have that document?

10   A         Yes, sir.

11   Q         Do you have a three-page document?

12   A         Yes, sir.

13   Q         Would you look or read those names on that

14   Witness List and if you have heard of those names or know

15   them personally or have ever met them would you let me

16   know who those persons are?

17   A         I don't recognize none of the names.

18   Q         You stated that you had heard something about

19   the case or since the time you filled out your

20   questionnaire, can you tell me what you have heard about

21   the case?

22   A         I just heard it was suppose to have been a

23   murder down there, older gentleman was killed.

24   Q         In what town, did you hear?

25   A         I think it was Cason they said.

1    Q        Did you discuss with several people or just one

2    person at work or a telephone call or do you recall?

3    A        Just -- just a couple people talked about they

4    seen it in the paper.

5    Q        Did anyone that you talked with express any

6    opinion to you regarding the truth that may be printed

7    in the paper, whether that was the truth or allegations?

8    A        No.  Just what they had read.

9    Q        Based on what you heard have you formed any

10   opinion as to the guilt or innocence of Mr. Wardlow?

11   A        No, sir.  I don't know the man.

12   Q        Mr. Eaves, there is a document that looks like

13   this up there that is the indictment in this case.

14   (Indicating)

15   A        Yes, sir.

16   Q        I'm not sure, have you read -- did you read

17   that document?

18   A        Yes, sir.

19   Q        Okay.  And you see and I believe Mr. Lee

20   discussed it with you the fact that there is alleged and

21   intentional death in the course of the offense or

22   robbery, do you understand how that would be a capital

23   murder as opposed to murder?

24   A        Yes, sir.

25   Q        Now, lesser included offense to capital murder

1   would be murder if the State failed to prove to you that

2   any offense of robbery occurred as alleged.

3                    Could you consider the lesser included

4   offense of murder?

5   A        Yes.

6   Q        And Mr. Lee also discussed with you the range

7   of punishment for murder which is five years probation

8   and 99 years or life in prison.

9                    In the proper circumstances could you

10  consider five years probation in a murder case?

11  A        Yes.

12  Q        And you will see there in the middle of the

13  page on the indictment or I see the middle of the page

14  where it's typewritten in in a little different type from

15  the rest of it, starts, "Intentionally cause the death

16  of an individual."   (Indicating)

17  A        Yes.

18  Q        Do you know that capital murder is charged,

19  that there was an intentional causing the death as

20  opposed to lesser included offense of murder,

21  intentionally and knowingly or knowingly causing the

22  death of an individual?

23  A        Yes.

24  Q        And if you are chosen as a juror could you

25  listen to the evidence and hold the State to the burden

1    to prove beyond a reasonable doubt that there was a

2    death, was caused intentionally for capital murder?

3    A        Yes.

4    Q        And if you found that it was not intentional,

5    let's say you found "knowingly", could you consider the

6    lesser included offense of murder?

7    A        Yes.

8    Q        And, Mr. Eaves, I believe the Judge will

9    instruct you that the actual indictment is not evidence

10   for you to consider.

11            If you were chosen as a juror and you

12   have read the indictment could you set the indictment

13   aside as you deliberated and consider the evidence that

14   was presented to you here to make your decision?

15   A        Yes, sir.

16   Q        The indictment itself would have no influence

17   on your deliberation?

18   A        No.

19   Q        And I asked you previously had you formed any

20   opinion as to Mr. Wardlow's guilt or innocence?

21            According to the laws of our country a

22   person is presumed innocent until proven guilty, can you

23   start with that proposition?

24   A        Yes, sir.

25   Q        Now, because a person is charged by indictment

1    and brought to trial which is obvious that the trial is

2    proceeding, does that cause you to form any opinion or

3    lean one way or another as to guilt or innocence of that

4    person so charged?

5    A        No.

6    Q        All right.  I will talk to you a little bit

7    about the punishment involved in a capital case; assuming

8    that the defendant was found guilty of a capital murder

9    in any case, I just -- so I don't confuse us both there

10   is a flow chart up there, would you look at that and you

11   see there at the first block there is "Phase I, the guilt

12   or innocence?"  (Indicating)

13   A        Yes, sir.

14   Q        You hear evidence presented to you and you will

15   determine whether or not the defendant was guilty.  If

16   you find not guilty the trial would be over, if guilty

17   you can go to Phase II, the punishment phase.

18            Let's assume that a juror in a case in

19   Phase II, the punishment phase and the consideration,

20   once a person has been convicted in Phase I of capital

21   murder the consideration would be whether that defendant

22   receives a life sentence or the death sentence, the death

23   penalty.

24            I believe you also discussed a little

25   bit the parole laws in the State of Texas.  Regarding

this offense I believe the Court would instruct you that

the parole laws as they are regarding this offense would

require a defendant convicted of capital murder to serve

a minimum of 35 calendar years before they were eligible

for parole.  That is they are not going to get out in 35

years, they could be considered eligible based on

whatever the guidelines of the Board of Pardons and

Paroles would have in 35 years.

A        Okay.

Q        Knowing that the life sentence is equal to at

least 35 years plus and we are still in Phase II, could

you still consider as a juror in any capital case,

consider a life sentence versus the death penalty in any

case?

A        Yes, sir.  The right case.

Q        Would knowing that a life sentence would impose

a minimum of 35 calendar years before they could become

eligible for parole, would that effect your deliberation

as a juror where you might lean toward the death penalty?

A        No.  I would just have to see how the evidence

was, how the case was.

Q        Now while we are looking to the flow chart

there is also a document up there called "Special

Issues", I believe you read over that -- and you will

notice there on the bottom of the flow chart in Phase II

1   of the punishment that your answer to Special Issue #1

2   and your answer to Special Issue #2 in the punishment

3   phase, that is your duty as a juror, you don't assess the

4   death penalty but by your answers this actual punishment

5   would be assessed?

6   A        Yes.

7   Q        Do you follow me?

8   A        Yes.

9   Q        Do you see there in Special Issue #1 that the

10  State is required to prove to you beyond a reasonable

11  doubt that there is a probability that the defendant

12  would commit criminal acts of violence that would

13  constitute a continuing threat to society.

14           Would you hold the State to their burden

15  of proving those facts to you beyond a reasonable doubt?

16  A        Yes, sir.

17  Q        And I believe you went over the word

18  "probability" with Mr. Lee as being defined by the State

19  "more likely than not?"

20  A        Yes.

21  Q        And you agree that would be somewhat more than

22  50 percent?

23  A        Yes, sir.

24  Q        Is that within your own personal definition?

25  A        Yes, sir.

1      Q        You would agree that "probability" is at least

2    more than 50 percent?

3      A        Yes, sir.

4      Q        All right.   On Special Issue #2 there are

5    certain considerations taken there regarding mitigating

6    evidence and the last two lines there is the definition

7    of "mitigating evidence", would you read that again,

8    please?  (Indicating)

9      A        Okay.

10     Q        "Mitigating evidence" as defined there doesn't

11   excuse a defendant's conduct, it's just possibly in your

12   mind, in each juror's mind, may make you believe because

13   of the person's age or background or other factors that

14   a life sentence may be more appropriate than a death

15   penalty and in answer to Special Issue #2 would you take

16   into account or consider a person's age as mitigating

17   evidence?

18                    MR. TOWNSEND:   Object, Your

19   Honor.  He is asking the juror to go into --

20                    THE COURT:   Sustained.   I

21   still think that's an attempt to commit a juror.

22                    I think the appropriate response -- not

23   "response" but "inquiry" is to whether he can consider

24   certain factors when he considers whether or not there

25   is mitigation or mitigating evidence.

1       He's going to ask you about several

2   definitions and we are not trying to say "Yes, I will do

3   that" or make you say "No, I won't do that", we just want

4   to see if there's anything that you just have in your

5   mind that you just wouldn't listen to when you are

6   considering evidence.

7           MR. HINSON:    As you are

8   answering Issue #2 and looking at the definition there

9   of "mitigating evidence" could you take into

10  consideration and not reject evidence regarding a

11  person's family history or background, how they are

12  raised, where they were raised?

13          THE POTENTIAL JUROR:    Yes,

14  sir.

15  Q       (BY MR. HINSON)  A person's age?

16  A       "Age?"

17  Q       Yes, sir.

18  A       I would really have to look hard at that.  Just

19  because a guy is a  certain age, you mean, you know, not

20  -- not to me means --

21  Q       Would you automatically --

22  A       -- means that he gets a lesser sentence.

23  Q       Do you have or are you inclined to reject

24  mitigating evidence regarding a person's age?

25  A       No.   I mean, you know, like I said, it's

1   according to the circumstances for me.  I just wouldn't

2   do it because a fellow is a certain age.

3   Q        You would look at the circumstances, you

4   wouldn't automatically reject it but you could consider

5   it?

6   A        Yes, sir.

7   Q        Could you consider and not reject psychological

8   evidence regarding this defendant?

9   A        Yes.

10   Q        Could you consider and not reject a person's

11   religious background or religious training?

12            Could you consider that?

13   A        I could consider it.  Yes.

14   Q        Could you keep an open mind as to any

15   mitigating evidence regardless of what someone else

16   thought if you thought it was evidence of mitigation

17   could you keep an open mind and take into consideration

18   whatever was presented to you?

19   A        Yes.

20   Q        On Special Issue #1 you said you could hold the

21   State to their burden beyond a reasonable doubt to prove

22   to you probability -- there is a "probability" which is

23   equal to "more likely than not" that the defendant would

24   commit criminal acts of violence that would constitute

25   a continuing threat to society.

1              Could you do that?

2     A       Yes.

3     Q       And you understand that any defendant in any

4     criminal case has a Fifth Amendment right not to testify

5     and as we saw in the flow chart or as you see in your

6     flow chart there, has a right to not testify in either

7     Phase I or Phase II, do you understand that?

8     A       Yes, sir.

9     Q       If this Defendant chose not to testify in Phase

10    I would that effect your deliberations as to the guilt

11    of that Defendant?

12    A       No, sir.

13    Q       In Phase II, the punishment phase, if this

14    Defendant chose not to testify would that effect your

15    deliberation as to the punishment of -- this Defendant

16    might receive?

17    A       No.

18    Q       Would you lean toward imposing the death

19    penalty if the defendant failed to testify in the

20    punishment phase and failed to -- well, just failed to

21    testify in the punishment phase?

22    A       No.

23    Q       I am looking at your questionnaire now, do you

24    have a copy of it in front of you?

25    A       No, sir.  I don't see it.

1          THE COURT:  Excuse me.  A copy

2     of what?

3          MR. HINSON:  The questionnaire

4     he filled out.

5          THE COURT:    I  have  got  it

6     right here.

7

8          (Handed to the potential juror.)

9

10          THE POTENTIAL JUROR:  Okay.

11          MR. HINSON:  On the first page

12     it states basically I believe that a life sentence rather

13     than the death penalty is appropriate under the proper

14     circumstances and you stated that you are in favor of the

15     death penalty.

16          Have these been your views regarding the

17     death penalty most of your adult life or all of your

18     adult life, have they ever changed?

19          THE POTENTIAL JUROR: No, sir.

20     I guess they -- most of my adult life.

21          In  certain  cases,  like  I  said,  it's

22     certain cases.  I just don't believe every case is --

23     Q          (BY MR. HINSON)  Mr. Eaves, on Page 7 when we

24     were -- when you were asked about a religious preference

25     you wrote you were raised in the Church of Christ?

1    A        Yes.

2    Q        Do you belong to the Church of Christ or is

3    that just as a child or youth, you were brought up

4    through the Church of Christ?

5    A        That was just as a youth.  I'm not a member of

6    the Church of Christ.

7    Q        And you didn't fill out a religious preference

8    and I assume that you don't have a religious preference?

9    A        Yes.  I am not a member of no church.

10   Q        Based on your religious upbringing would those

11   contacts or your involvement in a Church of Christ, would

12   that effect your deliberations as a juror in any manner?

13   A        No, sir.  That was such a long time ago.

14   Q        Has any member of your family or close friend

15   ever been killed as a result of any kind of criminal

16   activity?

17   A        No, sir.

18   Q        And on Page 11, Mr. Eaves, on the very back

19   page there at the top, "What is your personal opinion

20   about the criminal justice system?"

