*72102*

CAUSE NO. 12,764

| | |
|---|---|
| THE STATE OF TEXAS | § IN THE DISTRICT COURT OF |
| | § |
| VS. | § TITUS COUNTY, TEXAS |
| | § |
| BILLY JOE WARDLOW | § 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 14, 1994

VOLUME 19 of 43 volumes

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1

VOLUME 19

2

VOIR DIRE EXAMINATION

3

NOVEMBER 14, 1994                              PAGE/VOLUME

4

APPEARANCES . . . . . . . . . . . . . . .        1/19

5

MORNING SESSION . . . . . . . . . . . . .        3/19

6

POTENTIAL JUROR, NELL COMBS OWSLEY
          EXAMINATION BY MR. TOWNSEND . . .      9/19

7

NOON RECESS . . . . . . . . . . . . . . .        47/19

8

AFTERNOON SESSION . . . . . . . . . . . .        47/19

9

POTENTIAL JUROR, NELL COMBS OWSLEY, (CONTINUING)
          EXAMINATION BY MR. OLD  . . . . .      47/19

10

11

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR  . . . . .      54/19

12

DISCUSSION CONCLUDED  . . . . . . . . . .        54/19

13

POTENTIAL JUROR, NELL COMBS OWSLEY, (CONTINUING)
          CONTINUING EXAMINATION BY MR. OLD      63/19

14

15

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
          OF THE POTENTIAL JUROR  . . . . .      87/19

16

RECESS  . . . . . . . . . . . . . . . . .        88/19

17

COURT ADJOURNED . . . . . . . . . . . . .        89/19

18

COURT REPORTER'S CERTIFICATE  . . . . . .        90/19

19

20

21

***** 

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VOLUME 19

ALPHABETICAL INDEX OF

POTENTIAL JURORS

NOVEMBER 14, 1994                                  PAGE/VOLUME

POTENTIAL JUROR, NELL COMBS OWSLEY
EXAMINATION BY MR. TOWNSEND . . . . . . . . .          9/19
EXAMINATION BY MR. OLD  . . . . . . . . . .           47/19
EXAMINATION BY MR. OLD (CONT.)  . . . . . .           63/19

* * * * *

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 14, 1994

**VOLUME 19 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)

APPEARANCES

ATTORNEYS FOR THE STATE OF TEXAS:

        MR. RICHARD TOWNSEND
        District Attorney
        Morris County Texas
        Morris County Courthouse
        Daingerfield, Texas 75638

            and

        MR. RANDY LEE
        Assistant District Attorney
        Cass County Texas
        P.O. Box 940
        Linden, Texas 75563

1     ATTORNEYS FOR THE DEFENDANT:

2           MR. BIRD OLD, III
               Old, Rolston & Old

3           P.O. Box 448
               Mt. Pleasant, Texas 75456-0448

4

5               and

6           MR. LANCE HINSON
               Law Offices of Danny Woodson
               P.O. Box 399

7           Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          On the 14th day of November, 1994, the

2    above-entitled and numbered cause came on for hearing

3    before said Honorable Court, Judge Gary R. Stephens of

4    Midlothian, Texas, serving by judicial assignment in the

5    District Court of Titus County, Texas, on change of venue

6    from Morris County, Texas, and the following proceedings

7    were had:

8

9          (The following occurred outside the

10   presence and hearing of any potential juror:)

11

12          THE COURT:  On the record.

13          MR. TOWNSEND:  We have agreed

14   to excuse 26, who was "Newman" and 28, "Theo Blaylock."

15          THE COURT:  That was my

16   recollection but just to be sure for the record; Mr. Old,

17   did you and Mr. Wardlow agree to excuse Theo Blaylock,

18   juror 28 along with juror 26 who was -- what was that

19   name?

20          THE BAILIFF:  "Newman."

21          THE COURT:  "Newman?"

22          MR. OLD:  Was Newman here last

23   Thursday?

24          THE COURT:  I think somebody

25   was here.

1          MR. TOWNSEND:  He was here but

2    I don't think we ever talked to him.

3                     THE DEFENDANT:  He never came

4    in.

5                     MR.  OLD:     I   thought   we

6    eliminated 27 and 28.

7                     MR. TOWNSEND: No, Your Honor.

8                     THE COURT:    27 I understand

9    has been out of town or going to be out of town.

10                     MR.  OLD:     I   thought   we

11   eliminated them on the record last week.

12                     THE COURT:  I do not recall.

13   I did not make a note of it, I did not make a note either

14   in my notes or on the sheet themselves.

15                     We can refer back to the record and find

16   out.

17                     MR. OLD:  He's not here, it

18   was my recollection  we excused both 27 and 28, 27 being

19   a "one" and 28 being a "three."

20                     THE COURT:  Do you agree to

21   excuse Blaylock, a "three" today?

22                     She is here, she is 76.

23                     MR. TOWNSEND:  Yes.  She is

24   76.

25                     MR. OLD: We would excuse her,

1    if it's on the record we excuse 27, we would like to have

2    him excused.

3                        The Reporter can check.

4                            THE COURT:  27 was not excused

5    on the record.

6                        Are you still agreeing to excuse Theo

7    Blaylock?

8                            MR. OLD:  Yes.

9                            THE COURT:  Mr. Wardlow, do

10   you agree?

11                           THE DEFENDANT:  Yes.

12                           THE COURT:  Mr. Townsend?

13                       We are going to check with the record.

14                           MR. TOWNSEND:  He can't be

15   here anyway.

16                           THE COURT: Yes.  That's fine.

17                       Tell Blaylock that she is excused and

18   bring out Owsley.

19

20                           (The following occurred in the presence

21   and hearing of the potential juror:)

22

23                           THE BAILIFF:  Have a seat up

24   there and watch your step.

25

1          NELL COMBS OWSLEY, Potential Juror #370,

2    was called as a Potential Juror and, having been

3    previously sworn by the Court, testified as follows:

4

5                              THE COURT:  Good morning.  How

6    are you, ma'am?

7                              THE POTENTIAL JUROR:   Good

8    morning.

9                              THE COURT:   Go ahead if you

10   would and just take your seat right there, all those

11   papers are lined up.

12                    Ma'am, would you state your name for the

13   record as soon as you get settled in?

14                              THE POTENTIAL JUROR:  Let me

15   get my glasses on so I need to see.

16                              THE COURT:  You probably will.

17                    "Dortha Neill Owsley, juror 29."

18                    Ma'am, I'm Gary Stephens, I am presiding

19   over this jury selection and trial in this case.

20                    There are two District Attorneys working

21   on this case, the one that is present with us today is

22   the District Attorney from Morris County, Mr. Richard

23   Townsend.

24                              MR. TOWNSEND:   Hello.

25                              THE POTENTIAL JUROR:   Hello.

1                              THE   COURT:      We   have   two

2     Defense Attorneys, we have Mr. Bird Old, III.

3                              MR. OLD:   Hello.

4                              THE   COURT:      And   Mr.   Lance

5     Hinson.

6                              MR. HINSON:   Good morning.

7                              THE COURT: Next to Mr. Hinson

8     is the person charged, Billy Joe Wardlow.

9                         Now, ma'am, the lawyers have read your

10    questionnaire and they are familiar with your answers,

11    they are going to discuss some of those answers and they

12    are also going to be talking to you about principles of

13    law involved in a death penalty case.

14                         You will be asked a lot of questions.

15                         In order to put you on the jury, in

16    order to be on any criminal jury you must be able to

17    understand and follow the law but the ability to follow

18    the law doesn't necessarily mean that you would be an

19    appropriate person in a death case.

20                         We are going to explain the law to you

21    then we are going to ask questions to find out whether

22    you can follow that law but knowing whether you can or

23    can't follow the law doesn't always tell us whether this

24    is a task that you should undertake.

25                         So we want to know something about your

feelings, something about your opinions on the law that we are going to discuss.

There's no right or wrong answers and there's no right or wrong opinions, ma'am.  You don't have to try to guess what kind of answers we want and supply them.  We want your answers, we want to know how you think and feel and the only way we can find out is to ask questions and hope that you just share your opinions without worrying about what we may think about them because what we think about your opinions are immaterial, it's your opinions that are important, we want you to share them with us.

Ma'am, the trial will not begin until after the first of the year, it should begin the first week of January.

When the trial does begin it will last probably close to two weeks.

Do you know of any reason you could not sit for two week period as a juror if chosen in January of '95?

Do you have any questions before we proceed?

THE POTENTIAL JUROR:  No.

THE COURT:  Okay.  Mr. Townsend.

VOIR DIRE EXAMINATION

BY MR. TOWNSEND


Q        Ms. Owsley, I am Richard Townsend and I represent the State of Texas in this case and I'm the District Attorney in Morris County.

Mr. Lee who is with me part of the time is not here today to help me.

As the Judge said, there's no right or wrong answer to any of these questions that either I or the other side of the table will ask. We are just simply seeking answers as you know from your prior jury service and when the Judge talked to you this is a capital murder case, the State, we are actively seeking the death penalty against the Defendant in this case, Mr. Wardlow.

Now, I have read your questionnaire and I know you probably don't remember what all you put on there now but I have read your questionnaire and understand that you -- there I believe I understand your feelings about the death penalty what you said basically was you felt it was appropriate in some murder cases and that you could return a verdict in a proper case which assessed the death penalty, is that the way you still feel?

A        Correct.

Q        Okay.  Now, Ms. Owsley, a lot of people think in a death penalty case if a person is found guilty that they automatically are going to receive the death penalty.  That's not really the case in Texas.

In Texas a person is found guilty of capital murder then the jury after hearing some more evidence do what we call the punishment hearing, we'll decide the proper sentence as a life sentence or death penalty depending on their answer to some Special Issues and we will talk to you a little later.

But what I would like to know from you right now; is there any reason if the State showed you an appropriate case and an appropriate defendant for the death penalty that you couldn't do it, that you couldn't vote in such a way that they would receive the death penalty if you felt it was appropriate?  Could you do that?

A        If I felt like the evidence proved that he was a threat to society I don't think I would have a problem.

Q        Okay.  Your feelings about the death penalty, are those feelings that you have had ever since you were an adult or is that something that maybe has changed over the years?

I know it's probably -- not something that you have thought about a lot?

1    A        Well, the way I feel about the death penalty

2    and a lot of people think the person that is on the jury

3    is actually the one that is sentencing this person but

4    in my opinion that is not right.  If evidence is produced

5    that in fact without a shadow of a doubt that they did

6    it that person chose at that point in time to his fate.

7            That is my belief.

8    Q        Let me talk to you a little bit about the type

9    of murder in Texas; in Texas we have what I call "plain

10   murder" or non-capital murder which is the situation

11   where someone has intentionally caused the death of

12   another individual or knowingly caused the death of

13   another individual and that is to say it was done, they

14   did it, they didn't have the legal excuse like self

15   defense or it was an accident or anything like that.

16   They just intentionally caused another person's death.

17            The most a person can be punished for

18   that in Texas is 99 years to life in prison.

