

CAUSE NO. 12,764

THE STATE OF TEXAS  §  IN THE DISTRICT COURT OF
§
VS.  §  TITUS COUNTY, TEXAS
§
BILLY JOE WARDLOW  §  76TH JUDICIAL DISTRICT


STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 15, 1994

VOLUME 20 of 43 volumes


FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

VOLUME 20

VOIR DIRE EXAMINATION

NOVEMBER 15, 1994                               PAGE/VOLUME

APPEARANCES . . . . . . . . . . . . . . . .        1/20

MORNING SESSION . . . . . . . . . . . . . .        3/20

POTENTIAL JUROR, PATRICIA ANN ISBELL
              EXAMINATION BY MR. TOWNSEND . . .     8/20

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
              OF THE POTENTIAL JUROR  . . . . .    12/20

RECESS   . . . . . . . . . . . . . . . . .         13/20

POTENTIAL JUROR, TERESA DIANE COKE
              EXAMINATION BY MR. TOWNSEND . . .    18/20

RECESS   . . . . . . . . . . . . . . . . .         53/20

POTENTIAL JUROR, TERESA DIANE COKE, (CONTINUING)
              EXAMINATION BY MR. OLD  . . . . .    54/20

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
              OF THE POTENTIAL JUROR  . . . . .    81/20

DISCUSSION CONCLUDED  . . . . . . . . . .          83/20

NOON RECESS . . . . . . . . . . . . . . .          91/20

AFTERNOON SESSION . . . . . . . . . . . . .        91/20

POTENTIAL JUROR, BETTY JOYCE HOLLINGSWORTH
              EXAMINATION BY MR. TOWNSEND . . .    97/20

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
              OF THE POTENTIAL JUROR  . . . . .   129/20

RECESS   . . . . . . . . . . . . . . . . .        129/20

POTENTIAL JUROR, JAMES SETH THURMAN
              EXAMINATION BY MR. TOWNSEND . . .   135/20
              EXAMINATION BY MR. OLD  . . . . .   164/20

COURT ADJOURNED . . . . . . . . . . . . . .       192/20

COURT REPORTER'S CERTIFICATE  . . . . . . .       193/20

1        CAUSE NO. 12,764

2    THE STATE OF TEXAS        §   IN THE DISTRICT COURT OF
                               §
3    VS.                       §   TITUS COUNTY, TEXAS
                               §
4    BILLY JOE WARDLOW         §   76TH JUDICIAL DISTRICT

5

6                   STATEMENT OF FACTS

7                 VOIR DIRE EXAMINATION

8                  November 15, 1994

9                **VOLUME 20 of 43 volumes**

10

11          Before Honorable Gary R. Stephens

12            Judge by Judicial Assignment

13       (Venue changed from Morris County, Texas)

14

15                    APPEARANCES

16

17   ATTORNEYS FOR THE STATE OF TEXAS:

18            MR. RICHARD TOWNSEND
              District Attorney
19            Morris County Texas
              Morris County Courthouse
20            Daingerfield, Texas 75638

21                    and

22            MR. RANDY LEE
              Assistant District Attorney
23            Cass County Texas
              P.O. Box 940
24            Linden, Texas 75563

25

1      ATTORNEYS FOR THE DEFENDANT:

2            MR. BIRD OLD, III
             Old, Rolston & Old
3            P.O. Box 448
             Mt. Pleasant, Texas 75456-0448

4

                and
5

            MR. LANCE HINSON
6            Law Offices of Danny Woodson
             P.O. Box 399
7            Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          On the 15th day of November, 1994, the

2     above-entitled and numbered cause came on for hearing

3     before said Honorable Court, Judge Gary R. Stephens of

4     Midlothian, Texas, serving by judicial assignment in the

5     District Court of Titus County, Texas, on change of venue

6     from Morris County, Texas, and the following proceedings

7     were had:

8

9                    (The following occurred outside the

10    presence and hearing of any potential juror:)

11

12                    THE COURT:  Okay.  Let's get

13    on the record.

14              Let the record reflect no juror is

15    present.

16              Mr. Townsend, I understand that you and

17    Mr. Old have agreed to excuse juror 32, juror sheets,

18    "S H E E T S", is that right?

19                    MR. TOWNSEND:  That's correct,

20    Your Honor.

21                    THE COURT:  Mr. Old, do you

22    agree?

23                    MR. OLD:  That's correct, Your

24    Honor.

25                    THE COURT:  Mr. Wardlow, do

1   you agree?

2                              THE  DEFENDANT:    Yes,  Your

3   Honor.

4                              THE  COURT:    Mr.  Sheets  is

5   excused.

6                      Tell Mr. Sheets he may go home and bring

7   out Isbell.

8

9                      (The following occurred in the presence

10  and hearing of the potential juror:)

11

12                             THE BAILIFF:  Watch your step

13  as you go up there, don't trip.

14                             THE  COURT:    Right  up  here,

15  ma'am.

16                             THE POTENTIAL JUROR:  Okay.

17

18        PATRICIA ANN ISBELL, Potential Juror #219,

19  was  called  as  a  Potential  Juror  and,  having  been

20  previously sworn by the Court, testified as follows:

21

22                             THE COURT:  How are you doing

23  this morning?

24                             THE POTENTIAL JUROR:  Okay.

25                             THE COURT:  Ma'am, would you

1    please state your name for the record?

2                         THE POTENTIAL JUROR: Patricia

3    A. Isbell.

4                         THE COURT:  This is juror 33.

5                         Ma'am,  I  am  Gary  Stephens,  I  am

6    presiding over this trial.

7                         Of course you know you are here today

8    so we can talk to you about some of the answers in your

9    questionnaire and talk to you about the principles of law

10   involved in a capital murder trial.

11                        There are two assistants or -- not "two

12   assistants", there's one Assistant District Attorney and

13   one District Attorney working on this case.

14                        The  District  Attorney  is  Richard

15   Townsend and he's from Morris County.

16                        MR. TOWNSEND:  Hello.

17                        THE  COURT:  The  person

18   assisting  him  is  Randy  Lee,  he's  not  with  us  this

19   morning.

20                        We have two Defense Attorneys, Mr. Bird

21   Old, III.

22                        MR. OLD:  Good morning.

23                        THE  POTENTIAL  JUROR:  Good

24   morning.

25                        THE COURT:  Mr. Lance Hinson.

1          MR. HINSON:   Good morning.

2          THE COURT:  Next to Mr. Hinson

3   the person charged, Billy Joe Wardlow.

4          Now, ma'am, the lawyers are going to

5   talk to you as I said about some of your answers, they

6   are also going to talk to you about the law and see

7   whether or not you can follow the law that applies in

8   this type of a case.

9          In order to be a juror you must be able

10  to understand and follow the law.  You don't necessarily

11  have to agree with the law, if you disagree with some

12  aspect of our law but you can still follow the law you

13  are qualified.

14          But we need to know more about whether

15  you can or can't follow the law.  We want to know what

16  you think about our law, we want to know what your

17  opinions are of our law.

18          We have found that most people can

19  follow the law but that doesn't necessarily mean they are

20  appropriate persons in a death penalty case.  You may be

21  an excellent juror in some other case but a death penalty

22  case may not be the appropriate task for you so we want

23  you to share your opinions with us and as lawyers the

24  only way we know to get those opinions is to ask lots of

25  questions.

1            There's no right or wrong opinions, your
2   answers are your answers and your opinions are your
3   opinions, that's what we are concerned with, you don't
4   have to prove you are a good citizen by agreeing with our
5   law, you have already proved your citizenship by
6   appearing for jury duty and filling out the questionnaire
7   and coming back in.   In this country you are absolutely
8   free to agree or disagree with the laws, we just want to
9   know what your opinions are.

10           We may talk to you for 20 or 30 minutes
11  or we may talk to you for two or three hours.

12           We haven't gone three hours yet but
13  sometimes the selections do take awhile and the reason
14  is just sometimes it's harder to get some people's
15  opinions than others so what we want you to do is just
16  open up and share those opinions.

17           If you don't understand the question get
18  the lawyer to repeat it.  If there's something you think
19  we need to know about you that we don't ask just give us
20  that information.

21           Just think of it this way, ma'am, if you
22  were on trial and there's something about a juror that
23  you think would be important to you and it applies to you
24  then tell us because that's all any of us want is 12 fair
25  people that can do whatever the appropriate thing is

1    after hearing evidence.

2                    Mr. Townsend.

3

4                    VOIR DIRE EXAMINATION

5                    BY MR. TOWNSEND

6

7    Q        Ms. Isbell, I'm Richard Townsend, I represent

8    the State in this case along with Randall Lee and Randall

9    Lee is not here.

10                   I want to talk to you about some

11   different areas of the law and like the Judge says,

12   there's really no right or wrong opinions, we are just

13   concerned what your opinions are, what your feelings are

14   about certain aspects of the law.

15                   And I want to go into first on your

16   questionnaire toward the end of the questionnaire -- I'm

17   sure you don't remember everything you put down here but

18   you mentioned a back problem if you sit too long or stand

19   too long?

20   A        Yes.

21   Q        I think the Court would probably take a break

22   about every hour or hour and a half or something like

23   that, would that cause you any undue problem?

24   A        No.  As long as I don't stand a long time.

25   Q        Okay.  It's mainly just if you have to stand

1    a long time?

2    A        Yes, sir.

3    Q        Like you may have had to do when we had the

4    first section?

5    A        Right.  Standing -- standing up all day makes

6    my back hurt.

7    Q        All right.  And I notice that you wrote on the

8    questionnaire that you just lost your mother and that was

9    -- would have an effect on your ability to keep your

10   attention on things.

11            When did you lose your mother?

12   A        Almost six months ago.

13   Q        Okay.  Do you know -- you know we won't ask you

14   or expect you to be able to put that out of your mind but

15   in order to serve on the jury you would need to, you

16   know, concentrate on the task that a juror has and not

17   let that distract you to the point that you couldn't

18   concentrate on the trial.

19            Do you think that would be something

20   that you could do?

21   A        It would be kind of hard because when I sit

22   still my mind wanders every time.  I start thinking about

23   my mother.  And my grandmother now is real ill.

24            The day of my mother's funeral we found

25   out she has had cancer and she has gotten worse, we have

1    been going over everyday seeing about her.

2                   They have only given her about a month

3    to live.

4                   Now is a pretty bad time in my life.

5    Q          It's your grandmother?

6    A          My grandmother.

7    Q          Really what I think it all boils down to, we

8    can't answer this question for you and we don't know how

9    you feel and the only way I know to ask it is have you

10   ever served on a jury before?

11   A          No.

12   Q          Even though you haven't served on a jury I

13   think you understand that you are going to be listening

14   to evidence and you need to be able to listen to this

15   evidence and consider all of it.

16                   And do you believe considering your

17   personal problem that you could do that or do you believe

18   that you couldn't do it?

19                   And it's just -- you are the only one

20   that can make that decision.

21   A          Well, I don't know right now at this point in

22   my life, I don't know if I could but -- because that's

23   why I went back to work, to try to get my mind off it and

24   working really hasn't helped that much.  I still wander

25   off and I kind of tune everybody out.

1    Q        What kind of work do you do?

2    A        I am a florist.

3    Q        Are you able to do your job successfully?

4    A        Yeah.

5    Q        Okay.

6                    THE COURT:  Excuse me just a

7    minute, Mr. Townsend.

8                    Ma'am, in a trial of course there will

9    be evidence in the form of people sitting on that stand

10   and testifying, I can understand when you are not busy

11   listening or concentrating your mind might wander, you

12   might be working on a floral arrangement and your mind

13   would wander, do you believe it would be the case if

14   someone were testifying, do you think that you could

15   become distracted and not listen to their testimony or

16   if there's something to focus on to put your problem

17   aside and focus on what is going on?

18                    THE POTENTIAL JUROR:   I am

19   really bad about kind of tuning everything out.

20                    THE   COURT:    I   think   if

21   something is going on you are afraid that you might tune

22   out something that is said?

23                    THE  POTENTIAL  JUROR:    I'm

24   afraid I wold, especially at this point in my life.

25                    THE COURT:  The trial is going

1  to be the first of the year and you said you don't think

2  your grandmother has more than a month, that would be

3  about that time frame.

4                              THE POTENTIAL JUROR:  Yes.

5                              THE COURT:   Excuse me, Mr.

6  Townsend.

7                          I just wanted to answer that one

8  question about the time frame.

9                              MR. TOWNSEND:   Approach the

10  bench?

11                              THE COURT:  You may.

12                          Ma'am, would you step outside the door

13  for just a minute and let me have a talk with these

14  lawyers?

15                              THE BAILIFF:  Watch your step

16  there.

17

18                          (The following occurred outside the

19  presence and hearing of the potential juror:)

20

21                              MR. OLD:   We agree, Your

22  Honor.

23                              THE COURT:  On the record.

24                          Mr. Townsend, do you agree to excuse

25  juror 33, Isbell?

1          MR.   TOWNSEND:    Yes,   Your

2  Honor.

3          THE COURT:  Do you agree, Mr.

4  Old?

5          MR. OLD:  Yes.

6          THE COURT:  Mr. Wardlow?

7          THE DEFENDANT:  Yes.

8          THE COURT:  Mr. Hinson, do you

9  agree?

10          MR. HINSON:  Yes, Your Honor.

11          THE COURT:  I thought I might

12  include you there.

13          Tell her that we will let her go and

14  appreciate her coming down.

15          Bring in our next one.

16          THE BAILIFF:  That's all we

17  have got, Your Honor.

18          We have got another one at 10:30.

19

20          (Recess.)

21

22          (The following occurred outside the

23  presence and hearing of any potential juror:)

24

25          THE COURT:  All right.  If

1    everybody is in place let's bring her in.

2

3                    (The following occurred in the presence

4    and hearing of the potential juror:)

5

6                              THE BAILIFF:  Step all the way

7    right around here and then right up there.  Have a seat

8    right up there.  No problem.

9

10        TERESA DIANE COKE, Potential Juror #447,

11   was  called  as  a  Potential  Juror  and,  having  been

12   previously sworn by the Court, testified as follows:

13

14                              THE  COURT:    Good  morning,

15   ma'am.  How are you doing?

16                              THE POTENTIAL JUROR:  Fine.

17                              THE COURT:  Go ahead and take

18   your seat.

19                    We kind of rushed your interview on you

20   this morning, I hope we didn't inconvenience you too much

21   but the first couple of people we have didn't last very

22   long.

23                    Ma'am, I'm Gary Stephens, I'm the one

24   presiding over the trial and jury selection.

25                    For the record you are "Teresa Coke?"

1              THE POTENTIAL JUROR:    Yes,

2    sir.

3              THE COURT:    This is juror

4    number 34.

5              We have two District Attorneys that are

6    representing the State of Texas, we have present what we

7    call the "lead counsel", the one that will present the

8    case and that is Mr. Richard Townsend from Morris County,

9    we have two Defense Attorneys, Mr. Bird Old, III.

10              MR. OLD:    Hello.

11              THE COURT:  Mr. Lance Hinson.

12              MR. HINSON:   Good morning.

13              THE COURT:  Next to Mr. Hinson

14    the person charged, Billy Joe Wardlow.

15              The other District Attorney involved in

16    this case, "Randy", "Randall Lee" is from Cass County,

17    he's not with us this morning.

18              Now, Ms. Coke, the lawyers have read

19    your questionnaire and they are familiar with your

20    answers, they are going to discuss some of those answers

21    with you and they are also going to talk to you about the

22    principles of law involved in a death penalty case.

23              You will be asked a lot of questions,

24    frankly the answers will let us know whether or not to

25    put you on the jury.

In order to be a juror you must be able to follow the law. You don't even have to agree with the law, if you disagree with some aspect of our law but you can still follow the law you are qualified but if you disagree to some aspect of our law to such an extent and can't follow the law you are not qualified.

So we will explain the law to you and ask you whether or not you can follow the law.

But the ability to follow the law, ma'am, doesn't necessarily mean that you would be an appropriate person in a death penalty case so we want to know more than "Yes, I can" or "No, I can't follow the law."

I want to know what you think about the law, think about the issues that we will talk about, we may use examples to illustrate some of the issue or illustrate laws and if we do use an example, ma'am, I want you to understand that the examples do not relate to Mr. Wardlow or his case, any fact about this case will come out in trial. That's what the trial is for. So if we are discussing, if we make up an example to illustrate a point it has absolutely nothing to do with this case, you are not being qualified as a juror for this specific case, you are being qualified as a juror in a capital murder case so the comments will be general comments

1    without specific reference to this particular person.

2           Ma'am, the trial itself will not begin

3    until after the first of the year.  When it does begin

4    I anticipate the trial will last two weeks, it could go

5    into three weeks but not too likely.

6           Do you know of any reason you could not

7    serve for a two week period on this jury say the first

8    and second week of January of next year?

9           THE POTENTIAL JUROR:  Not that

10   I know of except for it will be difficult with my job

11   because I teach and it would be very difficult to find

12   a substitute to do what I need to do.

13          THE COURT:  So other than work

14   problems you know of no problem that you could not serve?

15          THE POTENTIAL JUROR:  That's

16   correct.

17          THE COURT:  Ma'am, if there's

18   something you don't understand get us to clarify it, if

19   you think there's anything that we need to know about

20   you let us know.

21          Most people we talk to frankly just

22   don't end up on a capital murder type jury, we won't know

23   whether you are going to be on this jury, not until

24   probably toward the last part of the week but you will

25   be notified either Friday or Monday whether or not you

1    will be on the jury.

2              Mr. Townsend.

3

4              VOIR DIRE EXAMINATION

5              BY MR. TOWNSEND

6

7    Q         Ms. Coke, I'm Richard Townsend, I represent

8    Morris County and the State of Texas in this case and I

9    want to reiterate to you what the Judge said in that

10   there are no right or wrong answers to these questions,

11   we just want you to tell us how you feel and what you

12   think.

13             If you don't understand anything I have

14   asked be sure and ask me to restate it or if I mumble or

15   something like that.

16             We are seeking the death penalty in this

17   case and I have read your questionnaire and I understand

18   or I believe I understand your feelings about the death

19   penalty in that you said that you felt it was appropriate

20   in some murder cases and you could return a verdict in

21   a proper case which assessed the death penalty.

22             And you also said that you were in favor

23   of a life sentence under the proper circumstances.

24             That's the sort of questions that we are

25   concerned about in a death penalty case because in Texas

1    if the death penalty is involved in a case in a capital

2    murder as it is here if a person is found guilty of

3    capital murder they don't automatically receive the death

4    penalty, they could, depending on what the jury decides,

5    they could receive a life sentence or the death penalty

6    after they have heard all the evidence and made their

7    decision.

8            And what we have to have going in are

9    those kinds of jurors who can keep an open mind all the

10   way through the trial and only at the end of the trial

11   and after they have heard all the evidence then decide

12   whether the appropriate punishment should be a life

13   sentence or the death penalty.

14           Do you feel that you could do that?

15   A        Yes, sir.

16   Q        Ms. Coke, do you know of any reason why, like

17   I said, I represent the State and of course our interest

18   is that we are seeking the death penalty in this case,

19   do you know of any reason why if we gave you what you

20   felt was an appropriate case for the death penalty, do

21   you know of any reason why you couldn't personally vote

22   that way?

23   A        I have never been faced with that problem

24   before.  It's easy to say "It would be easy to do" but

25   I don't know.

Q        Ma'am, I think clearly it's not something that is easy to do but my question is not so much "Is it easy to do", my question is; if you felt like the facts and evidence were appropriate for it could you do it whether it was easy or not?

A        After a lot of prayer if I consciously thought that it was the right thing to do, yes, I could do it.

Q        Okay.  Ms. Coke, in Texas there are two basic types of murder that we talk about.  I want to talk to you about those a little bit, one is what I call "plain murder" or non-capital murder, the most a person can be punished for this is 99 years to life in the penitentiary.

On the other hand that murder is where someone was intentionally caused -- intentionally or knowingly caused the death of another individual, that is to say without a legal justification or excuse, when I say that I mean it wasn't self defense or it wasn't an accident, they intentionally caused another person's death.

On the other hand the other type murder is what we call "capital murder" and that -- that is where you have this plain murder plus something else and that plus something is the murder was a police officer or fireman, the murder was a multiple type murder type

situation, the murder was done during the commission of a robbery or burglary or rape or kidnapping, something of that nature.

If you will, there is a sheet of paper up there, I think it's marked "Exhibit 3" and it's the indictment in this case.

THE COURT:    That's it. (Indicating)

MR. TOWNSEND:    If you will just read that to yourself and I will talk to you about it.

THE POTENTIAL JUROR:  Okay.

Q        (BY MR. TOWNSEND) Okay.  Ms. Coke, can you see where if we were able to prove everything that is in that indictment that rather than just being a plain murder that would be a capital murder because it has that murder plus something else that I talked about and the plus something else in this situation is a robbery?

A        Yes.

Q        Okay.  So what we are seeking in this case is to prove that it is a capital murder and to seek the death penalty what we have to have in the way of jurors are those people who can keep an open mind throughout the trial and not have their mind closed.

So let's assume that the person is found

1    guilty of capital murder, we have to have the type juror

2    who can keep an open mind.

3                   You know, I have heard jurors say,

4    "Well, if I find the person guilty of capital murder I

5    am automatically going to give him the death penalty."

6                   You see, they are not qualified jurors

7    because they have already decided what the punishment

8    should be before they have heard all the evidence.

9                   On the other hand some jurors might say,

10   "Well, I just don't believe in the death penalty at all,

11   I would never give anyone the death penalty."

12                  Again, their mind is made up on the

13   punishment before they have ever heard the evidence.

14                  Do you believe that you could keep an

15   open mind about what the proper punishment should be

16   until you heard all the evidence and then make that

17   decision?

18   A         Yes, sir.

19   Q         Okay.  In a capital murder case the evidence

20   is presented in sort of two phases, one is the guilt or

21   innocence phase and that's where you are going to hear

22   evidence that basically helps you to determine the guilt

23   or innocence,  "Did he do it" and at that point in the

24   trial you are not going to be concerned with what the

25   proper punishment should be.  You will just strictly be

concerned with whether the person is guilty or not guilty.

After that determination is made if the defendant is found guilty then there will be further evidence presented during the punishment hearing and at that punishment hearing you will hear additional evidence but this evidence won't be the guilt or innocence of the defendant because you have already decided that he was guilty or you wouldn't be hearing the punishment hearing, this is going to be evidence that would tend to help you in your decision toward what you think the proper punishment should be.

It could be evidence of -- and keep in mind, Ms. Coke, when we are talking to you we are not specifically talking to you about this trial but just capital murder trials in general -- the kind of evidence you might hear, oh, the defendant's religious background, family history, mental retardation if there was any such thing involved, alcohol or drug abuse, psychological testimony, testimony of prior acts of criminal activity by the defendant or bad acts by the defendant.

You might hear just almost anything.

