

72102

CAUSE NO. 12,764

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 16, 1994

**VOLUME 21 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

ORIGINAL

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

1

## VOLUME 21

2

### VOIR DIRE EXAMINATION

3        NOVEMBER 16, 1994                          PAGE/VOLUME

4        APPEARANCES . . . . . . . . . . . . . . .         1/21

5        MORNING SESSION . . . . . . . . . . . .           3/21

6        POTENTIAL JUROR, CARL EUGENE SMITH
                    EXAMINATION BY MR. TOWNSEND . . .      10/21
7
         RECESS  . . . . . . . . . . . . . . . .          43/21
8
         POTENTIAL JUROR, CARL EUGENE SMITH, (CONTINUING)
9                   EXAMINATION BY MR. HINSON . . . .      44/21

10       DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
                    OF THE POTENTIAL JUROR  . . . . .      77/21
11
         DISCUSSION CONCLUDED  . . . . . . . . . .         81/21
12
         NOON RECESS . . . . . . . . . . . . . .           86/21
13
         AFTERNOON SESSION . . . . . . . . . . .           86/21
14
         POTENTIAL JUROR, RICHARD DEAN WILTSE
15                  EXAMINATION BY MR. TOWNSEND . . .      91/21

16       RECESS  . . . . . . . . . . . . . . . .          126/21

17       POTENTIAL JUROR, RICHARD DEAN WILTSE, (CONTINUING)
                    EXAMINATION BY MR. OLD  . . . . .     127/21
18
         DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
19                  OF THE POTENTIAL JUROR  . . . . .     163/21

20       RECESS  . . . . . . . . . . . . . . . .          164/21

21       POTENTIAL JUROR, BOBBY DWAYNE MOORE . . . .      164/21

22       COURT ADJOURNED . . . . . . . . . . . . .        172/21

23       COURT REPORTER'S CERTIFICATE  . . . . . .        173/21

24

25

                              *****

VOLUME 21

ALPHABETICAL INDEX OF

POTENTIAL JURORS

NOVEMBER 16, 1994                              PAGE/VOLUME

POTENTIAL JUROR, BOBBY DWAYNE MOORE
EXAMINATION BY COURT  . . . . . . . . . . .      164/21

POTENTIAL JUROR, CARL EUGENE SMITH
EXAMINATION BY MR. TOWNSEND . . . . . . . .       10/21
EXAMINATION BY MR. HINSON . . . . . . . . .       44/21

POTENTIAL JUROR, RICHARD DEAN WILTSE
EXAMINATION BY MR. TOWNSEND . . . . . . . .       91/21
EXAMINATION BY MR. OLD  . . . . . . . . . .      127/21

* * * * *

1

CAUSE NO. 12,764

2

THE STATE OF TEXAS          §   IN THE DISTRICT COURT OF
                            §
3

VS.                         §   TITUS COUNTY, TEXAS
                            §
4

BILLY JOE WARDLOW           §   76TH JUDICIAL DISTRICT

5

6

STATEMENT OF FACTS

7

VOIR DIRE EXAMINATION

8

November 16, 1994

9

**VOLUME 21 of 43 volumes**

10

11

Before Honorable Gary R. Stephens

12

Judge by Judicial Assignment

13

(Venue changed from Morris County, Texas)

14

15

APPEARANCES

16

17

ATTORNEYS FOR THE STATE OF TEXAS:

18

        MR. RICHARD TOWNSEND
        District Attorney
19

        Morris County Texas
        Morris County Courthouse
20

        Daingerfield, Texas 75638

21

                and

22

        MR. RANDY LEE
        Assistant District Attorney
23

        Cass County Texas
        P.O. Box 940
24

        Linden, Texas 75563

25

1    ATTORNEYS FOR THE DEFENDANT:

2        MR. BIRD OLD, III
        Old, Rolston & Old
3        P.O. Box 448
        Mt. Pleasant, Texas 75456-0448
4

5               and

6        MR. LANCE HINSON
        Law Offices of Danny Woodson
        P.O. Box 399
7        Mt. Pleasant, Texas 75456-0399

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          On the 16th day of November, 1994, the

2     above-entitled and numbered cause came on for hearing

3     before said Honorable Court, Judge Gary R. Stephens of

4     Midlothian, Texas, serving by judicial assignment in the

5     District Court of Titus County, Texas, on change of venue

6     from Morris County, Texas, and the following proceedings

7     were had:

8

9          (The following occurred outside the

10    presence and hearing of any potential juror:)

11

12          THE COURT:  Let's get on the

13    record.

14          Let the record reflect that no

15    prospective jurors are present in the courtroom.

16          Mr. Townsend, it is my understanding

17    that you and Mr. Old have been looking at questionnaires

18    and discussing our lineup and that there has been an

19    agreement that the State and Defense under 35.05 will

20    dismiss and release from this panel all jurors who circle

21    any number on Page 1 other than a "2?"

22          That means people that circled the "1,

23    3, 4, 5 and 6's" under the section describing their

24    feelings on the death penalty will be excused.

25          Now, that means specifically today we

1   will excuse juror Billy White, 27, who is a "Number 1",

2   Bobby Gray, number 36 who is also a "Number 1", James

3   Brown, number 39, who is a "1" and Linda Smith, juror 40

4   who is a "Number 4."

5            Do you agree to excuse those specific

6   jurors along with all jurors who have circled any number

7   other than "2", Mr. Townsend?

8            MR.  TOWNSEND:   Yes,  Your

9   Honor.

10            THE COURT:  Do you agree, Mr.

11   Old?

12            MR. OLD:  Let me ask a couple

13   of questions, I don't think we have a problem, I just

14   want a clarification.

15            THE COURT:  All right.

16            MR. OLD:   I have been going

17   through the next 10 that you sent for, we have one that

18   circled both "1" and "2."

19            MR.  TOWNSEND:    I  hadn't

20   thought about that, which number is that?

21            MR. OLD:  That's number 45.

22            THE COURT:  Off the record.

23

24            (Off the record discussion.)

25

1        THE   COURT:    Back   on   the

2   record.

3            Let the record reflect there was an off

4   the   record   discussion   because   a   couple   of   our

5   questionnaires have both "1's" and "2's" or "2's" and

6   other numbers circled.

7            So, Mr. Old, I understand you agree with

8   the Court's statement a moment ago that you would dismiss

9   under 35.05 everyone who circled anything other than a

10  "2" with the exception of people who circled a "2" and

11  a "1" or a "2" and a "3", we will bring those in to

12  clarify what they really are, is that the agreement, sir?

13        MR.   OLD:    That's   the

14  agreement.

15        THE   COURT:    And   do   you

16  specifically agree to release the jurors scheduled for

17  today that I stated into the record?

18            MR. OLD:  Yes.

19        THE   COURT:   Mr.  Wardlow,  do

20  you agree with this agreement between your lawyer and the

21  State's lawyer?

22        THE   DEFENDANT:    Yes,   Your

23  Honor.

24        THE   COURT:   We will dismiss

25  all but the "2's."

1          You may tell Mr. White he has been
2    released and then tell Mr. Smith we will bring him in in
3    just a moment.
4                    Off the record.
5
6                    (Off the record discussion.)
7
8                    (The following occurred in the presence
9    and hearing of the potential juror:)
10
11                   THE BAILIFF:  Watch your step
12   and sit right up there, sir.
13                   THE POTENTIAL JUROR:   Here?
14   (Indicating)
15                   THE BAILIFF:  Yes.  Take your
16   coffee up there if you want, you may need a sip of it.
17
18        CARL EUGENE SMITH, Potential Juror #307,
19   was called as a Potential Juror and, having been
20   previously sworn by the Court, testified as follows:
21
22                   THE COURT:  Good morning, sir.
23            Go ahead and take a seat.
24            Are you "Carl Smith?"
25                   THE POTENTIAL JUROR:   Yes.

1        THE COURT:  This is juror 38.

2        Mr. Smith, first I appreciate you coming

3   down  on  shorter  notice,  we  had  a  couple  of  jurors

4   scheduled before you but for reasons I don't need to go

5   into we are not going to talk to those two individuals.

6        That left us without anyone to talk to

7   so again thanks for rearranging your schedule.

8        Mr.  Smith,  I'm  Gary  Stephens,  I  am

9   presiding over the jury selection and trial in this case.

10       There  are  two  District  Attorneys  that

11  are representing the State.  Present in the courtroom is

12  Mr. Richard Townsend, he is the District Attorney from

13  Morris County.

14                 THE POTENTIAL JUROR:  Yes.

15                 THE COURT:   His  partner  for

16  this case is Randy Lee, he's in a murder trial in another

17  county, cannot be here.

18       We have two Defense Attorneys present,

19  we have Mr. Bird Old, III.

20                 MR. OLD:  Good morning.

21                 THE COURT:  Mr. Lance Hinson.

22                 MR. HINSON:  Good morning.

23                 THE COURT:  Next to Mr. Hinson

24  the person charged, Mr. Billy Joe Wardlow.

25       Now, Mr. Smith, the lawyers have read

your questionnaire and they are familiar with your answers, they are going to talk to you about some of those answers and they are also going to talk to you about the principles of law and issues involved in a death penalty case.

You will be asked a lot of questions and the answers will let us know whether or not to put you on the jury.

In order to be a juror you must be able to understand and follow the law, you don't even have to agree with the law.

If you disagree with some aspect of our law but you can still follow the law you are qualified but if you can't follow the law you are not qualified.

So we will explain some of the laws to you and ask you what you think about them, whether you can follow them.

And, sir, we need more than "Yes, I can follow the law" or "No, I can't."

In a death case we have found even though most people can follow the law that doesn't necessarily mean that this is the type of case they should be on so we want to know what you think about our laws and think about some of the issues we will discuss.

The lawyers may also use examples to try

1    to illustrate a point.    If they do I want you to

2    understand they are not using examples or fact situations

3    from this case.   The alleged facts of this case will be

4    brought out in trial and it's inappropriate for us to get

5    a juror to try to pre-judge a case.   So when we are

6    talking about some fact situation it has no relevance to

7    this case at all.

8                 Now, we frankly don't care what your

9    answers are but we very much care to understand how you

10   feel.

11                So what we want you to do is just open

12   up and be honest with us and we will try to decide

13   whether or not to put you on the jury.

14                There are no right or wrong answers,

15   there are no right or wrong opinions.

16                          THE POTENTIAL JUROR:   Right.

17                          THE COURT:   Just yours, sir.

18                The trial will not begin until after the

19   first of the year, it will probably last two weeks so I

20   need to know, sir, if you know of any reason that you

21   could not serve for a two-week period on this jury in

22   January of '95 if chosen?

23                          THE POTENTIAL JUROR:  No.  No.

24                          THE COURT:   Do you have any

25   questions of us?

1          THE  POTENTIAL  JUROR:    Not

2  right now.

3          THE COURT:  Mr. Townsend.

4          MR. TOWNSEND: Thank you, Your

5  Honor.

6

7              VOIR DIRE EXAMINATION

8              BY MR. TOWNSEND

9

10  Q       Mr. Smith, I noticed from looking at your

11  questionnaire that you had had open heart surgery.

12              How long ago was that?

13  A       December the 8th.

14  Q       It has been about a year?

15  A       Yes.  Almost a year.

16  Q       Is your health good at this time?

17  A       Right.

18  Q       That would hinder you so far as serving on the

19  jury?

20  A       No, sir.

21  Q       Okay.  You said you worked part-time, you

22  cannot sit for a long time.

23              Generally in here we will take a break

24  about every hour or hour and a half, would that be any

25  kind of problem for you?

A        No, sir.

Q        All right.  We got that out of the way and let me ask you or first tell you that like the Judge said, there's no right or wrong answers, we are simply seeking to sort of find out what your opinions are.

I'm going to ask you some questions about law, some questions about the death penalty in particular.

When I get through the other side will ask you some questions sort of from their point of view.

I have read your questionnaire and understand what you have said about the death penalty and I want you to know that the State through the District Attorney's Office is seeking the death penalty in this case and talk to you a little bit about the way the death penalty works in Texas.

I think maybe back in the old days the jury went back and if they found the defendant guilty of capital murder maybe they just voted whether to give him a life sentence or the death penalty.

It's done differently in Texas now. Once you decide if a person is guilty or not guilty then there's a punishment hearing that is held, once you have heard all that evidence then you go back and answer a couple of questions and that, the answer to those

1    questions determine whether the defendant receives the

2    death penalty or not.

3                        So it's a little bit different.

4                        Let me talk to you first about the kind

5    of juror we need, those kind of jurors who can keep an

6    open mind as to whether the appropriate punishment in a

7    case should be a life sentence or the death penalty.

8                        From your questionnaire it appears that

9    you believe in the death penalty in some murder cases and

10   that a life sentence would be appropriate in some murder

11   cases, is that kind of the way you still feel?

12   A            Dependant on the circumstances and evidence put

13   out.

14   Q            Okay. Let me talk to you about murder in Texas

15   a little bit; murder in Texas takes on two forms,

16   basically there is what I call "plain murder" which is

17   a non-capital murder, the most a person can be punished

18   for that murder is either a life sentence or 99 years,

19   they cannot receive the death penalty.

20                       And that type murder is the murder where

21   someone has intentionally or knowingly caused another

22   person's death and that is to say without legal

23   justification or excuse. We are not talking about a case

24   of self defense or accident but someone has intentionally

25   caused another person's death and didn't have a good

1   excuse for it but that's not punishable by the death

2   penalty.

3           The only type murder in Texas that is

4   punishable by the death penalty is capital murder.

5           Capital murder is that intentional

6   causing of death like in the plain murder plus something

7   else.  And that plus something else can be one of several

8   things, for instance, murder of a police officer or

9   fireman following their line of duty, murder that takes

10  place during the commission of a robbery or burglary or

11  rape or kidnapping.

12          The kind of jurors we have got to have

13  are those jurors that can keep an open mind throughout

14  the trial as to what the proper punishment should be and

15  that is to say that their mind is not made up, they

16  haven't discussed that the person should receive a life

17  sentence for a capital murder or they haven't decided

18  that the person should receive the death sentence for a

19  capital murder, they are just going to keep an open mind

20  on that until they have heard all the evidence.

21          Could you do that?

22  A      Yes, sir.

23  Q      Okay.  I'm going to show you what has been

24  marked, I think it says "Exhibit 3" up there, the copy

25  of the indictment in this case.

1          THE COURT:  It's under that

2    page right there.  (Indicating)

3          THE BAILIFF:  Right there.

4    (Indicating)

5          THE COURT:  No.  I think --

6          THE BAILIFF: You just had it.

7          THE POTENTIAL JUROR:  Second

8    one?

9          THE COURT:  That's it.

10   (Indicating)

11         THE POTENTIAL JUROR:  Okay.

12         MR. TOWNSEND:  If you would

13   just read that to yourself and I will talk to you about

14   it.

15         THE POTENTIAL JUROR:  Okay.

16   Q        (BY MR. TOWNSEND) Okay.  Mr. Smith, that's a

17   copy of the indictment in this case and you see where

18   it's -- if the State could prove everything in that

19   indictment that that would not be just plain murder, that

20   would be what we call capital murder because we have

21   alleged both a murder and a robbery?

22   A        Yes.

23   Q        Okay?

24   A        Yes.

25   Q        If you will there is a sheet of paper up there

1     that is -- I call it a "flow chart", looks like that.

2                Do  you  have  that  in  front  of  you?

3     (Indicating)

4     A          Right.

5     Q          Okay.   That  just  kind  of  describes  how  a

6     capital  murder  trial  goes  and  I  will  go  over  that  with

7     you  real  quick;  first  of  all  you  start  out  at  the  top  of

8     the  page,  you  are  going  to  hear  the  guilt  or  innocence

9     phase  of  the  trial,  you  are  going  to  hear  a  lot  of

10    evidence  and  that  evidence  pertains  as  to  whether  the

11    defendant  committed  the  crime  or  not.

12               At  the  end  of  hearing  all  that  evidence

13    then  the  jury  will  go  back  and  deliberate.

14               If  the  jury  decides  that  the  defendant

15    is  not  guilty  then  the  trial  is  over  and  everybody  goes

16    home,  if  on  the  other  hand,  the  jury  decides  the

17    defendant  is  guilty  then  you  go  down  to  this  next  phase

18    of  the  trial  in  the  middle  of  the  page  there  which  is  the

19    "punishment  phase"  then  you  are  going  to  hear  more

20    evidence.

21               Now,  that  evidence  will  not  pertain  to

22    whether  the  defendant  is  guilty  or  not  guilty  because  you

23    have  already  made  that  decision,  that  evidence  is  going

24    to  pertain  strictly  to  try  to  help  you  determine  whether

25    the  proper  punishment  should  be  a  life  sentence  or  the

1    death penalty.

2             You might hear evidence of family, the

3    defendant's family history, the defendant's education,

4    the defendant's mental ability, you might hear from a

5    psychologist, you might hear from a psychiatrist, you

6    might hear from the defendant's minister, you might hear

7    evidence of the defendant's prior bad acts of misconduct

8    or prior crime.  Just any sort of thing, almost anything

9    you can imagine you might hear at a punishment hearing.

10            Then after you have heard all that

11   evidence you decide the answer to Special Issue #1 and

12   that Special Issue is a question and we will go over what

13   those questions are in just a minute but for right now

14   you are going to have a question there that you answer

15   "Yes" or "No" and you do that based on the evidence that

16   you have heard.

17            If you decide the answer to that should

18   be "No" then the defendant receives a life sentence, if

19   you decide the answer to that is "Yes" then you go to

20   Special Issue #2.

21   A        Yes.

22   Q        Special Issue #2 is another question that you

23   answer "Yes" or "No."

24            If you answer that question "Yes" then

25   the defendant receives a life sentence, if you answer

that question "No" then the defendant receives the death penalty.

So what we are looking at here is if you answer that first question "Yes" the second question "No" the defendant receives the death penalty, answer them any other way he will receive a life sentence.

So what you are really doing is answering these questions, you are not deciding whether he gets the death penalty or not, you are just answering those questions but of course you are going to know what the results are because I just told you.

If it's "Yes" and "No" he gets the death penalty, if it's anything else he doesn't.

And, now, you are probably wondering what those questions are, there's a sheet up there that says "Special Issues" on the top, if you will look at that sheet -- have you got the sheet there?

A          Yes.

Q          If you will just read Special Issue #1 and then we'll talk about it.

Okay.  On that you have to weigh all the evidence and all that before you can really make any decision at all, right?

A          Right.

Q          That's correct.  And that's what you should do.

1              Let me talk to you just about Special

2    Issue #1 and we will go over Special Issue #2 in a little

3    bit.

4    A       Okay.

5    Q       And Special Issue #1 basically talks about the

6    future dangerousness of the defendant, is that kind of

7    the way it looks to you?

8    A       Yes, sir.

9    Q       Let me point out a few things there, one is in

10   a criminal case we are required to prove the defendant

11   is guilty beyond a reasonable doubt.

12              If you will notice there on that first

13   line of Special Issue #1 we are also required to prove

14   Special Issue #1 to you beyond a reasonable doubt?

15   A       Right.

16   Q       And then down on that second line is that --

17   the word that's marked in a little darker lettering

18   there, "probability."

19              "Probability" in Texas law is defined

20   as "more likely than not."

21              I call it just a little bit more than

22   50/50.  It's more likely than not.

23              Basically    your    definition    of

24   "probability" if you were giving the definition is that

25   about the way you see that word?

A        Yes, sir.

Q        Okay.  Then on further on the second line it describes criminal acts of violence, it says, you know, we are required to prove to you beyond a reasonable doubt, it's basically more likely than not that the defendant would commit criminal acts of violence.

Now, there's a lot of criminal acts, some of those are violent and some of them aren't.

We are required to prove to you that not necessarily that he would commit another capital murder but that he would commit some criminal act of violence.

Of course forgery and theft, those aren't acts of violence but on the other hand, assault, attempted murder, things like that are criminal acts of violence that would constitute a continuing threat to society.

When you and I think of "society" we probably think of in our homes and on the street and that sort of thing but actually "society" under the law, "society" is the people, no mater where they are or what they are doing, even if they are in the penitentiary those people that are in the penitentiary, those inmates are part of society, those guards are part of society as well, the nurses and doctors, anyone out on the street is part of society so we are not required to prove to you

1   that he would commit a criminal act of violence in any

2   particular spot, whether it be the penitentiary or

3   anywhere else but just somewhere else in society.

4            Are you with me on all that?

5   A        Right.

6   Q        The important thing on Special Issue #1 is that

7   -- and Issue #2, but we will go to Number One first, is

8   I have had jurors who have come in here and said, "Okay.

9   Now, if I find a person guilty of capital murder then I

10  really don't need to hear that punishment evidence.   I

11  am already going -- I already feel I know that my answer

12  to Special Issue #1 is going to be 'Yes'."

