

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 17, 1994

**VOLUME 22 of 43 volumes**

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

FILED IN
COURT OF CRIMINAL APPEALS

OCT 1 1 1995

Troy C. Bennett, Jr., Clerk

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1                           VOLUME 22

2                     VOIR DIRE EXAMINATION

3    NOVEMBER 17, 1994                        PAGE/VOLUME

4    APPEARANCES . . . . . . . . . . . . . . .        1/22

5    MORNING SESSION . . . . . . . . . . . . .        3/22

6    POTENTIAL JUROR, WANDA B. SCHINDLEY
             EXAMINATION BY MR. TOWNSEND . . .         9/22
7
     RECESS  . . . . . . . . . . . . . . . .          44/22
8
     POTENTIAL JUROR, WANDA B. SCHINDLEY, (CONTINUING)
9            EXAMINATION BY MR. OLD  . . . . .         45/22

10   DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
             OF THE POTENTIAL JUROR  . . . . .         67/22
11
     DISCUSSION CONCLUDED  . . . . . . . . . .         70/22
12
     POTENTIAL JUROR, WANDA B. SCHINDLEY, (CONTINUING)
13           CONTINUING EXAMINATION BY MR. OLD         70/22

14   DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
             OF THE POTENTIAL JUROR  . . . . .         87/22
15
     DISCUSSION CONCLUDED  . . . . . . . . . .         91/22
16
     DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
17           OF THE POTENTIAL JUROR  . . . . .         92/22

18   RECESS  . . . . . . . . . . . . . . . .          93/22

19   POTENTIAL JUROR, DONNA MAE NEWMAN . . . . .       93/22

20   NOON RECESS . . . . . . . . . . . . . . .         99/22

21   AFTERNOON SESSION . . . . . . . . . . . .         99/22

22   POTENTIAL JUROR, DANNY JAKE PURDON
             EXAMINATION BY MR. TOWNSEND . . .        105/22
23
     DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
24           OF THE POTENTIAL JUROR  . . . . .        138/22

25   RECESS  . . . . . . . . . . . . . . . .          138/22

VOLUME 22

VOIR DIRE EXAMINATION

(CONTINUING)

NOVEMBER 17, 1994                              PAGE/VOLUME

DISCUSSION CONCLUDED  . . . . . . . . . .     138/22

POTENTIAL JUROR, DANNY JAKE PURDON,  (CONTINUING)
            EXAMINATION BY MR. OLD  . . . . .     139/22
            CONTINUING EXAMINATION BY MR. OLD     147/22

RECESS  . . . . . . . . . . . . . .     157/22

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . .     157/22

OUT OF THE PRESENCE AND HEARING OF MR. TOWNSEND   158/22

IN THE PRESENCE AND HEARING OF MR. TOWNSEND       163/22

DISCUSSION HELD OUTSIDE THE PRESENCE AND HEARING
            OF THE POTENTIAL JUROR  . . . . .     164/22

COURT ADJOURNED . . . . . . . . . . . .     169/22

COURT REPORTER'S CERTIFICATE  . . . . . . .     170/22

\*\*\*\*\*

VOLUME 22

ALPHABETICAL INDEX OF

POTENTIAL JURORS

NOVEMBER 17, 1994                           PAGE/VOLUME

POTENTIAL JUROR, DONNA MAE NEWMAN
EXAMINATION BY COURT  . . . . . . . . . .         93/22


POTENTIAL JUROR, DANNY JAKE PURDON
EXAMINATION BY MR. TOWNSEND . . . . . . .        105/22
EXAMINATION BY MR. OLD  . . . . . . . . .        139/22
EXAMINATION BY MR. OLD (CONT.)  . . . . .        147/22

POTENTIAL JUROR, WANDA B. SCHINDLEY
EXAMINATION BY MR. TOWNSEND . . . . . . .          9/22
EXAMINATION BY MR. OLD  . . . . . . . . .         45/22
EXAMINATION BY MR. OLD (CONT.)  . . . . .         70/22

* * * * *

CAUSE NO. 12,764

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| | § | |
| VS. | § | TITUS COUNTY, TEXAS |
| | § | |
| BILLY JOE WARDLOW | § | 76TH JUDICIAL DISTRICT |

STATEMENT OF FACTS

VOIR DIRE EXAMINATION

November 17, 1994

**VOLUME 22 of 43 volumes**

Before Honorable Gary R. Stephens

Judge by Judicial Assignment

(Venue changed from Morris County, Texas)

APPEARANCES

ATTORNEYS FOR THE STATE OF TEXAS:

    MR. RICHARD TOWNSEND
    District Attorney
    Morris County Texas
    Morris County Courthouse
    Daingerfield, Texas 75638

        and

    MR. RANDY LEE
    Assistant District Attorney
    Cass County Texas
    P.O. Box 940
    Linden, Texas 75563

ATTORNEYS FOR THE DEFENDANT:

          MR. BIRD OLD, III
          Old, Rolston & Old
          P.O. Box 448
          Mt. Pleasant, Texas 75456-0448

               and

          MR. LANCE HINSON
          Law Offices of Danny Woodson
          P.O. Box 399
          Mt. Pleasant, Texas 75456-0399

1       On the 17th day of November, 1994, the

2    above-entitled and numbered cause came on for hearing

3    before said Honorable Court, Judge Gary R. Stephens of

4    Midlothian, Texas, serving by judicial assignment in the

5    District Court of Titus County, Texas, on change of venue

6    from Morris County, Texas, and the following proceedings

7    were had:

8

9       (The following occurred outside the

10   presence and hearing of any potential juror:)

11

12       THE COURT:  Let's get on the

13   record.

14       Mr. Townsend, I understand that you and

15   Mr. Old have agreed to excuse two jurors, juror 45,

16   Nolen, and juror 138, Collier, is that correct, sir?

17       MR. TOWNSEND:  That's correct.

18       THE COURT:  Mr. Old, do you

19   agree?

20       MR. OLD:  Yes, sir.  Agree.

21       THE COURT:  Mr. Wardlow, do

22   you agree?

23       THE DEFENDANT:  Yes, sir, Your

24   Honor.

25       THE COURT:  Those two will be

1    eliminated for our jury.

2                         Off the record.

3

4                         (Off the record discussion.)

5

6                         (The following occurred in the presence

7    and hearing of the potential juror:)

8

9                         THE BAILIFF:  Watch your step

10   and have a seat right up there.

11

12         WANDA B. SCHINDLEY, Potential Juror #167,

13   was   called   as   a   Potential   Juror   and,   having   been

14   previously sworn by the Court, testified as follows:

15

16                         THE   COURT:    Good   morning,

17   ma'am.

18                         THE POTENTIAL JUROR:  Hi.

19                         THE COURT:  How are you doing?

20                   Go ahead and take your seat.

21                   Are you "Wanda Schindley?"

22                         THE POTENTIAL JUROR:   Yes.

23   I am.

24                         THE COURT:   Juror 46.

25                   Ma'am, I'm Gary Stephens, I'm presiding

1    over the jury selection in this case.

2            There are two District Attorneys working

3    on this case, the District Attorney from Morris County

4    is Mr. Richard Townsend who is present with us this

5    morning.

6            THE POTENTIAL JUROR:  Yes.

7            THE COURT: The other District

8    Attorney is from Cass County, his name is "Randy" or

9    "Randall" Lee, he's in trial and won't be with us today.

10           The two Defense Attorneys are both here,

11    Mr. Bird Old, III.

12            MR. OLD:  Good morning.

13            THE COURT:  Mr. Lance Hinson.

14            MR. HINSON:  Hello.

15            THE COURT:  Next to Mr.

16    Hinson, the person charged, Mr. Billy Joe Wardlow.

17            THE DEFENDANT:  Good morning.

18            THE COURT:  Now, ma'am, the

19    lawyers have read your questionnaire and are familiar

20    with your answers and they are going to discuss some of

21    those answers with you.

22           You will be asked a lot of questions and

23    the answers will let us know whether or not to put you

24    on the jury.

25           In order to be a qualified juror you

1   must be able to understand, follow the law but we have

2   also found over the years of picking juries in this type

3   of case that the ability to follow the law doesn't

4   necessarily mean that you would be a good or appropriate

5   juror in a death penalty case.

6           So we need to know more about our jurors

7   and whether they can or can't follow the law, we want to

8   know what they think about the laws and some of the

9   issues that may be involved in a death penalty case so

10  we will ask a lot of questions that don't necessarily

11  have right or wrong answers.   We are going to ask

12  questions to try to get inside your mind and see how you

13  think.

14          THE POTENTIAL JUROR:  Yes.

15          THE COURT:   Both sides are

16  looking for the same thing, that's 12 fair impartial

17  people that can do whatever the facts dictate should be

18  done.

19          THE POTENTIAL JUROR:  Yes.

20          THE COURT:   Ma'am, this is

21  kind of like a job interview for a job no one wants but

22  we do want you to do one thing and that's just open up

23  and be honest with us.

24          Frankly, it doesn't matter what your

25  opinions are because you have an absolute right to those

1    opinions but we really need for you to share them with

2    us so we can decide whether or not to put you on the

3    jury.

4                    And the only way we know for that to

5    happen is for you to open up and talk to us.

6                    Sometimes we will use fact situations

7    to illustrate a point, if we do I want you to know that

8    they don't apply to this case.  The facts of this case

9    will   come   out   in   the   trial   so   it's   certainly

10   inappropriate for us to discuss any facts that might be

11   related to this case so we are just using hypotheticals

12   that are not associated with this case to illustrate

13   points.

14                    If   there's   something   you   don't

15   understand, you want clarified, stop us, tell us what is

16   on your mind and we will try to clarify any confusion we

17   might create.

18                    Also, ma'am, if there's something about

19   you that you think we need to know and we don't ask just

20   volunteer the information.

21                    Like I said, everybody wants the same

22   thing and you are in a better position than us to decide

23   whether or not this is a case you should sit on.

24                    The trial itself won't start until after

25   the first of the year.  When we do start the trial it

1    will last probably two weeks.

2              Do you know of any reason that you could

3    not serve for a two-week period in January of next year?

4              THE POTENTIAL JUROR:  No.

5              THE COURT:  Now, I'm going to

6    have to have verbal answers because everything is

7    recorded.

8              THE POTENTIAL JUROR:  No.

9              THE COURT:  Ma'am, on the last

10   page of the questionnaire there's a place for you to say

11   "Yes" or "No" on the question "Do you know anything about

12   the facts of this case, have you heard anything about

13   this case either through the news media or through

14   friends or family members?"

15             THE POTENTIAL JUROR:  When it

16   first happened I heard the news.  I didn't read the whole

17   paper, I don't read the paper often.  I don't get a local

18   TV channel.

19             I do know what the case is, that it's

20   Morris County.

21             THE COURT:  All right, ma'am.

22             In a trial, of course, the jurors should

23   pay attention to what is going on in the courtroom and

24   base their verdict on that evidence and if you have heard

25   anything outside of the courtroom you certainly need to

1   disregard it or discount it.

2   In other words, if you have heard

3   something about this case outside the courtroom out in

4   the community that might conflict with something you hear

5   in the courtroom so you certainly need to base your

6   verdict on what you hear from the witnesses that have

7   been sworn in and placed on that witness stand.

8   Do you believe that you could set out

9   of your mind anything you have heard and base your

10   verdict solely on what happens in this courtroom?

11   THE POTENTIAL JUROR:  Yes.

12   THE COURT:  We are going to

13   keep saying that to you until we get you trained.

14   Do you have any questions?

15   THE POTENTIAL JUROR:  No.

16   THE COURT:  Mr. Townsend.

17   MR. TOWNSEND:  Thank you, Your

18   Honor.

19

20   VOIR DIRE EXAMINATION

21   BY MR. TOWNSEND

22

23   Q        Ms. Schindley, my name is Richard Townsend, I

24   represent the State of Texas in this case along with Mr.

25   Lee who is not here.

1          I'm going to be asking you some

2     questions and there, as the Judge says, no right or wrong

3     answers, there are several questions of you that relate

4     to death penalty cases and some questions that relate to

5     other criminal law that really doesn't closely coincide

6     with the death penalty.

7          I have read your questionnaire and it

8     appears that you believe in the death penalty, it says,

9     "Are you in favor of the death penalty?"

10          And you said "Yes" and it says that you

11     "believe it's appropriate under the law and if

12     appropriate under the law and warranted by the

13     circumstances."

14          And basically that's what we are looking

15     for in the way of capital murder jurors are those people

16     who can give the death penalty if a person is found

17     guilty of capital murder, if the circumstances and the

18     evidence warrant the death penalty.

19          On the other hand, if the circumstances

20     and the evidence warrant that the defendant receive a

21     life sentence rather than the death penalty they can do

22     that.

23          Do you believe you could do that?

24     A          Yes.

25     Q          Okay.  Do you feel as if you have any bias or

1   prejudice against the death penalty or for the death

2   penalty or for or against a life sentence or could you

3   just as easily give a life sentence or the death penalty

4   depending on whether you thought the facts were

5   appropriate or not?

6   A      Yes.

7   Q      Okay.  I want to talk to you a little bit

8   about, first off; if the State gave you a case and gave

9   you enough evidence that you felt like in your mind that

10   not only if you found that defendant guilty but the case

11   was appropriate for the death penalty could you do it?

12   Could you vote that way?

13   A      Yes.

14   Q      Okay.  Let me talk to you a little bit about

15   the law that involves murder and capital murder in Texas.

16             There are two basic types of murder in

17   Texas, one what we call or what I call "plain murder" or

18   non-capital murder and that is where someone has

19   intentionally caused another -- intentionally or

20   knowingly caused another person's death.

21             And that is to say there's no legal

22   excuse for it, no self defense, no accident but they have

23   intentionally caused another person's death.

24             Now, that person has committed a murder.

25   It's not punishable by the death penalty but it is

1    punishable by 99 years or life in the penitentiary.

2              Then the other type murder is a capital

3    murder and that's where we have someone who has

4    intentionally caused the death of another person similar

5    to the murder plus something else and that "plus

6    something" is the person that was murdered was a police

7    officer or fireman killed in the line of duty or perhaps

8    it was murder that was committed during the commission

9    of a robbery or rape or kidnapping and that plus factor

10   makes that a capital murder.   That is punishable by

11   either a life sentence or death penalty, those are the

12   only two possible punishments.

13             And I notice you keep shaking your head.

14   I feel like your husband, a police officer, and you

15   probably know a lot of stuff that you --

16   A         I watch CNN, too and I read a lot.

17   Q         Okay.   I have got to go over this anyway to

18   make sure you and I are on the same page here.

19             If you will, there is a sheet up there,

20   I think it's marked "Exhibit 3" and it's a copy of the

21   indictment in this case.

22             THE COURT:   That's not it,

23   look under the next one.

24             There is it right there.   (Indicating)

25             MR. TOWNSEND: And if you will

1    read that to yourself then we'll talk about it.

2          Okay.  Ms. Schindley, can you see from

3    looking at it that is a copy of the indictment and can

4    you see from looking at that if we could prove everything

5    that is on that indictment, if the State would prove that

6    to you that that would be a capital murder rather than

7    just a murder, okay?

8                    THE POTENTIAL JUROR:   Yes.

9    Q         (BY MR. TOWNSEND)   A capital murder case in

10   Texas is going to be in two phases, the first phase is

11   just involved in guilt and innocence and that is, you

12   know, basically, "Did he do it" then of course the -- if

13   a person is found guilty you go into the second phase

14   which is the punishment phase and that's where you make

15   those decisions that relate to whether the defendant

16   receives a life sentence or the death penalty.

17          You   are   going   to   hear   additional

18   evidence during that punishment hearing and that evidence

19   will relate to not guilt or innocence but as to what the

20   proper punishment should be.

21          If you will, there is a flow chart up

22   there, looks like this.  (Indicating)

23   A         Yes, sir.

24   Q         That is is what is -- it's kind of a flow chart

25   of how a capital murder goes and I will just run over

1    that real quick with you.

2                        First during the guilt or innocence

3    phase at the top of the page you are going to hear

4    evidence and that evidence will relate to the guilt or

5    innocence of the defendant, then if he's found not guilty

6    the trial is over, everybody goes home, if he's found not

7    guilty everybody goes home then you -- if he's found

8    guilty you go to the next phase, the next phase is called

9    the "punishment phase", that's where you are going to

10   hear evidence as to what the proper punishment should be

11   in the case.

12                       That evidence could be a wide variety

13   of type things, you might hear evidence from a minister

14   or psychologist, a family member, might hear evidence of

15   the defendant's background, his mental abilities, prior

16   criminal history, prior history of bad acts and

17   misconduct, pretty much anything you can imagine you

18   might hear during the punishment hearing.

19                       After you have heard all that evidence

20   then you go back and deliberate again and decide the

21   answer to Special Issue #1.

22                       Now, Special Issue #1 is a "Yes" or "No"

23   question and we'll go over what those questions are in

24   a little bit.  But for right now that's a "Yes" or "No."

25                       If you, the jury, answer that question

1  "No" the defendant would automatically receive a life

2  sentence, if your answer that question "Yes" then the

3  defendant would receive the death penalty -- excuse me

4  -- the defendant, if you answer that question "Yes" then

5  you would go to Special Issue #2.

6  Special Issue #2 again is a "Yes" or

7  "No" question.

8  Once you have answered that question -

9  -if you answer that question "No" the defendant would

10  receive the death penalty, if you answer that question

11  "Yes" the defendant would receive a life sentence.

12  So, Ms. Schindley, what you are doing

13  is you really don't just go back there and raise your

14  hand and say, "How many want life and how many want

15  death?"

16  You answer those two questions and those

17  two questions determine whether the defendant receives

18  a life sentence or the death penalty.

19  Of course you are going to know what the

20  result of those answers are because I just told you.

21  If you answer Number One "Yes" and

22  Number Two "No" the defendant will receive the death

23  penalty, if they are answer any other way the defendant

24  would receive a life sentence.

25  Are you with me so far?

1   A        Yes.

2   Q        If you would go to -- there is a sheet up there

3   that is marked "Special Issues."

4            Read Special Issue #1 and then we will

5   talk about it for a little bit.

6            Okay.   Ms. Schindley, that basically

7   refers to the future dangerousness of the defendant,

8   would you agree with that?

9   A        Yes.

10  Q        The defendant, there is some key language in

11  there I would to point out to you, first of all in

12  proving the defendant guilty or not guilty the State has

13  to prove that beyond a reasonable doubt where in Special

14  Issue #1 we also have to prove to you Special Issue #1

15  beyond a reasonable doubt and then on the second line

16  there is a word there, that's the word "probability."

17           Do you find beyond a reasonable doubt

18  that there is a probability and then it goes on.

19           "Probability" is defined in Texas law

20  as "more likely than not" or what I would call just

21  barely more than 50/50.

22           It is -- is "more likely than not",

23  would that be pretty close to your own personal

24  definition of "probability?"

25  A        Yes.

1    Q        Now, I wouldn't have any trouble following the

2    law and defining "probability" as "more likely than not?"

3    A        No.

4    Q        So we have got to prove to you beyond a

5    reasonable doubt that it's more likely than not that the

6    defendant would commit criminal acts of violence.

7              There's a lot of different types of

8    criminal acts, for instance, the defendant is on trial

9    for capital murder but we are not required to prove to

10   you that he would commit another capital murder or that

11   he would be likely, just that he would commit some

12   criminal act of violence.

13             But then there are other criminal acts

14   that aren't violent such as forgery or theft or something

15   like that and those are criminal acts but they are not

16   "criminal acts of violence."

17             But there are other "criminal acts of

18   violence, assault, attempted murder, rape, things of that

19   nature" so that what we are required to prove to you is

20   that -- is that it's more likely than not that he would

21   commit further criminal acts of violence.

22             Reading on down to the rest of the

23   sentence it says "that would constitute a continuing

24   threat to society."

25             "Society", the law defines it basically,

1    just "the people", wherever they may be located, whether

2    it's a policeman on the street, in the penitentiary as

3    an inmate, as a guard, as a doctor or nurse or whatever.

4              So we are not required to prove to you

5    that he would commit criminal acts of violence in a

6    particular location, just that he would commit criminal

7    acts of violence anywhere, okay?

8    A         Yes.

9    Q         If you will read Special Issue #2 and we will

10   talk about that one.

11             Okay.   Special Issue #2 sort of is a

12   legal mouthful but it also is a "Yes" or "No" question,

13   it's a little different from Number One in that we are

14   not required to prove that one to you beyond a reasonable

15   doubt.   That one is, Special Issue #2 is more or less

16   just your opinion.   There is no standard of proof that

17   we are required to meet, it's just pretty much your

18   opinion.

19             And basically what you are saying when

20   you get to Special Issue #2 is, "Okay.   We found the

21   defendant guilty of capital murder and we have decided

22   that he's a threat to society or we wouldn't be looking

23   at Special Issue #2.   So, is there anything in this case

24   that makes me believe based on all the evidence that this

25   defendant should receive a life sentence rather than the

1    death penalty?"

