## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| **BILLY JOE WARDLOW,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-v-** | § | **NO.  4:04-cv-00408-MAC** |
| | § | |
| | § | |
| | § | |
| **LORIE DAVIS, Director, Texas** | § | **CAPITAL CASE** |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | **Execution Date of July 8, 2020** |
| | § | |
| **Respondent.** | § | |
| | § | |

_____

## PETITIONER'S MOTION FOR RELIEF FROM JUDGMENT
_____

**RICHARD BURR**
**TBA No. 24001005**
**PO Box 525**
**Leggett, Texas 77350**
**(713) 628-3391**
**(713) 893-2500 fax**
**dick@burrandwelch.com**

**Counsel for Billy Joe Wardlow**

## TABLE OF CONTENTS

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Intervening Procedural Development that Calls for the Court
to Vacate its Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Federal Rule of Civil Procedure 60(b)(6) Gives this Court Broad Power to Vacate
Judgments in Order to Remedy Injustice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

A.      The Court's Broad Power to Do Justice Under Rule 60(b)(6) . . . . . . . . . . . . . . . . . . 2

B.      Rule 60(b) Applies in Federal Habeas Proceedings, So Long as the Motion
        Cannot Be Construed as a Successive Habeas Petition . . . . . . . . . . . . . . . . . . . . . . . 4

Mr. Wardlow's Rule 60(b)(6) Motion Cannot Be Construed as a Successive
Habeas Petition . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

A.      Once this Court Determined that the CCA's Procedural Dismissal Was an
        Adequate State Ground, and that the Claims Were Procedurally Barred, the
        Merits of his Claims Were No Longer Before this Court . . . . . . . . . . . . . . . . . . . . . . 6

B.      This Court's Ruling on the Merits of Mr. Wardlow's Claims Did Not Amount to
        the Meaningful Federal Judicial Review to Which He Was Entitled . . . . . . . . . . . . . . . 8

Mr. Wardlow's Motion is Timely and Extraordinary Circumstances Justify
the Reopening of the Final Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

A.      Mr. Wardlow's Motion Is Timely. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

B.      Extraordinary Circumstances Justify Reopening the Judgment . . . . . . . . . . . . . . . . . . 10

        1.      CLAIM V(4):  Defense counsel provided ineffective assistance in failing
                to object to the inexpert opinion testimony of the medical examiner
                concerning the distance from which the murder weapon was fired due to
                the absence of gunpowder residue. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        2.      CLAIM III: The  prosecution violated Mr. Wardlow's right to due process
                by substantially interfering with the choice of Tonya Fulfer to testify for
                the defense  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        3.      CLAIM V (A) and (B):  Defense counsel provided ineffective assistance
                by failing to conduct a reasonable investigation of mitigating evidence and
                investigate the red flags identified by the defense mental health expert that
                would have led to substantial mitigating evidence and evidence of mental

illness . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Certificate of Conference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Exhibit – *Ex parte Wardlow*, 2020 WL 2059742 (Tex.Crim.App. April 29, 2020)

## PETITIONER'S MOTION FOR RELIEF FROM JUDGMENT

Pursuant to Fed.R.Civ.Proc. 60(b)(6), petitioner BILLY JOE WARDLOW moves for relief from the judgment entered herein on August 22, 2017, denying his Petition for Writ of Habeas Corpus.  Dkt. Item 38.

## Introduction

The Court denied Mr. Wardlow's habeas petition because it was "procedurally barred and otherwise without merit."  *Wardlow v. Director*, 2017 WL 3614315 *1 (E.D.Tex. 2017). The basis for the Court's procedural bar ruling is now gone.  It was removed by the Texas Court of Criminal Appeals (CCA) on April 29, 2020, when it reconsidered and reversed its dismissal of Mr. Wardlow's initial state habeas application on procedural grounds and then denied his claims on the merits.  Even though this Court also denied Mr. Wardlow's habeas petition because his claims were "without merit," that ruling, made as it was after the Court had already concluded that the petition was procedurally barred, was preordained by the procedural bar ruling.  A ruling that the claims had merit could not have been given effect, because as the Fifth Circuit has observed, the Court "had no federal claim before it [when] ... [it] concluded, the CCA applied an independent and adequate state law ground to deny relief."  *Ruiz v. Quarterman*, 504 F.3d 523, 527 (5th Cir. 2007) (citing *Coleman v. Thompson*, 501 U.S. 722 (1991)).  The Court should vacate its previous judgment and examine the merits of the claims presented by Mr. Wardlow anew, without the results of this analysis being preordained by the procedural bar.

## The Intervening Procedural Development
## that Calls for the Court to Vacate its Judgment

Mr. Wardlow's federal habeas corpus proceeding ended when the Supreme Court denied certiorari on October 15, 2019.  *Wardlow v. Davis*, ___ U.S. ___, 2019 WL 5150494.  On

December 3, 2019, able to return to the state courts because of the conclusion of the federal proceeding,[1] Mr. Wardlow asked the CCA to reconsider the procedural basis – Mr. Wardlow's purported waiver of state habeas proceedings – on which it had dismissed Mr. Wardlow's initial state habeas application.  The dismissal had provided the basis for this Court's determination that Mr. Wardlow's federal habeas petition was procedurally barred.  *Wardlow v. Director, supra*, at *9-*10.  On April 29, 2020, the CCA "reconsider[ed] that dismissal" due to "Applicant's pleadings and the evolution of Article 11.071[2] caselaw."  *Ex parte Wardlow*, 2020 WL 2059742 *1 (Tex.Crim.App.) [attached as an Exhibit hereto].  The CCA then listed the claims Mr. Wardlow had raised in his habeas application and held as follows: "After reviewing Applicant's claims and the record of the case, we have determined that the claims should be denied."  *Id.*

This ruling by the CCA "pulled the ground from under [this] court's earlier judgment...." *Ruiz v. Quarterman*, 504 F.3d at 525.  The procedural bar on which the Court rested its decision is now gone.

### Federal Rule of Civil Procedure 60(b)(6) Gives this Court Broad Power to Vacate Judgments in Order to Remedy Injustice

**A.    The Court's Broad Power to Do Justice Under Rule 60(b)(6)**

Under Article III of the Constitution, federal courts have inherent "power over [their] own judgments."  *United States v. Ohio Power Co.*, 353 U.S. 98, 99 (1957) (per curiam).  Federal Rule of Civil Procedure 60(b)(6) is a vehicle for exercising this power, which "in simple

---

[1]The Court of Criminal Appeals has held that state courts must abstain from deciding any matter that is the subject of federal habeas litigation until that federal litigation is completed. *Ex parte Soffar*, 143 S.W.3d 804, 807 (Tex. Crim. App. 2004).  Thus, until the denial of certiorari on October 15, 2019, Mr. Wardlow could not return to state court.