21            You stated it was okay and I know you

22   were limited in time to fill these out -- you weren't

23   limited in time but I am sure you could have written more

24   there.

25            Can you explain your personal opinion

1   about the criminal justice system?

2   A       Well, it's the best in the world I figure and

3   I'm sure it's got some flaws in it but everything does.

4   Q       We talked a little bit about probation, that

5   you could consider in a proper circumstances probation

6   in a murder case.

7           Do you have any prejudices or biases

8   against probation?

9   A       No.

10  Q       We talked about parole in a capital murder, the

11  defendant convicted of capital murder would have -- in

12  this case would have to serve a minimum of 35 calendar

13  years before they were eligible for parole.

14          Do you have any prejudice against or

15  bias for the parole system as you understand it in the

16  State of Texas?

17  A       No.

18  Q       And have you ever had a discussion with anyone

19  or hold any firm convictions regarding the sentencing of

20  repeat offenders?

21  A       You know, you talk about it with people.

22  Q       Would you agree that each case should be

23  considered on its own facts?

24  A       Oh, yes, sir.

25                  THE   COURT:      Twenty-five

1    minutes.

2                            MR.  HINSON:    Mr.  Eaves,

3    there's a document typewritten, looks like this.

4                    Do you have that?  (Indicating)

5                            THE  POTENTIAL  JUROR:    Yes,

6    sir.  I believe so.

7    Q          (BY MR.  HINSON)    Starts at the top, "All

8    persons are presumed?"  (Indicating)

9    A          Yes, sir.

10   Q          About the middle -- a little bit -- the middle

11   of that page a paragraph starts "reasonable doubt", do

12   you find that paragraph?  (Indicating)

13   A          Yes, sir.

14   Q          Would you read that paragraph along with me?

15                    "A reasonable doubt is a doubt based on

16   reason and common sense after a careful and impartial

17   consideration of all the evidence in the case.  It is the

18   kind  of  doubt  that  would  make  a  reasonable  person

19   hesitate  to  act  in  the  most  important  of  his  own

20   affairs."

21                    I believe if you were to be picked as

22   a juror that would be the definition that you would be

23   instructed  to  follow  in  this  case  and  not  your  own

24   personal opinion or personal definition of "reasonable

25   doubt", does it vary or differ much from that definition?

1    A        Basically the same.

2    Q        Could you follow that definition?

3    A        Yes, sir.

4    Q        And hold the State to proving their case to you

5    based on that definition?

6    A        Yes.

7    Q        Mr. Eaves, I believe you discussed a little bit

8    previously about the credibility of witnesses with Mr.

9    Lee and in this case based on the Witness List that you

10   saw you saw several officers listed there, police

11   officers?

12   A        Yes, sir.

13   Q        And if you were selected as a juror and a

14   police officer was called to testify in this case would

15   his testimony carry any more credibility with you,

16   anymore weight than a non-police officer who testified

17   in this case?

18   A        No, sir.

19   Q        You would start off a police officer based on

20   -- you would judge his credibility, start as he testified

21   just like you would any other witness?

22   A        Yes, sir.

23   Q        Doesn't start off with any head start?

24   A        No, sir.

25   Q        We talked a little bit about religion,

1    preachers, pastors, would a pastor or preacher -- would

2    you give his testimony any more credibility than you

3    would the law officer?

4    A        No, sir.

5    Q        Would you give the pastor any more credibility

6    than any other witness that might be called?

7    A        No, sir.

8    Q        Start each witness off at the same point in

9    your own mind?

10   A        Yes, sir.

11   Q        Let me go back to one little spot here to

12   Special Issue #2, talks about mitigating evidence, you

13   understand that there is no burden on the defendant to

14   testify or to present any mitigating evidence to you, do

15   you understand that?

16   A        Yes, sir.

17   Q        If there was none presented to you could you

18   still consider a life sentence versus a death sentence

19   in a case, a capital case?

20   A        Certain circumstances.

21   Q        You wouldn't require the defendant to put on

22   any evidence in mitigation for you to consider a life

23   sentence?

24   A        Well, I would just have to see everything, it's

25   hard to make a decision without seeing all the evidence.

1    Q        I understand.

2             Say we are in the punishment phase of

3    a capital murder trial, the defendant was convicted of

4    capital murder and in Phase II, the punishment phase, the

5    defendant does not testify, there is no mitigating

6    evidence in your own mind.

7             Can you still consider a life sentence

8    and/or the death sentence?

9    A        Yes.  I guess I could consider both of them.

10   Q        Without mitigating circumstances?

11   A        Like I said, it goes back to the whole

12   circumstances for me.  I would have to see all of it.

13   Q        I think I'm getting a little ahead -- just

14   going back to Phase I like on your flow chart?

15   (Indicating)

16   A        Yes.

17   Q        "The flow chart?"

18   A        Yes.

19   Q        And you are a juror in a capital murder case

20   and you find that defendant guilty of capital murder?

21   A        Okay.

22   Q        And you are going to Phase II; can you still

23   consider a defendant convicted of capital murder, can you

24   still consider imposing a life sentence and a death

25   sentence in that case?

1    A        Yes.

2    Q        And you can postpone making a decision on

3    punishment until in Phase II the evidence was presented

4    to you?

5    A        Yes.

6    Q        And on the Special Issues, talked about holding

7    the State to their burden --

8    A        Yes.

9    Q        -- regarding criminal acts of violence?

10             Again, in the punishment phase if the

11   defendant did not testify and you didn't see any

12   mitigating evidence and by looking at the flow chart you

13   see that you answered Special Issue #1, you answer "No",

14   it's a life sentence, you answer "Yes" you go to Special

15   Issue #2?  (Indicating)

16   A        Yes.

17   Q        If there were no mitigating circumstances in

18   your mind and the defendant had not testified would you

19   be more inclined to answer Special Issue #1 "Yes?"

20   A        Just for him not testifying?

21             No.

22   Q        With him not testifying and in your mind no

23   mitigating evidence?

24   A        I really don't know, I'll be honest with you,

25   I don't exactly know what you want.

1    Q        All right.  Where you see on Special Issue #1

2    when  you  answer  "Yes"  you  go  to  the  next  issue?

3    (Indicating)

4    A        Yes.

5    Q        You answer "No" to Special Issue #1, that's a

6    life sentence?

7    A        Yes.

8    Q        In answer to Special Issue #1 would you require

9    any mitigating evidence to answer that Special Issue #1

10   "No?"

11   A        No, sir.  Just -- I mean it's based on what all

12   the evidence -- if I decided I don't think he needs the

13   death penalty I wouldn't give it to him.

14   Q        Mr. Eaves, back to the flow chart just so we

15   can stay on the same plane; you know in answer to Special

16   Issue #1 "No" it gives a life sentence?

17   A        Yes, sir.

18   Q        You answer Special Issue #1 "Yes" you go to

19   Special Issue #2?

20   A        Okay.

21   Q        And how you answer Special Issue #2, either

22   "Yes" or "No" again equates to a life sentence or death

23   sentence?

24   A        Yes, sir.

25   Q        So knowing the result of your answer, would

1    that effect your deliberations in answering those Special

2    Issues?

3    A        No, sir.

4    Q        You could look at the evidence presented to you

5    and not consider the effect of your answer, just answer

6    the questions as they are stated to you?

7    A        Yes, sir.

8    Q        In some cases, capital murder cases, other

9    types of cases the defendant may or may not make a

10   written confession and assuming that you were a juror in

11   this case it would be your job to determine the

12   truthfulness of that statement and whether the statement

13   was made voluntarily.

14              Do you follow me?

15   A        Yes.

16   Q        So let's assume that in the course of a trial

17   you found a statement presented to you in the evidence,

18   you found it to be a truthful statement and this truthful

19   statement was a confession of the crime as alleged in the

20   indictment but as evidence was presented to you you found

21   that for some reason by law that this truthful statement

22   had been taken from the defendant involuntarily and the

23   Court instructs you -- or I'm sorry, let me back up --

24   and as part of your deliberation you find that the

25   statement, the whole jury finds that the statement is

involuntary or that you find that the statement was involuntary, can you set that statement, can you get that out of your mind and base your decision on the other evidence presented to you during the course of that trial?

A        Yes.

Q        Knowing that a statement was truth but involuntary you can set that statement aside?

A        If he was forced into it or it wasn't legal. Yes, sir.

Q        Just one last question, Mr. Eaves; based on your experiences, you are selected for the jury in this case and based upon the evidence -- not "the evidence" but things that you have heard today and prior to today have you formed any opinion as to the defendant's guilt or innocence?

A        No, sir.

Q        If you are selected as a juror you would be able and willing to come in, take your seat as a juror and start with a level playing field?

A        Yes, sir.

Q        And the State and the Defense would come in at the same place both at the starting block?

A        Yes, sir.

         They would have to prove he's guilty.

1          MR. HINSON:  I appreciate it,

2    Mr. Eaves.

3               We pass the juror, Your Honor.

4          THE COURT:  Sir, do you have

5    any questions?

6          THE POTENTIAL JUROR: No, sir.

7          THE COURT:  If you will step

8    out, I will have a discussion with the lawyers and I will

9    give you some further instructions.

10          THE POTENTIAL JUROR:  Okay.

11

12          (The  following  occurred  outside  the

13    presence and hearing of the potential juror:)

14

15          THE  COURT:  Does  the  State

16    have any challenges?

17          MR.  TOWNSEND:  None,  Your

18    Honor.

19          THE COURT:  The Defense?

20          MR. OLD:  The Defense does not

21    have any challenges, Your Honor.

22          THE COURT: All right.  Inform

23    Mr. Eaves that we will let him know something Friday and

24    he's free to go.

25

1                    (Off the record discussion.)

2

3                    (Noon recess.)

4

5                    (The following occurred in the presence

6      and hearing of the potential juror.)

7

8           LaWYANDA JOYCE PRINCE, Potential Juror #433,

9      was called as a Potential Juror and, having been

10     previously sworn by the Court, testified as follows:

11

12                         THE COURT:   Good afternoon,

13     ma'am.

14                    How are you doing?

15                         THE POTENTIAL JUROR:   I am

16     fine.

17                         THE COURT:   Go ahead and take

18     a seat if you would.

19                    Are you "LaWyanda Prince?"

20                         THE POTENTIAL JUROR:   Yes.

21     I am.

22                         THE COURT:   This is juror 23.

23                    Ma'am, I am Gary Stephens, I'm presiding

24     over the jury selection and trial in this case.

25                    We have two lawyers representing the

1  State of Texas, present we have the District Attorney

2  from Morris County, Mr. Richard Townsend and we have the

3  District Attorney or a District Attorney from Cass

4  County, Mr. "Randall" or "Randy" Lee.

5  We also have two Defense Lawyers, Mr.

6  Bird Old, III.

7  MR. OLD:  Hello.

8  THE COURT:  Mr. Lance Hinson.

9  MR. HINSON:  Good afternoon.

10  THE COURT:  Next to Mr. Hinson

11  the person charged, Mr. Billy Joe Wardlow.

12  Now, Ms. Prince, the lawyers have read

13  your questionnaire and they are familiar with your

14  answers.  They are going to talk to you about some of the

15  answers and they are also going to talk to you about the

16  principles of law involved in a death penalty case.

17  You will be asked a lot of questions and

18  your answers are going to let us know whether or not to

19  put you on the jury.

20  In order to be a juror you must be able

21  to understand and follow the law.

22  Now, you don't necessarily have to agree

23  with that law, you can disagree with our laws but if you

24  can still follow the law you are qualified but if you

25  disagree with the law to such an extent that you can't

follow it then you are not qualified.

We have also found that even most of the jurors are qualified it doesn't necessarily mean that they are appropriate for a death penalty case.

So we want to know what you think about our laws, we want to know what your thought processes are in general and we want to know some of your opinions.

There aren't right or wrong answers, there aren't right or wrong opinions, your opinions are just yours and we want you to just be open and honest with us and we will try to make this as short as possible.

Now, ma'am, the trial itself will not begin until January, probably the first week of January and it will last a couple of weeks.

I notice that you are attending night class every Monday at 4:30, is that correct?

THE POTENTIAL JUROR: Correct.

THE COURT: Will that continue in January?

THE POTENTIAL JUROR: No. It won't.