19            However, we have a different type murder

20   that we call "capital murder" that the most severe

21   sentence that a person can receive for that is the death

22   penalty or they can receive a life sentence, those are

23   the only two choices that the jury would have if they

24   found a person guilty of capital murder.

25            And that type of murder is like the

1    murder we just talked about where someone has

2    intentionally caused someone's death plus something else.

3    And that plus something else is that the murder was a

4    murder of a policeman or a fireman killed while in the

5    line of duty, there are several other situations such as

6    multiple murders or murder done during the commission of

7    a robbery or burglary or rape, something like that.

8              If you will, there is a sheet of paper

9    up there, I think it's marked "Exhibit 3" and it's a copy

10   of the indictment in this case.

11             THE BAILIFF:   Right there.

12   (Indicating)

13             MR. TOWNSEND:   If you will

14   just read over that then we will talk about it.

15             Okay.  Ms. Owsley, can you see where if

16   the State could prove everything in that indictment that

17   rather than just being a "plain murder" as I called it

18   that would be a capital murder because you have got the

19   murder as well as it was done during the commission of

20   a robbery?

21             Are you with me on that?

22             THE POTENTIAL JUROR:   Yes.

23   Q        (BY MR. TOWNSEND)   And then if a person is

24   found guilty of capital murder and, Ms. Owsley, we'll be

25   talking basically about capital murder in general this

1      morning, not this case in particular -- but if a person

2      is found guilty of capital murder in Texas the punishment

3      is either a life sentence or the death penalty.

4              And the kind of jurors that we have got

5      to have in a capital murder case in order for a person

6      to be qualified to be on the jury they have got to be

7      able to follow the law.

8              And when I say that; they have got to

9      be able to keep an open mind as to whether the punishment

10     should be a life sentence or the death penalty and you

11     are going to hear evidence during the trial as to the

12     guilt or innocence of the defendant then later on you

13     will hear, assuming if the defendant were found guilty,

14     you would hear more evidence during the punishment

15     hearing that would help you make your decision as to

16     whether the defendant should receive a life sentence or

17     the death penalty.

18             The kind of jurors that we have got to

19     have are those kinds of jurors that can keep an open mind

20     until they have heard all the evidence before deciding

21     whether the life sentence was more appropriate or the

22     death penalty was more appropriate.

23             Could you do that?

24     A       I believe that I could.

25     Q       Okay.  Ms. Owsley, the way you and I talk and

1     the way most people say, "We believe we could" or "We

2     think we could" or "I don't believe I could do that" or,

3     you know, what I really need is, "Can you do it?"

4     A          Well, this --

5     Q          I know you don't know the fact situation yet.

6     A          Just let me say this; this has been a traumatic

7     summer for me, I was the one that hit the little Hispanic

8     boy on South Jefferson, you know.

9     Q          When did that happen?

10    A          That happened the 14th day of July.

11                And of course when the accident happened

12    I thought I had killed the child.  There wasn't anything

13    I could have done to prevent it because he ran out in

14    front of the car.

15    Q          Yes.

16    A          And I did everything I could.

17                Fortunately, it just fractured his skull

18    but he did have to be air lifted to Parkland and was over

19    there.

20                And then when he came home we had to go

21    through therapy so, you know, when I looked at that child

22    and saw that I, you know, could have killed that child

23    my mental -- this summer -- and then I lost my mother the

24    25th of August after being in the nursing home for six

25    years.

1          And it's really been a traumatic year

2  and I just really feel that I am under -- I am taking

3  medication and I, you know, I just really don't know if

4  you people would want a juror like me or not.

5  Q          Is the medication you take, are you still able

6  to concentrate on -- do you work, ma'am?

7  A          No.  I am retired.

8  Q          You are retired?

9          Does the medication you take impair your

10 ability to concentrate?

11 A          No.  It's not a tranquilizer.

12 Q          Okay.  Would you be able to -- let me ask you

13 this; first, is the little boy okay?

14 A          He's doing fine.

15 Q          Okay.

16 A          I have kept in touch.

17 Q          There's nothing about that that is worrying you

18 to any extent right now?

19 A          Well, I'm not worried about it but I feel like

20 probably in the near future that we will be sued, you

21 know.

22 Q          Did you have insurance?

23 A          Yes.

24 Q          Okay.  Let me ask -- just ask you this, whether

25 -- it's the situation with the, you know, we need a juror

1    who can concentrate on hearing the evidence and

2    concentrate on the trial, would you be able to, you know,

3    and I -- when I say this we don't expect you to put all

4    these problems that you may have had out of your mind,

5    we are not saying that but would you be able to

6    concentrate on the evidence when it's time to concentrate

7    on it and give it the attention it needs as far as

8    sitting as a juror if you are selected or would that --

9    these other things just completely negate, prohibit your

10    ability to concentrate?

11    A       I have made great progress in letting go of

12    both my mother's death and this accident without

13    forgetting about it but I have let it go.

14    Q       Okay.  That's kind of what I was asking.

15    Of course we don't expect you to forget

16    and we know that you could not do that but it -- you

17    don't believe it would impair your ability to concentrate

18    on what we are doing here in the courtroom?

19    A       No.

20    Q       Okay.  But anyway, back to where I was, we have

21    got to have the type jurors who can keep an open mind

22    during the entire trial and decide that issue of whether

23    an appropriate sentence should be a life sentence or the

24    death penalty.

25    And when I say that, we have had jurors

1   and I have talked to jurors in the past who would say

2   either "I don't believe in the death penalty, I don't

3   care what the evidence is, I will not give anybody the

4   death penalty."

5           You see, they are not a qualified juror

6   because they are not keeping an open mind to both sides.

7           On the other hand, we have had jurors

8   that would say, "If I find a person guilty of capital

9   murder I don't need to hear that evidence during the

10  punishment hearing.  I'm going to give them the death

11  penalty."

12          You see, that juror is not qualified,

13  either because they are not keeping an open mind in

14  listening to this evidence in the punishment hearing

15  before making their decision.

16          Do you believe that you could keep an

17  open mind and listen and consider all the evidence before

18  making your decision?

19  A       Yes.

20  Q       Bearing in mind, Ms. Owsley, that in a capital

21  murder trial it goes in two phases, first you are going

22  to hear evidence of the guilt and innocence of the

23  defendant, basically "Did he do it" then the jury then

24  would go back and decide that issue.

25          Then later on if he were found guilty

1    then you would go back and decide the issue of whether

2    the appropriate sentence should be life or death so

3    that's two separate phases.

4    A        Yes.

5    Q        Ms. Owsley, there's a sheet of paper up there

6    that looks like this, if you will just kind of look at

7    it and I will talk to you a little bit -- that's what I

8    call the "flow chart", a chart of how a capital murder

9    case goes.

10               You start up at the guilt or innocence

11   part there at the very beginning of the trial, you will

12   hear evidence and after you have heard all that evidence

13   that pertains to the guilt or innocence of the defendant

14   then the jury decides whether he was guilty or not

15   guilty.

16               If they decide that he's not guilty then

17   of course the trial ends there and everybody goes home.

18               If, on the other hand you find that he's

19   guilty they are going to the next phase here in the

20   middle of the page where it says "Punishment", you are

21   going to hear more evidence and that evidence is not

22   going to be about -- it won't at all be about the guilt

23   or innocence that in that particular case because --

24   because you have already decided this evidence that you

25   -- there is going to be evidence that relates to what the

1    proper punishment should be.

2          It might be evidence of prior family

3    background of the defendant, prior criminal history of

4    the defendant, prior bad acts by the defendant,

5    psychiatric evidence, psychological evidence, testimony

6    about the religious background of the defendant, it might

7    be just any number of things that you might hear that

8    would relate to the issue of whether a life sentence or

9    a death penalty should be more appropriate.

10          And the kind of juror that we have got

11   to have is those that will be able to listen to that

12   evidence and consider it and then make their decision.

13   That's not too make -- not to say that you have to buy

14   into everything you hear, you can listen to it and

15   consider it and decide whether "I don't think that is

16   very important" or "That doesn't mean anything to me" or

17   "That is important", you know, you make those decisions.

18          But we have to have jurors that will be

19   willing to listen to that evidence and consider it and

20   then decide what weight to put on it.

21          Could you do that?

22   A        I could.

23   Q        Okay.  After you have heard all that evidence

24   -- a jury in a capital murder case does not hear all that

25   evidence and then go back and say, "How many want a life

sentence, how many want the death penalty", you never
actually make that decision exactly that way but what you
do is you go back and you answer two Special Issues
numbers or questions -- and I will go over those with you
in just a minute -- but if you would just bear with me
until we go over those.

But first, on that Special Issue #1 you
are going to vote either "Yes" or "No" on that.

If you vote "Yes" on it  --  excuse me
-- first, if you vote "No" on it then the defendant will
automatically receive a life sentence, if you vote "Yes"
on it then you are going to go to Special Issue #2.

Special Issue #2 is another question
that you are going to answer "Yes" or "No."

If you answer that question "Yes" then
the defendant would receive a life sentence, if you
answer the question "No" the defendant would receive the
death penalty.

When I say "you" I don't mean you as an
individual but the jury as a whole.

So even though you are not saying the
person gets the life sentence or the person gets the
death penalty you are going to know if you answer Special
Issue #1 "Yes" and Special Issue #2 "No" that the
defendant is going to receive the death penalty and you

1   are also going to know if you answer those questions any

2   other way that he will receive a life sentence.

3                       Are you with me on that?

4   A        Yes.

5   Q        Now, I know you don't know what those questions

6   are and we'll go over that at this time.

7                       There is a sheet of paper up there

8   marked on the top, it says "Special Issues", do you have

9   that?  (Indicating)

10  A        Yes.

11  Q        Okay.  Read it if you will to yourself, Special

12  Issue #1, and then I will talk to you about that.

13                      Okay.  That's that first Special Issue

14  and it sort of relates to future dangerousness of the

15  defendant and that's something you mentioned a little

16  earlier, "If you thought he was a threat to society" and

17  that's kind of what that first Special Issue is about.

18                      Would you agree with me on that?

19  A        Yes.

20  Q        Okay.  There's a couple of things -- and I want

21  to point out to you about that one is, you know, in a

22  criminal case the State has to prove to you beyond a

23  reasonable doubt that the defendant committed the crime.

24                      Well, in this Special Issue #1 the State

25  also has to prove that to you beyond a reasonable doubt,

1    we have got to prove to you beyond a reasonable doubt

2    that he -- that there is a probability that he will be

3    a threat to society.

4            Another thing I want to point out to

5    you is that word "probability."

6            "Probability" has been defined by Texas

7    state law as being "more likely than not."

8            Is that about what your definition of

9    "probability" would be, pretty close to that, sort of be

10   like 51 percent would be "probability", 49 percent

11   wouldn't be?

12   A       Yes.

13   Q       Okay.  So if the law says that "Probability is

14   more likely than not" is that something that you could

15   follow and not have any problems?

16   A       Yes.

17   Q       So, see, the State is required to prove this

18   beyond a reasonable doubt but we are not required to

19   prove that we can guarantee that he would commit another

20   criminal act of violence.  We are not required to predict

21   that he would commit a criminal act of violence in the

22   future, just that it's more likely than not that he

23   would.