And after you have heard all that then you are going to decide whether the proper sentence should be a life sentence or the death penalty.

1            In making that decision you are able to

2    consider that evidence that you heard during the guilt

3    or innocence phase, you don't have to throw it away, you

4    can go back and consider it also but you have also got

5    to be able to consider that evidence that you hear during

6    the punishment phase.

7            Do  you  believe  if  you  found  the

8    defendant guilty of capital murder that you could listen

9    and  consider  all  that  evidence  during  the  punishment

10   phase before making your decision?

11   A        Yes, sir.

12   Q        Okay.  There is a flow chart up there, what I

13   call the "flow chart", looks like this.

14            And it kind of explains to us a little

15   bit about how a capital murder trial works.  And I will

16   just start at the top and go over this, most of this I

17   have already been over with you but first you go to guilt

18   or innocence phase and at that point you are going to

19   hear evidence as to whether the defendant is guilty or

20   not guilty.

21            If the defendant is found not guilty the

22   trial is over, everybody goes home.

23            On the other hand if he's found guilty

24   you go to the second phase, that second phase is the

25   punishment phase in the middle of the page there.

Then you are going to hear more evidence and that's the kind of evidence I talked to you a moment ago, that might be evidence of a lot of different varieties and types of evidence there.

Then you are going to vote on Special Issue #1 and Special Issue #1 is a question that the jury is going to answer either "Yes" or "No."

If the jury answers "No" to that question then -- and I will talk to you in a little bit about what that question is but if the jury answers "No" to that question then the defendant is automatically going to receive a life sentence.

If the jury answers "Yes" then you to go to Special Issue #2.

Special Issue #2 is another question, if the jury answers that question "No" the defendant will receive the death penalty, if the jury answers that question "Yes" the defendant will or would receive a life sentence.

So actually what the jury is doing is the jury is not required to say, "Okay, let's give him a life sentence" or "Okay, let's give him the death penalty."

What you are really doing is you are asked to answer two questions.  Now, you are going to

1    know what the result of those answers are, you are going

2    to know if Number One is "Yes" and Number Two is "No" the

3    defendant is going to receive the death penalty but if

4    you answer them any other way then the defendant would

5    receive a life sentence.

6                    Are you with me so far?

7    A        Yes.

8    Q        There's a sheet up there that is marked

9    "Special Issues" on the top.

10                   Pull that out and read Special Issue #1

11   and then we will talk about it.

12                   Okay.  Special Issue #1 basically talks

13   about the future and dangerousness of the defendant, is

14   that about the way you assess that?  (Indicating)

15   A        Yes.

16   Q        Okay.  I want to point out a few things about

17   that to you, the first thing is that word "probability."

18                   In Texas the law defines "probability"

19   as being "more likely than not" or just -- just more than

20   50/50, you know, 51/49 or more basically if you want to

21   put it into numbers.

22                   Is "more likely than not", would that

23   be about like your personal definition of "probability?"

24   A        Yes.

25   Q        Would you be able to follow that and use that

1    term or that definition for "probability" that --

2    A        Are you saying "49 to 51?"  Are you saying --

3    Q        Well, "more likely than not?"

4    A        Yes.

5    Q        When I say "51/49", that is just kind of a

6    broad -- kind of a numerical way to look at it.

7             The second thing I want to call your

8    attention to toward the end of the second line it talks

9    about "criminal acts of violence."

10            Of course the defendant is charged with

11   capital murder and we are required to prove to you beyond

12   a reasonable doubt and that is something that I should

13   have noted just like in the guilt or innocence phase

14   where we are required to prove the defendant guilty

15   beyond a reasonable doubt the State also has to prove to

16   you beyond a reasonable doubt that it's more likely than

17   not that the defendant would commit a criminal act of

18   violence in the future.

19            Criminal acts of violence, while the

20   defendant is charged with capital murder there are many

21   other criminal acts of violence besides murder; assault,

22   rape, attempted murder, you know, several other type

23   crimes that are acts of violence even though they are not

24   murder.

25            Of course there are crimes that are

1    considered "acts of violence", theft, forgery, those

2    sorts of things while they are criminal they are not acts

3    of violence.

4             Are you kind of with me on that?

5    A         Yes.

6    Q         The last word in the third line there is the

7    word "society" and what that means is that -- "society"

8    to you and me is just people walking around I think but

9    the way the law looks at "society" that includes not only

10   walking around on the street, not only in our homes and

11   in our communities, also in the penitentiary, that's a

12   part of society, too, because after all those are people

13   also.   The inmates are part of society, the guards are

14   part of society, the nurses and doctors and dentists and

15   whoever might be there are part of society as well.

16            So we are not required to prove to you

17   that the defendant would commit a criminal act of

18   violence in the future in the penitentiary or out of the

19   penitentiary, just that it would be probable that it

20   would happen somewhere he would commit some criminal act

21   of violence somewhere.

22            After you have heard the evidence during

23   the guilt or innocence phase then before you vote on

24   Special Issue #1 you are going to hear all that evidence

25   that I talked about during the punishment hearing.

After hearing all that evidence then you kind of go back and reconsider that evidence that you have heard during the guilt and innocence phase and reconsider all that evidence that you have heard during the punishment phase then vote "Yes" or "No" on Special Issue #1.

Then you go to Special Issue #2, if you will read that issue over and then we'll talk about it.

Okay.    Ms. Coke, Special Issue #2, remembering that you don't get to Special Issue #2 unless the jury voted "Yes" on Special Issue #1, if you voted "No" on that Special Issue then the defendant would automatically receive a life sentence.

Let's assume for what we are discussing today that you voted "Yes", the jury voted "Yes" on Special Issue #1 and that you do believe beyond a reasonable doubt that the defendant is likely to be dangerous in the future then you look at Special Issue #2.

Special Issue #2 basically, although there's a lot of legal wording in there, it basically boils down to I believe "Is this a death penalty type case, is this a death penalty type defendant", and you go back and again just like you did on Special Issue #1, you go back to the very beginning of the trial and you

reconsider all that evidence that you have heard and decide at that point "Is there something in here, something here that is sufficiently mitigating to me that makes me feel that this defendant should receive a life sentence rather than the death penalty?"

That term "mitigating" there is defined there for you where it says it's evidence that the jury might regard as reducing the defendant's moral blameworthiness so it's not evidence that would excuse his behavior but just simply evidence that you believe that would reduce the blame that he should be held responsible for.

And before the -- and you will note before the word "mitigating" it says "sufficient mitigating circumstances" so that means -- just any mitigating circumstance is not enough but it should be sufficient in your mind that you think it should reduce his blame enough to give him a life sentence rather than the death penalty.

Now, when you talk about "mitigating evidence", that is evidence that you might hear from this side of the table or you might hear from that side of the table, it might be evidence that one of our witnesses gave you that you felt was mitigating, it might be evidence that one of their witnesses gave that you felt

was mitigating, it could be evidence -- what one juror

might think is "mitigating" another juror might not.

For instance, if the facts of the case

show that the defendant committed the crime while he was

intoxicated, that might be -- one juror might look at

that and say, "Well, you know, if he hadn't been

intoxicated he probably wouldn't have done it so I'm

going to think that reduces his blame" while another

juror might say, "Well, you know, he's responsible for

his behavior.  The fact that he was intoxicated doesn't

make any difference, it's still his behavior."

In any other type evidence, if you talk

about the defendant's age, if you talk about his family

background, any of that sort of thing so something that

different jurors might think of in different ways.

But that's the sort of evidence that you

would be hearing -- another example might be if you knew

or found from the evidence that the defendant was

retarded might make a difference to some juror, it might

not, it depends on the individual and how they feel about

it.

But the important part to remember is

that in Special Issue #2 you are going to be looking at

all types of evidence possibly and we are not asking you

"Will you consider this important" or "Will you consider

this important" but to be a fair and impartial juror you have got to be able to keep an open mind and listen and consider all that evidence.

Now, once you have listened to it and considered it it's up to you to decide whether it's important or unimportant or believable or unbelievable. But the important part is can you keep an open mind and listen and consider all the evidence before making your decision?

A        Yes, sir.  I can keep an open mind but you are saying that it's still based on my opinion whether or not the evidence should be swayed one way or another, for instance if to take into effect his family background or whatever, that's up to me?

Q        Right.  Right.

And when you say "It's up to your opinion" that is really particularly true with Special Issue #2.

Now, as to guilt or innocence the State has to prove that to you beyond a reasonable doubt, the same way with Special Issue #1 but Special Issue #2, that is basically what Special Issue #2 is, strictly your opinion and we are not -- I am not trying to and the other side when they question you, we are not trying to get you to look in and say -- if there's evidence

1      presented of intoxication, for instance, just use that

2      as an example; if there's evidence presented of

3      intoxication will you promise us that you will consider

4      that and consider that to be mitigating?

5                   That's not what I'm trying to say.  What

6      I'm trying to say is that we have got to have jurors who

7      will keep an open mind and listen to the evidence,

8      consider the evidence and then decide whether that

9      evidence is important in your mind or not and not just

10     automatically say, "Okay.  If they are going to talk

11     about the defendant's family background I don't think

12     that is important and I'm not even going to listen to it

13     and I'm not going to consider it at all."

14                   Do you see what I'm saying?

15                   For instance, some people have the

16     "prejudice" you might say against psychologists and if

17     a psychologist got up there on the witness stand and that

18     person might say, "Well, I don't care what that guy says

19     I'm not listening to him and I'm not paying any attention

20     to it."

21                   See, they are not listening and

22     considering all the evidence.

23                   So, we are not trying to get you to say

24     that you would think anything was important or not

25     important, that's up to you, but just that you would

1    listen  to  it  before  making  your  decision,  you  would

2    consider it?

3    A         Yes, sir.  I could do that.

4    Q         You could do that?

5              Okay.  Now, I want to emphasize again

6    that we expect you and it's your job and you should if

7    you are selected on the jury and it comes to your own

8    opinion on Special Issue #2, you know that should be your

9    opinion as to what -- whether you felt like any of that

10   stuff was sufficiently mitigating or not, as long as you

11   are  just  willing  to  listen  and  consider  it  all  before

12   making your decision.

13   A         Yes.

14   Q         Do you think we are clear on that?

15   A         Yes.

16   Q         Okay.  Another  thing  when  looking  at  the

17   capital murder case when you are deciding the answer to

18   Special  Issues #1 and Issue #2 as I would expect the

19   Court would instruct you that in a capital murder case

20   in this particular capital murder case if the Defendant

21   is  found  guilty  of  capital  murder  and  given  a  life

22   sentence he would have to serve 35 calendar years in the

23   penitentiary, at that time he would become eligible for

24   parole.

25              Now,  it  does  not  mean  that  he  would

1    receive parole at that time, he could receive parole then

2    or he might never receive parole but he would be eligible

3    for parole at that time.

4              And I think the Court would instruct you

5    that in deciding your answer to Special Issue #1 and

6    Special Issue #2 that you are not to consider parole in

7    any way.

8              Now, when I say that what I mean is we

9    don't expect you to put it out of your mind, we know that

10   people can't just put things out of their mind but we do

11   -- you know, you are required to set that aside and not

12   use that in deciding your answer to Special Issue #1 or

13   Issue #2.   Basically you are just to consider a life

14   sentence as a life sentence and the death penalty the

15   death penalty and base your answer to Special Issue #1

16   and Issue #2 on the evidence that is presented to you and

17   not hold it against the defendant or consider in any way

18   the fact that he might at some point get parole.

19             Can you put that aside and not use that

20   in determining your answer to Special Issue #1?

21   A         That is a hard question for me.

22             I feel that 35 years is not enough for

23   a life sentence and how do you completely put that out

24   of your mind?

25             You know, I would try to do it but as

you said it would still be there.

Q        Well, Ms. Coke, I think what you know what I was saying is we realized that you or no one else can put that out of your mind and we don't expect you to be able to do that.  What -- what a qualified juror has got to be able to do, though, is to set that aside while they are making their decision and because after all we are not telling you that he would be released in 35 years, we are telling you that, you know, at the end of 35 years he would be eligible for parole.

The Parole Board could decide to release him at some point after that or they might decide never to release him.  That's not for your consideration.

We don't expect you to put that out of your mind but in making your decision as to what the appropriate answer should be to Special Issue #1 or Special Issue #2 you have got to be able to decide those Special Issues based on the evidence that you have been presented with all throughout the trial and base your decision on that and not on something like some possibility of parole out there in the future.

And what I'm asking you is as to Special Issue #1 could you not -- I'm not asking you to put it out of your mind but could you just set it aside and make your decision based on the evidence that you have heard?

1          You are supposed to make your decision

2  in this case based on the evidence that you have heard

3  in the courtroom, not something -- something that you

4  might have read in the newspaper or something that is not

5  evidence, well, that parole business is not evidence, the

6  evidence that you hear in the courtroom is.

7          And what we are asking you to do is just

8  put aside your feeling about parole, whatever they might

9  be, base your decision on the evidence you hear in the

10  courtroom and follow the law in that regard, you know.

11          Could you do that?

12  A          Yes, sir.

13  Q          Okay.  Same question as to Special Issue #2,

14  you have got to be able to put parole aside and not

15  consider it when deciding the -- after all, Special Issue

16  #1 and Issue #2 are both just "Yes" or "No" questions and

17  in answering Special Issue #2 can you also set that aside

18  and base your answer just on the evidence that you have

19  heard during the entire trial?

20  A          Yes, sir.

21  Q          Okay.  Let's shift gears for a minute and talk

22  to you about some aspects of the law that are true in not

23  only capital murder but other cases as well; I talked to

24  you a little bit earlier about the range of punishment

25  in a murder case.

1          The most severe sentence a person could

2   get in a plain murder case would be 99 years to life is

3   the range of punishment in a murder case, is anywhere

4   from five years probation to 99 years to life.

5          And I think that, you know, there are

6   murders that take many different stances, you know, some

7   of those murders are very vicious, on the other hand,

8   some murders are much less vicious type things, some

9   murders -- are you familiar with "mercy killings", are

10  you familiar with that term?

11  A       Yes, sir.

12  Q       Of course you know if an elderly person does

13  basically what is called a "mercy killing" to their

14  invalid spouse or something who is in a great deal of

15  pain that is not quite what we usually think of as

16  "murder" but that is a situation where someone has

17  intentionally caused another person's death so under

18  Texas law even though it's not near what you and I

19  usually think about when we think about murder it is

20  technically speaking it is a murder so there's a broad

21  range of punishment there.  And the jury is required to

22  assess what type of murder it is basically and decide

23  whether the appropriate punishment should be 99 years to

24  life or five years probation or somewhere in between.

25          In order to be a qualified juror we have

got to have the type jurors that can keep an open mind that in a murder case they could listen and consider all the evidence and then decide what the appropriate punishment should be and in considering what the appropriate punishment should be you have got to be able to follow the law and consider that full range of punishment.

Could you consider the full range of punishment from 99 years to life to five years probation?

A        Yes, sir.

Q        Okay.  And again, when I say "consider", that doesn't mean you have to say, "Well, I will do this" or "That I will do that", just that you will consider it and then make your decision.

Do you believe that you could do that?

A        Yes, sir.

Q        Let's say for instance in a capital murder case where a murder and a robbery are alleged, let's say for instance that the State proves to you beyond a reasonable doubt that the defendant committed the murder but we didn't quite prove to you that the defendant committed a robbery; it would be your duty at that time to find the defendant not guilty of capital murder but guilty of murder.

Do you understand why?

1          Because we didn't prove that robbery to

2  you.

3          So everything that is in that indictment

4  there we didn't quite make it, we made the murder part

5  but we didn't make the robbery part, could you do that?

6  A          You are saying if the evidence showed that he

7  was not -- whomever was there was not there to rob?

8  Q          Right.  Or if -- not necessarily this evidence

9  showed that but we proved to you the murder but we didn't

10  -- I'm not saying that the evidence will show you that

11  he didn't commit the robbery, it's just that we failed

12  to prove to you beyond a reasonable doubt that he

13  committed the robbery.

14          Do you see what I'm saying?

15          We have proven, you know, this is -- do

16  you believe that -- you believe that we proved the

17  murder?

18  A          Yes.

19  Q          But you also believe that we did not prove

20  beyond a reasonable doubt the robbery, you think he might

21  have done -- maybe you even think he did do it but you

22  don't think that we have proved it to you beyond a

23  reasonable doubt, we did the murder but failed to prove

24  the robbery then you would have to find him not guilty

25  of capital murder but guilty of murder.

1          Could you do that if that were the

2    situation?

3    A        The question is that I'm thinking about would

4    be why was he there just to murder or I mean -- I don't

5    understand.

6              Would you define that?

7              I mean if it's murder I know what you

8    saying about the law, about the extra circumstances but

9    if he was there or she was there to murder isn't that

10   premeditated?

11   Q        Well, that would -- in the scenario you gave

12   me that would be a murder, a premeditated murder.

13   A        Okay.

14   Q        But in Texas that is murder but that is not

15   capital murder.

16   A        Okay.

17   Q        Because capital murder, remember I said had to

18   be murder plus these things?

19   A        Yes, sir.

20   Q        And one of the things was a robbery, that was

21   an example I was using but just the fact that a person

22   has planned the murder and as you termed it, was

23   "premedicated" that doesn't necessarily make it a capital

24   murder.

25              It can only be a capital murder if it

1   fits those categories we talked about; murder during the

2   commission of a robbery or burglary or rape or something

3   of that nature.

4                Let's just say, for instance, that a

5   person -- if we charge a person with murder and robbery

6   but instead of being able to prove murder and robbery the

7   evidence showed you that it wasn't a robbery at all, they

8   just went there and murdered the guy because he didn't

9   like him, because he was mad at him.

10               That defendant would be guilty of murder

11  but he wouldn't be guilty of capital murder because we

12  failed to prove the robbery, in fact there was none.

13               And in the example I just gave you do

14  you see what I'm saying?

15  A        Yes.

16  Q        And what I'm asking you is that in order to

17  find a defendant guilty of capital murder we have got to

18  prove to you beyond a reasonable doubt by example two

19  things; one that he intentionally committed the murder

20  and, two; that he also committed the robbery.

21               And my question is, assume with me for

22  a moment that we don't quite prove the robbery beyond a

23  reasonable doubt; your duty as a juror would be to find

24  him guilty of murder but not guilty of capital murder.

25               Could you do that if that were the

1    facts, if that were the evidence?

2    A       Yes, sir.

3    Q        Okay.   Same way if -- if we charge in our

4    indictment murder and robbery but for some reason the

5    evidence shows it wasn't murder and robbery, it was

6    murder and arson.

7             Murder and arson is capital murder but

8    that is not what we put in the indictment and we are

9    required to prove what we put in the indictment and

10   that's our burden to prove that so if we -- if we prove

11   to you murder and arson but the indictment says murder

12   and robbery you should find him not guilty of capital

13   murder but guilty of murder because we proved that to you

14   and that's in the indictment but we didn't prove the

15   robbery to you so you couldn't find him guilty of capital

16   murder under that circumstance.

17            Are you following me on that?

18   A       Yes.

19            But something -- would you go back and

20   tell me what -- which is the highest offense, "capital

21   murder" or "murder", I have got that confused.

22   Q        Capital murder is the highest offense because

23   capital murder is punishable either by a life sentence

24   or the death penalty.

25   A       So you are saying --

1    Q         Murder   is   punishable   by   possibly   a   life

2    sentence but not the death penalty.

3    A         -- so if you are saying if there was an error

4    on the paperwork, what you are accusing him of, he or

5    she, and they go in and they murder and it's arson but

6    you said "murder and robbery" that even though in my mind

7    they are equal I would have to go down to a lesser

8    degree?

9    Q         You would have to find him guilty or murder

10   rather than capital murder because we didn't prove what

11   we put in the indictment.

12   A         Even though that was your mistake?

13   Q         Right.

14   A         I would have a problem with that.

15   Q         Okay.   Let me   talk to you a  little about

16   the indictment; an indictment is that charging instrument

17   -- have you ever been on the Grand Jury?

18   A         No, sir.

19   Q         An indictment is a charging instrument that a

20   Grand Jury uses basically to get a case to trial and it

21   indicates that they believe there is probable cause for

22   bringing the case to trial.

23            And the indictment also serves another

24   purpose under the law, the indictment sort of gives the

25   defendant notice as to what he should have to defend

1    himself for in Court.

2              Okay.  If our indictment says "murder

3    and robbery" then that is what the defendant has an

4    opportunity to prepare for in Court because that's what

5    he's charged with, the defendant and his attorneys have

6    the right, the opportunity to look at this indictment and

7    know "what we have got to be ready for, this is what we

8    are charged with."

9              It would be fundamentally unfair for the

10   State to say, "Okay, we are going to charge you with

11   murder and robbery", you know, really it's "murder and

12   arson" but we are going to tell him something different

13   so they won't be prepared for that.

14             And so the law requires that we prove

15   our case as set out in the indictment so an example I was

16   using, we would have to prove a murder and a robbery for

17   us, for you as a jury to find the defendant guilty of

18   capital murder because it would be fundamentally unfair

19   for us to be able to prove something else and count that

20   as capital murder, too.

21             Are you with me?

22   A       Yes.

23   Q       So if the scenario I gave you happened it would

24   be your duty as a jury to find him guilty of not capital

25   murder because we didn't prove the murder and the

robbery, it doesn't matter what else we have proved, it

doesn't matter if we proved that he killed the Pope 50

years ago, that is not in the indictment so we have got

to be able to prove to you in order for you to find him

guilty of capital murder we have got to be able to prove

to you what is in that indictment, not other stuff, you

know, not arson, not JFK's assassination or not that he

got caught for DWI two or three years ago or anything

like that. We have got to prove strictly what is in that

indictment to you, if we don't do it we haven't met our

burden and it's your responsibility as a jury to find the

defendant in that situation guilty of murder because we

proved that to you but not capital murder because we

didn't prove the robbery.

A        Okay.

          I have a question for you.

Q        Okay.

A        What if something comes up that you are unaware

of that say arson was involved but you were unaware of

that and maybe you didn't prove the robbery fact but that

unaware fact came out, you still could not -- it still

would not be capital murder, is that what you are saying?

Q        Right.  Because we have -- in order for us to

get a conviction for capital murder it's really -- I

think maybe I have complicated this for you but really

1    we have got to prove the murder and we have got to prove

2    the robbery, it doesn't matter what else comes out.  If

3    we don't prove that murder and that robbery then the

4    jury's responsibility is to find the defendant not guilty

5    of capital murder but, you know, but guilty of murder.

6                    THE    COURT:     Thirty-five

7    minutes.

8                    THE POTENTIAL JUROR:  Are you

9    asking me if I could do that?

10                    MR. TOWNSEND:  I am asking you

11    if you could do that if that were to happen because

12    that's what you would have to do to be able to follow the

13    law.

14                    THE  POTENTIAL  JUROR:    Yes,

15    sir.