13           You see, they are not a qualified juror

14  because they are not waiting until they have heard that

15  evidence during the punishment hearing to help them make

16  their decision, they are shutting their mind, you might

17  say?

18  A        Right.

19  Q        And what we need are those jurors who can keep

20  an open mind throughout that punishment hearing before

21  deciding what their answer should be on Special Issue #1.

22           Do you believe you could do that?

23  A        Yes.

24  Q        Okay.  Now, keep in mind that evidence you have

25  heard during the guilt and innocence phase of the trial,

1    we are not expecting you to forget that, you can

2    certainly use that in helping you determine Special Issue

3    #1, but, you know, you can't just use that, you have got

4    to also listen and consider that evidence that you hear

5    during the punishment hearing.

6              Do you believe you could do that?

7    A       Yes, sir.

8    Q       Okay.  Now, if you will read Special Issue #2

9    and we will talk about that for a little bit.

10             Okay.  Mr. Smith, this is a legal

11   mouthful there, isn't it?

12   A       It is.  It's hard to understand for a layman.

13   Q       Okay.  Basically after you found the defendant

14   guilty in -- of capital murder, and keep in mind as the

15   Judge said, we are not really talking about this case,

16   we are just talking about capital murder cases in

17   general.

18             Let's say you are a juror on a capital

19   murder case, you found a defendant guilty of capital

20   murder, you answer "Yes" to Special Issue #1 because if

21   you answer "No" you never would get to Number Two.

22   A       Yes.

23   Q       Say you have answered "Yes" to Number One, when

24   you get to Number Two that, unlike Special Issue Number

25   One where we have got to prove it to you beyond a

1    reasonable doubt we don't have to prove it to you on

2    Number Two, it's just your opinion.

3    A        Yes.

4    Q        You know, what do you think, is this a death

5    penalty case or is this a death penalty type defendant,

6    you know, we are not --

7    A        Well, I really can't hardly make a decision

8    until you hear all the evidence and see which way you

9    want to go with it.

10   Q        Right.

11            In Special Issue #2 I think the

12   significant line in there is that where it starts out and

13   says, "sufficient mitigating circumstance" or

14   "circumstances."

15            And that term basically means -- and

16   "mitigating evidence" is defined there at the very

17   bottom? (Indicating)

18   A        Yes.

19   Q        And that's evidence that reduces the

20   defendant's moral blameworthiness or reduces his blame,

21   it doesn't excuse his behavior but maybe reduces in a

22   person's mind the amount of blame that a person should

23   receive for that behavior.

24            "Sufficient mitigating circumstance",

25   that means just the fact that something is mitigating

doesn't mean it reduces, that you give him a life sentence rather than the death penalty, it has to be sufficient in your mind, enough mitigating circumstance or circumstances, the type of evidence that you might hear in a punishment hearing.

And you know, you might hear this evidence from either this side of the room or from that side of the room but basically what we are talking about is evidence that might make you feel that the defendant was a little less blameworthy than you might normally think.

And many things in many people's mind could cause them to believe that, it depends on how you feel about certain kinds of evidence.

For instance, you might -- if there was evidence that a capital murder defendant was mentally retarded some people might feel like that reduces his blame to some extent, if there was evidence presented that a capital murder defendant was intoxicated one juror might listen to that and say, "Well, he's not quite as much to blame because he was intoxicated", another juror might say, "Well, it doesn't make me any difference, he's still responsible."

So, you know, it might, you know, some people might feel like if the defendant had a rough

1    upbringing or something that might excuse him -- not

2    "excuse it" but reduce the blame to a certain extent.

3              So, anyway what one person might feel

4    is sufficiently mitigating another person might not feel

5    that way at all.  So it's just kind of up to your

6    opinion.

7              The important thing about Special Issue

8    #2 is that before you make your decision on Special Issue

9    #2 even though you found him guilty of capital murder,

10   even though you decided he's a continuing threat to

11   society but you base your answer to Special Issue #2 on

12   all that evidence that you have heard up until then.

13             Could you do that?

14   A         Yes, sir.

15   Q         Okay.

16   A         Because I don't believe a person is not

17   responsible for their mind, they are drunk, that's their

18   responsibility.

19   Q         We are not trying to pin you down.

20   A         I know that.  I understand.  But I'm just

21   telling you how I feel about it, a person's upbringing

22   and all this because I have been down that road.

23   Q         Okay.  One thing that we -- that is important

24   in deciding Special Issue #1 or Issue #2, and I think

25   sometimes more so with Issue #2 is that you are going to

hear all the evidence during the punishment hearing.

In order to be a qualified juror we have got to have those jurors who will keep an open mind and listen and consider all that evidence.

A  Yes.

Q  Now, that doesn't mean you have to give weight to it.

A  Right.

Q  It doesn't mean you have to say, "Hey, that's important because I heard it", you know, you can hear it and decide, "Well, that just doesn't seem important to me" or "I'm not sure that that has anything to do with this case", you know.

For instance, some people don't believe very much or any in psychologists or psychiatrists and that's fine, whatever a person believes is fine but in order to be a qualified juror we have to have those kind of jurors who will keep an open mind and whether that witness is a psychologist or a minister or the defendant's mother or whoever it might be that that juror will keep an open mind and listen and consider all their testimony and then decide whether they think it's important or not and not just say, "Well, that person, that's the defendant's mother, obviously she is going to be doing this or doing that" or "That's a psychologist,

1    I don't believe anything they have got to say."

2         We have got to have people that will be

3    -- will listen to that evidence, consider it all and then

4    make up their mind as to what the correct answer should

5    be to that question.

6         Could you do that?

7    A         Yes.

8    Q         Okay.   One thing that is important on these

9    Special Issues is that you answer those questions as the

10   evidence dictates it to you that you should answer those

11   questions and not being a case "Well, I think this guy

12   needs a life sentence so I'm going to answer this way"

13   or "I think this guy needs the death penalty so I'm going

14   to answer this way."

15        Could you do that?

16   A         Yes, sir.

17   Q         And just let the chips fall where they may?

18   A         Yes, sir.

19   Q         Just give your honest answer, what you think

20   is appropriate and if it turns out it's a life sentence,

21   okay, if it turns out it's the death penalty, okay?

22   A         Right.

23   Q         Could you do that?

24   A         Right.

25        I am retired Military and I have been

1    on quite a few court marshals so I understand what you

2    are talking about.

3    Q        When you say you "have been on court marshals",

4    you mean as a juror or a witness?

5    A        Both.

6    Q        "Both?"

7             Okay.  Well, in the Military I know that

8    you are required to follow the rules and that's kind of

9    the way this is in Court, there are certain rules just

10   like in life where we are required to pay our taxes, we

11   may not like it but we do it anyway?

12   A        Yes.

13   Q        Well, that's the way it is in Court, you have

14   rules that you have to follow and in order to be a

15   qualified juror you don't have to agree with those rules

16   as long as you can follow the law and follow those rules.

17            Do you believe you could do that?

18   A        Yes.  I did for 20 years.

19   Q        Okay.  There are several things about a capital

20   murder trial that are -- that are different, several

21   things that are, you know, very similar to other trials.

22            In a capital murder trial when you are

23   considering the answer to Special Issue #1 and Issue #2

24   if a person is found guilty of capital murder they are

25   going  to  be  required  to  serve  35  years  in  the

27

penitentiary, 35 calendar years if they receive a life sentence before being eligible for parole.

That doesn't mean that they would get a parole at the end of 35 years, they might get it at the end of 35 years or they might never get it but they would become eligible for parole at the end of 35 years.

I believe the Court in its instruction to you before you deliberate punishment I believe the Court would instruct you that in order to follow the law what you have to do is assume that a life sentence is a life sentence and assume the death penalty is the death penalty and not consider parole in any way.

Now, human nature being what it is we are not asking you to put that out of your mind because obviously if a person gets something in their mind they can't get it out but basically to set it aside when you are deciding on Special Issue #1 and Special Issue #2 and decide those answers like I just said based on the evidence and let the chips fall where they may and not say, "Well, I'm going to answer this a certain way because I am concerned about parole."

Could you do that?

A       Yes.

Q       And not use parole in any way in your consideration to either one of those questions?

A        No, sir.

Q        I want to shift gears with you a little bit and talk to you about some areas of the law that pertain not only to capital murder cases but maybe to other type cases as well.

The range of punishment in a murder, which is what we talked about earlier, not a capital murder but a non-capital murder is from five years probation to 99 years or life.

Now, of course murder in Texas can be a lot of different things, it can be a very vicious type crime, on the other hand, it can be basically a mercy killing where an older couple lived together for years and one of them has cancer and is in a lot of pain and begs the other one to pull the plug.

If the other one pulls that plug in Texas that's murder because they have intentionally caused another person's death but most of us may not look at that the same way as we look at some vicious type crime, type murder.

So the range of punishment is broad so that at jury can listen and consider all the evidence before they decide, you know, what would be the appropriate range of punishment, whether it's five years probated or 20 years in the penitentiary or 99 years or

life in the penitentiary.

If you are a juror on a murder case in order to follow the law you would have to be able to consider that full range of punishment.

That's not to say you have to give 99 years or you have to give five years probation but you have to be able to consider all of it.

Could you do that?

A       Yes.

It comes back to evidence again.

Q       Okay.  Let's say you are a juror in a capital murder case and let's say where the indictment -- of course we are required to prove what -- the State is required to prove what is in that indictment and let's say the capital murder case is a murder and robbery and in order for us to -- for you to find the defendant guilty of capital murder in that situation we have got to prove to you beyond a reasonable doubt not only the murder but also the robbery.

If we prove the murder to you but we didn't prove the robbery to you you would have to find the defendant not guilty of capital murder but guilty of that lesser offense of murder.

Could you do that if we didn't quite prove our robbery to you?

A        Yes.

Q        Okay.  And the reason -- one of the reasons for an indictment is to give the defendant notice as to what he's charged with and for that reason we are required to prove capital murder by what is on the indictment.

And when I say that what I mean is we have to prove murder and robbery.

Murder and rape is also capital murder but if murder and rape is not in that indictment and, for instance, for some wild reason the evidence showed you that we proved a murder but not a robbery but we did prove a rape, still we haven't proved what we put in that indictment so you would have to find the defendant not guilty of capital murder but guilty again of murder.

Could you do that?

A        Yeah.

Q        Okay.  And all that sort of relates back to the burden of proof.

Let me mention one other thing about a murder case, a murder can be proved by saying, you know, we can prove that one of two ways, that someone intentionally caused another person's death or that they knowingly caused another person's death.

The legal definition of those are a little different.

1   "Intentionally", that it was your
2   conscious objective or desire to do this, "knowingly" is
3   a little bit less than that in that it's, you do it and
4   you knew it could be, it was likely to occur but you
5   didn't set out to do it that way, you knew if you did
6   what you did it was likely to happen but you didn't set
7   out to do it.

8   If we proved in a capital murder --
9   murder case you can prove intentionally or knowingly
10  either one and that's sufficient but in a capital murder
11  case we have got to prove it was intentional.

12  Let's say we proved the robbery to you,
13  we proved the murder to you but we didn't prove that it
14  was done intentionally, we only proved that it was done
15  knowingly so the defendant could not be found guilty of
16  capital murder but they could still be found guilty of
17  murder.

18  If that happened would you find the
19  defendant not guilty of capital murder and just guilty
20  of murder?

21  A        Yes.

22  Q        The burden of proof in a criminal case is
23  beyond a reasonable doubt and that's a burden that the
24  State has.

25  The Defense, on the other hand, has no

1  burden of proof, they are not required to prove that he's

2  not guilty, we are required to prove that he is guilty

3  and that's something we accept and we knew going in it

4  was that way and that's just the way the law is and

5  that's fair.

6          Is that okay with you?

7  A       Yes.

8  Q       All right.  Along with that burden of proof is

9  the Fifth Amendment privilege and that's the defendant's

10  right not to testify.

11          If the defendant chose not to testify

12  during the guilt or innocence phase of the trial in order

13  to be a qualified juror you cannot hold that against him

14  in any way in deciding whether he was guilty or not

15  guilty.

16          Could you do that?

17  A       Yeah.  But it would still put a doubt in your

18  mind why he didn't testify to defend himself.

19  Q       Mr. Smith, I think it's human nature that you

20  would be curious.

21  A       Right.

22  Q       And you would wonder and maybe think to

23  yourself, "Well, if it was me I would want to get up

24  there and tell my side of the story" but there may be any

25  number of reasons why the defendant would not testify and

1  that's not really for us to speculate about.

2  A       Right.

3  Q       But it kind of goes back to following the

4  rules, the law says and again I used the phrase several

5  times, we know you can't put it out of your mind, we are

6  not asking you to put it out of your mind but we are

7  asking you to lay that aside and decide this case based

8  on the evidence presented and not say, for instance,

9  "Well, they didn't quite prove it but since he didn't

10  testify that's probably good enough."

11       You know, we have got to have jurors

12  that cannot hold it against him in any way.

13       Like I said, not necessarily put it out

14  of your mind but not use that in your decision-making

15  process at all and base your decision strictly on the

16  evidence that is presented, could you do that?

17  A       Yes.  But you would still have that doubt like

18  you was talking about why he didn't.

19  Q       Well, again, that is human nature and that's

20  okay as long as you don't use it in any way in deciding

21  whether he's guilty or not guilty.

22       Could you do that?

23  A       Yes.

24  Q       Okay.

25       THE COURT:  Thirty minutes.

1          MR. TOWNSEND:  Thank you, Your

2     Honor.

3                And the same holds for that punishment

4     phase of the hearing, again, going back to human nature,

5     I think it's human nature for a lot of people to think,

6     "Well, we found this guy guilty of capital murder, in

7     order for me to give him a life sentence it would sure

8     make me feel better about it, I want him to get up there

9     and say he's sorry."

10               But  again,  that  Fifth  Amendment

11    privilege, he doesn't have to get up there and testify,

12    he doesn't have to say he's sorry, he doesn't have to

13    testify in any way unless he chooses to.

14               And again, in order to follow the law

15    we have got to have the type juror who in answering

16    Special Issue #1 and Special Issue #2 will answer those

17    questions strictly based on the evidence, not hold it

18    against the defendant in even a small way if he chooses

19    not to testify because, after all, you don't know why he

20    did it?

21               THE POTENTIAL JUROR:  You are

22    right.

23    Q          (BY MR. TOWNSEND)  Could you do that?

24    A          Yes.

25    Q          Mr. Smith, there could be any number of reasons

1    why a defendant might not testify, he might stutter, he

2    might be so nervous that he just couldn't do a good job

3    of testifying, he might be -- he might want to testify

4    but yet his attorney advised him against it, you know,

5    there's a lot of reasons there that really are no concern

6    of those people on the jury so far as making their

7    decision.

8                    Like I said, human nature, you might

9    wonder about it and that's okay so long as you don't use

10   that as part of your decision-making process, okay?

11   A          Okay.

12   Q          You could do that?

13   A          Yes.

14   Q          Talking about the indictment awhile ago, the

15   indictment, I think the Judge told you back in October

16   when you were here an indictment is not evidence of

17   anything, that's merely a charging instrument that the

18   Grand Jury uses to notify the defendant what he's charged

19   with but you cannot consider it evidence of any kind.

20                    Could you do that?

21   A          Yes.

22   Q          Okay.  In many criminal cases, capital murder

23   cases or other type criminal cases you will hear

24   confessions or have read to you a confession or maybe

25   given a copy of a confession to look at.

1          I would expect that the Court would

2     advise you that in order to use that confession as

3     evidence in helping determine whether the defendant is

4     guilty or not guilty you would first have to decide that

5     the confession was truthful and voluntary.

6          And when I say "voluntary" I mean

7     legally voluntary and of course voluntary legally means

8     what you and I think of as "voluntary", that is to say

9     he wasn't beat up or forced to do it but it means other

10    things, too; there are times when it's appropriate under

11    the law that a defendant be read his Miranda Rights prior

12    to giving a statement of some sort.

13          Are you familiar with that term,

14    "Miranda Rights", that's the right to remain silent?

15    A       Yes.

16    Q       Right to have an attorney present and -- and

17    that sort of thing?

18          There are situations where a confession

19    is not legally voluntary unless the defendant was --

20    excuse me -- read his Miranda Rights.

21          In order for you to follow the law, in

22    order to be a qualified juror you would have to be able

23    to take a confession -- let's assume that you believe the

24    confession is truthful but you don't believe that he was

25    read his Miranda Rights and it was a time when it was

1  appropriate and he should have been read his Miranda

2  Rights, in order to follow the law you have to take that

3  confession just like you were talking about some of this

4  other stuff, can't expect you to put it out of your mind,

5  but you would have to set it aside and not use it as

6  evidence in any way because it was not done legally.

7        Could you do that?

8  A   If it wasn't legally you couldn't.

9  Q   You could not use it then, is that what you are

10  saying?

11  A   Right.

12  Q   I thought that's what you were saying but I

13  wanted to be clear on it.

14        When I say you "couldn't use it", you

15  couldn't use it to determine guilt or innocence, would

16  you be able to do that?

17  A   Yes.

18  Q   You wouldn't even be able in determining the

19  credibility of witnesses -- and when I say that what I

20  mean, maybe you have got two witnesses and they are

21  telling sort of different stories but one of them's story

22  kind of goes along with what the confession says, you

23  wouldn't be able to use that confession to help you

24  determine which one of those people's story you went

25  along with, you would have to make that determination

based on just listening to those people and deciding if they sound like they are telling the truth and other evidence that had been presented.

Could you do that?

A        Yes.

It would be what other people said and what they said and weigh it out.

Q        And that also goes for the punishment phase, when you decide the answer to Special Issue #1 and Issue #2 if, let's say for instance you heard a confession and that you decided it was not voluntary but during that confession that you believed to be truthful the defendant describes committing an extremely brutal murder, you would not be able to use that confession to say, "Okay. Now, on Special Issue #1 I think he's going to be a threat to society because I remember back in that confession where he said some bad stuff."

You wouldn't be able to use that confession in any way even for Special Issue #1 and Issue #2, you would have to decide that on the legal evidence that was presented.

Could you do that?

A        Yes.  To be legal.

Q        Mr. Smith, you mentioned in your questionnaire, you may not remember answering this question but you said

1   you had served on jury duty; have you ever served on a

2   Grand Jury?

3   A        No.

4   Q        And you mentioned that you had served in civil

5   cases, have you not served in criminal cases?

6   A        No.

7   Q        You mentioned you had been on court marshals

8   and you said both as a juror and as a witness, I believe?

9   A        "Juror and a panel", sit on the panel, what

10  they call "the panel."

11  Q        Okay.

12  A        With the attorneys.

13  Q        How long ago was that?

14  A        Early 60s, middle 60s.

15  Q        It has been a good long while?

16  A        Yes.

17  Q        You have answered this in your questionnaire,

18  let me ask you again; do you know anything at all about

19  the facts of this case?

20  A        No.

21  Q        Haven't read anything about it?

22  A        I read a little bit in the paper that it

23  happened and all this.  That was it.

24  Q        You haven't talked to anybody about it?

25  A        No, sir.

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    Q        Haven't seen anything on TV about it?

2    A        No.

3    Q        What was it that you read in the newspaper and

4    what do you remember reading in the newspaper?

5    A        That a murder was committed and that the

6    individual was in a closet, I believe the body was found

7    in a closet and a robbery was performed -- I mean a

8    robbery occurred, too.

9    Q        Okay.

10   A        And that had got out, you know, got away.

11   Q        Okay.  Did you ever hear -- do you remember the

12   victim's name?

13   A        No.

14   Q        The victim's name was "Carl Cole", did you know

15   him?

16   A        No.

17   Q        The defendant in this case is Billy Wardlow,

18   do you remember his name being connected with whatever

19   it was that you read in any way?

20   A        No.

21   Q        Let's talk about what you have heard.

22            Of course I think you understand that

23   whatever you read in the newspapers is not evidence?

24   A        Right.

25   Q        Can't be used in any way in helping you to make

1  your determination of guilt or innocence.

2          Let me just talk to you a little bit

3  about -- do you remember -- you said something about "the

4  closet, the victim being in the closet?"

5  A          Yes.

6  Q          Let's just assume that you heard evidence

7  during the trial that the victim was in the closet and

8  maybe you heard evidence that the victim was somewhere

9  else other than the closet, you are going to have to

10 decide this case based on the evidence that is presented

11 here today, not say, "Well, I think I'm going to go along

12 with that person because she told it the way they said

13 it in the newspaper, she went along with the closet

14 story."