2          And when I say "Is there anything in the

3    case" I mean is there anything that is sufficiently

4    mitigating or that sufficiently reduces the defendant's

5    blame to the point that you believe the defendant should

6    receive a life sentence rather than the death penalty?

7          Now, that is an issue that -- that the

8    evidence presented could be all sorts of things, you

9    might hear evidence from this side of the table or that

10   side of the table that would be sufficiently mitigating

11   to you.

12         And something that was sufficiently

13   mitigating to me might not be sufficiently mitigating to

14   you or vice versa.

15         For instance, you might hear evidence

16   of the defendant's age, education, family history,

17   religious background.  You might hear evidence that the

18   defendant was intoxicated at the time of the offense, you

19   might hear evidence that the defendant was mentally

20   retarded, who knows?

21         Let me remind you when I'm talking to

22   you and Mr. Old is talking to you we are not particularly

23   talking about this case, we are just talking about

24   capital murder cases in general so if I relate some sort

25   of situation to you it's not -- probably not a situation

1      that would come up in this case but it's probably just

2      a situation that illustrates a point.

3                  So any of these situations that might

4      come, whether it was intoxication or retardation or

5      whatever, one juror might sit there and think, "Well, if

6      he was retarded or if he was intoxicated he wouldn't be

7      quite as much to blame and I think that would be

8      sufficient in my mind to just give him a life sentence."

9                  On the other hand, another juror hearing

10     the same evidence might think, "Well, that doesn't make

11     any difference, he's still responsible for his conduct."

12                 So that's the type of issues that you

13     look at when you are answering Special Issue #2.

14                 The kind of jurors we have to have,

15     first off, are those type jurors who can be fair and

16     impartial as to guilt and innocence and base that

17     strictly on the evidence presented in the courtroom and

18     not on anything else.

19                 Could you do that?

20     A          Yes.

21     Q          Then when we go to Special Issue #1 which

22     basically talks about future dangerousness that is a

23     different question from guilt or innocence.

24                 Now, when you are there deliberating

25     Special Issue #1 we don't expect you to close your mind

1   to that testimony that you heard during that guilt or

2   innocence phase but you can certainly consider that in

3   making your decision but you also have to be able to

4   consider that evidence that you heard during the

5   punishment hearing before answering Special Issue #1.

6                    Could you do that?

7   A        Yes.

8   Q        Consider it all before you make your decision?

9   A        Yes.

10  Q        Okay.  And then Special Issue #2, the same way,

11  you found the defendant guilty of capital murder.

12                   And I have heard jurors say this before,

13  "I found a person guilty of capital murder, I have

14  decided they are going to be a danger to society in the

15  future.  When it gets to Special Issue #2 I'm going to

16  answer that one 'No' because if I have made these other

17  decisions I want to make sure he gets the death penalty."

18                   You see, they are not a qualified juror

19  because they are not really considering what Special

20  Issue #2 -- they are not really answering that question,

21  "as it falls" so to speak, they have already made up

22  their mind what their answer is going to be based on what

23  their answers were to guilt and innocence and in Special

24  Issue #1.

25                   And the kind of jurors we have to have

1    are those kind of jurors who can answer those questions

2    "Yes" or "No" depending on the evidence and pretty much

3    you might term it just "Let the chips fall where they

4    may" and if those answers result in the death penalty

5    then so be it, if they result in a life sentence then so

6    be that.

7              Could you do that?

8    A        Yes.

9    Q        Okay.  Let me talk to you a little bit about

10   "mitigating evidence."

11             "Mitigating evidence" is the evidence

12   that a jury might regard as reducing the defendant's

13   moral blameworthiness.  It doesn't excuse the action but

14   it might help explain the action.  It might lead a juror

15   to conclude that a life sentence was more appropriate

16   than the death penalty.

17             _ And the kind of jurors we have to have

18   are those kind of jurors when they hear that evidence

19   during the punishment hearing if they will consider all

20   that evidence -- and when I say "consider all that

21   evidence" I don't mean that you are going to give weight

22   to all of it because you might think that some of it

23   doesn't make any difference in your mind, some of it you

24   may think -- I notice you have a psychology background

25   in your questionnaire -- there are people out there that

1   just think psychologists have no place in society and are

2   of no use and those, you know, I have had jurors say

3   "Well, if a psychologist testifies or a psychiatrist

4   testifies I'm not even going to listen to that garbage,

5   you know."

6               Well, what you have decided about the

7   evidence after you hear it is your personal opinion and

8   you are entitled to that and that's fine, whatever that

9   is, whether it's about age or family background or

10  religious -- or religious background or whatever --

11  whatever it is.

12              We have to have qualified jurors who can

13  listen to the evidence and consider it before they just

14  chuck it.

15              Could you do that?

16  A       Yes.

17  Q       So you could consider all the evidence, whether

18  it was age, education, religious background or whatever?

19  A       Yes.

20  Q       Okay.  Another consideration in deciding

21  Special Issue #1 and Issue #2 in a capital murder case

22  if the defendant is found guilty and given a life

23  sentence he will receive 35 years in the penitentiary

24  before coming eligible for parole.  That doesn't mean he

25  would necessarily get parole at that time but he would

1    be eligible for it, he might get it at that time, it

2    might be several years before he got it or he might never

3    get it.

4              But I believe the Judge will instruct

5    you in your instructions before you deliberate on Special

6    Issue #1 and Issue #2 basically that you are to consider

7    a life sentence a life sentence and the death penalty the

8    death penalty and not give parole any consideration in

9    making your decision.

10             And that is to say that we don't expect

11    you to put those things like parole out of your mind,

12    that's too much to expect, but we do expect you to kind

13    of set that aside and not use that in determining whether

14    or not, whether you believe in determining how you think

15    those Special Issues should be answered.

16             Could you do that?

17    A      Yes.

18    Q      Okay.  Let me talk to you about some general

19    areas of the law, now, that relate to all cases as well

20    as death penalty cases; the punishment range in a murder

21    case, not a capital murder case but just murder case is

22    five years probation to 99 years or life and that -- that

23    kind of takes into account the idea that murder is not

24    necessarily the same type action, some murders are very

25    violent, very vicious, whereas other murders may be what

1   we term mercy killings where elderly people may have been

2   in a lot of pain and suffering and ask their husband or

3   wife to pull the plug and they thought about it and did

4   it.

5              But   under   Texas   law   that   is

6   intentionally causing another person's death so even

7   though that's a very different type fact than a violent

8   vicious type murder it's still murder, hence we have a

9   broad range of punishment from five years probated to 99

10  or life.

11             In order to be a qualified juror you

12  don't have to tell us that you would give somebody life

13  or that you would give them five years probation but you

14  have got to be able to consider that full range of

15  punishment in deciding what is appropriate depending on

16  the facts and the evidence.

17             Could you do that?

18  A       Yes.

19  Q       What you looked at a little earlier was the

20  indictment in this case and what we -- let's assume that

21  you were a juror in a capital murder case and the

22  allegation was similar to this one in that it alleged a

23  murder and a robbery, assume along with me again that we

24  have proved to you beyond a reasonable doubt that the

25  defendant in that case did commit the murder but we were

1    a little shy, we didn't quite prove to you that he

2    committed the robbery.

3           It would be your duty as a juror at that

4    point to find that defendant not guilty of capital murder

5    but guilty of the lesser offense of murder.

6           Could you do that even though you

7    thought he probably did the robbery but we didn't quite

8    prove it, could you go ahead and follow your oath and

9    just go ahead and find him guilty of murder?

10   A       Yes, sir.

11   Q       Same way, we have got to prove to you what is

12   in that indictment even -- let's say we alleged

13   murder/robbery in an indictment but in fact proved

14   something else, we proved murder/rape, for instance, we

15   are giving you some farfetched examples here but just

16   assume that; so what you have got there in your mind is

17   a capital murder but it's not the capital murder we said?

18   A       Right.

19   Q       Again, your duty would be to find him guilty

20   of murder because we have proved that to you but not the

21   capital murder.

22           Could you do that?

23   A       Yes.

24   Q       Bearing in mind that some of these examples are

25   kind of extreme and bearing in mind that we realize that

1   some of these might go against -- you might want to do

2   something but you have got to be able to follow the law.

3             And I believe you said you could do

4   that?

5   A       Yes.

6   Q       Okay.  Same way, murder can be proved in Texas

7   by showing that the defendant knowingly committed the

8   murder or by showing that the defendant intentionally

9   committed the murder but to prove a capital murder we

10   have to be able to prove the defendant intentionally

11   committed the murder.

12             Let's assume again that we have proven

13   -- that time we have proven the robbery to you and we

14   have proved the murder to you but you don't believe we

15   have proved that he did it intentionally but we did prove

16   that he did it knowingly; the legal definition for

17   "intentionally" is "with intent, a person acts

18   intentionally with respect to a result of his conduct

19   when it is his conscious objective or desire to cause the

20   result."

21             And then "knowingly" is defined, "A

22   person acts with respect to a result of his conduct when

23   he is aware that his conduct is reasonably certain to

24   cause the result."

25   A       He -- "intentionally" doesn't include

1       "knowingly?"

2                   It says "intentionally" on this, it

3       doesn't say "knowingly."   (Indicating)

4       Q       Okay.  Are you looking at the indictment?

5       A       Yes.

6       Q       Okay.  The indictment says "Intention" because

7       in order to prove a capital murder you have to prove

8       "intentionally."

9                   Personally  I  think  if  you  proved

10      intentionally you have also proved knowingly, you know,

11      if a person did something intentionally they also would

12      have done it knowingly.

13                  However,  if  a  person  did  something

14      knowingly they might not have done it intentionally.

15                  That goes back to the legal definition,

16      it's kind of close but "intentionally" means it's your

17      conscious objective or desire to cause the result or

18      cause the death, "knowingly" means that you do or your

19      conduct with knowledge and a person acts knowingly or

20      with knowledge with respect to a result of his conduct

21      when he's aware that his conduct is reasonably certain

22      to cause the result.

23                  In other words, you are going to do it

24      and you realize it might cause the death, you are going

25      to do it anyway but you are not -- you know, which is a

1    little bit different state of mind than say "This is what

2    I want to do, I want to kill this guy."

3            Okay.  In a capital murder we have got

4    to prove that he intentionally committed the act,

5    committed the murder.

6            Let's say we don't prove that to you but

7    we do prove that he knowingly committed the murder which

8    is good enough for a murder charge, it's not good enough

9    for capital murder.

10           And we also proved the robbery to you;

11   your duty as a juror would be to find him guilty, again

12   of murder and not of capital murder.

13           Could you do that?

14   A       Yes.

15   Q       The burden of proof in a criminal case is

16   beyond a reasonable doubt and there's a legal definition

17   for that that the Judge can show you or will give to you

18   when you go back to deliberate and that is our burden in

19   this case as in all criminal cases, we accept that, we

20   know it going in, we think -- if we didn't think we could

21   handle it we wouldn't be wasting our time being here.

22           Is that something that you are familiar

23   with "beyond a reasonable doubt?"

24   A       Yes.

25   Q       Watch TV and read the newspaper and see that

1    in there?

2    A        Yes.

3    Q        Okay.  Along with that burden of proof goes the

4    idea that the State has to prove our case to you, the

5    defendant doesn't have to prove anything, he doesn't have

6    to prove he's not guilty but we have got to prove that

7    he is guilty.

8             Is that okay with you?

9    A        Yes.

10   Q        Okay.  Along with that goes the Fifth Amendment

11   privilege and the Fifth Amendment privilege basically

12   sets out the defendant doesn't have to testify unless he

13   chooses.

14            Where that impacts on the jury is that

15   the jury has to make their decision and not consider or

16   hold against the defendant in any way if he chose not to

17   testify.

18            Could you do that?

19   A        Yes.

20   Q        Okay.  Hold us to our burden and not --

21   A        Yes.

22   Q        -- help us out by using that?

23            Okay.  That also holds true during the

24   punishment phase, you know, during the guilt or innocence

25   phase human nature might dictate that, "Well, I would

1    like to hear what he's got to say."

2              You have already said that you won't

3    hold that against him, it's the same thing in the

4    punishment phase, you might like to hear what he's got

5    to say during the punishment phase, you might like to

6    hear him say, "I'm sure sorry about this" and you have

7    got to decide your answers to Special Issue #1 and

8    Special Issue #2 on the evidence that is presented to you

9    and not hold it against him in any way if he chooses not

10   to testify during that punishment phase.

11             Could you do that also?

12   A        Yes, sir.

13   Q        Okay.  I kind of get the feeling you are ahead

14   of me on this.

15             We have also in criminal trials, capital

16   murder trials or any other type trials you have a lot of

17   different types of witnesses, just like I talked to you

18   about considering different types of evidence you also

19   have different types of witnesses, you have maybe

20   preachers, police officers, doctors, lawyers, Indian

21   chiefs, any number of type of different type witnesses.

22             In order to be a qualified juror you

23   have got to be able to take each witness and start them

24   out on the same spot on the track.

25             And when I say that, not give anyone a

1   head start because they are a police officer -- since

2   your husband is involved in law enforcement I will use

3   that example -- whether it's a minister or whoever it is.

4                    Let's say it's a police officer, if you

5   are involved in law enforcement or your husband is you

6   probably know there are good ones and bad ones, they can

7   make mistakes just like anybody else?

8   A        Yes.

9   Q        We have got to have jurors who cannot start

10  those police officers out a little ahead of everybody

11  else.

12                   Now, you certainly can take into

13  consideration their training if it's testimony that, you

14  know, that relates to their training but just as far as

15  just before we ever know what they are going to testify

16  but just -- say that "This guy has got a little bit of

17  a head start with me in believing him", that's not being

18  fair to everybody else testifying.

19                   Can you start everybody out at the same

20  spot and not give anyone an advantage over the other?

21  A        Say that again.  Ask that again.

22  Q        Okay.  As to anyone's testimony, whether it's

23  a police officer or criminal defendant or the defendant's

24  mother or whoever it might be can you start them all out

25  on the same spot, give them the same opportunity to

1    testify and listen to their evidence, listen to the

2    evidence of the other people and determine from all that

3    their credibility and --

4    A       Yes.

5    Q       Okay.   And when I say that I mean not

6    automatically start out, I mean obviously after you have

7    heard the testimony you are going to make determinations

8    as to who is more credible to you or whose testimony is

9    more important to you and that's what you are supposed

10   to do.

11   A       Yes.

12   Q       But what you are not supposed to do is start

13   out and see a guy walk in who has a police uniform on and

14   before he eve said anything or before any of the other

15   witnesses have ever testified say, you know, "This guy

16   has got a little bit of a head start in your mind."

17           Can you do that?

18   A       Well, when you say "A little bit of a head

19   start" that's -- that's pretty relative because the

20   interest you would have, vested interest in what you

21   would say or motivation that you would have would have

22   something to do with it or so -- when you are saying

23   whether or not they might have --

24   Q       Certainly we expect you to take into account

25   the witnesses' interests, the witnesses' motivation for

1    testifying, however they might testify and that sort of

2    thing.  We are not asking you not to do that.

3    A        Okay.

4    Q        We are just asking you, can you give a

5    psychologist or -- you wouldn't give a psychologist or

6    police officer, whoever it might be or let's say it was

7    a witness that you knew, I don't think we would have one

8    but if there was a witness that you knew could you start

9    those people out on the same spot and not give them an

10   advantage just because that is what they are there

11   because they are a minister or police officer?

12   A        Yes.

13                     THE     COURT:       Thirty-two

14   minutes.

15                     MR. TOWNSEND:  After you have

16   listened to their testimony and had a chance to judge

17   everybody's credibility then certainly what you are

18   saying is correct, you are supposed to look into what

19   might be their motivation, what is their training for

20   their job and that sort of thing.

21                     In criminal cases oftentimes you have

22   confessions, what we will call "a confession", either

23   oral statements or written statements made by the

24   defendant that basically boils it down, just basically

25   says, "Yeah.. I did it."

1          Those are -- if a confession of some

2     sort came into play in a trial -- in a criminal trial the

3     Judge would instruct you not to consider that as evidence

4     unless you found beyond a reasonable doubt that it was

5     both truthful and voluntary.

6          And when I say "voluntary" the obvious

7     thing is, you know, if you decided that the defendant

8     confessed, was beaten, made to confess, then of course

9     that wouldn't be voluntary but we are also talking about

10    legal -- legally speaking "voluntary" which means in

11    certain situations the defendant's confession would not

12    be admissable unless he was given his Miranda Rights.

13          THE POTENTIAL JUROR:   Yes.

14    Q        (BY MR. TOWNSEND)   In certain situations that

15    wouldn't be necessary but in certain situations it would.

16          Let's assume it's one of those

17    situations and the defendant in fact was not given his

18    Miranda Rights but you believe beyond a reasonable doubt

19    that the confession is truthful, you have got a truthful

20    confession in your opinion but yet it wasn't legally

21    proper because it was not -- he was not given his Miranda

22    Rights.

23          To follow your oath you have to be able

24    to not put that out of your mind but set it aside and not

25    consider it in any way in determining the defendant's

1   guilt or innocence.

2              You know my next question; could you do

3   that?

4   A          Yes.

5   Q          Okay.   The same way as to the punishment

6   issues, if there was something in that confession that

7   was particularly gruesome, that, you know, we can't ask

8   you again to put that out of your mind, since it wasn't

9   taken voluntarily it's not admissable evidence, you have

10  got to be able to set that aside in determining your

11  answer to Special Issue #1 and Issue #2.

12             Could you do that?

13  A          Yes.

14  Q          I believe the Judge told you back in October

15  that the indictment in a criminal case is not evidence

16  of anything and cannot be used as evidence against the

17  defendant in determining his guilt or innocence.

18             Can you do that?

19  A          Yes.

20  Q          Okay.   I have been talking, doing most of the

21  talking and I have got a few more questions to ask you

22  but let me stop at this point and ask if there's anything

23  that you would like to ask or anything that you feel like

24  you need to add that might give us some idea or maybe

25  something I should have asked that I haven't asked?

1          Is there anything that you want to add

2     at all at this point?

3     A          No.

4     Q          I notice from your questionnaire that you said

5     you know Mr. Old slightly and that you speak, has he ever

6     represented you or your family?

7     A          No.

8     Q          Is there anything about your relationship with

9     Mr. Old that would make you lean in this case one way or

10    another?

11    A          No.

12    Q          Okay.  The other attorney involved for the

13    Defense is Lance Hinson, do you know Lance?

14    A          No.

15    Q          Okay.  Do you know any of his family so far as

16    you know?

17    A          "Hinson?"

18    Q          Yes.

19    A          The "Hinsons" here?

20    Q          I believe so.

21                    MR. OLD:   That covers a lot

22    of territory, doesn't it, Lance?

23                    THE POTENTIAL JUROR:   I know

24    Neal Hinson, I don't know if he's related to him or not.

25                    MR. TOWNSEND:   They are.

1          MR. OLD:   You don't have to
2    answer that.

3          MR. TOWNSEND:   That might be
4    incriminating.

5          There is nothing in that relation that
6    would cause any problem?

7          THE POTENTIAL JUROR:   No.

8    Q      (BY MR. TOWNSEND)   You said that you know
9    something about the facts in the case and from what you
10   said it sounded like you didn't know a whole lot but you
11   knew a little; the important thing is that -- tell us the
12   most you can remember about the facts that you have heard
13   or read or anything.

14   A      Well, actually the most conversations I have
15   had about it was regarding change of venue trial.

16   Q      Okay.

17   A      And a person I know had to testify in that
18   trial.

19   Q      Okay.

20   A      And the -- it wasn't really regarding facts.

21   Q      That was just in regard to where the trial
22   would be held, basically?

23   A      Yes.

24   Q      Who was this person?

25   A      Ron Cowan.

1      It was regarding his -- the fact that

2  he had made a statement in an earlier trial and it came

3  up and he felt, you know, like it was kind of --

4  Q       Kind of landed in on my head in the change of

5  venue hearing.

6  A       And that was a casual conversation, he was

7  dressed up and normally on Fridays we normally wear jeans

8  on Friday.

9  Q       That really didn't relate to the facts of the

10 case?

11 A       There was some talk in the office when it

12 happened, just about a pursuit, I think, if I even have

13 the right facts, the right situation, that there was a

14 pursuit to the north or something.

15 Q       Okay.  Is that about all you remember?

16 A       That and a man was murdered.

17 Q       Okay.

18 A       And I don't know if I heard this or if this is

19 or if I assumed this, that a vehicle was stolen and that

20 was the pursuit.

21 Q       Whatever it is that you may know or may recall

22 right now or may recall at some other point about the

23 facts of this case from hearing, those newspapers or on

24 the street or wherever you heard them as the Judge said

25 that is not evidence, would you be able to set whatever

1    that is aside and decide this case based on the evidence

2    and not based on anything you may have heard about change

3    of venue?