[2]Article 11.071 is the section of the Texas Code of Criminal Procedure setting forth the procedure to be followed in capital habeas corpus proceedings.

English, vests power in courts adequate to enable them to vacate judgments whenever such action is appropriate to accomplish justice." *Klaprott v. United States*, 335 U.S. 601, 615 (1949). Rule 60(b)(1)-(3) allows a party to seek relief from a final judgment, order, or proceeding and request reopening of his case under a limited set of circumstances including fraud, mistake, and newly-discovered evidence.  Rule 60(b)(6) expands that capability to include "any other reason that justifies relief."

The central concern of Rule 60(b)(6) is that justice be done.  *Klaprott*, 335 U.S. at 615. The rule "reflects and confirms the courts' own inherent and discretionary power, 'firmly established in English practice long before the foundation of our Republic' to set aside a judgment whose enforcement would work inequity." *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995) (quoting *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 235, 244 (1944)).  Thus, the Circuits have long identified Rule 60(b)(6) as a "grand reservoir of equitable power to do justice," *Phelps v. Alameida*, 569 F.3d 1120, 1133 (9th Cir. 2009) (quoting *Harrell v. DCS Equip. Leasing Corp.*, 951 F.2d 1453, 1458 (5th Cir. 1992)), that affords courts the discretion and power to "vacate judgments whenever such action is appropriate to accomplish justice." *Gonzalez v. Crosby*, 545 U.S. 524, 542 (2005) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

A court's ability to grant relief under Rule 60(b)(6) is constrained only by the requirements that a petitioner "demonstrate both the motion's timeliness and . . . that 'extraordinary circumstances justif[y] the reopening of the final judgment.'" *Christeson v. Roper*, 574 U.S. 373, 380 (2015) (quoting *Gonzalez*, 545 U.S. at 535).

**B.    Rule 60(b) Applies in Federal Habeas Proceedings, So Long as the Motion Cannot Be Construed as a Successive Habeas Petition**

3

Rule 60(b), "like the rest of the Rules of Civil Procedure, applies in habeas corpus proceedings" and "has an unquestionably valid role to play in habeas cases." *Gonzalez*, 545 U.S. at 534.  In the habeas context, however, a Rule 60(b) motion is only proper if it is consistent with the requirements of the Antiterrorism and Effective Death Penalty Act. *Gonzalez v. Crosby*, 545 U.S. at 529.  A 60(b) motion that seeks to present a claim, or "attacks the federal court's previous resolution of a claim *on the merits,*" 545 U.S. at 532 (emphasis in original), contravenes the AEDPA's strictures on successive petitions and is not appropriate. *Id*. at 531.  District courts do have jurisdiction to consider Rule 60(b) motions in habeas proceedings, however, when such a motion "asserts that a previous ruling which precluded a merits determination was in error – for example, a denial for such reasons as failure to exhaust, procedural default, or statute-of-limitations bar." *Id*. at 532 n.4.

Thus, a Rule 60(b) motion that seeks relief from a judgment on the basis of a procedural bar which precluded consideration of the merits of a claim cannot properly be construed as a successive federal habeas petition. *See Tamayo v. Stephens*, 740 F.3d 986, 990 (5th Cir. 2014) ("[a] Rule 60(b) directed to a procedural ruling that barred consideration of the merits, such as a procedural default, is not considered a successive petition and is properly brought as a Rule 60(b) motion); *Rocha v. Thaler*, 619 F.3d 387, 399 n.26 (2010) (the district court had jurisdiction to consider a 60(b) motion where the 60(b) movant argued that the district court's application of procedural default was invalid, after returning to state court and obtaining what he contended was an adjudication on the merits).

Moreover, in such a motion, the movant can ask the court to re-evaluate already-decided claims without crossing the line into successive petition territory.  As the Fifth Circuit has explained, "Rule 60(b) motions can legitimately ask a court to re-evaluate already-decided

4

claims – as long as the motion credibly alleges a non-merits defect in the prior habeas proceedings." *United States v. Vialva*, 904 F.3d 356, 361 (5th Cir. 2018), *cert. denied*, ___ U.S. ___, 140 S.Ct. 860 (2020).

### Mr. Wardlow's Rule 60(b)(6) Motion Cannot Be Construed as a Successive Habeas Petition

But for the Court's denial of Mr. Wardlow's federal habeas petition as procedurally barred *and* on the merits, it would be indisputable that his 60(b)(6) motion would be properly made and not considered a successive petition under *Gonzales v. Crosby, supra*, because the motion is based on the CCA's removal of the basis for the procedural bar portion of the Court's ruling.  Even though the Court also ruled on the merits, this should not matter for purposes of entertaining the 60(b) motion.  As the Fifth Circuit made clear in *Vialva, supra*, "Rule 60(b) motions can legitimately ask a court to re-evaluate *already-decided claims* – as long as the motion credibly alleges a non-merits defect in the prior habeas proceedings."  904 F.3d at 361 (emphasis supplied).  An examination of the fabric of federal habeas corpus jurisprudence underlying this cryptic statement by the *Vialva* court demonstrates its applicability in Mr. Wardlow's case.

A. **Once this Court Determined that the CCA's Procedural Dismissal Was an Adequate State Ground, and that the Claims Were Procedurally Barred, the Merits of his Claims Were No Longer Before this Court**

Once this Court concluded that Mr. Wardlow's claims were procedurally barred because the CCA had applied an adequate and independent state law procedural ground to deny relief, the Court "had no federal claim before it." *Ruiz v. Quarterman*, 504 F.3d at 527 (citing *Coleman v. Thompson*, 501 U.S. 722 (1991)). *Coleman* explained, the "adequate and independent state grounds doctrine ... applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." 501 U.S. at 729-30. *Coleman* goes on to explain why this doctrine precludes federal review of the merits of claims. On direct review of a state court judgment, the independent and adequate state ground doctrine precludes review of the merits of claims because the state ground removes the court's jurisdiction to consider the state court *judgment*. 501 U.S. at 730. In federal habeas, by contrast, "[t]he court does not review a judgment, but [pursuant to 28 U.S.C. § 2254] the lawfulness of the petitioner's custody *simpliciter*." *Id*. "Nonetheless, a state prisoner is in custody pursuant to a judgment." *Id*. Thus,

> [w]hen a federal habeas court releases a prisoner held pursuant to a state court judgment that rests on an independent and adequate state ground, it renders ineffective the state rule just as completely as if this Court had reversed the state judgment on direct review.

*Id*. Accordingly, the federal habeas court cannot rule on the merits of claims that were dismissed by the state courts on independent and adequate state grounds. *Id*. at 730-31. As *Ruiz* succinctly noted, "[t]he federal court below would have had no federal claim before it if, as the district court concluded, the CCA applied an independent and adequate state law ground to deny relief." 504 F.3d at 527.