THE COURT: Will you be attending class at all in January?

THE POTENTIAL JUROR: No.

1          THE COURT:   Okay.   So you

2   don't have any conflict -- well, let me, instead of me

3   telling you you tell me; do you know of any other

4   conflict you might have that would interfere with your

5   ability to serve for two weeks the first of next year?

6          THE POTENTIAL JUROR:   No.

7          THE COURT:   Okay.   Do you have

8   any questions?

9          THE POTENTIAL JUROR:   No.

10          THE COURT:   Don't be nervous,

11   it may seem like you are on trial but you are not.

12          At this time you may proceed.

13

14          VOIR DIRE EXAMINATION

15          BY MR. TOWNSEND

16

17   Q        Ms.  Prince,  I  am  Richard  Townsend  and  I

18   represent the State of Texas along with Randy Lee in this

19   case and as the Judge said, there's no right or wrong

20   answer to these questions, we just want you to give us

21   your opinions on some things and whatever your opinion

22   is, fine, as long as you feel free to express it.

23          I looked over your questionnaire and I

24   have seen your answers on the death penalty.

25          What I would like to do right now is

1    just let you tell me or tell the Court how you feel about

2    the death penalty.

3    A        I feel that the death penalty is a cruel act

4    but depending on which crime the person committed depends

5    on whether they should get the death penalty.

6    Q        Okay, ma'am.  So are you telling me that -- you

7    say "It is a cruel act", is that the term you used,

8    "cruel act?"

9    A        Yes.

10   Q        And your answer on the questionnaire was "Could

11   you give the death penalty" and your answer was "Yes"

12   then you explained that by saying, "It depends on the

13   case?"

14   A        Yes.

15   Q        Are you telling me that you believe in the

16   death penalty?

17   A        Yes.

18   Q        In certain situations?

19   A        Yes.

20   Q        Okay.  And you also answer on there -- there

21   was a question on the bottom of the first page says, "If

22   you are in favor of the death penalty in some murder

23   cases do you agree that a life sentence rather than the

24   death penalty would be appropriate under the proper

25   circumstances?"

1   A        Yes, sir.

2   Q        Was "Yes?"

3              So you are telling me in certain

4   situations you would believe the death penalty was

5   appropriate and under other situations you would believe

6   a life sentence was appropriate?

7   A        Yes.

8   Q        And would that, I suppose depend on the facts

9   and circumstances of the case to you?

10             THE COURT:   I would need a

11  verbal answer, everything is reported.

12             THE POTENTIAL JUROR:   Yes.

13  I'm sorry.

14             MR. TOWNSEND:   Ms. Prince,

15  there is a piece of paper up there, I think it's called

16  "Exhibit 3", if you would find that, it's a copy of the

17  indictment.

18             THE COURT:   Right in front of

19  you there -- no, the one you first touched.   (Indicating)

20             THE POTENTIAL JUROR:   This

21  one?   Okay.

22             MR. TOWNSEND:   Have you had

23  a chance to read it?

24             THE POTENTIAL JUROR:   Yes,

25  sir.

1    Q        (BY MR. TOWNSEND)  Let me talk to you a little

2    bit about murder in Texas, in Texas there are two kinds

3    of murder, basically, there's plain murder or non-capital

4    murder, that's where someone has intentionally caused the

5    death of an individual.

6    A        Yes.

7    Q        And that's to say without legal justification

8    or excuse, it wasn't self defense, it wasn't an accident,

9    they just intentionally caused someone's death is murder

10   but it's not capital murder.

11   A        Okay.

12   Q        It's punishable by up to a life sentence but

13   not punishable by the death penalty.

14            On the other hand, we also have capital

15   murder and that is murder where someone has intentionally

16   caused the death of an individual plus something else.

17   And that plus something, that's murder of a police or

18   fireman while in the line of duty, that they did commit

19   multiple murder, perhaps they committed murder during the

20   commission of a robbery or rape or burglary.  Are you

21   with me on the difference between capital murder and

22   plain murder?

23   A        Yes.

24   Q        Okay.  After reading that indictment if the

25   State could prove to you everything in that indictment

1    can you see where that would be a capital murder rather

2    than just a plain murder?

3    A         I would say "just a plain murder."

4    Q         Okay.  Let me talk to you about that indictment

5    a little bit.

6    A         Okay.

7    Q         That indictment alleges in there that there was

8    an intentional murder, can you see that in there?

9    A         Yes.

10   Q         Can you see where it also alleges that it was

11   done during a robbery?

12   A         Yes.

13   Q         Okay.  Now, on a -- as I was describing the

14   difference between murder and capital murder is if

15   someone intentionally or knowingly causes someone's

16   death?

17   A         Yes.

18   Q         That would be murder.

19                   In order to be capital murder it would

20   have to be one, it would have to be a situation where

21   someone has intentionally caused another person's death

22   plus something else and one of those things that it could

23   be is if it was done during the commission of a robbery.

24   A         Oh, okay.

25   Q         Can you see where that situation there --

1    A        Yes.

2    Q        -- if we could prove all that?

3    A        Yes.

4    Q        That would be a capital murder?

5    A        Right.

6    Q        Okay.  Are you with me on that?

7    A        Yes.

8    Q        In a capital murder case, Ms. Prince, the trial

9    is split in two parts, one part of that trial being the

10   guilt and innocence phase, the other part being the

11   punishment phase.

12            During the guilt and innocence phase all

13   you are deciding is the person guilty or not guilty,

14   basically "Did he do it?"

15            You are not worried at that time, you

16   are not concerned with at that time whether the person

17   would receive the death penalty or life sentence.  You

18   are just strictly trying to determine the guilt or

19   innocence part.

20            Then when you get to that second -- if

21   the person is found guilty then you would concern

22   yourself with what the possible punishment might be.

23            There is a -- what I call a "flow chart"

24   up there, looks kind of like this, it kind of describes

25   what happens in a capital murder case.  (Indicating)

1              Let me just kind of run that down and

2     you follow down the sheet with me.

3              You start off during the guilt and

4     innocence phase of the trial and you are going to hear

5     evidence and that evidence is going to relate to whether

6     the defendant is guilty or not guilty then the jury will

7     make a decision.

8              If the jury decides that the defendant

9     is not guilty then the trial is over.

10    A        Okay.

11    Q        If the jury decides that the defendant is

12    guilty then you go on to that next phase of the trial I

13    talked about which is called "the punishment phase."

14             At the punishment phase you have already

15    decided that the defendant is guilty, you are going to

16    hear some more evidence, that evidence is not going to

17    relate to whether the defendant is guilty or not because

18    you have already made that decision by the time you get

19    that far.

20             Are you with me?

21    A        Yes.

22    Q        When you get that far the evidence you are

23    going to hear is going to relate to the defendant's

24    punishment in the case, whether the appropriate

25    punishment should be a life sentence or the death

penalty.

And the type evidence you are going to hear is going to be, oh, it may be evidence of prior bad acts by the defendant, evidence of prior crimes by the defendant, it might be evidence of his religious background, evidence of his family history, psychological evidence, you might hear evidence from some of his family members or from a minister, you know, could be all sorts of stuff you might hear during that punishment hearing.

After you have listened to all that evidence then you have got to go to what we call "Special Issue #1" which is a question that you are going to answer "Yes" or "No", and I will talk to you a little more about that, about those Special Issues in a minute, but, first of all you are going to go to Special Issue #1.

When you answer then you are going to answer that "Yes" or "No", if you answer it "No" the defendant is going to receive a life sentence, if you answer it "Yes" the defendant -- then you go to question Number Two, Special Issue #2 -- and again I will go over that Special Issue with you in a little bit -- but if you answer "Yes" to Special Issue #2 the defendant would receive a life sentence and if you answer "No" to Special Issue #2 the defendant would receive the death penalty.

1                        Are you with me?

2       A           Yes.

3       Q           Okay.   And the important part to remember is

4       that once the defendant is found guilty of capital murder

5       the punishment decision is not made at that point, you

6       have got to hear more evidence before you make up your

7       mind on that.

8                        Do you think you could wait and not make

9       up your mind until you heard all that evidence?

10      A       /   Yes.

11      Q           Okay.   Ma'am, there is a sheet there on top,

12      it says "Special Issues", if you will pull that up --

13      have you got it?   (Indicating)

14      A           Yes.

15      Q           Okay.   If you will read Special Issue #1 then

16      I will talk to you about that after you have had a chance

17      to read it.

18      A           Okay.

19      Q           Okay.   Ms. Prince, Special Issue #1 basically

20      relates to the future dangerousness of the defendant, is

21      that kind of the way it looks to you?

22      A           Yes.

23      Q           Okay.   There are some things about that Special

24      Issue #1 I would like to talk about, one is that word on

25      the second row there where it says "probability."

The law defines "probability" to us as "more likely than not", is that similar to the way you would define "probability?"

A        Yes.

Q        Okay.  So "more likely than not", basically means just a little bit more than 50/50, 51/49, something like that, just a little more than -- more likely than not, a little more than half.

Also if you will notice on Special Issue #1 it says that you have to find beyond a reasonable doubt that there is a probability, just like the State of Texas has to prove the guilt in this case the State of Texas also has to prove beyond a reasonable doubt that it's a probability or that's more likely than not that the defendant would commit criminal acts of violence in the future.

That term there, "criminal acts of violence", of course this trial is about capital murder but there are other "criminal acts of violence", assault, rape, attempted murder, aggravated robbery -- but then of course on the other hand all crimes are not "acts of violence", a forgery, you steal somebody's check and right down -- sign their name to it, while that might be a crime it's not violent and there are other crimes that are not violent I am sure you can think of some examples

1    but, you know, we are not required to prove to you that

2    they are going to commit another murder or that it's

3    probable that he would commit another murder but just

4    that it is probable that he would commit some sort of

5    criminal act of violence.

6                    Are you with me on that?

7    A          Yes.

8    Q          "That would constitute a continuing threat to

9    society."

10                   Now, "society", you and I probably think

11   of day to day is out there on the streets, you know,

12   around town here.  But the law defines "society" as also

13   in the penitentiary.  If a person is in the penitentiary

14   they are still a part of society and if they were to

15   commit a criminal act of violence against someone in the

16   penitentiary, another inmate or guard or nurse or doctor

17   or something like that that would still constitute "a

18   criminal act of violence that would be a threat to

19   society."

20                   Are you with me on that?

21   A          Yes.

22   Q          Okay.  After you have heard all that evidence

23   and you talk about Special Issue number and you

24   deliberate on that then you have got to decide either a

25   "Yes" or "No" answer to that and -- and do you think you

1    could wait and hear all that evidence before -- the

2    punishment hearing before deciding what your answer

3    should be to Special Issue #1?

4    A          Before I -- before what?

5    Q          Okay.  When you answer Special Issue #1 you

6    would have already found the defendant guilty.

7    A          Okay.

8    Q          But then you are going to hear some more

9    evidence, like I said, the punishment hearing.

10   A          Yes.

11   Q          You are going to hear more evidence.

12   A          Right.

13   Q          When you hear that evidence would you be

14   willing to listen to all that evidence and consider it

15   all before making your decision on Special Issue #1?

16   A          Yes.

17   Q          Okay.  Okay.

18              Now, Ms. Prince, if you vote "No" on

19   Special Issue #1 the defendant would get a life sentence.

20   A          Right.

21   Q          But if you vote "Yes" then you go to Special

22   Issue #2.

23              Special Issue #2, if you will read

24   Special Issue #2 and then we will talk about it.

25   A          Okay.

Q        Okay.   Special Issue #2, ma'am, is -- talks

about "sufficient mitigating circumstances" and basically

what that is talking about "Is this a death penalty type

case" or "Is that a death penalty type defendant" or "Is

there something in this case that I have heard, either

the guilt or innocence or during the testimony that I

heard during the punishment hearing that makes me feel

like the defendant is a little bit less blameworthy or

the blameworthiness of the conduct is reduced to the

extent that I think that he should receive a life

sentence rather than the death penalty?"

Of course that's a mouthful of legal

words but there it tells you that you heard the

testimony, you feel that the defendant should receive a

life sentence rather than the death penalty.

That's not an issue that the state has

to prove to you beyond a reasonable doubt, that's just

kind of your opinion.