24           Another part I want to call your

25   attention where it says "criminal acts of violence", of

1    course the defendant would be on trial for capital murder

2    but there are many other criminal acts of violence that

3    are -- besides capital murder, you know, attempted

4    murder, assault, aggravated robbery, aggravated rape,

5    things of that nature are criminal acts of violence even

6    though they are not capital murder.

7              Are you with me on that?

8    A         Yes.

9    Q         Of course there are crimes also that even

10   though they are against the law they are not considered

11   "acts of violence" such as forgery, theft, you know,

12   things of that nature.  Even though they are crimes they

13   are not violent crimes so we have got to be able to prove

14   to you that he would commit some criminal act of violence

15   irregardless of what sort of criminal act of violence

16   that was.

17             Are you with me on that?

18   A         Yes.  I am.

19   Q         The last words say "that would constitute a

20   continuing threat to society."

21             "Society" as you and I think of it day

22   to day is out there on the street and in our home like

23   this, is that kind of what you think of?

24   A         Yes.

25   Q         But "society" as it is defined in the law

1    includes the penitentiary so -- and when I say that, if

2    you decided that it's probable that he would commit a

3    criminal act of violence in the future but you thought

4    that that criminal act of violence might take place in

5    the penitentiary, well, that's still part of society

6    because after all those people are part of our society,

7    the criminals are there, the guards, the doctors and

8    nurses, people like that.  They are considered part of

9    society, too.

10            So on Special Issue #1 the important

11   part to remember is that you found the defendant guilty

12   of capital murder.

13            When you go to consider what your answer

14   should be on Special Issue #1 you can certainly go back

15   to that evidence you heard during the trial and give that

16   consideration but you have also got to be willing to

17   listen and consider that evidence that you heard during

18   the punishment phase of the hearing and kind of consider

19   it all before making your decision what you think the

20   appropriate answer should be on Special Issue #1.

21            Could you do that?

22   A        Well, I think I could.

23   Q        Okay.  Well, I know this is all new, Ms.

24   Owsley, and do you know of any reason that you couldn't

25   do that?

1   A        No.

2   Q        Okay.  Then you get down to Special Issue #2

3   and if you will read that to yourself and it's a little

4   bit confusing -- read that to yourself and then we'll

5   talk about it.

6   A        All right.

7   Q        Okay.  That second Special Issue is not like

8   the first Special Issue in that we don't have to prove

9   that to you beyond a reasonable doubt, that is just sort

10  of left to your own opinion and basically what it's

11  saying is you found the person guilty of capital murder,

12  you decided that Special Issue #1, he is likely to be a

13  danger to society, now you have got to decide is there

14  something about this case that I've heard in the evidence

15  or something about this defendant that is sufficiently

16  mitigating to me that makes me feel as if the appropriate

17  sentence should be a life sentence rather than the death

18  penalty.

19           And, you know, I can't tell you what

20  "sufficiently mitigating evidence" might mean to an

21  individual, it varies from one person to another but, you

22  know, -- and it can be anything you have heard during the

23  first part of the trial or during the punishment hearing

24  that you would consider sufficiently mitigating or that

25  mitigating -- term "mitigating evidence" is the evidence

1    that reduces the defendant's moral blameworthiness.

2            So basically when you say "sufficiently

3    mitigating" you are talking about sufficiently reduces

4    the blame, doesn't excuse his behavior but sufficiently

5    reduces that person's blame to the point that you think

6    a life sentence would be more appropriate than the death

7    penalty.

8            And that could be any kind of evidence.

9            Some people if they had evidence during

10   the trial presented by the State or Defendant that

11   indicates that the defendant was intoxicated when he

12   committed the crime, some people might say that doesn't

13   make any difference, it's still his responsibility while

14   someone else sitting on the jury might think if he hadn't

15   have been intoxicated this wouldn't have happened.

16           So you can see where different people

17   might feel differently about this.

18           Or it could be evidence of a rough

19   childhood, some people would reduce his blame for that

20   reason, some people would reduce the blame for just any

21   number of various reasons you might think of.

22           And of course you can choose not to

23   reduce the blame but basically if you answer "Yes" to

24   that you are saying, "Yes, I found something in the

25   evidence that I find sufficiently mitigating that makes

1    me believe a life sentence is more appropriate."

2              If you answer "No" you are saying,

3    "Well, I have listened to all this evidence during both

4    parts of the trial but I just don't see anything there

5    that could help reduce his blame."

6              When I say "reduce his blame" it also

7    has to be sufficiently reduced -- or reduced -- "I don't

8    see anything that sufficiently reduces his blame to me

9    that makes me think he should receive a life sentence,

10   I still think he should get the death penalty."

11             If you have answered that question after

12   you have answered Special Issue #1 -- of course your

13   answer to both issues are after you have heard the guilt

14   and innocence evidence and you have heard all the

15   evidence during the punishment hearing -- my question to

16   you is this; you told us a little bit earlier that if you

17   felt like the person had committed a capital murder and

18   you felt like they were "a continuing threat to society"

19   I believe is what you said, that you might believe the

20   case was appropriate for the death penalty?

21   A         Yes.

22   Q         Okay.  Well, let's base -- let's just assume

23   that you found a person guilty of capital murder, let's

24   assume that you have answered Special Issue #1 "Yes", if

25   you have done that you have basically said what you said

1    a little earlier which is found him guilty and found that

2    he's a threat to society.

3              Could you keep an open mind even after

4    you found him guilty and even after you found him a

5    threat to society, could you keep an open mind and go

6    back and reconsider all that evidence before deciding

7    what your answer was to Special Issue #2?

8    A         Yes.

9    Q         Okay.  And that's what -- what we are really

10   requiring of you is that you at each phase, you go back

11   and reconsider the evidence and make your decision on

12   each issue separately and not just say, "Well, I have

13   heard the evidence and I think he needs the death penalty

14   so I'm going to answer this 'Yes'."

15             You see, what we need, we have got to

16   have qualified jurors who can answer those Special Issues

17   if the appropriate answer in their mind, whether it be

18   "Yes" or "No", and just what we call, just "Let the chips

19   fall where they may."

20             If the appropriate answer gives him a

21   life sentence that's what he gets, if the appropriate

22   answer gives him the death penalty that's what he gets.

23             Could you do that?

24   A         Yes.

25   Q         Okay.  Another thing to keep in mind, Ms.

1    Owsley, is that sufficiently mitigating evidence, it

2    could come from the State, it does not necessarily have

3    to come from the Defense side of the table.  You might

4    hear something through one of our witnesses that would

5    make you think like, you know, if it was one of our

6    witnesses talked about he was intoxicated and that was

7    important to you, you know, but irregardless of where the

8    evidence comes from, the State or comes from the Defense

9    or comes from a psychiatrist or preacher or whoever it

10   comes from the important thing is that you are willing

11   to listen and consider whoever is up there on the witness

12   stand and then decide whether that is important or not.

13                    Could you do that?

14   A         Yes, sir.

15   Q         Just basically keep an open mind?

16   A         Yes.

17   Q         Okay.

18                    THE COURT:  You have used 27

19   minutes.

20                    MR. TOWNSEND:  Thank you, Your

21   Honor.

22                    In Texas, Ms. Owsley, I believe before

23   deciding what the appropriate punishment was in this case

24   and answering those Special Issues you would have a set

25   of instructions from the Judge.

1           And I believe those instructions would

2   tell you that in deciding what the appropriate punishment

3   should be you should not consider parole in any way.

4           When I say that what I mean is in Texas

5   if a person is found guilty of capital murder as in this

6   situation he would be eligible for parole after 35

7   calendar years and at the end of that 35 calendar years

8   that does not mean that he would receive parole but he

9   could receive parole because -- because he would be

10  eligible for it, it could be that he received a parole

11  at the end of 35 years, it could be that he never

12  receives parole.

13          What the jury is required to do is while

14  that is probably something that you couldn't put out of

15  your mind the jury is required not to use that in

16  connection of what their answer should be to Special

17  Issue #1 or Issue #2, basically just say, "I'm going to

18  consider a life sentence a life sentence and the death

19  penalty the death penalty, I am not going to worry about

20  parole stuff because there's nothing I can do about

21  that."

22          Could you basically not use parole in

23  your consideration as how you could answer those Special

24  Issues?

25          THE POTENTIAL JUROR:  Yes.

Q           (BY MR. TOWNSEND)   Okay.   Let me shift gears
a little bit and talk to you just in general, criminal
laws that relate to capital murder cases and also other
type cases; the punishment range in a murder I told you
couldn't receive the death penalty for just a plain
murder, the punishment range in a murder is from five
years probation up to 99 years or life in the
penitentiary.

Of course murder takes on many different
types of situations from very vicious type crimes all the
way to the type crimes we might call a mercy killing.

Are you familiar with what a mercy
killing might be?

A        Yes.

Q        In that range of punishment in order to be a
qualified juror you have got to be able to consider the
full range of punishment from five years probation up to
99 years or life.

And that is not to say, "Well, I would
give somebody 99 years to life" or "I would give somebody
five years probation" but that you would consider both
ends of the spectrum and everything in between.

Could you do that?

A        Yes.

Q        And of course that depends on the facts of the

1    case, you know, as to how you would make your

2    determination on that.

3                    Let's say, for instance Ms. Owsley, that

4    we have proved to you in this case that the Defendant was

5    guilty of murder but we didn't quite prove the robbery

6    beyond a reasonable doubt.

7                    Then it would be your duty as a jury to

8    find the defendant not guilty of capital murder but

9    guilty of murder because, you see, we didn't prove that

10   murder and robbery, we just proved the murder.

11                   Could you do that?

12   A        Well, I think so.

13   Q        Did you understand what I'm saying?

14                   If we have got to prove the murder and

15   the robbery, if we proved the murder but didn't prove the

16   robbery then you would have to find him guilty -- not

17   guilty of capital murder?

18   A        Right.

19   Q        Because we didn't prove the murder and robbery?

20   A        Right.

21   Q        But since we did prove the murder you would

22   still find him guilty of murder?

23   A        Right.

24   Q        In that situation the defendant would be

25   eligible for anywhere from five years probation -- and

I'm not talking about this case but any capital murder case where the murder was proven but the other element wasn't, then you are looking at from five years probation to 99 years to life sentence.

To follow the law you have to be able to listen and consider the evidence before deciding and consider that full range of punishment.

Could you do that?

A      Yes. I think you would have to.

Q      Certainly.

We are required to prove our case beyond a reasonable doubt. And of course that is not beyond all doubt but it is beyond a reasonable doubt and that's a burden that we accept going in. We know that's our burden.

Are you familiar with that burden of proof?

A      Yes.

Q      Is that something that you are comfortable with and feel it's appropriate?

A      Yes.

Q      You know, in a capital murder, Ms. Owsley, we are required to prove that the murder took place intentionally, in a regular murder it can be knowingly or intentionally but let's say we proved the murder was

1    done   knowingly  but   we   didn't   prove   it   was   done

2    intentionally and we also proved the robbery, we haven't

3    proved  an  intentional  murder,  we  have  only  proved  a

4    knowing murder, that won't fit -- under the law that's

5    not capital murder, you would have to find the defendant

6    not guilty of capital murder but again guilty of murder.