16    Q        (BY MR. TOWNSEND)  Okay.  Let's see, along

17    with, you know, we have talked about this a little bit,

18    the burden of proof being with us, along with that burden

19    of proof goes the Fifth Amendment privilege and the Fifth

20    Amendment privilege basically says the defendant has a

21    right in a criminal case to not testify if he so chooses.

22                    Are you familiar with that?

23    A        Yes.

24    Q        Is that okay with you?

25    A        Yes.

Q        And that is to say you couldn't hold that against him in any way during the guilt and innocence phase of the trial, you can't base your decision in any way on the fact that he chose not to testify.

Could you do that?

A        Yes.

Q        And the same way for the punishment phase, during that punishment phase it might be human nature for you to think, "Well, you know, I would like for him to just get up there and say he's sorry" but on the other hand the Fifth Amendment privilege says if he doesn't get up there and testify then you have got to make your decision on Special Issue #1 and Issue #2 strictly on the evidence that is presented and not on something that didn't happen, you know.

Could you do that, not hold that against him if he didn't testify at that punishment phase?

A        Yes, sir.

Q        Okay.  You are going to hear testimony in criminal trials from all sorts of witnesses, some of them may be teachers, preachers, police officers, maybe even possibly somebody you know, I think that's probably unlikely but the key thing is there are all sorts of witnesses.

Could you judge those witnesses and be

1  fair and give every witness the same starting spot on the

2  track and not give one a head start over the other one

3  just because he wears a police uniform or just because

4  he's a minister or something like that?

5          Would you give every witness a fair

6  shot?

7  A        Yes.

8  Q        And not give one an edge over the other one

9  just because of their profession or something like that?

10  A        Yes.

11  Q        I have done quite a bit of talking, Ms. Coke,

12  I have just got a couple more things I want to ask you;

13  I notice that you mentioned that you knew something about

14  the facts of the case, where did you learn about the

15  facts -- what is it that you understand about the facts

16  of the case?

17          Is it something that you read from the

18  newspaper or did you overhear somebody talking about it?

19  A        The news on TV media and paper.

20  Q        Okay.   Of course the important thing to

21  remember in a situation like this is in order to be on

22  the jury and follow the law you have got to be able to

23  take whatever you may have heard on the streets or read

24  in the newspaper or seen on TV or whatever it was, you

25  have got to be able to -- like we -- like I talked about

something earlier, you -- we can't expect you to dislodge that from your mind but simply not to consider that when you are deciding the issues in this case because after all that is not evidence, what they say on TV and what you might see in the newspaper or something.

Would you be able to put that aside and decide the case based on the evidence that you hear in the courtroom?

A Yes, sir.

Q Okay. Mr. Old is one of the Defense Attorneys in the case and you indicated that you know Mr. Old; how well do you know him?

A I believe you have represented some of my family members.

"John Terrell" was my grandfather and you have been their attorney on some of the "Terrells", that's how I know him.

Q How are the "Terrells" related to you, ma'am?

A That's my mother's family.

Q Okay. Has Mr. Old ever represented you?

A No, sir.

Q In his representation of your other family members were you ever associated with Mr. Old while he was representing them?

A No, sir.

1    Q        Okay.    Is    there    anything    about    your

2    relationship with Mr. Old, has he ever visited in your

3    home?

4    A        No.

5    Q        Have you ever visited in his home?

6    A        No.

7    Q        Is there anything about your relationship that

8    would cause you to be slanted one way or another in this

9    case?

10   A        No, sir.

11   Q        Okay.    The other Defense Attorney is Lance

12   Hinson and he stepped out for a moment but do you know

13   Lance?

14   A        No, sir.

15   Q        You mentioned that you would be teaching school

16   and that it would be difficult to find a substitute.

17            Of course a job is not in any way an

18   excuse for getting off jury duty and I know you

19   understand that but my question to you, if you were

20   sitting on  --  as a juror in this case and would you be

21   -- would you be able to focus your attention on the

22   evidence of would you be so distracted that you wouldn't

23   concentrate on the evidence because you were concerned

24   about your classroom?

25            I know my wife is a teacher and I

1     understand those sorts of concerns but would you be able

2     to -- once again I say, kind of put that aside and do the

3     duty that a juror has and concentrate on those things at

4     the times that you needed to?

5     A       It would be very stressful to handle both

6     because I would still be in control of what is going on,

7     I am still responsible for what goes on in my classroom

8     so that would be stressful doing this and having made

9     sure that everything is taken care of at work.

10                 Could I put it out of my mind?

11                 Yes.  I could.  But it would still be

12     lingering in any moment that we were not speaking or

13     whatever, it would be there.

14     Q       Okay.  I think, and correct me if I am wrong,

15     but what I think you are saying is that if we were taking

16     a break or if when you went home at night you would be

17     concerned about your school classroom but that you

18     wouldn't be able to put it out of your mind but you could

19     set it aside and concentrate on the jury service, you

20     know, at the times that you needed to be concentrating?

21     A       Yes.

22     Q       Okay.  Ms. Coke, I have taken quite a bit of

23     your time up and I apologize for it to you.  If you feel

24     like I have kind of beat you up a little bit I didn't

25     intend to.  Some of these things are kind of complicated

1    and I'm not real good at explaining them sometimes.

2    But my last question to you is; is there

3    anything that you feel like you don't understand that we

4    have got -- that we have gone over that you would like

5    me to clear up?

6    A        No, sir.

7    MR. TOWNSEND: Pass the juror,

8    Your Honor.

9    THE COURT:  Let's take about

10   a  five   minute  break  then    we  will  proceed  to  the

11   Defense.

12   You may just go ahead and step down.

13

14   (Recess.)

15

16   (The following occurred in the presence

17   and hearing of the potential juror:)

18

19   THE COURT:  Ma'am, you didn't

20   quite know what to expect when you came up here, did you?

21   THE POTENTIAL JUROR: No, sir.

22   THE COURT:  Do you have any

23   questions so far?

24   THE POTENTIAL JUROR: No, sir.

25   THE COURT:  Mr. Old.

1          VOIR DIRE EXAMINATION

2            BY MR. OLD

3

4     Q        Ms. Coke, I suppose you could say I am "Act II"

5     and there is a reason for me being Act II; the law of the

6     State and the United States requires that the Government,

7     the State of Texas in this case, to prove a man guilty

8     beyond a reasonable doubt -- there is an exhibit before

9     you, it has a "6" on it.  (Indicating)

10    A        Yes, sir.

11    Q        Starting with the second paragraph on that page

12    it defines and tells you what by law "beyond a reasonable

13    doubt" means.

14             Would you read that?  (Indicating)

15    A        Yes, sir.

16    Q        Now, you asked or answered a lot of questions

17    about the word "reasonable doubt", the word "reasonable

18    doubt" has a specific legal meaning and that can -- what

19    is on that page, we all have our own idea about what

20    words mean but when the Court tells you a word has a

21    specific meaning you must make your finding or be bound

22    by that definition and not your own definition.

23             Does your own definition of reasonable

24    doubt conflict with what you read on the page?

25    A        No, sir.

Q        I mean you are not in argument or opposition to that definition?

A        No, sir.

Q        In order to qualify as a juror you must take an oath and that oath tells you what your job as a juror is and you are required to affirm that "The case that you are trying that you will a true verdict render according to the law and the evidence so help you God."

The definition that you read of reasonable doubt is the law of the State, jurors are not required to know the law, His Honor through the written instrument at the end of evidence in this case will submit to you the law of this case.  He will tell you what the law is and then your job as a juror is to weigh or to judge the evidence based upon the law.

And that is to say you must make your finding or most of your findings beyond a reasonable doubt or you will not find the defendant guilty.

Do you have any problems with accepting the law from the Court as the law?

A        No, sir.

Q        Now, I suppose if we went far enough with any person we would find a law that they disagreed with and that ultimately we would find one to where a person would have to say, "I don't care if that's the law or not, I

can't find a man guilty of having done that because morally I don't think that ought to be the law" or "It's just wrong."

Now, that is really what we are asking you and not about all the laws of the State of Texas but about the law that pertains to a capital murder case or to a criminal case in general.

Mr. Townsend talked to you about the parole law and in this written instruction that the Court gives you the Court will tell you words to the effect -- these may not be the exact words but they will have the same meaning -- "You are instructed that in determining punishment in this case you are not to discuss among yourselves how long the defendant will be required to serve any sentence, the sentence imposed, such matters come within the exclusive jurisdiction of the Board of Pardons and Paroles and are no concern of yours."

The Court will go on and tell you that the law of this State requires that as to a life sentence in a capital murder case that you, before a person even becomes eligible for parole that he must serve 35 years and that is not counting good time credit or anything, that is he will spend 35 calendar years in a penal institution before he would ever come under the

1      jurisdiction of the Board of Pardons and Paroles.

2              The fact that a person becomes eligible

3      for parole does not entitle him to it, it does not mean

4      that he will get -- that he will ever get it.

5              In answer to Mr. Townsend's questions

6      you said that that bothered you and that 35 years was not

7      enough.   And if I understood you correctly about

8      "bother", if I read you correctly, I'm not trying to put

9      words in your mouth, that it might be hard for you not

10     to consider what you have been told about the law, is

11     that correct?

12     A       Yes, sir.

13     Q       Okay.   That if you found a man guilty of

14     capital murder and you are answering the Special Issue

15     #1 you would know by answering that question "No" there

16     is a probability that 35 years later that he would become

17     eligible for parole and you did not think that was long

18     enough, is that correct?

19     A       Are you asking me could I -- would I base my

20     decision on knowing that, not on that opinion?

21              Is that what you are asking me?

22     Q       What I'm saying is -- let me see if we agree

23     about something; what the Court will instruct you is that

24     you are not even to consider pardon and parole.

25     A       Okay.

Q        That you are not to consider the 35 years that
-- in sentencing a man you must consider life to equal
actual life, that a man is going to stay in the
penitentiary until he dies.

A        So you are asking me can I go along with that?
Could I in determining a sentence?

Q        Let me go away from capital murder, go back to
ordinary murder; you know if you give a man life that at
some point that he's going to become eligible for parole,
is that going to effect the sentence that you gave him?

A        No, sir.

Q        Okay.  I mean in determining the giving of a
life, of a life sentence you can consider life to
actually mean life?

A        Yes.

Q        You will not consider -- you will not be
influenced by at all the fact that after 35 years he may
become -- he becomes eligible for parole?

A        Okay.  I wouldn't like it but, yes, I could
keep that out of my mind when I am making that decision.
Yes, sir.

Q        Okay.  Special Issue #1 asks you if you find
beyond a reasonable doubt that there is a probability
that the person charged will commit criminal acts of
violence in the future and be a danger to society.

1          Mr. Townsend told you that "society"

2    included life in the penitentiary.  Okay.

3          So what that question really is, if you

4    find this man guilty are you -- or you found him guilty

5    and you answer this question "No", you have given him a

6    life sentence?

7    A        Yes, sir.

8    Q        Okay.  And what you are saying is that you must

9    presume that he's going to be in the penitentiary for the

10   rest of his life?

11   A        Yes, sir.

12   Q        And that's part of society?

13   A        Yes.

14   Q        Okay.  Is the fact that you are concerned about

15   the law of parole, is that going to influence you in

16   answering that question "No?"

17   A        No, sir.  It wouldn't.

18   Q        I mean you will create the fiction in your mind

19   and lay aside that if you answer that question "No" he's

20   going to spend the rest of his life in the penitentiary?

21   A        Yes.

22   Q        Mr. Townsend was questioning you about the

23   indictment, you understand that indictment is not

24   inference of guilt?

25   A        Yes, sir.

1   Q       It does not mean a thing --

2   A       Yes, sir.

3   Q       -- in your role as a juror?

4   A       Yes, sir.

5   Q       I mean it doesn't make anything more likely

6   than not?

7   A       You just have to prove it.

8   Q       What?

9   A       He just has to prove it, that's what you are

10  saying?

11  Q       Who has to prove it?

12  A       He has to prove the indictment.

13  Q       But the fact that somebody has been indicted

14  is not evidence of guilt?

15  A       Yes, sir.  I know that.

16  Q       Now, he asked you a hypothetical about murder

17  plus robbery and the evidence showed murder plus arson,

18  let me change the hypothetical, let's say it is, the

19  indictment in my hypothetical case is murder plus

20  robbery, intentionally killing plus robbery and the facts

21  of this case prove to you that -- that it was not murder

22  plus robbery, it was murder versus kidnapping and you

23  believe beyond a reasonable doubt that the person charged

24  intended to kidnap that person and had no intention of

25  robbing him; can you say by your verdict "Not guilty of

1    capital murder?"

2    A          Yes.  I could.

3                    Because that's what I have to look at,

4    that is what I have to go by but I wouldn't agree with

5    it.

6    Q          You wouldn't agree with it?

7    A          I mean to me it's both wrong.

8    Q          Would you be violating your own conscience to

9    do that?

10                   MR. TOWNSEND:   Object, Your

11   Honor.  I believe that's an improper question.

12                   She said she wouldn't agree with it, she

13   could do it, whether she violates her conscience or not.

14                   THE COURT:  Sustained.

15                   You don't have to answer the question.

16                   If I sustain the objection you don't

17   have to answer the question, if it's overruled that means

18   you do answer it.

19                   MR. OLD:   In yours and Mr.

20   Townsend's discussion about that you asked him I think,

21   I mean -- I mean if you made a decision or if the

22   indictment was wrong, is that what you call a "legal

23   technicality?"

24                   THE POTENTIAL JUROR:   Yes,

25   sir.

Q          (BY MR. OLD)  The Court will tell you that the
State has the burden in the case and it never shifts to
the Defendant.

A          Would you repeat that, please?

Q          Excuse me.  In the written instruction of the
Court the Court will tell you that the State has the
burden of the proof, that is they must prove beyond a
reasonable doubt their case against the person charged?

A          Yes, sir.

Q          And the Defendant does not have the burden of
proof?

A          Yes, sir.

Q          And I think in the -- I guess it has been about
a month ago since the first day we were here, the Court
told you that Mr. Wardlow and I could sit over here and
twiddle our thumbs and do nothing, "work crossword
puzzles" is the way that he put it, I assure you that it
wouldn't be done, I wouldn't work crossword puzzles but
if the defendant did absolutely nothing, did not testify,
did not present evidence, would that be an inference of
guilt to you?

A          No, sir.

Q          Do you consider that instruction to be a "legal
technicality?"

A          I am confused now.

Q        Okay.  You asked him, you said the indictment
being wrong being a "legal technicality."

         The fact that the Court tells you that
"All men are presumed to be innocent and you must presume
them to be so until they are given -- until they are
proven -- until the State proves guilt beyond a
reasonable doubt", do you consider that to be a
"technicality?"

A        No, sir.

Q        Do you consider that to be a real part of our
law?

A        Yes, sir.

Q        And do you think that is something that a
person is charged with a crime -- that is charged with
a crime is entitled to?

A        Yes, sir.

Q        A presumption of innocence?

A        Yes, sir.

Q        What have you heard about this case or read
about it?

A        I saw it on the evening news one day where they
went to the house and that the body had been found
wrapped in a blanket or something in a closet and that
they at that point,  they had no clues,  they did not
have any suspects,  looked like there was a missing

1    vehicle -- it has been a long time.

2    Q        And is all of your information that you have

3    received in that regard from media?

4    A        Yes, sir.

5    Q        And I mean not a matter of what other people

6    have said?

7    A        No, sir.  I can't remember anybody saying

8    anything.

9    Q        Now, I believe you told the Court that you

10   could lay that aside?

11   A        Yes, sir.

12   Q        Okay.  What if another hypothetical; during the

13   trial of this case there was a conflicting evidence as

14   to whether or not the body was wrapped in a blanket, one

15   witness testified it was, one witness testified it was

16   not, would the fact that had been reported to you that

17   way outside of this courtroom, would that effect you in

18   the way you determine that issue?

19   A        There is no significant proof either way -- I

20   would have to determine in my mind.

21   Q        You have got two witnesses that you consider

22   to be of equal credibility, one of them says "No.  It

23   wasn't wrapped in a blanket."

24            The other one says, "Yes.  It was."

25   A        I would think that would -- that might have a

1   bearing on my -- my decision, I'm afraid it might.

2   Q        It might if the evidence was conflicting as to

3   what you heard you might be put in a position to where

4   you would go out of the evidence to support some of the

5   evidence?

6   A        Well, if I have to decide if that's -- it's

7   according to what you are asking me to decide, if you are

8   asking me to decide if I have to assume what happened by

9   the facts I am afraid I may have to assume that the way

10  I feel -- and I don't know how to explain that -- if

11  there's conflicting evidence I would be undecided, I

12  wouldn't know how to decide except for what is in my mind

13  and there's a possibility I might think -- probably would

14  think that it happened that way if there is not evidence

15  but if there is conflicting evidence.  Yes.

16  Q        So what you have heard in that situation could

17  influence your decision?

18  A        I think in that instance.  Yes.

19  Q        On the questionnaire, it has been about a month

20  since you have seen it, if you don't want to take my word

21  what I quote from it I will show you a copy -- copy of

22  it.

23               The first page asks you your opinion

24  about the death penalty.

25               THE   COURT:     Here's   your

questionnaire.


                    (Handed to the potential juror.)


                    MR.   OLD:     And   you   circled
"Number 2" and what that says is that in an appropriate
case that you could return a verdict that had the effect
of the death penalty.

          It did not say "In all cases?"

                    THE POTENTIAL JUROR:    That's
true.

Q          (BY MR. OLD)   Going down to the bottom it's
asking you a question, "If you are in favor of the death
penalty in some murder case do you agree that a life
sentence rather than the death penalty would be
appropriate under the proper circumstances?"

          And you wrote "Undecided" and you marked
it out and put "Yes."

          And I mean I presume and I believe that
people do put a lot of thought into their answers and
that's not a question that is easily answered "Yes" or
"No" and I'm not criticizing you for that, having changed
your answer.

          What was your mental impression, what
were you undecided about when you first started answering

1    that question, if anything?

2    A         I think that I didn't read it very carefully.

3    Q         Okay.

4    A         And that's why I put "Undecided", that if the

5    evidence was that -- appropriate that this person should

6    not get the death penalty I could go along with that.

7              However, I feel just from watching media

8    and stuff that lots of times it seems like our criminals

9    get off too easy.

10             Now, that's just an opinion that is

11   based on our society and not by fact and I realize that,

12   I realized that it's a lot more complicated than what it

13   appears.

14             But I think when I first read that

15   that's why I went back and I reread it and I put more

16   thought into it.

17   Q         But I mean you were undecided, was that you

18   were leaning more toward the death penalty than the life

19   sentence?

20   A         No.  I think I just -- I didn't read it very

21   carefully the first time.

22   Q         Up above where it asks you to explain your

23   answer to being in favor of the death penalty you

24   answered "No one should murder another person without

25   losing their  own life or freedom."

1          Would giving a life sentence be the

2     equivalent by what you mean by "losing their freedom?"

3     A          Yes, sir.

4     Q          Now, as to plain old ordinary murder or non-

5     capital intentionally or knowingly taking the life of

6     another, that is punishable by from a minimum of five

7     years probated with a five to 99 years or life and again,

8     would your views on the loss of freedom carry you to the

9     upper ends of the scale, would you be more in favor of

10    a life sentence than a five year probated sentence?

11    A          It would be according to the circumstances.

12    Q          What I'm really doing is I am making you "King

13    for a Day" and you can rewrite the law; do you think five

14    years probated is too light a sentence for any murder?

15    A          No.  I don't think so.  I think we have -- I

16    think our laws have to look at each individual case and

17    determine the outcome and you cannot just say overall

18    that it's the same for everybody.

19    Q          What do you teach?

20    A          Home Economics.

21    Q          High school?

22    A          Yes.

23    Q          Have you taught that most of your career or all

24    of your career?

25    A          I taught fifth grade for two years and I have

1   been at the high school for eight years now.

2   Q        Special Issue #2 that you have looked at before

3   defines mitigating evidence, I would like to ask you

4   about some different categories of evidence and I'm not

5   asking you whether or not you would find them being

6   sufficiently mitigating, I'm asking -- what I'm asking

7   you is can you consider that type of evidence and not

8   reject it automatically?

9            Could you consider the age of a person

10  charged with a crime as to mitigating evidence?

11  A        Yes.  I could consider it.

12                      MR. TOWNSEND:  Object.

13                      THE POTENTIAL JUROR:   But I

14  am not for sure what that -- my outcome.

15                      MR. OLD:  I'm not asking you

16  your outcome, I'm saying would it be evidence that would

17  fall within mitigation?

18            I'm not saying you would find it

19  sufficiently mitigating but I mean would you at least

20  consider it as being the type evidence that might go to

21  mitigation?

22                      THE POTENTIAL JUROR:   Yes,

23  sir.

24  Q        (BY MR. OLD)  Let me give you an example; I

25  have had people tell me, "I wouldn't consider what a

1    psychiatrist said as to anything, I just would reject

2    that evidence?"

3    A        Yes.

4    Q        And the way I say that is "I wouldn't weigh

5    that evidence, I just wouldn't consider it?"

6    A        Yes.

7    Q        Okay.

8    A        Are you asking me do I agree with that or I am

9    -- yes -- I understand what you are saying.

10   Q        How about psychiatric evidence?

11   A        "How do I feel about that?"

12   Q        Yes.

13   A        I think that they are experts in their field

14   and we have to take into consideration what they say.

15              I may not always agree with it but I

16   have to consider it.

17   Q        But that is evidence that you would weigh --

18   A        Yes, sir.

19   Q        -- as to sufficiently mitigating?

20   A        Yes.

21   Q        Along with that and perhaps independent of it

22   would you consider somebody's background, their family

23   background, how they were raised?

24   A        Yes, sir.

25   Q        Would you consider their religious belief,

whether or not they are Christians?

A        Yes, sir.  All of this I will consider.

I don't know.  You are not asking me my final opinion, are you?

Q        No, ma'am.  No, ma'am.  What I'm asking you, will you at least hear it before you say "No?"

The person who "I wouldn't believe a word a psychiatrist told me" or "I would put no confidence into any opinion that they have", they aren't going to consider that evidence, they are not going to weigh it.

A        No, sir.  I am not like that.

Q        Special Issue #1 requires for you to answer that question that it be proven to you beyond a reasonable doubt, which you now know the legal definition of that, there is a probability.

"Probability", you have been told is "more likely than not."

"That the defendant will commit criminal acts of violence that will constitute a continuing threat to society."

Now, you know something that is more likely than not is mere probability, it takes 50 percent of the evidence plus just a little more, it doesn't take 51 percent, it just takes -- if you are weighing it on

1   the scale just a shifting of the scales is "more likely

2   than not", do you agree with that, "more probable than

3   not?" (Indicating)

4   A        Yes, sir.

5   Q        But that 50 percent -- 50 plus a little

6   evidence has to be evidence that all of it is proven to

7   you beyond a reasonable doubt?