15 A          Yes.

16 Q          That would be improper because you are using

17 that newspaper article to help you decide what the

18 evidence is.

19          Could you not -- would you be able to

20 follow the law and not do that?

21 A          Right.  The newspaper is just a story.

22 Q          All right.  Mr. Smith, before I finish do you

23 have any or anything you would like to say, any question

24 you would want to ask me?

25 A          No, sir.

1              MR.   TOWNSEND:     Okay.     I

2    appreciate your answering my questions.

3              I will pass the juror, Your Honor.

4              THE COURT:  We are going to

5    take about a five minute break, no more than that, we

6    will proceed with the Defense.

7              So you can step down, stretch a little

8    bit, we'll come get you.

9

10             (Recess.)

11

12             (The following occurred in the presence

13   and hearing of the potential juror:)

14

15             THE COURT:  Mr. Old, are you

16   going to talk to the juror?

17             MR. HINSON:  I am.

18             THE COURT:  All right.   You

19   may be seated.

20             And, sir, do you have any questions of

21   us at all?

22             THE POTENTIAL JUROR:  Not as

23   yet.

24             THE COURT:  Is there anything

25   you don't understand or want clarified?

1          THE POTENTIAL JUROR:  No, sir.

2          THE COURT:    Okay.    Then the

3    Defense may proceed.

4

5              VOIR DIRE EXAMINATION

6                BY MR. HINSON

7

8    Q          Mr. Smith, my name is Lance Hinson, along with

9    Mr. Old I represent Mr. Wardlow in this matter.

10             I just want to go over some of the

11   documents there in front of you, there's one of them

12   entitled "Witness List?"  (Indicating)

13   A          Right.

14   Q          Would  you  check?    Is  that  a  three-page

15   document?

16   A          Yes, sir.

17   Q          There's several names listed on that document,

18   these  persons  have  been  listed  as  being  possible

19   witnesses to this case as to certain events that happened

20   or forensic tests that were done.

21             Would you look down through those lists

22   of names and if you recognize any of those names, if you

23   know the name or heard the name or whether you know this

24   person would you let me know?

25   A          The   one   "Harry  Washington",   is   he   from

1  Carthage?

2  Q          I'm not sure where Harry is from.   He's from

3  -- he worked here in Mount Pleasant, there might be a

4  "Washington" in that area that is a highway patrolman?

5  A          There is.  The highway patrolman in Carthage.

6  Q          Okay.  Mr. Washington, the one listed here is

7  not a highway patrolman in Carthage.

8  A          He's the one on the drug deal.

9  Q          Do you know him personally?

10  A          No.

11  Q          Okay.

12  A          I just knowed of him.

13  Q          Know of him?

14              How do you know of him?

15  A          Reading in the paper.

16  Q          Is it related to this case or another case?

17  A          No.  Other things.

18  Q          Do  you  have  any  opinion  as  to  Harry

19  Washington's  credibility,  whether  he  would  be  more

20  credible than other police officers?

21  A          No.  I won't make a decision because I don't

22  know him that well.

23  Q          Never met him personally?

24  A          No.

25              No, sir.  I don't recognize no names.

1   Q        Okay.  Another document, Mr. Smith, up there

2   is the indictment.  I believe you looked at that

3   document?

4   A        Yes, sir.

5   Q        Did you have the opportunity to read that

6   document?

7   A        Yes, sir.

8   Q        It states the name of "Carl Cole", are you

9   acquainted with Mr. Cole or any of his relatives?

10  A        No, sir.

11  Q        You know, you understand that an indictment

12  alleges a charge against a defendant but is not evidence

13  that you can consider if you were a juror in this case?

14  A        No.

15           Go back to what I said, you have got to

16  have evidence to prove anything.

17  Q        Could you disregard the indictment if you were

18  a juror and listen to the evidence that was presented to

19  you at the time of trial and base your decision on what

20  you heard and not what you may have read out of the

21  indictment?

22  A        Yes.

23  Q        Based on the indictment a person is brought to

24  trial, does that cause you to believe that the person is

25  guilty because they are brought to trial?

1   A        No.

2   Q        Do you start with the proposition that a person

3   is innocent until proven guilty?

4   A        True.

5   Q        Mr. Smith, there is another document,

6   typewritten marked "Number 6", okay, it starts off, "All

7   persons" there at the top.   (Indicating)

8   A        Right.

9   Q        About a little better than halfway down a

10  paragraph starts "A reasonable doubt.", do you see that

11  paragraph?  (Indicating)

12  A        Yes, sir.

13  Q        Would you read that paragraph and the following

14  two paragraphs and let me know when you get through?

15                      MR. TOWNSEND:  Your Honor, I

16  want to object on this, the definition of reasonable

17  doubt starts there at the paragraph above that where it

18  says "It's not required" and I would like for him to read

19  --if he's going to read I would like him to read that

20  much so he would get the full definition, not just the

21  bottom part there.

22                      THE COURT:  Since we have --

23  I believe that's where we have been starting on everybody

24  else, "The prosecution has the burden of proving the

25  defendant guilty" so I will instruct the juror to back

1    up -- the second full paragraph where it says "The

2    prosecution has the burden of proving the defendant

3    guilty", start there and read to the bottom.

4                        THE POTENTIAL JUROR:   Okay.

5    Okay, sir.

6                        MR. HINSON:   Okay.   Now, you

7    understand that the prosecutor's burden is to prove to

8    you in a criminal case matters beyond a reasonable doubt,

9    is that your understanding of the law?

10                       THE POTENTIAL JUROR:   Yes.

11   Q         (BY MR. HINSON)   And for the Court Reporter's

12   benefit would you answer out "Yes" or "No" or maybe where

13   he gets it down for our record, please?

14   A         Okay, sir.

15   Q         I am sure we all have our own definition of

16   "reasonable doubt" and you read this definition of

17   "reasonable doubt" which I believe the Court will

18   instruct you is the definition of reasonable doubt as

19   used in a criminal case in the State of Texas today.

20                       Is your definition basically the same

21   as this definition of reasonable doubt?

22   A         Yes, sir.

23   Q         And if you were instructed to apply this

24   definition of reasonable doubt could you accept that as

25   your definition and apply the facts in this case to that

1    definition and make your decision based on this

2    definition in Exhibit 6?

3    A        Yes.  I could use that.

4                 I might have some feeling of my own on

5    reasonable doubt.

6    Q        What -- how would your definition differ?

7    A        I may find something in there that I think has

8    been said or something in the evidence that I would hang

9    up on, you know.

10   Q        You say "hang up on?"

11                Explain.

12   A        It would stick in your mind is what I mean,

13   may be small, it may be large, you know.

14   Q        Are you saying a fact would be proven to you

15   at a certain point during the trial?

16   A        No.  Not necessarily, that you would go -- keep

17   -- your mind would be going back to that one point or

18   something, you know, evidence must be proved -- I don't

19   know how you would say -- evidence would still be there,

20   you know, you would have to prove it but yet you would

21   have to go along with the reasonable doubt like you have

22   got wrote in here.

23                I can't explain exactly what I mean.

24   Q        If a fact was proven to you during the course

25   of the trial could you wait until the end of the trial

1     after you have heard all the evidence to make your

2     decision in that case on that fact or do facts become

3     established in your mind as the trial progresses?

4     A     No. You would have to wait until you hear the

5     whole evidence and give an individual a fair trial.

6     Q     When you say you "go back to something that

7     stuck in your mind", is there some way you can explain

8     that?

9            I don't really understand what you mean.

10     A     Well, you know, like you have somebody saying

11     one thing and then somebody else says something else and

12     somebody else says something else, you would have to

13     figure the whole mess, which was the truth and which

14     wasn't the truth and you would be waiting to find out

15     what that was.

16     Q     I'm not trying to pick on you, I'm just trying

17     to get an answer that we can understand.

18     A     I understand.

19     Q     Where we started there on the paragraph "A

20     reasonable doubt", the second sentence in there, "is the

21     kind of doubt that would make a reasonable person

22     hesitate to act in the most important of his own

23     affairs."

24            Do you find that, that sentence?

25     A     Yes.

1    Q        And that's part of the definition of reasonable

2    doubt.

3                     If you listen to evidence, if you were

4    a juror and you were instructed by the Court on this

5    definition of reasonable doubt would you require the

6    State to prove facts to you?  Facts to you beyond what

7    is required by the definition?

8    A        No, sir.  I would be -- it would come out, you

9    know, what I would think.

10   Q        Would it come out that it took less evidence

11   than what is defined as a "reasonable doubt" to make that

12   fact credible with you?

13   A        No.

14   Q        So you could keep the definition of reasonable

15   doubt and apply the facts?

16   A        Yes.

17   Q        As to that definition?

18   A        Yes, sir.

19   Q        There is another document, it's got "Special

20   Issues" at the top of it.  (Indicating)

21   A        Yes.

22   Q        And I believe you have read those.

23                     On Special Issue #1 there you talked a

24   little bit about "probability as being more likely than

25   not" and that's somewhere around your definition of

1    "probability?"

2    A       Yes.

3    Q       Somewhat more than 50 percent?

4    A       Yes.

5    Q       Can you explain how your definition of

6    reasonable doubt is as compared to what your definition

7    of credibility is?

8    A       The only thing I could say about that would be

9    that from the evidence didn't all mount up, you know,

10   come to one area, I mean to one point, prove itself as

11   the truth, if it's not the truth I can't go with it.

12   Q       A fact proven beyond a reasonable doubt, is

13   that a higher burden than a probability or about the same

14   or in your own opinion?

15   A       I would say "reasonable doubt."

16   Q       Is a higher burden or about the same?

17   A       They are about the same I would say.

18   Q       And you have mentioned, "A probability" would

19   be a little more than 50 percent?

20   A       Yes.

21   Q       Now, Special Issue #2 there, you see the

22   highlighted words or it's in bold, "mitigating

23   circumstances?"  (Indicating)

24   A       Yes.

25   Q       And you read the definition of -- there at the

bottom, "Mitigating evidence is evidence that a juror

might regard as reducing the defendant's moral

blameworthiness?"

A        Yes.

Q        Now, during the course of the trial if certain

evidence that may or may not be presented to you, we

believe there will be some in each case that may come

from either the State's side or from the Defense side and

as you listen to that what we might consider mitigating

evidence may not be mitigating evidence to you and this

is the type of evidence that doesn't excuse the person's

act for what he did but as the definition says, it might

reduce his moral blameworthiness because of age or

background, family upbringing, religious history, other

factors that in your opinion may make a life sentence

more appropriate than a death sentence?

A        Yes, sir.  I look at a person's upbringing and

all is their own, they make their own, you know, I can't

hold that as anything, you know, because they are the one

that makes the decision on their upbringing.

         And I had a hard row and my life has

been straight.

Q        If in a trial if someone presented evidence of

someone's family history or background or how they were

raised could you consider, but I'm not saying will you

consider, but could you consider that as mitigating evidence without rejecting that as mitigating evidence?

MR. TOWNSEND:  Object to the form of the question, Your Honor.  He's not required to consider anything as mitigating, he's just required to consider all that evidence and listen to it and then decide whether he considers it mitigating or not.  He's not required to consider something mitigating if in his opinion it's not.

THE COURT:  Sustained.

You may rephrase it.

MR. HINSON:  Would you consider as a juror in a trial in a capital murder trial say evidence of someone's history or background is presented, in your own mind are you going to reject that evidence as mitigating evidence?

MR. TOWNSEND:  Again, Your Honor, he's calling on him to tell what he would do, it's perfectly permissible for him to reject that as mitigating evidence if he chooses to.  He's only required to listen to it and consider.

As long as he will listen to it and consider it, that he has already testified that he would do.

THE COURT:  I think he has a

further obligation to listen to it, consider it and he's not required to give it full force and effect. There's a lot of things that might come out in the trial, a person's age, background, psychological state of mind. The law doesn't say that this is and this is not a mitigating circumstance, the law says we should all keep our mind open and if we hear this and we think it's mitigating give it effect, if we don't think it's mitigating we can dismiss it.

But what the Defense is asking you; is there certain areas that you are just not even going to listen to and consider because you have your mind made up, it wouldn't have any effect on you at all or will you listen and give it what effect or give it effect if you believe after hearing it that it did have some effect on the action?

THE POTENTIAL JUROR: I will just have to wait and hear, it goes with the evidence.

THE COURT: Some people tell us, "I couldn't ever listen to that psychiatrist."

THE POTENTIAL JUROR: I can't say that because my girl is a nurse.

THE COURT: That's the point he's trying to make, the law requires we listen to evidence, if we think it's mitigating sufficient to

1    justify a life sentence we give it that effect, we listen

2    to it and not find it mitigating to give a life sentence

3    then we can disregard it.

4                      I just want to make sure that you are

5    not having your mind closed to these areas before we even

6    start.

7                               THE POTENTIAL JUROR:  No, sir.

8                               THE COURT:  Mr. Hinson.

9                               MR. HINSON:  Mr. Smith, what

10   I'm trying to understand, you are talking about your

11   upbringing, is that going to influence your decision as

12   a juror in this case to where you would be more inclined

13   to not consider evidence of family background or history?

14                               THE POTENTIAL JUROR:  No.  But

15   it's still a thought, if I can do it somebody else can

16   do it.  There's no --

17   Q        (BY MR. HINSON)   If you can do what?

18   A        If I come from hard knocks they can do the hard

19   knocks, you know.

20                      I just took the right road, I feel

21   everybody else can, too, if I did why can't they do it,

22   you know?

23                      It makes you think.

24   Q        Does that put you as a juror in a case in a

25   position of wanting -- where a person doesn't take the

1    right road -- of wanting to assess the death penalty more

2    than a life sentence?

3    A        No, sir.

4    Q        During this trial you might hear evidence

5    regarding age or as the Judge stated a psychological

6    test, would you listen to that evidence and consider that

7    evidence without rejecting it once the witness took the

8    stand?

9    A        Yes.

10   Q        And when I say "that evidence", evidence of

11   psychological tests, could you consider that, listen to

12   it?

13   A        Yes.

14   Q        Religious upbringing?

15   A        Yes.

16   Q        And I believe we have sort of walked around the

17   personal history or the family background; you would be

18   in the same position on that evidence?

19   A        Yes.

20   Q        Evidence of age, age of a person at the time

21   an incident occurred?

22   A        I mean that to me he knows right from wrong

23   there I consider there on his age.

24   Q        Are you saying you couldn't consider age?

25   A        No, sir.

1    Because he should know right from wrong

2    if he's old enough to know it.

3                    MR. TOWNSEND:   Your Honor, I

4    ask that the Court rephrase that in such a way that the

5    juror understands the difference between "considering and

6    considering" and, you know, "considering in giving

7    mitigating weight."

8                    THE COURT:    I think the

9    question was clear enough.   I don't think it would be

10   proper for me to intercede.

11                   MR. HINSON:   Mr. Smith, you

12   talked a little bit about your Military -- you were in

13   the Air Force?

14                   THE POTENTIAL JUROR: Navy and

15   Air Force.

16   Q        (BY MR. HINSON)  What years were you in?

17   A        I went in the Navy in 1956, got out -- no --

18   I went in in '53, got out in '56, went in the Air Force

19   in '56 and got out in '72.

20   Q        And you said that as a juror and a witness you

21   were involved in some court marshal activity?

22   A        Yes.

23   Q        What was your job in the Navy and Air Force?

24   A        Well, Navy I was a Bosun's Mate and the Air

25   Force I worked in Civil Engineering.

1    Q        Did they send you to school?  Did you get any

2    advanced degrees?

3    A        I went to some college on my own, I did go to

4    some technical schools.

5    Q        So what you did for the Navy and Air Force was

6    not related to police enforcement or --

7    A        No, sir.

8             Every once in awhile you would have the

9    duty of escorting somebody somewhere, it's a detail that

10   you would have.

11   Q        I worked for the Army for a little while but

12   I have never been in the Service.

13            The Military Police, is that a branch

14   within that you would not have been part of the Military

15   Police and then also worked as an engineer, correct?

16   A        No.  That's a separate -- what they call "AFS

17   Job Title."

18   Q        You were never in that part?

19   A        No.

20   Q        Can you recall -- can you recall the specific

21   facts that related to the court marshal you were in as

22   a juror and a witness, "insubordination" or out on leave,

23   they committed some offense or some other -- theft on the

24   base, do you recall what that might have related to?

25   A        Well, one of them was this one individual

1  couldn't advance and we was making -- he got in a little

2  trouble with another superior, a NCO was getting --

3  insubordination is what he was going for, one of them and

4  the other one --

5  Q        Were you a juror on that case?

6  A        I was a witness because he worked for me.

7                And then the other one was -- I sit in

8  on an individual trying to commit murder trying to escape

9  from jail.

10  Q        You sat as a juror in this case?

11  A        I sat on the panel.

12  Q        You weren't selected as a juror?

13  A        No.  We had a panel, you have -- they have got

14  the lawyers and so many enlisted men and so many officers

15  on the panel.

16                      THE COURT:  What is the

17  panel's duty?

18                      THE POTENTIAL JUROR:  Same as

19  juror's, make the decision, what punishment they should

20  get.

21                      THE COURT:  So you are saying

22  the panel that you were on would be what we call -- would

23  call "the jury?"

24                      THE POTENTIAL JUROR:  Right.

25                      THE COURT:  I have never been

1    in the Military so I don't understand some of this

2    either.

3                          MR. HINSON:   Do you recall

4    what the decision that the panel made was?

5                          THE POTENTIAL JUROR:   He got

6    -- I can't remember how many years he got in Leavenworth.

7    Q          (BY MR. HINSON)   He was convicted of, either

8    was charged with --

9    A          He was charged -- I can't remember how it all

10   went.

11                     He went to Leavenworth.

12   Q          For several years, several months?

13   A          "Years."

14                          THE COURT:   Excuse me again,

15   Mr. Hinson, I just want to clarify in my mind; did the

16   panel make the decision as to whether the guy did what

17   he was accused or did the panel just decide punishment?

18                          THE POTENTIAL JUROR:   We

19   decided that he was guilty.

20                          THE COURT:   And then decided

21   punishment?

22                          THE POTENTIAL JUROR: And then

23   decided punishment.

24                          THE COURT:   Thanks.

25                          THE POTENTIAL JUROR:   With

1    the presiding judge of the panel, penal officer.

2                        MR. HINSON:  And that was some

3    type of murder?

4                        THE POTENTIAL JUROR: Attempted

5    -- what he done, he took some firewood and tried to knock

6    this guard in the head, this guard happened to work for

7    me, he was down on detail.

8    Q       (BY  MR.  HINSON)   Mr.  Townsend  I  believe

9    informed you or I believe informed you a little bit about

10   a life sentence and what the effect of parole might have

11   on a life sentence.

12                        You understand in a capital case based

13   on the indictment if those allegations were proven and

14   the defendant was found guilty of capital murder his

15   possibility as punishment are life in prison or the death

16   penalty?

17   A       Yes, sir.

18   Q       Do you understand that?

19   A       Yes.

20   Q       And in this case based on the date of the

21   offense I believe the Court would instruct you that a

22   life sentence would mean that the Defendant, if he was

23   convicted in the guilt or innocence phase, would have to

24   serve a minimum of 35 calendar years as punishment?

25   A       Yes, sir.

1    Q          Before he would be eligible for parole?

2    A          Yes, sir.

3    Q          Not that he would get out in 35 years or in

4    40 years or ever but that's when he becomes eligible.

5               If you are selected as a juror in this

6    case and knowing that life is 35 years plus whatever

7    parole does, but knowing that the Court is going to

8    instruct you that life equals life, that if you assess

9    a life penalty that the person is put in jail for his

10   life, knowing what the parole laws are are you going to

11   lean toward assessing the death penalty in a capital

12   murder case?

13   A          It depends on the evidence.

14              You can't make your mind up until you

15   hear all the evidence.

16   Q          Knowing what the parole law is, that is a

17   maximum -- no, not a "maximum", a "minimum" of 35

18   calendar years, is that going to effect your deliberation

19   as a juror in what punishment is assessed?

20   A          No.

21   Q          You would give a defendant in a capital murder

22   case, you would equally consider a life sentence versus

23   the death penalty?

24   A          Yes, sir.  Consider it, weigh it which way.

25   Q          Based on any Military experience or your own

1   life experience do you lean heavily toward assessing the

2   death penalty in a capital murder case?

3   A          I can't really say until I hear all the

4   evidence, you know, you can't make up your mind, you

5   know, until you know the whole facts.

6                         THE COURT:  Thirty minutes.

7                         MR. HINSON:   I believe you

8   talked a little bit with Mr. Townsend about the

9   indictment and the failure of the State to prove the

10  robbery?

11                        THE POTENTIAL JUROR:   Yes,

12  sir.