4    A        Yes.

5    Q        Or anything else?

6    A        Yes.

7    Q        Okay.  I notice that you have some background

8    in   psychology;   it's   possible   that   we   might   have

9    psychologists or psychiatrists appear as witnesses in

10   this case, if that happened or if it didn't happen would

11   you be able to decide this case based on the facts and

12   the  evidence  and  not -- let's  say,  for  instance,  a

13   psychologist testified and you decided after hearing the

14   person that you thought they were credible and had gave

15   good evidence or the opposite, would you be able to base

16   your  decision  on  what  you  have  heard  here  in  the

17   courtroom   and   not   go   back   in   your   psychological

18   background and use that for determining the answers to

19   Special Issue #1 and Issue #2?

20   A        Well, when you were talking about "mitigating

21   circumstances", I think that would be related.

22   Q        Well, when you are talking about you forming

23   an opinion as to what is sufficiently mitigating or not?

24   A        Yes.

25   Q        You might think about some knowledge you --

1    A        My background would --

2    Q        -- that you would have?

3    A        -- my background would necessarily be a factor.

4    Q        Certainly.  But what I'm saying is if a

5    psychologist testified in a certain way would you be able

6    to listen to that person and consider their evidence and

7    not just basically shut him out if you didn't agree with

8    his opinion?

9    A        Yes.  I could listen to it and not just shut

10   him out.

11   Q        Listen and consider it?

12            Okay.

13                       THE COURT:   You have eight

14   minutes.

15                       MR. TOWNSEND:  Thank you, Your

16   Honor.

17            The key thing, Ms. Schindley, is in the

18   mitigating circumstances is that you be able to consider

19   anything and everything that is thrown at you and then

20   decipher it out in your mind and decide what you think

21   is appropriate or important but the key thing is that you

22   be able to consider it all and you could do that?

23                       THE POTENTIAL JUROR:   Yes,

24   sir.

25   Q        (BY MR. TOWNSEND)   The other key is, like I

1    said earlier, we talked about "key" as far as being open

2    to the evidence and listening to different types of

3    evidence, the other key is that you keep an open mind and

4    be able to follow the law in regard to what type person

5    is testifying and what -- what we talked about earlier

6    about police officer's testimony and again we are not

7    asking that you not consider their training and

8    background, certainly that's something you should

9    consider for their motivation for testifying in certain

10   ways, certainly that's something you should consider,

11   just that you not place them a little bit ahead in your

12   mind just because they are -- because of their job or

13   occupation, you could do that?

14   A        Well, I don't know the way you put it, what you

15   have actually said by considering training or motive then

16   you might --

17   Q        Well, I understand, yeah, okay.  Let's put it

18   in this perspective; let's say that you have a person who

19   is not trained to be an observer of activity, you might

20   say then you have a police officer who is a trained

21   observer, those things, it might be proper, it depends

22   on what the evidence shows to lend him as more credible

23   because he's trained to observe as opposed to another

24   person that may not be and that's okay.  But what is not

25   okay is to take a person in a situation -- we are not

1   talking about trained observation but we are just talking

2   about are they a credible person or credible witness and

3   just say automatically without ever hearing either person

4   testify that just because that person has a police

5   uniform on I'm going to automatically give him more

6   credibility than I am another person.

7   A       Okay.

8   Q       Are you with me?  Do you understand what I'm

9   saying?

10  A       Yes.  Yes.

11  Q       Kind of -- it's kind of a small bit of

12  difference then but there is a difference?

13  A       Yes.

14  Q       Do you believe that you could do that?

15  A       Yes.

16  Q       Okay.  Back to this thing on psychologists and

17  psychiatrists; you in determining what is mitigating it's

18  certainly proper for you to base your opinion on your

19  background and lifetime experiences and we have all had

20  lifetime experiences whether they were in school studying

21  psychology or out on the street doing carpenter work or,

22  you know, we have all had lifetime experiences and that's

23  what we use in making these determinations and so there

24  is nothing improper about that, you know, but what I was

25  asking you about your psychological background I was

1  mainly saying would you be able to listen to the

2  psychological evidence with an open mind and -- because

3  I don't know that much about psychology but I do know

4  that different people that have different psychological

5  training  maybe  have a little bit different beliefs

6  about --

7  A       I think it comes into play in whether or not

8  you consider something mitigating.

9  Q       Right.

10  A       But as far as considering evidence or whether

11  or not something was evidence I don't think it would be

12  relevant.

13              MR. TOWNSEND: Ms. Schindley,

14  I appreciate your listening to my questions and wading

15  through them.

16              And I will pass the juror.

17              THE COURT: Let's take about

18  a five minute recess and he will bring you back for the

19  Defense.

20

21              (Recess.)

22

23              (The following occurred in the presence

24  and hearing of the potential juror:)

25

1       THE COURT:  Do you have any

2   questions before we move over to the Defense side?

3       THE POTENTIAL JUROR:  No.

4       THE COURT:  Mr. Old.

5

6   VOIR DIRE EXAMINATION

7   BY MR. OLD

8

9   Q       Ms. Schindley, a juror qualifies to be a juror

10  by taking an oath, on your questionnaire, you have never

11  been on a jury?

12  A       No.

13  Q       Have you ever been in contention to be on a

14  jury before?

15  A       No, sir.

16  Q       Never been drawn and gone down for voir dire?

17  A       I was called once when I was a full-time

18  student 14 years ago.

19  Q       That oath is set by law, you are required to

20  swear or to affirm that in the case that you are going

21  to try that you will a true verdict render according to

22  the law and the evidence so help you God.

23       And your oath is to render a true

24  verdict.

25       Now, a lot of times jurors they, "Boy,

1   how do I know what the law is, I'm not a lawyer."

2            I don't know, you are not a lawyer, are

3   you?

4   A        No, sir.

5   Q        I suspect you have more knowledge than some of

6   the quote law, you have been around law enforcement a

7   good bit of your adult life?

8   A        Yes.

9   Q        Okay.  Now, the law is given to you by the

10  Court.

11           Are you familiar with what a "charge"

12  is or a jury -- written jury instructions?

13  A        I believe so.

14  Q        Okay.  At the close of evidence in a case the

15  Court does what we call "charges you" and the Court tells

16  you what the law is and what you are doing is you are

17  taking an oath that you will follow that instruction.

18  A        Yes.

19  Q        For example, there is before you an exhibit,

20  I believe it's numbered "6", can I get you to look at

21  that?

22           Starting with the second paragraph at

23  the end of the page is the Court's instructions or

24  definition of the word "reasonable doubt", can I get you

25  to read that definition?

1   A        This page?    (Indicating)

2                          THE    COURT:      The    second

3   paragraph.    (Indicating)

4                          THE   POTENTIAL   JUROR:     "The

5   prosecution   has   the   burden   of   proving   that   the

6   defendant?"

7                          MR.  OLD:   Yes.   Go ahead and

8   read   that   to   yourself   and   tell   me   when ·you   are

9   comfortable   with   it.

10                          THE  POTENTIAL  JUROR:   Yes.

11   Q        (BY MR. OLD)   Have you ever had an occasion to

12   read that definition before if you recall?

13   A .       I don't know that I read it.

14   Q        You know, I suspect if we had asked you to sit

15   down and write your definition of reasonable doubt it

16   would not have matched those words.

17                      Did you read past the second paragraph

18   to the end of the page?

19                          THE COURT: I thought that was

20   pretty fast.

21                          MR. OLD: I wouldn't doubt it,

22   she   reads   a   lot   from   her   testimony   and   from   her

23   questionnaire.

24                      Does that definition or qualification

25   of   reasonable   doubt   or   instruction   about   reasonable

1   doubt, does that vary from what you consider to be

2   "beyond a reasonable doubt" when you came in here this

3   morning?

4                        THE POTENTIAL JUROR:  No.

5   Q        (BY MR. OLD)  I mean would you require the

6   State to prove more to you than what is set out in that

7   instruction?

8   A        No.  I think I understand "beyond a reasonable

9   doubt."

10  Q        Would you render a verdict of guilty on less

11  evidence than is required by the definition?

12  A        No.

13  Q        Okay.  Now, that is what -- the thing the Court

14  will instruct you on and that's what you are bound by and

15  that's what we mean by the law and we say that His Honor

16  or the Court is the exclusive judge of the law in the

17  case, the jury is the exclusive judge of the evidence in

18  the case.

19                   You know, at one time in the practice

20  of law I was told it was my job to disqualify jurors, I

21  have kind of -- my position, I think it's my job to

22  qualify jurors.

23                   We have got to get a jury to try a case.

24                   I'm concerned about some particular

25  areas with you as a juror and I would like to talk to you

1   about them and it first is your connection with law

2   enforcement; how long has your husband -- I mean I

3   presume your husband has been in law enforcement most of

4   his adult life, is that fair?

5   A        No.

6   Q        How many years has he been in law enforcement?

7   A        15.

8   Q        Okay.

9   A        Well, I guess you could say that is "most" but

10   it wasn't his first career.

11   Q        I don't know how old Ken is.

12   A        He's 45.

13   Q        What was his first career?

14   A        He was a teacher at one time, he was a teacher

15   at one time, he was a parole officer, that would I guess

16   be under "law enforcement" but he was a printer first

17   and he was in printing management.

18   Q        Mr. Bailey told a joke out in the hall, you may

19   not have heard it about probation officers?

20   A        I did hear that, it may be true of "probation"

21   but he was "parole."

22   Q        You are not offended by that joke, are you?

23   A        No.

24   Q        It wouldn't effect your deliberation?

25   A        No.

Q        You would not apply the same thing to parole officers?

A        Well, he didn't enjoy it and he does enjoy drinking coffee.

Q        For the benefit of the Court was -- Mr. Townsend was quoting that all a probation office did was drink coffee, at least that's what Mr. Bailey said he said.

MR. TOWNSEND:  All I said is the probation officer, Ronnie Hardin, I wanted to talk to him a minute and they said they thought he had gone to his office and I said "I didn't think he got that far away from the coffee pot."

THE COURT:  Since I'm not a probation officer I don't think I can take any offense to anything like that, it sounds true to me.

MR. OLD:  How long was he a parole officer?

THE POTENTIAL JUROR:  Maybe five years.

Q        (BY MR. OLD)  And after that law enforcement was his next endeavor?

A        We had a club and a restaurant at the Holiday Inn.

Q        Was he a deputy sheriff prior to being a parole

1    officer?

2    A        Yes.

3    Q        And that was here in Titus County?

4    A        Yes, sir.

5    Q        Has he ever been a law enforcement officer

6    anywhere but Titus County?

7    A        No.

8    Q        How long was he a deputy sheriff before

9    becoming a parole officer?

10   A        Well, he was at the police department a couple

11   of years and then at the sheriff's office three years.

12   Q        About five years in Mount Pleasant?

13   A        Yes.

14   Q        Then he came back to Mount Pleasant and went

15   back to the sheriff's department?

16   A        Right.   After the club and restaurant, went

17   back to the sheriff's department.

18   Q        How long ago would that have been?

19   A        About five years.

20   Q        Okay.

21   A        Close to five years.

22   Q        Let me ask you, I mean I am sure when Ken was

23   a parole officer you and he discussed Parole a lot, I'm

24   sure he expressed to you frustration about principles of

25   parole?

1    A        Yes.

2    Q        You may have some of your own.

3             You will be instructed in the charge of

4    this Court that a life sentence requires a man to spend

5    at least 35 years hard time, flat, you know, no good

6    time, prior to becoming eligible for parole and that

7    merely because someone is eligible for parole does not

8    mean they will parole at any particular time.

9    A        Right.

10   Q        May never parole.  They just are eligible to

11   be considered?

12   A        Right.

13   Q        Then the Court tells you that reaching your

14   verdict as to punishment that you are not to consider it,

15   consider the fact someone may possibly parole someday

16   because that's speculation, we don't know that they ever

17   will?

18   A        Right.

19   Q        You know, I think you answered Mr. Townsend you

20   could lay aside the law of parole, I mean I'm not taking

21   issue with your answer, I mean you well understand the

22   difference between "objective" and "subjective", don't

23   you?

24   A        Yes, sir.

25   Q        Objectively I have no doubt that you can lay

1    that aside, you won't mention it in the jury room.

2                Now, I cannot take the fact out of your

3    head that you know that I'm asking you subjectively,

4    subjectively is that going to effect you in reaching the

5    sentence or the punishment in the case?

6    A          No.   I would say if it were a case -- and I

7    think maybe the law has changed but at one time parole

8    would be much sooner than that and I think age is a

9    factor in recidivism so 35 years is a long time.

10   Q          And you understand that this is a death penalty

11   case?

12   A          Yes.

13   Q          I understand, I think I understand what you

14   just said but my next question is, you are sitting there

15   saying that, you know, at one time you thought it had

16   been less, is that going to be in your mind when you come

17   to sentencing?

18   A          No.   I said that, now, with the idea, however

19   realistic it is that parole might be a factor, it would

20   be 35 years and I think that is a long time.

21   Q          Now, you realize this case is being tried, the

22   offense alleged in the indictment is capital murder?

23   A          Yes.   Right.

24   Q          Now, there is a lesser included offense which

25   by law is alleged by that indictment which is just plain

1    murder?

2    A        Right.

3    Q        And parole, when you give an instruction on

4    parole as to that it's a different set of rules I believe

5    and I will be corrected by the Court, that instruction

6    there is at least 15 years before he becomes eligible.

7                          MR. TOWNSEND:   No.   I object,

8    Your Honor.   I object.   That is an improper statement of

9    the law.

10                         THE   COURT:    I'm  going  to

11   sustain the objection.

12                         I really do not want to get into the

13   parole laws on a non-capital case, we get into "deadly

14   weapon  findings",  it  depends  on  the  state  of  the

15   circumstances, under some circumstances it's now 35 years

16   so I think it would be totally inappropriate to get into

17   the possibility of how long parole might extend except

18   as to capital murder and the instruction would be that

19   you are not consider the effect of parole period in

20   setting your punishment if it's a non-capital finding.

21                         THE   COURT:    Mr. Old, if you

22   on  the  evidence  found  this  man  guilty  of  less  than

23   capital murder, found him guilty of murder or a lesser

24   offense would your feeling about the law of parole, would

25   that -- and once you get out of capital murder, it's

1    either life or death in a capital murder, once you get

2    into a non-capital offense, you know, it's a term of

3    years which receiving in this case could be five years

4    probated to life to 99 years.

5              Now, considering punishment for less

6    than capital offense is your knowledge or feeling of the

7    law of parole going to effect your sentence in the number

8    of years or the amount of time that you would give?

9              THE POTENTIAL JUROR:  I think

10   I could go by the instructions,  whatever my feelings

11   were --

12             MR.  OLD:    Well,  in  your

13   feelings in reaching that number of years are you going

14   to say, "Well, parole, you know, if I gave him 40 years

15   that may be actually meaning he will serve lesser years?

16             THE POTENTIAL JUROR:  "Could

17   I do or could I advocate what I thought was appropriate

18   and not consider parole?"

19             Yes.

20   Q        (BY MR. OLD)  Okay.  What you are required to

21   do is like on a life sentence you must define life for

22   the purposes of a capital case as the man is going to the

23   penitentiary, the person is going to the penitentiary and

24   he will remain there until the end of his life, you are

25   not to consider whether or not he will ever parole.

1  A        Right.

2  Q        The same is true in a non-capital case.

3  A        Yes.

4  Q        If you think 40 years is appropriate punishment

5  you must assume that he will spend at least 40 years, you

6  aren't to concern yourself with whether he will ever

7  parole or not prior to that.

8                That's what I call a "legal fiction."

9  A        Yes.

10  Q        Can you reach a verdict without thinking about

11  or considering the possibility of parole?

12  A        Under the constraints.  Yes.

13  Q        And subjectively that's not going to effect the

14  number of years or sentence that you give?

15  A        No.  Well, subjectively, no.

16  Q        Can  I  get  you  to  finish  your  thought,

17  "objectively?"

18  A        Well, it kind of goes back to an earlier -- we,

19  you know, what is inside and your experience somehow

20  contributes in some way, I mean you can't say that it

21  absolutely is not a factor because you are not a blank

22  slate.

23  Q        You could not tell me absolutely that you are

24  not going to consider the law of parole in reaching a

25  sentence?

A          I think I could.  I could make a determination under the law without --

Q          "Without" what?

A          -- without thinking, well, translating it into years that were possible or probable under the parole rules.

Number one; I don't know what the new rules are.

Q          But you know there are rules?

A          I know there are rules.  Yes.

Q          And --

A          I know parole exists.

Q          In either case what the Court is telling, you don't consider the possibility of parole?

A          Right.

Q          And is not going to tell you to sit back there and talk about it, it's too tell you not only tell you not to sit back there and talk about it, tells you subjectively in your mind you are not to consider that in reaching a verdict -- you are shaking your head?

A          I can do that.

THE COURT:  The problem is some jurors will get back there and say, "I think 20 years is appropriate, everybody gets parole, let's give them 50 so we can try and keep them there for 20", that's

1     the problem.

2               We need jurors that say, "I think this

3     case is appropriate for 20 years" and you give 20 years

4     without trying to calculate in your own mind how long he

5     will serve.

6               Can you do that?

7               THE POTENTIAL JUROR:  Yes.

8               MR.  OLD:    I  will  ask  you

9     another question about -- about law enforcement.

10              There's an exhibit before you that has

11    "Witness List" on the heading, can I get you to go over

12    that  entire  document  and  when  you  come  to  the  first

13    person that you know -- and by "know" I don't mean close

14    friends, just somebody that you have heard of or know of?

15              THE POTENTIAL JUROR:  I have

16    heard of Harry Washington and I have seen him.  I don't

17    know that I have ever spoken to him.

18    Q         (BY MR. OLD)  Anything in your relationship or

19    knowledge  of  Harry  Washington  that  would  effect  your

20    verdict in this case?

21    A         No.

22    Q         Would  you  consider  him  more  credible  than

23    anyone else?

24    A         I would give him equal weight.

25    Q         Okay.

1    A        Dewayne McClung I know.

2    Q        As a peace officer?

3    A        Yes.  And also in the Blue Knights motorcycle

4    club.

5    Q        Is that a close relationship that you have with

6    him?  Do you all belong to the same club?

7    A        Yes.

8    Q        How close a relationship is that between you

9    and he or perhaps you and your husband and he?

10   A        I wouldn't say "close" like "friends" but, you

11   know, interact in -- well, interact to a limited degree

12   on the motorcycle.

13   Q        Do you all take trips, I mean trips --

14   A        Yes.  We have taken a trip with them.  Yes.

15   Q        So I mean you would know him a little better

16   than Harry Washington who you spoke of?

17   A        Yes.

18   Q        I presume you know his wife to some degree?

19   A        Yes.

20   Q        If he has one, I don't know.

21   A        Yes.  He does.

22   Q        More of a social relationship?

23   A        Yes.  Well, some, yes.  Acquaintances.

24   Q        Then there is another bond between you all in

25   that your husband and he are both law enforcement

officers?

A          Yes.   They are both law enforcement officers.

I don't know how much of a bond that is.

I sure would think of that kind of bond with every law

enforcement officer I know.

Q          I mean it's a mutual likeness?

A          Well, not because of -- no.   Not necessarily.

Q          I mean it's common ground that your family has

with his, ground, you all have the same profession?

A          It's a common element but it doesn't mean you

like somebody because they are in law enforcement.

Q          I'm not implying that it does, I'm saying it's

some common ground that you all have?

A          It's common ground.

Q          Anything in your relationship with him that

would   cause   you   to   give   greater   weight   or   more

credibility or consider his testimony more truthful than

another witness?

A          No.

Q          Anyone else on the list that you know or know

of?

A          No.

Q          Do you know Ricky Blackburn?

A          Yes.

Q          I believe he was on there.

1    A        Was he?

2    Q        Yes.  Look up at the top, you may have missed

3    some names or the group -- okay?

4    A        Yeah.  I know who he is and I'm doing a class

5    in fact in Morris County and I have had discussion with

6    him over scheduling of the class.

7    Q        What do you mean?  You are doing a class in

8    Morris County for the officers?

9    A        I'm teaching a class for the inmates.  Yes.

10   Q        In the jail?

11   A        In the jail.

12   Q        What kind of class?

13   A        Life  skills,  academic  skills,  vocational

14   skills.

15   Q        Anything  in  your  relationship  with  Mr.

16   Blackburn that would cause you to consider him more

17   credible than another witness in this case?

18   A        No.

19            We have never talked about anything

20   other than the class situation.

21   Q        But he would not have a head start with you?

22   A        Not necessarily.

23   Q        As to his propensity to tell the truth, would

24   he have a head start with you?

25   A        Well, I think most people -- generally I give

1   most people the benefit of the doubt that they are

2   telling the truth.

3   Q     I'm not talking about "most people", I'm

4   talking about Mr. Blackburn.