6

For these reasons, this Court's determination that "the petition is procedurally barred," *Wardlow v. Director*, 2017 WL 3614315 at *1, *also* barred the Court from considering the merits of Mr. Wardlow's claims.  If, after considering the merits of the claims, the Court found that any claim had merit, *Coleman* makes it clear that the Court would have had no authority to grant relief.  As *Coleman* explained,

> Without the rule, a federal district court would be able to do in habeas what this Court could not do on direct review;  habeas would offer state prisoners whose custody was supported by independent and adequate state grounds an end run around the limits of this Court's jurisdiction and a means to undermine the State's interest in enforcing its laws.

501 U.S. at 730-31.

This makes the Court's opinions on the merits of the claims in Mr. Wardlow's case an exercise of "hypothetical jurisdiction."[3] Opinions reached on such a basis cannot have sufficient weight to justify the denial of 60(b)(6) relief.  As the Court explained in *Citizens for a Better Env't*,

> Hypothetical jurisdiction produces nothing more than a hypothetical judgment – which comes to the same thing as an advisory opinion, disapproved by this Court from the beginning. *Muskrat v. United States*, 219 U.S. 346, 362 (1911); *Hayburn's Case*, 2 Dall. 409 (1792).  Much more than legal niceties are at stake here.  The statutory and (especially) constitutional elements of jurisdiction are an essential ingredient of separation and equilibration of powers, restraining the courts from acting at certain times, and even restraining them from acting permanently regarding certain subjects.  *See United States v. Richardson*, 418 U.S. 166, 179 (1974); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 227 (1974).  For a court to pronounce upon the meaning or the constitutionality of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act *ultra vires*.

523 U.S. at 101-02.  This Court's prior exercise of hypothetical jurisdiction should not stand in

---

[3]The "doctrine of 'hypothetical jurisdiction' ... enables a court to resolve contested questions of law when its jurisdiction is in doubt."  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101 (1998)

7

the way of Mr. Wardlow's attempt to secure one full and fair round of federal merits review of his claims.

**B.      This Court's Ruling on the Merits of Mr. Wardlow's Claims Did Not Amount to the Meaningful Federal Judicial Review to Which He Was Entitled**

Federal habeas corpus proceedings in capital cases, like trial proceedings, must be conducted with the awareness that death is different. "From beginning to end, judicial proceedings conducted for the purpose of deciding whether a defendant shall be put to death must be conducted with dignity and respect." *Wellons v. Hall*, 558 U.S. 220 (2010). Federal habeas review serves a "vital role in protecting constitutional rights." *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). For these reasons, Mr. Wardlow is entitled to "one full and fair round of federal habeas review" of his federal constitutional claims. *Gonzalez v. Crosby*, 545 U.S. at 542 (Stevens, J., dissenting). This Court's prior adjudication of the merits of his claims was not adequate to constitute that review for several reasons.

First, this Court's determination that Mr. Wardlow's claims were subject to a procedural bar preordained the determination that his claims were without merit. As *Coleman v. Thompson* makes clear, because of the procedural bar determination, the Court would have been precluded from granting relief on the merits if it had determined that any of Mr. Wardlow's claims entitled him to relief. 501 U.S. at 730-31. Thus, the Court was bound to determine there was no merit to his claims. The Court could not have concluded otherwise. After determining that the claims were procedurally barred, the Court said that it would nevertheless review the merits of his claims "in the interest of justice," 2017 WL 3614315 at *19, *29 n.6, but this was a hollow declaration. If the results of a review in the interest of justice are predetermined, as they were here by the procedural bar ruling, that cannot be a just review.

8

Second, the procedural bar determination necessarily constrained this Court's review of the merits of Mr. Wardlow's claims, because of the principles of judicial restraint and efficiency. As we have noted, the Supreme Court has disapproved of hypothetical holdings – of courts ruling on claims that are not before them – because such rulings violate the principle of judicial restraint. *See Cal.Fed.Sav. & Loan Ass'n v. Guerra*, 479 U.S. 262, 296 (1987) (Scalia, J., concurring) (rejecting the idea that "we can decide any issue, so long as the facts before us either do or do not present it"). For this reason, all courts disregard hypothetical holdings with respect to grounds over which the court had no jurisdiction. *Id*. Here, the finding of procedural default was tantamount to a finding of no jurisdiction to decide Mr. Wardlow's claims. *See Ruiz v. Quarterman*. 504 F.3d at 527 ("[t]he federal court below would have had no federal claim before it if, as the district court concluded, the CCA applied an independent and adequate state law ground to deny relief"). This rationale therefore cautions against affording any effect to the Court's prior statements regarding the merits of Mr. Wardlow's claims.

Third, absent the merits analysis, Mr. Wardlow could clearly establish grounds for relief under 60(b)(6). *See Ruiz*, 504 F.3d at 526-27. *Accord Rocha v. Thaler*, 619 F.3d at 399 n.26 (the district court had jurisdiction to consider a 60(b) motion where the 60(b) movant argued that the district court's application of procedural default was invalid, after returning to state court and obtaining what he contended was an adjudication on the merits); *Balentine v. Thaler*, 626 F.3d 842, 847 (5th Cir. 2010). ("[i]f Balentine actually later got a ruling on the merits from the CCA on his ... claim, *Ruiz* would be authority supporting his argument that it was error not to grant the 60(b) motion"). This brings into sharp relief the harm associated with the Court's hypothetical merits ruling. If the merits ruling could not have been sufficient to justify a *grant* of habeas relief, *see Coleman v. Thompson*, 501 U.S. at 730-31, yet is sufficient to prevent this Court from

9

reopening the judgment under Rule 60(b)(6), then the hypothetical opinion on the merits has an

effect – even though, under *Coleman* and the Fifth Circuit's reading of *Coleman* in *Ruiz* the

Court "had no federal claim before it," 504 Fed. 3d at 527.

### Mr. Wardlow's Motion is Timely and Extraordinary Circumstances Justify the Reopening of the Final Judgment

#### A.    Mr. Wardlow's Motion Is Timely

Mr. Wardlow's motion is timely, filed as it is, less than two months after the CCA

entered its order removing the state procedural ground for this Court's procedural bar ruling.

*See Gonzalez v. Crosby*, 545 U.S. at 542 n.3 (Stevens, J., dissenting) ("[w]hile Rule 60(b)(6)

contains no specific time limitation on filing, it is worth noting that petitioner filed his motion

within the strict 1-year limitation that applies to motions under Rules 60(b)(1)-(3)"); *Liljeberg v.