What one person might consider to be

"sufficiently mitigating" or one person might think

reduces the blame of the defendant, someone else might

feel differently about that.

Are you kind of with me on that do you

think?

A        So it would be personal decision?

1    Q        Yeah.  It's your opinion based on the evidence

2    that you heard.  If you felt like the evidence that you

3    heard didn't convince you that there was enough there to

4    reduce his blame and give him a life sentence then your

5    answer to that would be "No" and if all the other jurors

6    agreed  then  that  defendant  would  receive  the  death

7    penalty, if, on the other hand your answer was "Yes" then

8    the defendant would receive a life sentence.

9              Do you feel like you understand?

10   A        I understand.

11   Q        I know that's a bunch of wording there that is

12   kind of complicated.

13   A        Will we get to study this before?

14   Q        Sure.  You will have written instructions and

15   they will have those questions on there and among those

16   instructions that you will receive, Ms. Prince, I would

17   think  would  be  an  instruction  from  the  Judge  that

18   indicated to you that the possibility or likelihood that

19   the defendant might at some point in his sentence receive

20   a parole would -- could not be considered in any way in

21   determining what your sentence would be.

22              And when I say that I mean when you are

23   deciding between a life sentence and the death penalty

24   you have got to be able to assume or just think of that

25   life sentence as life is life and then whether or not the

1    defendant ever received parole really shouldn't -- it's

2    something that you really shouldn't consider.

3                    Could you do that?

4    A      Yes.

5    Q      Ms. Prince, what we have charged the Defendant

6    with is murder and robbery.

7                    Let's say, for instance, that you felt

8    like at the end of the testimony that we had proved

9    beyond a reasonable doubt that the defendant committed

10   a murder or the murder but we did not prove to you beyond

11   a  reasonable  doubt  that  the  defendant  committed  a

12   robbery.

13                   Then you would be bound by your oath to

14   find the defendant not guilty of capital murder but

15   guilty of murder.

16   A      Yes.

17   Q      Okay?

18   A      Yes.

19   Q      Now, the range of punishment on murder is not

20   the same as a capital murder.  The range of punishment

21   on a murder is from -- from five years probation to 99

22   years or life.

23                   And of course a murder can be all sorts

24   of things, it can be anything from a vicious type deal

25   all the way to a  --  from one end to the  other end of

1    the spectrum where it might be what, like a mercy killing

2    -- are you familiar with a mercy killing?

3    A        No.

4    Q        Well, a mercy killing like maybe you have a

5    situation where you have two elderly people have been

6    husband and wife for 50 years and one of them is dying

7    of cancer and is in intense amount of pain and asks her

8    husband or wife to pull the plug and "Let me out of this

9    pain."

10   A        Yes.

11           MR. OLD:   I object to the

12   question, he's limiting her to that set of facts.

13           THE COURT:   I think she said

14   she didn't know what "mercy killing" was.  I think all

15   he's trying to do is give her an illustration so the

16   objection is overruled.

17           If that was in the form it was.

18           THE   POTENTIAL   JUROR:     I

19   understand.

20           MR. TOWNSEND:   Are you with

21   me on what a "mercy killing" is?

22           THE POTENTIAL JUROR:   Yes.

23   Q        (BY MR. TOWNSEND)  All I'm saying in a mercy

24   killing situation that's a situation where a person has

25   intentionally  or  knowingly  caused  the  death  of  an

1    individual so in Texas that is called "murder."   Even

2    though that is very different from what you normally

3    think of as "murder", it's still a murder.

4    A        Okay.

5    Q        And what I'm asking you is could you consider

6    that full range of punishment?

7             And when I say that, anywhere from five

8    years probation to 99 years or life, could you give that

9    full range of punishment consideration and base your

10   decision on the facts and circumstances of the case?

11   A        Yes.

12   Q        Okay.  Ms. Prince, the burden of proof in a

13   criminal case is beyond a reasonable doubt.  It's up to

14   the State of Texas to prove the case against the

15   defendant, it's not up to the defendant to prove its

16   innocence, we have got to prove his guilt.

17            Is that something you are comfortable

18   with and familiar with?

19   A        No.

20   Q        Well, in a criminal case we have got to prove

21   that -- prove our case -- basically we have got to prove

22   that the defendant is guilty beyond a reasonable doubt,

23   it's not up to the defendant to prove that he's not

24   guilty or that he's innocent, it's up to the State to

25   prove that he's guilty.

1    A          Okay.

2    Q          Could you hold us to that burden of proof and

3    make us prove that he's guilty if he is and not require

4    the defendant in any way to prove that he's innocent or

5    not guilty?

6    A          "Could I do that?"

7    Q          Yes.

8    A          Yes.

9    Q          And along with that goes the Fifth Amendment

10   privilege and that's the defendant's Constitutional right

11   to only testify if he chooses to, if he doesn't want to

12   testify he doesn't have to, you know.

13                    Are you familiar with that?

14   A          Yes.

15   Q          And to say that -- when I say that I mean you

16   can't hold that against the defendant in any way when you

17   are deciding whether he's guilty or not guilty, you have

18   got to decide that based on the evidence that is

19   presented and not hold it against him in any way if he

20   chose not to testify.

21                    Could you do that?

22   A          Yes.

23   Q          Okay.  Ms. Prince, in a criminal trial you will

24   hear testimony or you are likely to from all sorts of

25   different kinds of people.  You might hear testimony from

1    police officers, psychologists, ministers, you might hear

2    testimony from someone you know but the important part

3    is that no matter who that witness is that you hold them

4    to the same standard.

5             And when I say that I mean give them

6    all an equal chance as far as your deciding whether to

7    believe them or not or whether their testimony is

8    important or not and not give someone a head start, so

9    to speak, just because they are a friend of yours or

10   because they are a minister or police officer or school

11   teacher or whatever.

12             Could you do that?

13   A        Yes.

14   Q        Okay.

15                      THE    COURT:      Twenty-five

16   minutes.

17                      MR. TOWNSEND: Thank you, Your

18   Honor.

19             Ms. Prince, I want to get back and

20   clarify a couple of things for me; on your statement

21   about the death penalty you said that you consider it a

22   cruel act, which of course the death penalty is an

23   important part of this case so I want to know as much as

24   I can about how you feel about the death penalty.

25             Do you understand that if you disagree

with me or disagree with any of the other attorneys or

if you disagree with the law that that's okay, you know,

that's perfectly fine.   The important part to remember

I think is that in that just tell us the truth about how

you really feel and that you are open and -- about your

feelings and you were very open earlier when you said you

felt like it was a "cruel act."

The State of Texas in this case is going

to be definitely seeking the death penalty, I mean we are

not making any bones about it, we are seeking the death

penalty against this fellow right over here and we need

jurors who can keep a sort of a mind-set that they can

either go toward a life sentence or the death penalty

depending on the facts.

And of course it wouldn't be fair, you

know, I have had jurors say things like, "Well, if I find

a person guilty of capital murder then I am automatically

going to give them the death penalty."

You see, they are not a qualified juror

because they are not being fair and impartial, you know,

in keeping both options open, so to speak.

On the other hand, if a juror has

feelings about the death penalty that would interfere

with their ability to assess that penalty or to give

someone that penalty then they are not giving the State

1    maybe a fair opportunity, either.

2            And only you really know how you feel

3    but I would like you to keep in mind that, you know, a

4    lot of people feel like they have to go along with all

5    the law whether they agree with it or not in order to be

6    a good citizen.

7            Well, that's not really quite right.

8    You proved your citizenship by showing up for jury duty,

9    you proved it again by showing up today and answering

10   these questions in what is probably a fairly uncommon

11   situation for you, it is most people.

12           THE POTENTIAL JUROR:  It is.

13   Q        (BY MR. TOWNSEND)  So your citizenship, you

14   have proved that you are a good citizen.  What you don't

15   have to do is do something that goes against your grain,

16   so to speak, something that bothers you to such a point

17   that you feel as if you couldn't do it or would be

18   extremely uncomfortable doing it.

19           And being as you have told me earlier

20   that you felt like the death penalty was "a cruel act"

21   and I know you also stated in your opinion here that you

22   were in favor of the death penalty depending on the case

23   but you think it's a cruel act, would your feelings about

24   the death penalty be such that even though you feel like

25   the death penalty is appropriate in murder cases would

1    your feeling about it being a cruel act be such that even

2    though you felt like a death penalty might be appropriate

3    that you would, that you personally could not sit on a

4    jury and be one of the people that gave somebody the

5    death penalty?

6    A        No.  I feel like just because it's cruel I feel

7    like the death penalty is a cruel act, has nothing to do

8    with the evidence if proven, you know, that a person did

9    whatever they did.

10            Whatever they did was probably "a cruel

11   act" as well so --

12   Q        Right.

13   A        -- I feel like -- like that's what that person

14   deserves, that's what they should get.

15   Q        So when you said earlier that you felt like it

16   was "a cruel act" you didn't mean in any way that if the

17   facts were appropriate for it that you would hesitate to

18   do it?

19   A        No.

20   Q        If the facts were appropriate you could do it?

21   A        If they were appropriate.  Yes.

22                      MR. TOWNSEND:  Okay.

23            Pass the juror, Your Honor.

24                      THE COURT:  Mr. Old.

25

## VOIR DIRE EXAMINATION

### BY MR. OLD

Q        Ms. Prince, I am Act III, I guess.

First; if you are selected as a juror in this case you will be required to take the oath of a juror and that oath provides and requires you to affirm that you "do solemnly swear that in the case of the State of Texas against the defendant you will a true verdict render according to the law and the evidence so help you God."

And would I correctly be stating what I just said if your job as a juror is to render a verdict on the law and the evidence in the case?

A        Repeat that.

Q        Your duty as a juror is to render a verdict on the law and the evidence?

Let me go a little bit further; His Honor is the exclusive judge of the law of this case, jurors are not required to know law, the Court will tell them the law that is raised by the evidence and it will give you a set of written instructions as to the law and how you are to conduct yourself in deliberating and deciding the facts.

Jurors determine facts beyond a

1    reasonable doubt.

2              As a matter of fact they don't say "Give

3    him the death sentence, give him a life sentence", they

4    answer questions which result in the same.

5              Now, the first thing a juror has to do

6    is -- to live up to his oath is to be able to take the

7    law from the Judge and accept what the Judge gives them

8    as the law.

9              Do you feel like you can take what His

10   Honor tells you in writing about the law and be governed

11   thereby?

12   A         Yes.

13   Q         Okay.  And I know you don't know what all that

14   law is and I'm asking you to say that you will do

15   something that you don't know about but we are going to

16   talk about that in a minute.

17             And then you are to take the evidence

18   as it comes to you through this Court and make your

19   decision based on the evidence, not what you read in the

20   newspaper, not what you think might have happened, you

21   are required to make your findings on the evidence beyond

22   a reasonable doubt.

23             Now, the Court's instructions or charge

24   is the law of the case, you will find before you a typed

25   sheet, looks like this, I believe it has a "6" on the

1    bottom of it.  (Indicating)

2    A        Okay.

3    Q        Will you start reading -- I mean read from the

4    end of the first paragraph starting with "Prosecution has

5    the burden of proving" and to the end of the page for me

6    and when you are comfortable with it let me know.

7    A        Okay.

8    Q        Are you finished?

9    A        I am finished reading but I'm not really

10   comfortable.

11   Q        That is -- what the Court is telling you that

12   is in his charge and it will be in his charge that when

13   you are required to find something happened beyond a

14   reasonable doubt that that is your guide in doing so and

15   you must make your decision within the boundaries of that

16   definition.

17               Could you do that?

18   A        If that's what I'm supposed to do.

19   Q        Let me argue with you, I mean, yes, that's what

20   you are supposed to do, you obviously have some

21   disagreement with that definition.

22               If you were going to define the word it

23   would not come out the same, is that right?

24   A        Right.

25   Q        What?

1    A        Right.

2    Q         Now,  this  --  I'm  not  challenging  your

3    citizenship, whether you are a good or bad person, the

4    question is whether -- I mean there are laws, everyone,

5    if we go far enough with anybody we will find a law that

6    you just can't, you know -- there's laws I would have to

7    say, "No.  I could not be a fair juror in this case

8    because I don't believe that ought to be the law, I just

9    can't do it, I recognize and accept it as the law but I

10   mean I would violate my conscience to act on that law."