7                        Could you do that?

8                        Are you with me on that?

9    A        Say that again.

10   Q        Okay.  If a person is found guilty of capital

11   murder  they  must  be  found  to  be  --  of  having

12   intentionally  --  caused  the  death  of  the  individual

13   intentionally?

14   A        Okay.

15   Q        Let's just say they didn't do it intentionally

16   or the State failed to prove to you beyond a reasonable

17   doubt that they did it intentionally.  Let's say that we

18   only  proved  to  you  that  they  --  that  it  was  done

19   knowingly and not intentionally.

20                        There is not a whole lot of difference

21   in  those  terms  but  there  is  some  difference  between

22   intentionally and knowingly.

23   A        I guess that's what I'm having a problem with.

24   I don't see that much difference in it.

25                        MR. TOWNSEND:    "Knowingly"

1    -- Your Honor, do you have the definition there?

2                    THE COURT:   I don't think I

3    have a penal code up here.

4                    MR. TOWNSEND:   I hate to give

5    a definition.

6                    THE BAILIFF:   Do you have one,

7    Bird?

8                    MR. OLD:    (Handed to the

9    Court.)

10                    THE COURT:   Okay.   Ma'am, I

11   will read the definition of "intentional" then I will

12   read you the definition of "knowingly."

13                    THE POTENTIAL JUROR:   Okay.

14                    THE COURT:   "A person acts

15   intentionally or with intent with respect to the nature

16   of his conduct or to a result of his conduct when it is

17   his  conscious  objective  or  desire  to  engage  in  the

18   conduct or cause the result.

19                    A   person   acts   knowingly   or   with

20   knowledge with respect to the nature of his conduct or

21   to circumstances surrounding his conduct when he is aware

22   of the nature of his conduct or that the circumstances

23   exist.

24                    A person acts knowingly with or with

25   knowledge with respect to a result of his conduct when

1   he's aware that his conduct is reasonably certain to

2   cause the result."

3            "Intentional" takes more of a mind-set,

4   "I want to kill you" and I do.

5            "Knowingly, I may do it, is a dangerous

6   act, not intend to kill but if I engage in that dangerous

7   act it kills", then I could be guilty of knowingly

8   killing you, not intentionally doing it.

9            So it's a state of mind.

10           THE POTENTIAL JUROR:   Thank

11  you.

12           MR. TOWNSEND:   Okay.   In a

13  capital murder we have to prove that the death was caused

14  intentionally.

15           Say you decide we didn't prove that to

16  you beyond a reasonable doubt, we only proved to you

17  beyond a reasonable doubt that he killed the person

18  knowingly, you would have to find the defendant guilty

19  -- not guilty of capital murder because we didn't prove

20  intentional but guilty of knowingly committing murder

21  which would be murder but not capital murder.

22           Could you do that?

23           THE POTENTIAL JUROR:   Yes.

24           I just feel like, you know, for me to

25  convict somebody of a capital murder it would have to be

1    proven.

2    Q          (BY MR. TOWNSEND)   Yes.

3    A          Beyond a shadow of a doubt.

4    Q          Okay.   Okay.   I talked to you a moment ago

5    about the burden of proof.   The burden of proof in a

6    criminal case, that kind of led into something, we are

7    talking about the burden of proof is -- is that the State

8    has to prove our case, we have got to prove the defendant

9    guilty, he doesn't have to prove his innocence.

10            Are you comfortable with the law being

11   that way?

12   A          Right.

13   Q          Along with that goes the Fifth Amendment

14   privilege and the Fifth Amendment privilege to the

15   Constitution says he can't be required to testify in a

16   criminal case unless he chooses.

17            Is that something that is okay with you?

18   A          Right.

19   Q          Okay.   When I say that the important part is

20   that we have got to prove our case, they don't so

21   therefore you should not and cannot follow the law if you

22   hold it against him in any way because he doesn't testify

23   if that -- if that's his choice.

24            Of course human nature again, that is

25   something that you can't put completely out of your mind

1    because human nature says, "I would like to hear what

2    he's got to say" or "I would like to hear his version"

3    and that's okay to have those thoughts in the back of

4    your mind.   But when you go to consider the guilt or

5    innocence you have got to be able to set that aside and

6    not give that consideration in any way.

7                        Could you do that?

8    A         Yes.

9    Q         Okay.   And that's the same way with the

10   punishment phase of the hearing, you know, during that

11   punishment phase when you are listening to evidence and

12   wanting to decide what the proper answer should be to

13   Special Issue #1 and Issue #2 you might prefer it or

14   might -- it might appeal to you if the defendant took the

15   stand and said, "Hey, I'm sorry."

16                        But again, that Fifth Amendment

17   privilege says he has the right to choose not to take the

18   stand.

19                        If he did not take the stand even during

20   that punishment phase in order to follow the law you have

21   got go not hold that against him in any way in deciding

22   the answer to Special Issue #1 and Issue #2.

23                        Could you do that?

24   A         Yes.

25   Q         You are going to hear testimony in any criminal

trial from all sorts of witnesses, they might be police officers or ministers or psychologists or might even be someone you know.   The important part about it is that no matter who that witness is that you start them out at the same place on the track and not give anybody a head start in your believing them just because you know them or just because they are a police officer or just because they are a minister but first listen to their evidence and consider it and then decide whether their evidence was important, unimportant, believable, not believable.

Are you following me?

A        Yes.

Q        Could you do that and give everybody a fair shake?

A        Yes.

Q        The indictment in a criminal case is a copy of -- that is what you looked at a little earlier and I think the Judge told you several weeks ago that the indictment is not evidence of anything.   That is not evidence in a criminal trial at all.   You would have to be able to not to consider it in any way in deciding your verdict.

Could you do that?

A        Yes.

Q        Okay.   Oftentimes in criminal trials you will

1   be presented with statements or confessions by the

2   defendant.

3           If you receive the -- a confession, have

4   it read to you or given a copy of it and it was presented

5   into evidence, I believe the Court will instruct you that

6   before you can use that confession as evidence in the

7   crime in any way you have got to find beyond a reasonable

8   doubt that that confession is truthful and voluntary.

9           And so my question is this; let's just

10  suppose that you found -- when I say "voluntary" I mean

11  under the legal "voluntary", you know, legally a

12  statement is not voluntary of course if it is coerced,

13  if the person was beaten up to give a confession then

14  that is not voluntary, under certain situations if the

15  defendant was not read his Miranda Rights -- are you

16  familiar  with Miranda Rights,  that's the right to

17  remain --

18  A       Right.

19  Q          -- the police officers on TV?

20  A       Right.

21  Q       When they read them the little card, "You have

22  a right to remain silent?"

23  A          "Silent."

24  Q          "Have the right to have an attorney present"

25  and that sort of thing?

A          Yes, sir.

Q          If they are not properly given their Miranda

Rights in certain circumstances that may invalidate a

confession, not in all circumstances but in some.

If for instance in a criminal trial you

heard a confession and you believed beyond a reasonable

doubt that the confession was truthful but you also

believe that the State did not prove to you beyond a

reasonable doubt that it was voluntary because there was

no testimony that he was ever given his Miranda Rights

or the testimony was that he wasn't given his Miranda

Rights to follow the law the Judge would instruct you

that you could not consider that confession in any way

in deciding what the proper verdict should be because the

confession was involuntary.

And again, that's one of those things

we could not ever expect anyone to put that completely

out of their mind but you have got to be able to set that

aside in deciding the guilt or innocence of the defendant

because it was not voluntarily taken.

Could you do that?

A          Yes.  I think so.

Q          Okay.  And when we say that keep in mind that

you also need to be able to not use that in considering

the other evidence.

1              For instance, if you had a witness that

2    testified to a certain fact that was consistent with

3    something that you heard in that confession you have got

4    to decide whether that witness is telling the truth or

5    not without referring back to that confession.

6              Could you do that?

7    A      Yes.

8    Q      Okay.  Ms. Owsley, I have been talking to you

9    for a good while and I have asked most of the questions.

10             Do you have any questions of me or

11   anything that you feel like you need to bring up that

12   hasn't been discussed yet?

13   A      Well, just one thing; I did overhear this being

14   discussed, I had a garage sale a few weeks ago and I

15   overheard two ladies talking about the trial.

16   Q      Were they talking about from their personal

17   knowledge or was it from something they had seen in the

18   newspaper or do you remember?

19   A      Well, it -- it was what they had heard and, you

20   know, I don't remember just everything.

21   Q      Okay.

22   A      But I did overhear them.

23   Q      Let me ask you this; I believe you understand

24   that whatever you may have heard from them or have you

25   heard anything yourself in the newspaper?

1   A          Well, yes.  I read about it in the newspaper.

2   Q          Do you understand that whatever you may have

3   read in the paper or whatever you may have heard these

4   ladies say whether you remember it or not very well that

5   that's not evidence?

6              I think you understand that?

7   A          Right.

8   Q          Could you be able to decide this case based on

9   the evidence that is presented in the courtroom and just

10  push that aside and not consider it when deciding the

11  issues in this case, could you do that?

12  A          Yes.   You know  --   I don't think that this

13  is -- this is not anything that people enjoy doing.

14  Q          Right.

15  A          You know.  And I --

16  Q          Certainly.

17  A          -- I believe it's our duty to serve our

18  community.

19  Q          Right.

20  A          And being a native of this community I feel

21  very close to it and -- but this is not something that

22  someone -- that I am just overjoyed about being here.

23  Q          Well, ma'am, I don't know that -- I know you

24  have probably never been involved in this process before

25  but we don't get a lot of volunteers.

1    A          You don't?

2                          THE COURT:  Normally, ma'am,

3    if somebody wants to do this we would wonder about them.

4                          MR. TOWNSEND:  Let me ask you

5    this, too; I noticed in your questionnaire that you

6    indicated that you knew Mr. Old?

7                          THE POTENTIAL JUROR:  Yes.

8    Q          (BY MR. TOWNSEND)  How do you know him?

9    A          I am a native of Titus County and I believe

10   Attorney Old is also, aren't you?

11                         MR. OLD:  She and I graduated

12   from high school together.

13                         THE POTENTIAL JUROR:  Right.

14   We did.

15                    How about that.

16                         MR. TOWNSEND:  Has Mr. Old

17   ever represented you in a criminal case or civil case of

18   any kind?

19                         THE POTENTIAL JUROR:  Has he?

20   Q          (BY MR. TOWNSEND)  Yes.

21   A          No.

22   Q          How about his father?

23   A          No.

24   Q          Has the other attorney representing the Defense

25   in this case, Lance Hinson, do you know Lance?

1    A         I do know his parents better than I know Lance

2    or know his mother and I know his dad.

3    Q         In your relationship with Mr. Old or Lance

4    Hinson either one is there anything about that that would

5    keep you from being fair and impartial in this case?