8   A        Yes, sir.

9   Q        Okay.

10                       THE COURT:  Thirty minutes.

11                       MR. OLD:  Thank you.

12               As to "criminal acts of violence", do

13   you understand that all criminal acts are not "acts of

14   violence", like a forgery?

15                       THE POTENTIAL JUROR:  Yes,

16   sir.

17   Q        (BY MR. OLD)  Okay.  Like theft?

18   A        Yes, sir.

19   Q        There's a lot of crimes that are committed

20   without violence?

21   A        Yes, sir.

22   Q        Would you require the State to prove to you

23   beyond a reasonable doubt that it is more likely than not

24   that there will be a criminal act of violence rather than

25   just "criminal acts?"

1    A          I don't think I understand what you are saying.

2    Q          Would you require the State to prove to you,

3    answer that question "Yes" that the probability is that

4    there will be "criminal acts of violence" and not merely

5    "criminal acts?"

6    A          I would have to research that more.

7    Q          "Research it?"

8               You better ask me your question, I don't

9    think we are communicating.

10   A   .      It sounds like to me that you are asking me are

11   there more acts of criminal violence as just criminal

12   acts, is there violence -- is there more violence in the

13   criminal acts or non-violence, is that what you are

14   asking me?

15               THE COURT:  I'm not sure that

16   you are talking about the issue.

17               MR. OLD:  The words in bold

18   there, "criminal acts of violence", that's what the State

19   must prove to you.

20               THE POTENTIAL JUROR:  Okay.

21   Okay.

22   Q     (BY MR. OLD)   If they merely prove to you

23   beyond a reasonable doubt that there was a probability

24   that the person charged would continue to write hot

25   checks or forged checks, that's all they prove to you,

1   you wouldn't consider that to be a "criminal act of

2   violence?"

3   A        I still don't think I understand exactly what

4   you are asking.

5            I think I'm getting closer, though.

6   Q        Okay.  You agree that there are crimes that are

7   committed without violence?

8   A        Yes, sir.

9   Q        Okay.  The State would have to prove to you

10  more than the probability that the defendant would commit

11  criminal acts, they would have to prove to you that the

12  defendant would commit criminal acts of violence in the

13  future?

14  A        Yes, sir.  They would have to prove beyond a

15  doubt the probability of that before I would agree with

16  that.

17  Q        We talked about "probability", the second issue

18  you are asked, if there is sufficient mitigating

19  circumstances -- what does the word -- I mean what does

20  "sufficient" mean to you?

21  A        "Enough."

22  Q        "Enough?"

23  A        Yes.

24  Q        One -- what is the least passing grade you can

25  make in Mount Pleasant now?

1    A        70.

2    Q        Well, is 70 "sufficient" in school?

3    A        Yes.

4    Q        Not "good" but it's "sufficient?"

5    A        Yes.

6    Q        In the indictment it alleges the word

7 "intentionally" -- do you have the indictment in front

8 of you?

9    A        Okay.  (Indicating)

10    Q        It says "did then and there intentionally cause

11 the death of an individual."

12               The word "intentional" is one of those

13 words that has a specific legal definition that a juror

14 must be bound by.  The law will tell you that "A person

15 acts intentionally or with intent with respect to a

16 result of his conduct when it is his conscious objective

17 or desire to cause the result."

18               I mean that is a definition that you can

19 follow?

20    A        Yes, sir.

21    Q        Okay.  "Conscious objective", does that mean

22 that he intended to do it, he wanted to do it?

23    A        Yes, sir.

24    Q        There is another word and another -- and that's

25 what the law calls "mental state", there is another

1    mental state that is defined by the word "knowingly" and

2    the law again has a definition for the word "knowingly."

3                    "A   person   acts   knowingly   or   with

4    knowledge with respect to the result of his conduct when

5    he is aware that his conduct is reasonably certain to

6    cause a result?"

7    A        Yes, sir.

8    Q        Okay.   Do you have any quarrel with that

9    definition as the definition that you can follow in

10   reaching a verdict in this trial?

11   A        No, sir.

12   Q        Now, what Mr. Townsend referred to as "plain

13   murder" or non-capital murder is either intentionally or

14   knowingly killing someone.

15                    Capital murder, it must be intentional,

16   it must be a conscious objective or desire to cause the

17   result.

18                    Okay.  If the State proves -- fell short

19   in its burden of proof and the evidence as you saw it was

20   that the defendant knowingly caused -- killed someone in

21   the course of committing a robbery would you find them

22   not guilty of capital murder?

23   A        Yes, sir.

24   Q        You wouldn't have any problem with that?

25   A        I might have a problem with it but according

1    to what I have been instructed to do that's what I would

2    do but morally, you know, it's still "murder."

3    Q          "Morally" or "legally?"

4    A          I guess both.  You are defining murder, I know

5    capital and just regular murder but I know legally it

6    would be "murder" but morally I feel -- I don't know --

7    what  I'm trying to explain to you is that I would have

8    to do that because that's the difference between the two

9    words  and  he  used  the  word  "intentionally"  here  and

10    because the word "knowingly" -- I would have to go with

11    the verdict of murder instead of capital murder.

12                    "Personally do I like that?"

13                    I have some problems with that.  If it

14    was still -- still as being a wrong -- I'm trying to

15    choose the right words here.

16    Q          I asked  you a moment ago if you were  "King

17    for a Day" and could change the words would you perhaps

18    be -- to perhaps make "intentionally" and  "knowingly"

19    both capital murder?

20    A          Probably.

21    Q          Then what you would like the law to be is

22    different from what it is?

23                    There's nothing wrong with that.

24    A          On this particular issue some of the laws --

25    this is the first time I have ever been involved in

1    something like that but in that particular instance those

2    two words are very close.   Yes.

3    Q        But you do see the difference in them?

4    A        Yes.

5    Q        Okay.   Would the fact that you may be of the

6    opinion that both "intentionally" and "knowingly" in this

7    case ought to be punishable by -- as capital murder, are

8    you sure that you can lay aside your opinion or your bias

9    to the law and render a true verdict or is what you think

10   ought to be, is it going to subjectively effect your

11   answer to that question?

12            Is it going to take you from "knowingly"

13   I mean objectively you say "knowingly" but subjectively

14   are you going to get it up to the intentional because

15   that's what you think it ought to be?

16            Is it going to have a subjective effect

17   on your deliberations?

18   A        No, sir.

19   Q        I mean if all they proved is "knowingly" you

20   would answer "murder?"

21   A        Yes, sir.

22   Q        There is a list of witnesses in front of you,

23   what I would ask you to do is to look at the list, has

24   "Witness List" at the top of it and go over this list and

25   when you come to a name that you recognize tell me the

1  name and we will talk.  Even if you just know who they

2  are, I'm not asking you if you have personal knowledge

3  of them but tell me both.  (Indicating)

4  A        No, sir.  I don't know any of these people.

5  Q        Your grandfather was Sheriff of this county for

6  a long time?

7  A        Yes, sir.

8  Q        One of the most popular men that ever lived in

9  this county, probably the most popular; the fact that he

10  was a law enforcement officer, the Sheriff of this county

11  -- now, I'm sure you notice the names of a -- of a lot

12  of people who were sheriffs and other type law officers

13  on that list, would you give a witness a head start

14  merely because they are law enforcement officers?

15              That is to say does that fact alone have

16  more credibility with you?

17  A        No, sir.

18  Q        Thank you.

19              Let me ask you this other question; if

20  you are John Terrell's granddaughter you are kin to most

21  -- or more people in this county than most people.  In

22  fact I have heard it said that you are kin to everyone?

23  A        That's right.

24  Q        Did you recognize any last name on that list

25  that could be your relatives?

A          My maiden name is "Cook", I saw "Officer Cook" but I'm not familiar with that "Cook."

Q          Okay.

A          No, sir.  I didn't see any names.

Q          If Officer Cook turned out to be your long lost whatever cousin, could you lay that aside in weighing his testimony?

A          Yes, sir.  I could.

Q          You live in Argo?

A          Yes, sir.

Q          Do you attend Argo Missionary Baptist?

           Who is the minister there now?

A          Jackie Barrett, Brother Jackie.

Q          I think we have covered this in your answer, your opinion as to the criminal justice system, that it was not tough enough for or on the ones who break the law.

           I think you told me earlier that's how it appeared to you but you weren't the person on those juries?

A          That's true.

           MR. OLD:  Okay.  And if those seats over there are hot -- I mean you would have to yield your opinion to a juror who spent whatever time required to reach a verdict in the case and weighing the

1   facts as opposed to what you might have read in the

2   newspaper?

3                We would pass the witness, Your Honor.

4                THE COURT: Ma'am, if you will

5   step down I will have some more instructions for you in

6   a few minutes.

7                Do you have any questions of us, though,

8   before you leave the courtroom?

9                THE POTENTIAL JUROR: No, sir.

10               THE BAILIFF:  Watch your step

11  there.

12

13               (The following occurred outside the

14  presence and hearing of the potential juror:)

15

16               THE COURT:   Does the State

17  have any challenges?

18               MR. TOWNSEND:    None, Your

19  Honor.

20               THE COURT:  Defense have any

21  challenges?

22               MR. OLD:  Yes, Your Honor.

23               The Defendant would first challenge the

24  juror as to what she had heard about the case, she

25  indicated that if those things came into play in certain

circumstances that she would fall back and consider what she had heard outside of this courtroom that was not testimony under oath.

Secondly we would challenge the juror on her statement that 35 years was not enough prior to being eligible for parole, that she expressed a bias or a prejudice against that particular law.

She said that she would try to follow it but it would still bother her.  Though she did answer affirmatively that she could put it out of her mind she had great concern as to whether she actually could or not.

No other challenges.

THE COURT:   I'm going to overrule the second objection on the 35 years and I intend to ask the juror about whether or not she could follow the law if she was instructed not to consider the news accounts.

Mr. Townsend, you are standing, did you wish to address the Court on either of these issues?

MR.   TOWNSEND:   If you are going to talk to her about the news coverage that's all I was going to request -- she told me she could put it aside and she told Bird maybe she might not could, she was equivocating.

1    I would like you to clear it up.

2    THE COURT:   I will try to

3    clear it.

4    Mr. Old, you are talking about when she

5    was talking about the body being wrapped in a blanket

6    might be disputed testimony and she would fall back on

7    what she had heard?

8    MR. OLD:   Yes.

9    THE COURT:   Let's bring her

10   back in.

11   THE BAILIFF:   Come back in,

12   please.

13

14   (The following occurred in the presence

15   and hearing of the potential juror:)

16

17   THE COURT:   Okay, ma'am, it's

18   now my turn, I'm not going to take long, I would just

19   have   one   area   that   I   would   like   to   get   some

20   clarification; when Mr. Old was talking to you about what

21   you had heard about the case you told us that you had

22   heard or watched the news accounts, that you saw the

23   house on the news, you knew that a murder or a death had

24   occurred, that somebody might be missing and that a body

25   was found wrapped in a rug or blanket in the closet.

Then Mr. Old talked to you about the "What if scenario" where you had two credible witnesses, one said the body was wrapped in a blanket, one said the body wasn't wrapped in a blanket and he asked you what would you do about it and would you give more credibility to the one that said it was wrapped in a blanket because you had heard it on the news, that basically was the question.

Now, ma'am, you will take an oath if you are on this jury to base your verdict on the law and the law is what will be given to you by the Court and the evidence.

The evidence must come from witnesses who have been sworn in who sit on the witness stand where you are and answer under oath.  You as a juror have a right to judge their credibility based on their demeanor, the way they appear, what they say and the reasonableness of what they say.

It certainly is inappropriate for any juror or jury to base a verdict on what they heard outside the of the courtroom.

Now, that news account is something that you have to be able to put out of your mind and if you can't I'm not going to quarrel with you over it, I just need to get clarified in my mind whether you can or not

1    follow the oath that requires you not to consider

2    anything other than what you hear in the courtroom.

3            Now, you may hear a witness that is very

4    credible say, using his example, "A body was found in the

5    closet wrapped in a blanket", you may hear another

6    credible witness say, "No.  The body was not wrapped in

7    a blanket."

8            You have to decide -- first, that may

9    or may not be an issue, it might not have anything to do

10   with anything, you have to decide and it may, we don't

11   know, that's just an example we are using, you might not

12   know which one to believe but you can't rely on what you

13   have heard from somebody else, see, that's the instance

14   where if you are going to be a qualified juror you must

15   put out of your mind what you have heard in the community

16   or on the news because if you are going to let the news

17   accounts influence you then you are basing your verdict

18   on something other than the evidence.

19           Now, if you will not be able to put it

20   out of your mind and if in that particular case it would

21   influence you then I need to know about it but if you can

22   do the mental gymnastics necessary to put it out of your

23   mind and base your decision and verdict on what you heard

24   in the courtroom then I want to know that.

25           And you are the only one that can answer

1    that question.  If you are not sure of a fact -- let's

2    just get away from that one example -- if you are not

3    sure of a fact in a trial, you have heard different

4    things from different people and you are not really sure

5    in your own mind what the fact is you cannot go outside

6    of this courtroom for an independent investigation nor

7    can you go outside of what you have heard in this

8    courtroom to base your verdict on what you have heard

9    from the community.

10    So in a case, again, leaving aside the

11    blanket, in a case where the State has some critical

12    thing to prove to you and you have heard from a couple

13    of different people  and it's not just proven you can't

14    look to someone outside of the Court to help you make

15    your mind up if it's not proven so if the blanket were

16    a critical issue and you couldn't believe either one then

17    that gets back to that reasonable doubt; you haven't been

18    convinced beyond a reasonable doubt of whatever that fact

19    is.

20    And you can't let the outside news

21    influence you to get to this reasonable doubt.

22    Let's just say it's "guilt.  "Well, I

23    don't know whether he's guilty or not, I sure think he

24    is guilty but, you know, but based on all these witnesses

25    I don't know but, you know, that television report said

he was guilty so I will just find him guilty."

I know that wasn't the case, that wasn't an example given but that's just another example given, you can't do that.

If you can set it aside, fine, if you can't and you are going to let something that you have heard influence you that's fine, too, we just need to know what you can and can't do.

THE POTENTIAL JUROR:   The reason I'm hesitant is because if you -- if I have to come up with -- and I know I am going back to the blanket because it frightens me -- that if I have to make that kind of decision they are in -- and there is conflicting evidence but I am told I have to come up with -- make a decision and that's lingering in the back of my mind -- I don't know how -- and maybe because the blanket is insignificant and probably if it was something important like get back here -- I wouldn't have -- have a problem. I don't know.   I'm having a hard time with this, too.

THE COURT:   I can't see how the blanket could make that critical of a decision but it might if it were something other than a murder trial but since we are in a murder trial you certainly can have a dispute on evidence that may not be material but if you have a doubt on a material fact -- let's just say that

1    the TV said that the man was shot with a gun and you have

2    one witness saying, "No.  It wasn't a gunshot, it was a

3    knife wound" and another witness says, "No.  It was a

4    gunshot."

5              Let's  say  they  are  both  medical

6    examiners and they can't agree what killed him, it might

7    have been a knife, it might have been a gun, there's a

8    hole in the body and they can't say.

9              This is not going to happen in most

10   cases but let's say the medical examiners, one says --

11   they are both credible -- one says "It was a gunshot",

12   one said "It was a knife wound."

13             In that case actually the State has

14   failed to prove to you beyond a reasonable doubt how the

15   man died because you have two credible people saying

16   different things.  That's where you couldn't go back to

17   that TV newscast and say, "Well, the reporter says he was

18   shot so I'm going to believe the medical examiner that

19   says he was shot."

20             Now, there might be something in the

21   medical examiner's testimony to make you believe one or

22   the other but you can't look to outside sources to

23   determine who is or is not more credible.

24             THE POTENTIAL JUROR:  Maybe

25   because it's the significance of the blanket or something

1    like that.  I don't have a problem with that on the

2    blanket, I think that's because there would be so many

3    eyewitnesses I guess they are doing the -- or doing the

4    TV spot or whatever and they may have seen the blanket

5    so I think that's where I'm having a problem with the

6    blanket because you do not have to be an expert as to

7    whether or not you saw the blanket, you see, I have a

8    hard time with that.

9             As far as evidence, I would go by what

10   the expert or whoever has the most knowledge of that

11   area, that would be the evidence here.

12            And I know what you are saying about

13   putting TV out and everything.

14           THE COURT:  Can you do it?

15   Can you base your verdict strictly on what you hear in

16   this courtroom and not let that outside news account

17   influence your verdict?

18           THE POTENTIAL JUROR:  I think

19   it influences everybody's verdict I am afraid.

20           THE COURT:  I'm not worried

21   about other people, I'm worried about you.

22           THE POTENTIAL JUROR:  I don't

23   know.  It's according to the issue, what comes up.  I

24   don't think I would.

25           THE COURT:  You don't think

1    you would what?

2                        THE POTENTIAL JUROR:  I don't

3    think that there was anything I saw that would -- is

4    evidence is what I'm saying but the blanket issue, I

5    don't know why I can't just say -- I guess because if you

6    are asking me to make a decision whether or not the

7    blanket was there -- and I wish I could get off the

8    blanket but I can't -- and you have conflicting -- you

9    have  to say  "Yes" or "No" whether  the blanket was

10   there because  my mind   would  go  back   and search

11   everything, I would have to go with, "Yes.  The blanket

12   was there."

13                        THE COURT:  So you are telling

14   me you would base your verdict on evidence that you have

15   heard outside of the courtroom?

16                        That's what you are telling me?

17                        THE POTENTIAL JUROR:  No.  I

18   know -- that's why it's bothering me.

19                        THE COURT:  If I'm reading you

20   correctly you would allow the media to influence your

21   verdict if it were in an area that you could not decide

22   just based on what you have heard in this courtroom, you

23   have heard from witnesses, can't make your mind up so

24   your mind is going to go back to what you heard on TV and

25   let that influence your decision, is that what you are

1    saying?

2                      THE POTENTIAL JUROR:  That's

3    what I'm saying.  I don't know if I agree with it but

4    that's what it sounds like I am saying.

5                      THE COURT:  Okay.  Thank you,

6    ma'am.

7                      You may step down.

8

9                      (The following occurred outside the

10   presence and hearing of the potential juror:)

11

12                     THE COURT:  Sustained.

13                     Let's go to lunch, tell her she will not

14   be on the jury.

15

16                     (Noon recess.)

17

18                     (The following occurred in the presence

19   and hearing of the potential juror:)

20

21                     THE COURT:  Good afternoon,

22   ma'am, how are you doing?

23                     THE POTENTIAL JUROR:  Fine.

24

25

1    BETTY JOYCE HOLLINGSWORTH, Potential Juror #145,

2    was called as a Potential Juror and, having been

3    previously sworn by the Court, testified as follows:

4

5                    THE COURT:  Go ahead and take

6    your seat and try to get comfortable.

7                    THE POTENTIAL JUROR:  Okay.

8                    THE COURT:  Ma'am, are you

9    "Betty Hollingsworth?"

10                   THE POTENTIAL JUROR:  Yes,

11   sir.

12                   THE COURT:  Juror 35?

13             Ma'am, I'm Gary Stephens, I am presiding

14   over the jury selection and trial in this case.

15             We have two District Attorneys working

16   on this case, the lead attorney is the District Attorney

17   of Morris County and that's Mr. Richard Townsend.

18             His partner for this case is "Randy",

19   "Randall Lee", I think he's in trial in another Court so

20   he won't be with us today.

21             We have two Defense Attorneys, Mr. Bird

22   Old, III.

23                   MR. OLD:  Good afternoon.

24                   THE POTENTIAL JUROR:  Good

25   afternoon.

1          THE   COURT:    And  Mr.  Lance

2  Hinson.

3          MR.  HINSON:   Hello.

4          THE COURT:  Next to Mr. Hinson

5  is the person charged, Billy Joe Wardlow.

6          THE DEFENDANT:  Good evening.

7          THE COURT:   The lawyers have

8  read your questionnaire and they are familiar with the

9  answers.   They are going to talk to you about some of

10  your answers and they are also going to talk to you about

11  the principles of law involved in a death penalty case.

12          You will be asked a lot of questions and

13  your answers will let us know whether or not to put you

14  on the jury.

15          In order to be a juror you must be able

16  to understand and follow the law so we are going to ask

17  you if you can understand the laws that apply and we are

18  going to ask you if you can follow those laws but, ma'am,

19  we need to know more than just "Yes I can" or "No I

20  can't", we have found over the years of picking death

21  penalty cases that most jurors can follow the law but

22  that  doesn't  necessarily  mean  that  they  are  an

23  appropriate person in a death case.

24          So we want to know what your opinions

25  are about some of the laws and issues and we want to just

1    kind of get inside your head and find out what your

2    thoughts are.

3                    The only way we know to do that as

4    lawyers is to ask questions and, ma'am, there aren't any

5    right or wrong answers, there's no right or wrong

6    opinions, you have a right to agree or disagree with our

7    laws, you have proven your citizenship by appearing for

8    jury service so we certainly don't want you to try to

9    guess as to what kind of answers you should give to be

10   a good citizen.  There's nothing you have to prove to us,

11   just share your thoughts and opinions with us so we can

12   decide if this is a task you should undertake.

13                    Now, ma'am, in your questionnaire you

14   stated that you do have some knowledge of the facts of

15   this case; have you heard that from news media or from

16   people in the community?

17                    THE POTENTIAL JUROR:  Both the

18   news media and people in the community.

19                    THE COURT:    What have you

20   heard, ma'am?  What do you think occurred based on what

21   you heard?

22                    THE POTENTIAL JUROR:  At the

23   time this allegedly took place we had the scanner on, was

24   listening to it, we were listening to it and it stays on

25   all the time, plus my husband is a reserve deputy

1    sheriff.

2             Then I read the newspaper and the TV

3    media that this allegedly happened, this elderly man that

4    was shot and his pickup was taken.

5             So that's what I have seen or heard.

6             THE COURT:  Did you ever hear

7    the man's name mentioned?

8             THE POTENTIAL JUROR:  I did

9    but his name is not familiar to me. I didn't know him.

10            THE COURT:  You did not know

11   him?

12            THE POTENTIAL JUROR: No, sir.

13            THE COURT: Did you ever heard

14   Mr. Wardlow's name mentioned?

15            THE POTENTIAL JUROR:  No.  I

16   didn't.

17            THE COURT:  Do you have an

18   opinion as to whether or not Mr. Wardlow is guilty?

19            THE POTENTIAL JUROR:  He must

20   be proven guilty to me.

21            THE COURT:  So you can still

22   sit here and tell me you an ignore what you have heard

23   and put it out of your mind and base your decision on the

24   evidence that comes out in this trial?

25            THE POTENTIAL JUROR:  That's

1   right.

2              THE COURT:  And you will not

3   let the news media or from what you have heard from the

4   community influence you?