13  Q          (BY MR. HINSON)  And you understand that if the

14  robbery was not proven to the jury then the jury should

15  find the defendant guilty of the lesser included offense,

16  murder?

17  A          Yes.

18  Q          Do you understand?

19                        And you went over the range of

20  punishment for murder as being from five to 99 years or

21  life in prison and the minimum five years probation?

22  A          Yes, sir.

23  Q          Could you consider in a murder case, could you

24  consider that range of punishment?

25  A          Yes, sir.

1   Q        Can you explain your personal feeling about

2   probation?

3   A        Probation has been a lot of good people, you

4   know, went to prison, come out and lived a straight life

5   and there are others went right back in a few days after

6   so I really have no thought on it which way you should

7   go with it.

8   Q        Is probation appropriate in some cases and not

9   appropriate in other cases?

10  A        I would say yes.

11  Q        In your own life experience are you aware of

12  anyone that ever received probation that you think did

13  not deserve probation?

14  A        Not that I can recollect.

15  Q        Do you have any bias against a person serving

16  probation?

17  A        No, sir.

18  Q        The Fifth Amendment to the United States

19  Constitution allows a defendant in a criminal case the

20  right not to testify if he so chooses and I listened to

21  you as you explained your feeling on that previously but

22  I'm not sure exactly -- you talk about doubt in the

23  juror's mind and I'm not exactly sure what you meant by

24  that.   Usually -- let me back up; that flow chart?

25  (Indicating)

1    A       Yes.

2    Q       Do you see there, it should have as Phase I at

3 the top, "jury selection?"

4    A       Yes.

5    Q       But it's for this Phase I the guilt and

6 innocence?   (Indicating)

7    A       All right.

8    Q       All right.  And guilt and innocence, as a juror

9 the first part of the evidence that you would hear, you

10 would determine whether a person was guilty or innocent

11 of the charge and if he was not guilty the trial would

12 end but, if he was found guilty you would go to the next

13 phase, the punishment phase.   (Indicating)

14    A       Yes.

15    Q       So that's how the process would work there.

16 Now, in the Phase I, the guilt and

17 innocence phase the defendant has the Fifth Amendment

18 right not to testify if he does not want to testify, it's

19 his decision.

20 And there may be several factors of why

21 he did not testify.

22 As you listen to the evidence and maybe

23 you would want to hear testimony from the defendant in

24 Phase I but he just doesn't testify, would you hold that

25 against the defendant in any manner?

A        No.

I still believe a man should try to
defend -- you know, testify for hisself, you know.

Q        Is that belief going to effect your
deliberation toward a verdict in any way?

A        No, sir.

Q        If he doesn't testify for himself are you going
to lean more heavily toward finding the defendant guilty?

A        No.

Q        If he does not testify in Phase I you would
give him an equal start with the State?

A        Yes.

Still you would have that feeling, why
didn't he testify, like I said awhile ago, you know.

Q        So let's assume in a capital murder trial,
Phase I, the defendant was found guilty and you went to
Phase II, the punishment phase, that is what punishment
should you assess, a life sentence or the death penalty.

A        All right.

Q        And there is evidence presented to you and
again you found him guilty, you said you could, you know,
you would not hold that against him as to the guilt or
innocence in Phase I.

In Phase II there was evidence presented
to you and maybe deep down you wanted the defendant to

1    testify, you said you had that doubt in your mind?

2    A          Yes, sir.

3    Q          If in Phase II the defendant did not testify

4    there, would that cause you to lean more heavily toward

5    answering your questions to assess the death penalty?

6    A          No, sir.

7               But there would be still the thing, why

8    didn't he defend hisself?

9    Q          You understand in a criminal case that the

10   State has the burden of proving that the defendant is

11   guilty beyond a reasonable doubt and we have gone over

12   that definition of reasonable doubt and before you make

13   up your mind whether or not it has been proven to you

14   beyond a reasonable doubt, the evidence is presented but

15   the defendant fails to testify, would you require

16   evidence from the defendant for you to consider whether

17   or not the State had proven their case beyond a

18   reasonable doubt?

19   A          No.

20              But still, why didn't he testify?

21   Q          Now, I believe you stated previously that in

22   your own mind you could set that aside that he did not

23   testify and you wouldn't hold that against him?

24   A          No, sir.  I wouldn't.

25   Q          But I guess subjectively is that that he didn't

1    testify going to be in the back of your mind?

2               I think that's what you are saying?

3    A       Yes.

4    Q       Is it possible that this doubt, I believe you

5    characterized it as "down in a juror's mind", is it

6    possible that will effect your deliberation as a juror?

7    A       No, sir.

8    Q       We talked a little bit about confessions,

9    admissions during the course of a trial, sometimes

10    there's confessions, written confessions taken or given

11    by the defendant, admissions made in open court or

12    whatever, witnesses have heard.

13               Assume that there is a trial going on

14    and there is a written confession and you read that

15    confession and you find it to be very truthful, seems

16    very honest to you and you consider it to be exactly what

17    occurred but there is evidence presented to you that that

18    defendant that you know is guilty because you think his

19    statement is true, that the officers or police department

20    or someone tricked him into giving that confession.

21               Can you set that confession aside and

22    find that defendant not guilty knowing that he's guilty

23    because you believe his statement, can you set that aside

24    and find him not guilty?

25    A       Well, if the evidence points toward the

confession I would find guilty.

Q       If there was no evidence offered other than this confession, that there was no witnesses to the crime, let's call it "the perfect crime", you have probably watched Perry Mason, he seems to solve the perfect crime all the time, and the only evidence is that somehow or another the defendant was tricked by the police in giving a confession and to you the confession is accurate, everything that is written in there, you don't have any problem that it's not the truth, that it's the truth as you understand it?

A       Yes.

Q       But because they tricked the defendant it's involuntary, can't be considered as evidence and there's no other evidence, you said, you know, "There's other evidence that supports his confession" but in this case there's no other evidence other than his confession.

        Can you set that aside and find that defendant when in your own mind that he's guilty, can you find him not guilty?

A       He's not proven guilty, that wouldn't prove him guilty, really.

        THE COURT:   Let me give you an illustration to point out what he's saying; let's say the man is sitting on the side of a building next to a

building, the police come up and say, "What are you doing here?"

Says, "Oh, I'm just sitting."

Says, "You didn't break in there or anything?"

"No. No. I didn't do anything but a couple of weeks ago I killed a guy but I haven't done anything today."

They take him in and he writes out his statement but they don't give him any kind of warnings, your right to remain silent, they don't give him anything and they bring him to trial and the only evidence we have is he said, "A week ago I killed someone."

And since that confession is not voluntary, since that confession doesn't meet our rules you couldn't consider it so without our statement they don't have any evidence, they don't have any evidence of a body, they don't have any evidence whatsoever.

Would you be able to set aside that statement he made since it was not according to the law and find him not guilty?

THE POTENTIAL JUROR:  Yes.

THE COURT:  Thank you, sir.

THE POTENTIAL JUROR:  I understand.

1          THE COURT:   I just wanted to

2 give you sort of a fact situation to illustrate a point

3 that he was trying to make.

4          THE POTENTIAL JUROR:   Thank

5 you.

6          MR. HINSON:   One step further

7 with that; you said if there was other evidence to

8 support this confession that you would find him guilty

9 and disregard the confession and in another fact

10 situation the defendant makes a confession but there is

11 also other evidence to support that he's guilty and as

12 we talked about the confession, you find it to be true,

13 that the other evidence supports the confession but you

14 don't find it to be voluntary; can you disregard that

15 confession in that situation and look at the evidence

16 that was presented and hold the State to the burden of

17 proof of proving to you beyond a reasonable doubt that

18 the defendant is guilty?

19          THE POTENTIAL JUROR:   Yes.

20 Yes.

21 Q          (BY MR. HINSON)   And you would not consider

22 this confession as you considered the other evidence that

23 supported it?

24 A          Unless the man made his confession in the

25 Court.

Q        Okay.   The written confession,  you would not -- you could --

A        I could --

Q        -- you would know it's there but you could disregard it and look at the other evidence in making your assessment?

                    THE COURT:  Five minutes, Mr. Hinson.

                    MR. HINSON: Mr. Smith, I know you haven't been a police officer, are you related to anyone -- your daughter, you said was a nurse, do you have a son-in-law or anyone that is in law enforcement?

                    THE POTENTIAL JUROR: No.  All I have is a son which is in the Navy, he pulls shore patrol once in awhile.

Q        (BY MR. HINSON)  But it's not his career as a Military Police?

A        No.  It's not.  No.

Q        During the course of the trial we showed you a long list, a Witness List, I am sure that you noticed that most of those were connected with some law enforcement agency.

                    There will be other witnesses testify that aren't connected with law enforcement agencies, there might be a preacher, a pastor, a minister, maybe

a psychologist or a psychiatrist testify along with police officers, there may be just the old lumber yard worker, you know, girl that works down at the Dairy Queen.

When the girl at the Dairy Queen testifies she says one thing and the police officer, he says another.

That happens in a lot of cases.

Okay. As a juror when you are sitting and listening to the evidence do you give a police officer's testimony a little more credibility than other witnesses in the case?

A        Yes and no.

Q        Can you explain what you mean?

A        Well, the policeman may not be there, the Dairy Queen worker may be there and he's going on hearsay, the police officer or vice versa, you have to see which one was actually there or what statement was said to them and so on and so forth.

You can't downgrade a Dairy Queen worker, either.

Q        All right. Let's assume there's a hundred people in a circle here and we show them one event on the TV and I'm sure you would agree with me that we are going to have a lot of different stories about that event that

1    occurred?

2    A        Yes.

3    Q        And witnesses are the same way, they have

4    different recollections of how events occur?

5    A        Yes, sir.

6    Q        "Did the car run the red light, well, I saw it

7    was red and the other one saw it was green" so that's the

8    same situation we are in, perspective, the same, the

9    question is, though, does one have anymore credibility,

10   does the police officer have any more credibility with

11   you than another witness?

12   A        I would say a police officer should have more

13   credibility -- "does have more credibility", I'll put it

14   that way, because that's his training.

15   Q        Okay.  And "credibility" meaning he's truthful

16   in relating a story to you?

17   A        Yes.

18   Q        Would a pastor, preacher, minister have any

19   more credibility with you than another witness in the

20   case?

21   A        No, sir.

22   Q        Would a psychiatrist or psychologist have any

23   more or less credibility with you?

24   A        No.

25   Q        You would start them off on equal footing?

1    A        They would be all equal.

2    Q        I believe on October the 6th when the jury

3    panel first came in there has been articles in the

4    newspaper, you have seen the questionnaire, the

5    indictment, we have gone over several things.

6             Based on all you have seen and heard

7    have you formed any opinion as to the defendant's guilt

8    or innocence as you sit there right now?

9    A        No, sir.  I have no evidence.

10   Q        So if you were picked as a juror you would

11   start the State off on the same place that you would

12   start the defendant?

13   A        Same level.

14   Q        And it's up to the State to prove to you beyond

15   a reasonable doubt the defendant's guilt?

16   A        Both sides have to prove it.

17   Q        And you don't require the defendant to testify?

18   A        Well, just looking back again, the defendant,

19   if I do something wrong I'm going to try to defend

20   myself.

21   Q        Do you expect a defendant to offer evidence,

22   offer their evidence to defend themselves?

23   A        If there is some.  Yes.  If they have any.

24             MR. HINSON:  Pass the juror,

25   Your Honor.

                                                      76

1        THE COURT:  Sir, if you will

2 step out for a few minutes we will discuss your jury

3 service and I will give you some more instructions

4 shortly.

5        THE POTENTIAL JUROR:   Okay,

6 sir.

7

8      (The following occurred outside the

9 presence and hearing of the potential juror:)

10

11        THE COURT:   Does the State

12 have any challenges?

13        MR. TOWNSEND:    None, Your

14 Honor.

15        THE COURT:  The Defense?

16        MR. OLD:  Yes, Your Honor.

17      Your Honor, may I make them -- would I

18 offend you if I make them sitting down?

19        THE COURT:  No.  Go ahead.

20        MR. OLD:  The Defendant would

21 challenge for cause the juror Carl Eugene Smith, original

22 number 307, renumbered 38 and as grounds for challenge

23 for cause would show the Court that he expressed by

24 testimony that merely because a man was a peace officer

25 he thought he was more credible for truthfulness over

another witness and in doing so has expressed a prejudice against the Defendant in this case.

As to our second challenge for cause; the witness testified, the juror testified that while he would try not to consider a defendant not testifying he would still have doubt, said several times he could set it aside and his last statement from the witness stand concerning the law, he expected a man to defend himself if he was innocent.

And that puts a burden on the defendant which is not required by law and our challenge for cause would be that he expressed a prejudice against the laws of the United States and the State of Texas as to the Fifth Amendment and the right not to testify and in doing so has said he could not follow the Court's instructions.

Challenge number three; the witness expressed a prejudice against the defendant and a prejudice against evidence in that he said "I could not consider age as evidence."

Those would be our three challenges.

MR. HINSON:   Your Honor, I think we have --

MR. OLD:   Go ahead.

MR. HINSON:   Additionally he equated the definition of "reasonable doubt" equalling

1    "probability, more likely than not" of which is a matter

2    of law it is not.

3                         THE COURT:  Any response from

4    the State?

5                         MR. TOWNSEND:  Let me take the

6    last one first on "beyond a reasonable doubt", he said

7    he could follow the law as to that definition, Your

8    Honor, he stated that on a couple of occasions as to his

9    statement, not that he would not consider age as

10   evidence, his statement was that he would not consider

11   age -- it was unclear to me from the -- with me and from

12   his testimony with the Defense whether he meant he would

13   not consider it as mitigating or he would not consider

14   it period.

15                        I think he misunderstood what they were

16   asking.

17                        I would like the Court to clear that up

18   with him.

19                        I think he was -- his responses on that

20   were equivocating.

21                        As to the police officer, his statement

22   -- I think that he would give more credibility because

23   they are trained or something like that.

24                        THE COURT:  That's the way I

25   recall it but I will talk to him.

1          MR. TOWNSEND:   And I would

2     like the Court to clear that up as well.

3               As to his Fifth Amendment answer

4     regarding -- respecting the defendant, he said on several

5     occasions that whether the defendant testified or not

6     would have no effect on his verdict.   He did not ever

7     say he would hold that against the defendant, he just

8     said he would expect that.

9               Well, I think most people would expect

10    that.

11              THE COURT:   I think so, too.

12    I do not think he's disqualified but I will talk to him

13    in that area, I will talk to him in each of the areas.

14              Frankly the latest court cases I have

15    read unless something has come out in the last two weeks

16    do not require a juror to give age any mitigating effect

17    period, they did for awhile and then they came out and

18    said they are not going to so I don't know what their

19    position is this week.

20              MR. OLD:   That's not the

21    objection, the objection is he said he would reject age

22    as evidence.

23              THE COURT:   Again, I'm not

24    concerned with that but I'm going to talk to him on all

25    four issues.

1          Bring back Mr. Smith.

2

3               (The following occurred in the presence

4     and hearing of the potential juror:)

5

6               THE COURT:  Mr. Smith, I have

7     got a couple of questions for you.

8               THE POTENTIAL JUROR:  Okay.

9               THE COURT:  I'm going to be

10    kind of repetitive but I told you when I kind of

11    explained the law to you and whether you can follow it

12    and some of your answers have been a little contradictory

13    so I want to get some clarification in my mind if I

14    could.

15               Let's talk about police officers first;

16    you said you wouldn't start out a preacher or

17    psychologist or anybody else ahead of the other, you

18    indicated you might start a police officer out ahead of

19    the others but you were also talking about a police

20    officer's training.

21               Now, our law says that all witnesses are

22    to be started out equal, no one had a head start.

23               Now, after you listen to a witness you

24    judge that witness's credibility and truthfulness by

25    looking at his or her background, training and interest

1    in the case.

2             If  a  person  in  a  civil  lawsuit  is

3    seeking money and they are testifying what someone else

4    did  and  why  he  should  be  paid  you  might  want  to  weigh

5    that against somebody that has nothing at stake, that is

6    just going to tell you what he or she observed.

7             We  all  probably  believe  that  police

8    officers are trained to observe, maybe they are and maybe

9    they aren't, you may have some police officers that are

10   highly  trained,  you  may  have  some  police  officers,

11   reserve deputies, maybe they haven't had any training.

12            Now,  if  you  are  going  to  give  a  head

13   start  to  a  police  officer  I'm  not  going  to  take  issue

14   with  that,  I  just  need  to  know  whether  or  not  you  are

15   going to be able to start all witnesses equal or whether

16   you are going to be able to give a police officer a head

17   start over all witnesses.

18            THE POTENTIAL JUROR:  No.  All

19   I meant awhile ago when he was talking about a Dairy

20   Queen worker and a police officer, I believe the police

21   officer has more training and so forth than the Dairy

22   Queen worker does as his judgment.

23            THE COURT:  If you found out

24   the Dairy Queen worker had been a police detective in New

25   York for 20 years and was retired and the other police

1   officer was a rookie, that might very well change your

2   opinion?

3                        THE POTENTIAL JUROR:   Yes,

4   sir.

5                        THE COURT:  So are you telling

6   me that you will listen and weigh and hear their

7   qualifications, decide who is the most believable and

8   weigh their testimony?

9                        THE POTENTIAL JUROR:   Yes,

10  sir.

11                       THE COURT:  You are not going

12  to believe a police officer just because he's a police

13  officer?

14                       THE POTENTIAL JUROR:   True.

15                       THE COURT:  Let's go back to

16  this "reasonable doubt", you were told that reasonable

17  doubt is what is on that long piece of paper, our courts

18  did not define "reasonable doubt" for us for years, we

19  have gone a hundred years or more without definitions and

20  then a few years ago they decided that they were going

21  to define it and they defined it in that very long

22  paragraph there that we had you read.  (Indicating)

23                       THE POTENTIAL JUROR:   Yes.

24                       THE COURT:  That's it right

25  there.

Now, "reasonable doubt", they say it basically is the prosecution has the burden of proving to you not beyond all doubt because all doubt basically means you would have to be a witness, but beyond any reasonable doubt that the person is guilty as to what he or she is accused, they say that reasonable doubt is the kind of doubt that would make a person hesitate to act in the most important of their own affairs, kind of like open heart surgery, you took all the factors, weighed them, you had your surgery.

Maybe you had some hesitation, maybe you didn't, but you weighed the factors and decided that's what you had to do.

As a lawyer and Judge if I told you based on your symptoms you probably needed open heart surgery maybe you would have hesitated and maybe sought some other opinion.

That's what we are trying to do, let's make sure before we make a decision, and we are as sure as we can be, as sure as we can but coming up -- without coming up with some incredible situation, maybe they might say that "A guy came down from another planet", that's not credible.

But you said that "reasonable doubt" meant about the same thing as the word "probability" in

1    that Special Issue so I want you to go to that next page,

2    the one right there, the one there in your hand, and

3    there is a Special Issue, let me look at mine and make

4    sure I have got it right, it says, "Do you find from the

5    evidence beyond a reasonable doubt that there is a

6    probability that the defendant would commit criminal acts

7    of violence?"

8              You say to you "reasonable doubt" and

9    "probability" were the same.

10             Our law says that "probability" means

11   "more likely than not."

12             Our law says that "reasonable doubt" is

13   "more than just more likely than not."

14             "More likely than not" could be 51

15   percent or more?

16             THE POTENTIAL JUROR:  Yes.

17             THE COURT:  Most people equate

18   "reasonable doubt" as way up there, maybe in the 90s,

19   there's no legal place that you put "reasonable doubt"

20   but the law says the standard of "reasonable doubt" is

21   much higher than "probability."

22             Are they the same to you or are you

23   going to equate "probability" and "reasonable doubt" as

24   both around 51 percent?

25             THE POTENTIAL JUROR:  I would

1    say around 51.

2                        THE COURT:  So you are saying

3    if the State can prove more likely than not then to you

4    they have met their burden of "reasonable doubt?"

5                        THE  POTENTIAL  JUROR:   One

6    side, the other side, I have to hear all the evidence

7    before I can hear any evidence, keep an open mind.

8                        THE COURT:  Okay.  Thank you,

9    sir.

                            You may step down.

10

11

12                       (The  following  occurred  outside  the

     presence and hearing of the potential juror:)

13

14

15                       THE COURT:  Sustained.

16                       Tell him he's excused, we appreciate him

     coming in.

17

18                       I will see you guys at 1:00 o'clock.

19

20                       (Noon recess.)

21

22                       (The  following  occurred  outside  the

     presence and hearing of any potential juror:)

23

24

25                       THE COURT:  Let's get on the

                                                              86

1    record.