5   A     I would say equal with most of the people I

6   know and come in contact with.

7   Q     How about with other witnesses in this case?

8   A     I don't know the other witnesses.

9   Q     Okay.  Because you don't know them and you do

10   know him does that give him a head start as to

11   truthfulness?

12   A     No.

13           Do you want to ask me why?

14   Q     I will if you are asking.

15           Why?

16   A     Well, I think the general idea is do I think

17   an officer can be capable of not telling the truth, is

18   that what you would like to know?

19   Q     No.  I'm asking about Ricky Blackburn right

20   now, you know him?

21   A     I know him, not personally, I mean I don't know

22   any of his personal or moral characteristics.

23   Q     Well, you have had a chance to observe --

24   A     So I don't know.

25           I have spoken to him about inmates, he

1   seems to be genuinely concerned and very cooperative with

2   the classes.

3   Q        Let me ask you about another officer that is

4   not on the list and presume with me that Ken Schindley

5   became a witness in this case.

6   A        Yes.

7   Q        As to truthfulness would he have a head start

8   with you?

9   A        He better.

10  Q        I mean.  Okay.  Presume with me that several

11  years ago I presume you probably knew every officer in

12  Mount Pleasant, everybody that worked in the sheriff's

13  department, I think we have gotten to a number that is

14  not likely?

15  A        Right.

16  Q        I think it's a fair statement to ask you, you

17  probably know more than someone who is not married to a

18  deputy sheriff?

19  A        Yes.

20  Q        Generally who works down there?

21  A        In the sheriff's office in Titus County?

22  Q        Titus County.

23  A        Right.

24  Q        And I also presume that you have some friends

25  other than your husband that work for the sheriff's

1    department?

2    A        Acquaintances.

3    Q        "Acquaintances?"

4    A        There's only one other one that I think

5    something of personally.

6    Q        Okay.

7    A        Other than the Sheriff.

8    Q        But I mean you have knowledge of a lot of

9    people that work down there?

10   A        Yes.

11   Q        You know their past, know something about them

12   and know them on a speaking basis?

13   A        Yes.

14   Q        When I say "a friend" I'm not implying someone

15   has to be your closest friend but it's somebody that you

16   are acquainted with and regularly communicate with?

17            "Regularly" doesn't mean everyday, you

18   know, on occasion?

19   A        Rare occasion for most of them.

20   Q        If those people became witnesses in this case

21   would they have a head start with you or your belief that

22   they would -- for your belief that they would tell the

23   truth?

24   A        Do you want a percentage?

25   Q        Would any of them?

1    A        Well, my husband.

2    Q        Okay.  I'm not trying to put you in a position

3    to where you say who you would believe and who you

4    wouldn't, I don't think that is fair; are there other

5    people involved in the sheriff's department that have

6    credibility with you to the point that they would have

7    a head start with you?

8    A        To the degree that I think someone can

9    represent what he or she believes is true and another

10   person could do the same thing and they may not see it

11   the same way but they may both be telling what they

12   believe is true.

13   Q        Who is the other person?

14   A        Well, if it's a conflict between the testimony

15   of two witnesses?

16   Q        Yes.

17   A        You are saying -- you are asking for that

18   comparison, right, when you say would I give a certain

19   few officers more credence than --

20   Q        All I'm asking you, those that you know that

21   work for Titus County or those that you have told me

22   there are some as to those when they sit down on that

23   witness stand they have a head start with you as to the

24   issue of truthfulness of their testimony?

25   A        Well, that bothers me when you say "head start"

1    because that doesn't mean that another person may have

2    the same.

3    Q        "Head start?"

4    A        Yes.

5    Q        Who?

6    A        Who is not an officer.

7             As far as I'm concerned whether or not

8    a person is an officer does not necessarily mean that

9    that person is more truthful than another person.

10   Q        But there are people that you can conceive of

11   that work for the Mount Pleasant Sheriff's Department

12   that would have a head start with you over somebody you

13   knew nothing about?

14   A        If their perception of the truth was in

15   conflict with someone else?

16   Q        Yes.

17   A        Is that what you are saying?

18   Q        Yes.  If they testified -- I'm not talking

19   about --

20   A        Yes.  There are a couple of people there that

21   I would --

22   Q        Let me say something, I'm not talking about an

23   officer trained in reading fingerprints and making

24   comparisons and getting up and saying "That fingerprint

25   matches that fingerprint" versus me getting on the stand

1    and saying, "Look, I never had courses or anything but

2    those fingerprints don't match."

3                     I'm not talking about if the officer is

4    on the stand and it's proven that he has training, those

5    are things that you can consider.

6                     I'm talking about the propensity to tell

7    the truth.

8    A          And I told you there are a couple that I would

9    put --

10                     THE COURT:   Ma'am, are those

11   "couple" on that Witness List?

12                     THE POTENTIAL JUROR:   No.

13                     THE COURT:   Thank you.

14                 Thirty minutes.

15                     MR. OLD:   Your Honor?

16                     THE COURT:   Yes.

17                     MR. OLD:   Could I approach the

18   bench?

19                     THE COURT:   Ma'am, would you

20   mind stepping out for just a moment?

21                     THE BAILIFF:  Watch your step.

22

23                     (The   following   occurred   outside   the

24   presence and hearing of the potential juror:)

25

1          MR. OLD:   I do not feel it

2     fair to put that woman in the position of having to say

3     who those officers are at this time.   It may become

4     necessary based on -- I'll make a challenge -- on your

5     ruling, I will reserve doing that if the Court thinks

6     it's necessary.

7          THE COURT:   Yes.  Because if

8     they are not on the Witness List I don't know how they

9     are going to testify unless you call them and if you call

10    them it's certainly to your advantage so I don't see a

11    potential problem.

12         MR. OLD:   I'm thinking out

13    loud.

14         You see, the problem, the problem is

15    this is November 17th, I think?

16         THE COURT:   Correct.

17         MR. OLD:   We are going to try

18    this case sometime in January.  My client is going to be

19    housed in the Titus County Jail from now to then and I

20    do not know what events can occur between now and then

21    that would bring officers before this Court and who they

22    are.

23         And I think as to certain events the

24    State could supplement and say these people are going to

25    be witnesses or it's very well I might have to reach out

1    and get a witness from down there.

2                      MR.  TOWNSEND:    Are  we  to

3    consider the entire universe as a potential witness?

4                      THE COURT:  What I'm going to

5    do, I will ask her who those two people are out of the

6    presence of everybody in this courtroom, we'll make it

7    part of the record and seal it.

8                      If those two people show up on a Witness

9    List prior to this trial -- of course we have to assume

10   that this lady ends up on this jury -- if she ends up on

11   the jury and those two witnesses end up being placed on

12   the Witness List then I will take up the issue at that

13   point in time.

14                     I think it's just too speculative right

15   now to find this as an area of concern of the Court and

16   I'm not even concerned about asking those two names, I

17   just will do it or maybe more than two, I will do it just

18   to supplement the record for you if you are asking me or

19   if you would like for me to do that.

20                     MR. OLD:  Are you going to do

21   it at the end of voir dire?

22                     THE COURT:  Yes.

23                     MR. OLD:  After we make our

24   challenges?

25                     THE COURT:  We will do it at

1   the end of voir dire.

2          Bring her back.

3          You have used 30 minutes so there are

4   20 remaining.

5

6          (The following occurred in the presence

7   and hearing of the potential juror:)

8

9          THE COURT:  Sorry to exclude

10   you but it's easier to have a conference by taking you

11   out than with all of us walking out.

12          Mr. Old.

13          MR. OLD:  Ms. Schindley, let

14   me go on to something else; I know that you are an author

15   and it is my understanding that you have authored some

16   pretty sophisticated books, I believe it's in the area

17   of children's literature, is that correct?

18          THE POTENTIAL JUROR:    No.

19   Secondary English, High School English and College

20   English.

21   Q     (BY MR. OLD, CONTINUING VOIR DIRE EXAMINATION)

22          Is that writing textbooks?

23   A     Yes.

24   Q     Are you still doing that as well as teaching

25   at the college and writing?

1    A          Yes.

2                       Right now I'm working on a college

3    textbook.

4    Q          Are you interested in other forms of writing?

5    A          Yes.  I write.

6    Q          Writing what, writing a novel, things like

7    that?

8    A          I am pretty much a nonfiction person in my

9    reading and my writing.

10   Q          I'm going to ask you a silly question that is

11   one of those questions I wouldn't have asked two or three

12   years ago; in watching CNN, Nightline and so forth

13   apparently people out in California probably are actually

14   willing to pay a little money to get on O.J.'s jury.

15   A          So they can write a book about it?

16   Q          Or one of the talk shows because they will pay

17   them a bunch of money to interview them.

18                       I know that you have sat through other

19   trials that I was involved in, I know that you have an

20   interest in the legal system, I'm not criticizing, that's

21   fine, that's what people are supposed to do and this is

22   an open court, I'm speculating on what you are doing

23   here, you obviously are interested?

24   A          Yes.

25                       I think I said on my questionnaire that

1    I read the entire Perry Mason series and have been

2    interested in law long before Ken.

3    Q        My question is this; do you have any ambitions

4    or thoughts about writing a book about jury service or

5    anything that relates --

6    A        It has not occurred to me.

7    Q        I mean I don't believe anybody wants on this

8    jury.

9    A        Well, that -- that has not occurred to me.  If

10   you are saying whether or not I would want to serve on

11   a jury, I have felt a little bit excluded because I

12   haven't been called in 14 years, never once and also felt

13   that -- also felt that the fact that Ken was an officer

14   would exclude me from a jury so --

15   Q        My question is this; you don't have any

16   motivation for being a juror other than being a citizen?

17   A        No.

18             It hadn't even occurred to me.

19   Q        I will agree it's a silly question and I'm not

20   accusing you of that.

21   A        No.  I understand.  I have seen the California

22   things.

23   Q        I have the same motivation you do, I would love

24   to be on the jury.

25             I got called one time and sat down there

LLOYD E. BILLUPS, CSR, #149
OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT
MT. PLEASANT, TEXAS

1    three hours and everybody I knew struck me, they double

2    struck me.

3    A        It makes you feel kind of --

4                      THE COURT:   "Unwanted?"

5                      THE POTENTIAL JUROR:   Yeah.

6    Really.

7                      MR. OLD:  There's nothing more

8    in this world that I'm more intrigued with than walking

9    through this door and seeing what really goes on first

10   hand, however once that burden is put on your shoulders

11   this isn't -- I'm not saying any case is easy, I mean if

12   somebody came down here and volunteered for jury service

13   in a capital murder case I would be real scared of them,

14   wouldn't you?

15                     THE POTENTIAL JUROR:   Well,

16   yes.  Yes.

17   Q        (BY MR. OLD)  I mean it's our duty as citizens

18   to serve and yet we want to do our duty but anybody

19   saying, "I want to sit in a capital case and I'm looking

20   forward to it?"

21   A        That might indicate they didn't realize their

22   responsibility.

23   Q        Yes.

24                     And I mean my question to you is you are

25   not overly anxious to be on this jury?

A        No.   Not because it's a capital case or not because it's any kind of case but I actually would at some point in my life like to serve on a jury.

Q        I have no problem with that.   I am in there with you, maybe we can get on the same one sometime.

        Something that you said that you were excluded because Ken is an officer, what do you mean by that?

        I mean obviously it doesn't disqualify you because you are here?

A        Well, in a general way and in another way I think my education is an exclusionary factor.

        I observed the jury selection once and made a bet on whether or not they would take a woman who seemed to me to be a good potential juror and she was stricken and the person, the reporter next to me said it was because she had advanced degrees.

Q        Okay.  Let me go back to why does your husband being an officer exclude you or why do you think that it does?

A        Well, because I think the Defense would have a tendency to think there would be a bias there because of that relationship.

        And that one might not be able to execute those duties without a bias.

1    Q        You talked to Ron Cowan about the change of

2    venue hearing, you know this case was moved from Morris

3    County to Titus County?

4    A        Yes.

5    Q        Did Mr. Cowan share with you why?

6    A        "Why" what?

7    Q        Why it was moved?  Do you know why it was

8    moved?

9    A        I assume because of publicity.

10   Q        You assumed that?  Are you guessing or you

11   think that's what somebody told you?

12   A        Well, I think that's why they are normally

13   moved.

14   Q        Okay.  I agree that's why they are normally

15   moved, there are other reasons.  I'm not trying to tell

16   you why this one was moved, I'm asking you if you know

17   why it was, really?

18   A        Other than publicity I can't imagine what

19   reason there would be.

20   Q        I assume Ron told you what he said he had made

21   a statement in another trial about this case?

22   A        He said the statement he made -- and I don't

23   remember exactly but it was to the effect that in another

24   trial he had testified they didn't need change of venue

25   then they mentioned this and he said, "Yes.  But everyone

1    knows that victim" or something to that effect.

2    Q        Okay.

3    A        And then -- so it was related to how many

4    people knew the victim or something.

5    Q        Is it a fact that you sat through a change of

6    venue hearing in this county or part of it?

7    A        Yes.  I think a little bit of it.  I'm not sure

8    how much.

9    Q        That would have been "Jeanette Harvey?"

10   A        Yeah.

11   Q        I remember you at the trial, I don't really

12   remember you at the change of venue or not.

13   A        I remember something about it and I think I did

14   at least pop in.

15   Q        Okay.  Anything in the fact that because this

16   case the venue has been changed, and I mean you assume

17   is publicity but you know it has been changed, anything

18   that makes this -- is there any way the fact venue was

19   moved, would it effect your deliberations in this matter?

20   A        No.

21   Q        I want to ask you some questions about evidence

22   and things as value -- having value as evidence.

23   A        Yes.

24   Q        The indictment in this case, you have read it,

25   does it have any value as evidence?

1    A        It's not evidence, is it?

2    Q        Is your answer "No.  It has no value?"

3    A        I guess not.  I mean I don't know what -- I

4    didn't even know it was evidence.

5    Q        Okay.  I didn't say it was.  I said to you

6    right now does it have any value?

7    A        No.  To me it's not evidence.  No.

8    Q        You would not take the fact that a man has been

9    indicted by a Grand Jury as an inference of guilt?

10            Does it infer guilt to you?  The fact

11   that he has been indicted?

12   A        Not absolute.  No.

13            I have known of people being indicted

14   who weren't guilty.

15   Q        But I mean right now in your mind it is an

16   inference that he's guilty?

17   A        I wouldn't --

18   Q        Perhaps not beyond a reasonable doubt but it's

19   an inference?

20   A        It's a charge.

21   Q        It's a charge and it infers guilt to you?

22   A        Well, it's a charge.

23            Like I said, I have seen indictments

24   that people weren't guilty.

25   Q        Okay.  But you told me it inferred guilt to you

1  right now?

2  A          I didn't say that.

3                          MR. TOWNSEND: He's misstating

4  what the witness has said.

5                          THE COURT:  Sustained.

6                          MR. OLD: You said it does not

7  infer "absolute guilt", I think?

8                          THE POTENTIAL JUROR: No.  It

9  doesn't.

10  Q          (BY MR. OLD)   The  Fifth  Amendment  is  our

11  privilege not to give testimony against ourselves, the

12  defendant is not required to testify at any phase of the

13  trial, not required to produce evidence at any phase of

14  the trial, do you understand that?

15  A          Yes.

16  Q          If a defendant does not testify in either phase

17  of the trial does that infer to you guilt?

18  A          No.

19  Q          Okay.  Does it have any value at all to you in

20  weighing the evidence and reaching a verdict?

21  A          No.

22  Q          You would not hold it against the defendant who

23  did not testify?

24  A          No.

25  Q          Along with that is -- the defendant does not

1    have a burden of proof, the State has to prove him guilty

2    beyond a reasonable doubt and if the State doesn't do

3    that, if I sit over here and work crossword puzzles you

4    would find him not guilty?

5    A        Right.

6    Q        Mr. Townsend talked to you about a hypothetical

7    about a confession that you believed beyond a reasonable

8    doubt was true but you also believe beyond a reasonable

9    doubt or had a reasonable doubt thereof that it was a

10   voluntary confession.

11            As evidence does that confession have

12   any value?

13   A        If it wasn't a voluntary?

14   Q        It's not voluntary but in your mind you believe

15   it is true beyond reasonable doubt.

16   A        Well, it can't be considered.

17   Q        Okay.  Does it have any value as evidence?

18   A        If it's not a voluntary confession.  No.

19   Q        Now, we talked about objectively you lay it

20   aside, you don't talk about it; in your subjective mind

21   if you believe that to be true beyond a reasonable doubt

22   could it influence your verdict?

23   A        If it's not voluntary.  No.

24   Q        Okay.  But I mean --

25   A        And I say that from my experience, too because

1    I have had -- I sit through a trial in fact where there

2    was a statement presented and a person was in fact

3    convicted and the guy was not guilty in my opinion and

4    there was a confession but it was -- it was --

5    Q        Where was that trial?

6    A        Yes.

7    Q        Was that trial here?

8    A        Yes.

9    Q        Who was it?

10   A        Donald Markle was convicted of killing a baby

11   and I did not believe he did it but they had a confession

12   so --

13   Q        As to the type of evidence that you would

14   consider talking about, psychological testimony and if

15   they -- if a psychiatrist testified would your training

16   and knowledge of psychology, would it override his

17   testimony?

18   A        You mean would I discount a psychologist's

19   testimony because I thought I knew more than he did?

20   Q        Yes.

21   A        No.

22   Q        I'm not telling you you have to accept the

23   testimony of any witness, psychologist with the best

24   credentials in the world who testify and you can say, "I

25   don't accept it" but you have got to be able to consider

1    it and weigh it as evidence.

2    A        Yes.

3    Q        It doesn't mean it reaches the proof that is

4    required of it but you wouldn't just reject it and say,

5    "I'm not listening to him?"

6    A        No.

7    Q        The school he went to, "I know that school and

8    they don't teach it right?"

9    A        No.  I would not do that.

10   Q        Did you form any opinion -- I'm not asking you

11   if you found -- have you had --

12   A        Yes.  I see another name on here I missed the

13   first time.

14   Q        Who is that?

15   A        Jailer Patsy Martin, I know her the same way

16   that I know Ricky Blackburn.  I have just talked to her

17   about -- she is the Chief Jailer, I talked to her about

18   classes.

19   Q        Anything that would give her that head start?

20   A        No.

21   Q        Have you been to the Morris County Jail in the

22   last year?

23   A        Yes.

24   Q        As a visitor or on business?

25   A        On business.

1          In fact last Tuesday.

2    Q          Other than -- have you been there other times?

3    A          Other than on business?

4    Q          Yes.  Yes.

5    A          No.

6    Q          Was Tuesday the first time you went there?

7    A          No.

8              I take classes there since October 18th.

9    Q          "October the 18th?"

10   A          On Tuesdays and Thursdays.

11   Q          Did you ever have any contact with Mr. Wardlow

12   by virtue of being there?

13   A          No.

14   Q          To your knowledge?

15   A          No.

16   Q          I mean I presume you did not know every

17   prisoner in the place by name?

18   A          No.  But I --

19   Q          And they weren't all in your class?

20   A          Pardon?

21   Q          They were not all in your class?

22   A          No.  I have eight in the class.  There was an

23   orientation for a larger group and I don't know if he was

24   there or not.

25   Q          Okay.  Have you formed any sort of opinion of

1      what happened as to the incident that gave rise to this

2      case based on what Ron Cowan told you or what you have

3      read in the paper or what you have heard in the news?

4      A        Ron didn't discuss the facts of the case, no

5      great conversation and --

6      Q        You haven't formed an opinion of any kind?

7      A        No.

8      Q        Your views on the death penalty, you say you

9      would give it in an appropriate case?

10     A        Yes.

11     Q        Do you have any strong strong feelings about

12     death over life?

13                Do you lean that way?

14     A        Well, I think overall the practical --

15     Q        Do you belong to any organizations or read the

16     literature of any organizations who are pro penalty,

17     advocates of the death penalty?

18     A        No.  I do not belong to any organizations.

19                In my research and in my work with in

20     textbook writing I read arguments from both sides as I

21     do on gun control and any number of issues, I read, I

22     make it a point to read arguments on both sides.

23     Q        You don't belong to any organizations that are

24     particular advocates of the death penalty?

25     A        No.

1    Q        And I also asked you about reading literature,

2    I don't know if Ken belongs to any organizations, I guess

3    he would belong to some peace officer organizations?

4    A        I think the Sheriff's Association.

5    Q        I also presume from what I read in your resume

6    you read everything that goes in your hands and read a

7    lot and I don't know if this organization that he belongs

8    to in any of his literature -- is it pro death penalty?

9    A        I have no idea and I don't recall any

10   publications that we receive at the house.

11   Q        I want to ask you one more question and I'm

12   going to quit; in the past I have had peace officers and

13   their wives, people very close to them as prospective

14   jurors in cases, after those people have been voir dired

15   and decisions made I have had peace officers tell me,

16   "Well, I knew you weren't going to take me but I made

17   you use a strike and gave the State a strike."