Health Servs. Acquisition Corp.*, 486 U.S. 847, 873-74 (1988) (Rehnquist. C.J., dissenting,

joined by White and Scalia, JJ.) (with respect to a motion filed almost 10 months later, "although

relief under Rule 60(b)(6) is subject to no absolute time limitation, there can be no serious

argument that the time elapsed ... must weigh heavily in considering the motion").

#### B.    Extraordinary Circumstances Justify Reopening the Judgment

A 60(b) motion must not only allege a defect that infected the judgment, it must also

show that extraordinary circumstances warrant reopening. *Gonzalez*, 545 U.S. at 535.  This

requires an equitable assessment of the totality of the circumstances, including the potential

merit of claims whose evaluation was compromised by the procedural defect in question.  The

totality of circumstances here show that continued enforcement of this Court's judgment against

Mr. Wardlow "would work inequity" not only on Mr. Wardlow, but on the fair and orderly

administration of justice in the context of federal habeas corpus proceedings.  *Plaut*, 514 U.S. at

233-234.

In *Montana v. United States*, 440 U.S. 147, 164 n.11 (1979), the Court provided helpful guidance for the task of determining whether the totality of circumstances call for relief form the judgment.  "Redetermination of issues is warranted if there is reason to doubt the quality, extensiveness or fairness of procedures followed in prior litigation."  Because of the distorting effect of the procedural bar holding, we submit there is reason to doubt "the quality, extensiveness or fairness" of the Court's consideration of the merits of the claims presented by Mr. Wardlow.

We appreciate how difficult it may be for the Court – indeed for anyone in the Court's position – to be open to this conclusion.  The Court stated that it was considering the merits of the claims in the interest of justice, even though the claims were procedurally barred from consideration.  This raises the question, what was the interest of justice that was served?  As the cases make clear, had the Court found merit in any of the claims, *it could not have granted relief.*  Undertaking consideration of the merits of claims in the interest of justice means that if a claim has merit, then justice would be served by disregarding the procedural bar and granting relief.  But the Court could not have done that.  It is thus apparent that no interest of justice was being served.  It appears that the Court experienced ambivalence about precluding review altogether of Mr. Wardlow's claims.  That is quite understandable, especially in a death penalty case.  But, if all a court can do in such circumstances is to determine that the claims have no merit, the question becomes, whose interest is being served?  Is it to reassure the petitioner that he would have lost anyway?  If that is the case, then the distorting effects of the procedural bar ruling become clear.  The Court had to find – and was thus predisposed to find – that the claims had no merit.

11

The Court's predisposition to find the claims had no merit is apparent in the way the Court dealt with three claims.

1.     **CLAIM V(4)[4]:  Defense counsel provided ineffective assistance in failing to object to the inexpert opinion testimony of the medical examiner concerning the distance from which the murder weapon was fired due to the absence of gunpowder residue**

The medical examiner, Dr. Jeffrey Barnard, testified on behalf of the prosecution that on autopsy he found no evidence of gunpowder residue at the entrance wound.  ROA.5901.[5]  On this basis, he testified that the gun was fired from "somewhere around three feet or greater."  *Id*. Thereafter, in his closing argument in the guilt phase, the prosecutor used this aspect of the medical examiner's testimony to rebut Mr. Wardlow's trial testimony that the gun went off during a struggle with  Mr. Cole: "[T]he only problem with [Mr. Wardlow's testimony] ... of course, is that that doesn't jibe [sic] with what the medical examiner said.  The medical examiner said that it had to be over three feet."  ROA.6598.

The defense failed to object to Dr. Barnard's testimony even though counsel realized later that the testimony was not within Barnard's expertise.  In the state habeas proceeding, trial counsel gave no reason for his failure to object except that he was not "expecting a pathologist to give that sort of testimony," and "it just got by me."  ROA.143.  He acknowledged that Dr. Barnard did not appear to have the expertise to give this kind of opinion testimony.  *Id*.

Before this Court, Mr. Wardlow conceded that as a medical examiner, Dr. Barnard had the expertise to determine whether there was a foreign substance such as gunshot residue on the

---

[4]Mr. Wardlow is using the numeric designation of the claims used by the Court in its opinion.

[5]Cites are to the Record on Appeal, as compiled by the clerk of this Court for the previous appeal to the Fifth Circuit.

skin of a homicide victim.  However, absent specialized training and experience in firearms

analysis, he argued Dr. Barnard was not qualified to render an opinion about the likely distance

from which a weapon was fired.  Nothing in the record established that Dr. Barnard had any

special training or expertise in firearms analysis.

In the state habeas proceeding and in this Court, Mr. Wardlow submitted the affidavit of

C.E. Anderson, former director of the Houston Police Department firearms laboratory.

ROA.178-79.  Anderson explained that the only way to determine the distance from which a

weapon is fired is for a qualified firearms examiner to test-fire that weapon and examine the

residue that is deposited in the field of fire.  *Id.*  He pointed out that there was no evidence that

such a procedure was followed prior to the time Dr. Barnard testified.  *Id.*  The prosecution

firearms expert, Raymond Cooper, testified concerning the gun and the ammunition in it, but he

did not indicate that a test-firing for gunpowder residue had been done.  ROA.6126-41.  Thus,

Mr. Wardlow argued that at the time Dr. Barnard testified, there was no evidentiary basis for this

aspect of his testimony.

Mr. Wardlow argued that trial counsel's failure to object to the testimony of Dr. Barnard

concerning the distance from which the fatal shot was fired was not only unreasonable but also

prejudicial, *Strickland v. Washington*, 466 U.S. 668, 694 (1984), in light of its use by the

prosecution to question the credibility of Mr. Wardlow's trial testimony.[6]

This Court's reasoning for finding no merit in this claim was the following:

Despite Wardlow's assertion, medical examiners who perform autopsies on crime

---

[6]As the prosecutor summed it up in his guilt phase closing, "when you boil it all down
everything is undisputed except one part, there's only one part for us to argue about and that is
whether this guy here did it intentionally or not."  ROA.6559.  The evidence concerning the
distance from which the gun was fired was crucial evidence on this issue.

victims often testify as to the distance from which a fatal gunshot was fired based on the presence or absence of gunpowder residue.  *See, e.g., Turner v. Johnson*, 106 F.3d 1178, 1182 (5th Cir. 1997) (medical examiner testified that absence of gunpowder stippling on victim's body meant that fatal bullet fired from at least 24 inches away); *Westley v. Johnson*, 83 F.3d 714, 717 (5th Cir. 1996) (medical examiner testified gunshot was fired within six inches of victim), *cert. denied*, 519 U.S. 1094 (1997).  Consequently, the court rejects the suggestion that Dr. Barnard was not qualified to give the same type of testimony in Wardlow's case. If defense counsel had objected to the medical examiner's testimony on this topic, the trial court would have overruled the objection.