11            Now, is your prejudice or your feeling

12   about that definition to the extent that you can tell me

13   whether or not your own feelings about that are going to

14   interfere with your deliberations?

15            And that was a poor question.

16   A        I still would say, you know, I have to, I would

17   do what I am supposed to do, follow this.  (Indicating)

18   Q        Now, you disagree with the definition?

19   A        Right.

20   Q        To  what  extent  do  you  disagree  with  the

21   definition?

22   A        I don't know how to answer that.

23   Q        What?

24   A        I don't know how to answer that.

25   Q        Okay.  That may be a good answer.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEX. 

150

1      What you are saying is you just aren't

2   comfortable with being told what reasonable doubt means

3   and to be governed thereby?

4   A      Right.

5   Q      I'm not asking you, I know you would try to

6   follow the instruction of the Court, I have no doubt in

7   my mind about that but you are going to have difficulty

8   doing so in that you really don't agree with the

9   definition?

10  A      Do I not believe --

11  Q      Are you going to have difficulty deliberating

12  in this case, that is making a decision based on that

13  definition?

14  A      I am not sure.

15  Q      You can't tell me for sure you can accept and

16  follow that definition?

17  A      No.  I can't.

18  Q      Let me go on to another area of the law; when

19  His Honor in his charge, the law of the case, tells you

20  that a word has a special legal meaning that means you

21  are to use that definition and not your own, whether you

22  like it or not.

23          I mean sometimes we just can't do things

24  and we talked about that.

25          In the indictment in order for that man

or anyone to be committed or convicted for capital murder -- we'll stay away from this case -- but for anyone to be convicted of capital murder it must be proved that he intentionally killed a person.

"Intentional" is a word that has a specific and real meaning, we say it means something in law, the law says it does and that's another one of those words the Court will tell you intentional means and what it will tell you is that "A person acts intentionally or with intent with respect to a result of his conduct when it is his conscious objective or desire to cause the result."

Okay. Now, can you accept that as the definition of the word "intentional, intentionally?"

A          Read it again.

Q          Okay. "A person acts intentionally or with intent with respect to a result of his conduct when it is his conscious objective or desire to cause the result."

A          Yes.

Q          Okay. I mean you don't have any problem with the meaning of that word?

A          No.

Q          Okay. In order to find a person guilty it must be proven to you that a person acted intentionally?

1    A       Yes.

2    Q       Doesn't make any difference if they don't prove

3    he intentionally killed someone, whether or not it was

4    in the course in attempting a robbery has nothing to do

5    with it if intentional is not proven then you would have

6    to say by your verdict to capital murder "not guilty?"

7    A       Right.

8    Q       I don't recall whether or not Mr. Townsend

9    defined the lesser offense of murder for you or not, non-

10   capital murder -- non-capital murder is intentionally or

11   knowingly taking the life of another.

12            "Knowingly" has another legal meaning.

13   "Knowingly" will be -- you will be instructed that

14   "knowingly" means "A person acted knowingly or with

15   knowledge with respect to a result of his conduct when

16   he's aware that his conduct is reasonably certain to

17   cause the result."

18            Do you see the difference between

19   "intentionally" and "knowingly?"

20   A       No.

21   Q       Which one do I need to read back for you?

22   A       "Knowingly."

23   Q       Okay.  "A person acts knowingly or with

24   knowledge with respect to a result of his conduct when

25   he is aware that his conduct is reasonably certain to

1    cause the result."

2    A       Okay.

3    Q       Now, let's say that you believe beyond a

4    reasonable doubt that in an indictment or in that

5    indictment and in that charge that person accused acted

6    knowingly but not intentionally, could you find -- I mean

7    that's the only -- they just, you know, say, "Well, he

8    acted knowingly but he didn't act intentionally."

9              Can you accept those two definitions and

10   say by your verdict "not guilty" as to capital murder if

11   it was proven to you "knowingly" and not "intentionally?"

12   A       Yes.

13   Q       Okay.   Regardless of the consequences of it?

14   A       Yes.

15   Q       Okay.   Another thing the law will ask you to

16   do in some cases you may have a statement or a confession

17   of the person charged, there is an issue that the jury

18   is asked to decide and that is whether or not the

19   statement or confession was voluntarily taken.

20             And the Court will tell you what

21   "voluntarily" means or tell you what must be done and

22   what cannot be done in order for a statement to be

23   voluntary.

24             Are you familiar with the word "Miranda

25   Warnings?"

A         No.

Q         Well, that's "You have the right to remain silent, you have the right to a lawyer, any statement may be used against you, you have the right to stop interrogation or questioning at any time."

          Is that -- are you more familiar with "Miranda" now that I have made those statements?

A         Yes.

Q         Now, the persons taking a statement on behalf of the State of Texas must tell someone before it can be used, I mean it's a condition or, you know, for it to be a voluntary statement then -- I mean obviously a statement can be beaten out of somebody, coerced, but I mean those things have, you know, become a fact issue for the jury to decide and before you could consider a confession you must believe beyond a reasonable doubt based on the evidence that you heard that the statement was voluntary.

          Okay. Let me put you in a position, in a jury room you have heard the evidence in a case, a confession has been offered into evidence, you read the charge and the Judge tells you basically this statement is voluntary if the Miranda Warnings were given, it's not a result of being coerced or beaten and you are not to use this confession for any purpose unless you find it's

1    voluntary.

2              You are sitting there in the jury room

3    and you have a reasonable doubt that the confession is

4    voluntary, which means you would have to find the

5    confession that you have read and heard, you would have

6    to make a finding that it is involuntary -- follow me?

7    A        Yes.

8    Q        But yet on the other hand you believe

9    absolutely that the statement is true.

10             Now, I mean you are in a position of

11   believing the statement is true and knowing that it is

12   not voluntary.

13             The Court tells you "Unless you find it

14   is voluntary I want you to forget about it, I do not want

15   you to use it for any purpose and I don't want it to

16   influence your verdict.  The knowledge in that statement

17   you will remove from your mind so far as considering the

18   evidence in this case."

19             Let me -- I think the exact or close

20   words the Court will tell you, "You will not consider the

21   statement or confession for any purpose whatever or any

22   evidence obtained as a result of it unless you find it

23   is voluntary beyond a reasonable doubt."

24   A        Yes.

25   Q        Okay.  You are sitting here, you believe that

1    statement is true.

2              Can you set it aside and not let your

3    belief that it is true influence your verdict?

4    A         Yes.

5    Q         You can?

6              I mean you could remove it and set it

7    aside?

8    A         Yes.

9    Q         Now, I am -- the law asks us to do some hard

10   things.

11   A         For sure.

12   Q         Anyone that can sit here and tell me "I

13   wouldn't have a bit of problem in this world doing that"

14   I would really question it.

15             It would be hard to do, wouldn't it?

16   A         Well, no.  I deal with that everyday.

17   Q         What?

18   A         As a school teacher you have to deal with some

19   of those things everyday anyway so I'm used to putting

20   it to the side.

21   Q         You could lay it aside even though you believe

22   it to be true if you are convinced that it was

23   involuntary?

24   A         Yes, sir.

25   Q         Let me go back to one thing the Court is going

1    to tell you in his instructions.

2              The Court will instruct you probably in

3    the punishment phase of the trial, "You are further

4    instructed that in determining the punishment in this

5    case you are not to discuss among yourself how long the

6    Defendant will be required to serve any sentence imposed.

7    Such matters come within the exclusive jurisdiction of

8    the Board of Pardons and Paroles and are not your

9    concern."

10             You will first be told that a person

11   being tried or you have found guilty of capital murder

12   has to serve 35 calendar years a day at a time until he

13   becomes eligible for parole.

14             I know you know what the word "eligible"

15   means but what that means is "you qualify", to be

16   "eligible" doesn't mean you parole, it does not mean that

17   you will ever parole.

18             I don't know, I'm making that point

19   because some people just assume that when someone becomes

20   eligible for parole they are going to parole.

21             Do you assume that?

22   A        No.

23   Q        What this is, we know, you know, or have some

24   idea about parole but we don't want you considering it

25   and in deliberating in this case we want you to presume

1   that when you say life or the answer to your question

2   says life?

3   A        "It's life."

4   Q        That "life equals life" being that person will

5   be in the penitentiary for the rest of their lives.

6            In assessing a life sentence versus

7   another sentence, whether it be the death sentence or

8   whether it be a period of years can you lay aside the

9   rule -- the possibility of parole?

10   A        "Can I lay it aside?"

11   Q        Can you lay it aside and not use it in arriving

12   at your verdict as to punishment?

13   A        I thought it would only be life or death, is

14   that what you --

15   Q        Okay.    Okay.    Excuse    me.    We    are

16   miscommunicating.

17   A        Yes.

18   Q        Do you remember me talking to you about the

19   difference    between    the    word    "intentionally"    or

20   "knowingly?"

21   A        Yes.

22   Q        We have what we call "lesser and included

23   offenses."

24            Let's say the evidence in this case --

25   Mr. Townsend used the example you found beyond a

1   reasonable doubt that the person charged intentionally

2   killed someone but you did not find that it was in the

3   course of a robbery.

4   A        Okay.

5   Q        Okay.  That would make them not guilty of

6   capital murder.

7   A        Right.  Just "murder."

8   Q        But then you would come back, they

9   intentionally or knowingly killed someone which is non-

10  capital murder or plain murder chronicled by from --

11  punishable by five years probated to life.

12  A        Okay.

13  Q        Well, let me just -- I was asking you about

14  whether or not if you could lay aside those instructions

15  as to parole, doesn't make any difference whether it's

16  a capital case or non-capital case you still have to

17  assess punishment either by answering a number of years

18  or in the case of capital murder by answering questions

19  "Yes" or "No" which determines life or death.

20               Okay?

21  A        Yes.

22               "Would I consider the possibility of

23  parole in assessing the punishment in a case?"

24               You say too much.

25               MR. OLD:  I'll tell you what

1    the Court is going to tell you, it's going to tell --

2    what we are really saying is, yeah, you know about it,

3    you have some idea about it and the only thing we can

4    tell you it's going to equal at least 35 -- if you give

5    someone life or in the event you are not determining life

6    or death I think that he would tell you that -- Judge,

7    you correct me if I misstate it.

8                          THE COURT:   I will correct

9    you.

10                         MR. OLD:  That a person is not

11   eligible until they have served one-fourth of the actual

12   years given, not -- one-fourth of the actual years given

13   not to exceed 15 and to be less than I believe -- I

14   believe two.

15                         And I'm asking the Court.

16                         THE COURT:   "Two."

17                         MR. OLD:   Which means a non-

18   capital life sentence would require someone to serve at

19   least 15 years before they became eligible for parole.

20                         THE POTENTIAL JUROR:   Yes.

21   Q          (BY MR. OLD)  Would you not consider the laws

22   of parole in assessing punishment whether it be a capital

23   case or non-capital?

24   A          "Would I not consider it?"

25   Q          Not consider the possibility of parole?

1   A        I would consider it.

2   Q        You would consider it?

3            And I mean you just don't think you

4   could take it out of your mind and lay it aside?

5   A        I don't know.

6   Q        What?

7   A        I don't think I'm understanding your question.

8   Q        Okay.  What the Court tells you is that you

9   are not to concern yourself with the laws of parole in

10  reaching your verdict --

11  A        Okay.  If the verdict is 35 --

12  Q        It's not a concern for you.

13  A        If -- are you asking me if the sentence is a

14  life sentence and in 35 years the person could -- could

15  be eligible for parole?

16  Q        Okay.  He's eligible.  "Eligible" does not mean

17  you get parole.

18  A        Right.

19  Q        It merely means you can apply for it.

20  A        Right.

21  Q        Or you will come up for it and be considered.

22  It doesn't mean that you will be paroled.

23  A        Right.  So what you are asking me --

24  Q        What is the question?

25  A        That can I just throw it out?

Q          Can you throw it out and not let it effect your

sentence?

A          Yes, sir.

Q          Let me go to a non-capital case.

THE COURT:  Excuse me.

MR. OLD:  In a murder case you

are asked to assess a number of years between five years

probated and life.

THE POTENTIAL JUROR:  Yes.