6              And when I say that I mean is there

7    anything that would make you sympathize more with their

8    side or sympathize more with my side or could you just

9    base it on the evidence and not worry about whether you

10   are making me happy or Mr. Old happy?

11   A         I think I could be very --

12   Q         "Very fair?"

13   A         Right.  Not biased.

14   Q         "Unbiased?"

15   A         "Unbiased."

16   Q         I think you mentioned in your questionnaire

17   that you have had prior jury service but it was a good

18   long while ago?

19   A         Yes.  It was.

20   Q         Was that on a criminal case or civil case?

21   A         It was a civil case.

22   Q         All right.

23   A         And I was an alternate in a federal jury one

24   time.

25   Q         Was this a criminal case or civil case?

1    A        Civil.

2    Q        Okay.  So you have never served on a criminal

3    jury?

4    A        No.

5             My husband has and I know what it's like

6    because they were sequestered for the whole time.

7    Q        I don't know at this point, Ms. Owsley, whether

8    you would be sequestered or not for certain.

9             If you were I don't know how long a

10   period of time that would be.  I wouldn't think it would

11   be a substantial period but I certainly can't say that

12   for certain.

13            Is there anything about that fact that

14   you might be sequestered that would cause you any undue

15   problem with, you know, anymore than the normal problem

16   that it would cause anyone?

17   A        Well, no.

18            MR. TOWNSEND:  Okay.  I'll

19   pass the juror, Your Honor.

20            THE COURT:  Ma'am, you got

21   here a little bit late, we are going to have to go to

22   lunch before we can finish talking to you because the

23   Defense will probably talk about the same length of time.

24            So let's take a lunch break and start

25   at five minutes 'til 1:00, start shortly before 1:00 or

1    right at 1:00.

2                         We are in recess.

3

4                         (Noon recess.)

5

6                         (The following occurred in the presence

7    and hearing of the potential juror:)

8

9                               THE COURT:  Well, ma'am, are

10   you ready for another session?

11                              THE POTENTIAL JUROR:  I just

12   told the security man I don't think you all want me

13   because I couldn't find my way in or out.

14                              THE COURT:  We will give you

15   a special escort if you are on the jury.

16                              THE POTENTIAL JUROR:  It's

17   just like a maze.

18                              THE COURT:  Mr. Old, you may

19   proceed.

20

21                   VOIR DIRE EXAMINATION

22                      BY MR. OLD

23

24   Q        Ms. Owsley, I am probably going to ask you

25   about the same questions the prosecutor asked you.

1                    First, I think it's important that you

2    and I both understand the purpose of a juror and jury

3    duty and that duty arises from the oath that a juror

4    takes when he begins to try a case and what a juror is

5    asked to swear or affirm to is that in the particular

6    case he has been selected to try that as a juror "You

7    will a true verdict render according to the law and the

8    evidence so help you God."

9                    And that is to render a true verdict on

10   -- on the law and on the evidence.

11                   The Court will give you the law.

12                   You have been on a civil jury or

13   criminal?

14   A          Civil.

15   Q          Did it -- did you all reach a verdict or --

16   A          We did.  It was --

17   Q          -- do you remember at the end of the trial or

18   at the end of the evidence the Court gave you an

19   instrument called "a charge?"

20   A          Right.

21   Q          It was a written instruction.

22                   That is the law that His Honor will give

23   you and those are the rules that you are bound by in

24   making your determination in this case.  A juror is not

25   required to know law, his duty is to follow the law.

1          Now, the evidence is another matter, the

2     jury collectively is the exclusive judge of the evidence

3     of the case and you can give whatever evidence you want

4     credibility or question the credibility of any of the

5     evidence.  That is you determine the facts of the case.

6          And as I think you said earlier that

7     the facts really gave the death sentence, not the jury?

8     A          Well, that -- that is my opinion.

9     Q          That is exactly the law in the State of Texas.

10    It is based on the answers to those Special Issues, you

11    answer the issue, one of them is to find the fact and the

12    other one maybe expresses an opinion but in doing so we

13    tell you the result of the outcome of your answer and so

14    you know the result of how you answer those questions.

15         Now,  as we have  talked about  the

16    Judge will tell you what the law is and if you can be

17    bound -- and that you are to be bound by the law that he

18    gives you in those instructions.  He may give you a

19    definition of a particular word.

20         When the Court defines a word for you,

21    say you asked "knowingly and intentionally", again, those

22    words  have  specific  legal  meaning  and  that's  the

23    definition and it may or may not veer from what we

24    ordinarily think a word means but in many cases I guess

25    it does and as your oath implies if the Court tells you

1    a word means something you must take that definition and

2    lay aside your own definition if it's in conflict with

3    what the Court tells you a word means.

4            There is before you a page on the second

5    paragraph it has the definition of "beyond a reasonable

6    doubt."

7            And I believe I should be able to tell

8    you how it's marked and I can't find mine.

9            THE COURT:  That's the wrong

10    one.   To  your  left  --  to  your  right,  excuse  me.

11    (Indicating)

12            MR. OLD:  "SVDX 6."

13            THE COURT:  She has it.

14            MR.  OLD:   Starting with the

15    full  paragraph  on  the  page  "The  prosecution  has  the

16    burden  of  proving",  could  I  get  you  to  read  those  next

17    paragraphs  to  the  end  of  the  page?

18            THE POTENTIAL JUROR:  Okay.

19    Q       (BY MR. OLD) When or this morning you made the

20    statement  that  "No  one  wants  to  do  this"  and  that's

21    correct,  no  one  wants  to  sit  on  the  jury  or  any  jury

22    probably.

23            But you said you "had a duty to serve

24    the community."

25            I think it's correct to say that you

1    fulfilled your duty as a citizen when you showed up about

2    a month ago for jury service.  What we are doing now is

3    not determining whether you are a good citizen or not,

4    we are determining whether or not you can a true verdict

5    render in this case on the law and on the evidence.

6                     I think there are laws that everyone

7    -- everyone can think up something they would change in

8    the law as they go far enough, there are things that I

9    don't think ought to be against the law and there's

10   probably things that because of my opinion I couldn't sit

11   on a jury and be fair about.  That's what we are really

12   asking and because there is something in a particular

13   type case that you cannot accept does not make you a bad

14   citizen.

15                     As to the definition of "reasonable

16   doubt", does that definition -- I'm not asking you what

17   it means, does that definition mean something to you?

18   A        It does.

19   Q        Now, you said twice this morning or maybe three

20   times that "It would have to be proven to you beyond a

21   shadow of a doubt before you could render a verdict of

22   guilty in a capital case" and that is sentence -- reach

23   a verdict that resulted in the death sentence?

24   A        I believe.  Yes.

25   Q        Okay.

1    A          Because --

2    Q          Let me ask you something.

3    A          Okay.

4    Q          Does your -- do your words "beyond a shadow of

5    a doubt" require a greater burden of proof that is

6    defined as "beyond a reasonable doubt?"

7    A          Well, I think -- I don't think that -- I don't

8    think that -- I think this could make me have some

9    questions.

10   Q          Okay.  I don't understand.  When you say "this"

11   you are talking about the definition of "reasonable

12   doubt?"

13   A          This says, the last sentence, "the kind of

14   doubt that would make a reasonable person hesitate to act

15   in the most important of his own affairs."

16   Q          Okay.  Is that a greater or lesser burden or

17   proof than your quote beyond a shadow of a doubt?

18   A          I don't know.

19   Q          In those three or four paragraphs you are

20   saying that the operative word in there or the words that

21   you come back to "act upon without hesitation in the most

22   important of your own affairs?"

23   A          Yes.

24   Q          As to whether or not somebody committed the

25   crime of capital murder, would you require more proof

than proof that would be the same type that you rely on,
act upon without hesitation in the most important of your
own affairs?

A          Well, I -- this is something that -- that you
really can't give a concrete answer to I don't think.

Q          I understand what you are saying but we are
entitled to your best answer and I mean the thing about
this is -- I will give you an example; people say they
are for the death penalty and they could give it and they
may in their mind have a frame of circumstances that they
could give it under.  To get on a jury is a different
thing, I don't know how it effects you and I know before
you -- no one would do it voluntarily as we said this
morning, you would not come down here and volunteer to
sit on the jury nor would any sane citizen?

A          Right.

Q          But I mean we are trying to get the best answer
from you that we can and we want to be certain that you
are in a position to render a fair verdict.

               I'm not picking on you.

A          I know.

Q          And I'm not -- and what my question really is;
can you render a verdict in this case on the definition
of "reasonable doubt" that is given you or are you going
to require less than that or more than that?

1   A          Well, I just feel like I might have to have

2   more.

3   Q          Okay.

4                          MR. TOWNSEND:  May we approach

5   the bench, Your Honor?

6                          THE COURT:   Ma'am, would you

7   mind stepping out for a moment, let me talk to the

8   lawyers for just a second.

9

10                         (Off the record discussion.)

11

12                         (The following occurred outside the

13  presence and hearing of the potential juror:)

14

15                         THE COURT:  Bring her back.

16

17                         (The following occurred in the presence

18  and hearing of the potential juror:)

19

20                         THE COURT:  I'm sorry to ask

21  you to step out, it's just easier to talk to the lawyers

22  without you here because sometimes we have to discuss

23  certain matters of law.

24                         THE  POTENTIAL  JUROR:   And

25  maybe I just don't understand this as I should.

1          THE COURT:   Well, I'm sure
2    there will be some more questions on it.
3               Mr. Old.
4               MR. OLD:   Your Honor, do you
5    want --
6               THE COURT:   I will be glad to.
7          Let me talk to you about it for just a
8    minute, ma'am; for over a hundred years we have never had
9    a definition of "reasonable doubt", the Court came out
10   with a definition a few years ago and they told us this
11   is the definition of "reasonable doubt."   The State of
12   Texas must prove all of the elements of an offense, they
13   must prove where it happened, what happened and basically
14   how it happened beyond a reasonable doubt.   They must
15   prove it.   If you think something happened that's not
16   "beyond a reasonable doubt", if you believe it happened
17   but you are not sure that's not "beyond a reasonable
18   doubt."
19          But we never really had a definition.
20          To some people "reasonable doubt" might
21   be 95 percent on the scale of zero to a hundred or it may
22   be 99, you could never be convinced beyond a shadow of
23   a doubt, at least a lot of people felt that way because
24   to be beyond a shadow of a doubt is basically an absolute
25   and you would have to be a witness if you are a witness

1    obviously you would not be a juror.

2                THE POTENTIAL JUROR:  Okay.

3                THE COURT:  So the courts have

4    used the standard in Texas "beyond a reasonable doubt."

5                And the Court is saying in there,

6    whatever that says to you, now, I'm not going to tell you

7    how to interpret it but I'm going to tell you if you

8    require more proof than that then you are requiring a

9    burden on the State that they don't have.

10                If you require less proof to convince

11   you than that requires then you are not requiring the

12   State to prove what they must and you are kind of giving

13   the advantage to the Defense in that instance.

14                If you are requiring beyond all doubt

15   then you are imposing an unreasonable burden on the State

16   so we have to have this definition and if you are on this

17   or any other criminal jury you will be instructed this

18   definition of "reasonable doubt" is what you read.