5              THE POTENTIAL JUROR:  No.

6              THE COURT:  On the first page

7   of the questionnaire you have six categories to choose

8   from as to express your view of the death penalty.  The

9   last question is if you are in favor of the death penalty

10  do you agree a life sentence may be appropriate under

11  proper circumstances, and you left it blank?

12             THE POTENTIAL JUROR:  Well,

13  to me that would be certain circumstances -- let me

14  explain -- in the manner in which the murder took place.

15             THE COURT:  You don't really

16  have to give me an example, what I'm really getting at

17  is lots of people say "I don't care what the law is, if

18  a person is guilty of murder they ought to be executed

19  period."

20             Other people say, "No.  It depends on

21  the facts, it could either be a death sentence or I could

22  agree with a life sentence depending on what I hear."

23             So are you telling me that you could go

24  with a life sentence if you thought it appropriate and

25  if you thought it appropriate you could answer questions

1    that -- in a way that would result in the death penalty?

2                          THE   POTENTIAL   JUROR:      I

3    believe I could.

4                          THE COURT:  Thank you, ma'am.

5    Mr. Townsend.

6

7                    VOIR DIRE EXAMINATION

8                    BY MR. TOWNSEND

9

10   Q         Ms. Hollingsworth, I am Richard Townsend who

11   represents the State of Texas and Morris County in this

12   case and Mr. Lee is normally with me, he's not here

13   today.

14                    I'm going to ask you some questions and

15   as the Judge said, there's no right or wrong answer to

16   those questions, we are just asking your opinions.

17                    The Defense will ask you some questions

18   a  little  later  at  their  proper  time  and  they  are

19   basically seeking the same thing, to find out what your

20   opinion is.

21                    We  are  actively  seeking  the  death

22   penalty in this case and so a lot of the questions I will

23   be asking you will relate to the death penalty and how

24   that is done in Texas and your feeling about the law in

25   the regard.

1          Your feelings that you have expressed

2    here about the death penalty after reading your

3    questionnaire, are those opinions that you pretty much

4    held all of your life since you were an adult anyway or

5    has your opinion changed at any point in your life?

6    A         Maybe it has changed at times and after the day

7    I was called for jury duty the first day in October I

8    really did a lot of thinking about the death penalty and

9    I believe I am honest with you.

10          I had a question in my heart, do I have

11   the right to condemn another to death and then I reasoned

12   with myself for quite awhile and we must obey the law of

13   the land, that must be obeyed is the way I feel.

14   Q         My question, since you have said that, let's

15   just assume for the moment that we have presented a case

16   to you that you believe based on the evidence and based

17   on the law, and we'll talk some more about the law and

18   exactly what the laws are, law is in Texas a little later

19   but let's just presume that we have presented a case to

20   you that we believe based on the law is appropriate for

21   the death penalty and you are a member of the jury; could

22   you vote in such a way as to give the defendant in a

23   capital murder case the death penalty if you felt the

24   facts were appropriate?

25   A         Yes, sir.

1    Q        Let me talk to you a little bit about murder

2    in Texas, there are basically two types of murder, one

3    being non-capital murder or what I call "plain murder"

4    and that's where someone has intentionally or knowingly

5    caused the death of an individual.  And that's to say

6    it's without a legal justification or excuse like self

7    defense or accident, we are not talking about those

8    situations, we are talking about a situation where

9    someone has intentionally caused another person's death

10   without an excuse.

             In Texas that is not punishable by the

11
     death penalty but it's punishable by up to a life
12
     sentence.
13

             On the other hand capital murder is that
14
     same kind of murder where there has been an intentional
15
     causing of a death plus something else.  And that plus
16
     something else can be the murder of a police officer or
17
     fireman in the line of duty, it can be the murder in the
18
     commission of rape or kidnapping.
19

             And those situations, assuming those can
20
     be proved, that is what is called "capital murder" in
21
     Texas and it's punishable by either a life sentence or
22
     the death penalty.  Those are the only two possible
23
     punishments.
24

             And there is a sheet of paper up there,
25

I believe it's marked "Exhibit 3", it's the indictment
in this case, if you would --

                  THE   COURT:    The   next   one.
(Indicating)

                  THE   POTENTIAL   JUROR:    This
one?   (Indicating)

                  THE   COURT:    That's   that   one
right there.   (Indicating)

                  MR.   TOWNSEND:    If   you   would
read over that and then I will talk to you about it.

             Okay.  Ms. Hollingsworth, that comes off
the indictment in this case, can you see from reading
that indictment that if the State could prove all that
that that would be a capital murder rather than just what
I  call  the  "plain  murder"  because  of  the  murder
allegation as well as the allegation of robbery?

                  THE   POTENTIAL   JUROR:    Yes,
sir.

Q       (BY   MR.   TOWNSEND)    Okay.    That   is   the
indictment in this case.

             From here on out basically what we will
be talking about, it's not so much particularly this
capital murder case but just capital murder cases in
general.

             The kind of person we have to have for

our jury service in a case like this is the kind of person who can keep an open mind throughout the trial first as to the guilt or innocence of the defendant and then as to whether the appropriate punishment should be a life sentence or the death penalty.

You know, we have talked to jurors in the past who have expressed the feelings that they just did not believe in the death penalty and could never vote in such a way to give someone the death penalty.

Well, you can see if they have that opinion they basically wouldn't be giving the State a fair trial because their mind is already made up as to what the punishment should be.

On the other hand, you know, there are people who say, "Well, if a person is guilty of capital murder then automatically I'm going to vote for the death penalty."

You see, they are not giving the Defense a fair trial because they are not leaving their mind open to consider both possible punishments.

Do you believe you could keep your mind open and consider both possible punishments until then?

A        Yes.

Q        Capital murder trials fall in two phases, one phase is the guilt and innocence phase and that's where

1    you just basically decide the defendant is guilty or not

2    guilty and just "Did he do it" then you get -- if the

3    defendant is found guilty then you get into that second

4    phase of the trial which is called the punishment phase

5    and that's where you decide whether the appropriate

6    punishment should be the life sentence or the death

7    peantly.

8              So during that first phase of the trial

9    your only concern at that time, "Is the defendant guilty

10   or not guilty?"

11             At that point you have no reason to be

12   concerned with whether the appropriate sentence is a life

13   sentence or death sentence.  You will make that decision

14   later.

15             Are you with me on that?

16   A        Yes.

17   Q        Okay.  There's a sheet of paper up there, I

18   call it a "flow chart", looks kind of like this.

19             Have you got that?

20   A        (Indicating)

21   Q        I'm going to go over this with you and that

22   kind of shows you how a capital murder trial goes.  You

23   start at the top of the page, you are going to hear --

24   that's the guilt and innocence phase of the trial -- you

25   are going to hear evidence and that evidence is going to

relate to whether the defendant is guilty or not guilty.

At the end of hearing all that evidence you are going to -- the jury will decide their verdict. If the verdict is not guilty the trial is over, everybody goes home.

If, on the other hand, the jury decides that the defendant is guilty then you are going to go to that next phase of the trial, that's what I call the punishment phase down in the middle of the page.

At that point you are going to hear more evidence but this evidence is not going to relate to whether the defendant is guilty or not guilty because you have already decided that, this evidence is going to relate to -- what it will be, evidence presented to help you and guide you in a way to help you make your decision to whether the appropriate punishment should be a life sentence or death sentence, it could be any type of evidence, it might be psychological testimony, it might be evidence of family background of the defendant, it might be evidence of the defendant's mental ability, it might be evidence of the defendant's prior criminal activity, prior bad acts by the defendant, it could be just almost anything.

But anyway, that evidence is something that before you deliberate and decide whether the person

should receive a life sentence or death sentence you will

hear all that evidence in deciding whether the defendant

should receive life sentence or the death penalty, you

can consider, you don't have to shut your mind out but

all that stuff that you heard during the guilt or

innocence phase of the trial, you can consider that in

your mind as well.

But you have also got to consider this

evidence that is presented during the punishment hearing.

Do you believe that you could do that?

A        I believe.

Q        Okay.  After you have heard all that evidence

then you are going to decide your answer to Special Issue

#1.

Now, Special Issue #1 is going to be a

question that you are going to answer either "Yes" or

"No", and we'll go over that question in a few moments

but first you are just going to answer that "Yes" or

"No."

If you answer it "No" the defendant is

automatically going to receive a life sentence, if you

answer that question "Yes" then you go down to Special

Issue #2.

When you get to Special Issue #2 again

you go back and mentally sort of go back and reconsider

1  all that evidence that you heard during the guilt and

2  innocence phase, you kind of reconsider all the evidence

3  that you heard, if you answer it "Yes" then the defendant

4  receives a life sentence, if you answer "No" the

5  defendant will receive the death peantly.

6              So even though you are in effect

7  answering questions "Yes" and "No", you are not really

8  saying, "Okay, let's give a life sentence or let's give

9  him the death penalty", you are just answering questions

10  but you are going to know what your answers mean, you

11  know, you are going to know if you answer Number One

12  "Yes" and Number Two "No" this defendant is going to get

13  the death penalty.

14              If you answer them in any other way the

15  defendant will get a life sentence.

16              Do you feel like you are -- are you with

17  me right now?  Is there anything that you are confused

18  about?

19  A        I feel like I am with you.

20  Q        If I haven't confused you yet I will confuse

21  you on these questions here.

22              If you will look there is another sheet

23  that is marked "Special Issues."  (Indicating)

24  A        Okay.

25  Q        Okay.  Read Special Issue #1 and then we will

1    talk about it.

2              Okay.   Special   Issue   #1   basically

3    relates to the future dangerousness of the defendant, is

4    that kind of the way it reads to you?

5    A         Yes, sir.

6    Q         There's some terminology there I want to go

7    over with you a little bit, first that word on -- first

8    on the first line it says "Do you find from the evidence

9    beyond a reasonable doubt", of course we have to prove

10   the defendant guilty to you beyond a reasonable doubt,

11   the State also has to prove Special Issue #1 to you

12   beyond a reasonable doubt.

13             Okay.   Now, Special Issue #1, we have

14   got to prove to you beyond a reasonable doubt, look at

15   that   third   word   on   the   second   line,   the   word

16   "probability."

17             In Texas "probability" is defined by law

18   as "more likely than not."

19             Which I'm going to give a number value

20   to which means that must barely over 50 percent, just a

21   little bit more likely than not, is that about the way

22   that you would define "probability" or is that something

23   that you would agree with?

24   A         Very close.

25             For   instance,   once   someone   had   done

1   something criminal they would do it again, that's what

2   I would -- the chances or of them repeating the crime.

3   Q        Now, what you consider to be "more likely than

4   not" would be up to you, you know.

5            After you heard all the evidence then

6   you would decide based on all the evidence is it more

7   likely, have we proven to you beyond a reasonable doubt

8   that it's more likely than not?

9            Are you with me?

10  A        Yes.

11  Q        Okay.  Then at the end of the sentence there

12  the second line it says "criminal acts of violence."

13           Of course a capital murder is a criminal

14  act of violence but there's a lot of other crimes out

15  there, some of those are criminal acts of violence such

16  as attempted murder or rape and assault, others while

17  criminal acts they are not criminal acts of violence, for

18  instance, forgery or theft, certainly it's a criminal act

19  but it's not a criminal act of violence.

20           And we are required to prove to you that

21  it's more likely than not that the defendant would commit

22  criminal acts of violence.

23           Then the last word in Special Issue #1

24  is that word "society."

25           I think you and I, most of us think of

"society" as out on the street, in our home, that sort of thing.  But actually the law says that "society" is basically "the people" and that's all the people, even if those people are in the penitentiary, you know, those people are considered part of society also as well as the guards, as well as the nurses, the doctors and of course the people out on the street and in their home, too.

So we are not required to prove to you that more likely than not that he would commit criminal acts of violence that would constitute a continuing threat to people outside the penitentiary or inside the penitentiary, just that he would be a threat to folks anywhere irregardless of whether they were in or out.

Okay.  After you consider Special Issue #1 -- first of all when you are considering Special Issue #1 you can certainly go back to that first part of the trial, that guilt or innocence phase and sort of go over that in your mind again and say, "Now, is there evidence there that makes me believe that he would be a continuing threat to society?"

You can consider that and that's -- that's not only something that you can do but something that you probably should do.  But you have also got to consider that evidence during the punishment hearing.

And when I say that I have had people

say that, "Well, if I find a person guilty of capital murder I am automatically going to answer 'Yes' to Special Issue #1."

You see, they have closed their mind to this punishment hearing.

The kind of jurors we have to have are those kind of jurors that can keep an open mind throughout the trial and throughout the punishment hearing and then decide their answer on Special Issue #1 based on not just that first part of the trial but all the evidence during the punishment hearing also.

Could you do that?

A        Through the first part of the trial it was proven to me beyond a shadow of a doubt I'll be more -- honestly -- I would be more -- like -- I'll be honest with you, I would think that person would be a repeat offender, do other criminal deeds in society.

Q        You would be more likely to believe that?

A        Yes.

Q        That's okay, Ms. Hollingsworth, if that's the way you feel about that.

But what we need to understand from you, would you consider that evidence during the guilt or innocence phase, and you said you would, but what we need to understand from you, would you give consideration,

would you listen and consider that evidence during the
punishment hearing and, you know, once you got it all
together then consider all the evidence and then make up
your mind on Special Issue #1 after listening and
considering that evidence during the punishment hearing
as well or would you just automatically decide after
hearing the guilt or innocence evidence, well, I'm not
listening to anything else, my mind is made up?

            Do you see what I'm saying?

A       Yes, sir.

Q      Okay.  So could you consider that evidence and
Special Issue #1 before making your decision?

A      I think so.   That I could consider it but
that's the way I oftentimes feel about criminals, a
criminal act of violence, that that person would repeat
it.

            That's the way I feel about it.

Q      And that's fine, Ms. Hollingsworth, there's a
lot of people that feel that way and in order to follow
the law however you feel about that is fine as long as
you are willing to keep an open mind and listen to that
evidence that you hear during the punishment hearing and
weigh that evidence along with this other evidence before
making your decision and not make your -- because you
found the defendant guilty of capital murder you have got

to be able to -- because that's one issue there, is he guilty or not, you have made that decision when you get to Special Issue #1, Special Issue #1 is a separate issue, it's not the same question as "Is he guilty or not", the question is, "Is he a threat to society", basically.

You have got to be willing to listen to it all and then make your decision, not make your decision then say, "Well, I made my mind up on Special Issue #1 but I will go ahead and listen to this other stuff anyway", can you withhold your decision on Special Issue #1 until you have heard everything?

A        Yes, sir.  I believe I -- I can.  You have to be open and hear all of it.

Q        If you will now read Special Issue #2 and then we'll talk about it.

Okay.   That is sometimes confusing wording there.

Special Issue #2 I think basically says you found the person guilty of capital murder, you have decided that he's a continuing threat to society, if you decided that he wasn't you wouldn't even be looking at that Special Issue so you have made those two decisions.

Now you have got a third decision to make but on the third decision whereas the first two

decisions the State has had to prove that to you beyond a reasonable doubt, on this third decision or Special Issue #2 that's not something we have to prove to you beyond a reasonable doubt, that's just basically your opinion and it's your opinion based on all the evidence you heard during the guilt or innocence phase and all the evidence you heard during the punishment phase whether it came from this side of the table or that side of the table, it doesn't matter where it came from, is there something in the evidence that you heard that sufficiently mitigated the blameworthiness of the defendant for this crime?

And that's not to say excuse the defendant for the crime but reduces blame in a sufficient amount to you that you believe he should receive a life sentence rather than the death penalty.

And what is "sufficiently mitigating"

What would sufficiently reduce his blameworthiness to you and nobody can answer that for you, that's strictly your opinion and, you know, everybody has different opinions. You are going to hear all this evidence during the guilt or innocence phase, you are going to hear all this evidence during the punishment hearing and there may not be anything there that you think is sufficiently mitigating but someone

else might or you might find something that reduces his blame to you but maybe another person might not feel the same way.

For instance, if there was evidence presented in a capital murder case that the defendant was mentally retarded, now, that might convince one person that that should reduce his blame to the point that he would receive a life sentence rather than the death penalty while other persons might not think that that was important, same thing if a person was intoxicated when the offense took place, one party might -- one juror might feel like that was important enough that that reduced his blame, another person might say, "Well, he's still responsible for his behavior anyway."

So, you know, I can't tell you what piece of evidence it might be or I can't tell you what combination of evidence it might be that might make you feel like the defendant deserved a life sentence rather than the death penalty but that's just something that each juror has to weigh in their own mind.

And the jurors don't necessarily have to find that a sufficiently mitigating circumstance -- they don't have to agree on what that circumstance is, one person might think it's this, one person might think it's that but the important thing is that if you have

1    answered -- I have had jurors say this, "Okay.  Now, I

2    find a person guilty of capital murder, I decided that

3    they are a continuing threat to society, now on Special

4    Issue #2 I am automatically going to answer that 'No' so

5    he will get the death penalty."

6             You see, they are not qualified jurors

7    because they are not keeping a fair and impartial state

8    of mind and keeping an open mind as to all the evidence

9    before deciding their answer on Special Issue #2, they

10   are just saying, "If I answer 'guilty' and I answer 'Yes'

11   to Number One I'm not really going to consider what the

12   proper answer should be to Number Two, I'm just going to

13   answer it 'No' so he will get the death penalty" but

14   Number Two is a separate question just like the other two

15   are separate questions.

16            Could you hold your determination as to

17   the answer to Special Issue #2 until you have time and

18   have had a chance to consider what the appropriate answer

19   should be and just give whatever the appropriate answer

20   is, what it calls for, just let the chips fall where they

21   may.

22            The answer should be based on your

23   opinion, if the answer should be "Yes" you answer "Yes",

24   give the person a life sentence and if, based on your

25   opinion the answer should be "No" you would answer "No"

1   and the defendant would receive the death penalty.

2               Could you do that?

3   A      It would be an opening of my mind, I would

4   really have to open my mind up to do that.  I have some

5   very strong beliefs about some things and I mean I would

6   have to open my mind and really listen to the whole case

7   for this Special Issue #2.

8   Q      Do you believe you could open your mind and

9   listen and make your decision based on the evidence and

10   not base it on anything but the evidence?

11   A      I would have to base my decision on the

12   evidence and what I felt in my heart was right.

13   Q      Okay. And that's basically, ma'am, that's what

14   Special Issue #2 is, it's basically just your opinion.

15            Now, there is one thing about that

16   opinion and about Special Issue #2 that is important and

17   that is during that punishment hearing you may hear, like

18   I said, all sorts of different kinds of evidence and as

19   a juror it's your right and your duty to decide when that

20   evidence is truthful, important, untruthful, unimportant

21   so basically once you have listened to the evidence and

22   considered it you are supposed to make those decisions

23   but where we have trouble with people, sometimes a person

24   will say something like, "Well, if they put a

25   psychiatrist up there on the stand I'm just not going to

1  believe him.  I don't believe in psychiatrists, I don't

2  believe in all that mental stuff and I'm not going to pay

3  any attention to that evidence and I'm not going to

4  listen to it at all."

5           Now, it's perfectly okay for you to

6  listen to that evidence and consider it and then decide

7  you don't really think that is important but, on the

8  other hand, if you are going to just -- not going to

9  listen to it, if you are just going to reject it out

10 without even having given the witness a fair chance then

11 you are not a qualified juror.

12           Do you believe that you could take

13 whatever testimony it was, whether it was from a

14 psychiatrist or the defendant's mother or the defendant

15 or a police officer or whoever it was and listen to this

16 evidence, consider it and then make your decision as to

17 whether you thought it was important or not important?

18 A        Yes, sir.  I do.

19 Q        Okay.  Another consideration in deciding the

20 answer to Special Issue #1 and Issue #2 is in this

21 particular capital murder case if the defendant w e r e

22 found guilty according to the law in Texas at this time

23 he would be eligible for parole after 35 years, 35

24 calendar years, that doesn't mean that he would get

25 parole but he would be eligible to be considered for

parole.   He might get parole after 35 years, he might never get parole but the important thing to remember is, and I believe the Judge will instruct you in his written instructions when you go to deliberate, to this effect and that is this; if you are back there considering and trying to decide the answer to Special Issue #1 or Special Issue #2 you are to consider that a life sentence is a life sentence, the death penalty is the death penalty and not in any way use the possibility of parole in making your determination because that's not something that you would have evidence on, that's not something that we can tell you with any certainty.

Would you be able to put that 35 years and the possibility of parole after 35 years out of your mind?

You know, I shouldn't say "out of your mind", we can't expect you to put these things out of your mind but simply just to set it aside and say, "Okay, I'm going to answer Special Issue #1 'Yes' or 'No' based on what the evidence is, I'm going to set this parole aside for the moment until I have made my decision on Special Issue #1", the same way with Special Issue #2, could you do that?

A          I think I could.

Q          Well, --

1   A        That's a question that I'm really having to sit

2   and think about.

3   Q       Ms. Hollingsworth, this -- I know these

4   questions are questions that you have not thought about

5   probably --

6   A        I never have.

7   Q        -- or some of them.

8           And they are also questions that are not

9   always that easily answered but unfortunately we have to

10   have answers today.

11          But let me go back on parole; parole

12   basically, see, from a fairness standpoint parole is not

13   something fair for you to be considering for several

14   reasons, one; it's not evidence because the evidence has

15   to come during the trial so you are not to consider it

16   for that reason and, too; we don't know what parole is

17   going to do, we are not telling you that the defendant

18   would be paroled in 35 years, we don't know that he would

19   ever be paroled or not, the law is -- we are just saying

20   the law is that he would be eligible to be considered in

21   35 years but anyway as a juror you are asked to answer

22   Special Issue #1 and Issue #2 based strictly on the

23   evidence presented so even though whatever your feeling

24   might be about parole that is something that you are not

25   to consider in deciding whether he's going to be a

continuing threat to society.

For instance, that has nothing to do with parole.

Either "Yes.  He's going to be" or "No. He's not going to be."

We have proved it to you or we haven't proved it to you, it has nothing to do with parole.

Same way with Number Two; is there a sufficient mitigating circumstance to reduce his moral blame?

That has nothing to do with parole, that is just strictly -- is there something to sufficiently reduce his blame, strictly to give him a life sentence instead of the death penalty, either "Yes.  There was" or "No.  There wasn't" and parole has nothing to do with it.

So to be a qualified juror you have got to be able to keep an open mind and set that aside.

And you said you "think you could do it", what we need to know, and I know this is difficult but we need, you know, it's a common speech pattern I guess for people to say "I think I could" or "I don't know if I could or not" or, you know, but basically what we need to know is "Yes.  I can set that aside" or "No. I can't."

1          And I know that's a difficult question.

2   A          I believe I could all I -- yes.  I believe I

3   could to be truthful with you.