2                    There are no jurors present.

3                    It has come to the Court's attention

4    that some people may have been going through the Court's

5    file, the Court's file is public record but since there

6    are several things in the Court's file that could

7    possibly reflect upon the Defendant's ability to have a

8    fair trial in this county I am going to order that the

9    file be sealed and that no one have access to this file

10   other than the two District Attorneys working on this

11   case, Mr. Lee and Mr. Townsend, the two Defense Attorneys

12   working on the case, Mr. Old and Mr. Hinson and the

13   District Clerk and his employees.

14                   No other person is to have access to

15   that file period without further order of the Court.

16                   Let's bring in our next juror.

17

18                   (The following occurred in the presence

19   and hearing of the potential juror:)

20

21       RICHARD DEAN WILTSE, Potential Juror #476,

22   was called as a Potential Juror and, having been

23   previously sworn by the Court, testified as follows:

24

25                   THE COURT: How are you doing,

1  sir?

2                              THE POTENTIAL JUROR:   Fine.

3                              THE COURT:   Go ahead and take

4  your seat.

5                      First let me thank you for coming in on

6  short notice, we had some other people scheduled and we

7  did some changes and had to get some late scheduling done

8  so thank you for your cooperation.

9                      Sir, are you "Richard Wiltse?"

10                             THE POTENTIAL JUROR:   Yes.

11                             THE COURT:   This is juror 41.

12                      I am Gary Stephens, I'm presiding over

13  the trial.

14                      We have two District Attorneys that are

15  working on behalf of the State, one is in trial in

16  another county, his name is Randall Lee, the lead

17  attorney, the one that is actually in charge and

18  presenting the evidence is present, that's Mr. Richard

19  Townsend from Morris County.

20                      We have two Defense Attorneys who are

21  both present, Mr. Bird Old, III.

22                             MR. OLD:   Good afternoon.

23                             THE COURT:    And Mr. Lance

24  Hinson.

25                      We have the Defendant seated next to Mr.

1    Hinson, his name is Billy Joe Wardlow.

2              Now, sir, the lawyers have read your

3    questionnaire and they are familiar with your answers,

4    they are going to talk to you about some of those answers

5    and they are also going to talk to you about the

6    principles of law and about the issues involved in a

7    death penalty case.

8              You will be asked a lot of questions and

9    the answers will let us know whether or not to put you

10   on the jury.

11             In order to be a juror you must be able

12   to understand, follow the law so we are going to ask you

13   first, we'll explain the laws to you and we will ask

14   whether or not you can follow that law.

15             But we have found, sir, that we need to

16   know more about jurors in a death penalty case, more than

17   just, "Yes, I can" or "No, I can't follow the law."

18             We want to know what those jurors think

19   about our laws and about the issues that they will be

20   passing on.

21             The only way as lawyers we know to find

22   out what is in your mind is to ask you a lot of questions

23   so that's what's going to happen.

24             We may give you some facts, if we do we

25   are not using -- we are just making up facts sometimes

1   to try to illustrate a point and I want you to understand

2   that if we do bring up some facts to illustrate a point

3   it has nothing to do with the alleged facts of this case.

4   The law prohibits us from talking about the facts of this

5   case, that's why we are going to have a trial.

6            So if we give you a fact situation it's

7   just a hypothetical to try to illustrate a point.

8            But, sir, there aren't any right or

9   wrong answers to these questions, there's no right or

10  wrong opinions, as a citizen you certainly have the right

11  to your opinion, it's just that we need you to share

12  those opinions with us so we can decide whether or not

13  this is a task you should undertake.

14            The trial will last probably two weeks

15  and we will not start testimony, meaning the trial, until

16  after the first of the year.

17            Do you know of any reason that you could

18  not sit for a two-week period as a juror if chosen in

19  January of next year?

20            THE POTENTIAL JUROR:  No, sir.

21  Not right now.

22            THE COURT:  Do you have any

23  questions before we proceed?

24            THE POTENTIAL JUROR:  No.

25            THE COURT:  All right, again,

just be as open and honest with us as you can and just remember we don't really care what your opinions are and I don't mean to be rude by that but we very much care to understand those opinions and the only way we can find out is for you to open up and share them with us.

THE POTENTIAL JUROR:  Okay.

THE COURT:  Mr. Townsend.


VOIR DIRE EXAMINATION

BY MR. TOWNSEND


Q        Mr. Wiltse, my name is Richard Townsend and as the Judge said I represent Morris County as the District Attorney prosecuting this case.

As you know from your earlier jury service in October when the Judge talked to the group we are actively seeking the death penalty in this case and we need to have the type jurors who can keep an open mind as to the possible punishment in a capital murder case.

In Texas if a defendant is found guilty of capital murder they will receive one of two sentences, either a life sentence or the death penalty.

And we need jurors who can keep an open mind as to actually what the appropriate sentence should be and not just automatically say, "Well, he's guilty,

1   I'm going to give a life sentence, if he's guilty I'm

2   going to give him the death penalty", could you keep an

3   open mind to that and base your decision on the evidence

4   as presented?

5   A        Yes, sir.  I think I could.

6   Q        Assuming that he's found guilty of course?

7   A        Yes, sir.

8   Q        Okay.  If the facts and the evidence presented

9   to you, Mr. Wiltse, if the facts and evidence that you

10  heard convinced you that the defendant needed to receive

11  the death penalty could you do it?

12  A        Yes, sir.  I believe I could.

13  Q        Okay.  If the facts and evidence presented to

14  you made you feel like that the defendant should receive

15  a life sentence rather than a death penalty could you do

16  that?

17  A        Yes.

18  Q        I will talk to you a little bit about murder

19  in Texas and the law; murder in Texas, there are

20  basically two types of murder, one is what I'm going to

21  call "plain murder" or non-capital murder and that is

22  where someone has intentionally caused -- intentionally

23  or knowingly caused the death of an individual and that

24  is to say they don't have any legal excuse like self

25  defense or accident, they intentionally caused another

1   person's death or knowingly.

2                    And   in   that   situation   the   most

3   punishment that person could receive is 99 years to life

4   in  the  penitentiary.    They  cannot  receive  the  death

5   penalty.

6                    There  is  another  type  murder  in  Texas

7   where the death penalty is involved and that's capital

8   murder  and  that's  the  murder  where  someone  has

9   intentionally caused another person's death, like in that

10   first example I gave you, plus something else.  And that

11   plus  something  else  is  that  the  murder  was  a  police

12   officer or a fireman was murdered in the line of duty or

13   the murder took place during the commission of a robbery

14   or rape or kidnapping or an arson or something of that

15   nature.

16                    If you will, there is a sheet of paper

17   up there marked "Exhibit 3."  (Indicating)

18                    THE COURT:   To your right,

19   next to it.  Right there.   (Indicating)

20                    MR. TOWNSEND:  That is a copy

21   of the indictment in this case.

22                    If you will just read it to yourself and

23   I will talk to you about it some.

24                    Okay.  Mr. Wiltse, that is a copy of the

25   indictment in this case and can you see from reading that

1    if the State were to prove all that to you that rather

2    than being a plain non-capital murder that would be

3    capital murder?

4                        THE POTENTIAL JUROR:    Yes,

5    sir.

6    Q          (BY MR. TOWNSEND)   Because it alleges both

7    murder and the robbery?

8    A          Yes, sir.

9    Q          The kind of juror we need in a capital murder

10   case must be able to follow the law, you know, the law

11   -- I don't guess any of us would probably agree with all

12   the law but kind of like paying taxes, we might not agree

13   with how much tax we have got to pay but we go ahead and

14   do it anyway.

15              To sit on a jury you have got to be able

16   to follow the law.  And the Judge will set out the law

17   for you and tell you what the law is, before you go

18   deliberate you will have written instructions from the

19   Judge that will tell you what the law is in this

20   particular case or any other case you might be involved

21   in as a juror.

22              In other words, to be a qualified juror

23   you have got to be able to follow that law, you don't

24   have to agree with it but as long as you can set aside

25   your difference and do what the law tells you what to do

1    -- do you believe that you could do that?

2    A        Yes, sir.

3    Q        We are going to talk some more about different

4    areas of the law and get your feelings on it but in a

5    capital murder trial it takes place in two different

6    parts, first there's a guilt or innocence phase in which

7    the jury listens to the evidence and just determines "Is

8    he guilty or not guilty, did he do it?"

9                    And the second part, if the defendant

10   is found guilty you go into what is called the

11   "punishment phase" where you are going to hear more

12   evidence but that evidence is going to relate to what the

13   proper punishment should be.

14                   And after you have heard that evidence

15   you kind of consider that with all the other evidence you

16   have heard and then decide whether the defendant should

17   receive a life sentence or the death penalty.

18                   There's a piece of paper up there that

19   I call a "flow chart", looks kind of like this.

20   (Indicating)

21                        THE    COURT:     That's   it.

22   (Indicating)

23                        MR.  TOWNSEND:   If you will

24   look at that, I will go over that with you briefly.

25                   You start -- this is kind of the way a

capital murder trial goes, we start at the top and the guilt or innocence phase, you are going to hear evidence about guilt or innocence of the defendant then after that is over the jury deliberates.

If the defendant is found not guilty the trial is over, everybody goes home.

If the jury finds the defendant guilty then you go to that next phase of the trial which is called the "punishment phase" there in the middle of the page there then you are going to hear more evidence.

Now, that evidence there rather than being about the guilt or innocence of the defendant, it won't cover that at all because you have already made that decision.  That evidence is going to be about -- will be the type of evidence that would hopefully help you decide what the appropriate sentence should be, the life sentence or death sentence.

It may be -- that evidence could be anything, it might be evidence from psychologists, evidence from the family members of the defendant, evidence that the defendant is alcoholic, is mentally retarded, has done prior criminal acts, has done prior acts of misconduct, any number of things.

But anyway those -- that evidence is designed to help you make your decision on punishment.

1          Now,  in  making  that  decision  on
2    punishment you don't have to throw that stuff away you
3    heard during the guilt or innocence, you know, you can
4    also consider that but in addition to considering that
5    you have to be able to listen to and consider that
6    evidence that you hear during the punishment hearing, no
7    matter what kind of evidence it is, you know, you can
8    listen and consider it and decide it's not important but
9    in order to be an open-minded fair juror you have got to
10   be able to listen to it, consider it and then kind of
11   weigh it all and decide what is important and what is not
12   important.
13          Do you believe that you could do that?
14             THE POTENTIAL JUROR:  Yes.
15   Q       (BY MR. TOWNSEND)  Okay.  After you have heard
16   all that evidence -- I think in the old days maybe the
17   jury just went back there and decided, "Well, you want
18   to give him a life sentence, raise your hand, if you want
19   to give him the death penalty, raise your hand", it's not
20   done that way in Texas anymore.  It's done by answering
21   Special Issues or questions.
22          After you have heard all this evidence
23   that I have talked about during the trial you are going
24   to go back there and vote in there, you are going to vote
25   on Special Issue #1, the question you answer "Yes" or

1    "No" -- and we'll go over that, what those questions are

2    in a minute -- but for right now suffice it say you are

3    going to answer Special Issue #1 "Yes" or "No."

4                    If you answer that Special Issue #1 "No"

5    the defendant will automatically receive a life sentence,

6    if you answer that question "Yes" then you are going to

7    go to Special Issue #2.

8                    Special Issue #2, again is another "Yes"

9    "No" question, if you answer that question "Yes" the

10   defendant receives a life sentence, if you answer that

11   question "No" the defendant receives the death penalty.

12                   So basically what you are going to be

13   doing, Mr. Wiltse, you are not going to be deciding

14   whether he gets a life sentence or death penalty, you are

15   just going to be answering those two questions "Yes" or

16   "No" based on the evidence that you have heard.

17                   Now, you are going to know, of course,

18   because I just told you, what the results of those

19   answers are, Number One is "Yes" and Number Two is "No"

20   then he gets the death penalty, if they are answered any

21   other way then he will receive a life sentence.

22                   And those Special Issues, there is a

23   sheet up there that is marked, says "Special Issues" on

24   the top of it.  (Indicating)

25                        THE    COURT:    That's   it.

(Indicating)

MR. TOWNSEND:   If you will read just Special Issue #1 and we'll talk about it.

THE POTENTIAL JUROR:   Okay.

Q      (BY MR. TOWNSEND)   Special Issue #1 is one thing I want to -- in proving our case to you on guilt or innocence the State has to prove that to you beyond a reasonable doubt and I think you are familiar with that Special Issue #1.

Also you read that first line there, we are required to prove that to you beyond a reasonable doubt, also then the second like is that word "probability" there and what that means is that first of all -- I'm sorry, I skipped over something -- Special Issue #1 basically is talking about I think the future dangerousness of the defendant, is that kind of what it looks like to you?

A      Yes.

Q      When you get to that word "probability", Texas law defines that as being "more likely than not" and "more likely than not" to put a numerical value on it, you might say just a little bit more than 50/50, is that kind of what "probability" means to you, "more likely than not", would that be close to your definition?

A      Yes.   I would say, you know, "The chances are

good."

Q       We would have to prove to you beyond a reasonable doubt that it's more likely than not.

A       Okay.

Q       We are not required to predict to you or guarantee you or anything of that nature but just to prove to you beyond a reasonable doubt that it's more likely than not that he would commit some criminal act of violence in the future.

That word or the wording there toward the end of the second line, "criminal acts of violence", there are criminal acts of violence that are violent that are not capital murder such as assaults, rapes, attempted murders, things of that nature.

Now, we are not required to prove to you that the defendant would commit another capital murder, just that he would commit some other criminal act of violence.

On the other hand, there are criminal acts that are not violent such as forgery or theft or something like that and even though as a criminal act it's not a "criminal act of violence" so we are required to prove to you that it's likely that he would commit some criminal act of violence.

And then you read on down, "A criminal

act of violence that would constitute a continuing threat
to society."

               "Society" as the law defines it is not
at your home or at work or wherever but it's just people
-- it would include people on the street, it would
include people in the penitentiary, it would include
inmates in the pen, it would include nurses, doctors in
the pen or anyone outside.

               So we are not required to prove to you
that he would be a threat to someone in a particular
place, just that he would be a threat to society or
threat to the people anywhere, you know, any particular
place it might be.

               Are you with me on that?

A         Yes.

Q         Okay.  The important part about Special Issue
#1 from the juror's standpoint is that in order to be a
fair and impartial juror and follow the law once you have
heard that evidence during the guilt or innocence you
decide at that point whether the defendant is guilty not
but you can't decide the answer to Special Issue #1 yet
because you haven't heard that evidence during the
punishment hearing.

               So we have got to have the type jurors
who can wait and not make their decision on Special Issue

1    #1 until they have had a chance to hear all that

2    punishment hearing evidence.

3                   Now, like I said, you can certainly go

4    back and consider that guilt and innocence evidence when

5    you are deciding Number One as long as you are willing

6    to listen and consider that evidence that you heard from

7    the punishment hearing also.

8                   Could you do that?

9    A        Yes.

10   Q        Okay.  If you will read over Special Issue #2

11   and then I will talk to you about that.

12   A        Okay.

13   Q        Okay.  Mr. Wiltse, Number Two is a lot of legal

14   wording there and what it all boils down to is you have

15   found the defendant guilty of capital murder, you have

16   decided that he's a threat to society because if you

17   voted "No" on that you wouldn't be considering Number

18   Two.

19   A        Right.

20   Q        He would have already automatically received

21   the life sentence but since you are considering Number

22   Two you have already decided that he's already a threat

23   to society.

24                   One thing about Number Two that is

25   different, we are not required to prove that to you

beyond a reasonable doubt, that is just kind of your opinion on Number Two.

And what it is; you have looked at the case and you are saying or they are asking you, is there anything about this case that makes you feel like this defendant should receive a life sentence rather than the death penalty, is there something in this evidence that is sufficiently mitigating to you whether it's one thing or a combination of things, whether the evidence came from this side of the table or that side of the table but is there just anything or something in this case that is sufficient in your mind?

And if you will notice the term "sufficient" -- "mitigating."

Mitigating evidence is the evidence that reduces the defendant's moral blameworthiness, down there at the very bottom, so is there something in this case that sufficiently reduces his blame in your mind to the point sufficiently enough or to the point that you believe the defendant should receive a life sentence rather than the death penalty.

If you answer "No" to that then you are saying, "No.  There is nothing in there that sufficiently reduces his blame to me so I think he should get the death penalty."

If your answer is "Yes" then you are saying, "Yes, there is something in there that I think should reduce his blame enough to give him a life sentence."

That evidence that you hear during the punishment hearing or during the trial, different people look at it different ways, you know, some people might think that a defendant -- and, Mr. Wiltse, keep in mind I am not necessarily talking to you -- as a matter of fact I'm not talking to you about this case, I'm just talking to you about capital murder cases in general so, you know, in a capital murder case you might hear evidence that the defendant was mentally retarded, if you heard evidence like that it might or might not, depending on your point of view make you feel as if that reduced his blame enough that he should receive a life sentence.

You might hear evidence of some psychologist or you might hear evidence that they had had a defendant that had a rough upbringing, had kind of a rough family life, you might hear all sorts of evidence but the important thing about that evidence and the important thing from a juror's standpoint in order to be a qualified juror you have got to be able to keep an open mind as to any of that evidence that you hear.

And when I say "Keep an open mind", what

1    I mean, you have got to be able to listen to it and

2    consider it all and then make your decision.

3              For instance, some people distrust or

4    don't believe that psychologists know what they are

5    talking about.  We have got to have jurors who don't

6    necessarily think psychologists are great but we have

7    got to have jurors who are at least willing to listen to

8    them, consider what they have to say and then determine

9    whether that's important or not and not just say, "That

10   psychologist, I'm not going to listen to him."

11             Would you be able to keep an open mind

12   and listen to all the evidence?

13   A        Yes, sir.

14   Q        And consider it and then make your decision?

15   A        Yes.

16   Q        And that would be whether it was as to family

17   history, could you listen and consider family history

18   the same way?

19   A        Yes, sir.

20   Q        Retardation the same?

21   A        Yes.

22   Q        Could you listen to the evidence that did --

23   that indicated that the defendant had a drug problem, for

24   instance, could you listen and consider that?

25   A        Yes, sir.

1   Q       Could you listen and consider evidence as to

2   the age of the defendant?

3   A       Yes, sir.

4   Q       Okay.   Those are just examples, you know, I

5   couldn't even think of all the possible situations but

6   those are examples of things that you might hear and if

7   there was any other type evidence that was presented

8   would you listen to it and consider it before making your

9   decision?

10  A       Yes.

11  Q       Mr. Wiltse, that's not to say that you are

12  going to give weight to that evidence, you must listen

13  to it, consider it and decide, "Well, that's just not

14  important" or you might think it was very important.   And

15  we are not asking you -- I'm not and I know the Defense

16  Attorney wouldn't be asking you, you know, we are not

17  trying to pin you down and get you to say that you will

18  give weight to any particular piece of evidence, just

19  simply that you would be willing to listen to it and

20  consider it.

21          Could you do that?

22  A       Yes, sir.

23  Q       Okay.   And the answers on Special Issue #1 and

24  Issue #2, the death penalty -- excuse me -- capital

25  murder cases in Texas; if the defendant is found guilty

1   and received a life sentence he will go to the

2   penitentiary for 35 years before becoming eligible for

3   parole.

4                   That doesn't mean he will be paroled in

5   35 years but he would be eligible for parole at that time

6   which means he could get parole in 35 years or 40 years

7   or 45 years or he might never get parole.

8   A       Yes.

9   Q       But the important thing from a juror's

10  standpoint -- I believe the Judge will instruct you

11  before you go back and make your decision on Special

12  Issue #1 and Issue #2, instruct you in the law something

13  like this and that is to say that basically the Judge is

14  going to put in these instructions that you cannot

15  consider parole for any purpose in determining your

16  answers to Special Issue #1 or Issue #2, you are -- that

17  is to say you are just supposed to consider a life

18  sentence as a life sentence and death penalty as the

19  death penalty and, after all, your answers to Special

20  Issue Numbers 1 and 2, those are "Yes" or "No" questions,

21  you know, you are supposed to be fair-minded and answer

22  those questions based on the evidence and not consider

23  parole in any way.

24                   Could you do that?

25  A       Yes.

Q          When I say "Answer those questions based on the evidence" basically what I'm saying you need to do is just go ahead, answer those questions as the evidence dictates that those answers should be, whether it be "Yes" or "No" and just basically let the chips fall where they may and not answer, not in any way say, "Well, I want this guy to get a life sentence so I'm going to say 'Yes' and 'No' on these" or I'm going to say "No and 'No' on these questions or whatever" or "I want the guy to get the death penalty so I'm going to make sure and answer these questions 'Yes' and 'No'."