18              I have been told that a lot, I have been

19   -- had their wife on a jury, "Cost you a strike, didn't

20   I?  Just flat told her what to do."

21              That happens all the time.

22              That a strike -- and you know what "a

23   strike" is?

24   A        I know what "a strike" is.

25   Q        It has some value to Mr. Wardlow, a legal

1    right,  something the law gives him and I mean I believe

2    -- I'm not accusing you of this but I believe there are

3    people, especially some peace officers who have answered

4    questions to where I had to use a strike.

5    A         No.

6    Q         Now, that is wrong to a man charged with a

7    crime to take a strike away from him.

8    A         Absolutely.  I agree.

9    Q         Out of spite or out of support of law

10   enforcement?

11   A         I agree.

12   Q         Going back and reviewing the substance of what

13   you have told us here today is there any area that you

14   consider to where perhaps you might want to clarify

15   something or might want to change an opinion?

16              I'm not accusing you of leaning to --

17   I'm not even accusing you of giving me a wrong opinion,

18   I can change an opinion in about five seconds and things

19   to change from time to time, anything that you think is

20   of value we ought to hear about?

21   A         No.

22              Actually I consider myself to be a

23   person who is very rationale and -- and can put rationale

24   above --

25   Q         I'm not accusing you of not being rationale and

1    not implying in any way that you aren't.

2    A        Well, that's what I wanted to say, actually is

3    that the irony of striking someone because they are an

4    officer's wife or whatever or even an officer, that

5    doesn't mean that they are not rationale and couldn't

6    fulfill their duties as the law requires.

7    Q        I didn't say that it did.  I mean you are not

8    excluded merely because you are married to Ken Schindley.

9    A        Well, --

10   Q        I mean I don't think a person would objectively

11   ever sit on a jury and give greater punishment than the

12   evidence proved to them merely because they are a peace

13   officer or related to one, I just can't believe that

14   there is anybody that can do that.

15            Obviously I mean we all have biases and

16   we all have prejudices, the problem with this question

17   is until you move from there over to there you are only

18   telling me what you think your biases and your prejudices

19   will do, when you get over there and you start listening

20   to the evidence and you have to make a decision that, you

21   know, really we are asking you to tell us "Yes" or "No"

22   what you are going to do in certain events that have not

23   happened and I know that it's hard.  (Indicating)

24   A        The only thing I can say with reasonable

25   certainty if you know yourself is that you can in a

1  logical way make whatever decisions under the law as the

2  law requires.

3  Q        Are you telling me you think you can, is what

4  you are telling me until you are put in those positions

5  you don't know what you are going to do?

6              I'm not saying you -- I don't believe

7  anybody  really  knows,  you  are  just  telling  us  the

8  best --

9  A        Yes.

10  Q        -- any biases or prejudices that you have that

11  might effect your ability to render a verdict as to the

12  law in this case?

13  A        Any what?

14  Q        "Biases or prejudices?'

15  A        No.

16              MR. OLD:  Pass the witness.

17              THE COURT: Ma'am, if you will

18  step out I will have a discussion with the lawyers and

19  I will have some more instructions for you.

20

21              (The  following  occurred  outside  the

22  presence and hearing of the potential juror:)

23

24              THE COURT:   Does the State

25  have any challenges?

1          MR.   TOWNSEND:     None,   Your

2     Honor.

3          THE COURT:   The Defense have

4     any challenges?

5          MR. HINSON:  Yes, Your Honor.

6          I will try to state them the best I can,

7     the first challenge for cause would be that the potential

8     juror has a bias or prejudice against the law applicable

9     to this case in that she said she could not subjectively

10    get parole out of her mind as she made a determination

11    on this case.

12         The second challenge for cause would be

13    that the potential juror has a bias or prejudice against

14    -- or against the Defendant in that she finds some police

15    officers   with   more   credibility   than   other   police

16    officers.

17         And   as   the   facts   of   this   case   were

18    presented to a juror if events occur at the Titus County

19    Jail particular witnesses that she has a stated bias and

20    favor   of   as   to   their   credibility   they   are   potential

21    witnesses from the Titus County Sheriff's Department that

22    could be called that she would give a head start and that

23    would be a prejudice against the Defendant.

24         In general the third challenge would be

25    that the potential juror has a bias or prejudice against

1    the law applicable to the case in that some witness has

2    a head start on another witness and that some witnesses

3    in law enforcement are believed to have the propensity

4    to tell the truth more than other witnesses.

5            The next challenge would be that the

6    potential juror has a bias or prejudice against the law

7    applicable to the case in that the potential juror would

8    rely on the indictment as some evidence of guilt wherein

9    the potential juror stated that the indictment does not

10   infer absolute guilt it implies that the juror infers

11   some amount of guilt from the indictment itself and would

12   not disregard that as she considered the evidence

13   presented to her.

14           That would be the extent of our

15   challenges, Your Honor.

16           THE COURT:      The first

17   challenge on the bias against the parole law is

18   overruled, the third challenge, bias against the law

19   because some witnesses may have a head start is

20   overruled, the fourth challenge on inference of guilt on

21   the indictment is overruled, the second challenge has to

22   do with some police officers being more credible than

23   others, she told us that no one on that list would have

24   a head start, that they would start equal with everyone

25   else.

1          She said that her husband and maybe a

2     couple of others might have a head start.

3          I'm not going to sustain the challenges

4     based on speculation.  If this lady ends up on the jury

5     I will find out the names of those people who have a head

6     start, obviously if the Defense calls them it's to your

7     advantage.

8          If they are potential witnesses because

9     they may have some contact with the Defendant I will make

10     sure that there is no contact with the Defendant between

11     the time that she is chosen and the time this trial is

12     over.

13          I don't think that I'm going to require

14     her to give me those names unless she does get chosen and

15     then if she is chosen I will talk to her and get those

16     names, find out where they work and if I determine that

17     they already are potential witnesses even though they are

18     not on the Witness List I will then inform both parties

19     and we can make a decision.

20          Assuming that they are not potential

21     witnesses and don't know anything of Mr. Wardlow I will

22     make sure they don't become potential witnesses between

23     now and the time of this trial.

24          So with that explanation the second

25     challenge is overruled.

1          Let's go off the record.

2

3          (Off the record discussion.)

4

5          THE COURT:  Bring her back in

6     a moment, I'm going to tell her she is a potential juror,

7     I might need to talk to her this afternoon and find out

8     whether she can come back or not.

9

10         (The following occurred in the presence

11    and hearing of the potential juror:)

12

13         THE COURT:   Ma'am, you are

14    still a potential juror, I won't know anything until this

15    afternoon about your jury service.

16         Normally if a person ends up on the jury

17    I will send them a letter, if we don't then we have

18    Bobby's office give them a phone call.

19         Now, if I need to talk to you, there's

20    a possibility I might need some more information from you

21    this afternoon, would you be able to come back to the

22    courthouse this afternoon around 2:00 or 3:00 for about

23    five minutes if I needed you?

24         THE POTENTIAL JUROR:   Yes.

25    I will be in Camp County for a short time, probably 1:00

1    to 2:00, 2:30.

2                         THE   COURT:    Where  could  I

3    reach you after 2:30?

4                         THE   POTENTIAL   JUROR:    The

5    Adult Education Center.

6                         THE   COURT:    Do  you  have  a

7    phone number?

8                         THE POTENTIAL JUROR: 572-5154.

9                         THE COURT:   "572-5154?"

10                   How long would it take you to get here?

11                        THE   POTENTIAL   JUROR:    Five

12   minutes.

13                        THE   COURT:    I  don't  know

14   whether I will need to ask you anything else or not, if

15   I do I will call, if you haven't heard from us this

16   afternoon -- you will hear from us to let you know by

17   letter you are on the jury or by phone to tell you that

18   you are not.

19                   Thank you, ma'am.

20                        THE POTENTIAL JUROR:   Okay.

21

22                   (The   following   occurred   outside   the

23   presence and hearing of the potential juror:)

24

25                        THE COURT:  Okay.  Let's take

1    a short break.

2

3                         (Recess.)

4

5                              THE COURT:  Bring in our next

6    juror.

7                         THE BAILIFF:  Ms. Newman.

8              Have a seat up there.  Watch your step

9    and have a seat right up there, ma'am.  (Indicating)

10

11        DONNA MAE NEWMAN, Potential Juror #306,

12   was  called  as  a  Potential  Juror  and,  having  been

13   previously sworn by the Court, testified as follows:

14

15                              THE COURT:  How are you doing,

16   ma'am?

17                         THE POTENTIAL JUROR:  Fine.

18                              THE COURT:  Go ahead and take

19   a seat if you would, please.

20                   Are you "Donna Newman?"

21                         THE POTENTIAL JUROR:  Yes.

22                    THE COURT:  "N E W M A N?"

23                         THE POTENTIAL JUROR:  Yes.

24                              THE COURT:  This is our juror

25   47.

1      Ma'am, I'm Gary Stephens, I'm presiding

2  over the trial.

3      We have the District Attorney from

4  Morris County, Mr. Richard Townsend, we have two Defense

5  Attorneys, Mr. Bird Old, III and Mr. Hinson.

6      MR. OLD:  Good morning.

7      THE COURT:   And Mr. Lance

8  Hinson.

9      MR. HINSON:  Hello.

10      THE COURT: Next to Mr. Hinson

11  is the person charged, Mr. Billy Joe Wardlow.

12      THE DEFENDANT: Good morning.

13      THE COURT:   Now, ma'am, the

14  lawyers have read your questionnaire and they are going

15  to talk to you this morning about some of your answers

16  and before they do there's a couple of things I want to

17  go over with you, first you informed our Bailiff that you

18  needed to be at work this afternoon?

19      THE POTENTIAL JUROR:  Yeah.

20      THE COURT:  I don't know that

21  I can accommodate you on that but that gives me a concern

22  about whether or not you would be able to serve on this

23  jury.

24      We are not going to start the trial --

25  to back up and to cover this for the record; ma'am, you

1    work for a doctor, is that correct?

2                    THE POTENTIAL JUROR:  Yes.

3                    THE COURT:  Two doctors in the

4    same office?

5                    THE POTENTIAL JUROR:  Yes.

6                    THE COURT:   And you are a

7    nurse?

8                    THE POTENTIAL JUROR:  Yes.

9                    THE COURT:  The trial itself

10   will not begin until after the first of the year, it will

11   be sometime in January when we start the trial, you will

12   probably be, if you are on the jury you will be required

13   to be here from 9:00 to 5:00 for two weeks, maybe three,

14   probably not but maybe two weeks.

15                    What effect would it have on your job,

16   ma'am?

17                    THE POTENTIAL JUROR:  Well,

18   I really don't know.  It was just like they called me

19   yesterday afternoon and I just don't have nobody to cover

20   for me today.

21                    THE COURT:  Would you be able

22   to have someone cover for two weeks?

23                    THE POTENTIAL JUROR:  That's

24   an awful long time, I would have to talk to Dr.

25   Sarmiento, he would probably have to hire someone.

1    THE COURT:  Do you know if you

2 would be paid when you are on jury service?

3    THE POTENTIAL JUROR:  No.  I

4 would not.

5    THE COURT:  Ma'am, are you

6 married?

7    THE POTENTIAL JUROR:  Yes,

8 sir.

9    THE COURT:  Does your husband

10 work?

11    THE POTENTIAL JUROR:  Not now.

12 He works outages and this one is over next week then he

13 will go back to work in February.

14    THE COURT:  So if you are down

15 here in January your husband is going to be unemployed

16 and you will not be receiving any income?

17    THE POTENTIAL JUROR:  Not for

18 those two weeks for the trial.  No.

19    THE COURT:  Is that going to

20 cut into your ability to meet your financial obligations?

21    THE POTENTIAL JUROR:  Yes.

22    THE COURT:  Let's talk about

23 one more area; in this questionnaire you talked about

24 knowing some facts of this case?

25    THE POTENTIAL JUROR:  Just on

1    the news.

2                          THE COURT:   Tell me what you

3    heard, ma'am, or what you can remember hearing.

4                          THE POTENTIAL JUROR:  That the

5    young man and his girlfriend went to this man's house and

6    shot him and stole his car.

7                    That's basically what I heard.

8                          THE COURT:   Do you believe

9    what you heard -- I don't mean you believe you have heard

10   it -- do you believe the report, do you think it was

11   true?

12                         THE POTENTIAL JUROR:  I really

13   don't know.   I don't know.

14                         THE COURT:   Have you formed

15   a conclusion about Mr. Wardlow's guilt or innocence based

16   on those media accounts?

17                         THE POTENTIAL JUROR:  No.   I

18   haven't heard enough, I just --

19                         THE COURT:   Can you set out

20   of your mind what you have heard and base your verdict

21   on what you hear in the courtroom?

22                         THE     POTENTIAL     JUROR:

23   Probably.

24                         THE COURT:   See, in a jury

25   trial we don't want people guessing or speculating, we

1    want them to listen to the evidence and base their

2    verdict on that evidence and what would be improper would

3    be for a juror to say, "Well, you know, that's what that

4    witness said but I heard the report say this and I think

5    the reporter is right."

6              If that reporter is not one of those

7    witnesses you can't think about what that reporter said

8    or what that newspaper article said because that is not

9    evidence.

10             Would you be able to put that out of

11   your mind and base your verdict just strictly on what you

12   hear here?

13             THE POTENTIAL JUROR:  I think

14   I could just on evidence.

15             THE COURT:  Ma'am, before we

16   go any further let me talk to these lawyers about what

17   you know about the case and about your work problem and

18   I will bring you back in in just a minute.

19             THE POTENTIAL JUROR:  Okay.

20

21             (The following occurred outside the

22   presence and hearing of the potential juror.)

23

24             (Off the record discussion.)

25

1      THE COURT:  Let's get back on

2  the record.

3           Mr. Townsend -- first let the record

4  reflect there was an off the record discussion about the

5  juror's inability to earn income if on the jury.

6           Mr. Townsend, do you agree to excuse

7  juror Newman, number 47?

8           MR.  TOWNSEND:   Yes,  Your

9  Honor.

10          THE COURT:  Mr. Old, do you

11  agree?

12          MR. OLD:  Yes.

13          THE COURT:  Mr. Wardlow?

14          THE DEFENDANT:  Yes, sir.

15          THE COURT:  Tell Ms. Newman

16  that we don't want her to have to lose money to serve her

17  county and she is free to go and won't be on the jury.

18          THE BAILIFF:  All right.

19          THE COURT:   We will go to

20  lunch, be back at 1:00 o'clock.

21

22           (Noon recess.)

23

24           (The following occurred in the presence

25  and hearing of the potential juror:)

1           DANNY JAKE PURDON, Potential Juror #281,

2     was called as a Potential Juror and, having been

3     previously sworn by the Court, testified as follows:

4

5                         THE BAILIFF:   Have a seat

6     right up there.   Watch your step as you are going up

7     there.   (Indicating)

8                         THE COURT:   Good afternoon,

9     sir.

10                  Go ahead and take a seat.

11                  Sir, would you state your name for the

12    record?

13                        THE POTENTIAL JUROR:   Danny

14    Purdon.

15                        THE COURT:   "P U R D O N?"

16                        THE POTENTIAL JUROR:   Yes,

17    sir.

18                        THE COURT:   This is juror 48.

19                  Sir, I am Gary Stephens, I'm presiding

20    over the trial.

21                  We have a District Attorney from Morris

22    County present, that's Mr. Richard Townsend.

23                        MR. TOWNSEND:   Hello.

24                        THE COURT:   We have two

25    Defense Attorneys, Mr. Bird Old.

1       MR. OLD:  How are you?

2       THE COURT:   And Mr. Lance

3 Hinson.

4       MR. HINSON:  Hello.

5       THE COURT: Next to Mr. Hinson

6 is the person charged, Mr. Billy Joe Wardlow.

7     Now, sir, the lawyers have read your

8 questionnaire and they are familiar with the answers.

9 They are going to discuss some of those answers with you

10 and they are also going to discuss the laws and issues

11 involved in a death penalty case.

12    You will be asked a lot of questions and

13 the answers will let us know whether or not to put you

14 on the jury.  There's no right or wrong answers, in order

15 to be a juror you must be able to understand and follow

16 the law but we need more than just "Yes I can" or "No I

17 can't", we want to know what you think about some of our

18 laws and some of the issues.

19    We have found over the years picking

20 jurors in this type of case that most people are

21 qualified, they can understand the law but we have also

22 found that being qualified doesn't mean that you are a

23 juror appropriate for a death case so we want you to open

24 up and share your views and opinions with us.

25    And I want you to keep in mind, sir,

1   this is not a citizenship test and you don't have to

2   agree with our laws, we just want to know whether you do

3   or don't and the only way we need to find out is ask

4   questions, what we want from our questions is honesty,

5   what both sides are looking for in this case are 12 fair

6   jurors that can do whatever the right thing is and that

7   will be dictated by whatever evidence comes out at trial.

8              If there's anything in your background

9   or in your beliefs that you think would probably make you

10   a better juror on a different type of case let us know.

11   We have talked to, well, you are "48" we have talked to

12   48 people, we have five jurors so most of the people we

13   talk to frankly don't end up on the jury, we won't know

14   whether you are on the jury or not until we finish

15   talking to you and like I said, it's your opinions and

16   your answers to the questions that will decide whether

17   or not to put you on the jury.

18              The trial will not begin until after the

19   first of the year, the trial will probably take two weeks

20   so I need to know, sir, if you know of any reason that

21   you could not sit for a two-week period in January to

22   serve as a juror in this case?

23              THE POTENTIAL JUROR:  Not that

24   I know of at this time.

25              THE COURT:  You mention on the

1    last page of the questionnaire that you had heard about

2    the case or you knew something about the facts of the

3    case, could you tell me what you have heard, sir, and

4    where you have heard it?

5                          THE POTENTIAL JUROR:   In the

6    newspaper, the Longview newspaper is all I have heard

7    about it.

8                          THE COURT:   Did you ever read

9    Billy Joe Wardlow's name in that paper?

10                         THE POTENTIAL JUROR:    Yes.

11   I did.

12                         THE COURT:   And did you read

13   the name of the alleged victim?

14                         THE POTENTIAL JUROR:    Yes.

15   I did.

16                         THE COURT:   Did you know or

17   do you know Mr. Wardlow?

18                         THE POTENTIAL JUROR:   No.

19                         THE COURT:   Did you know the

20   alleged victim in this case?

21                         THE POTENTIAL JUROR:   No.   I

22   didn't.

23                         THE COURT:   Sir, what did you

24   read, what facts have you -- do you recall about the

25   articles that you have read?

1    THE POTENTIAL JUROR:   Well,

2   I remember vaguely when it happened, you know, when they

3   came out in the paper and I had forgot most of that until

4   I was called up here, you know, the last time and then

5   what you all told me I heard and then since -- since that

6   time the Longview paper has printed -- I think I have

7   read three articles in it at that time and other than,

8   you know, that he allegedly done it and that he had sold

9   -- allegedly sold the vehicle in -- somewhere up in

10  Missouri or north of here, I'm not really familiar with

11  it, you know.  I kind of read a paper, I don't really pay

12  a lot of attention to it because there's so much stuff

13  come out of it that, you know, you don't -- you don't

14  really know if it's true or not, some guy's opinion, you

15  know.

16    THE COURT:   Well, that's --

17  you are exactly right, it's "some guy's opinion" and that

18  guy probably won't be on the jury.  It's going to be 12

19  people on the jury that have to decide what really

20  happened, if anything.

21    Sir, can you put out of your mind what

22  you have heard?  I don't mean forgetting, obviously you

23  can't forget but can you base your verdict on what you

24  hear in this courtroom and not let those articles

25  influence you?

1     THE POTENTIAL JUROR:   Yes,

2  sir.

3     THE COURT:   Have you formed

4  any conclusion about the guilt or innocence of Mr.

5  Wardlow based on what you have heard about the case?

6     THE POTENTIAL JUROR:   No.   I

7  haven't.

8     THE COURT:  Your mind is still

9  open?

10     THE POTENTIAL JUROR:   Yes,

11  sir.

12     THE COURT:  So you presume Mr.

13  Wardlow to be not guilty as far as sitting here right

14  now?

15     THE POTENTIAL JUROR:   Right

16  now so far as I know we have got to prove him guilty as

17  I understand it.

18     THE COURT:   The State may

19  proceed.

20

21               VOIR DIRE EXAMINATION

22                  BY MR. TOWNSEND

23

24  Q          Thank you, Your Honor.

25     Mr. Purdon, my name is Richard Townsend

1   and I'm representing the State in this case but we are

2   actively seeking the death penalty in this case against

3   this Defendant.

4                   Do you know of any reason why if you

5   were selected as a juror in this case if we gave you the

6   appropriate facts and evidence that you couldn't return

7   a verdict that gave the death penalty to this Defendant?