2017 WL 3614315 at *32.

The way the Court dispensed with this issue shows a predisposition to find no merit in this claim.  Even if medical examiners' testimony concerning the range of fire of a murder weapon may be commonplace, that phenomenon does not fairly determine this claim.  That such testimony may often be admitted without objection does not mean that it would be admitted if properly and effectively challenged.  In the two cases cited by the district court in which such testimony was admitted, there is no indication that the defendants challenged the admissibility of the testimony.

Had the Court undertaken an unfettered consideration of this claim, it would have (1) wanted to know whether state cases had examined the admissibility of this kind of testimony by a medical examiner, (2) whether state law had addressed the kind of expertise and testing necessary to make a determination concerning gunshot residue, (3) whether experts such as the defense expert and the prosecution's firearms expert would agree that the actual murder weapon must be tested to determine the pattern of gunpowder residue, and (4) whether without that testing having been done at the time Dr. Barnard testified he could have reliably testified as he did.  Accordingly, had this claim been examined without the predisposition to find it without merit, these legal questions would have been considered and an evidentiary hearing would have

14

been held to determine whether an objection to Dr. Barnard's testimony would have been

sustained, and whether the state courts' disposition of the claim was entitled to deference in

federal habeas proceedings.  Had the Court explored these questions, it would have determined

that the merits of this claim were far more difficult to decide than the analysis in its opinion

made it appear.

   **2.     CLAIM III: The  prosecution violated Mr. Wardlow's right to due process
        by substantially interfering with the choice of Tonya Fulfer to testify for the
        defense**

   Tonya Fulfer was with Mr. Wardlow at Mr. Cole's house when Cole was shot, ROA.389,

393-94, and she was thereafter arrested with Mr. Wardlow in South Dakota.  ROA.406.  The

salient facts underlying this claim are the following:

- According to Fulfer's unsigned affidavit, Fulfer told her lawyer that the shooting was
  accidental when her lawyer told her the prosecution wanted her to testify that the
  shooting was intentional.

- Given the ongoing discussion of possible terms for a plea deal between Fulfer's lawyer
  and the prosecutor, it is likely that her lawyer communicated this to the prosecutor.
  There is some uncertainty about this, however, because Fulfer's lawyer did not address
  this question in his mid-trial hearing testimony concerning the plea offer to Fulfer, and
  Fulfer does not know if he communicated this to the prosecutor.  It is a pivotal fact,
  because if the prosecutor knew or had reason to know that Fulfer would testify that the
  shooting was accidental, he clearly would have a reason to discourage Fulfer from
  testifying for the defense.

- The prosecutor's actions appeared to be designed to discourage Fulfer from testifying for
  the defense.  The plea offer was completely contingent upon the conclusion of Mr.
  Wardlow's trial and could be withdrawn at any time.  Despite efforts by Fulfer's lawyer
  to persuade the prosecutor not to await the conclusion of Mr. Wardlow's trial to finalize
  her plea, the prosecutor steadfastly refused.  Fulfer's lawyer did not testify whether the
  prosecutor informed him why he would not budge from this position.  These
  circumstantial facts strongly support the inference that the prosecutor wanted to
  discourage Fulfer from testifying for Mr. Wardlow.

- On the basis of the prosecutor's unwillingness to finalize Fulfer's plea until after Mr.
  Wardlow's trial – and perhaps on the basis of other communications between Fulfer's
  lawyer and the prosecutor that are not known to Mr. Wardlow – Fulfer's lawyer advised

her not to testify for the defense.  According to Fulfer's unsigned affidavit, he told her that "testifying for [Mr. Wardlow] would only hurt my chances of getting a good sentence."  For these reasons, he advised her to assert her Fifth Amendment rights, and she did.

- Fulfer pled guilty after Mr. Wardlow's trial.  In her testimony at the plea hearing, she testified, as found by the state habeas court: "Fulfer saw Cole and Wardlow begin to struggle over the gun, then she turned and ran away out of the carport.  Fulfer stopped at the end of the carport, turned, and asked Wardlow to drop the gun.  According to her testimony, Fulfer wasn't looking at them when the gun went off, and she didn't see what happened.  She was all the way out of the carport when the gun went off."  In her unsigned affidavit, Fulfer added a fact that she was not asked about in her plea hearing testimony: when she stopped at the end of the carport, she saw "[t]hey were still struggling over the gun."

The Court found this claim without merit because (1)  "the State's plea bargain offer was *not* conditioned on Fulfer *not* testifying for Wardlow," 2017 WL 3614315 at *24; (2) for this reason, the State did not substantially interfere with her decision not to testify for Mr. Wardlow, *id*.; (3) Fulfer's attorney's advice that testifying for Mr. Wardlow would "hurt [her] chances of getting a good sentence," *id*. at *22, "does not amount to the governmental conduct necessary to establish a due process violation," *id*. at *24; and (4) Fulfer would not have testified that "'the shooting was an accident, was not intended by Wardlow, or occurred during a struggle.'" *Id*. at *25.

The Court's analysis critically rested on its determinations that the advice from Fulfer's lawyer did not amount to governmental interference, and that Fulfer's testimony would not have helped Mr. Wardlow.  Both of these determinations were drawn into serious question by the facts.

Ms. Fulfer stated in her unsigned affidavit that her lawyer advised her that she would hurt her chances of getting a good sentence if she testified for Mr. Wardlow.  This message had to emanate in some fashion from the prosecutor.  Even if the prosecutor did not expressly threaten

16

to withdraw Ms. Fulfer's plea offer if she testified for Mr. Wardlow, he apparently caused her lawyer to believe that she would lose the advantages of her plea offer if she testified for Mr. Wardlow.  That was the underpinning for counsel's advice to Ms. Fulfer to plead her Fifth Amendment rights.  While "the defendant must show a causal connection between the governmental action and the witness's decision not to testify," *Knotts v. Quarterman*, 253 Fed.Appx. 376, 381 (5th Cir. 2007) (unpublished), the causal connection need not be directly between the prosecution and the witness.  It can be communicated to the defense lawyer by the prosecutor and then "transferred from the defense lawyer to the witness." *United States v. Thompson*, 130 F.3d 676, 687 (5th Cir. 1997), *cert. denied*, 524 U.S. 920 (1998).  Here, Fulfer's lawyer appears to have been "the defense lawyer" who passed on the "governmental action."

The Court also missed the mark in holding that Fulfer's testimony would not have helped Mr. Wardlow.  The State's theory of the case as established by Mr. Wardlow's first confession letter and other witnesses, 2017 WL 3614315 at *24-25, was that the shooting was intentional and not the result of a struggle over the gun.  *See* ROA.6300 (after Mr. Cole grabbed his arm, Mr. Wardlow "pushed him off and shot him right between the eyes").  By contrast, in his defense, Mr. Wardlow testified that Mr. Cole grabbed the gun and his arm, threw him off balance, and kept holding on to his arm, and that he then fired the gun trying to get Mr. Cole to let him go as he (Wardlow) was falling backwards.  ROA.6432, 6480-81, 6502.  Accordingly, a witness who observed that Mr. Wardlow and Mr. Cole were struggling over the gun would have provided testimony favorable to Mr. Wardlow.