Q          (BY MR. OLD)  And I stumbled through what you

would be told as to the range of the punishment and I

believe it's up to one-fourth of the sentence but not to

exceed 15 years and not less than two years, you have to

serve two years regardless and even if you get a life

sentence then it's not more than 15 until you become

eligible.

A          Yes.

Q          Okay.  Now, the thing that I mean and I'm not

implying you would do this but let's say you decided you

wanted a man to spend 15 years in the penitentiary, you

wanted to be sure that he was going to be there 15 years

and you said, "Well, we can either give him life which

means he will serve at least 15 or we can multiply four

times 15 and get 60 and give him 60 and that means that

he  will  have  15  years  to  actually  stay  in  the

1    penitentiary."

2    A          Okay.

3    Q          Okay.   Knowing, you know, the mathematical

4    portion of it would you consider if you said you wanted

5    to give this man life that you are in fact locking him

6    up for the rest of his life or would you consider the law

7    of parole?

8    A          The law of parole.

9    Q          You would have to consider it?   It would bear

10   on your mind?

11   A          I still don't think I'm understanding your

12   questions.

13                        THE   COURT:    Excuse   me   a

14   moment, Mr. Old.

15                  Here's the problem that we run into,

16   sometimes a person may be back there deliberating in a

17   jury room and they may think the appropriate sentence is

18   20 years but then they stop and say, "Well, I've heard

19   all this stuff about parole, he's not going to serve 20

20   and I'm going to give him 40", that's wrong.   That's not

21   what you are supposed to do.   If that's what you will do

22   or think you will do that's fine, I'm not telling you

23   what you should or should not do, I'm telling you as a

24   qualified juror you cannot do that.

25                  In a death penalty case you have to

decide based on the evidence whether certain things justify of a death sentence or not.   We don't want someone getting back there saying "Life doesn't mean life, he might get paroled so we will vote to make sure that they stay in there."

If you think that it could cause you to up your sentence to try to keep him there longer then that's wrong.

The rules concerning parole can change from year to year.

THE POTENTIAL JUROR:  Right.

THE COURT:  The Parole Board changes its policy, somebody that gets a 20 year sentence 10 years ago may serve 10 years, somebody that gets a 20 year sentence today may serve 18 years, some may serve 20 years of 20 years, it depends on their conduct in prison, it depends on lots of factors.

All we do is tell the jurors, "You know there is parole but when you assess your sentence don't let the fact that parole is possible influence you."

If you can do that fine, if you can't that's fine.

Excuse me, Mr. Old.  I will let you continue with your questions.

MR. OLD:  Approach the bench?

1          THE COURT:  Yes.

2              Do you want me to have the juror step

3    out for a moment?

4                    MR. TOWNSEND:  Please.

5                    THE COURT:  Ma'am, will you

6    step out for a moment while I have a discussion with the

7    attorneys?

8

9                    (The following occurred outside the

10   presence and hearing of the potential juror:)

11

12                   MR. OLD:   I think the last

13   five minutes I questioned Lance was trying to push a note

14   under me, kept pushing it back saying the State agreed.

15                   THE COURT:  You agreed?

16                   MR. OLD:   Next time you are

17   offering to agree grab me a little harder.

18                   THE  COURT:    Okay.    I

19   understand that based on some of the juror's answers the

20   State and Defense have agreed to excuse this juror, is

21   that correct, Mr. Townsend?

22                   MR. TOWNSEND:  Correct, Your

23   Honor.

24                   THE COURT:  Is that correct,

25   Mr. Old?

1                    MR. OLD:   That's correct.

2                    THE COURT:      Tell her she is

3     -- bring her back in, I want to talk to her.

4                    Off the record.

5

6                    (Off the record discussion.)

7

8                    (The following occurred in the presence

9     and hearing of the potential juror:)

10

11                   THE  COURT:    Ma'am, we  are

12    going to excuse you as a prospective juror, you are free

13    to go.

14                   I just wanted to bring you back in and

15    tell you that so far you have the prettiest handwriting

16    of any of these questionnaires I have looked at.

17                   But you are free to go and we are not

18    going to bother you anymore.

19                   So you have a good day.

20

21                   (Off the record discussion.)

22

23                   (The  following  occurred  out  of  the

24    presence and hearing of any potential juror:)

25

1          THE COURT:  Let's get on the

2    record.

3          It is my understanding that there has

4    been three indictments in this case, the original

5    indictment appears to me to have been returned

6    on July 22nd, 1993 out of the 76th Judicial District

7    Court.

8          I'm going to instruct the Reporter that

9    when he is transcribing this trial to show that this case

10   is being tried by me as or under assignment to the 76th

11   Judicial District Court of Morris County.

12         Mr. Old, do you have any objection to

13   designating the 76th as the Court of record?

14         MR. OLD:  No, Your Honor.

15         THE COURT:  Mr. Townsend, do

16   you have any objection?

17         MR. TOWNSEND:  None, Your

18   Honor.

19         THE COURT:  All right.  Mr.

20   Reporter, so designate the 76th as the Court of

21   jurisdiction.

22         Are we ready?

23

24         (Recess.)

25

1          (The following occurred in the presence

2    and hearing of the potential juror:)

3

4          JANELL ANN SMITH, Potential Juror #118

5    was called as a Potential Juror and, having been

6    previously sworn by the Court, testified as follows:

7

8                    THE BAILIFF:   Have a seat

9    right there and watch your step.  Go all the way around

10   there.  Have a seat right up there next to the Judge.

11                   THE COURT:  How are you doing

12   this afternoon?

13                   THE POTENTIAL JUROR:  Good.

14   How are you?

15                   THE COURT:  Pretty good.

16          Ma'am, go ahead and take your seat.

17          Are you Janell Smith?

18                   THE POTENTIAL JUROR:  Yes.

19   I am.

20                   THE COURT:  This is juror 24.

21          Ma'am, I'm Gary Stephens, I'm presiding

22   over this trial.  We have two lawyers representing the

23   State of Texas, we have the Morris County District

24   Attorney, Mr. Richard Townsend.

25                   MR. TOWNSEND:  Hi.

1                       THE COURT:   And we have a

2    District Attorney from Cass County, Mr. Randall Lee, we

3    have two attorneys representing the Defendant, Mr. Bird

4    Old, III.

5                       MR. OLD:   Hello.

6                       THE COURT:  Mr. Lance Hinson.

7                       MR. HINSON:   Good afternoon.

8                       THE COURT:  Next to Mr. Hinson

9    is the person charged, Billy Joe Wardlow.

10                      Ma'am,  the  lawyers  have  read  your

11   questionnaire and they are familiar with your answers and

12   they are going to discuss those answers with you.

13                      They are also going to talk to you about

14   the principles of law involved in a death penalty case.

15   You will be asked a lot of questions and the answers will

16   let us know whether or not to put you on the jury.

17                      In order to be a juror you must be able

18   to understand and follow the law.  You don't necessarily

19   even have to agree with the law, it's like driving down

20   the road, you may not agree with the 55 mile speed limit

21   but if you can obey it then you are following the law and

22   that's  what  we  want  you  to  do  as  a  juror but if you

23   disagree with some aspect of our law to such an extent

24   that you cannot follow the law then you are not qualified

25   so we need to discuss the law that applies to you and

1   find out whether you can follow that law.

2          Ma'am, we have also found that even

3   though most people can understand and follow the law that

4   doesn't necessarily mean that they are an appropriate

5   juror for a death case so we want to know something about

6   your views on our law and how you feel about various

7   issues so we can decide if this is a task that you should

8   undertake.

9          The thing I want to explain to you is

10  that you as a citizen of this country you certainly have

11  a right to disagree with anything we are saying and we

12  are not going to judge you based on your opinions, we are

13  going to judge your ability to sit on the jury but not

14  you.

15         I don't want you to hedge on anything.

16  If you don't like what you are hearing, if there's

17  something about what we are telling you you don't like

18  be honest with us.  We are not going to take issue with

19  you.  There aren't any right or wrong answers and there

20  are no right or wrong opinions.

21         Both sides are looking for 12 fair

22  unbiased jurors that can follow the law and do whatever

23  the right thing is and that right thing will be

24  determined by the evidence and if you are one of those

25  12 we want you and if there's some reason you can't be

on the jury or can't follow the law then it's not going to hurt our feelings.  That's why we brought in all those people a few weeks ago.

We just want honest from you.

Now, ma'am, the trial is going to start in January.  When we start trial it will probably start two weeks, you will be required to sit on one of those chairs over there and we will be in the courtroom anywhere from an hour, hour and a half then take a break, we will work approximately from 9:00 to 5:00.

I plan at this point for the jurors to be able to go home at night.  If for some reason we start getting a lot of news coverage on this case I might have to put you up in a motel during the trial but I don't plan on it during this time.

Once the testimony is over and the jury has been retired to begin its deliberation the jury will be kept together until a verdict is reached.  The day we start argument then you will be put up in a motel overnight.

I'm going to go over all this with you because the medical condition you told us in the questionnaire, in the questionnaire you said you have a bad back and arthritis, do you think that will interfere with your ability to sit as a juror for a two week

1    period?

2                          THE POTENTIAL JUROR:  No.  It

3    doesn't keep me from doing what I have to do but I have

4    a lot of pain but I live with it.

5                          THE COURT:  The chair that you

6    are sitting in now is the same chair that will be in the

7    jury box, does that chair seem to be comfortable that

8    you will be able to sit?

9                          THE POTENTIAL JUROR:  Yes.

10                         THE COURT:  So you are not

11   concerned about your jury service?

12                         THE POTENTIAL JUROR:  No.

13                         THE COURT:  Do you know of any

14   other reason that you could not serve a two week period?

15                         THE POTENTIAL JUROR:  No.  I

16   don't.

17                         THE COURT:   The State may

18   proceed.

19

20              VOIR DIRE EXAMINATION

21                 BY MR. LEE

22

23   Q        Ms. Smith, as the Judge mentioned, my name is

24   Randy Lee and I'm from Cass County and as he also

25   mentioned we are just asking questions not only to see

1   if you can follow the law but get a feel for your

2   personality, background and feelings and just try to make

3   a decision in our opinion whether this would be the type

4   of case that you should sit on.

5           A lot of people have trouble with the

6   death penalty and that's an area that a lot of people

7   just can't seem to do and so I'm going to jump right into

8   this; we are going to ask for the death penalty, we are

9   going to pursue that and that's the purpose we are here

10  today and according to your questionnaire you don't seem

11  -- you seem to agree with it.

12          Is that the case, that you can agree on

13  certain cases to give the death penalty?

14  A       I believe in letting the punishment fit the

15  crime.

16  Q       And under the right set of circumstances you

17  would have no problem voting in such a way that would

18  give a person the death penalty?

19  A       No.

20  Q       Could you vote in such a way if you thought it

21  was the right situation to give a person a life sentence

22  on a capital --

23  A       Yes.

24  Q       -- capital murder case?

25          I don't believe I know you but does

1   Richard Townsend, do you know him or has he represented

2   you?

3   A        No.

4   Q        The same question for Mr. Bird Old or Lance

5   Hinson?

6   A        No.  I don't.

7   Q        Do you know anything about them?

8   A        No.

9   Q        Okay.  In Texas as far as murder there are two

10  different types of murder, there are several types of

11  homicides but there are two different types of murder.

12           There's murder which is intentionally

13  and knowingly cause the death of an individual, two

14  people fighting or shooting each other or many ways to

15  cause a death and then there's capital murder.

16           Capital murder is murder plus something

17  else and the statute outlines what that something else

18  is.

19           For instance, it could be two murders

20  in the same -- arising out of the same circumstance or

21  it could be a murder and a robbery or killing two police

22  officers -- killing a police officer or a fireman in the

23  line of duty and killing -- there is any number of ways

24  to commit capital murder.

25           Do you kind of see the difference there,

1   that's murder plus something else?

2   A       Yes.

3   Q       In this case we have alleged that in the course

4   of committing a robbery the Defendant committed murder,

5   do you see where that would be capital murder as opposed

6   to "murder?"

7   A       Yes.  I do.

8   Q       In Texas we have a two-part trial, we have a

9   guilt/innocence portion of the trial which basically both

10  sides introduce evidence as to the guilt, as to whether

11  the person committed the offense he's charged with then

12  if a person is found guilty we go to a second trial, it's

13  a shorter or generally shorter but it's a punishment

14  phase of the trial, that's, "Okay, now that you have

15  decided he's guilty what do you do with him", type trial.