19                If you can follow that definition and

20   not hold the State to a higher standard you are qualified

21   but if you are going to hold the State to a higher

22   standard, in other words, if you tell me "I'm going to

23   make the State prove it beyond all doubt" or "I'm sorry,

24   but this definition of reasonable doubt is not strong

25   enough, I have a higher burden in my mind before I could

1  ever convict somebody of a crime or before I could ever

2  answer questions that would result in the execution of

3  a human."

4                    If that's the way you feel I don't have

5  a problem with it nor do the lawyers but we must know.

6                    If you are going to hold them to a

7  lesser standard then we need to know that and you are the

8  only one that can tell us and I can't really tell you

9  what this means because my interpretation doesn't matter,

10 it's your interpretation based on the law that has been

11 set forth from the courts, if you can follow that

12 definition of reasonable doubt and feel comfortable and

13 abide by it and not make the State prove more nor let the

14 State prove less to return these answers you are

15 qualified but if you have a problem with it we need to

16 know right now.

17                    THE POTENTIAL JUROR:  I think

18 I understand.  Right now I think I could apply this.

19                    THE COURT:  Here's where I am

20 going to stop you and say I need more than "think", I

21 need "Yes I can" or "No I can't."

22                    It doesn't get easy, does it?

23                    THE POTENTIAL JUROR:  No.  It

24 doesn't, it really doesn't.

25                    THE COURT:  Can you follow the

1    instructions and not require more of the State or would

2    you require more of the State?

3                              THE POTENTIAL JUROR:   As to

4    this  interpretation as  to state it  you would actually

5    -- they would have to be a witness to -- to the crime?

6                              THE COURT:   To be absolutely

7    beyond any doubt.

8                              THE    POTENTIAL    JUROR:

9    Absolutely a shadow of a doubt.

10                             THE COURT:   You would have to

11   be a witness.

12             If   someone   says,   "Well,   you   know,

13   someone from Mars might have come down and done it", I

14   don't think that's reasonable.

15             If they say, "You know, they didn't

16   prove that everybody else in this county didn't do it so

17   maybe it was someone else", that's not reasonable.

18             It's a doubt based on reason on a

19   reasonable circumstance or a set of facts, you must feel

20   as comfortable as you can.

21             Some people have compared this to making

22   the decision to get married or making the decision if

23   it's not an accident to have a baby or to make the

24   decision whether or not to buy a house.

25             It's a very important decision and the

1    courts are trying to equate it to the juror's frame of

2    reference by saying, "You need to be as convinced in this

3    matter as you are in any of the affairs of your personal

4    life that requires a great deal of thought and

5    concentration before you make a decision."

6                    THE POTENTIAL JUROR:   Well,

7    I would keep an open mind.   I believe that I could.

8                    THE COURT:   And would you

9    accept that definition and make the State prove beyond

10   a reasonable doubt to you all of the elements of this

11   offense before you would find the person guilty?

12                   THE POTENTIAL JUROR: I would.

13                   THE COURT:  And if you do find

14   a person guilty of capital murder would you make the

15   State prove beyond a reasonable doubt that the answers

16   to the issues should be "Yes" and "Yes" before you would

17   vote "Yes?"

18                   THE POTENTIAL JUROR:   Yes.

19                   THE COURT:   Okay.   Mr. Old.

20                   MR. TOWNSEND: Your Honor, --

21                   THE COURT:   Yes, sir.

22                   MR. TOWNSEND:  We have talked

23   about this before off the record on different jurors in

24   such a way as to -- as a life sentence going to require

25   beyond a reasonable doubt as the -- without the death

1    penalty requiring more than that.

2                  THE   COURT:   Ma'am,   Mr.

3    Townsend has a good point; you realize based on what you

4    have been told by everyone that if you found a person

5    guilty of capital murder then you will answer some

6    questions, the answer to those questions will indicate

7    whether it's a death sentence or life sentence. The law

8    in essence says if you convict somebody of a capital

9    murder they start out with a life sentence, if the State

10    wants death then they must prove beyond a reasonable

11    doubt that, number one; he or she will be a danger in the

12    future and, number two; that he or she actually intended

13    that a death occur or anticipated that a death occurs,

14    those are the questions that we are concerned with. In

15    fact we don't -- in question two we haven't even been

16    voir diring on this other question -- forget what I

17    said -- they have to prove the answer to that first

18    question -- look at the sheet over there; if the State

19    proves "Yes" that the person will be a continuing danger

20    to society -- and "danger" means a person is going to

21    commit dangerous violent criminal acts, not just

22    nonviolent but if the person is going to commit violent

23    acts of criminal violence that will constitute a

24    continuing danger to society, if that's proven to you you

25    will answer that question but it has to be proven beyond

1   a reasonable doubt.    If it's not proven beyond a

2   reasonable doubt the answer is "No."

3                    If the answer is "No" it's a life

4   sentence, if the answer is "Yes" it's a death sentence

5   then you go to the next question which I'm not going to

6   talk to you about right now because the State has no

7   burden.

8                    What Mr. Townsend was saying is that

9   some people would require a higher burden than beyond a

10  reasonable doubt before they could ever vote for a death

11  sentence, they would impose on the State a burden to

12  prove -- kind of like you were saying earlier "beyond a

13  shadow of a doubt" and some people may put such a higher

14  burden on the State of Texas before they could return a

15  verdict that results in a verdict of death that it would

16  be an impossible burden for the State to meet.

17                   The burden is the same for guilt or

18  innocence as it is when you answer "Yes" or "No", in fact

19  the burden of proof is the State's in a traffic ticket

20  beyond a reasonable doubt, the consequences are far

21  greater here but the concepts are the same from a traffic

22  ticket to answer a question on the death penalty.

23                   Would you be able to impose the same

24  burden in the first part of the trial, the guilt or

25  innocence and in the second part of the trial?

1        In other words, are you going to make

2   the State prove beyond more than just -- more than just

3   beyond a reasonable doubt before you could answer the

4   question in such a way to result in death or would you

5   maintain the same burden of proof in both the

6   guilt/innocence and punishment stage?

7        THE POTENTIAL JUROR:   Well,

8   I think that still is real hard to answer until you get

9   there.   I don't think when I got in the jury room if I

10  didn't feel comfortable one way or the other that I could

11  just be swayed.

12        THE COURT:   You are doing

13  fine, you are doing fine.

14        You would not have to be an eyewitness

15  in order to find somebody guilty of a crime, would you?

16  You wouldn't have had to have been there and to see it?

17        THE POTENTIAL JUROR:  No.  If

18  I felt like the evidence -- if I was satisfied with the

19  evidence that was presented.

20        THE COURT:  And would you have

21  to be convinced beyond all doubt that a person would be

22  a continuing danger before you could answer that question

23  "Yes" or would you be satisfied with the burden of proof

24  that has been established by our courts?

25        THE POTENTIAL JUROR:  I think

1    I could go by this.

2                    THE COURT:  You "think" or you

3    "will?"

4                    See, you will take an oath to follow the

5    law and that's the law.

6                    THE POTENTIAL JUROR:  I will.

7                    THE COURT:   Mr. Townsend, I

8    am convinced at this point that she does understand the

9    burden and will not impose a greater burden on the State

10   nor a lesser burden on the State than required by law.

11                   MR. TOWNSEND:  Thank you, Your

12   Honor.

13                   THE COURT:   Thank you.

14           Mr. Old.

15                   MR. OLD:  As you looked at the

16   indictment this morning you understand that an indictment

17   is not an inference or evidence of guilt and the fact

18   that this man has been indicted or charged with an

19   offense would not infer anything to you as to innocence

20   or guilt?

21                   THE POTENTIAL JUROR:  Correct.

22   Q          (BY MR. OLD, CONTINUING VOIR DIRE EXAMINATION)

23                   Another law that you will be confronted

24   with, you will be told that all men are presumed to be

25   innocent until proven guilty beyond a reasonable doubt,

1    do you have any problem with that law?

2    A       No.

3    Q       Do you presume this man to be innocent at this

4    time?

5    A       Yes.

6    Q       Okay.   As to whether or not a defendant or a

7    person charged with a crime testifies, he has the right

8    not to, do you understand that?

9    A       I do.

10   Q       And as to innocence or guilt or on punishment

11   he doesn't have a burden of proof is what the law says.

12           Would you require Mr. Wardlow through

13   his attorney or in any way to prove anything to you in

14   order for you to acquit him?

15   A       Yes.

16   Q       You would require him to do something?

17           Now, bear in mind the State has to prove

18   him guilty beyond a reasonable doubt.

19   A       Okay.

20   Q       Okay.   Could you find him not guilty if the

21   State didn't quite live up to that burden of proof?   You

22   would  hesitate a   little bit?    It wouldn't be like

23   making the decision to buy the house, it would be almost

24   that -- do we have to prove anything?

25   A       These are real hard questions.   I have never

1    encountered anything like this before and I will be

2    perfectly frank with you, it's really hard for me to give

3    a concrete answer.

4    Q        You know what's terrible about it?

5    A        Pardon?

6    Q        Do you know what's really terrible about that?

7    A        What?

8    Q        The people asking you have never been in that

9    position either and I don't know.

10                  Mr. Townsend, have you ever had jury

11   duty?

12   A        No.

13   Q        We have never been in this position and for

14   obvious reasons have not and I know -- we are not trying

15   to embarrass you.

16   A        I know you are not and I know that you all are

17   doing exactly what you have to but at the same time it's

18   not easy for me to sit up here and give you a "Yes" or

19   "No" answer to everything that's asked.

20                  I left this morning after Counselor

21   Townsend had questioned me and I got to thinking, you

22   know, I said "Yes" to some of those things and I got to

23   thinking, you know, do I really -- there's mixed emotions

24   about this and I think anyone that would sit up here, if

25   they didn't have mixed emotions must be something wrong

1    with them.

2    Q        Let me try some more law on you, Mr. Townsend

3    spoke to you about the law of statements or confessions,

4    the first issue is when a confession of a defendant or

5    a party to a suit is offered in evidence is whether or

6    not it's voluntary and the law again has its definition

7    on or the criteria that the State must prove beyond a

8    reasonable doubt in order for that statement to be

9    admissable and it must be of his own free will and

10   voluntary and he must have been given the Miranda Rights

11   that we talked about prior to doing this and if it was

12   the subject of custodial interrogation you must make the

13   finding whether it's voluntary or not.

14            Now, let's say that as a juror that on

15   the evidence it had not been proven to you beyond a

16   reasonable doubt that the statement was voluntary, okay,

17   you believe or the evidence clearly shows that, for

18   example the officer taking the statement didn't read one

19   of those Miranda Rights to him, didn't tell him he had

20   the right to have a lawyer, didn't tell him it could be

21   used against him, one of those things, but you believe

22   overwhelmingly beyond a reasonable doubt that that

23   statement is true.

24            Now, in that situation what the Court

25   instructs you is if you find it's involuntary or it's not

1   proven to you that it's voluntary beyond a reasonable

2   doubt and true you should totally disregard that

3   statement and not let it effect your deliberations.