4                    THE COURT:  Thirty minutes.

5                    MR. TOWNSEND:  Thank you, Your

6   Honor.

7          Let me talk to you just a little bit

8   about murder as opposed to capital murder; we talked a

9   little bit earlier about "plain murder" were someone has

10  intentionally caused someone's death, the range of

11  punishment in a murder case rather than being life or

12  death is anywhere from five years probation to 99 years

13  or life.

14          Of course a lot of murders are very

15  vicious and you might tend to go toward the 99 or life

16  on those -- excuse me -- other murders are more like what

17  you would call a mercy killing, are you familiar with

18  what a mercy killing is?

19                    THE POTENTIAL JUROR:  Yes.

20  Q          (BY MR. TOWNSEND)  Elderly people maybe?

21  A          Yes, sir.

22  Q          Very ill people?

23          In those situations you might consider

24  it for a lighter punishment but the important thing is

25  to follow the law.  To be a qualified juror in a murder

1    case, not a capital murder you have got to be able to

2    consider that full range of punishment and that full

3    range of punishment goes from 99 to life to five years

4    probation.

5              And my question is; could you consider

6    the full range of punishment if you are a juror in a

7    murder case?

8    A         Are you asking me could I consider 99 years

9    like a life sentence?

10   Q         I'm not asking you whether you could give 99

11   or you could give five years probation, I'm simply asking

12   you, could you consider it all the way before making your

13   decision?

14   A         Probably not.  I am very staunch in my belief.

15   Q         When you say "Probably not" I assume you are

16   like most people, if you have a problem with this you

17   don't have a problem with 99, you have a problem with

18   five years probation?

19   A         Yes.  I do.

20   Q         Okay.  Five years probation, keep in mind that

21   murder cases take all forms, you take a person who is 85

22   years old, their wife is dying of cancer, she is in a

23   great deal of pain, she begs him to pull the plug and he

24   pulls the plug.

25              What he has done is he has intentionally

1    caused another person's death so under Texas law even

2    though that is not the kind of murder that you and I

3    think of when we think of murder technically and legally

4    that is murder.

5    A        Yes.  Murder is murder.

6    Q        Right.  And there are other situations that you

7    might think of that might be similar where even though

8    it's a murder it's not the same kind of murder that we

9    normally think of and in order to be a qualified juror

10   you have got to be able to consider the full range of

11   punishment as I said.

12             When I say "Consider the full range of

13   punishment" that doesn't mean that you have to agree that

14   you would give 99 years without knowing what the facts

15   are or that you would agree to give five years probation

16   without knowing what the facts are, all you are -- all

17   we are asking you to do is could you consider that before

18   making your decision?

19             Now, your decision could be anything you

20   want it to be, you know, but you have got to be able to

21   consider that range of punishment before making your

22   decision, you know, you may consider it and decide "20

23   years" or you may consider the range of punishment and

24   decide "99" or you may consider "probation" but -- and

25   decide "probation" but you have got to keep an open mind

1    and consider that full range.

2            Do you believe that you could consider

3    the full range?

4    A        I believe I could consider it.  Yes.

5    Q        And bear in mind we are not asking you to lock

6    into a 99 year sentence or lock in and say you would give

7    probation but that you would consider that full range of

8    punishment.

9            Do you think that you could do it?

10   A        I think I would have to be open-minded enough

11   to do so.

12   Q        Okay.  You know capital murder cases -- let's

13   say that the indictment talked about the defendant has

14   committed -- first of all as to an indictment, I think

15   you understand from what the Judge said when you all were

16   here in October that an indictment is not evidence of

17   anything, the evidence comes in here, you couldn't --

18   wouldn't consider like what we showed you up there with

19   a copy of the indictment, you do understand that cannot

20   be used at all?

21   A        Yes.

22   Q        Okay.  But the indictment is a charging

23   instrument and that instrument is basically used to let

24   the defendant know what he's charged with and it's also

25   used to get the case from the Grand Jury to trial.

The indictment in this case or in any capital murder case charges murder, this one is murder and robbery, we will use that for an example, it could also be murder and rape, something like that, let's -- this one, let's just talk about one that says "murder and robbery", do you understand that in order to find the defendant guilty of capital murder we have to prove to you that indictment and that means if the indictment says "murder and robbery" that's what we have got to prove to you.

If we prove to you something else, let's say we proved to you murder and -- and, you know, I can't imagine this happening, let's say we proved to you murder and rape instead of murder and robbery, we -- we didn't prove to you what was on this indictment, we proved to you the murder, we didn't prove the robbery so you would have to find that defendant not guilty of capital murder but you found him guilty of murder because we did prove the murder, we just didn't prove the other part.

If you are on a jury and feel like you had a defendant there that was really a bad guy and you felt like the State has proved the murder to you but didn't prove the robbery could you find the defendant not guilty of capital murder and find him guilty only of murder?

1 A  This is hard to answer.

2 Q  Do you understand my question?

3 A  I do.

4 Q  In order to follow the law you have got to find

5 him guilty of what we proved.

6 A  You are asking me could I find him guilty of

7 murder but not of capital murder?

8 Q  Right.  If that's what we proved to you

9 A  If it could be proven to me but I would really

10 -- it would have to be proven, I am not really -- I mean

11 I am the type of person I want to see all the evidence

12 be proven to me instead of just, you know, saying it's

13 this way or that way.

14 Q  Well, when I ask you these questions, ma'am,

15 I am assuming that we have proven what we say we can

16 prove.

17    Assuming that I can prove to you a

18 murder but I can't -- of course again we are talking

19 about hypothetical cases -- assuming that I can prove

20 -- I have alleged in the indictment a murder and robbery

21 but in fact the evidence at the trial shows that there

22 is clearly been proved to you beyond a reasonable doubt

23 that the defendant committed a murder but we failed to

24 prove to you that he committed a robbery, instead we

25 proved nothing or we proved rape, let's say, then

1    whatever we have proved if it doesn't kind of add up to

2    murder and robbery, if it just adds up to murder you have

3    to find the defendant guilty of murder and not capital

4    murder.

5                    Could you do that?

6    A       To be real honest with you I do not know.   I

7    would have to think about it for a little bit.

8    Q       Well, --

9    A       Just sitting here and listening and give you

10   a real fast answer --

11   Q       Do you understand that the burden of proof is

12   on the State?

13   A       Yes.  I understand that.

14   Q       And you could not find the defendant guilty of

15   something that we didn't meet our burden on, could you?

16   A       That's true.  But if you gave me all the proof

17   committed a murder?

18   Q       Right.

19   A       I would have no doubt in my mind that he did.

20   Q       Okay.  If we proved that to you you would find

21   him guilty of murder?

22   A       Yes, sir.

23   Q       But we didn't prove the robbery aspect of it

24   so you could not find him guilty of capital murder, could

25   you?

1            You could find him guilty of murder but

2      not capital murder?

3      A          I could find that person guilty of murder.

4      Q          See, that's what we call a "lesser offense",

5      you know, capital murder being the more serious offense

6      but we didn't quite prove that because we didn't prove

7      the robbery but we did prove the lesser included offense

8      which is murder so it would be your duty to find him

9      guilty of murder, not capital murder because we failed

10     to prove that robbery.

11            Are you with me?

12     A          I am with you.   It's just a little -- it's

13     confusing me, okay, you have found this person guilty of

14     murder?

15     Q          Yes.

16     A          But you didn't have the proof of the robbery?

17     Q          Yes.   We didn't prove that to you beyond a

18     reasonable doubt.

19     A          You did not prove it beyond a reasonable doubt,

20     a doubt, but yet you have proved to a jury or person that

21     this murder was committed, to me that is still murder.

22     Q          "It's still murder?"

23     A          It's not robbery, that's what you are saying?

24     Q          Yes.   It's still murder so you would find the

25     person guilty of murder but on the other hand you could

not find him guilty of capital murder because we failed
to prove to you beyond a reasonable doubt the robbery?

You would be finding him guilty -- you
wouldn't be turning him loose, you would be finding him
guilty of murder, it just wouldn't be capital murder.

I think we are missing each other
somewhere.

A       No.   It's my opinion -- what my opinion is,
okay, supposedly this person robbed a person then
murdered this person, murder is murder?

Q       Right.

A       Regardless of whether it was robbery or under
what circumstance, when a life is taken a life is taken
is what I'm saying.

Q       And you would find that person guilty of murder
or capital murder?

A       "Capital murder" because it's murder.  That's
the way I feel.

I'm not sure of all these legal terms
but, you know, it's kind of fast, I'm not sure of all the
legal terms.

MR. TOWNSEND:   Approach the
bench, Your Honor?

THE COURT:   Ma'am, would you
mind stepping out for just a minute, let me have a

1    discussion with these layers.

2                    THE BAILIFF:  Watch your step

3    there.

4

5                (The  following  occurred  outside  the

6    presence and hearing of the potential juror:)

7

8                   THE COURT:  On the record.

9                   MR. OLD:   Challenge her for

10    cause in that she has expressed a prejudice against the

11    defendant or a prejudice against the law and she has

12    stated that she would not follow the law, that she would

13    find a man guilty of capital murder even though it was

14    not proven to her beyond a reasonable doubt all the

15    elements of the offense.

16                 THE COURT:  Sustained.

17              Inform Ms. Hollingsworth we appreciate

18    her appearance and she is excused then we will take a

19    short break and proceed on to Mr. Thurman.

20

21             (Recess.)

22

23             (The following occurred in the presence

24    and hearing of the potential juror:)

25

1              THE BAILIFF:  Watch your step.

2

3          JAMES SETH THURMAN, Potential Juror #31,

4     was  called  as  a  Potential  Juror  and,  having  been

5     previously sworn by the Court, testified as follows:

6

7                         THE COURT:  How are you doing,

8     Mr. Thurman?

9                         THE  POTENTIAL  JUROR:    All

10    right.

11                        THE COURT:  Go ahead and take

12    your seat.

13              You are "James Thurman?"

14                        THE POTENTIAL JUROR:   Yes,

15    sir.

16                        THE COURT:  This is juror 37.

17              Mr. Thurman, I am Gary Stephens and I

18    am presiding over the jury selection and trial in this

19    case.

20              We have two District Attorneys working

21    on this case, the lead attorney is Mr. Richard Townsend,

22    he's from Morris County.

23                        THE POTENTIAL JUROR:  Okay.

24                        THE  COURT:    We  have  two

25    Defense Attorneys present in Mr. Bird Old, III.

1          MR. OLD:  How are you doing,

2     sir?

3                    THE POTENTIAL JUROR:  Nice to

4     meet you.

5                    THE COURT:  His partner for

6     the case is Lance Hinson, he will probably be along

7     shortly.

8                    Mr. Townsend's partner for the case is

9     Randall Lee from Cass County, he's in trial on another

10    case and won't be here today.

11                   By the way, you said that you did know

12    the District Attorney, which one did you know?

13                   In your questionnaire you said you knew

14    either Randall Lee or Richard Townsend?

15                   THE POTENTIAL JUROR:  It was

16    Richard Townsend.

17                   THE COURT:  Do you know him

18    personally?

19                   THE POTENTIAL JUROR:  No.

20                   THE COURT:  Is that --

21                   THE POTENTIAL JUROR:  Just

22    know of him.

23                   THE COURT:  Now, Mr. Thurman,

24    the lawyers have read your questionnaire and they are

25    familiar with your answers.

1          What they are going to do today is talk

2   to you about some of those answers and they are also

3   going to talk to you about the principles of law involved

4   in a death penalty case.

5          You will be asked a lot of questions and

6   the answers will let us know whether or not to put you

7   on the jury.

8          THE POTENTIAL JUROR:   All

9   right.

10          THE COURT:   There aren't any

11   right or wrong answers and there are no right or wrong

12   opinions.

13          A lot of people believe that they need

14   to come up here and agree with the law, even if they

15   don't know what the law is they try to figure out what

16   kind of answer, they want to try and answer

17   appropriately.   That's not what we want.

18          You have proven you are a good citizen

19   by showing up for your jury service and filling out this

20   questionnaire and coming back for the interview.

21          We don't want you to violate your

22   conscious or your opinions by trying to agree with a law

23   you don't agree with.

24          If you don't agree with something just

25   tell us.

We have found that most people can agree and follow the law but we have also found that ability to follow the law doesn't always make you a good juror in a death penalty case.  So we want to know -- know about whether or not you can follow the law, we want to know what you think about the laws and the issues we are going to discuss.

We may use some fact situations to illustrate some issues or points of law and I want you to know that if we do make up some facts we are not talking about Mr. Wardlow's case.

In fact I forgot to introduce Mr. Wardlow, I believe that is Mr. Wardlow, he's the person charged.  (Indicating)

But if we -- if we are talking about facts don't associate those facts with this trial, we are not permitted to talk about the facts of this case, that's what the trial is for but sometimes it's easier to illustrate a point by making up some facts.

And again, sir, I can't stress enough that it's your opinions that are important, not ours, not what you think we want to hear, it's what you truly believe.

You told us in this questionnaire that you knew something about the facts of this case, could

1    you tell me, sir, what you have heard?

2                    THE POTENTIAL JUROR:  Whenever

3    the -- I heard it, I think was it in the newspaper?

4                    Something about that they said that a

5    guy and his girlfriend had broke in a house and killed

6    a man, and old man and taken his car and that's what I

7    know about it.

8                    THE COURT:  Did you know the

9    victim, the alleged victim of this crime?

10                    THE POTENTIAL JUROR:  No.

11                    THE COURT:  Do you know Mr.

12   Wardlow?

13                    THE POTENTIAL JUROR:  No.

14                    THE COURT:  Did you ever read

15   about or hear about Mr. Wardlow in connection with this

16   case before the date that you all came down here and I

17   first talked to you?

18                    THE POTENTIAL JUROR:  No.  The

19   first time I seen him was at the initial jury call.

20                    THE COURT:  Have you heard

21   enough to make your mind up whether or not Mr. Wardlow

22   is guilty or is your mind still open?

23                    THE POTENTIAL JUROR:  My mind

24   is still open.

25                    THE COURT:  Can you presume

1    him to be innocent as you sit here and he sits here

2    today?

3                        THE POTENTIAL JUROR:  Yes.

4                        THE COURT:  Okay.  Now, the

5    trial will not begin until after the first of the year,

6    we are hoping to start shortly -- well, the first week

7    in January, it may not be the first week in January but

8    it will be shortly after the first of the year.

9                   The trial will last probably two weeks.

10                  Do you know of any reason that you could

11   not sit as a juror for a two-week period in January of

12   next year?

13                       THE POTENTIAL JUROR: No, sir.

14                       THE COURT:  Do you have any

15   questions of us?

16                       THE POTENTIAL JUROR:  No.

17                       THE COURT:  Mr. Townsend.

18

19                   VOIR DIRE EXAMINATION

20                   BY MR. TOWNSEND

21

22   Q        Mr. Thurman, I'm Richard Townsend, I represent

23   the State and Morris County in this case along with Mr.

24   Lee who is not present today.

25                  And I'm going to ask you some questions

1    about the death penalty and some questions just about law

2    in general and see what your thoughts and ideas are.

3            And if you don't understand my question

4    because of the way I have worded it or just because I

5    mumble let me know.

6    A        All right.

7    Q        The State through the District Attorney's

8    Office in Morris County is seeking the death penalty in

9    this case and the death penalty in Texas is only

10   available in cases involving capital murder.

11           And of course that's what the charge is

12   in this, in this situation and your finding as a juror

13   as to whether the death penalty should be appropriate or

14   a life sentence should be appropriate will depend on the

15   facts and the evidence presented and how you assess those

16   facts.

17           Let's just assume for the moment that

18   you have listened to all the evidence during this trial

19   and first of all early in the trial have found the

20   defendant guilty of capital murder and you have heard

21   that evidence that is presented to you during a

22   punishment hearing and after hearing all that stuff you

23   have decided that the appropriate sentence for that

24   defendant would be a death penalty, can you personally

25   vote that way?

A        If the evidence led to it and the -- and I was sure in my mind that person's mind was clear, you know, not having any kind of mental, you know, something wrong with him or something, you know, I would be for the death penalty.  Yes.

Q        Okay.  So you are saying if the facts and the evidence were appropriate to you or in your opinion that you could do it?

A        Yes.

Q        Okay.  I'm going to go through a little more with you about murder in Texas and the law and capital murder.

First of all in Texas there are two kinds of murder basically, one is what we -- what I call "plain murder" or non-capital murder, the most a person could be punished for that is 99 years to life.

That is where someone has intentionally caused the death, that is where someone has intentionally or knowingly caused the death of another person.  That is to say it was done without any legal excuse or accident or something like that, that they have intentionally caused another person's death, that is murder.

But in order for it to be capital murder you have got to have that plain murder plus something

else and that plus something else has to be one of several sorts of conditions, one being murder of a police officer or fireman in the line of duty and another, murder that takes place during the commission of a robbery or rape or kidnapping or something of that nature.

If you will there is a sheet up there that's marked "Exhibit 3" I believe, if you will look at that.

THE COURT:  It's the next one under the one you have got.  (Indicating)

THE POTENTIAL JUROR:  Okay.

MR. TOWNSEND:  Read that to yourself and then we'll talk about it.

THE POTENTIAL JUROR:  All right.

Q    (BY MR. TOWNSEND) Okay.  Mr. Thurman, can you see if the State were able to prove everything that is in that indictment -- that is a copy of the indictment, by the way -- if the State were able to prove all that can you see where that would be capital murder rather than just murder because it's got murder plus that other element I talked about which is that it was during the commission of a robbery?

Are you with me on that?

A          Yes.

Q          Okay.   The  kind  of  juror  we  have  to  have  in capital murder cases are those type jurors who after they find  a  defendant  guilty  of  murder  or  "capital  murder", excuse  me,  they  can  keep  an  open  mind  as  to  what  the proper  punishment  should  be.

The  punishment  in  Texas  for  capital murder is one of two things, it's either a life sentence or  the  death  penalty,  there  are  no  other  options.

And  after  a  person  had  been  found  guilty of  capital  murder  then  you  are  going  to  have  another hearing  that  is  called  "the  punishment  hearing",  at  that time  you  would  hear  more  evidence  and  that  evidence  will have  to  --  will  relate  to  not  whether  the  person  is guilty or not because you have already made this decision but just relates to what the proper punishment should be.

Do  you  believe  that  you  could  keep  an open mind after you found a person guilty and not make up  your  mind  as  to  whether  the  life  sentence  or  death penalty was appropriate, could you keep an open mind and not  make  your  decision  on  that  until  you  have  heard  all the  evidence  at  the  punishment  hearing?

A          That  would  be  hard  to  do  but  I  could  do  it. That  would  be  --

Q          If  you  will  there  is  what  I  call  a  "flow  chart"

1    up there, it looks kind of like this.   (Indicating)

2    A        Yes.

3    Q        I'm going to run down kind of how a capital

4    murder case goes, first you have a -- the guilt or

5    innocence phase, you are going to hear evidence as to

6    guilt or innocence of the defendant, at the end the jury

7    will deliberate, if the person is found not guilty the

8    trial is over, if the person is found guilty then you go

9    to that next phase which is called "the punishment

10   phase", then is when you are going to hear all this other

11   evidence that I was talking about.

12            And that might be evidence presented by

13   the State or maybe evidence presented by the defendant

14   and it will relate to what the proper punishment could

15   be.

16            It   could   be   evidence   from   a

17   psychologist, it could be evidence about the family

18   history of the defendant, it could be evidence of his

19   religious background, evidence of retardation, evidence

20   of  alcoholism,  evidence  of  prior  bad  acts  by  the

21   defendant, evidence of prior criminal activity by the

22   defendant, it could go on and on.  It could be any number

23   of type things you might hear.

24            After you have heard that evidence then

25   you will decide the answer "Yes" or "No" to Special Issue

#1.

All right.   You don't know what this Special Issue is but it's a question that you answer "Yes" or "No" and we'll go over that in a minute.

If you answer that question "No" the defendant automatically is going to receive a life sentence, if you answer that question "Yes" then you to go Special Issue #2 which is another "Yes" or "No" question, if you answer Number Two "Yes" then the defendant would receive a life sentence, if you answer it "No" the defendant receives the death penalty.

So you can see you are not just going to go back there and say, "Well, how many want to give him a life sentence, how many want to give him a death penalty", you are not going to decide that at all.   You are just going to answer those Special Issues "Yes" or "No."

Now, you are going to know because I just told you if you answer Number One "Yes" and Number Two "No" he's getting the death penalty.

A       Yes.

Q       If you answer them any other way then the defendant would receive a life sentence.

Are you with me so far?

A       Yes.

1  Q        All right.  If you will there is a sheet that

2  says on top "Special Issues", do you have that sheet?

3  (Indicating)

4  A        All right.  All right.

5  Q        Read Special Issue #1 to yourself and then

6  we'll talk about it.

7  A        Okay.  The whole sheet or just the top?

8  Q        Just Special Issue #1.

9  A        I read it.

10  Q        Special Issue #1 basically talks about the

11  future dangerousness of the defendant, is that kind of

12  the way it looks to you?

13  A        Yes, sir.

14  Q        Okay.  I'm going to talk to you about a little

15  bit of wording in there; Special Issue #1 is just like

16  the guilt and innocence phase of the trial in that the

17  State is required to prove to you -- prove that issue to

18  you beyond a reasonable doubt.

19           Look at the -- there is some wording

20  there on the second line, that word "probability?"

21  A        Yes.

22  Q        "Probability" is defined in Texas law as "more

23  likely than not" and what I call just a little bit more

24  than 50/50.

25  A        All right.

Q          "More likely than not", is that -- would that kind of go along with your personal definition of "probability?"

A          Yes.

Q          Okay.  And you could use that definition and follow the law in that regard?

A          Yes.

Q          Okay.  Down at the end of the second line it talks about "criminal acts of violence."

We have got to prove to you beyond a reasonable doubt that it's more likely than not that the defendant would in the future commit criminal acts of violence.  You notice it doesn't just say "criminal acts" because there are things like forgery or theft or things like that --

A          Yes.

Q          -- that are crimes but they are not violent crimes?

A          Right.

Q          But it also doesn't say "capital murder", we are not required to prove to you that he would commit another capital murder, just that he would commit some criminal act of violence, assault, attempted murder, rape, something of that nature?

A          Yes, sir.

Q        Then on the last word there is that word "society."

         "Society" means different things to different people but the way the law in Texas describes society, it means people everywhere and that means people on the street, people in their home, people in the penitentiary so we are not required to prove to you that he would be -- that he would commit criminal acts of violence, you know, in -- out on the street or in our homes or in the penitentiary?

A        Right.

Q        Just that he would commit criminal acts of violence somewhere no matter where it is.

         Are you with me on that?

A        Yes.  I am.

Q        Now, if you will read Special Issue #2 and then we will talk about it.

A        All right.