We have got to have jurors that can answer those questions as they should be answered based on what you believe about the evidence and how you would interpret that evidence.

Could you do that?

A          Yes.

Q          When I say that I mean we have got to have jurors who are not biased toward a life sentence or biased toward the death penalty or don't have a prejudice one way or another.

And I believe in your questionnaire I believe you indicated that you could give the death penalty on -- in murder cases if you felt like it was appropriate and you also answered that you could give a

1   life sentence if you felt like that was appropriate.

2               I don't know if you remember your answer

3   on that or not.

4   A          That sounds right.

5   Q          That's basically what you said.

6   A          Yes.

7   Q          You also said that "I believe that the

8   punishment for a crime should be equal to the crime

9   committed."

10              Having said that are you saying that you

11  believe that after you have heard all the evidence then

12  you would note what you feel the appropriate punishment

13  would be?

14  A          Yes.  I think so.

15  Q          You are not saying --

16  A          I'm not necessarily --

17  Q          -- you are not saying "An eye for an eye,

18  anytime there's a murder there would have to be a death

19  penalty?"

20  A          No.  I think there are probably circumstances

21  that would surround it that would change that.

22  Q          And that's basically what a fair juror does,

23  that he waits and weighs all that evidence before making

24  their decision.

25              Okay.  You don't have any bias or

prejudice toward the death penalty or toward a life

sentence, you could give each one a fair opportunity

and --

A          I think I could.  Yes.

Q          Just as quickly give a defendant a life

sentence or the death penalty, depending on what you felt

was appropriate?

A          Yes, sir.  I believe I could be fair in

something, you know, as the evidence was presented to me

I could take it and weigh it and decide fairly.  I hope.

Q          Okay.  Let me kind of shift gears a little bit

and talk to you about some general areas of the law that

relate to death penalty cases but also relate to most

any criminal case; murder in Texas is what -- just plain

murder, not capital murder what we talked about earlier

and that's punishable by from five years probation up

through 99 years or life in the penitentiary and that's

sort of recognizing that murder is a lot of different

things to a lot of different people and a lot of

different situations involved that are called "murder."

A murder can be just anything from a

very vicious type crime to mercy killing type situation

where you have elderly people living together and one of

them has cancer and is dying slowly and in such a great

deal of pain and begs the other person to pull the plug

1     for them.

2                    And when that person pulls the plug they

3     have done what we call in Texas "intentionally caused the

4     death of another individual."

5                    So even though it is not what you and

6     I normally think of when we think of murder that is

7     technically a murder.

8     A          Yes.

9     Q          So when you have got that full range of

10    punishment if you are a juror on a murder case -- and we

11    are not asking you again to say you would give five years

12    probation or you would give 99 years to life because you

13    don't know what the situation might be but just what I'm

14    asking you, in order to be a fair juror you have got to

15    be able to keep an open mind to what the proper

16    punishment would be and you have got to consider that

17    full range of punishment, whether it was 99 years to life

18    or five years probation or anywhere in between.

19                    Could you consider that full range of

20    punishment?

21    A          Yes, sir.  I could.

22    Q          Let's say we had a capital murder case and

23    involved an allegation in the indictment of murder and

24    robbery and that's the reason it's called capital murder,

25    because there's murder and robbery.

1          And the State went in and proved to you

2     beyond a reasonable doubt that the defendant committed

3     the murder but we didn't quite prove to you that he

4     committed the robbery.

5          In following your oath as a juror you

6     would have to find that defendant not guilty of capital

7     murder because we failed to prove the robbery to you but

8     find him guilty of the offense of murder, "murder" not

9     "capital murder?"

10    A          Yes.

11    Q          Could you do that if the evidence was a little

12    bit weak on the robbery and we didn't quite prove it to

13    you?

14    A          Yes.  I could.

15    Q          Okay.  Because after all that indictment there

16    -- well, let's take for instance this case, the

17    indictment says murder and robbery, that's what we have

18    got to prove to you, what we have got in the indictment.

19          If we prove capital murder some other

20    way, say the indictment says murder and robbery yet we

21    didn't prove murder and robbery, we proved murder and

22    rape, again, we didn't prove what we said in the

23    indictment.

24    A          Yes.

25    Q          So you would have to find him not guilty of

capital murder but still guilty of murder.

Could you do that if that were the case?

A        Yes, sir.

Q        It would be a pretty strange scenario for us to allege one thing and prove another but a lot of things we talk about are kind of unusual circumstances but we are just trying to cover as much ground as we can.

Another thing about murder cases is that in a capital murder case we have to prove that the murder was done intentionally and that is to say if the defendant's conscious objective and desire was to commit that murder, that's what he wanted to do, that's what he intended to do but in a regular murder case, a "plain murder" case, is what I call it, we can prove that he intentionally did it or prove that he knowingly did it which basically means that he didn't necessarily intend it but he knew that it was likely to happen.

A        Yes.

Q        If we proved to you the robbery and proved to you the murder but didn't prove that he did it intentionally, only proved that he did it knowingly, again, your duty as a juror would be to find him not guilty of capital murder but guilty of murder because we didn't prove the intentional part.

Could you do that?

1    A        Yes, sir.

2    Q        Okay.

3                          THE COURT:   Thirty minutes.

4                          MR. TOWNSEND:   Thank you, Your

5    Honor.

6                          We are required to prove these things

7    to you beyond a reasonable doubt.   Of course that's not

8    beyond all doubt but along with proving it beyond a

9    reasonable doubt this is what we call the burden of

10   proof, the burden of proof in this case rests strictly

11   with the State of Texas.

12                          The defendant, on the other hand, they

13   have no burden of proof.   They don't have to prove

14   anything, they could sit there -- and I'm sure they won't

15   -- but they could sit there and not do a dad gum thing,

16   okay, now, and that wouldn't shift the burden of proof

17   because the burden of proof never shifts, it stays right

18   here.

19                          We accept that, we knew it going in,

20   it's always been that way, we wouldn't be here if we

21   weren't ready to accept that burden.

22                          Is that a burden that you are familiar

23   with that burden of proof and could you hold us to our

24   burden of proof and not make them prove his innocence,

25   so to speak?

A          Yes, sir.

Q          Okay.  Along with that burden of proof goes the Fifth Amendment privilege and that basically says that the defendant has the right to -- not to testify if he so chooses.

The important thing about that from a juror's standpoint is that in order to be a qualified juror you have got to be able to base your decision on the evidence and not hold it against the defendant in any way.

If he chose not to testify could you do that?

A          Yes.

Q          Okay.  And that goes not only to the guilt and innocence phase but it also goes to the punishment phase.

In the punishment phase, you know, it may be human nature for you to want to hear what the defendant has got to say or it may be human nature, "I would just like him to, if he's guilty, to say his story", but the Fifth Amendment privilege says the defendant has the right not to testify and there may be a lot of different possible reasons why the defendant might not make that choice but anyway the important part from the juror's standpoint that you understand that you can't hold that against him at the punishment hearing.

You can't on Special Issue #1 and Issue #2, you can't base your decision in any way on the fact that he didn't testify.

                    Could you do that?

A        Yes, sir.

Q        Okay.  In criminal cases you hear testimony from all sorts of witnesses, some of those witnesses might be ministers, psychologists, someone that worked at the Dairy Queen, a police officer, you know, all sorts of different types of witnesses.

             The important part for the jury is that they be able to start each witness out and give each witness a fair shake and not start one witness out ahead of the other one by saying, "Well, that guy is a policeman, I'm going to really pay a little more attention to him" or "I'm going to start him out a little bit ahead of everybody else."

             You know, certainly we want you to listen to the witnesses, we want you to make a determination in your own mind as to whether or not those witnesses' testimony has been truthful, whether it's been important, that sort of thing.

             So we have got to have jurors who would -- can start each witness out at the same place on the track, so to speak, not give any witness an advantage

just because of his profession or just because he might

be someone that, you know, I don't think it's likely that

you would know any of the witnesses in this case but if

you did you would need to be able to give them the same

opportunity that you gave anyone else, listen to their

testimony and then decide what you think about their

evidence and what you think about their testimony.

Could you do that?

A        Yes, sir.

Q        Even if that witness was a police officer, even

if that witness was a minister?

A        Yes.

Q        The defendant's mother?

A        Yes.

Q        Whoever it might be?

A        Yeah.

Q        Okay.  In criminal trials oftentimes you hear

or you are presented evidence of a defendant making a

confession.  That confession might be in writing or it

might be just an oral confession, either way.

I believe if you heard such a confession

in a criminal trial the Judge would instruct you that in

order for you to consider that confession as evidence you

would have to decide and determine beyond a reasonable

doubt that evidence -- excuse me -- "that confession" was

1    both voluntary and truthful.

2            And when I say "voluntary" the obvious

3    situation is if you believe that the defendant gave the

4    confession but he was beat up, too, you know, and forced

5    to give it of course that would be involuntary and the

6    law requires that you not consider that confession in any

7    way if that's the case

8            Could you do that?

9    A        Yes, sir.

10   Q        And there's another voluntariness issue; under

11   the law a confession, depending on circumstance of a

12   confession but certain -- at certain times confessions

13   would not be considered legally voluntary, if the

14   defendant has had -- not had his Miranda Rights read to

15   him -- do you know what I'm talking about when I say

16   "Miranda Rights?"

17   A        Yes, sir.

18   Q        The right to remain silent and so on?

19   A        Yes.

20   Q        In certain situations a confession wouldn't be

21   considered legally voluntary unless those rights were

22   read to him completely, just say find, that you have been

23   presented evidence of a confession, you have decided that

24   we have proven to you beyond a reasonable doubt that that

25   confession is truthful but we haven't proven to you that

1   it was voluntary because you don't believe that the

2   defendant was read his Miranda Rights or wasn't read --

3   that they left the part of it, read it but they left

4   about half of it out.

5                    Your duty as a juror in following your

6   oath would be to follow the law.  In following the law

7   you would have to be able to set that aside.

8                    I mean, we can't ask you to put that out

9   of your mind --

10  A          Yes.

11  Q          -- because it's there.

12                   But you would have to be able to set

13  that aside and in determining the guilt or innocence of

14  the defendant you would have to be able to determine that

15  without considering that confession that you heard in any

16  way.

17                   Could you do that?

18  A          Yes, sir.

19  Q          The same thing holds true for the punishment

20  phase; if the defendant somehow or another in that

21  confession that you believe to be truthful even though

22  it wasn't voluntary, the defendant said something about

23  an act that he committed that was very gruesome or

24  brutal, when you are deciding your answer to Special

25  Issue #1 and Issue #2 you cannot consider that confession

1    in any way in making those decisions.  You would have to,

2    you know, again mentally set it aside.

3                      Could you do that?

4    A          Yes.

5    Q          Okay.  The same question; if you have a couple

6    of different witnesses that testified during the trial

7    and their testimony is in conflict but yet one of those

8    witnesses' testimony kind of goes along with what the

9    confession said, you have got to decide the credibility

10   of those witnesses without saying, "Well, you know, what

11   she said kind of went along with the confession so I'm

12   going to believe her."

13                      You   have   got   to   consider   their

14   credibility   some   other   way   without   considering   the

15   confession.

16                      Could you do that?

17   A          Yes, sir.

18   Q          You have looked at the copy of the indictment

19   in this case, Mr. Wiltse, I think from talking to the

20   Judge   back   in   October   he   explained   to   you   that   an

21   indictment is not evidence of any kind in this case or

22   any criminal case.

23   A          Yes, sir.

24   Q          And   you   cannot   consider   it   in   any   way   in

25   determining   whether   the   defendant   is   guilty   or   not

1    guilty.

2              Would you be able to set that indictment

3    aside and not consider it so far as determining guilt or

4    innocence?

5    A         Yes, sir.

6    Q         Okay.  After looking at your questionnaire, Mr.

7    Wiltse, I had a few questions and it may have been so

8    long ago you -- since you filled this out you may not

9    even remember what you put on there.

10             THE COURT:  There it is if you

11   need it.  (Indicating)

12             MR.  TOWNSEND:   There  is  a

13   question there that refers on Page 9, about the middle

14   of Page 9 and it talks about if you or your spouse or any

15   family  member  have  ever  been  charged  with  crimes,

16   basically.  (Indicating)

17             THE  POTENTIAL  JUROR:   Yes,

18   sir.

19   Q         (BY MR. TOWNSEND)  Above the level of traffic

20   tickets.

21             You said "Yes" and said "Marijuana."

22             Was  that  you  or  some  other  family

23   member?

24   A         It  was  actually  me.   It  was  a  misdemeanor

25   charge.

1    Q        It was a misdemeanor?

2    A        Yes, sir.

3    Q        How long ago was that?

4    A        It would have been December of '78.

5    Q        It has been awhile then?

6    A        Yes, sir.

7             When I was a senior in high school, got
8    caught with a couple of other boys and was in their
9    vehicle and it was found in the vehicle.

10   Q        Was that here or somewhere else?

11   A        It was here in Titus County.

12   Q        Here?  Okay.

13            Is that the only arrest that you have?

14   A        Yes, sir.

15   Q        Other than traffic tickets?

16   A        Other than a traffic ticket.

17   Q        Okay.  Was there anything about that arrest or
18   anything about the disposition of that case that -- did
19   you feel like you were treated fairly?

20   A        I spent the night in jail and I went home and
21   paid my fine and that was it.

22            I was caught for something that was done
23   wrong and, yeah, I felt like I was -- that I was dealt
24   with fairly.

25            I do now, maybe at the time I didn't but

1    I do now.

2    Q        Well, our opinions change a little as we get

3    older, don't they?

4              You indicated on your questionnaire also

5    over on Page 11 you indicated that you knew something

6    about the facts or the purported facts of the case; is

7    that information that you have, is that through the

8    newspaper or to you?

9    A        Yes, sir.  Newspaper and hearsay, I mean.

10   Q        Have you heard people talk about the case?

11   A        Yes, sir.

12   Q        Okay.  What is it that you -- what have you

13   heard?

14   A        Just basically that this person, you know, was

15   killed and his truck was stole, it was recovered in

16   another state.

17              That's about really all I know about it.

18   Q        Is that about the sum total of what you know?

19   A        Yes, sir.

20   Q        Okay.  Of course I think you know from what we

21   have talked about so far that you can't base your

22   decision on anything but the evidence that you heard in

23   the courtroom?

24   A        Yes.

25   Q        And of course anything you heard out on the

1   street or anything you may have read in the newspaper or

2   seen on TV, that's not evidence and I think you

3   understand that?

4   A      Yes, sir.

5   Q      Would you be able to sit on the jury and make

6   the decision you need to make without giving any

7   consideration whatsoever to what you heard in the

8   newspaper or heard on the street or anything of that

9   nature?

10  A      Yes, sir.  I could.

11  Q      Okay.  Mr. Wiltse, we all say things like, we

12  say like "We think we could" and "I don't know if I could

13  do that."

14         Really what I need and what we need to

15  hear from you is either you can do it or you can't.

16         I don't mean to be --

17  A      Yeah.  Okay.  Yes.  I could.

18  Q      You could do that?

19  A      Yes.

20  Q      I think that's what you meant anyway?

21  A      Yes.

22  Q      But that's just a phrase we all use.

23         Okay.  Mr. Wiltse, one of the attorneys

24  in this case is Mr. Bird Old, do you know him?

25  A      No, sir.

1              I have seen him around town.   I don't
2    know him.
3    Q        Nothing about that situation that would cause
4    you to lean toward the State or against the State?
5    A        No.
6    Q        The other Defense Attorney is Lance Hinson.
7             Do you know Lance?
8    A        No, sir.   Never seen him before until earlier
9    -- the time we met before.
10   Q        Okay.   Do you know the Defendant, I mean the
11   Defendant in this case, Mr. Wardlow, do you know anything
12   about him or any of his family?
13   A        No, sir.
14   Q        The victim in the case was Carl Cole, do you
15   know anything about Mr. Cole?
16   A        I know a nephew of his, that's the only thing.
17   I know Mr. John Edwards that is a nephew of his.
18   Q        Okay.
19   A        I didn't know he was even a nephew of his until
20   after the murder had took place and realized that it was
21   his uncle that had been killed.
22   Q        Have you discussed this case with John Edwards?
23   A        No, sir.
24   Q        Is there anything about -- to your knowledge
25   of Mr. Edwards that would cause you to lean toward the

1    State or lean toward the Defendant?

2             Could you be fair and impartial, the

3    fact that you know Mr. Edwards?

4    A        Yes, sir.  I believe I can.

5    Q        It wouldn't make any difference?

6    A        No.  It would not.

7    Q        Mr. Wiltse, I spent a lot of time asking you

8    questions and I haven't given you an opportunity to ask

9    questions; do you have any questions about the law or

10   that you would like to ask me?

11   A        No.

12   Q        Is there anything that you feel, anything that

13   we need to know that I just forgot to ask that might be

14   important and have a bearing on your jury service?

15   A        No.  I feel like, you know, I can be fair and

16   impartial and do the best I can if I am chosen.

17             MR. TOWNSEND:  Okay.

18             Your Honor, I'll pass the juror.

19             THE COURT:  Let's take about

20   a five minute break.

21             We will start back at 2:00 o'clock.

22             You may step down, sir, we will bring

23   you back out in about five or six minutes.

24

25             (Recess.)

1              (The following occurred in the presence

2      and hearing of the potential juror:)

3

4                              THE  COURT:   Is  the  Defense

5      ready to proceed?

6                              MR.  OLD:   They  are,  Your

7      Honor.

8                              THE  COURT:   Proceed.

9

10                    VOIR DIRE EXAMINATION

11                         BY MR. OLD

12

13     Q        Mr. Wiltse, I have been introduced to you, I

14     am Bird Old, I represent Mr. Wardlow.

15                    The way I like to start this off; what

16     we are trying to do is determine whether or not you

17     qualify in this case to be a juror.  The one necessary

18     ingredient for you to move from the seat that you are in

19     to one of those over there is when you get over there you

20     take an oath, you take an oath to tell the truth.  And

21     I  believe  you  are  telling  us  the  truth,  I'm  not

22     questioning  you  on  that  but  the  oath  is  a  little

23     different to become a juror.

24                    And what that oath asks you to affirm

25     or swear to is that "In the case that you are going to

1 try you will a true verdict render according to the law

2 and the evidence so help you God."

3     Now, according to the law a juror might

4 say, "I can't do that, I don't know what all the law is.

5 I'm not a lawyer, I am not a judge."

6     That is not what you are required to do.

7     His   Honor   through   your   written

8 instructions at the end of the evidence, he will instruct

9 you in writing on what the law for you to use in this

10 case is.

11     Then your duty is to determine on the

12 evidence that is before you.

13 A  Yes.

14 Q  Okay.  And what we are -- the questions we are

15 asking,  and I'm probably  going to ask you about the

16 same things that Mr. Townsend did, I'm trying to hear

17 your views on things and I want to hear your views, I

18 want -- I don't want to do all the talking, I want you

19 to talk to me.  I'm not trying to embarrass you and I'm

20 not trying to take issue with you, I'm not picking on

21 you, I'm not trying to get rid of you, I'm just trying

22 to find out enough about you and about your views to make

23 a decision on.

24 A  Okay.

25 Q  Let's   go   to   the   first   page   of   your

1    questionnaire; you said you were in favor of the death

2    penalty in some cases and you could also assess life in

3    some cases?

4    A        Yes.

5    Q        Okay.  In your written explanation you said

6    that you believe the punishment for a crime should be

7    equal to the crime committed?

8    A        Yes, sir.

9    Q        And I mean I see those -- that is inconsistent

10   with your other two answers, I'm not trying to put words

11   in your mouth and imply that you said something that you

12   didn't say, I think that written statement, that says to

13   me that "If you kill someone or murder someone then you

14   ought to be killed", isn't that pretty well your view?

15   A        I didn't read it that way.

16   Q        Okay.

17   A        Personally I felt like, you know, in certain

18   situations, certain -- like this issue said, there are

19   mitigating evidence that might cause a person to commit

20   a crime and be guilty of a murder but not necessarily be

21   guilty to or deserving of the death penalty in that case.

22            But then I believe there are some cases

23   and, you know, I think that's part of what you have got

24   to find out, if those circumstances equal up to more than

25   the death penalty or not.

1      Q        Okay.  I think so.

2               The indictment you have read uses the

3      word "intentional."

4               "Intentional" -- let me -- in the law

5      the Court gives you he will define words to you and one

6      of those words defined will be the word "intentionally",

7      it will tell you what "intentionally" means according to

8      the law.

9      A        All right.

10     Q        And what your oath says, whether you think

11     "intentionally" means something else or not you have got

12     to take what the law says about "intentionally" and use

13     that as a standard.