8   A          No.  I don't know of any reason I couldn't.

9   Q          You could do it if the facts and evidence were

10  appropriate?

11  A          That's right.  If I thought that.

12  Q          Mr. Purdon, I have read your questionnaire and

13  I understand from that your feelings about the death

14  penalty, have your feelings about the death penalty

15  changed any since you filled out that questionnaire?

16  A          No.  It hasn't.

17  Q          Is that the same feelings you had about the

18  death penalty since you have been an adult or have they

19  changed over the years?

20  A          Virtually the way I have always felt and

21  believed.

22  Q          Okay.  I want to talk to you a little bit about

23  murder cases in Texas.  There are two types of murder

24  cases in Texas, one being what I call "plain murder" and

25  that's a non-capital murder, that's where someone has

1    intentionally or knowingly caused another person's death.

2              However, and along with that there is

3    no justification legally or no excuse such as self

4    defense or accident, that intentionally or knowingly

5    caused another person's death is punishable to a life

6    sentence in Texas but not the death penalty.

7              There is another type murder called

8    "capital murder" and that murder is a murder that is

9    intentionally caused like other murder plus something

10   else and that plus something is the person killed a

11   police officer or fireman in the line of duty or for

12   instance a murder committed during the commission of

13   robbery, rape, kidnapping.

14             And that capital murder is punishable

15   in Texas by two possible punishments, one being a life

16   sentence, the other the death penalty.

17             The kind of jurors we have got to have

18   in this case are those jurors who can keep an open mind

19   and follow the law and give a defendant in a capital

20   murder case if the facts and evidence are appropriate for

21   it a life sentence and if they are appropriate give the

22   death penalty.

23             Do you believe you could do that?

24   A        Yes.  I do.

25   Q        Okay.  So from what you are telling me I take

1    it that you don't have a particular bias for or against

2    a life sentence or death penalty, that you could give one

3    equally as you could the other if the evidence was

4    appropriate?

5    A        Yes.  I believe I could.

6.   Q        Okay.  If you will there's a sheet of paper up

7    there that I believe it's marked "Exhibit 3", it's a copy

8    of the indictment in this case.

9                      THE COURT:    Keep on going.

10   That one right there in your right hand.   (Indicating)

11                      MR. TOWNSEND:    If you will

12   read over that then we will discuss it.

13                      Okay.  Mr. Purdon, that is basically,

14   that is a copy of the indictment in this case, can you

15   see by looking at that indictment if the State could

16   prove the allegations in that indictment do you see where

17   that would be rather than a plain murder that would be

18   a capital murder because it has both the murder

19   allegation and the robbery allegation in it?

20                      THE POTENTIAL JUROR:   Yes.

21   Q        (BY MR. TOWNSEND) Okay.  There's another sheet

22   of paper up there, Mr. Purdon, that looks like this, what

23   I call the "flow chart", I'm going to talk to you about

24   that.

25                      In a capital murder trial this is kind

1    of a flow chart and kind of describes how a capital

2    murder trial goes.

3              In a capital murder trial the first part

4    of the trial is the guilt and innocence phase, that's

5    where you are going to hear evidence and that evidence

6    will be presented and related to the guilt or innocence

7    of the defendant.

8              After you have heard all that evidence

9    then you are going to go back as a jury and make your

10   decision whether the defendant is guilty or not guilty.

11             If the jury finds the defendant not

12   guilty then of course the trial is over and everybody

13   goes home.

14             However, if the jury finds the defendant

15   guilty then you go into what we call the "punishment

16   phase."

17             That punishment phase, during that

18   period you will hear more evidence.  However, that

19   evidence won't relate to the guilt or innocence of the

20   defendant because you have already made that decision.

21   That evidence will relate to -- will be brought forward

22   to try to help you in your determination as to what the

23   possible or what the appropriate -- excuse me -- the

24   appropriate sentence should be.

25             That evidence could be any number of

things, it could be evidence of the defendant's age,
evidence of defendant's education, family history,
psychological evidence, evidence of defendant's prior
acts of misconduct, evidence of defendant's criminal
history, evidence of intoxication on the part of the
defendant, evidence of the defendant's mental
retardation, any number of things.

And when I'm talking to you about this
I'm not really talking about this capital murder case,
I'm just talking to you about a capital murder case in
general.

Certainly some of these things may crop
up in this trial and some may not or none of them might
but anyway those are typical types of evidence that you
might hear during the punishment hearing.

Once you have listened to all that
evidence then you go back and deliberate again and decide
Special Issue #1.

Now, Special Issue #1 is a question that
you will be asked to answer either "Yes" or "No."

If your answer to that -- and I'm going
to go over what those questions are in a little bit but
for right now if you answer that, if the jury answers
that question "No" the defendant would receive a life
sentence automatically.

1          On the other hand, if the jury answers

2     that question "Yes" then you will go down to Special

3     Issue #2.

4          Special Issue #2 is a question that you

5     answer "Yes" or "No."

6          If you answer that question "Yes" the

7     defendant will automatically receive a life sentence, you

8     answer it "No" the defendant automatically receives the

9     death penalty.

10          So, Mr. Purdon, what you are doing is

11    you are not really going to go back there and raise your

12    hand, "How many want the death penalty, how many want a

13    life sentence", you are going to answer these questions,

14    these two questions and the answer to those questions

15    determine what the sentence is.  So you are really not

16    going to be deciding on the death penalty exactly but of

17    course you are going to know what the answers to those

18    questions cause, you are going to know the result of

19    those answers and you are going to know if you answered

20    Number One "Yes" and Number Two "No" the defendant will

21    receive the death penalty and you will know if you answer

22    them any other way that the defendant will receive a life

23    sentence.

24          The    important    thing    about    those

25    questions and those Special Issues is that from the

juror's standpoint is that during that guilt or innocence phase of the trial you are going to hear all this evidence but then you are going to hear more evidence during that punishment hearing.

That evidence that you hear during the guilt or innocence part, we are not going to ask you to shut that out of your mind, you can also consider that when answering those Special Issues or those questions but you need to also be able to consider that evidence you heard during the punishment hearing.

And when I say that, I have talked to jurors before who have said, "Okay. Now, if I listen to the evidence during guilt or innocence and we found this guy guilty of capital murder I don't need to hear this other stuff because I'm automatically going to vote in such a way to make sure that he receives the death penalty."

You see, they are not a qualified juror because they can't withhold their determination on those Special Issues until they have heard all the evidence.

And do you believe that you could wait until you have heard all the evidence before making your decision?

A          Yeah.   I believe I could.

Q          Okay.   If you will there is another sheet of

1  paper up there that is marked on the top and it says

2  "Special Issues."

3          Do you have that?  (Indicating)

4  A       Yeah.

5  Q       Okay.  If you will read Special Issue #1, just

6  that Number One then we will talk about it.

7          Okay.  Special Issue #1 basically talks

8  about the future dangerousness of the defendant, would

9  you agree with that?

10  A       Yeah.

11  Q       Okay.  I'm going to point out a few things to

12  you about that Special Issue, first of all in proving

13  the defendant's guilt in a case the State is required to

14  prove that beyond a reasonable doubt and Special Issue

15  #1 we are also required to prove that beyond a reasonable

16  doubt, the second thing I want to point out is in the

17  second line of that word "probability" -- excuse me --

18  I had too much barbecue for lunch -- but that word

19  "probability"  legally  the  legal  definition  for

20  "probability" is "more likely than not."

21          "More likely than not" in my estimation,

22  that it's just a little bit over 50 percent but the legal

23  definition is "more likely than not", is that definition

24  pretty  close  to  what  your  definition  would  be  of

25  "probability?"

1    A          Yeah.

2    Q          Okay.  As opposed to beyond a reasonable doubt

3    which is -- we don't have a percentage figure on that but

4    would you say that beyond a reasonable doubt would be

5    higher than probability, "probability" being just barely

6    over half?

7    A          Well, "reasonable doubt" would be the same,

8    wouldn't it?

9    Q          Well, "beyond a reasonable doubt", there is

10   a definition for that, I'm not sure what the number is.

11                    THE COURT:   It's up there,

12   that long sheet.  (Indicating)

13                    MR. OLD:   "6" I believe.

14                    MR. TOWNSEND:   "6" I think.

15             If you will start with the second

16   paragraph and read the rest of that definition and then

17   we will talk about that.

18             Okay.  Mr. Purdon, "beyond a reasonable

19   doubt", that is the legal definition of -- of reasonable

20   doubt in Texas and that definition down there, one of the

21   lines says, "It's the kind of doubt that would make a

22   reasonable person hesitate to act in the most important

23   of their own affairs."

24             So that burden or that reasonable doubt

25   is a pretty high deal there as far as if you are tilting

the scales of justice probability is more likely than not

which is just over 50 percent, that's just barely a

tilting of those scales, would you agree with that?

(Indicating)

              THE POTENTIAL JUROR:  Yes.

Q      (BY MR. TOWNSEND)  But in proving a criminal

case beyond a reasonable doubt we are required to prove

that to you not 100 percent, you know, not beyond all

doubt but it's not just barely 50 percent, either.  It's

beyond a reasonable doubt which would be somewhere up in

there higher than that, would you agree with that?

A      Yeah.

Q      It would be higher than "probability?"

A      Yeah.

Q      It's not something we can put a number figure

on but would you agree that it's higher than

"probability?"

A      It would be like common sense, if you have got

any doubt on it you wouldn't want to act on it.

Q      That's right.  That's something that you take

your common sense in there?

A      Yeah.

Q      You have read the word "probability" and that

is "more likely than not" and we talked about "reasonable

doubt" then as you read on down there it says that the

1    "defendant would commit criminal acts of violence."

2    "Criminal acts of violence", of course

3    the defendant would be on trial for capital murder but

4    there are other criminal acts of violence besides capital

5    murder, there's attempted murder, murder, assault, rape,

6    any number of things that would constitute a criminal act

7    of violence but then there is also criminal acts that

8    aren't acts of violence such as theft or forgery, they

9    are crimes that are not violent.

10    Are you with me on all that?

11   A    Yeah.

12   Q    Following down it says "that would constitute

13   a continuing threat to society."

14    You and I probably think of "society"

15   as out there on the streets and in our homes and so on

16   but really the law defines "society" as the people pretty

17   much, wherever they might be.

18    So we are not required to prove to you

19   that the defendant would commit future acts of violence

20   in a particular area or location but that he would more

21   likely than not commit criminal acts of violence

22   somewhere, whether it be on the street, in the

23   penitentiary to an inmate, to a guard, to a nurse, to a

24   doctor, just any criminal act of violence is sufficient

25   irregardless of where that takes place, okay?

1          Okay.  If you will look at Special Issue

2   #2 and read that and we will talk about it.

3          Okay.  That is kind of a legal mouthful,

4   isn't it?

5   A          Yeah.

6   Q          Basically I think you boil all that down what

7   you have got is you found the defendant guilty of capital

8   murder, you have decided that, yes, he's probably going

9   to be dangerous in the future because if you decided

10  other than that you wouldn't be looking at Special Issue

11  #2 but you have decided that you -- you have decided that

12  he's probably going to be dangerous in the future,

13  Special Issue #2 just basically says is this a death

14  penalty type case, death penalty type defendant or is

15  there something in this evidence, whether it came from

16  the State over here or from the other side of the table,

17  is there something in the evidence that makes me believe

18  that this defendant deserves a life sentence rather than

19  the  death  penalty,  is  there  something  that  is

20  sufficiently mitigating?

21          If you look at that terminology there

22  on the fourth line, is there something sufficiently

23  mitigating as to reduce the defendant's blame enough that

24  you believe he deserves a life sentence rather than the

25  death penalty?

1    That's not to excuse the defendant's

2    behavior but just to reduce the amount of blame.

3    Now, the kind of evidence that you are

4    going to hear during the trial and particularly during

5    the punishment hearing evidence is the kind of evidence

6    that we talked about a little bit earlier and that is

7    evidence that might be evidence of the defendant's age,

8    family background, religious background, education,

9    intoxication if that was involved in the case,

10   retardation if the defendant has any mental problem of

11   that nature, any psychological evidence, you might hear

12   almost anything.

13   The important part of that is that as

14   a member of the jury in order to be a qualified juror you

15   have got to be able to listen and consider all that

16   evidence.

17   Now, that doesn't mean that you have got

18   to give weight to all of it because obviously you are

19   going to hear some evidence that you don't think makes

20   any difference to you, you may listen to that and say,

21   "Well, okay, but that doesn't make any difference to me,

22   I think he's just as responsible as ever."

23   But in order to be a fair and qualified

24   juror you don't have to give weight to all the evidence

25   you hear, you don't have to think, well, that's

1    important, but you have to be open-minded enough to

2    listen and consider all the evidence and then determine

3    what weight to give it.

4            When I say that, we have people who

5    occasionally say, "Well, you know, if I have a

6    psychologist up there on the witness stand to testify or

7    the other side does they might have the attitude that

8    they don't like psychologists, they don't believe them,

9    they don't think they know anything and I'm just not

10   going to listen to that evidence at all."

11           You see, they are not a qualified juror

12   because they are not willing to listen and consider all

13   the evidence before making their determination about that

14   evidence.

15           Do you think you could listen and

16   consider all the evidence whether it was evidence from

17   a psychologist, a minister or police officer or the

18   defendant's mother or whoever it might be?

19   A       Yeah.  I could.

20   Q       Okay.  When considering whether or not evidence

21   is sufficiently mitigating or sufficiently reduces the

22   defendant's blame to return a life sentence instead of

23   the death sentence then you are saying you would be able

24   to consider the evidence about the defendant's age,

25   background, family history, etcetera, you could consider

1    all of it?

2    A        Yeah.  I could consider it.

3    Q        And that's what we are saying, we are not

4    trying to get you to say you will give a lot of weight

5    to this particular kind of evidence or that particular

6    kind of evidence but just that you would be willing to

7    listen to it and be wiling to consider it before making

8    your decision as to what you thought the appropriate

9    answer should be to those Special Issues.

10           Do you believe that you could do that?

11   A        Yes.  I could.

12   Q        Okay.  If a defendant in a capital murder case

13   is found guilty they would -- and given a life sentence

14   -- they would go to prison for 35 years before becoming

15   eligible for parole.

16           That's not to say that they would

17   receive parole, just that they would become eligible for

18   it.  They could possibly receive parole at that time or

19   it could be that they would never receive parole.  But

20   I think the important thing for the jury's standpoint is

21   that the Judge will instruct you in answering Special

22   Issue #1 and Special Issue #2 that you should not give

23   parole any consideration at all in determining what the

24   answers to those questions should be.

25           And that's just to say that you would

1    consider a life sentence a life sentence and the death

2    penalty the death penalty.

3           Again, as in some other things we are

4    not asking you or expecting you to put that out of your

5    mind because we know we can't do that but just that you

6    set it aside and not use that when you are considering,

7    for instance, Special Issue #1 whether the defendant is

8    a future danger to society or Special Issue #2, could you

9    set that aside and base the decision that you make on

10   Special Issue #1 and Issue #2 on the evidence that is

11   presented and not consider parole, the possibility of

12   parole for any purpose?

13   A        I believe I could.

14   Q        Okay.  Mr. Purdon, you like a lot of jurors and

15   like I do everyday tend to use phrases like "I believe

16   I could" and "I think I could."

17          We need to know, you can and I think

18   when you say "I believe I could" that is what you are

19   saying, is that what you are saying is that you could do

20   it?

21   A        Well, I think I could, you know, we don't know

22   until we are under the pressure to do that, do we?

23   Q        That's right.  But you don't have any reason

24   to think that you could not do that?

25   A        None to my knowledge I don't.

Q        Okay.  Mr. Purdon, you have never been in this

situation so you can't possibly know for certain what you

would do, I have never been in the situation, either.

I have never served on a jury so it would be a new deal

for me, too.

I want to talk to you about some law

that relates to murder cases, in other murder cases, not

specifically capital murder although it would relate to

those cases.

Murder in Texas, and I'm not talking

about capital murder, just the "plain murder" that I

talked about earlier is punishable by from five years

probation up to 99 years or life.  And that sort of takes

into account the fact that -- the fact that murder can

be a lot of different things, it can be an extremely

violent vicious type murder on the one hand or on the

other hand it can be a mercy killing where an elderly

couple maybe have lived together for years and one of the

other parties is extremely ill, in a lot of pain and begs

the other person to pull the plug.  The other person does

it.  When they do that even though that's not what you

and I typically think of when we think of murder, under

the law that is intentionally causing another person's

death so in effect it is murder.

But you can see murder can take on a lot

1    of different type angles.

2              In order to be a qualified juror you

3    have got to be able to listen and consider all the

4    evidence and then decide what the appropriate punishment

5    should be in a murder case.  You have got to be able to

6    consider that full range of punishment to be a qualified

7    juror, that is from 99 years to life to five years

8    probation, you don't have to give 99 to life, you don't

9    have to give five years probation but you have got to be

10   able to consider the full range.

11             Can you do that?

12   A       Yes.  I could.

13   Q       Okay.  Let's just assume that you are seated

14   as a juror in a capital murder case and the State has

15   alleged the defendant committed a murder and a robbery;

16   after hearing all the facts and all the evidence you

17   believe that the State has proven the murder but has

18   failed to prove to you beyond a reasonable doubt the

19   robbery.

20             In following your oath as a juror you

21   have to find the defendant not guilty of capital murder

22   because we didn't prove the robbery aspect of it but you

23   find him guilty to that lesser offense of murder.

24             Are you with me on that?

25   A       Yes.

1   Q          Would you be able to do that?

2   A          Yes.

3   Q          Okay.  Also we are required to prove what is

4   on that indictment.  Of course you have looked at the

5   indictment, you looked at the indictment in this case,

6   let's assume that we have proved to you or we have

7   alleged in our indictment a murder and robbery but then

8   when the evidence got out there all of a sudden instead

9   of a murder and robbery we proved a murder and an arson

10  or a murder and a rape, normally those would be capital

11  murder but it doesn't work in this case because we have

12  alleged in our indictment murder and robbery so again you

13  would be, to follow your oath you would have to find the

14  defendant not guilty of capital murder because we didn't

15  prove that robbery but guilty of murder because we did

16  prove that.

17          Would you be able to do that?

18  A          Yes.

19  Q          Okay.  In Texas in capital murder -- first of

20  all in murder we can prove a murder by proving that it

21  was done knowingly or intentionally but in order to prove

22  capital murder it has to be done intentionally.

23          Let me go over the definition of those

24  words, they sound kind of alike but they are somewhat

25  different; "intentionally" is when it is your conscious

1    objective or desire to cause the result or it is your

2    conscious objective or desire to commit murder.

3                   "Knowingly", if you do it intentionally

4    you do it knowingly also but you can do it knowingly

5    without doing it intentionally because knowingly is with

6    respect to a result of your conduct and the person is

7    aware that his conduct is reasonably certain to cause the

8    result.

9                   That's to say you are not intentionally

10   going to try to kill the person but you know your conduct

11   is reasonably certain to do that and that's okay with you

12   so you don't intend to do it necessarily, you don't

13   really set out to do it but if it happens it happens and

14   you know what you are fixing to do and it's reasonably

15   certain to cause a person's death and you go ahead and

16   do it anyway.

17                   Can you see the difference in those?

18                   "Sort of?"

19   A          Yeah.   Sort of.

20   Q          In capital murder we are going to have to be

21   able to prove to you that it was done intentionally, that

22   it was the person's conscious objective or desire to

23   cause the result or cause the murder.

24                   If we don't prove, if we did not prove

25   intentionally to you, we proved the robbery, we proved

1   the murder knowingly, that he knew that was what he was

2   doing, knew that was what -- knew that that was

3   reasonably certain to cause the result but we didn't

4   prove to you that it was his conscious objective and

5   desire then you would have to find him guilty -- or "not

6   guilty" of capital murder because we didn't prove

7   intentionally but guilty of murder because we did prove

8   the knowingly.

9                    Could you do that?

10  A          I believe I could.

11  Q          Okay.  We are required to prove our case beyond

12  a reasonable doubt and the thing along with that is that

13  the burden of proof in this case as in all criminal cases

14  rests right here.  I accept that burden, the State does,

15  we know we have got it, we have it in every criminal

16  trial.  If we weren't prepared to do that then it

17  wouldn't make sense to be in here.

18                   On the other hand the defendant and the

19  defendant's attorney, they have no burden of proof.  We

20  have got to prove the defendant guilty, they don't have

21  to prove that he's not guilty.

22                   Is that something that you are familiar

23  with in the law?

24  A          Yes.

25  Q          Is that okay with you?

1  A        Yeah.   That's the way -- that's the way it

2  reads and it should be but somewhere down the line the

3  papers and all have forgot that and found him guilty just

4  as quick as he's accused.

5  Q        Well, the newspaper makes a lot of decisions

6  before they should be made, is that kind of what you are

7  saying?