Ms. Fulfer could have provided that very testimony as shown by her testimony in her guilty plea hearing, *see* ROA.393-94, and in her unsigned affidavit.  She saw the struggle over the gun continuing to the moment when she exited carport, and she heard the gunshot almost

immediately thereafter.  Thus, even though "Fulfer did not actually witness the shooting," she saw a continuing struggle over the gun.  That observation was distinctly *not* "consistent with the State's theory of the case," ROA.754, and *was* favorable to Mr. Wardlow.

The other aspect of the district court's finding about Ms. Fulfer's testimony – "she certainly could not corroborate [Wardlow's] claim that he did not intend to kill Cole," ROA.754 – also fails to recognize another benefit that Ms. Fulfer's testimony could have had for Mr. Wardlow.  Ms. Fulfer testified in her plea hearing that Mr. Wardlow never told her he intended to seriously hurt or kill Mr. Cole, only that his plan was hit Mr. Cole on the head and take his money.  ROA.388, 390-91.  That of course does not corroborate with any certainty Mr. Wardlow's trial testimony that he did not intend to kill Mr. Cole, but it is evidence tending to support his testimony.  Moreover, Ms. Fulfer told her lawyer that she believed the killing was accidental and would be lying if she were to testify for the prosecutor that it was intentional.  ROA.160.  This testimony would have been both admissible and favorable to Mr. Wardlow.[7]

Had the Court been unfettered in its consideration of this claim, it would have seen more clearly all the facets of this claim.  To fully explore the claim, the Court needed an evidentiary hearing, at which Tonya Fulfer, her lawyer Mac Cobb, the District Attorney Richard Townsend, and the Sheriff Ricky Blackburn would have testified.  Despite Mr. Wardlow's pleas to the state trial court for a hearing, the court refused to hold a hearing.  Whether the DA knew what Ms. Fulfer would testify to, and whether he was using an implicit threat to withdraw her plea offer – communicated directly or indirectly to her through her lawyer – to keep her from testifying are

---

[7]Fulfer's impression would have been admissible under Tex.R.Evid. 701, which provides, "If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue."

central issues that could not fairly have been resolved on the paper record.  Moreover, how Ms.
Fulfer would have testified had she been called by Mr. Wardlow's counsel, and to what extent
her testimony would have helped Mr. Wardlow, cannot be determined solely by examining how
she testified on her own behalf in her plea hearing.  Her unsigned affidavit suggests she would
have given more favorable testimony had she been questioned by counsel representing Mr.
Wardlow's interests.  Without a hearing, it is impossible to know this information.  It seems
pretty apparent that the Court would have held a hearing had it been approaching the claim
without a predisposition to deny it.

**3.     CLAIM V (A) and (B):  Defense counsel provided ineffective assistance by failing to conduct a reasonable investigation of mitigating evidence and investigate the red flags identified by the defense mental health expert that would have led to substantial mitigating evidence and evidence of mental illness**

Billy Wardlow grew up in a very poor family.  ROA.26.  His mother Lynda was the dominant adult in the family.  *Id*.  She herself had grown up in a very poor, extremely abusive family.  She and her family were often homeless, evicted time and again because of their inability to pay the rent.  ROA.128.

Lynda suffered deeply from the trauma of her childhood.  Throughout her adult life, she experienced frequent rage episodes, during which she would exhibit extraordinary strength, anger, and violence.  She experienced voices directing her during these episodes.  ROA.129.  Her family, especially Billy, lived in fear of these episodes because they were the targets of her rage.  ROA.133, 139.  Lynda also believed deeply that she had been abducted by aliens.  Her belief was so strong that she became convinced that her first child was conceived during an abduction.  She shared her belief with Billy that she had been abducted by aliens.  ROA.130.  Billy thereafter believed he was similarly abducted.  *Id*.

Lynda was extremely protective of her children, Billy and his older brother John.  She severely limited their activities, forbidding contact with people whom she did not approve.  Billy was not allowed to participate in sports or school-related social activities.  ROA.125.  As a result of his mother's over-protectiveness, Billy did not develop friendships and felt very different from other children.  ROA.133.

Billy's own life history was, in some ways, as hard and marginalized as his mother's.  He was born late and experienced head trauma and a loss of oxygen at birth.  ROA.125.  He developed slowly, though he grew quickly.  He did not walk until 19 months.  By that time he

20

already weighed 37 pounds.  *Id*.  As he grew up, he was painfully aware of the fact that he was socially isolated and socially inept.  Machines were his friends.  He was unable to socialize with other children.  ROA.133-34.  He continued to wet his pants at night and at school until age 10.  He was painfully humiliated by this experience.  Children at school teased him and at home his mother made him walk around with his wet underwear on his head.  ROA.125.

As Billy grew into his mid-teens, life became more difficult for him.  His parents' enforced isolation from other children meant that he was not a part of any "crowd" at school.  He felt very different from the other kids and was not very close to anyone.  ROA.133.  There was also a growing tension between him and his mother during this time and he began to experience serious emotional distress.  ROA.125.  He had attempted suicide twice by the time he was arrested for the murder of Mr. Cole.  ROA.126-27, 149.

In October, 1991, Billy met Tonya Fulfer, who was a special education student at Daingerfield High School.  ROA.134.  They soon learned that they both considered themselves to be "black sheep" in their family, and they found it easy to open up to each other.  Tonya was the first person Billy ever opened up to and is the only person with whom he ever experienced love.  *Id*. Tonya had been severely abused at home and was able to talk to Billy about these problems.  The two became inseparable.  *Id*.

In early 1993, Billy and Tonya decided to leave Cason.  They dropped out of school and went to Fort Worth, where Billy's brother lived and moved into his apartment.  For several months, Billy had jobs but then his truck broke down and could not be fixed.  R.134.  He borrowed a vehicle from a friend until he lost his last job.  In early June 1993, he and Tonya test drove a truck, and while driving it, decided to move to Montana and start a new life.  Several days later, they were arrested and admitted stealing the pickup after test driving it. The owner of

21

the pickup dropped the charges.  *Id*.

In Cason, Billy and Tonya continued to talk about leaving home and going to Montana. ROA.135.  They decided to steal some money and a pickup, thinking they could escape their pain by leaving home and finding a new life in Montana.  The course they chose was tragically flawed and led to the murder of Mr. Cole.

In connection with state habeas corpus proceedings, Billy was seen and evaluated by a clinical psychologist, Paula Lundberg-Love, Ph.D. who reviewed extensive information about his background and his family and interviewed his parents.  ROA.167-72.