16          The law requires that you are able to

17  not make up your mind ahead of time on what you will do

18  but listen to all the evidence and decide in order of

19  what you are going to do to be fair and open-minded until

20  all the evidence has come in and not just jump the gun

21  and decide just because he's guilty he needs the death

22  penalty.

23          Do you think you could wait until the

24  appropriate time as the Judge directs and --

25  A       Yes.  I do.

Q          -- wait until all the evidence comes in?

The burden of proof is on the State, we are required to prove to the jury beyond a reasonable doubt all the elements of the offense, that's both in the guilt portion and in the punishment portion, can you hold us to that burden and make us do our job?

A          Yes.

Q          And the Judge will give you a definition of reasonable doubt, if you have a different definition in your own personal meaning can you use the Judge's and put aside your own personal definition if it's a little bit different?

Everybody wouldn't agree on every meaning of a word but in this kind of case we have got to have one meaning and everybody follow the Court's instruction.

A          I think so.

Q          You need to take a look at a document that we have up there called "Special Issues" at the top of the page, I believe it has a "number 3", should be sitting in front of you there somewhere.   It will have two questions, two long questions.

Have you found that?

A          Here?   (Indicating)

Q          No.

1                          THE BAILIFF:  Underneath that,

2      ma'am.

3                          THE    COURT:       That's    it.

4      (Indicating)

5                          MR.    LEE:     Could   you   read

6      Special Issue #1 to yourself and then we will talk about

7      it briefly.

8                          THE POTENTIAL JUROR:  Yes.

9      Q          (BY MR. LEE)  In order to get to that point in

10     the trial where you are answering that question you would

11     have already found the defendant guilty of capital murder

12     in   the   guilt/innocence   portion   and   will   be   at   the

13     conclusion of the punishment portion, you have heard the

14     evidence and obviously Special Issue #1 is talking about

15     probability   that   the   defendant   will   have   to   commit

16     criminal   acts   of   violence   as   a   continuing   threat   to

17     society.   The State will be -- we will be required to

18     prove to you that -- that there is a probability of acts

19     of violence because obviously we can't prove that there

20     definitely will be because that would be in the future.

21                        Do  you  kind  of  see  what  that  question

22     is saying?

23     A          All right.

24     Q          I will take it step by step.

25     A          All right.

Q        If   the   Judge   gives   you   a   definition   of
probability that would mean it's more likely than not to
happen,   a   little   over   50   percent   that   some   act   of
violence will probably happen.

Can you follow that definition that the
Court gives you or would you -- would you agree with that
definition  that  it's  more  likely  --  "probability"  means
"more  likely  than  not"  that  it  will  happen,  not  that  it
won't but it's more likely than not that it will happen?

Is that pretty much what your definition
would be?

A        Right.

Q        And we have to prove beyond a reasonable doubt
that there is a probability of violence in the future.

Now,  criminal  acts  of  violence,  it
doesn't  have  to  be  murder,  obviously  we  can't  prove  to
you that any individual will commit murder in the future.

"Violence" can be anywhere from murder,
it could be assault, rape, robbery, shooting, stabbing,
punching  people  in  the  nose,  just  --  there's  a  whole
range  of  violence  and  there  are  various  ways  to  prove
probability.

Past acts of violence, that's the way
we prove a lot of things to show what someone has done
in the past as to the likelihood of what they will do in

1   the future.

2           But can you hold us to that burden and

3   if it's proved to you that it's more likely than not that

4   the defendant will commit acts of violence that you could

5   answer "Yes" to that question if we prove it to you?

6   A       If you prove it to me.

7   Q       "Society" is -- also causes people some

8   confusion and that's Special Issue #1.

9           Obviously it means the people on the

10  street, you and I, you know, you go out of the

11  courthouse, all the people walking around but the courts

12  have also said that "society" means people in the

13  penitentiary.  A lot of people work there.  There are

14  guards, there are wardens, there are doctors, nurses and

15  there is inmates.

16          Is that -- would that include your

17  definition of "society" if that's -- would you feel like

18  they are part of society also in that definition?

19  A       If they are in --

20  Q       Their own society but it's a society as a

21  whole?

22  A       I guess so.  Yeah.

23  Q       And obviously we -- we don't want to put a

24  threat to anyone, even guards and we don't want to have

25  a continuing threat necessarily to guards or prison

1    officials  or  even  other  inmates,  we  don't  want  to

2    necessarily  cause  them  anymore  threats  than  necessary.

3              Would  you  agree  with  that?

4    A         Yes.

5    Q         Okay.   Could  you  read  Special  Issue  #2  and  we

6    will talk  about  that?

7              That's  a  long  statement  but  basically

8    it  seems  to  be  talking  about  some  other  reason  why  a

9    person  might  ought  to  be  given  a  life  sentence  rather

10   than  death,  "mitigating",  something  that  would  make  them

11   less  blameworthy  in  this  particular  case  than  maybe

12   another  case,  is  that  kind  of  your  meeting,  what  you  take

13   out  of  the  reading?

14   A         Yes.

15   Q         And  nobody  can  tell  you  personally  what

16   mitigating  --  what  is  mitigating,  what  evidence  should

17   be  mitigating,  what  you  should  consider  but  basically  the

18   law  requires  that  you  listen  to  the  evidence  and  consider

19   or  think  about  it,  that  you  not  make  up  your  mind  until

20   you  have  heard  all  the  evidence  and  that  you  look  --  you

21   look  at  the  whole  situation  in  making  up  your  mind.

22             Do  you  think  you  could  do  that?

23   A         Yes.   I  could.

24   Q         Some  people  --  "mitigating"  means  one  thing,

25   to  others  it  means  something  completely  different.

If a person is severely retarded a lot of people feel like they shouldn't be held to the same standard as the average person, that their intellectual capabilities ought to be taken into account, some people would think age, there are extremely older persons or younger persons, that ought to be taken into account, some people take into account their raising, their background, there are any number of things that some people may consider, other people wouldn't.

"Intoxication", some people might think if he wasn't drunk it wouldn't have happened or the next person would say, "Well, he shouldn't have been drinking", maybe it ought to make it worse.

So only you can decide what is mitigating.

Can you listen to all the evidence and just say -- not say that you are never going to consider it as mitigating until you have heard it?

A        I think so.

Q        That's a little hard to answer ahead of time because you don't know what the answer is?

A        Right.

Q        But -- but can you withhold making up your mind until you have heard all the evidence?

A        Yes.

Q          You are deciding you don't actually -- if you are on the jury you won't actually fill in a blank that says "This person needs the death penalty" or "This person needs life in the penitentiary" but, however, it will be obvious from the questions that you are to answer what the result of those answers are so when you answer a question you will know what those results are and what will happen as a result of your answer.

Can you put aside that knowledge that you know the result and answer it truthfully based upon the evidence?

A          Yes.

Q          And not try to avoid one sentence or the other just because you don't want that result?

A          Yes.

Q          Some people have that problem and that's really why we ask, they want to bend the evidence to fit their result that they want.

There are possibilities or it has happened in the past on other cases on a capital murder, for instance if something like that was to happen in this case, the State proved the murder, proved that the individual committed the murder but they don't prove the robbery, the other element that makes it capital murder, if we don't do our job and don't prove the robbery beyond

1    a reasonable doubt can you discard that and come back

2    with a verdict of guilty of murder, lesser included,

3    rather than capital murder if we don't -- if we don't

4    meet the burden, we don't prove a robbery, we just prove

5    that he caused the death?  Can you come back and find him

6    not guilty of capital murder and find him guilty of

7    murder as the result of that verdict if we don't -- if

8    I don't do my job?

9    A        "If you don't do your job?"

10   Q        If I don't do my job and I don't bring the

11   evidence to you on robbery, I prove the murder but I

12   don't prove the robbery, can you find him not guilty of

13   capital murder?

14   A        I don't think so.

15   Q        Do you think you would find him guilty of

16   capital murder if I don't prove it to you?

17   A        No.  If you prove to me that he did it?

18   Q        Right.

19   A        Because he's innocent until he's proven guilty.

20   Q        Exactly.

21            So I think I am probably wording the

22   questions wrong.

23   A        I don't understand the whole concept.

24   Q        Part of what I have got to prove to you, not

25   that I have got to prove that to you -- that on that date

1   that he intentionally and knowingly caused the death of

2   an individual in the course of committing a robbery --

3                        MR. OLD:  I object.  That's

4   a misstatement of the law.

5                        THE COURT:  I believe you need

6   to remove the word "knowingly."

7                        MR. LEE:  If he intentionally

8   caused the death of an individual in the course of

9   committing a robbery or attempted robbery.

10                       So obviously I have got to prove several

11  things in that, intentionally causing the death and I

12  have got to prove a robbery or attempted robbery.

13                       If I just prove "intentionally caused

14  the death" can you find the defendant not guilty if I

15  don't prove the robbery, not guilty of capital murder

16  because obviously it wouldn't be capital murder?

17                       THE POTENTIAL JUROR:  Well,

18  yes.  I guess so.

19  Q        (BY MR. LEE)  And in that case if I just proved

20  murder you could find him guilty of murder I am assuming

21  because that's what he actually did if I don't prove --

22  A        Yes.

23  Q        The range of punishment -- we will have to talk

24  a little bit about that -- for capital murder, you will

25  have -- the Judge will have or you will have, depending

on you all's answer, two classes for the sentence, either

life in the penitentiary or the death penalty, one or the

other.

There's no probation, nothing else.

However, if it's murder in Texas there's

a big range of punishment, anywhere from five years

probation to 99 years or life in the penitentiary.

And the reason there is a huge range of

punishment is because there is all kinds of murder,

intentionally and knowingly caused the death of an

individual covers a broad range of possibilities.

For instance, you could have an 80 year

old man, couple been married for years, all their life,

the woman is dying of cancer, in great pain, on life

support, she is going to die within a few weeks, maybe

a few days but she is in terrible pain, begs her husband,

"Please do something about the pain, put me -- put me to

death."

And he unplugs the life support system.

When he does that under Texas law that's

"murder", that he caused her death by unplugging the

machine but obviously that is a case that you might want

to consider the lesser range of punishment.

Is that or is that or some other

situation an area that you could consider a probated

1    sentence on a murder case, something along those lines?

2              You might think of your own

3    possibilities.

4    A       Yes.

5    Q       And obviously there's cruel and violent murder,

6    could you consider life in the penitentiary for a murder

7    on some other fact situation?

8    A       Yes, sir.

9    Q       So if you had to find someone guilty of murder

10   you could consider the full range of punishment and not

11   make up your mind ahead of time?

12   A       Right.  Right.

13   Q       You could give the defendant that benefit?

14             The law also requires that you not give

15   an advantage to one side or the other in the sense that

16   as witnesses we'll call police officers, that they

17   require that you not believe a police officer simply

18   because he's a police officer but that you put him on the

19   same level as any other witness and listen to his

20   testimony and see if it makes sense and see -- can you

21   do that?

22   A       Yes.

23   Q       You won't give a policeman a boost just because

24   he's a policeman?

25   A       No.

1    Q          Obviously good cops and bad cops in every

2    place?

3    A          Right.

4    Q          Preachers, and I know jurors, a lot of people

5    want to give a preacher a boost, there are good preachers

6    and bad preachers, could you put them on the same level

7    that you would any other witnesses?

8    A          Yes, sir.

9    Q          And even the defendant or the defendant's mom?

10   A          Yes.

11   Q          And you could listen to what they have to say,

12   make your determination as to truth based on what they

13   say?

14   A          Yes.

15   Q          In the United States every person has the right

16   to remain silent, not to say anything, not to incriminate

17   himself, basically Fifth Amendment, it's a right and the

18   law requires that you not hold that against them if they

19   don't say anything, that you make -- basically the theory

20   is that the State has to prove their case on what comes

21   from the stand, not what he doesn't say, what is said on

22   the stand, not what is not said.

23               Can you base your decision on the

24   evidence and not let the fact if the Defendant doesn't

25   testify, not let -- consider that fact, just put it aside

1    that he didn't testify and base your decision solely on

2    what you hear from the stand and from the evidence?