4   A        Just as if it didn't happen?

5   Q        Just as if it didn't happen, you hadn't read

6   it and, you know, you believe beyond a reasonable doubt

7   that the defendant signed the statement, it's in his

8   handwriting and because of part of the evidence it's an

9   involuntary statement, for example; the officer taking

10  the statement did not tell him that it could be used

11  against him in a Court but you still believe, you know,

12  not only beyond a reasonable doubt, perhaps to your

13  "shadow of a doubt" that the statement is true; can you

14  lay aside that statement and not consider it if the Court

15  instructs you to?

16              THE COURT:   Ma'am, what Mr.

17  Old is telling you, you may have a case where you have

18  a confession that you have read and you believe it's

19  truthful, that the person that wrote it or signed it

20  meant every word and it described the crime in great

21  detail so you have absolutely no doubt that person did

22  it but then when you heard, like he said, that they

23  didn't prove that all of the man's rights were given you

24  are going to be told you can't consider it unless the

25  State proves it was voluntary.   So we are assuming for

1    this conversation that the State failed to prove all the

2    warnings were given so, you know, you know based on the

3    law that you can't consider that statement but you have

4    read it and without that statement you don't have quite

5    enough proof to convince you beyond a reasonable doubt

6    that he's guilty.

7                    Would you have the mental discipline to

8    disregard the fact that you know he's guilty because of

9    reading that statement and finding that person not

10   guilty?

11                   That's basically what he's asking,

12   that's what it boils down to.

13                   THE POTENTIAL JUROR:  That's

14   what I hear.  I just don't know.

15                   MR. OLD:  Let me -- Special

16   Issue #1 --

17                   THE COURT:   To your left.

18   (Indicating)

19                   MR. OLD:  That question kind

20   of sets to me what I call a "double burden of proof",

21   first the evidence that you arrive at in finding

22   probability must be proven beyond a reasonable doubt and

23   then there must be a probability that the defendant will

24   commit criminal acts of violence in the future and then

25   they must constitute a continuing threat to society.

1            "Probability" the law tells us means

2    "more likely than not?"

3                        THE  POTENTIAL  JUROR:    All

4    right.

5    Q          (BY MR. OLD)  And it's probably a poor way of

6    talking about it but 50 percent plus a grain of sand on

7    one side would be "probability", agreed?

8    A          Possibly.

9    Q          If "beyond a reasonable doubt" came out exactly

10   even, it was proven to you by 50 percent would you answer

11   that question "No?"

12   A          Yes.  I would.

13   Q          You would answer it "No?"

14   A          If it was 50/50.

15   Q          It  would  have  to  be  pushing  over  a

16   preponderance of the evidence from more likely than not?

17   A          Right.

18   Q          In arriving at a sentence, now, the event --

19   I mean the crime of what I think Mr. Townsend called

20   "ordinary murder", which is intentionally or knowingly

21   killing someone, range of punishment in that is from five

22   years probated to life.

23                    Now, that is a little different for a

24   jury, a jury doesn't answer Special Issue questions like

25   this, they write down a number of years or life or 99

1    years or five years and then find probation.

2          What the Court tells you about the law

3    of parole is that you are not to consider the law of

4    parole, you are then told that the rule of law is that

5    a person convicted of capital murder in a capital case

6    must serve at least 35 real years, 365 days a year times

7    35 before he becomes eligible for parole.  It doesn't

8    mean he will get parole, it means that he can apply for

9    it or be considered for it but it does not mean that --

10   there is no mandate on the Parole Board to parole that

11   person.

12         For the purposes of assessing punishment

13   what that says, you must consider life to equal life,

14   that is if you give someone a life sentence you are

15   saying that you presume that they will spend the rest of

16   their life in the penitentiary and you are not concerned

17   about the law of parole and the same would be true in a

18   non-capital case, you say whatever number of years you

19   put down, you presume they are going to spend, if it's

20   75 years, 75 years.  You can't look back and say "Well,

21   if we give him 75 he will actually do this and that

22   because of the law of parole" because the rules of the

23   Parole Board change from time to time but the 35 years

24   does not.

25         Still I mean that's the law.  Rules are

1  different things, the law is if you are convicted of

2  capital murder you are given a life sentence, 35 years

3  before you even become eligible.

4           Now, in either case whether it's a

5  murder case or capital case can you assess a sentence

6  without considering the law of parole?

7  A       Yes.

8  Q       Okay.   In answer to Special Issue #1, and

9  remember Mr. Townsend told you that "society" includes

10 the penitentiary?

11 A       Right.

12 Q       Can you in giving a life sentence assume that

13 what that question is asking, "Do you find from a

14 preponderance of the evidence beyond a reasonable doubt

15 that there is a probability that the defendant would

16 commit criminal acts of violence that would constitute

17 a threat to the society of a state penal institution?"

18 A       That's what it means?

19 Q       Yeah.   Is that how you read the question?

20 A       Right.

21 Q       So you would have assumed life equals life and

22 you would not consider the law of parole?

23 A       Right.

24 Q       You made a statement that you had read

25 newspaper accounts, something about this case and if I

1  understood you correctly since you were here the first

2  time you overheard a conversation about this case?

3  A       Right.

4  Q       Or about the facts giving rise to the case?

5  A       Right.

6  Q       Or what somebody said they were?

7          Did what you -- did what you heard or

8  what you have read make an impression upon you?

9          I mean that is do you recall it -- do

10  you recall what you heard or part of what you heard?

11  A       Right.

12  Q       Would it require evidence to remove that from

13  your mind?

14          I don't know whether that's a good

15  question or not.

16          My question really is; does that mean

17  anything to you about the evidence in this case?

18  A       Well, of course it was something I overheard

19  which I think you would consider as "hearsay."

20  Q       Yes.

21  A       You know --

22  Q       It's hearsay but I mean, you know, we all form

23  opinions?

24  A       Right.

25  Q       Up until yesterday afternoon about 5:30 I would

1     have strongly been of the opinion that Dallas was going

2     to beat San Francisco.

3     A          Well, I was too.

4     Q          And I got proven wrong.  I guess that was not

5     -- my opinion was not beyond a reasonable doubt.

6                But I mean we form opinions everyday on

7     very little knowledge, all of us do.  That's the way we

8     live.

9     A          Yes.

10    Q          Everybody has an opinion about O.J. and I'm not

11    going to ask you --

12    A          Please don't.

13    Q          -- my question is this; what you have heard,

14    is it going to effect your deliberation in that jury box

15    even if you hear the same thing?

16    A          No.

17    Q          Will the fact that you are hearing it for the

18    second time be stronger evidence than if it were the

19    first time and you hadn't heard the people talking about

20    it or read about it?

21    A          Well, if it came out as actual evidence?

22    Q          Let me --

23    A          Okay.

24    Q          -- give you an example; let's say what you

25    heard, overheard or whatever comes into play, let's say

1    you heard someone say -- and I mean I am going to

2    oversimplify this and it may not help you.

3    A        You have to do this for this person.

4    Q        I am simple, too.

5              You heard someone say "Everybody knows

6    the car was black, I saw it myself."

7              You get in the jury box and a witness

8    who you have never seen before, you view their

9    credibility as they sit in this witness stand testify the

10   car was black, okay, somebody else testifies the car was

11   red; is the fact that this hearsay out of court statement

12   that you heard someone say "Everybody knew the car was

13   black, I saw it myself", is that going to effect your

14   verdict in this case?  Is it going to maybe create the

15   word "boot strap the evidence", make it more believable?

16   A        If everybody said it was black?

17   Q        No.  The fact that you heard before you got

18   here that the car was black, do I have to disprove to you

19   that the car was black?

20   A        No.

21   Q        If the proof is one witness says the car is

22   black and the other one says the car is red, is the fact

23   that you heard it was black going to effect your verdict?

24   Is it going to make you go for black?

25   A        Well, it probably wold.

1    Q        You think it would?

2             You don't think you -- do you see -- the

3    law requires you to make your verdict on the evidence as

4    it comes to you.

5    A        Right.

6    Q        I mean --

7    A        No.

8    Q        -- merely having that thought is not what I'm

9    asking you, what I'm saying is; is that actually going

10   to become evidence outside of the courtroom?

11   A        No.

12            THE COURT:  What he's talking

13   about, like you have one witness says the car is black

14   and the other one says the car is red and you are back

15   there saying, "Well, I kind of believe both of them but

16   all my neighbors said it was black so I think I will

17   decide it was black."

18            That's what we can't have.  We can't

19   have jurors base their opinions on what they heard

20   outside the Court.

21            THE POTENTIAL JUROR:  That's

22   what I was saying, when you get back there in the jury

23   room if I believe something, you know, if something has

24   been presented to me one way or the other that I feel

25   strongly about and maybe we are -- we are split one-

1   fourth and three-fourths, you know, I'm not sure how

2   easily I would be swayed one way or the other.

3                      THE COURT:     As long as you

4   -- as long as you are swayed by what happened in the

5   courtroom that's fine.  We want to make sure that a juror

6   won't take what they have heard outside the courtroom to

7   help make their mind up and that's what Mr. Old is

8   discussing with you at this point.

9                      Can you tell us whatever you heard --

10                     THE POTENTIAL JUROR:   I can

11  dismiss it.

12                     THE COURT:  You will dismiss

13  it?

14                     THE POTENTIAL JUROR:   I will

15  dismiss it and listen to what is presented.

16                     THE    COURT:      Thirty-two

17  minutes.

18                     MR. OLD:   Mr. Townsend made

19  a statement to the effect that "The State is seeking the

20  death penalty in this case."

21                     Okay, now, Mr. Townsend is the District

22  Attorney of Morris County, Texas and the offense as

23  alleged happened in Morris County, Texas.   He is an

24  elected official in Morris County and he's the District

25  Attorney.  That is a political office and with my tongue

1    in my cheek I'm going to call Mr. Townsend "a politician"

2    which I think has got to be a dirty word in this country

3    but I don't intend it that way; now, the statement that

4    he made is his own statement, that is within the bounds

5    of his office, he's the person that decides whether or

6    not the State will seek the death penalty.

7                        That does not imply that the Governor

8    called him up or the Attorney General called him up or

9    the Legislature voted on it and said, "State, seek the

10   death penalty."

11                   Now, is the fact that he represents the

12   State and he through his office is asking for the death

13   penalty, does that have any credibility with you as to

14   your verdict in this case?

15                   Does that make it easier for you to give

16   the death penalty, if you do, the fact that Mr. Townsend

17   says he is seeking it?

18                        THE POTENTIAL JUROR:   Well,

19   that's one of his duties.

20   Q        (BY MR. OLD)  Yes.  But I mean you don't take

21   that to mean that -- "The State", after all is the people

22   of this state?

23   A           Right.  Right.

24   Q           That's not -- you don't interpret that as being

25   the majority of the people of the State of Texas saying

1   in this particular case, "Mr. Townsend, we want you to

2   seek the death penalty?"

3   A        No.

4   Q        So it's his -- you understand that is totally

5   his decision as to whether or not the State asks for the

6   death penalty?