Q        Okay.  Mr. Thurman, Number Two whereas on guilt or innocence the State has to prove that to you beyond a reasonable doubt, Special Issue #1 we also have to prove to you beyond a reasonable doubt, however, in Special Issue #2 that's not a deal where we have to prove it to you beyond a reasonable doubt or anything like that.  That is basically just your opinion.

A       Okay.

Q       It's basically, what it's asking you, is this
a death penalty type case or death penalty type defendant
or is there something there that reduces his blame to the
point that -- not that he's not responsible for it but
does it reduce his blame to the point that you believe
that he deserves a life sentence rather than the death
penalty?

And the word, the key language in there
is probably where it talks about sufficient mitigating
circumstances, circumstances in what is sufficient.

I    think    most    people    describe
"sufficient" as meaning "enough?"

A       Right.

Q       What is sufficient is strictly up to you, up
to your opinion after you have heard all that evidence
during the guilt or innocence phase and you have heard
all this evidence during the punishment hearing is there
something in there, whether it come from this side of the
table or that side of the table, is there something in
there that makes you feel like his blame has been reduced
to an appropriate level that he should receive a life
sentence rather than the death penalty?

Do you believe -- here's the important
part, so far as following the law we have had -- I have

1   had jurors say, "Okay.  I found this person guilty of

2   capital murder, I am automatically going to answer 'Yes'

3   or 'No' on Issue #1 and Issue #2 because I want to be

4   sure that he gets the death penalty."

5          But you see, they are not following the

6   law because the law says you can't make up your mind yet,

7   you can't decide his guilt and have your mind made up

8   what your answer to Special Issue #1 and Special Issue

9   #2 is because you haven't heard the punishment evidence

10  yet, you have got to listen and consider all that

11  evidence.

12         You don't have to close your mind to

13  this guilt or innocence evidence, what you heard there,

14  you know, you can consider that and you can also consider

15  and you should also consider that evidence at the

16  punishment hearing then make your decision on Special

17  Issue #1.

18         Could you basically wait and hear all

19  that evidence and consider it before deciding what your

20  answer was on Special Issue #1?

21  A      Yes.

22  Q      And again when you got to Special Issue #2

23  that's a separate question and you need -- would need to

24  go back and reconsider all that evidence from the first

25  of the trial on through the punishment hearing before

1   deciding what you believe the appropriate answer should

2   be to Special Issue #2.

3             Could you do that?

4   A       Yes.

5   Q       Okay. Another thing is in capital murder the

6   law in this case would say that if the defendant was

7   found guilty and given a life sentence he would be

8   eligible for parole at the end of 35 years.

9             Now, that's not to say he would receive

10  parole, you know, he might receive it at that time, he

11  might not ever receive parole but it's just all we can

12  tell you and all that we know is that he would be

13  eligible at that time but I believe the Court's

14  instruction to you before you deliberated your punishment

15  in this case, I believe the Court's instruction to you

16  would state that when deciding the answer to Special

17  Issue #1 and Issue #2 that this decision should be based

18  strictly on the evidence.

19            And when I say "strictly on the

20  evidence" I mean parole cannot be a consideration when

21  you are deciding whether your answer should be "Yes" or

22  "No" on these issues.  You have got to basically just

23  consider that a life sentence is a life sentence and the

24  death penalty is the death penalty and decide Number One

25  and Number Two based on the evidence that you have heard

1      throughout the trial.

2              Could you do that?

3      A       Yes.

4      Q       Okay.  I will talk to you a little bit about

5      the mitigating evidence that you might hear; as I said

6      earlier you might hear evidence that the defendant was

7      intoxicated, you might hear evidence that the defendant

8      was young or old or had a good family history or bad

9      family history, you might hear evidence of all sorts of

10     things, you might hear evidence of retardation.

11              The important thing about that evidence

12     from the standpoint of being a qualified juror you have

13     got to be -- in order to be qualified you have got to be

14     the type juror who is willing to listen and consider all

15     that evidence.

16              Now, once you have listened to it and

17     considered it you should and are certainly free to make

18     your own decision as to whether, "Well, this witness's

19     testimony is" -- either you might decide that witness was

20     important or unimportant or truthful or untruthful or,

21     you know, you might decide that that evidence is

22     mitigating or you might decide that it wasn't.

23              You might say, "Well, I think that

24     reduces his blame" or "I don't think that reduces his

25     blame", whatever you decide is fine so long as you are

1    willing to listen and consider the evidence before making

2    your decision.

3                    Could you do that?

4    A        Yes, sir.

5    Q        When I say that, some people have biases or

6    prejudices against certain types of witnesses, some

7    people in a capital murder case might not want to hear

8    from the defendant's mother or they might not want to

9    hear from a psychologist.

10   A        Right.

11   Q        Or they might not want to hear from any number

12   of ministers or whoever it might be.

13                   And if you listen to these people and

14   consider their evidence and decide that that is not

15   important that's fine as long as you can follow the law

16   and listen and consider it before making that decision.

17                   Could you do that?

18   A        Yes.  I could.

19   Q        Let me talk to you just a little bit about just

20   some basic law that relates to capital murder cases but

21   also relates to most any criminal case.

22   A        All right.

23   Q        The punishment range in capital murder, we have

24   already talked about the punishment range, in a regular,

25   just a plain murder is five years probation to 99 years

1   or life of course that regular murder or plain murder is

2   any number of different type acts, it could be a very

3   vicious type murder?

4   A        Yes, sir.

5   Q        It could be a situation where an 85 year old

6   man has begged his wife to pull the plug because he's

7   dying of cancer and he's in a great deal of pain, if she

8   does that and pulls that plug that's murder.

9              Now, of course that's an entirely

10   different kind of murder than what we normally think of

11   but anyway the murder statute in Texas has a broad range

12   of punishment and in -- to be a qualified juror you have

13   to keep an open mind as to what the proper punishment

14   should be in just a regular murder case, whether that

15   proper punishment, now, you though as a juror, you can

16   decide what the proper punishment should be and you can

17   decide all the way from 99 years to five years probation?

18   A        Yes.

19   Q        But to be qualified you have to be able to

20   consider that full range of punishment before making your

21   decision.

22              Could you consider the full range of

23   punishment?

24   A        Yes.

25   Q        That would be from five years probation, you

1    could consider that and you can consider the 99 or life

2    or anywhere in between?

3    A         Right.

4    Q         In a capital murder case and, well, let's just

5    say we have got a capital murder case and the allegations

6    are murder and robbery, let's say, for instance, that we

7    have sought to prove that to you and the State has proved

8    to you beyond a reasonable doubt that a murder -- that

9    the defendant committed murder, we -- but that we did

10   not quite prove to you beyond a reasonable doubt that the

11   defendant committed the robbery.

12             Since we charged him by that indictment

13   with murder and the robbery you would have to find him

14   not guilty of capital murder but guilty of murder because

15   that is all we have proved.

16             And murder is kind of a lesser included

17   offense of capital murder.

18             In that situation you would be bound by

19   your oath to find him not guilty of capital murder but

20   guilty of murder, could you do that?

21   A         Yes.

22   Q         Okay.  And would that -- that would also be the

23   case if you -- for some reason we made a mistake and we

24   alleged murder and robbery and we should have alleged

25   murder and arson, we proved murder but of course we

1  didn't prove the robbery, it was arson, that goes back

2  to our burden of proof?

3  A          Right.

4  Q          Could you still find him guilty of murder but

5  not capital murder because we didn't prove it?

6  A          Because he wasn't tried on the right thing?

7  Q          All right.   Right.   Okay.

8            Same thing in capital murder and murder,

9  it can be proven that the person knowingly cause another

10 person's death or it can be proved that they

11 intentionally caused another person's death but in

12 capital murder it has to be intentional.

13           Let's say that we proved to you that the

14 murder was committed, we proved the robbery to you beyond

15 a reasonable doubt and we proved the murder to you but

16 we only proved that he did it knowingly, we didn't prove

17 that he did it intentionally as we had in our indictment.

18           You, under your oath you would have to

19 find the defendant guilty again of murder but not capital

20 murder?

21 A          Right.

22 Q          Could you do that?

23 A          Yes.   That -- that would be kind of hard for

24 me but, you know, I'm just trying to be fair.   Yes.   I

25 would.

1   Q        Okay.  The burden of proof in any criminal case

2   is beyond a reasonable doubt as you know and that's not

3   beyond all doubt but that is a burden that we accept and

4   burden that we are use to.

5            Is that something that you are familiar

6   with from watching TV or from whatever other source, is

7   that familiar?

8   A        I am familiar with it, I am, you know --

9   Q        Along with that burden of proof resting with

10  the State it also goes that the Defense has no burden of

11  proof, they don't have to prove that the defendant is

12  innocent or that he's not guilty, we have got to prove

13  that he is guilty.

14           Do you agree with that?

15  A        Yes.

16  Q        Okay.  Along with that goes the Fifth Amendment

17  privilege.

18           The Fifth Amendment of the United States

19  Constitution basically says that a defendant does not

20  have to testify in a criminal case unless he chooses to.

21           And when we say that what that really

22  means is that we have to prove our case and you can't

23  hold it against the defendant in any way if he doesn't

24  get up there and testify.

25  A        Yes.

1    Q       Can you do that?

2    A       Yes.

3    Q       And that also holds true through the punishment

4    phase, you know, that sometimes people might think, why,

5    you know, I would like him to get up there and say he's

6    sorry.

7                He doesn't have to.  The Fifth Amendment

8    says he doesn't have to testify at all?

9    A       Right.

10    Q       So you have got to make your decision on

11    Special Issue #1 and Issue #2 based on the evidence that

12    is presented and not hold it against the defendant in any

13    way if he chooses not to testify because there may be

14    various reasons why he might make that choice.

15                Could you do that?

16    A       Yes.

17    Q       I think you understand that we -- what you have

18    been looking at up there earlier was the indictment, I

19    think you understand the indictment in a criminal case

20    is not evidence of guilt?

21    A       Right.

22    Q       And that indictment is strictly a charging

23    instrument.

24                And you won't hold that against the

25    defendant in any way, would you?

A        No.

Q        Okay.  In many criminal cases something that comes up is the voluntariness of statements the defendant may sign or may give, some sort of confession where the defendant has -- to make a long story short, just basically said, "Yeah.  I did it."

Under the law if there was such a statement or confession presented in Court the Judge would instruct the jury that they couldn't consider that confession in any way unless they first found beyond a reasonable doubt that it was both voluntary and truthful.

Okay.  The question is this; if you heard a confession, it was presented in Court, that you believed beyond a reasonable doubt that it was truthful but you legally did not believe beyond a reasonable doubt that it was voluntary because it was a situation where the defendant should have been read his Miranda Rights for instance?

A        Yes.

Q        Are you familiar with Miranda Rights?

A        Yes, sir.

Q        The right to remain silent, the right to have a lawyer present and that sort of thing?

A        Yes, sir.

Q        Let's say it was a situation where the

1    defendant should have been read his Miranda Rights but

2    he wasn't.

3                    Then legally that confession is not

4    voluntary.

5                    Are you with me?

6    A        Yes.

7    Q        Even though you believe almost beyond a

8    reasonable doubt in your mind the confession is truthful?

9    A        Yes.

10   Q        But it's not legally voluntary.

11                   The Court will instruct you that you

12   cannot consider that confession in any way in deciding

13   guilt or innocence.

14                   Could you do that?

15   A        Yes.

16                   That's another one that would be -- it

17   would be hard for me to do but that is something that I

18   would make myself do because it would be, you know, to

19   be fair.

20   Q        Okay.  Mr. Thurman, what we run into is in

21   situations like that no human being can be expected to

22   put that out of their mind.

23   A        Right.

24   Q        But the Court does expect you to be able to

25   just put that aside while you are deliberating and

1    consider only that evidence that has legally been

2    presented to you.

3    A       Yes, sir.

4    Q       And you could do that?

5    A       Yes.

6    Q       Mr. Thurman, you indicated to the Judge you

7    knew a little bit about the facts of this case and from

8    what you said to the Judge it seemed like you didn't know

9    a whole lot about the facts of the case but you did know

10    a little, my question to you is, you are going -- if you

11    are selected as a juror in this case you would be under

12    oath to make your decision strictly on the evidence that

13    was presented.

14            And when I say that, anything that you

15    may have read in the newspaper, seen on TV --

16    A       Yes, sir.

17    Q       -- heard at the coffee shop, that is not

18    evidence and you can't consider that in any way in

19    determining the guilt or innocence of this defendant or

20    determine what his punishment should be.

21    A       Yes.

22    Q       Would you be able to do that?

23    A       Yes.

24    Q       Okay.  You indicate that you knew of me,

25    anything about that that would cause you to be less than

1    fair in this case?

2    A       No.  No.  Just heard the name, that's all.

3    Q       Okay.  You indicated that you had -- in your

4    questionnaire I notice that you indicated that there were

5    -- you had relatives that had been involved or were

6    involved in police work?

7    A       Yes.

8    Q       In a criminal case you will hear testimony from

9    all sorts of witnesses, you might hear testimony from

10   psychologists, ministers, criminals, police officers, you

11   know.

12   A       Yes.

13   Q       Any number of different types of people.

14           The important thing is that you give

15   everyone a fair start.

16   A       Yes.

17   Q       And not start anybody out, any witness out

18   ahead of another one just because he's of a particular

19   profession or because he's a police officer?

20   A       Like if he's a police officer.  Right.

21   Q       Or because he's someone you know or something

22   of that nature.

23           Do you believe that you could do that?

24   A       Yes.

25   Q       Now, when I say that I notice on Page 10 of

1    your questionnaire it -- I think the Judge has a copy of

2    it there.

3                          THE COURT:  Yes.

4                It has been 30 minutes.

5

6                (Handed to the potential juror.)

7

8                          MR.  TOWNSEND:   If you will

9    look at the bottom of Page 10 it says --

10                         THE POTENTIAL JUROR:  Yes.

11   Q       (BY MR. TOWNSEND)  -- "Do you have any personal

12   feeling about law enforcement in general or police

13   officers in particular?"

14                And said, "If yes, please explain, most

15   of the time I would believe the word of a police

16   officer?"

17   A       Yes.

18   Q       You have been around and had -- related with

19   police officers over the years, I am sure you are aware

20   that there are good police officers and there are bad

21   police officers?

22   A       Yes.

23   Q       There are good police officers or bad police

24   officers either one, they can be in situations where they

25   are correct or they can also make a mistake?

1    A        Yes.

2    Q        And the important thing to be a qualified juror

3    you have got to be able to take each witness, listen to

4    their testimony, consider their testimony and then decide

5    whether that testimony is truthful, important,

6    unimportant, not critical.

7                    Could you do that?

8    A        Yes.

9    Q        Even as to a police officer?

10   A        Yes.

11                   What I meant by this is most of -- just

12   what I said, most of the time I believe the word of a

13   police officer.

14   Q        Let me ask you this; when you say "Most of the

15   time you would believe the word of a police officer",

16   most of the time I believe what somebody tells me unless

17   I have got some reason not to.

18   A        Right.  Right.

19   Q        Is that the way you are with most everybody?

20   you generally believe them until you have reason not to

21   or unless there's something that bothers you about what

22   they are saying?

23   A        Right.  Yes.  If there's something that --

24   Q        Just doesn't add up?

25   A        Right.

1   Q       Okay.  My basic question boils down to this;

2   you are going to hear all kinds of testimony from all

3   kinds of people and some of those people will be police

4   officers, are you going to start those police officers

5   out before you have ever heard anything they say, when

6   they walk in the courtroom because they have got a police

7   uniform you are going to say, "Well, I automatically

8   believe them more than I do the rest of them?"

9   A       No.

10  Q       Okay.   Mr. Thurman, I have been asking

11  questions and I have been doing lots of talking and I

12  haven't let you talk a whole lot.

13          Is there anything that you would like

14  to ask me?

15  A       On the jury when the people, you know, what is

16  it, 11 jurors?

17  Q       "Twelve."

18  A       "Twelve?"  Okay.  "Twelve."

19          When they vote on these things is it

20  like a majority or how does that --

21                  MR. TOWNSEND:   I'm going to

22  let the Court --

23                  THE POTENTIAL JUROR:   -- how

24  does that go?

25                  THE COURT:   In order to find

1    a person guilty it must be unanimous, all 12 of you have

2    to agree in order to answer that question "Yes" all 12

3    of you must agree.

4                         THE POTENTIAL JUROR:  Yes.

5                         THE   COURT:    It  can't  be

6    answered, the first issue can be answered "No" with 10

7    or more but "unanimous" is the requirement for a "Yes."

8                         "Yes" is the one that gets the death

9    penalty.

10                        THE POTENTIAL JUROR:  Okay.

11                        THE COURT:  So if you are --

12   then on the last issue, the second issue.

13                        THE POTENTIAL JUROR:  Yes.

14                        THE COURT:  It would have to

15   be a "No" results in the death penalty, that would have

16   to be unanimous.

17                        THE    POTENTIAL    JUROR:

18   "Unanimous?"  Okay.

19                        THE COURT:  Frankly I have not

20   looked up the law as to Number Two but I still suspect

21   it could be answered with 10 "Yes", if you answer "Yes"

22   but to find a person guilty and assess the death penalty

23   it must be unanimous, all 12 must be -- must agree.

24                        THE POTENTIAL JUROR:  Then if

25   it's not unanimous does it go to -- would be to what,

1    "life imprisonment" or just --

2                          THE COURT:  You all ask some

3    good questions down here.

4                          THE POTENTIAL JUROR:  Did I

5    ask a stupid question or what?

6                          MR. TOWNSEND:  No.

7                          THE COURT:  I was trying to

8    decide whether or not the law would allow me to answer

9    it but I'm going to answer it anyway because I believe

10   it does; in order to find a person guilty it's unanimous.

11           Now, if a person is found guilty of

12   capital murder the law says the punishment would be life

13   so you can't come up with a verdict on the second part

14   of the trial, since the minimum punishment is life the

15   net effect of a hung jury is a life sentence but before

16   you get to that second part you have to have the

17   unanimous agreement.

18           If it's not unanimous on the first part

19   it's a new trial.

20                          THE POTENTIAL JUROR:  Okay.

21                          THE COURT:  Mr. Townsend?

22                          THE POTENTIAL JUROR:  That's

23   all the questions.

24                          THE COURT:  You don't have any

25   more questions?

1                      THE POTENTIAL JUROR:  No.

2                      THE COURT:  Good.

3                      MR. TOWNSEND:  That was a good

4    question.

5                      Well, I have got one more; is there any

6    reason that you know of that you couldn't be a fair and

7    impartial juror in this case?

8                      THE POTENTIAL JUROR:  No.

9                      MR. TOWNSEND:  I pass the

10   juror.

11

12                      VOIR DIRE EXAMINATION

13                      BY MR. OLD

14

15   Q        Mr. Thurman, I represent Mr. Wardlow, I guess

16   you would call me "Act II" of this.

17                      And we are going to talk about basically

18   the same questions of law that you just talked about.

19   A        All right.

20   Q        The first thing I would like for you to be

21   aware of is that a juror takes an oath, and I would like

22   to tell you what that oath is and have you consider it.

23   A        Okay.

24   Q        A juror is required to swear or to affirm that

25   he would "a true verdict render according to the law and

1    the evidence so help you God."

2                    Now, the Court, and that's the Judge,

3    is the exclusive judge of the law of this case.  I mean

4    two lawyers can't even agree on what the law is, someone

5    has to tell a jury what the law is.

6    A        Right.

7    Q        And the Court does that by giving you a set of

8    written instructions we sometimes call a "charge" and it

9    tells you what the law is.  They tell -- it tells a jury

10   the rules to conduct themselves by and in many cases what

11   they shall do or what they should not do or how they will

12   go about it.

13                   Now, the jury is the exclusive judge of

14   the evidence by the standards set by the law and that's

15   usually anything you find as evidence or to exist in fact

16   you must find beyond a reasonable doubt.

17   A        Right.

18   Q        Okay.  Now, you and Mr. Townsend talked a lot

19   about "beyond a reasonable doubt", what does that mean

20   to you?

21   A        That there is a -- I don't know, a very high

22   probability.

23   Q        "High probability" is what the word indicates

24   to you?

25   A        Right.

Q        Now, when the law says that the word has legal meaning the Court will give you a -- in its charge a definition of that word and if you will look at, I believe it's Exhibit 6 in front of you.

THE   COURT:     That's   it. (Indicating)

THE POTENTIAL JUROR:  Okay.

MR.  OLD:    Start  with  the second paragraph on that, begins, "The prosecution has the burden of proving", can I get you to read and study the rest of that page so we may talk about it?

THE POTENTIAL JUROR:   Okay. All right.  All right.

Q        (BY MR. OLD)  Court will tell you that's the definition of beyond a reasonable doubt and tell you to be governed thereby.

A        Yes.

Q        Can you follow that instruction?

A        Yes.

Q        Does that instruction in your mind differ from what you said as being a "high probability?"

A        Not really.

Q        Okay.  Obviously it doesn't say the same thing but I mean is there a real variance?

A        It says "beyond a reasonable doubt."

1    Q        Now, over in Special Issue #1 you are asked to

2    find   beyond   a   reasonable   doubt   that   there   is   a

3    probability.

4            I believe the District Attorney told you

5    that "probability" there meant "more likely than not?"

6    A        Yes.

7    Q        Is   "beyond   a   reasonable   doubt"   a   higher

8    standard than "more likely than not?"

9    A        I would say no.  To me.

10    Q        Okay.  You would say that a reasonable doubt

11    would  simply  --  be  a  high  probability,  would  be  more

12    likely than not?

13    A        Yes.  No.  No.  No.  I'm sorry.  I'm sorry.

14            I got that backward.  I'm sorry.

15    Q        Okay.

16    A        No.  I am just contradicting myself here.

17            No.   A  reasonable  doubt  would  be  a

18    higher standard.

19    Q        It's a higher standard than a mere probability?

20    A        Yes.

21    Q        And does that question say to you that the more

22    likely than not must be proven to you beyond a reasonable

23    doubt?

24    A        Yes.

25    Q        Do you have any quarrel with that, any problem

1    with that being the law?

2    A       No.

3    Q       Now, just as the oath implies you have got to

4    be able to follow the law.

5            If you and I talked long enough we would

6    find a law that you would say "That's wrong, that's not

7    the law, I can't follow that law."

8    A       Like "seat belts" or something?

9    Q       That's a good one:  "I don't care if you got

10   a videotape, I'm not going to find a man guilty of not

11   wearing his seat belt, I think it's his personal choice?"

12   A       Right.

13   Q       You know there are some things we can't do and

14   I want to go back over with you some things and if I

15   understood your answer correctly you said there are some

16   things that would be hard to do?

17   A       Yes.

18   Q       The first thing I want to talk to you about;

19   your grandfather was B.C. Sustaire?

20   A       Yes, sir.

21   Q       He was Chief of Police in Mount Pleasant for

22   as long as I can remember.