14     A        Yes.

15     Q        I suspect if you and I sat down and both wrote

16     out a definition of the word "intentionally" we might

17     come close to each other but it would be different.

18              And what the law will tell you, the

19     Court will tell you as to the word "intentionally; a

20     person acts intentionally or with intent with respect to

21     the result of his conduct when it is his conscious

22     objective or desire to cause the result."

23              Okay.  So you have to find it was a

24     person's conscious objective or desire to kill someone

25     that you find "intentional."

1    A        Yes.  Okay.

2    Q        Okay.  Is there anything offensive to you about

3    that definition?

4    A        No, sir.

5    Q        Okay.  Let me give you a comparison; I believe

6    Mr. Townsend mentioned to you that what he called "non-

7    capital murder" or "plain murder", that a person was

8    guilty of it if he intentionally or knowingly took the

9    life of another.

10             "Knowingly" is another one of those

11   words that has legal meaning and what it says is "A

12   person acts knowingly or with intent with respect to the

13   result of his conduct when he is aware that his conduct

14   is reasonably certain to cause the result."

15             Do you see a difference between --

16   between "intentionally" and "knowingly?"

17   A        Not really.

18   Q        Let me -- we said "intentionally" was someone's

19   conscious objective or desire -- or desire to cause the

20   result?

21   A        All right.

22   Q        As to "intentionally", we said that "with

23   respect to a result of his conduct, when he is aware that

24   his conduct is reasonably certain to cause the result?"

25   A        Yes.  I am -- I always, you know, to me if a

1   person is intentionally going to do something he

2   knowingly does it.

3   Q       Okay.  You are saying they mean the same thing

4   to you?

5   A       Yes, sir.

6   Q       Do you see the law making a distinction between

7   "intentionally" and "knowingly", what I have read to you?

8   A       I guess they do but I don't know that I see it,

9   I mean.

10  Q       I am not -- do you want me to repeat those

11  definitions for you or either one?

12  A       Yes.  Go ahead and read them again.

13  Q       Is "knowingly" the one that you are having a

14  problem with?  I --

15  A       Read them both again, that would be fine.

16  Q       I'm going to read "knowingly" first; "A person

17  acts knowingly or with knowledge with respect to a result

18  of his conduct when he is aware that his conduct is

19  reasonably certain to cause the result."

20  A       Okay.

21  Q       "Intentionally; a person acts intentionally or

22  with intent with respect to a result of his conduct when

23  it is his conscious objective or desire to cause the

24  result."

25  A       Okay.  I see what they are saying the

difference is.  Yes.

Q        So could you, now, I mean your -- the oath that you will take as a juror requires you to keep those two definitions and to apply those two definitions to the evidence.

Are you going to have a problem doing that?

A        I don't think so.  No, sir.

Q        Now, the indictment that you were reading -- that you have read, it says "intentionally" and does not say "knowingly", that is what is required of the State to prove, that's the written charge in this case, it says he must intentionally prove he caused the death during the course of a robbery.

A        Right.

Q        If it was proven to you and the -- if the evidence only sustained to you the result that a person knowingly caused the death during the course of a robbery would you find him not guilty of capital murder?

A        According to what you just read the law says.  Yeah.  You would have to.

Q        Now, I think you would have to, too.  Can you do that if that's what the evidence is?

A        Yes.  If that's what the evidence indicates.

Q        Do you -- and I mean if you can follow the law

1    whether you agree with it or not?

2    A        Yes.

3    Q        That's not a problem?

4             Do you -- first, do you disagree with

5    that being the law?

6    A        No, sir.  I don't think so.

7    Q        There is an exhibit before you numbered "6" and

8    in its second paragraph at the bottom of the page it is

9    what the Court will instruct you as to the meaning of

10   "beyond a reasonable doubt."

11            Can I get you to read that and consider

12   it and when you are comfortable will you tell me?

13   A        Okay.

14   Q        Again, if you and I both had written down,

15   wrote our definitions of reasonable doubt and I didn't

16   already know this, that's not what we would have written

17   down.

18            Did you read from the second paragraph

19   to the bottom of the page?

20   A        "To the bottom of the page?"

21            I  thought  you  said  "the  second

22   paragraph."

23   Q        Okay.  Is your own definition of reasonable

24   doubt different in meaning from what it says there?

25   A        Well, "reasonable doubt" to me means you have

1    no -- you know, I don't know if I would word it just like

2    that but to me "reasonable doubt" means "That you believe

3    wholeheartedly that what you were presented was the

4    truth."

5    Q        Okay.

6    A        Is how I would put it.

7    Q        What has been presented to you or what you have

8    decided from what has been presented to you?

9    A        Yes, sir.

10   Q        You work down at the Cason Power Plant for

11   Southwestern?

12   A        Yes, sir.

13   Q        In what you have heard about the incident

14   giving rise to this charge, did you hear that it happened

15   it or near Cason, Texas?

16   A        Yes, sir.

17   Q        As the crow flies Cason is what, mile, mile and

18   a half from the Power Plant, two miles?

19   A        Yeah.   Two miles, probably six miles by the

20   road.

21   Q        Did you hear this talked at work?

22   A        Yes.

23   Q        Was that near in time to the event that was

24   being reported?

25   A        Yes, sir.

1    Q        Okay.  You also said that you knew John Edwards

2    and he was a nephew of Mr. Cole?

3    A        Yes.

4    Q        Is that "John Edwards the plumber?"

5    A        Yes, sir.

6    Q        Does he have two sons?

7    A        Michael and David.

8    Q        About your age?

9    A        Yes.

10   Q        Did you all grow up together?

11   A        I didn't move to Mount Pleasant until I was a

12   junior in high school and they were both a couple of

13   years younger than me.  I didn't know them until I was

14   more or less out of school.

15                    We didn't grow up together.

16   Q        Are you all friends now?

17   A        Yes, sir.

18   Q        I mean you all socialize together?

19   A        Go to church with them.

20   Q        Where do you go to church?

21   A        Calvary Baptist Church here in Mount Pleasant.

22   Q        Is  Mike's  father-in-law  the  minister  at

23   Calvary?

24   A        No.

25   Q        Not trying to put words in your mouth but would

1    you consider them to be close friends?

2    A       No, sir.  Not really "close friends", just good

3    acquaintances, go to church with them.

4    Q       You are well acquainted with them?

5    A       Yes, sir.

6    Q       You all participate in church activities

7    together?

8    A       Yes, sir.

9    Q       Been to each other's homes?

10    A       Yes, sir.

11    Q       Your wives pass back and forth?

12    A       Not really.  Just basically our social life

13    revolves around the church more or less.

14    Q       Have they commented on this event?

15    A       No, sir.  Not -- as far as I know they are not

16    aware that I was even selected for the jury duty.

17    Q       No.  I don't mean that but I mean in talking

18    to them?

19    A       No, sir.  As far as I know I have never -- I

20    can't remember them ever mentioning it.

21    Q       How did you come to know that Mr. Cole was John

22    Edwards' uncle?

23    A       Well, at the time Mr. John and David weren't

24    even going to our church.  I knew them, I had gone to

25    church with them at another church previously and they

1    weren't going to church here but, you know, it was just

2    mentioned that John had lost an uncle and we needed to

3    remember the family and, you know, the circumstances

4    evolving, you know, the loss of his uncle were discussed

5    and that's how I knew who it was.

6    Q       Would your relationship with the Edwards in

7    deliberating and deciding this case if you are a juror

8    might could or would that relationship with them effect

9    you as a juror?

10           Would it effect your verdict is what I'm

11   asking?  Could it effect your verdict?

12   A       No, sir.  I don't think it would.  I would not

13   let it.  No.

14   Q       What I'm really asking you, I know that you

15   would do your best to guard against it but back here in

16   the back of your mind in that subjective analysis that

17   we do, that is going to be in there, isn't it?

18   A       Yes.  I am sure it is.

19   Q       I mean I can't make you -- I can't take it out

20   of your mind and have you on there not knowing, I can't

21   put you in that test tube but do you think that is going

22   to gnaw on you and come back to you as a juror that "This

23   man is related to someone who is close to me" to some

24   degree?

25   A       I am sure it's going to be back there in the

1    back of my mind but I don't think I will let that become

2    a factor in my decision if I have to make a decision in

3    a case.

4    Q        I'm going to be like Mr. Townsend, "I don't

5    think" isn't good enough.

6    A        No, sir.  It won't.

7    Q        I am taking you at your word that that is not

8    going to effect your deliberation.

9    A        Yes, sir.

10   Q        There is a Witness List in front of you that

11   is entitled at the top, is typed "Witness List", can I

12   get you to go over that and look at all the names on it

13   and the first one you come to, if any of them are names

14   that you know -- I'm not talking about somebody you

15   personally know but somebody you have heard of, even had

16   a casual relationship with onto a close relationship tell

17   me, please.

18   A        I knew a guy named -- it's "James Franklin

19   Ragsdale" here but he lived in Cason, I worked with him

20   for a period of time there at the Power Plant but --

21   Q        I think "Route 4, Pittsburg", may even be the

22   Power Plant, I think that's that area?

23   A        Yes, sir.  It is.

24   Q        All right.

25   A        He no longer -- what was his name -- "Greg" is

1    what he went by, though, so I don't know if that's the

2    same person or not.

3    Q        If    that is a    "Ragsdale"    that    lives    at

4    Cason --

5    A        Yes, sir.

6    Q        -- it's possible that you know him?

7    A        I worked with him.  Yes, sir.  It's possible

8    I do.  I don't know what his proper name -- I don't know

9    if "Greg" was his proper name or not.

10   Q        Let    me    ask    you    kind    of    a    double    jointed

11   question; if that is he or perhaps that is his father,

12   brother,    okay,    if    it    is    him    would    that    effect    your

13   deliberations?

14            And what I'm asking you, is he a person

15   to whom -- as to what he testified because you already

16   know them, would it put them at least at that starting

17   line that Mr. Townsend talked about, would it give him

18   a little head start?

19   A        No, sir.

20   Q        It would not?

21   A        No, sir.

22   Q        I presume that's not a close relationship?

23   A        No.

24   Q        You all didn't hunt, fish together?

25   A        No, sir.

Q        Go to church together or socialize together?

A        Just worked together for, I don't know, he worked there for maybe two years and then he left and went on, you know, and since then I have had -- not had any contact with him since then.

Q        There's a lot of law enforcement officers on that list, let me ask you a question about them; would you because a man is an agent of the state of Texas and that is a law enforcement officer, would that fact alone give him a head start in you believing his testimony?

A        No, sir.

Q        You wouldn't presume that he was telling the truth anymore than any other witness merely because he sat down on that witness stand wearing a badge?

A        No.

Q        Special Issue #1, you have looked at?

A        Yes.

Q        I believe Mr. Townsend talked to you about "probability", being -- the word "probability" meaning "more likely -- more likely than not?"

A        Yes.

Q        And that means just a little more than half?

A        Right.

Q        I mean if we were weighing it on scales it would be -- have a balancing scale, it would be to where

1    they just tilted one way?   (Indicating)

2    A       Yes, sir.

3    Q       As compared to "beyond a reasonable doubt", is

4    "beyond a reasonable doubt" a higher standard to you than

5    "probability?"

6    A       Yes, sir.

7    Q       Okay.   What a lawyer usually likes to talk

8    about it is the scales of justice in weighing the

9    evidence and "more likely than not" meaning just a

10   tilting?   (Indicating)

11   A       Right.

12   Q       A "reasonable doubt" is a "clear shift?"

13   (Indicating)

14   A       Yes, sir.

15   Q       Now, in that issue it tells you that you must

16   find to answer it "Yes, beyond a reasonable doubt, that

17   it is more likely than not that the defendant would

18   commit a criminal act of violence that would constitute

19   a continuing threat to society."

20           Now, that kind of requires you to -- is

21   that 50 percent of the evidence or 50 percent plus a

22   little has to be proven to you beyond a reasonable doubt?

23           Do you follow me on that?

24   A       Yes, sir.

25           All right.   I see what you are saying.

1    Q        The standard we talked about on "reasonable

2    doubt" that must be proven, that 50 percent must be proof

3    of such a convincing character that you would be willing

4    to rely and act upon it without hesitation in the most

5    important of your own affairs?

6    A        Yes, sir.  I understand.

7    Q        You know that's not saying if 10 things are

8    testified to that six of them go one way that that is,

9    you know, "more likely than not", you have to weigh those

10   things?

11   A        Right.

12   Q        And the five plus a little that you weigh that

13   on has to measure up to that without hesitation in the

14   most important of your own affairs.

15            Do you have any problem with weighing

16   evidence or considering evidence that way?

17   A        No, sir.

18   Q        "Criminal acts of violence", do you agree that

19   there are "criminal acts" that don't amount to

20   "violence?"

21   A        Yes, sir.

22   Q        Would you agree with me that forgery is not a

23   violent crime?

24   A        Yes, sir.

25   Q        And theft may not be a violent crime?

1    A        Yes, sir.

2    Q        Now, I don't recall whether or not Mr. Townsend

3    talked to you about "society", but "society" does not

4    exclude the penitentiary.

5    A        Yes.

6    Q        Have you ever -- you have lived near some

7    penitentiaries, I know that you lived in Palestine?

8    A        Yes, sir.

9    Q        Tennessee Colony and several of them around

10   there?

11   A        I have been in the penitentiary with some

12   church groups before.

13   Q        You have been in the penitentiary with some

14   church groups?

15   A        Yes, sir.

16   Q        When you were in Palestine what were you doing

17   for a living?

18   A        Worked for Houston Lighting & Power at a power

19   plant.

20   Q        Did you work in the -- in your job at your

21   power plant did you work in those penal institutions?

22   A        No, sir.  No.  Only time I have ever been there

23   or around one was with a group that is called -- oh,  I

24   can't remember now,  Paul Carlan  was  the man that --

25   "The Bible Prison Institute" is what it is.

Q        Were you active in that?

A        I went on three different occasions to three different units with -- on the prison there, prison revivals is what they are, you went in and talked and visited with the prisoners all day on Saturday and that night had a -- actually you went in on Saturday and then had a service that night, went back in Saturday, had a service and just invited them to church services, talked to them, visited with them, shared Christ with them if you was able.

                And that's the only contact that I have had with the prison system.

Q        Let me ask you something about that experience and I don't know exactly how to ask it, was that an experience that you enjoyed?

A        I enjoyed sharing my faith with men that I felt like needed it.  Yes, sir.

Q        Did you feel like we all have an obligation to God?

A        Yes, sir.

Q        Do you feel like in doing that you fulfilled your obligation, not totally fulfilled but toward fulfilling your obligation?

A        Yes, sir.  I felt like I was doing what I am supposed to as a Christian.  Yes, sir.

1    Q          You have been in penitentiaries as a visitor?

2    A          Yes, sir.

3    Q          And in this case you may be asked to send a man

4    to the penitentiary if you find him guilty?

5    A          Yes, sir.

6    Q          One of the options -- to some degree you have

7    seen the inner workings of the penitentiary?

8    A          To some degree.

9    Q          In fact you have seen penitentiary society?

10   A          Yeah.  I think when I -- the limited amount of

11   time I am there I'm not sure I could say that I fully

12   understand.

13   Q          But you have observed it to some degree?

14   A          Yes.

15   Q          That's knowledge you carry around in your head

16   that I can't take away from you?

17   A          Yes.

18   Q          Anything that might could or would effect your

19   verdict in this case?

20   A          I don't think so, you know.  I don't.  No.

21              I believe that those men were there,

22   were there for a reason, I believe that some jury

23   convicted them based on the evidence just like I will

24   have to do if I am selected for this jury and they were

25   there accordingly.

LLOYD E. BILLUPS, CSR. #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT. TEXAS

1    Q        What I'm really asking, you know some of the

2    inner workings of the penitentiary from your observation?

3    A        Yes, sir.

4    Q        As opposed to someone that has just driven by

5    the outside of one?

6    A        Yes, sir.

7    Q        Knowing that, could it influence your answer

8    to Special Issue #1 or any other issue in this case?

9    A        No.

10   Q        In answering Special Issue #1 you will be

11   informed as Mr. Townsend told you the result of your

12   answer, if you answer that question "No" the defendant

13   receives a life sentence in the penitentiary, right?

14   A        Yes, sir.

15   Q        Okay.  Mr. Townsend also told you that you are

16   -- that you aren't to consider the law of parole, the 35

17   years that you know that he's going to do.  In answering

18   that question life equals life, that means that you must

19   presume that he would be there for the rest of his life,

20   okay?

21   A        Yes, sir.

22   Q        Are you comfortable doing that?

23   A        Yes, sir.

24   Q        We ask a lot of you, we tell you something and

25   we say, "That's what it is but don't consider it?"

1    A        Right.

2    Q        Anything in your relationship and your ministry

3    at the penitentiary that could cause you to make an

4    improper answer to that question?

5    A        No.  No, sir.

6    Q        Let me ask you about the word "sufficient" as

7    it appears in the next issue; what does "sufficient" mean

8    to you?

9    A        It means it's good enough to just -- good

10   enough to get you by, if you do a sufficient job you are

11   just doing enough to get by.

12   Q        It's "enough, just enough?"

13   A        Yes, sir.

14   Q        And it may not even be 50 percent, is that

15   right, just "enough?"

16   A        Yes, sir.

17   Q        Okay.  It tells you under that question,

18   "Mitigating evidence is evidence that a juror might

19   regard  as  reducing  the  defendant's  moral

20   blameworthiness", I mean I am slow on these questions,

21   it's hard to ask and hard to get framed in the correct

22   manner, I'm going to ask you to bear with me.

23            I'm not asking you what you would do

24   with the evidence once you received it and heard it.

25   A        Yes.

Q        Did you ever hear a friend of yours or someone
say "My wife talks all the time, I just don't listen to
her, it goes in one ear and out the other?"

A        I have heard that.

Q        There are people -- I have had this answer,
"Mr. Old, I don't care how many psychiatrists you bring
in here, I don't care what college they went to, I don't
care how long they have done it.  Yeah.  I will sit over
there and I will hear the words but they will pass
through this ear and out the other one.  I just can't
consider that."

         Now, that's what I'm asking you about
the type of evidence that I'm going to ask you about, if
one of them falls in a category that is going to go in
one ear and out the other, the evidence that you would
just totally reject and say, "You could make me listen
to it all day but I'm not going to consider" --

A        Yes.

Q        -- "as evidence."

         Would you consider the age of a person?

         I'm not asking what you would do, I'm
just asking, would you listen to testimony and weigh it
to the extent that it would be evidence that you just
wouldn't reject and push off to the side and say "No.
Not under any circumstances am I going to listen to

1    evidence on that."

2    A        Yes, sir.  I would listen to it.

3    Q        Someone's background, I'm talking about how

4    they were raised, I mean I can give you any sort of

5    scenario, they came from a rich family or went to private

6    school or they came from a poor family and nobody made

7    them go to school; is that evidence that you would weigh

8    and not reject?

9    A        Yes.

10   Q        You would consider psychiatric testimony?

11   A        Yes, sir.

12   Q        Would you consider someone's religious belief

13   or confessing to be a Christian?

14   A        Yes, sir.

15   Q        Let me give you another question, I mean I'm

16   not talking about this trial, I'm just talking about in

17   general; a defendant has a choice of pleading guilty or

18   not guilty, that is a choice that if the person is

19   intelligent he lets his lawyer make.

20             Now, what Mr. Townsend has told you and

21   what I have told you and what the Judge told you; before

22   a man is guilty he's presumed to be innocent?

23   A        Yes, sir.

24   Q        Before -- until there is proof beyond a

25   reasonable doubt and the State doesn't prove something

1    to you beyond a reasonable doubt then your duty as a

2    citizen and as a juror is to find him not guilty.

3              Do you have a problem with that?

4    A         No, sir.

5    Q         In answering Special Issue #1 or Issue #2 if

6    a man pled not guilty and you found him guilty would the

7    fact that he pled not guilty effect your answers?

8    A         No, sir.

9    Q         I mean you are not going to say, "Well, I'm

10   taking into consideration the fact that the men pled not

11   guilty and the evidence showed that he was guilty?"

12   A         No, sir.

13   Q         I mean you wouldn't get into that and that

14   would not be evidence that you would weigh, that's not

15   evidence?

16   A         That's part of the indictment, isn't it?

17   Q         The same thing about the defendant testifying,

18   we have a Constitutional right both State and Federal

19   Constitution and the law of this land has always been the

20   law of this land, a person is not required to testify

21   against himself during his trial.

22   A         Yes.

23   Q         The Court will instruct you in his charge that

24   you shall not consider the failure of the defendant to

25   testify as an inference of guilt.