8  A        Yeah.

9                          THE COURT:  Thirty minutes.

10                         MR. TOWNSEND: Thank you, Your

11 Honor.

12                      Along with that burden of proof goes the

13 Fifth Amendment privilege, basically sets out that the

14 defendant does not have to testify in a case unless he

15 chooses to.

16                      And   what   is   important   from   the

17 standpoint of being a jury in such a case is that the

18 jury has to base their decision on the evidence that is

19 presented and not hold it against the defendant in any

20 way if he chooses not to testify.

21                      Could you do that?

22                         THE POTENTIAL JUROR:  Yes.

23 Q        (BY MR. TOWNSEND)  And that also goes for the

24 punishment phase of the trial.  I think it's human nature

25 during the guilt or innocence phase to either be curious

1    and wonder what the defendant would say if he got up

2    there, well, the same during that punishment phase.

3              Some jurors might think, "Well, I might

4    feel a little differently about this if he would just get

5    up there and say he's sorry."

6              But, you see, the defendant during that

7    punishment phase also has that Fifth Amendment privilege,

8    they can choose not to testify if they decide to and, you

9    know, there could be any number of reasons for that but

10   the important thing for a juror's standpoint is that you

11   have got to be able to make your decision on Special

12   Issue #1 and Issue #2 also without holding it against the

13   defendant if he chooses not to testify or if he chooses

14   not to get up there and say "I'm sorry."

15             Could you do that?

16   A         I would base it on what I have heard.

17   Q         Mr. Purdon, in a criminal trial you hear

18   testimony from all sorts of witnesses, some of those

19   witnesses possibly might even be someone you know,

20   probably unlikely but it could be.  It might be a police

21   officer, it might be a doctor, it might be a

22   psychologist, it could be a minister, any number of

23   different people from different walks of life might

24   testify in a criminal trial.

25             The important thing is we have got to

1    have jurors in a criminal case or any case, really, who

2    will give each witness a fair chance and not start one

3    witness out ahead -- out a little ahead of another one

4    just because of that witness's looks or that witness's

5    job or that witness's professional occupation.

6            Do you think you could give every

7    witness a fair start and not start one witness ahead of

8    the other?

9    A        I do.  Because all people are just human.

10   Q        Okay.  And that's not to say, you know, that

11   you can't listen and consider the witnesses and then

12   decide whether you think that witness is believable or

13   not believable or important or not important because

14   that's certainly your job to make those decisions but

15   just when they are sitting there and walk into the room

16   that you not decide ahead of time that one witness is

17   better than the other because of their job or station in

18   life.

19           Do you feel like you could do that?

20   A        Yeah.

21   Q        Okay.  I think the Judge told you a few weeks

22   ago that the indictment which you looked at a copy of it

23   today, the indictment is not evidence, it cannot be used

24   as evidence in any way in determining guilt or innocence

25   in this case.

1       Do you believe you could decide the case

2   based on the facts presented and not use that indictment

3   as any kind of inference of guilt whatsoever?

4   A       Yeah.  Because he's innocent right now until

5   he's proven guilty.

6   Q       In criminal trials, Mr. Purdon, oftentimes you

7   hear what we call "confessions", sometimes they might be

8   oral confessions that were heard, they may be written

9   confessions.

10      The important thing from the jury's

11  standpoint is that those confessions -- I believe the

12  Judge would instruct you before you could use those

13  confessions in any way in determining the defendant

14  guilty or not guilty, before you could use those

15  confessions you would have to determine that beyond a

16  reasonable doubt -- that the State has had -- proved to

17  you beyond a reasonable doubt that that confession was

18  both truthful and voluntary.

19      Now, I want to lay out a kind of

20  hypothetical situation for you and see how you feel about

21  it or what you would do if you were on the jury; let's

22  assume that you heard a confession and you believe that

23  confession to be truthful but you find out that that

24  defendant or you hear from the evidence and you decide

25  that the defendant was coerced into giving that

confession.     Then   legally  that  confession  is  not

voluntary even though you believe it to be truthful, you

also believe it is not voluntary.

Your instructions from the Court would

be to not use that confession in any way in determining

the guilt or innocence of the defendant.

Could  you  do  that  if  that  were  the

facts?

A          I believe I could, you know.

Q          Well, again, that's kind of like some of the

other things I have talked to you -- we can't expect you

to set that -- to block that out of your mind but what

we would ask you to do and what the law asks you to do

is to set that aside and make your determination as to

guilt  or  innocence  based  on  the  legal  evidence  as

presented and admitted into Court and not use anything

that is not -- was not done properly.

Do you believe you could do that?

A          Yes.

Q          Okay.  Same way, a confession that is -- while

it's not coerced it's a confession that you believe to

be the truth but it was taken in a situation where the

defendant should have been read his Miranda Rights -- are

you familiar with the Miranda Rights?

A          Yes.

1    Q        But for whatever reason even though the Miranda

2    Rights should have been read in that situation they

3    weren't so legally you are going to know as a juror

4    legally that confession was not considered legally

5    voluntary, it's not any good from the standpoint of

6    legality but you still believe it to be truthful; your

7    oath as a juror would require that you not use that

8    confession in any way in deciding the guilt or innocence

9    of the defendant.

10            The question is the same one I always

11   ask; could you do it?

12   A        I believe I could, you know.

13   Q        Okay.  Again, Mr. Purdon, we are not asking you

14   to do something possible, we are not asking you to throw

15   it out of your mind and act like you didn't hear it, we

16   are just asking you to set it aside and not use it when

17   you are considering what should be your proper verdict.

18            You believe you could do it?

19   A        Yes.

20   Q        I looked over your questionnaire and I notice

21   that you had a situation where you had a cousin in

22   prison, I believe you mentioned something about a cousin

23   in prison?

24   A        Yes.

25   Q        Did that cousin go to prison from this area or

1    from somewhere else?

2    A        Mount Vernon.

3    Q        "Mount Vernon?"

4             Anything about that situation that made

5    you have any hard feelings toward the police or law

6    enforcement in general?

7    A        No.

8    Q        Okay.  I did notice also that you have some

9    prior jury service?

10   A        It has been several years ago, it's been

11   several years ago.

12   Q        Was that on a civil case or criminal case?

13   A        It was on a civil, it was on a lawsuit.

14   Q        "A lawsuit?"

15            Have you had any prior jury service in

16   a criminal case?

17   A        No.  I haven't.

18   Q        Okay.  In your discussion earlier of your

19   knowledge of the facts of the case or you talked a little

20   about that to the Judge, I think you are aware that

21   anything that you hear like that out in the news media

22   or out on the street for that matter is not evidence in

23   this case.

24            Would you be able to put whatever you

25   have heard, you know, that you have heard and be able to

1    put that aside and not use it in any way in determining

2    the guilt or innocence of this defendant?

3    A        Yes.

4    Q        The Defense Attorney in this one is Mr. Bird

5    Old that you have indicated on here that you know him?

6    A        Yes, sir.  I do.

7    Q        How do you know Mr. Old?

8    A        Well, we grew up in Mount Pleasant together to

9    so speak, that's --

10   Q        Has he ever represented you or any of your

11   family members?

12   A        Not that I'm aware of, any family members, I

13   know he hasn't ever represented me.

14   Q        Have you -- do you consider him to be a close

15   friend or just an acquaintance?

16   A        Well, just a friend, you know.

17   Q        Okay.  Is there anything about your -- and only

18   you can know the answer to this -- is there anything

19   about your relationship with Mr. Old that would make you

20   tilt it one way or the other in this case in the least

21   bit?           .

22   A        No.

23   Q        The other Defense Attorney involved is Lance

24   Hinson, do you know Lance?

25   A        No.

1    Q         Okay.     Mr. Purdon,  I  notice  in  your

2    questionnaire that you on the first page, "Are you in

3    favor of the death penalty?"

4              And you checked "Yes."

5              And then it says, "Please explain your

6    answer."

7              And your answer is, "If there is no

8    doubt that the party is guilty and not provoked."

9              And the phrase I'm referring to is where

10   you say "no doubt."

11             The State is required to prove our case

12   to you beyond a reasonable doubt and I'm not sure what

13   you mean by "no doubt."

14             Let me just kind of give you some idea

15   from things I have heard people say in the past and you

16   tell me if that is what you mean; I have had jurors say,

17   "Okay.     Now,  I  could  find  a  person  guilty  beyond  a

18   reasonable doubt and use the legal definition there of

19   beyond a reasonable doubt and I could find that person

20   guilty but before I could give a person the death penalty

21   I would have to find that they was guilty beyond any

22   doubt, you know, I would have to have no doubt."

23             My question is; are you going to require

24   the State to prove this case to you without a doubt or

25   without any doubt or prove it to the point that you have

1    no doubt or before you could give the death penalty or

2    would you make us prove it to you beyond a reasonable

3    doubt?

4    A         For the death penalty?

5              It would be -- I wouldn't have to have

6    any doubt about it on the death penalty.

7    Q         Okay.  You would require that we prove that to

8    you and that you have no doubt?

9    A         Yes.

10   Q         Beyond a reasonable doubt -- would beyond a

11   reasonable doubt be enough to prove the case to you in

12   such a way -- in such a way that you would be able to

13   give a life sentence?

14   A         Yes.  Beyond a reasonable doubt.

15             A person's life is a little bit --

16   Q         But in order for you to give the death penalty

17   you would have to feel that we had proved the case to you

18   and that there was no doubt in your mind?

19   A         Yes.

20   Q         "No doubt?"

21             Mr. Purdon, you know if you have -- I'm

22   trying to think of an example -- if you had a case where

23   you had five eyewitnesses, five people that came in and

24   said, "Okay.  Now, we saw the defendant commit this

25   crime."

1          You still would not be in a situation
2    where you have no doubt because they could all be lying?
3    A          Well, you would have to weigh each one as to
4    what they said, wouldn't you?
5    Q          Yes.
6    A          Or I would.
7    Q          Okay.  But could you come up --
8    A          They are only human, you see, take five people,
9    everyone of them is going to see something different, the
10   same thing.
11   Q          I think the point I'm getting at is in order
12   to have no doubt would you, will you have to just about
13   see it yourself?
14   A          Well, no doubt in my mind.
15   Q          Okay.
16   A          I mean --
17   Q          In order to give someone the death penalty you
18   would have to -- we would -- if we just proved the case
19   to you beyond a reasonable doubt you could give them a
20   life sentence?
21   A          Yes.
22   Q          But we would have to prove the case to you with
23   no doubt left?
24   A          Well, in my mind there was no doubt.
25   Q          No doubt in your mind?

1    A        That's right.

2    Q        Before we would --

3    A        Because I have to sleep.

4                    MR. TOWNSEND:   -- we could

5 give him the death penalty?

6             Your Honor, could we approach the bench?

7                 THE COURT:   Sir, could you

8 step out for just a minute and let's have a discussion

9 with the lawyers.

10             I will send someone to get you in just

11 a minute.

12                 THE POTENTIAL JUROR:   Okay.

13

14             (The following occurred outside the

15 presence and hearing of the potential juror:)

16

17             (Off the record discussion.)

18

19             (Recess.)

20

21             (The following occurred in the presence

22 and hearing of the potential juror:)

23

24                 THE COURT:   Sir, while you

25 were gone we went ahead and just took a short break and

1    I kept you out a little longer than I intended to.

2              Mr. Townsend, do you have any further

3    questions of this juror?

4              MR. TOWNSEND: No, Your Honor.

5    I believe I have asked him plenty.

6              THE COURT:   Do you have any

7    questions before we proceed to the Defense?

8              THE POTENTIAL JUROR:   No.

9              THE COURT:   Mr. Old.

10

11              VOIR DIRE EXAMINATION

12              BY MR. OLD

13

14   Q       Mr. Purdon, let me ask you about your last

15   answer first; you said that it would have to be proven

16   to you beyond a reasonable doubt -- beyond -- it would

17   have to be no doubt for you to find a man guilty of

18   capital murder or to give him the death sentence?

19   A       No.   It was a beyond a reasonable doubt was

20   the --

21   Q       For what?

22   A       For the life and --

23   Q       Okay.  Now, -- okay.

24   A       You find him guilty and then the death penalty,

25   this part of it beyond -- no doubt in my mind, you know.

1    Q        It would have to be no doubt in your mind

2   before you answer the question that would result in the

3   death sentence?

4    A        Yes, sir.

5    Q        And that first Special Issue is if beyond a

6   reasonable doubt there is a probability that he would

7   commit an act of criminal violence in the future that

8   would endanger society?

9    A        Yes.

10   Q        In order to answer that question that would

11  have to be proven to you beyond doubt or by a reasonable

12  doubt?

13   A        By a reasonable doubt.

14   Q        That would have to be proven to you by a

15  reasonable doubt?

16   A        Yeah.

17   Q        And the answer to Issue #2 so far as Special

18  Issue #2 which deals with sufficient mitigation, what

19  does the word "sufficient" mean to you?

20   A        Well, "complete", you know.

21   Q        "Complete?"

22            Is "sufficient enough" enough?"

23   A        Yeah.

24   Q        Okay.  If you answer that question "No" it

25  would result in the death sentence, would you require

1    more than sufficient evidence of mitigation before you

2    answered it?

3    A        Well, it was sufficient in my mind.

4    Q        Okay.

5    A        You know.

6    Q        Are we still going back --

7    A        I answered that.

8    Q        -- to "no doubt?"

9    A        Yes.

10   Q        I mean in your mind there would have to be no

11   doubt is what you are telling me?

12   A        Yes.

13   Q        But to find a man guilty or innocent of capital

14   murder you would use reasonable doubt?

15   A        Yes.  "Beyond a reasonable doubt."

16   Q        And you told me and it's that you believe

17   reasonable doubt, after you read that definition if you

18   had any doubt you would not act on it?

19   A        That's right.

20   Q        Okay.  Would I be changing what you told us if

21   I said, changed what you said to "have any reasonable

22   doubt", if there was a reasonable doubt you would not act

23   upon it?  Is there a difference between what you said

24   "doubt" and what you said "reasonable doubt?"

25   A        Very little.

1    Q        "Very little?"

2    A        Yeah.

3    Q        It's set out in the instruction on reasonable

4    doubt, "It's the kind of doubt that would make a

5    reasonable person hesitate to act in the most important

6    of his own affairs."

7                I was reading the bottom of the third

8    paragraph up from the bottom.

9    A        Yeah.

10   Q        And then it turns around and repeats itself,

11   "must be proof of such convincing character that you

12   would be willing to rely and act upon it without

13   hesitation in the most important of your own affairs."

14               I don't know what you consider

15   "important in your own affairs", I would suggest that

16   making a medical decision for a child would meet that

17   criteria, perhaps buying a house, making plans for

18   retirement, whether you took a job or didn't take a job.

19               Would you require more proof or evidence

20   in order to answer the questions in a capital murder case

21   than you would in your own affairs?

22   A        No.

23               THE COURT:  Sir, let me ask

24   you a question about that, both lawyers got to talking

25   to you and I wanted to talk to you about this reasonable

1    doubt.

2         We all have in our minds certain things

3    that, certain connotations of words, the State has a

4    burden of proof they must prove beyond a reasonable doubt

5    all of the elements of the offense before you can find

6    a person guilty then they must prove beyond a reasonable

7    doubt that the answer to that first question should be

8    "Yes", if they fail to prove that a person is guilty of

9    course you would find a person not guilty and we don't

10   get to that question.

11        If they prove beyond a reasonable doubt

12   that the person is guilty then you answer those questions

13   and the law basically presumes that the first question

14   to be answered gives them the burden, the question is

15   "No" until they prove to you beyond a reasonable doubt

16   that it should be "Yes."

17        Once that is done the law says basically

18   "death penalty" then they give you one more way out

19   there, that's the one that talks about "mitigating."

20        The State doesn't have to prove it or

21   disprove it, the Defense doesn't have to prove it or

22   disprove it, there is not any burden on proof on that

23   second issue, the second issue is basically an escape

24   clause for the jury, maybe you believe from the evidence

25   beyond a reasonable doubt that he or she will be a danger

1    in the future but maybe there has also been some other

2    testimony that you have heard based on maybe family

3    background, based on upbringing, based on whatever it is,

4    maybe you have heard something about that person that

5    just says, "Well, maybe that person may be a danger or

6    in all probability he's going to be a danger in the

7    future but, by gosh, he don't deserve to die."

8                    That's your escape valve.

9                    The State doesn't have to prove either

10   way, the Defense doesn't have to prove it, it's just that

11   if you in your mind see enough to let the person escape

12   the death penalty you answered "Yes" and that means

13   "life."

14                   Now, what you are telling us is you

15   don't have a problem with the reasonable doubt definition

16   to prove a person guilty but you are going to hold the

17   State to a higher standard before you would be able to

18   answer that first question "Yes."

19                   And in our law we don't have "shadow of

20   a doubt" like you see on Perry Mason what they have

21   "reasonable doubt" and it's a doubt based on reason and

22   common sense.

23                   For instance, the State does not have

24   to prove or disprove that a person from Mars came down

25   and killed the person.  If you are not a witness to an

1    offense then you can never have absolutely no doubt.

2              To be completely doubt free I think you

3    would have to be a witness, actually observe it and of

4    course if you are a witness you can't be on the jury so

5    the law doesn't impose that kind of burden.  They don't

6    have to prove it to an absolute 100 percent, just beyond

7    a reasonable doubt, a doubt based upon reason and common

8    sense.

9              You have told us that's fine for the

10   guilt but you want more than that before you could vote

11   to give a man a death penalty.

12             And if you are going to require the

13   State to prove it absolutely to you you are imposing an

14   impossible burden on them.

15             If you are telling me "No reasonable

16   doubt", it's okay.  "But I am -- I'm going to have to

17   just hear a whole lot before I could do it", that's okay.

18             Your reasonable doubt may be 90 percent,

19   95, 98 percent but if it's up there at a hundred percent,

20   absolute, you are giving an impossible burden to the

21   State.

22             So by the use of your words I am not

23   sure what you mean.

24             Will the State have to prove 100 percent

25   beyond all doubt that the answer to that question should

1    be "Yes" before you could vote or would it just be

2    "beyond any reasonable doubt, beyond any doubt based upon

3    reason and common sense?"

4                          THE POTENTIAL JUROR:   Well,

5    it wouldn't be a hundred percent.  Like you say, the only

6    way I could be a hundred percent sure of anything is if

7    I was there and knew what was going on.

8                          THE COURT: So are you telling

9    me just in your own mind and your heart it's going to

10   have to be the right thing to do?

11                         THE POTENTIAL JUROR:   I am

12   hard-headed, it's -- I'm going to have to be convinced

13   and once I make my mind up I'm kind of hard to change my

14   mind.

15                         THE COURT:  Are you going to

16   sit there and speculate, "Well, they didn't prove that

17   somebody from another county come do this, maybe somebody

18   else did?"

19              That's not what you are telling me?

20                         THE POTENTIAL JUROR:   That

21   would be -- you can't speculate on things, just go with

22   what you are told, what I hear here in the Court.

23                         THE COURT: So the burden that

24   you are going to put on the State is beyond a reasonable

25   doubt and you are telling me your definition of

1    reasonable doubt is pretty far up there but it's not an

2    absolutely 100 percent certainty?

3                            THE POTENTIAL JUROR:  No.  You

4    can't be.

5                            THE   COURT:    The   Court   is

6    satisfied with the answer on reasonable doubt and ready

7    to proceed.

8                            Mr. Old, if you are ready so you may

9    proceed and I will not take this out of your time, the

10   time the Court used.

11                           MR. OLD:  Mr. Purdon, in order

12   to qualify if you are chosen for this jury you take an

13   oath as a juror and that oath provides that you swear or

14   affirm that you will a true verdict render according to

15   the law of the evidence in this case so help you God.

16                           Now, I talked to a juror about that and

17   they sometimes say, "Wait a minute, you are saying I have

18   got to render a true verdict on the law, how do I get the

19   law?  I'm  not a lawyer, I mean what I know about the law

20   is worthless."

21                           The law comes to you from the Court, he

22   will give you written instructions -- you were on a civil

23   jury?

24                           THE POTENTIAL JUROR:  Do what?

25   Q          (BY MR. OLD, CONTINUING VOIR DIRE EXAMINATION)

You were on a civil jury?

A       Yes.

Q       Do you recall at the end of evidence or when you went in to deliberate the Court gave you a written instruction that instructed you on how you were going to go about deliberating and what the law was?

A       Yes.

Q       They do the same in a criminal case, the Court tells you what the law is and you don't have to agree with that law, you just have to be able to follow it then, the Judge is the Master of the Law, the jury does not have to know any law but the jury is the exclusive judge of the evidence and they take the facts and apply them to the law as the Court gives it.

Mr. Townsend talked to you about a hypothetical about a confession being offered into evidence, that after having heard the evidence and when you deliberated you believe that according to the law the confession was involuntary -- and the Court will tell you what makes a confession involuntary -- but yet you believed beyond a reasonable doubt that the confession was true.  I mean you had no doubt as to the confession and you believe it was true.