Because of this information, Dr. Lundberg-Love was able to explain how Billy functioned.  Because he had a "familial tendency for schizophreniform disorder," a form of schizophrenia,[8] he sometimes experienced "disruption of logical thought processes," including thinking that was "disorganized, loosely connected, and tangential," "[d]elusions and/or hallucinations," and a "flat, somewhat detached" emotional tone.  ROA 175.  People with this illness, like Billy, often "lack close friends or confidants," "may possess odd beliefs [and] engage in magical thinking that influences their behavior," may have "paranoid thinking," and may engage in "behavior that may seem odd, eccentric, or peculiar."  *Id*.  Dr. Lundberg-Love reported that "both Lynda and Billy Wardlow possess some type of schizophreniform disorder." *Id* .

With an understanding of Mr. Wardlow grounded in his life history, Dr. Lundberg-Love was able to cast the killing of Mr. Cole in a starkly different light:

... Billy's schizophreniform symptomatology played [a powerful role] in the

---

[8]American Psychiatric Association, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, Fifth Edition, at 97 (2013).

> etiology of the crime. Because both Billy and Tonya engaged in similar magical
> thinking, over time they came to reinforce each other's magical
> thinking/delusional beliefs, such that they truly believed that they could transform
> the pain in each others' lives by escaping to Montana. Their shared delusion was
> that if they just superficially threatened Mr. Cole, he would not offer any
> resistance, and would give them his vehicle and enable their dream to come true.
> Under the influence of this magical thinking and a shared delusion, Tonya and
> Billy were not prepared for the reality of a crime victim being frightened,
> resisting, and fighting back.

ROA.175.

After summarizing similarly powerful mitigating evidence in another Texas capital case earlier this week, *Andrus v. Texas*, ___ U.S. ___, 2020 WL 3146872 at *1, the Supreme Court observed, "nearly none of this mitigating evidence reached the jury, ...because Andrus' defense counsel not only neglected to present it; he failed even to look for it." *Id*. That is precisely what happened in Billy's case.

In its analysis of the merits of the same issue in Billy's case, this Court recognized that trial counsel's investigation may have fallen short of constitutional requirements. "Assuming that counsels' investigation of mitigating evidence was deficient," 2017 WL 3614315 at *30, and that they were "deficient in failing to provide the aforementioned information to Dr. Walker [the mental health expert trial counsel engaged to evaluate Billy]," *id*. at *32, the Court nevertheless found that these failures were not prejudicial. *Id*. at 31, 32. As with the two claims previously discussed, had the Court been unfettered in its approach to this issue, we believe its approach and, likely it conclusions about prejudice, would have been different.

To be sure, the crime against Mr. Cole was aggravated. The Court captured that:

> [T]he victim was an elderly man, ... [Mr. Wardlow] planned the crime and
> concocted a ruse to get into the victim's home, ... he took his mother's gun and
> concealed it in his waistband, ... he cut the victim's phone lines, ... he went to the
> victim's house several times before finding the most opportune moment to
> commit the crime, and ... he knew the keys were in the victim's truck thereby

obviating any need to confront the victim if all he wanted to do was secure a
vehicle to leave town.

*Id*. at \*31.  And, the Court correctly noted that, on behalf of Mr. Wardlow, we "failed to
acknowledge," *id*., these facts in arguing the prejudice associated with trial counsel's deficient
performance.  However, the Court in its turn failed to acknowledge the nearly-complete absence
of any mitigating presentation by trial counsel.  That evidence, as the Court may recall, was from
three witnesses, a youth minister, a high school librarian, and an assistant high school principal.
Their testimony had virtually no mitigating weight.

The youth minister testified that Billy participated in Church fundraisers, and was a hard
worker, well mannered, very bright and respectful to her.  ROA.6898.  She knew that he was
involved in a church youth group, but since she was not connected with that group, she could not
provide any information about the group's activities or his involvement in it.  ROA.6896-97.
The librarian testified that Billy often came in the library before school and during lunch.
ROA.6903.  He enjoyed working with the computer programs and reading books about
mechanics, cars, and technology.  ROA.6903-04.  He also volunteered to help move the library
books and equipment during a school remodeling project.  ROA.6904-05.  The assistant
principal for Daingerfield High School testified that there were no disciplinary procedures
lodged against Billy while he was in high school and that he was in attendance 95% of the time.
ROA.6907-08.

On cross-examination, the prosecutor made the point that these witnesses had no contact
with Billy during the year and a half to two years before Mr. Cole was killed.  ROA.6900, 6908.
And in closing, the prosecutor made the point as effectively as anything we can say that this
evidence had no mitigating value:

24

> He [Bird Old, lead defense counsel] was talking about mitigation and, you know, we don't have a mentally retarded defendant, ... we don't have any evidence that family background was terrible, we don't have any evidence of any kind of strong mitigating circumstances in his life but they bring up those things about the librarian and his junior high church activities and what does it have to do with the fact that he cold-bloodily [sic] murdered an elderly man?
>
> Nothing.

ROA.6974.

The summary of the mitigating evidence that could have been presented, *supra*, shows that the prosecutor would have been precluded from making any of these points had counsel done their job. The defense could have presented evidence of mental illness (though not mental retardation), and evidence of a "family background [that] was terrible" – evidence that the prosecutor characterized as "strong mitigating circumstances." And, critically, the defense could have presented evidence that offered a mitigating explanation for "the fact that [Billy] cold-bloodily murdered an elderly man." In light of these facts, it is hard to understand how the Court could have decided, as it explained in denying Mr. Wardlow's Rule 59(e) motion, that after "reweigh[ing] all of the mitigating evidence, both old and new, against the aggravating evidence to determine if the new mitigating evidence would have changed the outcome of the trial[,] ... the court ... found that it would not have changed the outcome of the trial." *Wardlow v. United States*, 2017 WL 4868229 at *6. Where there was a complete absence of "strong mitigating circumstances at trial," ROA.6974, and, where the defense could have presented the very kind of mitigating circumstances the prosecutor argued would have been strong *and* could have provided a mitigating explanation for the aggravating aspects of the murder, it is difficult to understand how the Court could have reached the conclusion it did about prejudice.