3    A        Yeah.  Yeah.  I guess so.  You know, proven to

4    me.

5    Q        Right.  If the Judge tells you that's what you

6    are supposed to do you can do it?

7    A        Yes.

8    Q        You hesitated a little bit so I will ask a

9    couple more.

10            That means in the punishment phase a lot

11   of people say, "You found him guilty of capital murder

12   but you want to hear him and let him get up there and say

13   you are sorry", can you put that "want to" -- you are

14   going to think about it but can you put that aside and

15   base what should happen to him on the evidence and not

16   the fact that he didn't testify if he doesn't testify?

17   Could you not hold that against him?

18            There might be all kinds of reasons, he

19   might be a stutterer, he might not can speak, there could

20   be any number of reasons.  There are some legal reasons

21   why he might not want to put him up there but the law

22   requires that you be able to put that aside.

23            Could you not hold that against him?

24   A        No.

25   Q        You wouldn't hold it against him?

A        No.

Q        It's tough to say because we really don't know the evidence and don't know what is going to happen?

A        Right.

Q        What we are doing here, we are asking you everything that we can think of that might happen that might interfere with your ability to decide fairly and we know it's going to be hard for you to think -- we don't expect you to put this out of your mind but that you be able to set it aside and base your decision on what the law says and what the evidence is.  We know you can't just arbitrarily put everything out of your mind, especially if they tell you "Don't think about it", it's going -- that makes it that much harder not to think about it.

         But do you think you can set those things aside and make your decision on the evidence?

A        Yes.  I do.

Q        A lot of people have a problem with the indictment, that once a person has been indicted they automatically assume that is some kind of evidence.

         But as a prosecutor I can tell you that only one side is heard in the Grand Jury room, the Grand Jury doesn't hear anything from the defense, they only hear one side of it and the indictment is just solely

1    charged, it's just a piece of paper telling them exactly

2    what they are charged with and it's not evidence of

3    anything.

4                   Can you not consider the fact that an

5    individual is indicted against him and use it?

6                   It's basically on what you hear, not on

7    what somebody else heard.

8    A         Yes.

9    Q         And you wouldn't use the indictment as

10   evidence?

11   A         No.

12   Q         The law has a lot of requirements and along

13   with the Fifth Amendment right there are rights that any

14   confession or any statement made by the defendant be

15   voluntary and the purpose of that is obviously you can't

16   beat a confession out of someone then expect that to be

17   evidence or you can't take a statement and in such a way

18   that it violates their rights.

19                  And there are various requirements on

20   taking statements, for instance; they have to be

21   Mirandized, they have to be read their rights and waive

22   those rights.

23                  Are you familiar with the Miranda Rules,

24   the right to remain silent, the right to have an attorney

25   and if you can't afford to have one to have one

appointed?

And if you watched Dragnet a few years ago obviously they have gone over and over those.

A        Yes.

Q        The law requires basically that if a statement is taken involuntarily, you know, for instance say -- this is not the case -- but say in a trial you are serving on a jury and the officer says, "Oops, I forgot to tell him he had the right to an attorney and I didn't read him his rights, I just told him to give a statement and he did."

And the Judge will give you an instruction if it was illegally taken that you set that aside, that you are not to consider it for any purpose.

If something like that happened could you do that?  Could you set aside a confession that you believe was true and base your decision on the other evidence that was introduced and not let the confession play a role in your judgment?

A        I think so.

Q        Obviously we don't want statements that -- the purpose of that, we don't want statements that were beat out of someone or something along those lines that makes it involuntary, you can get some kind of far out facts as far as hypothetically; if the case took place, we

1    don't introduce, give anymore evidence other than the

2    statement, say we give a confession and that's the only

3    evidence that we have and you believe that statement was

4    taken involuntary, you believe it's a true statement,

5    could you find a defendant -- if that's the only evidence

6    -- could you find a defendant not guilty because the

7    confession was taken illegally?

8    A       I think I would have to have more --

9    Q       To find him guilty?

10   A       -- than that.

11   Q       Right.  Okay.

12           Let me make sure; you would have to find

13   -- have more evidence to find a defendant guilty than an

14   illegally taken statement?

15   A       Yes.

16   Q       And obviously if you thought it was illegally

17   taken you couldn't even use that statement.  Could you

18   set that aside, aside the fact that it was illegally

19   taken?

20   A       "Could I set it aside?"

21   Q       Yes.

22   A       "If I thought it was illegal?"

23   Q       You couldn't set aside the confession and not

24   consider it?

25           I think I asked the question backwards,

1   let me rephrase it; if in that situation I gave you

2   awhile ago where we gave you a statement and you decide

3   that was illegally taken, based upon what the Judge tells

4   you that the law was violated, can you put that statement

5   aside and not consider it as evidence if we did it wrong

6   or the officer did it wrong, they didn't do their job,

7   can you not consider that evidence, put it aside, not use

8   it for any purpose if they did it wrong?

9   A        "If the law did it wrong?"

10  Q        Yes.  If the cops did it wrong, they took a

11  statement wrong?

12  A        That would be illegal, wouldn't it?

13  Q        It would be illegal, right.

14           And if it's illegally taken and you

15  believe it's illegally taken can you put that aside and

16  not use that as evidence in your mind?

17  A        Yeah.

18           It's a mind boggling thing.

19  Q        A lot of these questions --

20  A        Mind boggling.

21  Q        -- a lot of these things you never thought

22  about, it takes lawyers years of law school to figure out

23  these weird fact situations and you are going to be

24  presented a lot of fact situations and if you don't

25  understand the question please don't hesitate to tell me.

1        What you are basing it on -- if you give

2   an answer and you are basing it on -- if you think I'm

3   confused or you are confused let me know because these

4   are hard questions to ask.

5   A        Okay.

6   Q        And I believe you stated that your health --

7   let me find your questionnaire -- in answer, on Page 11

8   you said -- the question was "Do you have any personal

9   or health problems that would prevent you from giving

10  your full attention to the testimony at trial?"

11           And I believe you told the Judge that

12  that really wouldn't interfere with your ability?

13  A        Well, I have a lot of pain but I live with it.

14  It doesn't keep me from doing what I have to do.

15  Q        And you could put that aside and listen to the

16  evidence?

17  A        Yes.  Yes.  I can.

18  Q        In case I didn't talk to you I will go back up

19  a little bit on punishment; the law obviously -- everyone

20  knows that there is a parole system in Texas that some

21  people can get parole and get out early on a sentence

22  that is given under certain circumstances, you know, it

23  happens, you hear it on the news.

24           The Judge in effect will tell you that

25  parole is a possibility if a person is given a life

1   sentence, however, he also tells you that you can't

2   consider the fact that parole -- that he might get out

3   early, might get out early, can you put that aside?

4           If you feel like he deserves life can

5   you consider life as being life and put aside the fact

6   that someone else down the line, some parole board might

7   let him out sometime in the future and if you think he

8   deserves life can you give him life and not consider the

9   fact that -- that he might get out early?

10  A       Yes.  I can.

11          THE    COURT:    Twenty-five

12  minutes.

13          MR. LEE:  Thank you.

14          Along those lines; some people like to

15  feel like if it's a murder trial you feel like he needed

16  20 years but you are afraid that he will get out early,

17  some people say, "Give him 40 to make sure that he

18  doesn't get out in 20."

19          Can you not do that and give the person

20  what you think they deserve and not let the fact that a

21  parole board or anybody else might do something

22  different?

23          THE POTENTIAL JUROR:  Yes,

24  sir.

25  Q       (BY MR. LEE)  Same thing, if you feel like he

1    deserves the death penalty can you give him the death

2    penalty?

3    A        I don't know.

4    Q        That's a real important question in this.

5    A        It's really a hard one.

6    Q        We understand that.  We are not trying to trap

7    you into -- there's no right answers.

8              How unsure are you?

9              Do you feel like you can't do it or

10   probably can't do it?

11   A        I just don't know if I could or not.  I mean

12   it's wrong to take a life, any life, I believe that.

13   Q        You think it's wrong to take any life?

14   A        I would have to wait I think to see all the

15   evidence and hear it.

16   Q        We are going to have to pick on you a little

17   bit on that question because that's what -- that's a big

18   part of this trial, we are going to ask for the death

19   penalty and if you serve on the jury you have to be able

20   to consider that or think about giving the death penalty

21   and not only that, there will be 11 other people but

22   there may become a fact situation where all 11 people

23   say, "Yeah.  He deserves the death penalty" and it boils

24   down to your decision and your decision alone.

25              It's got to take all 12 of you to agree

1   to give somebody the death penalty so it will boil down

2   to you personally.

3               In one sentence; are you going to be

4   able to make the appropriate answers to the questions

5   that it will boil down to your shoulders that you have

6   the power, death, an effect on that decision and that's

7   a big -- that's a lot to ask a person to do.

8   A          Yeah.  It is.

9   Q          And your answer concerns me a little bit along

10  those lines because we are going to ask for the death

11  penalty.

12              Do you think that your feeling that it's

13  wrong to give the death penalty or murder is wrong in any

14  case, is that going to interfere with your ability to

15  decide?

16  A          I don't know.  It might.

17              I just -- I just don't know if I could

18  do that.

19  Q          Is there -- I am going to kind of pick on you

20  a little bit because you are going to have to give an

21  answer for the Defense, it's going to ask that question

22  over and over again because that's something -- could you

23  yourself put your name in the blank?

24  A          Can I say that --

25  Q          Sure.  Go ahead.

1    A             -- if it's proven to me beyond a doubt that

2    this boy took that man's life then, yes, I could.

3    Q             Is that beyond any doubt?

4    A             Beyond any shadow of a doubt in my mind that

5    this boy took his life.

6    Q             And if the Judge gives you that definition of

7    reasonable doubt you are going to want to know it's

8    beyond any doubt?

9    A             I want to know -- know.  Yes.

10                 THE COURT:   Are you saying

11   that you are going to make the State prove it more

12   strongly to you than even they are required to by that

13   piece of paper?

14                 I want you to look at that definition

15   "reasonable doubt" again.

16                 THE POTENTIAL JUROR:   This

17   one?  (Indicating)

18                 THE COURT:   No, ma'am.   The

19   other one right below it.  I want you to reread that

20   starting with the second full paragraph, I think it

21   starts "Burden of proof", read that to yourself.

22                 THE POTENTIAL JUROR:   I am

23   saying that it has to be proven to me.

24                 MR. LEE:   I think we need to

25   approach the bench anyway if we are going to let her kind

1    of review that.

2                         THE COURT:  Ma'am, would you

3    mind stepping back into the jury room for a moment, it's

4    kind of hard to have conferences here with a juror here

5    the way the courtroom is laid out.

6                         THE BAILIFF: Watch your step,

7    ma'am.

8

9                         (The following occurred outside the

10   presence and hearing of the potential juror:)

11

12                        (Off the record discussion.)

13

14                        THE COURT:  Let's get on the

15   record.

16                        Mr. Old, I understand that the juror was

17   excused where there was some discussion between you and

18   your client and between you and the State, the end result

19   is you agree to excuse juror 24, Ms. Smith, is that

20   correct?

21                        MR. OLD:  That's correct, Your

22   Honor.   That's our recommendation.

23                        THE COURT:  Mr. Townsend, do

24   you agree?

25                        MR. TOWNSEND:  We agree.

1                              THE COURT:   She is excused,

2    Leo, tell her she is excused and we appreciate her coming

3    down.

4                     Now, let's go off the record.

5

6                     (Off the record discussion.)

7

8                     (Record closed for November 2nd, 1994.)

9

10                    (Whereupon   Court   was   recessed   until

11   10:00 a.m., November 3rd, 1994.)

12

13

14                         * * * * *

15

16

17

18

19

20

21

22

23

24

25

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS



STATE OF TEXAS      §
                                 §
COUNTY OF TITUS     §

          I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on November 2, 1994 and were reported by me.

          I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

          WITNESS MY HAND this 31ST day of January, 1995.

_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

LLOYD E. BILLUPS, CSR. #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT

1  Certification Number of Reporter: 149

2  Expiration Date of Certification: 12/31/96

3  Business Address: Drawer 1868
            Mt. Pleasant, Texas 75456-1868

4
  Telephone Number: 903/577-6735

5
  Transcribed By: Tandra K. Gibson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25