7   A        Right.  Yeah.

8   Q        There is a document in front of you that is

9   several pages entitled "Witness List."

10          I would like for you to go over this

11   list of names and as you come to them will you tell me

12   any name that you recognize or any person that you know?

13   A        There is only one name on here that sounds the

14   least bit familiar and that is "Dewayne McClung."

15          Seems like he went to school here, may

16   not have.

17   Q        I think that's correct.

18   A        That's the only name that rings a bell with me

19   at all.

20   Q        Other than knowing the name -- and I mean if

21   you said you were raised here as I was there's a lot of

22   "McClungs" in this county, does that give him anymore

23   credibility than any other name on that list or any other

24   person who would be a witness?

25   A        No.

1    Q       Verbal response, please.

2    A       No.

3    Q       Do you know of any reason why you could not

4 give every witness -- the testimony of every witness the

5 same test for credibility?

6    A       No.  I don't.

7    Q       I mean the fact that someone was a peace

8 officer, a preacher, a fire chief or whatever would not

9 give them more credibility because they are a peace

10 officer?

11    A       I believe I could listen to each one

12 constructively.

13    Q       You said that you had been on one civil jury?

14    A       Yes.

15    Q       Do you remember the name of that case?

16    A       It has been so long ago.

17    Q       What kind was it?  An automobile accident case,

18 a contract case?

19    A       I don't really remember but we gave a five year

20 probated sentence, that's what I recall on that.

21    Q       Okay.  It was a criminal case then?

22    A       No.

23                What did you say?

24    Q       It was a criminal case?

25    A       No.

1   Q       I mean you gave -- someone was charged with a

2   crime?

3   A       Well, it was -- well, it was a criminal case

4   I guess.

5              I think a "crime" is just "murder",

6   okay.

7   Q       Okay.

8   A       Okay.  Like I say, I don't remember but the

9   sentence was -- see, you all don't need me, I'm trying

10   to tell you you all don't need me because I am dumb, you

11   all.

12             THE COURT: Ma'am, I think you

13   are doing just fine.

14             THE POTENTIAL JUROR: You just

15   don't know.

16             MR.  OLD:  You said your

17   husband has been on a jury that was sequestered, do you

18   remember who that was?

19             THE  POTENTIAL  JUROR:  I

20   remember distinctly who that was.

21   Q       (BY MR. OLD)  Who was that?

22   A       I don't remember the first name, the last name

23   was "Doss."

24   Q       "Doss?"

25             Was that in this county?

1   A        Yes.

2   Q        How long ago was that?

3   A        About 30 years ago or so.

4            When I brought his clothes to him I

5   brought him a full bottle of Tylenol or aspirin, one or

6   the other and when it came home it only had about that

7   many in it.  (Indicating)

8                      THE COURT:  You will know what

9   to bring if you are on this jury.

10                      THE POTENTIAL JUROR:  You are

11  not going to keep me, you are going to let me go here in

12  a minute because  I'll tell you what, I got out the door

13  -- let me tell you this, now, you all, this is how

14  forgetful I am, you all need to let me go, I got out the

15  door awhile ago and I went back and kissed my husband and

16  I said, "Have I already kissed you?"

17                      He said, "Yes."

18                      But   you   are   getting   forgetful,

19  Counselor, because you and I didn't graduate the same

20  year and you have -- and you know yourself I am older

21  than you.

22                      MR. OLD:  Just a little.

23                      THE POTENTIAL JUROR:  No.  I

24  am.

25  Q        (BY MR. OLD)  I am 46, you must have been a

1    class ahead of me, you are "47."

2    A          I wish.

3    Q          "Flattery will get you anywhere."

4                         MR.  TOWNSEND:    I  want  to

5    object to the obvious attempt to prejudice the juror on

6    his behalf.

7                         THE  POTENTIAL  JUROR:    I'm

8    sorry.

9                         MR.  TOWNSEND:    I thought she

10   looked younger than Bird.

11                        MR.  OLD:    I agree with that.

12                        THE  COURT:    The  Court will

13   remain  neutral  but  I  would  have  to  lean  toward  the

14   State's side.

15                        Ma'am, let me talk to you a moment about

16   this reasonable doubt; I think during the general voir

17   dire that's when I talked to the entire group of people

18   I talked about murder as the intentional taking of a life

19   without  legal  justification  or  excuse  and  I  might  have

20   used a mercy killing where a person is on life support

21   and that life support is terminated, let's forget for a

22   moment that that could be "murder", let's assume that you

23   have  a  loved  one  on  life  support,  a  family  member  and

24   let's assume that the doctor has said to you that it is

25   -- that in that doctor's opinion the person will never

be able to come out of a coma or whatever the problem is,
let's take away that any crime has been committed and
it's left up to the family to decide.

Well, obviously there you would never
know whether or not that person would be able to live
without life support unless you took the life support off
so that's the kind of -- that is a decision where you are
going to have to take all of the factors and base your
decision on all of the reasonable factors, not emotion.

Emotion says "No.  I can't pull his
plug."

Don't react out of emotion in trial
either, it's reasonable, the evidence, does the evidence
lead you to a conclusion that it is guilt or all of the
reasons that you got there reasonable and is the evidence
sufficient to erase any doubt that is based on reason,
not any at all but any doubt based on reason?

I don't know if that helps you or not
but that again would be maybe an example of trying to
make your decision on what is reasonable and all the
facts given to you and not basing it on emotion or what
you want to happen.

Now, let's take that same reasonable
doubt and give you an example that could come up in a
trial to illustrate why it is important, let's take a

1    murder case, a person has been shot and a person has been

2    stabbed.

3            The indictment says that the defendant

4    shot the victim on such and such date and killed the

5    victim, the victim died from a gunshot wound.

6            Let's just say the defendant testifies,

7    "Yeah.  I shot him, I shot him 25 times, reloaded several

8    times, wanted to make sure he was dead."

9            Let's say the medical examiner testified

10   and says, "Yeah.  He shot him but the knife wound is what

11   in my opinion is what killed him."

12           See, the State has not prove to you

13   beyond a reasonable doubt that the gunshot killed that

14   person.  They have no evidence, they have evidence that

15   the person shot the other one, they have evidence that

16   he's dead but there's absolutely no evidence that the

17   gunshot caused the death because in fact their witness

18   says the knife caused the death.

19           Now, you know the person is guilty, you

20   know -- not "guilty", you know the person is dead, you

21   know beyond a reasonable doubt that the person on trial

22   shot the person but you don't have any proof that it was

23   a gunshot wound so, see, in that case the reasonable

24   doubt standard would not have been met and you would have

25   to find the defendant not guilty if you are to follow

1          your oath.

2                          That's why it's real important that

3          jurors understand this concept.  It's not what you want

4          to happen, it's "Can the State prove what they have to

5          prove to you beyond a reasonable doubt?"

6                          And if they can they are entitled to a

7          verdict of guilty, if they can't then they are not

8          entitled to that verdict.

9                          Do you have any questions on reasonable

10         doubt?

11                         THE POTENTIAL JUROR:  I don't

12         think so.  When you were talking about that I have more

13         or less gone through this procedure that you talked,

14         "pulling the plug" because my mother had -- we decided

15         earlier this year that everything had been done for her

16         that could be, she had the living will.

17                         THE COURT:  It was not an easy

18         decision?

19                         THE POTENTIAL JUROR:  It was

20         not an easy decision but we had Hospice to come in and

21         when she could not swallow anymore we did not choose --

22         she did not want a feeding tube, we didn't do that, they

23         did -- they did give her an IV.

24                         THE COURT:    But you do not

25         -- you can't tell me, though, whether she would still be

1    alive today if you had not done that?

2                          THE POTENTIAL JUROR:   No.

3                          THE COURT:   Because you had

4    to base your decision on all the factors and it was a

5    very difficult decision, wasn't it?

6                          THE POTENTIAL JUROR: It's not

7    easy.

8                          THE COURT:   That's what --

9    kind of what we are asking you to do in a criminal case,

10   take all the factors that you have heard, if it led you

11   to this conclusion and if it dispels all reasonable doubt

12   based on reason, not emotion, not emotion, not on desire,

13   then you do what your intelligence dictates.

14                          Can you do it?

15                          THE  POTENTIAL  JUROR:    I

16   understand it.   Yes.

17                          THE COURT: Ma'am, if you will

18   step out I'll have a discussion with the lawyers and I

19   will let you know something.   Probably you won't know

20   today whether you are on the jury.

21                          I'm out of Dallas, I'm up here all week,

22   Thursday afternoon we will make decisions on the jurors

23   we have talked to today so you probably won't know until

24   Friday.

25                          THE POTENTIAL JUROR:  I'll be

1    out of town Friday because that's my trip.

2                        THE COURT:  If you are on the

3    jury you will get a letter, if you are not you will

4    probably get a phone call.

5                        So if you go out of town Friday and

6    don't know anything you are welcome to call the District

7    Clerk's Office Monday when you get back and ask if you

8    were taken as a juror.

9                        All right.  Again, you have a good day.

10                        THE  POTENTIAL  JUROR:    All

11   right.  You all, too.

12

13                        (The  following  occurred  outside  the

14   presence and hearing of the potential juror:)

15

16                        (Off the record discussion.)

17

18                        THE  COURT:    Back  on  the

19   record.

20                        Does the State have any challenges?

21                        MR.  TOWNSEND:    None,  Your

22   Honor.

23                        THE COURT:  Does the Defense

24   have any challenges?

25                        MR. OLD:  None.

1              THE COURT:  Tell her she is

2     free to go and we will either send her a letter or she

3     is welcome to check back with us Monday.

4

5              (Recess.)

6

7              (The following occurred outside the

8     presence and hearing of any potential juror:)

9

10             THE COURT:  Let's get on the

11    record.

12             Mr. Townsend, I understand there's an

13    agreement between you and Mr. Old to excuse juror Valerie

14    Bell, 30, and juror Lesley Sandlin, "S A N D L I N",

15    number 31, is that correct, sir?

16             MR. TOWNSEND:  That's correct,

17    Your Honor.

18             THE COURT:  Mr. Old, do you

19    agree?

20             MR. OLD:  That's correct.

21             THE COURT:  Mr. Wardlow, do

22    you agree?

23             THE DEFENDANT:  Yes, sir.

24             THE COURT:  Both of those

25    jurors are excused, if you will inform those jurors we

1    appreciate their service and they may leave.

2                    And I guess I will see you guys in the

3    morning.

4

5                    (Record closed for November 14th, 1994.)

6

7                    (Whereupon Court was recessed until 9:00

8    a.m., November 15, 1994.)

9

10

11                            * * * * *

12

13

14

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS          §
                        §
COUNTY OF TITUS         §

        I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on November 14, 1994 and were reported by me.

        I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

        WITNESS MY HAND this __31ˢᵀ__ day of January, 1995.

_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

Certification Number of Reporter:   149

Expiration Date of Certification:   12/31/96

Business Address:   Drawer 1868
                    Mt. Pleasant, Texas 75456-1868

Telephone Number:   903/577-6735

Transcribed By:   Tandra K. Gibson