23   A       Right.

24   Q       You have got an uncle who was chief of police?

25   A       Euless.

1    Q        "Euless?"  What is his name?

2    A        "Blackie Sustaire."

3    Q        He has been a law enforcement officer forever?

4    A        Right.

5    Q        Then you have got another relative?

6    A        His son is a captain if I'm not correct over

7    there and I have got an uncle that is, I think a

8    detective or something in Greenville.

9    Q        Okay.  Did you kind of grow up around law

10   enforcement officers?

11   A        Yes.  Mainly around my grandfather.

12   Q        And your uncle from time to time?

13   A        Right.

14   Q        I want to challenge you on something, I'm not

15   trying to prove you wrong, say you told me wrong, I got

16   to know the answer; you wrote down on your questionnaire

17   that "Most of the time I would believe the word of a

18   police officer?"

19   A        Right.

20   Q        I'm not saying there's anything wrong with that

21   but going to whether or not you're a proper juror for

22   this case?

23   A        Okay.

24   Q        There's a Witness List in front of you, it's

25   a piece of paper that has "Witness List" on top of it.

1    (Indicating)

2    A        Yes.

3    Q        Would you go over that Witness List for me and

4    tell me if you know any of those people and I will also

5    call your attention to the fact that a lot of them appear

6    to be law enforcement officers.

7               When you get to one you know or heard

8    of I'm going to stop there if you do.

9    A        I have heard of "Jackie Martin."

10   Q        When you say "I heard of?"

11   A        I have heard of him, other than that -- I have

12   heard some of these names but I don't know anybody

13   personally.

14   Q        Have you heard of them as being "He's a deputy

15   sheriff in Daingerfield" or "He's a policeman in

16   Pittsburg", is that how you have heard of them?

17   A        I couldn't even really tell you what he does.

18   Q        All right.

19   A        I mean I have just heard the name.  That's all.

20   Q        Okay.

21   A        And I don't think I have even heard any of the

22   other ones on here, maybe some of these right here.

23   (Indicating)

24   Q        Have you gone over to the next page?

25   A        No.  Okay.

1          I can't even say I have even heard of

2     any of these names before.

3     Q          You do know a lot of those people on there are

4     law enforcement officers?

5     A          Right.  I take your word for it.

6     Q          Are they represented to be by that list?

7     A          Okay.

8     Q          You are not -- this requires that you make your

9     findings on the evidence that comes to you through the

10    Court, it's just like we talked about what you heard

11    about this?

12    A          Right.

13    Q          You have got to lay it aside and not consider

14    it.

15    A          Right.

16    Q          You said that you could do that.

17               Let me give you a hypothetical; a law

18    enforcement officer testifies, a non-law enforcement

19    witness testifies, just a witness, not saying -- maybe

20    the State calls them both, maybe the Defendant calls one

21    and the State calls the other and vice versa.

22    A          All right.

23    Q          And a law enforcement officer testifies in

24    contradiction to the other witness; holding everything

25    equal between the witnesses is the mere fact that one of

1  them is a law enforcement officer, is that going to be

2  more persuasive with you?

3  A          Yes.   The law officer, I would have to say,

4  would be more persuasive to me.

5  Q          Merely because of the fact that he's a law

6  enforcement officer?

7  A          Yes.

8              I wouldn't, now, I don't want to put any

9  law enforcement officer's opinion in front of anybody

10 else's.  I would try to hold, you know, all the evidence

11 equal but, you know --

12 Q          But I mean if you had to make a decision and

13 that was the only thing out there to make it on it would

14 probably make a difference?

15 A          Yes, sir.

16 Q          As you were raised around law enforcement

17 officers I was raised around lawyers.

18 A          Yes.

19 Q          And I would probably consider a lawyer more

20 credible if a lawyer was a witness.

21 A          Right.

22 Q          But what you are saying is a law enforcement

23 officer is going to have a head start with you as a

24 witness, he's going to have some instant credibility

25 because of that position?

1    A        He would have credibility.

2             I wouldn't put it above anything else

3    but he would have credibility.  Yes.  Because he was law

4    enforcement.

5    Q        It's going to be something that you would

6    consider in weighing the evidence in this case?

7    A        Right.

8             MR. OLD:  Your Honor, may we

9    approach the bench?

10            THE COURT:  Mr. Thurman, if

11   you would step out for a minute.  I need to talk to these

12   lawyers for just a second, we need to bring you right

13   back in.

14

15            (Off the record discussion.)

16

17            THE COURT:  Bring him back in.

18

19            (The following occurred in the presence

20   and hearing of the potential juror:)

21

22            THE COURT:  The record can

23   reflect there was an off the record discussion between

24   the parties while the juror was out of the room.

25            Mr. Thurman, you have a background in

1   law enforcement, at least your family does?

2                    THE POTENTIAL JUROR:   Yes.

3                    THE COURT: You told the State

4   during questioning that you would not start a police

5   officer out ahead of another witness, you would basically

6   look at all the witnesses and decide --

7                    THE POTENTIAL JUROR:   Right.

8                    THE   COURT:    --  who  you

9   believe?

10                   Now, you have told Mr. Old something a

11  little different, you have told him that you do believe

12  all things being equal that a police officer is more

13  credible.

14                   Now, there is nothing wrong with which

15  way you view things, you have told me two different

16  things, maybe you meant to, maybe you didn't mean to.

17                   THE   POTENTIAL   JUROR:    I

18  probably misunderstood -- just didn't -- I don't know how

19  to explain myself.

20                   THE COURT: Let me go a little

21  further; you know at trial a person's very freedom and

22  life can be at stake and our law says that all the

23  witnesses should be started equal, now, that doesn't mean

24  at the end they are all equal, if you have a doctor on

25  the stand and he gives testimony about how a certain

1  operation occurs based on his training you might very

2  well find him more credible than you would me telling

3  somebody how I think an operation ought to be performed

4  since I have absolutely no medical training or

5  background. And there's nothing wrong after you hear the

6  qualifications to give a person more credibility than

7  another but if you are going to say that you will always

8  believe a person because of his or her profession over

9  anyone else not in that profession then that is wrong.

10  If you are going to say that you will never believe

11  somebody because of their profession that's wrong.

12          The law wants us to be able to listen

13  to the witnesses, start them out basically equal then

14  judge their credibility based on what you hear. And what

15  you hear has to do with how are they trained, what are

16  they trained to do and what is their areas of expertise,

17  if any, and how does this apply to fact situation?

18          A policeman may be more trained in

19  observation than a non-policeman but if you have a doctor

20  get up here again and talk about how an operation is to

21  progress and the policeman says, "No.  I don't think

22  that's the way it ought to go" and he has had no training

23  I don't believe that you should necessarily believe this

24  policeman because he's a policeman.

25          THE POTENTIAL JUROR:  Right.

1      THE COURT:   There's nothing

2  wrong in it if that's the way you feel, if you are going

3  to start a policeman out and always believe everything

4  he says regardless then that is fine.   You just need to

5  tell us.

6      THE   POTENTIAL   JUROR:   I

7  wouldn't always believe a policeman regardless of what

8  he said.

9      THE COURT:  You would or would

10  not?

11      THE POTENTIAL JUROR:   Would

12  not.

13      THE COURT:  So are you telling

14  me that you will listen to his testimony and then decide

15  whether you would believe it?

16      THE POTENTIAL JUROR:   Yes.

17      THE COURT:   Some people say,

18  "Oh, if a policeman gets up there and is testifying I'm

19  going to believe everything he says, I'm not going to

20  have any other witness."

21      THE POTENTIAL JUROR:   That's

22  not true.   That shouldn't be like that.   That's not true

23  for me.

24      THE COURT:  So you are telling

25  me you might hear a policeman testify and you might or

1   might not believe him, it depends on what he's going to

2   say?

3                           THE POTENTIAL JUROR:   Right.

4                           THE COURT:  The importance of

5   this, Mr. Old is obviously not going to be presenting as

6   many police personnel as the State might.

7                           THE POTENTIAL JUROR:   Right.

8                           THE COURT:   So he does not

9   need to be put at a disadvantage by having to discredit

10  all of these policemen because in your eyes they are a

11  step   ahead   over   everybody   else,   that   creates   an

12  impossible burden.   He -- he has no burden of proving

13  anything so if he has to prove that all of them are just

14  not credible you are making him do something that the law

15  does not make him do.

16                  If you hear a policeman and you just

17  don't believe him can you discount his testimony?

18                           THE POTENTIAL JUROR:   Yes.

19  If I don't believe him.   Yes.

20                           THE COURT:  And if you believe

21  him can you find -- if you believe him find him credible,

22  can you give effect to his testimony?

23                           THE POTENTIAL JUROR:   Yes,

24  sir.

25                  I think what I meant by that was say I

1   was out on the street and I asked a policeman something

2   and, you know, he told me, I would believe what he says.

3               THE COURT:   For purposes of

4   this conversation we want you to try to confine your

5   thinking to what you would do here because each witness

6   is sworn in and they give an oath to tell the truth.

7               THE POTENTIAL JUROR:   Yes.

8               THE COURT:   Whether they do

9   or not is something for a jury to decide.   And you may

10  not have people lying to you, you may have people that

11  actually remember things differently in a trial and that

12  doesn't mean that one person is lying and the other isn't

13  but it does mean if you have that situation you are going

14  to have to decide which one you believe.

15              THE POTENTIAL JUROR:   Right.

16              THE COURT:   And that's when

17  you judge their credibility, what does that person do

18  that says this, what is their background and so on,

19  that's when you judge their credibility and for you to

20  say "I am always going to believe the policeman over

21  anybody else on the witness stand because he's a

22  policeman", it's inappropriate.

23                   It's not inappropriate for you to

24  believe but as a juror it's inappropriate just because

25  he's a policeman.   It's not inappropriate for you to feel

1    that way, if you believe that way tell me.

2                        THE POTENTIAL JUROR:  I don't

3    believe that way.

4                        THE COURT:  Mr. Old?

5                        MR. OLD:  Mr. Thurman, to be

6    sure I understand you; a witness gets on that witness

7    stand that has a badge on or uniform that you recognize

8    as a policeman?

9                        THE POTENTIAL JUROR:  Right.

10   Q         (BY MR. OLD, CONTINUING VOIR DIRE EXAMINATION)

11                       As he is taking that witness stand is

12   your mind-set going to be, I want to hear him testify

13   because I believe policemen tell the truth, I mean is he

14   -- as to people that -- just plain old people is he going

15   to have a little head start with you, are you going to

16   anticipate looking forward to his testimony because you

17   believe it would be coming as the truth?

18   A         No.

19   Q         Well, --

20   A         Can I ask a question?

21                       Does it sound like I'm saying two

22   different things here?

23   Q         It does to me.

24   A         Okay.

25   Q         And I'm not -- you made a strong statement on

1    your questionnaire and I'm not saying you are retracting

2    or hedging on me.

3    A        Right.

4    Q        I mean I may be -- I'm sitting there looking

5    at your relationship with law enforcement and I mean a

6    family heritage, obviously?

7    A        Just because I have law enforcement in my

8    family, though, I mean that doesn't effect, you know, how

9    I think.

10             I know there are good police officers

11   and bad police officers.

12   Q        But let me change it; you presume, and I think

13   you said "most police officers?"

14   A        Yes.

15   Q        Do you presume most police officers are

16   truthful?

17   A        Yes.  I would presume that it would be their

18   job to be truthful, you know, they probably don't tell

19   the truth all the time but --

20   Q        I'm not talking about "all the time", I'm

21   talking about when they are in the courtroom under oath.

22   A        Okay.

23   Q        Is the fact, the mere fact that they are a

24   peace officer, I'm not talking about an opinion about

25   whether a fingerprint is a fingerprint, something they

1   have knowledge of, I'm talking about just as to "The car

2   was red, the car was red, the car was black, I saw him

3   do it, I didn't see him" or "This was said, that was

4   said?"

5   A        That has no -- it's hard -- hard for me to

6   explain myself.

7            Just because he's a police officer, no,

8   that doesn't effect the way that I would listen about,

9   you know, what he says about something like that.

10  Q        Let me give you a hypothetical; a police

11  officer testifies that he had a conversation with the

12  person charged.

13  A        Right.

14  Q        "He says this, the defendant said this."

15           The defendant then gets on the witness

16  stand and testifies, "No.   I said this" or "The

17  conversation never occurred."

18           Now, the fact that the witness was a

19  peace officer going to give him greater credibility than

20  the other witness?  Are you going to be more likely to

21  believe him?

22  A        Yes, sir.   It's going to give him more

23  credibility.

24  Q        And that's solely because he's a peace officer?

25  A        I guess so.  I can't think of any other reason.

1    Q       And for me to bring his credibility down with

2    you I'm going to have to attack him and show you that he

3    is wrong or is not telling the truth?

4    A       Yes.   I think I would have to have evidence

5    that he was not telling the truth.

6    Q       Okay.   As to the defendant; would it have to

7    be proven to you that he was telling the truth?

8    A       Yes.   I would want to know that he was telling

9    the truth.

10    Q       And based on what you have told me the mere

11    fact the other witness was a peace officer, you will

12    probably take his word over the defendant?

13    A       If that's what I said I guess that's what I

14    said.

15    Q       Do you agree with me that's what you said?

16    A       Yes.

17    Q       Let's go on to something else; over on the

18    first page of your questionnaire you were asked to

19    explain your answer as to your opinion of the death

20    penalty.

21            First; have you always had the same view

22    about the death penalty or has it changed from time to

23    time?

24    A       I think I have had the same view on it.

25    Q       Okay.   You make the statement "If a person is

1   found guilty of capital murder he should be put to

2   death?"

3   A        Yes.

4   Q        Okay.   And that's if all of these Special

5   Issues are -- okay, let me challenge you.

6   A        If he's found guilty.   Yes.

7   Q        If he's found guilty of capital murder it's

8   proven to you beyond a reasonable doubt that in the

9   indictment you have read he intentionally killed a person

10  during the commission of a robbery he should be put to

11  death?

12  A        Yes.

13  Q        And that's your opinion of what should be done?

14  A        Yes, sir.

15  Q        It may not be the law.

16  A        That is the law, isn't it?

17  Q        Well, when you find him guilty then the law

18  asks you to answer some other questions.

19  A        Yeah.   If the other questions are answered

20  correctly.   Yes.

21  Q        But when you filled this out you weren't

22  considering this Special Issue, you were just saying if

23  a person was convicted of capital murder he should get

24  the death sentence?

25  A        Yes.

Q          That's your opinion, what you think the law ought to be?

A          Yes, sir.

Q          Now, Mr. Townsend explained to you this morning in order for someone to get the death penalty after you find them guilty beyond a reasonable doubt of capital murder you must answer "Yes-No" to two questions?

A          Yes.

Q          And you must answer those questions on evidence, right?

A          Yes.

Q          Now, your opinion of what the law ought to be and that is that -- not trying to put words in your mouth, what it says to me, "If you are convicted of capital murder there ought not to be two questions, it ought to be the death penalty?"

A          I think my view on that has changed a little bit since I found out about these other questions.  Now that I know about these you got here the Special Issue #1 and Issue #2 I don't think they should be put to death until those are answered correctly.

Q          Well, let me --

A          Did I answer?

Q          You answered the question, the problem I'm having with that in a short time you have changed your

1    opinion.

2    A          That's because I didn't know about this other.

3    Q          But you still have a strong -- you still

4    strongly favor the death penalty in a capital murder

5    case?

6    A          Yes.

7    Q          Okay.  Would the fact that you consider that

8    -- that you have a bias in favor of the death penalty in

9    a capital murder case, I'm not trying to be ugly but this

10   indicates that you really think the death sentence is the

11   more appropriate sentence?

12   A          Yes.

13   Q          Okay.  Is that opinion going to effect your

14   answer to Issues One and Two?

15   A          No.

16   Q          Okay.  You can lay that opinion aside and

17   answer those questions --

18   A          Right.

19   Q          -- on the evidence and not look to the outcome?

20   A          I can try my best.

21                    Yes.  I think I could.

22   Q          Let me ask you something; do you think that

23   your opinion as to the death sentence in capital cases

24   can effect others -- effect you in general in your

25   deliberation and viewing the evidence in this case?

1          I'm not saying you want to kill someone,

2     you just think if they committed capital murder the

3     punishment ought to be death?

4     A          No.  I think during the trial what I would be

5     interested in is just hearing the evidence to see if they

6     are guilty or not guilty of it.

7     Q          After that?

8     A          Okay.

9     Q          Maybe we missed something.

10    A          Okay.

11    Q          You hear the evidence in the case and you go

12    out and you find "guilty-not guilty", if you find the

13    defendant not guilty of capital murder then the death

14    penalty is never considered and you never see Special

15    Issue #1 and Issue #2?

16    A          Right.

17    Q          Okay.  Let me put you in the position of you

18    are on a jury and you have answered Special Issue #1 --

19    Special Issue Number -- excuse me; you have found the

20    defendant guilty of capital murder?

21    A          Okay.

22    Q          Come back out, the jury gets back in the

23    courtroom, more evidence may be presented?

24    A          Right.

25    Q          You then go, after you hear that evidence and

1   with new instructions of the Court you answer Special

2   Issue #1 and Issue #2?

3   A       Okay.

4   Q       Now, at the point that you have found a man

5   guilty of capital murder are you of the opinion that he

6   ought to get the death penalty unless he's proven to you

7   otherwise?

8   A       Not yet.  Not at that point.

9   Q       Are you favoring that outcome?

10          You found him guilty of capital murder,

11   are you --

12   A       I favor it but that, you know --

13   Q       I mean you lean that way?

14   A       No.

15          Really I would like to say I don't lean

16   either way until, you know, until you hear the other

17   evidence about if he was in his right mind, if something

18   was, you know --

19   Q       But I mean I think you have given me two

20   answers.

21   A       Oh, okay.

22          I seem to be good at that today.

23   Q       Listen, don't -- the advantage that Mr.

24   Townsend and I have over you, we are not going to be on

25   the jury.

A          All right.

Q          We are asking you to predict what you are going to do before you do it and I know these are extremely hard answers but the law says we are entitled to them and this is not a game we are playing to battle wits with you.

A          Yes.

Q          Let me go back, I think you told me that after you convicted somebody of capital murder but before you went further with hearing evidence as to Issues One and Two that you would not automatically be wanting to give him the death penalty but you would lean that way or you would have a bias that way?

It would be more likely than not that you thought he ought to get the death penalty?

A          Yes.

Q          I mean you would be over that -- just as soon as you convicted him you would be at 50 percent or above on the death penalty more likely than not?

A          Yeah.

Q          That's what you would think the appropriate punishment would be?

A          Yes.  That's what I would think the appropriate punishment would be.  Right.

Q          Then in answering Special Issue #1 would you

1    preference weigh in your decision on that issue?

2    A          No.  I don't think it would.

3               Does that tell you anything?

4    Q          I don't like the word "think", I understand the

5    word "think."

6               Let me ask you; are you telling me "I

7    would do my best not to, I think I could follow the

8    instruction of the Court but I really don't know whether

9    I could or not?"

10   A          No.  I would follow the instructions of the

11   Court and I could do that.

12   Q          And you think you could put that completely out

13   of your mind, that is your preference for the death

14   penalty in a capital case?

15   A          Yes.  I would put it out of my mind while --

16   I mean that's, you know, that would be something that

17   would be hard for anybody to put their preference out of

18   their mind but to be fair, yes, I would put it out of my

19   mind.

20   Q          You will try to put it out of your mind?

21   A          Yes.  I would try.

22   Q          You know it's real easy to say "Yeah, I'm not

23   going to consider that, I'm going to consider that, I'm

24   sitting right over here and I'm not going to look back

25   that way", that's being real objective?

1    A         Yes.

2    Q         Now, when you get to "subjective" and that is

3    what is in here in your mind, when you are weighing that

4    evidence is your preference going to subjectively effect

5    your weighing of the evidence as to Special Issue #1 or

6    Issue #2?

7    A         I would have to say I guess it would.

8    Q         Okay.

9                        THE COURT:  Let me see if you

10   just said what I heard.

11                       THE POTENTIAL JUROR:  Okay.

12                       THE COURT:  Your preference

13   is at the point that he's talking, your personal views

14   indicate to you that death is appropriate, forgetting the

15   law, "Death is the appropriate sentence?"

16                       THE POTENTIAL JUROR:  Right.

17                       THE COURT:  Then it seems to

18   me what you just said, your viewpoint, that death would

19   be appropriate would influence the way you answer the

20   issues, is that what you said?

21                       THE POTENTIAL JUROR:  I think

22   subconsciously, yes, it probably would.

23                       But that is something that I would try

24   to put aside to the best of my ability.

25                       THE COURT:  Well, I have to

1    agree with Mr. Old, we can't take "try" or "I think."

2                        THE POTENTIAL JUROR:  Okay.

3                        THE COURT:  Obviously there

4    may be a lot of things in your mind and you can't just

5    forget something, the problem is not whether you put it

6    out of your mind, the problem is whether it would

7    influence your answer and you said it would.

8                        And again, I don't take quarrel with

9    you, I just want to understand.

10                        He has a position, he has a position,

11   I am the referee, I am calling the balls and the strikes

12   and for me to do it I have got to get a better picture

13   of where the ball is being played so if you have an

14   opinion that the death penalty is the appropriate

15   punishment, would influence your decision that's fine,

16   if it wouldn't influence your decision that's fine, I

17   just want to know one way or the other, "Yes, it will"

18   or "No, it won't?"

19                        THE POTENTIAL JUROR:  I would

20   think that I would have to say "Yes, it would."

21                        THE COURT:  Okay.  Thank you,

22   sir.

23                        Would you step out of the room for just

24   a minute?

25

1          (Off the record discussion.)

2

3          (The following occurred outside the

4  presence and hearing of the potential juror:)

5

6          THE COURT:  On the record now,

7  Mr. Old?

8          MR. OLD:  My first challenge

9  would be that the witness has expressed such a bias for

10  the infliction of the death penalty as a punishment for

11  capital murder and by his answer that that bias would

12  effect his deliberation on punishment that that is a

13  prejudice against this defendant and against this case

14  and the statement that he cannot follow the law.

15          THE COURT:  I will sustain

16  your challenge for cause.

17          I find him to be not qualified.

18          Tell him we appreciate him coming down

19  and he is being released.

20

21          (Record closed for November 15th, 1994.)

22

23          (Whereupon Court was recessed until 9:00

24  a.m., November 16th, 1994.)

25          * * * * *

STATE OF TEXAS      §
                    §
COUNTY OF TITUS     §


          I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on November 15, 1994 and were reported by me.

          I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

          WITNESS MY HAND this _31ST_ day of January, 1995.


_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

Certification Number of Reporter:  149

Expiration Date of Certification:  12/31/96

Business Address:  Drawer 1868
                   Mt. Pleasant, Texas 75456-1868

Telephone Number:  903/577-6735

Transcribed By:    Tandra K. Gibson