1    If you told me, "Yes. I would like the

2    defendant to testify" I wouldn't be shocked.

3    Would you like for a defendant to

4    testify?

5    I mean do you think --

6    A    I don't think it would make any difference.

7    Q    -- do you think it would make your job as a

8    juror easier if he presented evidence?

9    A    Yes, sir. Probably.

10   Q    Okay. After you heard the evidence and in our

11   subjective minds as a juror do you agree that you may be

12   saying I sure wish he would have testified, is that fair?

13   A    Yes. That's probably fair.

14   Q    I mean we can tell you not to consider it but

15   we can't make you not think it?

16   A    Yes, sir.

17   Q    And I mean, presume that the defendant, the

18   Judge said back in October when you were first here we

19   could sit and work crossword puzzles, does not have to

20   open his mouth?

21   A    No.

22   Q    Said you were -- in that sort of situation,

23   let's say evidence is pretty close; is the fact that he

24   did not do anything going to influence your verdict?

25   A    No, sir.

1          THE    COURT:        Thirty-six

2    minutes.

3          MR. OLD:  You could lay that

4    aside and push it aside, could you make the decision on

5    the evidence that you hear?

6          THE  POTENTIAL  JUROR:     Yes,

7    sir.  I could.

8    Q          (BY MR. OLD)    Same thing on Mr. Townsend's

9    confession example, a jury determines and the Court will

10   tell you how to judge a confession as to whether or not

11   it is voluntary or not, will tell you that you must first

12   find that the confession offered was voluntary and will

13   tell  you  a  confession  is  voluntary  and  made  of  the

14   defendant's  own  free  will  if,  and  give  you  a  list  of

15   things that have to happen or can't happen.

16          Okay.   You  have  heard  the  confession

17   read,  you  believe  beyond  a  reasonable  doubt  that  the

18   confession is true.

19   A          Yes.

20   Q          But  you  find,  and  there's  no  question  beyond

21   a  reasonable  doubt  you  believe  it  is  involuntary?

22   A          Right.

23   Q          Okay.   Then  the  Court  says  if  you  are  in  that

24   position,  I  don't  care  how  much  you  believe  it's  true,

25   if  you  find  it  is  involuntary  or  have  a  reasonable  doubt

1    thereof as to the issue of voluntariness of the

2    confession push it aside over here, don't consider it for

3    any purpose.  (Indicating)

4    A        Right.

5    Q        Is that a hard thing?  Do you think that's

6    going to be a hard thing to do?

7    A        Yeah.  I think once you have heard it's going

8    to be something that's going to be in your mind, you have

9    to --

10   Q        Especially when you believe it to be true?

11   A        Yes, sir.

12   Q        Now, there's something that I call "boot

13   strapping", that is using one thing to pull another up,

14   you know, let's say there is some other evidence, are you

15   going to use that involuntary confession to boot strap

16   the other evidence, to pull it on up to "beyond a

17   reasonable doubt?"

18   A        No.

19   Q        I mean, I know you aren't going to

20   intentionally do that, do you think subjectively you

21   would?

22            I'm talking about mental process.

23   A        No, sir.  I think I can be fair about it, you

24   know.

25   Q        I mean I'm not -- let's talk about fairness,

1   fairness is this; if that confession is involuntary --

2   A          Then you discard it.

3   Q          You discard it.  Even if supported by other

4   evidence it's still discarded?

5   A          Yes.

6   Q          You can't say "Well, witness so and so

7   testified that, you know, about the same as the

8   confession, I believe the confession.  Now, witness so

9   and so has been the most -- I just have -- a problem I

10  had with them is they had all these bad things, they had

11  a motive to testify but because -- I believe it's

12  involuntary, the defendant made a true statement, that

13  proves to me that witness so and so's testimony is true

14  beyond a reasonable doubt."

15             Can you not do that in that situation?

16  A          Yes, sir.

17  Q          I mean if it matches perfectly and the witness

18  that testified is not credible enough for you to get you

19  beyond a reasonable doubt on their own you can't go grab

20  that confession that you laid aside and say, "They match,

21  let's add it over here to the stack and get it up over

22  here?"  (Indicating)

23  A          Yes, sir.  I can.

24  Q          This bit about parole, the Court will tell you

25  not to consider the fact that someone may ultimately be

paroled, they will tell you that it's not something that you are to consider and they will tell you in any event the defendant must spent 35 real years before he even becomes eligible.  "Eligible" does not mean that he will ever get parole, it merely means application can be made.

But we are telling you life equals life and that's the way you are supposed to see it, is that going to effect you in any way?

A      No, sir.

Q      See, in answer to Special Issue #1, you know that if you answer it "No" you have in effect given a life sentence?

A      Yes, sir.

Q      And you are assuming that he's going to be in the penitentiary for the rest of his life?

A      Yes, sir.

Q      Even though you know that after 35 years --

A      He will be eligible for parole.  Yes, sir.

Q      That's not going to sway you to the other answer to say "Yes?"

A      No, sir.

Q      Okay.  I mean you are really -- that question really asks you "If we put this man in the penitentiary for the rest of his life is he a continuing threat to society?"

1    A       Right.

2    Q       You summarized what you had heard or read in

3    the newspaper as "A man was killed, his truck was stolen

4    and his truck was recovered out of state?"

5    A       Yes, sir.

6    Q       Is that a shorthand rendition of what you heard

7    or is that just all that you have heard?

8    A       That's pretty shorthand.

9            I heard that he had him and his

10   girlfriend, I -- I guess I need to add there was another

11   accomplice or another person involved, too.

12   Q       Did you hear anything about how the man was

13   killed?

14   A       No, sir.  Shot.

15   Q       "Shot?"

16           Well, where he was shot?

17   A       No, sir.

18   Q       How many times?

19   A       No, sir.

20   Q       If the State's evidence was lacking to you

21   would you reach out to what you had heard and say, "Well,

22   I heard it and that is some evidence to me that the

23   State's evidence is right?"

24   A       No, sir.

25   Q       Okay.  I mean you understand that what you base

1    your decision on must come to you in this courtroom?

2    A        Yes, sir.

3    Q        From --

4    A        The evidence presented.

5    Q        -- the evidence in this case?

6             Which means basically is the testimony

7    of witnesses or tangible evidence offered?

8    A        Yes, sir.

9    Q        Now, you said you had heard, have you passed

10   on what you have heard to other people?

11   A        I just, you know, in the discussion if I had

12   heard something -- this has all took place basically when

13   the crime was committed or there shortly after when it

14   was in the news in this area.  No.  As far as recently.

15   No, sir.

16   Q        I mean I'm talking about back when you talking,

17   talking about this, did you, you know, to somebody who

18   had not heard did you say, "Hey, did you hear?"

19   A        Yeah.  I probably could have.

20             You know, it's been awhile ago so I

21   don't know.  I couldn't definitely say I have or I

22   haven't.

23   Q        I'm not asking you --

24   A        It's a possibility.  Yes.

25   Q        -- I'm not asking you how strong of an opinion

1    you -- I -- I'm not asking you beyond a reasonable doubt

2    you formed any particular opinion, did you form an

3    opinion about what happened out there?

4    A        Yeah.

5    Q        Okay.

6    A        Yes.  I mean just based on what you hear I

7    guess you form an opinion.  I would have to say "Yes" to

8    that.

9    Q        And did you form an opinion that the person who

10   was ultimately arrested was guilty?

11   A        From what I heard I would say "Yes" but, you

12   know, I can't say that anything that I heard was

13   conclusive enough to find someone guilty, you know.

14   Q        I mean -- but you did form an opinion, you

15   formed an opinion as to guilt?

16   A        Yes, sir.

17   Q        And that was the person who was ultimately

18   arrested?

19   A        I don't know.  I never -- until -- until I

20   heard the man's name back in October I didn't know who

21   it was.

22   Q        No.  I know you didn't know his name but you

23   heard they had arrested somebody?

24   A        Yes, sir.

25   Q        And presuming that's the same person being

1  tried that was arrested you formed an opinion of guilt?

2  A        Yes.

3  Q        As we sit here today or as evidence is started

4  in this case will it require evidence to remove that

5  opinion from your mind?

6  A        No, sir.  No.

7           I believe I can clean the slate and

8  start over.

9  Q        But you -- let me search your soul a little;

10  you said "I believe", that's how we talk, search your

11  soul and tell me whether you can or cannot.

12  A        Yes, sir.  I can.

13           THE COURT:  Four minutes.

14           MR.  OLD:    Other than by

15  presuming something you don't know that the person that

16  was -- that you heard was arrested with his girlfriend

17  or he and his girlfriend done it, you don't know that

18  this is the man seated here, do you?  (Indicating)

19           THE POTENTIAL JUROR: No, sir.

20  Q        (BY MR. OLD)  So I mean we can get back to --

21  I mean  even  though  you formed  an opinion about

22  something --

23  A        Yes.

24  Q        When you sit down in that jury box we are back

25  to even and we are back to the State having to prove to

1    you in this courtroom guilt beyond a reasonable doubt?

2    A        Yes, sir.

3    Q        We have talked about a lot.  I appreciate you

4    talking to me and let me ask you one more question, I am

5    inviting you to ask me a question is what I'm doing.

6    A        Yes.

7    Q        Anything that is bothering you about whether

8    or not you are truly qualified as a juror or any opinion

9    you may have changed since we started?

10            I mean someone told me the other day on

11   talking about the questionnaire and they said, "Yeah,

12   you know, I went home and I was kind of changed my

13   opinion on that" and that's -- I mean I understand why.

14   A        Yes.

15   Q        You know, it's real easy to sit around and talk

16   about how we feel about this particular issue or that

17   particular issue or "Yeah.  I'm in favor of the death

18   penalty" when we are in the coffee shop, we are in

19   conversation but when we get down to getting on the jury

20   and doing it that's -- sometimes we have to really decide

21   our position on the issue.

22            And I am by no means -- what you are

23   saying, you could give the death penalty in an

24   appropriate case?

25   A        Yes, sir.

Q        You are not -- if I read you correctly you are

not pro death penalty to the point, "I'm going to give

the death penalty until something else is proven to me?"

A        Right.

Q        You can let those two issues and the law really

decide the punishment?

A        Yes, sir.

Q        Anything you want to ask back to me or to the

Court, anything you think we need to know to consider

you?

A        No, sir.

         I believe I would just do, just say that

I would be fair and listen to the evidence and form an

opinion based on that evidence if I was chosen is all I

can say.

Q        Your use of the word "fair" there?

A        Yes, sir.

Q        Is that saying that --

A        It's saying -- I use the word "fair" to say

that I would be open-minded to what was being presented

to me.

Q        Can you be fair with the law and take the law

as you get it from the Court?

A        Yes, sir.

Q        I mean there's a lot of things you probably

1    think are horrible that may not actually be against the

2    law but I mean you wouldn't find a man guilty of doing

3    something because you personally didn't like it, it would

4    have to be against the law?

5    A        Yes, sir.

6                        MR. OLD: Your Honor, we would

7    pass the juror.

8                        THE COURT:  Sir, if you will

9    return to the jury room or to the waiting area I will

10   send further instruction to you in a moment.

11                       THE BAILIFF:  Watch your step

12   up there.

13

14                       (The  following  occurred  outside  the

15   presence and hearing of the potential juror:)

16

17                       THE COURT:   Does  the  State

18   have any challenges?

19                       MR.  TOWNSEND:    None,  Your

20   Honor.

21                       THE COURT:   The Defense have

22   any challenges?

23                       MR. OLD:  Lance is doing them

24   on this, I can't think of any, Your Honor.

25                       THE COURT:  Mr. Hinson?

1               MR. HINSON:   None that I can

2    credibly propose.

3               THE   COURT:     Let's   take   a

4    break.

5               Tell him he's still a prospective juror,

6    don't  discuss  this  case  with  anyone  and  he  will  be

7    notified  at  the  end  of  the  week  or  first  of  next  week

8    whether  or  not  he  will  be  on  the  jury.

9               Okay.   We are off the record.

10

11               (Off the record discussion.)

12

13               (Recess.)

14

15               (The following occurred in the presence

16    and hearing of the potential juror:)

17

18       BOBBY DWAYNE MOORE, Potential Juror #176,

19    was  called  as  a  Potential  Juror  and,  having  been

20    previously sworn by the Court, testified as follows:

21

22               THE COURT:   Go ahead and take

23    a seat, sir.

24               Are you "Bobby Moore?"

25               THE  POTENTIAL  JUROR:    Yes.

1    I am.

2                             THE COURT:  This is juror 42.

3                    First, Mr. Moore, I appreciate your

4    rearranging your schedule and coming on short notice and,

5    second, I'm sorry we got you down here on short notice

6    and made you wait.

7                             THE POTENTIAL JUROR:  Okay.

8                             THE COURT:  We never know how

9    long we are going to talk to a juror, that's why we had

10   to bring some in, our scheduling this morning kind of

11   fell apart and we needed to get some people in and we

12   appreciate it.

13                   I am Gary Stephens and I'm presiding

14   over the trial and jury selection, there are two District

15   Attorneys assigned, not "assigned" but are working on

16   this case for the State of Texas, the District Attorney

17   that is handling this case out of Morris County is Mr.

18   Richard Townsend.

19                   His partner for this case is Randy Lee

20   from Cass County, he's in trial on another case today and

21   is not with us.

22                   Both of the Defense Attorneys are

23   present today, Mr. Bird Old, III.

24                             MR. OLD:  Howdy.

25                             THE POTENTIAL JUROR:  Hi.

                                                          165

1          THE COURT:     And Mr. Lance

2 Hinson.

3          MR. HINSON:   Good afternoon.

4          THE COURT:  Next to Mr. Hinson

5 is the person charged, Mr. Billy Joe Wardlow.

6          Now, Mr. Moore, the lawyers have read

7 your questionnaire, they are familiar with your answers,

8 they are going to talk to you about those answers and

9 also talk to you about the principles of law and issues

10 involved in death penalty cases.

11          You will be asked a lot of questions and

12 the answers will let us know whether or not to put you

13 on the jury.

14          In order to be a juror you must be able

15 to understand and follow the law.   You don't even

16 necessarily have to agree with the law.   If you disagree

17 with some aspect of our law that you can put aside that

18 disagreement then you are qualified but if you disagree

19 to such an extent that you can't follow the law you are

20 not qualified.

21          The only way we know if you can follow

22 the law is to ask you but we need to know "Yes, I can"

23 or "No, I can't follow the law."

24          We have found that most jurors can

25 follow the law but that doesn't necessarily mean they are

appropriate jurors in a death penalty case so we want to know what you think about some of these laws and issues that we will discuss.

Often in trying to make a point a lawyer will use a set of facts to try to illustrate their point. If this happens, sir, I want you to understand that they are not using facts associate with this case, the facts of this case will be left up to the jury to determine from the trial so when we are talking about -- if we make up examples don't assume they have anything to do with this case because they don't.

This is kind of like an interview for a job that nobody wants but we do expect you to be truthful with us, there aren't right or wrong answers, there are not right or wrong opinions, just yours.

And if you will be as honest and open with us as you can we will decide whether or not to put you on the jury.

If you don't understand a question that a lawyer is asking you make them clarify it, if there's something that you think we need to know about you that might make us decide to put you on the jury or not volunteer that information, both sides want the same thing, they want 12 fair impartial people who can do whatever the right thing is and that will depend on the

facts.

Now, Mr. Moore, you said in your questionnaire that you do know something about the facts of this case.

Tell me, sir, where have you heard about this case?

THE POTENTIAL JUROR:   On Channel 7 News and the newspaper.

THE COURT:   What have you heard?

THE POTENTIAL JUROR:  Just on Channel 7 News, you know, that the -- he and someone else was or that he and someone else was in this man's house and, you know, they supposedly killed him and stuck him in a closet and got his pickup and took off.

THE COURT:  Did you hear Mr. Wardlow's name mentioned?

THE POTENTIAL JUROR: Not that I remember.

THE COURT:  Have you ever -- can you associate reading his name in the paper?

THE POTENTIAL JUROR: Originally I don't -- I don't remember his name.

THE COURT:  So you heard that a person was killed and that two people allegedly were

1    involved in the killing and took a pickup truck but you

2    don't know who those two people are?

3                        THE POTENTIAL JUROR:  No.

4                        THE COURT:  Did you know the

5    man that was allegedly murdered?

6                        THE POTENTIAL JUROR: No, sir.

7                        THE COURT:  Have you formed

8    an opinion about the guilt of Mr. Wardlow?

9                        THE POTENTIAL JUROR:  Well,

10   originally when the last facts I heard or not "facts" but

11   the last that I heard, you know, I assumed that he was

12   guilty.  Yeah.

13                       THE COURT:  Can you set aside

14   that assumption and can you presume Mr. Wardlow to be not

15   guilty at this time?

16                       THE POTENTIAL JUROR: Honestly

17   I would hope to think that I would, you know, could.

18                       THE COURT:  Have you formed

19   a conclusion about the guilt of Mr. Wardlow or innocence

20   of him that would influence your verdict?

21                       THE POTENTIAL JUROR:  Well,

22   again, you know, honestly, you know, because of, you

23   know, each time that I heard something about it, you

24   know, I just assumed, you know, that he -- that from the

25   -- what I have heard that he was guilty.

1        THE COURT:   Well, you are

2  telling me that you think you can do this and that you

3  made these assumptions and there's absolutely nothing

4  wrong with any of us making those assumptions, there's

5  certainly wrong with bringing those assumptions and

6  conclusions into the courtroom if a person has made their

7  mind up about Mr. Wardlow's guilt or innocence, if they

8  have decided based on what they have heard that he's

9  guilty obviously you don't belong on the jury.   You

10  wouldn't want to be on a jury that went in thinking that.

11        You are the only one that can look

12  inside your mind and heart and tell us, can you presume

13  Mr. Wardlow be not guilty and make the State prove beyond

14  a reasonable doubt that he's guilty?

15        THE POTENTIAL JUROR:  I think.

16  Yeah.   That I could, you know.

17        THE COURT:   You keep using

18  that word.

19        THE POTENTIAL JUROR:  "Think?"

20        THE COURT:   I can't accept

21  that.

22        THE POTENTIAL JUROR:   Okay.

23  You know,  probably to be honest that I -- that it would

24  -- that it would effect my thinking, what I already

25  believe, you know, to be true.

1    THE COURT:   Are you telling

2    me that you have formed a conclusion that would influence

3    your verdict in this case?

4    THE POTENTIAL JUROR:   Yes,

5    sir.

6    THE COURT:   Okay.

7    The Court believes based on some

8    previous rulings that the juror should be discharged at

9    this time.

10    Does either side disagree with the

11    Court?

12    MR. TOWNSEND: No, Your Honor.

13    MR. OLD:   No.

14    THE COURT:   I'm going to

15    release you, sorry we kept you down here for a couple of

16    hours sitting back there but as you can see it didn't

17    take too long.

18    THE POTENTIAL JUROR:   Okay.

19    THE COURT:   I really

20    appreciate your honesty.  A lot of people would come out

21    here and tell us, you know, "I haven't made my mind up"

22    because they would think if they were a good citizen that

23    that's what they would have to say and you have proven

24    you are a good citizen by coming down here and doing what

25    we wanted and being honest with us.

1            THE POTENTIAL JUROR:  Honestly

2   I don't believe I could come and --

3            THE COURT:   That's all we

4   wanted from you.

5            Thank you for coming down and telling

6   us that and you are free to go.

7

8            (Off the record discussion.)

9

10           (Record closed for November 16th, 1994.)

11

12           (Whereupon Court was recessed until 9:00

13   a.m., November 17th, 1994.)

14

15

16                    *****

17

18

19

20

21

22

23

24

25

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1   STATE OF TEXAS      §
                        §
2   COUNTY OF TITUS     §

3

4           I, Lloyd E. Billups, CSR #149 and

5   Official Court Reporter in and for the 76th Judicial

6   District, State of Texas, do hereby certify that the

7   above and foregoing contains a true and correct

8   transcription of the proceedings in the above-styled and

9   numbered cause, all of which occurred in open court or

10  in chambers on November 16, 1994 and were reported by me.

11          I further certify that this

12  transcription of the record of the proceedings truly and

13  correctly reflects the exhibits, if any, offered by the

14  respective parties.

15          WITNESS MY HAND this 31ST day of

16  January, 1995.

17

18  _____
    LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER

19  76TH JUDICIAL DISTRICT, STATE OF TEXAS

20

21

22

23

24

25

1    Certification Number of Reporter:   149

2    Expiration Date of Certification:   12/31/96

3    Business Address:   Drawer 1868
                        Mt. Pleasant, Texas 75456-1868

4

     Telephone Number:   903/577-6735

5

     Transcribed By:   Tandra K. Gibson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25