Now, what the Court instructs you to do is in that event where the confession was taken was

1    involuntary or illegal, take it, put it over there on the

2    side, don't consider it and don't base your verdict on

3    it.

4              Now, I mean like Mr. Townsend said, I

5    can't take that out of your mind.  I have just got to

6    satisfy myself that you are not going to subjectively use

7    it.  And I mean subjectively use it and in the back of

8    your mind it's hard when you believe something to be true

9    not to let it effect your verdict and that's what you

10   have got to do.

11             When you told me that you "believed you

12   could" I thought I saw some hesitation, I mean when  you

13   say "I believe I can" I know you can't tell me that, you

14   aren't over there and you aren't doing it and it's not

15   something that we have done before.

16             My question is this; I mean what you are

17   saying is "I believe I can follow the law."

18             Do you have a doubt as to your ability

19   to do that?

20   A         No.

21   Q         I mean you would follow the law?

22   A         I would.  I believe I would, you know, that's

23   all I can say until I am in that situation.

24   Q         And even if that means saying "not guilty" and

25   turning a man loose that you believe was guilty because

1   you believe the confession?

2   A          I say "I believe I can" but I don't know until

3   I have been in that.

4   Q          I understand.  But I mean -- I mean there's

5   some people who might say, "I believe he was guilty, I

6   just couldn't write down 'not guilty', I know I should,

7   I know that's what the law says but I mean I know the man

8   is guilty, I can't do it."

9              And my question is; if the law is not

10  satisfied can you find the man not guilty whether you

11  believe he's guilty or not?

12  A          Well, now, wait a minute.  The law is saying

13  that?  I mean that is kind of a different question, isn't

14  it?

15             I mean because you -- you were just

16  saying "The law has got to prove to me."

17  Q          I know.  But I mean you believe the confession

18  to be involuntary, it's not proper evidence but you also

19  believe it's true and without that confession there is

20  no other evidence to support a verdict of guilty but I

21  mean you are sitting there reading this thing, "I don't

22  care how many times they hit him, I believe the State,

23  I believe it's true but because of being improper in the

24  way the confession is taken" --

25  A          I believe I am -- I could do it but until you

1    get in that situation you can't say for sure.

2    Q        But I mean that's -- but you do understand --

3    A        It's -- what I'm saying, it's easy to talk but

4    it's hard to do the walk, you know.

5    Q        Yeah.   It is.   And I expect people are

6    developing an intense dislike for Mr. Townsend and myself

7    because we are sitting here asking you to answer

8    questions that I can't tell you -- if I move from here

9    to where you were to over there I can't tell what I would

10   do, I haven't been there.   (Indicating)

11            And I mean it takes -- I mean to me it

12   takes a lot of discipline to be able to follow the law

13   when you know you may be reaching an improper result so

14   far as the facts.

15            But, I mean you are telling me you

16   believe you can do it?

17   A        I believe I could.

18   Q        Are you going to try to do it if you get in

19   that situation?

20   A        If I was in that situation I would try.   Yes.

21   Q        You are not going to try to make the confession

22   admissable even though you know it's not?

23   A        Like I say, I would just have to be in that

24   situation to --

25   Q        You work at Lone Star Steel?

1    A       Yes.

2    Q       You said you read an account of whatever is

3    supposed to have happened in this case in the Longview

4    paper, have you heard it talked at Lone Star Steel?

5    A       No.

6    Q       Do you live at -- do you have a Cookville

7    route?

8                    Exactly where do you live?

9    A       You turn on 1993, go north toward Interstate

10   off of 67 at Cookville.

11   Q       Yeah.

12   A       And, let's see, I believe -- I'm not sure of

13   the road number -- "Northwest 28."

14   Q       You live north of Cookville on 1993 before you

15   get to Interstate?

16   A       Yeah.  Four and a half miles, I live a mile

17   from Lone Star Church if you know where that is.

18   Q       Okay.

19   A       It's on the same road.

20   Q       One more question for you and I think I'm going

21   to be through with you; there is a page before you, it

22   doesn't have a number, it says "A person acts

23   intentionally" at the top.

24                    THE COURT:  You are talking

25   about the definition?

1           MR. OLD:  Yes.

2           THE COURT:  It's sitting over

3   here.  Let me hand it to him.

4           I have underlined "intentionally" and

5   "knowingly" it may not be.

6           MR. OLD: Yes.  It is on ours.

7           THE COURT:  Okay.

8

9           (Handed to the potential juror.)

10

11          MR. OLD:  Will you read the

12  two definitions on that page?

13          You have read the exhibit and the way

14  the crime was alleged they allege that the resulting

15  death was intentionally caused, okay.

16          And in order to find a person guilty

17  capital murder you must find beyond a reasonable doubt

18  that the person charged acted intentionally and because

19  the Court will tell you the definition of the word

20  "intentional" that's the law and you are bound by that

21  definition.

22          And what the State has to prove to you

23  that it was the person's conscious objective or desire

24  to cause the result.

25          "Knowingly" is different.

1      I would say to you that it's lesser but

2  it's probably correct to say that it's "different."

3      When that person is aware that his

4  conduct is reasonably certain to cause the result, do you

5  see a difference between "intentionally" and "knowingly"

6  as they are defined?

7      THE POTENTIAL JUROR:   Yeah.

8  Q      (BY MR. OLD)   Okay.   The State did not prove

9  "conscious objective or desire" to you, would you find

10  a person not guilty of capital murder?

11  A      Yes.

12  Q      I mean if they proved to you -- the facts

13  proved to you that perhaps the defendant acted knowingly,

14  that is he was aware that his conduct was reasonably

15  certain to cause the result, you would find him guilty

16  of murder and not capital murder?

17  A      Yeah.

18  Q      Okay.   Even if you believed beyond a reasonable

19  doubt that it was in the course of committing a robbery,

20  if they just proved to you that he knowingly caused the

21  death during the course of committing a robbery you would

22  say guilty of murder, not capital murder?

23  A      Yeah.   That's what --

24  Q      One more thing; there is a Witness List in

25  front of you, will you go down and review the names on

1  that list and tell me anybody that you know or know of?

2  A       Only two names are even familiar on there and

3  I'm not sure I know them.

4  Q       Who are they?

5  A       Dewayne McClung and Ragsdale, James Franklin

6  Ragsdale.

7  Q       Dewayne McClung and who?

8  A       Dewayne McClung and James Ragsdale.

9  Q       Where does -- who is the "James Ragsdale" that

10  you know?

11  A       Well, I'm not sure if his name is even "James",

12  I went to school with a "Ragsdale."

13  Q       Okay.

14  A       That's the only way I know him that way and

15  "McClung" is the same way.

16  Q       Anything in your knowledge of those names that

17  might could or would effect your verdict in this case?

18  A       No.

19  Q       If it turned out that McClung was somebody that

20  you went to school with -- you went to school with and

21  knew well then you wouldn't give him a head start or give

22  him more than another witness because of that?

23  A       No.

24  Q       Same thing true of Mr. Ragsdale?

25  A       Yes.

1    Q        Do you know of any reason why Mr. Wardlow

2    wouldn't want you on his jury?

3    A        No.  I don't know.

4    Q        I mean --

5    A        I don't know Mr. Wardlow.

6    Q        Any reason why anybody wouldn't want you on a

7    jury?

8    A        I mean everybody has got their own reasons.

9    I don't know.

10            They may not like me, you know, looking

11   at me.

12   Q        You would do your best to render a verdict on

13   the law and on the evidence?

14   A        Yes.  I would.

15   Q        And you are not starting out to accomplish

16   anything by being on a jury other than rendering a true

17   verdict?

18   A        No.

19            MR. OLD:  We would pass the

20   juror, Your Honor.

21            THE COURT:  Sir, if you will

22   step back out of the room we will have another decision

23   about your jury service and I will send you some more

24   instructions.

25

1              (The following occurred outside the

2      presence and hearing of the potential juror:)

3

4                        THE COURT:   Does the State

5      have any challenges?

6                        MR. TOWNSEND:   None, Your

7      Honor.

8                        THE COURT:   The Defense?

9                        MR. OLD:   None, Your Honor.

10                       THE COURT:   Leo, tell him

11     first that he's still a prospective member of the jury,

12     that he will be notified either by mail or telephone and

13     hopefully he will know something before mid-week.

14              Let's take a couple of minutes.

15

16              (Recess.)

17

18              (The following occurred outside the

19     presence and hearing of any potential juror:)

20

21                       THE COURT:   Let the record

22     reflect that no prospective jurors are present in the

23     courtroom.

24              Let the record further reflect that Mr.

25     Townsend is present in the courtroom along with Mr.

1    Wardlow and both of his attorneys.

2              Mr. Old, you told the Court just a

3    moment ago that your client wished to address the Court

4    that he wished to do so out of the presence of the

5    District Attorney, Mr. Townsend, that's approximately

6    what you told me, sir?

7              MR. OLD:  That's what I told

8    you, sir.

9              THE COURT:  Mr. Townsend, I'm

10   going to request that you exit the courtroom?

11             I will hear out Mr. Wardlow, I will also

12   make it a part of the record, it will be recorded by the

13   Court Reporter, whether it will be sealed or not I don't

14   know, it depends on what the subject matter is.

15             Thank you, Mr. Townsend.

16             MR. TOWNSEND:  Yes, sir.

17

18             (At this time Mr. Townsend exited the

19   courtroom and the following occurred outside the presence

20   and hearing of Mr. Townsend:)

21

22             THE COURT:  Mr. Wardlow.

23             THE DEFENDANT:  Over in Titus

24   County Jail right now I have been held in lock-down since

25   October 6th, I haven't caused them any problem whatsoever

1    coming back and forth to Court or within the facility

2    there.  I have given them as much respect as I possibly

3    can.

4              They had a letter sent from Morris

5    County that said I had caused problems but that problems

6    "contenuated" from the radio, the use of a radio.

7              I asked when they first come in there

8    and they had me in lock-down in Morris County and asked

9    if I could have a radio and was told that I could later

10   on.

11             I wrote letters and asked for one and

12   they told me, "No, I couldn't."

13             My past actions speak louder than words

14   or maybe forceful words speak louder so I made some

15   threats and told them I would do this or do that to get

16   what I wanted and eventually they complied.

17             And that letter was sent over here to

18   Titus County and they "contestuated" and say I am a

19   continuing threat here.

20             Now, you can ask Warren, he brings me

21   over here, I don't give him any problem, you can ask Leo,

22   I don't give them any problem here.  I don't give them

23   any problem there.

24             I was wondering if there was anything

25   you could do to talk to them, I don't know, maybe change

1    their minds in some way, that way I can be taken off of

2    lock-down.

3                          THE COURT:  I don't have any

4    objection to your lawyer talking to them, I don't have

5    any objection to them checking with me for my opinion on

6    whether or not I have observed anything that I consider

7    a threat, and I have not.

8                          But I do think it would be inappropriate

9    for me to intercede in the decision of Titus County

10   unless your rights are being violated.  If your rights

11   are being violated, Mr. Wardlow, then I expect your

12   lawyer could bring it to my attention and I certainly

13   will do something about it.

14                         But as far as intervening in what I

15   consider their day to day decisions I think it's

16   probably, is inappropriate for the Court to do so absent

17   an assertion from your lawyer that some of your rights

18   have been violated.

19                         But again, Mr. Old, if you wish to talk

20   to the Sheriff about that problem I certainly give you

21   my consent to tell him that I have not observed anything

22   in the courtroom that is indicated to me that Mr. Wardlow

23   is a problem and that I have personally not had any

24   problem with him since I first met him on October 6th.

25                         MR. OLD:  Your Honor, I did

1    talk to the Sheriff yesterday, I talked to him for about

2    20 minutes and he told me he would look into it.

3              I don't know whether he has or not.

4              The only things I know is what Billy

5    tells me as to the Chief Jailer, the Chief Jailer told

6    me I had to talk to him and I talked to him, I think

7    Billy is upset, confused but I talked to him, that was

8    yesterday.   I don't know if he has had time to

9    investigate what I reported to him or what I requested

10   and acted upon it.

11             THE COURT:  I will do nothing.

12             When I come back I would like to hear

13   from you, Mr. Old, as to what has occurred if anything.

14             And, Mr. Wardlow, you are certainly to

15   tell me when I come back what has occurred if anything

16   since today but I'm curious as to why you did not want

17   Mr. Townsend in the courtroom.

18             THE DEFENDANT:  Well, I wanted

19   it to be just a private hearing in case something came

20   out that he did not know about that happened in Morris

21   County or something like that that he might use in the

22   prosecution or the punishment phase of this case.

23             THE COURT:  All right.

24             MR. OLD:  Your Honor, for me

25   to talk to the Sheriff, can I ask that the Bailiff be

1    required to vouch that you said what you have said, you

2    have not ordered anything specifically but made the

3    statement that he caused you no problem, that his conduct

4    has been good?

5                        THE COURT:  If you would like

6    for the Reporter to type this up you may take it to him

7    or have the Bailiff vouch, either way.

8                        MR. OLD:  Leo is fine with me.

9                        THE COURT:  Either way is fine

10   with me.  It's certainly fine.

11                       Leo, you certainly have my permission

12   to repeat what I said to the Sheriff.

13                       THE BAILIFF:  Yes, sir.

14                       MR. OLD:  My position in this

15   is the Sheriff is the master of his jail within reason,

16   he can secure a prisoner as he sees fit.  I do think the

17   problem I first became aware of was after we had been out

18   for a week, he was locked down for a week, was not taken

19   to exercise.  I mean I think the man is entitled to get

20   out of the cell for a few minutes and exercise.  I think

21   it's about a 6x8 cell, something like that, it's small,

22   they all are.  And I mean that's obviously the biggest

23   concern I have.

24                       They can make some arrangements to give

25   him some exercise.

1          THE COURT:  I certainly don't

2     have any objection to him not, I'm not requesting that

3     he be in lock-down, I'm not ordering it nor am I ordering

4     that he not be but as far as I'm concerned I have seen

5     no evidence that he's a threat or a threat risk at this

6     point.

7          MR. OLD:  Thank you.

8          THE COURT:  Now, I also intend

9     to tell Mr. Townsend that the discussion did not have

10    anything to do with him, that it had to do with a request

11    concerning the treatment at Morris County -- excuse me,

12    "Titus County Jail" because I know Mr. Townsend is going

13    to be curious about why he was excluded and I want to do

14    that just as a matter of courtesy.

15          As Richard to come back in.

16          Are  you  all  ready  to  make  your

17    announcements?

18

19          (Mr. Townsend enters the courtroom and

20    is present during an off the record discussion.)

21

22          THE COURT:  Mr. Townsend, the

23    conversation with Mr. Wardlow has nothing to do with you,

24    it had to do with a request concerning the Titus County

25    Jail.

1          MR. TOWNSEND: Mr. Moss is out

2  there, that's who I was just talking to.

3          THE COURT:  Let's get on the

4  record again.

5

6          (The following occurred outside the

7  presence and hearing of any potential juror:)

8

9          THE COURT:   There are no

10  jurors present in the courtroom.

11          When we last recessed on November 3rd

12  after receiving the announcements we ended up with five

13  jurors, four Defense strikes and three State strikes.

14          In the last four days of voir dire we

15  have qualified four people.

16          I will go over my notes on those four

17  people and ask the State whether or not they wish to use

18  a strike or accept the juror and after each juror or

19  after I talked to the State on each juror then I will ask

20  the announcement from the Defense.

21          All right.  Our first juror to qualify

22  that week was juror 29, Owsley.

23          What says the State?

24          MR. TOWNSEND: The State would

25  use a strike, Your Honor.

1        THE COURT:  All right.

2        MR. OLD:  Your Honor, the

3 Defendant would object to the State's strike.  Ms. Owsley

4 is in an age group comparable to juror number 5, 7, and

5 14, that the State has struck, all of which were females

6 above the age of 50 or above the age of 50.

7        Ms. Owsley I believe is 63 years old.

8        THE COURT:  "62" is what I

9 wrote down.

10        MR. OLD:  "62."

11        The State is discriminating and using

12 their strikes, they have used three strikes, one was Ms.

13 Littles, age 63, State strike two was Ms. Edwards, age

14 54, strike three, Linda Morris, age 50.

15        Making their strike four, Ms. Owsley,

16 age 62.

17        THE COURT:  Mr. Townsend --

18 well, before I get to Mr. Townsend, Mr. Old, basically

19 you are making a Batson Objection?

20        MR. OLD:  It's a group of

21 people considered a minority by the laws of the United

22 States.

23        THE COURT:  Based on "female"

24 and "age?"

25        MR. OLD:  "Female" and "age."

1            THE COURT:  Mr. Townsend, do

2    you wish to address the challenge?

3            MR. TOWNSEND:  My reason for

4    striking Ms. Owsley was I felt she was indecisive in a

5    lot of her answers, she was particularly indecisive in

6    saying that she could find the defendant beyond a

7    reasonable doubt, she tended to want to go toward "beyond

8    a shadow of a doubt" and mainly my reason for striking

9    her was her overall testimony with us.  She was very

10   indecisive on several issues, seemed to be unable to make

11   up her mind, seemed to be very nervous about the

12   possibility as serving as a juror, more so than your

13   average juror.

14           THE COURT:  I do recall the

15   other three jurors, I do recall Ms. Owsley and I do

16   believe that the State had some reasons independent of

17   her sex and age to strike her so I'm going to overrule

18   the Batson Challenge.

19           What says the Defense?

20           We don't have to go to the Defense on

21   Ms. Owsley.  That is State strike number four.

22           Our next juror to qualify, we had

23   several in a row that were either excused or

24   disqualified, our next juror to qualify would be juror

25   number 41, Wiltse, what says the State?

1              MR. TOWNSEND:  State accepts

2   the juror, Your Honor.

3              THE COURT:  What says the

4   Defense?

5              MR. OLD:  The Defense accepts

6   the juror, Your Honor.

7              THE COURT:  Mr. Wiltse has

8   become juror number 6.

9              MR. OLD:  Mr. Wardlow affirm

10  that, Your Honor?

11             THE COURT:  Mr. Wardlow, do

12  you agree to accept Mr. Wiltse, number 41 as your sixth

13  juror?

14             THE DEFENDANT:  Yes, Your

15  Honor.

16             THE COURT:  That puts us down

17  to our next juror to qualify which was Ms. Schindley,

18  juror 46.

19        What says the State?

20             MR. TOWNSEND:  The State

21  accepts the juror, Your Honor.

22             THE COURT:  What says the

23  Defense?

24             MR. OLD:  Your Honor, as the

25  attorney for Mr. Wardlow -- okay -- we strike Ms.

1   Schindley.

2               THE COURT:  That would be your

3   fifth strike, Mr. Old?

4               Do you agree?

5               MR. OLD:  Yes.

6               THE COURT:  Mr. Wardlow, do

7   you use your fifth strike on Ms. Schindley?

8               THE DEFENDANT:  Yes, Your

9   Honor.

10              THE COURT:  All right.  That

11  will be Defense strike number five.

12              Our last juror to qualify this week was

13  juror Purdon, "P U R D O N", what says the State --

14  excuse me, juror number 48, what says the State?

15              MR. TOWNSEND:  Accept the

16  juror, Your Honor.

17              THE COURT:  What says the

18  Defense?

19              MR. OLD:  The Defendant

20  accepts Mr. Purdon, Your Honor.

21              THE COURT:  Mr. Wardlow, do

22  you agree to accept Mr. Purdon as the seventh juror in

23  your trial?

24              THE DEFENDANT: Yes, sir, Your

25  Honor.

1                              THE COURT:   All right.   He

2    will be juror number 7.

3                    We have no more qualified this week.

4                    I'm going to order the record closed

5    unless either side has any more comment for the record.

6                    We are in recess.

7

8                    (Record closed for November 17th, 1994.)

9

10                   (Whereupon Court was recessed until

11   10:30 a.m., November 28th, 1994.)

12

13

14                            * * * * *

15

16

17

18

19

20

21

22

23

24

25

STATE OF TEXAS          §
                        §
COUNTY OF TITUS         §

        I, Lloyd E. Billups, CSR #149 and Official Court Reporter in and for the 76th Judicial District, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of the proceedings in the above-styled and numbered cause, all of which occurred in open court or in chambers on November 17, 1994 and were reported by me.

        I further certify that this transcription of the record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

        WITNESS MY HAND this 31ST day of January, 1995.

_____
LLOYD E. BILLUPS, CSR #149 & OFFICIAL COURT REPORTER
76TH JUDICIAL DISTRICT, STATE OF TEXAS

1    Certification Number of Reporter:   149

2    Expiration Date of Certification:   12/31/96

3    Business Address:   Drawer 1868
                           Mt. Pleasant, Texas 75456-1868

4    Telephone Number:   903/577-6735

5    Transcribed By:   Tandra K. Gibson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25