The explanation, we submit, lies in the shadow cast over the Court's assessment of the

merits of the claims by the procedural bar determination.  That determination predisposed the
Court against this claim, as it did the other claims.  And, because that determination cut off any
possibility of the Court holding an evidentiary hearing, it prevented the Court from fully
appreciating the outcome-changing strength of the mitigating evidence that could have been
presented.  Without hearing evidence, a court is limited to only words on paper and has no
opportunity fully to connect with truth. The *Andrus* opinion from the Supreme Court on June 15
makes this point in a compelling fashion: "During an 8-day evidentiary hearing, Andrus
presented what the Texas trial court characterized as a 'tidal wave of information ... with regard
to mitigation.'" 2020 WL 3146872 at *3. The "[trial] court found the abundant mitigating
evidence so compelling, and so readily available, that counsel's failure to investigate it was
constitutionally deficient performance that prejudiced Andrus during the punishment phase of
his trial." *Id*. at *1.  To provide Mr. Wardlow a full and fair proceeding, the Court needed to be
able to hold an evidentiary hearing, but because of the procedural bar ruling, it could not.

,   .   .   .

FOR THESE REASONS, Mr. Wardlow respectfully moves for relief from the judgment entered herein on August 22, 2017, denying his Petition for Writ of Habeas Corpus.

Respectfully submitted,

RICHARD BURR
TBA No. 24001005
PO Box 525
Leggett, Texas 77350
(713) 628-3391
(713) 893-2500 fax
dick@burrandwelch.com

Counsel for Billy Joe Wardlow

## CERTIFICATE OF CONFERENCE

I certify that on June 16, 2020, I conferred by email with counsel for Respondent, Gwendolyn Vindell, and she has told me that she opposes this motion.

Richard Burr

## CERTIFICATE OF SERVICE

I hereby certify that this motion was served on Respondent Davis through filing in the Court's ECF system, with service included upon Assistant Attorney General Gwendolyn Vindell, at her email address, *gwendolyn.vindell2@oag.texas.gov*, this 18th day of June, 2020.

Richard Burr

27

**Exhibit**

Case 4:04-cv-00408-MAC   Document 49   Filed 06/18/20   Page 32 of 33 PageID #:   7838

Ex parte Wardlow, Not Reported in S.W. Rptr. (2020)

2020 WL 2059742
Only the Westlaw citation is currently available.

UNDER TX R RAP RULE 77.3, UNPUBLISHED
OPINIONS MAY NOT BE CITED AS AUTHORITY.

Do not publish

Court of Criminal Appeals of Texas.

EX PARTE Billy Joe WARDLOW, Applicant

NOS. WR-58,548-01 and WR-58,548-02

|

April 29, 2020

ON APPLICATIONS FOR WRITS OF HABEAS CORPUS
AND A MOTION FOR STAY OF EXECUTION IN CAUSE
NO. CR12764, IN THE 76TH JUDICIAL DISTRICT COURT TITUS
COUNTY

ORDER

Per curiam.

*1 We have before us a subsequent post-conviction
application for a writ of habeas corpus filed pursuant to the
provisions of Texas Code of Criminal Procedure article
11.071 and a suggestion to reconsider Applicant's initial
Article 11.071 writ application.[1] We also have before us a
motion and supplemental motion for a stay of execution.

In February 1995, a jury found Applicant guilty of the 1993
capital murder of Carl Cole. The jury answered the special
issues submitted pursuant to Article 37.071, and the trial
court, accordingly, set Applicant's punishment at death. This
Court affirmed Applicant's conviction and sentence on direct
appeal. Wardlow v. State, No. AP-72,102 (Tex. Crim. App.
Apr. 2, 1997) (not designated for publication).

Applicant initially asked this Court to refrain from appointing
him counsel for habeas and to immediately set an execution
date for him.[2] However, in September 1997, Applicant
entered into a legal representation agreement with attorney
Mandy Welch in which she agreed to notify the appropriate
courts that applicant did, in fact, wish to pursue his
post-conviction remedies. After receiving confirmation from
the trial court that Applicant did wish to pursue habeas relief,
this Court in January 1998 appointed Welch as Applicant's
habeas attorney and ordered that any application be filed in
the convicting court no later than the 180th day after the date
of the appointment.

On July 2, 1998, this Court again received correspondence
from Applicant that he wanted to discontinue his appeal. In
light of that request, we issued an order granting Applicant's
request "to waive and forego all further appeals." Ex parte
Wardlow, No. AP-72,102 (Tex. Crim. App. July 14, 1998)
(not designated for publication). Despite this order, counsel
timely filed Applicant's habeas application on July 20, 1998.
The trial court reviewed the application and issued findings
and conclusions on the seven claims raised therein. Upon
receiving the application in this Court, we dismissed it for the
reasons stated in the order of July 14, 1998. Ex parte
Wardlow, No. WR-58,548-01 (Tex. Crim. App. Sept. 15,
2004) (not designated for publication).

On December 3, 2019, Applicant filed in this Court a
suggestion that this Court reconsider, on its own motion, its
dismissal of Applicant's initial writ application. Having
considered Applicant's pleadings and the evolution of Article
11.071 caselaw, we now reconsider that dismissal.

Applicant raises seven claims in his application. Specifically,
he asserts that: his confession was obtained in violation of his
Sixth Amendment right to counsel; he was deprived of the
effective assistance of counsel on appeal and at trial; the
State's pretrial plea bargain with his co-defendant deprived
him of due process and a fair trial; the State's failure to
disclose that the co-defendant's version of the events
corroborated his second confession violated the dictates of
Brady v. Maryland, 373 U.S. 83 (1963); and the admission
of false testimony violated his due process rights and his right
to the effective assistance of counsel. After reviewing
Applicant's claims and the record of the case, we have
determined that his claims should be denied.

Case 4:04-cv-00408-MAC   Document 49   Filed 06/18/20   Page 33 of 33 PageID #:  7839

Ex parte Wardlow, Not Reported in S.W. Rptr. (2020)

*2 Before filing in this Court his suggestion to reconsider his initial writ application, Applicant filed in the trial court his first subsequent writ application. Applicant raises two claims in his subsequent application. In the first, he complains that the State unknowingly presented false penalty phase testimony from Royce Smithey. In the second, he asserts that *Roper v. Simmons*, 543 U.S. 544 (2005), and ensuing Supreme Court cases, together with recent scientific advances, preclude the use of the future dangerousness issue to determine death eligibility in a capital sentencing proceeding for offenders under 21 years old at the time of their crimes.

We have reviewed the application and find that the allegations do not satisfy the requirements of Article 11.071 § 5. Accordingly, we dismiss the application as an abuse of the writ without reviewing the merits of the claim raised. Art. 11.071 § 5(c). Accordingly, we deny his motion and supplemental motion for a stay of execution.

IT IS SO ORDERED THIS THE 29ᵗʰ DAY OF APRIL, 2020.

All Citations

Not Reported in S.W. Rptr., 2020 WL 2059742

## Footnotes

1    Unless otherwise indicated, all references to Articles refer to the Texas Code of Criminal Procedure.

2    Under the version of Article 11.071 existing at that time, this Court appointed habeas counsel.

**End of Document**    © 2020 Thomson Reuters. No claim to original U.S. Government Works.